**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NATIONAL TREASURY<br>EMPLOYEES UNION,<br>    800 K Street, NW<br>    Washington, DC 20001,<br><br>NATIONAL CONSUMER LAW<br>CENTER,<br>    7 Winthrop Square<br>    Boston, MA 02110<br><br>NATIONAL ASSOCIATION FOR<br>THE ADVANCEMENT OF<br>COLORED PEOPLE,<br>    4805 Mt. Hope Drive,<br>    Baltimore, MD 21215<br><br>VIRGINIA POVERTY LAW<br>CENTER,<br>    919 East Main Street<br>    Richmond, VA 23219,<br><br>PASTOR EVA STEEGE,<br>    address omitted per LCvR 5.1,<br><br>CFPB EMPLOYEE<br>ASSOCIATION,<br>    1015 15th Street, NW<br>    Washington, DC 20005,<br><br>        *Plaintiffs*,<br><br>        v.<br><br>RUSSELL VOUGHT, in his official<br>capacity as Acting Director of the<br>Consumer Financial Protection<br>Bureau,<br>   1700 G Street NW<br>   Washington, DC 20552, and | Civil Action No. 25-cv-381-ABJ<br><br>**FIRST AMENDED COMPLAINT**<br><br>**TEMPORARY RESTRAINING<br>ORDER REQUESTED** |

CONSUMER FINANCIAL
PROTECTION BUREAU,
1700 G Street NW
Washington, DC 20552,

*Defendants.*

## INTRODUCTION

1.    In the aftermath of the 2008 financial crisis, Congress established the Consumer Financial Protection Bureau and charged it with supervising and regulating financial institutions across the country as well as assisting consumers harmed by those institutions. That mandate to the Executive Branch has led to the recovery of billions of dollars for average Americans and, as Congress required, produced a more "fair, transparent, and competitive" market for financial products and services. 12 U.S.C. § 5511. Congress established the CFPB through the exercise of its constitutional power to regulate commerce, and Congress has the ability to eliminate the CFPB through that same power. Congress has not done so.

2.     In defiance of Congress's role in our constitutional system and the separation of powers, President Trump has resolved to "totally eliminate[]" the CFPB.

3.    To carry out that plan, he fired the CFPB's director and illegally installed Russell Vought as the acting director on February 7. That same day, Elon Musk posted on his social media account "CFPB RIP."

4.    With a series of escalating actions beginning on February 8, Vought took drastic steps to make that promise a reality. First, he instructed CFPB staff and contractors to "immediately" stop all work that involved promulgating rules and

guidance, investigations, public communications, supervision of covered entities contracting, and litigation. He then informed the Federal Reserve that the CFPB would not take any additional funding for its operations in the next quarter. The next day, Vought directed staff "not [to] perform any work tasks" at all—including tasks mandated by statute. He also directed staff not to come into the office. Just one day later, February 10, Vought announced that the CFPB's Washington, DC headquarters was closed—and has since taken steps to cancel the lease on the building.

5.    Vought didn't stop there. The next day, February 11, he cancelled $100 million of contracts with companies that enabled the CFPB to do all aspects of its work, from processing consumer complaints to litigation to supervision. That same day, he took the dramatic step of firing, in indiscriminatory fashion, 70 probationary employees. To add insult to injury, he communicated the news via a mail-merged form email that didn't bother to personally address the fired employees who viewed the email on their phones.

6.    On February 12, the Bureau's statutorily mandated consumer complaint went dark, cutting off one of the Bureau's most direct links with consumers in dire financial straits. The Bureau's Consumer Response function is now functioning at diminished capacity at best, threatening a vital lifeline that collects hundreds of thousands of consumer complaints a month.

7.    Vought is not expected to stop there. On information and belief, Vought intends to return the CFPB's operating reserves to the Federal Reserve. Given that

he has already informed the Federal Reserve that the CFPB will not take any additional funding, that would eliminate its entire budget. And Vought has planned another mass layoff that may occur imminently—as early as today or tomorrow.

8.     American consumers are already suffering the consequences. Plaintiff Pastor Eva Steege—an 83 year old Lutheran pastor whose doctors have told her she has less than six months to live—can no longer discharge her student loan debt before she dies because the CFPB cancelled its meeting with her and the Bureau's statutorily mandated Student Loan Ombudsman's office has been forced to shut its doors. Meanwhile, military servicemembers and their families who are owed refund payments based on a consent order between a predatory car title lender and the CFPB are not getting those refunds because the payments must first be approved by CFPB employees—who, of course, cannot work.

9.     Neither the President nor the head of the CFPB has the power to dismantle an agency that Congress established. By suspending the statutorily mandated activities of the CFPB, Trump and Vought's shutdown of the CFPB runs afoul of core constitutional separation of powers principles, Congress's express statutory directive, and the Administrative Procedure Act.

10.     Trump and Vought's actions to disable the CFPB have already caused mass confusion and imposed significant and irreparable harm on consumers across the country. Absent immediate relief, the defendants will continue to upend the lives of countless civil servants. Consumers who were relying on the CFPB to help resolve urgent financial disputes—disputes that, absent the CFPB's intervention, can lead to

foreclosure or the inability to get a loan or rent an apartment—have been abandoned. Even litigation that was already pending against financial institutions that scammed consumers and exploited ordinary Americans has come to a halt, and the agency is not conducting any new enforcement actions. All supervision of financial institutions has been cancelled. With each day that the agency remains shut down, the financial institutions that seek to prey on consumers are emboldened—harming their law-abiding competitors and the consumers who fall victim to them.

