# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NATIONAL TREASURY
EMPLOYEES UNION, *et al.*,

               *Plaintiffs*,

   v.

RUSSELL VOUGHT, in his official
capacity as Acting Director of the
Consumer Financial Protection Bureau,
*et al.*,

               *Defendants.*

Case No. 1:25-cv-00381-ABJ

**MEMORANDUM IN SUPPORT
OF PLAINTIFF'S MOTION
FOR LIMITED
ADMINISTRATIVE STAY AND
TEMPORARY RESTRAINING
ORDER**

Deepak Gupta (DC Bar No. 495451)
Robert Friedman (D.C. Bar. 1046738)
Gabriel Chess (DC Bar No. 90019245)
Gupta Wessler LLP
2001 K Street, NW
North Tower, Suite 850
Washington, DC 20006
(202) 888-1741

Jennifer D. Bennett*
Gupta Wessler LLP
505 Montgomery Street
San Francisco, CA 94111
(415) 573-0335

* motion for *pro hac vice* admission
forthcoming

*Counsel for Plaintiffs*

Wendy Liu (DC Bar No. 1600942)
Adam R. Pulver (DC Bar No. 1020475)
Allison M. Zieve (DC Bar No. 424786)
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-1000

*Counsel for Plaintiffs*

Julie Wilson
General Counsel
National Treasury Employees Union
800 K Street, NW, Suite 1000
Washington, DC 20001
(202) 572-5500

*Counsel for Plaintiff National Treasury
Employees Union*

February 13, 2024

## TABLE OF CONTENTS

Introduction ................................................................................................................1

Legal Background ........................................................................................................5

Factual background .....................................................................................................8

    I.    President Trump illegally installs Russell Vought to run
the CFPB, and Vought brings the Bureau's work to a halt .................................9

    II.   The fallout from the stop-work order. .............................................................12

    III. Anticipated drastic cuts will work immense harms on Bureau staff. ..........18

Legal standard ...........................................................................................................19

Argument ...................................................................................................................20

    I.    The plaintiffs are very likely to succeed on the merits. ...............................20

    II.   The plaintiffs will suffer immediate, irreparable injury if the
CFPB shutdown continues. .................................................................................32

    III. The balance of equities favors the plaintiffs. ................................................37

Conclusion .................................................................................................................39

## INTRODUCTION

As this motion for an administrative stay and temporary restraining order is being readied for filing, the facts on the ground are changing rapidly. Over the past week, the defendants had already been in the process of doing to the Consumer Financial Protection Bureau what had been unprecedented until two weeks ago: unilaterally dismantling a federal agency established by Congress without any legal authority to do so.

Tonight, reports emerged that numerous employees have now been locked out of their phones and computers and are receiving form termination letters. Among those employees was the Student Loan Ombudsman, whose position is specifically required by federal statute. A massive reduction in force that would shrink the agency down to a handful of employees is reportedly in the works.[1]

These actions are part of a coordinated campaign by the new administration to eliminate the Consumer Financial Protection Bureau. In a series of escalating directives, the defendants have suspended virtually all CFPB operations, fired dozens of employees, cancelled over $100 million in contracts, and closed the agency's headquarters. They have brought to a halt the processing of hundreds of thousands of consumer complaints—a function required by statute—including urgent cases involving imminent home foreclosures. They have suspended all supervision of financial institutions and enforcement of consumer protection laws. They have

---

[1] Laura Wamsley, *Up to 100 more workers are fired at CFPB as staff fear mass layoffs are looming*, NPR, Feb. 13, 2025, *available at* https://www.npr.org/2025/02/13/nx-s1-5296929/cpfb-layoffs-staff-trump-doge.

declared their intent to return all of the agency's funding to the Federal Reserve, making it impossible for the CFPB to function at all.

The defendants' unlawful action will have immediate consequences for the Americans that the CFPB was designed by Congress to protect. Take, for example, one of the plaintiffs here, Pastor Eva Steege, who is 83 years old and in hospice care. Her doctors have told her she has less than six months to live. After years of struggling to navigate the complexities of student loan forgiveness, she finally secured help from the Consumer Financial Protection Bureau to discharge her loans under the Public Service Loan Forgiveness Program. The discharge would not only relieve her of debt but also allow her to fulfill her dying wish: to lift a stressful financial burden from her loved ones.

But on February 10, just hours before her scheduled meeting with CFPB staff, Pastor Steege received an email: Due to "new guidance," her meeting was cancelled. No new meeting was scheduled. The CFPB's Private Education Loan Ombudsman's Office—which was established by Congress and is required by statute to provide "timely assistance to borrowers"—had been ordered to cease all work.

Those who have devoted their careers to helping vulnerable consumers also face harsh consequences. One terminated CFPB employee is seven months pregnant. Now she has to face a job market as someone who must take leave immediately upon being hired or forego the time she was supposed to spend bonding with her child. And if she doesn't secure a job, her family will be unable to pay their mortgage, leaving her no choice but to uproot her newly expanded family. Another employee has had

both her spouse and child diagnosed with cancer in just the last 30 days. Without her employment-based medical benefits, they will not be able to continue treatments or afford surgeries—with possible death the result.

The law doesn't permit this wholesale dismantling of an agency created by Congress—and the tremendous harms that flow from it. Neither the President nor his appointees have the constitutional authority to eliminate an agency created by statute. In the aftermath of the 2008 financial crisis, Congress established the CFPB and charged it with supervising financial institutions and protecting consumers. Congress imposed numerous mandatory duties on the agency, from processing consumer complaints to examining banks to protecting student loan borrowers. Only Congress—not the Executive Branch—has the power to eliminate those duties or dissolve the agency created to perform them.

Yet that is exactly what the defendants have done. President Trump has declared his intent to "totally eliminate[]" the CFPB. And to accomplish that goal, he has installed Russell Vought as Acting Director through an appointment that violated both the Constitution's Appointments Clause and the Federal Vacancies Reform Act. Vought then issued a series of directives that effectively nullified Congress's statutory commands. He ordered the immediate suspension of all agency operations—including those that explicitly delegated by law to the CFPB. He cancelled the contracts that enabled the agency to fulfill its statutory duties. And he is poised to eliminate the agency's workforce and return its funding, making it impossible for the CFPB to function at all.

3

These actions violate bedrock constitutional principles and federal law in multiple ways. First, by attempting to eliminate a federal agency and its statutory duties without congressional authorization, the defendants have violated the separation of powers. Second, because Vought was neither nominated nor confirmed by the Senate, and because the President fired the previous Director, the Federal Vacancies Reform Act is inapplicable, Vought's appointment was unlawful, and his actions are all ultra vires. Third, the defendants' conduct violates the Administrative Procedure Act because it exceeds their statutory authority, is contrary to law, and is arbitrary and capricious.

The consequences of these violations are devastating and irreparable. Over 70 CFPB employees were fired earlier this week; all term employees were reportedly fired tonight; and nearly all remaining employees face imminent termination. Pastor Steege will likely die without discharging her loans, leaving her family with debt rather than the thousands in overpayments they are owed. The Virginia Poverty Law Center can no longer help its clients resolve predatory lending disputes through the CFPB's complaint system—a process that previously took minutes and achieved remarkable results, like halving interest rates and monthly payments. Thousands of other consumers who rely on the CFPB's complaint system have lost a critical lifeline for resolving urgent financial disputes. The NAACP was actively working with the CFPB to protect NAACP members who live in Altadena, California, and had been targeted by predatory fraudsters in the wake of the Los Angeles wildfires. The freeze has abruptly halted that collaboration.

