## INDEX OF EXHIBITS

| Exhibit Number | Exhibit |
|---|---|
| 1 | Declaration of Daniel J. Kaspar (Director of Field Operations, National Treasury Employees Union) |
| 2 | Declaration of Pastor Eva Steege (Evangelical Lutheran Church) |
| 3 | Declaration of Keisha D. Bross (Director, National Association for the Advancement of Colored People) |
| 4 | Declaration of Erie Meyer (Former Chief Technologist, Consumer Financial Protection Bureau) |
| 5 | Declaration of James Speer (Chief Executive Officer, Virginia Poverty Law Center) |
| 6 | Declaration of Richard Dubois (Executive Director, National Consumer Law Center) |
| 7 | Declaration of Ira Rheingold (Executive Director, National Association of Consumer Advocates) |
| 8 | Declaration of Senator Richard Blumenthal (U.S. Senator, Connecticut) |
| 9 | Declaration of Eric Halperin (Former Enforcement Director, Consumer Financial Protection Bureau) |

# Exhibit 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL TREASURY EMPLOYEES UNION, *et al.*,<br>  *Plaintiffs*,<br>v.<br>RUSSELL VOUGHT, in his official capacity as Acting Director of the Consumer Financial Protection Bureau, *et al.*,<br>  *Defendants*. | Case No. 25-cv-381-ABJ |

## DECLARATION OF DANIEL J. KASPAR

I, Daniel J. Kaspar, declare as follows:

1. I am the Director of Field Operations and Organizing at the National Treasury Employees Union (NTEU). I have worked at NTEU since 2011.

2. NTEU represents approximately 160,000 bargaining-unit employees across 37 federal departments and agencies. More than 775 of our members work at the Consumer Financial Protection Bureau (CFPB). NTEU's mission is to ensure that all federal employees are treated with dignity and respect, and to fight for their fair pay, benefits and working conditions.

3. As Director of Field Operations, I am responsible for overseeing NTEU's eight field offices across the country. Each field office employs one National Counsel and approximately five to seven field representatives. Every chapter (local) is assigned to a field office and field representative. NTEU field representatives serve as chapters' and members' first line of contact with NTEU on a day-to-day basis.

4. By virtue of my job duties, I am familiar with the details of NTEU's relationships with its chapters, chapter leaders, members, and bargaining-unit employees.

5. Our members at the CFPB have faced rapidly increasing uncertainty about their ability to retain, let alone perform, their jobs. On February 3, 2025, the CFPB's Office of the Director emailed the Bureau's entire staff notifying them that they were not allowed to perform several basic and core agency functions "unless expressly approved by the Acting Director."

6. Members of the Department of Government Efficiency (DOGE) entered the CFPB on February 6, 2025, and, by the next day, had gained access to all non-classified CFPB systems. Some of these systems contain CFPB employees' personal identifying information.

Bargaining-unit employees reasonably fear that DOGE team members or their presumptive leader, Elon Musk, will leak employees' personal information to the public, leading to harassment. That fear is founded, in significant part, on Musk's proclivity to using his social media site to denigrate the Bureau. On February 7, 2025, for example, he posted "CFPB RIP" accompanied by a tombstone emoji to his personal X account.

7. On February 8, 2025—without any communication with NTEU—the CFPB's just-appointed Acting Director, Russell Vought, ordered CFPB staff "to 'cease all supervision and examination activity,' "cease all stakeholder engagement,' pause all pending investigations, not issue any public communications and pause 'enforcement actions.'" These are the core functions of the Bureau and nearly every bargaining-unit employee performs work in support of one or more of these functions.

8. On February 9, 2025—again without any pre- or post-implementation notice or consultation with the union—all staff were informed that the CFPB's Washington, D.C. headquarters would be closed from February 10 until February 14. Employees were left uncertain because they were not directed to work but also had not been put on any type of leave.

9. The next day, February 10, Acting Director Vought halted the CFPB's work entirely, writing in a message to staff: "Employees should not come into the office. Please do not perform any work tasks." "[U]rgent matters" could be handled *only* with the approval of the Bureau's Chief Legal Officer. "Otherwise," the email continues, "employees should stand down from performing any work task."

10. This stop-work order has caused enormous confusion and stress among the bargaining unit and, specifically, NTEU's members. Staff inside the Bureau did not know how to implement the order. Some managers told staff that the directive broadly covers all activities, including individual meetings and training. Another supervisor told an employee that they were not allowed to check work emails. Several CFPB employees were told to shut off their laptops and not to work at all.

11. There has also been mass confusion about how the stop-work order affects employees' ability to comply with their obligations under existing laws, rules and policies. For example, employees do not know whether, or how, to comply with imminent financial disclosure deadlines or if they should seek approval for participating in the kinds of outside activities they are normally allowed to do on behalf of the Bureau.

12. CFPB attorneys are particularly concerned that they will violate their ethical obligations because they are not allowed to take *any* action under the stop-work order unless they get specific permission. For example, they worry that the stop-work order will cause them to fail to obey court orders that require them to make appearances or file papers.

13. The stop-work order has also interfered with the CFPB's internal harassment and bullying policies. Complaints that were filed under those policies have not been allowed to proceed. Employees have no way of knowing if those grievances—which often involve very sensitive matters—will ever be processed.

