# Exhibit 6

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL TREASURY EMPLOYEES UNION, *et al.*, <br> *Plaintiffs*, <br><br> v. <br><br> RUSSELL VOUGHT, in his official capacity as Acting Director of the Consumer Financial Protection Bureau, *et al.*, <br><br> *Defendants*. | Case No. 25-cv-381-ABJ |

**DECLARATION OF RICHARD DUBOIS**

I, Richard Dubois, declare:

1. I am the Executive Director at the National Consumer Law Center (NCLC), and have held this position since 2016. Prior to becoming the Executive Director, I served as the Deputy Director and Director of Development and Project Planning, as well as a staff attorney at NCLC. I have been with the organization for 27 years. I have personal knowledge of the matters set forth herein and could and would testify competently about them if called upon to do so. This Declaration identifies and describes the harm that the recent shut down of the Consumer Financial Protection Bureau (CFPB) has had and will have on the work, operations, and budget of NCLC.

2. NCLC is a non-partisan, nonprofit organization governed by a volunteer national board of directors that has included a past president of the American Bar Association, a former

1

Arizona Solicitor General, as well as bar association representatives and clients for low-income communities.

3. Since 1969, NCLC has used its expertise in consumer law and energy policy to work for consumer justice and economic security for low-income and other disadvantaged people in the United States. NCLC's expertise includes policy analysis and advocacy; consumer law and energy publications; litigation; expert witness services; and training and advice for advocates. NCLC works with nonprofit and legal services organizations, private attorneys, policymakers, and federal and state government and courts across the nation to stop exploitative practices, help financially stressed families build and retain wealth, and advance economic fairness. NCLC publishes a 21-book series of manuals on all major aspects of consumer law, which it updates regularly. It also conducts multiple training sessions nationally on consumer law for attorneys, paralegals, and other counselors.

4. Since the CFPB was created, NCLC has relied on its work to further its mission. As described in more detail below, NCLC depends on the research, reports, consumer complaint database, trainings, and staff at the CFPB as essential resources to support NCLC's core work.

5. These resources support NCLC's financial well-being and ability to operate, including by ensuring that NCLC's paid publications and trainings are well-informed and backed by expertise and data. The resources provided by the CFPB also enable NCLC to produce quality advice, support, and free materials that enable NCLC to obtain financial support from foundations and donors.

6. On February 8, 2025, newly appointed CFPB Acting Director Russell Vought ordered all work at the CFPB to cease, including issuing a directive to CFPB staff not to issue public communications of any type, including publication of research papers and compliance bulletins, not to approve or execute any material agreements, including relating to contractors

and to cease all stakeholder engagement. A true and correct copy of the email from Acting Director Vought, obtained from Philip Melanchthlon Wegmann (@PhilipWegmann), X, https://perma.cc/4KLT-C9M6, is attached as Exhibit 1. On February 11, 2025, President Trump confirmed his goal of eliminating the CFPB. Kate Berry, *President Trump confirms his goal is to eliminate the CFPB*, Am. Banker, Feb. 11, 2025, https://perma.cc/FYB5-QNHS (video at 1:26).

7.  The impact of Acting Director Vought's directives on NCLC was immediate. On February 11, 2025, NCLC received a Stop Work Order relating to its contract with the CFPB for subscription to NCLC's publications. A true and correct copy of the February 11, 2025, Stop Work Order is attached as Exhibit 2. On February 12, 2025, NCLC received a second mail with a subject line, "Termination for Convenience of the Government," from the Bureau of Fiscal Service on behalf of the CFPB, notifying NCLC that the CFPB "…hereby terminates in its entirety the subject contract, **effective 02/12/2025**," and instructing NCLC to take various actions. A true and correct copy of the "Termination for Convenience of the Government," email is attached as Exhibit 3 (emphasis in original). The CFPB has been a subscriber to NCLC's manuals for more than a decade. The CFPB's contract is the largest single publications contract for NCLC and significant assists in funding NCLC's publications work.

