# Exhibit 7

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NATIONAL TREASURY
EMPLOYEES UNION, *et al.*,
     *Plaintiffs*,

v.

RUSSELL VOUGHT, in his official capacity as Acting Director of the Consumer Financial Protection Bureau, *et al.*,

     *Defendants*.

Case No. 25-cv-381-ABJ

## DECLARATION OF IRA RHEINGOLD

I, Ira Rheingold, declare as follows:

1. I am the Executive Director of the National Association of Consumer Advocates, also known as NACA. I have been a practicing attorney since 1987. From 1987 through 2001, I worked as an attorney representing low-income families in legal aid offices and community organizations in Maryland and Illinois. From 1996 through 2001, I managed a legal services project in Chicago, Illinois that specialized in the representation of low income and senior citizen consumers who were victims of fraudulent lending practices. In 2001, I became the Executive Director of NACA. I remain in that position today.

2. NACA is the non-profit national membership organization of legal services and private attorneys, law professors, and law students dedicated to the practice of consumer protection law. NACA's current nationwide membership of consumer attorneys is approximately 1,500 individuals.

3. Our member attorneys meet with, assist and represent hundreds of consumers every day who have been victimized by unfair, deceptive, abusive and predatory practices.

1

4. In each instance, our members interview the consumer, review their paperwork, evaluate their potential legal claims and determine what type and whether they can provide the consumer with legal representation.

5. Because of the volume of consumer cases, the limited number of consumer protection attorneys, and the current state of consumer law, our private and legal service member attorneys frequently cannot provide full legal representation to consumers who have suffered significant harm caused by unfair, deceptive and abusive business practices.

6. In those instances where full legal representation is not possible, consumer attorneys will frequently advise and assist consumers in filing complaints with the Consumer Financial Protection Bureau (CFPB).

7. On other occasions, even when the consumer attorney intends to provide legal representation, as a matter of our larger commitment to pursuing consumer justice, our members will advise and assist consumers in filing complaints with the CFPB.

8. There are several reasons why our members do this. First, as we have seen on a significant number of occasions, the mere filing of the complaint about a company to the CFPB and the intervention of the Bureau's Office of Consumer Response will lead to redress for the consumer.

9. For example, these are two distinct cases from one legal aid consumer attorney that occurred within the last 6 months.

10. In the first case, their client was homeless. Mr. R had been living on the streets for over a year. The local homeless street outreach nonprofit called Legal Aid to assist him. Mr. R had suffered three strokes. He is disabled. Mr. R received a Social Security Disability check for backpay in the amount of $10,141. He opened a bank account and deposited the check, with the help of an advocate from the local street outreach nonprofit. The bank closed the account without

2

explanation the next day. The bank told Mr. R they would not return the check, and the bank told Mr. R he is not allowed to return to the bank. The consumer attorney filed a CFPB complaint. They received a call from a representative at the bank the same day. The CFPB complaint connected the attorney with the appropriate person at the bank relatively quickly, which led to the return of the SSDI check. Mr. R is now housed because he received this check.

11. In the second case, Ms. T was being evicted. She has 8 children. In addition to the eviction, the consumer attorney assisted Ms. T with filing her tax return. She received a tax refund in the amount of $29,624.01, which Ms. T deposited into her bank account. The bank held the check for 10 days, then told Ms. T that the check was fraudulent. The bank said they would hold the check indefinitely. The consumer attorney filed a CFPB complaint and received a phone call the same day from the bank. The hold was reversed within hours. Ms. T used the funds to pay off her former landlord, which helped her save her housing voucher.

12. In total, just one legal aid consumer attorney in just a few months was able to recover $39,765.01 for her clients with the help of the CFPB. This is not an outlier. The CFPB consistently has repeatedly helped legal aid and other consumer attorneys get redress for their clients.

