## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NATIONAL TREASURY
EMPLOYEES UNION, et al.,

               Plaintiffs,

           v.

RUSSELL VOUGHT, in his official
capacity as Acting Director of the Consumer
Financial Protection Bureau, et al.,

               Defendants.

Case No. 25-cv-00381

**BRIEF OF AMICI CURIAE STATES OF NEW YORK AND NEW JERSEY, THE DISTRICT OF COLUMBIA, AND THE STATES OF ARIZONA, CALIFORNIA, COLORADO, CONNECTICUT, DELAWARE, HAWAI'I, ILLINOIS, MAINE, MARYLAND, MASSACHUSETTS, MICHIGAN, MINNESOTA, NEVADA, NEW MEXICO, NORTH CAROLINA, OREGON, RHODE ISLAND, VERMONT, WASHINGTON, AND WISCONSIN IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

MATTHEW J. PLATKIN
  Attorney General
   State of New Jersey
124 Halsey Street, 5th Floor
Newark, New Jersey 07101

JENNIFER S. SCHIEFELBEIN
  *Assistant Attorney General*
CHANEL VAN DYKE
CLAIRE COREA
GRANT RAFFEL
 *Deputy Attorneys General*
*Counsel for the State of New Jersey*

BRIAN L. SCHWALB
  Attorney General
   District of Columbia
400 Sixth Street, NW
Washington, D.C. 20001

CHARLES SINKS
CARA SPENCER
PAMELA DISNEY
HANNAH COLE-CHU
 *Assistant Attorneys General*
*Counsel for the District of Columbia*

LETITIA JAMES
  Attorney General
   State of New York
The Capitol
Albany, New York 12224
(518) 776-2046

BARBARA D. UNDERWOOD
  *Solicitor General*
CHRISTOPHER M. D'ANGELO
  *Chief Deputy Attorney General, Econ. Justice*
ANDREA OSER
  *Deputy Solicitor General*
KARUNA B. PATEL
  *Senior Counsel, Econ. Justice*
SARAH L. ROSENBLUTH
  *Assistant Solicitor General*
CHRISTOPHER L. FILBURN
  *Assistant Attorney General*
*Counsel for the State of New York*

[Additional counsel on signature page]

## <u>TABLE OF CONTENTS</u>

INTEREST OF AMICI CURIAE ................................................................................ 1

BACKGROUND ........................................................................................................ 2

I.    FOLLOWING THE GREAT RECESSION, CONGRESS CREATED THE CFPB
      TO FILL SIGNIFICANT GAPS IN FEDERAL CONSUMER PROTECTION .............. 2

II.   IN FULFILLING ITS MANDATE, THE CFPB HAS PARTNERED WITH THE
      STATES AND COMPLEMENTED THEIR CONSUMER-PROTECTION WORK ....... 4

ARGUMENT .............................................................................................................. 7

THE SHUTTERING OF THE CFPB WILL CAUSE STATES IRREPARABLE HARM .......... 7

      A.    The Absence of Statutorily Mandated Services Provided by the CFPB Will
            Harm Consumers' Wellbeing and States' Own Enforcement Efforts. ................... 7

      B.    State-Chartered Banks Will Be Unfairly Disadvantaged by the CFPB's
            Abdication of Its Supervisory Duty Over Very Large Banks. ............................. 10

      C.    The CFPB's Failure to Fulfill Its Statutory Mandates of Supervision and
            Enforcement in Areas of Historic Joint Collaboration Substantially Increases
            the Burden on States to Protect Consumers. ..................................................... 12

CONCLUSION ......................................................................................................... 16

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                     **Page(s)**

*CFPB v. Community Fin. Servs. Ass'n of Am., Ltd.*,
   601 U.S. 416 (2024)........................................................................................................3

*CFPB v. Consumer Advocacy Ctr., Inc.*,
   No. 19-cv-01998 (C.D. Cal.) ........................................................................................7

*CFPB v. Credit Acceptance Corp.*,
   No. 23-cv-00038 (S.D.N.Y.).........................................................................................5

*CFPB v. Genuine Title, LLC*,
   No. 15-cv-01235 (D. Md.) ............................................................................................6

*CFPB v. ITT Educ. Servs., Inc.*,
   No. 14-cv-00292 (S.D. Ind.) .........................................................................................7

*CFPB v. JPL Recover Solutions, LLC*,
   No. 20-cv-01217 (W.D.N.Y.) .......................................................................................5

*CFPB v. Kern-Fuller*,
   No. 20-cv-00786 (D.S.C.).............................................................................................6

*CFPB v. MoneyGram Int'l Inc.*,
   No. 22-cv-03256 (S.D.N.Y.).........................................................................................5

*CFPB v. NationStar Mortg. LLC*,
   No. 20-cv-03550 (D.D.C.) ............................................................................................6

*CFPB v. Navient Corp.*,
   No. 17-cv-00101 (M.D. Pa.) .........................................................................................6

*CFPB v. StratFS, LLC*,
   No. 24-cv-00040 (W.D.N.Y.) ................................................................................5, 16

*CFPB v. Wells Fargo Bank, N.A.*,
   No. 15-cv-00179 (D. Md.) ............................................................................................6

*Cuomo v. Clearing House Ass'n, L.L.C.*,
   557 U.S. 519 (2009).......................................................................................................3

*Grewal v. Navient Corp.*,
   No. ESX-C-172-2020 (N.J. Sup. Ct.) ..........................................................................6

*Illinois v. Navient Corp.*,
   No. 17 CH 00761 (Ill. Ch. Div.) ..................................................................................6

i

**Cases**                                                                 **Page(s)**

*Jeffries v. Herr,*
    No. 24-cv-01455, 2024 WL 2977882 (D. Md. June 13, 2024)....................................8

*Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes*
    *Parnell,*
    915 F.3d 197 (4th Cir. 2019) .......................................................................................10

*Pennsylvania v. Navient Corp.,*
    967 F.3d 273 (3d Cir. 2020)...........................................................................................4

