# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **NATIONAL TREASURY EMPLOYEES UNION,** *et al.,*<br><br>    *Plaintiffs*,<br><br>v.<br><br>**RUSSELL VOUGHT, in his official capacity as Acting Director of the Consumer Financial Protection Bureau,** *et al.***,**<br><br>    *Defendants*. | No. 1:25-cv-00381-ABJ |

## DEFENDANTS' OPPOSITION TO PLAINTIFFS'
## MOTION FOR A PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................ 4

I.    Statutory Background ............................................................................................ 4

II.   Factual Background ............................................................................................... 4

III.  Procedural History ................................................................................................ 6

LEGAL STANDARDS ...................................................................................................... 7

ARGUMENT ..................................................................................................................... 7

I.    Plaintiffs are Unlikely to Succeed on the Merits of Their Claims. ...................... 7

    A.    The Union's Claims are Unlikely to Succeed Because It is Improperly
        Claim Splitting and Its Members Have Already Been Denied a Preliminary
        Injunction. .................................................................................................... 7

    B.    CFPB Employee Association Has Not Established Standing and Otherwise
        Fails to Show Any Likelihood of Success in this Proceeding. ..................... 9

    C.    Plaintiffs Must Address Their Employment-Related Interests Through the
        Statutory Scheme Congress Established. ..................................................... 11

    D.    Plaintiffs' APA Claims Fail Because They Do Not Seek Judicial Review of
        a Discrete Final Agency Action. ................................................................. 14

    E.    No Equitable Cause of Action is Available to Undermine the Strictures of
        the APA. ...................................................................................................... 20

    F.    NTEU, CEA, and Pastor Steege's Interests Fall Outside the Zone of
        Interests of the CFPA. ................................................................................. 22

    G.    Plaintiffs' "Separation of Powers" Claim is Unlikely to Succeed. ........... 23

    H.    Plaintiffs' Federal Vacancies Reform Act Claim is Unlikely to Succeed. ........... 26

    I.    The CFPA Does Not Foreclose the Vought E-Mail Given That It Directs
        Staff to Continue All Actions Required by All Law, Including the CFPA ........... 28

    J.    As Part of Defendants' Ongoing Decision-Making, Defendants Have
        Made and Are Making Reasonable Judgments that are, In Any Event,
        Committed to Agency Discretion by Law .................................................. 30

II.   Plaintiffs Do Not Face Irreparable Harm Justifying Extraordinary Relief. ...................... 33

i

III.    The Equities and the Public Interest Weigh Against a Preliminary Injunction. ................ 38

IV.    Any Injunction Should Be Narrowly Tailored and Stayed. ............................................... 39

CONCLUSION ..................................................................................................................................... 40

# TABLE OF AUTHORITIES

## CASES

*Abdullah v. Obama*,
    753 F.3d 193 (D.C. Cir. 2014) ............................................................................ 7

*Air Courier Conf. of Am. v. Am. Postal Workers Union AFL-CIO*,
    498 U.S. 517 (1992) ........................................................................................... 22

*Alaska v. USDA*,
    17 F.4th 1224 (D.C. Cir. 2021) ........................................................................ 10

*Alpine Sec. Corp. v. Fin. Indus. Regul. Auth.*,
    121 F.4th 1314 (D.C. Cir. 2024),
    *filing Supreme Court application*, 24-A808 (U.S. Feb. 20, 2025) ......................... 14

*Am. Bioscience, Inc. v. Thompson*,
    269 F.3d 1077 (D.C. Cir. 2001) ........................................................................ 17

*Am. Chemistry Council v. Dep't of Transp.*,
    468 F.3d 810 (D.C. Cir. 2006) ......................................................................... 36

*Am. Fed. of Gov't Emps. TSA Local 1 v. Hawley*,
    481 F. Supp. 2d 72 (D.D.C. 2006) ................................................................... 22

*Am. Fed'n of Gov't Emps., AFL-CIO v. Trump ("AFGE")*,
    929 F.3d 748 (D.C. Cir. 2019) ........................................................... 11, 12, 13, 14

*Am. Horse Prot. Ass'n v. Lyng*,
    812 F.2d 1 (D.C. Cir. 1987) .............................................................................. 30

*Appalachian Energy Grp. v. EPA*,
    33 F.3d 319 (4th Cir. 1994) .............................................................................. 18

*Arch Coal, Inc. v. Acosta*,
    888 F.3d 493 (D.C. Cir. 2018) ......................................................................... 12

*Armstrong v. Exceptional Child Ctr. Inc.*,
    575 U.S. 320 (2015) ...................................................................................... 20, 21

*Axon Enter., Inc. v. FTC*,
    598 U.S. 175 (2023) .......................................................................................... 14

*Ayele v. Dist. of Columbia*,
    704 F. Supp. 3d 231 (D.D.C. 2023) ................................................................. 34

*Bd. of Governors of Fed. Reserv. Sys. v. MCorp. Fin., Inc.*,
  502 U.S. 32 (1991) ............................................................................................... 21

*Bennett v. Spear*,
  520 U.S. 154 (1997) ..................................................................................... 17, 18

*Biden v. Texas*,
  597 U.S. 785 (2022) ............................................................................................ 18

*Bongiovanni v. Austin*,
  Case No. 3:22-cv-237, 2022 WL 1642158 (M.D. Fla. May 24, 2022) ...................... 9

*Bowles v. Russell*,
  551 U.S. 205 (2007) ............................................................................................ 11

*Bureau of Alcohol, Tobacco & Firearms v. FLRA*,
  464 U.S. 89 (1983) .............................................................................................. 13

*Cal. Ass'n of Priv. Postsecondary Schs. v. Devos*,
  344 F. Supp. 3d 158 (D.D.C. 2018) ...................................................................... 35

*Cal. Cmtys. Against Toxics v. EPA*,
  934 F.3d 627 (D.C. Cir. 2019) ............................................................................. 19

*Califano v. Yamasaki*,
  442 U.S. 682 (1979) ............................................................................................ 40

*California v. Texas*,
  593 U.S. 659 (2021) .............................................................................................. 9

*Canonsburg Gen. Hosp. v. Burwell*,
  807 F.3d 295 (D.C. Cir. 2015) ............................................................................... 9

*Chaplaincy of Full Gospel Churches v. England*,
  454 F.3d 290 (D.C. Cir. 2006) ....................................................................... 33, 34

*Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp.*,
  333 U.S. 103 (1948) ..................................................................................... 19, 26

*City of New York v. U.S. Dep't of Def.*,
  913 F.3d 423 (4th Cir. 2019) .............................................................................. 19

*City of Olmsted Falls v. FAA*,
  292 F.3d 261 (D.C. Cir. 2002) ............................................................................. 31

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013) ..................................................................................... 34, 35

*Coal. for Competitive Elec., Dynegy, Inc. v. Zibelman,*
  272 F. Supp. 3d 554 (S.D.N.Y. 2017) ............................................................. 21

*Cobell v. Kempthorne,*
  455 F.3d 301 (D.C. Cir. 2006) .............................................................. 15, 20

*Council of & for the Blind of Del. Cnty. Valley, Inc. v. Regan,*
  709 F.2d 1521 (D.C. Cir. 1983) .............................................................. 22

*Cousins v. Sec'y of the U.S. Dep't of Transp.,*
  880 F.2d 603 (1st Cir. 1989) .............................................................. 17

*Ctr. for Law and Educ. v. Dep't of Educ.,*
  396 F.3d 1152 (D.C. Cir. 2005) .............................................................. 38

*DaimlerChrysler v. Cuno,*
  547 U.S. 332 (2006) .............................................................. 9

*Dalton v. Specter,*
  511 U.S. 462 (1994) .............................................................. 23, 24, 25

*Drake v. FAA,*
  291 F.3d 59 (D.C. Cir. 2002) .............................................................. 32

*Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity,*
  878 F.3d 371 (D.C. Cir. 2017) .............................................................. 10, 37

*Elgin v. Dep't of Treasury,*
  567 U.S. 1 (2012) .............................................................. 12

*EPA v. Brown,*
  431 U.S. 99 (1977) .............................................................. 18, 29

*Equal Means Equal v. Ferriero,*
  3 F.4th 24 (1st Cir. 2021) .............................................................. 38

*Equal Rights Ctr. v. Post Properties, Inc.,*
  633 F.3d 1136 (D.C. Cir. 2011) .............................................................. 37

*Farris v. Rice,*
  453 F. Supp. 2d 76 (D.D.C. 2006) .............................................................. 34

*FCC v. Prometheus Radio Project,*
  592 U.S. 414 (2021) .............................................................. 30

*FDA v. All. for Hippocratic Medicine,*
  602 U.S. 367 (2024) .............................................................. 38

v

*Federal Express Corp. v. U.S. Dep't of Commerce*,
   39 F.4th 756 (D.C. Cir. 2022) ............................................................................... 20, 24

*Fla. Power & Light Co. v. Lorion*,
   470 U.S. 729 (1985).................................................................................................... 33

*Food & Water Watch, Inc. v. Vilsack*,
   808 F.3d 905 (D.C. Cir. 2015)................................................................................... 38

*Fornaro v. James*,
   416 F.3d 63 (D.C. Cir. 2005)...................................................................................... 12

*FTC v. Standard Oil Co. of Cal.*,
   449 U.S. 232 (1980)................................................................................ 14, 19, 35, 36

*Ghaly v. USDA*,
   228 F. Supp. 2d 283 (S.D.N.Y. 2002) ....................................................................... 13

*Graham v. Ashcroft*,
   358 F.3d 931 (D.C. Cir. 2004)...........................................................................11, 12, 13

*Gulf Oil Corp. v. Brock*,
   778 F.2d 834 (D.C. Cir. 1985).................................................................................... 39

*Havens Realty Corp. v. Coleman*,
   455 U.S. 363 (1982)........................................................................................ 35, 37, 38

*Heckler v. Chaney*,
   470 U.S. 821 (1985)........................................................................... 24, 25, 33, 39

*Hudson v. Am. Fed'n of Gov't Emps.*,
   308 F. Supp. 3d 388 (D.D.C. 2018) ............................................................................ 8

*Hunt v. Wash. State Apple Advert. Comm'n*,
   432 U.S. 333 (1977).................................................................................................... 36

*I.A.M. Nat'l Pension Fund Benefit Plan A v. Cooper Indus., Inc.*,
   789 F.2d 21 (D.C. Cir. 1986)...................................................................................... 36

*Indep. Equip. Dealers Ass'n v. EPA*,
   372 F.3d 420 (D.C. Cir. 2004)................................................................................... 19

*In re James R. Jones, House of Representatives*,
   B-203057 L/M, 1981 WL 23385 (Comp. Gen. Sept. 15, 1981) ............................. 25

*Jarkesy v. SEC*,
   803 F.3d 9 (D.C. Cir. 2015)........................................................................................ 13

*Katz v. Gerardi*,
  655 F.3d 1212 (10th Cir. 2011) ...................................................................... 8

*Keep Chi. Livable v. City of Chi.*,
  913 F.3d 618 (7th Cir. 2019) ........................................................................ 38

*Kim v. FINRA*,
  698 F. Supp. 3d 147 (D.D.C. 2023),
  *appeal dismissed by* No 23-7136, 2025 WL 313965 (D.C. Cir. Jan. 27, 2025)................. 38, 39

*League of Women Voters of the United States v. Newby*,
  838 F.3d 1 (D.C. Cir. 2016) .......................................................................... 35

*Lincoln v. Vigil*,
  508 U.S. 191 (1993) ......................................................................... 30, 32, 33

*Lujan v. Nat'l Wildlife Fed'n*,
  497 U.S. 871 (1990) ............................................................................. *passim*

*Lujan v. Def. of Wildlife*,
  504 U.S. 555 (1992) .................................................................................. 25

*M.M.M. on behalf of J.M.A. v. Sessions*,
  319 F. Supp. 3d 290 (D.D.C. 2018) ................................................................. 10

*Marbury v. Madison*,
  5 U.S. (1 Cranch) 137 (1803) ........................................................................ 25

*Maryland v. King*,
  567 U.S. 1301 (2012) ................................................................................ 39

*Mazurek v. Armstrong*,
  520 U.S. 968 (1997) ................................................................................... 7

*Mississippi v. Johnson*,
  71 U.S. (4 Wall.) 475 (1867) ......................................................................... 25

*N.Y.C. Transit Auth. v. Beazer*,
  440 U.S. 568 (1979) .................................................................................. 24

*Nat'l Ass'n of Home Builders v. EPA*,
  682 F.3d 1032 (D.C. Cir. 2012) ...................................................................... 31

*Nat'l Council of Agric. Emps. v. U.S. Dep't of Lab.*,
  Civ. Action No. 22-2569, 2023 WL 2043149 (D.D.C. Feb. 16, 2023) ........................... 35, 37

*Nken v. Holder*,
   556 U.S. 418 (2009) ........................................................................................ 38

*Norton v. S. Utah Wilderness All. ("SUWA")*,
   542 U.S. 55 (2004) ................................................................................... 14, 16

*NTEU v. Trump*,
   --- F. Supp. 3d ---, 2025 WL 561080 (D.D.C. Feb. 20, 2025) ....................... 3, 8

*Nyunt v. Chairman, Broad. Bd. of Governors*,
   589 F.3d 445 (D.C. Cir. 2009) ............................................................... 20, 24

*Petroleum Expl. v. Pub. Serv. Comm'n of Ky.*,
   304 U.S. 209 (1938) ........................................................................................ 36

