# Exhibit 1

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **NATIONAL TREASURY EMPLOYEES UNION,** *et al.,*<br><br>    *Plaintiffs,*<br><br>v.<br><br>**RUSSELL VOUGHT, in his official capacity as Acting Director of the Consumer Financial Protection Bureau,** *et al.,*<br><br>    *Defendants.* | No. 1:25-cv-00381-ABJ |

**DECLARATION OF ADAM MARTINEZ**

1.      My name is Adam Martinez.  I am currently employed at the Consumer Financial Protection Bureau ("CFPB" or "the Bureau") serving as the Chief Operating Officer ("COO") and Acting Chief Human Capital Officer.  As the COO, I am responsible for leading the Operations Division in executing all operational functions including finance, procurement, human resources, information technology and development, facilities, security, records management, Freedom of Information Act ("FOIA"), and data governance.  I started serving as the COO on February 20, 2023, and have been with the federal government for 25 years.  The following is based on my personal knowledge or information provided to me in the course of performing my duties.

**Events Occurring After Changes in Bureau Leadership and Events Related to the CFPB Building Closure**

2.      On February 3, 2025, CFPB employees and contractors were notified by email that the Secretary of the Treasury had been named Acting Director of the CFPB, effective January 31, 2025.  The email also identified six areas where, "unless expressly approved by the Acting Director or required by law," Bureau employees were to refrain from taking further action "[i]n order to promote consistency with the goals of the Administration."  This email was sent in order to allow the new, incoming political leadership to assess the CFPB's current operations and evaluate CFPB's priorities in light of the new Administration.  A copy of that email is attached hereto as Exhibit A.

3.      Based on my 25 years of government experience, this is a common practice at the beginning of a new administration and/or during the transition of a new head of agency.  As it relates to operations, during these transitions I immediately prepare and expect for a freeze on

travel, speaking engagements, conference attendance, hiring/recruitment, human resource processing, contracts, and certain mission actions.

4.      While the Secretary of the Treasury was the Acting Director, his team engaged in the evaluation of CFPB's current D.C. Headquarters.  On February 4, 2025, Treasury's Deputy Assistant Secretary ("DAS") for Operations contacted CFPB's Chief Administrative Officer ("CAO") to coordinate a tour of the building that same evening for personnel of the General Services Administration ("GSA") and the Office of Personnel Management ("OPM").  In addition, on the same day the DAS requested the Office of the Comptroller of the Currency ("OCC") to provide him with a copy of the CFPB lease and occupancy agreement.

5.      The CFPB Headquarters Building has provided the potential for greater efficiency and cost savings over the past couple of years.  For example, in 2023 and 2024, the former CFPB Director under the last Administration instructed the Operations Division to explore options to sublease office space and parking to other financial regulators and/or federal agencies.  Since the pandemic, the building has largely remained unoccupied, so this would have provided an opportunity to share costs with other partners.  The CAO coordinated with the OCC to determine the process to sublease if the CFPB found an interested party.  Interest was identified from at least a half dozen agencies.

6.      Officials representing the Department of the Treasury notified CFPB officials on the evening of February 6, 2025, that two United States DOGE Service ("USDS") officials would need access to CFPB Headquarters located at 1700 G St. NW.

7.      A follow-up meeting was held at CFPB Headquarters on the morning of February 7, 2025, between CFPB Management and USDS Personnel.  During the meeting, a CFPB employee who was not an attendee at the meeting began taking pictures of attendees through a conference room window.  The attendees moved to an adjacent conference room with a covered window due to privacy and safety concerns, but the same employee entered that conference room and began to disrupt the meeting.  The employee questioned the personnel in the conference room, demanded to know who they were, began to take pictures and video of open laptops and attendees' faces around the conference table, and demanded that the attendees show her their identification cards.  A CFPB physical security specialist and approximately four security officers were called to the scene to mitigate the problem.  A copy of the Incident Report describing these events is attached hereto as Exhibit B.

