IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL TREASURY EMPLOYEES UNION, *et al.*,<br>　　　　　*Plaintiffs*,<br>　v.<br>RUSSELL VOUGHT, in his official capacity as Acting Director of the Consumer Financial Protection Bureau, *et al.*,<br>　　　　　*Defendants*. | Case No. 25-cv-0381-ABJ |

**DECLARATION OF CHARLIE DOE**

I, Charlie Doe, declare as follows:

1.　I am a Contracting Officer at the Consumer Financial Protection Bureau. A Contracting Officer negotiates, administers, and terminates contracts on behalf of the United States. The statements made in this declaration are based on my personal knowledge.

2.　I am submitting this declaration pseudonymously because I fear retaliation. But if the Court would like to know my name, I would be willing to provide it ex parte and under seal.

3.　I have been a contracting officer for many years, through multiple changes in administration. The events of the past few weeks are unlike anything I've ever seen at any agency during any change in administration (or at any other time). The instructions to contracting officers did not reflect a change in policy direction, but rather a wholesale termination of the contracts needed to keep the CFPB running.

4.　On February 11, 2025, all contracting officers received an email ordering us to log in and begin terminating the vast majority of the CFPB's contracts. We were directed to "terminate all Enforcement (102 contracts), Supervision (16 contracts), External Affairs (3 contracts), Consumer Response (20 contracts), Office of Director (33 Contracts), and Legal Division (all

1

except 2 contracts – FD Online licenses and litigation data)." We were directed to "get these Termination Notifications out ASAP." The Bureau repeatedly authorized overtime for us to be able to terminate the contracts within a few days.

5. Following this directive, between February 11, 2025 and February 14, 2025, the CFPB issued notices of termination for over one-hundred contracts that supported the Bureau's work. The Bureau terminated almost all of the contracts it had with vendors, including all contracts related to enforcement, supervision, external affairs, and consumer response. Among many other things, these contracts included contracts for storing, maintaining, and transferring data. They included contracts for maintaining the consumer complaint database; scrubbing the database of personally identifiable information; enabling consumer complaint information to be shared with the public and with states, localities, and other federal agencies; and protecting the complaint database from computer viruses. All expert contracts, including contracts with experts in pending litigation, were canceled. Contracts for training examiners who supervise banks and for administering the test that employees must take to become examiners were canceled. Contracts for ensuring that the CFPB's website and publicly available information is accessible as required under the Americans with Disabilities Act. Contracts for the tools necessary for CFPB employees to do their jobs were canceled.

6. Before issuing contract termination notices, the Bureau asked CFPB employees to provide feedback on what contracts were necessary for the Bureau to continue to carry out its statutorily required functions. But the Bureau decided to ignore this feedback, instead issuing an urgent directive to the contracting department to cancel all of the agency's contracts. I am aware of only two exceptions to this initial directive: the contract for storing litigation data and the database that houses employees' financial disclosure information.

7. A very small number of contracts have been reinstated. For example, following widespread media attention on the cancellation of the consumer complaint hotline, that contract was reinstated. But because the contract to maintain the database that houses those complaints remains canceled, the database is quickly degrading. And I understand that there is a backlog of thousands of complaints that have not been forwarded to financial institutions. The vast majority of the contracts the Bureau needs to perform its functions remain terminated, and they have not been replaced.

8. The contract termination notices sent the week of February 11, 2025 informed contractors that they should stop work on the contract, that the Bureau intended to terminate the contract, and that the contractor had 30 days to report to the Bureau any outstanding costs or costs related to terminating the contract.

9. These stop-work orders do not themselves complete the termination of a contract. In order to complete a contract's termination, the vendor must report its settlement costs, the Bureau must pay those costs, and there must be what's called a "closeout modification" of the contract, signed by both the vendor and a Bureau contracting officer.

10. If a contract is fully terminated, that termination cannot simply be rescinded. Federal Acquisition Regulations govern the process agencies must go through to requisition goods or services, and once a contract is fully terminated, procurement must go through that process. Unless the agency can justify awarding the contract without having a competitive bidding process, it will need to go through that entire process again. That process often takes six months to a year or more. Even the process of justifying an exemption from competitive bidding can take months. Re-procuring services for the CFPB to get up and running again would likely take even longer than usual here because the CFPB's contracting office is already understaffed. The Bureau was

slated to hire additional Contract Specialists, but following a directive from Acting Director Vought, those offers were rescinded.

11. This full contract termination process is ordinarily completed within 30 days of the notice of termination, sometimes sooner. The Bureau recently began issuing directives to contracting officers that we should complete the termination process for the more than one hundred contracts for which it had issued stop-work notices as quickly as possible. We were directed to complete contract termination, even if the ordinary, required steps, such as consulting with legal, receiving and approving settlement costs, and even getting the vendor's signature, had not been completed. Following what I understand was a temporary agreement between the plaintiffs and the Government pending this Court's hearing on March 3, we were directed to pause the finalization of contract terminations. Absent that agreement, many of the CFPB's contracts would have been fully and irrevocably terminated by the end of this week. Once that agreement expires after the hearing, if there is no order prohibiting the continuation of contract terminations, I expect the vast majority of the CFPB's contracts to be fully terminated within the week.

12. To my knowledge, the Bureau has not taken any efforts to preserve CFPB data that is possessed by vendors whose contracts are terminated. Previously, when I issued a final contract termination, I would include a data preservation notice to ensure that Bureau data was not deleted. But none of the stop-work notices or other termination paperwork that I am aware of contains a provision requiring data preservation, requiring the return of data to the CFPB, or anything else governing data. We are being required to use form language that does not include anything about data preservation, and are not permitted to add that (or anything else) to the language provided.

13. As someone has been working in government procurement for 25 years, I have been a stalwart protector against waste, fraud, and abuse. I pride myself on being an excellent steward

of the tax payers' dollars, which is a cornerstone of government procurement. That is what contracting officers do. The wholesale termination of contracts will not prevent waste, fraud, or abuse. Instead, the government will incur—and already has incurred—substantial expense because the government will have to pay contractors their costs to terminate a contract, and then pay them again the costs to re-start that contract (such as re-hiring employees, re-creating or re-starting any databases or software, re-purchasing any necessary tools etc.). In addition, if the contracts are fully terminated, it will require substantial work from government employees to re-procure the services they provided.

    I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on February 27, 2025, in Washington, D.C.

/s/ *Charlie Doe*
Charlie Doe