IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NATIONAL TREASURY
EMPLOYEES UNION, *et al.*,
        *Plaintiffs*,

v.

RUSSELL VOUGHT, in his official capacity
as Acting Director of the Consumer Financial
Protection Bureau, *et al.*,

        *Defendants*.

Case No. 25-cv-381-ABJ

## DECLARATION OF BRIAN SHEARER

I, Brian Shearer, declare:

1. I currently serve as the Assistant Director in charge of the Office of Policy Planning and Strategy at the Consumer Financial Protection Bureau (CFPB). The Office of Policy Planning and Strategy is a sub-office within the Director's Front Office that manages and coordinates the policy functions of the agency consistent with statutory restrictions and responsibilities.

2. I have been in this role since March 2024. Before that, I served in senior roles in the CFPB's Front Office. I was on the CFPB agency review team for the last presidential transition and part of the "landing team" for the CFPB in 2020. Starting on January 20, 2021, I served as the lead advisor on enforcement and supervision for Acting Director David Uejio. When Director Rohit Chopra was confirmed in October 2021, I became his lead advisor on regulatory policy.

3. I also worked at the CFPB from September 2011 to July 2018. I spent most of that time as an attorney in the Office of Supervision Policy, but from early 2017 up until his departure from the agency in November 2017, I was Director Richard Cordray's Senior Advisor. For the first several months of Acting Director Mick Mulvaney's tenure, I was a Senior Advisor to

Associate Director of Supervision, Enforcement, and Fair Lending Chris D'Angelo, until leaving the CFPB in July 2018.

  4. I have been personally involved in every presidential administration change that the CFPB has experienced since its inception. During the transition from President Obama to President Trump appointees in 2017, I was one of the staffers who briefed the Trump appointees as they took over leadership of the agency. For example, I helped brief then Acting Director Mulvaney on the then-existing enforcement docket, and briefed the first Trump Administration's new political appointees on the CFPB's supervision work. During the transition from President Trump to President Biden appointees, I was one of the appointees who arrived at the CFPB after Director Kraninger resigned, and I advised Acting Director Uejio during that transition before Director Chopra was confirmed by the Senate. And I have now observed the recent transition from Director Chopra to Acting Director Bessent and Acting Director Vought.

  5. The typical actions of a transition, which both Acting Directors Mulvaney and Uejio immediately took, include (1) requiring new approval for publication of materials that have not been approved by the new leadership, (2) postponing the effective dates of outstanding rules pending reconsideration, (3) instructing the CFPB to pursue new projects consistent with new priorities, (4) receiving briefings on the outstanding enforcement docket and examination calendars in order to begin to steer the enforcement docket and examination calendar towards new priorities and to make decisions on individual investigations and exams, (5) fielding voluminous memoranda and briefings on whether to start, continue, or discontinue various projects, and (5) holding meetings to introduce themselves and convey priorities to the staff and management chain of command.

6.More specifically, in a normal transition, the CFPB's consumer complaint function continues largely unaffected because it is statutorily required and does not implicate ideology or matters of policy. Examinations that have already started continue, but the incoming administration makes adjustments to the *future* examination calendar. Enforcement matters in active litigation in court continue to be prosecuted. Enforcement investigations continue, though over time new investigative priorities are conveyed to staff to realign the work, and the Acting Director decides on a case-by-case basis whether to grant the enforcement staff authority to seek settlements, file lawsuits, reach out to targets of investigations, or close investigations. Economists continue to conduct research, but the Acting Director and his appointees review the research reports before approving them for publication. And other internal work of the agency continues in a similar vein. This is what Acting Director Mulvaney did under the prior Trump Administration.

