IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NATIONAL TREASURY
EMPLOYEES' UNION, *et al.*,
          *Plaintiffs*,

   v.

RUSSELL VOUGHT, in his official capacity as Acting Director of the Consumer Financial Protection Bureau, *et al.*,

          *Defendants*.

Case No. 25-cv-381-ABJ

### DECLARATION OF JULIA BARNARD

I, Julia Barnard, declare as follows:

1. I have served at the Consumer Financial Protection Bureau as the agency's designated Student Loan Ombudsman since 2024 and as a Markets & Policy Fellow since 2022.

2. Starting in February 2022 and until February 13th, 2025, when my contract was abruptly terminated, I was employed by the CFPB as a Markets & Policy Fellow. The termination notice that I received, from Chief Operating Officer Adam Martinez, said that my employment was "terminated effective at the close of business on February 13, 2025, due to Executive Order Implementing The President's 'Department of Government Efficiency' Workforce Optimization Initiative - The White House dated February 11, 2025." No other reason was provided.

3. Separately, I was also designated as the Student Loan Ombudsman of the CFPB by Janet Yellen in her capacity as the Secretary of the U.S. Treasury on February 12, 2024. I have not received notice that the current Secretary of the Treasury, Scott Bessent, has de-designated me or made any another designation.[1] There was no reference to this designation in my termination notice

---

[1] *See* 12 U.S.C. § 5535 (providing that the Ombudsman is designated by the Secretary of the Treasury, in consultation with the Director of the CFPB).

or in any other communications that I have received. For that reason, it is not entirely clear to me whether I have been formally removed as the Student Loan Ombudsman. Regardless, as a practical matter, I have been unable to carry out any of the statutory duties of the Student Loan Ombudsman since my termination, and no other person has been designated to perform those duties.

4. In my role as the Student Loan Ombudsman, I worked with only one other colleague to fulfill the statutory requirements of the position. There were other colleagues who, on an ad hoc basis, helped review and analyze complaints, reached out to borrowers and financial companies to resolve complaints through case work, and built processes to scale our work. Myself, my colleague, and the colleagues on the ad hoc team who had recently been involved with the complaint review and case work functions were terminated on February 13, 2025.

5. In my role as the Student Loan Ombudsman, I was responsible for providing timely assistance to borrowers of both private and federal education loans. The Consumer Financial Protection Act specifies that the Student Loan Ombudsman shall "resolve complaints in collaboration with the Department of Education" and "ensure coordination in providing assistance to and serving borrowers seeking to resolve complaints related to their private education or Federal student loans."[2] Because of this responsibility, I met regularly with senior staff at the Department of Education including the Student Loan Ombudsman and their staff at the Office of Federal Student Aid. In fact, all prior Ombudsmen serving during the Obama, Trump, and Biden Administrations dealt with federal student loan issues regularly.[3] The contrary suggestion in the defendants' opposition to the motion for preliminary injunction (ECF 31 at 23)—that the

---

[2] 12 U.S.C. § 5535.
[3] *See, e.g.,* Consumer Financial Protection Bureau, (Nov. 2024), *Annual Report of the Student Loan Ombudsman*, https://files.consumerfinance.gov/f/documents/cfpb_2024-annual-student-loan-ombudsmans-report_2024-11.pdf at 38 (establishing recurring patterns in prior annual reports related to federal student loans).

Ombudsman only assists works on private student loans—thus reflects an elementary misunderstanding about the functions of the position.

6.  To select which of the thousands of complaints we received each year to address through case work, my team and I read thousands of complaints each month, sorted complaints by issue type, and read through company complaint responses. The complaints that we selected for case work were those that received a response that we found to be incomplete, inaccurate, or missing entirely—and that we felt were actionable—meaning that we felt that an intervention from us could actually help the borrower resolve their problem. In many instances, we were successful in resolving borrower complaints using this process.[4]

7.  For example, we were in the middle of a project that included review and case work of approximately 900 complaints related to the cancellation of private student loans based on school misconduct.[5] For several weeks, I had been communicating directly with private student lenders to inquire about the status of borrowers' private loans that were likely eligible for discharge. In some cases, this outreach resulted in the cancellation of borrowers' loans and, in other cases, we were engaged in conversation with the lenders to work towards an informal resolution, as is required by the statute.[6] That work has now been suspended.

