IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL TREASURY EMPLOYEES UNION, *et al.*,<br>　　　　*Plaintiffs*,<br>　v.<br><br>RUSSELL VOUGHT, in his official capacity as Acting Director of the Consumer Financial Protection Bureau, *et al.*,<br>　　　　*Defendants*. | Case No. 25-cv-381-ABJ |

**DECLARATION OF LORELEI SALAS**

I, Lorelei Salas, declare:

　　1.　　I served as the Supervision Director at the Consumer Financial Protection Bureau from November 8, 2021 to February 11, 2025. I am preparing this declaration to inform this Court about the irreversible and lasting effects of the unprecedented decision to halt all of the Bureau's statutorily required supervision activity.

　　2.　　As the Supervision Director, I was the senior executive responsible for management of the Bureau's 550-person Supervision Division. Until its operations came to abrupt and complete halt as a result of Mr. Vought's February 8, 2025 stop-work order, the Supervision Division conducted supervisory activities for the purposes of assessing compliance with Federal consumer financial law, obtaining information about a supervised institution's activities and compliance systems and procedures, and detecting and assessing risks to consumers and to markets for consumer financial products and services.

　　3.　　In the most recent two years, the Supervision Division advised banks and mortgage companies to refund more than $350 million dollars that were charged in illegal junk fees to people's accounts. This is just one example of the far-reaching impact of the Bureau's supervisory

activities. We discuss our findings in an anonymized manner in *Supervisory Highlights* editions that are published periodically and that bring transparency to the consumer financial markets over which we have oversight. So, in addition to the millions of consumers we have touched directly via our examinations, millions more benefit from our work when market participants make changes to their practices because we have called out unlawful and unfair practices in our guidance. The supervision staff work behind the scenes to protect the financial lives and futures of all American families, but most people will never know that we were behind the unsolicited refund that they received by mail from their mortgage company, or the credit that was made to their account that they did not ask for. Neither the companies we supervise, nor the Bureau, discuss publicly who is under supervision, but that critical work is happening every day—or at least it was, until now.

4. Under the Consumer Financial Protection Act, enacted as part of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, the Bureau has the exclusive authority to conduct examinations and other supervisory activities for compliance with Federal consumer financial laws for insured depository institutions with over $10 billion in assets and is the only federal agency with supervisory authority over certain non-bank entities—such as debt collectors and payday lenders—that provide consumer financial products and services. These supervisory activities are required under the CFPA and are critical to carrying out Congress's intent.

5. On February 8, 2025, the Bureau's Supervision staff received a stop-work order that remains in effect.

6. In direct response to this order, the Supervision staff immediately halted all supervision-related activity.

7. While I was Supervision Director under Acting Director Russell Vought, all Supervision activity had come to a complete and indefinite stop. I am reliably informed by current Supervision staff and by public reporting that this continues to be true.

8. The Supervision Division has the smallest examination workforce of all the Federal bank regulators. Every year, the Division conducts a risk assessment and planning process to determine which entities to prioritize for examination. Supervision examiners require specialized training and certification, making it difficult to hire and replace qualified staff. Before February 8, the Supervision Division was already short staffed and we were in the process of training a dozen new examiners. These examiners, along with a number of attorneys and analysts that support the examinations, were included on the list of probationary employees that were terminated from the Bureau en masse.

9. The stoppage of supervision that is occurring now is causing irreversible harm. Because there is a limited team of examiners, halting the training and work of new people and firing or halting the work of experienced people will have lasting ripple effects. Even if activities resume, it will take a long time to even have the necessary complement of trained examiners at all. Moreover, in the interim, while supervision is stopped, society is not catching predatory, fraudulent, or otherwise illegal practices. And once it restarts, if it does, the Bureau cannot possibly examine all of the institutions that would have been examined in the interim along with whatever other institutions would be examined ordinarily upon restarting. There just aren't enough examiners in the workforce for that to be feasible. And so consumers will be at much higher risk of losing money from their bank accounts in the form of junk overdraft fees, simply because their banks use complex payment ordering processes that make it impossible to track one's expenses. They will be more vulnerable to the deceptive and unfair practices we have uncovered in

companies that advertise "no fee" loans but are actually extracting money from consumers via the use of dark patterns and other deceptive tactics. Student borrowers will be subjected to poor servicing of their loans and will be sold repayment plans that take away their basic rights. Car owners and home owners will be at the mercy of lenders that underinvest in their compliance operations and lack well trained staff who can answer questions and update their accounts promptly. Service members and their families will be more likely to be targeted with predatory loan products that exceed the interest rate capped by law. When the Bureau is functioning, the supervision staff is constantly monitoring risks to consumer and enforcing key laws that protect consumers' most precious assets and that bring financial safety to the marketplace. These laws and regulations include the Equal Credit Opportunity Act, the Fair Debt Collection Practices Act, the Truth in Lending Act, the Electronic Fund Transfer Act, the Fair Credit Reporting Act, among others, and the prohibition on Unfair, Deceptive, or Abusive Acts or Practices.

9. As of late January 2025, there were a half-dozen exams about to kick-off where the Bureau was working in close partnership with state regulators. These coordinated exams promote efficiency and reduce the burden on entities that are under supervision by both the Bureau and the states. Exams covered mortgage lenders, auto finance companies, and debt collection agencies, among other important markets where the data shows risks to consumers are high. There were another six or more exams planned for the second half of 2025. Now all those examinations are suspended and state partners likely cannot get in touch with the examiners scheduled to work with them.

10. I have also learned that the Bureau is planning to cancel the credit cards for all of the examiners within the Bureau. Some examiners report that their available credit was recently lowered to $1 and it was later restored. An examiner's role is to travel to various financial

institutions to perform supervisory duties; examiners cannot do their jobs if they do not have the means to book travel and in fact canceling an examiner's credit card is generally quickly followed by their termination.

11. The complete and unprecedented shutdown of the Supervision Division will result in incalculable and irreparable injury to consumers, organizations that serve consumers, state and local governments, and other Bureau stakeholders. As mandated by statute, the Supervision Division identifies and addresses consumer harm through the supervisory process and acts to prevent such harm before it happens. When the Bureau staff were issued the stop-work order on February 8, there were dozens of exams taking place across the country. Examiners were looking into companies that offer medical credit cards. They were scrutinizing new types of lenders such as Buy Now Pay Later companies and payroll advance companies. They were reviewing new credit decisioning models that use artificial intelligence to process credit card applications. They were responding to the millions of complaints from consumers that pointed to errors in their credit reports. None of that important work is happening right now and consumers are at higher risk of losing their homes, their cars, and their savings because the one agency whose job is to protect all American consumers has been shut down.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Executed in New York, NY/s/ Lorelei Salas
February 27, 2025Lorelei Salas