IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL TREASURY EMPLOYEES' UNION, *et al.*,<br>　　　　*Plaintiffs*,<br>　v.<br>RUSSELL VOUGHT, in his official capacity as Acting Director of the Consumer Financial Protection Bureau, *et al.*,<br>　　　　*Defendants*. | Case No. 25-cv-381-ABJ |

**SECOND DECLARATION OF ERIC HALPERIN**

I, Eric Halperin, declare:

　　1.　　I served as the Enforcement Director of the Consumer Financial Protection Bureau from October 24, 2021 to February 11, 2025. As the Enforcement Director, I was the senior executive responsible for management of the Bureau's Enforcement Division. This declaration supplements my February 13, 2025 declaration. ECF 14-9.

　　2. The enforcement of Federal consumer financial law is a primary function of the Consumer Financial Protection Bureau mandated by the Dodd-Frank Act, which was passed in the wake of the 2008 financial crisis and Great Recession.

　　3.　　Before the creation of the CFPB, consumer financial protection had not been the primary focus of any federal agency, and no agency had effective tools to set the rules for and oversee the entire market for consumer financial products and services. The Dodd-Frank Act consolidated consumer financial protection authorities that had existed across several different federal agencies and centralized them in the CFPB. Congress also provided by law that the CFPB is the primary enforcer of the more than a dozen Federal consumer financial laws with respect to many non-depository financial institutions and is the primary enforcer of the Federal consumer

financial laws with respect to all very large banks, savings associations, and credit unions. See 12 U.S.C. § 5515(c); see also 12 U.S.C. § 5481(12), (14). Section 1031 of the Dodd Frank Act prohibits entities under the CFPB's jurisdiction from engaging in abusive acts and practices and granted the CFPB the authority to bring enforcement actions to prevent and stop this conduct. The CFPB is the primary enforcer of this prohibition for very large financial institutions, and for thousands of non-bank consumer financial service providers, no other federal agency possesses this authority.

4. The Act further requires the CFPB to enforce Federal consumer financial law consistently as it applies to depository entities and non-depository entities—or, in common parlance, banks and "non-banks" such as payday lenders, auto title lenders, debt collectors, digital payment platforms, and consumer reporting agencies. The CFPB is the only federal financial regulatory enforcement agency with broad jurisdiction over both banks and non-banks. Moreover, a significant number of non-banks are not subject to the CFPB's supervisory jurisdiction but *are* subject to the CFPB's enforcement authority.

5. The dismantling of the CFPB's enforcement function thus means that there is a large gaping hole in the legal regime mandated by Congress. The federal government's capacity to enforce more than a dozen Federal consumer financial protection laws against both banks and non-banks will be completely eviscerated—leaving regulatory oversight of the financial sector even weaker than it was before the financial crisis.

6. While many enforcement matters arise through CFPB's ongoing supervision, most of Enforcement's investigations, especially of non-banks and service providers to financial institutions, arise through other sources—consumer complaints, referrals, whistleblower tips, and

the CFPB's other market risk monitoring tools. The Enforcement Division evaluates this information and determines if enforcement action is warranted.

7. Enforcement actions, whether they originate from the CFPB's supervision process or otherwise, require significant resources to take appropriate actions to address violations of Federal consumer financial protection laws, including securing relief for consumers who have been harmed by entities that have broken the law. Over the last thirteen years of the CFPB's existence it has returned nearly $21 billion to consumers as a result of enforcement actions. In recent years, the market for consumer financial products and services has grown explosively, particularly in the non-bank sector. This growth has underlined the need for an Enforcement Division with the capacity to conduct ever-more-complex investigations and litigations.

8. Over the last two years, to address this need, the Enforcement Division hired additional highly qualified attorneys, data analysts, technologists, investigators, and legal support specialists. The CFPB expended significant time and resources in hiring and training to fill these specialized roles.

9. During the week of February 10th, many of these staffers were terminated en masse by Acting Director Russell Vought when he terminated staff who were on probation or who were hired to serve for a fixed term of years.

10. Firing Enforcement staff hired to meet the need to respond to the rapidly evolving marketplace for consumer financial products and services will have a serious adverse impact on the CFPB's ability to enforce Federal consumer financial law.

11. My understanding is that the Acting Director may dismiss all or almost all the Enforcement staff. If that unprecedented event should occur, it would cause irreparable harm. The CFPB's capacity to enforce the Federal consumer financial laws cannot be recreated or rebuilt

quickly. Even if staff were ultimately rehired much of the capacity and expertise would be lost permanently.  When there is no enforcement of the law, there will be no recourse or remedies for consumers that are injured and there will be less incentive for companies to comply with the law, harming law-abiding companies and consumers.

12. The Enforcement Division has already been directed to stop performing all work tasks, with, apparently, the sole exception of dismissing enforcement actions that are currently being litigated.   Stopping all work tasks would likely stop payment of redress to consumers in some cases where entities have been ordered to make payments to consumers since Enforcement staff must review redress plans submitted by the entity and those plans must be approved by the Enforcement Director.

13. It has also been publicly reported that the CFPB has cancelled all contracts with all expert witnesses in *all* existing enforcement litigation. See Evan Weinberger, *CFPB Nixes All Expert Witness Contracts in Enforcement Halt*, Bloomberg Law, https://news.bloomberglaw.com/banking-law/cfpb-nixes-all-expert-witness-contracts-in-enforcement-shutdown, Feb. 13, 2025. A mass cancellation of expert contracts makes it impossible for the CFPB to successfully prosecute its claims in many cases.

14. The CFPB has additionally mass cancelled contracts for services that provide litigation support and management. *See* https://doge.gov/savings.  In a typical investigation or litigation, the CFPB collects a large volume of information and data, including confidential business information and, when necessary, consumers' personal identifiable information.  Without critical services to manage that data, it would be impossible to effectively conduct investigations, or meet the CFPB's discovery obligations in litigation.

15. As of February 27, 2025, the Acting Director of the CFPB has voluntarily dismissed, with prejudice, six active litigations that the CFPB was prosecuting in federal court. Before this, the CFPB had voluntarily dismissed only one case in its entirety without relief to consumers in the previous 13 years of its existence, which spanned three presidential administrations (Obama, Trump, and Biden). And that case was dismissed without prejudice.

16. The cases dismissed by the CFPB sought relief on behalf of students who were subject to illegal collections on loans that had been discharged in bankruptcy; borrowers who were deceived about the true cost of loans made on a peer-to-peer nonbank lending platform; people shopping for a mortgage loan that were victims of an illegal scheme to steer them to a specific lender; manufactured home buyers who were set up to fail with unaffordable loans; struggling customers of small dollar loans who were induced into a fee-harvesting and loan-churning scheme; and consumers who were deceived about their personal savings accounts. The CFPB's complaints had alleged that consumers in these cases experienced billions of dollars of harm.

17. Should the Acting Director continue to voluntarily dismiss the active cases currently being litigated by the CFPB, millions of consumers injured by banks and non-banks will not receive a remedy for harm that they have suffered. This includes servicemembers and their families who were charged illegal interest rates by their lenders; disabled and older Americans who receive Social Security, and coal miners with black lung disease who receive federal benefits; delivery drivers who were forced to open high-cost deposit accounts in order to receive their pay; students who were subjected to illegal debt collection practices; people attempting to correct errors on their credit reports; and the hundreds of thousands of consumers who experienced fraud on the peer-to-peer payment network operated by the nation's largest banks.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Executed in Washington, DC/s/ Eric Halperin
February 27, 2025Eric Halperin