IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL TREASURY EMPLOYEES UNION, *et al.*, <br>                  *Plaintiffs*, <br>    v. <br><br> RUSSELL VOUGHT, in his official capacity as Acting Director of the Consumer Financial Protection Bureau, *et al.*, <br><br>                  *Defendants*. | Case No. 25-cv-381-ABJ |

**DECLARATION OF SETH FROTMAN**

I, Seth Frotman, declare:

1. I served as General Counsel and Senior Advisor to the Director of the Consumer Financial Protection Bureau from 2021 through Friday, February 7, 2025. In those capacities, I was the chief legal officer of the CFPB and was also extensively involved in the day-to-day management of the agency, including by sitting on many senior leadership committees devoted to agency administration. I also previously served at the CFPB from 2015 to 2018 as the Student Loan Ombudsman and Assistant Director for the Office of Students and from 2011 to 2015 in the Office of Servicemember Affairs.

2. I have reviewed the filings in this case, including the defendants' opposition to the preliminary-injunction motion, ECF 31, and the declaration attached to that opposition. I am preparing this declaration to address statements or implications in those two documents that are, to the best of my knowledge, either inaccurate or misleading, or both.

3. In my role as General Counsel and Senior Advisor to the Director, I communicated frequently with members of the CFPB Legal Division's senior leadership team; senior management and staff in all CFPB departments, including specifically the CFPB's Offices of

Operations, Information & Technology, and Human Capital (*i.e.,* human resources); the CFPB's Deputy Director; and eventually with staff at the Department of Treasury operating on behalf of then-Acting CFPB Director Secretary Scott Bessent.

4. It is my understanding—based on firsthand accounts from within the Bureau, screen shots of emails sent within the Bureau that have been published, and public news reports—that CFPB employees were directed "not [to] perform any work tasks," with no reference to performing duties required by law, at the beginning of the first business day (February 10, 2025) following my last day as General Counsel (February 7, 2025) and have been directed to adhere to that directive since that time. I also reviewed public statements from President Trump later in the day on February 10 indicating that the CFPB "was a very important thing to get rid of." *See* CNN, *Trump confirms goal to "totally eliminate" the Consumer Financial Protection Bureau* (Feb. 10, 2025).[1] These facts are inconsistent with the picture painted in the defendants' opposition memorandum.

5. I have also reviewed public statements from Acting CFPB Director Russel Vought specifically instructing CFPB employees not to perform statutorily mandated duties. For example, I have observed an X (formerly Twitter) account named "CFPB Tip Line," with markings indicating a confirmed government-affiliated account, that included the following text: "Are you being pursued by CFPB enforcement or supervision staff, in violation of Acting Director Russ Vought's stand down order? If so, DM us or send an email."

---

[1] https://www.cnn.com/politics/live-news/trump-doge-presidency-news-02-10-25/index.html



6.     This "CFPB Tip Line" raises a number of significant legal issues. First, enforcement and supervision are both core activities that Congress has required the agency, by statute, to perform. Second, the establishment of this unusual "Tip Line" is inconsistent with the notion that Mr. Vought's "stand down order" is some kind of ordinary, transitional "pause" of the kind portrayed in the defendants' opposition and accompanying declaration. Instead, it suggests an unprecedented campaign to frighten Bureau employees out of performing their statutory duties—clearly confirming that the "stand down order" applies to all activities of "CFPB enforcement or supervision staff," with no mention of activities required by law. Indeed, I served at the CFPB during the previous leadership transition to Acting Director Mick Mulvaney, and nothing remotely similar occurred at that time. Third, this bizarre project has Mr. Vought's direct approval—I reviewed a message from Vought himself on X (Twitter) confirming his personal involvement in this "tip line." *See* American Bankers Association (ABA) Banking Journal, *CFPB launches 'tip line' to report on bureau employees* (Feb 20, 2025).[2]

---

[2] https://bankingjournal.aba.com/2025/02/cfpb-launches-tip-line-to-report-on-bureau-employees/

*Indiscriminate Leave or Terminations of CFPB Employees, Contractors, or Contracts Would Result in the CFPB Failing to Meet Its Legal Obligations*

7. In Title X of the Dodd-Frank Act, Congress imposed a number of specific legal requirements on the CFPB, including with respect to administration and management of the agency, as well as obligations to maintain certain departments and perform certain functions. As a federal government agency, the CFPB is also subject to many other statutory requirements and legal obligations, including, *e.g.,* records retention requirements under the Federal Records Act, disclosure requirements under the Freedom of Information Act, cybersecurity obligations pursuant to the Federal Information Security Management Act and other statutes, and requirements related to the protection of confidential and personally identifiable information under the Privacy Act, the Trade Secrets Act, and CFPB regulations, 12 C.F.R. Subpart D. The CFPB is also subject to obligations arising from judicial proceedings, such as active litigation holds. Some of these requirements have criminal liability for noncompliance.

