IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NATIONAL TREASURY
EMPLOYEES UNION, *et al.*,

                   *Plaintiffs*,

    v.

RUSSELL VOUGHT, in his official capacity
as Acting Director of the Consumer Financial
Protection Bureau, *et al.*,

                   *Defendants*.

Case No. 25-cv-0381-ABJ

**REPLY MEMORANDUM IN
SUPPORT OF PLAINTIFFS'
MOTION FOR PRELIMINARY
INJUNCTION**

Deepak Gupta (DC Bar No. 495451)
Robert Friedman (DC Bar. 1046738)
Gabriel Chess (DC Bar No. 90019245)*
Gupta Wessler LLP
2001 K Street, NW
North Tower, Suite 850
Washington, DC 20006
(202) 888-1741

Jennifer D. Bennett (*pro hac vice*)
Gupta Wessler LLP
505 Montgomery Street
San Francisco, CA 94111
(415) 573-0335

* motion for admission pending

*Counsel for Plaintiffs*

Wendy Liu (DC Bar No. 1600942)
Adam R. Pulver (DC Bar No. 1020475)
Allison M. Zieve (DC Bar No. 424786)
Adina H. Rosenbaum (DC Bar No. 490928)
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-1000

*Counsel for Plaintiffs*

Julie Wilson (DC Bar No. 482946)
General Counsel
Paras N. Shah (DC Bar No. 983881)
Deputy General Counsel
Allison C. Giles (DC Bar No. 439705)
Assistant Counsel
National Treasury Employees Union
800 K Street, NW, Suite 1000
Washington, DC 20001
(202) 572-5500

*Counsel for Plaintiff National Treasury
Employees Union*

February 27, 2024

# TABLE OF CONTENTS

**INTRODUCTION AND SUMMARY OF SUPPLEMENTAL FACTS**

As the Court considers our motion for a preliminary injunction, the defendants are actively eliminating a federal agency created by Congress. They have ordered a halt to virtually all CFPB functions mandated by law. They have closed the headquarters and regional offices, removed the CFPB signage from the D.C. building, and moved to cancel all leases. Indeed, they have rushed to cancel almost every contract essential to the Bureau's operations. They have sought to return the agency's funds. They have fired hundreds of civil servants. And, had this Court's order not posed an obstacle, they would already have fired most of the rest—1,200 employees, "within 36 hours." A. Doe. Decl. ¶ 4.

The evidence reveals that the defendants are pursuing a three-step plan to eliminate the CFPB. *Id.* ¶ 3. First, they ordered all employees to "stand down from performing *any* work task." Martinez Decl., Ex. F. Second, they began mass firings and cancelations of all contracts. Third, within "60-90 days," they plan to complete the job, "***leaving a Bureau that could not actually perform any functions, or no Bureau at all***." A. Doe Decl. ¶ 3. If this does not constitute unauthorized closure of an agency established by Congress, it is hard to know what would.

The Chief Operating Officer, Adam Martinez, detailed his plan to shutter the agency—consistent with the defendants' public promises to "totally eliminate" or "delete" the CFPB by executive fiat, without Congress's say-so. *See* Roston Decl. ¶¶ 3-8.

- In a meeting held the day before this Court's February 14 hearing, Martinez informed employees that the CFPB was now in "***wind down mode***." B. Doe Decl. ¶ 3.

- Martinez told employees that all of the CFPB's statutory "***functions would be transferred to other agencies***,"—which would represent a complete reversal of Congress's judgment, in the Dodd-Frank Act, to consolidate in a single watchdog the consumer-protection roles that were widely dispersed in the run-up to the 2008 financial crisis. B. Doe Decl. ¶ 3

1

- In a meeting held after this Court's order, Martinez told staff that "the CFPB would keep the specific positions necessary to "***carry out the 'closure of the agency***,'" after which "those employees would then eventually be fired themselves." A. Doe Decl. ¶ 7.

- Martinez analogized this plan to past scenarios in which *Congress* abolished a federal agency. He discussed what other agency might "inherit the CFPB's administrative portfolios—human resources, FOIA, records management, and data systems—***once the CFPB itself was no longer operating***." A. Doe Decl. ¶ 5. "Martinez stated that he did not yet know what agency would perform [that] role for the CFPB or whether the Bureau itself would ***technically continue to exist***" for this limited purpose. A. Doe Decl. ¶ 5.

- In meetings on February 18 and 25, staff were told by Senior Executives that "once this Court's injunction was over, everything would need to be either removed from the building or destroyed" and that compliance with a host of rules "would not be necessary because ***the CFPB would 'not exist'***." D. Doe Decl. ¶ 7.

Martinez's statements do not stand alone. The defendants have wasted no time translating their plan into action. After firing over a hundred employees, the administration raced against the clock to "fire the vast majority of the remaining employees on February 14th"—the day after this case was filed—and "the only reason it did not do so is because of this Court's order temporarily prohibiting it from doing so" that same day. A. Doe ¶ 4. And although this Court also ordered that all CFPB data must be preserved, the defendants rushed to terminate contracts, raising "serious concerns" about "***the irretrievable impairment and loss of Bureau data***." 3d Meyer Decl. ¶ 3.

As one current staffer reports, "[t]he instructions to contracting officers" over the past few days "did not reflect a change in policy direction, but rather ***a wholesale termination of the contracts needed to keep the CFPB running***." C. Doe Decl. ¶ 3. Despite a Bureau-wide work stoppage, these contracting officers were directed to work "overtime," and set aside all normal protocols, to terminate "all contracts related to enforcement, supervision, external affairs, and consumer response"—the full range of the Bureau's activity—regardless of the serious practical

consequences and loss of data. C. Doe Decl. ¶ 5. This is all "highly irregular." 3d Meyer Decl. ¶ 3; *see* Shearer Decl. ¶¶ 4-15 (comparing recent events with all prior presidential transitions).

Yet in their opposition brief, the defendants invite the Court to indulge in the fiction that nothing unusual is happening—this is just a routine "pause," they say, to "orient" with a new administration's policy preferences. Remarkably, the government's sole factual support is Mr. Martinez himself, who—despite what he has repeatedly been telling staff in meetings—attempts to portray this situation as an orderly transition in which the Bureau merely wishes to make its operations more "streamlined and efficient." Martinez Decl. ¶ 18. The overwhelming evidence contradicts that sanitized account and shows that the defendants are systematically eliminating the Bureau's capacity to function at all. These actions are not merely a policy shift or a routine transition; they represent an attempt, unprecedented in American history, to unliterally eliminate an agency that Congress established and that the Supreme Court upheld last year.

The defendants' own internal communications contradict their account. On February 10, Acting Director Vought emailed all CFPB staff to direct that they "not perform any work tasks." Martinez Decl., Ex. F. Unlike his earlier directive, which included an exception for work "required by law," this directive had no such exception. From senior leadership on down, everyone understood this directive as ordering a complete work stoppage, with one official noting "that the CFPB's core statutory responsibilities have, in fact, completely stopped." Shearer Decl. ¶ 17.

The defendants' rationalizations become even less credible when considered alongside the statements by the President, Acting Director Vought, and Elon Musk. When asked directly if his goal was to have the CFPB "totally eliminated," the President responded, "I would say, yeah." He added that the CFPB "was a very important thing to get rid of" and even "used the past tense to describe the [CFPB]." Roston Decl. Ex. G; *see also* id. Exs. A–G, P (similar statements). Rather

than deny or explain these statements, the defendants ask this Court to ignore them entirely. The defendants' position also defies logic. If, as they claim, the administration merely wishes to change the Bureau's direction or reduce its size, why would they:

- Instruct every employee to "stand down" completely rather than focus on new priorities?

- Cancel the contracts that support the Bureau's operations—including those that maintain essential data systems and that maintain basic cybersecurity protections—even though restarting operations will take months to a year, at great cost to the taxpayer? C. Doe Decl. ¶ 10-13; 3d Meyer Decl. ¶ 5-17.

- Close the Bureau's headquarters, without arranging for alternative space—especially in light of the recent executive order banning remote work? Diotalevi Decl. ¶¶ 8–20; *see also* Roston Decl. Exs. H–N, Q.

- Seek to return the Bureau's funding to the Federal Reserve? B. Doe Decl. ¶ 5.

The only plausible explanation is the simplest one: The defendants are attempting to eliminate the CFPB entirely, just as they and the President and have repeatedly said they are.

