| | |
|---|---|
| **From:** | Martinez, Adam (CFPB) |
| **To:** | Gueye, Jafnar (CFPB); Chilbert, Christopher (CFPB) |
| **Cc:** | Licata, Anthony; Shapiro, Daniel |
| **Subject:** | Contracts/Data |
| **Date:** | Tuesday, February 18, 2025 6:47:00 PM |

Hi Jafnar and Chris –

I spoke with Mark P. a few minutes ago regarding our contracts that support statutorily required work. I let him know that Jafnar has the master list with all contracts, the status of each (work hold vs. terminated), and a description regarding their support of statutory/regulatory mandates. Could you work together to pull the master spreadsheet and ensure that the notes are clear regarding which contracts support statutorily required functions and data?

Mark P. said that you may connect with Tony (copied) regarding this ask or have any questions. I've also copied Dan in case I missed anything.

Thank you both.

Adam

Adam Martinez
Chief Operating Officer

| | |
|---|---|
| **From:** | Paoletta, Mark (CFPB) |
| **To:** | Martinez, Adam (CFPB); Gueye, Jafnar (CFPB) |
| **Cc:** | Shapiro, Daniel (CFPB) |
| **Subject:** | Contracts |
| **Date:** | Wednesday, February 19, 2025 11:10:12 AM |

To follow up on my conversation with Adam just now, I am directing you to not terminate or suspend any contracts without specific authorization from Acting Director Vought or me.  Please let me know if you have any questions.
Thanks.

Mark Paoletta
Chief Legal Officer
CFPB

| | |
|---|---|
| **From:** | Gueye, Jafnar (CFPB) |
| **To:** | Paoletta, Mark (CFPB); Licata, Anthony; Martinez, Adam (CFPB); Chilbert, Christopher (CFPB) |
| **Subject:** | RE: Rescinding/Reinstating Termination-Noticed Contracts |
| **Date:** | Thursday, February 20, 2025 10:15:29 AM |

Quick follow up:

We've sent continuance notices to all vendors on that list. We're waiting for confirmation. Anthony in the master spreadsheet we're adding updates once the vendor confirms. I'll update you all if we run into any issue.

Respectfully,

Jafnar

**From:** Paoletta, Mark (CFPB) <■■■■■■■■■■■■■■>
**Sent:** Wednesday, February 19, 2025 7:19 PM
**To:** Licata, Anthony <■■■■■■■■■■■■■■>; Martinez, Adam (CFPB) <■■■■■■■■■■■■■■>; Gueye, Jafnar (CFPB) <■■■■■■■■■■■■■■>; Chilbert, Christopher (CFPB) <■■■■■■■■■■■■■■>
**Subject:** Re: Rescinding/Reinstating Termination-Noticed Contracts

Yes, please rescind these termination notices. I do not believe they have gone into effect and want to make sure there is no interruption. Thanks

**From:** Licata, Anthony <■■■■■■■■■■■■■■>
**Sent:** Wednesday, February 19, 2025 7:08:15 PM
**To:** Martinez, Adam (CFPB) <■■■■■■■■■■■■■■>; Gueye, Jafnar (CFPB) <■■■■■■■■■■■■■■>; Chilbert, Christopher (CFPB) <■■■■■■■■■■■■■■>
**Cc:** Paoletta, Mark (CFPB) <■■■■■■■■■■■■■■>
**Subject:** Rescinding/Reinstating Termination-Noticed Contracts

Hi all,

Mark Paoletta directs that the termination notifications issued for the contracts itemized in the attached spreadsheet be rescinded/withdrawn and, if any have already been so terminated, that such contracts be reinstated.

Thank you in advance.

Best,
Anthony

Anthony Licata
Attorney Advisor to the Chief Legal Officer

**From:** Martinez, Adam (CFPB)
**To:** Gueye, Jafnar (CFPB)
**Subject:** RE: Do not terminate
**Date:** Friday, February 21, 2025 8:53:00 AM

Hi Jafnar. We are holding on all of them for now. Mark P. is the one that wrote the "Do not terminate" on the subject line. He asked me what I thought, and I told him that the description was clear that they support statutorily required functions. If we completely terminate now, we can't get it back so I advised to hold until he has more people to look into what is truly needed.

Hope this helps.