## JURISDICTION AND VENUE

11.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, because this action arises under the laws of the United States, namely, the United States Constitution and the Administrative Procedure Act (APA), 5 U.S.C. §§ 702, 706.

12.    Venue is proper in this judicial district under 28 U.S.C. § 1391(e)(1)(A) because the defendants are officers and agencies of the United States.

## PARTIES

13.    Plaintiff National Treasury Employees Union is the exclusive bargaining representative of employees at 37 federal departments and agencies, more than 1,000 of whom work at the CFPB. About sixty probationary employees who were fired were represented by NTEU.

14.    Plaintiff National Consumer Law Center uses the tools of advocacy, education, and litigation to fight for economic justice for low-income and other vulnerable people who have been abused, deceived, discriminated against, or left

5

behind in our economy. NCLC interacts with and relies on the CFPB in many ways: the Bureau purchases NCLC's publications and hires NCLC to conduct trainings for CFPB employees; NCLC's treatises and reports rely heavily, and link to, the CFPB's reports and data; and NCLC uses the CFPB's complaint database to draft reports.

15.    Plaintiff National Association for the Advancement of Colored People is the oldest and largest civil rights organization in the United States. Its mission is to achieve equality, political rights, and social inclusion by advancing policies and practices that expand human and civil rights, eliminate discrimination, and accelerate the well-being, education, and economic security of Black people and all persons of color. The NAACP was actively working with the CFPB to address predatory practices targeted at its members in the wake of the Los Angeles wildfires.

16.    Plaintiff Virginia Poverty Law Center is a 501(c)(3) nonprofit organization that since 1978 has worked to break down systemic barriers that keep low-income Virginians in the cycle of poverty through advocacy, education, litigation, and direct counseling and referral services. It routinely relies on the CFPB's consumer response function, consumer complaint database, and CFPB research and publications to serve its client base.

17.    Plaintiff Rev. Eva Steege is an 83-year-old retired pastor of the Evangelical Lutheran Church in America. Pastor Steege took on student loans to pursue higher education at a seminary, to fulfill her calling as a pastor. Because of her advanced chronic obstructive pulmonary disease, Pastor Steege has been told that she has no longer than six months to live. She is entitled to discharge her loans under

the Public Service Loan Forgiveness Program, and the CFPB was helping her do so. Pastor Seege wants to ensure that she discharges her debt before she dies, so that she will not burden her surviving family, and because she could pass on to her family as much as $15,000 of overpayments. Pastor Steege had a meeting scheduled with the Bureau this week that was suddenly cancelled because of the CFPB's unlawful closure. Absent the CFPB's assistance, it is unlikely that she will be able to discharge her debt and get her overpayments returned before she passes away.

18.    Plaintiff CFPB Employee Association is a membership organization of dedicated public servants committed to advocating for the interests of the Consumer Financial Protection Bureau. Its members include current and former employees of the CFPB, including probationary employees who were recently terminated.

19.    Defendant Russell Vought is the Acting Director of the Consumer Financial Protection Bureau. He is sued in his official capacity.

20.    Defendant Consumer Financial Protection Bureau is an agency of the United States.

## BACKGROUND

**Statutory Creation of the CFPB**

21.    In July 2010, Congress enacted the Dodd-Frank Wall Street Reform and Consumer Protection Act (Dodd-Frank Act), Pub. L. No. 111-203, 124 Stat. 1376, 1376 (2010), "[t]o promote the financial stability of the United States by improving accountability and transparency in the financial system, to end 'too big to fail', to

protect the American taxpayer by ending bailouts, [and] to protect consumers from abusive financial services practices." *Id.*

22.    Title X of the Dodd-Frank Act, titled the Consumer Financial Protection Act of 2010 (CFP Act), established the CFPB as an "independent bureau" within the Federal Reserve System. 12 U.S.C. § 5491(a). Congress tasked the CFPB with "implement[ing]" and "enforc[ing]" a large body of financial consumer protection laws to "ensur[e] that all consumers have access to markets for consumer financial products and services and that markets for consumer financial products and services are fair, transparent, and competitive." *Id.* § 5511(a). Congress required the CFPB's "principal office" to be located in Washington, D.C. *Id.* § 5491(a).

23.    The CFPB is headed by a single Director, who is appointed by the President with the advice and consent of the Senate. 12 U.S.C. § 5491(b)(1)–(2). Congress required that the Bureau's Deputy Director, who is "appointed by the Director," shall "serve as acting Director in the absence or unavailability of the Director." *Id.* § 5491(b)(5).