This Court should act swiftly to prevent further irreparable harm by issuing an administrative stay immediately and then a temporary restraining order enjoining the defendants' unlawful conduct. The public interest and balance of equities weigh decisively in favor of preserving the status quo and preventing the defendants from unilaterally dissolving an agency that Congress created to protect American consumers.

## LEGAL BACKGROUND

In the aftermath of the 2008 financial crisis, Congress created the Consumer Financial Protection Bureau. *See* Dodd-Frank Wall Street Reform and Consumer Protection Act, P.L. 111-203, 124 Stat. 1376 (July 21, 2010). Congress directed the CFPB to "regulate the offering and provision of consumer financial products or services," and tasked it with "ensuring that all consumers have access to markets for consumer financial products and services" that "are fair, transparent, and competitive." 12 U.S.C. §§ 5491(a), 5511(a). The Dodd-Frank Act not only established a series of new responsibilities for the Bureau, but also "transferred the administration of 18 existing federal statutes to the CFPB, including the Fair Credit Reporting Act, the Fair Debt Collection Practices Act, and the Truth in Lending Act." *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 206 (2020).[2] Among other things, the CFPB's responsibilities include:

---

[2] Unless otherwise specified, all internal quotation marks, emphases, alterations, and citations are omitted from quotations throughout.

***Monitoring and responding to consumer complaints***. Congress instructed that the CFPB's director "shall establish a unit" within the Bureau "whose functions include … the centralized collection of, monitoring of, and response to consumer complaints regarding consumer financial products or services." 12 U.S.C. § 5493(b)(3)(A). That unit must "establish[] a single, toll-free telephone number, a website, and a database" to carry out those duties. *Id.* The CFPB is further required to "establish … reasonable procedures to provide a timely response to consumers" for complaints or inquiries. *Id.* § 5534(a).

***Research, reporting, and information obligations***. The CFPB has numerous research, reporting, and information obligations imposed by statute. For example, the CFPB is required to "research[], analyz[e], and report[]" on market developments for consumer financial products or services and consumer understanding of and access to financial products, among other things. *Id.* § 5493(b)(1). In addition, it is required to publish and disseminate information about credit rates and credit cards. *See* 15 U.S.C. §§ 1646(a), (b); *id.* § 1632(d)(3). And the CFPB must "provide staff and data processing resources" to the Federal Financial Institutions Examination Council, 12 U.S.C. § 2809(b), to compile information on depository institutions and aggregate lending patterns, *id.* § 2809(a).

***Subject matter specific offices***. Congress further required the CFPB to perform work targeted at specific consumer-protection activities and for specific groups. For example, the CFPB must have a Private Education Loan Ombudsman "to provide timely assistance to borrowers of private education loans." *Id.* § 5535(a).

Among other things, the Ombudsman is required to "compile and analyze data on borrower complaints regarding private education loans" and, in accordance with regulations, "receive, review, and attempt to resolve informally complaints" from loan borrowers. *Id.* § 5535(c)(1), (3).

*Supervision and enforcement*. The Dodd-Frank Act gives the CFPB broad supervisory authority to examine financial institutions for compliance with federal consumer financial laws. 12 U.S.C. §§ 5514, 5515. For instance, the CFPB "shall require reports and conduct examinations on a periodic basis" of payday lenders and private education lenders, and "larger participant[s]" in certain markets for a consumer financial product or service, *Id.* § 5514(a)(1)(B), (D)–(E), (b)(1). And it "shall have exclusive authority to require reports and conduct examinations on a periodic basis" of insured depository institutions and credit unions with more than $10 billion in assets. *Id.* § 5515(b)(1).

The CFPB also is vested with potent enforcement powers, with authority to conduct investigations, issue subpoenas and civil investigative demands, initiate administrative adjudications, and prosecute civil actions in federal court. *Id.* §§ 5562, 5564(a), (f). The statute also empowers the CFPB "to conduct hearings and adjudication proceedings … to ensure or enforce compliance with" the Consumer Financial Protection Act, CFPB's rules, and any other federal law that the CFPB is authorized to enforce. *Id.* § 5563(a).

*Rulemaking*. The Act also confers rulemaking authority on the CFPB. *See* 12 U.S.C. § 5512(b). For example, the CFPB has the authority to prescribe rules

identifying practices that are "unfair, deceptive, or abusive," *id.* § 5531(b), and rules imposing disclosure requirements to help consumers understand the terms, benefits, costs, and risks of financial products and services, *id.* § 5532; *see also id.* § 5533. The CFPB also has rulemaking authority pursuant to 19 federal statutes that govern numerous consumer activities and services, including debt collection practices, debit card transfers, overdraft services, consumer leases, mortgage lending, credit card lending, mortgage appraisals, real estate settlement practices, and credit reporting. *See id.* § 5581(a)(1)(A), (b).[3]

## FACTUAL BACKGROUND

Despite Congress's "establish[ment]" of the CFPB—which it said "shall regulate ... consumer financial products or services," 12 U.S.C. § 5491(a)—President Trump is resolved to "totally eliminate[]" the agency.[4] The President has not,

---

[3] *See* Alternative Mortgage Transaction Parity Act, 12 U.S.C. §§ 3801, et seq.; the Consumer Leasing Act of 1976, 15 U.S.C. §§ 1667, et seq.; the Electronic Funds Transfer Act, 15 U.S.C. §§ 1693, et seq., except with respect to section 920; the Equal Credit Opportunity Act, 15 U.S.C. §§ 1691, et seq.; the Fair Credit Billing Act, 15 U.S.C. §§ 1666, et seq.; the Fair Credit Reporting Act, 15 U.S.C. §§ 1681, et seq., except with respect to sections 1681m(e) and 1681w; the Homeowners Protection Act of 1998, 12 U.S.C. §§ 4901, et seq.; the Fair Debt Collection Practices Act, 15 U.S.C. §§ 1692, et seq.; subsections (b) through (f) of section 43 of the Federal Deposit Insurance Act, 12 U.S.C. §§ 1831t(c)-(f); sections 502 through 509 of the Gramm-Leach-Bliley Act, 15 U.S.C. §§ 6802-6809, except for section 6805 as it applies to section 6801(b); the Home Mortgage Disclosure Act of 1975, 12 U.S.C. §§ 2801, et seq.; the Home Ownership and Equity Protection Act of 1994, 15 U.S.C. § 1639; the Real Estate Settlement Procedures Act of 1974, 12 U.S.C. §§ 2601, et seq.; the S.A.F.E. Mortgage Licensing Act of 2008, 12 U.S.C. §§5101, et seq.; the Truth in Lending Act (TILA), 15 U.S.C. §§ 1601, et seq.; the Truth in Savings Act, 12 U.S.C. §§ 4301, et seq.; section 626 of the Omnibus Appropriations Act, 2009, P.L. 111-8 § 626; the Interstate Land Sales Full Disclosure Act, 15 U.S.C. § 1701, et seq.; and many provisions of the Mortgage Reform and Anti-Predatory Lending Act, Dodd-Frank Act Title XIV, Subtitles A, B, C, and E, and §§ 1471, 1472, 1475, and 1476).

[4] https://x.com/joeygarrison/status/1889132023933022283?mx=2.

however, lobbied Congress to repeal or amend the law it passed establishing the CFPB. Instead, he has sought to eliminate the agency entirely through executive branch action.