14. Particularly given the confusion surrounding the stop-work orders, our members are afraid of retaliation for even accidentally doing something that might later be considered a violation. The CFPB has set up a Twitter account urging companies to report CFPB employees who have purportedly violated the stop-work order. Employees are afraid that companies will report employees not only for purportedly working, but out of retaliation for having previously done their job of supervision or enforcement.

15. One day after the stop-work order, on February 11, the CFPB's acting chief human capital officer sent an email to approximately 70 CFPB employees telling them that they were fired.

16. NTEU's members are profoundly affected by the CFPB's closure. The overwhelming majority of the 70 fired employees were NTEU members. These members relied on their continued employment at the CFPB for their livelihood and are now suddenly unemployed.

17. Members who are terminated will lose their health insurance and ability to pay for medicine and health care. One probationary employee has serious health conditions that are kept in remission by expensive medications and is already facing an $8,000 out of pocket bill for medication to keep them alive. If this employee does not receive treatment according to the prescribed schedule, their disease will recur, and they may develop antibodies that would mean they could never use their lifesaving medication again. Other probationary employees need their health insurance for chronic medical conditions and preventative testing for high-risk conditions, for recovery from surgeries they recently had, or for immediate fertility procedures (which, if delayed, diminishes the employees' health and chance of fertility).

18. Many members will also lose health insurance coverage for their entire families. One employee reports that both their spouse and their child received cancer diagnoses of differing types within the last 30 days, and without medical benefits they will not be able to continue with treatments or obtain necessary surgeries, which could ultimately result in their deaths. Those recent diagnoses will also prevent them from being eligible for future coverage for life insurance which had been established under the employee's employment with CFPB, and possibly prevent them from obtaining other medical coverage.

19. Members have relocated to Washington, D.C. from lower cost-of-living areas to take positions at the CFPB, and they now have leases and mortgages they have no way of paying. Employees report being unable to afford housing in their current neighborhoods where their children go to school, necessitating a move where they will need to remove their children from their current schools, communities and friends. Another employee purchased their first home in September 2024 and will not be able to pay their mortgage without their job. Employees report that they will have no choice but to take on high-interest debt, to sell their homes at a loss, or to default on financial obligations.

20. Members will face reputational harm to their careers because they were terminated from federal employment, which harms their ability to obtain new jobs in the private sector. Employees have already been told by private sector recruiters that there is a "stigma"

around their terminations, because the terminations were labeled "for cause." "For cause" terminations generally must be disclosed in response to questions in job application, interview, or background check processes, and they are materially damaging to employees' job prospects.

21. One terminated employee is seven months pregnant, and thus her chance of getting new employment in the next several months is severely hindered. The employee submitted her request for maternity leave with the CFPB before her termination. Without new employment, her family will not be able to afford their mortgage. Additionally, she is risking recovery time and bonding time with her new infant because soon after giving birth, she will need to start looking for new employment.

22. Multiple members at the CFPB were eligible for Public Service Loan Forgiveness (PSLF), and because they have lost their federal employment, they may not be able to complete the required 10 years of public service to have their student loans forgiven. One employee reports that they were very close to completing ten years in government prior to their termination, and because they may not find another qualifying public service job, they will lose a major financial benefit upon which they were relying, even though they faithfully completed the terms of the program. Even if they can secure another public service job, any months they are out of work will set back their progress in making qualifying payments.

23. Another employee reports that they were planning to take the California bar in July 2025. As a result of the "for cause" termination, they now must disclose that they were dismissed for cause to the California bar.

24. Pursuant to the CFPB's ethical requirements, one employee recently divested stock holdings that were intended to secure their retirement. They cannot regain those positions. Because of their loss in income, they will need to use those proceeds as they search for another position and will not be able to take advantage of the certificate of divestiture program, which means they will lose a portion of these forced-sale proceeds to tax obligations.

25. Bargaining-unit employees who were not fired on February 11 remain in a precarious position. Several NTEU members report being told by managers that a mass layoff of the Bureau's employees will soon be announced. As I write this declaration, it appears this mass firing has begun, with termination letters starting to go out on the evening of February 13, 2025. My understanding is that the Bureau could ultimately be shrunk down to as few as five people. Members also report being told that the CFPB headquarters building lease in Washington, D.C. has not been renewed. NTEU's records show that 1,050 employees are assigned to the headquarters office. Those employees will face the same severe consequences as individuals who have already been fired.

26. In addition to the extraordinary harm inflicted on NTEU's members by the CFPB's closure, there is direct harm to the Union. The CFPB bargaining unit is 1,054. Within the bargaining unit, 776 are dues-paying NTEU members. That number continues to increase daily as employees fear for their jobs.

4

27. Reductions to the CFPB's workforce will decrease the Union's dues revenue. NTEU collected $569,456 in dues from CFPB members in fiscal year 2024. Even if former CFPB employees remain in the Union after their termination, their dues rates will be significantly reduced.

28. Based on my experience and discussions with unions who have been through similar challenges, I expect that a substantial portion of NTEU's CFPB members will not remain in the Union after being fired, regardless of NTEU's efforts, offers of assistance and encouragement.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Executed in Washington, D.C. on February 13, 2025.

Daniel J. Kaspar