8.  This week, the CFPB canceled a training contract with NCLC. NCLC entered into a contract with the CFPB on January 30, 2025, under which the CFPB would pay NCLC $10,000 for a three-part training series for CFPB staff, which was scheduled to begin on Wednesday, February 12, 2025, and end on June 18, 2025. A true and correct copy of the contract letter dated January 30, 2025 is attached as Exhibit 4. The CFPB canceled the training on Monday, February 10, 2025, after NCLC staff already spent time organizing and preparing a presentation for the training. The CFPB has paid $2,760 of the total contract price, which NCLC may have to refund if the training series is canceled entirely, and NCLC will lose the balance of

3

the contract funds it was set to receive if the remainder of the training is canceled. Other trainings also have been impacted. For example, a NCLC staff member organized a training for the Practicing Law Institute to take place on March 13 and 14, 2025, which included CFPB staff members as panelists. She and others now need to substitute themselves in for the absent CFPB the panelists, and spend time to prepare to do these presentations.

9. NCLC's comprehensive digital treatise series is intertwined with CFPB website materials. All of NCLC's treatises link extensively to CFPB materials on the CFPB's website. If the CFPB's website is scrubbed or ceases to exist, NCLC's staff will need to spend considerable time and effort replacing all of these links. NCLC will either have to link to archive.org or download all the material from that website and host it as companion material. Over time, much of this material will go out of date and not be replaced by updated CFPB resources.

10. NCLC relies heavily on CFPB publicly available resources and data to support its work, including writing NCLC's reports and manuals, and developing advocacy initiatives. These resources include periodic CFPB reports, its consumer complaint database and the materials to which the CFPB provides access online, including its regulations and their commentary. This work is core to NCLC's mission and a significant amount of NCLC's fundraising efforts go to support this work.

11. By way of example, with respect to NCLC's manuals, NCLC uses the CFPB's annual Fair Debt Collection Practices (FDCPA) report and the CFPB's bi-annual report on the credit card market (which the CFPB is required to publish pursuant to the CARD Act of 2009 and is next due to be published in 2025) for its FDCPA and other manuals. NCLC relies on the CFPB's Supervisory Highlights for NCLC's Consumer Banking & Payments Law manual, among others. The CFPB periodically implements the inflation adjustment for certain dollar

figures in TILA (i.e., for the scope of consumer credit covered) and other statutes, and NCLC includes those adjustments in its manuals.

12. NCLC also relies on the CFPB's publicly available complaint database to draft its reports. Some examples of NCLC's reports that have used the complaint database include, "Digital Denials," (2023) available at, https://perma.cc/7DLL-QHWT, "Unfair Debts With No Way Out: Consumers Share Their Experiences With Rental Debt Collectors" (2022), available at https://perma.cc/Y7D9-52YN, and "Automated Injustice Redux," (2019), available at https://perma.cc/5WHE-63FT.

13. NCLC also uses the complaint database to develop training materials for its conferences. For example, for NCLC's most recent national Consumer Rights Litigation Conference held in October 2024, NCLC staff used the complaint database to provide examples of mortgage servicer abuses for one of its panels. This is just one example. NCLC staff frequently uses the complaint database for this reason, in presentations, seminars and in providing guidance to other advocates that rely on NCLC's work.

14. If Acting Director Vought's stop work orders to CFPB staff continue and/or the CFPB is permanently shuttered, NCLC will lose access to essential resources upon which it has relied to do its core work. NCLC will not be able to inform those who rely on it on current trends in consumer issues and, as a result, its work supporting other advocates and, ultimately, supporting consumers will be detrimentally impacted.

15. In addition to what NCLC has lost and stands to lose, NCLC's work will increase in the absence of the CFPB, including by organizing more trainings and publishing more written materials such as issue briefs. Without the CFPB engaging in oversight and enforcement and administering its consumer complaint function, the private bar and legal services community will see a dramatic increase in need from consumers, which will lead to a strain on its one-on-one

intake and support of these legal service providers. NCLC will have to engage in dramatically increased advocacy in the states to fill the gaps left by elimination of federal consumer protection resources, and redirect our other advocacy to multiple agencies and litigation that would otherwise not be necessary.