13. Our member consumer attorneys also file complaints because we understand that when the CFPB receives a significant number of complaints about an entity, it often can and will lead to supervisory and enforcement actions that private attorneys cannot bring and consumer relief that they cannot obtain. Finally, the public availability of the CFPB complaint database provides consumer attorneys (and public regulators) with the ability to evaluate claims made by potential consumer clients and determine whether the case merits individual representation or even broader legal action.

14. In addition to our necessary reliance on CFPB complaint database and its Consumer Response staff, NACA, as an organization, and our member attorneys are dependent on the CFPB in a number of other ways.

15. The full panoply of federal consumer protection statutes created over the past fifty years were premised on the notion that the effective implementation of these laws required both private consumer lawyers and public regulators, like the CFPB, to work independently and in concert to enforce them.

16. Because of this shared mission of enforcing our nation's consumer protection laws, NACA, as an organization, has built a strong and interdependent relationship with the CFPB.

17. I and other NACA staff speak regularly with CFPB staff to discuss trends we are seeing in the consumer marketplace including emerging unfair, deceptive and abusive practices by the financial institutions subject to their oversight.

18. We also regularly discuss bad acts and actors that we, as private litigators, can no longer prosecute because of the presence of forced arbitration and class action waiver clauses.

19. In those instances, we often provide client stories and legal analysis to the CFPB so that it can bring enforcement actions, that we simply cannot.

20. A recent example is the case of *Story v. Heartland Payment Systems*. NACA member private attorneys filed a class action lawsuit against Heartland – a financial services payment processor for more than 30,000 school district lunch programs across the nation - for charging an unfair and deceptive "program fee" to parents and their children every time they place money into a child's lunch account. Immediately after the litigation was filed, Heartland attempted to limit and/or waive the parent class members' consumer rights and protections by inserting a retroactive arbitration clause and class action waiver into their electronic "contract." Because Heartland claimed that about 75% of the parent class members, by continuing to use the school lunch

4

program after the unilateral electronic change to the program's terms, lost their right to participate in the case, we met with and urged the CFPB to take public action to protect those parents who might otherwise not be eligible for relief.

21. Additionally, I and NACA often talk with CFPB staff about coordinating overlapping private and public enforcement actions so that all harmed consumers receive the relief to which they are entitled.

22. In August 2024, the CFPB entered a Consent Order against Faye Servicing for violations of mortgage servicing laws, as well as for violations of a previous 2017 Bureau order that addressed its illegal foreclosure practices. The Consent Order required Fay Servicing to pay consumer redress of $3 million. As of today, that money has not been distributed and will not be distributed as long as the Bureau remains effectively closed.

23. This consent order has particular salience to NACA's consumer attorneys – from Maine to Oklahoma - who represent hundreds of individual mortgage borrowers, many in foreclosure actions against Faye for their servicing violations. If they were eligible to receive the financial relief contemplated by the Consent Order (an average of $10,000 per injured party is estimated), some of these homeowners would be able to save their homes. Today, that remains an impossibility.

24. Beyond the close litigation relationship NACA has had with the CFPB, our organization also frequently provides and receives training from CFPB attorneys.

25. Each year, NACA and our partner organization, the National Consumer Law Center, offer two national training conferences on the practice and substance of consumer protection law. Additionally, each year we present a national mortgage conference which rotates between a virtual and in-person event. Finally, at least twice a month, we present webinars on the latest important topics in consumer law.

26. Each year, numerous CFPB attorneys attend our in-person conferences to learn more about consumer protection law and to meet with their private consumer law allies. Further, leading CFPB experts are frequently presenters at our conferences and webinars.

27. As an example, four weeks ago, on January 16, 2025, two CFPB attorneys presented a webinar to NACA members titled "How to Effectively Search the CFPB's Consumer Complaint Database."

28. For our upcoming Spring Training running from April 30 – May 3 we had planned to invite CFPB attorneys speak to our members on topics ranging from solar and auto financing to credit reporting and the electronic funds transfer act.

29. Unfortunately, that can no longer be the case.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on February 13, 2025                                          */s/ Ira Rheingold*
                                                                       Ira Rheingold