## Federal Statutes

12 U.S.C.
    § 2803..................................................................................................................................9
    § 2809..................................................................................................................................9
    § 5497(d)(2)........................................................................................................................9
    § 5511(c)..............................................................................................................................3
    § 5512(c)(1)–(3).................................................................................................................3
    § 5514...............................................................................................................................3, 8
    § 5514(b)(3)........................................................................................................................4
    § 5515.............................................................................................................................3, 13
    § 5515(b)(1)......................................................................................................................13
    § 5515(b)(2)........................................................................................................................4
    § 5531................................................................................................................................12
    § 5531(a)............................................................................................................................3
    § 5534................................................................................................................................4
    § 5534(a)............................................................................................................................4
    § 5552(a)............................................................................................................................4
    § 5552(a)(1)........................................................................................................................3
    § 5552(a)(2)........................................................................................................................3
    § 5552(a)(2)(A)............................................................................................................3, 12
    § 5552(a)(2)(B)..................................................................................................................3
    § 5581................................................................................................................................3

Pub. L. No. 111-203, 124 Stat. 1955 ....................................................................................2

## Federal Regulations

12 C.F.R.
    Pt. 1026............................................................................................................................14
    § 1075.103...........................................................................................................................9
    § 1075.104...........................................................................................................................9

*Defining Larger Participants of a Market for General-Use Digital Consumer*
    *Payment Applications*, 89 Fed. Reg. 99582 (2024) ...............................................15

**Rules**                                                                                                        **Page(s)**

Local Civil Rule 7(o)(1)....................................................................................................1

**Miscellaneous Authorities**

2013 CFPB-State Supervisory Coordination Framework (May 7, 2013), *available at* https://www.csbs.org/sites/default/files/2017-11/2013%20CFPB-State%20Supervisory%20Coordination%20Framework%20050713.pdf...............................5

CFPB, *CFPB v. Access Funding, LLC* (last visited Feb. 21, 2025), *available at* https://www.consumerfinance.gov/enforcement/payments-harmed-consumers/payments-by-case/accessfunding/.......................................................9-10

CFPB, *CFPB v. Tempoe, LLC* (last visited Feb. 21, 2025), *available at* https://www.consumerfinance.gov/enforcement/payments-harmed-consumers/payments-by-case/tempoe/ .........................................................10

CFPB, *CFPB and 11 States Order Prehired to Provide Students More than $30 Million in Relief for Illegal Student Lending Practices* (Nov. 20, 2023), *available at* https://www.consumerfinance.gov/about-us/newsroom/cfpb-and-11-states-order-prehired-to-provide-students-more-than-30-million-in-relief-for-illegal-student-lending-practices/ .........................................................10

CFPB, *CFPB State of Intent for Sharing Information With State Banking and Financial Services Regulators* (Dec. 6, 2012), *available at* https://www.consumerfinance.gov/compliance/supervisory-guidance/statement-sharing-information-state-regulators/ .........................................................4

CFPB, *CFPB to Issue $95 Million in Redress to Consumers Harmed by Premier Student Loan Center* (Dec. 13, 2022), *available at* https://www.consumerfinance.gov/about-us/blog/cfpb-to-issue-95-million-redress-to-consumers-harmed-by-premier-student-loan-center/...............................7

CFPB, *Civil Penalty Fund* (last visited Feb. 21, 2025), *available at* https://www.consumerfinance.gov/enforcement/payments-harmed-consumers/civil-penalty-fund/ .........................................................10

CFPB, *Consumer Financial Protection CFPB and Multiple States Enter Into Settlement with Owner of ITT Private Loans for Substantially Assisting ITT in Unfair Practices* (September 15, 2020), *available at* https://www.consumerfinance.gov/about-us/newsroom/cfpb-multiple-states-enter-settlement-itt-private-loans-owner-assisting-itt-unfair-practices/...............................7

CFPB, *How to Avoid Foreclosure* (last visited Feb. 21, 2025), *available at* https://files.consumerfinance.gov/f/documents/cfpb_adult_fin_ed_how-to-avoid-foreclosure.pdf .........................................................8

**Miscellaneous Authorities**                                                        **Page(s)**

CFPB, *Institutions Subject to CFPB Supervisory Authority* (last visited Feb. 21, 2025), *available at* https://www.consumerfinance.gov/compliance/supervision-examinations/institutions/ ...................................................................................13

CFPB, *Mortgage Data (HMDA)* (last visited Feb. 21, 2025), *available at* https://www.consumerfinance.gov/data-research/hmda/ ..........................................9

CFPB, *Payments to Harmed Consumers by Case* (last visited Feb. 21, 2025), *available at* https://www.consumerfinance.gov/enforcement/payments-harmed-consumers/payments-by-case/ ......................................................................9

CFPB, *Submit a Complaint About a Financial Product or Service* (last visited Feb. 21, 2025), *available at* https://www.consumerfinance.gov/complaint/ ............................8

CFPB Supervisory Highlights, Issue 33 (Spring 2024), *available at* https://files.consumerfinance.gov/f/documents/cfpb_supervisory-highlights_issue-33_2024-04.pdf..................................................................................................15

CFPB Supervisory Highlights, Issue 35 (Fall 2024), *available at* https://files.consumerfinance.gov/f/documents/cfpb_supervisory-highlights-special-ed-auto-finance_2024-10.pdf ......................................................................15

CFPB Supervisory Highlights, Issue 37 (Winter 2024), *available at* https://files.consumerfinance.gov/f/documents/cfpb_Supervisory-Highlights-Issue-37_Winter-2024.pdf ................................................................................13

CFPB, *What the Access Funding Lawsuit Means for You* (last visited Feb. 21, 2025), *available at* https://www.consumerfinance.gov/access-funding/ .............................9

Conference of State Bank Supervisors, *Nonbank Mortgage Regulation* (May 10, 2024), *available at* https://csbs.org/newsroom/nonbank-mortgage-regulation-misconceptions-background ........................................................................................8