*Preserve Endangered Areas of Cobb's History, Inc. v. U.S. Army Corps of Eng'rs*,
   87 F.3d 1242 (11th Cir. 1996) ........................................................................ 17

*Puerto Rico v. United States*,
   490 F.3d 50 (1st Cir. 2007) ..................................................................... 20, 21

*Racing Enthusiasts & Suppliers Coal. v. EPA*,
   45 F.4th 353 (D.C. Cir. 2022) ........................................................................ 19

*Ranchers-Cattlemen Action Legal Fund, United Stockgrowers of Am. v. USDA*,
   573 F. Supp. 3d 324 (D.D.C. 2021) ............................................................... 37

*Sampson v. Murray*,
   415 U.S. 61 (1974) ......................................................................................... 34

*SEC v. Chenery Corp.*,
   332 U.S. 194 (1947) ........................................................................................ 32

*Seila L. LLC v. CFPB*,
   591 U.S. 197 (2020) ........................................................................................ 26

*Sherley v. Sebelius*,
   689 F.3d 776 (D.C. Cir. 2012) ....................................................................... 28

*Sierra Club v. Costle*,
   657 F.2d 298 (D.C. Cir. 1981) ....................................................................... 28

*Sierra Club v. Morton*,
   405 U.S. 727 (1972) ........................................................................................ 38

*Stark v. Starr*,
   94 U.S. (4 Otto) 477 (1876) .............................................................................. 8

*Summers v. Earth Island Inst.*,
    555 U.S. 488 (2009) .................................................................................. 36

*Thunder Basin Coal Co. v. Reich*,
    510 U.S. 200 (1994) .................................................................................. 12

*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021) .................................................................................... 9

*United States v. Fausto*,
    484 U.S. 439 (1988) .............................................................................. 12, 13

*United States v. Nixon*,
    418 U.S. 683 (1974) .................................................................................. 24

*Vanover v. NCO Fin. Servs., Inc.*,
    857 F.3d 833 (11th Cir. 2017) .................................................................... 8

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*,
    435 U.S. 519 (1978) ........................................................................ 31, 32, 33

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ................................................................................... 7, 35

*Wis. Gas Co. v. Fed. Regul. Comm'n*,
    758 F.2d 669 (D.C. Cir. 1985) .......................................................... 33, 34, 35

*Women's Equity Action League v. Cavazos*,
    906 F.2d 742 (D.C. Cir. 1990) .................................................................. 22

*Wong Yang Sung v. McGrath*,
    339 U.S. 33 (1950) .................................................................................... 21

**CONSTITUTION**

U.S. Const. art. II, § 3 ...................................................................................... 24

**STATUTES**

5 U.S.C. § 701 .................................................................................................. 32

5 U.S.C. § 704 ........................................................................................... 17, 18

5 U.S.C. § 706 ............................................................................... 6, 7, 17, 21

5 U.S.C. § 3345 .......................................................................................... 26, 27

5 U.S.C. § 3347 ................................................................................... 27

5 U.S.C. § 5511 ................................................................................... 22

5 U.S.C. § 7105 ................................................................................... 13

5 U.S.C. § 7123 ................................................................................... 13

5 U.S.C. § 7703 .............................................................................. 12, 13

12 U.S.C. § 5493 ................................................................................. 30

12 U.S.C. § 5497 ........................................................................... 16, 39

12 U.S.C. § 5511 ................................................................................... 4

12 U.S.C. § 5535 ................................................................................. 23

20 U.S.C. § 1018 ................................................................................. 38

28 U.S.C. § 1331 ..................................................................................11

Pub. L. No. 111-203, Tit. X, 124 Stat. 1376, 1955 ........................... 4

**RULES**

Fed. R. Civ. P. 21 ................................................................................. 10

Fed. R. Civ. P. 65(d)(1)(C) ................................................................. 39

Local Civil Rule 40.5 .......................................................................... 10

**REGULATIONS**

58 Fed. Reg. 6074 (Jan. 25, 1993) ................................................. 1, 30

66 Fed. Reg. 7702 (Jan. 24, 2001) ................................................. 1, 30

74 Fed. Reg. 4435 (Jan. 26, 2009) ................................................. 1, 30

82 Fed. Reg. 8346 (Jan. 24, 2017) ................................................. 1, 30

86 Fed. Reg. 7424 (Jan. 28, 2021) ................................................. 1, 30

90 Fed. Reg. 8249 (Jan. 20, 2025) ................................................. 1, 31

## OTHER AUTHORITIES

33 Charles A. Wright & Arthur R. Miller,
Fed. Prac. & Proc. Judicial Review § 8307 (2d ed. 2024 update) ...................................... 20, 21

CFPB, Student loan forgiveness,
https://www.consumerfinance.gov/paying-for-college/student-loan-forgiveness/#public-service-loan-forgiveness-(pslf) .................................................................................. 23

*Designating an Acting Director of the Bureau of Consumer Financial Protection*,
41 Op. O.L.C. 99 (2017) ....................................................................................................... 27

*Designating an Acting Att'y Gen.*,
42 Op. O.L.C. 182 (2018) ................................................................................................. 27, 28

Fed. Student Aid, An Office of the U.S. Dep't of Educ.: Help, https://studentaid.gov/help-center/answers/article/are-private-education-loans-eligible-for-pslf ....................................... 23

*Guidance on Application of Federal Vacancies Reform Act of 1998*,
23 Op. O.L.C. 60, 61 (1999) ................................................................................................. 27

Homeland Security & Governmental Affairs, Media/Majority News (Thursday, Feb. 6, 2025),
https://www.hsgac.senate.gov/media/reps/dr-paul-releases-statement-on-senate-confirmation-of-russell-vought-to-be-director-of-the-office-of-management-and-budget/
https://www.hsgac.senate.gov/media/reps/dr-paul-releases-statement-on-senate-confirmation-of-russell-vought-to-be-director-of-the-office-of-management-and-budget/ .......................... 27

*Nomination Hearing, Before the Comm. on Banking, Housing, & Urban Affairs*,
119th Cong. (Feb. 27, 2025),
https://www.banking.senate.gov/hearings/02/20/2025/nomination-hearing ............................. 2

**INTRODUCTION**

Incoming Presidents of both parties have routinely issued directives that pause policy-related decision-making to allow the reevaluation of those policies that were under consideration or under development but not finalized by the prior administration.[1]  Consistent with this practice, on January 20, 2025, President Trump ordered agencies across the government to freeze regulatory actions so that new agency leadership may reevaluate policies and enforcement priorities.  The White House, *Regulatory Freeze Pending Review*, 90 Fed. Reg. 8249 (Jan. 20, 2025).

In line with these principles, on February 8, 2025, Russell Vought, Acting Director of the Consumer Financial Protection Bureau ("CFPB"), e-mailed all CFPB staff to direct that, unless "required by law" or "expressly approved by the Acting Director," staff were not to take substantive actions that might reflect policy decisions inconsistent with new leadership's views on the best way to meet the agency's statutory responsibilities.  ECF No. 23-2.  As Acting Director Vought explained, he was "committed to implementing the President's policies, consistent with the law, and acting as a faithful steward of the Bureau's resources."  *Id.*

After this directive, Plaintiffs—two CFPB employee organizations, three consumer advocacy organizations, and an individual who has a meeting scheduled with CFPB staff regarding a program administered by the Department of Education—filed the present motion.  They seek injunctive relief that is breathtaking in scope.  That relief would essentially place the CFPB in a judicially managed receivership, with its day-to-day decision-making across a universe of issues superintended by the Court, rather than by the officer designated by the President.

---

[1] *E.g.*, Office of Management & Budget ("OMB"), *Memorandum for the Heads of Executive Departments & Agencies*, 86 Fed. Reg. 7424 (Jan. 28, 2021) (memorandum from President Biden's Chief of Staff); OMB, *Memorandum for the Heads of Executive Departments & Agencies,: Regulatory Freeze Pending Review*, 82 Fed. Reg. 8346 (Jan. 24, 2017) (memorandum from President Trump's Chief of Staff); The White House Office, *Memorandum for the Heads of Executive Departments & Agencies*,74 Fed. Reg. 4435 (Jan. 26, 2009) (memorandum from President Obama's Chief of Staff); 66 Fed. Reg. 7,702 (Jan. 24, 2001) (memorandum from President Bush's Chief of Staff); OMB, Regulatory Review, 58 Fed. Reg. 6074 (Jan. 25, 1993) (memorandum from Director of OMB).

In addition to petitioning this Court, CFPB employees have taken to the streets to protest any change in CFPB policy priorities.  Declaration of Adam Martinez ("Martinez Decl.") ¶¶ 7-16, attached as Exhibit ("Ex.") 1.  Those protests involve large and disruptive gatherings outside of the CFPB Headquarters building, even though the overwhelming majority of CFPB employees primarily telework rather than work in the office.  *Id.* ¶¶ 8, 15, 17.  Given these disruptive protests involving the CFPB's own staff, CFPB leadership has closed the CFPB Headquarters Building and tightened staff supervision, making sure that they are focused only on aspects of the mission that are, in fact, urgently required by law, as determined by the Chief Legal Officer.  Martinez Decl. Exs. E, F.  Under this internal procedure, work requests have been approved to allow the CFPB to maintain its statutory obligations.  Martinez Decl. ¶ 21.

Remarkably, the CFPB employee groups and other Plaintiffs now spin these actions and others as being part of a "coordinated campaign by the new administration to eliminate the" CFPB. Mem. in Supp. of Pl.'s Mot. for Limited Administrative Stay & TRO, ("PI Mot.") at 1, ECF No. 14.  But President Trump has nominated Jonathan McKernan—currently a Board Member of the Federal Deposit Insurance Corporation—to be the new CFPB Director, and the Senate Banking Committee will hold a hearing on his nomination this week[2]—actions that are inconsistent with Plaintiffs' view of current events.  Similarly, as Acting Director Vought noted in a letter to the Federal Reserve, the "Bureau's new leadership will run a substantially more streamlined and efficient bureau[.]"  Martinez Decl. Ex. G.  The predicate to running a "more streamlined and efficient bureau" is that there will continue to be a CFPB.  *See id.*

In all events, Plaintiffs fail to satisfy any of the criteria for a preliminary injunction.  First, they fail to establish a likelihood of success on the merits of their claims.  Because Plaintiff National Treasury Employees Union ("NTEU") has filed a separate lawsuit against Acting Director Vought seeking to preclude essentially the same adverse employment actions that it seeks to preclude here, it is improperly claim-splitting.  Indeed, Judge Cooper has denied NTEU's motion

---

[2] *Nomination Hearing, Before the Comm. on Banking, Housing, & Urban Affairs*, 119th Cong. (Feb. 27, 2025), https://www.banking.senate.gov/hearings/02/20/2025/nomination-hearing

to preliminarily enjoin Acting Director Vought from taking adverse employment actions because its claims must be brought before the Federal Labor Relations Authority ("FLRA"). *NTEU v. Trump*, --- F. Supp. 3d ---, 2025 WL 561080 (D.D.C. Feb. 20, 2025). That same reasoning applies to all the employment-related claims in this suit. But this case provides no basis for this Court to reconsider Judge Cooper's analysis. Issue preclusion and comity principles preclude NTEU from taking a mulligan and seeking an inappropriate do-over before a new judge.

Plaintiffs are also unlikely to succeed because the claims they frame in their memorandum and their Amended Complaint are for precisely the type of wholesale supervision of agency management by court decree, as opposed to judicial review of a circumscribed and discrete agency action, that the Supreme Court has held the Administrative Procedure Act ("APA") does not allow—even in the face of allegations of "rampant" violations of law. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990). And Plaintiffs cannot sidestep the traditional case-by-case approach involving review of discrete agency actions by invoking equitable causes of action.

Even putting aside these threshold flaws, Plaintiffs' claims still fail. Their claims that the agency is flouting statutory obligations—whether as framed in Count One or Three of the Amended Complaint—are baseless. Acting Director Vought's pause does not apply to agency activities "required by law[.]" Martinez Decl. Ex. D. And CPFB leadership remains committed to having CFPB perform its statutory obligations. *Id.* ¶ 19-23. Contrary to Plaintiffs' claims, Vought's designation as Acting Director is consistent with the Federal Vacancies Reform Act. And the Court should not substitute Plaintiffs' judgment for that of CFPB's properly designated officers regarding agency management. Nor are Defendants proceeding outside the zone of reasonableness permitted by the APA. Again, their actions are consistent with a longstanding tradition in which agencies reevaluate policies upon the commencement of a new administration. And agency decisions reflecting the ordering of its priorities are committed to agency discretion by law.

Finally, any finding of irreparable harm justifying an injunction would be misplaced. Although Plaintiffs argue that they will suffer irreparable harm if Defendants fail to carry out their statutory obligations, those fears are belied by the record. And because the public has an interest

in ensuring that an agency can carry out its statutory duties in line with the policy priorities of the democratically elected administration, the public interest and balance of the equities tip in Defendants' favor. As such, Plaintiffs have not established the criteria necessary for this Court to enter the extraordinary remedy of a preliminary injunction—especially this one.

## BACKGROUND

### I. Statutory Background

The Bureau was established as part of the Federal Reserve System by the Consumer Financial Protection Act of 2010 ("CFPA"), Pub. L. No. 111-203, Tit. X, 124 Stat. 1376, 1955. The Bureau is charged with implementing the federal consumer financial laws, principally for purposes of ensuring "consumers are protected from unfair, deceptive, or abusive acts and practices[.]" 12 U.S.C. § 5511.