8.      On the same day, CFPB employees began protesting outside of the CFPB Headquarters building.  The protest activities included following and questioning staff about who they were and at times making staff feel harassed.

9.      On the evening of February 7, 2025, the National Treasury Employees Union ("NTEU") local chapter president emailed the CFPB's Chief Information Officer ("CIO") and copied the CFPB Legal Team.  She stated that she was made aware of messages being sent to

employees that orders were being received from the "Whitehouse" directly that, in her view, contradict and circumvent CFPB policy and procedures. Further, the NTEU President reminded the CIO that the CFPB is an independent agency and stated that "Whitehouse officials" "are not your supervisor" and "have no authority to order you to carry out orders as a CFPB government employee; only the [Chief Operating Officer] and the Director have that authority." A copy of that email is attached hereto as Exhibit C.

10.     On February 7, 2025, shortly after receipt of the NTEU President's email to the CIO, the President named Russell Vought, the Office of Management and Budget ("OMB") Director, as the CFPB's Acting Director.

11.     On February 8, 2025, the Acting Director emailed CFPB employees stating his commitment to "implementing the President's policies, consistent with the law, and acting as a faithful steward of the Bureau's resources." The email also consisted of eight functions from which CFPB employees should refrain, absent approval "by the Acting Director or required by law." The email also invited employees to raise any questions that they may have "through your existing management for consideration by the Acting Director." This email was sent in order to allow the new Acting Director and political leadership to assess the CFPB's current operations and evaluate the CFPB's priorities in light of the new Administration. It is not unusual for these types of steps to be taken at an agency at the beginning of a new administration and during the transition period for new leadership. A copy of this email is attached hereto as Exhibit D.

12.     On February 9, 2025, I was advised by our new leadership that the Headquarters building would be closed the week of February 10, 2025, due to safety concerns, and employees and contractors would need to work remotely unless instructed otherwise from our Acting Director or his designee. This would provide an opportunity for employees needing access to the building to do so safely given the disruptions caused on February 7, 2025. As the Chief Operating Officer, I sent an email to CFPB employees advising them of the office building closure. A copy of my email is attached hereto as Exhibit E.

13.     On February 9, 2025, CFPB management became aware of additional, planned protests at CFPB Headquarters from 4:15 to 6:00 p.m. and included representatives from Indivisible, Progress Change Institute, MoveOn, and Americans for Financial Reform.

14.     On February 10, 2025, the Acting Director sent an email providing validation of the building closure and instructions regarding work tasks. A copy of the email is attached hereto as Exhibit F.

15.     On February 10, 2025, additional protests occurred at CFPB Headquarters. Those protests consisted of hundreds of people, making the opening of the building unsafe. CFPB Security Staff advised that, due to the protests, the building should remain closed, and as the Chief Operating Officer, I support the continued closure of the building due to ongoing security concerns.

16.    On February 12, 2025, staff protests occurred in front of the CFPB building at approximately 12:00 pm as reported by CFPB security personnel.

17.    The building closure should have limited impact to the Bureau and its employees. Approximately 900 employees currently primarily telework from home full time in the National Capital Region. An estimated 350 employees and contractors are currently assigned an office or cubicle in the building, but not all of them enter the building five days a week.  The CFPB Headquarters building currently has a capacity of 1,221 seats and the annual operational costs are greater than $25.7 million.

18.    After considering the Bureau's priorities to run a more streamlined and efficient Bureau, current CFPB leadership determined that it did not need the footprint associated with its current office space and decided to cancel CFPB's Headquarters lease.  As of the date of this declaration, the cancelation of the lease has not been fully executed.  After the cancelation of the lease, CFPB will have thirty days to move out.  CFPB leadership is evaluating and assessing CFPB's future office space needs.  The Bureau, in consultation with USDS, will evaluate options for alternative office space once the Bureau has ascertained the amount of office space it will need to carry out its more streamlined operations.  In the meantime, CFPB employees will continue to telework. The termination of CFPB's lease will not prevent the CFPB from performing the statutory functions described below, as employees have become accustomed to either working from home or remotely and the Bureau's informational technology supports it.