7.In short, transitionary Acting Directors that serve between confirmed Directors have no legitimate need to bring the agency to a complete stop in order to shift the agency's policy priorities—and, indeed, they have never done so at any prior point in the agency's history. Instead, the agency's work continues. And transition periods are busy times. Agency staff have many meetings with new leadership and write many memos seeking new direction. Staff seek guidance from the new administration's leadership, and the new agency leadership reviews and approves, adjusts, or rejects individual investigations, regulations, exam reports, research reports, and other output before they are published. The new administration also starts new projects at the direction of the new agency leadership, and over a short amount of time the back-log of projects started under the prior administration are replaced by projects started by the new administration.

8. Based on my personal experience with CFPB transitions, including the differences between this transition and the beginning of the first Trump administration, the current transition is not normal and does not appear designed to redirect the agency towards new policy priorities. The incoming Trump appointees have not held all-hands or all-manager meetings. They have not communicated with most managers at the agency, including me. They have not even announced themselves to the agency.

9. The incoming administration has not approved the publication of any materials. They have not instructed the CFPB to pursue any new affirmative projects that I am aware of. They have not expressed the agency's new priorities to the staff.

10. Notably, I have informed the incoming administration that I will be resigning and I have not heard of any plans to replace me. I occupy a position that guides policy across the agency under the Director's vision. The fact that this administration has not bothered to fill my position suggests they are not engaged in a serious effort to redirect the agency's policy work.

11. What the incoming administration has done is take the unprecedented action of putting everyone on *paid* administrative leave with limited exceptions. That means that examinations that were underway have been canceled, even though the American taxpayers are still paying the examiners. It means that the Office of Enforcement has stopped investigating cases, even though the taxpayers are still paying the investigators. It means that many of the actions necessary to keep the CFPB's consumer complaint process fully functional have ceased. It means that the CFPB's Markets teams are being paid to *not* meet with industry representatives. It means that the CFPB's Research team is paid to not conduct ongoing, nonpartisan research. It means that the CFPB has stopped processing Freedom of Information Act (FOIA) requests, even though we still pay for employees whose sole job is to help the CFPB comply with FOIA, and even though

the law requires that we respond to such requests. And the CFPB has stopped reviewing comments on open proposed regulations, which it is obligated to review under the Administrative Procedure Act even if the incoming administration does not wish to finalize those rules (something one should not assume given that many of the open rulemakings have broad bipartisan consensus).

12.     If one actually wanted to quickly re-align the CFPB to new priorities, the best (and most obvious) way to do so would be to put the agency staff to work briefing the leadership on the various available options on pending matters. CFPB staff often work overtime during transition periods to handle the workload necessary to quickly re-align priorities and policy in a responsible manner. And CFPB staff are professionals who put their personal views aside to present all available options to leadership—policy approaches taken under Director Chopra regularly involved debate and disagreement, but staff never let that get in the way of ensuring that the agency pursues the Director's policy priorities. Placing staff on paid administrative leave en masse makes it impossible to perform this process at the volumes necessary to responsibly steer the agency towards new policy objectives.

13.     Notably, leadership does not need to put everyone on paid leave to stop them from making announcements or taking public actions without permission. CFPB staff are accustomed to obtaining permission from leadership before speaking publicly or issuing anything on behalf of the CFPB. A great deal of the CFPB's work is preparatory and non-public. For example, you do not need to cease work on document review in pending investigations in order to ensure the agency does not reach out to the target of the investigation without permission. You do not need to stop internal memo writing, comment review, or case law research to ensure that a regulation is not issued without permission. In fact, that is the very work necessary to brief the incoming leadership so that they are informed when making a decision on whether to proceed with those matters.

14. The incoming administration has also taken the unprecedented step of immediately laying off employees in their probationary period or with time-limited employment contracts. And it has rushed to cancel contracts, including the CFPB's lease. They have removed the CFPB signage from the agency's DC headquarters building. They have closed the CFPB's offices. They immediately, on the very first day of Acting Director Vought's tenure, sent a letter to the Federal Reserve System determining that the funds in the CFPB's operating account were sufficient to cover CFPB's expenses through the 2025 fiscal year (i.e. to September 31, 2025).