---

[4] Consumer Financial Protection Bureau, (Nov. 2024), *Annual Report of the Student Loan Ombudsman*, https://files.consumerfinance.gov/f/documents/cfpb_2024-annual-student-loan-ombudsmans-report_2024-11.pdfhttps://files.consumerfinance.gov/f/documents/cfpb_2024-annual-student-loan-ombudsmans-report_2024-11.pdf at 57 ("The Student Loan Ombudsman's Office worked directly with colleges and schools to resolve transcript withholding complaints. Several colleges released transcripts after being contacted directly by the Student Loan Ombudsman, enabling borrowers to apply to jobs or other programs. One borrower who received their transcript with help from the Ombudsman's Office said: '[I] cried [when the transcript was released], it was as if it was a hold on my life, over the years I became desperate for an education.... I am still in disbelief.'")

[5] *Id*, at 53.

[6] 12 U.S.C. § 5535(c)(1).

8.  In fact, we were in the middle of making our process more efficient and increasing our case load. During the week of February 10th, we were in the process of identifying hundreds of borrowers with private and federal loans to assist through case work but were unable to continue this work after the directive on February 10th and our terminations on February 13th.

9.  The responsibility to provide timely assistance to borrowers is why I was working with Pastor Eva Steege and many other borrowers to help them seek relief or navigate repayment related to federal and private student loans. Her story is one of many similar stories, and the systemic failure that has led to this tragic outcome for her family continues to impact millions of other borrowers.[7]

10. The Department of Education and its subcontractors have not provided adequate assistance to many borrowers like Pastor Steege.[8] I submitted my annual report to Congress last November and reported that student loan servicers routinely make blunders, oversights, and errors that harm millions of borrowers and likely cost them millions of dollars. Borrowers told us through their complaints that these servicing errors were enormously consequential. They reported that servicing issues made them late on rent, miss their car payments, lose eligibility for mortgages and homeownership, forego saving for retirement, change employment, and even put some borrowers at risk of homelessness.[9] Borrowers also reported substantial emotional distress and described the

---

[7] Consumer Financial Protection Bureau, (Nov. 2024), *Annual Report of the Student Loan Ombudsman*, https://files.consumerfinance.gov/f/documents/cfpb_2024-annual-student-loan-ombudsmans-report_2024-11.pdfhttps://files.consumerfinance.gov/f/documents/cfpb_2024-annual-student-loan-ombudsmans-report_2024-11.pdf.
[8] *Id.*
[9] *Id*, at 4-5.

student loan experience as a "nightmare," told us that they felt "hopeless and taken advantage of," and were trapped in a "death loop to nowhere."[10]

11. Many of the issues that borrowers like Pastor Steege face related to federal student loans are, in fact, related to the acts and practices of private student loan servicing companies. One such company, Navient, was recently banned from student loan servicing by the CFPB due to past misconduct.[11] Other student loan servicers are subject to ongoing supervision by the CFPB,[12] and their practices related to long call hold times and extended delays were recently described as unfair, deceptive, and abusive by the CFPB's Office of Supervision.[13] Similarly, the Office of Supervision also identified several unfair and deceptive acts and practices related to the administration of the Public Service Loan Forgiveness program.[14]

---

[10] Consumer Financial Protection Bureau, (Nov. 2024), *Annual Report of the Student Loan Ombudsman*, https://files.consumerfinance.gov/f/documents/cfpb_2024-annual-student-loan-ombudsmans-report_2024-11.pdfhttps://files.consumerfinance.gov/f/documents/cfpb_2024-annual-student-loan-ombudsmans-report_2024-11.pdf at 5.

[11] Consumer Financial Protection Bureau, (Sep. 2024), *CFPB Bans Navient from Federal Student Loan Servicing and Orders the Company to Pay $120 Million for Wide-Ranging Student Lending Failures*, https://www.consumerfinance.gov/about-us/newsroom/cfpb-bans-navient-from-federal-student-loan-servicing-and-orders-the-company-to-pay-120-million-for-wide-ranging-student-lending-failures/.

[12] *See, e.g.,* Consumer Financial Protection Bureau, (Jan. 2024), *Issue Spotlight: Federal Student Loan Return to Repayment*, https://www.consumerfinance.gov/data-research/research-reports/issue-spotlight-federal-student-loan-return-to-repayment/ ("The Consumer Financial Protection Act directs the CFPB to conduct risk-based supervision that considers the dangers to consumers created by the provision of consumer financial products or services and focuses resources toward areas with greater risk. The CFPB determined that the return to repayment of federally owned student loans presents significant consumer risks and initiated its supervisory response due to the number of impacted consumers [over 28 million], consumer complaints and other field market intelligence, and the history of compliance issues by student loan servicers.").