8. In my role as General Counsel and Senior Advisor to the CFPB Director, I was extensively involved with the staffing and management of the agency. Specifically, I served on nearly every committee of agency senior leadership dedicated to agency staffing during my tenure. I also was extensively involved with agency budgeting, contracting, and related decisions.

9. In my extensive experience with management of the CFPB as well as my familiarity with the agency's legal obligations as General Counsel, the CFPB relies on a combination of employees, contractors, and contracts to meet its legal obligations.

10. Based on my extensive experience with management of the CFPB as well as my familiarity with the agency's legal obligations, the agency cannot possibly be meeting its legal obligations if employees and contractors are not "perform[ing] any work tasks," nor could the

agency do so if the vast majority of its employees were indiscriminately put on leave or terminated. To give just some of the many available examples:

11. **Exclusive Federal Examiner and Primary Enforcer:** As of my departure, a very significant portion of the CFPB's staff—in the range of 500 employees, *i.e.*, 30-40% of all employees—was dedicated to examination activity, which Congress required the CFPB by law to conduct. *See, e.g.,* 12 U.S.C. § 5514(b)(1) ("The Bureau shall require reports and conduct examinations on a periodic basis of [nondepository covered persons] . . . .").

12. As of my departure, a significant portion of the CFPB's staff—in the range of 200 employees, *i.e.*, 10-20% of all employees—was dedicated to enforcement activity, which Congress required the CFPB by law to conduct. *See, e.g.,* 12 U.S.C. § 5511(a)(1) ("The Bureau shall seek to implement and, where applicable, enforce Federal consumer financial law consistently for the purpose of ensuring that all consumers have access to markets for consumer financial products and services and that markets for consumer financial products and services are fair, transparent, and competitive.").

13. Thousands of institutions meet the definition of "nondepository covered persons" that the CFPB is required to "conduct examinations [of] on a periodic basis." 12 U.S.C. § 5514(b)(1). The CFPB is the only federal regulator that can examine many of these nondepository financial institutions, such as credit reporting agencies, debt collectors, and payday lenders.

14. Congress also provided by law that the CFPB is the exclusive federal examiner for consumer financial protection law of all very large banks, savings associations, and credit unions (i.e., insured depository institutions and credit unions with total assets of more than $10 billion and their affiliates). *See* 12 U.S.C. § 5515(a)(1). As of September 2024, there were about 180 very large banks, savings associations, and credit unions meeting these criteria.

15. Congress also provided by law that the CFPB is the primary enforcer of the more than a dozen federal consumer financial laws with respect to many nondepository financial institutions and is the primary enforcer of the federal consumer financial laws with respect to all very large banks, savings associations, and credit unions. *See* 12 U.S.C. § 5515(c); *see also* 12 U.S.C. § 5481(12), (14).

16. CFPB examination staff is responsible for supervising compliance with numerous court and administrative orders. *See, e.g.,* Stipulated Final Judgment and Order, *CFPB v. Navient*, No. 3:17-CV-00101-RDM (M.D. Pa. Sept. 12, 2024) (requiring regular submissions to the CFPB Supervision Director).

17. Based on my extensive experience with management of the CFPB as well as my familiarity with the agency's legal obligations, a work stoppage or indiscriminate mass layoff of the staff dedicated to examination activity would make it impossible to continue to meet the agency's legal obligations with respect to the thousands of institutions that the CFPB, and only the CFPB, examines at the federal level. If the CFPB were to terminate most of its staff, I do not believe the CFPB would be able to meet its legal obligations with respect to examinations and enforcement.

18. Additionally, Acting Director Vought's order "not [to] perform any work tasks" and subsequent creation of the "CFPB Tip Line" to inform on any activity by "CFPB enforcement or supervision staff" is obviously an instruction not to perform the supervision and enforcement activities that Congress required by law. Indeed, I understand from court filings in this case that Acting Director Vought specifically instructed CFPB employees to "[c]ease all supervision and examination activity" and "[n]ot [to] commence, take additional investigative activities related to, or settle enforcement actions." I also understand that the agency has ceased ongoing work on

examinations, has failed to begin exams that were already scheduled, and has fired expert witnesses, missed deadlines, and dropped active enforcement matters.