The defendants also attempt to minimize the magnitude of their actions by suggesting that the Bureau is maintaining essential services. Martinez claims, for example, that "[o]perations related to the Consumer Complaint Database are continuing." Martinez Decl. ¶ 22. But this claim is directly contradicted by the Chief of Staff of Consumer Response, who explains in a detailed declaration that Mr. Martinez's declaration is "misleading, inaccurate, or both"—contrary to what he says, "operations related to the Consumer Response Complaint Database" are *not* "continuing," and many of the "contracts needed for work related to the Consumer Complaint Database" have *not* remained intact and operational." Pfaff Decl. ¶¶ 7–9. There is a "large and unprecedented backlog" of consumer complaints that will only get worse. *Id.* "Complaints referred by

congressional offices, states, and most federal agencies are not being reviewed and sent to companies." *Id.* ¶ 12. "Complaints are not being 'monitored.'" *Id.* ¶ 17. Complaints are not being "investigated." *Id.* ¶ 18. Escalated issues—such as "consumers who are facing imminent foreclosure"—are "not being addressed," an obvious source of irreparable harm. *Id.* ¶ 19. "Complaint systems, including the case management system and systems for sharing data, are not being maintained." *Id.* ¶ 20. "Complaints submitted by servicemembers are their families" and "[s]tudent loan complaints"—two categories prioritized by Dodd-Frank—are not being addressed. *Id.* ¶¶ 23–24.

The defendants' claim that some CFPB functions remain operational is further refuted by evidence of their treatment of the Bureau's Student Loan Ombudsman's office. Despite Martinez's suggestion that "the position is currently vacant" due to ordinary circumstances, Defs. Opp. 23 n.6, former Student Loan Ombudsman Barnard attests that she was abruptly terminated on February 14—the day after this lawsuit was filed. Barnard Decl. ¶ 2. This termination occurred despite the fact that the Ombudsman position is specifically required by statute. 12 U.S.C. § 5535.

The picture that emerges from all of these declarations is not of an agency "pausing" its operations to adjust priorities. It is of an agency being systematically dismantled—with employees fired, contracts canceled, headquarters closed, and core statutory functions abandoned. And all of this has been undertaken without any congressional authorization to eliminate the CFPB. Indeed, the defendants do not even attempt to argue that they have such authority.

*    *    *

The legal violations here are profound, and the plaintiffs are likely to succeed on the merits.

*First,* in attempting to eliminate an agency Congress created, the defendants have violated the separation of powers. As the Supreme Court has made clear, the President's power "must stem

5

either from an act of Congress or from the Constitution itself." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952). But "[t]here is no statute that expressly authorizes the President to" shut down the CFPB, "nor is there any act of Congress ... from which such a power can be fairly implied." *Id.*

*Second*, Mr. Vought's actions as the CFPB's Acting Director are all unlawful because he was not validly appointed. President Trump fired Director Chopra and then purported to appoint Vought as Acting Director under the Federal Vacancies Reform Act. But the FVRA only applies when an officer "dies, resigns, or is otherwise unable to perform the functions and duties of the office." 5 U.S.C. § 3345(a). It does not apply when the President simply fires an officer—a reading confirmed by statutory text and historical context.

*Third*, the defendants' actions violate the Administrative Procedure Act because they exceed statutory authority and are arbitrary, capricious, and contrary to law. No statute authorizes the defendants to stop the CFPB from doing what Congress said it must, and they have offered no reasoned explanation for their extraordinary efforts to wind down the agency.

The defendants try, through a series of procedural maneuvers, to keep this Court from addressing their unlawful actions. But their attempts to do so suffer a basic flaw. This case isn't an employment dispute. It's about the fundamental constitutional question of whether the Executive Branch can unilaterally eliminate an agency created by Congress. Because that's not how our system of government works, the answer is no.

*    *    *

The human consequences of the defendants' actions are immediate and devastating. Pastor Eva Steege, an 83-year-old minister with less than six months to live, had been receiving assistance from the CFPB's Student Loan Ombudsman to discharge her loans. Now, she faces the prospect

of dying without resolving her debt, leaving her family burdened rather than receiving the $15,000 in overpayments they are owed. Virginia Poverty Law Center can no longer help its clients resolve predatory lending disputes through the CFPB's complaint system—a process that previously took minutes and achieved remarkable results, like halving interest rates and monthly payments. The Center's experience demonstrates the ripple effects of the CFPB's shutdown on organizations that serve vulnerable populations. The NAACP's "members who are victims of the Altadena fire will be unable to recover money lost to financial predators" now that they lack the help that the CFPB was providing. West-Tillman Decl. ¶ 4.

Every day the defendants' actions continue, irreparable harm accumulates. As a CFPB contracting officer explains, if the CFPB's contracts are "fully terminated," they cannot be reinstated; instead, it will take "six months to a year" to enter new contracts—contracts that are "essential to all of the CFPB's work." Charlie Doe Decl. ¶¶ 5, 10.  Similarly, the Bureau's former Chief Technologist warns that "the automated complaint [function] is likely to break down soon" without continual technological support, "bringing the last vestiges of the Bureau's consumer complaint function to a halt." Dkt. 14-4, Meyer First Decl. ¶ 28; Pfaff Decl. ¶ 20.

*　　*　　*

This Court should act swiftly to prevent further irreparable harm by granting the requested preliminary injunction. The evidence from multiple current and former employees is consistent and compelling: The defendants are systematically dismantling an agency created by Congress, in violation of the Constitution and federal law. Only this Court's intervention can preserve the status quo while these grave constitutional questions are resolved.

The defendants' rush to destroy the Bureau before this Court can rule on the preliminary injunction motion underscores the urgency of the need for immediate relief. These escalating

7

actions will make it impossible to restore the status quo and resume the CFPB's legally mandated functions, even if the Court ultimately rules in the plaintiffs' favor.

If the Court does not act to preserve the status quo, the defendants plan will come to fruition in short order: The CFPB, in open defiance of the law enacted by Congress, will be transformed into "a room at Treasury, [the] White House, or [the] Federal Reserve with five men and a phone in it." Drew Doe Decl. ¶ 10.

## ARGUMENT

### I.    The plaintiffs are likely to succeed on the merits of their claims.

#### A.    The plaintiffs are likely to succeed on the merits of their constitutional claims.

##### 1.    The defendants' decision to dismantle the CFPB violates separation of powers.

The plaintiffs claim—and have offered substantial evidence to demonstrate—that the defendants are violating the separation of powers by shuttering the CFPB. The defendants' lead response (at 23–24), relying principally on *Dalton v. Specter*, 511 U.S. 462 (1994), is that the plaintiffs have not "properly pled" a separation-of-powers claim because dismantling the CFPB is a statutory violation, not a constitutional one.[1] Defendants are wrong, and *Dalton* does not support their theory.

*Dalton* concerned President Bush's closure of a naval base, allegedly in violation of statutory procedures governing closures. *Id.* at 466. Because the closure decision was committed by statute to the President's discretion, the Court held it unreviewable. *Id.* at 474. In reaching that conclusion, the Court observed that not every claim that a president "exceeded his statutory authority" raises a "constitutional claim," which *would* be reviewable. *Id.* Thus, *Dalton* "merely

---

[1] Unless otherwise specified, all internal quotation marks, emphases, alterations, and citations are omitted from quotations throughout.

stands for the proposition that when a statute entrusts a discrete specific decision to the President," it's unreviewable. *Chamber of Com. v. Reich*, 74 F.3d 1322, 1331 (D.C. Cir. 1996).

Here, the plaintiffs do not claim that a statute entrusted the defendants with deciding whether to close the CFPB but that the defendants merely made the wrong decision. They claim that the defendants have *no* authority to decide whether to shut down the CFPB because Congress has already decided that it shall exist. Under *Dalton*, that claim is a separation-of-powers claim. Indeed, the Supreme Court there explicitly distinguished between cases, like *Dalton*, about "excess or abuse of discretion in exerting a power given" from cases, like this one, involving the "want of Presidential power." 511 U.S. at 473. Here, the defendants do not dispute that there is "no statutory authority" for shutting down the CFPB. *Id.* So, unlike cases where the Executive merely abuses its power, this is a case where "no statutory authority [is] claimed" for the challenged conduct. *Id.* This case therefore turns "on whether the Constitution authorized the President's actions." *Id.* (discussing *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952)). Not even the defendants claim a constitutional authority to dismantle an agency.

Defendants also try to avoid judicial review by rewriting the facts. As the defendants tell it (at 25–26), this case is about the setting of "policy priorities," "enforcement decisions," and "how best to implement programs"—the ordinary decisions of the executive branch. But as explained above, the defendants' actions are anything but ordinary. They have not tried to change the CFPB's policy direction; they have tried to shutter the agency.