Adam

Adam Martinez
Chief Operating Officer

---

**From:** Gueye, Jafnar (CFPB) <​███████████​>
**Sent:** Friday, February 21, 2025 8:18 AM
**To:** Martinez, Adam (CFPB) <​███████████​>
**Subject:** RE: Do not terminate

Hi Adam,
Are we holding on to all of them? Just want to make sure before I let the team know.

Thanks!

Respectfully,

Jafnar

---

**From:** Martinez, Adam (CFPB) <​███████████​>
**Sent:** Thursday, February 20, 2025 7:17 PM
**To:** Gueye, Jafnar (CFPB) ███████████
**Subject:** FW: Do not terminate

FYSA – I can explain in the morning. Mark P. said not to terminate.

Adam Martinez
Chief Operating Officer

---

**From:** Paoletta, Mark (CFPB) ███████████
**Sent:** Thursday, February 20, 2025 7:13 PM
**To:** Martinez, Adam (CFPB) ███████████
**Subject:** Do not terminate

Please call me to discuss.

**From:** Wick, Jordon (CFPB) <████████████>
**Sent:** Thursday, February 20, 2025 7:04 PM
**To:** Vought, Russell (CFPB) <████████████>; Paoletta, Mark (CFPB) <████████████>
**Cc:** Lewin, Jeremy <████████████>; Young, Christopher (CFPB) <████████████>
**Subject:** More contracts to cut

Hi all,

Please see attached for the next tranche of contracts for which we recommend immediate termination– they're composed of the following:

- Consumer Credit Information Surveys and Panels, which will no longer be used
- Various support services (user research and testing, financial mgmt., internal controls, and identity access software), all of which we can do without

These contracts represent $8.4M in obligated value. @Vought, Russell (CFPB), let us know if you approve cancelling these and then the rest of the team will proceed.

Best,
Jordan

**From:** Chilbert, Christopher (CFPB)
**To:** Martinez, Adam (CFPB); Chang, Jean (CFPB)
**Subject:** FW: Reviewing analytics related to dip in Complaints
**Date:** Wednesday, March 5, 2025 5:22:39 PM
**Attachments:** image001.png

FYI – see below on February complaint volume.

Chris Chilbert

---

**From:** Scott, Adam (CFPB) <███████████>
**Sent:** Wednesday, March 5, 2025 4:40 PM
**To:** Johnson, Nicholas (CFPB) <███████████>; Schafer, Jessica (CFPB) <███████████>; Wingerberg, Jennifer (CFPB) <███████████>
**Cc:** Bernstein, Christopher (CFPB) <███████████>; Fiano, Liane (CFPB) <███████████>; Chilbert, Christopher (CFPB) <███████████>
**Subject:** Re: Reviewing analytics related to dip in Complaints

This is surprising but good to hear! Thank you both for doing this analysis, I really appreciate it. CCing a few folks for their awareness.

--
Adam Scott
Director of Digital Services| Technology & Innovation | CFPB

**From:** Johnson, Nicholas (CFPB) <███████████>
**Date:** Wednesday, March 5, 2025 at 4:38 PM
**To:** Schafer, Jessica (CFPB) <███████████>, Scott, Adam (CFPB) <███████████>, Wingerberg, Jennifer (CFPB) <███████████>
**Subject:** Re: Reviewing analytics related to dip in Complaints

+Adam and Jen

Jen and I poked around in GA4 to see what impact a 404-ing homepage had on complaint submissions via the web. We explored a few things, but the upshot is—kind of surprisingly—it looks like complaint starts and submissions from the web were pretty normal since the homepage has been down. Here's a quick graph of complaint starts and submissions by month with the February numbers highlighted:



Other than that huge spike in January, they're pretty on par with—and actually a little ahead of—other months this year when GA4 was collecting that data (especially given 28 days hath February).

We can send over more detailed data if you need it (with some limitations now that we're on the basic GA4 plan). But from what Jen and I can tell, complaint analytics seem pretty normal. So, if there has been a big decrease in submissions that CR is seeing, it might be from something else in the pipeline? Happy to keep chatting more if it's helpful.