24.    The CFP Act charges the CFPB with numerous mandatory duties to protect consumers and taxpayers. including duties related to the supervision of financial institutions, research and education, enforcement, and rulemaking. *See generally* P.L. 111-203, Title X, §§ 1001–1100H. Among other things, Congress required the CFPB to perform the following activities:

a.    ***Obligations to Monitor and Respond to Consumer Complaints.*** The CFP Act requires the CFPB to "collect[]," "monitor[]," and

"respon[d] to consumer complaints regarding consumer financial products or services." *Id.* § 5493(b)(3)(A). The CFPB is further required to "establish … reasonable procedures to provide a timely response to consumers" for complaints or inquiries. *Id.* § 5534. Those complaints can and do "help consumers get resolution to the problems they encounter."[1]

     b.    ***Research, Reporting, and Information Obligations.*** The Act imposes on the CFPB numerous research, reporting, and information obligations. For example, the CFPB is required to "research[], analyz[e], and report[]" on market developments for consumer financial products or services and consumer understanding of and access to financial products. *Id.* § 5493(b)(1). In addition, it is required to publish and disseminate information about credit rates and credit cards. *See* 15 U.S.C. §§ 1646(a), (b); *id.* § 1632(d)(3). And the CFPB must "provide staff and data processing resources" to the Federal Financial Institutions Examination Council, 12 U.S.C. § 2809(c), and to compile information on depository institutions and aggregate lending patterns, *id.* § 2809(a).

     c.    ***Obligations to establish specific offices.*** Congress further required the CFPB to establish offices that perform specified tasks or aid specific groups of consumers. For example, the CFP Act requires that a Private Education Loan Ombudsman "provide timely assistance to borrowers of

---

[1] CFPB, *Four million complaints: More than just a milestone* (Sep. 29, 2023), https://www.consumerfinance.gov/about-us/blog/four-million-complaints-more-than-just-a-milestone/.

private education loans." *Id.* § 5535(a). Among other things, the Ombudsman is required to "compile and analyze data on borrower complaints regarding private education loans" and, in accordance with regulations, "receive, review, and attempt to resolve informally complaints" from loan borrowers. *Id.* §§ (c)(1)(3).

In addition, the statute requires the CFPB to establish an Office of Financial Protection for Older Americans that "shall … monitor certifications or designations of financial advisors who advise seniors and alert the Commission and State regulators of certifications or designations that are identified as unfair, deceptive, or abusive" and "conduct research … to educate and counsel seniors about personal finance management." *Id.* §§ (g)(3)(B), (D).

The Act also requires the establishment of several other offices, including the Office of Service Members Affairs, which "shall be responsible for developing and implementing initiatives for service members and their families," *id.* § (e)(1); the Office of Financial Education, which is mandated to "implement a strategy to improve the financial literacy of consumers" through various "activities including providing opportunities for consumers to access" services, information, and assistance," *id.* § (d)(2); and the Office of Fair Lending and Equal Opportunity, which provides oversight and enforcement of various federal laws and "work[s] with private industry, fair lending, civil rights, consumer and community advocates on the promotion of fair lending compliance and education," *id.* § 5493(c).

d.    ***Supervision***. The Dodd-Frank Act gives the CFPB broad supervisory authority to examine financial institutions for compliance with federal consumer financial laws. 12 U.S.C. §§ 5514, 5515. For example, the CFPB "shall require reports and conduct examinations on a periodic basis" of payday lenders and private education lenders.  *Id.* § 5514(b)(1). In addition, for insured depository institutions and credit unions with more than $10 billion in assets, the CFPB "shall have exclusive authority to require reports and conduct examinations on a periodic basis" to "assess[] compliance" with federal law, "obtain information" about the activities, systems and procedures of the entity, and "detect[] and assess[] risks to consumers and to markets for consumer financial products and services." 12 U.S.C. § 5515(b)(1).

25.    The Act also confers rulemaking authority on the CFPB. *See* 12 U.S.C. § 5512(b). The CFPB has the authority to prescribe rules identifying acts or practices that are "unfair, deceptive, or abusive," *id.* § 5531(b), and rules imposing disclosure requirements to help consumers understand the terms, benefits, costs, and risks of financial products and services, *id.* § 5532; *see also id.* § 5533. The CFPB also has rulemaking authority pursuant to 19 federal statutes that govern numerous consumer activities and services, including debt collection practices, debit card transfers, overdraft services, consumer leases, mortgage lending, credit card lending,

mortgage appraisals, real estate settlement practices, and credit reporting. *See* 12 U.S.C. §§ 5581(a)(1)(A), (b).[2]

26.    Since its inception in 2010, the CFPB has fulfilled its statutorily mandated duties by creating the requisite administrative apparatuses and enacting dozens of rules and regulations. The agency has published hundreds of fact sheets, studies, and technical assistance documents that are used by financial services providers, consumers, advocates, and researchers. And the agency has helped millions of consumers obtain relief, both through formal enforcement actions, and through informal dispute resolution mechanisms required by Congress.

27.    On average, the Bureau's statutorily-mandated complaint resolution system receives approximately 350,000 complaints per month. In January 2025, the number was closer to 500,000. Although some complaints are automatically sent to