## I.    President Trump illegally installs Russell Vought to run the CFPB, and Vought brings the Bureau's work to a halt

Trump's effort to eliminate the CFPB began by firing then-Director Rohit Chopra on February 1, 2025.[5] Two days later, the President named the Secretary of the Treasury as the Acting Director of the CFPB.[6] That same day, the Acting Director sent an email, titled "Instruction from Acting Director," directing all CFPB staff and contractors to "immediately" suspend activities in six areas of work.[7] The email told all workers that they were required:

- "[n]ot to approve or issue any proposed or final rules or formal or informal guidance";

- "[t]o suspend the effective dates of all final rules that have been issued or published but that have not yet become effective";

- "[n]ot to commence, take additional investigative activities related to, or settle enforcement actions";

- "[n]ot to issue public communications of any type, including publication of research papers";

- "[n]ot to approve or execute any material agreements, including related to employee matters or contractors"; and

---

[5]    https://www.cnbc.com/2025/02/03/trump-names-scott-bessent-acting-cfpb-head.html https.

[6] https://x.com/joeygarrison/status/1889132023933022283?mx=2.

[7]    https://www.jdsupra.com/legalnews/what-about-cfpb-examinations-and-other-7336474/#:~:text=As%20we%20previously%20blogged%20about,or%20formal%20or%20informal%20guidance.

- "[n]ot to make or approve filings or appearances by the Bureau in any litigation, other than to seek a pause in proceedings."

Any exception to those requirements had to be expressly approved by the Acting Director. The next day, the Acting Director "[u]pdated" his directive to expand the work stoppage to include not "initiat[ing] supervisory designation proceedings or designate any nondepository institution for supervision."[8]

Three days later, on Friday February 7, President Trump named Russell Vought—the Director of the Office of Management and Budget—as the new Acting Director of the CFPB.[9] That same day, Elon Musk and other members of the so-called "Department of Government Efficiency" (DOGE) accessed CFPB's headquarters and computer systems.[10] Several hours later, Musk posted "CFPB RIP" with a tombstone emoji on his social-media site X.[11]

The next day, Vought sent a Bureau-wide email.[12] The email further expanded on the prior work-stoppage directive, adding to the list a command to "[c]ease all supervision and examination activity" and "[c]ease all stakeholder engagement."[13]

---

[8]          https://prospect.org/economy/2025-02-07-bessent-gives-musk-present-stalling-cfpb-oversight-big-tech/

[9]               https://www.nytimes.com/2025/02/09/business/vought-cfpb-musk-trump.html

[10]     https://www.politico.com/news/2025/02/07/elon-musk-team-cfpb-00203119; https://www.forbes.com/sites/saradorn/2025/02/10/trump-vs-cfpb-russ-vought-orders-consumer-financial-protection-bureau-to-stop-work/.

[11] https://x.com/elonmusk/status/1887979940269666769.

[12]     https://www.nytimes.com/2025/02/08/us/politics/cfpb-vought-staff-finance-watchdog.html.

[13]     https://www.nytimes.com/2025/02/08/us/politics/cfpb-vought-staff-finance-watchdog.html.

Around an hour later, Vought posted on X that he "ha[d] notified the Federal Reserve that CFPB will not be taking its next draw of unappropriated funding because it is not 'reasonably necessary' to carry out its duties."[14]

On Sunday evening, February 9 (two days after Vought was appointed), the CFPB's Chief Operating Officer sent an email to all staff stating that CFPB's headquarters would close the next day and instructing "[e]mployees and contractors … to work remotely unless instructed otherwise from our Acting Director or his designee."[15] No reason was given for the closure.

Vought sent another all staff email the next morning reiterating that CFPB's "DC headquarters building is closed this week."[16] That email directed all CFPB staff "not [to] perform any work tasks" at all and that "employees should stand down from performing any work task."[17]

Two days later, Vought cancelled $100 million dollars in contracts and fired 70 employees.[18] As this is being filed late Thursday evening, more employees are being

---

[14] https://x.com/russvought/status/1888423503537360986.

[15]    https://www.nytimes.com/2025/02/09/us/russell-vought-consumer-bureau-protect-hq-close.html; *see* https://www.reuters.com/world/us/cfpbs-headquarters-be-closed-coming-week-email-says-2025-02-09/.

[16]    https://www.hrgrapevine.com/us/content/article/2025-02-11-stand-down-consumer-watchdog-agency-staff-in-state-of-confusion-after-being-ordered-to-stop-work

[17]    https://www.hrgrapevine.com/us/content/article/2025-02-11-stand-down-consumer-watchdog-agency-staff-in-state-of-confusion-after-being-ordered-to-stop-work

[18]    https://news.bloomberglaw.com/banking-law/cfpb-nixes-all-expert-witness-contracts-in-enforcement-shutdown

fired. Kaspar Decl. ¶ 25. The expectation is that Vought will soon lay-off as many as 95% of the CFPB's remaining employees. Kaspar Decl. ¶ 13.

## II.    The fallout from the stop-work order.

Because the Bureau depends on its people to function, the stop-work order and cancellation of contracts has effectively shuttered the agency. The fallout is wreaking havoc already.

*CFPB's consumer-complaint functions.* Take, for example, the Consumer Response division. Consumer Response is responsible for carrying out Congress's mandate to "collect[]," "monitor," and secure a "timely response" to consumer complaints about financial products. *See* 12 U.S.C. §§ 5493(b)(3)(A), 5534(a). Consumer Response receives hundreds-of-thousands of complaints a month. Meyer Decl. ¶ 11. They come from various sources—a toll-free hotline, web submissions, the mail, agency referrals, and Congress—and they cover the full range of consumer financial products, from debt collection, to foreclosure, to credit reporting issues and more. Meyer Decl. ¶ 9. Consumers normally lodge complaints in times of urgency— for example, when they are facing foreclosure or an error in their credit report has prevented them from obtaining a loan to buy a car for work or to drive their kids to schools. Meyer Decl. ¶¶ 21–24.

Consumer Response has established a system that efficiently handles these hundreds of thousands of complaints, but that system depends on Bureau staff and contractors to function. The most urgent complaints—for example, those that involve imminent foreclosure—are routed to an Escalated Case Management Team. Meyer

Decl. ¶ 17. That team gives personalized attention to over a thousand complaints per year. *Id.*

And even if a complaint is not escalated, many complaints still need staff or contractor assistance just to get routed to the company that is the subject of the complaint. Meyer Decl. ¶¶ 13–17. That includes complaints submitted through the hotline, the mail, or agency referrals. Meyer Decl. ¶ 15. Complaints needing to be manually processed also include any complaint about a company that's not already in the CFPB's system or any complaint where the consumer made a typo or otherwise typed the company name differently from the CFPB's system. Meyer Decl. ¶ 13. The Bureau also maintains a special portal to facilitate referrals from Congress, with each submission being assigned a case worker. Blumenthal Decl. ¶¶ 9–10.

Even the complaints that can be automatically routed to companies—those submitted through Consumer Response's online portal about a company already in the system—depend on back-end contractor support. Meyer Decl. ¶ 28. The complaint volume is so high that without constant maintenance on the electronic system, it will crash. *Id.*

The substantial resources that go into this system produces efficient and effective results. 98 percent of complaints receive a response in under 15 days. Meyer Decl. ¶ 15. And consumers regularly find that the results exceed what they were able to achieve without help from the Bureau. Meyer Decl. ¶ 19; Blumenthal Decl. ¶ 9.