      I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

February 13, 2025                                      s/Richard Dubois
                                                                               Richard Dubois, Executive Director
                                                                               National Consumer Law Center

# Exhibit 1

Dear Colleagues,     Exhibit 1

I am honored that President Trump designated me as Acting Director of the Bureau on February 7, 2025. As Acting Director, I am committed to implementing the President's policies, consistent with the law, and acting as a faithful steward of the Bureau's resources. To that end, I am directing that, effective immediately, unless expressly approved by the Acting Director or required by law, all employees, contractors, and other personnel of the Bureau shall:

- Not approve or issue any proposed or final rules or formal or informal guidance.
- Suspend the effective dates of all final rules that have been issued or published but that have not yet become effective.
- Not commence, take additional investigative activities related to, or settle enforcement actions.
- Not open any new investigation in any manner, and cease any pending investigations.
- Not issue public communications of any type, including publication of research papers and compliance bulletins.

- Not approve or execute any material agreements, including related to employee matters or contractors.
- Not make or approve filings or appearances by the Bureau in any litigation, other than to seek a pause in proceedings.
- Cease all supervision and examination activity.
- Cease all stakeholder engagement.

If you have any questions, please raise issues through your existing management for consideration by the Acting Director.

Thank you.

Russell T. Vought

# Exhibit 2



Katie Eelman <keelman@nclc.org>

## Stop Work Notice - Contract 20343021C00006

**Braden K. Sanner** <braden.sanner@fiscal.treasury.gov>  Tue, Feb 11, 2025 at 10:27 PM
To: "keelman@nclc.org" <keelman@nclc.org>
Cc: "Jawad.Syedain@cfpb.gov" <Jawad.Syedain@cfpb.gov>, Kathy Sanders <Kathy.Sanders@cfpb.gov>

Good Evening,

You might have received a blanket Stop Work Order from the Consumer Financial Protection Bureau (CFPB), Office of Finance and Procurement yesterday, 02/10/2025.  Please note that this is your official notice, in accordance with FAR 52.242-15, with instruction to stop work on the subject contract immediately, incurring no additional costs, until otherwise instructed by the Contracting Officer.  Fiscal Service Procurement will follow up if there are any additional changes in direction. This notice is effective immediately, 02/11/2025.

Please confirm receipt of this email as soon as possible.

### Braden K. Sanner

Supervisory Contracting Officer

Bureau of the Fiscal Service

braden.sanner@fiscal.treasury.gov

304-480-7858

# Exhibit 3

Shennan Kavanagh <skavanagh@nclc.org>

## Fwd: Termination for Convenience of the Government – Contract 20343021C00006
1 message

---

**Katie Eelman** <keelman@nclc.org>  Wed, Feb 12, 2025 at 4:17 PM
To: RapidResponse@nclc.org

FYI on the below.

Can someone let me know if I should respond to confirm receipt?

Thanks!

---------- Forwarded message ---------
From: **Mark A. Board** <Mark.Board@fiscal.treasury.gov>
Date: Wed, Feb 12, 2025 at 3:19 PM
Subject: Termination for Convenience of the Government – Contract 20343021C00006
To: keelman@nclc.org <keelman@nclc.org>
Cc: Syedain, Jawad (CFPB) <Jawad.Syedain@cfpb.gov>, Sanders, Kathy (CFPB) <Kathy.Sanders@cfpb.gov>, Braden K. Sanner <braden.sanner@fiscal.treasury.gov>


Good Afternoon,

On 02/11/2025, you were notified to stop work. Pursuant to FAR clause 52.212-4(l), Fiscal Service Procurement on the behalf of the Consumer Financial Protection Bureau (CFPB) hereby terminates in its entirety the subject contract, **effective 02/12/2025**. As such, you are directed to immediately stop all work under the subject contract, terminate all subcontracts, and place no further orders. You are also directed to provide by electronic means similar instructions to all subcontractors and suppliers. You are required to keep detailed, individual records of your steps taken and expenditures, if any, you intend to claim as a result of the CFPB terminating this contract. We request that you provide within 30 days the entirety of the termination settlement proposal(s), if any, you will be submitting for the subject contract.

Finally, it is necessary that you immediately confirm receipt of this termination for convenience notice via an electronic mail (e-mail) response to me, the Contracting Officer for the subject contract.