Consent Order, *In re JPMorgan Chase Bank, N.A.,* No. 2015-CFPB-0001 (Jan. 22, 2015), *available at* https://files.consumerfinance.gov/f/201501_cfpb_consent-order_jp-morgan-chase-bank-na.pdf......................................................................6

Consent Order, *In re Wells Fargo Bank, N.A.*, No. 2015-CFPB-0002 (Jan. 22, 2015), *available at* https://files.consumerfinance.gov/f/201501_cfpb_consent-order_wells-fargo-bank-na.pdf ..................................................................................6

Dep't of Treasury, *Blueprint for a Modernized Financial Regulatory Structure* (Mar. 2008), *available at* https://www.govinfo.gov/content/pkg/GOVPUB-T-PURL-LPS110157/pdf/GOVPUB-T-PURL-LPS110157.pdf....................12

**Miscellaneous Authorities**                                                                  **Page(s)**

Fin. Crisis Inquiry Comm., *Final Report of the National Commission on the Causes of the Financial and Economic Crisis in the United States* (2011), *available at* https://fcic-static.law.stanford.edu/cdn_media/fcic-reports/fcic_final_report_full.pdf.....................................................................................................................2

Mullin, John, *Shopping for Bank Regulators, Econ Focus of the Federal Reserve Bank of Richmond* (4th quarter 2019), *available at* https://www.richmondfed.org/publications/research/econ_focus/2019/q4/federal_reserve ....................................................11

National Consumer Law Center, *Restore the States' Traditional Role as 'First Responder'* (Sep. 2009), *available at* https://www.nclc.org/images/pdf/preemption/restore-the-role-of-states-2009.pdf....................................................11

Navient Multi-State Settlement, *39 State Attorneys General Announce $1.85 Billion Settlement With Student Loan Servicer Navient* (August 17, 2023), *available at* https://www.navientagsettlement.com/Home/portalid/0 ...........................................6

Reuters, *Fed's Powell: No Agency Other Than CFPB Tasked With Consumer Protection Enforcement* (Feb. 11, 2025), *available at* https://www.reuters.com/world/us/feds-powell-no-agency-other-than-cfpb-tasked-with-consumer-protection-2025-02-11/ .....................................................................................11

S. Rep. No. 111-176 (2010)................................................................................2-3, 11

Wilmarth, Arthur E., Jr., *The Expansion of State Bank Powers, the Federal Response, and the Case for Preserving the Dual Banking System*, 58 Fordham L. Rev. 1133, 1152 (1990).............................................................................................................11

## INTEREST OF AMICI CURIAE

The State of New York, the State of New Jersey, the District of Columbia, and the States of Arizona, California, Colorado, Connecticut, Delaware, Hawaii, Illinois, Maine, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New Mexico, North Carolina, Oregon, Rhode Island, Vermont, Washington, and Wisconsin (collectively referred to here as the States), submit, pursuant to Local Civil Rule 7(o)(1), this brief as amici curiae in support of plaintiffs' motion for a preliminary injunction to prevent defendants from taking steps—many irreversible—to dismantle the Consumer Financial Protection Bureau (CFPB), to the detriment of States and consumers. The States agree that plaintiffs are likely to succeed on the merits of their claims but leave that argument to the parties. This brief is submitted to explain that, while States' roles in consumer protection and financial regulation are robust and diverse, there are several forms of irreparable harm that many States and state residents will suffer as a result of defendants' actions if relief is not granted.

First, CFPB has long been providing statutorily mandated services that benefit the States' residents and support for the States' own enforcement efforts. Second, States have benefited from the CFPB's supervision of compliance with consumer-protection laws by very large banks. Third, many States have benefited as well as from the CFPB's collaboration in a number of areas of joint supervision and enforcement. The sudden withdrawal of these CFPB services, supervision and collaborative assistance will thus inflict immediate harm on States and their residents.

Indeed, these harms have already begun. In the absence of a functioning CFPB, States have suddenly lost the CFPB's significant expertise and resources that can be invaluable in ongoing matters that protect their residents. States' access to the benefits provided by the CFPB has effectively ceased. Referrals of consumer complaints to the CFPB have been left in limbo. States that have collaborative enforcement investigations or active litigations pending, or that have

previously established schedules for joint supervisory examinations, have been unable to communicate directly with their CFPB counterparts. And direct inquiries to the CFPB by States have gone unanswered. The Court should grant plaintiffs' motion for a preliminary injunction.

**BACKGROUND**

## I. FOLLOWING THE GREAT RECESSION, CONGRESS CREATED THE CFPB TO FILL SIGNIFICANT GAPS IN FEDERAL CONSUMER PROTECTION

In 2008, the United States experienced the most severe financial recession since the Great Depression. The Great Recession, as it has come to be known, "nearly crippled the U.S. economy," S. Rep. No. 111-176, at 2 (2010), causing millions of Americans to lose their jobs, homes, and savings, *id*. at 9. While the underlying causes were complex, there is little debate that abusive subprime mortgage lending and the associated collapse of the real-estate market played a central role.[1] And Congress, in examining the fallout, concluded that the Great Recession resulted from "the failure of the federal banking and other regulators to address significant consumer protection issues detrimental to both consumers and the safety and soundness of the banking system." *Id.* Instead, the multitude of federal regulators were beset by "conflicting regulatory missions, fragmentation, and regulatory arbitrage." *Id*. at 10.

In direct response to these events, Congress enacted the Dodd-Frank Act, Pub. L. No. 111-203, 124 Stat. 1955. Title X of the Dodd-Frank Act contains the Consumer Financial Protection Act (CFPA), which created the CFPB. The CFPA reflects four main innovations:

- <u>Consolidation of authority within one federal regulator</u>: To address the then-diffuse responsibility for enforcement of federal consumer protections by federal regulators, Congress transferred to the CFPB certain consumer-protection functions from existing federal agencies, including the Federal Reserve, Federal Deposit Insurance Corporation, Office of the Comptroller of the Currency, and National

---

[1] *See generally* Fin. Crisis Inquiry Comm., *Final Report of the National Commission on the Causes of the Financial and Economic Crisis in the United States* at 67–80 (2011) (For sources available on the internet, full URLs appear in the table of authorities).