### II. Factual Background

After a brief period when Secretary of the Treasury Scott Bessent served as Acting Director of the CFPB, on February 7, 2025, President Trump designated Russell Vought to be the agency's Acting Director. Martinez Decl. ¶¶ 2, 10. Consistent with the Trump Administration's goals of reducing wasteful spending and streamlining efficiencies in the federal government, Acting Director Vought reviewed the sums available to the Bureau and sent a letter to the Federal Reserve on February 8, 2025, stating that CFPB would be requesting $0 for the Third Quarter of Fiscal Year 2025, having determined that the hundreds of millions of dollars in existing funds are sufficient to support the agency's operations and indeed that the current balance of funds are "more than sufficient—and are, in fact, excessive—to carry out" CFPB's duties. Martinez Decl. Ex. G. In the final paragraph of the Letter, Acting Director Vought stated that "[t]he Bureau's new leadership will run a substantially more streamlined and efficient bureau[.]" *Id*.

Later that evening, Acting Director Vought sent an e-mail to CFPB staff. *Id*. Ex. D. The e-mail directed that employees, contractors, and other personnel of the Bureau temporarily pause certain activities "unless expressly approved by the Acting Director or required by law[.]" *Id*. As reflected in that email, Acting Director Vought and others in agency leadership were, and continue

to be, engaged in ongoing decision-making to assess how to make the Bureau more efficient and accountable. *Id*. ¶¶ 11, 19.

Acting Director Vought's arrival at CFPB coincided with a series of episodes of an extraordinary and disruptive nature. First, on Friday, February 7, 2025, a CFPB employee disrupted a meeting between CFPB management and United States DOGE Service ("USDS") personnel. *Id*. ¶ 7. Later that day, CFPB employees began a protest outside of CFPB Headquarters. *Id*. ¶ 8. Several protestors followed and questioned other CFPB staff members, making them feel harassed. *Id*.

After the events of Friday, February 7, 2025, CFPB leadership decided to close the CFPB Headquarters Building for the week of February 10, 2025. *Id*. ¶ 12. Employees and contractors were expected to work remotely unless instructed otherwise by agency leadership. *Id*. And on the morning of Monday, February 10, 2025, Acting Director Vought sent another e-mail to CFPB staff. *Id*. ¶ 14. The e-mail instructed CFPB staff focus only on "urgent matters" as approved by the agency's Chief Legal Officer. *Id*. Ex. F.

Meanwhile, the protests continued on February 9, growing to a protest of hundreds of people outside CFPB headquarters by the afternoon of February 10. *Id*. ¶¶ 13, 15.

Despite these challenges, CFPB leadership has worked to ensure that the agency complies with statutorily required functions. *Id*. ¶¶ 19-23. The building's closure, which has continued to the present day,[3] has not prevented the CFPB from performing statutorily required functions given CFPB's capacity to perform its functions remotely. *Id*. ¶ 17.

Nor has Acting Director Vought's e-mail dated February 10, 2025, which requires staff to focus only on "urgent matters" as approved by the agency's Chief Legal Officer, prevented the

---

[3] As part of this Administration's focus on a more streamlined CFPB, the Bureau has determined that it does not need its footprint associated with its current office space and has decided to cancel the lease for its headquarters building. Martinez Decl. ¶ 18. As of this date, however, the cancelation of the lease has not been fully executed. *Id*. After the cancelation of the lease, CFPB will have thirty days to move out. *Id*. The Bureau, in consultation with USDS, will evaluate options for alternative office space once the Bureau has ascertained the amount of office space it will need to carry out its more streamlined operations, such as those required by statute

agency from performing its statutory functions. *Id.* ¶¶ 14, 21. For example, the agency has maintained operation of CFPB's call centers and the agency has continued to process payments through the Civil Penalty Fund. *Id.* ¶ 21. Operations related to the Consumer Complaint Database are continuing. *Id.* ¶ 22. Contracts for work related to the Consumer Complaint Database have remained intact and operational. *Id.* The Bureau is providing information technology and technical assistance to enable filers to submit data as required by the Home Mortgage Disclosure Act. *Id.* ¶ 23. Indeed, the agency's Chief Operating Officer attests that he has never had a work request denied. *Id.* ¶ 22.

## III. Procedural History

Plaintiffs filed a Complaint on February 9, 2025. ECF No. 1. On February 13, 2025, Plaintiffs filed an Amended Complaint seeking declaratory relief at the broadest level of generality; namely, that the "suspension of CFPB's statutorily mandated activities [is] unlawful[.]" Am. Compl.; Prayer for Relief ¶ A, ECF No. 7. They ask the Court to declare unlawful and set aside actions "including," and presumably not limited to, "issuance of stop-work instructions, cancellation of contracts, declining and returning funding, reductions in force, firing of employees, and termination of the lease for its headquarters[.]" *Id.* ¶ B.

The Amended Complaint includes four counts. In Count One, Plaintiffs seek equitable non-statutory *ultra vires* review of Defendants alleged "actions to eliminate the CFPB[.]" *Id.* ¶ 80. *See id.* ¶¶ 75-80. In Count Two, Plaintiffs claim that Acting Director Vought's designation violates the Federal Vacancies Reform Act, and seek review under a non-statutory equitable cause of action. *Id.* ¶¶ 81-89. Counts Three and Four invoke the APA. *Id.* ¶¶ 90-96. In Count Three, Plaintiffs claim that Defendants lack "statutory authority to require CFPB to cease work on the activities it is statutorily required to perform" and have thus violated 5 U.S.C. § 706(2)(C). *Id.* ¶ 92. In Count Four, Plaintiffs claim that "Defendants' actions and intended further action to

---

and those for which physical office space is necessary. *Id.* In the meantime, and due to the unique circumstances involved, CFPB employees performing necessary operations will be permitted to telecommute, to the extent feasible if office space is not available. *Id.*

suspend or terminate CFPB's statutorily mandated activities and to return the funding that the CFPB needs to sustain its operations" violate 5 U.S.C. § 706(2)(A).  *Id*. ¶ 94.

Later on February 13, Plaintiffs filed a motion for temporary restraining order and administrative stay.  ECF No. 10.  On February 14, Plaintiffs filed a memorandum in support of that motion.  ECF No. 14.  Upon agreement of the parties and following a scheduling conference, the Court issued an order converting Plaintiffs' motion for a temporary restraining order into a motion for a preliminary injunction.  ECF No. 19.  The Court's order also memorialized Defendants' agreement that, until the Court rules on Plaintiffs' motion for a preliminary injunction, CFPB will not destroy certain records, will not terminate CFPB employees except for cause, and will not transfer CFPB's reserve funds.  *See id*.  A preliminary injunction hearing is set for March 3, 2025.  *Id*.

**LEGAL STANDARDS**

"A preliminary injunction is an extraordinary remedy never awarded as of right."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Plaintiffs must "*by a clear showing*" establish that (1) they have a substantial likelihood of success on the merits; (2) they will suffer irreparable harm without an injunction; (3) the balance of equities tips in their favor; and (4) preliminary relief serves the public interest. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997); *Abdullah v. Obama*, 753 F.3d 193, 197 (D.C. Cir. 2014).

**ARGUMENT**

**I.    Plaintiffs are Unlikely to Succeed on the Merits of Their Claims.**

Plaintiffs cannot show they are likely to succeed on the merits of their claims, which have both threshold and substantive flaws.

**A. The Union's Claims are Unlikely to Succeed Because It is Improperly Claim Splitting and Its Members Have Already Been Denied a Preliminary Injunction.**

NTEU has no likelihood of success on its claims because it has already sued Acting Director Vought, in his capacity as Acting CFPB director, in another case that it brought "to protect the workers [it] represent[s] from the Executive Branch's . . . firings of hundreds of thousands of

7

employees," Am. Compl., *NTEU v. Trump*, No. 1:25-cv-00420-CRC (D.D.C. Feb. 17, 2025), ECF No. 13, and where it has already been denied a motion for a preliminary injunction on the same grounds that apply here, *NTEU v. Trump*, 2025 WL 561080.  The claim-splitting doctrine ensures that a plaintiff may not "split up his demand and prosecute it by piecemeal, or present only a portion of the grounds upon which special relief is sought, and leave the rest to be presented in a second suit, if the first fail[s]."  *Stark v. Starr*, 94 U.S. (4 Otto) 477, 485 (1876).  *See Vanover v. NCO Fin. Servs., Inc.*, 857 F.3d 833 (11th Cir. 2017); *Katz v. Gerardi*, 655 F.3d 1212, 1218-19 (10th Cir. 2011); *Hudson v. Am. Fed'n of Gov't Emps.*, 308 F. Supp. 3d 388, 394 (D.D.C. 2018).  That is exactly what NTEU has done here.  Claim-splitting requires an analysis of "(1) whether the case involves the same parties and their privies, and (2) whether separate cases arise from the same transaction or series of transactions."  *Vanover*, 857 F.3d at 841-42.  The claim-splitting factors are readily met.

First, overlapping parties are involved in both cases.  *See id*.  NTEU is proceeding on behalf of the same CFPB workers in both this case and in *NTEU v. Trump*.  *Compare*, Am. Compl. ¶¶ 13, 64, *with*, Am. Compl. ¶¶ 13, 47, 52, *NTEU v. Trump*.  Both cases name Russell Vought in his official capacity as Acting Director of the CFPB as a Defendant.  *Compare*, Am. Compl., *with*, Am. Compl., *NTEU v. Trump*.

Turning to the second prong, the claims in both actions are for essentially the same prospective labor-related relief.  Here, NTEU seeks declaratory and equitable relief to preclude Acting Director Vought from issuing "stop work instructions, . . . reductions in force, [and] firing of employees."  Am. Compl., Prayer for Relief.  In *NTEU v. Trump*, NTEU seeks declaratory or injunctive relief to preclude Acting Director Vought from "mass firing of . . . employees[;]" from implementing a "directive to terminate probationary employees;" and from violating "the [Reduction in Force] statute and regulations[.]"  Am. Compl., Prayer for Relief, *NTEU v. Trump*. And it bases its claims for relief on alleged facts at CFPB that are also at issue here.  *Id*. ¶¶ 52, 60. "It is irrelevant if [NTEU] 'seeks relief on different legal theories in the two cases[.]'"  *Hudson*, 308 F. Supp. 3d at 394 (citation omitted).  But the legal theories are, nonetheless, substantially

overlapping. *Compare* Am. Compl. ¶¶ 75-80, 90-92 (vaguely alleging that Acting Director Vought's actions are *ultra vires* and that they violate the APA), *and* PI Mot. at 21-23, 29 (arguing that Acting Director Vought has violated separation of powers principles and that "the agency has not followed applicable regulations" addressing reductions-in-force when making employment decisions), *with* Am. Compl. ¶¶ 87-99, *NTEU v. Trump* (pleading two counts: a "separation of powers principles" claim and an APA claim challenging employment termination decisions as contrary to reduction-in-force regulations).

Even if the claim-splitting doctrine does not apply, the Court should not render Judge Cooper's adjudication of NTEU's request for preliminary injunction against Acting Director Vought meaningless by re-adjudicating the same issues that he has already decided. Whether as a matter of issue preclusion, *see Canonsburg Gen. Hosp. v. Burwell*, 807 F.3d 295, 301 (D.C. Cir. 2015), or, at the least, "as a matter of 'good sense and wise judicial practice,'" the Court should not condone "inappropriate 'do-overs' with a new judge," *Bongiovanni v. Austin*, Case No. 3:22-cv-237, 2022 WL 1642158, at *14 (M.D. Fla. May 24, 2022) (citation omitted). At a minimum, Judge Cooper's opinion precludes the Court from preliminarily enjoining Defendants from taking essentially the same actions against NTEU members that were in the scope of the preliminary injunction that NTEU had requested against Acting Director Vought in *NTEU v. Trump*, No. 1:25-cv-00420 (CRC) (D.D.C.).

### B. CFPB Employee Association Has Not Established Standing and Otherwise Fails to Show Any Likelihood of Success in this Proceeding.

Plaintiff CFPB Employee Association ("CEA") has not demonstrated Article III standing to enjoin Defendants from making employment-related decisions. "A plaintiff has standing only if he can 'allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief.'" *California v. Texas*, 593 U.S. 659, 668-89 (2021) (quoting *DaimlerChrysler v. Cuno*, 547 U.S. 332, 342 (2006)). "[S]tanding is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they seek to press[.]" *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021). To succeed on CEA's motion for a

preliminary injunction, it must demonstrate standing "under the heightened standard for evaluating a motion for summary judgment." *Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 377 (D.C. Cir. 2017). But beyond mere allegations, the record is "completely silent on what injury, if any, [CEA] suffers" due to the challenged conduct, much less whether any such injury is likely to be redressed by the requested relief. *See Alaska v. USDA*, 17 F.4th 1224, 1230 (D.C. Cir. 2021).