**The CFPB is Committed to Performing Statutory Obligations**

19.    Since the arrival of the Acting Director, the new leadership is engaging in ongoing decision-making to assess how to make the Bureau more efficient and accountable. Our leadership has worked to comply with statutorily required functions, and my operations team has been mindful of this as we advise on operational related issues.

20.    The closure of the CFPB's Headquarters pursuant to the February 9 and 10 emails has not prevented the CFPB from performing statutory functions as described in this declaration. As mentioned, the approximately 350 employees who have assigned cubicle or office space have the ability to work from home and not all of them came to the office five days a week before the office building closure as reflected in the February 9 and 10 emails.  I or the Chief Legal Officer have approved access for employees that require onsite access to perform their jobs.  Personnel that have been approved for access include newly appointed personnel, security personnel, facilities staff, information technology personnel, mailroom personnel, and cleaning contractors. For example, employees working in mail services have been permitted to access the building and have continued to process consumer complaints that are mailed in.

21.    Work requests have been approved to allow the CFPB to maintain operations required by statute.  For example, the CIO was provided approval to onboard new political leadership with service desk support, perform security monitoring tasks for CFPB networks, and perform maintenance tasks needed to ensure the continuation of the Home Mortgage Disclosure

Act ("HMDA") application, Consumer Complaint Database, ServiceNow, and Microsoft365 platforms. Other approvals included maintaining the CFPB Call Centers and the processing of payments through the Civil Penalty Fund. While the Student Loan Ombudsman position is currently vacant, consumers have other options to receive support from the CFPB including utilizing the CFPB Consumer Complaint Center and/or the CFPB Ombudsman Office, which houses five employees. The CFPB Ombudsman Office is an independent, impartial, and confidential resource to help consumers, financial entities, consumer or trade groups, or anyone else interacting with the CFPB. These functions help ensure that the CFPB continues to engage in statutorily required work.

22.    Since the February 3 email, I have never had a work request be denied. The Bureau is committed to performing its statutory obligations, including those listed in 12 U.S.C. § 5493(b)(3)(A), entitled "Collecting and tracking complaints." The Bureau is maintaining a single, toll-free telephone number, a website, and a Consumer Complaint Database to facilitate the centralized collection of, monitoring of, and response to consumer complaints regarding consumer financial products or services. Operations related to the Consumer Complaint Database are continuing. Contracts needed for work related to the Consumer Complaint Database have remained intact and operational.

23.    Additionally, as required by the HMDA, the Bureau is providing information technology technical assistance to enable filers to submit their data and enabling the Federal Financial Institutions Examination Council to compile and publish information about applications for mortgage loans that is reported to the Bureau by mortgage lenders. 12 U.S.C. § 2809(a). In short, operations related to the CFPB's statutory requirements under HMDA are continuing. Contracts needed for work related to the HMDA have remained intact and operational.

**CFPB's Funding Structure and the Funding Request from Acting Director Vought**

24.    With respect to funding, the Bureau maintains two types of funds: (1) the Bureau of Consumer Financial Protection Fund ("Bureau Fund") and (2) the Civil Penalty Fund. The Federal Reserve funds the Bureau Fund through transfers administered by the Board of Governors of the Federal Reserve System, and this money is used for the Bureau's operations and expenses. Entirely separate from the Bureau Fund, the Civil Penalty Fund is funded by civil penalties imposed and collected by the Bureau—not the Federal Reserve. The Civil Penalty Fund is used to redress harmed consumers. Issuance of approved payments to affected consumers has continued to be processed.

25.    At the Bureau, new leadership is engaged in ongoing decision-making to assess how to make the Bureau more efficient and accountable, consistent with this Administration's goals of reforming the federal bureaucracy, reducing wasteful spending, and streamlining efficiencies in the federal government.