15. The combination of (1) indiscriminately putting staff on administrative leave, (2) not setting up a process to make a high volume of individual decisions on discrete, ongoing matters, (3) immediately laying off tranches of employees with fewer employment protections, (4) terminating the lease and removing the CFPB's signage from the building, (5) canceling contracts in a hasteful manner, (6) never introducing new members of leadership staff to existing staff or conveying any message at all to the agency about what it should be affirmatively working on, (7) telling the Federal Reserve System they would not ask for further funding for the rest of the fiscal year, (8) closing the agency's offices amid an administration wide push to return to the office, (9) public statements by the President of the United States and the head of the new Department of Government Efficiency that the CFPB is being shut down, and (10) the unexplainable speed and urgency of each of those steps, suggests that the current acting leadership is attempting to shut down the CFPB expeditiously. In fact, I have heard from several other CFPB employees that they were directly told by the new leadership that we are in "wind down mode."

16. The speed with which these actions are being taken is extraordinary. If the agency's leadership wanted to marginally or even significantly shrink the agency's headcount, redirect the agency's efforts, and cut costs, it could do so in an orderly fashion over time, considering contracts,

investigations, and projects on an individual basis, after staffing up the political leadership structure of the agency in order to perform those tasks responsibly. This would not require a work stoppage, and in fact would require a substantial portion of the agency's staff. The speed with which these efforts are being taken, and the fact that the leadership is not using the staff to make these decisions, suggests that the temporary acting leadership is attempting to "wind down" the agency before a court can enjoin their efforts. I cannot think of any other reason for this reckless speed given that the current presidential administration has four years—plenty of time—to accomplish its goals.

17. In particular, I would like to draw attention to a number of statements made in a declaration by Adam Martinez on February 24 that are either misleading by omission or are outright falsehoods:

- The declaration, at paragraph 11, references the Acting Director's February 8 email to employees and describes it as communicating "eight functions" that CFPB staff should refrain from unless it is approved by the Acting Director or required by law. This email is framed in the declaration as suggesting that the CFPB is still performing functions required by law, which is false to a significant extent. He omits that this email was followed up by another email on February 10 directing staff to stop all work. Mr. Martinez states that this step was "not unusual," but it is a step that has never been taken before in the history of the agency. The CFPB has never stopped substantially all work during a transition, and has never put the majority of agency staff on administrative leave.

- The declaration appears to focus on a caveat in the February 8th email about "statutorily required" work, but does not acknowledge that the February 10th email eliminated that caveat. Nor does it acknowledge the basic fact that the CFPB's core statutory responsibilities have, in fact, completely ceased, including the full supervision and enforcement divisions. The full division of the CFPB tasked with managing the consumer complaint function is on administrative leave (some of the automated processes are still live, but the manual maintenance and work has ceased). Staff in statutorily required offices or positions (e.g. student loan ombudsman, Office of Fair Lending and Equal Opportunity, Office of Research, Office of Financial Education) have been fired or put on administrative leave.

- The declaration falsely suggests that the entire headquarters building was closed for safety, citing small union protests and one incident where an employee pushing a baby stroller took pictures of White House staff. The CFPB's employee union has picketed the agency


before, including recently during a labor dispute with management during Mr. Martinez's tenure at the CFPB. The CFPB's office is near the White House, and thus, the streets around the office are often filled with protestors advocating for a variety of causes. The CFPB has security guards capable of handling this security environment, locks on doors, and the ability to take individual personnel actions in response to incidents or to turn off individuals' access to the building. The cited security reasons for closing the building are simply not credible and were not articulated at the time of the closure.[1]

- In paragraph 21, the declaration claims that leadership has approved the following tasks: (1) onboarding political leadership, (2) data security, (3) maintaining a discrete set of systems, (4) maintaining a consumer complaint call center contract, and (5) and processing Civil Penalty Fund payments to consumers. Of course, the CFPB has many other statutory obligations, including the obligations to enforce federal consumer financial law, conduct examinations of regulated entities, and many other functions. The CFPB has turned off whole divisions tasked with performing those statutory duties.