[13] Consumer Financial Protection Bureau, (Dec. 2024), *Supervisory Highlights: Special Edition Student Lending (Issue 36)*, https://files.consumerfinance.gov/f/documents/cfpb_supervisory-highlights-special-ed-student-lending-issue-36-winter_2024-12.pdf at 16-20.

[14] Consumer Financial Protection Bureau, (Jun. 2021), *Supervisory Highlights* (Issue 24), https://files.consumerfinance.gov/f/documents/cfpb_supervisory-highlights_issue-24_2021-06.pdf at 34-37.

12. It is my understanding that Pastor Steege had reached out to her student loan servicer and the Office of Federal Student Aid for help but, like many other borrowers, was experiencing long delays and was unable to understand the guidance provided.[15] It is my belief that, without urgent escalation and cooperation between the parties involved in the administration of the federal student loan system, Pastor Steege's family will be forced to pursue a death discharge after her death and will lose the opportunity to receive over $15,000 in refunds of overpayments. This causes harm of a very significant magnitude to one family. Still, it is only one example in a much larger group of borrowers who have served the public faithfully for decades but are unable to actually achieve Public Service Loan Forgiveness due to the complex program requirements and program and servicer failures that result in "doom loops" where many borrowers are unable to get useful information or navigate the program despite their best efforts.[16]

13. After receiving guidance on February 8th, 2025 from Acting Director Vought specifying that work should cease "unless expressly…required by law," I determined that my work could proceed because it was expressly required by law.

---

[15] Consumer Financial Protection Bureau, (Nov. 2024), *Annual Report of the Student Loan Ombudsman*, https://files.consumerfinance.gov/f/documents/cfpb_2024-annual-student-loan-ombudsmans-report_2024-11.pdfhttps://files.consumerfinance.gov/f/documents/cfpb_2024-annual-student-loan-ombudsmans-report_2024-11.pdf; *See also* Consumer Financial Protection Bureau, (Sep. 2022), *Supervisory Highlights: Student Loan Servicing Special Edition*, https://files.consumerfinance.gov/f/documents/cfpb_student-loan-servicing-supervisory-highlights-special-edition_report_2022-09.pdf at 19 (explaining the CFPB's recent determination that excessive PSLF processing delays can be unfair and cause harm to borrowers).

[16] Consumer Financial Protection Bureau, (Nov. 2024), *Annual Report of the Student Loan Ombudsman*, https://files.consumerfinance.gov/f/documents/cfpb_2024-annual-student-loan-ombudsmans-report_2024-11.pdfhttps://files.consumerfinance.gov/f/documents/cfpb_2024-annual-student-loan-ombudsmans-report_2024-11.pdf at 15-18 (Outlining common problems faced by borrowers related to PSLF) and 32 (explaining that the term "doom loop" describes the common experience where automated or otherwise insufficient servicer responses fail to resolve a customer's issue and instead lead them in continuous loops of repetitive, unhelpful jargon or legalese, which can leave borrowers unable to access their basic financial information and increase their frustration.)

14. However, after receiving additional guidance from Acting Director Vought two days later, on February 10th, specifying that all employees should "stand down from performing *any* work task"—this time without any mention of an exception for statutorily-required activities—we cancelled our meeting with Pastor Steege and other upcoming meetings. I did not seek approval on any urgent matters on February 10th prior to being terminated on February 13th because the prior carve-out for statutorily required work had been clearly rescinded. Like many of my colleagues,[17] I was unsure whether requesting an exception or compiling information to explain my in-process work would themselves be violations of the order.

15. It is unclear to me how the CFPB could currently be capable of performing these statutory duties, as Mr. Martinez claims in his declaration. I cannot imagine how all of this work could be continuing if the Student Loan Ombudsman position is vacant (or if I am currently serving in the position without pay and without the ability to use email, the files we were using to organize our work, the internal complaint database) and if employees, including the Student Loan Ombudsman, are unable to perform work tasks.