19.   **Consumer Complaints:**   As of my departure, a very significant portion of the CFPB's staff—more than 100 full-time equivalent employees—was dedicated to the CFPB's statutory obligations with respect to receiving, responding to, and otherwise handling consumer complaints.

20.   Congress required the CFPB to establish a unit "to facilitate the centralized collection of, monitoring of, and response to consumer complaints regarding consumer financial products or services." 12 U.S.C. § 5493(b)(3)(A). The CFPB is required by law "to provide a timely response to consumers, in writing where appropriate, to complaints against, or inquiries concerning, a covered person, including– (1) steps that have been taken by the regulator in response to the complaint or inquiry of the consumer. . . ." 12 U.S.C. § 5534(a)(1). The CFPB is also required "to present an annual report to Congress not later than March 31 of each year on the complaints received by the Bureau in the prior year regarding consumer financial products and services" and to "share consumer complaint information with prudential regulators, the Federal Trade Commission, other Federal agencies, and State Agencies." 12 U.S.C. § 5493(b)(3)(C), (D).

21.   Congress also put various other legal requirements on the CFPB and other entities with respect to consumer complaints received by the Bureau. *See, e.g.,* 12 U.S.C. § 5493(e)(1)(B) (requiring the CFPB's Office of Service Member Affairs to, among other things, "coordinate with the unit of the Bureau established [by law to receive consumer complaints] in order to monitor complaints by service members and their families and responses to those complaints by the Bureau or other appropriate Federal or State Agency"); 12 U.S.C. § 5535(c)(3) (requiring the CFPB Student Loan Ombudsman to "compile and analyze data on borrower complaints"); 15 U.S.C. §

1681i (requiring preparation of annual report about consumer complaints related to consumer reporting and transmittal of those complaints to consumer reporting agencies, which are required to review them).

22. The number of complaints to the CFPB has grown consistently from year to year. During the period of April 1, 2023, through March 31, 2024, the CFPB received approximately 1.8 million consumer complaints.

23. Based on my extensive experience with management of the CFPB as well as my familiarity with the agency's legal obligations, the agency would need significant staff dedicated to receiving, responding to, and otherwise handling consumer complaints to continue to meet these legal obligations.

24. Indeed, according to press accounts, the CFPB is currently telling consumers that it is not meeting its legal obligations with respect to complaints, such as responding to or otherwise handling complaints that it has received. *See* National Public Radio, *Personal Finance columnist says CFPB is important 'one stop shop' to protect consumers* (Feb. 19, 2025) ("I actually called their hotline and a person did answer. . . . what she told me was that she could still take complaints, but they have stopped action.").[3]

25. **Student Loan Ombudsman:** As noted above, I was previously the CFPB's Student Loan Ombudsman—designated, as Congress required by law, by the Secretary of the Treasury, "in consultation with the [CFPB] Director, . . . to provide timely assistance to borrowers of private education loans." 12 U.S.C. § 5535(a). Congress required the CFPB Student Loan Ombudsman by law to perform certain specific duties, including, for example, to "receive, review, and attempt

---

[3] https://www.npr.org/2025/02/19/nx-s1-5297840/personal-finance-columnist-says-cfpb-is-important-one-stop-shop-to-protect-consumers

to resolve informally complaints from borrowers of loans," to "make appropriate recommendations" to federal government agencies and Congress, and to prepare annual reports. 12 U.S.C. § 5535(c), (d).

26. It is my understanding from her public statements that the current CFPB Student Loan Ombudsman, Julia Barnard, was recently unlawfully terminated and that no replacement has been designated by the Secretary of the Treasury. The statutory duties of the Student Loan Ombudsman are not being fulfilled during a work stoppage or with no one in the position. For instance, borrowers who attempt to contact the CFPB Student Loan Ombudsman will not be able to have her "receive, review, and attempt to resolve informally" such complaints. 12 U.S.C. § 5535(a).

27. *Regulations:* One of the core mandates that Congress required of the CFPB is to ensure that consumer financial regulations are not "outdated, unnecessary, or unduly burdensome," 12 U.S.C. § 5511(b)(3), and one of the primary functions of the CFPB is "issuing rules, orders, and guidance implementing Federal consumer financial law," 12 U.S.C. § 5511(c)(5).