### 2. Vought's installment as "Acting Director" violates the Appointments Clause.

Defendants do not dispute that, unless the Federal Vacancies Reform Act authorizes Vought to serve as Acting Director of the CFPB, every directive that he has given in that role is unconstitutional under the Appointments Clause. That concession is sensible. There's no other

possible source of authority for Vought's appointment to a principal-officer position for which he was neither nominated nor confirmed. *See, e.g.*, *Olympic Fed. Sav. & Loan Ass'n v. Dir., Off. of Thrift Supervision*, 732 F. Supp. 1183, 1199 (D.D.C. 1990). But the defendants' contention that the FVRA authorizes Vought's appointment runs afoul of the text of the statute.

The temporary appointment power that the FVRA provides is triggered only when "an *officer* of an Executive agency … dies, resigns, or is otherwise unable to perform" the office's functions. 5 U.S.C. § 3345(a) (emphasis added). By its terms, then, the statute applies when an *officer* "is unable to perform" their duties. *Id.* That is, a person must be *both* an officer *and* be unable to perform the duties of their office at the same time. But once an agency head is removed, that person is no longer an officer. Thus, there is no officer who has died or resigned, and there is no officer "otherwise unable to perform" the duties of the office, so the FVRA does not apply. *Id.*

The interpretive canon of ejusdem generis confirms this interpretation. Under that rule, "where general words follow an enumeration of specific items, the general words are read as applying only to other items akin to those specifically enumerated." *Harrison v. PPG Indus.*, 446 U.S. 578, 588 (1980). The words that precede "otherwise unable to perform" in the FVRA are "dies" and "resigns." 5 U.S.C. § 3345(a). "The essential characteristic that 'dies' and 'resigns' share is that both are uncontrollable inabilities to serve from the president's perspective." Ben Miller-Gootnick, Note, *Boundaries of the Federal Vacancies Reform Act*, 56 Harv. J. on Legis. 459, 464 (2019). To be akin to "dies" and "resigns," then, "otherwise unable to perform" must be read to capture other things that are likewise beyond the president's control, such as a principal officer's illness, absence to care for a family member, or a conflict of interest necessitating recusal. *See id.* at 464–65.

That reading also comports with everyday usage. In common parlance, no one would say that Mr. Chopra—the prior director of the CFPB—was "unable" to do the job of director; they'd say he was "fired" or "removed." *See Comm'r v. Soliman*, 506 U.S. 168, 174 (1993) (statutory interpretation requires "look[ing] to the ordinary, everyday senses of the words"). That's why the only court to consider this question didn't hesitate to conclude that removals are outside the FVRA's scope. *See United States v. Valencia*, 2018 WL 6182755, at *4 (W.D. Tex. Nov. 27, 2018).

History supports that conclusion. Congress has provided the president with general temporary appointment power since 1792, but no statute has ever covered "firing" or "removal." *See* Miller-Gootnick, *supra*, at 472. Rather, up until the FVRA, the statutes "consistently listed only four cases where the Act applied: death, resignation, sickness, or absence," terms that do not ordinarily capture removal. *See id*. It would be quite odd for Congress, after 200 years of unchanged practice, to use "otherwise unable to perform" to capture "removals," without saying so more clearly. That's especially so given that some agency-specific automatic succession statutes do apply to all "vacancies." *See id.* at 469–70 (collecting examples). "[T]hese provisions demonstrate [] that Congress knows how to" cover all vacancies when it wants to. *Miller v. Clinton*, 687 F.3d 1332, 1340 (D.C. Cir. 2012).

In arguing otherwise, defendants do not offer a textual analysis. And they do not deny that, under their interpretation, the FVRA allows a president to avoid the check on presidential power that the Appointments Clause provides by simply firing a principal officer—notwithstanding that the FVRA was a response to Congress "[p]erceiving a threat to the Senate's advice and consent power." *N.L.R.B. v. SW Gen., Inc.*, 580 U.S. 288, 295 (2017). Instead, they offer a policy reason for reading the statute contrary to its plain language: that without this power, agencies would be leaderless once an agency head is removed in cases involving corruption or national security

concerns. Defs. Opp. 27–28. That argument fails in two ways. First, as explained above, many statutes (like the one governing the CFPB) provide for automatic succession within an agency when the agency head's seat is vacant. *See* 12 U.S.C. § 5491(b)(5). If Congress left gaps, the President can propose legislation to fill them. And if the President is unhappy with the temporary head, he can nominate someone and go through the Constitution's advice-and-consent process. Second, the D.C. Circuit has posited that the president may possess an inherent power to make temporary appointments in an "emergency situation" if necessary to ensure that he "take care that the laws be faithfully executed." *Williams v. Phillips*, 482 F.2d 669, 670 (D.C. Cir. 1973) (per curiam). A president's desire not to go through the confirmation process is not an "emergency."[2]

### 3.    Plaintiffs have properly brought claims for violations of the Constitution.

As to the plaintiffs' first and second causes of action, the defendants (at 21) assert that the plaintiffs cannot bring claims for violations of the Constitution because they can bring claims under the APA. At the same time, though, the defendants argue that the plaintiffs' claims are "unreviewable" under the APA as well. Defs. Opp. 32–33; *see id.* at 14–19. Together, then, their position is that the plaintiffs have no means of seeking judicial redress for violations of the Constitution that are causing them irreparable injury. That is incorrect. *See, e.g.*, *Webster v. Doe*, 486 U.S. 592, 603 (1988) (foreclosing any judicial review of constitutional claims would raise serious constitutional questions of its own).

Independent of the APA, "the court's power to enjoin unconstitutional acts by the government is inherent in the Constitution itself." *Trudeau v. FTC*, 456 F.3d 178, 190 n.22 (D.C.

---

[2] The defendants also state (at 27 n.9) that "senators" said in floor statements that the statute covered removals. They wisely relegate that claim to a footnote. Only a single senator made that claim. Miller-Gootnick, *supra*, at 481. A second, whom the first referred to as "the author" of the FVRA, did not identify removals. *Id.* at 476 & n.82. And regardless, "floor statements by individual lawmakers" are "among the least illuminating forms of legislative history." *Advoc. Health Care Network v. Stapleton*, 581 U.S. 468, 481 (2017).

Cir. 2006) (quoting *Hubbard v. U.S. E.P.A. Adm'r*, 809 F.2d 1, 11 n.15 (D.C. Cir. 1986)); *see generally Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015). This power applies just as much to "Appointments Clause or separation-of-powers claim[s]" as it does to "every other constitutional claim." *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010).[3]

"Nothing in the APA evinces … an intent" to bar courts from exercising this traditional jurisdiction over constitutional claims. *Juliana v. United States*, 947 F.3d 1159, 1167 (9th Cir. 2020) (rejecting argument that "APA's comprehensive remedial scheme for challenging the constitutionality of agency actions implicitly bars the plaintiffs' freestanding constitutional claims"); *see also Trudeau*, 456 F.3d at 185 ("[T]he APA neither confers nor restricts jurisdiction."); *Armstrong*, 575 U.S. at 328 (courts' traditional jurisdiction exists, unless the defendants "establish Congress's intent to foreclose equitable relief"). As then-Judge Ketanji Brown Jackson explained, "the Constitution itself" provides "a cause of action independent of the APA" that "eschew[s] the statutory requirements that apply only to APA claims." *Z St., Inc. v. Koskinen*, 44 F. Supp. 3d 48, 65 (D.D.C. 2014), *aff'd sub nom. Z St. v. Koskinen*, 791 F.3d 24 (D.C. Cir. 2015); *see also, e.g.*, *Trudeau*, 456 F.3d at 189–90 (recognizing stand-alone constitutional claim separate from the APA and its final agency action requirement); *Juliana*, 947 F.3d at 1167–68 (compiling cases); *Chacoty v. Pompeo*, 392 F. Supp. 3d 1, 12 (D.D.C. 2019).[4] So too here.

---

[3] To be sure, the plaintiffs' constitutional claims are also cognizable under the APA as there is plainly final agency action for the reasons explained in detail below.

[4] The defendants' reliance on *Federal Express Corp. v. U.S. Department of Commerce*, 39 F.4th 756, 763 (D.C. Cir. 2022), is misplaced. *See Dart v. United States*, 848 F.2d 217, 224 (D.C. Cir. 1988) ("When an executive acts *ultra vires*, courts are normally available to reestablish the limits on his authority." (citing *American School of Magnetic Healing v. McAnnulty*, 187 U.S. 94 (1902))); *see also Chamber of Commerce v. Reich*, 74 F.3d 1322, 1327–28 (D.C. Cir. 1996).

**B.      The plaintiffs are likely to succeed on the merits of their APA claim.**

The plaintiffs brought this action to seek review of the defendants' decision to dismantle the CFPB and the actions that the defendants undertook to implement that decision, including ordering employees to stop work, canceling contracts, and firing employees. Those actions are reviewable final agency action, and the plaintiffs are likely to succeed in showing that they should be set aside.