Nicholas

---

**From:** Schafer, Jessica (CFPB) <████████████>
**Date:** Wednesday, March 5, 2025 at 2:34 PM
**To:** Johnson, Nicholas (CFPB) <████████████>
**Subject:** Reviewing analytics related to dip in Complaints

Nicholas,

As part of T&I's effort to ensure the Complaints system is functioning correctly, please spend some time today reviewing website analytics and confer with Jenn Wingerberg on any unusual traffic you see around the submit a complaint function.

Thank you,
Jess

Jessica Schafer (she/her)
User Experience Lead | Technology & Innovation
Mobile: ████████

Consumer Financial Protection Bureau
consumerfinance.gov

Confidentiality Notice: If you received this email by mistake, you should notify the sender of the mistake and delete the email and any attachments. An inadvertent disclosure is not intended to waive any privileges.



March 6, 2025

**VIA EMAIL**

Sonya White
Deputy General Counsel
Legal Division
Consumer Financial Protection Bureau
1700 G St. NW
Washington, DC 20552

      **RE:**    **NTEU Institutional Grievance – CFPB's Mass Firing of Probationary and Trial Employees in Violation of Contract and Law**

Dear Ms. White:

      In accordance with Article 43, Section 6, of the parties' 2024 Collective Bargaining Agreement, the National Treasury Employees Union (NTEU) files this institutional grievance against the Consumer Financial Protection Bureau (CFPB). On February 11, 2025, the CFPB fired every probationary employee working for the Bureau, with no advance notice to the Union or to employees. On February 13, 2025, the CFPB fired all its employees on a trial period, with no advance notice to the Union or to employees. Both actions were a direct response to the *Guidance on Probationary Periods, Administrative Leave and Details* issued by the Office of Personnel Management (OPM) on January 20, 2025, and Executive Order 14,210, *Implementing the President's "Department of Government Efficiency" Workforce Optimization Initiative* issued on February 11, 2025. No matter the instigating event, the Bureau's mass firing of probationary and trial employees was done to effectuate the administration's effort to reduce and reorganize the CFPB workforce.

      The CFPB's actions violate Articles 41 and 46 of the NTEU-CFPB collective bargaining agreement; the Federal Service Labor-Management Relations Statute (Statute), at 5 U.S.C. § 7114(a)(1), 5 U.S.C. § 7116(a)(1), (5), (7), & (8), and any other Article, Section, law, rule or regulation that may apply. Because the violations NTEU alleges are ongoing each day, this grievance and any requested remedies are continuing in nature.

    **I.**    **Background**

        **A.**    **OPM Directive on Probationary Employees**

      Mere hours after he was named OPM's Acting Director, Charles Ezell issued a three-page document titled, *Guidance on Probationary Periods, Administrative Leave and Details*, to the heads and acting heads of every department and agency in the Executive Branch including CFPB. That document stated: "Probationary periods are an essential tool for agencies to assess

Sonya White
March 6, 2025
Page 2

employee performance and *manage staffing levels*." (Emphasis added.) It directed agencies to identify "all employees on probationary periods" and to "promptly determine whether those employees should be retained at the agency." The document concludes with suggested "flexibilities [available] to agencies during the [presidential] transition period and *as agencies undertake reorganization efforts and close offices*." (Emphasis added.)

Approximately two weeks later, the President issued Executive Order 14,210, *Implementing the President's "Department of Government Efficiency" Workforce Optimization Initiative,* with the purpose of "commenc[ing] a *critical transformation* of the Federal bureaucracy." (Emphasis added.) As part of that effort, the Order directed that "Agency Heads *shall promptly undertake* preparations to initiate large-scale reductions in force (RIFs)". (Emphasis added.)

When an agency seeks to eliminate employees because of an organizational reorganization, it must follow the reduction-in-force (RIF) procedures in 5 U.S.C. Part 3501-04 and OPM's implementing regulations at 5 C.F.R. Part 315. OPM-promulgated RIF regulations apply to competitive and excepted service employees, and probationary employees are expressly included in those regulations. OPM is responsible for issuing guidance for agencies on RIF procedures. *See* Workforce Reshaping Operations Handbook (March 2017).

B.   **CFPB's Failure to Follow RIF Procedures**

CFPB's mass firing of probationary and trial employees was a reduction-in-force, aimed at reducing the Bureau's workforce and reorganizing its functions. CFPB failed to follow the requisite RIF procedures provided by the parties' collective bargaining agreement, regulation and law, including but not limited to:

- Before any agency begins a RIF, agencies must establish "competitive areas in which employees compete for retention." 5 C.F.R. § 351.402(a).