---

[2] *See also* Alternative Mortgage Transaction Parity Act, 12 U.S.C. §§3801, et seq.; the Consumer Leasing Act of 197615 U.S.C. §§1667, et seq.; the Electronic Funds Transfer Act, 15 U.S.C. §§1693, et seq., except with respect to section 920; the Equal Credit Opportunity Act, 15 U.S.C. §§1691, et seq.; the Fair Credit Billing Act, 15 U.S.C. §§1666, et seq.; the Fair Credit Reporting Act, 15 U.S.C. §§1681, et seq., except with respect to sections 1681m(e) and 1681w; the Homeowners Protection Act of 1998, 12 U.S.C. §§4901, et seq.; the Fair Debt Collection Practices Act, 15 U.S.C. §§1692, et seq.; subsections (b) through (f) of section 43 of the Federal Deposit Insurance Act, 12 U.S.C. §§ 1831t(c)-(f); sections 502 through 509 of the Gramm-Leach-Bliley Act, 15 U.S.C. §§6802-6809, except for section 6805 as it applies to section 6801(b); the Home Mortgage Disclosure Act of 1975, 12 U.S.C. §§2801, et seq.; the Home Ownership and Equity Protection Act of 1994, 15 U.S.C. §1639; the Real Estate Settlement Procedures Act of 1974, 12 U.S.C. §§2601, et seq.; the S.A.F.E. Mortgage Licensing Act of 2008, 12 U.S.C. §§5101, et seq.; the Truth in Lending Act (TILA), 15 U.S.C. §§1601, et seq.; the Truth in Savings Act, 12 U.S.C. §§4301, et seq.; section 626 of the Omnibus Appropriations Act, 2009, P.L. 111-8 §626; the Interstate Land Sales Full Disclosure Act, 15 U.S.C. §§1701, et seq.; and many provisions of the Mortgage Reform and Anti-Predatory Lending Act, Dodd-Frank Act Title XIV, Subtitles A, B, C, and E, and §§1471, 1472, 1475, and 1476).

companies, many have to be referred manually by a CFPB employee. CFPB employees also monitor the complaints to ensure that companies respond to consumers in a timely fashion and refer some complaints to the Bureau's enforcement division. And some complaints—including ones related to imminent actions like foreclosures—are investigated by the Bureau's Escalated Case Management Team. More than 1,000 of these complaints filed each year require attention from the Escalated Management.

28.     Regardless of whether a complaint is sent to the Escalated Case Management Team, they are very often urgent. The majority relate to consumer credit reports, and most people do not become aware of an error on their reports until they are trying to secure a loan. Consumers also file complaints when they have been "debanked"—denied access to their accounts because of their past financial history— and face banks who are unwilling to help them restore their accounts. The CFPB is often the only resource available to help them regain access. Consumers also complain regularly about surprise fees and interest attached to payday loans. Consumers who need payday loans typically have little-to-no expendable income, and these surprise costs can mean missing the bus to work and therefore losing your job, skipping or rationing medications, or losing child-care.

29.     The Dodd-Frank Act specifies that funding of the CFPB come from "the combined earnings of the Federal Reserve System." *See* 12 U.S.C. § 5497.

30.     The Act directs that, each quarter, the Board of Governors of the Federal Reserve will transfer "the amount determined by the Director [of the Bureau] to be

reasonably necessary to carry out the authorities of the Bureau," subject to a statutory cap of 12% of the total operating expenses of the Federal Reserve (inflation adjusted). *Id.* § 5497(a)(1); *see id.* § 5497(a)(2)(A)–(B). In addition, the CFPB Director may request additional funds from Congress if necessary to carry out the authorities of the Bureau. *See id.* § 5497(e).

31.    For Fiscal Year 2025, "[t]he CFPB's projected budget estimate for its operations … [was] $810.6 million."[3]

32.    By letter to the Federal Reserve on October 8, 2024, then-CFPB Director Rohit Chopra requested a monetary transfer in the amount of $248,900,000, stating that he had "determined [it] is the amount necessary to carry out the authorities of the Bureau for FY2025 Q1."[4] Three days later, the Federal Reserve confirmed by letter that the requested funds had been transferred to the CFPB.[5]

33.    By letter to the Federal Reserve on December 19, 2024, then-Director Chopra requested a monetary transfer of $245,100,000 to the CFPB, stating that he had "determined [it] is the amount necessary to carry out the authorities of the

---

[3] Cong. Research Service, R48295, *The Consumer Financial Protection Bureau Budget: Background, Trends, and Policy Options*, at 6, https://crsreports.congress.gov/product/pdf/R/R48295/2#:~:text=The%20CFPB's%20projected%20budget%20estimate,director%20or%20in%20CFPB's%20priorities.

[4]    https://files.consumerfinance.gov/f/documents/cfpb_funds-transfer-request-fy-2025-q1.pdf.

[5]    https://files.consumerfinance.gov/f/documents/cfpb_letter-from-frb-fy-2025-q1.pdf.

Bureau for FY 2025 Q2."[6] On January 2, 2025, the Federal Reserve confirmed by letter that the requested funds had been transferred to the CFPB.[7]

**Treasury Secretary Bessent named Acting Director of the CFPB and halts the CFPB's Work**

34.    On February 1, 2025, President Trump fired then-Director of the CFPB Rohit Chopra as Director of the CFPB. Pursuant to Dodd-Frank, the CFPB's then-Deputy Director, Zixta Martinez, then became Acting Director of the CFPB. *See* 12 U.S.C. § 5491(b)(5).

35.    Two days later, President Trump appointed Treasury Secretary Bessent as the Acting Director of the CFPB.

36.    On February 3, 2025, then-Acting Director Bessent sent an email, titled "Instructions from Acting Director," directing all CFPB staff and contractors to "immediately" suspend activities in six areas of work. Specifically, the February 3 email stated that unless expressly approved by Bessent, all CFPB workers were required:

- "[n]ot to approve or issue any proposed or final rules or formal or informal guidance";

- "[t]o suspend the effective dates of all final rules that have been issued or published but that have not yet become effective";

- "[n]ot to commence, take additional investigative activities related to, or settle enforcement actions";

---

[6] https://files.consumerfinance.gov/f/documents/cfpb-12-19-letter-from-cfpb-to-frb_2025-01.pdf.