Approximately forty percent of complaints result in some form of relief from the company. 2024 Consumer Response Annual Report at 9.[19]

Vought's stop-work order has left Consumer Response no longer operational. Meyer Decl. ¶¶ 25–29. The only remaining function is the work of the contractor-run call center that answers the hotline—the contract for which was initially cancelled and then "un-terminated"—but consumer response does not function with that little support. Meyer Decl. ¶ 27. There is no "Escalated Case Management team" to help "consumers with imminent foreclosures or to facilitate other time-sensitive complaint resolution when the company does not adequately respond." Meyer Decl. ¶ 26. Complaints submitted "about companies that are not already in the [CFPB's] system are not being processed at all," and "no one is processing referrals from agencies or Congress." *Id.* "By now, there are likely thousands of complaints that have gone unprocessed." *Id.* Even for those that have been processed, "no one is monitoring company response times to the complaints," "ensuring that companies respond at all to those complaints, or bringing companies to the attention of the enforcement division." *Id.*; *contra* 12 U.S.C. §§ 5493(b)(3)(A), 5534(a). And "the automated complaint function is likely to break down soon"—because it requires continuance back-end technological support to avoid crashing—bringing the last vestiges of the Bureau's consumer complaint function to a halt. Meyer Decl. ¶ 28. In fact, the system

---

[19] https://files.consumerfinance.gov/f/documents/cfpb_cr-annual-report_2023-03.pdf

already appears to be breaking down—complaints filed after January 29, 2025 appear to be missing. Meyer Decl. ¶ 29.

The elimination of this critical—statutorily mandated—resource will work serious harms. As the experience of plaintiff Virginia Poverty Law Center demonstrates, consumers frequently rely on it to successful resolve disputes. Speer Dec. ¶ 10. To take just one example, after a Center client used Consumer Response, a lender that had previously maintained that it was not subject to state usury law halved the consumer's payments and drastically cut her interest rate. Speer Dec. ¶ 12. Without that resource, the Center will struggle to achieve similar results for other consumers. *Id.* ¶ 16. And even if it can secure the results, the significant increase in time required will prevent the Center from doing other critical work and serving other clients. *Id.*

Members of Congress are in the same boat. As Senator Blumenthal explains, the Bureau set up a Consumer Response portal for their use with assigned case workers. Blumenthal Dec. ¶ 7. And the results are frequently successful. Blumenthal Dec. ¶ 9. Without that resource, the Senator's staff will, similar to the Center, be forced to take time away from other constituent work to get the same results. Blumenthal Dec. ¶¶ 12–13.

And the scale of the harm is tremendous. Over a million people use the consumer-complaint mechanism each year. 2024 Annual Report at 9. More than 40 percent of those people secure some form of relief through the process. *Id.* at 9, 18. More than ten thousand people get monetary relief. *Id.* at 18. So as a result of the

stop-work order, the next hundreds of thousands of people facing wrongful foreclosure, in urgent need of a loan blocked by a faulty credit report, unable to access their bank accounts, and much more will lose access to a critical resource. Meyer Decl. ¶¶ 21–24.

***Private Education Loan Ombudsman's office***. The Ombudsman's office— responsible for implementing Congress's mandate to provide timely assistance to borrowers of education loans who lodge complaints with the bureau, *see* 12 U.S.C. § 5535—has met the same fate. The ombudsman's office receives thousands of complaints annually from education borrowers about inaccurate billing statements, yearslong processing delays, inability to reach lenders, and the refusal of lenders to provide refunds in the thousands of dollars. 2024 Annual Report of the CFPB Student Loan Ombudsman at 9.[20]  And CFPB employees assist in the resolution of hundreds of these complaints each month. 2024 Annual Report of the CFPB Student Loan Ombudsman at 9.

The Ombudsman's office has an enormous effect on borrowers. Its work has freed college transcripts withheld as collateral to secure payment, allowing borrowers to search for employment; secured thousands of dollars in refunds; and brought to an end yearslong waits for responses from lenders. 2024 Annual Report of the CFPB Student Loan Ombudsman at 12, 20, 57.

---

[20]    https://files.consumerfinance.gov/f/documents/cfpb_2024-annual-student-loan-ombudsmans-report_2024-11.pdf.

Those who rely on the Ombudsman's office, like those who rely on Consumer Response, have now lost a critical resource. The Ombudsman's office is no longer processing complaints. Steege Decl. ¶ 6.  Indeed, just hours ago, Vought fired the Ombudsman.

Pastor Steege exemplifies the harms that consumers are already suffering. Pastor Steege is 83 years old and now in hospice, with her doctors putting her life expectancy at six months. Steege Decl. ¶ 1. She is entitled to have her loans discharged under the Public Service Loan Forgiveness Program, and the CFPB was helping her complete that process. Steege Decl. ¶¶ 2–5. Discharging the loan before she dies would allow Pastor Steege to avoid leaving her family with a significant burden and instead leave them with thousands of dollars in refunded overpayments. *Id.* ¶ 9.  Pastor Steege had a meeting scheduled with the CFPB, but that meeting has now been cancelled. *Id.* ¶¶ 4–7.  Without the Bureau's assistance, Pastor Steege does not know how she can discharge her loans before passes away.

***Other harm from the stop-work order.*** The harm from the stop-work order is not limited to those who rely on Consumer Response or the Education Ombudsman's Office. It is widespread. The CFPB was working with the NAACP to help consumers who were victims of the Los Angeles fires. Bross Decl. ¶¶ 3–5. That work has stopped. *See id.* Homeowners who were subject to illegal foreclosure actions were entitled to receive compensation—compensation that might enable them to save their homes. Rheingold Decl. ¶ 23. They now will not receive that compensation. *See id.* Pending litigation against companies that preyed on consumers has been halted.

17

The supervision of large financial services companies has stopped. Virtually all of the CFPB's work protecting ordinary Americans and serving law-abiding financial institutions has stopped.

## III.  Anticipated drastic cuts will work immense harms on Bureau staff.

The Bureau's closure has already inflicted great harm on its employees. As of the time of this filing, mass firings are underway, and more than seventy employees have already been fired. Kaspar Decl. ¶¶ 15, 25. Many of the employees who have lost their jobs (or will in the immediate future) are members of the National Treasury Employees Union or the CFPB Employee Association. *Id.*; First Am. Compl. ¶¶ 13, 18. Those fired employees have lost their income and health insurance. Kaspar Decl. ¶ 17–19. And the consequences have been personally devastating. "One employee reports that both their spouse and their child received cancer diagnoses … within the last 30 days, and without medical benefits they will not be able to continue with treatments or obtain necessary surgeries, which could ultimately result in their deaths." *Id.* ¶ 18. Others are facing $8,000 out-of-pocket medical bills to pay for essential medicines. *Id.* ¶ 17.

The harms aren't limited to medical treatment. Some employees relocated to Washington, D.C. from lower cost-of-living areas just for their jobs at the Bureau and are now saddled with leases and mortgages they can't afford. *Id.* ¶ 19. Their children will have to be withdrawn from their current schools and communities so that their parents can move to more affordable places. *Id.* Another former employee is seven months pregnant, which "severely hinder[s]" her chances of finding a new job. *Id.* ¶ 21. She requested maternity leave prior to her termination, but now will be forced

to try and find work during the time that she should have been bonding with her newborn child so that her family can afford its mortgage. *Id.*

The Bureau's current employees—however few of them may be left—are suffering, too. They are working under "enormous confusion and stress." *Id.* ¶ 10. They lack clarity on what they are allowed to do and are concerned about complying with their "obligations under existing law"—for example, do they "comply with [an] imminent financial disclosure deadline[]"? *Id.* ¶¶ 10–11. They are also concerned that their personal information will be released to the public, leading to harassment. *Id.* ¶ 6. The Bureau has gone so far as to facilitate retaliation against employees who might—understandably, given the mass confusion—accidentally do something that is later considered a violation of the stop-work order: There is now a public account on X "urging companies to report CFPB employees who have purportedly violated the stop-work order." *Id.* ¶ 14. Employees fear that, in addition to being reported for accidentally violating the stop-work order, they will be reported on "out of retaliation for having previously done their job of supervision or enforcement." *Id.*

This all harms not only the NTEU's member-employees, but also the union itself. "Reductions to the CFPB's workforce will decrease the Union's dues revenue." *Id.* ¶ 27.