Thanks,

Mark Board
Lead Contracting Officer
Bureau of the Fiscal Service
Office of Shared Services/DPS
Office:  (304)-480-8356



**Katie Eelman** (she/her/hers)
**Publishing Operations Manager**
National Consumer Law Center®
7 Winthrop Square, Boston, MA 02110
901.231.5681 | www.nclc.org/library

# Exhibit 4



NATIONAL HEADQUARTERS
7 Winthrop Square, Boston, MA 02110
(617) 542-8010

WASHINGTON OFFICE
Spanogle Institute for Consumer Advocacy
1001 Connecticut Avenue, NW, Suite 510
Washington, DC 20036
(202) 452-6252

**NCLC.ORG**

January 30, 2025

Theresa Burton
Resource Management Officer · Consumer Financial Protection Bureau
Consumer Financial Protection Bureau
1700 G Street, NW
Washington, DC 20553
Theresa.Burton@cfpb.org

Re: Cost Proposal for Spring Training

Dear Theresa:

The National Consumer Law Center (NCLC) agrees to develop and deliver a series of three 90-minute consumer law webinars for the Consumer Financial Protection Bureau (CFPB) in the Spring of 2025. The training will cover the following topics on the designated dates and times:

- *Is it a loan? Strategies for challenging alternative financing products*: February 12, 2025 from 1:00-2:30pm EST
- *Junk Fees in Auto Sales and Finance*: April 16, 2025 from 1:00-2:30pm EST
- *The New Payday Loans and other Usury Evasion Developments*: June 18, 2025 from 1:00-2:30pm EST

The training agenda will include background and current developments on the issue and relevant law and provide time for a question and answer discussion with the attendees. The presenters will prepare powerpoint slide material that incorporates references and links to all major relevant developments so participants will be able to keep this material as a resource. They will also continue to research ongoing developments in the particular subject area to share with attendees. The final agenda for each program session will be finalized in consultation with the CFPB Enforcement Training Coordinator.

**Personnel**: Each training session will be presented by at least one NCLC attorney who is an expert in the particular topic. For some sessions, we will engage consumer rights attorneys outside of NCLC who specialize in the subject area to co-present.

**Cost**: The proposed cost for the training series is as follows:

Each 90-minute training session will include having presenters log in at least 15 minutes beforehand and staying to either answer additional questions or debrief for about 15 minutes after for a total of 2-hours for each actual session. There will also be preparation time for a comprehensive powerpoint presentation with additional materials where relevant. Each advocate, other than those who work for the CFPB or FTC, will be billed at $230 per hour for 2025.

The breakdown of costs for the training series is as follows:

- Is it a Loan? Strategies for Challenging Alternative Financing Products

    We propose having 3 main speakers plus Lauren Saunders, Associate Director of NCLC, who will be the organizer and moderator. NCLC will invoice for 3 attorneys for a total of 6 hours for the actual presentation. $230 x 6= $1,380

    We estimate 8 total hours of preparation time: $230 x 8 = $1,840

    The total for this session would be $3,220

- Junk Fees in Auto Sales and Finance

    We propose 2 speakers, including John Van Alst, Senior attorney at NCLC. That would be a total of 4 hours for the presentation. $230 x 4= $920

    We estimate 8 total hours of preparation time: $230 x 8 = $1,840

    The total for this session would be $2,760

- The New Payday Loans and other Usury Evasion Developments.

    We propose 2 speakers, including Lauren Saunders. That would be a total of 4 hours for the presentation. $230 x 4= $920

    We estimate 6 total hours of preparation time: $230 x 6 = $1,380

    The total for this session would be $2,300

Andrea Bopp Stark, senior attorney at NCLC, will help organize, coordinate, make arrangements with outside speakers, and attend each session to help moderate, monitor the chat and Q&A, troubleshoot issues or help with anything else. We estimate that would be a total of 7.5 hours x $230 = $1725

TOTAL COST: $ 10,000 (rounded down from $10,005)

Payment:  NCLC will invoice as follows:

$3,500 upon execution of this contract

 $3,500when a final agenda with topics and speakers has been determined,

$3,000 is upon completion of the final session on June 18, 2025.

NCLC will provide a full refund for any work that is not performed.

We are very pleased to have the opportunity to work with you and provide training for the CFPB. Please let me know when you would like to discuss this proposal. Thank you!

Agreed to:

*[signature]*

Richard Dubois, Executive Director, National Consumer Law Center

Date: 1-29-2025

*[signature]*

Theresa Burton
Resource Management Officer · Consumer Financial Protection Bureau

Date:   January 30, 2025