Credit Union Administration. *See* 12 U.S.C. § 5581; *CFPB v. Community Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416, 421–22 (2024) (*CFSAA*).

- Prohibition of "abusive" practices: Congress provided the CFPB, for the first time for any federal regulator, the power to prohibit "abusive" acts and practices, *i.e.*, those that unreasonably take advantage of consumers, in addition to unfair and deceptive practices. 12 U.S.C. § 5531(a); S. Rep. No. 111-176, at 172. But Congress did not give States authority to target the abusive-practices provisions of the CFPA against national banks. *See* 12 U.S.C. § 5552(a)(2).

- Supervision of very large banks: Congress granted the CFPB "exclusive authority" to supervise compliance with federal consumer financial laws through examinations of "very large" banks, savings associations, and credit unions (*i.e.*, those federal- or state-chartered banks with at least $10 billion in assets). *Id.* § 5515.

- Authority over non-depository institutions: Congress granted the CFPB authority to regulate payday lenders, private education lenders, nonbank mortgage lenders, and other large participants in markets for consumer financial products. *Id.* § 5514.

The CFPA additionally sets forth the CFPB's other "primary functions" as: (i) "conducting financial education programs"; (ii) "collecting, investigating, and responding to consumer complaints"; (iii) analyzing data and other information "to identify risks to consumers" and to ensure that consumer financial markets function; (iv) enforcing federal consumer-protection laws; (v) "issuing rules, orders, and guidance implementing" those laws; and (vi) performing other "support activities." 12 U.S.C. § 5511(c). While the CFPB has exclusive authority to enforce against national banks the provisions of the CFPA itself—including its prohibition against abusive practices, *id.* § 5552(a)(2)(A), States maintain authority to enforce regulations issued under the CFPA, as well as other consumer financial laws, against both state and national banks, *id.* § 5552(a)(1), (a)(2)(B). *See generally Cuomo v. Clearing House Ass'n, L.L.C.*, 557 U.S. 519 (2009).

To achieve its goals, Congress set forth a host of additional specific statutory mandates, including that the CFPB "shall publish" annual reports on its monitoring of "risks to consumers," 12 U.S.C. § 5512(c)(1)–(3); that it "shall establish" procedures "to provide a timely response to

consumers" regarding "complaints against, or inquiries concerning" activity in consumer financial markets, *id.* § 5534(a); and that, to minimize regulatory burden, it "shall" coordinate designated supervisory activities with the relevant state and federal agencies, *id.* § 5514(b)(3).

## II. IN FULFILLING ITS MANDATE, THE CFPB HAS PARTNERED WITH THE STATES AND COMPLEMENTED THEIR CONSUMER-PROTECTION WORK

While Congress granted to the CFPB certain exclusive and mandatory functions, Congress also intended the CFPB to partner with States to achieve general efficiencies and to complement work traditionally done by States in the areas of consumer protection and financial regulation. For example, the CFPA mandates that the CFPB coordinate with state regulators its examinations of certain large banks and nonbank entities, a mandate the CFPB has interpreted to a require that it share information with state regulators.[2] 12 U.S.C. §§ 5514(b)(3); 5515(b)(2). Congress also codified the authority of state attorneys general to enforce various federal consumer financial laws, *id.* § 5552(a), thereby enabling cooperative state and federal enforcement as well as independent state enforcement, *see Pennsylvania v. Navient Corp.*, 967 F.3d 273, 286 (3d Cir. 2020).

In practice, the States' work in coordination with the CFPB reflects the diversity of the States themselves, and as a whole has spanned the breadth of the agency's functions:

Consumer-complaint portal. The CFPB has maintained a statutorily mandated system for fielding and responding to consumer complaints regarding the whole gamut of consumer financial products. *See* 12 U.S.C. § 5534. States have referred residents to the CFPB's consumer-complaint system for a variety of reasons, including when the CFPB has a track record for being able to quickly connect consumers with relevant providers (such as education lenders, mortgage originators, or servicing companies). States have also relied on the CFPB's consumer-complaint

---

[2] CFPB, *CFPB State of Intent for Sharing Information With State Banking and Financial Services Regulators* (Dec. 6, 2012).

portal to support investigations of specific providers, to spot and monitor trends in their States, and to explore opportunities for coordinated enforcement among States.

Bank examination. States have partnered with the CFPB for purposes of examining state-chartered large banks and nonbank entities, over which both States and the CFPB have supervisory authority. For example, California has coordinated with CFPB its examinations of large institutions such as East West Bank, Cathay Bank, and Rocket Mortgage. In North Carolina, First Citizens Bank & Trust, Live Oak Banking Company of Wilmington, First Bank of Southern Pines, Truist Bank, and the North Carolina State Employees Credit Union fall within the concurrent jurisdiction of CFPB and state banking regulators. Colorado has worked with the CFPB to conduct joint examinations of student-loan servicers. And the CFPB has worked directly with the Conference of State Bank Supervisors through a "coordination framework"[3] that facilitates coordination with interested States of supervisory examinations of large nonbank entities—such as nonbank mortgage originators, automobile-financing companies, debt collectors, payday lenders, and money transmitters—that are jointly regulated by federal and state laws.