Even if CEA had standing to pursue its claims, it fails to show a likelihood of success on the merits in this case because its employment-related claims should be severed, marked as related to NTEU's claims against Acting Director Vought in *NTEU v. Trump*, and assigned to the same judge. Under Fed. R. Civ. P. 21, this Court may "drop a party." And it "may also sever any claim against a party."[4] CEA's employment-related claims against Acting Director Vought, once severed, should be "deemed related" to NTEU's claims in *NTEU v. Trump* under Local Civil Rule 40.5 because they involve common issues of fact and grow out of the same event or transaction. *See supra* at 7-9. Consider the practical consequences of failure to sever and then relate these claims. It is far from clear whether CEA has members and, if so, the extent to which those members overlap with NTEU's members. But even if some CEA members are not NTEU members, "[s]everance and transfer will advance the goals of judicial economy and the orderly and efficient resolution of disputes." *M.M.M.*, 319 F. Supp. 3d at 297. Apart from obvious judicial economy considerations, it would be the antithesis of "orderly and efficient[,]" *id*. at 295, to contemplate preliminarily enjoining Defendants from taking the same employment actions against CEA members that, under Judge Cooper's ruling, Defendants may take against NTEU members. Granting CEA members an immediate injunction would result an irrational dichotomy among CFPB workers—those who are non-NTEU CEA members protected by this Court's injunction and NTEU members whose request

---

[4] "District courts have broad discretion in determining whether severance of particular claims is warranted." *M.M.M. on behalf of J.M.A. v. Sessions*, 319 F. Supp. 3d 290, 295 (D.D.C. 2018). "In making this determination, courts consider multiple factors, including . . . concerns related to judicial economy, multiplicity of litigation, and orderly and efficient resolution of disputes" as well as "potential for confusion[.]" *Id*. All of those concerns are implicated here.

for a preliminary injunction was adjudicated and denied by Judge Cooper.

### C. Plaintiffs Must Address Their Employment-Related Interests Through the Statutory Scheme Congress Established.

This case primarily involves a challenge to policy decisions governing federal employees. *See, e.g.*, PI Mot. at 32-34. The Court lacks jurisdiction over these claims because Congress has established a detailed statutory scheme for adjudicating disputes related to federal employment under the Federal Service Labor–Management Relations Statute ("FSL-MRS") and the Civil Service Reform Act ("CSRA"), and Plaintiffs' claims must be adjudicated through this administrative process. "Within constitutional bounds, Congress decides what cases the federal courts have jurisdiction to consider." *Bowles v. Russell*, 551 U.S. 205, 212 (2007). Although district courts have jurisdiction over civil actions arising under federal law, *see* 28 U.S.C. § 1331, "Congress may preclude district court jurisdiction by establishing an alternative statutory scheme for administrative and judicial review." *Am. Fed'n of Gov't Emps., AFL-CIO v. Trump ("AFGE")*, 929 F.3d 748, 754 (D.C. Cir. 2019). Here, as detailed below, Congress has precluded district court jurisdiction for the claims brought by Plaintiffs on behalf of CFPB employees.

Congress has established a detailed statutory scheme for adjudicating disputes that arise in the sphere of federal employment for civil servants. The FSL-MRS and the CSRA, of which the FSL-MRS is a part, together provide a comprehensive "scheme of administrative and judicial review" for resolving both disputes between employees and their federal employers and disputes between unions representing those employees and their federal employers. *AFGE*, 929 F.3d 748, 752 (D.C. Cir. 2019) (regarding FSL-MRS); *see Graham v. Ashcroft*, 358 F.3d 931, 933 (D.C. Cir. 2004) (regarding CSRA more broadly). In these statutes, Congress provided that most federal labor and employment disputes must first be administratively exhausted before the employing agency and the applicable administrative review board—either the Merit Systems Protection Board ("MSPB") for employment disputes or the FLRA for labor disputes. Judicial review, if any, is generally available only following the exhaustion of administrative review. *See AFGE*, 929 F.3d at 752 (citing 5 U.S.C. §§ 7105, 7123(a), (c)); *Graham*, 358 F.3d at 934 (citing *United States v.*

*Fausto*, 484 U.S. 439, 448–50 (1988)); *see also* 5 U.S.C. § 7703(b) (providing for judicial review in the Federal Circuit or other court of appeals).

Statutory schemes like these largely preclude jurisdiction in the district courts, either altogether or prior to the completion of jurisdictional administrative exhaustion requirements. *AFGE*, 929 F.3d at 754. In *AFGE*, the D.C. Circuit applied the "two-step framework set forth in *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994)," to conclude that the union plaintiffs in that case could not challenge in district court three executive orders related to federal employment. *AFGE*, 929 F.3d at 754. Under that framework, district courts lack jurisdiction over suits like this one when the intent for exclusive review in the court of appeals is "fairly discernible in the statutory scheme," and "the litigant's claims are of the type Congress intended to be reviewed within [the] statutory structure." *See AFGE*, 929 F.3d at 754 (citations omitted).

Indeed, the Supreme Court has repeatedly held that the CSRA provides the exclusive means of redressing employment disputes involving federal employees, *see Fausto*, 484 U.S. at 455, even when those disputes involve constitutional claims. *See Elgin v. Dep't of Treasury*, 567 U.S. 1, 10-15 (2012). Likewise, the D.C. Circuit has repeatedly recognized that the FSL-MRS and the CSRA readily satisfy the first prong of the *Thunder Basin* framework. *See AFGE*, 929 F.3d at 755 (concluding that union plaintiffs could not challenge in district court three executive orders related to federal employment); *Fornaro v. James*, 416 F.3d 63, 66 (D.C. Cir. 2005). In other words, Congress intended to make the FSL-MRS and CSRA the exclusive scheme, and they satisfy the first step of the two-step *Thunder Basin* framework.

Plaintiffs' claims are also the type to be challenged through this statutory structure. In fact, "[c]laims 'will be found to fall outside of the scope of a special statutory scheme in only limited circumstances, when (1) a finding of preclusion might foreclose all meaningful judicial review; (2) the claim[s] [are] wholly collateral to the statutory review provisions; and (3) the claims are beyond the expertise of the agency.'" *AFGE*, 929 F.3d at 755 (quoting *Arch Coal, Inc. v. Acosta*, 888 F.3d 493, 500 (D.C. Cir. 2018)).

Here, all three factors point toward preclusion of Plaintiffs' claims. First, a finding of preclusion will not thwart meaningful judicial review. In essence, Plaintiffs are challenging the lack of work assigned to some CFPB employees and the dismissal or potential dismissal of others, and perceived consequences or incidental effects that will flow from those employment decisions, whether related to financial benefits to the employees and third parties or to continued employment. But such employment disputes can be challenged under the CSRA or FSL-MRS. *Cf. Ghaly v. USDA*, 228 F. Supp. 2d 283 (S.D.N.Y. 2002) (plaintiff challenging his transfer to paid-administrative leave needed to exhaust administrative remedies). In particular, the negotiated Collective Bargaining Agreement between NTEU's CFPB workers and the agency has an established grievance procedure for determining whether the Agency violated, misinterpreted, or misapplied laws, rules, or regulations in setting conditions of employment. *See Collective Bargaining Agreement Between CFPB and NTEU Chapter 335*, Art. 21, Art. 43, Nov. 8, 2024, attached as Ex. 2. If dissatisfied with the decision by the employing agency and the applicable administrative review board, CFPB employees still have the opportunity for judicial review in a court of appeals. *See AFGE*, 929 F.3d at 752 (citing 5 U.S.C. §§ 7105, 7123(a), (c)); *Graham*, 358 F.3d at 934 (citing *Fausto*, 484 U.S. at 448–50); *see also* 5 U.S.C. § 7703(b) (providing for judicial review in the Federal Circuit or other court of appeals).

For similar reasons, Plaintiffs' challenges are also not "wholly collateral" to the statutory review provisions. Rather, their claims may arise in the context of a specific labor dispute, as set forth above. *See AFGE*, 929 F.3d at 759–60 ("This consideration is 'related' to whether 'meaningful judicial review' is available, and the two considerations are sometimes analyzed together." (quoting *Jarkesy v. SEC*, 803 F.3d 9, 22 (D.C. Cir. 2015)).

Finally, Plaintiff's claims are precisely within the FLRA's expertise. The FLRA is—together with the MSPB—the federal authority on matters of federal employment and labor relations. *E.g., Bureau of Alcohol, Tobacco & Firearms v. FLRA*, 464 U.S. 89, 97 (1983). Even if clothed in constitutional and APA garb, Plaintiffs' claims are nonetheless subject to the CSRA and FSL-MRS. On this point, *AFGE v. Trump* is instructive. The district court characterized the

claims there as involving "separation-of-powers issues" and "whether a statute or the Constitution has authorized the President to act in a particular way," 929 F.3d at 760, much as Plaintiffs have framed their claims in this case. But the D.C. Circuit nonetheless concluded that the *AFGE* plaintiffs had to follow the statutory scheme, observing that, like here, the claims at issue could be adjudicated by resorting to the provisions of the relevant congressional legislation. *Id.* at 760–61. And even assuming the FLRA and MSPB have lesser expertise on questions of constitutional dimension, they may well be able to "offer an interpretation of the [statutes] in the course of the proceeding that might alleviate or shed light on the constitutional concerns." *Id.* at 761 (quotation omitted). Plaintiffs' claims are not subject to judicial review unless and until they have been pursued through the comprehensive statutory scheme Congress devised.[5]

### D. Plaintiffs' APA Claims Fail Because They Do Not Seek Judicial Review of a Discrete Final Agency Action.

Plaintiffs fail to satisfy the essential elements of their APA claims in Counts Three and Four because they are not petitioning for judicial review of a circumscribed and discrete agency action. "Under the terms of the APA, [Plaintiffs] must direct [their] attack against some particular 'agency action' that causes [them] harm." *Lujan*, 497 U.S. at 891. And that agency action must be "circumscribed" and "discrete[.]" *Norton v. S. Utah Wilderness All. ("SUWA")*, 542 U.S. 55, 62 (2004). Consistent with these principles, the APA does not permit Plaintiffs to "seek *wholesale*

---

[5] Plaintiffs may contend that they are subject to an immediate injury that cannot justify awaiting the administrative process called for by *Thunder Basin* and its progeny. But the only "'here-and-now' injury" that the Supreme Court has suggested permits bypassing a dedicated statutory scheme is an alleged "subjection to an unconstitutionally structured decisionmaking process," for example by an allegedly unaccountable Administrative Law Judge. *Axon Enter., Inc. v. FTC*, 598 U.S. 175, 192 (2023). Here, however, there is no adjudicatory process yet underway, let alone a claim that such a process has been "unconstitutionally structured." And in any event, the Supreme Court has "made clear . . . that 'the expense and disruption' of 'protracted adjudicatory proceedings' on a claim do not justify immediate review." *Id.* (quoting *FTC v. Standard Oil Co. of Cal.*, 449 U.S. 232, 244 (1980)). The D.C. Circuit more recently explained the *Axon* Court's holding in a way that, if it has any bearing here at all, cuts sharply against preliminary relief: "*Axon* at most says that, as a matter of statutory jurisdiction, a federal-court challenge to an unconstitutional *appointment* can begin before the agency acts. It does not say that every agency proceeding already underway must immediately be halted because of an asserted constitutional flaw." *Alpine Sec. Corp. v. Fin. Indus. Regul. Auth.*, 121 F.4th 1314, 1336 (D.C. Cir. 2024), *filing Supreme Court application*, 24-A808 (U.S. Feb. 20, 2025) (emphasis added).

improvement" of agency management "by court decree"—even in the face of allegations of "rampant" violations of law. *Lujan*, 497 U.S. at 891. "Because 'an on-going program or policy is not, in itself, a final agency action under the APA,' [a court's] jurisdiction does not extend to reviewing generalized complaints about agency behavior." *Cobell v. Kempthorne*, 455 F.3d 301, 307 (D.C. Cir. 2006) (citation omitted). "Consequently, as each case only presents the court with a narrow question to resolve, [the court] can have no occasion to order wholesale reform of an agency program." *Id.*

Plaintiffs' claims and requested injunction present exactly the type of wholesale challenge that the APA forbids. They do not seek judicial review of a discrete agency action. Rather, they seek wholesale judicial review of Defendants' management of the CFPB. For example, they argue in their memorandum that they are seeking judicial review of actions "including" and presumably not limited to "issuing stop-work instructions, cancelling contracts, declining and returning funding, firing employees, and terminating the lease for its headquarters[.]" PI Mot. at 26. *See* Am. Compl. ¶ 91. In *Lujan*, the Supreme Court dispelled any notion that such a programmatic challenge can proceed under the APA:

> [I]t is at least entirely certain that the flaws in the entire "program"—consisting principally of the many individual actions referenced in the complaint, and presumably actions yet to be taken as well—cannot be laid before the courts for wholesale correction under the APA, simply because one of them is ripe for review and adversely affects [a plaintiff].

497 U.S. at 892-93 (footnote omitted)

Just as in *Lujan*, Plaintiffs' APA counts seek to bring a collective, programmatic, challenge to all of these individual actions, including actions yet to be taken when the Amended Complaint was filed.

The wholesale nature of the challenge is confirmed by Plaintiffs' pleading. Both APA counts involve claimed statutory violations, but neither bothers to mention a specific statute that forms the basis of the challenge. Rather, Plaintiffs vaguely allege at the highest level of generality that Defendants lack "statutory authority to require CFPB to cease work on activities it is

statutorily required to perform." Am. Compl. ¶ 92. But addressing that type of claim would require the Court to supervise all of the agency's activities and decide what is or is not statutorily required—an even more extreme kind of supervisory claim than what was at issue in *Lujan* itself. But as the Court explained in *SUWA*, the purpose of the APA's discrete agency action requirement is:

> to protect agencies from undue judicial interference with their lawful discretion, and to avoid judicial entanglement in abstract policy disagreements which courts lack both expertise and information to resolve. If courts were empowered to enter general orders compelling compliance with broad statutory mandates, they would necessarily be empowered, as well, to determine whether compliance was achieved—which would mean that it would ultimately become the task of the supervising court, rather than the agency, to work out compliance with the broad statutory mandate, injecting the judge into day-to-day agency management. . . . The prospect of pervasive oversight by federal courts over the manner and pace of agency compliance with such congressional directives is not contemplated by the APA.