26.    Shortly after becoming Acting Director, Mr. Vought reviewed the sums available to the Bureau in its Bureau and Civil Penalty Funds. After considering the Bureau's total current

balance and the projected expenses for the upcoming quarter, Acting Director Vought determined that these currently available funds were sufficient for the Bureau to carry out its statutory mandates for the next fiscal quarter.

27.     In making that determination, Acting Director Vought considered the President's priorities of running a more streamlined and efficient Bureau, the public's interest in a streamlined and efficient Bureau, the impact of government spending on the federal deficit, the impact of anticipated efficiency initiatives at the Bureau, and the consumer interest.  Based on his determination, Acting Director Vought sent Chairman Powell a letter requesting $0 for the Third Quarter of Fiscal Year 2025.  A copy of that letter is attached as Exhibit G.

28.     The Bureau has made no attempts to transfer any of its Funds back to the Federal Reserve.   Indeed, I am not aware of a mechanism to transfer Funds back to the Federal Reserve.

***

I declare under penalty of perjury that the foregoing is true and correct.

Executed in Washington, DC this 24th day of February.

ADAM MARTINEZ
Digitally signed by ADAM MARTINEZ
Date: 2025.02.24 17:45:53 -05'00'

Adam Martinez
Chief Operating Officer

# Exhibit A

**From:**      CFPB_OfficeOfTheDirector
**To:**        _DL_CFPB_AllHands; _DL_CFPB_AllHands_Contractors
**Subject:**  Instructions from Acting Director
**Date:**     Monday, February 3, 2025 10:59:59 AM

Colleagues,

Secretary of the Treasury Bessent has been named Acting Director of the CFPB, effective January 31, 2025. As Acting Director, Secretary Bessent is committed to appropriately stewarding the agency pending new leadership. In order to promote consistency with the goals of the Administration, effective immediately, unless expressly approved by the Acting Director or required by law, all employees, contractors, and other personnel of the Bureau are directed:

- Not to approve or issue any proposed or final rules or formal or informal guidance.
- To suspend the effective dates of all final rules that have been issued or published but that have not yet become effective.
- Not to commence, take additional investigative activities related to, or settle enforcement actions.
- Not to issue public communications of any type, including publication of research papers.
- Not to approve or execute any material agreements, including related to employee matters or contractors.
- Not to make or approve filings or appearances by the Bureau in any litigation, other than to seek a pause in proceedings.

If you have any questions, please raise issues through your existing management for consideration by the Acting Director.

Thank you.

# Exhibit B

February 21, 2025
Information Memo for the Chief Operating Officer

| **FROM** | ███████████, Director of Security, 202-███ |
|---|---|
| **THROUGH** | ███████████, Physical Security Specialist, 202-██████ |
| **SUBJECT** | Employee Incident Report on Friday, February 7, 2025 |

| Select Applicable Information Type(s) | ☒Situational Awareness | ☐Request for Directional Feedback | ☐Reply to Inquiry from Director/FO | ☐ Draft Document Feedback Request |
|---|---|---|---|---|

Issue

On Friday, February 7, 2025, at approximately 11:09 am, ██████████, CFPB's Physical Security Specialist, received a call from Special Police Officer Lt. █████ reporting a disruptive employee near Room B118. Upon arrival, Mr. ████████ observed Ms. ████ in front of Room B118. When Mr. ██████ approached Ms. ████████, she appeared agitated and stated she had the right to know who the people in the room are and what they are doing. Mr. ███████ noticed Ms. ██████████ was not displaying her PIV card in accordance with Bureau policy, and inquired if she was an employee and if he could see her PIV card. Ms. ████████ removed her PIV card from her pocket and showed it to Mr. ████████, then quickly put it back in her pocket. Mr. ████████ informed her that CFPB policy requires staff to display a PIV card while in CFPB space, but she did not comply. At that time ████████████ from the Legal Division arrived and asked to speak with Ms. █████████. They proceed down the hallway to have a private conversation.