- In particular, in paragraph 21, Mr. Martinez claims that even though the Student Loan Ombudsman position is currently vacant, consumers can seek support from the CFPB's Ombudsman Office for their student loan related issues. This is patently false. Both positions are statutorily required, but their functions are completely different. The CFPB Ombudsman Office is, by statute, a liaison between the CFPB and effected persons. 12 USC 5493(a)(5). In other words, it is an office outside parties can use if they have complaints or concerns *about the CFPB*, not if they need help dealing with a regulated entity. Only the Student Loan Ombudsman performs the statutorily required work of assisting consumers with individual student loan related issues. This mistake is particularly concerning because it suggests a lack of familiarity with the functions of the agency—it appears to be a mistake based on the fact that the names of the roles are similar.

- In paragraph 22, Mr. Martinez states that the agency has not pulled down the CFPB's complaint website, and has not canceled contracts relating to the complaint database, without mentioning that the whole Consumer Response division that maintains the CFPB's complaint function is currently on administrative leave.

- In paragraph 26, Mr. Martinez states that Acting Director Vought determined that the current operating balance of the CFPB was enough to cover projected expenses for the upcoming quarter. But Acting Director Vought said that the funds were sufficient to cover expenses through the end of the *fiscal year,* not just the upcoming quarter. And Mr. Martinez neglected to convey that the Acting Director claimed that the CFPB had a balance of $711 million, when in fact a large percentage of that money is obligated and unavailable for future CFPB expenses. For example, $100 million in the account is from a settlement

---

[1] See Kate Berry, *Justice Dept. insists 'there will continue to be a CFPB'*, The American Banker, Feb. 25, 2025 (reporting that the government's legal filings in this case "falsely claimed that it closed the CFPB's Washington D.C. headquarters in response to protests by employees — even though the protests happened only after the office was shuttered.").

    with Navient Corp. and must be distributed as redress to victims once the CFPB takes the applicable employees off administrative leave.

- In paragraph 27, Mr. Martinez states that Acting Director Vought considered a variety of factors including the impact of anticipated efficiency initiatives at the CFPB and consumer interests, before deciding that the funds in the operating account are enough to cover the agency's expenses through September 31, 2025. If that were true, and the agency had a concrete plan about the specific budget and expenses necessary to continue the functions it intends to continue, the agency would be able to articulate that concrete spending plan to the court. These kinds of financial plans are not confidential—the CFPB publishes its financial reports, and I would expect that the agency would publish this information in the Chief Financial Officer's next update, which is due to be published right around now.

18.  Lastly, I wish to highlight the ongoing harm to the public associated with the continued work stoppage at the CFPB. Every day, CFPB staff work to investigate cases, conduct examinations of regulated entities, produce valuable research, and publish data about consumer finance in the United States, review public comments and issue regulations, provide guidance to industry, and facilitate complaints. On a relatively small budget of just over $800 million per year (none of which comes directly from appropriations), the CFPB produces billions of dollars in quantifiable savings to the American people every year. For example:

- The CFPB's enforcement team has returned over $20 billion ill-gotten gains to consumers since the agency's founding.

- In December, the CFPB returned double the agency's annual budget, $1.6 billion, to victims of a single debt relief scam.

- The CFPB's recent "junk fee" initiatives have reduced fees by up to $21 billion annually, including $10 billion from the CFPB's credit card late fee rule, $6 billion in contracting overdraft and non-sufficient fund fees in response to the agency's policy and law enforcement work, and $5 billion from the CFPB's recent overdraft rule.

- The CFPB's Qualified Mortgage Rule, issued under Director Kraninger, saves at least $4 billion annually.

- The CFPB's Regulation X, issued in 2014, continues to save $45 million every year in forced-placed insurance premiums.