16. The Consumer Complaint system cannot replace the work of a dedicated team of experts focused on resolving borrowers' problems. Mr. Martinez's declaration states that, in the absence of a Student Loan Ombudsman, borrowers can still seek relief through the Consumer Complaint system. In fact, our case work process was built on a review of those complaints and

---

[17] Cowley, S., (Feb. 10, 2025), "Confusion Reigns as 'a Wrecking Ball' Hits the Consumer Bureau," *The New York Times*, https://www.nytimes.com/2025/02/10/business/cfpb-shutdown-confusion.html ("[E]mployees spent Monday[, February 10th,] in a state of deep confusion about what they should - or should not - be doing…. Could they talk to one another on the bureau's Microsoft Teams messaging system? Could they read their email, or would that be a violation of the stop-work command?.... No answers were forthcoming, said several agency employees…. Department leaders were left to field questions from alarmed employees without any guidance from their new bosses on what to say.").

the associated company responses.[18] The cases that were resolved through that system were not the cases we were involved with, so this process is not a substitute for our escalated case work process. Furthermore, it is my understanding that my colleagues, including those in Consumer Response, are not able to perform work tasks and, thus, the complaint process is significantly degraded. Indeed, an early analysis of publicly available information indicates that thousands of consumer complaints are not being processed.[19]

17.     The defendants' opposition to the motion for preliminary injunction (ECF 31 at 23 n.6) reflects yet another elementary misunderstanding of the Bureau's operations when it suggests that the CFPB's general Ombudsman's Office could somehow provide assistance to consumers like Pastor Steege. That office is entirely distinct from, and is no way a replacement for, a team of issue experts focused on consumer redress. To be clear, I did not have any affiliation with that Office or with the staff located there. In fact, the CFPB's website explicitly states that the general Ombudsman's Office does "**not assist in resolving issues as between consumers and financial entities**" (emphasis added).[20] Rather, the Ombudsman's Office "review[s] whether the CFPB is

---

[18] We also regularly monitored complaint responses by student loan servicers and lenders to ensure student loan lenders and servicers were providing timely, accurate, and complete responses. To my knowledge, this function is now suspended.

[19] Minority Staff of the U.S. Senate Committee on Banking, Housing, and Urban Affairs, (Feb. 2025), *Left in Limbo: How President Trump's Efforts to Dismantle the Consumer Financial Protection Bureau Force Consumers to Face Corporate Greed Alone*, https://www.banking.senate.gov/imo/media/doc/left_in_limbo_how_president_trumps_efforts_to_dismantle_the_consumer__financial_protection_bureau_force_consumers_to_face_corporate_greed_alone.pdf ("Analysis of the Consumer Complaint Database in recent days suggests that the agency is uploading an average of just 2,234 of the complaints it receives each day to the Database. Furthermore, the Database shows the agency submitting an average of just 2,067 complaints per day to companies. This represents an 80 percent reduction in complaints submitted to companies.").

[20] Consumer Financial Protection Bureau, *CFPB Ombudsman Frequently Asked Questions Webpage*, (accessed Feb. 26, 2025), https://www.consumerfinance.gov/cfpb-ombudsman/ombudsman-faqs/.

following its own processes and procedures."[21] By contrast, in my capacity as the Student Loan Ombudsman, I was seeking to substantively resolve consumer complaints.[22]

18. Furthermore, I have been developing my own knowledge of the student loan system for over a decade and do not believe that this critical role can be performed by someone with little or no prior knowledge of our notoriously complicated student loan system. Even more and especially without the benefit of an orderly transition and in a situation where the staff members previously engaged in the work were suddenly terminated.

19. Finally, the Student Loan Ombudsman is meant to do more than resolve consumer complaints. The case work and analyses are meant to power insights, improve the case work process, develop policy recommendations, identify illegal conduct, and ultimately to improve the broader student loan system. For example, prior to my termination, I was working with my colleagues on non-public law enforcement matters and was meeting regularly with the state-based Student Loan Ombudsmen to help share knowledge, provide technical assistance, and increase collaboration. The Student Loan Ombudsman is also statutorily required to prepare an annual report.[23] Neither the Martinez declaration nor the defendants' opposition to the preliminary injunction motion explain how they contemplate the continuation of these statutorily required functions.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Executed on February 26, 2025

_____
Julia Barnard

---

[21] Consumer Financial Protection Bureau, *CFPB Ombudsman Frequently Asked Questions Webpage*, (accessed Feb. 26, 2025), https://www.consumerfinance.gov/cfpb-ombudsman/ombudsman-faqs/.
[22] 12 U.S.C. §5535.
[23] 12 U.S.C. §5535.