28. As part of those obligations, Congress required the CFPB to promulgate a host of regulations. For example, Congress required the CFPB to complete several mortgage-related regulations that the agency finalized shortly after the agency's creation. Congress also required the CFPB to promulgate a small business lending data rule in Section 1071 of the Dodd-Frank Act, and the CFPB completed that rule in recent years under a court order requiring its completion. That rule has not yet gone into effect. Congress also required the CFPB to complete an open banking rule in Section 1033 of the Dodd-Frank Act. The CFPB recently completed that rule, but it has not yet gone into effect. Both of those rules will require ongoing implementation work—to administer the data collection and recognize standard-setting bodies, respectively.

29. Since passage of the Dodd-Frank Act, Congress has assigned additional regulatory tasks to the CFPB as well. For example, Congress recently passed the Financial Data Transparency Act of 2022, which requires the CFPB to conduct multiple rulemakings. The CFPB continues to be legally obligated to perform this important work.

30. The CFPB also has half a dozen open rulemakings. Under the Administrative Procedure Act, the CFPB has a legal obligation to review comments it receives in those rulemakings and complete the rulemaking process for each. And the CFPB has dozens of open rulemaking petitions that the CFPB is legally obligated under the Administrative Procedure Act to respond to.

31. The CFPB has an Office of Regulations and Legal Division that maintain existing regulations that are required by statute to ensure that they do not become outdated over time and that industry has appropriate guidance on how to comply. This is ongoing work under the statutory mandate to perform this function, as well as to maintain the regulations that were created by Congressional separately. For example, the CFPB has to update its regulations to adjust various monetary figures for inflation, based in some cases on specific statutory direction, and in other cases based on regulatory obligations.

32. Based on my extensive experience with management of the CFPB as well as my familiarity with the agency's legal obligations, the agency is not fulfilling its legal obligations with respect to regulations under the work stoppage and would not be able to meet these legal obligations if the defendants were to carry out their planned indiscriminate mass layoff.

33. ***Specific Functional Units****:* As of my departure, a significant portion of the CFPB's staff was dedicated to meeting legal obligations of "specific functional units" that Congress required by law to perform certain specific functions. *See generally* 12 U.S.C. § 5493 (mandating

the creation of and specific obligations for Offices of Research; Consumer Complaints; Community Affairs; Fair Lending and Equal Opportunity; Financial Education; Service Member Affairs, and Financial Protection for Older Americans).[4]

34. Based on my extensive experience with management of the CFPB as well as my familiarity with the agency's legal obligations, the agency cannot possibly be meeting the obligations of these units under the current work stoppage, and could not meet the legal obligations of these offices if the defendants were to carry out their planned indiscriminate mass layoff. Further, to the degree that the CFPB has indiscriminately terminated contracts, it raises questions about whether the agency intends to meet other continuous legal obligations in the Dodd-Frank Act, such as to monitor markets, on an ongoing basis.[5]

---

[4] *See* 12 U.S.C. § 5493(b)(1) (mandating the creation of the Office of Research, "whose functions shall include researching, analyzing, and reporting on" certain specific topics); *id.* § 5493(b)(2) (mandating the creation of the Office of Community Affairs, "whose functions shall include providing information, guidance, and technical assistance regarding the offering and provision of consumer financial products or services to traditionally underserved consumers and communities"); *id.* § 5493(c) (mandating the creation of the Office of Fair Lending and Equal Opportunity, whose functions must include, among other things, "providing oversight and enforcement of Federal laws intended to ensure the fair, equitable, and nondiscriminatory access to credit," "working with private industry, fair lending, civil rights, consumer and community advocates on the promotion of fair lending compliance and education," and "providing annual reports to Congress on the efforts of the Bureau to fulfill its fair lending mandate"); *id.* § 5493(d) (mandating the creation of the Office of Financial Education, "which shall be responsible for developing and implementing initiatives intended to educate and empower consumers to make better informed financial decisions," among other duties); *id.* § 5493(e) (mandating the creation of the Office of Service Member Affairs, "which shall be responsible for developing and implementing initiatives for service members and their families" for various specific purposes); *id.* § 5493(g) (mandating the creation of the Office of Financial Protection for Older Americans, which "shall," among several other things, "coordinate consumer protection efforts of seniors with other Federal agencies and State regulators, as appropriate, to promote consistent, effective, and efficient enforcement" and "work with community organizations, non-profit organizations, and other entities that are involved with educating or assisting seniors").