**1.** The challenged actions "mark the consummation of the agency's decisionmaking process" and are "one[s] by which rights or obligations have been determined, or from which legal consequences will flow," *Bennett v. Spear*, 520 U.S. 154, 178 (1997)—that is, they are final. With respect to the first *Bennett* requirement, there is nothing "tentative or interlocutory" *id.* (or, for that matter, "abstract," *see* Defs. Opp. 18) about the defendants' decision to dismantle the CFPB: that decision was announced by President Trump ("We virtually shut down the out-of-control CFPB") and the defendants are implementing it. Roston Decl. Ex. P; *see also id.* Exs. A–G. Likewise, there is nothing tentative or interlocutory about the stop-work order, canceling of contracts, or firing of employees.[5] Although the defendants describe the orders to stop work as "the initiation, not the consummation of the agency's decision-making process," Defs. Opp. 18, the orders did not *propose* a work stoppage; they ordered employees not to perform their work. *See* Martinez Decl., Ex. F. That the order came from the agency's Acting Director, rather than agency staff, is a further

---

[5] The defendants wrongly assert that the plaintiffs have argued only that the decision to eliminate the CFPB met the first *Bennett* prong and that the order to stop work met the second, and thus did not argue that "any *single* agency action satisfies both Bennett prongs." *See* Defs. Opp. 18. As the defendants acknowledge, the plaintiffs' discussion of the first *Bennett* prong in fact also discussed the defendants' actions implementing the decision to eliminate the CFPB. *See* Pls. Mem. at 26 (describing actions, including the firing of employees, stop-work orders, and canceling of contracts as "the consummation of agency decision-making"). And the plaintiffs' discussion of the second *Bennett* prong discussed the "decision to shut down the agency," along with actions taken to implement that decision. *Id.* at 28.

indication of its final nature. *Cf. Soundboard Ass'n v. FTC*, 888 F.3d 1261, 1268 (D.C. Cir. 2018) (holding that letter that expressed the "views of 'staff'" rather than the agency head was not final agency action).

Moreover, that the defendants may later change their mind and allow some employees to work does not undermine finality. As the Supreme Court has explained, "[t]he mere possibility that an agency might reconsider … does not suffice to make an otherwise final agency action nonfinal." *Sackett v. EPA*, 566 U.S. 120, 127 (2012); *see also Nat'l Env't Dev. Ass'ns Clean Air Project v. EPA*, 752 F.3d 999, 1006 (D.C. Cir. 2014) ("An agency action may be final even if the agency's position is 'subject to change' in the future.").

The challenged actions also meet the second *Bennett* requirement, because they determine "rights or obligations" and "legal consequences" flow from them. *Bennett*, 520 U.S. at 178. A plaintiff need not face "risk of significant criminal and civil penalties" for an action it challenges to meet this requirement. Defs. Opp. 19 (quoting *Cal. Cmtys. Against Toxics v. EPA*, 934 F.3d 627, 637 (D.C. Cir. 2019)). An action can also meet this requirement where, for example, it "limits or defeats a party's ability to enter into an advantageous [] arrangement," *Spirit Airlines, Inc. v. U.S. Dep't of Transp.*, 997 F.3d 1247, 1252 (D.C. Cir. 2021), or binds agency "staff by forbidding them to continue [a] program," *Biden v. Texas*, 597 U.S. 785, 808 (2022). Here, the challenged actions have deprived people, including Pastor Steege and the Virginia Poverty Law Center's clients, of their right to receive assistance from the agency; they have forbidden CFPB employees, including NTEU and Employee Association members, from undertaking their work tasks, presumably with adverse consequences if they disobey; and they have fired employees (again including NTEU and Employee Association members) have been deprived of their employment and corresponding

15

benefits. The actions have "direct and appreciable legal consequences," *Bennett*, 520 U.S. at 178, and are subject to suit under the APA.

Arguing otherwise, the defendants seek to recast the plaintiffs' APA claim as a challenge to the defendants' management of the agency. *See* Defs. Opp. 15. Contrary to the defendants' arguments, however, the plaintiffs are not seeking "wholesale reform of an agency program" or making "generalized complaints about agency behavior." *Id*. They are challenging discrete, identifiable actions. To the extent that relief from the challenged decision and the agency actions through which it is implemented would broadly affect the agency, it is because of the breathtakingly broad effects of the defendants' actions themselves—not because the agency action is insufficiently discrete. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 894 (1990) (recognizing that, although wide-ranging attacks on agency programs are impermissible, a challenge to a final agency action may still "ultimately have the effect of requiring … a whole 'program' to be revised by the agency in order to avoid the unlawful result that the court discerns").

Likewise, the plaintiffs do not "vaguely allege" that the defendants are committing statutory violations. *Id*. 15–16. Rather, the First Amended Complaint makes clear that the APA claims are premised on requirements imposed on the CFPB by the Consumer Financial Protection Act of 2010 (CFPA), *see* FAC ¶ 24, and alleges that "defendants have put an immediate halt to the CFPB's performance of its statutorily mandated functions," *id*. ¶ 52. And this case is not analogous to *Lujan*, where the Court held that a program consisting of "many individual actions" could not be challenged "simply because one of [the actions] that is ripe for review adversely affects one of respondent's members." 497 U.S.  at 893. The plaintiffs have shown how the discrete actions challenged here adversely affect them. *See* Pls. Mem. 32–37.

**2.** The defendants also contend that their wholesale dismantling of the CFPB is "unreviewable" because they have merely taken a "temporary pause," an action that, they say, is "committed to agency discretion by law" under 5 U.S.C. § 701(a)(2). Defs. Opp. 32. As the D.C. Circuit has explained, however, section 701(a)(2) is "'a very narrow exception' to judicial review that should be invoked only where there is 'no law to apply.'" *Amador Cnty v. Salazar*, 640 F.3d 373, 380 (D.C. Cir. 2011) (quoting *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 410 (1971)); *see also Drake v. FAA*, 291 F.3d 59, 70 (D.C. Cir. 2002) (stating that section 702(a)(2) "encodes the principle that an agency cannot abuse its discretion … where its governing statute confers such broad discretion as to essentially rule out the possibility of abuse"). That narrow exception has no applicability here, because the defendants have no discretion to dismantle the agency.

The CFPB's governing statute, the CFPA, does not confer any discretion, let alone "broad discretion," to shut down the agency. Defs. Opp. 33. To the contrary, that statute establishes the CFPB, 12 U.S.C. § 5491(a), provides that the CFPB "shall regulate the offering and provision of consumer financial products or services," *id.*, and requires the CFPB to perform numerous functions, *see* Pls. Mem. 5–7; *see also* 12 U.S.C. § 5493(b)(3)(A) (requiring monitoring and responding to consumer complaints); *id.* §§ 1646(a)–(b), 1632(d)(3) (requiring researching, analyzing, and reporting on market developments for consumer financial products or services, and consumer understanding of and access to financial products, among other things); *id.* § 2809(b) (requiring the "provi[sion] of staff and data processing resources" to the Federal Financial Institutions Examination Council; *id.* § 2809(a) (requiring the compiling information on depository institutions and aggregate lending patterns); *id.* § 5535(a) (requiring the "provi[sion] [of] timely assistance to borrowers of private education loans" through a Private Education Loan

Ombudsman, and "compil[ing] and analyz[ing] [of] data on borrower complaints regarding private education loans"). In light of these statutory mandates, the notion that the agency has "complete discretion" over those matters is "implausible." *Amador Cnty.*, 640 F.3d at 381; *see also Dickson v. Sec'y of Def.*, 68 F.3d 1396, 1401 (D.C. Cir. 1995). As a case on which the defendants rely makes clear, "Congress may always circumscribe agency discretion"; "[a]n agency is not free simply to disregard statutory responsibilities." *Lincoln v. Vigil*, 508 U.S. 182, 193 (1993).

The defendants' assertion that they are entitled to "highly deferential rational basis review" is likewise meritless. Defs. Opp. 30. The APA's arbitrary-and-capricious standard requires agencies "to examine all relevant factors and record evidence, and to articulate a reasoned explanation for [their] decision[s]." *Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 923 (D.C. Cir. 2017). "'[N]o deference' is owed to an agency action that is based on an agency's 'purported expertise' where the agency's explanation for its action 'lacks any coherence.'" *Fox v. Clinton*, 684 F.3d 67, 75 (D.C. Cir. 2012). The Court "do[es] not … simply accept whatever conclusion an agency proffers merely because the conclusion reflects the agency's judgment. … Not only must an agency's decreed result be within the scope of its lawful authority, but the process by which it reaches that result must be logical and rational." *Id.* (quoting *Tripoli Rocketry Ass'n v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 437 F.3d 75, 77 (D.C. Cir. 2006)).