- Each agency must establish competitive levels consisting of all positions in a competitive area with similar grade, pay and duties, for potential reassignment of any affected employee. 5 C.F.R. § 351.403.

- RIF regulations require agencies to classify competing employees on a retention register on the basis of their tenure of employment, veteran preference, length of service, and performance in several different tenure groups. 5 C.F.R. § 351.501(a).

- An agency must give an employee at least 60 days specific written notice before the employee is released from the competitive level by a RIF action, unless "caused by circumstances not reasonably foreseeable". 5 C.F.R. § 351.801.

Sonya White
March 6, 2025
Page 3

- The notice must include the reasons for the taken action, the employee's competitive area and level, and where the employee can find information about applicable regulations and appeal rights. 5 C.F.R. § 351.802.

II. **The CFPB's mass firing of probationary and trial employees violates Articles 41 and 46 of the parties' collective bargaining agreement.**

   A. **Article 46: Midterm Bargaining**

Article 46, Section 2 states that CFPB "shall provide the Union with reasonable advance notice of intended changes in personnel policies or practices or conditions of employment." CFPB failed to provide notice to NTEU of its planned reduction-in-force, as required by the agreement. Article 46, Section 3 provides for bargaining over "the implementation or impact on employees of the [Bureau's] proposed change(s)". CFPB management was required to honor its collective bargaining obligations by providing notice and an opportunity to bargain over the separation of almost 100 CFPB employees.

   B. **Article 41: Reduction in Force**

Article 41 of the parties' collective bargaining agreement states that CFPB "will use RIF only as a last resort, when efforts to avoid it [ ] are not successful." Art. 41, Sec. 1. The CFPB RIF provision "applies to any RIF conducted by [CFPB] during the term of [the parties'] Agreement." Art. 41, Sec. 2.

Article 41, Section 2 requires that CFPB "provide National NTEU with a written notice at the earliest practicable date but not later than 90 calendar days prior to the planned effective date, unless the circumstances leave the [Bureau] no choice but to give less notice." CFPB did not provide any notice to the Union, let alone advanced notice, of the planned RIF. Because no notice was provided, CFPB is precluded from arguing that there were unforeseen circumstances that prevented it from timely notifying the Union. And, even if those circumstances existed, the Bureau was still required to provide notice.

Article 41, Section 5 states that CFPB "shall provide the Union with advance courtesy notice and the opportunity for feedback prior to the establishment of competitive areas." CFPB did not establish competitive areas prior to the termination of all probationary and term employees. By extension, the Union was not given courtesy notice or opportunity to provide feedback.

Article 41, Section 6 states that CFPB "shall establish competitive levels" and that the Union "will be notified of the competitive levels once they have been finalized". CFPB did not establish competitive areas prior to the termination of all probationary and term employees. By extension, the Union was not notified of those levels.

Sonya White
March 6, 2025
Page 4

Article 41, Section 7 requires that CFPB "shall establish a separate retention register for [each] competitive level" and the "Union will be provided a copy of any retention registers at the time they are finalized." CFPB did not establish retention registers prior to the termination of all probationary and term employees. By extension, the Union was not notified of those retention registers.

Article 41, Section 8 sets forth specific instructions on how to use performance ratings for purposes of RIF retention register. Those instructions align with 5 C.F.R. § 351.504. CFPB did not establish retention registers prior to the termination of all probationary and term employees. By extension, the Bureau did not assess individual employees' service credit for performance.

Article 41, Sections 9 & 10 address employee rights if reassigned or involuntarily placed due to a RIF. CFPB did not offer any employee reassignment or seek to move an employee to another position.

Article 41, Section 11 requires that, before separating an employee because of a RIF, CFPB "ensure the [affected] employee is advised of the provisions of the Employer's Career Transition Assistance Plan." CFPB did not do so.

Article 41, Section 12 requires – consistent with OPM regulation – that CFPB "issue specific RIF notices to employees affected by a reduction in force at least 60 days before the effective date of the RIF." Probationary and trial employees were given mere days, if not hours, prior to termination in violation of this provision and law.

Article 41, Section 13 sets forth the specific information to be included in a RIF notice to employees. CFPB failed to include the information described in Section 13.1 to 13.8.