[7] https://files.consumerfinance.gov/f/documents/cfpb_01-02-letter-from-frb-to-cfpb_2025-01.pdf.

- "[n]ot to issue public communications of any type, including publication of research papers";

- "[n]ot to approve or execute any material agreements, including related to employee matters or contractors"; and

- "[n]ot to make or approve filings or appearances by the Bureau in any litigation, other than to seek a pause in proceedings."

*Id.* The February 3 email stated that Acting Director Bessent was issuing these directives "to promote consistency with the goals of the Administration." *Id.*

37.     By email to all CFPB staff and contractors on February 4, 2025, Acting Director Bessent "[u]pdate[d]" his February 3 directive halting another category of work. He instructed CFPB employees "[n]ot to initiate supervisory designation proceedings or designate any nondepository institution for supervision."

**Defendant Vought named Acting Director and halts CFPB's Work**

38.     On Friday, February 7, 2025, President Trump named Russell Vought, the Director of the Office of Management and Budget, as Acting Director of the CFPB.

39.     That same day, Elon Musk and other members of the so-called "Department of Government Efficiency" (DOGE) accessed CFPB's headquarters and computer systems.[8] Several hours later, Musk posted "CFPB RIP" with a tombstone emoji on his social-media site X.[9]

---

        [8]     https://www.politico.com/news/2025/02/07/elon-musk-team-cfpb-00203119; https://www.forbes.com/sites/saradorn/2025/02/10/trump-vs-cfpb-russ-vought-orders-consumer-financial-protection-bureau-to-stop-work/.

        [9] https://x.com/elonmusk/status/1887979940269666769.

40.     Also on February 7, the CFPB's official X account was deleted,[10] and the CFPB's website homepage was replaced with a banner stating, "404: Page not found."[11]

41.     On February 8, 2025, Acting Director Vought sent an email titled "Directives on Bureau Activities." The email stated that Vought was "committed to implementing the President's policies" and that "[t]o that end," he directed all CFPB staff and contractors to comply "immediately" with nine directives to cease work, unless expressly approved by Vought:

- "[n]ot approve or issue any proposed or final rules or formal or informal guidance";

- "[s]uspend the effective dates of all final rules that have been issued or published but that have not yet become effective";

- "[n]ot commence, take additional investigative activities related to, or settle enforcement actions";

- "[n]ot open any new investigation in any manner, and cease any pending investigations";

- "[n]ot issue public communications of any type, including publication of research papers and compliance bulletins";

- "[n]ot approve or execute any material agreements, including related to employee matters or contractors";

- "[n]ot make or approve filings or appearances by the Bureau in any litigation, other than to seek a pause in proceedings";

- "[c]ease all supervision and examination activity";

---

[10]     https://www.forbes.com/sites/saradorn/2025/02/08/cfpbs-x-account-goes-dark-as-russell-vought-takes-over-elon-musk-posts-cfpb-rip/.

[11]     https://www.forbes.com/sites/eriksherman/2025/02/09/consumer-financial-protection-bureau-adds-error-message-to-home-page/.

- "[c]ease all stakeholder engagement."

42.     Approximately one hour later, Acting Director Vought stated in a social media post on X that he "ha[d] notified the Federal Reserve that CFPB will not be taking its next draw of unappropriated funding because it is not 'reasonably necessary' to carry out its duties." [12]

43.     In the absence of taking a draw from the Federal Reserve, the Bureau must rely on its reserve fund.

44.     On information and belief, Defendant Vought intends to imminently return the funds in the CFPB's reserves to the Federal Reserve. Although Vought has stated that in his view, that money is not "necessary to fulfill the Bureau's mandate," without that money, the Bureau will be unable to fund its operations.

45.     On the evening of February 9, 2025, CFPB Chief Operating Officer Adam Martinez sent an email to all CFPB staff stating that the CFPB's headquarters would close the next day and instructing "[e]mployees and contractors … to work remotely unless instructed otherwise from our Acting Director or his designee."[13] No reason was given for the closure.

46.     On the morning of Monday, February 10, 2025, Vought sent an email with the subject line "Additional Directives on Bureau Activities," reiterating that the CFPB's "DC headquarters building is closed this week." The February 10 email

---

[12] https://x.com/russvought/status/1888423503537360986

[13]     https://www.nytimes.com/2025/02/09/us/russell-vought-consumer-bureau-protect-hq-close.html;  *see*  https://www.reuters.com/world/us/cfpbs-headquarters-be-closed-coming-week-email-says-2025-02-09/.

directed all CFPB staff "not [to] perform any work tasks" at all and that "employees should stand down from performing any work task." The email stated that "[i]f there are any urgent matters," CFPB staff should "alert [Vought] through Mark Paoletta," who is the Office of Management and Budget General Counsel and who was identified in the email as the CFPB's Chief Legal Officer, "to get approval in writing before performing any work task."

47.    Later that day, reporters speaking with President Trump asked him to confirm that "his goal was to have [the CFPB] totally eliminated." President Trump stated, "I would say, yeah, because we're trying to get rid of waste, fraud, and abuse."[14] President Trump further stated, "[W]e did the right thing. [The CFPB] was a very important thing to get rid of, and it was also a waste. I mean, number one, it was a bad group of people running it, but it was also a waste."[15] President Trump reportedly "praised his administration for shutting the CFPB and used the past tense to describe the [CFPB]."[16]

---

[14] https://x.com/joeygarrison/status/1889132023933022283?mx=2.