## LEGAL STANDARD

To obtain a temporary restraining order, "the moving party must show: (1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable injury if the [temporary restraining order] were not granted, (3) that [such an order] would not substantially injure other interested parties, and (4) that the public

interest would be furthered" by the order. *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006); *see also Hall v. Johnson*, 599 F. Supp. 2d 1, 3 n.2 (D.D.C. 2009) ("[T]he same standard applies to both temporary restraining orders and to preliminary injunctions."). "When the movant seeks to enjoin the government, the final two TRO factors—balancing the equities and the public interest—merge." *D.A.M. v. Barr*, 474 F. Supp. 3d 45, 67 (D.D.C. 2020).

"[T]he TRO inquiry operates on a 'sliding scale,' wherein 'a strong showing on one factor c[an] make up for a weaker showing on another.'" *Am. Foreign Serv. Ass'n v. Trump*, 2025 WL 435415, at *2 (D.D.C. Feb. 7, 2025) (quoting *Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 726 (D.C. Cir. 2022)).

"An administrative stay buys the court time to deliberate: it do[es] not typically reflect the court's consideration of the merits, but instead reflects a first-blush judgment about the relative consequences of the case. While administrative stays are more common in appellate courts, district courts have recognized their applicability in cases seeking emergency relief - including in this District." *Dellinger v. Bessent*, 2025 WL 450488, at *1 (D.D.C. 2025).

## ARGUMENT

### I.    The plaintiffs are very likely to succeed on the merits.

The defendants' actions are as unprecedented as they are unlawful: Until two weeks ago, never before had an Administration attempted to unilaterally eliminate a federal agency created by Congress. It is thus unsurprising that this conduct violates our constitutional structure and federal law in multiple, independent ways. The plaintiffs bring four causes of action challenging the defendants' actions to suspend

or terminate the CFPB: (1) the defendants' actions violate the constitutional principle of the separation of powers; (2) defendant Vought's actions are ultra vires because they violate the Appointments Clause; (3) the defendants' decision to shut down CFPB violates the Administrative Procedure Act (APA), 5 U.S.C. § 706(2)(C), because it exceeds their statutory authority; and (4) the defendants' decision to shut down CFPB violates the APA, § 706(2)(A), because it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. The plaintiffs are overwhelmingly likely to succeed on each claim.

**A. *Separation of powers.*** To start, the plaintiffs are likely to succeed on the merits of their claim that the defendants' actions to shut down CFPB violate the constitutional principle of the separation of powers. "The President's power, if any, to issue [an] order must stem either from an act of Congress or from the Constitution itself." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952). But "[t]here is no statute that expressly authorizes the President to" shutdown the CFPB—either himself or through his appointee—"[n]or is there any act of Congress . . . from which such a power can be fairly implied." *Id.*

Here, the defendants' actions to shut down the CFPB—including by issuing stop-work orders, cancelling contracts, declining and returning funding, and firing employees en masse—is contrary to and thus effectively repeals multiple mandatory statutory duties that Congress imposed. Title X of the Dodd-Frank Act, titled the Consumer Financial Protection Act of 2010 (CFP Act) established the CFPB as an "independent bureau" and required the CFPB to perform a number of activities. 12

21

U.S.C. § 5491(a), For example, Congress required the CFPB to "collect[]," "monitor[]," and "respon[d]," to consumer complaints, *id.* § 5493(b)(3)(A); *see id.* § 5534. Congress instructed that the Bureau "shall" establish a "toll-free telephone number" to handle consumer complaints. *Id.* § 5493(b)(3)(A). And it required that there "shall" be a private education loan ombudsmen to "to provide timely assistance to borrowers of private education loans." *Id.* § 5535(a). The defendants actions are directly contrary to those statutory commands.

What's more, the defendants' actions are contrary to Congress's conscious deliberate statutory choice to structure the CFPB so that it can weather political change. For example, when the agency is missing a director, Congress has instructed that the deputy director shall automatically take over. *See id.* § 5491(b)(5). And Congress has "provid[ed] the Bureau a standing source of funding outside the ordinary annual appropriations process"—creating a "shield[] . . . from the influence of the political branches" that the U.S. Supreme Court recently upheld. *Consumer Fin. Prot. Bureau v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416, 422 (2024).

The defendants' actions have thus seized power that Congress has reserved to itself. The Constitution prohibits these power grabs. *Youngstown*, 343 U.S. at 585. Because Congress established the CFPB without any mechanism for the Executive to dismantle it, "only Congress can take [it] away." *Helvering v. Or. Mut. Life Ins. Co.*, 311 U.S. 267, 272 (1940).

That same conclusion would hold even if the defendants were to claim that they are shutting down only parts of the agency rather than the agency as a whole.

The Executive Branch has no more power to exercise an after-the-fact line-item veto than it does to functionally repeal the law wholesale. *See Clinton v. City of New York*, 524 U.S. 417, 421 (1998) (holding that statute that permitted the President to veto only a portion of a statute while signing the rest into force violated the Presentment Clause, Art. I, § 7, cl. 2, of the Constitution). For example, by ordering the Student Loan Ombudsman and the agency's Consumer Response offices to cease work, Vought's actions nullify direct Congress's statutory commands—with severe consequences. Vought's stop-work order is unconstitutional.

    **B.** *Unconstitutional appointment as Acting Director.* The plaintiffs are also very likely to succeed on the merits of their claim that Vought was not lawfully appointed as Acting Director of the Consumer Financial Protection Bureau and thus all of his actions to date are ultra vires. The Constitution mandates that the President obtain "the Advice and Consent of the Senate" before appointing "Officers of the United States." U.S. Const. art. II, § 2, cl. 2. This requirement of Senate confirmation is a critical "structural safeguard of the constitutional scheme," envisioned by the Framers as "'an excellent check upon a spirit of favoritism in the President' and a guard against 'the appointment of unfit characters.'" *N.L.R.B. v. SW Gen., Inc.*, 580 U.S. 288, 293 (2017) (quoting The Federalist No. 76, p. 457 (C. Rossiter ed. 1961) (A. Hamilton)).

    The Director of the CFPB is a principal officer of the United States requiring this Senate confirmation. Vought, however, was neither nominated to serve as the Director nor confirmed by the senate. His appointment is lawful, then, only if

Congress gave authority to the President to install Vought outside the ordinary advice-and-consent process (and only if that grant is itself constitutional).

President Trump purported to appoint Vought as an Acting Director under the authority of the Federal Vacancies Reform Act. The Act allows the President to temporarily fill a role for which Senate confirmation is required when the prior office holder "dies, resigns, or is otherwise unable to perform the functions and duties of the office." 5 U.S.C. § 3345(a). That assignment, though temporary, may be substantial, lasting as long as 210 days. *Id.* § 3346.