Law enforcement. The CFPB has also partnered with States to stop deceptive, unfair, and abusive conduct. For example, in the past few years alone, the CFPB worked with New York to stop improper debt collection, *CFPB v. JPL Recover Solutions, LLC*, No. 20-cv-01217 (W.D.N.Y.), inaccurate and misleading remittance transfers, *CFPB v. MoneyGram Int'l Inc.*, No. 22-cv-03256 (S.D.N.Y.), and harmful subprime auto lending, *CFPB v. Credit Acceptance Corp.*, No. 23-cv-00038 (S.D.N.Y.). The CFPB also partnered with New York and six other States to shut down an illegal debt-relief scheme. *CFPB v. StratFS, LLC*, No. 24-cv-00040 (W.D.N.Y.). And the CFPB worked with all 50 States to successfully enforce consumer-protection laws against a large

---

[3] 2013 CFPB-State Supervisory Coordination Framework (May 7, 2013).

mortgage servicer, *CFPB v. NationStar Mortg. LLC*, No. 20-cv-03550 (D.D.C.); with a coalition of States to stop the unlawful brokerage of contracts offering high-interest credit to consumers, primarily disabled veterans, *CFPB v. Kern-Fuller*, No. 20-cv-00786 (D.S.C.); and with Maryland to obtain a series of consent orders in connection with a scheme to exchange marketing services for referrals of settlement-service business in connection with consumers' home-mortgage transactions, in violation of federal law.[4]

The CFPB has also routinely collaborated with States on actions seeking to root out frauds, including frauds targeting student borrowers. The CFPB's involvement has been instrumental to the success of these and other actions, and thus to ensuring that state residents are protected in the marketplace and, when harmed, receive the redress that Congress intended. For example, the CFPB and several States sued the nation's then-largest student-loan servicer for deceiving borrowers by, among, other things, steering them into costly repayment options. *CFPB v. Navient Corp.*, No. 17-cv-00101 (M.D. Pa.); *Illinois v. Navient Corp.*, No. 17 CH 00761 (Ill. Ch. Div.); *Grewal v. Navient Corp.*, No. ESX-C-172-2020 (N.J. Sup. Ct.). With the CFPB's support, the multistate coalition obtained $1.85 billion in student debt relief and consumer restitution.[5] The CFPB likewise partnered with 47 States and the District of Columbia in an action against a for-profit school and its affiliates for knowingly making high-cost loans to students that would be unable to repay; that

---

[4] *CFPB* v. *Wells Fargo Bank, N.A.*, No. 15-cv-00179 (D. Md.); Consent Order, *In re Wells Fargo Bank, N.A.*, No. 2015-CFPB-0002 (Jan. 22, 2015); Consent Order, *In re JPMorgan Chase Bank, N.A.*, No. 2015-CFPB-0001 (Jan. 22, 2015); *CFPB v. Genuine Title, LLC*, No. 15-cv-01235 (D. Md.).

[5] Navient Multi-State Settlement, *39 State Attorneys General Announce $1.85 Billion Settlement With Student Loan Servicer Navient* (August 17, 2023).

partnership resulted in $500 million in debt forgiveness for tens of thousands of students.[6] *CFPB v. ITT Educ. Servs., Inc.*, No. 14-cv-00292 (S.D. Ind.). And the CFPB partnered with Minnesota, North Carolina, and California to shut down an illegal student-loan debt-relief scheme, recovering $95 million in consumer restitution.[7] *CFPB v. Consumer Advocacy Ctr., Inc.*, No. 19-cv-01998 (C.D. Cal.).

In sum, the CFPB has, to date, been an invaluable partner to many States in performing a variety of consumer-protection functions mandated by Congress. Defendants' actions to effectively shutter the CFPB go well beyond the normal shift in enforcement priorities that accompanies any change in presidential administration—they amount to a total dereliction of *all* mandatory statutory duties. As explained in greater detail below, the States will be irreparably harmed as a result of these actions.

## ARGUMENT

### THE SHUTTERING OF THE CFPB WILL CAUSE STATES IRREPARABLE HARM

#### A. The Absence of Statutorily Mandated Services Provided by the CFPB Will Harm Consumers' Wellbeing and States' Own Enforcement Efforts.

As a result of defendants' actions, the States and their residents face a significant risk of irreparable harm, and they will continue to face that risk as long as the CFPB remains effectively out of commission. One of the most significant sources of that risk is the loss of the CFPB's statutorily mandated consumer-complaint system, which fields approximately 25,000 consumer

---

[6] CFPB, *Consumer Financial Protection CFPB and Multiple States Enter Into Settlement with Owner of ITT Private Loans for Substantially Assisting ITT in Unfair Practices* (September 15, 2020).

[7] CFPB, *CFPB to Issue $95 Million in Redress to Consumers Harmed by Premier Student Loan Center* (Dec. 13, 2022).

complaints about financial products and services each week.[8] Among other tasks, the CFPB's intake process identifies and prioritizes complaints received in which a consumer asserts an imminent home foreclosure and then refers such consumers to local counselors to assist in resolving disputes.[9] Although some States have similar mechanisms in place, those mechanisms by themselves cannot replace overnight the CFPB's vast nationwide complaint intake system. In the CFPB's absence, consumers will be left without critical resources. In some States, this includes the risk of foreclosure, a prototypical form of irreparable harm. *See Jeffries v. Herr*, No. 24-cv-01455, 2024 WL 2977882, at *2 n.3 (D. Md. June 13, 2024). This is particularly true given the rise of nonbank mortgage lenders that operate in multiple States, such as Rocket Mortgage,[10] for which the CFPB is the only federal regulator with supervisory authority. 12 U.S.C. § 5514.

The number of such consumers who will face that risk is substantial. New York and New Jersey each refer hundreds of consumer complaints to the CFPB every year. Maryland has referred 900 complaints to the CFPB since January 1, 2020; California has referred nearly 4,000 complaints since 2022; Colorado has referred more than 3,800 complaints in the last two years. And Minnesota has secured redress for consumers on multiple occasions with the CFPB's assistance, including for a consumer who obtained corrections to credit reports, resulting in a credit-score increase of more than 150 points; a consumer who resolved several thousand dollars of disputed bank deposits; and a consumer who obtained relief from a cryptocurrency scam. And California has partnered with the CFPB's Office of Servicemember Affairs to provide outreach and training on military installations.

---

[8] CFPB, *Submit a Complaint About a Financial Product or Service* (last visited Feb. 21, 2025).