542 U.S. at 66-67. With those principles in mind, the wholesale nature of Plaintiffs' challenge is also confirmed by the requested injunction, which is breathtaking in scope in that it would require:

- this Court's supervision over seemingly any claim that the CFPB has violated the Federal Records Act;

- this Court's supervision of whether any termination of any CFPB employee satisfied a "for cause" standard established by the injunction;

- precluding the agency from even considering a reduction-in-force;

- reinstatement of a class of employees whose employment agency leadership does not view as being in the government's interest;

- this Court's supervision over claims that CFPB financial management decisions are not satisfying "the ordinary operating obligations of the CFPB"—making this Court the day-to-day manager of CFPB financing (even though Congress vested the Director with that discretion, 12 U.S.C. § 5497(a));

- CFPB staff to carry out policies not required by statute and inconsistent with the policy positions of a democratically-elected administration;

- the Court to oversee whether any employees decided to take administrative leave this month and, if so, to ensure that their leave balance is restored;

- the CFPB to enter into contracts with vendors that agency leadership does not view as being in the government's interest;

- mechanizing this Court's supervision via reporting requirements.

[Proposed] Order, ECF No. 20-1.  Plaintiffs may argue that this case is nothing like *Lujan v. Nat'l Wildlife Fed'n*.  497 U.S. at 891.  If they do, they are correct in one respect:  This case is many times more intrusive than anything at issue in *Lujan*.

Even more practically, a wholesale challenge like Plaintiffs' is impossible to litigate under the mechanics of judicial review that the APA contemplates.  "[W]hen a party seeks review of agency action under the APA, the district judge sits as an appellate tribunal."  *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001).  Accordingly, "APA review typically takes place on the basis of a record compiled by the agency" consisting of the materials considered "in making the challenged decision."  *Cousins v. Sec'y of the U.S. Dep't of Transp.*, 880 F.2d 603, 610 (1st Cir. 1989).  Wholesale challenges to programmatic decision-making make it impossible for the agency to "compil[e] and organiz[e] the complete administrative record" for the agency action, *see Preserve Endangered Areas of Cobb's History, Inc. v. U.S. Army Corps of Eng'rs*, 87 F.3d 1242, 1246 n.2 (11th Cir. 1996), because there is no discrete agency action, as necessary for the parties to proceed to summary judgment.  Nor is it possible for the Court to apply the applicable standard of review, *see* 5 U.S.C. § 706, to the agency action.  Plaintiffs are unlikely to succeed on their APA claims because they are sweeping programmatic challenges unavailable under the APA.

Because the Amended Complaint raises a wholesale challenge, Plaintiffs are not likely to succeed on the merits in this case.  But out of an abundance of caution, Defendants address Plaintiffs' "final agency action" argument.  *See* PI Mot. at 26-27.  "Final agency action" has two components.  First, the action must "mark the 'consummation' of the agency's decisionmaking process[.]"  *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (citation omitted).  It may not be a "preliminary, procedural, or intermediate agency action[.]" 5 U.S.C. § 704.  Second, the action

must "be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett*, 520 U.S. at 178 (citation omitted). Confusingly, Plaintiffs' brief refers to two different purported actions when it attempts to show it is challenging "final agency action." First, it claims that a purported "decision to eliminate the CFPB" satisfies *Bennett* prong one. Then it claims that Vought's "stop-work" e-mail satisfies *Bennett* prong two. Because Plaintiffs have made no argument that any *single* agency action satisfies both *Bennett* prongs, they have forfeited any claim that they are challenging final agency action at the preliminary injunction stage.

In any event, Defendants have made no "decision to eliminate the CFPB[.]" PI Mot. at 26. Plaintiffs' *Bennett* prong one analysis essentially confirms the programmatic nature of their challenge by referring to five different alleged actions rather than analyzing how the abstract "decision to eliminate the CFPB" satisfies prong one. *Id*. Moreover, the APA does not permit review of an "abstract decision" like this one, even if it is circumscribed and discrete. *See Biden v. Texas*, 597 U.S. 785, 809 (2022). Rather, only "specific agency action, as defined in the APA" is subject to review. *Id*. Because Plaintiffs identify no nonabstract "agency action" to eliminate the agency, it cannot be subject to judicial review. *See EPA v. Brown*, 431 U.S. 99, 104 (1977) ("For [courts] to review [agency actions] not yet promulgated, the final form of which has only been hinted at, would be wholly novel."); *Appalachian Energy Grp. v. EPA*, 33 F.3d 319, 322 (4th Cir. 1994) (no final agency action where agency "has not taken any action at this point triggering [the court's] power to review its position").

Plaintiffs fare even worse with the Vought "stop work" e-mail in that it satisfies neither *Bennett* prong. First, the e-mail marks the initiation, not the consummation, of the agency's decision-making process. As described in more detail *infra* at 28-33, the Vought e-mail's directive to pause some agency activities reflects a decision by CFPB leadership that agency personnel should not advance the prior administration's policies until new leadership has an opportunity to reevaluate agency priorities. That decision is thus "preliminary" in nature and "not directly reviewable[.]" *See* 5 U.S.C. § 704. "It may be a step, which if erroneous will mature into a

prejudicial result[.]" *Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 112 (1948). But that does not make the Vought e-mail itself the "consummation of the administrative process" reevaluating the agency's priorities. *Id*. at 113.

Nor does the Vought e-mail satisfy the second *Bennett* prong. Prong two's language includes terms of art reflecting "a 'pragmatic' inquiry that requires courts to examine the 'concrete consequences' of an agency action." *Racing Enthusiasts & Suppliers Coal. v. EPA*, 45 F.4th 353, 358 (D.C. Cir. 2022) (citation omitted). The court must consider the "concrete impact the [agency action] had on [the Plaintiffs]." *Indep. Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 427 (D.C. Cir. 2004); *see also FTC v. Standard Oil Co. of Cal.*, 449 U.S. 232, 239 (1980) (considering whether agency action had a "'direct and immediate . . . effect on the day-to-day business' of the complaining parties" (citation omitted)); *City of New York v. U.S. Dep't of Def.*, 913 F.3d 423, 431 (4th Cir. 2019) ("This limitation ensures that judicial review does not reach into the internal workings of the government, and is instead properly directed at the effect that agency conduct has on private parties"). And Plaintiffs here do not allege any concrete harm due to the Vought e-mail alone. The D.C. Circuit looks to, for example, whether a plaintiff faces any "risk of significant criminal and civil penalties" for failing to comply with a challenged agency action. *Cal. Cmtys. Against Toxics v. EPA*, 934 F.3d 627, 637 (D.C. Cir. 2019). The Vought e-mail results in nothing like that type of consequence for Plaintiffs.

Moreover, in making prong two determinations, courts consider pragmatic issues that would arise from considering the agency action to be reviewable. *Standard Oil*, 449 U.S. at 242-43 (considering that reviewing particular agency action would "interfere[] with the proper functioning of the agency" and turn "prosecutor into defendant before adjudication concludes"); *City of New York*, 913 F.3d at 432 (considering "incursion into internal agency management"). Interfering with the ability of new leadership—brought about after a national election by the people casting their votes—to briefly pause agency activities pending reconsideration of agency priorities is precisely the type of incursion into internal agency management that prong two precludes.

**E.  No Equitable Cause of Action is Available to Undermine the Strictures of the APA.**

The fact that Plaintiffs do not invoke the APA to seek wholesale judicial supervision of the CFPB based on the "Separation of Powers" and Federal Vacancies Reform Act theories pleaded in Counts One and Two does not render their wholesale challenge any more permissible.  Plaintiffs invoke an equitable cause of action to raise these claims.  Am. Compl. ¶ 75-89.  But the D.C. Circuit has explained that the Court's "equitable powers" are just as "limited" as they are under APA review "by the court's inability to order broad, programmatic reform[.]"  *Cobell*, 455 F.3d at 307.  Plaintiffs are thus unlikely to succeed on the merits of these claims for the same relief as well.

Plaintiffs lack an extraordinary equitable cause of action to address the claims pleaded in Counts One and Two because the APA provides an adequate alternative means of vindicating their purported rights via review of discrete final agency actions (if those actions take place).  "In the context of agency action, parties occasionally invoke the principles of 'nonstatutory review.'"  *Puerto Rico v. United States*, 490 F.3d 50, 59 (1st Cir. 2007).  This review involves the residuum of power that remains with the district court to review agency action that is *ultra vires*, stemming from "courts' use of their equitable jurisdiction to enjoin illegal agency action."  33 Charles A. Wright & Arthur R. Miller, Fed. Prac. & Proc. Judicial Review § 8307 (2d ed. 2024 update).  A court's power to enforce the Constitution in the absence of a statutory cause of action does not rest upon an implied right of action contained in the Constitution.  *Armstrong v. Exceptional Child Ctr. Inc.*, 575 U.S. 320, 324-27 (2015).  Rather, "[t]he ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity[.]" *Id*. at 327.

Given the equitable basis of a nonstatutory cause of action, Plaintiffs may not invoke it unless they satisfy "the traditional requirement for equitable relief that a plaintiff lack an adequate remedy at law."  33 Fed. Prac. & Proc. Judicial Review, *supra*, § 8307.  *See Federal Express Corp. v. U.S. Dep't of Commerce*, 39 F.4th 756, 763 (D.C. Cir. 2022) (there must be "no alternative procedure for review" (quoting *Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009))).  "Thus, if the APA or a special statutory review proceeding can provide adequate

relief, an equitable remedy via nonstatutory review ought not be available." 33 Fed. Prac. & Proc. Judicial Review, *supra*, § 8307; *see also Puerto Rico*, 490 F.3d at 59 ("[S]uch review may occur only if its absence would 'wholly deprive the party of a meaningful and adequate means of vindicating its . . . rights.'") (quoting *Bd. of Governors of Fed. Reserv. Sys. v. MCorp. Fin., Inc.*, 502 U.S. 32, 43 (1991)). In this way, "[t]he power of federal courts of equity to enjoin unlawful executive action is subject to . . . implied statutory limitations." *Armstrong*, 575 U.S. at 327.

Plaintiffs do "have a means of vindicating [their] rights without nonstatutory review: the APA" (or, as relevant, the special statutory review scheme under the FSL-MRS or the CSRA addressed *supra* at 11-14). *Puerto Rico*, 490 F.3d at 59-60. Within these judicial review frameworks, Plaintiffs may assert their Separation of Powers and Federal Vacancies Reform Act claims as part of this Court's review of a discrete final agency action. Indeed, the APA explicitly provides for judicial review of final agency action that is contrary to constitutional power or in excess of statutory limitations. 5 U.S.C. § 706(2)(B)-(C).

The APA's framers legislated against background principles from courts of equity and understood that, by creating an adequate statutory cause of action for judicial review, they were limiting the circumstances in which extraordinary equitable jurisdiction—available when there is no adequate alternative—could be invoked. To override that understanding and permit a plaintiff to bypass the APA's procedural requirements for judicial review would render those procedural limits surplusage. The APA's "consideration and hearing, especially of agency interests, was painstaking." *Wong Yang Sung v. McGrath*, 339 U.S. 33, 40 (1950). It "represents a long period of study and strife; it settles long-continued and hard-fought contentions, and enacts a formula upon which opposing social and political forces have come to rest[,]" and "contains many compromises[.]" *Id*. For example, those compromises require Plaintiffs to "direct [their] attack against some particular 'agency action' that causes [them] harm." *Lujan*, 497 U.S. at 891. "[T]he existence of the APA as a means for reviewing [Defendants'] actions at least implies that nonstatutory review is inappropriate." *Puerto Rico*, 490 F.3d at 60; *see also Coal. for Competitive Elec., Dynegy, Inc. v. Zibelman*, 272 F. Supp. 3d 554, 566 (S.D.N.Y. 2017) ("The limited private

21

right of action provided by [a statute] is by itself sufficient to establish that Congress intended to foreclose [an] equitable" cause of action).

Nor does the fact that Plaintiffs are seeking wholesale judicial supervision of Defendants' management of the CFPB, not judicial review of a discrete "agency action," *see supra* at 17-18, indicate that Plaintiffs have no adequate means of vindicating their claims under the APA.  The case-by-case approach required by the APA "is the traditional, and remains the normal, mode of operation of the courts." *Lujan*, 497 U.S. at 894.  Even if that approach is "frustrating" to Plaintiffs who seek "across-the-board" relief, *see id.*, that does not make case-by-case APA review inadequate. *See Council of & for the Blind of Del. Cnty. Valley, Inc. v. Regan*, 709 F.2d 1521, 1532 (D.C. Cir. 1983) ("Even if we agreed that one nationwide suit would be *more effective* that several [discrete] suits, tha[t] does not mean that the remedy provided by Congress is *inadequate*"); *see also Women's Equity Action League v. Cavazos*, 906 F.2d 742, 752 (D.C. Cir. 1990) (holding that a "generalized action . . . against federal executive agencies lacks the requisite green light from the legislative branch" and that courts "may not on their own initiative create the claim for relief").