At that point, ████████████, T&I Infrastructure Director, exited Room B118 and informed Mr. ████ that it was he who notified security regarding her disruptive and harassing behavior. Mr. ████ stated he was in a meeting in Room B116 with CFPB CIO ████████████, along with DOGE staff ████████████ and ████████████, who were recently assigned to CFPB. While in the meeting in Room B116, Mr. ██████ noticed Ms. ███████ pushing a baby carriage past the room on several occasions with a telephone pointing towards the window apparently attempting to capture pictures or video of staff in the room. Mr. ████████ offered, and the team agreed, to move the meeting to Room B118 because the windows were covered. Mr. ████████ then stated that when he was exiting Room B118, Ms. ████████ confronted him in the hallway and was pointing her phone camera yelling at him about what he was doing. He requested Ms. ████████ to stop pointing the camera at him when she responded, 'don't touch me'. She then entered Room B118 and started recording and taking pictures of the computers and people in the room.

The incident was captured on CFPB security footage, Camera 13 at 11:04 am.

Timing Considerations

No timing considerations.

Information Memo Reviewer Sheet

| Subject/Document Title<br>Employee Incident Report | | |
|---|---|---|
| Name of Document Owner<br>█████████ | Office<br>Office of Administrative<br>Operations | Telephone Extension<br>202-██████ |
| Approved by<br>█████████ | | |
| Office<br>Office of Administrative<br>Operations | Name of Reviewer<br>█████████ | Date<br>2/21/2025 |
| Office<br>[Insert office] | Name of Reviewer<br>[Insert name of reviewer] | Date<br>[Insert date] |

# Exhibit C

| From: | Farman, Catherine (CFPB) |
|---|---|
| To: | Chilbert, Christopher (CFPB); Martinez, Adam (CFPB); Schafer, Jessica (CFPB); Scott, Adam (CFPB); Doguin, John Paul (CFPB); White, Sonya (CFPB); Belasco, Lisa (CFPB); Heiser, Nicole (CFPB); Rice, Kevin (CFPB); Smith, Jarid (CFPB); Noble, Erin (CFPB) |
| Subject: | Reminder you take orders from CFPB officials |
| Date: | Friday, February 7, 2025 6:37:32 PM |
| Importance: | High |

Chris,

I've been made aware of messages you're sending employees that you are receiving orders from the "Whitehouse" directly that contradict and circumvent CFPB policy and procedure. As a reminder the CFPB is an independent agency; DOGE officials and Whitehouse officials are not your supervisor and have no authority to order you to carry out orders as a CFPB government employee; only Adam Martinez and the Director have that authority.

If you are being asked and/or pressured by people other than your chain of command, ask your supervisor in writing to verify or clarify the request and cc CFPB Legal. Congress, CFPB Union and news reports have warned federal officials of well-documented pressure tactics from staff outside of independent agencies designed to manipulate government employees into circumventing law and standard operating procedure at their request and you should heed these warnings.

Thank you,

--

Catherine Farman (they/them, she/her/hers)
Web Developer | Technology & Innovation
President | CFPB Union NTEU 335
Mobile: ██████████
#Solidarity
consumerfinance.gov
nteu335.org

# Exhibit D

| | |
|---|---|
| **From:** | Vought, Russell |
| **To:** | _DL_CFPB_AllHands |
| **Subject:** | Directives on Bureau Activities |
| **Date:** | Saturday, February 8, 2025 8:50:28 PM |

Dear Colleagues,

I am honored that President Trump designated me as Acting Director of the Bureau on February 7, 2025.  As Acting Director, I am committed to implementing the President's policies, consistent with the law, and acting as a faithful steward of the Bureau's resources. To that end, I am directing that, effective immediately, unless expressly approved by the Acting Director or required by law, all employees, contractors, and other personnel of the Bureau shall:

- Not approve or issue any proposed or final rules or formal or informal guidance.
- Suspend the effective dates of all final rules that have been issued or published but that have not yet become effective.
- Not commence, take additional investigative activities related to, or settle enforcement actions.
- Not open any new investigation in any manner, and cease any pending investigations.
- Not issue public communications of any type, including publication of research papers and compliance bulletins.
- Not approve or execute any material agreements, including related to employee matters or contractors.
- Not make or approve filings or appearances by the Bureau in any litigation, other than to seek a pause in proceedings.
- Cease all supervision and examination activity.
- Cease all stakeholder engagement.