- The CFPB's complaint function processes over one million consumer complaints annually, which, for comparison, is more than 10 times the volumes handled by the Better Business

      Bureau. Over the course of the CFPB's short existence, the CFPB has closed over 2.5 million complaints with non-monetary relief, and in over 171,000 complaints, the company reported to the CFPB that it provided monetary relief.

- In the last two years alone, the CFPB's supervision function returned $350 million to consumers harmed by various illegal fee practices.

      19.     As with any other effective law enforcement agency, the CFPB's work creates an undeniable deterrence effect. When companies know that there is an active supervision program to examine for compliance with the law, a robust enforcement team investigating lawbreaking, and a complaint function that consumers use, very large bureaucratic corporations invest in compliance efforts to ensure compliance with the law. Right now, companies are almost certainly deprioritizing compliance in light of the news of the agency's work stoppage, planting the seeds for a white-collar financial crime spree that will likely manifest in the coming years.

      20.     In addition to the monetary relief, each investigation or examination has a chance to produce value for American consumers in the form of illegal practices that are stopped. For example, before the CFPB was created, many banks used deceptive practices to attach "add-on" services to credit cards, which consumers paid for but never benefited from. A sweep of CFPB enforcement actions in 2014 put an end to that practice. The CFPB's enforcement team, under leadership appointed by Presidents Obama, Trump, and Biden also ended the widespread practice of banks opening fake checking accounts in people's names (sometimes leading to consumer charges) in order to inflate account-opening metrics. As has been publicly revealed in editions of *Supervisory Highlights*, the CFPB's supervision team, under leadership appointed by Presidents Obama, Trump, and Biden, stopped auto loan companies from accidentally repossessing cars when the loan was not in default, and stopped auto loan companies from withholding consumers' personal property found in repossessed vehicles until the consumer paid a fee. CFPB enforcement and supervision teams stop hundreds of harmful law violations every year.

21. The CFPB's complaint function saves consumers unquantifiable amounts of money, through both monetary relief granted by companies in response, non-monetary relief, and the incentive created to provide higher quality customer service. In particular, the CFPB automatically escalates complaints involving a pending home foreclosure for manual attention to prevent an unnecessary foreclosure if possible, something that is not currently happening. And agency staff spot-check the complaint database for complaints that would benefit from individualized, manual handling, which is also currently not happening.

22. The CFPB's research and data releases are foundational to the public's understanding of the financial markets. For example, the CFPB releases data on consumer credit trends that outside researchers regularly use. And the CFPB publishes the most detailed data on the credit card market available, something that is statutorily required but currently halted.

23. The agency only has so much capacity to handle enforcement investigations, examinations, complaints, research reports, and other work. We will not be able to make up for lost production caused by the current work stoppage, even if any individual case or examination or report can be finished later. An examination that is not occurring now, and is pushed off to next year, would occupy capacity that could have been used for another examination. If you shut down a car factory, you can restart it a month later and finish the car you didn't complete before shutting down the factory, but you can't make up the lost aggregate production of cars. The same is true for enforcement investigations, for complaints filed with the CFPB that require manual processing, for supervisory examinations, for research reports, and for nearly every other function of the CFPB that produces output for the benefit of the public and American consumers.

24. The CFPB was created in response to the predatory mortgage crisis that caused the Great Recession. When a small number of primarily nonbank mortgage lenders started originating

loans that set consumers up to fail in the 2000s, federal regulators failed to respond due to a lack of authority and the competing priorities of bank safety and soundness and monetary policy. The CFPB was established by an act of Congress to fill that gap and Congress assigned the CFPB with the responsibility and duty to police the market so that this never happens again. Since the creation of the CFPB, the United States has not experienced another economic recession caused by the consumer finance sector. But if the agency does not perform its statutory duties, I am concerned history will repeat itself.

      I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Executed in Washington, DC　　　　　　　　　　　　　*/s/ Brian Shearer*
February 27, 2025　　　　　　　　　　　　　　　　　　Brian Shearer