[5] For example, the law indicates that "[i]n order to support its rulemaking and other functions, the Bureau shall monitor for risks to consumers in the offering or provision of consumer financial products or services, including developments in markets for such products or services."

35. ***Other Legal Obligations:*** Finally, generally stopping work or indiscriminately putting on leave or terminating CFPB employees, contractors, or contracts would be extremely likely to cause the agency to immediately be violating its other legal obligations, including specifically requirements related to active litigation holds, record retention, responding to FOIA requests, requirements related to the protection of trade secrets, personally identifiable information, and confidential supervisory information, and cybersecurity requirements.

36. Indeed, if the CFPB has already indiscriminately terminated CFPB employees, contractors, or contracts, it would be extremely likely that agency leadership has created the potential for widespread exposure of industry trade secrets and confidential supervisory information, as well as consumers' personally identifiable information, in violation of law, among other violations of the agency's legal obligations.

37. The statutory obligations that I have mentioned in this declaration are not exhaustive. Generally speaking, the CFPB's staff is almost entirely oriented towards the statutorily required functions of enforcement, supervision, complaints, financial education, research, market monitoring, regulations (including statutorily required regulations), specific functional units, complying with legal obligations applicable across government agencies, and the basic administrative, management, legal, accounting, and technology staff that is necessary to support the work of those teams. This is not surprising, as these are the "primary functions" Congress provided for in law for the CFPB. *See* 12 U.S.C. § 5511(c).

---

12 U.S.C. § 5512(c)(1). The CFPB had various contracts with industry providers to be able to perform this market-monitoring function. I have reviewed public statements from the "Department of Governmental Efficiency" indicating that it has canceled contracts that are crucial to this function, such as the Consumer Credit Information Panel.

***Termination of CFPB Probationary Employees Was Considered and Rejected by the Agency***

38.  As CFPB General Counsel and Senior Advisor to the Director, I was involved in many decisions involving management of CFPB employees.

39.  Specifically, with respect to probationary employees, I had primary responsibility for advising CFPB management on agency decisions, where appropriate and at the direction of the CFPB Director, to carry out the U.S. Office of Personnel Management's January 20, 2025 memorandum entitled "Guidance on Probationary Periods, Administrative Leave and Details." In particular, that memorandum directed agencies to (1) "identify all employees on probationary periods, who have served less than a year in a competitive service appointment, or who have served less than two years in an excepted service appointment" and (2) "promptly determine whether those employees should be retained at the agency."

40.  At the time of my departure from the agency, the CFPB employed many employees on probationary periods—employees whose appointment "becomes final," 5 U.S.C § 3321(a), only after a period of time that has not yet elapsed. This included both employees in and outside of the CFPB's collective bargaining unit (i.e. eligible to be a member of the CFPB union).

41.  In response to OPM's January 20, 2025 guidance, I consulted formally, orally and in writing, with agency leaders about the CFPB's employees on probationary periods, to determine whether those employees were necessary for ensuring compliance with the agency's statutory objectives and whether there were any performance issues with those employees or any other non-political reasons for their termination.

42.  Based on those consultations, the CFPB's assessment was that those employees are indeed necessary to support the CFPB's ongoing functioning, including to meet its legal obligations. The agency did not identify any employees on probationary periods with performance

or conduct issues that would have justified their termination. Indeed, in my consultation with agency leadership, not a single reason for terminating any employees on probationary periods was raised from January 20, 2025 through my last day as General Counsel on February 7, 2025.

43. Accordingly, from January 20, 2025 through February 7, 2025, no employees on probationary periods were terminated by the CFPB.

44. *The New York Times* has reported on a memorandum, attributed to me, providing the CFPB's determination about whether employees on probationary periods should be retained at the agency. *See* The New York Times, *Trump Names 2 New Top Financial Regulators* (Feb 11, 2025).[6] The *Times* article indicated that this memorandum by me "to agency leaders" explained the CFPB's reasoned justification for retaining employees on probationary periods, who "helped the bureau obtain more than $30 million in remedies for consumers." Based on my personal knowledge of the facts, I would not dispute the accuracy of these assertions.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Executed in Washington, DC　　　　　　　　　　　　　　*/s/ Seth Frotman*
February 27, 2025　　　　　　　　　　　　　　　　　　Seth Frotman

---

[6] https://www.nytimes.com/2025/02/11/us/politics/trump-financial-regulators-jonathan-mckernan-gould.html