Here, there is no evidence that the defendants engaged in reasoned decisionmaking before deciding to dismantle the CFPB. Their opposition memorandum does not seriously contend otherwise. *See* Defs. Opp. 33 (admitting that they offered "only a cursory explanation" in emails implementing the decision to stop work at the agency). Although they assert that their action is "reorient[ing]" to implement the Executive's policies, *id.* at 32, that assertion is not a reasoned explanation. *See* Pls. Mem 30–31. Because the agency did not examine or consider evidence on the

disruptive consequences of dismantling the CFPB, and did not articulate a reasoned explanation for its decision to shutter the CFPB, the plaintiffs are likely to succeed on their APA claim that the agency's action is arbitrary and capricious.[6]

**3.** The defendants' "zone of interests" argument is similarly unavailing. This action is brought on behalf of seven plaintiffs: two groups representing CFPB employees, an individual consumer, a consumer advocacy, research, and education organization, a legal services organization, and a civil rights organization. The defendants contend that three of the seven fall outside the "zone of interest" of the Consumer Financial Protection Act and, therefore, that they cannot pursue their APA claim that the defendants are acting arbitrarily and capriciously in dismantling the agency, insofar as they seek to base their claim on the CFPA. Defs. Opp. 22. The Court need not address the defendants' contention because, in addition to limiting their argument to just one portion of one cause of action, the defendants do not dispute that the other four plaintiffs fall within the zone of interests. *See, e.g.*, *Animal Legal Def. Fund, Inc. v. Glickman*, 154 F.3d 426, 445 (D.C. Cir. 1998) (where one plaintiff "falls within the zone of interests" of the statute, there is "no need to consider" whether that is also true for "the other individual plaintiffs").

"In any event, the test for whether a [plaintiff's] 'interests fall within the zone of interests protected by the law invoked' is 'lenient' and 'not especially demanding.'" *Am. Whitewater v. FERC*, 125 F.4th 1139, 1151 n.6 (D.C. Cir. 2025) (quoting *Myersville Citizens for a Rural Cmty.,*

---

[6] Nor is there any merit to the Defendants' brief suggestion (at 33) that the Court should remand to the agency to allow it to better explain why it's unconstitutionally dismantling itself. *See League of Women Voters v. Newby*, 838 F.3d 1, 14 (D.C. Cir. 2016) (reversing the denial of a motion for preliminary injunction where plaintiffs had shown a likelihood of success on their claim that defendants had violated the APA by failing to provide a reasoned explanation for their action); *see also Hill Dermaceuticals, Inc. v. FDA*, 709 F.3d 44, 46 n.1 (D.C. Cir. 2013) (stating that "because preliminary injunctions are expedited, they may sometimes be appropriate in APA cases where time is of the essence").

*Inc. v. FERC*, 783 F.3d 1301, 1316 (D.C. Cir. 2015)). A plaintiff is outside a statute's zone of interests

only if its "interests are so marginally related to or inconsistent with the purposes implicit in the

statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Id.* (quoting

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012)).

Here, Pastor Steege—an individual consumer who is clearly among the population of consumers

on whose behalf the CFPA was expressly enacted and who was receiving direct assistance from

the CFPB until the actions challenged here—falls squarely within the zone of interests.[7]

**4.** The defendants' final gambit to avoid APA review is to assert that the Vought email

directing CFPB staff to stop work cannot be "not in accordance with law," 5 U.S.C. § 706(2)(A),

because it includes a line stating "unless expressly approved by the Acting Director or required by

law." Def. Op. 28. A "consistent with law" provision, however, does not avoid constitutional or

other legal concerns where the order "is entirely inconsistent with law in its stated purpose and

directives." *Cty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 516 (N.D. Cal. 2017) (rejecting as

unreasonable a reading that would render the order "legally meaningless" and contrary to its stated

broad intent). In addition, this argument ignores that the stop-work order that is in effect now does

not contain that exception. Martinez Dec., Ex. F. The language on which the defendants rely was

---

[7] The defendants are wrong (at 22–23) that Pastor Steege cannot seek assistance from the CFPB with her "federal loans." By statute, the CFPB's Loan Ombudsman "shall ensure coordination in providing assistance to … borrowers seeking to resolve complaints related to their private education or Federal student loans." 12 U.S.C. § 5535(c)(2) (emphasis added); *see also* Barnard Decl. ¶ 5 (explaining that all Student Loan "Ombudsmen serving during the Obama, Trump, and Biden Administrations dealt[] with federal student loan issues regularly"); CFPB and U.S. Dep't of Education, *Memorandum of Understanding* (Apr. 31, 2020), https://files.consumerfinance.gov/f/documents/cfpb_ed-memorandum-of-understanding_student-loan-borrowers_2020-02.pdf (agreement between CFPB and DOE and provides that CFPB "will accept complaints related to private educations loans and the servicing of Title VI [federal] loans and process those complaints in the ordinary course, including providing the complaints to the servicers and providing the servicers' response to the borrower, in accordance with 12 U.S.C. § 5534" (emphasis added)).

in only an early version. Agency management has implemented the current directive with that understanding, even in the face of explicit requests by staff to perform essential, statutorily required functions. *See* Drew Doe Decl. ¶ 10 (recounting denial of request to perform "necessary work" to collect and maintain CFPB data); Scott Decl. ¶ 3; Diotalevi Decl. ¶ 5; *see also* Roston Decl. Exs. M, R–Z (press documenting work stoppage).

## II. The defendants cannot evade review by mischaracterizing this case as one about personnel actions.

The defendants argue (at 2–3) that "threshold" barriers preclude this Court's review. Those arguments all stem from their mischaracterization of the facts. Having tried to shrink this case into an employment dispute, they insist that it belongs in the MSPB or FLRA. This case, however, is about the defendants' dismantling of the CFPB, and there are no barriers to this Court's review.

### A. The claims alleged are not the kind that Congress intended to channel to an agency.

"Provisions for agency review do not restrict judicial review unless the statutory scheme displays a fairly discernible intent to limit jurisdiction, and the claims at issue are *of the type* Congress intended to be reviewed within the statutory structure." *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 489 (2010) (emphasis added). Neither the "sweeping constitutional claims" nor the APA claims in this case are the kind that Congress intended to route through the MSPB or FLRA. *Axon Enter., Inc. v. FTC*, 598 U.S. 175, 189 (2023).

That "common-sense" conclusion follows from the nature of the MSPB and FLRA. *Alpine Secs. Corp. v. Fin. Indus. Regul. Auth.*, 121 F.4th 1314, 1336 (D.C. Cir. 2024). The MSPB has "authority to adjudicate any claim asserting that an agency ha[s] violated a merit system principle or committed a prohibited personnel practice by violating a statute which embodied any merit system principle." *Barnhart v. Devine*, 771 F.2d 1515, 1520 (D.C. Cir. 1985). And the FLRA was

"charged with adjudicating federal labor disputes, including 'negotiability' disputes and 'unfair labor practice disputes.'" *AFGE v. Trump*, 929 F.3d 748, 752 (D.C. Cir. 2019).

When courts decide whether Congress has implicitly stripped their jurisdiction by channeling cases to an agency forum, the "[t]he ultimate question" is always "how best to understand what Congress has done." *Axon*, 598 U.S. at 186. Congress did not "implicitly," by way of two statutes governing federal employment relations, route "fundamental, even existential" questions about the structure of our constitutional system to two agencies that handle employment and labor disputes. *Id.* at 180, 185.

Moreover, here, additional plaintiffs seek the same relief as the plaintiffs that represent employees. That's because the injuries of those other plaintiffs can't be redressed unless the CFPB is functioning, and the CFPB can't function without employees. The presence of non-union plaintiffs differentiates this case from the decisions in which the Supreme Court or the D.C. Circuit have channeled a party into an agency forum. In each of those decisions, the plaintiffs were employees, and their claims *could be* channeled to the agency. *See e.g.*, *Elgin v. Dep't of Treasury*, 567 U.S. 1, 6 (2012) ("Petitioners are former federal competitive service employees[.]"); *United States v. Fausto*, 484 U.S. 439, 441 (1988) (plaintiff is a federal employee); *AFGE*, 929 F.3d at 753 (plaintiffs are seventeen federal labor unions).