Because CFPB failed to follow the required contractual process for conducting its RIF of probationary and trial employees, it has violated Article 41 of the parties' collective bargaining agreement. As part of its failure to bargain with NTEU over the RIF, it has also violated Article 46 of the agreement.

### III. The CFPB committed unfair labor practices when it fired every probationary and trial employee.

The CFPB's failure to bargain with the Union is an unfair labor practice under 5 U.S.C. § 7116(a)(1), (5) and (8). Further, all the above contractual violations constitute patent breaches and repudiations of the parties' 2024 collective bargaining agreement, in violation of 5 U.S.C. § 7114(a)(1), which is an unfair labor practice under 5 U.S.C. § 7116(a)(1), (5) and (8). Finally, to the extent that DOE argues that any of its actions were permitted pursuant to an executive order or other presidential declaration, those actions are an unfair labor practice under 5 U.S.C. §

Sonya White
March 6, 2025
Page 5

7116(a)(7), which states that it is an unfair labor practice to enforce rules or regulations that conflict with any preexisting applicable collective bargaining agreement.

**IV.    CFPB's mass firing of employees violates the Separation of Powers Doctrine.**

The CFPB's mass firing of probationary and trial employees violates the United States *Constitution*, specifically, the Separation of Powers doctrine that recognizes the division of legislative powers afforded to Congress, U.S. Const., art. I., and executive powers vested in the President, U.S. Const., art. II. The CFPB's actions circumvent Congress's Article I legislative authority to create CFPB, dictate the Bureau's purpose and provide the requisite funding to carry out the Bureau's purpose and duties.

Congress can create or destroy executive branch agencies and dictate their missions. "To Congress under its legislative power is given the establishment of offices . . . [and] the determination of their functions and jurisdiction." *Myers v. United States*, 272 U.S. 52, 129 (1926). *Accord Buckley v. Valeo*, 424 U.S. 1, 138 (1976) (discussing Congress's ability to create or remove federal agencies through the Necessary & Proper Clause). Congress thus "control[s]" the very "existence of executive offices." *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 500 (2010).

Congress has the power to fund or defund executive branch agencies—and, in exercising that power, determines whether and how agencies may function. The Antideficiency Act, 31 U.S.C. § 1341, which generally prohibits the executive branch from incurring obligations that Congress has not authorized, and the Impoundment Control Act, 2 U.S.C. §§ 681-688, which prevents the Executive from refusing to postpone or withhold the use of appropriated funds, illustrate this. Thus, while the President is responsible for the enforcement of federal laws, Congress alone has the power of the purse with which to fund or defund agencies and their activities.

Because it undermines Congress's ability to set and fund the missions of CFPB, the Bureau's mass firing of probationary and trial employees impermissibly encroaches on Congress's legislative authority, thereby violating Constitutional separation of powers principles.

**Requested Remedies**

To remedy the foregoing violations, NTEU requests that CFPB:

1)    Cease and desist from further violations of the parties' 2024 collective bargaining agreement, the Statute, and the U.S. *Constitution*;

2)    Restore the parties and bargaining unit employees to the *status quo ante*, by returning any adversely affected bargaining unit employee back to the position they occupied prior to termination;

Sonya White
March 6, 2025
Page 6

3) Post a notice physically in the workplace and transmit it via electronic mail, drafted by NTEU and signed by the head of the CFPB, to all bargaining unit employees in which the Acting Director admits that the Bureau has violated the Statute by unilaterally changing conditions of employment and repudiating the collectively bargained agreement between NTEU and CFPB;

4) Provide make whole relief to every adversely affected bargaining unit employee, including back pay, where applicable, under the Back Pay Act; and

5) Grant NTEU all other appropriate remedies to which it is entitled under the law

NTEU's representative in this matter will be Assistant Counsel Cynthia Woerner. Ms. Woerner can be reached at (202) 670-0641or via email at Cynthia.Woerner@nteu.org.

Sincerely,

*[signature: Doreen P. Greenwald]*

Doreen P. Greenwald
National President

cc:   Peyton Diotalevi, National Counsel, NTEU
      Cynthia Woerner, Assistant Counsel, NTEU



EXECUTIVE ORG CHART AS OF 12/20/24

CFPB_00130