[15]    https://www.facebook.com/ANINEWS.IN/videos/shes-a-nasty-woman-trump-slams-senator-elizabeth-warren-after-her-cfpb-neutraliz/1227075188971091/; *see also* Alejandra Jaramillo, *Trump confirms goal to "totally eliminate" the Consumer Financial Protection bureau*, CNN Politics (Feb. 10, 2025), https://www.cnn.com/politics/live-news/trump-doge-presidency-news-02-10-25/index.html (quoting President Trump).

[16]    https://www.americanbanker.com/news/president-trump-confirms-his-goal-is-to-eliminate-the-cfpb

*Defendants' Additional Actions to Shut Down the CFPB*

48.     By email on the evening of February 11, 2025, approximately 70 CFPB employees who were newly hired and subject to a two-year probationary period were terminated.[17] The email stated, "Unfortunately, the Agency finds that that [sic] you are not fit for continued employment because your ability, knowledge and skills do not fit the Agency's current needs."[18]

49.     In the past few days, the CFPB has cancelled more than 150 vendor contracts. The canceled contracts reportedly include "102 vendor contracts for the CFPB's enforcement division, 33 contracts linked to the director's office, and 16 contracts for the agency's supervision unit."[19] The Bureau also cancelled nearly all contracts that underlie the consumer complaint function.

50.     The defendants have reportedly informed the General Services Administration that they are terminating the lease of the CFPB's headquarters office in Washington, D.C.

51.     The defendants are also preparing to conduct another mass firing, this time of over 95% of the Bureau's employees. That would make it impossible for the Bureau to fulfill any of its statutorily required functions.

---

[17]     https://news.bloomberglaw.com/banking-law/cfpb-fires-70-enforcement-lawyers-other-probationary-employees

[18]     https://news.bloomberglaw.com/banking-law/cfpb-fires-70-enforcement-lawyers-other-probationary-employees.

[19]     https://news.bloomberglaw.com/banking-law/cfpb-cancels-more-than-100-million-in-contracts-amid-doge-probe.

**Consequences of Defendants' Stop-Work Orders**

52.    By freezing the CFPB's work, the defendants have put an immediate halt to the CFPB's performance of its statutorily mandated functions.

53.    The defendants' orders to halt work at the CFPB have had devastating consequences. Among countless other consequences, halting CFPB work has suspended oversight of the biggest banks to ensure that they comply with the law; pending rulemakings, including a rulemaking to stop data brokers from selling sensitive personal data to scammers, stalkers, and spies;[20] and enforcement actions against institutions violating consumer financial protection laws.[21]

54.    Shuttering the agency has also severely disrupted the CFPB's consumer complaint operation: The hotline consumers call to submit complaints went offline, despite Congress's clear command that the CFPB "establish[] a single, toll-free telephone number" for use in collecting complaints. 12 U.S.C. § 5493(b)(3)(A). Although the Bureau may now have reinstated the contractors who operate the hotline, the operation remains severely diminished. The CFPB cancelled the contract for the contractors that processed mailed-in complaints and complaints referred to the CFPB by other federal agencies and Congress. Complaints submitted online can't

---

[20]    https://www.consumerfinance.gov/about-us/newsroom/cfpb-proposes-rule-to-stop-data-brokers-from-selling-sensitive-personal-data-to-scammers-stalkers-and-spies/

[21]    *See* Press Release, National Consumer Law Center, *Unlawful Shut Down of Consumer Agency Endangers Working Families, Honest Businesses, and the Economy* (Feb. 10, 2025), https://www.nclc.org/unlawful-shut-down-of-consumer-agency-endangers-working-families-honest-businesses-the-economy/ (identifying various impacted enforcement actions).

be sent to companies unless those companies are already in the CFPB's system. Particularly devastating is that the Escalated Case Management Team—which responds to extremely time sensitive complaints, like those involving foreclosures—is not working. And consumers who filed complaints related to other time-sensitive matters—like correcting a credit report so that they can obtain a loan, or regaining access to a bank account after being frozen out—can't rely on the CFPB to ensure they receive timely responses to their complaints, either.

55.    The shutdown has had a similar effect on the Student Loan Ombudsman's Office. The Office receives thousands of complaints a year, and its staff resolve hundreds of complaints each month. 2024 Annual Report of the CFPB Student Loan Ombudsman at 9.[22]

56.    The complaints concern inaccurate billing statements, yearslong processing delays, inability to reach lenders to lodge complaints directly, and missing refunds of hundreds to tens of thousands of dollars.

57.    The complaints are submitted through a telephone hotline, an electronic submission process and referrals from congressmembers and direct service organizations.  Complaints are screened by contractors and Bureau staff before being routed to lenders, who are required to respond within 15 days.

---

[22]    https://files.consumerfinance.gov/f/documents/cfpb_2024-annual-student-loan-ombudsmans-report_2024-11.pdf.

58.     Because of the stop-work order, complaints are not being addressed by staff and not being routed to lenders, who sometimes resolve issues without the need for intervention from the CFPB.

59.     The Ombudsman's work has had profound impact on the borrowers it served. For instance, CFPB staff has successfully resolved complaints that involve schools withholding college transcripts and thereby preventing borrowers from pursuing employment. One borrower described the hold on her transcript as like a "hold on [her] life."