The Act does not apply here. The last Senate-confirmed Director of the CFPB, Rohit Chopra, did not die. He did not resign. And he was not "unable to perform the functions and duties of the office." *Id.* § 3345(a). Instead, President Trump fired him. The Act gives the President no authority to appoint a temporary head in this circumstance: where the vacancy is of the President's own making rather than outside the President's control. *See United States v. Valencia,* 2018 WL 6182755, at *4 (W.D. Tex. Nov. 27, 2018) ("Had [former Attorney General Jeff] Sessions chosen to refuse to resign the President could have exercised his authority to fire him, which would make the statute inapplicable."). And that makes sense, as the authority the President claimed here would allow a complete end-round around the Constitution's advice-and-consent requirement. A president could simply fire an agency head and then appoint a series of temporary replacements, and thus evade the Senate.

This case presents especially stark defiance of the Constitution's advice-and-consent requirement. The appointment of Vought is not the product of anything

24

urgent. President Trump waited until two weeks into his term to fire Chopra and only now has nominated a replacement only yesterday. Rather than make a timely nomination and work to get that person confirmed, he appointed without any statutory authority a person intent on destroying the agency that Congress has created and repeatedly declined to dissolve and whose funding structure the Supreme Court recently upheld.[21]

In addition, Vought hasn't even stopped at exercising illegal authority over the CFPB. He has also seized the power of the Secretary of Education, too. Congress gave the Secretary of Treasury the power to name as the "Private Education Loan Ombudsman." 12 U.S.C. § 5535(a). By instructing the Ombudsman—and her entire office—not to work, and to leave people like Pastor Steege hanging in the balance, Vought has grabbed power delegated by law to the Education Secretary.

The plaintiffs are therefore likely to succeed on their claim that Vought's actions to suspend or terminate the CFPB and its statutorily mandated activities are ultra vires.

**C.** *Violations of the Administrative Procedure Act.* The APA empowers courts to set aside final agency action that is, among other things, "not in accordance

---

[21] Congress notably has not left the CFPB with a leadership void in a situation like this. In the same section providing that the CFPB, which was originally envisions as an independent agency with a director removed only for cause, Congress provided that the Deputy Director will automatically become the director in the "absence" of the director. 12 U.S.C. § 5491(b)(5). The Deputy Director remains at the CFPB.

with law," "arbitrary [and] capricious," or carried out "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D).

As an initial matter, the defendants' actions to shut down the CFPB, including by issuing stop-work instructions, cancelling contracts, declining and returning funding, firing employees, and terminating the lease for its headquarters, constitute final agency action. The Supreme Court has identified two factors to determine whether agency action is final: first, the action must "mark the consummation of the agency's decisionmaking process," rather than be merely "tentative," and, second, the action "must be one by which "rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997).

Both requirements are satisfied here. First, nothing about the defendants' decision to eliminate the CFPB is tentative.  CFPB employees have been instructed to stop working immediately—and they have done so. *See* Halperin Decl. ¶¶ 4–5. The Bureau has cancelled $100 million in contracts.[22] It has stopped Consumer Response from functioning.  Meyer Decl. ¶ 29.  The ombudsman's office has stopped working and cancelled, without rescheduling, appointments, as Pastor Steege's experience shows. Steege Decl. ¶ 7. And Vought has fired or is about to fire nearly all employees. These actions are the consummation of agency decisionmaking. *See, e.g.*, *Biden v. Texas*, 597 U.S. 785, 808–09 (2022) (Department of Homeland Security decision to

---

[22]    https://news.bloomberglaw.com/banking-law/cfpb-cancels-more-than-100-million-in-contracts-amid-doge-probe.

end the Migrant Protection Protocols program was final agency action because it forbade staff "to continue the program in any way from that moment on").

Second, legal consequences flow from Vought's stop-work order, and it determines the "rights" of affected individuals. *See Bennett*, 520 U.S. at 178. As this Court has explained, when a statute creates a right to agency resources, a rule that deprives people of it constitutes agency action. *See Drs. for Am. v. Off. of Pers. Mgmt.,* 2025 WL 452707, at *6 (D.D.C. Feb. 11, 2025) (collecting cases and issuing TRO to restore CDC websites that had been taken offline). As noted above, the Ombudsman's office and Consumer Response unit were created to comply with a specific statutory directive. *See* 12 U.S.C. § 5535(a). And Pastor Steege, for example, had a statutory right to receive assistance from the Ombudsman. That right has been nullified. *See* 12 U.S.C. § 5535. Virginia Poverty Law Center's clients have a statutory right to lodge complaints—and receive the assistance that follows—through the Bureau's consumer response unit. Speer Decl. ¶ 10. That right has been nullified.

Vought's work to shutter the agency has also determined the rights of NTEU's and the Association's members. It has completely deprived dozens of individuals of employment and the attendant benefits. And even for those who have not yet been removed, the decisions are clearly not spur-of-the-moment but carefully planned, evidenced by the logistics of firing so many people alone. Further, NTEU's members can only receive 10 days of administrative leave per year. 5 C.F.R. § 630.1404. Although Vought did not use the label "administrative leave" in his stop-work order, it is defined as occurring when an "employee is not engaged in activities that qualify

as official hours of work" but suffers no reduction in compensation—exactly what happened here. *See* 5 C.F.R. § 630.1402. That cap on administrative leave will thus be reached for everyone in just over a week. That, too, is a legal consequence flowing from Vought's directive.

In particular, because of the defendants' decision to shut down the agency, over a thousand employees have been placed on administrative leave, and the agency has stopped fulfilling its legal obligations, as described above.

And this final agency action, in turn, violates the APA in multiple ways. First, the plaintiffs are likely to succeed in establishing that is the defendants' actions exceed their statutory authority in violation of 5 U.S.C. § 706(2)(C) because no defendant possess the statutory authority to require CFPB to cease the activities that Congress mandated it to perform. Congress established the CFPB and charged it with numerous mandatory duties, including, among others: processing and responding to consumer complaints about covered financial institutions, 12 U.S.C. §§ 5934, 5534, 5511(c)(2); providing "timely assistance to borrowers of private education loans," including by handling borrower complaints, *id.* § 5535(a); providing resources to consumers to improve financial literacy, *id.* § 5493; furnishing background information to the FBI to facilitate the mandatory registration of loan originators, *id.* § 5106; and publishing semi-annually "credit card price and availability information" and credit-card agreements, 15 U.S.C. §§ 1632, 1646(b). No statute or delegation of authority purports to give the Acting Director or CFPB the power to dissolve CFPB.

Second, the defendants' suspension of the CFPB is contrary to law. "[A]gency action is 'not in accordance with law' if it violates some extant federal statute or regulation." *Ovintiv USA, Inc. v. Haaland,* 665 F. Supp. 3d 59, 72 (D.D.C. 2023). Here, defendants' actions directing and resulting the CFPB in ceasing work are contrary to the CFPB's specific statutory mandates to perform various activities and is contrary to Congress's establishment of the CFPB in the first instance. *See* 12 U.S.C. § 5491(a).

The defendants' actions are also contrary to law because the agency has not followed applicable regulations governing its employment decisions. Civil servants are entitled to 60-days notice before being subject to a reduction in force. *See* 5 C.F.R. §§ 351.202, 351.805(a). That has not occurred here. Likewise, when "approving specific incidents of administrative leave" not already authorized in agency policies. *See* 5 C.F.R. § 630.1403(a)(6). There is no agency policy that permits putting the entire Bureau on administrative leave, and Vought did not consider those factors.