[9] CFPB, *How to Avoid Foreclosure* (last visited Feb. 21, 2025).

[10] Conference of State Bank Supervisors, *Nonbank Mortgage Regulation* (May 10, 2024).

The States also regularly utilize data that the CFPB is required to collect pursuant to the Home Mortgage Disclosure Act (HMDA) for insight into trends in mortgage-lending products, like the decline of refinancing and rise in closing costs.[11] *See* 12 U.S.C. §§ 2803, 2809. The HMDA data that has been collected and maintained by CFPB constitutes the single largest loan-level data set for mortgage lending across the country. Without this data, States will suddenly find themselves significantly hampered in their ability to monitor nationwide mortgage-foreclosure trends, trends on which they rely to proactively address troubling developments in housing markets.

The CFPB's absence also leaves the Civil Penalty Fund inactive. A person or entity against whom the CFPB has taken legal action may be required to pay money into the agency's Civil Penalty Fund, which Congress directed to be established. *See* 12 U.S.C. § 5497(d)(2). The CFPB, after determining that victims will not receive compensation from the wrongdoers or any other source of restitution, 12 C.F.R. §§ 1075.103, 1075.104, is authorized to distribute compensation to such victims from the Civil Penalty Fund.

As of this filing, there were more than a dozen matters for which distributions from the Civil Penalty Fund remained outstanding—*i.e.*, cases in which consumers have already been found to be entitled to relief.[12] If the Civil Penalty Fund remains inactive, thousands of state residents will be deprived of awarded monetary relief planned to be distributed from the Fund. For example, the CFPB sued an entity called Access Funding, alleging that it deprived consumers of significant portions of structured settlements; the lawsuit resulted in stipulated judgments.[13] The CFPB's claims process for affected consumers closed on January 10, 2025,[14] but no payments have yet

---

[11] CFPB, *Mortgage Data (HMDA)* (last visited Feb. 21, 2025).

[12] CFPB, *Payments to Harmed Consumers by Case* (last visited Feb. 21, 2025).

[13] CFPB, *CFPB v. Access Funding, LLC* (last visited Feb. 21, 2025).

[14] CFPB, *What the Access Funding Lawsuit Means for You* (last visited Feb. 21, 2025).

been distributed.[15] Similarly, Minnesota, Washington and nine other States partnered with the CFPB in a suit against a company called Prehired for deceptive marketing and debt-collection practices; Prehired agreed to void all outstanding loan agreements, and the CFPB allocated $4.3 million from the Civil Penalty Fund to compensate these victims but most, if not all, payments remain outstanding.[16] States involved in the case provided the CFPB with victim address verifications and other information in early 2025, but have not heard anything further from the CFPB regarding distribution of funds. And in another case, the CFPB brought an administrative enforcement action against a company called Tempoe that was found to have deceptively leased consumer goods to consumers who believed they were purchasing the goods; distribution of more than $192 million to the victims of this scheme only began this past October but has now abruptly stopped.[17]

The ongoing imposition of these financial losses warrants injunctive relief. *See Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes Parnell*, 915 F.3d 197, 218 (4th Cir. 2019) (where "monetary damages will be unavailable to remedy financial losses" there "is no bar to treating those losses as irreparable injury justifying preliminary relief").

### B.    State-Chartered Banks Will Be Unfairly Disadvantaged by the CFPB's Abdication of Its Supervisory Duty Over Very Large Banks.

As Jerome Powell, Chair of the Federal Reserve, recently acknowledged in his testimony to Congress, in light of the CFPB's dormancy, there is no federal regulator that is currently examining very large banks, such as JPMorgan and Wells Fargo, for their compliance with

---

[15] CFPB, *CFPB v. Access Funding, LLC* (last visited Feb. 21, 2025).

[16] CFPB, *Civil Penalty Fund* (last visited Feb. 21, 2025) (*see* drop-down category "What cases have received an allocation?"); CFPB, *CFPB and 11 States Order Prehired to Provide Students More than $30 Million in Relief for Illegal Student Lending Practices* (Nov. 20, 2023).

[17] CFPB, *CFPB v. Tempoe, LLC* (last visited Feb. 21, 2025).

consumer financial-protection laws.[18] The absence of a functioning CFPB thus creates a regulatory vacuum even greater than what existed before the Great Recession. The very large financial institutions that compete with state-chartered banks will have carte blanche to loosen their regulatory compliance and profit accordingly—to the detriment of consumers—as was seen in the years leading up to the 2008 financial crisis. Meanwhile, state-chartered banks will remain subject to state supervision for their compliance with the same laws.

Consistent supervision serves to maintain a healthy dual banking system[19] by reducing the regulatory arbitrage that results in a race to the bottom. Material differences in the relative burden posed by different regulators incentivizes banks to game the system, which harms everyday consumers.[20] And such gaming is not merely theoretical: arbitrage and the introduction of risky products by financial institutions loosely supervised for consumer protection contributed to the Great Recession, and Congress crafted the CFPB's mandates with that risk in mind. S. Rep. No. 111-176, at 10.[21] The CFPB's sudden shuttering means that there will be drastically reduced oversight of the very large banks, to the detriment of consumers. Other federal regulators are not positioned to pick up this slack because, as the Department of the Treasury had recommended in the wake of the Great Recession, Congress expressly transferred to the CFPB certain consumer-

---

[18] Reuters, *Fed's Powell: No Agency Other Than CFPB Tasked With Consumer Protection Enforcement* (Feb. 11, 2025).

[19] *See generally* Arthur E. Wilmarth, Jr., *The Expansion of State Bank Powers, the Federal Response, and the Case for Preserving the Dual Banking System*, 58 Fordham L. Rev. 1133, 1152 (1990).

[20] National Consumer Law Center, *Restore the States' Traditional Role as 'First Responder'*, at 22 (Sep. 2009).