### F.  NTEU, CEA, and Pastor Steege's Interests Fall Outside the Zone of Interests of the CFPA.

Insofar as NTEU and CEA are seeking an order to enforce Defendants' statutory obligations to administer provisions of the CFPA, or contend that Defendants are acting arbitrarily or capriciously in administering provisions of the CFPA, their claims necessarily fail because their interests fall outside the zone of interests protected by the statute.  The CFPA was enacted to protect consumers, not to protect the workers at the agency.  5 U.S.C. § 5511(a).  It is well settled that agency workers lack zone of interest standing to challenge whether the agency is devoting sufficient resources to carrying out its statutory obligations. *See Air Courier Conf.  of Am. v. Am. Postal Workers Union AFL-CIO*, 498 U.S. 517, 523-30 (1992); *Am. Fed. of Gov't Emps. TSA Local 1 v. Hawley*, 481 F. Supp. 2d 72, 93-95 (D.D.C. 2006).

Pastor Steege's interests also fall outside the zone of interests of the relevant provisions of the CFPA.  Pastor Steege alleges that she is entitled to have her loans discharged under the Public

Service Loan Forgiveness (PSLF) Program and she had hoped that the CFPB Ombudsman's Office[6] would assist her.  PI Mot. at 17.  But the PSLF program "allows qualifying *federal student loans*," not private loans, "to be forgiven" in certain circumstances.  CFPB, Student loan forgiveness,                    https://www.consumerfinance.gov/paying-for-college/student-loan-forgiveness/#public-service-loan-forgiveness-(pslf) (emphasis added); *see also* Fed. Student Aid, An Office of the U.S. Dep't of Educ.: Help, https://studentaid.gov/help-center/answers/article/are-private-education-loans-eligible-for-pslf (Question: "Are private education loans eligible for Public Service Loan Forgiveness (PSLF)?" Answer: "No. Private education loans aren't eligible for PSLF[.]").  Congress, however, explicitly limited the Ombudsman's role to assisting student loan "borrowers of *private education loans*," not federal loans.  12 U.S.C. § 5535(a) (emphasis added).  Pastor Steege should contact the Department of Education, which administers the PSLF program, for assistance; not CFPB, which regulates private companies.

### G.  Plaintiffs' "Separation of Powers" Claim is Unlikely to Succeed.

Plaintiffs' constitutional separation of powers claim is barred at the outset because it is purely statutory.  In Count One, Plaintiffs cite the Take Care Clause, alleging that Defendants have violated the separation of powers doctrine because they have "exceed[ed] executive authority [and] usurp[ed] legislative authority conferred upon Congress[.]" Am. Compl. ¶¶ 75-80. This "constitutional" claim is nothing more than Plaintiffs' statutory objections dressed up in constitutional garb.  But Plaintiffs cannot turn what is otherwise an amorphous statutory claim into a constitutional issue merely by alleging that Defendants' failure to act within the confines of the CFPA encroaches on Congress's Article I powers or amounts to a violation of the President's constitutional responsibilities under Article II, Section 3.  *See* PI Mot. at 22 (arguing that "defendants [*sic*] actions are directly contrary to those statutory commands").  As the Supreme Court explained in *Dalton v. Specter*, permitting a party to assert a separation-of-powers claim like

---

[6] Plaintiffs' brief refers generally to the "Ombudsman's office[.]"  PI Mot. at 16.  While the Student Loan Ombudsman position is currently vacant, consumers have other options to receive support from the CFPB, including utilizing the CFPB Consumer Complaint Cetner and/or the CFPB Ombudsman Office, which houses five employees.  Martinez Decl. ¶ 21.

Plaintiffs' would "eviscerat[e]" the well-established "distinction between claims that an official exceeded his statutory authority, on the one hand, and claims that he acted in violation of the Constitution." 511 U.S. 462, 474 (1994). The Court in *Dalton* thus squarely rejected the proposition "that whenever the President acts in excess of his statutory authority, he also violates the constitutional separation-of-powers doctrine." *Id*. at 471. Plaintiffs therefore cannot prevail on the merits of Count I by alleging a constitutional violation.

At any rate, because the CFPA does not foreclose Defendants' decision-making, *infra* 28-30, Plaintiffs' separation of powers claim would lack merit even if properly pled. The Court should find Plaintiffs' claim unlikely to succeed on this ground alone. *See N.Y.C. Transit Auth. v. Beazer*, 440 U.S. 568, 582 (1979) ("Before deciding [a] constitutional question," a court must consider whether other "grounds might be dispositive."). Indeed, Plaintiffs' decision to invoke a non-statutory cause of action to raise this "ultra vires" claim, Am. Comp. ¶ 75, means they must meet a heightened standard "confined to 'extreme'" errors. *See Fed. Express Corp.*, 39 F.4th at 763-64. In this way, this claim, and the Federal Vacancies Reform Act claim pleaded in Count Two, are "Hail Mary pass[es]—and in court as in football, the attempt rarely succeeds." *Nyunt*, 589 F.3d at 449. In any event, the Supreme Court has long recognized that agencies can permissibly decide what enforcement and supervision actions to take, if any, consistent with the statutory duties imposed on the agency by Congress. *See Heckler v. Chaney*, 470 U.S. 821 (1985) (agency enforcement discretion generally not subject to judicial review). Judicial deference to Defendant's decision-making about the priorities of the CFPB is especially warranted here, as "the Executive Branch has exclusive authority and absolute discretion to decide whether to prosecute a case." *United States v. Nixon*, 418 U.S. 683, 693 (1974). *See also Heckler*, 470 U.S. at 832 ("[W]e recognize that an agency's refusal to institute proceedings shares to some extent the characteristics of the decision of a prosecutor in the Executive Branch not to indict—a decision which has long been regarded as the special province of the Executive Branch, inasmuch as it is the Executive who is charged by the Constitution to 'take Care that the Laws be faithfully executed.'" (quoting U.S. Const. art. II, § 3)).

As the Court explained in *Heckler*, agencies are "far better equipped" to evaluate "the many variables involved in the proper ordering of its priorities" than are the courts. 470 U.S. at 831-32. Plaintiffs' subjective views about how to best implement the CFPA and administer CFPB do not serve as a basis for the Court to reorder those priorities itself. The Government Accountability Office (GAO), itself an entity within the Legislative Branch, has similarly approved of agencies "taking the steps it reasonably believes are necessary to implement a program efficiently and equitably, even if the result is that funds temporarily go unobligated." *In re James R. Jones, House of Representatives*, B-203057 L/M, 1981 WL 23385 (Comp. Gen. Sept. 15, 1981). Defendants' decision-making fits comfortably within this Executive Branch practice of short-term pauses in order to determine how best to implement programs consistent with the President's policy objectives and underlying law, and therefore is not violative of separation of powers principles.

As Acting Director Vought stated in his letter to the Federal Reserve, "[t]he Bureau's new leadership will run a substantially more streamlined and efficient bureau . . . and do its part to reduce the federal deficit." Martinez Decl. Ex. G. The implementation of such policy priorities is plainly within the purview of Defendants, acting on behalf of the President. In cases where the President must "exercise . . . Executive discretion," the duty "imposed on the President is in no just sense ministerial. It is purely executive and political." *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 498–99 (1867). Thus, "[a]n attempt on the part of the judicial department of the government to enforce the performance of such duties by the President might be justly characterized . . . as 'an absurd and excessive extravagance.'" *Id.* (citation omitted); *see also Lujan v. Def. of Wildlife*, 504 U.S. 555, 577 (1992) (finding it improper for courts "to assume a position of authority over" the President's duty to "take Care that the Laws be faithfully executed" (citations omitted)). To hold otherwise would itself upset the separation of powers by allowing judicial superintendence over the exercise of Executive power that the Clause commits to the President alone. *See Dalton*, 511 U.S. at 474–75 (judicial review of discretionary Presidential decisions "is not available"); *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 170 (1803) ("The province of the court is, solely, to decide on the rights of individuals, not to enquire how the executive, or executive

officers, perform duties in which they have a discretion. Questions, in their nature political, or which are, by the constitution and laws, submitted to the executive, can never be made in this court."); *Chi. & S. Air Lines*, 333 U.S. at 114 (refusing to review President's decision that "embod[ied] Presidential discretion as to political matters beyond the competence of the courts to adjudicate"). While Defendants' policy priorities and enforcement decisions may differ from those preferred by Plaintiffs, Plaintiffs are unlikely to succeed in demonstrating that Defendants' decision-making amounts to a violation of the separation of powers.

### H.  Plaintiffs' Federal Vacancies Reform Act Claim is Unlikely to Succeed.

Plaintiffs' Federal Vacancies Reform Act ("FVRA") claim challenges an unextraordinary series of events: (1) a new President is elected; (2) the President removes an agency head; (3) and the President designates a temporary acting director to perform the duties of the office until a permanent replacement is nominated and confirmed by the Senate. Because that fact pattern— and the series of events challenged in this case—are authorized by the Constitution and the FVRA, Plaintiffs are unlikely to succeed on the merits of their claim.

The FVRA allows the President to temporarily fill a role for which Senate confirmation is required when the prior office holder "dies, resigns, or is otherwise unable to perform the functions and duties of the office." 5 U.S.C. § 3345(a). Here, the facts are not complicated: (1) President Trump was elected; (2) President Trump removed former Director Rohit Chopra from office; and (3) President Trump ultimately[7] designated Russell Vought as the Acting Director because former Director Chopra was "unable to perform the functions and duties of the office" after his removal. Plaintiffs do not challenge former Director Chopra's removal. *See generally Seila L. LLC v. CFPB*, 591 U.S. 197 (2020). Plaintiffs do not dispute Acting Director Vought's qualifications as a designee. He was confirmed by the Senate as the Director of the United States Office of Management and Budget ("OMB") on February 6, 2025, and appointed as Acting Director to the

---

[7] Again, Treasury Secretary Bessent briefly served as Acting Director. Martinez Decl. ¶ 2.

CFPB on February 7, 2025.[8]  *See* 5 U.S.C. § 3345(a)(2) (permitting the President to direct another presidential appointee, who is already Senate confirmed, to perform the functions and duties of the vacant office).  Plaintiffs contend only that the FVRA does not apply because former Director Chopra did not die, resign, or become "unable to perform the functions and duties of the office" by virtue of his removal.  But Plaintiff's argument is difficult to square with the FVRA.

The Government's position is simple: Removal is an event that would render an officer "unable to perform the functions and duties of the office."[9]  If an officer is no longer holding an office, then the officer is unable to perform the duties and functions of that office.  The statute includes no causal conditions on this catchall provision.  Inability to perform thus means inability to perform, whether because of sickness, some mental or physical infirmity, or removal.  The statutory text is indifferent as to the reason why.  Indeed, rather than raising a question of fact as to whether an officer is unable to perform the duties and functions of an office, removal may be the easiest case: the officer clearly cannot.

Far from an end run around the statute, as Plaintiffs contend, an interpretation to the contrary would have sweeping and adverse consequences.  Accepting Plaintiffs' atextual interpretation would leave a troubling gap in the ability to name acting officers.  *Designating an Acting Att'y Gen.*, 42 Op. O.L.C. 182, 185 n.1 (2018).  For most Senate-confirmed offices, the FVRA is "the exclusive means" for naming an acting officer.  5 U.S.C. § 3347(a).  If the FVRA

---

[8] Homeland Security & Governmental Affairs, Media/Majority News (Thursday, Feb. 6, 2025),        https://www.hsgac.senate.gov/media/reps/dr-paul-releases-statement-on-senate-confirmation-of-russell-vought-to-be-director-of-the-office-of-management-and-budget/ https://www.hsgac.senate.gov/media/reps/dr-paul-releases-statement-on-senate-confirmation-of-russell-vought-to-be-director-of-the-office-of-management-and-budget/

[9]The Government's position precedes this litigation.  *See Designating an Acting Director of the Bureau of Consumer Financial Protection*, 41 Op. O.L.C. 99, 102 (2017) (explaining that "an officer is 'unable to perform the functions and duties of the office' during both short periods of unavailability, such as a period of sickness, and potentially longer ones, such as one resulting from the officer's removal"); *Guidance on Application of Federal Vacancies Reform Act of 1998*, 23 Op. O.L.C. 60, 61 (1999) ("In floor debate, Senators said, by way of example, that an officer would be 'otherwise unable to perform the functions and duties of the office' if he or she were fired, imprisoned, or sick.").

did not apply in cases of removal, then it could mean that no acting officer could take the place of a removed officer, even where the President had been urgently required to remove the officer, for instance, by concerns over national security, corruption, or other workplace misconduct. *Designating an Acting Att'y Gen.*, 42 Op. O.L.C. at 185 n.1. Plaintiffs are essentially asking this Court to require the FVRA to specify "removal" as a separate basis for designating a temporary officer and to somehow read the catchall provision as specifically not covering removal. Because removal falls into one of the bases already provided for under the FVRA, the Court should reject Plaintiffs' atextual request.

### I. The CFPA Does Not Foreclose the Vought E-Mail Given That It Directs Staff to Continue All Actions Required by All Law, Including the CFPA.