If you have any questions, please raise issues through your existing management for consideration by the Acting Director.

Thank you.

Russell T. Vought

# Exhibit E

| | |
|---|---|
| **From:** | Martinez, Adam (CFPB) |
| **To:** | _DL_CFPB_AllHands |
| **Subject:** | Please Read: DC Headquarters Building Operating Status (2/10-2/14) |
| **Date:** | Sunday, February 9, 2025 1:39:00 PM |

(This message is for DC Headquarters Staff and Contractors)

Dear Colleagues:

The DC Headquarters Building will be closed this week (2/10-2/14).  Employees and contractors are to work remotely unless instructed otherwise from our Acting Director or his designee.

Thank you.

Adam

Adam Martinez
Chief Operating Officer

# Exhibit F

| | |
|---|---|
| **From:** | Vought, Russell |
| **To:** | _DL_CFPB_AllHands |
| **Subject:** | Additional Directives on Bureau Activities |
| **Date:** | Monday, February 10, 2025 8:30:43 AM |

Good morning, CFPB staff,

As you have been informed by the Chief Operating Officer in an email yesterday, the Bureau's DC headquarters building is closed this week. Employees should not come into the office. Please do not perform any work tasks. If there are any urgent matters, please alert me through Mark Paoletta, Chief Legal Officer, to get approval in writing before performing any work task. His email is ███████████████. Otherwise, employees should stand down from performing any work task. Thank you for your attention on this matter.

Best,

Russ Vought

Acting Director

Bureau of Consumer Financial Protection

Exhibit G

 Consumer Financial
Protection Bureau

1700 G Street NW, Washington, D.C. 20552

February 8, 2025

The Honorable Jerome H. Powell
Chairman, Board of Governors of the Federal Reserve System
20th Street and Constitution Avenue, NW
Washington, D.C. 20551

Dear Chairman Powell:

The Consumer Financial Protection Act requires the Board of Governors of the Federal Reserve System to transfer each quarter an "amount determined by the Director to be reasonably necessary" for the Bureau of Consumer Financial Protection to carry out its authorities under law. 12 U.S.C. 5497(a)(1).  In determining this amount, the Director must "take into account such other sums made available to the Bureau from the preceding year" or quarter.  *Id.*

This letter is to inform you that for the Third Quarter of Fiscal Year 2025, the Bureau is requesting $0.

During my review of the Bureau's finances, I have learned that the Bureau has a balance of $711,586,678.00 in the Bureau of Consumer Financial Protection Fund.  By law, I must take account of this sum when determining the amount "reasonably necessary" for the Bureau to fulfill its statutory authorities.  *Id.*  I have determined that no additional funds are necessary to carry out the authorities of the Bureau for Fiscal Year 2025.  The Bureau's current funds are more than sufficient—and are, in fact, excessive—to carry out its authorities in a manner that is consistent with the public interest.

In the past, the Bureau has at times opted to maintain a "reserve fund" for financial contingencies.  But no such fund is required by statute or necessary to fulfill the Bureau's mandate.  The Bureau's new leadership will run a substantially more streamlined and efficient bureau, cut this excessive fund, and do its part to reduce the federal deficit.

Sincerely,

/s/ Russell T. Vought
Russell T. Vought, Acting Director

cc:    Patrick J. McClanahan, Chief Operating Officer, Board of Governors of the Federal Reserve System