That difference is meaningful. In *Elgin*, the Supreme Court reasoned that Congress intended to channel the individual employees' constitutional claims because holding otherwise would "reintroduce the very potential for inconsistent decisionmaking and duplicative judicial review that the [Civil Service Reform Act] was designed to avoid." 567 U.S. at 14 (channeling employee who brought suit after he was fired for failing to register for the draft). That same

rationale cuts against channeling here. By taking jurisdiction over the entire case, this Court will avoid the risks that concerned the Court in *Elgin*.[8]

Application of the three *Thunder Basin* factors—which courts look to as "general guideposts," but not as "a strict mathematical formula," *Jarkesy v. S.E.C.*, 803 F.3d 9, 17 (D.C. Cir. 2015)—confirm that the Court has jurisdiction.

**1.** The plaintiffs are asserting a "here-and-now injury" that cannot be redressed if the Court shuttles them into an agency. *Axon*, 598 U.S. at 192. That's because of the nature of their claims— that the defendants are unilaterally closing an agency Congress created. The harms that result from that closure are underway right now. Yes, some of them are employment related. But many are not—consumers can't have their student loans forgiven or rely on the Consumer Response function; advocacy groups are scrambling; necessary contracts are being cancelled; indispensable data is at risk. Even if the CFPB is eventually reopened, the harms that result from this lost time— examinations not done, consumer complaints not processed, research not conducted—can never be made up for. Shearer Decl. ¶¶ 18–23. Further, to the extent it's even possible to reboot an agency that has been shuttered, it will be a long and difficult process. *See* Charlie Doe Decl. ¶ 10 (entering new contracts will take "six months to a year"); 3d Meyer Decl. ¶¶ 4–8 (absent immediate relief, "it will be too late to forestall permanent loss of the Bureau's data"). And finally, like in *Axon*, the

---

[8] The defendants seem to suggest (at 13) that even the non-employee-representing plaintiffs can't seek relief related to the Bureau's staffing. That can't be right. Because they can't go bring their claims before the MSPB or FLRA, foreclosing them from seeking that relief here would "entirely foreclose judicial review" of their constitutional claims. *Elgin*, 567 U.S. at 11 n.4. "[W]here Congress intends to preclude judicial review of constitutional claims its intent to do so must be clear." *Webster v. Doe*, 486 U.S. 592, 603 (1988). A statutory scheme that implicitly strips jurisdiction—like the CSRA—can't possibly meet that "heightened" standard. *Elgin*, 567 U.S. at 11 n.4. And there's nothing remarkable about private plaintiffs seeking injunctions that require governments to retain or hire employees. *E.g.*, *Pride v. Correa*, 719 F.3d 1130, 1134 (9th Cir. 2013) (injunction requires prison to "hire medical staff").

plaintiffs claim these harms are being inflicted by an officer—Acting Director Vought—who has no constitutional authority to "exercis[e] any power" over the CFPB. 598 U.S. at 189.

Neither the MSPB nor FLRA can remedy these harms. For one thing, the agencies can only redress individual employees' damages, for instance by ordering "back pay and related benefits." 5 U.S.C. § 1214(g); *see also id.* §§ 7105(g)(3), 7118(a)(7)(D). Neither agency can order the defendants to resume the CFPB's functions, nor can they prevent Acting Director Vought from continuing to illegitimately exercise control over the CFPB. For another, the employment-related relief that the plaintiffs *are* seeking is needed to remedy the non-union plaintiffs' harms. Even if the MSPB or FLRA eventually orders that relief down the line, it will be too late: The plaintiffs will have already suffered irreparable harm from the CFPB's closure. That means that the plaintiffs are complaining about a "here-and-now injury" "that is impossible to remedy" later, "when appellate review kicks in." *Axon*, 598 U.S. at 191. "What makes the difference here"—like in *Axon*—"is the nature of the claims and accompanying harms that the parties are asserting." *Id.* at 192.

The defendants are also trying to force the plaintiffs to litigate in a forum that they themselves insist is unconstitutionally structured because it impedes the President's removal power.[9] The irony is rich, given that the Court in *Axon* and *Free Enterprise Fund* refused to channel a party into an agency forum because the plaintiff was pressing that very argument. *See Axon*, 598 U.S. at 189 ("The claims here are of the same ilk as the one in *Free Enterprise Fund*. There,

---

[9] *See Harris v. Bessent*, 2025 WL 521027, at *1 (D.D.C. Feb. 18, 2025); Office of the Solicitor General, *Letter to Senator Durbin re: Restrictions on Removal of Certain Principal Officers of the United States* (Feb. 12, 2025) (announcing that Department of Justice would seek to overturn *Humphreys Executor v. United States*, 295 U.S. 602 (1935)). https://files.lbr.cloud/public/2025-02/2025.02.12-OUT-Durbin-530D.pdf?VersionId= MFIDYbxyfEEprHKMl7Jk9Xis.1TGGsg9.

the complaint alleged that the Board's freedom from Presidential oversight rendered unconstitutional all power and authority the Board exercised."). So this case looks like *Axon* twice-over. The plaintiffs are bringing "sweeping constitutional claims," and the defendants insist the adjudicative agency body is comprised of officers who cannot "constitutionally exercise governmental authority because of their … protection from removal." *Id.* at 183, 189.[10]

    **2.** The second factor also supports this Court's jurisdiction. The claims here "have nothing to do with the" federal employment- and labor-related "matters [the agencies] regularly adjudicate." *Axon*, 598 U.S. at 193. The plaintiffs haven't brought claims under the Civil Service Reform Act or the Federal Service Labor-Management Relations Statute. And it is those laws—not Article II, the Appointments Clause, or the Consumer Financial Protection Act—that are the usual "subject" of the agencies' adjudications. *Id.* "Nor do the [plaintiffs'] claims address the sorts of procedural or evidentiary matters an agency often resolves on its way to a merits decision." *Id.* The FLRA's rules, for instance, would require the plaintiffs to explain how their factual allegations "allegedly violate specific section(s) and paragraph(s) of the" Federal Service Labor-Management Relations Statute. 5 C.F.R. § 2423.4(a)(5). As the complaint and briefing demonstrate, though, this case isn't about whether the defendants' actions violate that statute.

---

[10] The President's actions vis-à-vis the MSPB and FLRA further underscore the problems of channeling the plaintiffs into either forum. The President has fired members of both bodies, thereby threatening to break their quorums. *See Harris v. Bessent*, 2025 WL 521027 (D.D.C. Feb. 18, 2025); Erich Wagner, *Trump Apparently Fires FLRA Chairwoman*, Government Executive (Feb. 11, 2025), https://www.govexec.com/workforce/2025/02/trump-apparently-fires-flra-chairwoman/402933/. That could incapacitate the agencies or, alternatively, ensure that no one can get the fair trial in either forum that due process requires. *See Withrow v. Larkin*, 421 U.S. 35, 46 (1975) ("[A] fair trial in a fair tribunal is a basic requirement of due process."). Indeed, the government has all but confirmed that the President intends to remove anyone who "halt[s] employment decisions made by other executive agencies." Office of Solicitor General, *Letter re: Scott Bessent v. Dellinger* (Feb. 26, 2025), https://www.supremecourt.gov/DocketPDF/24/24A790/348789/20250226181021604_Letter%202 4A790.pdf.

**3.** Application of the third factor confirms that Congress did not intend to channel a case like this to the MSPB or FLRA. This case is far "outside the [MSPB's or FLRA's] expertise." *Axon*, 598 U.S. at 194. Like in *Axon*, these claims raise "questions of administrative and constitutional law, detached from considerations of agency policy." *Id.* The MSPB and FLRA "know[] a good deal about" the administration of the civil-service and federal labor relations laws. *Id.* But neither knows anything "special about the separation of powers," and both "are generally ill suited to address structural constitutional challenges—like those maintained here." *Id.* at 194–95.

Nor is this a case where the claims are "intertwined with or embedded in matters on which the [MSPB and FLRA] are expert." *Id.* at 195. There are no "preliminary questions unique to the employment context [that] may obviate the need to address the constitutional challenge." *Elgin*, 567 U.S. at 22–23. To see why, imagine the alternate universe where the employees brought their claims before the MSPB or FLRA and the agency found that the defendants' actions violated one of the statutes that those entities administer. The constitutional and APA claims would *still* need to be resolved. That's because defendants would *still* have closed the CFPB by stopping its work.