60.     Another borrower, had nearly $5,000 erroneously drawn from her account for a loan payment. She was given conflicting information and then told a refund could take 12 weeks. After lodging a complaint with the Ombudsman, she received a refund.

61.     Another borrower had loans cancelled and was due a $20,000 refund. After contacting the lender directly and waiting nearly two years, the borrower lodged a complaint with the CFPB. The lender issued a refund shortly after.

62.     Stories like this abound, and borrowers just like this will be left to the long delays, conflicting information, and denials of refunds that the Ombudsman's office, when functioning, has helped others avoid.

63.     These immediate consequences have already harmed each of the plaintiffs.

64.     The National Treasury Employees Union's more than 775 members at the CFPB face severe uncertainty and stress about their job security. Seventy CFPB

employees, many of whom were NTEU members, have already been fired. Those who have not yet been fired understandably fear for their jobs. Indeed, they have good reason to believe a mass layoff is imminent. And given the instructions to stop work, they lack clarity about their job status and their ability to comply with their usual work obligations.

65.    The National Consumer Law Center has already had multiple of its contracts with the CFPB cancelled. Those cancellations will cost NCLC thousands of dollars. The CFPB's subscription to NCLC's publication, for example, funds much of the organization's publishing work. CFPB employees have also withdrawn as panelists from trainings organized by NCLC. And NCLC relies extensively on data and reports published by the CFPB. Stopping the CFPB's work will deprive NCLC of this important information going forward.

66.    Pastor Steege has, over the years, had great difficulty in attempting to enroll in Public Service Loan Forgiveness. In late 2024, however, the pastor sought help from the CFPB. After an initial meeting with the Bureau in January 2025, Pastor Steege was hopeful that she might finally enroll in the program, have her loans forgiven, and, in fact, be returned $15,000 in overpayments. She scheduled a follow-up meeting with the Bureau for February 10, 2025. But the night before the meeting Pastor Steege learned that President Trump had taken steps to shut down the CFPB. Then, on the morning of the scheduled meeting, CFPB staff emailed Pastor Steege and informed her that, "due to new guidance CFPB employees recently received," the meeting was cancelled. No new meeting was scheduled, and Pastor

Steege has no reason to believe that the CFPB—with its worked indefinitely stopped—will ever be able to help her.

67.     The inability to seek loan forgiveness and a refund of $15,000 would be a devastating consequence standing alone. But it is even more dire for Pastor Steege. Because of her advanced cancer diagnosis, Pastor Steege has been told she has no more than six months to live. She hoped to have her loans forgiven so that she would not burden her surviving family with her debt, and so that they could use the $15,000 refund for basic needs after she passes. If the CFPB isn't able to help her, Pastor Steege will spend her final six months in great duress, worried that she is leaving her family with a financial burden and without the monetary help to which they are entitled. And if the loan is not forgiven while she is alive her family will be forced to pursue a death discharge that will not provide them with the $15,000 refund.

68.     The NAACP was actively working with the CFPB to protect NAACP members who live in Altadena, California. Those members have been targeted by predatory financial practices in the wake of the Los Angeles wildfires. The complete freeze on the CFPB's work has halted that collaboration and harmed both the NAACP members and the NAACP itself, which now must assist its members without the CFPB's assistance.

69.     The Virginia Poverty Law Center operates a Predatory Loan Helpline that consumers can call when they need help with unfair and predatory loans. The phone number is featured prominently on the Center's website. Because of the Center's limited staffing, even the CEO helps to answer the hotline.

70.    The Center routinely directs consumers who call the hotline to use the CFPB's consumer response complaint function. It even notes this resource on the Center's website.

71.    This process takes Center staff approximately 10 minutes and gets timely and helpful results. In September, for example, the Center received a complaint about an out-of-state lender that had been claiming that it was not subject to Virginia law. The Center helped the consumer submit a complaint to the CFPB, and it quickly resulted in a reduction of the interest rate on the loan from 118% to 36%, with a 50% reduction in payments.  This is just one example of success the Center's client base has seen from referrals. There are many others.

72.    Before the CFPB's existence, the Center used to handle these complaints entirely itself.  It consumed far more resources to replicate what the CFPB now does in minutes. Because the Center's staff is so limited, if it had to return to handling complaints itself, it would be unable to commit resources to other work.

73.    The Center also uses the CFPB's consumer response database to inform its work.  If that database were not updated, or trustworthy, the Center would lose an important tool that it relies on to set its organizational priorities on what to advocate about and how to educate consumers.

74.    Plaintiff CFPB Employee Association's members include probationary employees who have already been fired, as well as current employees who rightly fear for their jobs.

## CAUSES OF ACTION

### Count One
(Non-statutory review of official and agency action)

75.    Plaintiffs have a non-statutory right of action to enjoing and declare unlawful official action that is ultra vires.

76.    The Constitution vests executive power in the President. U.S. Const., art. II, and imposes on the President a duty to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3.

77.    The President of the United States has only those powers conferred on him by the Constitution and federal statutes.

78.    Federal legislation must be passed by both chambers of Congress before it may be presented to the President, and, if signed, become law. U.S. Const., art. I. The President and Executive Branch have no authority under the Constitution to amend statutes unilaterally.

79.    The CFPB was established as a federal agency by Congress by statute, the Dodd Frank Act, signed into law in 2010, and can be eliminated only by Congress.

80.    Defendants' actions to eliminate the CFPB exceed executive authority, usurp legislative authority conferred upon Congress by the Constitution, defendant Vought was not lawfully appointed, and his actions are ultra vires and should be enjoined.