Third, the defendants' actions are also arbitrary and capricious. The APA's prohibition on arbitrary and capricious agency action requires agencies "to examine all relevant factors and record evidence, and to articulate a reasoned explanation for [their] decision[s]." *Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 923 (D.C. Cir. 2017); *see also Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 16 (2020) (stating that the APA "requires agencies to engage in 'reasoned decisionmaking'" (quoting *Michigan v. EPA*, 576 U.S. 743, 750 (2015)). To do so, "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice

29

made.'" *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)). Agency action fails to satisfy this standard if the agency "failed to consider an important aspect of the problem, *id.*, or if it "offer[s] an explanation for its decision that runs counter to the evidence before the agency," *Am. Wild Horse Pres. Campaign*, 873 F.3d at 923. When reviewing agency action, a court "may not supply a reasoned basis for the agency's action that the agency itself has not given." *Motor Vehicle Mfrs. Ass'n of U.S., Inc.*, 463 U.S. at 43.

Here, the CFPB has provided no reasoned explanation at all for its decision to stop all work and deprive the public of the services that Congress mandated. That is a sufficient basis to deem its action arbitrary and capricious. Vought's statements that he is "committed to implementing the President's policies" are not a reasoned explanation for the decision to shut down a congressionally-mandated agency.[23] What little else Vought has said publicly betrays either a shocking lack of knowledge of the agency's functions or willful misleading of the public. He has declared the CFPB "unaccountab[le]" even though, as his presence (and Chopra's firing) demonstrates, the agency's head is as accountable to the President as any other.[24] He has reposted on X the false assertion that the CFPB is "NOT a Wall Street regulator," but a "Main Street regulator,"[25] even though the CFPB is specifically charged with supervisory

---

[23]https://www.nytimes.com/2025/02/08/us/politics/cfpb-vought-staff-finance-watchdog.html

[24] https://x.com/russvought/status/1888423503537360986.

[25] https://x.com/MarkCalabria/status/1888624162626789388.

authority over financial institutions with more than $10 billion in assets. 12 U.S.C. § 5515. And he has declared that the agency has weaponized itself "against disfavored industries,"[26] even though Congress has chosen the industries that the CFPB oversees. To the extent any of this was meant to justify the gutting of the CFPB, it is all "counter to the evidence." *Am. Wild Horse Pres. Campaign*, 873 F.3d at 923.

Moreover, Vought's action cannot be justified by reference to President Trump's assertion that there he wants to get rid of "waste, fraud, and abuse." There is no evidence that the entire Ombudsman's office or Consumer Response unit is waste, fraud, and abuse or that every employee fired, placed on administrative leave, or now facing imminent termination was engaged in waste, fraud, and abuse. Indeed, the defendants have done nothing to substantiate their claims of waste, fraud, and abuse. And they have not weighed all the relevant factors or explained why the action taken here—closing down statutorily mandated functions of the Bureau—is an appropriate response to that wrongdoing.

In short, the defendants' attempt to unilaterally eliminate an agency created by Congress through a duly enacted statute has no antecedent in our nation's history and constitutional tradition—and for good reason. It flagrantly violates the Constitution's separation of powers, contravenes the Appointments Clause, and runs afoul of basic principles of administrative law. The plaintiffs aren't just likely but overwhelmingly likely to succeed in establishing that the defendants' actions are unlawful and should be enjoined.

---

[26] https://x.com/russvought/status/1888625239703110013.

## II.   The plaintiffs will suffer immediate, irreparable injury if the CFPB shutdown continues.

"An irreparable harm is an imminent injury that is both great and certain to occur, and for which legal remedies are inadequate." *Beattie v. Barnhart*, 663 F. Supp. 2d 5, 9 (D.D.C. 2009). The plaintiffs here have made that showing. By freezing the CFPB's work, the defendants have put an immediate halt to the Bureau's performance of its statutory functions. Each of the consumer plaintiffs rely on the Bureau's performance of those functions and are certain to be seriously harmed by their stoppage—indeed, they already have. And the harm to employees—and the organizations that represent them—caused by the defendants' use of mass firings to effectuate their goal of dismantling the agency is self-evident.

***National Treasury Employees Union and the Employee Association.*** The "circumstances surrounding" the mass firing that is underway "so far depart from the normal situation" that, "together with the resultant effect [of the defendants' conduct] on the employee[s]," the Union and Employee Association will suffer irreparable injury absent an injunction. *Sampson v. Murray*, 415 U.S. 61, 92 n.68 (1974). Take it from Mr. Vought himself, who promised to put federal workers "in trauma."[27] That's exactly what will happen if the layoffs are permitted to go through. *Id.* ¶ 13.

Many of the workers who have been fired are in dire situations. One employee's spouse and child were both diagnosed with cancer in the last 30 days. Kaspar Decl. ¶ 18. Because that employee has now lost their medical benefits, they may "not be

---

[27]   https://www.govexec.com/management/2024/10/inside-key-maga-leaders-plans-new-trump-agenda/400607/

able to continue with treatments or obtain necessary surgeries, which could ultimately result in their deaths." *Id.* Another employee is seven months pregnant—and had already put in for maternity leave—but will now have to search for work in the first moments of her newborn child's life so that she can pay her mortgage. *Id.* ¶ 21. Multiple employees were working towards Public Service Loan Forgiveness but now may not be able to find a qualifying public service job and will therefore "lose a major financial benefit upon which they were relying." *Id.* ¶ 22. The list of horrible stories goes on. *See id.* ¶¶ 17–23.

The employees still working—however few of them there may be, given that the "mass firing has begun," *id.* ¶ 25—are no less traumatized. They "do not know whether, or how, to comply with imminent financial disclosure deadlines." *Id.* ¶ 11. Attorneys in the Bureau "are particularly concerned that they will violate their ethical obligations" by failing to meet court ordered deadlines if they are prohibited from acting because of the stop-work order. *Id.* ¶ 12. Current employees can't avail themselves of the CFPB's internal harassment policies, and employees who filed complaints under those policies in the days before the stop-work order have not been allowed to proceed. *Id.* ¶ 13. And all employees—current and those who have already been fired—fear that their personal information will be leaked to the public, leading to harassment. *Id.* ¶ 6. The Bureau is even helping to facilitate that harassment by creating "a Twitter account urging companies to report CFPB employees." *Id.* ¶ 14. That mechanism is ripe for "retaliation" against employees "for having previously done their job of supervision or enforcement." *Id.* The way the CFPB has been closed

down is, in other words, no normal employment action—the defendants' treatment of the Bureau's employees "so far depart[s] from the norm[]" that it is sure to inflict irreparable harm if not enjoined. *Sampson*, 415 U.S. at 92 n.68.

**Pastor Steege.** Paster Steege has already suffered harm from the Bureau's closure—her meeting with the CFPB was cancelled and she is in "extreme distress" about "[t]he uncertainty surrounding [her] financial future." Steege Decl. ¶¶ 7–8. But the harm that lies ahead should the CFPB's shutdown continue is perhaps even more profound. Pastor Steege is in hospice and has been told she has no more than six months left to live. *Id.* ¶ 1. Unless this Court intervenes, she will spend the final six months of her life in that state of "extreme distress," and without the "dignity and peace of mind" that the loan forgiveness would have delivered to her. *Id.* ¶ 8. To subject Pastor Steege to that indignity in the final months of her life is to inflict irreparable harm. *See, e.g.*, *Obergefell v. Kasich*, 2013 WL 3814262, at *7 (S.D. Ohio 2013).

So too is the harm that is certain to come after she dies. Without the CFPB's assistance, Pastor Steege will die with student loan debt that will become her surviving family's burden to bear. Steege Decl. ¶ 9. And she will not be able to leave them the $15,000 of overpayments she may well be entitled to recoup and which they would use for their basic needs after they pass. *Id.* ¶¶ 4, 9. Instead, her surviving family would be left to seek a death discharge, without recourse for the $15,000. *Id.* That Pastor Steege's survivors will be unable to recover money that Pastor Steege would leave to them but-for the defendants' unlawful actions is further irreparable

harm that only preliminary relief can prevent. *See Holiday CVS, L.L.C. v. Holder*, 2012 WL 10973832, at *2 (D.D.C. 2012) ("[P]laintiffs' losses will be sufficiently irrecoverable, certain, and great to warrant the required finding of irreparable harm.").