[21] *See* John Mullin, *Shopping for Bank Regulators, Econ Focus of the Federal Reserve Bank of Richmond* (4th quarter 2019).

protection functions that had previously been dispersed among multiple federal agencies,.[22] Accordingly, the CFPB is now the only federal entity that is statutorily authorized to supervise and bring enforcement actions against national banks under federal law in connection with the abusive-practices provisions of the CFPA. States, meanwhile, are statutorily precluded from enforcing those provisions  unless and until the CFPB promulgates regulations under those provisions, *see* 12 U.S.C. §§ 5531, 5552(a)(2)(A), which it has not yet done. The CFPB's dismantling thus leaves no entity that is empowered by federal law to target abusive practices by those banks (including the nation's largest banks), effectively nullifying a crucial federal statutory protection for the nation's consumers. The resulting prospect of the States' residents being offered riskier products by unsupervised banks, and of state-chartered banks losing customers and goodwill by being undercut by now unsupervised very large banks, constitute irreparable harms that should be prevented by a preliminary injunction.

### C.    The CFPB's Failure to Fulfill Its Statutory Mandates of Supervision and Enforcement in Areas of Historic Joint Collaboration Substantially Increases the Burden on States to Protect Consumers.

Defendants' actions to dismantle the CFPB have already begun to harm the States by suddenly increasing the burden on them to protect their residents through both enforcement and supervision of the financial industry. The loss of CFPB's partnership has concrete and far-reaching implications: from collaborating on supervisory examinations, to sharing of complaints and trend data, to providing training, to partnering on joint investigations and litigations, the CFPB has been a force multiplier for States' consumer-protection efforts. Absent a preliminary injunction to prevent the sudden loss of these significant contributions, the States will be unexpectedly stretched.

---

[22] Dep't of Treasury, *Blueprint for a Modernized Financial Regulatory Structure*, at 143–46 (Mar. 2008)

Supervision. The CFPB was designed to enable States to benefit from a synergistic relationship in many areas, ensuring coverage across sectors of a sprawling financial industry and its evolving products. While the CFPB has supervisory authority over approximately 200 of the largest financial institutions in the country,[23] it shares supervisory authority with States and augments States' own supervisory efforts in a number of important ways. First, States rely on the CFPB to supervise compliance with federal consumer-protection laws by very large national banks, over which the CFPB has "exclusive authority," 12 U.S.C. § 5515(b)(1).[24] Information gleaned from this supervision is regularly shared with the States and can inform States' decisions on how to supervise and identify risk within the financial institutions under their direct supervision. Second, the CFPB and States each have supervisory authority over the largest state-chartered banks, nonbank entities offering consumer financial products such as nonbank mortgage lenders and payday lenders, and emerging markets such as digital payments. Because many States' decisions about how best to allocate resources have relied on the CFPB's role in these areas, the CFPB's sudden absence will create gaps in supervision that will be difficult to fill at all, let alone promptly.

The resulting vacuum will uniquely burden States. A number of the 200-plus very large banks over which the CFPB has supervisory authority are state-chartered banks, each with more than $10 billion in assets. The CFPB's lack of supervision of those banks will place a huge burden

---

[23] This includes banks, thrifts, and credit unions with assets over $10 billion and their affiliates. 12 U.S.C. § 5515. As of September 30, 2024, 179 depository institutions and approximately 21 depository affiliates met this criteria. *See* CFPB, *Institutions Subject to CFPB Supervisory Authority* (last visited Feb. 21, 2025).

[24] *See, e.g.,* CFPB Supervisory Highlights, Issue 37 (Winter 2024) (summarizing CFPB's recent findings that some large institutions were charging unlawful overdraft fees or engaging in other unlawful conduct that resulted multiple fees being charged to consumer bank accounts being for having insufficient funds).

on States—especially those that particularly rely on CFPB's expertise and resources—to fill the void, again with no advance notice. Notably, the shutdown has already disrupted at least one examination that had been jointly scheduled by the CFPB with several States including California, and the CFPB's continued shuttering may impact others scheduled to proceed in the foreseeable future. The CFPB's oversight of the largest state-chartered banks throughout the country also helps provide consistency in examination and allows the CFPB to monitor nationwide trends and similarities that may need to be addressed. Leaving authority entirely to individual States will hamper their ability to monitor to such trends.

Even for smaller state-chartered banks that do not fall under the CFPB's examination authority, the CFPB has provided essential resources and training to assist many States. Regular calls between the CFPB and States have helped to identify emerging issues; CFPB data and analytics have helped States identify trends. Many States also regularly refer to the CFPB's training materials and participate in CFPB-led trainings. For example, the District of Columbia regularly uses CFPB's materials in credit-repair workshops that it offers to District residents. And Illinois participates in the CFPB's in-depth trainings on the Loan Originator Compensation Requirements under the Truth in Lending Act (Regulation Z), with which mortgage licensees must comply. 12 C.F.R. Pt. 1026.

States similarly benefit from the CFPB's concurrent jurisdiction over nonbank entities offering consumer financial products. For one, the CFPB has ferreted out and deters misconduct through its oversight. Without oversight by the CFPB, many consumers obtaining credit from a nonbank mortgage loan originator will be left without key protections. The same will be true for

14

those seeking auto financing or payday loans, as well as those subject to debt collection or mortgage servicing.[25]

In addition, CFPB's coordination of multistate examinations and data collection has provided efficiency to participating States and the nonbank institutions they regulate. The CFPB has used its robust data and analytics to help States determine scope and priorities for examination, including by making training available to state agency personnel to ensure consistent and high standards. And for 2025, the coordinated multistate examination schedule has already been set. State resources have been committed on the understanding that the CFPB would supply expertise, examiners, and contribute significantly to examination planning and execution. The loss of CFPB's partnership in supervising nonbank entities and in providing nationwide market data and insight into these sectors will dramatically increase the burden on States to supervise in areas vital to both consumers and the stability of the nation's economy.