Even if Plaintiffs could overcome the threshold defects of their claims, they are unlikely to succeed on the merits of their claim that the CFPA foreclosed the Vought e-mail. *See* PI Mot. at 28-29. Insofar as they are challenging the Vought e-mail, *see* Martinez Decl. Ex. D, their claims fail because they rely on characterizations of that e-mail that are inconsistent with its terms. The Vought e-mail does not "require CFPB to cease the activities that Congress mandated it to perform." PI Mot. at 28. *See also id.* at 29 (arguing that Defendants' actions "are contrary to the CFPB's specific statutory mandates"). Rather, the Vought e-mail instructs CFPB staff to pause policy-related decision-making to the extent permitted by applicable law. Specifically, the Vought e-mail provides that employees, contractors, and other personnel of the Bureau temporarily pause certain activities "unless expressly approved by the Acting Director *or required by law*." Martinez Decl. Ex. D (emphasis added).

Definitionally, directing staff to pause actions *unless required by law* cannot be interpreted to violate the law. It is plainly lawful for the Acting Director to instruct staff to act within the agency's discretion to pause policy-related decision-making consistent with applicable law, including the CFPA. *See, e.g.*, *Sherley v. Sebelius*, 689 F.3d 776, 784 (D.C. Cir. 2012) ("[A]s an agency under the direction of the executive branch, it must implement the President's policy directives to the extent permitted by law."); *Sierra Club v. Costle*, 657 F.2d 298, 406 (D.C. Cir.

1981).  Plaintiffs argue that "[n]o statute or delegation of authority purports to give the Acting Director or CFPB the power to dissolve CFPB."  PI Mot. at 28.  But that argument attacks a straw man, since there is no challenged agency action to do any such thing.  Again, the notion that the agency is being dissolved is wholly inconsistent with Acting Director Vought's statement that the "Bureau's new leadership will run a substantially more streamlined and efficient bureau[.]"  *See* Martinez Decl. Ex. G.

The initial Vought E-mail dated February 8, 2025, had paused certain activities "unless expressly approved by the Acting Director or required by law[.]"  *Id*. Ex. D.  After extraordinary events, *id.* ¶¶ 7-14, on February 10, 2025, Acting Director Vought sent an additional e-mail to CFPB staff, *id*. Ex. F.  That e-mail clarified that all work tasks should be cleared by the agency's Chief Legal Officer to ensure that those tasks are, in fact, urgently required by law.  *See id*.  But that administrative decision in no way reflects a determination that the agency should not perform or is not performing activities that a statute or other law requires it take now.  *See id*.  Indeed, the agency is committed to performing its statutory obligations.  *Id*. ¶¶ 19-23.

Plaintiffs also raise APA claims that Defendants have acted contrary to regulations in taking certain employment actions.  PI Mot. at 29.  Again, these claims face fatal threshold flaws.  *Supra* at 7-14.  But they also fail on their terms.  Plaintiffs first claim that Defendants have violated a rule requiring "60-days notice before . . . a reduction in force."  PI Mot. at 29.  But they are not petitioning for judicial review of any agency action making a reduction in force.  *See Brown*, 431 U.S. at 104 ("For [the Court] to review [agency action] not yet promulgated, the final form of which has only been hinted at, would be wholly novel").  They also claim that the Vought e-mail does not "permit[] putting the entire Bureau on administrative leave[.]"  PI Mot. at 29.  But they suggest elsewhere that the Vought e-mail did not instruct employees to take any administrative leave within the meaning of the cited regulations.  *Id*. at 27.  And insofar as Plaintiffs are complaining about a cap on administrative leave referenced in Title 5 of the Code of Federal Regulations, *see id*. at 27-28, Plaintiffs fail to grapple with the CFPB Director's statutory authority, independent of Office of Personnel Management policy and regulations, to provide CFPB

employees administrative leave derived from its compensation authority, *see* 12 U.S.C. 5493(a)(2). In any event, the Vought e-mails dated both February 8, 2025, and February 10, 2025, contemplate that agency staff will continue to perform work tasks as "expressly approved by the Acting Director or required by law[.]"  Martinez Decl. Ex. D.  *See id.* ¶¶ 19-23.

### J.  As Part of Defendants' Ongoing Decision-Making, Defendants Have Made and Are Making Reasonable Judgments that are, In Any Event, Committed to Agency Discretion by Law.

Plaintiffs are likewise unlikely to succeed on the merits of their arbitrary and capricious claim, which, as briefed, involves actions committed to agency discretion by law.  "Judicial review under [the arbitrary and capricious] standard is deferential, and a court may not substitute its own policy judgment for that of the agency."  *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).   Rather, the Court must ensure "that the agency has acted within a zone of reasonableness[.]"  *Id.*  "[R]eview under the 'arbitrary and capricious' tag line . . . encompasses a range of levels of deference to the agency," *Am. Horse Prot. Ass'n v. Lyng*, 812 F.2d 1, 4-5 (D.C. Cir. 1987), and agency action regarding reallocation of resources and reorganizing of enforcement priorities after a change in presidential administrations, if reviewable at all, must be afforded highly deferential rational basis review, *cf. Lincoln v. Vigil*, 508 U.S. 191, 193 (1993) (noting that, absent a statutory directive to the contrary, an agency has unreviewable "capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way.").

Again, incoming Presidents of both parties have routinely issued directives that pause policy-related decision-making, to allow the reevaluation of those policies that were under consideration or under development but not finalized by the prior administration.  *E.g.*, 86 Fed. Reg. 7424 (Jan. 28, 2021) (memorandum by President Biden's Chief of Staff); 82 Fed. Reg. 8346 (Jan. 24, 2017) (memorandum from President Trump's Chief of Staff); 74 Fed. Reg. 4435 (Jan. 26, 2009); 66 Fed. Reg. 7702 (Jan. 24, 2001); 58 Fed. Reg. 6074 (Jan. 25, 1993).  Consistent with this practice, President Trump issued an Executive Order on January 20, 2025, freezing regulatory

actions so that new agency leadership may reevaluate the agency's policies.  90 Fed. Reg. 8249 (Jan. 20, 2025).

In line with these principles, on February 8, 2025, Acting Director Vought messaged all CFPB staff, directing that, "unless required by law," CFPB personnel were not to take regulatory actions, open new instigations into regulatory entities, enter into settlements, or take other actions that could represent policy decisions inconsistent with new leadership's views on the most desirable way for CFPB to meet its statutory responsibilities.  Martinez Decl. Ex. D.  As Acting Director Vought explained, he was "committed to implementing the President's policies, consistent with the law, and acting as a faithful steward of the Bureau's resources."  *Id*.  The directed pause permits new leadership to "evaluate priorities in light of the philosophy of the administration[.]" *Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032, 1043 (D.C. Cir. 2012) (citation omitted).  The pause in no way authorized CFPB personnel to abandon the agency's statutory obligations.  *See* Martinez Decl. Ex. D ("unless expressly approved by the Acting Director or required by law").

Plaintiffs bear the burden of showing that the Vought e-mail is arbitrary and capricious. *City of Olmsted Falls v. FAA*, 292 F.3d 261, 271 (D.C. Cir. 2002).  But they come nowhere close to meeting that burden.  Their argument that "the CFPB has provided no reasoned explanation . . . . for its decision to stop all work and deprive the public of the services that Congress mandated," PI Mot. at 30, reflects a fundamental "lack of understanding" of "the nature" of the Vought e-mail, *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 553 (1978).  Again, the Vought e-mail does not direct the stoppage of all work.  Rather, it temporarily pauses only decision-making that is not "approved by the Acting Director or required by law."  Martinez Decl. Ex. D.  A separate e-mail issued on February 10, 2025—after the events described in the Martinez Declaration—clarified that all work tasks should be cleared by the agency's Chief Legal Officer to ensure that those tasks are, in fact, urgently required by law. *See Id*. Ex. F.  But this internal oversight check in no way "deprive[s] the public of the services that Congress mandated." *See* PI Mot. at 30.  Rather, it merely requires staff to clear their work with the Chief Legal Officer to make sure that it is, in fact, work that Congress mandated continue to occur now.  Martinez Decl. Ex. F.

Indeed, the CFPB is committed to performing its statutory obligations and work requests have been approved to allow the CFPB to maintain its operations required by statute. *Id.* ¶ 21. This type of internal check on agency staff is traditionally left to an agency's unreviewable discretion. *See Vt. Yankee*, 435 U.S. at 524 (explaining that the Supreme "Court has for more than four decades emphasized that" even outward facing "procedures [are] basically to be left within the discretion of the agencies to which Congress had confided the responsibility for substantive judgments"). Courts lack the power to "dictat[e] to the agency the methods [and] procedures" the agency must use to complete its statutory obligations. *Id.* (quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)). To override these principles and enjoin agency leadership from exercising procedural control over its own staff to ensure that staff is carrying out statutory obligations or otherwise exercising agency leadership's policies would be an extraordinary violation of the separation of powers.

At bottom, the e-mails from February 8, 2025, and from February 10, 2025, incorporate the type of actions that are "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). "In determining whether a matter has been committed solely to agency discretion, [courts] consider both the nature of the administration action at issue and the language and the structure of the statute that supplies the applicable legal standards for reviewing that action." *Drake v. FAA*, 291 F.3d 59, 70 (D.C. Cir. 2002). Here, each factor shows that Defendants' managerial decisions reflected in the aforementioned e-mails are committed to agency discretion.

First, these decisions fit neatly among those "categories of administrative decisions that courts traditionally have regarded as 'committed to agency discretion.'" *Lincoln*, 508 U.S. at 191-92 (quoting 5 U.S.C. § 701). A temporary pause on policy-related decision-making to permit new agency leadership an opportunity to evaluate agency priorities in light of the philosophy of the new administration is in the nature of other actions that courts have traditionally found committed to agency discretion by law. After all, the very point of the pause is to give new agency leadership an opportunity to reorient any ongoing agency decision-making so that the CFPB "meet[s] its statutory responsibilities in what [the new administration] sees as the most effective or desirable

way." *Id.* at 192. "[A]n agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion." *Heckler*, 470 U.S. at 831. The Vought e-mail reflects new agency leadership's effort to determine whether ongoing agency actions "best first the agency's overall policies" under new leadership and "whether agency resources are best spent on" current projects or whether they would be better spent differently. *Id.* at 831. "The agency is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities." *Id.* at 831-32.

Second, Plaintiffs can point to no particular statute limiting the agency's inherent discretion to pause policy-related decision-making while the agency reorients its priorities or precluding the agency from requiring projects to be cleared by the Chief Legal Officer. Again, agencies generally have broad discretion to fashion internal procedures for formulating policies and implementing a statute. *See Vt. Yankee*, 435 U.S. at 543.

The aforementioned e-mails include only a cursory explanation—unsurprising given the traditionally unreviewable nature of the decisions they reflect. But even if this Court were to conclude that the explanation provided is insufficient for judicial review, that would in no way justify a preliminary injunction precluding new agency leadership from continuing the brief pause and instead authorizing CFPB staff to expend agency resources pursuing violations that may not "fit[] the agency's overall policies[.]" *Heckler*, 470 U.S. at 831. Rather, "the proper course" would be "to remand to the agency for additional . . . explanation," not any type of injunction. *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985).

## II.    Plaintiffs Do Not Face Irreparable Harm Justifying Extraordinary Relief.

The D.C. Circuit "has set a high standard for irreparable injury." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). The moving party must demonstrate an injury "both certain and great" and "of such *imminence* that there is a 'clear and present' need for equitable relief in order to prevent irreparable harm." *Id.* (quoting *Wis. Gas Co. v. Fed. Regul. Comm'n*, 758 F.2d 669, 674 (D.C. Cir. 1985). The injury must also "be beyond remediation," meaning that the possibility of corrective relief "at a later date . . . weighs heavily against a claim

of irreparable harm." *Id.* at 297–98.  The mere fact that a complaint alleges a violation of a constitutional right does not automatically demonstrate an irreparable injury.  *Ayele v. Dist. of Columbia*, 704 F. Supp. 3d 231, 239 (D.D.C. 2023) ("[T]here is no per se rule that the violation of any constitutional right is inherently irreparable.").

Plaintiffs' alleged harm does not satisfy the D.C. Circuit's requirement that the harm be both certain and great, as well as beyond remediation.  *Chaplaincy*, 454 F.3d at 297.  Plaintiffs first claim that the stop work directive and dismissal of some CFPB employees constitutes an irreparable injury "to employees and the organizations that represent them."  PI Mot. at 32.  But typically, employment decisions, even up to a loss of employment, are only irreparable in "genuinely extraordinary situation[s]."  *Sampson v. Murray*, 415 U.S. 61, 92 & n.68 (1974).  Loss of income or reputation are not such extraordinary situations.  *See id.* at 89–92; *see also id.* at 92 n.68 (declining "to define in advance of their occurrence" what might constitute extraordinary circumstances, but ruling out "insufficiency of savings or difficulties in immediately obtaining other employment . . . however severely they may affect a particular individual").  And this case does not present such a situation; the employees at issue here have merely been told to stop work on their current assignments, or in some cases dismissed from their roles.  *See, e.g.*, *Farris v. Rice*, 453 F. Supp. 2d 76, 79–80 (D.D.C. 2006) ("[C]ases are legion holding that loss of employment does not constitute irreparable injury").  Their "fear" that they may be dismissed at some point in the future or that their personal information will be leaked to the public, PI Mot. at 33, falls short of alleging a fairly traceable concrete and particularized injury for purposes of Article III standing, let alone an imminent irreparable harm that is both "certain and great," as required to meet the "high standard for irreparable injury."  *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297 (quoting *Wis. Gas Co.* 758 F.2d at 674).  *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013) (plaintiffs "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending").  And a stop work directive itself cannot present irreparable injury, especially where any incidental harms employees and their unions face from this action can be redressed through the CSRA.  *See Sampson*, 415 U.S. at 92 &

34

n.68; *supra* 11-14.