**4.** The decision in *NTEU v. Trump*, on which the defendants rely (at 9), did not address the channeling issue presented here. Judge Cooper understood the federal sector unions in that case to be bringing claims challenging the effect of (1) the Office of Personnel Management's coordination of a "mass firing of probationary employees" across the entire federal government, (2) the government-wide "deferred resignation program" (the "Fork in the Road" email), and (3) an executive order directed to every federal agency to "initiate large-scale reductions in force." *NTEU v. Trump*, 2025 WL 561080, at *1–2 (D.D.C. Feb. 20, 2025).[11] Judge Cooper found significant that

---

[11] It's not at all clear that this understanding is correct. With the opportunity for further briefing, the unions may well avoid channeling by arguing that the case isn't about employment actions at all but instead is about the President's violation of Article II.

one of the unions' claims turned on the defendants' non-compliance with the Civil Service Reform Act's rules "governing [reductions in force]." *Id.* at *3. Judge Cooper reasoned that the claims were therefore "of the type generally" addressed by the FLRA and within the purview of "the agency's usual review." *Id.* at *5, *8. There is no similar federal employment statute related claim in this case. And *NTEU v. Trump* involved only union plaintiffs. *See id.* at *3.

Although the defendants don't cite it, the decision in *American Foreign Service Ass'n v. Trump,* 2025 WL 573762 (D.D.C. Feb. 21, 2025), is distinguishable too. The court there reasoned that the plaintiffs' complaints were "essentially" "about the effects on their members of being placed on administrative leave and of being asked to return to the United States," *not* whether USAID was being "dismantl[ed]." *Id.* at *7. Having characterized the facts that way, the court held that the difference "matter[ed]," because the former type of claims "are, at bottom, archetypal complaints about changed employment conditions." *Id.* at *7–8. The latter claim—that the CFPB is being dismantled—is, by contrast, exactly what this case is about.

## B. NTEU has not engaged in claim-splitting.

The D.C. Circuit "has never acknowledged the rule against claim-splitting." *Smith v. District of Columbia*, 387 F. Supp. 3d 8, 19 (D.D.C. 2019). As district courts have explained, though, it is not a "jurisdictional" rule, but instead "a prudential 'matter of docket management' allowing district courts to 'dispense with duplicative litigation.'" *Id.* (citing 18 Wright & Miller, Fed. Prac. & Proc. § 4406 (3d ed. 2019)). "To determine whether a plaintiff is claim-splitting, the proper question is whether, assuming the first suit was already final, the second suit would be precluded under res judicata analysis." *Hudson v. AFGE*, 308 F. Supp. 3d 388, 394 (D.D.C. 2018). That requires asking, in turn, whether the two cases "share the same nucleus of facts." *Id.* This case and *NTEU v. Trump* plainly do not.

As explained above, in *NTEU v. Trump* the unions brought claims to challenge the executive branch's plans to "drastically reduc[e] the size of the federal workforce." 2025 WL 561080, at *1. True enough, the unions pointed to the firing of employees at the CFPB as one of many examples showing that the government-wide efforts were underway. *Id.* at *2. But the case was not about the efforts to close the CFPB. Put differently, although the events at the CFPB may relate to the broader events challenged in *NTEU v. Trump*, that case's "vastly expanded substantive scope poses constitutional questions of a different kind." *Smith*, 387 F. Supp. 3d at 20. And consider just how unwieldy it would have been to litigate this case—which requires a laser focus on what's happening at the CFPB—inside of that much broader one. The "[in]convenient" nature of resolving the two cases together confirms that they do not share the "same nucleus of facts." *Apotex, Inc. v. Food & Drug Admin.*, 393 F.3d 210, 217 (D.C. Cir. 2004).

The defendants also suggest in passing (at 9) that *NTEU v. Trump*'s denial of a preliminary injunction works issue preclusion on the channeling question here. Not so. For one, the issues aren't the same. And regardless, "issues litigated in a preliminary injunction action are not res judicata and do not form a basis for collateral estoppel." *Cmty. Nutrition Inst. v. Block*, 749 F.2d 50, 56 (D.C. Cir. 1984).

## C.    The Employee Association has standing, and its claims should not be transferred.

The defendants take two passing shots at picking off the Employee Association. Both are dealt with quickly. First, the Employee Association has Article III standing. Its members are current and former CFPB employees. Association Decl. ¶3. Some of those members have been fired, and the rest face an imminent threat of termination. *Id.* And the Association exists to serve the interests

of its employee-members. *Id.* ¶ 2. Nothing more is required. *See United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544, 545–46 (1996).[12]

Next, the defendants claim (at 10) that the Association's claim should be "deemed related" to NTEU's claims in *NTEU v. Trump* and that the case should be transferred to Judge Cooper. That's wrong. The "core of this case challenges" the dismantling of the CFPB. *Haitian Bridge Alliance v. Biden*, 2022 WL 2132439, at *3 (D.D.C. 2022). The core of the case before Judge Cooper challenges government-wide actions in conducting "mass firing" of probationary and "nonessential" employees as well as a "pressure campaign" to get them to quit. Compl. at 3, *NTEU v. Trump*, No. 1:25-cv-420 (D.D.C. Feb. 17, 2025). It's "not enough to make the cases related" that the plaintiffs in each case challenge, at a high level of generality, the executive branch's firing of federal employees. *Haitian Bridge Alliance*, 2022 WL 2132439 at *2. To meet its "heavy" burden to demonstrate that the cases are related under Local Civil Rule 40.5, the defendants need to show a "substantial overlap" between the cases. *Id.* at *2. They haven't done so.

## III.    The plaintiffs will suffer irreparable harm absent a preliminary injunction, and the balance of equities and public interest support an injunction.

### A.    The defendants are in the process of permanently dismantling the CFPB, and the resulting harms can never be undone.

Like so much else in this case, the defendants' argument turns on their attempts to warp reality. Vought didn't tell everyone to "stand down from performing any work task," he just told them to "focus only on 'urgent matters.'" *Compare* Dkt. 31-1, Martinez Decl., Ex. F (Vought email), *with* Def. Opp. 5. The defendants didn't "abruptly terminate[]" the statutorily required Student Loan Ombudsman, it just so happens that the "position is currently vacant." *Compare* Barnard

---

[12] The Association can't be faulted for failing to address standing in a declaration "accompanying [the] opening brief" where it reasonably assumed its "standing [was] self-evident." *American Library Ass'n v. F.C.C.*, 401 F.3d 489, 493–95 (D.C. Cir. 2005).

Decl. ¶ 2 (Ombudsman's declaration), *with* Def. Opp. 23 n.6. The Consumer Response function isn't experiencing "a large and unprecedented backlog," but instead is working just as it should. *Compare* Pfaff Decl. ¶ 16 (Chief of Staff for Consumer Response), *with* Dkt. 31-1, Martinez Decl. ¶ 22. Perhaps if any of that was true this would be a different case. But in reality, as the defendants' own declarant put it, the CFPB is in "wind down mode." Blake Doe Decl. ¶ 3; Drew Doe Decl. ¶ 5; Alex Doe Decl. ¶¶ 6–7. And because *that's* what's happening—the CFPB is being dismantled—there's little doubt that, absent an injunction, the plaintiffs will suffer irreparable harm.

Start with the prospect, or rather lack thereof, of "remediation" if the Court doesn't grant preliminary relief. *League of Women Voters of United States v. Newby*, 838 F.3d 1, 8 (D.C. Cir. 2016). Were it not for the Court's February 14, 2025 order, the defendants would have fired 1,200 employees "within 36 hours," and there's no reason to think they won't do just that the first moment they can. Alex Doe Decl. ¶¶ 3–4. Then, "within 60-90 days," the defendants will fire "most of [the] remaining staff, leaving a Bureau that [can't] actually perform any functions, or no Bureau at all." *Id.* ¶ 3. The work the Bureau doesn't do while closed can never be made up for. As one senior Bureau official put it, the CFPB is like a car factory, and if you shut it down for a month, you can restart it, but "you can't make up the lost aggregate production of cars." Shearer Decl. ¶ 23. Nor is rebooting a dismantled federal agency simple. If the CFPB's contracts are "fully terminated," for instance, they can't be reinstated. Charlie Doe Decl. ¶ 10. Instead, it will take "six months to a year" to enter new contracts. *Id.* And these contracts are essential to all of the CFPB's work. *Id.* ¶ 5. Or consider the Bureau's examiners, who "require specialized training and certification" and can't just be sent out to start inspections their first day on the job. Salas Decl. ¶¶ 8–9 ("Even if

activities resume, it will take a long time to even have the necessary complement of trained examiners[.]").

While the CFPB is closed, billions of dollars that could be returned to American consumers will be forever lost, unrecoverable because the Bureau can't make up for its lost time. Shearer Decl. ¶ 18. "[P]redatory, fraudulent, or otherwise illegal practices" are going undetected by the Bureau's supervisors. Salas Decl. ¶ 9. "Service members and their families will be more likely to be targeted with predatory loan products." *Id.* ¶ 8. Were the Bureau fulfilling its statutory obligation to supervise, 12 U.S.C. §§ 5514(b), 5515, it would "prevent" these harms and others "before [they] happen[]," Salas Decl. ¶ 11. Even the banking industry is concerned about the chaos unleashed by the Bureau's dismantling. *See* Roston Decl. Exs. DD–II.