**Count Two**
(Non-statutory review of official and agency action)

81.    The Constitution mandates that the President obtain "the Advice and Consent of the Senate" before appointing "Officers of the United States." U.S. Const. art. II, § 2, cl. 2.

82.    The Director of the CFPB is an Officer of the United States.

83.    President Trump appointed Defendant Vought as acting Director without the advice and consent of the Senate.  Defendant Vought was neither nominated nor confirmed by the Senate to that position.

84.    President Trump purported to appoint Defendant Vought under the Federal Vacancies Reform Act, which allow for temporary appointments without the advice and consent of the Senate when the prior holder of a Senate-confirmed office "dies, resigns, or is otherwise unable to perform the functions and duties of the office." 5 U.S.C. § 3345(a).

85.    But President Trump fired the last Senate-confirmed Director, Rohit Chopra. Chopra did not die, he did not resign, and he was not unable to perform the functions and duties of the office. He continued to perform them until the day he was fired, over a week into President Trump's term.

86.    The President's appointment of Defendant Vought as Acting Director of the CFPB is therefore unconstitutional and Defendant Vought has no power to direct the agency.

87.     Congress has provided that, when the Bureau is missing a director, the deputy director shall lead the agency. See 5 U.S.C. § 5491(b)(5). The deputy director, not Defendant Vought, therefore has the authority to exercise the Bureau's powers.

88.     In addition, Congress has charged the Secretary of Education, not the Director, with responsibility for designating the Private Education Loan Ombudsman. 12 U.S.C. § 5535(a). The authority to control who holds that office rests with the Secretary. By functionally removing the ombudsman from the office by prohibiting her from doing any work, Defendant Vought has exercised power of the Secretary without being confirmed by the Senate to do so.

89.     Because defendant Vought was not lawfully appointed, his actions are ultra vires and should be enjoined.

### Count Three
(Administrative Procedure Act—706(2)(C))

90.     Under the APA, a court shall "hold unlawful and set aside agency action … in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

91.     Defendants' actions and intended further actions to suspend or terminate CFPB's statutorily mandated activities—including by issuing stop-work instructions, cancelling contracts, declining and returning funding, firing employees, and terminating the lease for its headquarters—constitute final agency action under the APA.

92.     No defendant possesses the statutory authority to require CFPB to cease work on the activities it is statutorily required to perform. Defendants' actions exceed their statutory authority.

### Count Four
(Administrative Procedure Act—706(2)(A)

93.     The APA authorizes this Court to hold unlawful and set aside final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

94.     Defendants' actions and intended further action to suspend or terminate CFPB's statutorily mandated activities and to return the funding that the CFPB needs to sustain its operations constitute final agency actions under the APA.

95.     Defendants' actions were taken without notice, reasoned explanation, or reasonable recourse.

96.     Defendants' actions were arbitrary, capricious, unconstitutional, and not in accordance with law.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court:

(A)     Declare that the defendants' actions to dismantle the CFPB and their suspension of CFPB's statutorily mandated activities are unlawful;

(B)     Declare unlawful and set aside the defendants' actions and intended further actions to dismantle the CFPB, including issuance of stop-work instructions, cancellation of contracts, declining and returning funding, reductions in force, firing of employees, and termination of the lease for its headquarters, as arbitrary,

30

capricious, an abuse of discretion, or otherwise not in accordance with law under 5 U.S.C. § 706(2)(A), contrary to constitutional right, power, privilege, or immunity under 5 U.S.C. § 706(2)(B), and in excess of statutory jurisdiction, authority, or limitations, or short of statutory right under 5 U.S.C. § 706(2)(C);

(C)    Issue an injunction barring Defendants Vought and CFPB from implementing or complying with the directions to cease work absent the authorization of Congress;

(D)    Order Defendants Vought and CFPB to resume immediately all activities that CFPB is required by statute to perform;

(E)    Issue a temporary restraining order and preliminary injunction directing Defendants Vought and CFPB to cease immediately actions to cease CFPB's operations;

(F)    Award Plaintiffs their costs, reasonable attorney's fees, and other disbursements as appropriate; and

(G) Grant such other relief as the Court deems necessary, just, and proper.

Dated: February 13, 2025

Respectfully submitted,

*/s/ Deepak Gupta*
Deepak Gupta (DC Bar No. 495451)
Robert Friedman (D.C. Bar. 1046738)
Gabriel Chess (DC Bar No. 90019245)
Gupta Wessler LLP
2001 K Street, NW
North Tower, Suite 850
Washington, DC 20006
(202) 888-1741

Jennifer D. Bennett*
Gupta Wessler LLP

*/s/ Wendy Liu*
Wendy Liu (DC Bar No. 1600942)
Adam R. Pulver (DC Bar No. 1020475)
Allison M. Zieve (DC Bar No. 424786)
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-1000

*Counsel for Plaintiffs*

505 Montgomery Street
San Francisco, CA 94111
(415) 573-0335

* motion for *pro hac vice*
admission forthcoming

*Counsel for Plaintiffs*

Julie M. Wilson
General Counsel
Paras N. Shah
Deputy General Counsel
Allison C. Giles
Assistant Counsel
National Treasury Employees Union
800 K Street, NW, Suite 1000
Washington, DC 20001
(202) 572-5500

*Counsel for Plaintiff National Treasury*
*Employees Union*