***NAACP***. The stop-work order has left members of the NAACP who were victims of the Los Angeles fires that destroyed much of the city vulnerable to financial fraud and unable to secure financial assistance available to fire victims. Bross Decl. ¶¶ 3–4. In the aftermath of the fires, financial scammers sought to exploit NAACP members. *Id.* ¶¶ 2–3. To serve its members facing this threat, the NAACP reached out to the CFPB's Natural Disaster Team. *Id.* ¶ 3. The Natural Disaster Team quickly provided assistance—educating NAACP members about the risks of post-fire financial fraud and connecting them with in-state resources. *Id.* The Team also committed to provide additional educational materials and to send a CFPB staffer to Los Angeles to help hundreds of fire victims in person. *Id.*

But the Team never provided the additional resources and the staffer did not show up because of the stop-work order—leaving NAACP members already devastated from the fires to secure mortgage forbearance on their own and fend off scammers without much need resources. *Id.* Without the CFPB's assistance securing forbearance, many members' mortgage companies have refused forbearance or tack on illegitimate fees—and the members continue to deal with the fallout. *Id.* ¶ 4.

The shuttering of the CFPB has injured the NAACP and its members in a second way. Prior to the shutdown, the NAACP had collaborated with the CFPB to

educate its members—part of the NAACP broader effort to protect its members, particularly older ones vulnerable to financial fraud, from economic harms. *Id.* ¶ 6. The NAACP and CFPB had a meeting about a plan for a state-by-state approach to help members across the country as recently as last month and held multiple joint education events in 2024, with former director Chopra appearing at one event. *Id.* That work was supposed to continue this year, but because of the shutdown, the NAACP is left without the CFPB's assistance in pursuing this project of educating its members. *Id.* This, too, is irreparable harm. *See Drs. for Am. v. Off. of Pers. Mgmt.*, 2025 WL 452707, at *9 (D.D.C. Feb. 11, 2025) (granting temporary restraining order based on wrongful deprivation of information).

***Virginia Poverty Law Center.*** The Virginia Poverty Law Center will no longer be able to serve its clients in the same ways if the shutdown continues and Consumer Response remains non-functional. The Center relies on Consumer Response to assist consumers who call its predatory lending hotline—a central part of its work—in an efficient and effective way. Speer Decl. ¶¶ 10, 12–14. It knows from experience that providing assistance without utilizing Consumer Response consumes substantially more resources. Speer Decl. ¶¶ 15–16, 24. Having to return to that work would prevent the Center from serving its other clients and do the outreach work that is equally important to the Center's ability to serve its community. Speer Decl. ¶ 24; *see, e.g.*, *League of Women Voters of United States v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016) (defendant's actions "unquestionably make it more difficult for the"

organizations "to accomplish their primary mission," which "provide[s] injury for purposes both of standing and irreparable harm").

　　*National Consumer Law Center.* The National Consumer Law Center will also be irreparably injured if Consumer Response remains shut down. NCLC is a non-profit dedicated to "help[ing] financially stressed families build and retain wealth, and advance economic fairness." Dubois Decl. ¶¶ 2–3. A central way in which it does so is by researching, writing, and publishing on matters that affect low-income consumers. *Id.* The CFPB's consumer database—which is a collection of the complaints filed and responses given and that Congress has required to be maintained and publicly available, 12 U.S.C. §§ 5512(c)(3)(A); 5493(b)(1), (b)(3)(C), (c)(2)(D); 5535(d)—is critical to that work. Dubois Decl. ¶¶ 12–13.  NCLC uses these materials (and other CFPB reports) to publish major white papers used by the large network of consumer advocates that look to its expertise to guide their work. *Id.* It also uses the database to form the substance of the presentations and seminars it conducts. *Id.* Without this resource, NCLC will be incapable of providing the same information to the advocates and consumers it supports—undermining a central aspect of its mission and work. *See Action All. of Senior Citizens of Greater Phila. v. Heckler*, 789 F.2d 931, 937 (D.C. Cir. 1986) (organization suffered cognizable injury when government cut off "generous flow of information" on which it relied); *Drs. for Am. v. Off. of Pers. Mgmt.*, 2025 WL 452707, at *9 (D.D.C. Feb. 11, 2025).

## III.　The balance of equities favors the plaintiffs.

　　"[W]hen the Government is the opposing party" the final two factors—the balance of equities and the public interest—"merge." *Pursuing Am.'s Greatness v.*

*FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016). The question, then, is whether the harm to the plaintiffs if the Court does not issue an injunction outweighs the harm to the government if the Court does. *See id.* The balance weighs heavily in the plaintiffs' favor.

Consider what happens absent emergency relief. Hundreds of employees may lose their jobs; their families will lose that income and needed health insurance. *See* Kaspar Decl. ¶¶ 2, 16–23. Hundreds of thousands of consumers will be left without access to the CFPB's complaints' system—leaving them vulnerable to foreclosure, wrongfully denied credit, unable to secure college transcripts to look for work; simply losing money that they do not owe; and in Pastor Seege's case, leaving behind a debt burden on her family. Members of congress like Senator Blumenthal and entities like the Virginia Poverty Law Center will be unable to serve their constituencies and communities in the same efficient and effective ways, stretching their limited resources to the detriment of the people they serve. Blumenthal Decl. ¶ 13; Speer Decl. ¶ 24. The people the NAACP serves will be left without critical resources as they strive to recover. And the large number of consumers and consumer advocates that NCLC supports will be worse off.

On the other side of the ledger, the risk of harm to the government is insignificant. "It is well established that the Government cannot suffer harm from an injunction that merely ends an unlawful practice." *C.G.B. v. Wolf*, 464 F. Supp. 3d 174, 218 (D.D.C. 2020). And there is "no public interest in the perpetuation of

38

unlawful agency action." *Open Cmtys. All. v. Carson*, 286 F. Supp. 3d 148, 179 (D.D.C. 2017). The equities therefore tilt heavily in the plaintiffs' favor.

## CONCLUSION

For the foregoing reasons, the Court should grant a limited administrative show, grant the motion for a temporary restraining order, or in the alternative, grant a preliminary injunction.

Dated: February 13, 2025

/s/ *Deepak Gupta*
Deepak Gupta (DC Bar No. 495451)
Robert Friedman (D.C. Bar. 1046738)
Gabriel Chess (DC Bar No. 90019245)
Gupta Wessler LLP
2001 K Street, NW
North Tower, Suite 850
Washington, DC 20006
(202) 888-1741

Jennifer D. Bennett*
Gupta Wessler LLP
505 Montgomery Street
San Francisco, CA 94111
(415) 573-0335

* motion for *pro hac vice*
admission forthcoming

*Counsel for Plaintiffs*

Respectfully submitted,

/s/ *Wendy Liu*
Wendy Liu (DC Bar No. 1600942)
Adam R. Pulver (DC Bar No. 1020475)
Allison M. Zieve (DC Bar No. 424786)
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-1000

*Counsel for Plaintiffs*

Julie Wilson
General Counsel
National Treasury Employees Union
800 K Street, NW, Suite 1000
Washington, DC 20001
(202) 572-5500

*Counsel for Plaintiff National Treasury Employees Union*

39