Finally, States will not have the benefit of mandated CFPB supervision of the emerging market of digital-payment providers such as PayPal, Venmo, and their large competitors, which process over $1 trillion in payments annually. In November 2024, the CFPB finalized a rule to provide federal oversight of digital-payment companies that process more than 50 million transactions annually. *Defining Larger Participants of a Market for General-Use Digital Consumer Payment Applications*, 89 Fed. Reg. 99582 (2024). The rule also seeks to protect consumer data, to strengthen protections against fraud, and to prevent scams through these digital-payment apps. With the CFPB now ceasing all activity, States will suddenly be left without a significant partner to police this fast-growing industry.

---

[25] *See, e.g.*, CFPB Supervisory Highlights, Issue 35 (Fall 2024) (summarizing results of exams of auto finance companies); CFPB Supervisory Highlights, Issue 33 (Spring 2024) (summarizing results of mortgage servicing exams).

<u>Enforcement</u>. The CFPB has exercised indispensable enforcement authority, alongside the States, over consumer financial laws and to protect consumers from unfair, deceptive, and abusive acts and practices in consumer financial markets. The shuttering of the CFPB will be extremely disruptive to ongoing litigation in which the CFPB has been an active partner. Experts who have been retained by the CFPB to assist in such ongoing litigation matters have had their contracts abruptly terminated, and States will now have to take over sole responsibility for such joint litigation. One such case is *CFPB v. StratFS, LLC*, No. 24-cv-00040 (W.D.N.Y.), in which seven States partnered with the CFPB to shut down an illegal debt-relief scheme. The States will now have to assume sole responsibility for that litigation, which remains active in both the trial and appellate courts. Meanwhile, the defendants in that case are already seeking to take advantage of the CFPB's inactivity: they have sought to have a previously entered preliminary injunction lifted on the ground that "the CFPB may still exist in theory, but it is wholly nonfunctional." (ECF No. 613 at 3.)

These responsibilities will require the States to divert resources from other crucial law-enforcement efforts. Thus, in addition to the direct harms imposed by the CFPB's absence, its absence will also have ripple effects throughout the country, to the detriment of consumers.

## **CONCLUSION**

The Court should grant plaintiffs' motion for a preliminary injunction.

Dated: February 21, 2025

Respectfully submitted,

MATTHEW J. PLATKIN
  Attorney General
    State of New Jersey
JENNIFER S. SCHIEFELBEIN
  *Assistant Attorney General*
CHANEL VAN DYKE
CLAIRE COREA
GRANT RAFFEL
  *Deputy Attorneys General*
124 Halsey Street, 5th Floor
Newark, New Jersey 07101

LETITIA JAMES
  Attorney General
    State of New York

By:  /s/ Andrea Oser
  ANDREA OSER
  The Capitol
  Albany, New York 12224
  (518) 776-2046

BRIAN L. SCHWALB
  Attorney General
    District of Columbia
CHARLES SINKS
CARA SPENCER
PAMELA DISNEY
HANNAH COLE-CHU
  *Assistant Attorneys General*
400 Sixth Street, NW
Washington, D.C. 20001

BARBARA D. UNDERWOOD
  *Solicitor General*
CHRISTOPHER M. D'ANGELO
*Chief Deputy Attorney General, Econ.*
*Justice*
ANDREA OSER
  *Deputy Solicitor General*
KARUNA B. PATEL
*Senior Counsel, Econ. Justice*
SARAH L. ROSENBLUTH
  *Assistant Solicitor General*
CHRISTOPHER L. FILBURN
*Assistant Attorney General*

17

KRISTIN K. MAYES
  Attorney General
    State of Arizona
2005 N. Central Avenue
Phoenix, Arizona 85004

ROB BONTA
  Attorney General
    State of California
1515 Clay Street
Oakland, California 94612

PHILIP J. WEISER
  Attorney General
    State of Colorado
1300 Broadway, 10th Floor
Denver, Colorado 80203

WILLIAM TONG
  Attorney General
    State of Connecticut
165 Capitol Avenue
Hartford, Connecticut 06106

KATHLEEN JENNINGS
  Attorney General
    State of Delaware
820 N. French Street
Wilmington, Delaware 19801

ANNE E. LOPEZ
  Attorney General
    State of Hawai'i
425 Queen Street
Honolulu, Hawaiʻi 96813

KWAME RAOUL
  Attorney General
    State of Illinois
115 S. LaSalle Street
Chicago, Illinois 60603

AARON M. FREY
  Attorney General
    State of Maine
6 State House Station
Augusta, Maine 04333

ANTHONY G. BROWN
  Attorney General
    State of Maryland
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21201

ANDREA JOY CAMPBELL
  Attorney General
    Commonwealth of Massachusetts
1 Ashburton Place
Boston, Massachusetts 02108

DANA NESSEL
  Attorney General
    State of Michigan
P.O. Box 30212
Lansing, Michigan 48909

KEITH ELLISON
  Attorney General
    State of Minnesota
102 State Capitol
75 Rev. Dr. Martin Luther King Jr. Blvd.
St. Paul, Minnesota 55155

AARON D. FORD
  Attorney General
    State of Nevada
100 N. Carson Street
Carson City, Nevada 89701

RAÚL TORREZ
  Attorney General
    State of New Mexico
408 Galisteo Street
Santa Fe, New Mexico 87501

JEFF JACKSON
  Attorney General
    State of North Carolina
114 W. Edenton Street
Raleigh, North Carolina 27603

DAN RAYFIELD
  Attorney General
    State of Oregon
1162 Court Street NE
Salem, Oregon 97301

PETER F. NERONHA
  Attorney General
    State of Rhode Island
150 S. Main Street
Providence, Rhode Island 02903

CHARITY R. CLARK
  Attorney General
    State of Vermont
109 State Street
Montpelier, Vermont 05609

NICHOLAS W. BROWN
  Attorney General
    State of Washington
800 Fifth Avenue, Suite 2000
Seattle, Washington 98104

JOSHUA L. KAUL
  Attorney General
    State of Wisconsin
17 W. Main Street
Madison, Wisconsin 53703