The consumer-orientated Plaintiffs' allegations of irreparable harm, based on the alleged "halt to the Bureau's performance of its statutory functions," fare no better. PI Mot. at 32. First, and again, there mere fact that agency leadership must review and approve work to make sure that it is consistent with the agency's statutory obligations does not mean that CFPB is not performing statutory functions. The Bureau is committed to performing its statutory obligations. Martinez Decl. ¶¶ 19-23. "[E]xpenditure[s] based on a nonparanoid fear" to the contrary are insufficient. *Clapper*, 568 U.S. at 416.

In any event, consistent with the "characterization of injunctive relief as an extraordinary remedy," *Winter*, 555 U.S. at 22, "[a] prospective injury that is sufficient to establish standing . . . does not necessarily satisfy the more demanding burden of demonstrating irreparable injury." *Cal. Ass'n of Priv. Postsecondary Schs. v. Devos*, 344 F. Supp. 3d 158, 170 (D.D.C. 2018). Rather, the injury must be "great" in magnitude. *Wis. Gas Co. v. Fed. Energy Regul. Comm'n*, 758 F.2d 669, 674 (D.C. Cir. 1985). *See, e.g., Standard Oil*, 449 U.S. at 244.[10]

The consumer-orientated Plaintiffs' declarations are insufficient to show that, while this litigation is pending, they will experience the type of great injury necessary to justify extraordinary relief. For example, James Speer attests that if the CFPB complaint system and hotline were unavailable, that would make fulfilling the Virginia Poverty Law Center (VPLC)'s mission "much harder" and would "strain [its] already limited resources." Decl. of James Speer, ECF No. 14-5, ¶¶ 15-16 ("Speer Decl."). In particular, Speer speculates that VPLC might "hire additional staff" or "divert another staff member's time." *Id*. ¶ 24. The CFPB complaint system and hotline are available. Martinez Decl. ¶¶ 20-22. But in any event, VPLC fails to provide any evidence placing those diverted resources "in the context of [its] overall finances." *Nat'l Council of Agric. Emps. v. U.S. Dep't of Lab.*, Civ. Action No. 22-2569, 2023 WL 2043149, at *7 (D.D.C. Feb. 16, 2023). And in the absence of evidence showing that the "expense is disproportionate" to those finances,

---

[10] For this reason, *League of Women Voters of the United States v. Newby*, 838 F.3d 1 (D.C. Cir. 2016), cannot be understood to equate the standard for irreparable harm and the standard for organizational standing derived from *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982).

more resource-intensive activities would "not justify [an] injunction[.]" *Petroleum Expl. v. Pub. Serv. Comm'n of Ky.*, 304 U.S. 209, 220-21 (1938).

What is more, the Supreme Court has held that expenses associated with addressing a dispute are precisely the type of costs that do not qualify as irreparable harm. *See, e.g., Standard Oil*, 449 U.S. at 244 ("Mere litigation expense, even substantial and unrecoupable cost, does not constitute irreparable injury" (citation omitted)); *see also I.A.M. Nat'l Pension Fund Benefit Plan A v. Cooper Indus., Inc.*, 789 F.2d 21, 25 (D.C. Cir. 1986) ("Formidable as it is, the cost and delay associated with modern-day litigation simply does not establish irreparable harm."). And Plaintiffs' characterizations aside, VPLC complains of increased expenses associated with addressing consumers' disputes with financial companies—not meaningfully different from litigation expenses insufficient to show irreparable injury. *See id.*; *see also Petroleum Expl.*, 304 U.S. at 220 (considering "expense in preparing for and carrying out an investigation"). Indeed, Speer concedes that "going to litigation" is one of several "other options"—adequate alternative remedies at law other than utilizing CFPB resources—that exist for addressing disputes between VPLC clients and financial services companies. ECF No. 14-5, Speer Decl. ¶ 11. Given those options, it is far from clear that any harms here are truly beyond remediation, let alone great in magnitude. *See id*. Indeed, Plaintiffs provide evidence that any harm will be addressed via adequate remedies at law assisted by "the private bar and legal services community." Decl. of Richard Dubois ¶ 15, ECF No. 14-6 ("Dubois Decl.").

NAACP, for its part, does not provide evidence to demonstrate standing, let alone irreparable harm. It alleges that it is proceeding in this action on behalf of its members. Am. Compl. ¶¶ 15, 68. Membership organizations may assert standing on behalf of its members, but in order to do so they must show that at least one member "would otherwise have standing to sue in [its] own right." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343–44 (1977); *see Summers v. Earth Island Inst.*, 555 U.S. 488, 494–96 (2009). Associational standing doctrine thus requires that NAACP "*identify* members who have suffered the requisite harm." *Summers*, 555 U.S. at 499 (emphasis added); *see Am. Chemistry Council v. Dep't of Transp.*, 468 F.3d 810, 815,

820 (D.C. Cir. 2006) (holding that "an organization bringing a claim based on associational standing must show that at least one specifically-identified member has suffered an injury-in-fact"). NAACP fails to do so here.[11] And insofar as it is alleging organizational standing, it fails to provide even conclusory evidence (which itself would be insufficient evidence at this stage) of any drained resources at all. *See Havens Realty Corp.*, 455 U.S. at 379; *Equal Rights Ctr. v. Post Properties, Inc.*, 633 F.3d 1136, 1141 (D.C. Cir. 2011). In any event NAACP certainly has not shown the type of disproportionate and great injury necessary for extraordinary emergency relief overseeing a federal agency.

The same is true for the National Consumer Law Center ("NCLC"). That organization has been serving American consumers since 1969, more than forty years before the CFPB was created. Dubois Decl. ¶ 3. The notion that Acting Director Vought's directive to CFPB staff pausing policy-related decision-making to the extent permitted by applicable law will cause NCLC harm that is beyond remediation finds no support in the Dubois Declaration, which is focused on equating that action with "permanently shutter[ing]" CFPB. *Id.* ¶ 14. And NCLC's claim to great harm sufficient in magnitude to justify an injunction faces similar flaws to that of VPLC. NCLC fails to place any purported "detrimental[] impact[]" on its ability to educate the public, *id.* ¶ 14, "in the context of [its] overall finances." *Nat'l Council of Agric. Emps.*, 2023 WL 2043149, at *7. And insofar as NCLC is complaining about CFPB's cancellation of its subscription to NCLC's publications, Dubois Decl. ¶ 7, those type of disputes are handled by the Court of Federal Claims; that forum certainly provides an adequate legal remedy, foreclosing a finding of irreparable harm.

Moreover, NCLC's interests in this case are insufficient for Article III standing, let alone irreparable harm. Again, based on a case that the Supreme "Court has been careful not to extend

---

[11] While courts in this district "disagree about whether a plaintiff-association is required to name a specific member at the pleading stage," *Ranchers-Cattlemen Action Legal Fund, United Stockgrowers of Am. v. USDA*, 573 F. Supp. 3d 324, 334 (D.D.C. 2021), "[i]n the context of a preliminary injunction motion," a plaintiff must "'show a substantial likelihood of standing' 'under the heightened standard for evaluating a motion for summary judgment,'" *Elec. Priv. Info. Ctr.*, 878 F.3d at 377 (citation omitted), and, at that stage, courts agree that a plaintiff-association must demonstrate that a specific member has standing, *see Ranchers-Cattlemen Action Legal Fund*, 573 F. Supp. 3d at 335.

. . . beyond its context," *FDA v. All. for Hippocratic Medicine*, 602 U.S. 367, 396 (2024), an organization may sometimes establish standing by demonstrating that a defendant's challenged conduct has "perceptibly impaired" its efforts to provide services and it is experiencing a "consequent drain on [its] resources." *Havens Realty Corp.*, 455 U.S. at 378–79.  But on the other hand, "a mere 'interest in a problem,'" is insufficient.  *Sierra Club v. Morton*, 405 U.S. 727, 739 (1972).  This vital difference—between an obstacle to the provision of services to individuals and an interest in an issue—is why courts have been resistant to the notion that advocacy organizations suffer an injury when they allege only that their advocacy has been curtailed by government action.  *See Equal Means Equal v. Ferriero*, 3 F.4th 24, 30 (1st Cir. 2021); *Keep Chi. Livable v. City of Chi.*, 913 F.3d 618, 625 (7th Cir. 2019); *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015); *Ctr. for Law and Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1161 (D.C. Cir. 2005).  Based on the totality of its evidence, NCLC's activities fall on the *Sierra Club* side on the divide.  *See, e.g.* Dubois Decl. ¶ 15 ("NCLC will have to engage in dramatically increased advocacy in the states to fill the gaps left . . .").

Pastor Steege faces no harm, let alone irreparable harm, from allegedly not being able to immediately meet with CFPB staff to address her application for the PSLF program.  Again, the PSLF program is administered by the Department of Education, not the CFPB.  *Supra* at 22-23.  Paster Steege provides no evidence that the Department of Education will not assist her with a PSLF application.  And even if she did, that grievance would be between Pastor Steege and the Department of Education, not CFPB, which has no statutory role to play administering or assisting consumers with public loans.  *See id*.  Indeed, the Department of Education has its own statutory student loan ombudsman.  20 U.S.C. § 1018(f).

### III.    The Equities and the Public Interest Weigh Against a Preliminary Injunction.

The third and fourth requirements for issuance of a preliminary injunction—the balance of harms and whether the requested injunction will disserve the public interest—"merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). These factors tilt decisively against granting a preliminary injunction here. *See Kim v. FINRA*, 698 F. Supp. 3d 147,

172 (D.D.C. 2023) ("[A] court can deny preliminary injunctive relief solely on the balance of equities and public interest factors even in cases, like this, involving constitutional claims."), *appeal dismissed by* No 23-7136, 2025 WL 313965 (D.C. Cir. Jan. 27, 2025).

The public has an interest in permitting the President to take decisive action when it comes to setting his policy priorities for the CFPB. A preliminary injunction would displace and frustrate the President's decision about how to best address those issues. *Heckler*, 470 U.S. at 831-32.

Moreover, an injunction restricting the Acting Director of CFPB from exercising his statutorily-authorized discretion to determine the amount "reasonably necessary to carry out the authorities of the Bureau" for purposes of his funding request to the Federal Reserve, 12 U.S.C. § 5497(a)(1), would frustrate Congress's objectives by preventing him from "effectuating statutes enacted by representatives of [the] people," and causing the United States to "suffer[] a form of irreparable injury" as a result. *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (citation omitted). Because the public has an interest in the executive branch effectuating its policies, this final factor tips in favor of Defendant. The Court should deny Plaintiff's requested preliminary injunctive relief. *See Kim*, 698 F. Supp. 3d at 172.

## IV.    Any Injunction Should Be Narrowly Tailored and Stayed.

For all the foregoing reasons, it would be inappropriate for the Court to issue relief in any form. However, should the Court choose to do so, "an injunction must be narrowly tailored to remedy the harm shown." *Gulf Oil Corp. v. Brock*, 778 F.2d 834, 842 (D.C. Cir. 1985). Here, Plaintiff's requested order goes far beyond that principle. Not only does such a request fail to "describe in reasonable detail . . . the act or acts restrained or required," Fed. R. Civ. P. 65(d)(1)(C), *see* Proposed Order at 2, ECF No. 20-1, it also is not tailored to remedying the particular harms shown. And several components of the requested injunction bear no relationship to any of the arguments in Plaintiffs' briefing. For example, Plaintiffs request relief requiring this Court's supervision of Federal Records Act violations. *Id*. But there is no Federal Records Act claim argued in Plaintiffs' briefing or pleaded in the Amended Complaint. *See generally* PI Mot.; Am. Compl.

At most, Plaintiffs have attempted to show that they would be injured by the dismissal of virtually all CFPB employees *en masse*, and by the termination of CFPB's complaint collection systems. As such, any relief should apply no more broadly than a prohibition on the termination of virtually the entire CFPB workforce and complaint collection systems at once. An injunction that reaches more broadly would be overbroad if applied for any duration, as such an order would interfere with the day-to-day operations of an executive branch agency were it to prevent CFPB from assigning or un-assigning work to an employee for any reason whatsoever. It is a bedrock principle of equity that "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). Thus, the Court should limit any relief to a prohibition on the termination of virtually the entire CFPB workforce and complaint collection systems at once.

Particularly in light of the extraordinary breadth of Plaintiff's motion, to the extent the Court issues injunctive relief, the United States also respectfully requests that such relief be stayed pending the disposition of any appeal that is authorized, or at a minimum that such relief be administratively stayed for a period of seven days to allow the United States to seek an emergency, expedited stay from the Court of Appeals if an appeal is authorized.

### CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motion for a preliminary injunction.

DATED: February 24, 2025              Respectfully submitted,

ERIC J. HAMILTON
Deputy Assistant Attorney General

BRAD P. ROSENBERG
Special Counsel

*/s/ Liam C. Holland*
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch

40

1100 L Street, N.W.
Washington, DC 20005
Tel: (202) 514-4964
Fax: (202) 616-8470
Email: liam.c.holland@usdoj.gov

*Counsel for Defendants*