The plaintiffs will suffer the "certain and great" consequences of the Bureau's closure in the meantime. *Newby*, 838 F.3d at 8. Pastor Steege will die without the "dignity" of knowing that she has resolved her debts and left her surviving family in a stable financial situation. Dkt. 14-2, Steege Decl. ¶ 8; *see Ramirez v. Collier*, 594 U.S. 411, 434 (2022) (spiritual injury can't be remedied after plaintiff dies and is therefore irreparable).[13] The Virginia Poverty Law Center will face the "difficult if not impossible" task of filling the void left by the CFPB's closure, and its clients—like the woman who got out from under a usurious loan with the CFPB's help—will be the worse for it. Dkt. 14-5, Speer Decl. ¶¶ 12, 16. *See Newby*, 838 F.3d at 9 (because the defendants' actions "unquestionably make it more difficult for the [organization] to accomplish [its] primary mission of [serving its client base], they provide injury for purposes both of standing and irreparable harm"). The NAACP and its members will be hung out to dry in the wake of the Los

---

[13] The defendants have very little to say about Pastor Steege, simply reprising (at 38) their argument that the CFPB has nothing to do with federal student loans. As explained above, that's wrong.

Angeles wildfires, suffering from "the financial scams that were rampant post-fire" without the CFPB's promised help. Dkt. 14-3, Bross Decl. ¶ 3.[14] NCLC will lose access to "essential resources" that support its "core work." Dkt. 14-6, Dubois Decl. ¶ 4.[15]

And turn finally to the employees. They face a laundry list of "great" and "irreparable" personal consequences— losing health coverage months after receiving multiple cancer diagnosis in the family, lost time with their newborn children, defaulting on mortgages, and the list goes on. *See* Dkt. 14-l, Kaspar Decl. ¶¶ 17–23; Coll Decl. ¶¶ 5–7; *see, e.g.*, *Risteen v. Youth For Understanding*, 245 F. Supp. 2d 1, 16 (D.D.C. 2002) ("The loss of health insurance benefits— particularly for those who are unemployed—constitutes irreparable harm[.]"). They are also being

---

[14] The defendants say (at 36) that the NAACP lacks both standing and irreparable injury because it did not "*identify*" the specific members at issue. But one member, Juanita West-Tillman, has now submitted a declaration, mooting that complaint. At any rate, the defendants get the law wrong. The defendants' purported identification requirement traces to *Summers v. Earth Island Institute*, where standing was based on a claimed "statistical probability" that some of an organization's members would be injured. 555 U.S. 488, 497 (2009). That was insufficient, the Supreme Court explained, because Article III standing cannot rest on "probabilities"; rather, an organization must "identif[y]" someone who actually "ha[s] suffered or would suffer harm." *Id.* at 498. But that doesn't require *naming* the person. It can be satisfied "by identifying the injured member as 'Member l' just as well as by the name 'Samuel Clemens.'" *Speech First, Inc. v. Shrum*, 92 F.4th 947, 952 (10th Cir. 2024). The point is simply that the court must be assured that there is a "particular person who is injured." *Id.* Because the NAACP attested that the CFPB provided guidance to specific members and was scheduled to meet in-person with those members—facts that are within the defendants' knowledge and that they do not contest—it satisfies that test. Dkt. 14-3, Bross Decl. ¶¶ 3–4.

[15] The defendants also misstate the law when they claim (at 35, 37) that the Virginia Poverty Law Center and NCLC must place their need to "divert[] resources" "in the context of [their] overall finances." No such requirement exists. The defendants' support for this claim is a case where the harm alleged was purely financial, and the only reason it could be "irreparable" was because of sovereign immunity. *Nat'l Council of Agric. Emps. v. United States Dep't of Lab.*, 2023 WL 2043149, at *6 (D.D.C. Feb. 16, 2023); *see also Petroleum Exploration v. Public Service Commission of Kentucky*, 304 U.S. 209, 218 (1938) (injury alleged was purely financial). That's not the injury the Center or NCLC claim. And even if it were, *National Council* still held that financial injury is irreparable if "serious in terms of its effect on the plaintiff." *Nat'l Council*, 2023 WL 2043149, at *6. However the injuries here are characterized, their effects are surely "serious."

"deprived of [their] ability to perform [] statutory functions and fulfill [] statutory obligations." *Dellinger v. Bessent*, 2025 WL 471022, at *13 (D.D.C. 2025); *see* Diotalevi Decl. ¶ 5; *see generally* Frotman Decl.; Second Halperin Decl. That injury "cannot be remediated with anything other than equitable relief." *Dellinger*, 2025 WL 471022 at *11. And even if the Court were to order the employees restored to their positions at the end of this case, it would likely come too late: The agency will no longer exist, and whatever remains of its "legacy administrative functions" will have been folded into other federal agencies. Alex Doe Decl. ¶ 6. That would "extinguish[] any possible judicial remedy." *Dellinger*, 2025 WL 471022 at *12 n.7. So despite the defendants' repeated efforts to make what's happening sound like any other employment dispute, "this is not a routine case." *Id.* at *10.

### B.    The balance of the equities and public interest support an injunction.

The defendants have nothing to say about the profound harms that their conduct has caused and will continue to inflict, not just on the plaintiffs but on the broader public. Instead, they argue (at 39) that this is the price to pay for allowing the President to set "his policy priorities." But shutting down an agency that Congress has established is not a permissible "policy." Or, as this Court recently put it, "[i]t's as if the bull in the china shop looked back over his shoulder and said, 'What a mess!'" *Dellinger*, 2025 WL 471022, at *10 n.5. On the other side of the scale, "there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *League of Women Voters*, 838 F.3d at 12. That's all the plaintiffs are asking for here.

### IV.    The relief requested is necessary to remedy the harm.

The plaintiffs have requested relief necessary "to remedy the harm shown." *J.D. v. Azar*, 925 F.3d 1291, 1335 (D.C. Cir. 2019). They have asked the Court to take the necessary steps to

ensure that the CFPB functions on which they rely can operate and so that the CFPB is not irretrievably broken. If, for instance, the defendants aren't enjoined from terminating the CFPB's contracts, impairing its data, firing most of its employees, and directing remaining staff not to work, the CFPB won't be able to do anything now or for the foreseeable future. Drew Doe Decl. ¶ 8; Salas Decl. ¶¶ 8–9; 3d Meyer Decl. ¶¶ 3–10. And insofar as the defendants are complaining about the breadth of the injunction, their own "proclivity for unlawful conduct" has necessitated its scope. *Sec. & Exch. Comm'n v. Savoy Indus.*, 665 F.2d 1310, 1317 (D.C. Cir. 1981) (quoting *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 192 (1949)). Indeed, the defendants' actions since the Court entered its February 14 Order (ECF 19) confirm that, absent the relief sought, they will move expeditiously to finish the job of "wind[ing] down" the CFPB. Blake Doe Decl. ¶ 3.

Finally, the plaintiffs do not oppose the administrative stay of an injunction requested by the defendants, provided that (1) the Court's February 14 Order is extended through the administrative stay and (2) the Court order the defendants not to take any additional steps to terminate contracts during that period.

## CONCLUSION

For the foregoing reasons, the Court should grant the motion for a preliminary injunction.

Dated: February 27, 2025

Respectfully submitted,

/s/ Deepak Gupta                           - -
Deepak Gupta (DC Bar No. 495451)
Robert Friedman (DC Bar. 1046738)
Gabriel Chess (DC Bar No. 90019245)*
Gupta Wessler LLP
2001 K Street, NW
North Tower, Suite 850
Washington, DC 20006
(202) 888-1741

Jennifer D. Bennett (*pro hac vice*)
Gupta Wessler LLP
505 Montgomery Street

/s/ Wendy Liu
Wendy Liu (DC Bar No. 1600942)
Adam R. Pulver (DC Bar No. 1020475)
Allison M. Zieve (DC Bar No. 424786)
Adina H. Rosenbaum (DC Bar No. 490928)
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-1000

*Counsel for Plaintiffs*

San Francisco, CA 94111
(415) 573-0335

* motion for admission pending

*Counsel for Plaintiffs*

Julie Wilson (DC Bar No. 482946)
General Counsel
Paras N. Shah (DC Bar No. 983881)
Deputy General Counsel
Allison C. Giles (DC Bar No. 439705)
Assistant Counsel
National Treasury Employees Union
800 K Street, NW, Suite 1000
Washington, DC 20001
(202) 572-5500

*Counsel for Plaintiff National Treasury
Employees Union*