```
 1                IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLUMBIA
 2

 3      National Treasury Employees      )
        Union, et al.,                   )  Civil Action
 4                                       )  No. 25-cv-381
                          Plaintiffs,    )
 5                                       )  EVIDENTIARY HEARING
        vs.                              )  Day 1
 6                                       )
        Russell Vought, et al.,          )  Washington, DC
 7                                       )  March 10, 2025
                          Defendants.    )  Time:  10:18 a.m.
 8      _____

 9                TRANSCRIPT OF EVIDENTIARY HEARING
                            HELD BEFORE
10          THE HONORABLE JUDGE AMY BERMAN JACKSON
                    UNITED STATES DISTRICT JUDGE
11      _____

12                      A P P E A R A N C E S

13      For Plaintiff:    Deepak Gupta
                          Robert D. Friedman
14                        GUPTA WESSLER LLP
                          2001 K Street, NW
15                        Suite 850 North
                          Washington, DC 20006
16                        (202) 888-1741
                          Email:  Deepak@guptawessler.com
17                        Email:  Robert@guptawessler.com

18                        Jennifer D. Bennett
                          GUPTA WESSLER LLP
19                        505 Montgomery Street
                          San Francisco, CA  94111
20                        (415) 573-0335
                          Email:  Jennifer@guptawessler.com
21
                          Allison Marcy Zieve
22                        Wendy Liu
                          PUBLIC CITIZEN LITIGATION GROUP
23                        1600 20th Street, NW
                          Washington, DC 20009
24                        (202) 588-1000
                          Email:  Azieve@citizen.org
25                        Email:  Wliu@citizen.org
```

```
1    For Defendant:         Brad P. Rosenberg
                            U.S. DEPARTMENT OF JUSTICE
2                           1100 L Street, NW
                            Washington, DC 20005
3                           (202) 514-3374
                            Email:  Brad.rosenberg@usdoj.gov
4    _____

5    Court Reporter:        Janice E. Dickman, RMR, CRR, CRC
                            Official Court Reporter
6                           United States Courthouse, Room 6523
                            333 Constitution Avenue, NW
7                           Washington, DC  20001
                            (202) 354-3267
8
                                   *   *   *
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1        *   *   *   *   *   *   *P R O C E E D I N G S*   *   *   *   *   *   *

 2              THE COURTROOM DEPUTY:  We are on the record with

 3    civil case 25-381, National Treasury Employees Union, et al.

 4    versus Russell Vought, et al.

 5              Counsel, starting with the plaintiff, please approach

 6    and state your appearance for the record.

 7              MR. GUPTA:  Good morning, Your Honor, Deepak Gupta,

 8    of Gupta Wessler, on behalf of the plaintiffs, the National

 9    Treasury Employees Union, National Consumer Law Center, NAACP,

10    the Virginia Poverty Law Center, Pastor Eva Steege, and the

11    CFPB Employees Association.  I'm joined by my colleague

12    Jennifer Bennett, also of Gupta Wessler, and at counsel table

13    my colleagues Robert Friedman, Gabriel Chess, and Thomas

14    Scott-Railton, our co-counsel, Allison Zieve and Wendy Liu of

15    Public Citizen Litigation Group, and Julie Wilson, Paras Shah,

16    and Payton Diotalevi of the National Treasury Employees

17    Association -- Union.

18              THE COURT:  Okay.  You have more names than people at

19    the table, so I guess you're including the front row back

20    there.

21              MR. GUPTA:  One lawyer is back there, yes.

22              THE COURT:  All right.

23              MR. ROSENBERG:  Good morning, Your Honor, Brad

24    Rosenberg for the Department of Justice, Civil Division,

25    Federal Programs Branch, on behalf of the United States.
```

1    Joining me at counsel table is Liam Holland, also of the

2    Federal Programs Branch.

3         THE COURT:  Good morning, everybody.  I want to note

4    for the record that the public phone line is open.  Anyone who

5    is listening to this proceeding through that mechanism is

6    welcome to listen, however, you are instructed that you do not

7    have authority to record these proceedings and you do not have

8    the authority to broadcast them to other people while you're

9    listening to it yourself, or to record it and rebroadcast it

10   later.

11        I did hear argument, lengthy argument, from both

12   sides last week.  I think I have a full understanding of the

13   parties' positions.  However, before, during and after the

14   hearing I received information in support of conflicting

15   visions of what's actually going on on the ground.  And,

16   therefore, I continued the hearing on the preliminary

17   injunction until today for the presentation of live testimony.

18        I've received hundreds of pages of emails and

19   declarations, some submitted as of last Friday.  So before I

20   ask any questions of the lawyers, I think the thing to do is to

21   go ahead and hear from the witnesses first.

22        The plaintiffs have the burden of proving the need

23   for the preliminary injunction, so I'm going to have the

24   plaintiff call their witnesses first.  Of particular interest

25   to me is the state of the Office of Consumer Response.  I have

1    some interest also in the student loans and the disaster

2    response, the examinations necessary for the reporting

3    functions.  I'm not as interested in what's going on in

4    enforcement at this stage.

5            I will hear from the defendants' declarant as well,

6    and if the plaintiffs have someone that they think is necessary

7    to rebut what he says, you'll have that opportunity.

8            I want to tell everyone in this courtroom that this

9    is a public proceeding and you're absolutely entitled to be

10   here and see what goes on in a courtroom.  But anyone who

11   reacts audibly to the testimony will be excused from the

12   courtroom.  The witnesses from both sides are here and they

13   need to be treated with civility and without intimidation, so

14   we're not going to be letting them know what we think of what

15   they're saying while we're in the room.

16           All right.  Mr. Gupta, you can proceed.

17           MR. GUPTA:  Your Honor, we discussed the sequence

18   with the government beforehand and we came to an agreed-upon

19   proposal that I wanted to present to you.  And you can correct

20   me if I get anything wrong.

21           THE COURT:  Okay.  I know we're friends.  So --

22           MR. GUPTA:  So we anticipated you might say that, you

23   know, the plaintiffs go first because its our burden.  We then

24   proposed that we would call Mr. Martinez, the government

25   understandably would prefer that they get to do a direct

1    examination of him first and a cross.  We agreed to that and so

2    the proposal that we have jointly is that --

3              THE COURT:  They're going to call Mr. Martinez

4    first?

5              MR. GUPTA:  They get to call Mr. Martinez first, we

6    would cross him, they reserve the right to redirect.  And then

7    depending on how that testimony goes -- certainly, we have

8    Mr. Pfaff here available.  We also have two Doe declarants

9    available and they're, understandably, reluctant to testify

10   because of fear of retaliation, but they're available and ready

11   to do so.  And so we would -- we would make a determination

12   after Mr. Martinez's testimony.

13             Did I get that all right?

14             MR. ROSENBERG:  Yes.

15             THE COURT:  With the understanding that you have the

16   burden of proof, the government can go first and call its

17   witness and do a direct.  And then you'll do a cross and then

18   they'll do a redirect.

19             MR. ROSENBERG:  That is correct, Your Honor.

20             THE COURT:  Okay.  All right.  That's fine.

21             MR. ROSENBERG:  The one additional element of our

22   agreement is that we ask that any of plaintiffs' witnesses be

23   sequestered so they not hear Mr. Martinez.

24             THE COURT:  I believe they are in a witness room.

25             MR. GUPTA:  That's been done as well.

 1          THE COURT:  All right.  So you can call Mr. Martinez.

 2          MR. ROSENBERG:  We'll go get him.

 3          THE COURT:  All right.

 4          MR. ROSENBERG:  In the meantime, Your Honor, we have

 5     a couple of binders of the exhibits for Mr. Martinez, we have a

 6     set for you and your clerks and for plaintiffs' counsel.  So

 7     permission to approach?  We would use those binders as part of

 8     the examination.

 9          THE COURT:  You're not going to put them on the

10     screen?

11          MR. ROSENBERG:  I am a Luddite, so I think it would

12     be more efficient.  Plus, we've been working, obviously, to

13     prepare the binders we have, we're just not in a position to do

14     it electronically.

15          THE COURT:  All right.  I guess I'll take a binder.

16          MR. ROSENBERG:  There's something to be said for the

17     tangible feel of paper.

18          THE COURT:  I will say, even if people don't have

19     their exhibits on their laptop ready to show on the court

20     system, we have an Elmo where you can just put it down and turn

21     it on and we can all see it.

22          All right.  Mr. Rosenbeg, you can proceed.

23          MR. ROSENBERG:  One more note on the binders.  Each

24     binder has a cover sheet.  One binder consists of the filings

25     of the various internal documents that we've provided, the

1    other binder consists of plaintiffs' documents.  I will note

2    that the cover sheet is a little bit of a misnomer because our

3    binder also includes Mr. Martinez's declaration.  So it's a

4    little bit broader than what is on the cover sheet.  But,

5    everything that is in the binder is something that has been

6    publicly filed on the docket in this court.

7              THE COURT:  Okay.

8              MR. ROSENBERG:  And then last question, I think this

9    is just a logistical question.  Because the exhibits that we're

10   relying upon -- or anticipate relying upon, you know, and there

11   may be an issue that will come up during the examination today,

12   but other -- which we'll address it at an appropriate time.

13   But since these documents have all already been filed on the

14   public docket, we do not anticipate a need to separately move

15   them into evidence, since they're all already before the Court.

16             THE COURT:  That's fine.  I'm not planning to have

17   people move things in evidence.

18             MR. GUPTA:  We agree.

19             THE COURT:  And I also think -- is he going to have a

20   binder, so you don't have to walk around the courtroom and say

21   I'm handing you this, I'm handing you that?

22             MR. ROSENBERG:  Everyone has a binders.  You have a

23   set of binders, the witness has a set of binders, your law

24   clerks have a set of binders.

25             THE COURT:  Apparently you did not bring enough

```
 1    binders.  We've got two courtrooms full of people.  But, okay.
 2              MR. ROSENBERG:  Old school.
 3              The defense calls Mr. Martinez.
 4                        ADAM MARTINEZ,
 5    was called as a witness and, having been first duly sworn, was
 6    examined and testified as follows:
 7    BY MR. ROSENBERG:
 8    Q.  Good morning.  Can you please state your full name for the
 9    record?
10    A.  Yes.  It's Adam Martinez.
11    Q.  And, Mr. Martinez --
12              THE COURT:  Mr. Martinez, let me just tell you one
13    thing.  If you can move that microphone kind of closer to your
14    mouth, because the chair doesn't move, but it does.
15              THE WITNESS:  Is that better?
16              THE COURT:  All right.  Thank you.
17              THE WITNESS:  Wonderful.
18    BY MR. ROSENBERG:
19    Q.  Mr. Martinez, can you tell us where you went to college?
20    A.  I went to the College of Santa Fe, in Santa Fe, New Mexico.
21    Q.  When did you graduate from college?
22    A.  I graduated in 1999.
23    Q.  Can you just give us an overview of your post-college
24    career, at a high level, until your first interaction with
25    CFPB?
```

1    A.   Sure.   While I was in college I actually worked for my

2    member of Congress, handling constituent services in the

3    district office.   Shortly thereafter, when I graduated, I moved

4    to Washington, D.C., worked for two separate trade associations

5    for a short period of time, and then I was hired to work at the

6    House Ways and Means Committee with Congress.   I was there from

7    starting in about 2001 through 2007, and then I was hired for a

8    position at the Department of Treasury, specifically, serving

9    as a senior advisor to the Director of the Community

10   Development Financial Institutions Fund.   That is an office

11   within the Office of Domestic Finance.

12           It was during that time that the financial crisis

13   occurred, so it was a really interesting and wonderful

14   opportunity to be able to be part of the Treasury stand-up

15   team, to stand-up the CFPB.

16   Q.   And what do you mean to stand up the CFPB?

17   A.   So it was a very contentious time.   The regulators were not

18   generally happy about what was occurring because they were

19   losing quite a bit of jurisdiction from their portfolios, so

20   there didn't seem to be a lot of enthusiasm to stand up the

21   Bureau, so it was given the Department of Treasury's Treasury

22   Secretary with the authority to stand the Bureau up, build an

23   infrastructure and then allow them to be part of their own

24   independent Bureau status.

25   Q.   And can you describe for us what work you did as part of

1    the stand-up process?

2    A.  Yeah, it was fascinating.  I do have a background in human

3    capital, so I worked very closely with all of the regulators,

4    counterparts, liaisons to detail, in some cases actually hire

5    people into the CFPB during that time.

6    Q.  And I may ask you just to slow down a tiny, tiny bit to

7    make sure the court reporter can keep up with you.

8    A.  I'm sorry.  Yes.  Thank you.

9    Q.  I'm just curious, Elizabeth Warren -- my vague recollection

10   is that Elizabeth Warren was involved in the creation of the

11   CFPB.  Did you work with her at all as part of the stand-up

12   process?

13   A.  I did.  It was an incredible experience.  I was there for

14   three months.  She was an incredible leader to work with.  I --

15   there's a lot of things I learned from her.  But, yeah, she was

16   there on a daily basis, working directly with the employees.

17   Q.  Now, after -- was the stand-up process for which you were

18   involved about three months long?

19   A.  It was three months long.  My specific job was to work in

20   their human capital office, or a small version of a human

21   capital office, to get the initial detailees and transferees

22   into the CFPB, build out a payroll system and operational

23   infrastructure until -- the staff was originally under, like,

24   Treasury's payroll system, so we built an entirely new payroll

25   system that we transferred them into.

1    Q.  After that three-month process with which you were

2    involved, what did you do next?

3              THE COURT:  Can you tell us what year that was?  I

4    know when the statute was passed, but I'm not sure if you're

5    talking about before the statute was passed, after it was

6    passed.

7              THE WITNESS:  It was after it passed.  I was on the

8    ground, I believe, in December of 2010.  There were about 34,

9    35 of us from the Department of Treasury, and by the time I

10   left, it was February, I believe, of 2011, and there were

11   hundreds of people at that point on board, couple hundred.

12             THE COURT:  Go ahead.

13   BY MR. ROSENBERG:

14   Q.  What did you do next?

15   A.  After CFPB, I actually returned back to Treasury, I have a

16   love for the department.  I became an operations manager at the

17   same organization, the CDFI Fund, and then worked as a program

18   manager for their flagship grant program and their Native

19   American grant program.

20   Q.  And after that?

21   A.  After working for domestic finance, the CDFI Fund, I was

22   recruited into the HR director position for Treasury

23   headquarters.

24             THE COURT:  Let me interrupt you for one second.

25   I've been informed that while we do have authorization to

1    operate the public line when it's just a legal proceeding and

2    we're hearing argument in a civil case, that we don't have

3    authorization to do it if there are live witnesses testifying.

4    So before I turned it off, I didn't want everybody to think our

5    system was down and there's something wrong with the phone.

6    But the testimony is not going to be broadcast through the

7    line.

8         You can proceed.

9    BY MR. ROSENBERG:

10   Q.  Obviously you returned to CFPB at some point.  But maybe

11   you can just give us an overview of the other tasks that you

12   had at Treasury?

13   A.  Sure, I'll do that quickly, with enough time for the

14   reporter to do her job.

15        So after serving as HR director for Treasury

16   headquarters, I was recruited to serve as the chief management

17   officer of the Export/Import Bank of the United States, which

18   is another independent organization.  I was there for

19   approximately three years.  And then the chief operating

20   officer position became available at the CFPB and it was always

21   my goal to go back.  I enjoyed my experience there, and I

22   looked forward to it.

23   Q.  When did you become the chief operating officer of CFPB?

24   A.  It would have been in February of 2023.

25   Q.  And what is the role of the chief operating officer at

1    CFPB?

2    A.   The -- it was very similar to my experience at EXIM Bank.

3    My position there is to support the administrative or

4    operational infrastructure of the organization, so finance,

5    procurement, human capital, data governance, FOIA, records

6    management, security, facilities, those types of positions

7    report to me.

8    Q.   Now, when you started as chief operating officer in 2023,

9    that was, obviously, in the timeline under the prior

10   administration, who was director of CFPB at that time?

11   A.   It was Rohit Chopra.

12   Q.   And what was Mr. Chopra's management style like?

13   A.   Fortunately, with me, personally, he was -- he trusted me

14   and my position.  He was very hands-off.  However, the Bureau

15   historically -- and it's not just him, but the Bureau

16   historically has a very top-down approach.  So the head of

17   Agency -- it's very centric around the head of Agency, they

18   make the decisions.  I was in a unique position where I did not

19   make decisions as the chief operating officer under him, but,

20   nonetheless, he was the head of Agency, so he had that right.

21   Q.   You mention a top-down approach.  I'm just curious, at that

22   time, about how many employees did CFPB have?

23   A.   There were over 1700.

24   Q.   Relatively small agency?

25   A.   I would say for government agencies, yes, medium size,

1    perhaps.

2    Q.  Certainly smaller than Treasury?

3    A.  Much smaller than Treasury, yes.

4    Q.  When did Mr. Chopra's time as director of CFPB come to an

5    end?

6    A.  It was approximately Saturday, the 1st of February.

7    Q.  And what happened next, after he ceased to be the director

8    the CFPB?

9    A.  We -- it was -- we anticipated it because -- I mean, I was

10   personally surprised that it didn't happen sooner.  But, on the

11   morning of the 1st, we received an email from the director

12   letting us know that his time had come to an end.  And he had

13   notified, I believe, the White House at that point.  So, that's

14   how I learned.

15   Q.  Is that when -- you said this was the 1st.  Is that when

16   Acting Secretary Bessent, or Bessent, became acting director?

17   A.  No.  My recollection is we probably went about 24 to 48

18   hours without, like, a named leader.  I believe it was Monday,

19   after that weekend, that our deputy director sent an email out

20   essentially saying she would be acting director during that

21   time.  And then shortly after she sent that email, then we

22   received a separate email from Secretary Bessent, letting us

23   know that he had been named the acting director effective,

24   actually, which was a little odd, effective the 31st, which was

25   that Friday.

1    Q.  Retroactive?

2    A.  Retroactive, correct.

3    Q.  So, Mr. Martinez, there are two binders in front of you,

4    one of which says CFPB Internal Emails, CFPB Enforcement Action

5    Filings, CFPB Department of Education MOU, ECF No. 56.

6    A.  Okay.

7    Q.  I will note that the volume of materials that's in this

8    binder is a little bit larger than what the face of the binder

9    says.  And, in fact, we're going to turn to one of the

10   documents that's not explicitly referenced on the face of the

11   binder.

12          I'm going to ask you to turn to tab No. 56.  And I'll

13   just speed this along a little bit.  You'll see this is the

14   first declaration you submitted in this case.

15   A.  Yes.

16   Q.  And so I'm going to ask you to turn -- at the top of each

17   of the pages in this document is a running header that contains

18   the case number, you know, the docket number here, it's 31-1,

19   and then a page number, it will say page X of Y.

20   A.  Sure.

21   Q.  I'm going to ask you to turn to page 9.  So it will say

22   page 9 of 22 of document number 31-1.  Do you see that?

23   A.  Yes.  Yes.

24   Q.  Okay.  Is that the email to which you referred just now?

25   A.  This is the email that was sent out on February 3rd, yes.

1    Q.  That email is the one that names acting -- that names the

2    Treasury secretary as the acting director of CFPB?

3    A.  That is correct.

4    Q.  Let me back up for a second.  This was your first

5    transition from one administration to another at CFPB?

6    A.  No -- oh, at CFPB, yes.

7    Q.  But you actually anticipated what I was going to ask.  It

8    wasn't your first transition from one administration?

9    A.  No, no.

10   Q.  And that's because, if my memory serves me correctly, you

11   started working in the executive branch in 2007.

12   A.  That is correct.

13   Q.  And worked in the executive branch since then?

14   A.  I have.

15   Q.  Okay.  Based on your experience in the executive branch,

16   largely at the Department of Treasury or its components, does

17   this email strike you as odd in any way in the context of a

18   presidential transition?

19   A.  It does not.  I mean, this specific email from Secretary

20   Bessent wasn't, to me, surprising or unusual.

21              THE COURT:  Can you just tell me -- it wasn't your

22   first one, you've been in the executive branch since 2007 --

23   the presidential transitions that are the basis for your

24   experience when you talk about what's my experience?

25              THE WITNESS:  Yes, ma'am.  Well, one example is --

 1    well, I was there during the Bush to Obama transition, I was

 2    there from the Obama to Trump transition, and then the Trump

 3    transition to the Biden transition, and then now the Biden

 4    transition to the Trump transition.

 5              THE COURT:  Okay.  Thank you.

 6              THE WITNESS:  Sure.

 7    BY MR. ROSENBERG:

 8    Q.  Just to, you know, maybe build out on the Judge's question

 9    for a moment, what type of changes have you seen at Treasury,

10    or any other components, during these types of transitions that

11    makes you believe that this email is not unusual?

12    A.  There's been a couple of experiences that -- the first

13    experience I had at the Department of Treasury, and one of the

14    reasons I was recruited into that specific position at the CDFI

15    Fund, and most people probably would not know this, but back in

16    the 2000s -- the CDFI Fund is a grant and financial assistance

17    program.  And it was President Bush at that time, was

18    contemplating actually transitioning that organization into the

19    Department of Commerce, along with other federal grant

20    programs.

21              As a result of that, there were a lot of people that

22    left the organization.  So it was pretty decimated at that

23    point, so I was hired specifically to work with the new

24    appointed director, to essentially bring the agency back to

25    life and try to build some operational infrastructure into the

1    organization.

2    Q.  I'm just curious, are there any other examples that you can

3    think of?

4    A.  Yeah.

5           THE COURT:  I don't really think that the February

6    3rd email from -- concerning Secretary Bessent is the issue in

7    this hearing.  I mean --

8           MR. ROSENBERG:  I'll move on.

9           THE COURT:  You can talk about it as much as you

10   want, but I don't think that's what we need to talk about.

11          MR. ROSENBERG:  I'll move on.  And if there are any

12   points where the Court wants like to provide guidance on the

13   testimony that it wants to hear, please let me know.

14          THE COURT:  All right.  Thanks.

15   BY MR. ROSENBERG:

16   Q.  On that note, let's change topics then.

17          Are you familiar with the United States DOGE service?

18   A.  I am now.

19   Q.  What was your first interaction with DOGE?

20   A.  My first interaction with DOGE was the evening of February

21   6, which I believe was a Thursday.

22   Q.  And can you describe that for us?

23   A.  We received an email from the Secretary Treasury's staff to

24   let us know that several of the DOGE personnel were headed to

25   our building and we needed to let them in.

```
1    Q.  And --

2              THE COURT:  That night?

3              THE WITNESS:  That night.  The email came

4    approximately 5:45 and they were there at about 6:15, 6:30 that

5    evening.

6    BY MR. ROSENBERG:

7    Q.  If you recall, who is the "they" to which you are

8    referring?

9    A.  We were anticipating two IT engineers to show up.  There

10   was actually -- the two IT engineers ended up not showing up,

11   but who did show up was Christopher Young, with DOGE.

12   Q.  And at that time, what was your understanding --

13             THE COURT:  All by himself?  So it is not a "they,"

14   it was a "he"?

15             THE WITNESS:  It was just he, yes, ma'am.

16             THE COURT:  What was his title?

17             THE WITNESS:  He didn't have a title.  Based on my

18   interaction with him and what I was able to pull from him, it

19   was very clear that he was like a project manager or a project

20   lead that was there -- assigned to be on that specific

21   assignment, to lead the IT engineers that were to follow.

22   BY MR. ROSENBERG:

23   Q.  Since we're on that topic, let me ask, Mr. Young, is he

24   considered to be a CFPB employee?

25   A.  He has been detailed to the CFPB.  He is an employee, I
```

1    believe, of Office of Personnel Management.

2    Q.  And --

3              THE COURT:  When was he detailed to the CFPB?

4              THE WITNESS:  He was detailed officially on the 7th

5    to the CFPB.  So our introduction was the evening of the 6th

6    and then on the 7th the DOGE staff showed up and we worked with

7    them to try to figure out who they were and why they were

8    there.

9    BY MR. ROSENBERG:

10   Q.  And is that --

11             THE COURT:  Who showed up on the 7th?

12             THE WITNESS:  Initially it was Chris Young, Jordan

13   Wick, and Jeremy Lewin showed up that morning and then by the

14   afternoon there were three additional DOGE employees that

15   showed up.

16             THE COURT:  And what did they do?

17             THE WITNESS:  The discussion that we had with DOGE

18   Friday morning, the 7th, was a similar conversation that we had

19   with Chris Young on Thursday evening.  And the point of the

20   discussion was to talk about what their engagement was and what

21   they would be doing at the Bureau.

22             THE COURT:  And what did they say they were going to

23   be doing?

24             THE WITNESS:  I will say this loosely, I felt as

25   though the information they were requesting, which was

1    primarily operational data, they wanted access to our human

2    capital system, procurement system, travel system, and our

3    finance system.  They also wanted a copy of our org chart.  And

4    I -- based on my discussion with them, they were very

5    interested in the inner operations of the organization.  And I

6    almost felt like it was an engagement that I've had with prior,

7    like, inspector generals office.  So it seemed like an audit

8    almost of our operational functions.

9             THE COURT:  Did they undertake the audit on the 7th?

10            THE WITNESS:  They started on the evening of the 7th,

11   yes.  It was one individual on that team that was given access

12   to those systems they requested.  I had staff working with that

13   individual to show them quickly how to utilize the system

14   through Microsoft Teams.  It was a virtual session.  One of my

15   employees worked until 4 o'clock the next morning with the DOGE

16   personnel to provide that technical assistance.

17            THE COURT:  So when was this audit completed, as far

18   as you know?

19            THE WITNESS:  I believe it's still -- well,

20   there's -- they're still present.  They're still detailed to

21   the Bureau.  I feel -- from my recollection is, is that the

22   audit was quickly wrapped up.  It wouldn't have been the week

23   of the 10th, but it would have been the following week.

24            Once the director of OMB, who is our acting director,

25   and his chief legal officer became more engaged in the inner

 1   workings of our operations, there was definitely a change in

 2   posture that was very clear to me.  Somewhat differing

 3   opinions, differing approaches.  DOGE came in with a very hard

 4   fist, so to speak.  I felt as though, when the OMB director's

 5   team came in, I felt like the adults were around the table at

 6   that point.

 7          THE COURT:  Well, I thought Mr. Vought came in on the

 8   8th?

 9          THE WITNESS:  He did.

10          THE COURT:  So who was in charge at that point?

11          THE WITNESS:  Presumably he was in charge during that

12   point.  However, many of the -- so the evening of the 7th,

13   Director Vought sends email communications to the staff,

14   letting our team know that those employees were acting,

15   essentially, on his behalf and were detailed to the Bureau and

16   had access to our systems.  So --

17          THE COURT:  And so the conversations that you had

18   with them, that you talk about in your declaration, during the

19   week of the 10th, where you got the impression that they were

20   shutting things down because that's what they told you, he'd

21   already said they work for me?

22          THE WITNESS:  Yes.

23          THE COURT:  Okay.

24   BY MR. ROSENBERG:

25   Q.  Let me back up for just a moment, so the record is clear.

1    You referred to this being something like an audit?

2    A.  Yeah.

3    Q.  When I think of an audit, I think of an accountant's audit.

4    Was this a formal audit?  Was is it a process?  Was it

5    something else?

6    A.  Well, it felt like a formal audit, in the sense that

7    they -- I had the impression that they knew exactly what they

8    wanted to do, how they wanted to do it.  They asked for very

9    specific access to our systems and we provided that to them.

10    Q.  You mentioned, I think, that they requested access to

11    systems -- I think you may have said, like, sort of on the

12    operational side, or operations.

13    A.  Right.

14    Q.  Did they express any interest in the programmatic functions

15    of the CFPB?

16    A.  That's actually a great question.  Thank you.  The --

17    during the time in which DOGE -- I would say within the first

18    24 to 48 hours that DOGE was on site there did not appear to be

19    an interest in any of what I would call the mission critical

20    systems, the programmatic side of the house.  The reason I was

21    dealing with them directly at that point was it was my systems

22    that I was responsible for that they wanted access to.  We did

23    let them know, several times, and our chief information officer

24    let them know as well, that if at any point during the

25    engagement that they wanted access to any of our mission's

1    specific systems, that that was going to be a whole different

2    discussion, probably with our legal counsel and others.

3    Q.  And one more clarifying point just to make sure we're all

4    on the same page.  You're referring to DOGE --

5    A.  Right.

6    Q.  -- perhaps because I asked the initial question about DOGE.

7    But you also mentioned that within a day, at least for

8    Mr. Young, they were considered to be CFPB employees.  Is there

9    anything that documents that?

10   A.  Yes.  On the evening of the 7th, before they requested

11   access to our, like, our SharePoint site, our web page, other

12   systems under the purview of our chief information officer,

13   before we even allowed them access to those systems, we

14   received an email from Director Vought, letting the agency know

15   that the DOGE employees were being granted access from him.

16   And he also provided an e-signature copy of a memorandum of

17   understanding that evening.  It was that information that we

18   used to -- the CIO used to provide access to them.

19            THE COURT:  I'm not going to ask you the follow-up

20   question to this, I just want to understand the scope of your

21   knowledge.  You certainly know which systems there are that are

22   essential to your side of the house, the operations side of the

23   house, correct?

24            THE WITNESS:  Yes.

25            THE COURT:  Do you know -- you talked about there's a

 1   programmatic side of the house and there are mission-critical

 2   systems for the programmatic side of the house?

 3            THE WITNESS:  Yes.

 4            THE COURT:  Do you know what they are?

 5            THE WITNESS:  I generally know what they do and why

 6   we use them.  But I've never accessed those systems.  I've not

 7   had a need to access those systems.

 8            THE COURT:  So who knows the programmatic side of the

 9   house?  Who is the person with knowledge about that?

10            THE WITNESS:  So, the -- it would be the associate or

11   my peers who run their specific programs for the Bureau.

12            THE COURT:  So each program head knows what is

13   mission critical for their program?

14            THE WITNESS:  Correct.

15            THE COURT:  There's not a person like you who is over

16   all the program heads, other than the director themselves?

17            THE WITNESS:  The chief of staff played that role.

18   That position was a political appointment position and that

19   person did leave the same day that Director Chopra left.

20            THE COURT:  Okay.  Go ahead.

21   BY MR. ROSENBERG:

22   Q.  Let's go back to the February 7th meeting.  Is that the

23   same meeting that you discussed in your declaration that raised

24   security concerns?

25   A.  Yes.  There were a couple things that occurred -- well,

1    there was a couple of things that occurred that day, most -- so

2    I'm very sensitive to security issues just in general, having

3    worked on the Hill for Congress, but also in a Secret Service

4    environment, and also having worked in national security, you

5    become very, very focused on security-specific issues.

6           When I was talking to Chris Young on Thursday evening

7    by himself, he was telling me he thought that potentially the

8    reason that the DOGE boys were late was because they were

9    having to order car service because they were being essentially

10   stalked, tailed, followed, harassed.  So that was the first

11   indication that something was off and odd.

12          The next morning we had some of our career staff

13   members that were giving reports that they had been followed in

14   the building by other employees, they were asking to see their

15   PIV cards, they were wondering if they were with DOGE.  They

16   responded that they were not.  However, when DOGE finally

17   arrived at our building, we were in a conference room in the

18   basement that we had allocated for them to use during their

19   engagement and it was during that discussion that we started --

20   that we started to see employees circling the hallway of the

21   basement.

22          The DOGE folks pointed out and said, Are you aware

23   that somebody is pushing a baby stroller down the hallway and

24   taking pictures of us through the window?  And we were, like,

25   no, we weren't aware of that.  So somebody on our career staff

1    team said I think we need to move to the next conference room

2    over, where the window was covered.

3            So we moved over into that space.  And then I had

4    stayed behind to check an email in the conference room next

5    door and then all of a sudden I heard just the sheer chaos that

6    was going on next door.  And from what I could tell from where

7    I was sitting and standing, one of our employees,

8    unfortunately, walked directly into the conference room,

9    started to question everybody around the table, both our career

10   staff, the DOGE staff, started to demand to take -- to see

11   their IDs.

12           They showed their IDs, she started taking pictures.

13   They were concerned that they were live streaming.  She was

14   taking pictures of their laptops.  And at one point she got

15   face to face with one of our staff members in our technology

16   shop and said who are you?  Show me your ID.  Why are you here?

17   And his response back to her was, like, well, who are you?

18   Like, why are you asking me this question?

19           So it was very contentious.  Four security guards

20   were called down to see what was happening.  The employee did

21   leave.  I understand she left the building and then it was

22   shortly thereafter that we could hear the protesting taking

23   place outside of the building.

24   Q.  I'm going to ask you to turn -- we're still on tab No. 56.

25   So we're still looking at the attachments to your declaration.

```
1    I'm going to ask you to turn to document 31-1, page 18 of 22.

2    A.  You said tab?

3    Q.  Still the same tab, tab 56 in the binder of CFPB's

4    documents, page 18 of 22.

5    A.  Oh, 18.  Got it.  Yes.

6    Q.  Do you recognize this email?

7    A.  I do.

8    Q.  What is it?

9    A.  This was the email I sent to the workforce after being

10   instructed to do so by Director Vought's staff.

11            THE COURT:  By who?

12            THE WITNESS:  Director Vought's staff, our acting

13   director.

14            THE COURT:  Okay.

15   BY MR. ROSENBERG:

16   Q.  When she asked whom, is there anyone specific?

17   A.  I couldn't recall.  It was either -- it was either the

18   chief legal officer or it was Chris Young.

19   Q.  Why was -- you ultimately sent out the email to close the

20   building?

21   A.  I did send the email, yeah.

22            THE COURT:  I think at the last hearing I said,

23   again, that my interest isn't why the building was closed.

24            MR. ROSENBERG:  Okay.  I'll move on.

25   BY MR. ROSENBERG:
```

1    Q.  I would like you to turn, same tab, 56, page 16.  Just to

2    move this along, I think we all sort of recognize this

3    document.  This is the email from Acting Director Vought, sent

4    on Saturday, February 8th, noting that President Trump

5    designated him as acting director the prior day, February 7th.

6    And like the Bessent email, this email contains a series of

7    bullets as to what agency employees should or should not do.

8    It's a little bit different -- let me ask you this:  Is it a

9    little bit different in scope than Bessent's email?

10   A.  This was a lot more specific.  I recall the last two bullet

11   points.

12   Q.  How so?

13   A.  Because in this specific directive the employees were being

14   asked to cease all supervision and examination activity and to

15   cease all stakeholder engagement.

16   Q.  I asked you for your reaction to Acting Director Bessent's

17   email.  Do you have any reaction to this email in terms of

18   whether it's out of the ordinary?

19   A.  Well, I mean, there's a couple of different ways to look at

20   it.  I -- my take on the situation with this specific, like,

21   email, was that it appeared, though, that under Vought, I would

22   presume that they felt as though the agency needed further

23   clarification.  So, I would imagine, based upon my

24   understanding of the agency, there were some things that

25   stopped when Bessent sent his email out originally, and then

1    certain activities continued throughout the week and this

2    essentially made it much more clear.

3                    THE COURT:  What does "stakeholder engagement" mean

4    to you?

5                    THE WITNESS:  Stakeholder engagement, to me, would be

6    our interaction with our constituents or consumers or trade

7    associations or interest groups, financial institutions.

8                    THE COURT:  And have you ever seen something like

9    that in the transitions with which you have experience?

10                   THE WITNESS:  At Treasury I've seen similar.  This,

11   obviously, is a very unique situation.  But I have seen pauses

12   on stakeholder engagement specifically at the Department of

13   Treasury.  Generally, because, like, Treasury itself is

14   somewhat different than the Bureau, is a very policy

15   oriented -- I worked at headquarters, so headquarters is very

16   policy oriented.  So typically there is some stoppage or --

17   there's a lot more caution about sending employees out to speak

18   with the public or interest groups before the employees have an

19   idea what the administration expects out of their policy.

20                   THE COURT:  Go ahead.

21   BY MR. ROSENBERG:

22   Q.  I'm going to ask you to turn now -- we're still on tab 56,

23   but I'm going to ask you to turn to document 31-1, page 20 of

24   22.

25   A.  You said 20 out of 22?

1    Q.  Yes.  Just to be clear, this is the Monday, February 10th

2    email from Acting Director Vought?

3    A.  Correct.

4    Q.  Do you recognize this document?

5    A.  I do recognize it.

6    Q.  Okay.  What is your understanding, if you have one, of what

7    this document -- what this email was attempting to accomplish?

8    A.  The way that I read it was different than I've now

9    understood that my colleagues read it.  But what the --

10            THE COURT:  His question was -- we can all read it,

11   he wants to know if you know, from your personal knowledge,

12   what it was intended to accomplish?

13            THE WITNESS:  No.

14            THE COURT:  Okay.

15   BY MR. ROSENBERG:

16   Q.  The email does note, and correct me if I'm wrong, but if

17   there are any urgent matters, please alert the acting director

18   through Mark Paoletta, the chief legal officer, to get approval

19   in writing before performing any work task.  Is that correct?

20   A.  Correct.

21            THE COURT:  That was only urgent matters, otherwise

22   employees should stand down from performing any work task.  It

23   says that, too?

24            THE WITNESS:  Yes.

25   BY MR. ROSENBERG:

1    Q.  I'm going to go back to DOGE for a second.  And when I'm

2    referring to DOGE, it's a matter of convenience because I think

3    your testimony is at this point in time individuals affiliated

4    with DOGE were in fact with CFPB -- functionally CFPB

5    employees, is that fair?

6    A.  Yes.

7    Q.  Did individuals affiliated with DOGE ask about CFPB

8    finances?

9    A.  Yes.

10   Q.  Can you tell us about that?

11   A.  Yes.

12          THE COURT:  Would there be some document that shows

13   when these people were added or designated to be CFPB

14   employees?

15          THE WITNESS:  That would be the Director Vought's --

16   or, Acting Director Vought's email that he sent out the evening

17   of the 7th which specifically called out the names of the

18   individuals, and then it was a memorandum of understanding that

19   had been signed between himself and the DOGE representative.

20          THE COURT:  To the effect that?

21          THE WITNESS:  That they were allowed to have access

22   to our systems and --

23          THE COURT:  That's different than saying they're CFPB

24   employees now?  They're just getting access?

25          THE WITNESS:  Correct.  As -- we have detailees,

1    obviously, from across government and it's not abnormal to get

2    the MOU up front, to let the agency know that these individuals

3    are going to be detailed in.  And then what occurred, which

4    typically occurs, is the subsequent paperwork that follows that

5    structures the engagement with the other agencies.

6              THE COURT:  Go ahead.

7    BY MR. ROSENBERG:

8    Q.  I think I had asked, you know, what -- basically, tell us

9    what happened initially when individuals affiliated with DOGE

10   asked about CFPB finances?

11   A.  Yes.  The chief legal officer at DOGE asked specifically

12   what the status was of our finances.  And he specifically

13   wanted to know how much money we had in our accounts.  So I

14   immediately reached out to our chief financial officer to pull

15   the account information.

16            We have three accounts specifically for the Bureau

17   established, which could cause a little bit of confusion

18   because we're not just like a one-line item organization.

19   Q.  What did you mean by that?

20   A.  It means that we have three specific funds.  We have the

21   fund that is used to pay our financial costs for our operations

22   of the agency.  So that would be all of our contracts,

23   personnel, anything associated with the work that's done.  We

24   then have the civil penalty fund, which is a fund that's

25   established after a financial institution is directed to pay

1    what I would call restitution to affected consumers, and then

2    the agency makes a decision at that point with returning some

3    of that money back to consumers, which they have.  And then the

4    third fund is a reserve fund that was established.

5    Q.  Let's talk about that reserve fund for a moment.  And just

6    to move this along, I'm going to ask you to turn to page 22.

7    We're still looking at the attachments to your declaration, so

8    this is document 31-1, in tab 56, page 22.

9    A.  You said 31?

10    Q.  No, tab 56, same tab.

11    A.  Got it.

12    Q.  Document 31-1 at the top, page 22.

13         Do you recognize this letter?

14    A.  I do recognize the letter.

15    Q.  This is the letter from Acting Director Vought to Jerome

16    Powell, Chairman of the Board of Governors of the Federal

17    Reserve System.

18         Just to understand the context very briefly, the -- my

19    understanding at least, and you can correct me if I'm wrong, is

20    that CFPB sends letters such as this one on a quarterly basis

21    to the Federal Reserve regarding its funding, is that correct?

22    A.  That is the protocol, correct.  This letter or similar

23    letter goes to the chairman, yes.

24    Q.  CFPB gets its funding from the Federal Reserve?

25    A.  Correct.

1    Q.  It doesn't get appropriations from Congress?

2    A.  We're not an appropriations agency, that is correct.

3            THE COURT:  So that means it's not taxpayer money?

4            THE WITNESS:  Correct.

5    BY MR. ROSENBERG:

6    Q.  And I'll just summarize.  I mean, in -- why don't you

7    summarize the gist of this letter for us, based on your

8    understanding?

9    A.  The gist of this specific letter -- again, I'm not

10   surprised that this occurred.  I'm not surprised that the

11   director requested zero transfer from the Fed.

12   Q.  I was going to ask, when you said this occurred, the "this"

13   you referred to is what you just said now, which is requesting

14   zero dollars from the Fed?

15   A.  The exact same scenario played out under the first Trump

16   administration when Acting Director Mulvaney also sent a

17   similar letter to the Fed requesting zero transfer for that

18   quarter.

19   Q.  The letter refers to $711 million in the Bureau of Consumer

20   Financial Protection fund, but I think you testified that there

21   are various funds?

22   A.  Correct.

23   Q.  And you've mentioned a reserve fund.  What is the reserve

24   fund?

25   A.  So the reserve fund was somewhat controversial under

1    Director Mulvaney as well.  Again, not surprised that this

2    played out the way that it did.  The reserve fund --

3              THE COURT:  I'm going to ask you to just answer his

4    questions.  And he'll ask you if he wants your opinion.

5              THE WITNESS:  Okay.  Thank you.

6              THE COURT:  All right.

7    BY MR. ROSENBERG:

8    Q.  I actually may have forgotten what my question was.  I

9    think it was:  What is the reserve fund?

10             THE COURT:  I don't think you got there.  What is it?

11   A.  The reserve fund?

12   BY MR. ROSENBERG:

13   Q.  Yes.

14   A.  I call it a rainy day fund, a continuity fund.  The

15   director is allowed to build up that fund.  It was built up

16   since I arrived, in 2023, for a couple of different purposes.

17   Q.  So let me ask you then, what were the purposes for which

18   the reserve fund was built up?

19   A.  At the time, in 2023, we built it up for two purposes.  One

20   was there were specific potential items that the Agency

21   potentially could incur over time and that funding would be

22   available in the reserve fund to cover those costs.  The second

23   reason, that is very clear to me why it was being placed in the

24   reserve fund, was we were undergoing the Supreme Court ruling,

25   whether or not our agency should be appropriated or not

1    appropriated.

2    Q.  And for the record, is that -- does this name ring a bell:

3    *Consumer Financial Protection Bureau versus Community Financial*

4    *Services Association of America*?

5    A.  That's correct.

6    Q.  Now, you're not a lawyer?

7    A.  No.

8    Q.  But -- well, I thank goodness for small things.

9         What is your -- but you seem to have an understanding of

10    what the issue was in that case.  Can you explain --

11         THE COURT:  Are we kind of getting a little of far

12    afield for where we need to be right now?

13         MR. ROSENBERG:  I don't think so, Your Honor, because

14    I think there's an issue that's been raised in this litigation

15    about -- we're going to go to in a minute -- an attempt to

16    return funds to the Federal Reserve and the amount of money

17    that is in the Bureau's reserve fund.  And what I anticipate

18    that the witness will show is that there was actually a very

19    large amount of money in the reserve fund and so it was not at

20    all unusual for the acting director to send a letter to the

21    Federal Reserve not requesting additional funds.

22         If this is not an issue that is of concern to the

23    Court, I'm happy to move on.

24         THE COURT:  I think just for purposes -- it may be an

25    issue for the merits.  I think for the purposes of the

1    preliminary injunction, we're really talking about whether

2    there's an ongoing effort to have the agency move forward and

3    its mission, or whether there's an ongoing effort to dismantle

4    it.  Now, I understand that you're saying that they're saying

5    this is part of the effort to dismantle it, so we can touch on

6    it a little.

7            My question to you is:  Does the 711 figure include

8    the civil penalty fund?

9            THE WITNESS:  No.

10           THE COURT:  Okay.

11   BY MR. ROSENBERG:

12   Q.  Let me ask you this --

13           THE COURT:  Do you know what the operating costs were

14   per month?

15           THE WITNESS:  I don't recall the operating costs per

16   month for that period.

17           THE COURT:  Were you asked to provide that

18   information between the 7th -- the evening of the 6th, when the

19   DOGE people arrived, and the morning of the 8th, when this --

20   on the 8th, when this letter goes out, we don't need any more

21   money?

22           THE WITNESS:  The reserve fund was significant enough

23   to carry us for another quarter.

24           THE COURT:  All right.

25   BY MR. ROSENBERG:

1    Q.  Just to be clear on this, CFPB has a chief financial

2    officer?

3    A.  Yes.

4    Q.  That's not you?

5    A.  No.

6    Q.  But the chief financial officer does report to you?

7    A.  He does.

8    Q.  Okay.  And that's Mr. Guy?

9    A.  Yes, and he advised, as well, that in my discussions with

10   him, at that time, that we had sufficient funds to carry out

11   our expenditures or even zeroing out.

12            MR. ROSENBERG:  I'll also just note for the Court

13   that CFPB is currently under at least a temporary order

14   regarding the transfer of funds, and that's where this is going

15   and that's what I wish to address next.

16            THE COURT:  Well, there's an order from another Court

17   that I don't have any authority to go behind.  So that's one of

18   the reasons I asked you the question.  I think there's a

19   certain amount that's before that Court and there's a certain

20   amount that's before me.

21            MR. ROSENBERG:  That is correct.  That seems to be

22   the nature of our practice of having multiple lawsuits to

23   defend.  But that lawsuit is focused almost exclusively on this

24   issue.  And I think I can wrap this up pretty quickly.

25            THE COURT:  Okay.

1   BY MR. ROSENBERG:

2   Q.  Are you aware of any discussions regarding returning CFPB

3   funds to the Federal Reserve?

4   A.  Yes.

5   Q.  Can you tell us about those discussions?

6   A.  Yes.  The chief legal officer asked whether or not there

7   was a process or if it was even an option to return money back

8   to the Federal Reserve Board.  Again, I immediately contacted

9   our chief financial officer to ask him what he was aware of.

10  He immediately said I am not an attorney, but I seriously doubt

11  that is possible, let me reach out to the Federal Reserve

12  board, which he did, spoke to his counterparts there.  There

13  was no mechanism to return money back to the Federal Reserve.

14  Q.  We're going to -- relatively exciting moment here.  We're

15  going to switch binders for one second.

16      So if you close up that first binder and then open up

17  the plaintiffs' binder.  It's tab E.  They've marked it as

18  Exhibit E.  And it should say at the top 60-1, page 12 of 107.

19  A.  Okay.

20  Q.  Take a moment.  Do you recognize this document?

21  A.  Yes.

22  Q.  It's an email from you to various other individuals?

23  A.  Correct.

24  Q.  By the way, I'll note that among the individuals in this,

25  there is a CC recipient of this document, Christopher Young,

1    who you discussed earlier?

2    A.  Yes.

3    Q.  And it appears that he has, at least as of February 11th, a

4    CFPB email address?

5    A.  He does.

6    Q.  And that would be where it says Young, Christopher,

7    parenthetical, CFPB?

8                THE COURT:  These are two-sided now in this binder,

9    is that how this works?

10                MR. ROSENBERG:  We try to save paper where we can.

11                THE COURT:  The other one wasn't like that, so I'm

12    just trying to figure out if I'm looking at the right thing.

13    Behind tab A is a piece of paper that says Exhibit E, and then

14    you're talking about the email on the reverse of that, correct?

15    Just now, that's what you're asking him about?

16                MR. ROSENBERG:  It is the email, it says page 12 of

17    107.

18                THE COURT:  Okay.  All right.

19    BY MR. ROSENBERG:

20    Q.  Why did you send this email?

21    A.  Well, I sent it for two reasons.  One was I had received

22    the question to our CFO about the ability to return money back

23    to the Federal Reserve.  And the way that our funds work is

24    highly, highly unusual and it's very difficult to explain.

25    But, my recollection is on Tuesday, February the 11th, I

1    received a subsequent phone call from Mark Paoletta, our chief

2    legal officer, and Mr. Bishop, inquiring about the way that

3    our -- the Fed system transfer works, and then also they'd

4    specifically asked about the how the civil penalty fund works.

5        So I was not comfortable getting into that level of

6    detail, so this was intended for me to introduce them to the

7    CFO to have that discussion.

8    Q.  And I think we can wrap it up here, what was the CFO's

9    conclusion?

10   A.  Well, the conclusion with regards to the Federal Reserve

11   transfer back, that it was not possible.

12   Q.  And he also spoke with the Federal Reserve about that?

13   A.  He did.

14   Q.  Okay.  And do you have an understanding as to whether the

15   Federal Reserve shared that conclusion?

16   A.  They did.  They did.

17        THE COURT:  At the outset, did the DOGE people

18   understand that the civil penalty fund isn't available to fund

19   operations in any way?

20        THE WITNESS:  It didn't come up with DOGE

21   specifically.  It doesn't come up until Dan Bishop, who is an

22   advisor to Director Mulvaney, started to ask questions about

23   the civil penalty fund and what it was, you know, how did it

24   work, where was the money, whether it had stopped or not.  It

25   did not stop.  We have an obligation to continue with that.

1         THE COURT:  All right.  You meant Director Vought?  I

2    think you said Mulvaney.  I just want to make sure we're

3    talking about the present --

4         THE WITNESS:  I'm sorry.  I apologize for that.

5    BY MR. ROSENBERG:

6    Q.  Since these events occurred, has there been any attempt to

7    transfer funds back to the Federal Reserve?

8    A.  No.  No.

9    Q.  Or to any other organization, other than in the Bureau's

10   ordinary course of business?

11   A.  It is virtually impossible to do that, as we've learned.

12   The money -- the money can't even be sent back to the

13   Department of Treasury.  The only reason that some of the money

14   sits at the Department of Treasury is we pull funds from the

15   Federal Reserve Bank of New York into the Treasury account to

16   pay our bills.  It's like a checking account.  We move it from

17   the savings account to the checking account.

18        MR. ROSENBERG:  Ready to change topics, unless the

19   Court has any further questions?

20        THE COURT:  No, no.

21   BY MR. ROSENBERG:

22   Q.  Let's discuss RIFs and employment decisions.  What is a

23   RIF?

24   A.  It's a reduction in force.

25   Q.  What does that mean?

1    A.  Generally, reduction in force in government only -- it

2    rarely occurs.  It only occurs when there is excess staff that

3    is no longer needed for the Agency.  It's also been used in the

4    past if an Agency is not appropriated by Congress, there has to

5    be cuts made somewhere.  So essentially the process is, is that

6    you begin RIF procedures, if it's necessary.

7    Q.  Is a RIF different from an employee termination?

8    A.  It is different.  And -- yes, it is different.

9    Q.  Were any CFPB employees terminated the week of February

10   10th?

11   A.  They absolutely were, yes.

12   Q.  Can you give us the overview of the categories of employees

13   that were terminated?

14   A.  There were several categories that were terminated.  All of

15   this came at the direction of our new leadership.  The first

16   category we received a -- or, we were told to terminate were

17   those on probationary period.  Those would be career employees

18   who serve a one-year mandatory probationary period.  We also,

19   at the same time, terminated the trial-period attorneys, for

20   those employees that have to serve two years of probationary,

21   typically, accepted service, attorneys in our case.

22          There was as third category -- or, second category

23   really of employees that were serving in a not-to-exceed

24   position.  So a term appointment that was set to expire,

25   probably, within one to two years.

1    Q.  When were you first made aware of the possibility of RIFs?

2    I'm talking RIFs and not terminations.

3    A.  I remember that very well, actually.  That -- I was told on

4    Monday, the 10th of February, that I was expected to attend a

5    meeting at the Office of Personnel Management, with their

6    staff.  I was to meet with their policy staff and also a shared

7    service staff.  The shared service is an entity that supports

8    federal agencies while working along with their policy folks.

9    Q.  And as a result of that meeting, did you prepare -- did you

10    begin the RIF process?

11    A.  Well, the meeting was to talk about -- I mean, there have

12    not been RIFs in government in a long time, and so my sense was

13    try to understand exactly what the mechanics were.  You know,

14    what we needed to do.  So they provided specific guidance with

15    regards to how RIFs take place.  And the first start of it is

16    to develop your competitive areas within organization.

17              THE COURT:  Wasn't a subject of the discussion

18    whether typically they're supposed to involve notice, correct?

19              THE WITNESS:  That's correct.

20              THE COURT:  And there has to be some sort of

21    extraordinary circumstance that requires a RIF without even

22    notice?

23              THE WITNESS:  That is correct.

24              THE COURT:  And one of the things you were there to

25    justify was doing it without notice, right?

1          THE WITNESS:  It was -- it was a reduced timeframe

2     notice.

3          THE COURT:  Was there any notice?

4          THE WITNESS:  Well, it didn't happen.  But the

5     approval that -- typically it's a 60-day window that you

6     provide employees with advance notice of the intent to run the

7     RIF.  I was instructed to work with OPM to reduce that

8     timeframe from 60 days to 30 days.

9          THE COURT:  And what were the extraordinary

10    circumstances that warranted that?

11         THE WITNESS:  There were two specific items that we

12    referenced.  One was the executive order that the President had

13    signed on workforce reshaping, and then the specific item was

14    the work stoppage that occurred.

15         THE COURT:  So it was the February 10 email that said

16    you can't work but then became the emergency that justified the

17    RIF?

18         THE WITNESS:  Absolutely.  Yes.

19         THE COURT:  Okay.

20    BY MR. ROSENBERG:

21    Q.  Just to clarify, it was one of two justifications that you

22    provided to OPM, is that correct?

23    A.  That is correct.

24    Q.  The other one being the President's executive order?

25    A.  Yes.

1    Q.  Just for clarity sake -- and this may assist the Court --

2    I'm going to ask you -- we're still on plaintiffs' binder -- to

3    turn to tab OO.  Double O.  I'm going to ask you to turn to the

4    last page in that tab, which is document 66-1, page 28 of 60.

5    A.  Um-hum.

6    Q.  Do you recognize this document?

7    A.  I do.

8    Q.  What is it?

9    A.  This is the official approval from OPM's policy division,

10   granting the exception from the 60-day to 30-day rule for

11   running a RIF.

12   Q.  Does that document reference the two justifications that

13   you just identified for the Court?

14   A.  Yes.

15   Q.  I'm going to ask you to turn to tab JJ in plaintiffs'

16   binder.  I'm going to ask you, this is document 66-1, starting

17   on page 5 of 60 and running all the way until page 11 of 60.

18   A.  Um-hum.

19   Q.  I'm going to direct your attention to pages 9 through 11 of

20   that document.  This is a letter, or a memo, CFPB letterhead up

21   top, that's to Michael J Mahoney, Office of Personal

22   Management, from you?

23   A.  Correct.

24   Q.  Regarding the establishment of competitive areas.

25            And I'll just note that at the very end there's

1    paragraph 6, it says:  Discussion of circumstances that led to

2    the proposed changes less than 90 days before a proposed

3    reduction.  And in that paragraph you also identified those two

4    justifications?

5    A.  That is correct.

6    Q.  Now, why did you identify those two justifications?

7    A.  That is the information that we had available at the time.

8    Q.  Do you have any understanding as to whether Acting Director

9    Vought intended his stop-work email to serve as a justification

10   for a RIF?

11             MS. BENNETT:  Objection.

12             THE COURT:  If you have an objection, you stand up

13   and say, "Objection," and then you say the basis for your

14   objection in, like, two words.  You don't get to ask the

15   witness a question.  And then I can rule on the objection.

16             MS. BENNETT:  Objection, personal knowledge.

17             THE COURT:  All right.  Do you know what -- he's

18   Director Vought, not secretary?

19             THE WITNESS:  Director.

20             THE COURT:  Okay.  Do you know whether he thought

21   that was a justification for them coming back to his agency and

22   asking --

23             THE WITNESS:  I have no recollection.

24             THE COURT:  All right.  These are the justifications

25   they offered.  I think we've got that down.

1    BY MR. ROSENBERG:

2    Q.  These are the justifications you provided?

3    A.  Yes.

4    Q.  Is that because you have to provide a justification of some

5    sort?

6    A.  We do, absolutely.

7    Q.  The President's executive order is a publicly available

8    document?

9    A.  Yes.

10   Q.  And everyone at CFPB received Acting Director Vought's

11   email?

12   A.  Yes.

13   Q.  Okay.  Did the RIF notices ever go out?

14   A.  No.

15   Q.  Did you ever receive final authorization to send out RIF

16   notices?

17   A.  No.

18   Q.  Do you have an understanding as to how many employees,

19   approximately, would have been subject to the RIF notice, had

20   it gone out?

21   A.  It was different than what was submitted to OPM and there

22   is a reason for that.  But if the RIF had taken place, it would

23   have been approximately 7- to 900 employees.

24            THE COURT:  Did you say 720?

25            THE WITNESS:  700 to 900.

1    BY MR. ROSENBERG:

2    Q.  And why was it -- you said it was different than what was

3    in the documentation.  Can you explain why it was different?

4    A.  Yeah, correct.  We have to reconcile the numbers because

5    when -- initially when I submitted this to OPM for 1175

6    positions, we later had to take out those employees that had

7    been terminated based off a probationary trial period, and also

8    the employees that had been terminated for not-to-exceed.

9            And then there was a third category, which we've not

10   discussed, but there were a significant number of people that

11   actually applied for and were granted the deferred resignation

12   program.

13   Q.  That's sometimes called the fork in the road?

14   A.  The fork in the road, yes.

15           THE COURT:  When was that offered in this chronology

16   we've been talking about?

17           THE WITNESS:  It was offered before any engagement

18   from DOGE.

19           THE COURT:  So before you talked about the RIF, you

20   talked about employees who were in fact terminated.  So, how

21   many probationary employees were terminated, the one-year ones?

22           THE WITNESS:  I don't know -- I know the one-year to

23   two-year was approximately 75 to 85 employees.

24           THE COURT:  So the combination of probationary

25   employees and trial period is 75, did you say?

1                THE WITNESS:  Correct, um-hum.

2                THE COURT:  And how many not-to-exceed term type

3      employees were terminated?

4                THE WITNESS:  There were approximately 130 employees

5      on a not-to-exceed.

6                THE COURT:  So after the stop-work email, how many

7      employees were placed on administrative leave?

8                THE WITNESS:  I could not -- that would -- I would

9      make an assumption of how many employees.  I would say that

10     most -- I would say effective the 10th of February most

11     employees were taking administrative leave.

12               THE COURT:  You say taking it like they made a

13     choice.  Were they told to take it?

14               THE WITNESS:  They were told to take it.

15               THE COURT:  But you don't know how many people were

16     told to take it?

17               THE WITNESS:  I don't.

18               THE COURT:  Do you know how many people aren't taking

19     it anymore?

20               THE WITNESS:  I don't know the specific numbers,

21     ma'am.

22               THE COURT:  Okay.  You can ask your next question.

23     BY MR. ROSENBERG:

24     Q.  Let's go back to the setup of CFPB.  I think you testified

25     that you worked with Elizabeth Warren when CFPB was set up.  Do

1    you have an understanding from that time period as to how many

2    employees were anticipated to work at CFPB?

3    A.  At the time in which I was on detail, having worked in

4    human capital and looking at the staffing plans, it was

5    never -- my understanding, it was never supposed to be above

6    1,000 people.  And I've had subsequent discussions with former

7    colleagues at that time, you know, we've said, well, this is a

8    large organization.  It's become very large.

9    Q.  Is there any other reason why you may believe that the CFPB

10   was never intended to have more than approximately 1,000

11   employees?

12   A.  The concern was -- I mean, while we're not an appropriated

13   agency, we do have a cap for how much money can be transferred

14   from the Federal Reserve to the CFPB.  So based upon, at that

15   time, the calculations of the funding that we would have

16   available was approximately 1,000 people.

17   Q.  Now, at the time that you were evaluating potential RIFs,

18   was this also the time period where you may have provided

19   statements referring to wind-down mode or closure of the

20   agency?

21   A.  Oh, yes.  Yeah.

22   Q.  Can you shed some light on that?

23   A.  I -- yes.  There were a couple of ways of looking at it.

24   Even explaining it to my staff in human capital was concerning.

25   And I was having a hard time processing what was happening, and

1    then trying to explain to them what was happening was

2    difficult.  And my reference with regards to wind-down was that

3    the way that we have to look at this, because not everybody was

4    going to be RIF in that phase -- again, they didn't use

5    "phase," I'm using the word "phase."  Not everybody was going

6    to be RIF in that phase.  Those are specific groups that were

7    identified by the new leadership to be placed on the RIF list.

8          So what I told my team was I don't know what's going

9    to end up being left and the only way I can explain what we're

10   doing right now is winding things down to some number that I

11   don't know what we're aiming towards.

12   Q.  I hate to ask you this way, but --

13         THE COURT:  Well, you said, in your declaration --

14   you admitted that at that time you talked about closure of the

15   agency and wind-down mode.

16         THE WITNESS:  Correct.

17         THE COURT:  Now, whether that turned out to be

18   correct, you said that.

19         THE WITNESS:  I did.

20         THE COURT:  And you said that based on your meetings

21   with the DOGE people?

22         THE WITNESS:  That is correct.

23         THE COURT:  They led you to understand that's what

24   they were there to do?

25         THE WITNESS:  They led me to believe that,

1    absolutely.  Yes.

2              THE COURT:  So you weren't saying wind down, resizing

3    after you spoke with them.  That's not what you were saying.

4    You're saying it now, but that's not what you were saying then.

5              THE WITNESS:  Let me clarify one piece of it.  My

6    understanding directly from the DOGE folks was that there would

7    still be statutory-required individuals representing the CFPB.

8    I didn't know how many and I didn't know how many people would

9    support those individuals.

10             THE COURT:  How do you close the Agency and do

11   statutory-required work?

12             THE WITNESS:  Well, there's -- what I understood from

13   them was there was a possibility to, one, have a small

14   presence.  I don't know where they would be, that was not

15   discussed.  Or, the second part of that was potentially some of

16   the statutory-required work could go to other FIRREAs or

17   regulators that had done the work before.

18             THE COURT:  So that would require -- how would that

19   happen?  How would things that you're statutorily required to

20   do get assigned to some other agency?  What's involved there?

21             THE WITNESS:  That I don't know.

22             THE COURT:  Does it involve Congress saying that?

23             THE WITNESS:  I would anticipate that Congress would

24   have a lot to say about that.

25             THE COURT:  So when did your impression of what was

1    happening change and why?

2            THE WITNESS:  I would say for that week, from the

3    10th through the 14th, was all focused on this action.  The

4    following week, as more people arrived on detail from the

5    Office of Management and Budget, it became increasingly clear

6    that there was, in my opinion, misalignment between the DOGE

7    people and the OMB people.

8            THE COURT:  Well, who sent out the stop-work order?

9            THE WITNESS:  That was Director Vought.

10           THE COURT:  Okay.  Keep going.

11   BY MR. ROSENBERG:

12   Q.  And just to be clear on the chronology, approximately how

13   many days after he was announced as acting director did Acting

14   Director Vought send out the stop-work order?

15   A.  Two days.

16           THE COURT:  Has it been rescinded?

17           THE WITNESS:  It's been -- he has not rescinded that

18   email, although the chief legal officer who represents him has

19   gone back and told people that they need to be doing their

20   statutorily-required work.

21           THE COURT:  That was the February 27 email that went

22   out?

23           THE WITNESS:  That was one of them, yes.

24           THE COURT:  Has he further refined what that means?

25   That means this unit, this unit, this unit, this employee, this

1    employee, this employee?

2         THE WITNESS:  Not the employee specific, but what

3    occurred was the heads -- my peers, the heads of those specific

4    programmatic areas, as they began to make recommendations to

5    the chief legal officer as to what programs they ran that were

6    statutorily required -- and I only know this because I was

7    copied on several of those emails.  But they went to the chief

8    legal officer, requested approval to begin -- reinstate that

9    work, direct their staff to do the work.  And most of that,

10   that I'm aware of, was approved.

11        THE COURT:  Well, I've been treated to many of those

12   emails, so it would be helpful to me if you would identify the

13   people you are referring to as the heads of the statutory-

14   authorized areas --

15        THE WITNESS:  Sure.

16        THE COURT:  -- who are your peers.

17        THE WITNESS:  Sure.  One of the first offices that

18   actually did what I thought was a really fantastic job of

19   laying out their information was the Office of Consumer

20   Response in Education.  They have a really -- it's one of my

21   favorite organizations within the Bureau because of the type of

22   work that they do, but their leadership is also incredibly

23   strong.  So they put forward a list of statutorily-required

24   work and positions that were needed to continue that work.  So

25   I know that that was done.  And they have been all pulled back

1    into doing what they need to do in their jobs.

2          The second office that I'm aware of is the Office of

3    Research, Markets, and Regulation.  They also took a similar

4    approach.  They included all of their statutory-required work.

5    I believe all of that has been approved to continue.  There is

6    some -- a lack of clarity, I would say, with the supervision

7    team, the examination team that goes out and examines the

8    financial institutions.

9          There has been some back and forth between the chief

10   legal officer and their management to determine, other than the

11   examination work, what other statutory work is required by law

12   to continue.  And I believe he has requested their cases, who

13   is on their cases -- you know, who they're regulating, what is

14   the status of the regulation, what are some of the things that

15   he needs to consider on that.

16         My understanding, as well, is that the chief legal

17   officer, along with other OMB detailees have been working

18   directly with the office of enforcement to determine which

19   cases should remain litigated, through the litigation process,

20   and then also I understand, from what I've read publicly, is

21   that some of those cases have been pulled back from the core

22   system.

23         The Consumer Affairs division, most of their work --

24   again, the head of that organization also submitted a request

25   to the chief legal officer and all of it was approved based on

1   their recommendation, except for moving forward with one of the

2   FCRA required committees in statute.

3            THE COURT:  Some of the emails, there's some

4   information going back saying if you request this, you may have

5   to be approved by outside parties.  Who is that?

6            THE WITNESS:  Outside parties presumably would be the

7   acting dir -- I don't know.  I actually don't know, ma'am.

8            THE COURT:  So when they say you have to get

9   approval -- we're going to have to get approval from outside

10  parties, you don't know what that means?

11           THE WITNESS:  No.  I just know that I had the

12  discretion to approve operational matters to keep the engines

13  running within the organization.  Everybody else I encouraged

14  that they needed to go to Mark Paoletta, the chief legal.  I

15  don't have that authority.

16           THE COURT:  So you don't know, when people were told

17  we're going to have to get the approval of outside parties, you

18  also don't know who they're referring to when they said and

19  they want to know the names of who is requesting?  So you don't

20  know who is asking for names?

21           THE WITNESS:  No, no.

22           THE COURT:  So what about the hotline that was set up

23  where people could call if they thought somebody else was

24  working when they weren't supposed to be working and report

25  them?  Now that there's so many people that are supposed to be

1    working, is that still up and running?

2              THE WITNESS:  I was not aware of that until this

3    case.

4              THE COURT:  So you don't know if it's still up and

5    running?

6              THE WITNESS:  I was not aware of that hotline until

7    this case.  I was surprised that that occurred.

8              THE COURT:  Okay.

9              THE WITNESS:  And I don't know who authorized -- I

10   have no background on that whatsoever.

11             THE COURT:  Okay.  All right.

12             MR. ROSENBERG:  So, Your Honor, there was one last

13   issue on RIF that I wanted to address with the witness and then

14   I was actually going to go to the final two topics, which is

15   where the Court went just now, concerns contracts and, you

16   know, the activities of the agency.  And I don't know if the

17   Court wants me to skip ahead to that topic and then circle

18   back?

19             THE COURT:  If you have two questions on RIFs, you

20   can ask two questions on RIFs.

21             MR. ROSENBERG:  It's more than two, and it's

22   important.

23             THE COURT:  Ask whatever you think needs to be asked

24   to establish the record that you're trying to establish.

25             MR. ROSENBERG:  Okay.

1    THE COURT:  But I don't think you have to ask him

2    what somebody else meant by something they wrote.  He doesn't

3    know.  Okay.  Go ahead.

4    MR. ROSENBERG:  Understood.

5    BY MR. ROSENBERG:

6    Q.  Have circumstances changed since the week of February 10th

7    regarding potential for RIFs?

8    A.  Yes.

9    Q.  How so?

10   A.  We had a cooling off period, then there was guidance issued

11   by Director Vought to all federal agencies with a roadmap for

12   agencies to consider in running RIFs across government.

13   Q.  And when you say Acting Director Vought, you're referring

14   to Director Vought in his capacity as the head of the Office of

15   Management and Budget?

16   A.  That is correct.

17   Q.  I actually have a document that's not in the binder, but I

18   have copies for everyone.  It's the OMB memo to which the

19   witness is referring.

20   MR. ROSENBERG:  Permission to approach?

21   THE COURT:  Yes.  And you don't have to ask anymore,

22   just --

23   MR. ROSENBERG:  I think I have given it to everyone,

24   but if not, someone can raise their hands.

25   BY MR. ROSENBERG:

1    Q.  Is this the memo to which you referred just now?

2    A.  I don't have the memo, but based on what I saw, you --

3    Q.  It's right here (indicating).

4    A.  Oh, I'm sorry.  Thank you.

5              Yes, this is the memo that went out from Director

6    Vought.

7    Q.  In his capacity as the head of --

8    A.  OMB.

9    Q.  -- OMB.  Because he's dual-hatted?

10   A.  Yes.  And it's a collaborative memo that went out on behalf

11   of both OMB and OPM, which is not uncommon.

12   Q.  Do you have an understanding as to what would happen at

13   CFPB if this Court were to lift its temporary order regarding

14   the reduction in force or termination of employees in light of

15   this memo?

16   A.  My instructions right now is that we are to follow what

17   Director Vought has ordered for the rest of government and

18   intends that we apply it to the Bureau.

19   Q.  And I'll ask you to turn to page 2 of the memo.

20             Do you see where -- I'm going to read this to you.

21   Toward the top of page 2, under No. 5, it says:  Pursuant to

22   the President's direction, Agency should focus on the maximum

23   elimination of functions that are not statutorily mandated

24   while driving the highest quality, most efficient delivery of

25   their statutorily-required functions?

1    A.   Correct.

2    Q.   Do you have an understanding as to whether CFPB is

3    analyzing that in the context of complying with this memo?

4    A.   I understand that Director Vought and his staff are

5    evaluating the work of the Bureau to come up with that

6    decision.  I also understand that we have possibly an incoming

7    director coming in very soon, who I'm sure will have feedback

8    and opinions on this.

9    Q.   When you say in-coming director, that would be a Senate

10   confirmed?

11   A.   Senate-confirmed position.

12   Q.   Do you see -- one more passage here, about the middle of

13   the page.  Agency should review their statutory authority and

14   ensure that their plans and actions are consistent with such

15   authority.

16   A.   Yes.

17   Q.   CFPB conducting that analysis?

18   A.   Yes.

19   Q.   Are you aware of any discussion to the contrary?

20   A.   No.

21   Q.   Has anyone from -- has anyone affiliated with DOGE

22   indicated or asked you a question regarding RIFs following

23   this -- the issuance of this memorandum?

24   A.   Yes.

25              MR. ROSENBERG:  Okay.  I have one more document, this

1    is -- this is an internal text message.  We did not become

2    aware of it until after Friday's filing.  But with the Court's

3    permission, after this hearing we can file this on the public

4    docket.

5              THE COURT:  All right.

6    BY MR. ROSENBERG:

7    Q.  Take a moment to look at that text message.  And to speed

8    this along, I'll represent this is a text message from

9    Christopher Young, with a CFPB account, asking you, says:  Good

10   afternoon.  Just trying to get a sense of our current status.

11   Should the Judge lift the TRO on March 3rd, are we prepared to

12   implement the RIF?  Do you see that?

13   A.  Yes.

14   Q.  And you responded.  Can you read your response, please?

15   A.  Hi, Chris.  Good afternoon.  A discussion with Mark P. --

16   Paoletta -- is needed.  Our new team have been assessing over

17   the past several weeks and new guidance was issued a week ago

18   from OMB regarding how agencies should be approaching workforce

19   reshaping.

20   Q.  What is your understanding --

21             THE COURT:  As far as this says, he thought the only

22   thing in his way was the TRO, which actually was a consent

23   order, is that correct?

24             THE WITNESS:  Yes.

25             THE COURT:  Do you want to ask another question?

1          MR. ROSENBERG:  No, I -- I was only going -- the last

2     question I had on this is:

3     BY MR. ROSENBERG:

4     Q.  Sitting here today, what is your understanding as to how

5     CFPB intends to proceed with regard to any potential future

6     RIFs?

7     A.  My understanding and my direction -- and this is something

8     I've been working with my direct staff in human capital on the

9     last ten days, I would say, is that we need to put together

10    processes and a proposal for what -- not with regards to who

11    gets RIF'd or what parts of the origination, but a process in

12    place based upon the requirements of the OMB order and

13    instructions.

14          There's also -- just to note, there is absolutely no

15    way we will be able to meet the deadline that's in this

16    memorandum.  That is something I also shared with our team.  We

17    won't be able to meet that because I don't know -- I need

18    information from our leadership to tell me where we're headed.

19          THE COURT:  Has anybody asked the people to tell you

20    exactly what they think their statutory duties are and what

21    they need to support them?  Has everybody received that from

22    the top down?  You said it's a top down organization and I keep

23    seeing the people at the top saying to the people at the

24    bottom, you need to tell us.  So has everybody been told,

25    across the board, you tell me exactly who is needed, you tell

1    me exactly which contracts are needed?

2            THE WITNESS:  Contracts, yes.  Mission programmatic,

3    I don't know.

4            THE COURT:  Okay.  And on February 27th is the first

5    time after February 10th we get the Paoletta email telling

6    everybody actually -- it said no work, but that didn't meet

7    statutory-authorized, so he reverts back to the language from

8    February 8th, that's correct?

9            THE WITNESS:  Correct.

10           THE COURT:  But then it's 3:30 p.m. on the Sunday

11   before the last hearing when he goes:  Do your statutorily-

12   required work and you don't have to ask anybody for permission

13   first.  So up until that point they still had to ask for

14   permission?

15           THE WITNESS:  That was my understanding of what

16   people were doing, yes.

17           THE COURT:  And what happened after that -- it went

18   out Sunday, it looks like on Monday, while we were all here in

19   court, a lot of the supervisors are saying, well, wait, what do

20   you mean?  Do I have to ask permission?  Do I not have to ask

21   permission?  There was a little bit of confusion going on in

22   the building.  Is that fair to say?

23           THE WITNESS:  There was a lot of confusion in the

24   building.

25           THE COURT:  Would you say there's still a lot of

1    confusion in the building?

2              THE WITNESS:  I would say, from a lot of accounts,

3    there's still a local of confusion about what's going on.

4              THE COURT:  So is there any plan for somebody to

5    clearly call everybody together and say do your work?

6              THE WITNESS:  I don't know.

7              THE COURT:  Next question.

8              MR. ROSENBERG:  I'm just curious, I'm going to ask a

9    question to which I don't know the answer.

10              THE COURT:  Risky.

11              MR. ROSENBERG:  Risky, but I'm willing to roll the

12    dice.

13    BY MR. ROSENBERG:

14    Q.  Would you say that there's less confusion today than there

15    was a couple week ago as to what functions --

16    A.  There's less confusion today.  I think there's hope.  I

17    have hope for the future.  I think that people are -- I think

18    people want to go back to work and they want to do the work

19    they were hired to do.

20              THE COURT:  So sitting here right now, you think

21    there's still people not working?

22              THE WITNESS:  It would not surprise me if there were

23    people still not working.

24              THE COURT:  I think I asked you this earlier:  You

25    can't tell me how many people have come off administrative

1    leave to do this statutorily-authorized work that everybody is

2    committed to having them do.

3               THE WITNESS:  I cannot answer that, ma'am.

4               THE COURT:  Okay.

5    BY MR. ROSENBERG:

6    Q.  We're going to walk through, though, some of those emails.

7          I don't know, let me ask the witness:  We've been going

8    at this for an hour and a half, are you okay?

9    A.  I'm okay.

10              MR. ROSENBERG:  Is the Court okay proceeding?

11              THE COURT:  I'm fine.

12              MR. ROSENBERG:  Okay.  Great.  I think we should

13   turn, then, to the topic that the Court is most interested in,

14   and I'll just preview that we're going to --

15              THE COURT:  At 11 o'clock, after an hour and a half.

16   Okay.  Yes.

17              MR. ROSENBERG:  Like to end at a high note.

18              THE COURT:  Let's turn to it.

19   BY MR. ROSENBERG:

20   Q.  There's actually two topics.  We're going to walk through

21   some of the contracting issues and then we're going to walk

22   through the people who are working in statutorily required

23   areas.

24          So let's start with contracts.  Did DOGE-affiliated

25   folks within CFPB look at CFPB contracts?

1    A.  They did.

2    Q.  Was this the first time that CFPB evaluated the number of

3    contracts that it had?

4    A.  No.

5    Q.  Can you tell us, were you involved in a previous analysis

6    in some way, shape, or form of a number of contracts?

7    A.  There were a handful of analysis that I conducted when I

8    started again in 2023.  It was during the Supreme Court case,

9    we didn't know if we were headed towards being appropriated or

10   not.  It was a desire to look at all of the contracts.  I was

11   directed, along with our general counsel and some of my

12   employees, to look at every single contract to determine if

13   they were necessary for the agency to continue, or could they

14   potentially be cut?

15          And then the second most notable time was we, over

16   the past year, have gone pretty close to hitting our cap in

17   terms -- our budget cap of how much money we can transfer from

18   the Fed.  So with that in mind, the director was very concerned

19   about contracts and instructed my staff and I to try to pinch

20   pennies as much as possible.

21   Q.  When you say the director, you mean Director --

22   A.  Director Chopra.

23   Q.  -- Chopra from the last administration?

24   A.  Yes.  Correct.

25          THE COURT:  When you talk about you're doing it,

1    you're still talking about operations, or was somebody doing it

2    on the programmatic side, too?

3            THE WITNESS:  They were doing it on the programmatic

4    side as well.  Again, top-down approach.  There wasn't a lot in

5    the past of formulating a budget with a consensus process.  The

6    past 18 months, I would say, to two years, there's been more

7    of -- more engagement from the programmatic and operational

8    components to have the opportunity to go through their

9    contracts to determine if they were still needed.

10           The other thing the director did, if I may, is he had

11   our CFO do a -- a data called "all the staff," inviting them to

12   identify any contracts or cost savings that they could identify

13   to try to reduce costs to the Agency.

14           THE COURT:  When the order was issued in this case to

15   terminate them all, what date did that happen and who did that

16   come from?

17           THE WITNESS:  That was the week of the 10th.  It was

18   during the same exact time that the RIF process was in place.

19           THE COURT:  Did you do an analysis like you're

20   talking about here?  Did you provide anybody with that

21   analysis?

22           THE WITNESS:  The staff did not.  The staff did not.

23   There was a small data culling on a subset of contracts that

24   were identified by the General Services Administration to us,

25   saying you need to look at these consulting contracts to

1    determine if they are still needed or not and make your case

2    for that.  The CFO did go out to the heads of those

3    organizations and ask them for a justification on it.  But, the

4    big piece of what DOGE did was the whole population of

5    contracts that they had pulled.

6          THE COURT:  And so as a follow up to these emails oh,

7    you're supposed to do what's statutory authorized, with a what

8    they have to do is put the contracts back.

9          THE WITNESS:  Yes.

10          THE COURT:  And is that an easy thing to do?

11          THE WITNESS:  It was easier -- the time made it

12    easier to do that.  The contracts that were run through our

13    normal procurement shop requires a 30 day notification to

14    contractors of the agencies intent to terminate the contracts.

15    So my understanding is, as the acting director and his staff

16    started to get a lot more engaged in the organization and

17    identified potential gaps in having contracts to fulfil the

18    statutory requirements, they started to pull back.  And those

19    lists were going to the CFOs team to contract the contractor

20    and say we're not going to cancel the contract.

21          THE COURT:  So is it fair to say that there's thought

22    going into it but only after, it's like shoot first and ask

23    questions later.

24          THE WITNESS:  That's what it felt like.

25    BY MR. ROSENBERG:

1    Q.  Let's talk about the reinstatement of these contracts,

2    since we're on that topic.  I think you may need to switch

3    binders, back to the government's binder.  In other words, the

4    binder containing the documents provided by CFPB.  And I'm

5    going to ask you to turn to tab 49.

6        And just for the record, this has a Bates number at the

7    bottom right-hand corner, CPFB_00117.  It's an email from you

8    to Jafnar Gueye, the chief financial officer, and a few other

9    folks.

10   A.  Correct.

11   Q.  You wrote this email?

12   A.  I did.

13   Q.  And the email refers to a conversation that you had with

14   Mark P.  Is that Paoletta --

15   A.  Mark Paoletta, um-hum.

16   Q.  -- chief legal officer?

17       Is it fair to say that at this point in time he is

18   functionally running the agency?

19   A.  Yeah, I would consider Mark Paoletta to be our chief of

20   staff or staff director for the organization at this point.

21   Q.  Mr. Vought's email, I think, referred to him -- any

22   questions, to contact Mr. Paoletta through -- or, contact him

23   through Mr. Paoletta?

24   A.  Yeah.

25   Q.  There's reference to a master list of contracts, the status

1    of each, and a description regarding their support of

2    statutory/regulatory mandates, as well as a reference to a

3    master spreadsheet.  Can you tell us about those?

4              THE COURT:  Can you get me back to which document

5    you're looking at again?

6              MR. ROSENBERG:  Sure.  It's in our binder, tab 49.

7    And it's the document with the Bates number CFPB_00117.

8              THE COURT:  All right.  So as of February 18th,

9    contracts are either work-hold or terminated?

10             THE WITNESS:  Yes.

11             THE COURT:  And as of today, do you know what percent

12   of the contracts have left one of those two statuses?

13             THE WITNESS:  Most of them have been reinstated.  The

14   majority of the contracts have been reinstated, although the

15   chief financial officer has been also taking this seriously, to

16   also not irresponsibly turning everything on that we don't

17   need, to try to save money in that case.  But, yes.

18             THE COURT:  Well, in fact, he sent out a reminder

19   that if you think your contracts need to be reactivated, you

20   have to be prepared to not only provide succinct justifications

21   to him, but to justify them to outside partners.  You were

22   copied on that, too, weren't you?

23             THE WITNESS:  I was.

24             THE COURT:  Did you know what that meant?

25             THE WITNESS:  Yeah, I -- the chief financial officer

1  who, I appreciate, comes from other agencies that go through an

2  appropriated process.  So, in that appropriated process it's

3  very common to go through their contracts to determine if

4  you're not appropriated, what can you give up so that you don't

5  have to run a RIF or do something crazy.

6          I don't know who the other people are, but that --

7          THE COURT:  That was my question.  No one is

8  suggesting that there's anything wrong with evaluating your

9  contracts.

10         THE WITNESS:  I don't know the other people.

11         THE COURT:  The plaintiffs' concern is that you

12 started evaluating after you cancelled them, as opposed to

13 before.

14         THE WITNESS:  Correct.

15         THE COURT:  Then my question was:  Well, who's being

16 involved in the evaluation, besides the people that you're

17 telling me are in charge?  And you don't know that answer?

18         THE WITNESS:  Correct.

19         THE COURT:  Go ahead.

20 BY MR. ROSENBERG:

21 Q.  But you referred to, I think, in your testimony earlier, a

22 process whereby the new Bureau leadership -- and if I'm

23 mischaracterizing this in any way, let me know -- but, starting

24 to get its arms around the Bureau's statutory responsibilities

25 and what was needed to fulfil those?

1   A.  Yes.

2   Q.  Does this email, in your opinion, reflect that process?

3   A.  Yes.

4   Q.  All right.  Turn to the next tab, which is tab No. 50.

5   There's a document with a Bates number in the lower right-hand

6   corner, CFPB_00118?

7   A.  Yes.

8   Q.  This is an email from Mr. Paoletta to you and the chief

9   financial officer, one other individual, the next day.

10  A.  Yes.

11  Q.  He says:  To follow up on my conversation with Adam just

12  now, I am directing you to not terminate or suspend any

13  contracts without specific authorization from Acting Director

14  Vought or me.  Please let me know if you have any questions.

15       What is the conversation to which he's referring?

16  A.  The conversation I had with Mark was a bit of what I

17  perceived as frustration on his end about some of the contracts

18  that were going to be terminated or cut off and not having the

19  ability to access those contracts to meet some of the statutory

20  requirements that he was reviewing at the time and understood

21  why there was a necessity for the contract.

22            THE COURT:  Who is the "he" in that sentence?

23            THE WITNESS:  Mr. Paoletta, Mark Paoletta.

24  BY MR. ROSENBERG:

25  Q.  I think we're discussing a timeline, but, this is only

1   approximately a week or so after the initial termination of

2   some of these contracts?

3   A.  Yes.

4   Q.  Since this email was sent on February 19th, are you aware

5   of whether any contracts that are necessary to perform

6   statutory functions have been terminated?

7   A.  I'm not aware of contracts being terminated after this.  I

8   think --

9           THE COURT:  After this?  What is "this"?

10          THE WITNESS:  After the 19th.  February 19th email

11  from Mr. Paoletta.

12          MR. ROSENBERG:  Let me see if I can summarize.

13          THE COURT:  We've gotten email from the head of

14  Research, Monitoring, and Regulation on March 3rd, after they

15  were all told on March 2nd not only should you be doing

16  statutory-authorized, but you don't have to ask.  He said we

17  would do it, but we lost our people.  We lost our contractors

18  and we lot our data.

19          On February 27, after he said everybody do your

20  statutory-authorized work, the Consumer Response Center said,

21  yeah, but we need the people.

22          THE WITNESS:  Right.

23          THE COURT:  We can't do it without people.  Office of

24  Fair Lending said we can't do what we did do without talking to

25  people, but we have to get permission to talk to people.

```
 1                THE WITNESS:  Right.
 2                THE COURT:  So, just saying statutory-authorized
 3        doesn't really answer the question, does it?
 4                THE WITNESS:  No.
 5        BY MR. ROSENBERG:
 6        Q.  Some of the documents to which Judge Jackson referred are
 7        documents we're going to ask you about.
 8        A.  Yeah.
 9        Q.  I think you said that there was some confusion over what
10        was authorized and what was not.  But, over -- Mr. Paoletta did
11        send an email that if there were any questions, people should
12        contact him, is that correct?
13        A.  Yeah, that's correct.
14        Q.  And indeed, Acting Director Vought's February 10th email, I
15        believe, directed that if individuals had any questions
16        regarding urgent matters, that they should contact
17        Mr. Paoletta, is that correct?
18        A.  And some staff at the staff level did, they did reach out
19        to him.
20        Q.  Relatively quickly, what was the timeline, if you can
21        recall?
22        A.  There were a couple of high-priority issues that would have
23        been devastating had it stopped.  And in one case the manager
24        went to Mark and said we have a problem here.  Mark looked --
25        assessed the situation and said please do not stop work on
```

1     this, please continue moving forward with this.  In fact, asked

2     the employer to confirm that he had received the email so that

3     it would continue.

4              THE COURT:  When did he get there?

5              THE WITNESS:  Mark?

6              THE COURT:  Yes.

7              THE WITNESS:  Mark was appointed the same weekend as

8     the DOGE.  It would have been on the 10th -- 6, 7, 8 -- 9th.

9     9th and 10th of February.

10    BY MR. ROSENBERG:

11    Q.  Do you know if -- what the status of Mr. Paoletta's

12    computer access was at CFPB when he first started?

13    A.  My recollection is that all of the OMB staff were provided

14    and provisioned laptops and email addresses immediately upon

15    entrance.

16    Q.  And like acting Director Vought, is Mr. Paoletta dual-

17    headed?

18    A.  He is.  He is.

19    Q.  What is his other job function, if you know?

20    A.  The work that I have personally been working with him on is

21    not legal work per se, it's advisory management responsibility,

22    such as a senior advisor or a chief of staff role.  You know,

23    he's been providing management guidance to me, but I also

24    understand that he is the full-time OMB general counsel, if I'm

25    not mistaken.

1    Q.  Okay.  I would like to turn to tab No. 51, which is a

2    document CFPB_00119.  That's an email.  I would like you to

3    look at the bottom of this email chain.  It's from Anthony

4    Licata to you and various other people, and then there's a

5    series of responses to that email chain.

6        But to summarize, Mr. Licata's email says:  Mark

7    Paoletta directs that the termination notifications issued for

8    the contracts identified in the spreadsheet be rescinded or

9    withdrawn and if any have already been so terminated, that such

10   contracts be reinstated.

11       Then there's a follow-up from Mr. Paoletta:  Please

12   rescind these termination notices.  I do not believe they have

13   gone into effect and want to make sure there is no

14   interruption.

15       And then Mr. Gueye, the chief financial officer,

16   responds:  We've sent continuance notices to all vendors on the

17   list and are waiting for confirmation.

18       What is your understanding of what prompted this email

19   chain?  And do you have an understanding of the result of it?

20   A.  Yeah.  So, at the very beginning Director Vought's tenure

21   with us, there were only a couple of people that were on the

22   team.  Anthony Licata was one that was brought in specifically

23   to help do some analysis of statutory-required work.  And as he

24   started to look at the contracts and work directly with our

25   CFO, he assessed it and determined that some of those contracts

1    should not be turned off.

2    Q.  And is it your understanding that contracts pursuant to

3    this email exchange have been reinstated?

4    A.  Yes.

5    Q.  Okay.  One second please.  One moment.

6         I would like you to turn --

7         THE COURT:  Is there any consultation with the heads

8    of each of the programmatic areas?

9         THE WITNESS:  Yeah.  In fact, a lot of them were

10   identified by the heads of those organizations to say if we

11   have to -- if we are expected to do the statutory work, these

12   are the contracts that we must have to do it.  That's how I

13   think -- that engagement is, I believe, is what started to

14   really change the way that things were moving forward in the

15   new way.

16        THE COURT:  So, when the parties negotiated we're

17   going to leave the contracts in place, why are you insisting

18   that that only last until Monday, as opposed to when this

19   preliminary injunction gets resolved?  Or until such time as

20   there's a new director and the agency's statutory duties are

21   restricted by Congress?  Why Monday?

22        THE WITNESS:  I can't answer that.

23        THE COURT:  Okay.  I might ask you all later.

24        MR. ROSENBERG:  I figured as much.

25        THE COURT:  All right.

1    BY MR. ROSENBERG:

2    Q.  Are you aware that plaintiffs have raised an issue in this

3    litigation regarding the preservation of data associated with

4    contractors?

5    A.  Yes.

6    Q.  Do Bureau contracts generally include provisions for the

7    preservation or return of data?

8    A.  If they go through our official procurement system, which

9    is really the only way to purchase at the Bureau, there are

10   terms and conditions that require that the contractor return

11   data that's owned by the government.

12   Q.  I would like you to turn tab 18 in the CFPB binder.

13   There's a Bates number -- at the top it will say pages 36 to 38

14   [sic], the Bates numbers will be CFPB_36 through 38.  I don't

15   think -- take a moment to look at this email chain.

16        I'll just ask:  Is it fair to say that this email chain

17   concerns the authorization of work to ensure that data is

18   preserved?

19   A.  Yes.

20   Q.  And at the top of this email, it's from Christopher

21   Chilbert.  Who is Christopher Chilbert?

22   A.  He's our chief information officer.

23   Q.  So he would have knowledge of issues surrounding the

24   preservation of data for the Bureau?

25   A.  He would.  I mean, he doesn't own the IT systems and store

1    the data, but he certainly maintains them for the agency.

2    Q.  And he says at the top of this email:  Yes, retrieving

3    Bureau data and records from contractors in accordance with the

4    terms and conditions of the contracts is authorized work.  We

5    need to ensure that it is preserved.

6    A.  Correct.

7    Q.  Did I read that correctly?

8    A.  That is correct.

9    Q.  Do you have any reason to believe that data has not been

10   preserved?

11   A.  I don't know.

12   Q.  Do you have any reason to doubt Mr. Chilbert's assertion

13   that --

14            THE COURT:  He doesn't know.  Chilbert is the one who

15   knows, he wrote something.  He doesn't know.

16            MR. ROSENBERG:  Okay.

17   BY MR. ROSENBERG:

18   Q.  If someone were to approach you to identify a contract that

19   needed to be reinstated in order to perform statutorily

20   required obligations or functions, do you think it would be

21   approved?

22   A.  Yes.  And on some of them I directed and approved myself.

23   I was willing to do that.

24   Q.  Okay.

25            THE COURT:  And some, you tell people you have to

1    talk to your supervisor and some you say you have to talk to

2    Mark?

3            THE WITNESS:  Right.  And those that I sent back to

4    Mark were heavily missioned, again programmatic related.  I

5    don't know what their intent was with that.  But if, you know,

6    there was, like, a disability intake system, and I'm, like,

7    that's -- it would be a big problem if we did not turn that

8    back on.

9            THE COURT:  Okay.

10    BY MR. ROSENBERG:

11    Q.  Just to follow up on the Judge's point, that's because

12    individual circumstances may vary depending on what the ask is,

13    is that fair?

14    A.  Correct.

15    Q.  And so when you refer to referring mission-focused requests

16    to Mark, is that because you believe that the CFPB as an agency

17    has discretion within its statutory bounds to identify how it's

18    going to execute its mission?

19    A.  Yes.

20    Q.  And is that, for lack of a better term --

21            THE COURT:  Okay, let's -- we're not going to

22    cross-examine him with your theory.  You asked him, if somebody

23    brought him a contract, would he approve it?  And I just wanted

24    to get into what kinds of contracts he has that authority and

25    what he doesn't.  That's --

```
1              MR. ROSENBERG:  Fair, fair.

2              THE COURT:  Okay.  He's a fact witness, he's not a

3    law witness.

4    BY MR. ROSENBERG:

5    Q.  Are you aware of any requests to reinstate mission critical

6    contracts that have been denied?

7    A.  No.

8    Q.  I think you testified earlier about a distinction

9    between -- let me ask it this way:  There are contracts that

10   support statutorily-required functions?

11   A.  Um-hum.

12   Q.  Is it necessarily the case that all contracts that support

13   statutorily-required functions are in fact necessary for the

14   Bureau to carry out those statutory functions?

15   A.  That's an interesting question and the answer is no because

16   even over the last 18 months, we've gone through budget

17   scenarios where there's been a lot of discussion about whether

18   or not some of the contractors, for example, were doing work

19   that staff at the agency should be doing.  So, again, I can't

20   answer that question because I don't do the analysis and that.

21   But, no, it's not the first time it's been questioned.

22   Q.  I'm going to ask you to go to tab 38 in the CFPB binder.

23   And it is Bates No. CFPB_00096 to 00097.  Note that this email

24   chain starts with the March 2nd email from Mr. Paoletta.  And I

25   promise we will get to this email shortly, the substance of it.
```

1          But for purposes of this discussion, in response to

2    Mr. Paoletta's email, Mr. Chilbert refers to restarting some

3    tasks that are stopped, and some of our T&I capacities reduced.

4    What is T&I?

5    A.  Technology and innovation.

6    Q.  If there are capacities that -- capabilities that need to

7    be restored, please let me know as soon as possible what

8    specifically is needed and for what purpose.

9          And in response to that, Mr. Gueye, who is the chief

10   financial officer, responds, and he says that the Bureau --

11   that he'll be sending out guidance shortly, that the Bureau is

12   not turning back on every contract we've had.  We're taking a

13   very narrow approach.  If the contract -- if without the

14   contract the Bureau can't meet a statutory requirement, then it

15   will be considered for reactivation.  Meaning that a contract

16   enhancing our ability to meet a statutory requirement is not

17   enough to get it back on.  It needs to be the only way the

18   Bureau can currently meet that requirement.

19          THE COURT:  Right.  He just recognized that

20   distinction in your last question.

21          MR. ROSENBERG:  Right.  Okay.

22          THE COURT:  Has the further guidance been issued?

23          THE WITNESS:  I don't believe it has.

24   BY MR. ROSENBERG:

25   Q.  Are you aware of an example of a type of contract that

1    might be -- well, let me ask it this way:  Would you

2    characterize these as nice-to-have contacts?

3              THE COURT:  I think he explained the difference

4    between -- we've been here a really, really long time and this

5    is very painstaking.  And this is not a deposition, it's a

6    hearing.  There's a factfinder here who is reading the very

7    pieces of paper that you're reading.  So I don't think you have

8    to ask obvious questions that sum up the question you just

9    asked.  I'm getting the implication of the questions that you

10   asked.

11             MR. ROSENBERG:  Appreciate that, Your Honor.  And I'm

12   ready to move on to the last topic.

13             THE COURT:  All right.  I think that we're getting

14   close to the point where we're going to need to break to give

15   people who work here lunch.  So, how long do you think you have

16   left for this direct examination?

17             MR. ROSENBERG:  Probably about 20 minutes, maybe 30,

18   tops.

19             THE COURT:  I think 30 is too long.  I'll let you go

20   for ten more and then over lunch you can reduce what you have

21   left.

22             MR. ROSENBERG:  Okay.

23             THE COURT:  All right.

24   BY MR. ROSENBERG:

25   Q.  So let's go back to Mr. Vought's February 10th email.  I

1    would like you to turn to tab 1.  The bottom of this chain --

2    this is Bates No. CFPB_00001 to 2.  The bottom of the chain is

3    Mr. Vought's February 10th email.  Do you see that?

4    A.  Yes.

5              THE COURT:  Tell me which document you're in again.

6              MR. ROSENBERG:  This is tab No. 1 in the CFPB binder.

7              THE COURT:  All right.

8    BY MR. ROSENBERG:

9    Q.  Now, if you look further up on that chain on the same day,

10   does somebody reach out to you to ask whether it's acceptable

11   to perform certain categories of work --

12   A.  Yes.

13   Q.  -- that's immediate?

14             And he refers to performing maintenance tasks to ensure

15   the HMDA application, consumer complaint database, ServiceNow,

16   and Microsoft 365 platform continue to operate.  Did those

17   tasks continue to operate, notwithstanding Acting Secretary

18   Vought's email?

19   A.  They did.

20   Q.  Turn to tab 2.  This is an email from -- it's Bates No

21   00003.  It's an email from Christopher Johnson?

22             THE COURT:  Tab one is about operational stuff?

23             THE WITNESS:  It is.  I take that back.  Yes, but --

24             THE COURT:  I mean, operational emergencies.  The

25   computers have to work, the bathrooms have to work, the locks

1    on the doors have to work.

2              THE WITNESS:  I do want to point out that the HMDA

3    application and the consumer complaint database are mission

4    critical.  They are statutorily required.

5              THE COURT:  Right.  You have to have the database and

6    you have to have the hotline.

7              THE WITNESS:  Yes.

8              THE COURT:  You have to have people to answer it

9    though, right?

10             THE WITNESS:  Yeah.  And in one of the contracts we

11   have, the contract that did remain, there are people external

12   from the agency that do pick up those phone calls.

13             THE COURT:  Are they the ones who do the response?

14             THE WITNESS:  In some cases, yes.

15             THE COURT:  Go ahead.

16   BY MR. ROSENBERG:

17   Q.  Tab No. 2.  This is an email from Christopher Johnson, who

18   is the associate director, Division of Consumer Response and

19   Education.  I believe you discussed him earlier today?

20   A.  Um-hum.

21   Q.  The first two discussions with you that the work stoppage

22   will not apply to the Bureau's consumer resource center, can

23   you describe -- I think that's actually what Judge Jackson was

24   just asking you about.  Can you describe those conversations?

25   A.  Yeah.  Yes.  I was very, very concerned about the consumer

1   response center going down.  Again, having been a constituent

2   services person, I understand the reliance on that.  I was also

3   concerned about the potential backlash that could occur

4   government-wide if those systems came down.  So, I actually

5   coordinated a discussion between Mr. Johnson and the DOGE folks

6   to help them understand why his program was so important.

7   Q.  And, again, this is the very same day as Acting Director

8   Vought's email?

9   A.  Yes.

10  Q.  Okay.  By the way, what is APOR?  It's referred to in the

11  email.

12  A.  Sure.  As I understand -- I've never seen it, but as I

13  understand, the APOR is established by our organization through

14  our research team and helps determine the housing market in the

15  U.S.  So if that goes down, people cannot get loans, is what I

16  understand.

17  Q.  Okay.  Can you turn to tab 9, please.

18            THE COURT:  Can we go back to tab 2, for a second?

19            Do you know, from your own personal knowledge -- I

20  understand that the infrastructure, the contract necessary to

21  operate the consumer hotline, the ability to leave complaints,

22  was something that you understood the importance of and you

23  made sure that it's working, but do you know what the situation

24  is in terms of whether it's operating in terms of getting back

25  to consumers?  Elevating things to the emergency case managing

1    team, resolving the things that they're calling to complain

2    about, what the timing, what the turnaround is, what the

3    backlog is compared to before February 10?  Is that in your

4    bailiwick?

5              THE WITNESS:  It is not, although our chief

6    information officer last week did email me specifically about

7    the consumer complaint center.  I think his team was very

8    curious to see what the impact was with regards to our website.

9    There was a lot of controversy about a 404 page on our website,

10   giving the appearance that it was down.  So Chris Chilbert, our

11   CIO, and their team actually did some analysis to determine

12   what the effect was on that.  And what they found --

13             THE COURT:  They found even though your website was

14   down, people could still get to the hotline.  My question is:

15   Once they get to the hotline, are you getting to them?  And do

16   you know about that?

17             THE WITNESS:  The contract employees did have access

18   to the consumers and had the access, as I understand, to

19   communicate with some of the financial institutions.  What

20   didn't exist, that was then later reinstated, were the

21   employees who needed to -- where cases needed to be elevated to

22   somebody, to take it to a different level.

23             THE COURT:  When did that get reinstated?

24             THE WITNESS:  I don't recall the specific date.  I

25   would say within the last week.

```
 1       BY MR. ROSENBERG:

 2       Q.  Actually, let's jump ahead to tab -- because this is

 3       directly relevant to your question -- tab 53, which is the

 4       analysis of the email that you just referred to, which is the

 5       analysis of the impact of the 404 on the website.  And at the

 6       bottom of that email chain, does it -- Mr. Johnson sends an

 7       email.  Is he referring to complaints submitted via the hotline

 8       or complaints submitted via the website?

 9       A.  The website.

10       Q.  Okay.  Just wanted to be clear.

11              THE COURT:  So that's different.  All right.  So we

12       don't know what that has to do with the hotline?

13              THE WITNESS:  The hotline is always open.  I don't

14       know what the numbers were with regards to the hotline, but

15       that is like the last resort for consumers.  If the website

16       goes down, which we don't ever want it to go down, then the

17       hotline would be the final resort.

18              MR. ROSENBERG:  Okay.

19              THE COURT:  Assuming it's open, is it fair to say

20       that it's only as good as the response to what people leave on

21       the hotline?

22              THE WITNESS:  The hot --

23              THE COURT:  It's important to be able to leave your

24       complaint.

25              THE WITNESS:  Yes.
```

```
1              THE COURT:  I have a long-term complaint.  I'm

2    getting charged this fee every month, what is it?  Or, I'm

3    about to be put out on the street if I don't pay my mortgage.

4    My house just burned down.  The more emergent ones.  So it's

5    great that the hotline is always open, it needs to be opened,

6    it's statutorily authorized and required.  But how it's working

7    is a question that's different than whether it's open.

8              THE WITNESS:  Correct.  I don't have the inside

9    knowledge to know who picks up the phone and who provides

10   advice or what they do on the back end of that.

11             THE COURT:  Okay.

12   BY MR. ROSENBERG:

13   Q.  Can you turn to tab 9, please.  I'll try to move this

14   along.

15        This is an email, again, from Christopher Johnson,

16   referring to a memo that is at tab 10 to Jordan Wick and Jeremy

17   Lewin.  And I don't think we need to go into the details of

18   this, other than the memo.  Does the memo outline the number of

19   employees that Mr. Johnson believed were necessary to perform

20   statutory functions?

21   A.  Yes.

22   Q.  Okay.  And then he follows up sometime later with an email

23   to Mr. Paoletta identifying the needs to -- for Consumer

24   Response and Education section to carry out its statutory

25   functions.  Did Mr. Paoletta approve that?
```

1    A.  He did.

2    Q.  Okay.

3            THE COURT:  And Johnson is the head of the Consumer

4    Response?

5            THE WITNESS:  And Education, yes, ma'am.

6            THE COURT:  Okay.

7    BY MR. ROSENBERG:

8    Q.  Turn to tab 13, please.

9            THE COURT:  Wait.  That's different, the education,

10   than the consumer response team that we're talking about that

11   deals with the hotline, or is this --

12           THE WITNESS:  It's the same group, but it's two

13   functions.

14           THE COURT:  He's the head of it?

15           THE WITNESS:  Um-hum.

16           THE COURT:  Okay.

17   BY MR. ROSENBERG:

18   Q.  Turn to tab 13, please.  Email from Frank Vespa-Papaleo --

19   A.  Um-hum.

20   Q.  -- to Mark Paoletta.  He is the head -- the assistant

21   director of the Office of Fair Lending.  What does the Office

22   of Fair Lending do?

23   A.  They protect the consumer from -- ensuring that they have a

24   level playing field, that they have the ability to get credit

25   and it's fair.

1    Q.  And just to move this along, is this another approval of a

2    request to perform statutory-required functions?

3    A.  It is.

4    Q.  Tab 14.  CFPB_00031.  It's a request regarding FOIA.  Was

5    FOIA processing approved?

6    A.  Yes.

7              MR. ROSENBERG:  Imagine that would be a relief to

8    this Court, in light of FOIA its docket.

9              THE COURT:  Very favorite thing.

10   BY MR. ROSENBERG:

11   Q.  Tab No. 16.  This one is a little bit different.  This is

12   an email from you to RMR colleagues on February 27th.  Let's

13   take a moment to look at this email, then I'm just going to ask

14   you to explain why you sent this email out.

15   A.  Amongst some of the chaos that was going on, it was very

16   clear to me that people either were not comfortable or they

17   were not reaching out directly to Mark Paoletta for guidance or

18   to make recommendations.  So this was my personal attempt to

19   try to get folks to do it.  I didn't -- as being the operations

20   officer, this is not my normal -- I don't handle these types of

21   issues, but I knew from an operational perspective, some of

22   these folks needed support, they needed to be told you really

23   can move forward and ask for support.  I attempted to do that.

24             THE COURT:  Can we go back to the email at tab 13

25   from Mr. Paoletta stating you are authorized to perform

1    statutory functions?  There's another sentence after that that

2    says:  Any action or communication to an outside party should

3    be sent to me and Daniel Shapiro for review and approval before

4    being transmitted.  Would you say that the functions that he

5    lists below involve interaction with outside parties?

6                THE WITNESS:  Yes.

7                THE COURT:  You can ask your next question.

8    BY MR. ROSENBERG:

9    Q.  Okay.  Tab 17 is a similar email to the one you just -- the

10   one that you discussed at tab No. 16, an email to LaShaun

11   Warren.

12   A.  Yes.

13   Q.  Who is LaShaun Warren?

14   A.  She's our acting associate director for community affairs.

15   Q.  Okay.  In this are you --

16   A.  Or, external affairs.

17   Q.  Similar reasons for sending this email out as the email

18   behind tab 16?

19   A.  Yes.  Yeah.

20   Q.  Can you turn to tab 26, please.  This is CFPB_59 through

21   -64?

22   A.  Yes.

23   Q.  And this is an email involving -- it actually is a

24   follow-up on the email you sent out in which Ms. Warren

25   identifies many areas for which she would like authority or

1    approval to proceed.  Just to simplify this, does Mr. Paoletta

2    approve that, with the exception of -- I think this is the --

3    when he referred to the FACA, the Federal Advisory Committee

4    Act, there was an exception to item No. 1.  Was everything else

5    approved?

6    A.  It was.

7    Q.  Can you turn to tab 20.  This is an email chain involving

8    Janis Pappalardo, the deputy associate director and acting

9    associate director for Research, Monitoring, and Regulations.

10   What does she do?

11   A.  Jan?

12   Q.  Yeah.

13   A.  She is -- right now she is our acting associate director

14   for our research arm, markets arm that does market monitoring,

15   and also our regulation team.

16   Q.  And she says to you:  In light of your email and discussion

17   yesterday, my understanding is that we can resume all regular

18   work related to fulfilling statutory obligations, including our

19   regular management activities.  And you responded:  That's

20   correct?

21   A.  That is my understanding, yes.

22   Q.  Can you turn to tab 24, please.  This is an email that I

23   alluded to earlier at CFPB_00056.  It is an email from --

24   technically from you, but it is a message from Mark Paoletta,

25   the chief legal officer.  I think the email speaks for itself.

1    So let me just ask this:  Do you have an understanding as to

2    why Mr. Paoletta sent this email?

3    A.  I'm pretty certain that he understood that there was --

4              MS. BENNETT:  Objection.  Personal knowledge.

5              THE COURT:  Do you know why he sent it out?

6              THE WITNESS:  He sent it out because there was

7    confusion about the statutory work.

8              THE COURT:  Right.  Because after the 27th, where he

9    said you should do all statutory-authorized duties, everybody

10   is asking:  Does that mean me, does that mean me, does that

11   mean me?  And, so, at 3 p.m. on the day before our hearing, he

12   said you don't even have to ask.  That's what this is, right?

13             THE WITNESS:  I don't know if that's what his

14   thinking was.

15             THE COURT:  I didn't say that's what he was thinking,

16   that's what it says.

17             THE WITNESS:  It does.

18   BY MR. ROSENBERG:

19   Q.  Do you know whether Mr. Paoletta was receiving a lot of

20   requests for authorization?

21   A.  At this point in period he was.

22             THE COURT:  And you were, too?  You were basically

23   deluged with them.

24             THE WITNESS:  I was.

25   BY MR. ROSENBERG:

```
1    Q.  Let's talk about that deluge.  Let's look at tab No 25.

2    And I'll just walk through this quickly.  Is this an approval

3    email that follows up on Mr. Paoletta's email for RMR and

4    markets?

5    A.  Yes.

6    Q.  Tab 30.

7              THE COURT:  Does this -- after the March 2nd email,

8    where it's underscored that statutorily required duties should

9    be performed, didn't even have to ask for permission, that's

10   your job.  Who decided whether an employee could then come back

11   from administrative leave and do that work?  Did they have to

12   ask their supervisors?

13             THE WITNESS:  It would be the supervisor who would

14   have directed the work.

15             THE COURT:  Okay.  And did the supervisors have the

16   authority to bring people back from administrative leave?  Is

17   that what this means?

18             THE WITNESS:  I would take it as yes, that's what it

19   means.

20             THE COURT:  Do you know?

21             THE WITNESS:  I don't know if that's what occurred.

22             THE COURT:  Do you know if that's what it means?

23             THE WITNESS:  No.  But that's the process I followed

24   for my own staff.

25             THE COURT:  Okay.
```

1              MR. ROSENBERG:  We have an email on this, Your Honor.

2              THE COURT:  I'm sorry?

3              MR. ROSENBERG:  We have an email on this very issue.

4              THE COURT:  Great.

5    BY MR. ROSENBERG:

6    Q.  Turn to tab 32, please.  This is the document starting with

7    Bates No. 00079.  And, again, I'll just walk you through.  This

8    email chain starts with the March 2nd email from Mr. Paoletta.

9    And then Christopher Johnson responds, thanking him for

10   providing clarity about the work, and says:  Consistent with

11   your direction, we're going to, you know, conduct various

12   activities.

13          Mr. Paoletta says thanks for reaching out.  Yes, please

14   reactivate staff to support your work and reach out to

15   stakeholders.  And then the -- what I point the Court to and

16   you to is Mr. Johnson's Monday, March 3rd email at 5:59 a.m. --

17   gets up early -- email to the CRE team.  Do you have an

18   understanding what the CRE team is?

19   A.  Yes.

20   Q.  What is it?

21   A.  Consumer, Response, and Education.

22   Q.  Noting that the reactivation of all CRE team members

23   full-time has taken place, has been approved.  Does that help

24   you to answer the question that the Judge asked you about --

25              THE COURT:  Well, that says what it says.  You

1  answered the question.  I don't need him to answer the question

2  now.  I mean, I take your point.  It's an important email, but

3  I don't know if you need to ask him if it's an important email.

4       MR. ROSENBERG:  I wasn't asking him if it was an

5  important email.

6       THE COURT:  All right.  So with resect to the

7  Consumer Response Center you're familiar with, we have this,

8  indicating the exact question I was asking.  Were the employees

9  reactivated?  Are you aware of similar ones for other

10  functions?

11       THE WITNESS:  I know that Jan Pappalardo sent a

12  similar email out to her team.  She shared that with me, that

13  she was going to do that.

14       THE COURT:  And what team is that?

15       THE WITNESS:  That would be research, markets,

16  regulation.

17       THE COURT:  Okay.

18  BY MR. ROSENBERG:

19  Q.  And I think we have an email on that one as well.  So if we

20  could turn to tab 43.  Give you and the Court a moment to take

21  a look at that.

22       And, again, this starts with an email from Mr. Paoletta,

23  it leads to an email chain in which Ms. Pappalardo explains how

24  work will be implemented.  And Mr. Paoletta says:  Please

25  proceed with your proposed implementation strategies.  Is that

1    the exchange that you were thinking of when you testified just

2    now?

3    A.  It's one of them, yes.  I had a separate conversation with

4    her because she was trying to form, you know, how to

5    communicate all of this with her specific team.  You know, how

6    to cascade it down to all staff.  So she came back -- that

7    happened first, and then she came back and clarified a few

8    things with Mark Paoletta.

9            THE COURT:  When you're having separate conversations

10   with people, do they tend to be by email or by phone or by

11   text.

12           THE WITNESS:  By email.

13           THE COURT:  Did you communicate with anybody by text?

14           THE WITNESS:  No.

15   BY MR. ROSENBERG:

16   Q.  In this context at least?

17   A.  No.

18   Q.  We know that you had one text exchange previously --

19   A.  Yes.

20   Q.  -- with Mr. Young.

21   A.  Oh, yeah.  I mean, I do use Teams, yes.

22   Q.  Okay.  Can you turn to tab 35, please.

23           THE COURT:  All right.  I think we are past the point

24   where I said we were going to break for everyone's convenience.

25   So we're going to do that.  And you can resume your direct when

1    we get back.

2              Just given how much time it's going to take for

3    everyone to leave the room and return, we'll start again at 2.

4              (Recess.)

5              THE COURT:  All right.  You can resume your direct

6    examination of the witness.

7              MR. ROSENBERG:  Thank you.

8    BY MR. ROSENBERG:

9    Q.  Welcome back.  I would like to circle back on two very

10   brief topics that you discussed earlier today and then I think

11   we can go to a conclusion on the resumption of activities.

12             First, I ask you to take a look at tab 56 in the CFPB

13   binder.  And this is going to be page 16.  And just so you

14   know, this is the email from Acting Director Vought on

15   Saturday, February 8th.

16             I'm going to ask you just one specific question because

17   I'm not sure whether I heard I correctly, so I want some

18   potential clarification.  One of the bullets says that CFPB

19   employees are to cease all stakeholder engagement.  Do you

20   review that as applying to consumers themselves?

21   A.  No.

22   Q.  All right.

23             THE COURT:  Well, the first time when we asked who

24   stakeholders were, you added them in the list.  So what has

25   occurred over lunch that took him out of the list?

1          THE WITNESS:  It's not -- not about consumers

2     specifically.  When I heard the question the first time, when I

3     think of stakeholder engagement, I think of folks that handle,

4     like, some of our external affairs work, where we're taking

5     policy views or regulatory views on the Agency itself.

6          THE COURT:  So stakeholders would include all the

7     other things you mentioned; banks and lenders and all the

8     organizations that you interact with as part of your daily job?

9          THE WITNESS:  Correct.

10          THE COURT:  But not consumers?

11          THE WITNESS:  Consumers I put in a whole different

12     bucket of categories.  Like, that is public facing, taxpayers,

13     public individuals that we are -- should be providing services

14     to.

15          THE COURT:  Did anybody tell you that's what that

16     meant?  Or that's just how you're reading it as you think about

17     it?

18          THE WITNESS:  That's how I'm reading it because, like

19     I said earlier in my testimony, having been working as a

20     constituent liaison in a congressional office, I know the

21     importance of what some of these agencies do to fulfil that

22     service.

23          THE COURT:  I'm not sure that there's a doubt about

24     whether you know.  That's not really what the questions have

25     all been about.

1        You can ask your next questions.

2   BY MR. ROSENBERG:

3   Q.  I want to be -- let me be very clear about this:  Did we

4   discuss this topic at lunch?

5   A.  No.

6        THE COURT:  I didn't mean you had been cued on the

7   answer.  I just wondered why you included consumers the first

8   time and took it out after.

9   BY MR. ROSENBERG:

10  Q.  One other question regarding your prior testimony.  This is

11  perhaps an admission on my part, but when you were discussing

12  RIFs, was the Office of Consumer Response and Education part of

13  the anticipated RIFs during that week of February 10th,

14  February 14th?

15  A.  No, no.

16  Q.  No.  Okay.  Then let's pick up where we left off.

17       I would like to ask you turn to tab 35.  And this is

18  another email in response to Mr. Paoletta's email of March 2nd

19  regarding the CFPB ombudsman's office.  And this email

20  indicates that the CFPB ombudsman's office team will work in

21  conjunction with the statute.  Do you have an understanding as

22  to whether the CFPB ombudsman's office is operational once

23  again?

24  A.  It is operational.

25  Q.  Now, your declaration discussed the student loan ombudsman.

1    Is that position still vacant?

2    A.  It is vacant.

3    Q.  To fill that position, what would be required?

4    A.  The director would need to identify a person, submit that

5    request to the Department of Treasury.  And I understand the

6    Treasury secretary has to make the designation.

7    Q.  All right.  Let's talk about supervision.  Can you turn to

8    tab 22, please.

9         Take a look at that email and then I have a couple of

10   questions.  And just for the record, this is tab 22 in the CFPB

11   binder, CFPB_00050 to 00052.

12        Okay.  Let me start this way:  Was there confusion over

13   whether supervision could resume their statutorily required

14   activities?

15   A.  I believe there was confusion around the type of work that

16   was required by statute that could or could not be performed.

17   Q.  And in this email chain, starting at the bottom, there's an

18   email from you to Cassandra Huggins and Calvin Hagins, on

19   February 27th, 2025.  This email appears similar in some

20   respects to the other two emails that you sent out.  But I'll

21   also note that it's missing some other information that was in

22   your other emails.

23   A.  Yeah.

24   Q.  Can you tell us what makes this email a little bit

25   different?

1    A.  I think the bullet points in the email that went out from

2    Director Vought on, I believe, the 10th -- or, I'm sorry, the

3    8th, was very clear about the type of work they should not be

4    doing.

5    Q.  How did you interpret that?

6    A.  I interpreted it as though they should not be forward

7    facing, working directly, examining financial institution.

8    Because, again, I was not clear if there were other types of

9    congressional reports or other work they should be recommending

10   to Mark Paoletta about what they would be able to continue.

11   Q.  They reach out to you via email on Friday, February 28th,

12   saying:  Adam, to be clear the February 8th email directed us

13   to cease all supervision and examination activity.  Am I

14   correct that directive still stands?

15        And you answer:  That is correct.  And then you say --

16   then you recommend reaching out to Mark -- I assume that's Mark

17   Paoletta --

18   A.  Correct.

19   Q.  -- regarding reports to Congress per statute or anything

20   like that.  And then you note that other people are raising

21   questions about reports or other statutory requirements.

22        When you say, "That is correct," what did you mean by

23   that?

24   A.  I meant what I said earlier, which is that in the

25   initial -- the email that the acting director sent out on the

1    8th stopped certain work and my belief at that time was it was

2    clear that we should not be doing examination work.

3    Q.  Now let's turn to tab 44.  This is Bates number CFPB_00111

4    to 00 --

5          THE COURT:  Whether it was included in February 8th,

6    it certainly was included February 10th, that was all work?

7          THE WITNESS:  That was all work.

8    BY MR. ROSENBERG:

9    Q.  Tab No. 44, at CFPB_00111 through 00114.  This is starting

10   at the bottom of this chain.  Yet another chain that was

11   prompted by Mr. Paoletta's March 2nd email.  And then

12   Ms. Huggins responds --

13         THE COURT:  The one at the bottom is the one you

14   showed us just before, isn't it?  The one from Mr. Martinez

15   here.  It's not the same one that you just showed us, when he's

16   explaining it to her.  This is the one that went to everybody?

17         MR. ROSENBERG:  Yes.  The email -- if the Court is

18   referring to the email on page 114, that's the -- it's from

19   Mr. Martinez.

20         THE COURT:  That's the one that went to everybody.

21         MR. ROSENBERG:  It went to everybody.

22         THE COURT:  The one we just saw was sent out the same

23   day, where it clarified if you have questions about certain

24   things, you need to talk to Mark.  That's what we just saw in

25   tab 22.  Did that come out in between?

 1          MR. ROSENBERG:  That was a few days earlier.  So the

 2    email that the witness just testified about from tab 22 was

 3    sent out on February 27th.  And that prompts -- there's going

 4    to be a series of email chains here, but that prompts one email

 5    chain, and then the email chain in tab 44 starts with --

 6          THE COURT:  On March 2nd.

 7          MR. ROSENBERG:  On March 2nd.  It's from

 8    Mr. Martinez, but it's really Mr. Paoletta.  Mr. Martinez is

 9    sending the email out on his behalf.

10          THE COURT:  Okay.

11    BY MR. ROSENBERG:

12    Q.  And just to, again, speed this along a little bit, Miss

13    Huggins responds to Mr. Paoletta's email to everyone, on Monday

14    March 3rd in the morning, asking a question about the work

15    stoppage in the February 8th email.  Do you see that?

16    A.  Yes.

17    Q.  Like I said, that was sent at 10:33.  Now I'm going to ask

18    you to turn to tab 45.

19          And this is an email -- again, it's a different -- it's

20    a branch of a different chain, but it starts with the,

21    basically, the all-hands message from Mr. Paoletta on March 2nd

22    and that email is then forwarded on March 3rd, at 12:13 p.m.,

23    to DL_CFPB_Supervision_All, and it says, you know, supervision

24    staff.  So is that -- goes to supervision staff.  And that

25    email discusses Ms. Huggins's view as to what's been authorized

1    or not authorized.

2         Now, the first question for you is:  That email was sent

3    at 12:13 p.m. on Monday, March 3rd.  But if you look back at

4    tab 44, when Ms. Huggins asks Mr. Paoletta for clarification,

5    that was Monday, March 3rd, at 10:33 a.m.   In your experience

6    in working at the CFPB, is it reasonable to expect a response

7    on a substantive email of the type that Ms. Huggins sent on

8    Monday, March 3rd, at 10:33 a.m., in less than two hours?

9    A.  Not this type of email.

10   Q.  Now let's go back to tab 44.  There's an email from

11   Mr. Paoletta responding to Ms. Huggins's March 3rd email

12   seeking clarification.  Actually, hold on one second.

13        Let's go back to tab 45 for a moment.  Ms. Huggins's

14   email to the supervision staff.  And she says, in bold, that

15   she received -- there's been some confusion regarding the

16   message we received from Adam Martinez/Mark Paoletta on March

17   2nd.  We have requested and received clarification that their

18   message was not intended to authorize the reinstatement of

19   supervision/examination activity, even though the Bureau is

20   required by law to carry out those activities.  Right?

21   A.  (Nods head.)

22   Q.  Are you aware of Mr. Paoletta otherwise -- and this is a

23   yes or no question -- but are you aware of Mr. Paoletta

24   otherwise responding to Ms. Huggins between the time that she

25   asked for advice on the morning -- at 10:33 in the morning on

1    March 3rd and the time she indicated she received guidance from

2    you and Mr. Paoletta less than two hours later?

3            THE COURT:  She wrote Mr. Martinez at 10 a.m. and

4    asked him:  Are we still supposed to do supervision

5    examination?  He said yes, but you can get clarification from

6    Mark, right?  That happened.

7            MR. ROSENBERG:  That was a week prior.

8            THE COURT:  And then she sends the email to him

9    asking for clarification.

10            MR. ROSENBERG:  Yes.  And I'll cut to the point.

11            THE COURT:  Good.

12            MR. ROSENBERG:  She asks him for clarification.  She

13    asks him for clarification in her email -- and this is in tab

14    No. 44 -- on Monday, March 3rd, at 10:33 a.m.  And then, less

15    than two hours later, she tells her staff that she's received

16    clarification regarding Mark's March 2nd email, that they're

17    not intended to authorize the reinstatement of supervision or

18    examination activity.  And the point is just to be blunt?

19            MS. BENNETT:  Objection, Your Honor.  He's just

20    testifying and reading emails.

21            THE COURT:  Right.  Well, he's telling me what he's

22    doing here, which I think is helpful.  It's not a question.

23    He's talking to me.  You can finish your thought.

24            MS. BENNETT:  I apologize.

25            MR. ROSENBERG:  The point is simply she didn't give

1    Mr. Paoletta an opportunity to respond.  She sent out an email

2    to staff purporting --

3              THE COURT:  You don't think that Mr. Martinez

4    responded?

5              MR. ROSENBERG:  He did a week prior and in his

6    response he indicated that she should check with Mr. Paoletta.

7              THE COURT:  It wasn't a week prior, it was March 3rd.

8              MR. ROSENBERG:  I think the confusion may be that

9    Mr. Paoletta's email is coming from Mr. Martinez's email

10   account.  So there was an email that we discussed at the

11   beginning, from Mr. Martinez, I believe it was on February

12   27th.  This was the email in tab 22.

13             THE COURT:  Right.  That comes out on the 27th.

14             MR. ROSENBERG:  Yes.

15             THE COURT:  But then she asks a question on the 28th,

16   and he responds, "That's correct," and she says, "That's

17   helpful," but then this conversation keeps going.  So that's

18   all on the 28th.  All right.  And February -- March 2nd is just

19   a long time after that.

20             MR. ROSENBERG:  And then Mr. Paoletta sends out his

21   all-hands email.

22             THE COURT:  Okay.

23             MR. ROSENBERG:  So she responds to that and seeks the

24   guidance from Mr. Paoletta that Mr. Martinez had recommended

25   that she seek.

```
1              THE COURT:  Right.

2              MR. ROSENBERG:  And when she seeks that guidance from

3     Mr. Paoletta, she does so at 10:33 a.m. on March 3rd.  She asks

4     him a question and says, at the bottom of that email, she says:

5     Please confirm the message you sent is not intended to

6     authorize the reinstatement of supervision examination activity

7     and the activities that support this function, despite the fact

8     that the Bureau is required by law to conduct these activities.

9              THE COURT:  Okay.  But you think that only includes

10    the conversation that she had -- the email with Paoletta.  You

11    don't think that's a broader -- that also embraces what she

12    asks Mr. Martinez?

13             MR. ROSENBERG:  It may very well embrace what she

14    asked Mr. Martinez.

15             THE COURT:  Okay.  So she jumps the gun, she tells

16    everybody:  I asked for clarification.  She asks for

17    clarification, she tells them that she didn't get it.

18             All right.  Ask your next question.

19             MR. ROSENBERG:  Including ask for clarification from

20    Mr. Paoletta.

21    BY MR. ROSENBERG:

22    Q.  So I think we're near the end of this process here.  So go

23    back to tab 44.  And this is an email from Mr. Paoletta the

24    next day, on Tuesday, March 4th, 2025?

25             THE COURT:  And he's furious with her for
```

1    countermanding his directive, as he sees it.

2              MR. ROSENBERG:  I think that's a fair

3    characterization.

4              THE COURT:  All right.

5    BY MR. ROSENBERG:

6    Q.  And he asks her to prepare -- he makes clear that

7    supervision division is to carry out its activities,

8    statutorily-required activities, and asks her for various

9    reports.

10             So, with that, let me ask this:  Are you aware of

11   whether the supervisory staff has in fact started to prepare

12   those reports?

13   A.  Only based off of her acknowledge of the receipt of the

14   email in stating that she would have her staff work on that.

15   Q.  Do you have an understanding of what the status of the

16   supervisory staff currently is?

17   A.  No.

18             THE COURT:  Is that the one where they were all told

19   they could come off administrative leave to write the report,

20   saying this is what our statutory activities are, and then they

21   had to go back on?  Am I thinking about another series of

22   emails or am I correct about that?

23             MR. ROSENBERG:  I don't know if you're correct about

24   that.  If the Court wants to point me to that.

25             THE COURT:  I don't know where it is in the binder.

```
 1            MR. ROSENBERG:  And I'm not trying -- to be clear,

 2     I'm not trying to push back, I just don't know --

 3            THE COURT:  I'm sure if it's a plaintiffs' exhibit,

 4     they'll bring it up, but there was a discussion about that

 5     which suggested that they were, at the beginning of this

 6     conversation and the end of the conversation, still on leave.

 7            MR. ROSENBERG:  All right.  I think we've --

 8            THE COURT:  To be fair, I think the supervision

 9     enforcement area is the most complicated area with respect to

10     this dispute because to engage in the supervision and

11     monitoring, you have to do an examination.  Now, if you do an

12     examination, you find something that you think violates the

13     statute, you have to make a discretionary agency enforcement

14     decision about whether I'm going to go after that bad actor or

15     not, and that's plainly -- it's statutorily authorized, that

16     there shall be an office of enforcement, but what they do with

17     their enforcement authority, I think everybody agrees is

18     discretionary.

19            But they also have reporting requirements about what

20     they found based on their monitoring and supervision and

21     examination.  So how do you comply with those requirements

22     without doing the examination?

23            So a lot depends on how much precision you use when

24     you ask the question, is that statutorily authorized, because

25     there are things that they do that they have to do and there
```

1    are things that they do that they don't have to do.  Is that a

2    fair characterization of this particular branch?  Which is why

3    I think there's so much confusion arising out of it.

4              MR. ROSENBERG:  I think that's fair.  I think we're

5    delving a little bit to argument here as -- I'm not going to

6    call "my friends," but as opposing counsel has indicated with

7    her prior objection.  I think it is also fair to infer from

8    these emails that to the extent there was confusion, that

9    people had the opportunity to seek clarification.

10             Now, maybe the Court or plaintiffs might quarrel with

11   that particular management style, but ultimately we don't think

12   that that is an issue that is teed up by the allegations and

13   legal theories of plaintiffs' complaint.  And on the facts,

14   yes, I think it's fair to infer that Mr. Paoletta was upset, as

15   he noted in his email, among other things, Ms. Huggins's

16   directive to her staff for which Mr. Paoletta did not have a

17   meaningful opportunity to respond, was leaked to the press.

18   And it characterized --

19             THE COURT:  We're not going to figure out who did

20   that here, that's not part of this.  She was -- we have the

21   emails about that question and that's just -- we're not going

22   there.

23             MR. ROSENBERG:  I'm not suggesting that we would be

24   able to figure that out.

25             THE COURT:  No, we're not.

1                    Okay.  Ask your next question.

2    BY MR. ROSENBERG:

3    Q.  What is the current status of CFPB's website?

4    A.  As far as I am aware, it's up and running.

5    Q.  404 error has been fixed?

6    A.  Yes.

7    Q.  Hold on just one moment.

8              (Pause.)

9              All right.  I'm going to ask you to turn -- I think this

10   will be the last one -- to tab No. 55.  And this is in the CFPB

11   binder.  It's Bates number CFPB_00130.  Do you recognize this

12   document?

13   A.  Yes.

14   Q.  What is it?

15   A.  It's the org structure for the Bureau.

16   Q.  Is the current structure of the Bureau accurately reflected

17   in this document, to the best of your knowledge?

18   A.  Yes.

19   Q.  Some of the names on this may be outdated?

20   A.  Correct.

21   Q.  People have left, for example?

22   A.  Correct.

23   Q.  Okay.  What I would like to do is I would like to go

24   through some of the -- since we've had a lot of testimony about

25   a lot of emails and I think the Court is interested in what is

1    up and running at the agency, I would like to go through org

2    chart and let us see if we can summarize what's up and running

3    and, you know, maybe there's some areas that still need work.

4    Okay?

5           So, let's start with -- I see at the top -- I'm not

6    going to go through every single box on this, but just the ones

7    that are relevant.  But if there's something that I don't ask

8    about that you think is important, please let us know.

9           I see deputy director for Fair Lending.  That's -- I

10   think we had testimony from you about that earlier regarding an

11   email from Frank Vespa-Papaleo?

12   A.  Correct.

13   Q.  Okay.  Is that office now up and running, to your

14   knowledge?

15   A.  Yes.

16   Q.  Okay.  See on the main -- there's sort of a long list of

17   organizations, you know, subunits across the middle of the

18   chart.  Research, monitoring, and regulations?

19   A.  Yes.

20   Q.  Is that -- to your knowledge, is that section in the --

21   basically, subsections under it, are they up and running?  And

22   if not, are there any gaps that you're aware of?

23   A.  I'm aware that they're running.  And it's been validated

24   between the head of this organization and Mark Paoletta.

25              THE COURT:  Every single one of them?  I mean,

1    "regulations" doesn't sound like something that --

2           THE WITNESS:  They've been in discussions with the

3    regulations team.

4           THE COURT:  They're doing stuff, too?

5           THE WITNESS:  I mean, yeah.

6    BY MR. ROSENBERG:

7    Q.  Again, this is to the best of your knowledge, so if there's

8    something you think is a gap, I encourage you to let us know.

9    A.  Yep.

10   Q.  And please take your time.  If you need a minute to look

11   through different functions and if there are functions -- I'll

12   just say, if there are functions that you're not sure about,

13   let us know that as well.  Okay?

14   A.  (Nods head.)

15          THE COURT:  All right.  Well, what I've been told

16   adamantly is that statutorily-required activities are up and

17   running.  And you're asking about every one of these lines on

18   the organizational chart.  It's not -- I'm pretty sure it's not

19   your position that every one of these boxes falls into the

20   statutorily-required activities?

21          MR. ROSENBERG:  That is correct.

22          THE COURT:  All right.

23   BY MR. ROSENBERG:

24   Q.  External affairs is probably not statutorily required, but

25   I think we saw an email about that.  Is that up and running?

1    A.  The functions that are statutorily required that were taken

2    to Mark Paoletta, yes, those have resumed.

3    Q.  Consumer Response and Education?

4    A.  Based off of my testimony this morning, yes.

5    Q.  I think you just testified regarding supervision that's --

6    how would you characterize -- to the extent you can, how would

7    you characterize the current status of supervision?

8    A.  No current stakeholder engagement with financial

9    institutions, but it appears to be as though there are --

10   there's reporting that's been requested for Mark Paoletta from

11   that division, in terms of their case file or files.

12              THE COURT:  Reporting of?  Tell me everything you

13   were working on?

14              THE WITNESS:  Correct.

15              THE COURT:  So they're not actively doing any

16   examinations?

17              THE WITNESS:  That is my understanding.

18   BY MR. ROSENBERG:

19   Q.  We haven't spoken much about enforcement because it's in

20   many respects outside the scope of this litigation and it's --

21   I think Judge Jackson characterized the legal requirements of

22   enforcement as being within the Agency's discretion.  But,

23   nonetheless, do you have any understanding as to what the

24   current status is with Enforcement?

25   A.  There's a review being done of the current caseload for

1    Enforcement.  And in what I understand from our website and

2    other material, there have been some cases that have been

3    pulled back from the court system and then others have

4    remained.

5    Q.  And when you say that, some cases pulled back, does that

6    mean some cases have been dismissed?

7    A.  Correct.

8    Q.  And there are cases that are being pursued?

9    A.  Correct.

10             THE COURT:  Mr. Rosenbeg, if he says something that's

11    really clear, please don't repeat it.  We just have to move

12    this on.

13             MR. ROSENBERG:  I'm almost done.

14             THE COURT:  I can't have this hearing all week.

15    BY MR. ROSENBERG:

16    Q.  Legal?

17    A.  Yes, they -- yes.  They have been instructed to work.

18    Q.  Operations?

19    A.  Yeah.  Most of my staff, we're not fully -- we're not

20    statutorily required, but we do support the mission as the

21    mission is right now.  So as things start moving ahead and they

22    need more assistance from my workforce, then we will have more

23    people engaged.

24    Q.  Last question:  In light of all your testimony today, how

25    would you describe the current status of CFPB's operations?

1    A.  I don't want to say normal, but we're operating.

2            MR. ROSENBERG:  Thank you.  Nothing further at this

3    time, other than to note that we, with the Court's permission

4    we will file a notice of filing with the text message and the

5    OMB memo after this hearing, so they can be part of the record.

6            THE COURT:  Before the cross-examination starts, the

7    last question was whether something was normal.  And at the

8    beginning of your testimony we talked about the initial email

9    from the secretary of Treasury being pretty normal, kind of

10   transitional kind of email.  And the first email from the

11   Acting Director Vought also, generally, pretty typical.

12            Would you say that sending out an order that says "Do

13   no work" is typical?

14            THE WITNESS:  No.

15            THE COURT:  Would you say that canceling all the

16   contracts before the analysis as to whether these are

17   duplicative, worthwhile, not worthwhile is typical?

18            THE WITNESS:  No.

19            THE COURT:  Would you say that firing all

20   probationary employees and two-year employees from the get-go

21   is typical?

22            THE WITNESS:  No.

23            THE COURT:  Would you say that trying to implement a

24   RIF without notice before the new director is even put in place

25   is typical?

1          THE WITNESS:  No.

2          THE COURT:  And would you say putting the rest of the

3     employees on administrative leave with an order to do no work

4     is typical?

5          THE WITNESS:  No.

6          THE COURT:  All right.  Your witness.

7          MS. BENNETT:  We can just use the same binders we've

8     been using for simplicity.  I have Bates numbers references

9     instead of exhibit references, but they're marked on the

10    bottom.

11         THE WITNESS:  Okay.

12         THE COURT:  I would just say that what you just did,

13    which is go to tab whatever in your binder and page whatever of

14    the PDF in the binder did not create a record because you can

15    call anything by its name, Exhibit D, Exhibit F.  It got really

16    more about the binder.  And if you're going to talk about the

17    Bates numbers, they're not in the record at all.

18         MS. BENNETT:  Those are in the record.  We're going

19    to use the Bates numbers.

20         THE COURT:  At the bottom of the page.  But when you

21    docketed things, they were like Exhibit X and XO and Exhibit S.

22    If anyone is going to read this transcript and know what you're

23    talking about, those are the names of the documents.  That's

24    why we label them A and B and C, so they can be A and B and C

25    forever.  It would help if you use your same nomenclature so

1     that if someone wants to go back and know what you're talking

2     about, they'll be able to find it.  Do you understand what I'm

3     talking about?

4              MR. ROSENBERG:  Yes.  Can I speak to that?

5              THE COURT:  I think you largely went with the tab

6     number.

7              MS. BENNETT:  To be clear, I'm going to use the

8     numbering systems for both sets of exhibits that are on file.

9     So the government submitted exhibits with Bates numbers.  I'll

10    use the Bates numbers for theirs.  We submitted exhibits with

11    exhibit letters and I'll use the letters for ours.  So anybody

12    who has the transcript afterwards can just go to the record and

13    see which document.

14              THE COURT:  Okay.

15              MR. ROSENBERG:  Can I -- and just to speak to the

16    Court's concern, I mean, we did pull these documents together

17    very, very quickly and it was a substantial volume of

18    documents.  So we weren't able -- didn't have time to put

19    specific exhibit labels on these documents, but they are all on

20    the Court's CM-ECF system.

21              THE COURT:  No, I know I have them and I know when

22    you open them up they usually said like Exhibit F or Exhibit

23    something, so I knew it was Exhibit F to somebody's

24    declaration.  I'm just saying as a trial advocacy pointer, that

25    this record will be somewhat difficult to follow for anyone who

1  is going to have to review it.  Perhaps no one will have the

2  pleasure.  We'll see.

3            All right.  Go ahead.

4                          CROSS-EXAMINATION

5  BY MS. BENNETT:

6  Q.  Good afternoon, Mr. Martinez.  I'm Jennifer Bennett.  I'm

7  an attorney for the plaintiffs here.

8            So, I just want to clarify some of your testimony,

9  because you've already submitted testimony twice in this case

10  before, right?  So once was on February 24th, you submitted a

11  declaration, and that was in support of the defendant's

12  opposition to a preliminary injunction, right?

13  A.  Um-hum.

14  Q.  And then you submitted a supplemental declaration on March

15  2nd, right?  And that was the day before the first part of this

16  hearing on the preliminary injunction?

17  A.  (Nods head.)

18  Q.  The declaration you submitted on February 24th, that was

19  submitted -- you swore that that declaration was true and

20  correct, right?

21  A.  Yes.

22  Q.  Okay.  And it was under penalty of perjury?

23  A.  Yes.

24  Q.  And same thing with your March 2nd declaration.  You swore

25  under penalty of perjury that that was true and correct?

1    A.   Yes.

2    Q.   So let's start, I just want to make sure I understand what

3    your testimony is today about -- let's start with the idea of

4    winding down the agency, closing the agency, right?

5         So in your first declaration, the one submitted on

6    February 24th, you testified that since the arrival of the

7    acting director, the new leadership is assessing how to make

8    the Bureau more efficient, right?

9    A.   Yes.

10   Q.   And so by new leadership you meant Russ Vought?

11   A.   Correct.

12   Q.   Who was appointed on February 7th?

13   A.   Yes.

14   Q.   And Mark Paoletta, who I think you testified joined around

15   the same time, the 7th or the 8th right?  He's the chief legal

16   officer?

17   A.   He is.

18   Q.   And you testified, I think, that he's also kind of serving

19   in a chief of staff kind of role now, effectively?

20   A.   Correct.  I mean my communications with Mark has not been

21   with -- as a legal matter.

22   Q.   Okay.  Understood.

23   A.   Yeah.

24   Q.   And then, in addition to assessing how to make the Bureau

25   more efficient, I think you testified in your declaration on

1    February 24th that the new leadership was working to comply

2    with the Bureau's statutory functions, right?

3    A.  Yes.

4    Q.  Okay.  And then you also testified that your operations

5    team had been mindful of those.  By which, I think, correct me

6    if I'm wrong, you meant your operations team was also being

7    mindful of the statutory obligations, right?

8    A.  That's correct.

9    Q.  And winding down an agency would not be consistent with

10   statutory obligations, would it?

11   A.  It would not.

12   Q.  Okay.  In that first declaration you didn't mention

13   anything about an attempt to wind down the agency, right?

14   A.  That is correct.

15   Q.  But by your testimony now, it had already happened by then?

16         MR. ROSENBERG:  Objection.  Vague as to what the --

17   it already happened refers to.

18         MS. BENNETT:  I'm sorry.  Fair enough.

19   BY MS. BENNETT:

20   Q.  There had been an attempt to wind down the agency, or at

21   least you thought there was an attempt to wind down the agency,

22   right?

23   A.  The week of February 10th, yes.

24   Q.  That's before your declaration?  Before your declaration

25   on --

1    A.  It was a couple weeks before, yes.

2    Q.  And you're aware that following your declaration, which

3    didn't mention this at all, multiple federal employees

4    submitted declarations attesting to this attempt that you, I

5    think, recognized to shut down the agency?

6    A.  Sure.

7    Q.  Okay.  And one of those employees is pseudonymous, but

8    their declaration is under the name of Alex Doe, right?

9    A.  (Nods head.)

10   Q.  And in your second declaration, the one on March 2nd, you

11   say that Alex Doe's testimony regarding your statements is,

12   quote, not inaccurate?

13   A.  It was not inaccurate.

14   Q.  By that you mean it was accurate?

15   A.  The documentation that was provided to you that was

16   pre-decisional, that we didn't take action on the week of the

17   10th, the accounts that she provided or he provided were

18   accurate.

19   Q.  Okay.  And the same is true, another employee, Blake Doe,

20   testified similarly.  And, again, in your declaration you said

21   that Blake Doe's statements are, quote, not inaccurate, right?

22   A.  No, they were true.

23   Q.  Okay.  And so I just want to go through, you know, what the

24   plan was then.

25        So there was, as I understand it, there was a meeting

1    with OPM to discuss large-scale termination of employees, yes?

2    A.  Yes.

3    Q.  And that happened on the 13th?

4    A.  It actually happened on the 10th of February.

5    Q.  It happened on the 10th?

6    A.  It did.

7    Q.  And then there was another meeting.  So then on the 10th

8    and then on the 11th the probationary employees were fired?

9    A.  Yes.

10   Q.  And then on the 13th the term employees were fired?

11   A.  Yes.

12   Q.  That same day there was another meeting with OPM --

13   A.  Yes, ma'am.

14   Q.  -- to discuss firing the rest of the employees, right?

15   A.  RIFing employees, yes.

16   Q.  And at that meeting you explained that the CFPB was going

17   to terminate the vast majority of employees, yes?

18   A.  That's correct.

19   Q.  It was going to do so as quickly as possible, yes?

20   A.  That is correct.

21   Q.  That's because new leadership was asking you to do it as

22   quickly as possible, right?

23   A.  That is correct.

24   Q.  And then you said that first the Bureau was going to

25   terminate -- I think the record says 1200, I hear your

1    testimony saying that included some of the already fired

2    people.  But, a very -- together, roughly 1200 people --

3    A.  Correct.

4    Q.  -- yes?

5         And it was going to do so by eliminating whole divisions

6    and offices of the Bureau, right?

7    A.  That is true.

8    Q.  Okay.  And then you said the second step of this was, one

9    step, we're going to fire, say, 1200 people, the next step is

10   we're going to, quote, reduce altogether, is that right?

11         MR. ROSENBERG:  Objection.  Misleading.  Confusion

12   between firing and pro-reductions in force.

13         THE COURT:  Reduction-in-force people don't work

14   there anymore, correct?

15         MR. ROSENBERG:  Yes.

16         THE COURT:  Okay.  You can ask your question.

17   BY MS. BENNETT:

18   Q.  So I just to clarify, at this meeting on the 13th, you

19   described essentially a two-step plan?

20   A.  Um-hum.

21   Q.  One was we're going to fire about 1200 people.  That had

22   already started taking place.  And then the second step was

23   we're going to reduce -- the Bureau is going to reduce

24   altogether, yes?

25   A.  Based upon the facts I had at the time, yes, that is

1    absolutely correct.

2    Q.  Okay.  And there's a memo in the record that basically

3    memorializes this plan, and that's at Plaintiffs' Exhibit JJ.

4    It's the first page of that.  And you don't have to turn to it

5    necessarily.  You're welcome to, but --

6    A.  Yeah.

7    Q.  And that memorandum was sent by you, right?

8    A.  Yes.

9    Q.  To OPM?

10   A.  That is correct.

11   Q.  On February 13th?

12   A.  That sounds correct.

13   Q.  Okay.  So that's almost a week after Acting Director Vought

14   was appointed, right?  Six days?

15   A.  Yes.  Sorry.

16   Q.  And the memo identifies entire divisions, offices, and

17   units that are going to be eliminated, right?

18   A.  That is correct.

19   Q.  One of those was Supervision?

20   A.  Yes.

21   Q.  And you understand Supervision to be statutorily required?

22   A.  Yes.

23   Q.  Another one Enforcement?

24   A.  Yes.

25   Q.  And you understand Enforcement as a division or a function

1    to be statutorily required?

2    A.  Yes.

3    Q.  Okay.  Another was the Office of Fair Lending?

4    A.  Yes.

5    Q.  And that's statutorily required?

6    A.  Yes.

7    Q.  Division of Research, statutory, yes?

8    A.  Yes.

9    Q.  That's statutorily required?

10   A.  Yes.

11   Q.  I won't go through.  There are many others, right?

12   A.  Yeah, of course.  My front office was on that list.  I was

13   on that list.

14   Q.  And, actually, you were on that list and somebody asked you

15   about that, right?

16   A.  Correct.

17   Q.  And you said, "I will be terminated in the second round"?

18   A.  My staff was concerned about not having -- I was okay being

19   terminated as the chief operating officer, but my staff was

20   concerned about not having a leader to help them through

21   whatever next step was possible or needed.

22   Q.  Right.  You were needed to be able to close the agency?

23   A.  Exactly.  Right.  But I was prepared, I -- yeah.

24   Q.  And that memo -- just to confirm, that memo outlines the

25   first line of cuts and then it says there will be a second

```
1    round of divisions, offices, and units that will be cut, right?

2    A.  Yes.

3    Q.  And that second round, it says, will include Operations.

4    That's your office?

5    A.  Right.

6    Q.  Research, Monitoring, and Regulations, right?

7    A.  Correct.

8    Q.  And the Division of Consumer Response, right?

9    A.  Correct.  Yes, but --

10   Q.  Just yes or no.

11   A.  Go ahead.

12   Q.  And that memo requested permission from OPM for an

13   exemption from the rules regarding RIFs or large scale

14   termination so you could move faster, right?

15   A.  Yes.

16   Q.  Again, that's all at the direction of new leadership,

17   right?

18   A.  That is correct.

19   Q.  Okay.  And you were planning to -- the direction of new

20   leadership was all of these people in the first round, the

21   1200, had to be terminated by Friday, February 14th, right?

22   A.  That's correct.

23   Q.  Okay.  And the reason for that is because there was a

24   hearing in this case on Friday, February 14th, right?

25            MR. ROSENBERG:  Objection.  Facts not in evidence.
```

```
 1              THE COURT:  Do you know why February 14th?

 2              THE WITNESS:  No, I do not know.

 3    BY MS. BENNETT:

 4    Q.  So you wouldn't have said anywhere had the TRO not been

 5    executed when it was on Friday, we would have terminated all

 6    these people?  You wouldn't have said that then because you

 7    don't know it?

 8    A.  If I had known, I would have been freaked out.  I would

 9    have said something.  I would have probably challenged it.  I

10    was unaware --

11              THE COURT:  I think that's different.  Had I known

12    that the order would be issued on the 14th is different than

13    saying I asked for the 14th because I thought that there was

14    going to be a hearing that day.  The hearing was scheduled

15    immediately after a motion for a TRO was filed.

16              MS. BENNETT:  Right.

17    BY MS. BENNETT:

18    Q.  And so, can I ask you, though, there's -- can I ask you to

19    turn to plaintiffs' Exhibit LL.  And that's an email chain

20    between you and members of the team that was executing --

21    A.  Yes, yes.

22    Q.  And so you get an email and that email is at 1:30 -- I'm

23    sorry, 1:36, right?

24    A.  Correct.

25    Q.  So you get an email at 1:36 and it's from, presumably, a
```

1    member of this large-scale termination team?

2    A.  Yes.  Yes.

3    Q.  And this email says -- wanted to make sure you are aware

4    that --

5    A.  Right.

6    Q.  -- there's a hearing on a temporary restraining order.

7    A.  Right.

8    Q.  You respond "Thank you" three minutes later, yes?

9    A.  Yep.

10    Q.  And then about ten minutes later -- if you could turn to

11    Exhibit MM.

12         So that's an email, I think, from a member of this

13    termination team that says, "We cannot wait until COB," right?

14    A.  Right.

15    Q.  Did I read that correctly?

16    A.  Um-hum.

17    Q.  So we have an email sent to you that says there's this

18    hearing that's about to start?

19    A.  Um-hum.

20    Q.  You immediately respond "Thank you," right?

21    A.  (Nods head.)

22    Q.  Then a few minutes later the team decides they can't wait

23    until the end of the day to execute these terminations, right?

24         MR. ROSENBERG:  Objection.  The individuals on their

25    email chain all appear to be blacked out.  So to the extent

1    we're referring to the team, it assumes facts not in evidence

2    as to who is on the team, who is sending these emails, and what

3    they mean by them.

4            THE COURT:  Do you know who those emails were from?

5            THE WITNESS:  I do.

6            THE COURT:  Okay.  Were they members of the

7    termination team?

8            THE WITNESS:  They were.

9            THE COURT:  Okay.  Next question.

10    BY MS. BENNETT:

11    Q.  Okay.  So just to clarify the chain of events that happened

12    here, you got an email from a member of the termination team

13    saying the hearing is happening at 2 p.m., right?

14    A.  Right.

15    Q.  You immediately respond "Thank you," right?

16    A.  Yep.

17    Q.  And then that person emails the team at OPM, I think --

18    A.  Um-hum.

19    Q.  -- that says we can't wait until the close of business,

20    right?

21    A.  They were looking -- yes.

22    Q.  And the thing they couldn't wait until the close of

23    business on was to get the documents they needed to be able to

24    execute these terminations, right?

25    A.  That is correct.

1    Q.  Okay.  And as I understood your second declaration -- and

2    now I'm thinking I misunderstood it.  I understood your second

3    declaration to suggest that essentially this was all a mistake,

4    right?

5    A.  It was not a mistake.

6    Q.  It was not a mistake?

7    A.  No.

8    Q.  So these terminations were directed by new leadership?

9              MR. ROSENBERG:  Objection.  Also vague, repeated

10   references to new leadership.  It could be unclear if who

11   plaintiffs' counsel is referring to as new leadership are the

12   same individuals as the witness believes constitute new

13   leadership.

14             THE COURT:  All right.  Well, we've seen documents

15   indicating who the new leadership was, but if you want to

16   clarify that, go ahead.

17   BY MS. BENNETT:

18   Q.  I asked you at the beginning of the cross-examination who,

19   in your view, was new leadership, right?

20   A.  Yes.

21   Q.  You said Acting Director Vought, yes?

22   A.  At the week of the 10th of February, there were two tracks

23   going on at the same time, that's what's a little bit

24   confusing.

25   Q.  Are you saying that when you say "new leadership," you say

1    sometimes you mean actual new leadership, but other times you

2    mean other people?

3    A.  Well, I use new leadership together.  But I'm not -- I

4    didn't get the impression that people were on the same page

5    about what exactly was going on.

6          THE COURT:  Was Mr. Vought the leader the day he sent

7    out the email on February 8th?

8          THE WITNESS:  He was ultimately the leader, yes.

9          THE COURT:  Was he the leader that day?

10          THE WITNESS:  Yes.

11          THE COURT:  Was he the leader on February 10th when

12    he sent out the memo saying don't work?

13          THE WITNESS:  Yes.

14          THE COURT:  So who are the people directing you

15    since -- you got involved in OPM and the RIFs, correct?

16          THE WITNESS:  I did.

17          THE COURT:  At whose direction?

18          THE WITNESS:  DOGE.

19          THE COURT:  Okay.  At that point had DOGE become

20    Christopher Young of the CFPB because he was designated?

21          THE WITNESS:  He did.

22          THE COURT:  Who would have to designate him then?

23          THE WITNESS:  The acting director.

24          THE COURT:  So Vought designated the DOGE people to

25    be CFPB people?

1             THE WITNESS:  That is correct.

2             THE COURT:  They got to tell you to go do this thing

3     with OPM?

4             THE WITNESS:  Yes.

5             THE COURT:  Okay.

6     BY MS. BENNETT:

7     Q.  Okay.  So could you turn to plaintiffs' Exhibit JJ at 1.

8     So that's an email on February 13th?

9     A.  Correct.

10    Q.  Right.  And that's before these terminations were supposed

11    to happen, right?

12    A.  That's correct.

13    Q.  Okay.  And it's from Jeremy Lewin, right?

14    A.  Yes.

15    Q.  And he's a -- I think you identified him as a member of

16    DOGE, yes?

17    A.  That's correct.

18    Q.  And that email says we owe acting Director Vought an update

19    at 10 a.m. tomorrow, right?

20    A.  Yes.

21    Q.  So they were keeping Acting Director Vought apprised?

22    A.  Yes.

23    Q.  Is it your testimony that Acting Director Vought knew but

24    didn't do anything?

25    A.  I would presume that he knew.

1    Q.   Okay.  And then at Plaintiffs' Exhibit -- can you turn to

2    Plaintiffs' Exhibit KK?

3    A.   Um-hum.

4    Q.   And that's an email from you to what I recognize to be the

5    people you've identified as people who work for DOGE, right?

6    A.   Correct.

7    Q.   And that email says, "Mark P. just happened to call me."

8    That's Mark Paoletta?

9    A.   That is correct.

10   Q.   "Mark P. just happened to call me and I was able to ask for

11   clarification and expectations for this first phase of

12   notifications," yes?

13   A.   That is correct.

14   Q.   So Mark Paoletta, whom you've identified as sort of new

15   leadership on the director side, right?

16   A.   That's correct.

17   Q.   Was in the loop about this too, right?

18   A.   Yes.

19          THE COURT:  I'm sorry.  That was KK not K?  Never

20   mind.  Now I can find it.

21   BY MS. BENNETT:

22   Q.   And in that February 13th meeting, right, Jeremy Lewin, one

23   of the DOGE members --

24   A.   Yes.

25   Q.   -- was talking to Director Vought during the meeting,

1 right?

2 A.  I don't recall having a conversation that ever transpired

3 between -- that included both of those individuals.

4 Q.  So he wasn't sort of coming in and off screen to get

5 direction from Russ, as he would put it?

6 A.  Not that I'm aware of.

7 Q.  Okay.  And you wouldn't ever have said we're being directed

8 by the director to fulfil all these requirements as fast as

9 possible?

10 A.  I have received no communications from Acting Director

11 Vought.

12 Q.  Okay.  So you were receiving communications from Mark

13 Paoletta, who's functioning as chief of staff, right --

14 A.  Correct.

15 Q.  -- and DOGE?

16 A.  That is correct.

17 Q.  And do you have -- there's no reason to believe that Mark

18 Paoletta was sort of off on a limb, right?

19 A.  That is correct.

20 Q.  And that's especially true given from these emails.  It's

21 clear that Vought was being kept updated, right?

22 A.  Presume -- well, I don't know.  I don't know.

23 Q.  You don't know?

24 A.  I don't know.

25 Q.  But the emails -- you have no reason to doubt the email

```
1    that we just read, right?
2               MR. ROSENBERG:  Objection.
3               THE COURT:  If you don't know, he doesn't know.
4               THE WITNESS:  I don't know.
5               THE COURT:  Same rules for him we had on direct.  If
6    he doesn't know, he doesn't know.
7    BY MS. BENNETT:
8    Q.  Okay.  So you have testified that your confusion was the
9    week of the 10th, right?
10   A.  Sometime, yeah.
11   Q.  How about the following week?  It seems it was cleared up?
12   A.  I don't want to say it was cleared up.
13   Q.  Um-hum.
14   A.  It was becoming -- it was moving slower.  It was moving at
15   a much more -- I don't want to say manageable pace, but we had
16   adults at the table that we were able to talk to through some
17   of these issues, which I think started to really -- there was a
18   pivotal change that next week when things started to change.
19   Q.  It was moving -- you're aware that the Court issued an
20   order on February 14th, as agreed by -- with the government
21   that prohibited mass terminations?
22   A.  Yes.
23   Q.  Right?
24   A.  Yeah.
25   Q.  Okay.  So, and you're saying after that the plan to
```

1    terminate people en masse was moving a little bit more

2    methodically, yes?

3    A.  I was re --

4           MR. ROSENBERG:  Objection.  Mischaracterizes prior

5    testimony.

6           THE COURT:  That was a little argumentative.  Put that

7    into two questions.

8           MS. BENNETT:  Sure.

9    MS. BENNETT:

10   Q.  So your testimony is after the week after this court order,

11   things started to change, yes?

12   A.  They did.

13   Q.  Okay.

14   A.  Based off of the timing, yes.

15   Q.  Okay.  And were you in a meeting on February 19th to talk

16   about these?  Large-scale terminations?

17   A.  I don't recall what the email would have -- I mean, it's

18   possible.

19   Q.  Were you in meetings the week of -- between the -- I guess

20   it would be the week of the 17th, so the following week, that

21   continued to talk about these terminations?

22   A.  Lease terminations?

23   Q.  That continued to talk about the possibility of or the plan

24   to terminate the vast majority of the Bureau's employees?

25   A.  Oh, I -- to continue a RIF process --

1    Q.  Yes.  Yes.

2    A.  -- regardless.  Yeah, of course.  Yeah, right.

3    Q.  And as part of these meetings, you stated that, quote, we

4    know the vast majority of the workforce will be terminated,

5    right?

6    A.  That was my understanding.

7    Q.  Okay.  And that's the week after the 10th?

8    A.  Yep.

9    Q.  And that could have been the 19th?

10   A.  I have no idea when.

11   Q.  Fair enough.  And you also said that you'd been speaking

12   with acting leadership about who's going to inherit the CFPB

13   administrative portfolios once the agency is closed, right?

14   A.  That's absolutely correct.

15   Q.  By administrative portfolios, you mean HR, any records,

16   FOIA?

17   A.  Like a merger and acquisitions, somebody has to inherit

18   what you have left.

19   Q.  Right.  Merger and acquisition, that's what you were

20   discussing.  And that's the week -- the following week?  That's

21   not the week of the 10th, right?

22   A.  It was not the week --

23          MR. ROSENBERG:  Objection.

24          THE COURT:  Just to make sure we don't have any

25   confusion, when you said you were speaking with leadership

1    about that, who are you talking about?

2         THE WITNESS:  Those discussions were continued with

3    DOGE at that time.

4         MS. BENNETT:  So now --

5         THE COURT:  Mr. Paoletta is not involved?

6         THE WITNESS:  Mr. Paoletta was involved, yes.  There

7    were several different discussions that we had, but not

8    specifically about how to execute the RIF.  I think they needed

9    more time to think through what he needed to do.

10        THE COURT:  I'm talking about you said you were

11   speaking with leadership, about who would inherit the

12   administrative responsibilities of this agency.

13        THE WITNESS:  Yeah, I did mention that's Mark

14   Paoletta.  And I also mentioned that to DOGE because that was

15   my concern, that also --

16        THE COURT:  I don't understand.  Why are you using

17   the word "leadership" to refer to DOGE unless you were told

18   that DOGE is now your leadership?

19        THE WITNESS:  They were designated as senior

20   advisors.

21        THE COURT:  Senior leaders of the CFPB?

22        THE WITNESS:  Correct.

23        THE COURT:  Okay.

24   BY MS. BENNETT:

25   Q.  And you -- in a that -- in these discussions you've used

1    the phrase "acting leadership."  You were discussing this with

2    acting leadership, right?

3    A.  Yes.

4    Q.  And acting leadership would presumably be Mark Paoletta or

5    Vought because those were active leadership, right?

6    A.  That's correct.

7    Q.  So these discussions were with Vought and Paoletta and not

8    just DOGE?

9    A.  I never had any discussions with Russ Vought.

10   Q.  Okay.  So they were with Paoletta --

11   A.  Correct.

12   Q.  -- and DOGE?

13   A.  That is correct.

14   Q.  Understood.  And did you say, sort of, the week after the

15   court order -- just for timing, the week after the court order,

16   did you say, still, you know, we need that entire divisions,

17   offices, and units are going to be abolished?

18   A.  Yes.

19   Q.  Okay.  And you said that plan was approved, yes?

20   A.  The competitive area plan that was developed the prior week

21   was approved, yes.

22   Q.  Understood.  And then you said the problem now is that our

23   union filed a temporary restraining order, right?

24   A.  Sure.  Yeah.

25   Q.  So the problem with -- the impediment to going forward was

1    this Court's order on the 14th?

2    A.  Yep.

3    Q.  Okay.  And then you said that in some ways the delay was a

4    blessing because it gave you more time to figure out how to

5    accomplish this wide-scale termination, right?

6    A.  Absolutely.  Yes.

7    Q.  Did you mention during this week that there was something

8    like a single point of failure with the plan to wind down or

9    close the agency?

10   A.  I know I had discussions about the fact that we needed to

11   identify single points of failure --

12   Q.  Understood.

13   A.  -- if a RIF were to occur.

14           THE COURT:  I'm not familiar with that term.

15           THE WITNESS:  Single point of failure?  Whether

16   something is dependent upon one individual or one group, and if

17   that group is eliminated, then you've eliminated all of the

18   knowledge.

19           THE COURT:  Okay.

20   BY MS. BENNETT:

21   Q.  Would you identify as at least one of those single point of

22   failures, that Dodd-Frank -- the Dodd-Frank Act identifies some

23   statutorily required offices?

24   A.  Are you asking me to list out?

25   Q.  No.  I apologize.  When you were discussing a single point

1    of failure, did you ever say one of the single points of

2    failure, or the single point of failure here, is that the

3    statute requires specific offices to exist?

4    A.  As I testified this morning, my biggest concern, which

5    would have generated a lot of controversy, was the Consumer

6    Response and Education function for the organization.  That is,

7    like, the most public-facing organization that members of

8    Congress use.

9           Anytime the system goes down with that system, we get

10   complaints.  There are people who complain about that, yes.

11   Q.  Right.  And so you said while there are specific people the

12   statute requires --

13   A.  Yes.  Oh, yes.

14   Q.  -- and you said but it doesn't require those people to have

15   any employees, right?

16   A.  That was what I understood.

17   Q.  Okay.  And then you also said and anything else we can just

18   transfer to other agencies, right?

19   A.  That was what I understood was a possibility that could

20   happen, and that's what I testified on this morning.

21   Q.  Okay.  Do you have a meeting later in the week, again, to

22   talk about the current status of closing down the agency,

23   winding down the agency?

24   A.  I mean, there were many discussions I had -- I don't know

25   which specific discussion.  I mean are we talking about OPM?

1      Are we talking about, like, my internal staff that was

2      responsible for moving some of -- I don't know what --

3      Q.  With OPM, for example?

4      A.  Yeah.  We've continued to have discussions.  We entered

5      into a memorandum of understanding with Office of Personnel

6      Management to advise about how these RIFs take place.

7      Q.  Got it.  And so did you -- so this is the week after the

8      10th.  Did you say that there was a desire to expedite

9      everything as quickly as possible last week until the TRO was

10     implemented?

11     A.  Based upon the timing, yes.  Starting on the 10th, there

12     was -- yes.

13     Q.  Yeah.

14     A.  I'm struggling this a little bit because you keep talking

15     about the TRO.  And I understand why you're making the

16     connection with that.  I think the DOGE would have been equally

17     as happy if we had terminated people on Wednesday and not

18     Friday.  I got the impression there was no specific timeframe.

19     They would have been happy if we could have fired them on

20     Monday or Tuesday, along with the other probationary period.

21          So I didn't get the impression that this was

22     specifically about the TRO.  There was a desire to unload staff

23     from the agency.

24          THE COURT:  I think her point was that the first week

25     that we talked about, the 10th through the 14th, that desire

```
 1    was very much in existence.  So when you said there was a goal

 2    to do it as fast as possible --

 3              THE WITNESS:  Yes.

 4              THE COURT:  -- that was true that week?

 5              THE WITNESS:  Yes.

 6              THE COURT:  And what you're saying is it was true the

 7    following week too?

 8              THE WITNESS:  It was true, but it was moving at a

 9    slower pace.

10              THE COURT:  Okay.  But the desire was still there to

11    do it as fast as possible?

12              THE WITNESS:  Based on my understanding, yes.

13              THE COURT:  Okay.

14    BY MS. BENNETT:

15    Q.  So you conveyed things like there really isn't going to be

16    a CFPB now, right?

17    A.  I mean, when you're RIFing that number of people and

18    functions, yes.  And, yes.  And I testified this morning as

19    well that, if I may, is that I wasn't clear about, again, who

20    was going to inherit functions.  That was not discussed.  And

21    it's not just like -- obviously, my equities was focused around

22    operational functions because that affected my team the most.

23    But, also, I did have questions about the functions of the

24    programmatic part of the house that I just did not have any

25    clarity into at all.
```

1   Q.  Because you didn't know if you were -- if the CFPB is

2   shutting down, you didn't know what was going to happen to

3   those functions, right?

4   A.  That is correct.

5   Q.  Understood.

6           THE COURT:  And nobody was asking you about what you

7   thought about it either?

8           THE WITNESS:  No.  No.

9   BY MS. BENNETT:

10  Q.  And you said the whole agency is being completely wiped out

11  within 30 days, yes?

12  A.  Well, yes, because we received the approval for a 30-day

13  notice instead of a 60.

14  Q.  Yeah.  And then you described -- and again, talking about

15  around February 20th, you described the state of the Bureau on

16  that date, right?

17  A.  When?

18  Q.  There was a meeting -- did you have a meeting with OPM and

19  part of that included a description of the state of the Bureau

20  on that date?

21  A.  Yes.

22  Q.  So at this February 20th meeting with OPM you're describing

23  the state of the Bureau.  And you say the White House has

24  instructed the CFPB to immediately, this week, shut down all of

25  our committees and advisory boards, yes?

1    A.  Yes.  Yes.  Yes.

2    Q.  You say we don't have contracts anymore, yes?

3    A.  Well, can we go back to the committees part?  So I'm

4    assuming you're referencing the FACA committees or FACA

5    counsel.

6    Q.  I am asking if you said that.  Did you say that the White

7    House has instructed the CFPB to shut down all of their

8    committees and advisory boards?

9    A.  The General Services Administration made that call.  They

10   instructed us, through Christopher Young, to terminate the --

11   there were four FACA councils committees that were stood up by

12   the Bureau, one of them was statutorily required.  And I went

13   back and said, no, we won't do that.  We have to keep that.

14   But the other ones were discretionary, based off of their

15   charter language.

16   Q.  So the White House had instructed you to shut down these

17   committees and advisory boards.  Did you also say we don't have

18   contracts anymore?

19   A.  Certain contracts, yes.

20   Q.  And you said we don't have purchase cards anymore?

21   A.  General Services Administration ordered our agency to

22   terminate all purchase cards and travel cards for the agency.

23   Q.  Okay.  So you said --

24   A.  That did not come through Vought or Chris Young or anyone

25   else.

1    Q.  I apologize for the interruption.

2         So you said we don't have contracts anymore, we don't

3    have purchase cards anymore, and we don't have travel cards

4    anymore, yes?

5    A.  That is correct.

6    Q.  You said the termination has already started for releasing

7    the headquarters?

8    A.  Yes.

9    Q.  The letters have already come off the building?

10   A.  Yes.

11   Q.  The five regional offices are in the process of being

12   eliminated?

13   A.  Yes.

14   Q.  There's a stop order across-the-board for all work

15   associated with the Bureau?

16   A.  Based off of what we've discussed today, yes.

17   Q.  That absent the TRO -- by which I think you mean the

18   agreed-upon order that we were talking about before -- that

19   absent the TRO, the majority of the CFPD's employees would have

20   been terminated?

21   A.  Prior to?

22   Q.  Yes.

23   A.  The majority, yes.

24   Q.  And you said that was just phase one, yes?

25   A.  Yes.  Yes.

1    Q.  And phase two would have been terminating the rest, yes?

2    A.  I don't know what the rest would be.  I know that there

3    would have been terminations, I just don't know what.

4    Q.  And you said that you had told Jafnar Gueye -- is that how

5    he pronounces it?

6    A.  Gueye, yeah.

7    Q.  Jafnar Gueye, who is the chief financial officer, yes?  And

8    you said that you had told him the actions that were taken over

9    the last week, I am not sure how its even repairable, yes?

10   A.  Yes.

11   Q.  And you told him I think we're in a situation where it's

12   totally unrepairable, yes?

13   A.  That's how I felt at the time, yes.

14   Q.  And you said whatever ends up being required for -- to

15   happen with the terminated employees, the reality is there

16   aren't going to be any jobs to compete for, yes?

17   A.  That is a true statement.

18   Q.  And this was February 20th.  That's four days before you

19   submitted your first declaration in this case, right?

20   A.  Correct.

21   Q.  And you didn't mention any of this in your declaration?

22   A.  I did not.

23   Q.  And you said that the new executive order -- today you said

24   that the new executive order on RIFs has made this a more fluid

25   situation, yes?

1    A.  Yes.

2    Q.  Okay.  And you said that's because that executive order

3    referred to statutes and what's required by statutes, right?

4    A.  Amongst other things, yes.

5    Q.  And the prior executive order, though, that you cited also

6    referred to legal requirements, right?

7    A.  I don't recall the specifics.  But, yeah, sounds right.

8    Q.  Okay.  I think we have copies of that somewhere.  Just

9    going to --

10                MS. BENNETT:  May I approach?

11                THE COURT:  Yes.  Yes.  You don't have to ask.

12                MS. BENNETT:  I apologize.  We don't have enough

13    copies, but I will give you one later.

14    BY MS. BENNETT:

15    Q.  So this is the executive order that you cited, along with

16    the stop-work order and the terminations that occurred and the

17    terminations that were planned, right?

18    A.  Correct.

19    Q.  And page 2, at the bottom of that executive order, little

20    c.  Do you see that?

21    A.  Yes.

22    Q.  That talks about reductions in force, right?

23    A.  Yes, um-hum.

24    Q.  And it says that they have to be consistent with applicable

25    law, right?

```
1    A.  Correct.

2    Q.  And it says -- it talks about offices that perform

3    functions not mandated by statute, right?

4    A.  Correct.

5    Q.  So this essentially has, with respect to statutes,

6    basically the same requirements as the -- that are outlined in

7    the new executive order, right?

8              MR. ROSENBERG:  Objection.  Misleading.  Calls for

9    legal conclusion.  Assumes facts not in evidence.

10             THE COURT:  You can answer the question.

11   A.  Can you repeat the question?  I apologize.

12   BY MS. BENNETT:

13   Q.  Sure.  So I think on direct you talked about the new

14   executive order calling out statutorily authorized functions,

15   right?

16   A.  Correct.

17   Q.  And that's true of the old one too, right?

18   A.  Yes.

19             MR. ROSENBERG:  Objection.  Mischaracterizes prior

20   testimony.  I think his testimony was the OPM memo and not a

21   new executive order.

22             MS. BENNETT:  Understood.  Thank you for the

23   clarification.

24             So I'm going to try one more time.

25             THE COURT:  Rephrase your question then.
```

```
 1                  MS. BENNETT:  Yes.
 2    BY MS. BENNETT:
 3    Q.  So you testified that the situation became more fluid
 4    after -- thank you for the correction -- after the OPM/OMB
 5    memorandum came out?
 6    A.  Yes.
 7    Q.  And that memorandum talked about statutorily-authorized
 8    functions, right?
 9    A.  Amongst other things.
10    Q.  And this executive order, the one you relied on for the
11    prior terminations, also talks about offices that perform
12    statutorily-authorized functions, right?
13    A.  Correct.
14    Q.  Okay.  Thank you.
15         And did you have a meeting after this -- after the new
16    memorandum that we were just talking about, the OMB/OPM
17    memorandum came out, did you have a meeting after that with OPM
18    about terminations?
19    A.  We had discussions, coordination meetings with OPM about
20    what we needed from them.  But I had multiple discussions with
21    my human capital staff about the OPM memo, yes.
22    Q.  In those discussions after this memo came out, did you tell
23    them --
24                  THE COURT:  You're saying "this memo."
25    BY MS. BENNETT:
```

1    Q.  After the February 26th memorandum between OPM and OMB and

2    in those discusses you had with your team, did you tell them

3    that you would let them know if this changed anything?

4             MR. ROSENBERG:  Objection.  Assumes facts not in

5    evidence.  Confusing statement.

6             THE COURT:  I don't think so.  We've established the

7    meeting.  We've established that the meeting -- she was talking

8    about a meeting after the memorandum that you introduced in

9    evidence.  And so your question is:  At that meeting --

10   BY MS. BENNETT:

11   Q.  At that meeting did you tell your staff:  If plans have

12   changed, I'll let you know?

13   A.  Yeah, sounds right.

14   Q.  And did you ever let any of your staff know that plans have

15   changed?

16   A.  I actually had subsequent meetings with my staff to walk

17   them through following the OMB guidance and coming up with a

18   proposal on how to proactively guide our leadership.  There was

19   a lot of pushback from my staff, wanting to know what the end

20   state of the agency was, and I didn't have that information.  I

21   still don't have that information.  So what I advised my staff

22   was to do their best to try to document a roadmap to try to

23   come up with recommendations so that I could take to leadership

24   or they could take to leadership.

25             I also said that we need to make -- somehow manage

1    upward in that process.  If I am not at the agency any longer,

2    I want my staff to be successful, and being successful means

3    they need to manage upward with these individuals.  So --

4    Q.  So I heard you say -- and correct me if I'm wrong -- that

5    acting leadership, so Russ Vought, Mark Paoletta, has not told

6    you that there's any different end state, right?

7    A.  They have not mentioned about different end state.  But

8    Mark Paoletta advised me that we should be following the OPM

9    guidance issued that was issued by Director Vought.

10   Q.  Understood.  And because you're not sure what the end state

11   is, they haven't said, for example, we no longer plan to

12   conduct large-scale terminations, right?

13   A.  No.  There has been no discussions like that at all.  I

14   mean, again, I could speculate that we could have possibly a

15   new director coming in with a different vision, I don't know.

16   There's a lot of factors out there that I just am not aware of.

17   Q.  Got it?

18          THE COURT:  Has anybody told you that the end state

19   is not what you thought it was for a considerable period of

20   time, which is basically no agency, but, you know, parcel out

21   what's left?

22          THE WITNESS:  Yeah.  I mean, during the weeks from,

23   like, the 14th to, like, the 24th, 28th, Mark Paoletta

24   mentioned to me multiple times that -- how we need staff.  And,

25   I mean, there was even a question raised, I know that was part

1    of this suit as well, about the real estate of the building.

2    And Mark was kind of like, well, how many days do we have?  I

3    told him, and he said, Where is the staff going to go?

4         So there were, again, like not -- I can't just solely

5    rely off of specific details, other than sometimes I have to

6    formulate some basis to pivot at the last minute and make last-

7    minute recommendations.

8    BY MS. BENNETT:

9    Q.  So switching gears, your second declaration -- so the one

10   filed on March 2nd -- that declaration says that the new

11   leadership, including the chief legal officer, have taken a

12   methodical approach to handling the Bureau's operations, right?

13   A.  They were at that point, yes.

14   Q.  Okay.  And you stand by that testimony, that new leadership

15   have taken a methodical approach?

16   A.  Absolutely.  I -- yes.

17   Q.  And you said Acting Director Vought was appointed on

18   February 7th, right?

19   A.  February 7th, yes.

20   Q.  The evening of the 7th, right?

21   A.  Yes.

22   Q.  And on February 8th he had already sent a letter to the

23   Federal Reserve chair, Jerome Powell, saying that it was

24   unnecessary for the CFPB to draw funds from the Fed for that

25   year, right?

1    A.  My understanding, he referenced that because we had a

2    reserve fund with sufficient funding for that quarter that

3    could have been used, so we didn't have to ask for more funds.

4    Q.  And earlier -- but earlier today you testified that in

5    prior years -- recent years, the Bureau was coming close to its

6    budgetary cap, right?

7    A.  Correct.

8    Q.  So it was coming close to its budgetary cap, yet within 24

9    hours the new acting director said we're not going to need

10   money, yes?

11          MR. ROSENBERG:  Objection.  Misleading.  I believe

12   the witness's testimony regarding budgetary cap referred to the

13   amount that could be drawn down from the Federal Reserve, not

14   the amount of operating funds that the agency had.

15          THE COURT:  All right.  That's what she said.

16          MS. BENNETT:  Yeah.

17   BY MS. BENNETT:

18   Q.  So just to --

19   A.  So what's the question?  I'm sorry.

20   Q.  Just to sum -- I think --

21          THE COURT:  Juxtaposing the determination on March

22   8th that we don't need to draw more funds because we have this

23   big reserve.  But it's your testimony that under the prior

24   director there were many points where there were concerns and

25   need to review contracts to see if there was fat that needed to

1    be trimmed or duplication that needed to go because they were

2    at the cap of what they could get.

3            THE WITNESS:  Right.

4            THE COURT:  So now what's your question?

5    BY MS. BENNETT:

6    Q.  So given that situation, the acting director was, in your

7    view, methodical in taking less than 24 hours to make that

8    request?

9    A.  The reserve fund can be used however the director or head

10   of agency sees fit for funding.  And while the money was

11   allocated as what I'm calling a rainy day fund, my assumption

12   and understanding from the memo was that there was sufficient

13   money, including the reserve fund, to pay for the expenses for

14   the Bureau for that quarter without having to draw down.  And

15   again, as I said this morning, this was very similar to what

16   Director Mulvaney did when he was head of agency.

17   Q.  Okay.  And let's turn to the contracts.  You're aware that

18   on February 11th Acting Director Vought directed the

19   cancellation of all contracts supporting several divisions of

20   the Bureau, right?

21   A.  I have not seen a Director Vought email to that effect, but

22   there was an email from Mark Paoletta.

23   Q.  Okay.  Let's turn to the defendant's exhibits, Bates

24   stamped 6.

25   A.  Is it tab 6?

1    Q.  Bates stamp.  So on the bottom right of the pages there's a

2    number, that's CFPB, underscore, some number.  So we're looking

3    at CFPB_00006.

4              THE COURT:  No tab?

5              MR. ROSENBERG:  Tab 4.

6              THE COURT:  Oh, you don't know what tab they're in?

7              MS. BENNETT:  I'm just trying to use the numbers that

8    are already in the record so that you can match them up.  But I

9    can do both, if you like.

10              THE COURT:  It's hard for us to turn to something

11   unless -- are the numbers -- are the Bates numbers sequential

12   in your binder?

13              MS. BENNETT:  Yes.

14              THE COURT:  They're newly Bates stamped?  So they're

15   not the original Bates stamps?

16              MR. ROSENBERG:  The Bates numbers actually track the

17   ECF page numbers at the top of each of the documents.  So for

18   example, if you look at what's in tab 4, it's Bates No.

19   CFPB_0006, that's also at page 6 of ECF number 56-1.  So they

20   largely track -- they track that because each page number was

21   numbered sequentially when it was filed.

22   BY MS. BENNETT:

23   Q.  Okay.  So we are at tab 4, Bates No. CFPB_6, yes?

24   A.  Yes.

25   Q.  And that's an email from Mark Paoletta, right?

1    A.  Right.

2    Q.  And you're CC'd on this email?

3    A.  Right.

4    Q.  And that email says on behalf of Acting Director Vought --

5    A.  Yes.

6    Q.  -- right.

7        So that email was sent on behalf of Acting Director

8    Vought?

9    A.  Correct.

10   Q.  And it directs the cancellation of all contracts in several

11   divisions, right?

12   A.  Yes.

13   Q.  And all contracts in Enforcement?

14   A.  I don't know if that was all the contracts.  But, yeah.  I

15   mean, that's the contracts.

16   Q.  He says, "I have reviewed CFPB contracts and authorize and

17   direct the cancellation of all contracts in the following

18   divisions."

19   A.  Yes.

20   Q.  Did I read that correctly?

21   A.  Yes.

22   Q.  And the following divisions are Enforcement?

23   A.  Um-hum.

24   Q.  To all contracts in Enforcement, yes?

25   A.  Yes.

```
 1    Q.   Supervision?

 2    A.   Yes.

 3    Q.   External Affairs?

 4    A.   Yes.

 5    Q.   Consumer Response?

 6    A.   Yes.

 7    Q.   The Office of Director?

 8    A.   Yes.

 9    Q.   And all but two in the legal division?

10    A.   Correct, yes.

11    Q.   Okay.  And contracting officers, not only were they

12    directed to terminate all of these contracts wholesale, they

13    were directed to do it ASAP, right?

14    A.   Yes.

15    Q.   Okay.  And some of the contracts that were terminated had

16    already been identified as crucial to performing statutory

17    obligations, right?

18    A.   I don't know.  It's possible.

19    Q.   Okay.  Let's turn to Exhibit F in the plaintiffs' binder.

20         So that's an email from the chief financial officer,

21    right?

22    A.   Correct.

23    Q.   Asking all of the deputies to identify statutorily-required

24    contracts, right?

25    A.   Yes.
```

```
 1    Q.  And that went out before the wholesale termination, right?

 2    A.  Yes.

 3    Q.  Okay.  And then to go back to the government's binder.

 4    With apologies.  If we go to tab 2, which is Bates stamped

 5    CFPB_ 00003.

 6    A.  Yes.

 7    Q.  That's an email from Christopher Johnson, right?

 8    A.  Yes.

 9    Q.  And he's the deputy or the associate director in charge of

10    Consumer Response and Education, right?

11    A.  That's correct.

12    Q.  And he identifies several contracts that are critical to

13    the consumer complaint database, right?

14    A.  Yes.

15    Q.  The Deloitte contract, right?  The Mosaic contract?

16    A.  Yes.

17    Q.  An antivirus contract, right?

18    A.  Yes.

19    Q.  Address Doctor, right?

20    A.  Yes.

21    Q.  Provar?

22    A.  Yep.

23    Q.  And all of these contracts were cancelled, right?

24    A.  I don't recall if they were cancelled or not.  I'm sorry.

25    Q.  Okay.  And just to be clear --
```

1          THE COURT:  What's the document on which his are
2     listed?
3          MS. BENNETT:  Sure.  So the documents -- you mean the
4     email listing the required contracts?
5          THE COURT:  Yes.
6          MS. BENNETT:  That's Bates stamp CFPB_3.
7          THE COURT:  I just want to go back.  This email that
8     went out on February 12th, February 11th, we were talking about
9     what's reasonable to get a complete response.  It went out at
10    10:27 a.m. and they were supposed to respond by noon,
11    identifying all of their contracts and directly report
12    statutory requirements, right?
13         THE WITNESS:  Yes.
14         THE COURT:  Okay.  Were they all able to get that in
15    on time?
16         THE WITNESS:  They did.
17         THE COURT:  Okay.
18    BY MS. BENNETT:
19    Q.  And just so the record is clear, the email from Christopher
20    Johnson, the consumer response and enforcement lead,
21    identifying the contracts that were necessary for the consumer
22    complaint database, that was sent on February 10th, right?
23    A.  Yes.
24    Q.  And so that's the day before --
25    A.  Um-hum.

1    Q.  -- the wholesale termination of consumer response

2    contracts, right?

3    A.  Yes.

4    Q.  Which was on the 11th.

5    A.  (Nods head.)

6    Q.  Can you turn to Exhibit -- the defendant's -- it's tab 50,

7    it's Bates stamp CFPB_118.

8    A.  I think I totally got myself out of sync.  I think you're

9    going to have to walk me through which document.  I apologize.

10    Q.  No problem.  I think that's the right binder.  I think

11    we're going -- here (indicating).

12    A.  Got it.  Thank you.

13    Q.  No problem.

14        So, actually, just going back one page, so to 49

15    CFPB_117.  So this is an email from you to the chief financial

16    officer and the chief information officer, right?

17    A.  Yes.

18    Q.  And it says you spoke with Mark P. -- that's Mark Paoletta,

19    right?

20    A.  That's correct.

21    Q.  -- regarding contracts that support statutorily-authorized

22    work, or required work, right?

23    A.  Correct.

24    Q.  So that's several days after there was a hearing in this

25    case, yes?

1   A.  Yeah.  Yes.

2   Q.  The hearing in this case, the first hearing was a status

3   conference, was February 14th, right?

4   A.  I wasn't aware of the specific -- I -- yes.  I have not

5   been keeping track.

6           THE COURT:  Can you just tell me what document you're

7   on?

8           MS. BENNETT:  I'm on tab 49, CFPB_117.

9   BY MS. BENNETT:

10  Q.  So it's only after -- you're aware that sometime before

11  February 18th this lawsuit was filed?

12  A.  Yes.

13  Q.  Sometime before the 19th, right?

14  A.  Yes, of course.  Right.

15  Q.  So this email on February 18th about a spreadsheet

16  regarding contracts that support statutorily required work,

17  this email was sent after the lawsuit was filed, right?

18  A.  Yes.

19  Q.  And, in fact, it was sent after all of the contracts that

20  we were discussing before had already been terminated, right?

21  A.  The letters of intent to contractors were sent, yes.

22  Q.  Okay.  And by letters of intent, do you mean an order to

23  stop work, right?

24  A.  Either stop work or intend to cancel the contract, and the

25  contract has 30 days.

1    Q.  Understood.  So the way it works is you send a notice of a

2    termination or notice of intent, right?

3    A.  Correct.

4    Q.  And upon receiving that notice, the contractors stop work,

5    right?

6    A.  In some cases, yes.

7    Q.  Okay.  So this email that we're looking at now is after

8    those had already all gone out?

9    A.  Yes.

10   Q.  Okay.  So after those had gone out, then you sent an email

11   saying that there's a list that identifies statutorily-required

12   contracts, right?

13   A.  Yes, um-hum.

14   Q.  Okay.  And then let's turn the page to tab 50, which is

15   CFPB_118.  And that's an email from Mark Paoletta to you,

16   right?

17   A.  Yes.

18   Q.  And the chief financial officer?

19   A.  Yes.

20   Q.  And that's sent on February 19th, right?

21   A.  Yes.

22   Q.  And that email says, "I am directing you to not terminate

23   or suspend any contracts without specific authorization from

24   Acting Director Vought or me," right?

25   A.  Yes.

1    Q.  So that email saying don't terminate or suspend any

2    contracts without authorization was sent out after all of the

3    notices of termination had already been issued, right?

4    A.  Yes.

5    Q.  And then let's turn to the next tab, which is 50.  And it's

6    Bates No. CFPB_119.  It's just -- just the next page.  And you

7    discussed this on direct, I won't rehash it.  But this is an

8    email chain about rescinding notices of termination for certain

9    contracts, right?

10   A.  Yes.

11           THE COURT:  You said the next tab, but we're already

12   in 50, and then you said 50 again.  So where are we now?

13           THE WITNESS:  51.

14           MS. BENNETT:  We're at 51.  I apologize.  And it's

15   CFPB_119.

16           THE COURT:  You may have to slow down just a teeny

17   bit because we all got lulled into a different pace this

18   morning.  And I do appreciate the speed at which you talk and

19   move between questions, but I think your talking has to slow

20   down enough so somebody can type it.

21           MS. BENNETT:  Fair enough.  Sorry about that.

22   BY MS. BENNETT:

23   Q.  So we are on tab 51, Bates No. CFPB_119.  And this is the

24   chain that you discussed on direct about reinstating certain

25   notices, certain contracts, right?

```
 1    A.  Right.

 2    Q.  And that was a very small number of contracts that were

 3    reinstated, right?

 4    A.  I don't recall the number.

 5    Q.  Okay.  Perhaps I can refresh your memory.

 6    A.  Sure.

 7    Q.  Just take a look at that.  You don't read it out loud.

 8    A.  Sure.

 9            MR. ROSENBERG:  Do you have a copy?

10            MS. BENNETT:  Yeah.  (Hands document to counsel.)

11            MR. ROSENBERG:  Thanks.

12    BY MS. BENNETT:

13    Q.  So it's a small number of contracts, right?

14    A.  Of technology contracts, right.

15    Q.  So you were reinstating a small -- this email chain refers

16    to the reinstatement of a small number of technology contracts,

17    right?

18    A.  Yes.

19    Q.  Okay.  And you said as of now most contracts have been

20    reinstated?

21    A.  They have.

22    Q.  Are you sure about that?

23    A.  That was -- that's my understanding.

24    Q.  Okay.  And that's your understanding from personal

25    knowledge of the list of contracts?
```

1    A.  No.  No.  Not from looking at the contracts, no.  It's

2    based off of conversations I've had with our CFO on our team.

3    Q.  I see.  So you haven't actually looked -- there is this

4    master spreadsheet of contracts, right?

5    A.  I have not looked.

6    Q.  You have not looked at it?

7    A.  No, I have not --

8    Q.  Understood.

9    A.  -- looked --

10           MR. ROSENBERG:  Can the witness finish his answer?

11   There's a lot of crosstalk.

12           THE COURT:  All three of you need to be careful about

13   that.  All right.

14   A.  I have not looked at all of the contract listings.  The

15   only contracts that I know that I reviewed were some that I

16   reviewed specifically with Mark Paoletta, who needed some

17   guidance about operational contracts.

18   BY MS. BENNETT:

19   Q.  Okay.  So your personal knowledge is really limited to ops

20   contracts or technology contracts, right?

21   A.  That is correct.

22   Q.  Okay.  And could you turn, please, to tab 38, which is

23   Bates No. CFPB_96.

24   A.  96, correct.

25   Q.  Yes.  And I just want to clarify, you discussed this on

1    direct, but this says that there's going to be more guidance

2    about contracts, right?

3    A.   Um-hum.

4    Q.   And there has not yet been any guidance, right?

5    A.   There has not been.

6    Q.   And the contracts that were cancelled on February 11th,

7    when we talked about that initial email canceling all the

8    contracts in certain divisions, those contracts were cancelled

9    without any effort to preserve the records or data that might

10   have been -- that those vendors might have had, right?

11           MR. ROSENBERG:   Objection.   Vague and misleading.

12           THE COURT:   Now, look.   You're not the witness.

13   She's asking him and he can answer; no, that's not true.   But

14   you can't object because you don't think that's a fair

15   question.   She's asking a question and it had a question mark

16   at the end.   I understand it's a leading question because it's

17   cross-examination, but objection, what she said isn't true is

18   not an objection.   Do you understand?   I don't think -- you can

19   object to the form of a question, you can object to a lack of

20   foundation.   You objected to lots of things, but that one

21   basically you were saying that's not right.   What she's saying,

22   that's not right.   And that's not -- that's for him to say,

23   isn't it?

24           MR. ROSENBERG:   I don't have the transcript.   I think

25   that there was a -- probably would have reframed the objection

1    as a lack of foundation.  But I will withdraw.

2         THE COURT:  All right.  Well, let's -- you know,

3    obviously, if you know.  If you don't know, you have to answer

4    this question, "I don't know."  Okay.  Now ask the question.

5    BY MS. BENNETT:

6    Q.  Okay.  So when the contracts were cancelled or the notice

7    of termination were sent on February 11th, there's no

8    affirmative effort to preserve the data or the records that

9    those vendors had, right?

10   A.  Not in instructions when the termination letters went out.

11   But again, each contracting officer and contracting officer

12   representative who manages the contracts are responsible for

13   fulfilling what the terms and conditions of the contract is.

14        So if there's data saying, on the contract, based

15   upon the work that was performed by the contractor, then I

16   would expect that the SMEs, like the core, would be pulling

17   that data back.  And we did subsequently get questions from

18   staff asking whether or not we had lost the data or what was

19   the process and we walked them through what the terms and

20   conditions were in their contract.

21   Q.  Okay.  Can I ask you to turn in the plaintiffs' binder to

22   Exhibit A.  And at the bottom of the first page of that exhibit

23   there's a heading that says, "Required email notification

24   wording," right?

25   A.  Um-hum.

1   Q.  And it says, "The contracts that require a termination

2   notification, send the following email," yes?

3   A.  Yes.

4   Q.  And would you just read that -- not aloud, but to yourself.

5   Can you please review just that paragraph that constitutes the

6   email that they were supposed to send?

7       (Pause.)

8       Do you see where I am?

9   A.  Yeah.

10  Q.  Okay.

11      (Pause.)

12  A.  Okay.

13  Q.  And there's nothing in that form termination notice that

14  talks about preserving data, right?

15  A.  No, there's nothing.

16  Q.  Or preserving records, right?

17  A.  No.

18  Q.  Did you instruct the contracting officers to send an

19  additional email, in addition to this template?

20  A.  I didn't instruct the COs to do anything.

21  Q.  Okay.  And you said in the beginning of your direct, right,

22  one of your areas of responsibility is data, right?

23  A.  Yes.

24  Q.  And records management?

25  A.  Yes.

1    Q.  Okay.  And you issued no directive to the contracting

2    officers?

3    A.  Not in this case, no.

4    Q.  Okay.  Let's turn to -- make sure I have the right tab.  So

5    this is tab 7 in the defendant's binder.

6    A.  Yes.

7    Q.  And this is an email chain.  We start -- it starts from the

8    back, so it starts from Bates stamp CFPB_13 and goes through

9    CFPB 11.

10   A.  Yep.

11   Q.  And this email chain is from, initially, from the staff

12   director of Digital Communications, right?

13   A.  Yes.

14   Q.  And you're CC'd on it, right?

15   A.  That's correct.

16   Q.  And what it says is that the public channels of the CFPB

17   were unexpectedly removed, right?

18   A.  Yes.

19   Q.  Then it says -- or, before that it says, "Sprinklr," which

20   is -- it says, "Sprinklr, which is where our social media

21   backup records are maintained," right?

22   A.  Correct.

23   Q.  And it says that the staff director of Digital

24   Communications no longer has access to that, right?

25   A.  That is correct, because it had been cancelled, yes.

1    Q.  That contract had been cancelled?

2    A.  Yes.

3    Q.  So the Sprinklr contract, the contract for preserving

4    social media records had been cancelled, right?

5    A.  Yep.

6    Q.  And the social media itself had been unexpectedly removed,

7    right?

8    A.  Yes.

9    Q.  Okay.  And I'll just note this email chain starts on

10   February 25th, 2025, right?

11   A.  Correct.

12   Q.  And I'll represent to you that the Court's order, which

13   included data deletion, was issued on February 14th, 2025.  Do

14   you have any reason to quarrel with that?

15   A.  My concentration was to try to help figure out what the

16   Sprinklr system was, how it was purchased.  Wasn't clear if it

17   was purchased through procurement process, purchase card, why

18   we had it, whether they had consulted with my records team on

19   the data.  That was very unclear to me.  So I was trying to get

20   additional questions from this individual to ascertain exactly

21   what was going on.

22   Q.  So 11 days after an order prohibiting data deletion there

23   was a back and forth where data had been unexpectedly deleted

24   and it wasn't clear, because the contract had been cancelled,

25   whether it could be recovered, right?

1    A.  I mean, the way you stated it, yes.

2    Q.  Okay.

3    A.  Yep.

4    Q.  And then can you turn to Bates stamp CFPB_15, which is tab

5    8.  It's just the beginning of the thread.  It's just the next

6    tab.  And this is an email -- initially the first email in this

7    chain is February 25th, 2025, right?

8    A.  Um-hum.

9    Q.  And that is an enforcement -- sent from an enforcement

10   attorney, right?

11   A.  Yes.

12   Q.  And that email gets forwarded to you, right?

13   A.  Yes.

14   Q.  And the email says that this attorney has some software,

15   right?

16   A.  Yes.

17   Q.  That was preserving data, consumer data, right?

18   A.  Yeah.  I'm assuming it's consumer data.

19   Q.  And that data was under a litigation hold, right?

20   A.  I don't recall the specifics of the case, but I clearly see

21   that it was data preservation.

22   Q.  Sorry?  I missed the last part.

23   A.  No, I was confirming that I know that it's a data

24   preservation-specific issue, but I don't recall what the

25   specifics of it were.

1    Q.  Sure.  So on the bottom of CFPB_14 -- that's the first page

2    in this tab -- it says, "I am flagging this time-sensitive

3    account issue because my Sentinel account is connected to

4    several holds that I placed on searches of Sentinel data

5    related to Bureau matters for which Bureau litigation holds are

6    in place," right?

7    A.  Yes, yes.

8    Q.  That's litigation holds?

9    A.  Got it.  Yes.

10   Q.  So, again, this is February 25th, which is 11 days after

11   the data deletion order, right?

12   A.  Yes.

13   Q.  And there's an enforcement attorney saying we have a

14   problem because I can't get into my account --

15   A.  Yes.

16   Q.  -- to ensure that these litigation holds --

17   A.  Yeah, right.

18   Q.  Yeah.  And then you testified on direct that there was an

19   email that went out about records preservation and data

20   preservation, right?

21   A.  I don't recall.

22   Q.  Sure.

23   A.  Can you help me?

24   Q.  Let me ask you to turn to tab 18.  And -- in the second

25   page of that tab is CFPB_37.

1    A.  Yes.

2    Q.  So, that's an email sent by the chief information security

3    officer, right?

4    A.  Yes.

5    Q.  And that email, I believe, went out widely in the Bureau,

6    is that right?

7    A.  That appears to be the case, yes.

8    Q.  Okay.  And it says to work with your CORs.  Those are

9    contracting officer representatives, right?

10    A.  Correct.

11    Q.  And PoC?

12    A.  Yes.

13    Q.  Points of contact?

14    A.  Points of contact.

15    Q.  "To identify if CFPB data or records are at risk of being

16    deleted due to contract cancellations, memorandum/agreement

17    terminations, or other causes," right?

18    A.  Yes.

19    Q.  And that email goes out on February 27th, 2025, right?

20    A.  Yes.

21    Q.  That's almost two weeks after the February 14th data

22    deletion order?

23    A.  Yes.

24    Q.  And if you could turn to the next tab, which is 19.  This

25    is CFPB Bates stamps 39 through 43.

1    A.  Um-hum.

2    Q.  And that's an email chain that was triggered by the email

3    we just talked about from the chief information security

4    officer, right?

5    A.  Yep.

6    Q.  And this email says that the contract for the software --

7    for Entellitrak was cancelled, right?

8    A.  That is correct.

9    Q.  And that's the software that, among other things, is where

10   EEO, equal employment, data and complaints are stored, right?

11   A.  Multiple purposes, yes.

12   Q.  Okay.  And the employee asked you about the risk of

13   deletion -- advised you there was a risk of data deletion,

14   right?

15   A.  Right.

16   Q.  And you responded, "I would advise that we should reinstate

17   the ETK" -- the Entellitrak -- "contract if it is still

18   available in the short term," right?

19   A.  Yes.

20   Q.  So you didn't know if it was still available, right?

21   A.  I did not know.

22   Q.  And you were advising to reinstate it in the short term,

23   right?

24   A.  Yes.

25   Q.  And then the next sentence is, "ETK" -- Entellitrak, the

1    software -- "will help us prevent further litigation and/or

2    settlements as a result of the database being down," right?

3    A.  In these specific EEO cases, reasonable accommodation, or

4    anti-harassment type, yes.

5    Q.  So this email chain was on the 28th, right?

6    A.  Yes.

7    Q.  So that's two weeks after the date of the deletion order,

8    right?

9    A.  Yes.

10   Q.  Okay.  And then if I can ask you to turn to Exhibit EE in

11   the plaintiffs's binder.

12           And this is an email chain from March 3rd, 2025, right?

13   The 3rd and the 4th.  I apologize.

14   A.  Yes, yeah.

15   Q.  And the 3rd and the 4th of 2025, that's last Monday and

16   Tuesday, right?

17   A.  Yes.

18   Q.  And so last week -- and this email chain starts from the

19   director of data and analytics, right?

20   A.  Yes.

21   Q.  And the director of data and analytics makes a request to

22   pay a bill on software that stored their office's data, right?

23   A.  That appears to be the case, yes.

24   Q.  And the director states without payment the office would

25   lose all of its historical data, right?

1    A.  Based on the email, yes.

2    Q.  And then the following day, March 4th, 2025, the chief

3    financial officer responds, right?

4    A.  Yes.

5    Q.  And the chief financial officer says -- asks a number of

6    questions, right?

7    A.  Yes.

8    Q.  The chief financial officer doesn't say go ahead and

9    reinstate this contractor, pay this bill, right?

10   A.  He did not.  And there was a reason for that, yes.

11   Q.  Okay.  And the reason for that is that he had several

12   questions that needed to be answered, right?

13   A.  It wasn't just a matter of the questions, but it was a

14   matter of fact that GSA had turned our cards off so we

15   physically could not use them.  And we understood the bar to be

16   very high when going back to GSA to request them to reinstate

17   purchase cards for the agency.

18   Q.  I see.  So the -- tell me if I have this right:  GSA told

19   the agency to terminate all of the purchase cards?

20   A.  Very clearly, yes.

21   Q.  And those are the cards that employees have to pay for

22   small purchases, yes?

23   A.  Under a certain threshold.

24   Q.  Under certain -- okay.  And --

25   A.  Yeah.

1    Q.  -- so this employee says we're going to lose all of our

2    historical data if we don't make this payment, right?

3    A.  Yes, yes.

4    Q.  And there's no answer about how to ensure that doesn't

5    happen, right?

6    A.  That is correct.

7    Q.  Okay.  I'm going to ask to change gears again.  And let's

8    talk about the stop-work order.

9         So we have the February 10th email, right?

10   A.  Yes.

11   Q.  And Acting Director Vought was appointed, says employees

12   should stand down from performing work tasks, right?

13   A.  Yes.

14   Q.  Okay.  That has not been rescinded, has it?

15   A.  No.

16   Q.  And I believe you testified on direct this is a unique

17   situation, right?

18   A.  It is unique.

19   Q.  You're not aware of any other example where this has

20   happened, right?

21   A.  Not in my career, no.

22   Q.  Okay.  I just want to talk about what happened after the

23   stop-work order was issued.

24        So that stop-work order was in effect when you submitted

25   your declaration on February 24th, the first declaration?

1    A.  Yes.

2    Q.  And you said in that declaration that CFPB leadership has

3    worked to comply with statutorily-required functions, right?

4    A.  That's what they -- yes, that's what they told me.

5    Q.  And that's what they told you.  The leadership was telling

6    you that it was working with --

7    A.  That intent was to follow statutory requirements.

8    Q.  And you testified that the CFPB had maintained operations

9    when you --

10          THE COURT:  When you say that, are you talking about

11   the Vought/Paoletta or the whole other team that you've been

12   talking about as a leadership team, including the DOGE people

13   who have now been deputized?  Who told you the intention prior

14   to your declarations on --

15          THE WITNESS:  It was Mark Paoletta, because the

16   timing -- there were about two weeks from when, like, DOGE

17   started to my declaration being, you know, filled out and

18   signed.  And it was towards the latter part that it was very

19   clear that I think there was -- I got the perception there was

20   concerns about not following statutory requirements.  Is --

21   yeah.

22   BY MS. BENNETT:

23   Q.  So there were concerns about not following statutory

24   requirements?

25   A.  Yes.

1    Q.  That's what you're testifying.  Okay.  But, in fact, at the

2    time that your declaration was submitted, most statutory

3    functions were not up and running at the Bureau, right?

4    A.  I didn't know what was being -- necessarily what was being

5    implemented.  I mean, I'm not, again, part of the mission side

6    of the house.  What I understood from the chief legal officer

7    and his team was that they were going to follow the statutory

8    requirements for the agency.

9    Q.  I see.  So you were -- when you say in your declaration --

10   you say it in several different ways, I think -- that the

11   Bureau is fulfilling its statutory functions --

12   A.  That was the direction that we had received.

13          MR. ROSENBERG:  Objection.  That's misleading.  I

14   don't think he says in his declaration the Bureau was

15   fulfilling statutory functions.  He used different language.

16   BY MS. BENNETT:

17   Q.  So the Bureau, in your view, on February 24th, you didn't

18   know whether it was actually fulfilling its statutory

19   functions, right?

20   A.  There was some work that was -- that had continued, yes.  I

21   mean, they were looking at enforcement cases and -- yeah.  I

22   mean, there was some work being done.

23   Q.  So when you -- in your declaration --

24          THE COURT:  You said, in paragraph 20, the closure of

25   the headquarters has not prevented them --

1          THE WITNESS:  Correct.

2          THE COURT:  -- from performing statutory functions.

3    And they had the ability to work from home.

4    A.  Um-hum.

5    BY MS. BENNETT:

6    Q.  Fair to say that the impression that your declaration gives

7    is that statutory functions are ongoing, right?

8          MR. ROSENBERG:  Objection.

9          THE COURT:  All right.  Its either in there or it's

10   not.  But did you -- you don't have a sentence in here where he

11   said they are in fact performing the statutory functions?

12         MS. BENNETT:  So I'll just -- we'll just go directly

13   to the declaration.

14         THE COURT:  Here it is, paragraph 19.  Since the

15   arrival of the Acting Director, the new leadership is engaging

16   in ongoing decisionmaking to assess how to make the Bureau more

17   effective and accountable.  Our leadership has worked to comply

18   with statutorily-required functions and my operations team has

19   been mindful of this as we advise on operational-related

20   issues.  Is that the sentence you want to ask him about?

21         MS. BENNETT:  Yeah.

22         THE COURT:  All right /ask him a question.

23         MS. BENNETT:  So when you said that, your information

24   was coming -- it's just based, on what Mark Paoletta told you,

25   right?

1    A.  Yes, yes.

2    Q.  It's not based on any insight into the mission side of the

3    agency, right?

4    A.  Not at all.

5    Q.  Okay.  And, in fact, at that time, if you know, most of the

6    functions were not up and running, right?

7    A.  That's what I know now.

8    Q.  You know now that when you submitted your declaration on

9    February 24th, most of the functions were not up and running,

10   right?

11   A.  Most of the functions.

12   Q.  So supervision, not up and running?

13   A.  I was not aware of what -- I was only aware of what was in

14   the bullet point.  Again, I'm not mission programmatic.

15   Q.  Sure.

16   A.  So I have no control over that.  I also don't know what

17   engagement was taking place behind the scenes between those

18   entities and Mark Paoletta and the leadership.

19          THE COURT:  I think we've established he didn't know.

20   So you can ask your next question, as opposed to more about

21   what he didn't know.

22          MS. BENNETT:  Sure.

23   BY MS. BENNETT:

24   Q.  You didn't know about the mission side of the agency?

25   A.  No.

1    Q.  We can move on from there.

2         You did mention specifically the Student Loan Ombudsman.

3    That's paragraph 21 of your declaration.  And you recognize

4    that the position was vacant, right?

5    A.  Yes.

6    Q.  And that's because the ombudsman was terminated --

7    A.  Yes.

8    Q.  -- as part of the --

9    A.  Yes, yes.

10   Q.  And your declaration says that there are other options to

11   receive support from the CFPB, right?

12   A.  That is absolutely correct.

13   Q.  And one of those other options that you mentioned was the

14   general CFPD ombudsman office?

15   A.  Correct.

16   Q.  But that ombudsman office was not working at the time you

17   submitted your declaration, right?

18   A.  I was not aware of that.

19   Q.  You're aware of that now?

20   A.  I'm aware of that now, yes.

21   Q.  So now you know when you submitted your declaration on

22   February 24th, the office that you said people should go to was

23   actually not working because the stop-work order?

24   A.  Now I know, yes.

25   Q.  And the other place you said people could go was the CFPB

```
 1    Consumer Complaint Center, right?

 2    A.  Yes.

 3    Q.  And there was no human employees processing complaints at

 4    that time because of the stop-work order, right?

 5    A.  I can't say that.  I don't know.  We have contractors in

 6    other states that run some of those facilities, so I can't tell

 7    you what the status was, if they were live or if it was by

 8    phone.

 9    Q.  I see.  So on February 24th, when you submitted your

10    declaration suggesting the complaint center as an alternative,

11    you didn't know at the time whether they were up -- whether

12    that was a viable alternative or not?

13    A.  That's correct.  But I also wanted to clarify, if I may,

14    that my intent with that statement, which the media and

15    everyone has had a field day with and has questioned what -- a

16    little bit of my integrity and what I know, was never to

17    suggest that going to those two additional resources was a

18    replacement for the student loan ombudsman.

19          My -- if somebody is going to ask me a question about

20    what is my alternative, it's to file a complaint with the

21    agency ombudsman office, which is what they are supposed to be

22    doing, or you go to the Consumer Response Center and file a

23    complaint, if they're able to manage that.  But it was not

24    intended to be a replacement to the student loan payment

25    program, which people seem to think that's what I was referring
```

 1    to.

 2              THE COURT:  All right.  I just want to clear the air

 3    for one second.  I'm not interested at all -- and I'm not

 4    reading and I wouldn't pay attention to it if somebody sent it

 5    to me -- what the media is saying that's going on at the CFPB.

 6    That's why we're here.  And I don't think anybody is suggesting

 7    that you acted in bad faith or deliberately lied.  But I think

 8    they're probing some of the broad statements to see whether you

 9    actually knew the facts to support the inference that they tend

10    to give.  And it's hard not to feel that's a personal attack.

11    I don't think it's meant as a personal attack.

12              I think you've come across to everyone as a person

13    who cares about the mission of this agency, cares about his

14    job, cares about consumers.  The question is, is what's

15    happening the picture that's painted in some e-mails, or is

16    what's happening more like the picture in some other emails?

17    And the only person who has to figure that out at this moment

18    is me, and not the press.

19              THE WITNESS:  Yes, ma'am.

20              THE COURT:  Okay.  Go ahead.

21              MS. BENNETT:  Thank you.

22    BY MS. BENNETT:

23    Q.  And with that understanding, I want to just briefly touch

24    on the Home Mortgage Disclosure Act as another function that

25    you called out specifically in that declaration.  And just to

1    make sure my understanding is correct, that statute requires

2    financial institutions to disclose information about their

3    mortgage lending, right?

4    A.  Yes.

5    Q.  And the deadline for that was March 1st, right?

6    A.  Correct.

7    Q.  And the declaration says -- and this is at paragraph 23.

8    The declaration says, "Operations related to the CFPB statutory

9    requirements under HMDA, the Home Mortgage Disclosure Act, are

10   continuing."  And it also says that contracts needed for work

11   related to the HMDA have remained intact and operational.

12   A.  Correct.

13   Q.  And that informational came to you from Mark Paoletta?

14   A.  That it was intact?

15   Q.  Yes.

16   A.  No.  I actually -- this dates back to the evening of the

17   7th, when DOGE was in our building.  We were in a conference

18   room with our chief information officer, myself, and several

19   people in our T&I division, and they were looking at the

20   website.  And we had our oversight attorney in the room as well

21   at that time.  And we were advising them to be really careful,

22   to be careful about what came off the website that would

23   prevent the public from not being able to access.  The Consumer

24   Response Center was one of them, HMDA was the other one,

25   because we knew we had a statutory requirement to do that.

1          So it never stopped.  It was available.  We put

2     additional resources when they were asked by staff.  The CIO

3     came to me and asked me if he could put additional people on

4     that work because they were getting a specific number of help

5     desk tickets.  And I said absolutely, you need to get them to

6     respond to the public so they could successfully enter their

7     data.

8     Q.  Understood.  Well, let me check if I understand.  So you

9     identified very early on HMDA, Home Mortgage Disclosure Act,

10    that that -- because of the upcoming deadline and the

11    importance to financial institutions, that that was very

12    important that it --

13    A.  Yes.

14    Q.  -- kept going.  And your testimony is that it did keep

15    going?

16    A.  It did keep going.  It may not have been at the level of

17    preference, but it didn't stop.  Like, institutions were still

18    able to file their information into the system.

19    Q.  I see.  So by "keep going," you mean just did not stop?

20    A.  Correct.

21    Q.  You could technically do it?

22    A.  We didn't take it down.  We didn't cancel contract.

23    Q.  You didn't cancel contracts?

24    A.  Not for HMDA, not for that specific work.

25    Q.  Okay.  Could you turn to tab 6 of the defendant's binder?

1    That's Bates stamp CFPB_9.

2              THE COURT:  All right, we need to take a break.  I'm

3    sorry.  We came back from lunch, so my brain wasn't even

4    thinking about what time it is.

5              We'll take a break, just a ten-minute break, and then

6    we'll resume.

7              After we come back, it would be helpful if you give

8    me some idea of how much more time you think you're going to

9    take with this witness, whether you're still planning to call

10   other witnesses.  That will be useful information to have.

11             MS. BENNETT:  We will confer in the break.

12             (Recess.)

13             THE COURT:  Let's try to go until about 5, or at

14   least where you get to a reasonable stopping point, which could

15   conceivably be the end of your questions, before we talk about

16   timing for doing more.

17             MS. BENNETT:  Okay.

18   BY MS. BENNETT:

19   Q.  So I think where we left off, we were talking about HMDA?

20   A.  Yes.

21   Q.  Home Mortgage Disclosure Act?

22   A.  Yes, ma'am.

23   Q.  You said that you had urged them not to cancel any

24   contracts related to that, right?  Or that they hadn't

25   cancelled any contracts related to that?

1    A.  The focus was to keep it available to the public, to be

2    able to file their reports.  So I don't know what contracts

3    specifically would require that, but that was the intent.

4    Q.  And so can you turn to Bates stamp CFPB_9.

5         I think I switched my binder with yours.

6    A.  No worries.  Got it.  Thank you.

7    Q.  So that's tab 6, Bates stamp CFPB_9.

8    A.  Yes.

9    Q.  That's an email from Christopher Chilbert who's the chief

10   information officer, right?

11   A.  Yes.

12   Q.  To you, on February 21st, 2025, right?

13   A.  Correct.

14   Q.  And that email says -- it's about HMDA data, right?  And

15   it's about an inquiry from the FDIC about the status, right?

16   A.  Yes.  Right.

17   Q.  And Mr. Chilbert says, at the top of this page, "We're

18   doing our best effort to support the data collection, but it is

19   at risk due to several contracts being terminated," right?

20   A.  Yes.

21   Q.  So even HMDA data, the thing that you potentially most

22   strongly urged them to maintain --

23   A.  Yeah.

24   Q.  -- the contracts were cancelled?

25   A.  Yes.  I don't know if they were cancelled, but he was

1    concerned that they had stopped.

2    Q.  Understood.  And then let's talk about consumer complaints,

3    because that's the other division that you called out in your

4    first declaration as being operational.  And you testified in

5    that declaration -- this is paragraph 22 of that declaration --

6    that operations related to the consumer complaint database are

7    continuing, right?

8    A.  Some of it was, yes.

9    Q.  Some of it was?

10   A.  Yes.

11   Q.  So you testified just generally operations are continuing?

12   A.  Yeah, minimal amount required that we -- because I know

13   that we specifically talked to Chris Johnson early on about

14   what the minimum requirement was to ensure that the site didn't

15   go down or if the public could still access some form of

16   complaint or have access to complaints.

17   Q.  Understood.  So you talked to Chris Johnson, who is the

18   head of Consumer Response and Enforcement about what was

19   necessary to keep the database going, yes?

20   A.  To keep the lights on, yes.

21   Q.  Okay.  And we have already gone through that, identified

22   several things, right?

23   A.  Um-hum.

24   Q.  All of those things were terminated, at least initially,

25   right?

1    A.  Quite a few were, yes.

2    Q.  Okay.  And one of those things was the consumer call center

3    initially, right?

4    A.  I believe so.

5    Q.  Another one of those things was an antivirus software,

6    right?

7    A.  Yes.

8    Q.  And that antivirus software is essential for attachments to

9    be sent back and forth from consumers and companies?

10    A.  Yes.  Yes.

11    Q.  And when that was cancelled, a number of complaints were

12    not able to go through, right?

13    A.  My understanding, for a short period of time, yes.

14    Q.  Okay.  And that's even the automatic database, right?

15    A.  Yes.  Yes.

16    Q.  So there were problems even with the automatic sending and

17    receiving of complaints because of the termination of

18    contracts, right?

19    A.  During that -- during that period of time, yes, that's what

20    I understand.

21    Q.  And there wasn't any human processing of complaints during

22    that time, right?

23    A.  I don't know.

24    Q.  You don't know.  Okay.

25                THE COURT:  So in that paragraph 22 of your first

1    declaration where you talked about the Bureau's maintaining the

2    toll-free number, the website, the database, operations related

3    to the database are continuing, contracts needed for work

4    related to the database have remained intact and operational,

5    all you were intending to convey was the operation side?

6    Again, not the programming?

7              THE WITNESS:  That is correct.  That is correct,

8    yeah.

9              THE COURT:  Okay.

10   BY MS. BENNETT:

11   Q.  And while we're on the subject of consumer response, can I

12   just briefly ask you about the escalated case management team?

13   A.  Um-hum.

14   Q.  So in your March 2nd declaration -- that's the supplemental

15   declaration you submitted before the hearing?

16   A.  Yeah, right.

17   Q.  That declaration says that the escalated case management

18   team started -- was working as of February 27th, right?

19   A.  On or about.  I don't have it in front of me, I'm sorry.

20   Q.  Sure.  I'll -- I believe that is tab 56 in the defendant's

21   binder.

22             THE COURT:  I think 56 is the first one.

23   BY MS. BENNETT:

24   Q.  I apologize.  It's tab 57.  And it's paragraph 8 of that

25   declaration, which is ECF page 3.

1          So that paragraph says:  On February 27th, 2025, the

2      CFPB chief legal officer activated work related to compliance

3      with the agency's critical statutory responsibilities in the

4      area of the Office of Consumer Response.  Did I read that

5      correctly?

6      A.  That was my understanding.

7      Q.  Okay.  So, it was -- wasn't until the 27th that the chief

8      legal officer activated work, right?

9      A.  That sounds correct.

10     Q.  And then it says as of February 27th, 2025, members of the

11     escalated case management team, for example, are working,

12     right?

13     A.  I believe that was the case, yes.

14     Q.  And do you today believe it was the case that on February

15     27, 2025, members of the escalated case management team were

16     working?

17     A.  I would have to go back and build a timeline on that.  I

18     don't know offhand.

19     Q.  How -- what information did you have that they were

20     working?

21     A.  The information on this was based upon the discussions I

22     had with our chief legal officer, in addition to emailings

23     that -- and again, I don't know what the timeline was -- the

24     emails that went from Chris Johnson to Mark Paoletta

25     recommending additional work to start up again.

1    Q.  Okay.  So you didn't have firsthand knowledge of whether

2    they were working when you wrote this declaration?

3    A.  I did not.  It was my understanding.

4    Q.  Understood.  And then let's look at those emails that I

5    believe you're talking about.  So the first one is tab 9 of the

6    defendant's binder, it's CFPB_16, is the Bates stamp, and it

7    goes through CFPB_16 through CFPB_19.

8    A.  Yep.  Yes.

9    Q.  And that email asks for -- Chris Johnson introduces

10   himself, right?

11   A.  Correct.

12   Q.  So at that time Mark Paoletta did not know who the head of

13   Consumer Response and Education was?

14   A.  I don't know.

15   Q.  Okay.  And he explains what the division of Consumer

16   Response and Education does, right?

17   A.  Yes.

18   Q.  Okay.  And he's reaching out on the 26th about requests to

19   start some work, right?

20   A.  Correct.

21   Q.  And that request, which is on CFPB_17, is -- has three

22   parts.  One is about contracting, right?

23   A.  Yes.

24   Q.  The second is assessment, right?

25   A.  Yes.

1    Q.  So the request is the work I want to do is assess what's

2    going on in consumer response, right?

3    A.  Yes.

4    Q.  It's not I am activating people to actually do work in

5    consumer response, right?

6    A.  Yes.

7    Q.  Okay.  And because he says there's going to be -- you see

8    at the bottom of CFPB_17, he says there's going to be two

9    phases, one is assessment.  That's what I'm requesting

10   permission to do first, right?

11   A.  Yes.

12   Q.  Sorry.  I think for the court reporter you have to answer

13   out loud.

14   A.  Yes.  Yes.

15   Q.  And the second is after he does that assessment, he says

16   I'm going to prepare a recommendation and share it, right?

17   A.  Yes.

18   Q.  Okay.  So on the 26th he's asking for permission just to do

19   an assessment, right?

20   A.  Yes.  Yes.

21   Q.  And he gets that permission on February 27th, right?

22   A.  Um-hum.

23   Q.  Okay.  So as of that email, nobody is actually working in

24   the escalated case management team, as far as you know?

25   A.  I don't know.

1    Q.  Okay.  And then if you could turn to Bates stamp 65, which

2    I will tell you the tab for.  It's tab 27 in the defendant's

3    binder.

4    A.  Yes.

5    Q.  So this is an email from Chris Johnson to you, right?

6    A.  Yes.

7    Q.  It's on March 2nd, 2025 --

8    A.  Yes.

9    Q.  -- right?

10            And it CCs Mark Paoletta, right?

11   A.  Yes.

12   Q.  And it says what we're doing is assessing the complaint

13   handling process, right?

14   A.  Yes.

15   Q.  And then the permission to start work is given on March

16   2nd, 2025, right?

17   A.  Yes.

18   Q.  And then if you could turn to page Bates stamp 73, which is

19   tab 30 in the same binder, so CFPB_73.

20   A.  Yes.

21   Q.  This is an email between you and Christopher Johnson,

22   right?

23   A.  Christopher Johnson, yes.

24   Q.  I believe I'm directing you to the wrong tab.  Apologies.

25   Can you go to tab 32, which is CFPB_79?

```
 1   A.  Yes.
 2   Q.  So this is an email from Christopher Johnson to -- the
 3   first email to the entire consumer response team, right?
 4   A.  Right.
 5   Q.  It's sent on March 3rd, 2025, right?
 6   A.  Yes.
 7   Q.  At 6 a.m.?
 8   A.  Yes.
 9   Q.  And that is the email that activates them to do work,
10   right?
11   A.  Based on the timeline, yes.
12   Q.  Okay.  So on February 27th, 2025, the escalated case
13   management team, based on these emails, was not yet working?
14   A.  Now I know.
15   Q.  So now you know that.  And they started working last week?
16   A.  Right.
17   Q.  I want to turn back briefly to the stop-work order.  And
18   the day before the hearing last week -- so the hearing last
19   week was on March 3rd, 2025, right?  Last Monday?
20   A.  Yes.
21   Q.  I will represent to you that the hearing --
22   A.  Yes.
23   Q.  -- was on marched 3rd, 2025.
24          THE COURT:  I can't even remember that.
25   BY MS. BENNETT:
```

1   Q.  Yeah, I'll represent that to you.  The day before would

2   have been March 2nd, 2025, right?

3   A.  Yes.

4   Q.  It was a Sunday?

5   A.  Yes.

6   Q.  And Mark Paoletta sends an email to all staff, right, on

7   that day?

8   A.  Yes.

9   Q.  And what he says is -- this is at, by the way, CFPB Bates

10  stamp 56, if you want to look at it.

11       What he says is it's come to his attention that some

12  employees have not been performing statutorily required work,

13  right?

14  A.  Um-hum.  Yes.

15  Q.  And you believe, were under the impression that almost no

16  employees were working, right?

17  A.  I didn't know -- I didn't know how many people -- honestly,

18  I knew there was a good portion of the agency that was not

19  performing.

20  Q.  Okay.  And so a big portion of the agency was not

21  performing, which means either some -- a big portion of the

22  agency was doing nothing and the person performing the chief of

23  staff role just didn't notice, right?

24  A.  Yes.

25  Q.  Okay.  And then he says, "Let me be clear, employees should

1    be performing work that is required by law and do not need to

2    seek prior approval to do so," right?

3    A.  Yes.

4    Q.  And is that your understanding -- that's not your

5    understanding of what the order was before this email, right?

6    A.  No.

7    Q.  Your understanding was nobody should be performing work,

8    right?

9    A.  As an executive and as the COO of the agency, it's hard for

10   me to answer that question because I looked at the order and I

11   went and sought clarification from Mark Paoletta about what my

12   stuff should or should not be doing.  So I worked that out

13   separately with Mark.  I don't know who reached out to Mark

14   throughout that process.  I know that he was working with

15   enforcement on some issues.  I believe they were having

16   separate possible discussions with regulations.  But I don't

17   know what his daily interaction was with the mission part of

18   the house.

19            THE COURT:  It's your understanding that the stop

20   work was what it said?

21            THE WITNESS:  Yes.

22            THE COURT:  It was across the board and you had to

23   talk to him?

24            THE WITNESS:  I did.

25            THE COURT:  So different career people?

```
 1                 THE WITNESS:  Yes.

 2    BY MS. BENNETT:

 3    Q.  I think you testified to this earlier, you in fact

 4    characterized the stop-work order as a stop order

 5    across-the-board, for all work associated with the agency,

 6    right?

 7    A.  No.

 8    Q.  You never said that?

 9    A.  Not everything, no.  I don't believe I did.  I hope not.

10    Q.  And there was an office of human capital that issued a

11    directive on February 14th regarding administrative leave,

12    right?

13    A.  Yes.

14    Q.  And that directive is at Exhibit J of the plaintiffs'

15    binder, if you would like to take a look at it.

16         That directive says, "In accordance with the acting

17    director's guidance, employees should exercise administrative

18    leave until otherwise instructed," right?

19    A.  Yes.

20    Q.  Okay.  Nothing about statutorily required work, right?

21    A.  No.

22    Q.  And in the February 10th stop-work order there was also

23    nothing about statutorily required work there either, right?

24    A.  In the -- not that I recall.  No, it was on the 8th, I

25    believe, that -- yeah.
```

1    Q.  So we have it clear, the 8th talked about had this proviso

2    about work required by law, but the 8th, in that email, also

3    said you can't do any supervision or examination, right?

4    A.  At the end it did say that.

5    Q.  Okay.  And is your understanding that supervision and

6    examination are required by law?

7    A.  I understood that supervision was required by law.  I'm not

8    sure about enforcement.

9    Q.  Okay.  So on 8th there is this email that says -- has some

10    proviso that says "authorized by law," but also has bullet

11    points prohibiting work that is required by law?

12    A.  Right.

13    Q.  Not authorized by law, required by law.  Right?  So you

14    have this contradictory email and then on the 10th there's no

15    proviso, right?  It just says all employees are directed to

16    stop work?

17    A.  Right.

18         THE COURT:  I would say that fact has probably been

19    established.

20         MS. BENNETT:  Fair enough.

21    MS. BENNETT:

22    Q.  As we discussed, that's how it was understood in the

23    administrative leave email, it directs all employees to take

24    administrative leave, right?

25    A.  Yes.  And this email -- yes.

1    Q.  Okay.  And you're aware that the CFPB set up a tip line to

2    report people?

3    A.  I was not aware of that.

4    Q.  You're aware of that now, but --

5    A.  As part of the case, I became aware of it.

6    Q.  Understood.  And are you aware that when asked about this

7    tip line, asked whether the CFPB had set up this tip line,

8    Acting Director Vought responded, "Yes, we have"?

9    A.  I don't know what he -- I don't know what method he used

10   to -- I don't use social media.  I understand that that

11   possibly came from social media.  I'm trying really hard not to

12   pay attention to social media right now.

13   Q.  I see.  So you're also not aware that it's still up?

14   A.  I'm not aware of anything having to do -- I don't even know

15   who -- I don't even know who in the agency those calls go to,

16   if that's the case.  That has never been discussed in my

17   presence.

18   Q.  Okay.  And just a couple more questions on this.

19        The documents that were used to -- that were given to

20   the terminated probationary and term employees had one of the

21   reasons that was given for those terminations was the stop-work

22   order, right?

23   A.  Yes.

24   Q.  And so it wasn't just a stop-work order, it was such an

25   order that it meant that people were fired, right?

1    A.  Yes.  Yes.

2    Q.  Okay.  And fair to say that around the 27th there was a

3    flurry of emails requesting -- suddenly requesting permission

4    to do work, right?

5    A.  Yes.  Yes.

6    Q.  And some of those were started by you, right?

7    A.  It was.

8    Q.  It was started by you?

9    A.  Some of it was, yes.  Yeah.  I was concerned.

10   Q.  Okay.  So you were concerned that people weren't getting

11   authorization and so you generated this set of requests?

12   A.  Again, I didn't know who was going to Mark Paoletta

13   directly.  There were a couple of executives that chose to copy

14   me on their email to Mark, which helped me, actually.  It

15   helped me when they went to the CFO to ask for a procurement

16   issue, or to the CIO.  So it helped me to be able to confirm to

17   my staff that those things had been approved, or what the

18   status was.  But I didn't know what everybody was having, I

19   don't know what their communications were directly with Mark

20   Paoletta.

21   Q.  So if there was testimony that previous to this flurry of

22   emails people had asked Mr. Paoletta for guidance and hadn't

23   heard back, you wouldn't know whether that's correct or not?

24   A.  Unless he copied me on the email.

25   Q.  Unless they copied you, okay.

1    A.  In fact, when they copied me on the email, typically if he

2    didn't respond, I did respond somehow.

3    Q.  Okay.  And the stop-work order though just directed people

4    to contact Mr. Paoletta, right?

5    A.  Yes.

6    Q.  Okay.

7    A.  People chose to also include me in some of those emails as

8    well, which I tried to be helpful.

9    Q.  Okay.

10            THE COURT:  Going back to your question that began

11   with the flurry of emails.  What was the date when you kind of

12   started the flurry, the question?

13            MS. BENNETT:  I think it's the 27th.

14            THE COURT:  Okay.  That's just a flurry, that I

15   recall.  I wasn't sure if you were referring to that one.  I

16   just wanted to make sure which one you were referring to.

17            Okay.  Keep going.

18   BY MS. BENNETT:

19   Q.  So there's this flurry of emails that culminates, I think,

20   with -- maybe not culminates, but the email from Mr. Paoletta

21   on Sunday, the 2nd, is after this flurry of emails, right?

22   A.  Yes.

23   Q.  So -- and there was a hearing on March 3rd here, I will

24   represent, so there's -- so all of these emails, all of these

25   requests for authorization to work that were granted are in,

1    say, the five days before there was about to be a hearing in

2    this case, right?

3    A.  Based on your timeline, yes.

4    Q.  Okay.  And even after these emails went out, you testified

5    there's still a lot of confusion, right?

6    A.  Um-hum.

7    Q.  So I'm going to ask you to turn -- and one of the things

8    you went back with the defendants on was supervision.  So I'm

9    going to try to clarify what happened there.

10    A.  Sure.

11    Q.  So if you could turn to tab 22.  And this is CFPB Bates

12    stamps 50 through 52.

13        If you turn to 51.  This is an email from -- in the

14    middle of the page there's an email from Cassandra Huggins,

15    right?

16    A.  Yes.

17    Q.  And that's the principal deputy assistant director

18    responsible for supervision, yeah?

19    A.  Yes.

20    Q.  And to you?

21    A.  Yes.

22    Q.  And it's February 28th, 2025?

23    A.  Correct.

24    Q.  And Cassandra Huggins is asking you, "To be clear, the

25    February 8th email directed us to cease all supervision and

1    examination activity.  Am I correct that directive still
2    stands?"
3    A.  That was my understanding, yes.
4    Q.  And you answer, "That is correct," right?
5    A.  That is correct.
6    Q.  So after -- so there's a flurry of emails on the 27th.  On
7    the 28th Cassandra Huggins asks you, is the direction to stop
8    all supervision still in effect?  And you say yes, right?
9    A.  Yes.
10   Q.  Okay.
11   A.  And, again, I was basing that off of the email that went
12   all the way back to February 8th.
13   Q.  Understood.  So then I'm going to ask you to turn to tab 33
14   in the defendant's binder, which is Bates stamp CFPB_82.  And
15   this is another email chain between you and the same person,
16   Cassandra Huggins, right?
17   A.  Yes.  Yep.
18   Q.  Who, again, is the principal deputy in charge of
19   supervision, right?
20   A.  Yes.
21   Q.  And this email chain is on March 3rd, 2025, right?
22   A.  Yes.
23   Q.  So this email chain takes place after Mr. Paoletta sent out
24   his email on March 2nd, 2025, right?
25   A.  Yes.

1    Q.  Okay.  And, again, after having received that email,

2    Cassandra Huggins, the deputy in charge of supervision, reaches

3    out to you for more clarification, right?

4    A.  Yes.  Yes.

5    Q.  And the clarification that they request is whether

6    Supervision should remain on administrative leave, right?

7    A.  Yes.

8    Q.  And whether -- again, whether the prohibition on

9    supervision and examination is still in effect, right?

10   A.  Yes.

11   Q.  And you respond, your first sentence is -- I think we

12   talked about this on direct.  Your first sentence is, "I would

13   highly encourage you to communicate with Mark P. regarding

14   expectations?

15   A.  Yes.

16   Q.  Your second sentence is, "However, you are correct that the

17   email sent out yesterday does not change the specific work

18   stoppage in the bullet points issued on 8 February," right?

19   A.  That was my understanding, yes.

20   Q.  So then when Cassandra Huggins sends out an email to her

21   team a few hours later that says their understanding is that

22   the work stoppage still applies, that was based on your email

23   to them at the time?

24   A.  Yes.  However, I didn't realize that she had separately

25   reach out to Mark Paoletta for advice and did not receive a

 1    response before she sent that email.

 2    Q.  Right.  So she's emailed -- she sent an email to you,

 3    right?

 4    A.  Yes.

 5    Q.  You said, I think it's correct, that the work stoppage is

 6    in effect, but contact Mark P.?

 7    A.  Yes.

 8    Q.  Then she sent an email to Mr. Paoletta, right?

 9    A.  Yes.

10    Q.  But in the meantime, she said until I hear back, the work

11    stoppage is in effect, right?

12    A.  That's correct, yeah.

13    Q.  And even now, supervision is not actually doing any

14    supervision or examinations, right?

15    A.  That is my understanding.

16    Q.  Only thing they're authorized to do by Mr. Paoletta is

17    provide him a report, right?

18    A.  I thought his email was very clear.

19    Q.  You thought his email was very clear --

20    A.  Of what his expectations were with regards to providing him

21    with reports of what cases they had opened and who they were

22    with and wanted a status update on that.  I mean, I would

23    presume when somebody is asking me that question, it's to

24    assess, to see exactly what the population is within your

25    portfolio and then you make a decision based on that.  Again, I

1    don't know what's in the thinking of this administration, but

2    presumably he could order them back to do certain work, I don't

3    know.

4    Q.  Okay.  And just to -- so the record is clear, this email

5    from Mr. Paoletta is at tab 44 of the defendants' binder.  It's

6    Bates stamp CFPB_11 through CFPB_14 and this is the email that

7    we've been talking about that says I want a report from you,

8    right?

9    A.  Yes.

10    Q.  Okay.  I just want to spend a little bit of time -- so

11    supervision is not operating, except to provide this report to

12    Mark Paoletta, as far as you know?

13    A.  This is the last status update that I am aware of.

14    Q.  Okay.  There is one more -- just for the record, there's

15    one more status update that is in the exhibits, it's

16    plaintiffs' binder, Exhibit WW.  And this is an email from an

17    examiner at the CFPB, right?  That's somebody who does

18    examinations?

19    A.  There's a lot of redactions.  But, yes, it appears to be an

20    examiner within that office.

21    Q.  Sure.  So the signature block says "Examiner," right?

22    A.  Yes.

23    Q.  And it's a recap of a meeting that occurred on March 6,

24    2025, right?

25    A.  Yes.

1   Q.  And what that recap says is exactly the thing that you just

2   told me, right?

3   A.  Yes.

4   Q.  Which is after we are done with providing the information

5   for the report Casey requested yesterday, and that report is

6   the report Mr. Paoletta asked of her, right?

7   A.  Yes.

8   Q.  So it says, "After we're done with providing the

9   information for the report Mr. Paoletta requested, we're to go

10  back on administrative leave," right?

11  A.  Yes.

12  Q.  So, supervision, what's happening is they're providing a

13  report and they're otherwise on administrative leave?

14  A.  Yes.

15  Q.  As far as you know?

16  A.  As far as I know, yes.

17  Q.  Let's talk about what happened with some of the offices

18  that were actually authorized to do some work.  So the Office

19  of Civil Rights, they were authorized back to work sometime

20  between the 27th and the 3rd?

21  A.  I authorized it, yes.

22  Q.  You authorized them?

23  A.  I did.

24  Q.  And they returned to CFPB Bates stamp 41.  That is at tab

25  19.

1    A.  Yes.

2    Q.  We've already talked about this chain, but the email in the

3    middle of CFPB_41, so the -- you authorize back to work the

4    Office of Civil Rights on the 27th or 28th?

5    A.  Yeah.

6    Q.  And then they respond, "I want to make sure we're flagging

7    that Entellitrak is our system of record for EEO cases, and we

8    cannot do our work without it," right?

9    A.  Yes.

10   Q.  So the problem is they were ordered back to work, but they

11   don't have the system they used to track their cases --

12   A.  Yes.

13   Q.  -- because that contract was cancelled?

14   A.  Yes.

15   Q.  If we could go to CFPB Bates stamp 9, which is at tab 6.

16   I'm sorry, 99, which I believe is at tab 39.  And this is an

17   email from the section chief of the Disability and

18   Accessibility Programs section, right?

19   A.  Yes.

20   Q.  And it's to the chief financial officer, right --

21   A.  Yes.

22   Q.  -- and to you?

23   A.  Yes.

24   Q.  And it's sent on March 3rd, 2025, right?

25   A.  Yes.

1    Q.  And it explains that the Disability and Accessibility

2    Programs Service office has been technically activated, right?

3    A.  Yes.

4    Q.  But it can't do its work because the contracts required to

5    provided reasonable accommodations were cancelled, right?

6    A.  The work on the contract?

7    Q.  The contracts.  So it said --

8    A.  Oh, yes, yes.  Which was a separate contract, yes.

9    Q.  So it says, just so we're clear, "To meet the demands of

10   the statutes governing our work, we must have the resources of

11   our contracts that were recently terminated," right?

12   A.  Yes.

13   Q.  Then they outline what those are?

14   A.  Yeah.

15   Q.  So, "I have a attached the reasonable accommodations,"

16   right?

17   A.  Yes.

18   Q.  "And 508 contracts," right?

19   A.  Yes.

20   Q.  508 is also a disability accessibility?

21   A.  It's for reading on a website or a form.

22   Q.  Okay.  And then it also says, "We would need our instance

23   of the Entellitrak system."  That's the system you were

24   previously talking about that manages a whole bunch of HR data?

25   A.  It's a case management.

1    Q.  It's a case management system?

2    A.  It is.

3    Q.  So then it says, "We also would need our instance of the

4    Entellitrak system" -- the case management system --

5    "reinstated"?

6    A.  Yes.

7    Q.  "As we are legally required to keep and maintain a system

8    of record for reasonable accommodations," right?

9    A.  Yes.

10   Q.  So, in other words, they were put back to work, but they

11   didn't have the contracts in place needed to actually do their

12   work, right?

13   A.  Until they raised the concern that they didn't have those

14   tools.

15   Q.  And when they raised that concern -- if you turn back a

16   page, to CFPB_98 -- they raised that concern on Monday, March

17   3rd.  And there's a response by Jafnar Gueye, who is the chief

18   financial officer, right?

19   A.  Correct.

20   Q.  And it says Entellitrak either is going to be or has been

21   turned back on?

22   A.  Um-hum.

23   Q.  Then it says, "We are very narrowly turning back contracts,

24   or portions of contracts," right?

25   A.  Right.

1    Q.  And it say, "If without the contract the Bureau would fail

2    to meet those requirements, then we would turn it back on"?

3    A.  That's what he said.

4    Q.  But, it says if the Bureau can meet the statutory

5    requirement even if minimally without it, they're not going to

6    turn it back on, right?

7    A.  According to him, yes.

8    Q.  Yep.  And I just actually want to be clear, it says yes.

9    That's all I need from that.

10         So people are being activated to work, they can't work

11   because the contracts haven't been -- are cancelled, right?

12   And then they're not being told, oh, of course we're going to

13   turn those right back on, right?

14   A.  Correct.

15   Q.  They're getting questions --

16   A.  Correct.

17   Q.  -- and suggestions that it's going to be very narrow,

18   right?

19   A.  Correct.

20   Q.  Okay.

21   A.  But I also don't expect my procurement staff to know all of

22   the mission or programmatic details of every one of these

23   contracts.  So that's why Jafnar is relying on the officers to

24   help justify why these are important.  So I appreciate the fact

25   that Nykea stated what she stated to him, and we have been

 1   trying to work with them to make the accommodation.

 2   Q.  So the chief financial officer -- so all of these contracts

 3   were turned off, right?

 4   A.  (No response.)

 5   Q.  They sent notices of termination?

 6   A.  Yes.  Thank you.

 7   Q.  And the office responsible for figuring that out, your

 8   office, right, or at least you oversee procurement?

 9   A.  Yes, right.

10   Q.  So your office, responsible for figuring that out, doesn't

11   have the knowledge required to figure out which ones need to be

12   turned back on, right?

13   A.  Not with all of the contracts, with this one specifically

14   as it related to reasonable accommodation, EEO compliance,

15   anti-harassment, anti-bullying, these are people that work very

16   closely with my team and my staff.  They do not report to me,

17   but I'd like to think that this kind of work should not stop

18   because that just creates a whole different level of problems

19   for the Agency.  I mean, these are, again, legally-required

20   functions for people to accommodate them.

21   Q.  Okay.  And while we're on the subject of contract --

22            THE COURT:  Just to be clear, when we're talking

23   about these disability and accessibility, this is so that

24   internally your employees are having their disabilities

25   accommodated?

1          THE WITNESS:  Yes, ma'am.

2          THE COURT:  It's not about consumers.

3          THE WITNESS:  That's correct.

4          THE COURT:  They have access to your complaint

5    system.  This is about how you manage yourself?

6          THE WITNESS:  Yes.

7          THE COURT:  And those requirements flow from the

8    statutes creating CFPB, or flow from the statutes that govern

9    all federal agencies?

10          THE WITNESS:  EEOC.

11    BY MS. BENNETT:

12    Q.  In that we talked about the 508 contract being cancelled?

13    A.  Yes.

14    Q.  That contract, though, was agency-wide, right?  Or at least

15    there was a 508 contract for consumer response too, right?

16    A.  I don't know.

17    Q.  Okay.  So you're not aware whether there was a contract

18    that allowed consumers with disabilities to be able to access

19    the consumer complaint database, right?

20    A.  I don't know.  The only thing -- again, narrowly looking at

21    it, I'm aware of the operational legal requirements for the

22    agency to comply with both external and internal stakeholders

23    as it relates to 508, which is managed by our Office of

24    Minority and Women Inclusion.

25    Q.  Okay.  So you don't know whether the 508 contract for

1    consumer response was cancelled?

2    A.   I have no idea if they have a separate contract for 508.

3    Q.   Just very briefly while we're on the subject of contracts,

4    can you turn to Exhibit X in the plaintiffs' binder.

5         And that, again, is -- I believe was an email from the

6    chief financial officer, right?

7    A.   It appears to be, yes.

8    Q.   It emphasizes we're taking a very narrow approach, right?

9    And it says, "If without the contract the Bureau can't meet a

10   statutory requirement, then it will be considered for

11   reactivation," right?

12   A.   Yes.

13   Q.   That's what it says?

14   A.   Yes.  Yes.

15   Q.   And it also says you have to be -- "Please be prepared to

16   have to defend the justifications to external parties," right?

17   A.   Yes.  But can I explain about --

18   Q.   I think you'll probably get a chance to explain when

19   defendants get back up.

20        Okay.  So we've talked about the Office of Civil Rights,

21   we've talked about the Disability and Accessibility Programs

22   section.  Let's talk about the Office of Research.  What's

23   going on in the Office of Research since it was turned back on?

24        If you don't mind turning to Exhibit Y of the

25   plaintiffs' binder.  And this is an email from Jason Brown,

```
 1     right?

 2     A.  Yes.

 3     Q.  And who is Jason Brown?

 4     A.  He is head of our -- I believe he's the assistant director

 5     for Research.

 6     Q.  So it's an email from the assistant director of Research

 7     to, it looks like, the Research Division, right?

 8     A.  Yes.

 9     Q.  And it's sent on March 4th, 2025, right?  It's at the top.

10     A.  March 3rd, yes.

11     Q.  Sent on March 3rd of 2025?

12     A.  Right.

13     Q.  And it outlines several ways in which -- several challenges

14     that they are confronting with getting back to work, right?

15     A.  Yes.  I haven't read the whole thing, but, yes, it

16     sounds -- looks correct.

17               THE COURT:  Tell me the page number.

18               MS. BENNETT:  This is Exhibit Y in the plaintiffs'

19     binder and it's the first and second page of that exhibit.

20     It's only a two-page exhibit.

21     BY MS. BENNETT:

22     Q.  And it says -- I'm starting at the bottom of that page.

23     Jason Brown says, "As we are resuming our work, we are

24     confronting a few challenges," right?

25     A.  Um-hum.
```

```
 1    Q.  And he lists them?

 2    A.  Yes.

 3    Q.  One is loss of personnel?

 4    A.  Yes.

 5    Q.  He says, "The firing of much of our staff impacts our

 6    ability to complete assignments as planned," right?

 7    A.  Yes.

 8    Q.  And he also says, "We are trying to make sure we have

 9    access to the files of the staff who have left," right?

10    A.  Yes.

11    Q.  So they both -- people were fired that they needed to do

12    their -- complete their work, right?

13            MR. ROSENBERG:  Objection.  Potential lack of

14    foundation.  The email is from Jason Brown, to DL_CFPB_OR.

15    Maybe a missed it, have we established that Mr. Martinez has

16    received this email?

17            THE WITNESS:  I've never seen this email before.

18            MS. BENNETT:  We would be happy to -- I thought we

19    were --

20            THE COURT:  Have we shown people emails that they

21    didn't write or send?

22            MS. BENNETT:  Yes, yes.

23            MR. ROSENBERG:  I believe all of the emails that I

24    showed Mr. Martinez were e-mails that he either sent or

25    received, either directly or indirectly.
```

1          THE COURT:  What question were you going to ask about

2    this?  Did you have any interplay into this communication or

3    know anything about the problem that he's reporting?

4          THE WITNESS:  No.

5          THE COURT:  Okay.

6    BY MS. BENNETT:

7    Q.  Do you have any reason to doubt the head of research's

8    assessment of the problems that they're suffering in getting

9    back to work?

10   A.  No.

11   Q.  Okay.  And you previously opined on the status --

12         THE COURT:  All the emails and declarations that you

13   introduced and all the ones they introduced are still part of

14   the record.

15         MS. BENNETT:  Great.

16         THE COURT:  So they don't all have to come through

17   his mouth.

18   BY MS. BENNETT:

19   Q.  Let's talk about consumer response.  You're aware that

20   there's a backlog of thousands of complaints, right?

21   A.  Generally.

22   Q.  Generally.  So you're not aware of the current status of

23   Consumer Response, right?

24   A.  I don't know all of the specific details about Consumer

25   Response.

1    Q.  Okay.  So you don't know whether it's fully operational

2    right now or not?

3    A.  No.

4    Q.  Okay.  And --

5    A.  Well, fully operational versus a backlog?  I mean, there --

6            THE COURT:  Look, you're either a witness who can

7    testify to the status of this organization or you can't.  So if

8    you are, then she's going to ask you questions about it.  If

9    you aren't, she isn't.

10            THE WITNESS:  Yes, ma'am.

11            THE COURT:  So are you?

12            THE WITNESS:  I will hold back.  Thank you.

13            THE COURT:  Okay.

14    BY MS. BENNETT:

15    Q.  So you can testify to supervision based just on the emails

16    we went back and forth on, right?

17    A.  Yes.

18    Q.  And Research, you can't testify to the current status,

19    right?

20    A.  No.

21    Q.  And same with Consumer Response, right?

22    A.  Well, let me back up, though, because my testimony this

23    morning, when I was questioned about this, I was able to

24    reference the specific emails that I was copied on to Mark

25    Paoletta and what he subsequently approved.  So, I -- again, I

1    know what was approved, but I don't know the specifics of who

2    is performing work in those divisions.

3    Q.  I see.  So you know -- if you were CCed on an email, you

4    know what the email said?

5    A.  Yes.

6    Q.  But you don't know the current status of what's actually

7    happening on the ground in --

8    A.  I would have no way of knowing that.

9    Q.  Got it.  And how about Markets?  The Office of Markets?

10   A.  I have no idea.  Other than the email that I referenced

11   this morning, that I looked at and was asked about.

12   Q.  Okay.  So in general, in the mission side of the

13   organization -- just to be really clear, and that way I'll stop

14   asking you specific questions, all of the offices in the

15   mission side of the organization, you don't have insight into

16   what's actually happening on the ground?

17   A.  I have no insight.  I usually don't have insight into those

18   specific groups.  Again, those groups have historically, over

19   the last four years, reported to the chief of staff.  That's an

20   entirely different programmatic SME, subject matter expert,

21   responsibility.

22   Q.  And I just want to -- actually have just two more things to

23   ask you about.

24          THE COURT:  More topics or two more questions?

25          MS. BENNETT:  Two more topics, although they both

1    will be very short.  One is just one question.

2            THE COURT:  Ask the one-question topic.

3    BY MS. BENNETT:

4    Q.  So the one question topic is:  I just want to clear up, you

5    said on direct that you don't message about work, right?  You

6    don't send text messages about work?

7    A.  When I think of text messages, I think of using my iPhone

8    and sending text messages.

9    Q.  I said it was one question, but it might be three

10   questions.

11           The previous exhibit that the defendants showed you was

12   a Teams message?

13   A.  That was a Teams message.

14   Q.  You do use Teams messages for work, right?

15   A.  Yes.

16   Q.  And as far as you're aware, none of your Teams messages are

17   in this record, right?

18   A.  That is the only one I'm aware of.

19           MS. BENNETT:  Okay.  And then I have one last topic,

20   which would have probably four questions.

21           THE COURT:  All right.  Go ahead, try.

22   BY MS. BENNETT:

23   Q.  So the last thing I just want to ask you about is:  I think

24   your testimony is, but I'm not entirely sure, that current

25   leadership -- and by that I mean Acting Director Vought and

1    Mark Paoletta -- do not currently intend to wind down the

2    Agency, is that right?

3    A.  My understanding is that they have recognized that there

4    are statutory requirements that need to be fulfilled within the

5    agency, but I don't know how many people, I don't know what

6    functions.  I have no knowledge of what their thinking is right

7    now in terms of capacity or size of the agency.  But, yes, my

8    understanding is that they are committed to fulfilling the

9    statutory requirements of the Agency.

10   Q.  Okay.  But you have no idea what that means to them, right?

11   A.  I have no idea what that means.  I will find out once we're

12   building out this report that needs to go to OMB with regards

13   to the reduction in force across the federal government.  But I

14   have no idea as of right now what they're thinking.

15   Q.  Okay.

16          THE COURT:  And you don't know whether that means

17   they want -- they recognize that they will be fulfilled by the

18   CFPB or if finding a home in some other agency does the trick?

19          THE WITNESS:  Correct.

20          THE COURT:  You don't know what they're thinking on

21   that?

22          THE WITNESS:  I have no idea.

23          THE COURT:  Okay.

24   BY MS. BENNETT:

25   Q.  Okay.  And the evidence we do have is they've cancelled the

1    leases on all the buildings, right?

2    A.  Yes.

3    Q.  There's an executive -- return-to-work executive order,

4    right?

5    A.  Yes.

6    Q.  So they've cancelled all of the physical offices, but there

7    is an executive order that employees that still work for the

8    government have to go to a physical office, right?

9    A.  Yes.

10   Q.  Okay.  And we know that the virtual desktop is not

11   available, right?

12   A.  To a smaller population of individuals.

13   Q.  Okay.  So that's Exhibit M of the plaintiffs' exhibits.

14        We know that at least as of last week human resources

15   still had an auto response discussing employees' recent or

16   impending separation, right?

17   A.  Yes.

18   Q.  That's Exhibit N.

19        And we know that all mandatory training -- mandatory

20   training -- has been cancelled, right?

21   A.  Yes.

22   Q.  That's Exhibit SS of the plaintiffs'.

23        And, so, one last question is:  Is the mass termination

24   team still meeting?  The -- I think what you called the RIF

25   team?

1    A.  Yes.

2    Q.  The RIF team is still meeting, right?

3    A.  They're meeting regularly together as a team to come up

4    with what questions and guidance they need from the leadership

5    to develop the material that's due to OMB.

6    Q.  Okay.  So as far as you know, nothing -- you don't know

7    that anything has changed as the -- per the RIF plans?

8    A.  Well, for the RIF plan related to the 14th, that's, like,

9    off the table.  Our guidance is to go through the organized

10   process that OMB has put into place.  And there's several

11   things that call into question where agencies need to take

12   budgets, statutory requirements, collective bargaining

13   agreements.  There's a whole host of things that is very

14   orderly that I intend to follow based upon my conversations

15   with leadership.

16   Q.  I see.  So you are saying that -- not that the plan to

17   terminate the vast majority of the employees is off the table,

18   but that the -- they are taking into account the procedural

19   requirements in a way that they may not have before?

20   A.  Yes.

21        MS. BENNETT:  Okay.  Thank you.  No further

22   questions.

23        Oh, actually, can I just really quickly --

24        No further questions.

25        THE COURT:  All right.  It's always the better

```
1   answer.
2            Okay.  So we need to talk about scheduling.  I
3   presume that you have some very, very targeted and
4   nonrepetitive redirect that you would like to ask?  That's it
5   on that page?
6            MR. ROSENBERG:  Pretty much.
7            THE COURT:  All right.  I still don't think we can do
8   it this afternoon.  But you're not going to add any questions
9   to that overnight.  You're allowed to delete them, however.
10  Because I did -- I actually did read along with everything you
11  showed him, so you don't have to show him everything you've
12  already showed him.  But I'm going to allow you to do redirect
13  because you're entitled to redirect, but not today.
14           And do you have any other witnesses the government
15  intends to call?
16           MR. ROSENBERG:  The government does not have any
17  other witnesses.
18           THE COURT:  Okay.  Now, having conferred, possibly,
19  among yourselves, are you planning to call any of your
20  witnesses?
21           MR. GUPTA:  Yes.
22           THE COURT:  Okay.  Approximately how many?
23           MR. GUPTA:  Two.
24           THE COURT:  Two?
25           MR. GUPTA:  Two.  And it will be very short.
```

```
1          THE COURT:  And they'll be cross-examined, which is
2    appropriate and fair.  Okay.  So we have probably either a
3    morning or afternoon, it sounds like, of testimony, maybe a
4    little less, which is kind of where I thought we were headed
5    this month.  Silly me.  So we need to figure out when we can do
6    that.
7          I understand the parties were excited about tomorrow.
8    And I have a conflict in the morning tomorrow that I cannot
9    change, and it's not even going to be over until about 11,
10   11:30ish.  So I think we're talking about resuming in the
11   afternoon.
12         And I don't have anything else in court, anything
13   scheduled on my calendar for tomorrow afternoon?
14         THE COURTROOM DEPUTY:  No, ma'am.
15         THE COURT:  So we can resume tomorrow afternoon.
16   Does that work for you, Mr. Rosenbeg?
17         MR. ROSENBERG:  That does, Your Honor.
18         THE COURT:  What about you?
19         MS. BENNETT:  Yes, Your Honor.
20         MR. GUPTA:  Yes.
21         THE COURT:  Why don't we start at -- why don't we say
22   1:30 tomorrow afternoon.  Does that work?
23         You're done -- oh, no, you're not done.  I'm sorry.
24         THE WITNESS:  No.
25         THE COURT:  You'll be back.  If they tell you to be
```

1    back, you'll be back.  That's the way it is.  So we'll start

2    again at 1:30, in the hope that we won't be sitting here at

3    5 p.m. again.

4            MR. ROSENBERG:  Two housekeeping matters.  Plaintiffs

5    have indicated they plan to call two witnesses.  We would ask

6    them to identify those witnesses to us so we know who will be

7    testifying on plaintiffs' behalf.

8            THE COURT:  Well, that's -- I thought you already

9    knew who was here, but --

10           MR. GUPTA:  Matt Pfaff.

11           THE COURT:  You committed to having him all along.

12           MR. GUPTA:  Right.  We've identified him last week.

13   It's Matt Pfaff.  And then the other one is a person who

14   submitted a pseudonymous declaration.

15           THE COURT:  So you haven't determined yet whether

16   they're going to testify?

17           MR. GUPTA:  We haven't had a chance to speak with the

18   witness.

19           THE COURT:  All right.  Okay.

20           MR. ROSENBERG:  What is the pseudonymous name?

21           THE COURT:  You can give the pseudonymous name so

22   they can at lease prepare their cross.

23           MR. GUPTA:  It's Alex Doe.

24           THE COURT:  So now you know who you're looking for.

25           MR. ROSENBERG:  The second question is more of a

1    logistical question regarding the exhibits.  We, if this Court

2    will allow it, are prepared to re-file our exhibits by adding

3    exhibit numbers that correspond to the tabs in the binder, so

4    that to the extent that will help the Court with the clarity of

5    the record.  The exact same documents we already have to submit

6    and the two documents that we introduced today for the first

7    time, the OMB memo and the text message.

8         THE COURT:  So these weren't numbered as attachments

9    to the declarations with which they were submitted and the

10   notices with which they were submitted already as something?

11        MR. ROSENBERG:  So the documents -- most of the

12   documents in the CFPB binder are the emails that we submitted,

13   you know, in the two tranches, the first one on Tuesday and the

14   second one on Friday.  They were sequentially numbered with

15   Bates numbers.  Unfortunately, we didn't have time to add

16   exhibit numbers to those documents at that time.

17        The binder also includes the two Martinez

18   declarations which were also previously filed with the court

19   under separate exhibit tabs.  And what we would propose to do

20   is simply superimpose an exhibit number on each page of the

21   document that corresponds with the tab in the binder, so that

22   when we refer, for example, to tab 42, there will be a number

23   42 on each of those pages of the document, as well as the Bates

24   number to which we've all been referring.  I suppose the ECF

25   number at the top will get, like, superimposed.

1            THE COURT:  You're welcome to do that.  It just even

2    slows up further our trying to write an opinion based on it

3    because now the numbering system that we have been using, which

4    is your system, now we need to go through all our notes and

5    make sure we're talking about the same document.  But probably

6    for clarity sake it's a good thing to do, so you're welcome to

7    do it.

8            MR. ROSENBERG:  I only want to do it if the Court

9    believes it would be helpful.

10           THE COURT:  I think it would be a nice idea to have a

11   record of what you have moved in with individual exhibit

12   numbers.  So, go right ahead.  I'm not going to order you to do

13   it, just if you want to do it, do it.

14           MR. ROSENBERG:  One other -- since the Court referred

15   to ordering individual exhibit numbers, I believe we had an

16   agreement, since all of these exhibits were already on the

17   docket and were available for the Court, there was no need to

18   separately move in --

19           THE COURT:  Correct.  This is not a trial where we're

20   deciding what goes back to the jury room.  Everything you've

21   already given me was supported by a declaration as something

22   and they're in the record, in support of or in opposition to

23   the pending motion for preliminary injunction.  They're not in

24   the record for any other purpose.  You have to start all over

25   again, if there are depositions or summary judgment or all that

1     sort of thing, you'll have to call them something else.

2          But if you would like a clear record of what

3     transpired at this hearing, you are welcome to file these and

4     then they will have a name, and maybe use that name for them in

5     the future.  But, you're numbers, they are letters of the

6     alphabet.  And I don't think they have any more letters left,

7     unless we go with triple letters, which we're not going to do.

8          I think we know what we're doing about exhibits.

9          And I'm not going to ask you for an answer right now,

10    but I need you to consider the following thing:  You asked me,

11    when we were last here:  Oh, when are you going to decide this

12    by?  And I resisted telling you because I had not yet even had

13    this hearing or received everything that was submitted after

14    the hearing, which was substantial, and now this hearing isn't

15    even over.

16         I was prepared, before I took the bench, to say to

17    you, Can you continue what you've agreed to until Friday?  I

18    think it's the 21st, which was only four business days after

19    your agreement which ends on the 17th.  Now that I know -- I've

20    been in here all day and I didn't have the opportunity to write

21    and I don't have tomorrow afternoon to write -- I'm incapable

22    of telling you I could be done by that date.

23         But, I would be interested in knowing, tomorrow, if

24    the parties -- understanding that I'm trying to work with that

25    kind of expedition and so I would be targeting the following

1   week -- can agree to extend their agreement so it's parallel to

2   what's already binding you until I rule on the preliminary

3   injunction, with the understanding that I'm going to do

4   everything I can, assuming that this hearing ever ends, to get

5   it done by the week of -- whatever that week is -- the 24th.

6   Because the rest of my docket needs attention in between, and

7   certainly after whatever I do.

8           But I think we're now engaged in not just a legal

9   exercise, but a fact-finding exercise.  And you've both taken a

10  lot of time and a lot of effort to identify the documents that

11  you wanted me to look at and to consider it in connection with

12  his testimony and your argument, and you want me to do that

13  thoroughly and you want me to reach the right answer.  You

14  don't want me to rush it.  And that's in everybody's benefit.

15          So I would encourage you to think about having that

16  be an orderly and thoughtful process, while expedited, compared

17  to the typical summary judgment process, which gets balanced

18  against everything else you have on your docket.

19          So, think about that.  I would encourage you to be

20  open to that.  And I will see everybody tomorrow at 1:30.

21                          *   *   *

22

23

24

25

1                    CERTIFICATE OF OFFICIAL COURT REPORTER

2

3          I, JANICE DICKMAN, do hereby certify that the above and

4     foregoing constitutes a true and accurate transcript of my

5     stenographic notes and is a full, true and complete transcript

6     of the proceedings to the best of my ability.

7                              Dated this 12th day of March, 2025

8

9

10                         _____

11                         Janice E. Dickman, CRR, CMR, CCR
                          Official Court Reporter
12                         Room 6523
                          333 Constitution Avenue, N.W.
13                         Washington, D.C.  20001

14

15

16

17

18

19

20

21

22

23

24

25

**$**

**$711** [1] - 36:19

**/**

**/ask** [1] - 187:22

**0**

**00** [1] - 107:4
**00003** [2] - 87:21, 165:5
**00052** [1] - 105:11
**00079** [1] - 99:7
**00097** [1] - 84:23
**00114** [1] - 107:9

**1**

**1** [4] - 87:1, 87:6, 96:4, 138:7
**1,000** [3] - 53:6, 53:10, 53:16
**10** [5] - 47:15, 90:3, 92:16, 110:3, 138:19
**100** [1] - 129:21
**107** [2] - 41:18, 42:17
**10:27** [1] - 166:10
**10:33** [6] - 108:17, 109:5, 109:8, 109:25, 110:14, 112:3
**10th** [35] - 22:23, 23:19, 32:1, 45:10, 46:4, 52:10, 56:3, 61:6, 66:5, 70:17, 77:14, 78:8, 78:9, 86:25, 87:3, 104:13, 106:2, 107:6, 126:23, 127:17, 128:4, 128:5, 128:7, 136:22, 137:11, 141:9, 143:7, 143:21, 148:8, 148:11, 148:25, 166:22, 184:9, 206:22, 207:14
**11** [7] - 48:17, 48:19, 68:15, 176:9, 177:22, 179:10, 234:9
**114** [1] - 107:18
**1175** [1] - 51:5
**11:30ish** [1] - 234:10
**11th** [8] - 42:3, 42:25, 128:8, 161:18, 166:8, 167:4, 173:6, 174:7
**12** [2] - 41:18, 42:16
**1200** [4] - 128:25, 129:2, 129:9, 132:21
**12:13** [2] - 108:22, 109:3
**12th** [1] - 166:8
**13** [3] - 93:8, 93:18,

94:24
**130** [1] - 52:4
**13th** [6] - 128:3, 128:10, 129:18, 130:11, 138:8, 139:22
**14** [1] - 94:4
**14th** [16] - 56:3, 104:14, 132:21, 132:24, 133:1, 133:12, 133:13, 141:20, 146:1, 148:25, 158:23, 168:3, 177:13, 180:21, 206:11, 232:8
**16** [5] - 30:1, 94:11, 95:10, 95:18, 102:13
**17** [1] - 95:9
**1700** [1] - 14:23
**17th** [2] - 142:20, 238:19
**18** [7] - 29:1, 29:4, 29:5, 70:6, 81:12, 84:16, 179:24
**18th** [3] - 73:8, 168:11, 168:15
**19** [3] - 180:24, 187:14, 216:25
**1999** [1] - 9:22
**19th** [7] - 76:4, 76:10, 142:15, 143:9, 168:13, 169:20
**1:30** [4] - 133:22, 234:22, 235:2, 239:20
**1:36** [2] - 133:23, 133:25
**1st** [4] - 15:6, 15:11, 15:15, 192:5

**2**

**2** [10] - 62:19, 62:21, 87:2, 87:20, 88:17, 89:18, 102:3, 135:13, 154:19, 165:4
**20** [5] - 31:23, 31:25, 86:17, 96:7, 186:24
**2000s** [1] - 18:16
**2001** [1] - 10:7
**2007** [3] - 10:7, 17:11, 17:22
**2010** [1] - 12:8
**2011** [1] - 12:10
**2023** [5] - 13:24, 14:8, 37:16, 37:19, 69:8
**2025** [27] - 105:19, 112:24, 177:10, 177:13, 178:7, 180:19, 182:12, 182:15, 183:2, 195:12, 199:1, 199:10, 199:15, 202:7, 202:16, 203:5, 203:12, 203:19,

203:23, 204:2, 211:22, 212:21, 212:24, 215:24, 217:24, 224:9, 224:11
**20th** [3] - 150:15, 150:22, 153:18
**21** [1] - 189:3
**21st** [2] - 195:12, 238:18
**22** [16] - 16:22, 29:1, 29:4, 31:24, 31:25, 35:6, 35:8, 35:12, 105:8, 105:10, 107:25, 108:2, 111:12, 196:5, 197:25, 211:11
**23** [1] - 192:7
**24** [5] - 15:17, 24:18, 96:22, 160:8, 161:7
**24th** [11] - 124:10, 124:18, 125:6, 126:1, 158:23, 184:25, 186:17, 188:9, 189:22, 190:9, 239:5
**25** [1] - 98:1
**25-381** [1] - 3:3
**25th** [3] - 177:10, 178:7, 179:10
**26** [1] - 95:20
**26th** [2] - 157:1, 200:18, 201:18
**27** [4] - 56:21, 76:19, 199:15, 202:2
**27th** [19] - 66:4, 94:12, 97:8, 105:19, 108:3, 111:12, 111:13, 180:19, 198:18, 199:1, 199:7, 199:10, 201:21, 203:12, 209:2, 210:13, 212:6, 216:20, 217:4
**28** [1] - 48:4
**28th** [8] - 106:11, 111:15, 111:18, 158:23, 182:5, 211:22, 212:7, 217:4
**2nd** [22] - 76:15, 84:24, 98:7, 99:8, 104:18, 107:11, 108:6, 108:7, 108:21, 109:17, 110:16, 111:18, 124:15, 124:24, 127:10, 159:10, 198:14, 202:7, 202:16, 204:2, 210:21, 212:24

**3**

**3** [2] - 97:11, 198:25
**30** [8] - 47:8, 71:13, 86:17, 86:19, 98:6, 150:11, 168:25, 202:19

**30-day** [2] - 48:10, 150:12
**31** [1] - 35:9
**31-1** [6] - 16:18, 16:22, 29:1, 31:23, 35:8, 35:12
**31st** [1] - 15:24
**32** [2] - 99:6, 202:25
**33** [1] - 212:13
**34** [1] - 12:8
**35** [3] - 12:9, 101:22, 104:17
**36** [1] - 81:13
**365** [1] - 87:16
**38** [4] - 81:13, 81:14, 84:22, 172:22
**39** [2] - 180:25, 217:16
**3:30** [1] - 66:10
**3rd** [28] - 16:25, 19:6, 64:11, 76:14, 99:16, 108:14, 108:22, 109:3, 109:5, 109:8, 109:11, 110:1, 110:14, 111:7, 112:3, 182:12, 182:13, 182:15, 203:5, 203:19, 203:23, 210:23, 212:21, 216:20, 217:24, 219:17, 224:10, 224:11

**4**

**4** [4] - 22:15, 162:5, 162:18, 162:23
**404** [3] - 90:9, 91:5, 116:5
**41** [1] - 216:24
**42** [2] - 236:22, 236:23
**43** [2] - 100:20, 180:25
**44** [8] - 107:3, 107:9, 108:5, 109:4, 109:10, 110:14, 112:23, 215:5
**45** [2] - 108:18, 109:13
**48** [2] - 15:17, 24:18
**49** [4] - 72:5, 73:6, 167:14, 168:8
**4th** [5] - 112:24, 182:13, 182:15, 183:2, 224:9

**5**

**5** [4] - 48:17, 62:21, 194:13, 235:3
**50** [7] - 75:4, 167:6, 169:14, 170:5, 170:12, 211:12
**508** [7] - 218:18, 218:20, 222:12, 222:15, 222:23,

222:25, 223:2
**51** [5] - 79:1, 170:13, 170:14, 170:23, 211:13
**52** [1] - 211:12
**53** [1] - 91:3
**55** [1] - 116:10
**56** [12] - 16:5, 16:12, 28:24, 29:3, 30:1, 31:22, 35:8, 35:10, 102:12, 198:20, 198:22, 204:10
**56-1** [1] - 162:19
**57** [1] - 198:24
**5:45** [1] - 20:4
**5:59** [1] - 99:16

# 6

**6** [11] - 19:21, 49:1, 78:8, 161:24, 161:25, 162:19, 193:25, 195:7, 203:7, 215:23, 217:15
**60** [5] - 47:8, 48:4, 48:17, 150:13
**60-1** [1] - 41:18
**60-day** [2] - 47:5, 48:10
**64** [1] - 95:21
**65** [1] - 202:1
**66-1** [2] - 48:4, 48:16
**6:15** [1] - 20:4
**6:30** [1] - 20:4
**6th** [2] - 21:5, 39:18

# 7

**7** [3] - 50:23, 78:8, 176:5
**700** [1] - 50:25
**711** [1] - 39:7
**720** [1] - 50:24
**73** [1] - 202:18
**75** [2] - 51:23, 51:25
**7th** [18] - 21:4, 21:6, 21:11, 21:18, 22:9, 22:10, 23:12, 25:10, 26:22, 30:5, 33:17, 39:18, 125:12, 125:15, 159:18, 159:19, 159:20, 192:17

# 8

**8** [4] - 78:8, 178:5, 198:24, 213:18
**85** [1] - 51:23
**8th** [21] - 23:8, 30:4, 39:19, 39:20, 66:8, 102:15, 106:3, 106:12, 107:1, 107:5, 108:15,

125:15, 137:7, 159:22, 160:22, 206:24, 207:1, 207:2, 207:9, 211:25, 212:12

# 9

**9** [7] - 16:21, 16:22, 48:19, 89:17, 92:13, 200:5, 217:15
**90** [1] - 49:2
**900** [2] - 50:23, 50:25
**96** [1] - 172:24
**99** [1] - 217:16
**9th** [1] - 78:8, 78:9

# A

**a.m** [9] - 99:16, 109:5, 109:8, 110:3, 110:14, 112:3, 138:19, 166:10, 203:7
**ability** [7] - 42:22, 75:19, 85:16, 89:21, 93:24, 187:3, 225:6
**able** [22] - 10:14, 20:18, 65:15, 65:17, 91:23, 106:10, 115:24, 123:2, 123:18, 131:22, 135:23, 139:10, 141:16, 166:14, 190:23, 192:23, 193:18, 195:2, 197:12, 209:16, 222:18, 227:23
**abnormal** [1] - 34:1
**abolished** [1] - 145:17
**absent** [2] - 152:17, 152:19
**Absolutely** [1] - 47:18
**absolutely** [11] - 5:9, 45:11, 50:6, 55:1, 65:14, 130:1, 143:14, 146:6, 159:16, 189:12, 193:5
**acceptable** [1] - 87:10
**accepted** [1] - 45:21
**access** [25] - 22:1, 22:11, 23:16, 24:9, 24:10, 24:22, 24:25, 25:11, 25:13, 25:15, 25:18, 26:7, 33:21, 33:24, 75:19, 78:12, 90:17, 90:18, 176:24, 192:23, 196:15, 196:16, 222:4, 222:18, 225:9
**accessed** [1] - 26:6
**Accessibility** [3] - 217:18, 218:1, 223:21
**accessibility** [2] -

218:20, 221:23
**accommodate** [1] - 221:20
**accommodated** [1] - 221:25
**accommodation** [3] - 182:3, 221:1, 221:14
**accommodations** [3] - 218:5, 218:15, 219:8
**accomplish** [3] - 32:7, 32:12, 146:5
**accordance** [2] - 82:3, 206:16
**according** [1] - 220:7
**account** [11] - 34:15, 44:15, 44:16, 44:17, 64:9, 111:10, 179:3, 179:14, 232:18
**accountable** [1] - 187:17
**accountant's** [1] - 24:3
**accounts** [4] - 34:13, 34:16, 67:2, 127:17
**accurate** [2] - 127:14, 127:18
**accurately** [1] - 116:16
**acknowledge** [1] - 113:13
**acquisition** [1] - 143:19
**acquisitions** [1] - 143:17
**across-the-board** [2] - 152:14, 206:5
**Act** [6] - 96:4, 146:22, 191:24, 192:9, 193:9, 194:21
**acted** [1] - 191:7
**Acting** [31] - 15:16, 30:3, 30:16, 32:2, 33:16, 35:15, 36:16, 49:8, 50:10, 56:13, 61:13, 75:13, 77:14, 87:17, 89:7, 102:14, 121:11, 130:13, 136:21, 138:21, 138:23, 140:10, 159:17, 161:18, 163:4, 163:7, 169:24, 184:11, 187:15, 208:8, 229:25
**acting** [30] - 15:16, 15:20, 15:23, 17:1, 17:2, 22:24, 23:14, 29:12, 30:5, 32:17, 38:20, 56:13, 59:7, 71:15, 78:16, 95:14, 96:8, 96:13, 106:25, 125:7, 137:23, 138:18, 143:12, 145:1, 145:2,

145:4, 158:5, 160:9, 161:6, 206:16
**action** [3] - 56:3, 95:2, 127:16
**Action** [1] - 16:4
**actions** [2] - 63:14, 153:8
**activated** [4] - 199:2, 199:8, 218:2, 220:10
**activates** [1] - 203:9
**activating** [1] - 201:4
**active** [1] - 145:5
**actively** [1] - 119:15
**activities** [14] - 31:1, 60:16, 96:19, 99:12, 102:11, 105:14, 109:20, 112:7, 112:8, 113:7, 113:8, 113:20, 118:16, 118:20
**activity** [6] - 30:14, 106:13, 109:19, 110:18, 112:6, 212:1
**actor** [1] - 114:14
**actual** [1] - 137:1
**ADAM** [1] - 9:4
**Adam** [4] - 9:10, 75:11, 106:12, 109:16
**adamantly** [1] - 118:16
**add** [2] - 233:8, 236:15
**added** [2] - 33:13, 102:24
**adding** [1] - 236:2
**addition** [3] - 125:24, 175:19, 199:22
**additional** [9] - 6:21, 21:14, 38:21, 175:19, 177:20, 190:17, 193:2, 193:3, 199:25
**address** [5] - 8:12, 40:15, 42:4, 60:13, 165:19
**addresses** [1] - 78:14
**administration** [7] - 14:10, 17:5, 17:8, 31:19, 36:16, 69:23, 215:1
**Administration** [3] - 70:24, 151:9, 151:21
**administrative** [18] - 14:3, 52:7, 52:11, 67:25, 98:11, 98:16, 113:19, 122:3, 143:13, 143:15, 144:12, 206:11, 206:17, 207:23, 207:24, 213:6, 216:10, 216:13
**admission** [1] - 104:11
**admitted** [1] - 54:14
**adults** [2] - 23:5,

141:16
**advance** [1] - 47:6
**advice** [3] - 92:10, 109:25, 213:25
**advise** [3] - 148:6, 181:16, 187:19
**advised** [4] - 40:9, 157:21, 158:8, 181:13
**advising** [2] - 181:22, 192:21
**advisor** [3] - 10:9, 43:22, 78:22
**advisors** [1] - 144:20
**Advisory** [1] - 96:3
**advisory** [4] - 78:21, 150:25, 151:8, 151:17
**advocacy** [1] - 123:24
**affairs** [4] - 95:14, 95:16, 103:4, 118:24
**Affairs** [2] - 58:23, 164:3
**affected** [2] - 35:1, 149:22
**affiliated** [5] - 33:3, 33:7, 34:9, 63:21, 68:24
**afield** [1] - 38:12
**afternoon** [11] - 21:14, 64:10, 64:15, 124:6, 233:8, 234:3, 234:11, 234:13, 234:15, 234:22, 238:21
**afterwards** [1] - 123:12
**agencies** [12] - 14:25, 34:5, 46:8, 61:11, 61:12, 64:18, 71:14, 74:1, 103:21, 147:18, 222:9, 232:11
**Agency** [13] - 14:17, 14:20, 37:20, 45:3, 45:4, 55:10, 62:22, 70:13, 103:5, 221:19, 230:2, 230:9
**agency** [68] - 14:24, 18:24, 25:14, 30:7, 30:22, 30:24, 34:2, 34:22, 35:2, 36:2, 37:25, 39:2, 49:21, 53:13, 53:20, 54:15, 55:20, 60:16, 63:13, 69:13, 72:18, 82:1, 83:16, 84:19, 88:12, 114:13, 117:1, 125:4, 126:9, 126:13, 126:20, 126:21, 127:5, 131:22, 143:13, 144:12, 146:9, 147:22, 147:23, 148:23, 150:10, 151:21, 151:22,

157:20, 158:1, 158:20, 160:14, 161:10, 161:16, 183:17, 183:19, 186:8, 188:3, 188:24, 190:21, 191:13, 204:18, 204:20, 204:22, 205:9, 206:5, 208:15, 222:14, 222:22, 230:5, 230:7, 230:18
**agency's** [2] - 80:20, 199:3
**Agency's** [1] - 119:22
**agency-wide** [1] - 222:14
**ago** [2] - 64:17, 67:15
**agree** [2] - 8:18, 239:1
**agreed** [5] - 5:18, 6:1, 141:20, 152:18, 238:17
**agreed-upon** [2] - 5:18, 152:18
**agreement** [4] - 6:22, 237:16, 238:19, 239:1
**agreements** [1] - 232:13
**agrees** [1] - 114:17
**ahead** [18] - 4:21, 12:12, 26:20, 31:20, 34:6, 60:17, 61:3, 74:19, 88:15, 91:2, 120:21, 124:3, 132:11, 136:16, 183:8, 191:20, 229:21, 237:12
**aiming** [1] - 54:11
**air** [1] - 191:2
**al** [2] - 3:3, 3:4
**alert** [1] - 32:17
**Alex** [3] - 127:8, 127:11, 235:23
**all-hands** [2] - 108:21, 111:21
**allegations** [1] - 115:12
**Allison** [1] - 3:14
**allocated** [2] - 27:18, 161:11
**allow** [3] - 10:23, 233:12, 236:2
**allowed** [5] - 25:13, 33:21, 37:15, 222:18, 233:9
**alluded** [1] - 96:23
**almost** [7] - 22:6, 22:8, 40:23, 120:13, 130:13, 180:21, 204:15
**aloud** [1] - 175:4
**alphabet** [1] - 238:6
**alternative** [1] - 190:10, 190:12, 190:20
**altogether** [2] -

129:10, 129:24
**America** [1] - 38:4
**American** [1] - 12:19
**amount** [7] - 38:16, 38:19, 40:19, 40:20, 160:13, 160:14, 196:12
**analysis** [11] - 63:17, 69:5, 69:7, 70:19, 70:21, 79:23, 84:20, 90:11, 91:4, 91:5, 121:16
**analytics** [2] - 182:19, 182:21
**analyzing** [1] - 63:3
**announced** [1] - 56:13
**answer** [24] - 37:3, 67:9, 68:3, 74:17, 77:3, 80:22, 84:15, 84:20, 88:8, 99:24, 100:1, 104:7, 106:15, 155:10, 172:10, 173:13, 174:3, 184:4, 201:12, 205:10, 212:4, 233:1, 238:9, 239:13
**answered** [2] - 100:1, 183:12
**Anthony** [2] - 79:3, 79:22
**anti** [3] - 182:4, 221:15
**anti-bullying** [1] - 221:15
**anti-harassment** [2] - 182:4, 221:15
**anticipate** [4] - 8:10, 8:14, 38:17, 55:23
**anticipated** [5] - 5:22, 15:9, 17:7, 53:2, 104:13
**anticipating** [1] - 20:9
**antivirus** [3] - 165:17, 197:5, 197:8
**anytime** [1] - 147:9
**apologies** [1] - 165:4
**Apologies** [1] - 202:24
**apologize** [10] - 44:4, 110:24, 146:25, 152:1, 154:12, 155:11, 167:9, 170:14, 182:13, 198:24
**APOR** [2] - 89:10, 89:13
**appear** [2] - 24:18, 134:25
**appearance** [2] - 3:6, 90:10
**appeared** [1] - 30:21
**applicable** [1] - 154:24
**application** [2] - 87:15, 88:3
**applied** [1] - 51:11
**applies** [1] - 213:22

**apply** [2] - 62:18, 88:22
**applying** [1] - 102:20
**appointed** [6] - 18:24, 78:7, 125:12, 130:14, 159:17, 184:11
**appointment** [2] - 26:18, 45:24
**appreciate** [4] - 74:1, 86:11, 170:18, 220:24
**apprised** [1] - 138:21
**approach** [13] - 3:5, 7:7, 14:16, 14:21, 58:4, 61:20, 70:4, 82:18, 85:13, 154:10, 159:12, 159:15, 223:8
**approaches** [1] - 23:3
**approaching** [1] - 64:18
**appropriate** [2] - 8:12, 234:2
**appropriated** [8] - 37:25, 38:1, 45:4, 53:12, 69:9, 74:2, 74:4
**appropriations** [2] - 36:1, 36:2
**approval** [13] - 32:18, 47:5, 48:9, 57:8, 59:9, 59:17, 94:1, 95:3, 96:1, 98:2, 150:12, 205:2
**approve** [4] - 59:12, 83:23, 92:25, 96:2
**approved** [14] - 57:10, 58:5, 58:25, 59:5, 82:21, 82:22, 94:5, 96:5, 99:23, 145:19, 145:21, 209:17, 227:25, 228:1
**area** [4] - 114:9, 145:20, 199:4
**areas** [9] - 46:16, 48:24, 57:4, 57:14, 68:23, 80:8, 95:25, 117:3, 175:22
**argument** [5] - 4:11, 13:2, 115:5, 239:12
**argumentive** [1] - 142:6
**arising** [1] - 115:3
**arm** [2] - 96:14
**arms** [1] - 74:24
**arrival** [2] - 125:6, 187:15
**arrived** [4] - 27:17, 37:16, 39:19, 56:4
**ASAP** [1] - 164:13
**ascertain** [1] - 177:20
**assertion** [1] - 82:12
**assess** [3] - 187:16, 201:1, 214:24

**assessed** [2] - 77:25, 79:25
**assessing** [4] - 64:16, 125:7, 125:24, 202:12
**assessment** [5] - 200:24, 201:9, 201:15, 201:19, 226:8
**assigned** [2] - 20:20, 55:20
**assignment** [1] - 20:21
**assignments** [1] - 225:6
**assist** [1] - 48:1
**assistance** [3] - 18:16, 22:16, 120:22
**assistant** [4] - 93:20, 211:17, 224:4, 224:6
**associate** [7] - 26:10, 88:18, 95:14, 96:8, 96:9, 96:13, 165:9
**associated** [4] - 34:23, 81:3, 152:15, 206:5
**Association** [3] - 3:11, 3:17, 38:4
**associations** [2] - 10:4, 31:7
**assume** [1] - 106:16
**assumes** [3] - 135:1, 155:9, 157:4
**assuming** [4] - 91:19, 151:4, 178:18, 239:4
**assumption** [2] - 52:9, 161:11
**attached** [1] - 218:15
**attachments** [4] - 28:25, 35:7, 197:8, 236:8
**attack** [2] - 191:10, 191:11
**attempt** [7] - 38:15, 44:6, 94:18, 126:13, 126:20, 126:21, 127:4
**attempted** [1] - 94:23
**attempting** [1] - 32:7
**attend** [1] - 46:4
**attention** [5] - 48:19, 191:4, 204:11, 208:12, 239:6
**attesting** [1] - 127:4
**attorney** [6] - 41:10, 124:7, 178:10, 178:14, 179:13, 192:20
**attorneys** [2] - 45:19, 45:21
**audibly** [1] - 5:11
**audit** [9] - 22:7, 22:9, 22:17, 22:22, 24:1, 24:3, 24:4, 24:6
**authority** [11] - 4:7,

4:8, 10:22, 40:17, 59:15, 63:13, 63:15, 83:24, 95:25, 98:16, 114:17
**authorization** [10] - 12:25, 13:3, 50:15, 75:13, 81:17, 97:20, 169:23, 170:2, 209:11, 210:25
**authorize** [5] - 109:18, 110:17, 112:6, 163:16, 217:3
**authorized** [28] - 57:14, 60:9, 66:7, 68:1, 71:7, 76:16, 76:20, 77:2, 77:10, 82:4, 92:6, 94:25, 97:9, 108:25, 109:1, 114:15, 114:24, 155:14, 156:7, 156:12, 167:21, 207:10, 207:13, 214:16, 216:18, 216:19, 216:21, 216:22
**auto** [1] - 231:15
**automatic** [2] - 197:14, 197:16
**available** [15] - 6:8, 6:9, 6:10, 13:20, 37:22, 43:18, 49:7, 50:7, 53:16, 181:18, 181:20, 193:1, 195:1, 231:11, 237:17
**aware** [51] - 27:22, 27:25, 41:2, 41:9, 46:1, 57:10, 58:2, 60:2, 60:6, 63:19, 64:2, 76:4, 76:7, 81:2, 84:5, 85:25, 100:9, 109:22, 109:23, 113:10, 116:4, 117:22, 117:23, 127:2, 134:3, 140:6, 141:19, 158:16, 161:17, 168:4, 168:10, 184:19, 188:13, 189:18, 189:19, 189:20, 208:1, 208:3, 208:4, 208:5, 208:6, 208:13, 208:14, 215:13, 222:17, 222:21, 226:19, 226:22, 229:16, 229:18

## B

**baby** [1] - 27:23
**background** [2] - 11:2, 60:10
**backlash** [1] - 89:3
**backlog** [3] - 90:3, 226:20, 227:5
**backup** [1] - 176:21

**bad** [2] - 114:14, 191:7
**bailiwick** [1] - 90:4
**balanced** [1] - 239:17
**Bank** [3] - 13:17, 14:2, 44:15
**banks** [1] - 103:7
**bar** [1] - 183:15
**bargaining** [1] - 232:12
**based** [34] - 17:15, 20:17, 22:4, 30:23, 36:7, 51:7, 53:14, 54:20, 58:25, 62:2, 65:12, 113:13, 114:20, 119:4, 129:25, 142:14, 148:11, 149:12, 151:14, 152:16, 172:2, 174:14, 183:1, 187:24, 188:2, 199:21, 203:11, 203:13, 211:3, 213:22, 214:25, 227:15, 232:14, 237:2
**basement** [2] - 27:18, 27:21
**basing** [1] - 212:11
**basis** [5] - 11:16, 17:23, 35:20, 49:13, 159:6
**Bates** [47] - 72:6, 73:7, 75:5, 81:13, 81:14, 84:23, 87:2, 87:20, 99:7, 107:3, 116:11, 122:8, 122:17, 122:19, 123:9, 123:10, 161:23, 162:1, 162:11, 162:14, 162:15, 162:16, 162:18, 162:23, 165:4, 166:6, 167:7, 170:6, 170:23, 172:23, 176:8, 178:4, 180:25, 194:1, 195:4, 195:7, 200:6, 202:1, 202:18, 204:9, 211:11, 212:14, 215:6, 216:24, 217:15, 236:15, 236:23
**bathrooms** [1] - 87:25
**became** [8] - 12:16, 13:20, 15:16, 22:25, 47:16, 56:5, 156:3, 208:5
**become** [5] - 13:23, 27:5, 53:8, 64:1, 137:19
**becoming** [1] - 141:14
**beforehand** [1] - 5:18
**began** [2] - 57:4, 210:10
**begin** [3] - 45:6, 46:10, 57:8
**beginning** [7] - 79:20,

111:11, 114:5, 121:8, 136:18, 175:21, 178:5
**behalf** [8] - 3:8, 3:25, 23:15, 62:10, 108:9, 163:4, 163:7, 235:7
**behind** [5] - 28:4, 40:17, 42:13, 95:18, 188:17
**belief** [1] - 107:1
**believes** [2] - 136:12, 237:9
**bell** [1] - 38:2
**below** [1] - 95:5
**bench** [1] - 238:16
**benefit** [1] - 239:14
**BENNETT** [92] - 49:11, 49:16, 97:4, 110:19, 110:24, 122:7, 122:18, 123:7, 124:5, 126:18, 126:19, 129:17, 133:3, 133:16, 133:17, 135:10, 136:17, 138:6, 139:21, 141:7, 142:8, 142:9, 144:4, 144:24, 146:20, 149:14, 150:9, 154:10, 154:12, 154:14, 155:12, 155:22, 156:1, 156:2, 156:25, 157:10, 159:8, 160:16, 160:17, 161:5, 162:7, 162:13, 162:22, 166:3, 166:6, 166:18, 168:8, 168:9, 170:14, 170:21, 170:22, 171:10, 171:12, 172:18, 174:5, 185:22, 186:16, 187:5, 187:12, 187:21, 187:23, 188:22, 188:23, 191:21, 191:22, 194:11, 194:17, 194:18, 198:10, 198:23, 203:25, 206:2, 207:20, 207:21, 210:13, 210:18, 222:11, 224:18, 224:21, 225:18, 225:22, 226:6, 226:15, 226:18, 227:14, 228:25, 229:3, 229:19, 229:22, 230:24, 232:21, 234:19
**Bennett** [2] - 3:12, 124:6
**Bessent** [7] - 15:16, 15:22, 17:20, 19:6, 30:6, 30:25
**Bessent's** [2] - 30:9, 30:16
**best** [4] - 116:17,

118:7, 157:22, 195:18
**better** [3] - 9:15,
83:20, 232:25
**between** [21] - 33:19,
39:18, 56:6, 58:9, 84:9,
86:4, 89:5, 107:25,
109:24, 117:24,
129:12, 133:20, 140:3,
142:19, 157:1, 170:19,
188:17, 202:21,
212:15, 216:20, 239:6
**Biden** [2] - 18:3
**big** [5] - 71:4, 83:7,
160:23, 204:20, 204:21
**biggest** [1] - 147:4
**bill** [2] - 182:22, 183:9
**bills** [1] - 44:16
**binder** [54] - 7:15,
7:24, 8:1, 8:3, 8:5,
8:20, 16:8, 16:11, 29:3,
41:16, 41:17, 42:8,
48:2, 48:16, 61:17,
72:3, 72:4, 73:6, 81:12,
84:22, 87:6, 102:13,
105:11, 113:25,
116:11, 122:13,
122:14, 122:16,
162:12, 164:19, 165:3,
167:10, 174:21, 176:5,
182:11, 193:25, 195:5,
198:21, 200:6, 202:3,
202:19, 206:15,
212:14, 215:5, 215:16,
223:4, 223:25, 224:19,
236:3, 236:12, 236:17,
236:21
**binders** [13] - 7:5, 7:7,
7:13, 7:23, 8:22, 8:23,
8:24, 9:1, 16:3, 41:15,
72:3, 122:7
**binding** [1] - 239:2
**bishop** [1] - 43:2
**Bishop** [1] - 43:21
**bit** [21] - 8:2, 8:4,
10:19, 11:6, 16:8,
16:13, 30:8, 30:9,
34:17, 66:21, 75:16,
94:11, 105:24, 108:12,
115:5, 136:23, 142:1,
148:14, 170:17,
190:16, 215:10
**blacked** [1] - 134:25
**Blake** [2] - 127:19,
127:21
**blessing** [1] - 146:4
**block** [1] - 215:21
**blunt** [1] - 110:18
**board** [6] - 12:11,
41:12, 65:25, 152:14,
205:22, 206:5

**Board** [2] - 35:16, 41:8
**boards** [3] - 150:25,
151:8, 151:17
**bold** [1] - 109:14
**bottom** [18] - 65:24,
72:7, 79:3, 87:1, 87:2,
91:6, 105:17, 107:10,
107:13, 112:4, 122:10,
122:20, 154:19, 162:1,
174:22, 179:1, 201:8,
224:22
**bounds** [1] - 83:17
**box** [1] - 117:6
**boxes** [1] - 118:19
**boys** [1] - 27:8
**Brad** [1] - 3:23
**brain** [1] - 194:3
**branch** [6] - 17:11,
17:13, 17:15, 17:22,
108:20, 115:2
**Branch** [2] - 3:25, 4:2
**break** [6] - 86:14,
101:24, 194:2, 194:5,
194:11
**brief** [1] - 102:10
**briefly** [5] - 35:18,
191:23, 198:12,
203:17, 223:3
**bring** [4] - 8:25, 18:24,
98:16, 114:4
**broad** [1] - 191:8
**broadcast** [2] - 4:8,
13:6
**broader** [2] - 8:4,
112:11
**brought** [2] - 79:22,
83:23
**Brown** [4] - 223:25,
224:3, 224:23, 225:14
**bucket** [1] - 103:12
**budget** [3] - 69:17,
70:5, 84:16
**Budget** [2] - 56:5,
61:15
**budgetary** [3] - 160:6,
160:8, 160:12
**budgets** [1] - 232:12
**build** [1] - 102:2,
11:22, 18:8, 18:25,
37:15, 199:17
**building** [14] - 19:25,
27:14, 27:17, 28:21,
28:23, 29:20, 29:23,
66:22, 66:24, 67:1,
152:9, 159:1, 192:17,
230:12
**buildings** [1] - 231:1
**built** [4] - 11:24, 37:15,
37:18, 37:19
**bullet** [5] - 30:10,

106:1, 188:14, 207:10,
213:18
**bullets** [2] - 30:7,
102:18
**bullying** [1] - 221:15
**bunch** [1] - 218:24
**burden** [3] - 4:22,
5:23, 6:16
**Bureau** [54] - 10:21,
10:22, 10:24, 14:14,
14:15, 21:21, 22:21,
23:15, 26:11, 31:14,
34:16, 36:19, 38:3,
57:21, 62:18, 63:5,
74:22, 81:6, 81:9,
81:24, 82:3, 84:14,
85:10, 85:11, 85:14,
85:18, 109:19, 112:8,
116:15, 116:16, 125:8,
125:24, 128:24, 129:6,
129:23, 150:15,
150:19, 150:23,
151:12, 152:15, 160:5,
161:14, 161:20, 179:5,
180:5, 186:3, 186:11,
186:14, 186:17,
187:16, 220:1, 220:4,
223:9
**Bureau's** [8] - 38:17,
44:9, 74:24, 88:22,
126:2, 142:24, 159:12,
198:1
**burned** [1] - 92:4
**Bush** [2] - 18:1, 18:17
**business** [4] - 44:10,
135:19, 135:23, 238:18
**BY** [121] - 9:7, 9:18,
12:13, 13:9, 18:7,
19:15, 20:6, 20:22,
21:9, 23:24, 26:21,
29:15, 29:25, 31:21,
32:15, 32:25, 34:7,
36:5, 37:7, 37:12,
39:11, 39:25, 41:1,
42:19, 44:5, 44:21,
47:20, 50:1, 51:1,
52:23, 56:11, 61:5,
61:25, 64:6, 65:3,
67:13, 68:5, 68:19,
71:25, 74:20, 75:24,
77:5, 78:10, 81:1,
82:17, 83:10, 84:4,
85:24, 86:24, 87:8,
88:16, 91:1, 92:12,
93:7, 93:17, 94:10,
95:8, 97:18, 97:25,
99:5, 100:18, 101:15,
102:8, 104:2, 104:9,
107:8, 108:11, 112:21,
113:5, 116:2, 118:6,

118:23, 119:18,
120:15, 124:5, 126:19,
129:17, 133:3, 133:17,
135:10, 136:17, 138:6,
139:21, 141:7, 144:24,
146:20, 149:14, 150:9,
154:14, 155:12, 156:2,
156:25, 157:10, 159:8,
160:17, 161:5, 162:22,
166:18, 170:22,
171:12, 172:18, 174:5,
185:22, 186:16, 187:5,
188:23, 191:22,
194:18, 198:10,
198:23, 203:25, 206:2,
210:18, 222:11,
224:21, 226:6, 226:18,
227:14, 229:3, 229:22,
230:24

## C

**calculations** [1] -
53:15
**calendar** [1] - 234:13
**Calvin** [1] - 105:18
**cancel** [5] - 71:20,
168:24, 193:22,
193:23, 194:23
**canceling** [2] - 121:15,
173:7
**cancellation** [3] -
161:19, 163:10, 163:17
**cancellations** [1] -
180:16
**cancelled** [23] - 74:12,
165:23, 165:24, 173:6,
173:8, 174:6, 176:25,
177:1, 177:4, 177:24,
181:7, 194:25, 195:24,
195:25, 197:11,
217:13, 218:5, 220:11,
222:12, 223:1, 230:25,
231:6, 231:20
**cannot** [5] - 68:3,
89:15, 134:13, 217:8,
234:8
**cap** [7] - 53:13, 69:16,
69:17, 160:6, 160:8,
160:12, 161:2
**capabilities** [1] - 85:6
**capacities** [2] - 85:3,
85:6
**capacity** [3] - 61:14,
62:7, 230:7
**capital** [10] - 11:3,
11:20, 11:21, 14:5,
22:2, 53:4, 53:24, 65:8,
156:21, 206:10
**car** [1] - 27:9

**card** [1] - 177:17
**cards** [10] - 27:15, 151:20, 151:22, 152:3, 183:14, 183:17, 183:19, 183:21
**career** [7] - 9:24, 27:12, 27:25, 28:9, 45:17, 184:21, 205:25
**careful** [3] - 172:12, 192:21, 192:22
**cares** [3] - 191:13, 191:14
**carry** [6] - 39:23, 40:10, 84:14, 92:24, 109:20, 113:7
**cascade** [1] - 101:6
**case** [39] - 3:3, 13:2, 16:14, 16:18, 38:10, 45:21, 60:3, 60:7, 69:8, 70:14, 71:1, 73:17, 77:23, 84:12, 89:25, 119:11, 124:9, 132:24, 153:19, 167:25, 168:2, 176:3, 178:20, 180:7, 182:23, 198:12, 198:17, 199:11, 199:13, 199:14, 199:15, 201:24, 203:12, 208:5, 208:16, 211:2, 218:25, 219:1, 219:4
**caseload** [1] - 119:25
**cases** [17] - 11:4, 58:12, 58:13, 58:19, 58:21, 88:14, 90:21, 120:2, 120:5, 120:6, 120:8, 169:6, 182:3, 186:21, 214:21, 217:7, 217:11
**Casey** [1] - 216:5
**Cassandra** [7] - 105:18, 211:14, 211:24, 212:7, 212:16, 213:2, 213:20
**categories** [4] - 45:12, 45:14, 87:11, 103:12
**category** [4] - 45:16, 45:22, 51:9
**causes** [1] - 180:17
**caution** [1] - 31:17
**CC** [1] - 41:25
**CC'd** [2] - 163:2, 176:14
**CCed** [1] - 228:3
**CCs** [1] - 202:10
**CDFI** [4] - 12:17, 12:21, 18:14, 18:16
**cease** [5] - 30:14, 30:15, 102:19, 106:13, 211:25

**ceased** [1] - 15:7
**Center** [7] - 3:9, 3:10, 76:20, 100:7, 190:1, 190:22, 192:24
**center** [5] - 88:22, 89:1, 90:7, 190:10, 197:2
**centric** [1] - 14:17
**certain** [15] - 31:1, 40:19, 87:11, 97:3, 107:1, 107:23, 151:19, 170:8, 170:24, 170:25, 173:8, 183:23, 183:24, 215:2
**certainly** [6] - 6:7, 15:2, 25:21, 82:1, 107:6, 239:7
**CFO** [7] - 42:22, 43:7, 70:11, 71:2, 79:25, 172:2, 209:15
**CFO's** [1] - 43:8
**CFOs** [1] - 71:19
**CFPB** [106] - 3:11, 9:25, 10:15, 10:16, 11:5, 11:11, 11:22, 12:15, 13:10, 13:20, 13:23, 14:1, 14:10, 14:22, 15:4, 15:8, 16:4, 16:5, 17:2, 17:5, 17:6, 20:24, 20:25, 21:3, 21:5, 24:15, 25:8, 33:4, 33:7, 33:13, 33:23, 34:10, 35:20, 35:24, 40:1, 40:13, 41:2, 42:4, 42:7, 45:9, 48:20, 50:10, 52:24, 52:25, 53:2, 53:9, 53:14, 55:7, 62:13, 63:2, 63:17, 64:9, 65:5, 68:25, 69:2, 72:4, 78:12, 81:12, 83:16, 84:22, 87:6, 102:12, 102:18, 104:19, 104:20, 104:22, 105:10, 109:6, 116:10, 128:16, 137:20, 137:25, 143:12, 144:21, 149:16, 150:1, 150:24, 151:7, 159:24, 162:2, 163:16, 165:5, 176:9, 176:16, 180:15, 180:25, 185:2, 185:8, 189:11, 189:25, 191:5, 192:8, 199:2, 204:9, 208:1, 208:7, 211:11, 215:17, 216:24, 217:15, 222:8, 230:18, 236:12
**CFPB's** [3] - 29:3, 116:3, 120:25

**CFPB_00001** [1] - 87:2
**CFPB_00006** [1] - 162:3
**CFPB_00031** [1] - 94:4
**CFPB_00050** [1] - 105:11
**CFPB_00056** [1] - 96:23
**CFPB_0006** [1] - 162:19
**CFPB_00096** [1] - 84:23
**CFPB_00111** [2] - 107:3, 107:9
**CFPB_00117** [1] - 73:7
**CFPB_00118** [1] - 75:6
**CFPB_00119** [1] - 79:2
**CFPB_00130** [1] - 116:11
**CFPB_11** [1] - 215:6
**CFPB_117** [2] - 167:15, 168:8
**CFPB_118** [2] - 167:7, 169:15
**CFPB_119** [3] - 170:6, 170:15, 170:23
**CFPB_13** [1] - 176:8
**CFPB_14** [2] - 179:1, 215:6
**CFPB_15** [1] - 178:4
**CFPB_16** [2] - 200:6, 200:7
**CFPB_17** [2] - 200:21, 201:8
**CFPB_19** [1] - 200:7
**CFPB_3** [1] - 166:6
**CFPB_36** [1] - 81:14
**CFPB_37** [1] - 179:25
**CFPB_41** [1] - 217:3
**CFPB_59** [1] - 95:20
**CFPB_6** [1] - 162:23
**CFPB_73** [1] - 202:19
**CFPB_79** [1] - 202:25
**CFPB_82** [1] - 212:14
**CFPB_9** [3] - 194:1, 195:4, 195:7
**CFPB_96** [1] - 172:23
**CFPB_98** [1] - 219:16
**CFPD** [1] - 189:14
**CFPD's** [1] - 152:19
**chain** [37] - 79:3, 79:5, 79:19, 81:15, 81:16, 84:24, 87:1, 87:2, 87:9, 91:6, 96:7, 99:8, 100:23, 105:17, 107:10, 108:5, 108:20, 133:19, 134:25, 135:11, 170:8, 170:24, 171:15, 176:7, 176:11, 177:9, 178:7, 181:2,

182:5, 182:12, 182:18, 212:15, 212:21, 212:23, 217:2
**chains** [1] - 108:4
**chair** [2] - 9:14, 159:23
**Chairman** [1] - 35:16
**chairman** [1] - 35:23
**challenged** [1] - 133:9
**challenges** [2] - 224:13, 224:24
**chance** [2] - 223:18, 235:17
**change** [11] - 19:16, 23:1, 44:18, 56:1, 80:14, 141:18, 142:11, 184:7, 213:17, 234:9
**changed** [5] - 61:6, 157:3, 157:12, 157:15, 232:7
**changes** [2] - 18:9, 49:2
**channels** [1] - 176:16
**chaos** [2] - 28:5, 94:15
**characterization** [2] - 113:3, 115:2
**characterize** [3] - 86:2, 119:6, 119:7
**characterized** [3] - 115:18, 119:21, 206:4
**charge** [6] - 23:10, 23:11, 74:17, 165:9, 212:18, 213:2
**charged** [1] - 92:2
**chart** [4] - 22:3, 117:2, 117:18, 118:18
**charter** [1] - 151:15
**check** [3] - 28:4, 111:6, 193:8
**checking** [2] - 44:16, 44:17
**Chess** [1] - 3:13
**chief** [66] - 13:16, 13:19, 13:23, 13:25, 14:8, 14:19, 22:25, 24:23, 25:12, 26:17, 29:18, 32:18, 34:11, 34:14, 40:1, 40:6, 41:6, 41:9, 43:1, 56:18, 57:5, 57:7, 58:9, 58:16, 58:25, 59:14, 72:8, 72:16, 72:19, 73:15, 73:25, 75:8, 78:22, 79:15, 81:22, 85:9, 90:5, 96:25, 125:15, 125:19, 131:19, 140:13, 153:7, 159:11, 164:20, 167:15, 167:16, 169:18, 180:2, 181:3, 183:2, 183:5, 183:8, 186:6, 192:18,

195:9, 199:2, 199:7, 199:22, 204:22, 217:17, 217:20, 219:17, 221:2, 223:6, 228:19
**Chilbert** [7] - 81:21, 82:14, 85:2, 90:10, 195:9, 195:17
**Chilbert's** [1] - 82:12
**choice** [1] - 52:13
**Chopra** [4] - 14:11, 26:19, 69:22, 69:23
**Chopra's** [2] - 14:12, 15:4
**chose** [2] - 209:13, 210:7
**Chris** [12] - 21:12, 21:19, 27:6, 29:18, 64:15, 90:10, 151:24, 196:13, 196:17, 199:24, 200:9, 202:5
**Christopher** [18] - 20:11, 41:25, 42:6, 64:9, 81:20, 81:21, 87:21, 88:17, 92:15, 99:9, 137:20, 151:10, 165:7, 166:19, 195:9, 202:21, 202:23, 203:2
**chronology** [2] - 51:15, 56:12
**CIO** [4] - 25:18, 90:11, 193:2, 209:16
**circle** [2] - 60:17, 102:9
**circling** [1] - 27:20
**circumstance** [1] - 46:21
**circumstances** [4] - 47:10, 49:1, 61:6, 83:12
**cited** [2] - 154:5, 154:15
**Citizen** [1] - 3:15
**Civil** [4] - 3:24, 216:19, 217:4, 223:20
**civil** [7] - 3:3, 13:2, 34:24, 39:8, 43:4, 43:18, 43:23
**civility** [1] - 5:13
**clarification** [19] - 30:23, 102:18, 109:4, 109:12, 109:17, 110:5, 110:9, 110:12, 110:13, 110:16, 112:16, 112:17, 112:19, 115:9, 139:11, 155:23, 205:11, 213:3, 213:5
**clarified** [2] - 101:7, 107:23
**clarify** [9] - 47:21,

55:5, 124:8, 129:18, 135:11, 136:16, 172:25, 190:13, 211:9
**clarifying** [1] - 25:3
**clarity** [6] - 48:1, 58:6, 99:10, 149:25, 236:4, 237:6
**clear** [40] - 20:19, 23:2, 23:25, 31:2, 32:1, 37:23, 40:1, 56:5, 56:12, 91:10, 94:16, 104:3, 106:3, 106:8, 106:12, 107:2, 113:6, 114:1, 120:11, 123:7, 140:21, 149:19, 165:25, 166:19, 177:16, 177:24, 185:19, 191:2, 204:25, 207:1, 211:24, 214:18, 214:19, 215:4, 218:9, 220:8, 221:22, 228:13, 229:4, 238:2
**cleared** [2] - 141:11, 141:12
**clearly** [3] - 67:5, 178:20, 183:20
**clerks** [2] - 7:6, 8:24
**close** [11] - 29:19, 41:16, 55:10, 69:16, 86:14, 131:22, 135:19, 135:22, 146:9, 160:5, 160:8
**closed** [2] - 29:23, 143:13
**closely** [2] - 11:3, 221:16
**closer** [1] - 9:13
**closing** [2] - 125:4, 147:22
**closure** [3] - 53:19, 54:14, 186:24
**CM** [1] - 123:20
**CM-ECF** [1] - 123:20
**co** [1] - 3:14
**co-counsel** [1] - 3:14
**COB** [1] - 134:13
**collaborative** [1] - 62:10
**colleague** [1] - 3:11
**colleagues** [4] - 3:13, 32:9, 53:7, 94:12
**collection** [1] - 195:18
**collective** [1] - 232:12
**college** [4] - 9:19, 9:21, 9:23, 10:1
**College** [1] - 9:20
**combination** [1] - 51:24
**comfortable** [2] - 43:5, 94:16

**coming** [10] - 49:21, 63:7, 63:9, 111:9, 140:4, 157:17, 158:15, 160:5, 160:8, 187:24
**Commerce** [1] - 18:19
**committed** [3] - 68:2, 230:8, 235:11
**Committee** [2] - 10:6, 96:3
**committees** [7] - 59:2, 150:25, 151:3, 151:4, 151:8, 151:11, 151:17
**common** [1] - 74:3
**communicate** [4] - 90:19, 101:5, 101:13, 213:13
**communication** [2] - 95:2, 226:2
**Communications** [2] - 176:12, 176:24
**communications** [5] - 23:13, 125:20, 140:10, 140:12, 209:19
**Community** [2] - 10:9, 38:3
**community** [1] - 95:14
**companies** [1] - 197:9
**compared** [2] - 90:3, 239:16
**compete** [1] - 153:16
**competitive** [3] - 46:16, 48:24, 145:20
**complain** [2] - 90:1, 147:10
**Complaint** [1] - 190:1
**complaint** [16] - 87:15, 88:3, 90:7, 91:24, 92:1, 115:13, 165:13, 166:22, 190:10, 190:20, 190:23, 196:6, 196:16, 202:12, 222:4, 222:19
**complaints** [12] - 89:21, 91:7, 91:8, 147:10, 181:10, 190:3, 196:2, 196:16, 197:11, 197:17, 197:21, 226:20
**complete** [3] - 166:9, 225:6, 225:12
**completed** [1] - 22:17
**completely** [1] - 150:10
**compliance** [2] - 199:2, 221:14
**complicated** [1] - 114:9
**comply** [5] - 114:21, 126:1, 185:3, 187:17, 222:22
**complying** [1] - 63:3

**components** [3] - 17:16, 18:10, 70:8
**computer** [1] - 78:12
**computers** [1] - 87:25
**conceivably** [1] - 194:15
**concentration** [1] - 177:15
**concern** [9] - 38:22, 53:12, 74:11, 123:16, 144:15, 147:4, 219:13, 219:15, 219:16
**concerned** [9] - 28:13, 69:18, 88:25, 89:3, 131:18, 131:20, 196:1, 209:9, 209:10
**concerning** [2] - 19:6, 53:24
**concerns** [6] - 26:24, 60:15, 81:17, 160:24, 185:20, 185:23
**conclusion** [5] - 43:9, 43:10, 43:15, 102:11, 155:9
**conditions** [4] - 81:10, 82:4, 174:13, 174:20
**conduct** [3] - 99:11, 112:8, 158:12
**conducted** [1] - 69:7
**conducting** [1] - 63:17
**confer** [1] - 194:11
**conference** [6] - 27:17, 28:1, 28:4, 28:8, 168:3, 192:17
**conferred** [1] - 233:18
**confirm** [4] - 78:2, 112:5, 131:24, 209:16
**confirmation** [1] - 79:17
**confirmed** [2] - 63:10, 63:11
**confirming** [1] - 178:23
**conflict** [1] - 234:8
**conflicting** [1] - 4:14
**confronting** [2] - 224:14, 224:24
**confusing** [2] - 136:24, 157:5
**confusion** [19] - 34:17, 66:21, 66:23, 67:1, 67:3, 67:14, 67:16, 77:9, 97:7, 105:12, 105:15, 109:15, 111:8, 115:3, 115:8, 129:11, 141:8, 143:25, 211:5
**Congress** [10] - 10:2, 10:6, 27:3, 36:1, 45:4, 55:22, 55:23, 80:21,

106:19, 147:8
**congressional** [2] -
103:20, 106:9
**conjunction** [1] -
104:21
**connected** [1] - 179:3
**connection** [2] -
148:16, 239:11
**consensus** [1] - 70:5
**consent** [1] - 64:22
**consider** [5] - 58:15,
61:12, 72:19, 238:10,
239:11
**considerable** [1] -
158:19
**considered** [4] -
20:24, 25:8, 85:15,
223:10
**consistent** [4] - 63:14,
99:10, 126:9, 154:24
**consists** [2] - 7:24, 8:1
**constituent** [3] - 10:2,
89:1, 103:20
**constituents** [1] - 31:6
**constitute** [1] - 136:12
**constitutes** [1] - 175:5
**consultation** [1] - 80:7
**consulted** [1] - 177:18
**consulting** [1] - 70:25
**Consumer** [24] - 3:9,
4:25, 36:19, 57:19,
58:23, 76:20, 88:18,
92:23, 93:3, 100:7,
104:12, 132:8, 147:5,
165:10, 190:1, 190:22,
192:23, 196:18, 199:4,
200:13, 200:15,
226:23, 226:24, 227:21
**consumer** [29] - 38:3,
87:15, 88:3, 88:22,
88:25, 89:21, 90:7,
93:10, 93:23, 99:21,
119:3, 164:5, 165:13,
166:20, 166:21, 167:1,
178:17, 178:18, 196:2,
196:6, 197:2, 198:11,
201:2, 201:5, 203:3,
222:15, 222:19, 223:1,
226:19
**consumers** [15] - 31:6,
35:1, 35:3, 89:25,
90:18, 91:15, 102:20,
103:1, 103:10, 103:11,
104:7, 191:14, 197:9,
222:2, 222:18
**contact** [8] - 72:22,
77:12, 77:16, 180:13,
180:14, 210:4, 214:6
**contacted** [1] - 41:8
**contacts** [1] - 86:2

**containing** [1] - 72:4
**contains** [2] - 16:17,
30:6
**contemplating** [1] -
18:18
**contentious** [2] -
10:17, 28:19
**context** [4] - 17:17,
35:18, 63:3, 101:16
**continuance** [1] -
79:16
**continue** [12] - 43:25,
57:24, 58:5, 58:12,
69:13, 78:1, 78:3,
87:16, 87:17, 106:10,
142:25, 238:17
**continued** [7] - 4:16,
31:1, 142:21, 142:23,
144:2, 148:4, 186:20
**continuing** [4] -
192:10, 196:7, 196:11,
198:3
**continuity** [1] - 37:14
**contract** [43] - 69:12,
71:19, 71:20, 75:21,
82:18, 83:23, 85:12,
85:13, 85:14, 85:15,
85:25, 88:11, 89:20,
90:17, 165:15, 165:17,
168:24, 168:25,
172:14, 174:13,
174:14, 174:20, 177:1,
177:3, 177:24, 180:16,
181:6, 181:17, 193:22,
217:13, 218:6, 218:8,
220:1, 221:21, 222:12,
222:14, 222:15,
222:17, 222:25, 223:2,
223:9
**contracting** [8] -
68:21, 164:11, 174:11,
175:18, 176:1, 180:9,
200:22
**contractor** [4] - 71:19,
81:10, 174:15, 183:9
**contractors** [8] -
71:14, 76:17, 81:4,
82:3, 84:18, 168:21,
169:4, 190:5
**contracts** [119] -
34:22, 60:15, 66:1,
66:2, 68:24, 68:25,
69:3, 69:6, 69:10,
69:19, 70:9, 70:12,
70:23, 70:25, 71:5,
71:8, 71:12, 71:14,
71:17, 72:1, 72:25,
73:9, 73:12, 73:14,
73:19, 74:3, 74:9,
75:13, 75:17, 75:19,

76:2, 76:5, 76:7, 79:8,
79:10, 79:24, 79:25,
80:2, 80:12, 80:17,
81:6, 82:4, 83:24, 84:6,
84:9, 84:12, 88:10,
121:16, 151:2, 151:18,
151:19, 152:2, 160:25,
161:17, 161:19,
163:10, 163:13,
163:14, 163:15,
163:16, 163:17,
163:24, 164:12,
164:15, 164:24,
165:12, 165:23, 166:4,
166:11, 166:21, 167:2,
167:21, 168:16,
168:19, 169:12,
169:23, 170:2, 170:9,
170:25, 171:2, 171:13,
171:14, 171:16,
171:19, 171:25, 172:1,
172:4, 172:15, 172:17,
172:20, 173:2, 173:6,
173:8, 174:6, 174:12,
175:1, 192:10, 193:23,
194:24, 194:25, 195:2,
195:19, 195:24,
197:18, 198:3, 218:4,
218:7, 218:11, 218:18,
219:11, 219:23,
219:24, 220:11,
220:23, 221:2, 221:13,
223:3
**contradictory** [1] -
207:14
**contrary** [1] - 63:19
**control** [1] - 188:16
**controversial** [1] -
36:25
**controversy** [2] - 90:9,
147:5
**convenience** [2] -
33:2, 101:24
**conversation** [11] -
21:18, 72:13, 75:11,
75:15, 75:16, 101:3,
111:17, 112:10, 114:6,
140:2
**conversations** [5] -
23:17, 88:24, 101:9,
172:2, 232:14
**convey** [1] - 198:5
**conveyed** [1] - 149:15
**COO** [1] - 205:9
**cooling** [1] - 61:10
**coordinated** [1] - 89:5
**coordination** [1] -
156:19
**copied** [6] - 57:7,
73:22, 209:24, 209:25,

210:1, 227:24
**copies** [3] - 61:18,
154:8, 154:13
**copy** [4] - 22:3, 25:16,
171:9, 209:13
**core** [2] - 58:21,
174:16
**corner** [2] - 72:7, 75:6
**Correct** [1] - 69:24
**correct** [162] - 5:19,
6:19, 16:2, 17:3, 17:12,
25:23, 26:14, 32:3,
32:16, 32:19, 32:20,
33:25, 35:19, 35:21,
35:22, 35:25, 36:2,
36:4, 36:22, 38:5,
40:21, 41:23, 42:14,
46:18, 46:19, 46:23,
47:22, 47:23, 48:23,
49:5, 51:4, 52:1, 54:16,
54:18, 54:22, 61:16,
63:1, 64:23, 66:8, 66:9,
72:10, 74:14, 74:18,
77:12, 77:13, 77:17,
82:6, 82:8, 83:14, 92:8,
96:20, 103:9, 106:14,
106:15, 106:18,
106:22, 111:16,
113:22, 113:23,
116:20, 116:22,
117:12, 118:21,
119:14, 120:7, 120:9,
124:20, 124:25,
125:11, 125:20, 126:5,
126:8, 126:14, 128:18,
128:20, 128:23, 129:3,
129:14, 130:1, 130:10,
130:12, 130:18,
131:16, 132:7, 132:9,
132:18, 132:22,
133:24, 135:25,
137:15, 138:1, 138:9,
138:12, 138:17, 139:6,
139:9, 139:13, 139:16,
140:14, 140:16,
140:19, 143:14,
144:22, 145:6, 145:11,
145:13, 150:4, 152:5,
153:20, 154:18, 155:1,
155:4, 155:16, 156:13,
158:4, 160:7, 163:9,
164:10, 164:22,
165:11, 167:20,
167:23, 169:3, 172:21,
172:24, 176:15,
176:22, 176:25,
177:11, 180:10, 181:8,
184:6, 187:1, 189:12,
189:15, 190:13, 192:1,
192:6, 192:12, 193:20,

195:13, 198:7, 199:9,
200:11, 200:20,
209:23, 211:23, 212:1,
212:4, 212:5, 213:16,
214:5, 214:12, 219:19,
220:14, 220:16,
220:19, 222:3, 224:16,
230:19, 237:19
  **correction** [1] - 156:4
  **correctly** [6] - 17:10,
82:7, 102:17, 134:15,
163:20, 199:5
  **correspond** [1] -
236:3
  **corresponds** [1] -
236:21
  **CORs** [1] - 180:8
  **COs** [1] - 175:20
  **cost** [1] - 70:12
  **costs** [5] - 34:21,
37:22, 39:13, 39:15,
70:13
  **councils** [1] - 151:11
  **counsel** [12] - 3:5,
3:12, 3:14, 4:1, 7:6,
25:2, 69:11, 78:24,
115:6, 136:11, 151:5,
171:10
  **countermanding** [1] -
113:1
  **counterparts** [2] -
11:4, 41:12
  **couple** [15] - 7:5,
12:11, 18:12, 26:25,
27:1, 30:19, 37:16,
53:23, 67:15, 77:22,
79:21, 105:9, 127:1,
208:18, 209:13
  **course** [5] - 44:10,
131:12, 143:2, 168:14,
220:12
  **COURT** [394] - 3:18,
3:22, 4:3, 5:21, 6:3,
6:15, 6:20, 6:24, 7:1,
7:3, 7:9, 7:15, 7:18,
8:7, 8:16, 8:19, 8:25,
9:12, 9:16, 12:3, 12:12,
12:24, 17:21, 18:5,
19:5, 19:9, 19:14, 20:2,
20:13, 20:16, 21:3,
21:11, 21:16, 21:22,
22:9, 22:17, 23:7,
23:10, 23:17, 23:23,
25:19, 25:25, 26:4,
26:8, 26:12, 26:15,
26:20, 29:11, 29:14,
29:22, 31:3, 31:8,
31:20, 32:10, 32:14,
32:21, 33:12, 33:20,
33:23, 34:6, 36:3, 37:3,

37:6, 37:10, 38:11,
38:24, 39:10, 39:13,
39:17, 39:24, 40:16,
40:25, 42:8, 42:11,
42:18, 43:17, 44:1,
44:20, 46:17, 46:20,
46:24, 47:3, 47:9,
47:15, 47:19, 49:12,
49:17, 49:20, 49:24,
50:24, 51:15, 51:19,
51:24, 52:2, 52:6,
52:12, 52:15, 52:18,
52:22, 54:13, 54:17,
54:20, 54:23, 55:2,
55:10, 55:18, 55:22,
55:25, 56:8, 56:10,
56:16, 56:21, 56:24,
57:11, 57:16, 59:3,
59:8, 59:16, 59:22,
60:4, 60:8, 60:11,
60:19, 60:23, 61:1,
61:21, 64:5, 64:21,
64:25, 65:19, 66:4,
66:10, 66:17, 66:25,
67:4, 67:7, 67:10,
67:20, 67:24, 68:4,
68:11, 68:15, 68:18,
69:25, 70:14, 70:19,
71:6, 71:10, 71:21,
73:4, 73:8, 73:11,
73:18, 73:24, 74:7,
74:11, 74:15, 74:19,
75:22, 76:9, 76:13,
76:23, 77:2, 78:4, 78:6,
80:7, 80:16, 80:23,
80:25, 82:14, 82:25,
83:9, 83:21, 84:2,
85:19, 85:22, 86:3,
86:13, 86:19, 86:23,
87:5, 87:7, 87:22,
87:24, 88:5, 88:8,
88:13, 88:15, 89:18,
90:13, 90:23, 91:11,
91:19, 91:23, 92:1,
92:11, 93:3, 93:6, 93:9,
93:14, 93:16, 94:9,
94:24, 95:7, 97:5, 97:8,
97:15, 97:22, 98:7,
98:15, 98:20, 98:22,
98:25, 99:2, 99:4,
99:25, 100:6, 100:14,
100:17, 101:9, 101:13,
101:23, 102:5, 102:23,
103:6, 103:10, 103:15,
103:23, 104:6, 107:5,
107:13, 107:20,
107:22, 108:6, 108:10,
110:3, 110:8, 110:11,
110:21, 111:3, 111:7,
111:13, 111:15,
111:22, 112:1, 112:9,

112:15, 112:25, 113:4,
113:18, 113:25, 114:3,
114:8, 115:19, 115:25,
117:25, 118:4, 118:15,
118:22, 119:12,
119:15, 120:10,
120:14, 121:6, 121:15,
121:19, 121:23, 122:2,
122:6, 122:12, 122:20,
123:5, 123:14, 123:21,
129:13, 129:16, 133:1,
133:11, 135:4, 135:6,
135:9, 136:14, 137:6,
137:9, 137:11, 137:14,
137:17, 137:19,
137:22, 137:24, 138:2,
138:5, 139:19, 141:3,
141:5, 142:6, 143:24,
144:5, 144:10, 144:16,
144:21, 144:23,
146:14, 146:19,
148:24, 149:4, 149:6,
149:10, 149:13, 150:6,
154:11, 155:10,
155:25, 156:24, 157:6,
158:18, 160:15,
160:21, 161:4, 162:4,
162:6, 162:10, 162:14,
166:1, 166:5, 166:7,
166:14, 166:17, 168:6,
170:11, 170:16,
172:12, 173:12, 174:2,
185:10, 186:24, 187:2,
187:9, 187:14, 187:22,
188:19, 191:2, 191:20,
194:2, 194:13, 197:25,
198:9, 198:22, 203:24,
205:19, 205:22,
205:25, 207:18,
210:10, 210:14,
221:22, 222:2, 222:4,
222:7, 224:17, 225:20,
226:1, 226:5, 226:12,
226:16, 227:6, 227:11,
227:13, 228:24, 229:2,
229:21, 230:16,
230:20, 230:23,
232:25, 233:7, 233:18,
233:22, 233:24, 234:1,
234:15, 234:18,
234:21, 234:25, 235:8,
235:11, 235:15,
235:19, 235:21,
235:24, 236:8, 237:1,
237:10, 237:19
  **court** [11] - 7:19, 8:6,
11:7, 66:19, 120:3,
142:10, 145:15,
201:12, 234:12, 236:18
  **Court** [29] - 8:15,
19:12, 37:24, 38:23,

40:12, 40:16, 40:19,
44:19, 48:1, 48:13,
60:15, 60:17, 62:13,
68:10, 68:13, 69:8,
94:8, 99:15, 100:20,
107:17, 113:24,
115:10, 116:25,
141:19, 236:1, 236:4,
237:8, 237:14, 237:17
  **Court's** [6] - 64:2,
121:3, 123:16, 123:20,
146:1, 177:12
  **COURTROOM** [2] -
3:2, 234:14
  **courtroom** [4] - 5:8,
5:10, 5:12, 8:20
  **courtrooms** [1] - 9:1
  **cover** [4] - 7:24, 8:2,
8:4, 37:22
  **covered** [1] - 28:2
  **CPFB_00117** [1] - 72:7
  **crazy** [1] - 74:5
  **CRE** [3] - 99:17, 99:18,
99:22
  **create** [1] - 122:14
  **creates** [1] - 221:18
  **creating** [1] - 222:8
  **creation** [1] - 11:10
  **credit** [1] - 93:24
  **crisis** [1] - 10:12
  **critical** [7] - 24:19,
26:1, 26:13, 84:5, 88:4,
165:12, 199:3
  **CROSS** [1] - 124:4
  **cross** [9] - 6:1, 6:6,
6:17, 83:22, 121:6,
136:18, 173:17, 234:1,
235:22
  **cross-examination** [3]
- 121:6, 136:18, 173:17
  **CROSS-
EXAMINATION** [1] -
124:4
  **cross-examine** [1] -
83:22
  **cross-examined** [1] -
234:1
  **crosstalk** [1] - 172:11
  **crucial** [1] - 164:16
  **cued** [1] - 104:6
  **culling** [1] - 70:23
  **culminates** [2] -
210:19, 210:20
  **curious** [1] - 11:9,
14:21, 19:2, 67:8, 90:8
  **current** [13] - 64:10,
116:3, 116:16, 119:7,
119:8, 119:24, 119:25,
120:25, 147:22,
226:22, 227:18, 228:6,

229:24

**cut** [4] - 69:14, 75:18, 110:10, 132:1

**cuts** [2] - 45:5, 131:25

## D

**D.C** [1] - 10:4

**daily** [3] - 11:16, 103:8, 205:17

**Dan** [1] - 43:21

**Daniel** [1] - 95:3

**data** [47] - 14:5, 22:1, 70:11, 70:23, 76:18, 81:3, 81:7, 81:11, 81:17, 81:24, 82:1, 82:3, 82:9, 173:9, 174:8, 174:14, 174:17, 174:18, 175:14, 175:22, 177:13, 177:19, 177:22, 177:23, 178:17, 178:18, 178:19, 178:21, 178:23, 179:4, 179:11, 179:19, 180:15, 180:21, 181:10, 181:13, 182:19, 182:21, 182:22, 182:25, 184:2, 193:7, 195:14, 195:18, 195:21, 218:24

**database** [13] - 87:15, 88:3, 88:5, 165:13, 166:22, 182:2, 196:6, 196:19, 197:14, 198:2, 198:3, 198:4, 222:19

**date** [7] - 70:15, 90:24, 150:16, 150:20, 182:7, 210:11, 238:22

**dates** [1] - 192:16

**days** [17] - 47:8, 49:2, 56:13, 56:15, 65:9, 108:1, 130:14, 150:11, 153:18, 159:2, 167:24, 168:25, 177:22, 179:10, 211:1, 238:18

**deadline** [3] - 65:15, 192:5, 193:10

**dealing** [1] - 24:21

**deals** [1] - 93:11

**December** [1] - 12:8

**decide** [1] - 238:11

**decided** [1] - 98:10

**decides** [1] - 134:22

**deciding** [1] - 237:20

**decimated** [1] - 18:22

**decision** [4] - 35:2, 63:6, 114:14, 214:25

**decisional** [1] - 127:16

**decisionmaking** [1] -

187:16

**decisions** [3] - 14:18, 14:19, 44:22

**declarant** [1] - 5:5

**declarants** [1] - 6:8

**declaration** [59] - 8:3, 16:14, 23:18, 26:23, 28:25, 35:7, 54:13, 104:25, 123:24, 124:11, 124:14, 124:18, 124:19, 124:24, 125:5, 125:25, 126:12, 126:24, 127:2, 127:8, 127:10, 127:20, 136:1, 136:3, 153:19, 153:21, 159:9, 159:10, 184:25, 185:2, 185:17, 186:2, 186:9, 186:14, 186:23, 187:6, 187:13, 188:8, 189:3, 189:10, 189:17, 189:21, 190:10, 191:25, 192:7, 192:8, 196:4, 196:5, 198:1, 198:14, 198:15, 198:17, 198:25, 200:2, 235:14, 237:21

**declarations** [6] - 4:19, 127:4, 185:14, 226:12, 236:9, 236:18

**Deepak** [1] - 3:7

**defend** [2] - 40:23, 223:16

**defendant's** [9] - 124:11, 161:23, 167:6, 176:5, 193:25, 198:20, 200:6, 202:2, 212:14

**defendants** [3] - 211:8, 223:19, 229:11

**defendants'** [2] - 5:5, 215:5

**defense** [1] - 9:3

**deferred** [1] - 51:11

**definitely** [1] - 23:1

**delay** [1] - 146:3

**delete** [1] - 233:9

**deleted** [2] - 177:23, 180:16

**deletion** [7] - 177:13, 177:22, 179:11, 180:22, 181:13, 182:7

**deliberately** [1] - 191:7

**delivery** [1] - 62:24

**Deloitte** [1] - 165:15

**deluge** [1] - 98:1

**deluged** [1] - 97:23

**delving** [1] - 115:5

**demand** [1] - 28:10

**demands** [1] - 218:9

**denied** [1] - 84:6

**Department** [12] - 3:24, 10:8, 10:21, 12:9, 16:5, 17:16, 18:13, 18:19, 31:12, 44:13, 44:14, 105:5

**department** [1] - 12:16

**dependent** [1] - 146:16

**deposition** [1] - 86:5

**depositions** [1] - 237:25

**deputies** [1] - 164:23

**deputized** [1] - 185:13

**DEPUTY** [2] - 3:2, 234:14

**deputy** [7] - 15:19, 96:8, 117:9, 165:9, 211:17, 212:18, 213:2

**describe** [5] - 10:25, 19:22, 88:23, 88:24, 120:25

**described** [3] - 129:19, 150:14, 150:15

**describing** [1] - 150:22

**description** [2] - 73:1, 150:19

**designate** [1] - 137:22

**designated** [5] - 30:5, 33:13, 137:20, 137:24, 144:19

**designation** [1] - 105:6

**desire** [5] - 69:10, 148:8, 148:22, 148:25, 149:10

**desk** [1] - 193:5

**desktop** [1] - 231:10

**despite** [1] - 112:7

**detail** [4] - 11:4, 43:6, 53:3, 56:4

**detailed** [6] - 20:25, 21:3, 21:4, 22:20, 23:15, 34:3

**detailees** [3] - 11:21, 33:25, 58:17

**details** [4] - 92:17, 159:5, 220:22, 226:24

**determination** [2] - 6:11, 160:21

**determine** [8] - 58:10, 58:18, 69:12, 70:9, 71:1, 74:3, 89:14, 90:11

**determined** [2] - 79:25, 235:15

**devastating** [1] - 77:23

**develop** [2] - 46:16, 232:5

**developed** [1] - 145:20

**Development** [1] - 10:10

**dice** [1] - 67:12

**difference** [1] - 86:3

**different** [36] - 25:1, 30:8, 30:9, 30:19, 31:14, 32:8, 33:23, 37:16, 45:7, 45:8, 50:21, 51:2, 51:3, 90:22, 91:11, 92:7, 93:9, 94:11, 103:11, 105:25, 108:19, 108:20, 118:11, 133:11, 133:12, 144:7, 158:6, 158:7, 158:15, 170:17, 186:10, 186:15, 205:25, 221:18, 228:20

**differing** [2] - 23:2, 23:3

**difficult** [3] - 42:24, 54:2, 123:25

**Digital** [2] - 176:12, 176:23

**Diotalevi** [1] - 3:16

**dir** [1] - 59:7

**direct** [19] - 5:25, 6:17, 48:19, 57:9, 65:8, 86:16, 101:25, 102:5, 141:5, 155:13, 163:17, 170:7, 170:24, 173:1, 175:21, 179:18, 184:16, 213:12, 229:5

**directed** [14] - 34:25, 69:11, 77:15, 82:22, 98:14, 106:12, 136:8, 140:7, 161:18, 164:12, 164:13, 207:15, 210:3, 211:25

**directing** [4] - 75:12, 137:14, 169:22, 202:24

**direction** [10] - 45:15, 62:22, 65:7, 99:11, 132:16, 132:19, 137:17, 140:5, 186:12, 212:7

**directive** [9] - 30:13, 106:14, 113:1, 115:16, 176:1, 206:11, 206:14, 206:16, 212:1

**directly** [14] - 11:16, 24:21, 28:8, 55:6, 58:18, 79:24, 91:3, 94:17, 106:7, 166:11, 187:12, 209:13, 209:19, 225:25

**director** [60] - 12:22, 13:15, 14:10, 15:4,

15:7, 15:11, 15:16,
15:19, 15:20, 15:23,
17:2, 18:24, 22:24,
26:16, 29:13, 30:5,
32:17, 36:11, 37:15,
38:20, 49:19, 56:13,
63:7, 63:9, 69:18,
69:21, 69:22, 70:10,
71:15, 72:20, 80:20,
88:18, 93:21, 95:14,
96:8, 96:9, 96:13,
105:4, 106:25, 117:9,
121:24, 125:7, 137:23,
139:15, 140:8, 158:15,
160:9, 160:24, 161:6,
161:9, 165:9, 176:12,
176:23, 182:19,
182:21, 182:24,
211:17, 224:4, 224:6
 **Director** [56] - 10:9,
23:13, 25:14, 26:19,
29:10, 29:12, 30:3,
30:16, 32:2, 33:15,
33:16, 35:15, 36:16,
37:1, 43:22, 44:1, 49:8,
49:18, 50:10, 56:9,
56:14, 61:11, 61:13,
61:14, 62:5, 62:17,
63:4, 69:21, 75:13,
77:14, 78:16, 79:20,
89:7, 102:14, 106:2,
121:11, 130:13,
136:21, 138:18,
138:21, 138:23,
139:25, 140:10, 158:9,
159:17, 161:16,
161:18, 161:21, 163:4,
163:7, 164:7, 169:24,
184:11, 187:15, 208:8,
229:25
 **director's** [2] - 23:4,
206:17
 **directs** [3] - 79:7,
163:10, 207:23
 **disabilities** [2] -
221:24, 222:18
 **disability** [3] - 83:6,
218:20, 221:23
 **Disability** [3] - 217:17,
218:1, 223:21
 **disaster** [1] - 5:1
 **disclose** [1] - 192:2
 **Disclosure** [4] -
191:24, 192:9, 193:9,
194:21
 **discretion** [3] - 59:12,
83:17, 119:22
 **discretionary** [3] -
114:13, 114:18, 151:14
 **discuss** [4] - 44:22,

104:4, 128:1, 128:14
 **discussed** [17] - 5:17,
26:23, 42:1, 51:10,
55:15, 88:19, 95:10,
102:10, 104:25,
111:10, 149:20,
152:16, 170:7, 170:24,
172:25, 207:22, 208:16
 **discusses** [2] -
108:25, 157:2
 **discussing** [7] -
75:25, 104:11, 143:20,
145:1, 146:25, 168:20,
231:15
 **discussion** [15] -
21:17, 21:20, 22:4,
25:2, 27:19, 43:7,
46:17, 63:19, 64:15,
84:17, 85:1, 89:5,
96:16, 114:4, 147:25
 **Discussion** [1] - 49:1
 **discussions** [20] -
40:9, 41:2, 41:5, 53:6,
88:21, 118:2, 144:2,
144:7, 144:25, 145:7,
145:9, 146:10, 147:24,
148:4, 156:19, 156:20,
156:22, 158:13,
199:21, 205:16
 **dismantle** [2] - 39:3,
39:5
 **dismissed** [1] - 120:6
 **dispute** [1] - 114:10
 **distinction** [2] - 84:8,
85:20
 **district** [1] - 10:3
 **division** [10] - 48:9,
58:23, 113:7, 119:11,
130:25, 131:7, 164:9,
192:19, 196:3, 200:15
 **Division** [4] - 3:24,
88:18, 132:8, 224:7
 **divisions** [10] - 129:5,
130:16, 132:1, 145:16,
161:19, 163:11,
163:18, 163:22, 173:8,
228:2
 **DL_CFPB_OR** [1] -
225:14
 **DL_CFPB_
Supervision_All** [1] -
108:23
 **docket** [8] - 8:6, 8:14,
16:18, 64:4, 94:8,
237:17, 239:6, 239:18
 **docketed** [1] - 122:21
 **Doctor** [1] - 165:19
 **document** [37] - 16:17,
16:22, 29:1, 30:3,
31:23, 32:4, 32:7,

33:12, 35:8, 35:12,
41:20, 41:25, 48:4,
48:6, 48:12, 48:16,
48:20, 50:8, 61:17,
63:25, 73:4, 73:7, 75:5,
79:2, 87:5, 99:6,
116:12, 116:17,
123:13, 157:22, 166:1,
167:9, 168:6, 171:10,
236:21, 236:23, 237:5
 **documentation** [2] -
51:3, 127:15
 **documents** [24] - 7:25,
8:1, 8:13, 16:10, 25:9,
29:4, 72:4, 77:6, 77:7,
122:23, 123:16,
123:18, 123:19,
135:23, 136:14,
162:17, 166:3, 208:19,
236:5, 236:6, 236:11,
236:12, 236:16, 239:10
 **Dodd** [2] - 146:22
 **Dodd-Frank** [2] -
146:22
 **Doe** [4] - 6:8, 127:8,
127:19, 235:23
 **Doe's** [2] - 127:11,
127:21
 **DOGE** [56] - 19:17,
19:19, 19:20, 19:24,
20:11, 21:6, 21:14,
21:17, 22:15, 23:3,
24:17, 24:18, 25:4,
25:6, 25:15, 27:8,
27:15, 27:16, 27:22,
28:10, 33:1, 33:2, 33:4,
33:7, 33:19, 34:9,
34:11, 39:19, 43:17,
43:20, 51:18, 54:21,
55:6, 56:6, 63:21,
68:24, 71:4, 78:8, 89:5,
137:18, 137:19,
137:24, 138:16, 139:5,
139:23, 140:15, 144:3,
144:14, 144:17,
144:18, 145:8, 145:12,
148:16, 185:12,
185:16, 192:17
 **DOGE-affiliated** [1] -
68:24
 **dollars** [1] - 36:14
 **domestic** [1] - 12:21
 **Domestic** [1] - 10:11
 **done** [13] - 6:25,
34:23, 55:17, 57:25,
119:25, 120:13,
186:22, 216:4, 216:8,
234:23, 238:22, 239:5
 **door** [2] - 28:5, 28:6
 **doors** [1] - 88:1

**double** [1] - 48:3
 **doubt** [5] - 41:10,
82:12, 103:23, 140:25,
226:7
 **down** [50] - 7:20, 11:6,
13:5, 14:16, 14:21,
23:20, 27:23, 28:20,
32:22, 49:25, 53:19,
54:2, 54:10, 54:15,
55:2, 65:22, 70:4, 89:1,
89:4, 89:15, 90:10,
90:14, 91:16, 92:4,
101:6, 125:4, 126:9,
126:13, 126:20,
126:21, 127:5, 146:8,
147:9, 147:22, 147:23,
150:2, 150:24, 151:7,
151:16, 160:13,
161:14, 170:16,
170:20, 182:2, 184:12,
193:22, 196:15, 230:1
 **draw** [3] - 159:24,
160:22, 161:14
 **drawn** [1] - 160:13
 **driving** [1] - 62:24
 **dual** [2] - 62:9, 78:16
 **dual-hatted** [1] - 62:9
 **due** [3] - 180:16,
195:19, 232:5
 **duly** [1] - 9:5
 **duplication** [1] - 161:1
 **duplicative** [1] -
121:17
 **during** [22] - 4:13,
8:11, 10:12, 11:5,
15:20, 18:1, 18:10,
23:11, 23:18, 24:17,
24:24, 27:18, 27:19,
69:8, 70:18, 104:13,
139:25, 146:7, 158:22,
197:19, 197:21
 **duties** [4] - 65:20,
80:20, 97:9, 98:8

## E

 **e-mails** [1] - 191:15,
225:24
 **e-signature** [1] - 25:16
 **early** [3] - 99:17,
193:9, 196:13
 **easier** [2] - 71:11,
71:12
 **easy** [1] - 71:10
 **ECF** [6] - 16:5, 123:20,
162:17, 162:19,
198:25, 236:24
 **education** [1] - 93:9
 **Education** [12] - 16:5,
57:20, 88:19, 92:24,

93:5, 99:21, 104:12,
119:3, 147:6, 165:10,
200:13, 200:16
**EE** [1] - 182:10
**EEO** [4] - 181:10,
182:3, 217:7, 221:14
**EEOC** [1] - 222:10
**effect** [9] - 33:20,
79:13, 90:12, 161:21,
184:24, 212:8, 213:9,
214:6, 214:11
**effective** [4] - 15:23,
15:24, 52:10, 187:17
**effectively** [1] - 125:19
**efficient** [4] - 7:12,
62:24, 125:8, 125:25
**effort** [7] - 39:2, 39:3,
39:5, 173:9, 174:8,
195:18, 239:10
**either** [14] - 29:17,
73:9, 94:16, 150:7,
168:24, 187:9, 204:21,
206:23, 219:20,
225:24, 225:25, 227:6,
234:2
**electronically** [1] -
7:14
**element** [1] - 6:21
**elevated** [1] - 90:21
**elevating** [1] - 89:25
**eliminated** [4] -
130:17, 146:17, 152:12
**eliminating** [1] - 129:5
**elimination** [1] - 62:23
**Elizabeth** [3] - 11:9,
11:10, 52:25
**Elmo** [1] - 7:20
**email** [283] - 15:11,
15:19, 15:21, 15:22,
16:24, 16:25, 17:1,
17:17, 17:19, 18:11,
19:6, 19:23, 20:3,
23:13, 25:14, 28:4,
29:6, 29:9, 29:19,
29:21, 30:3, 30:6, 30:9,
30:17, 30:21, 30:25,
32:2, 32:7, 32:16,
33:16, 41:22, 42:4,
42:14, 42:16, 42:20,
47:15, 49:9, 50:11,
52:6, 56:18, 56:21,
66:5, 72:7, 72:11,
72:13, 72:21, 75:2,
75:8, 76:4, 76:10,
76:13, 77:11, 77:14,
78:2, 78:14, 79:2, 79:3,
79:5, 79:6, 79:18, 80:3,
81:15, 81:16, 81:20,
82:2, 84:23, 84:24,
84:25, 85:2, 86:25,

87:3, 87:18, 87:20,
87:21, 88:17, 89:8,
89:11, 90:6, 91:4, 91:6,
91:7, 92:15, 92:22,
93:18, 94:12, 94:13,
94:14, 94:24, 95:9,
95:10, 95:17, 95:23,
95:24, 96:7, 96:16,
96:22, 96:23, 96:25,
97:2, 98:3, 98:7, 99:1,
99:3, 99:8, 99:16,
99:17, 100:2, 100:3,
100:5, 100:12, 100:19,
100:22, 100:23,
101:10, 101:12,
102:14, 104:18,
104:19, 105:9, 105:17,
105:18, 105:19,
105:24, 106:1, 106:11,
106:12, 106:25,
107:11, 107:17,
107:18, 108:2, 108:4,
108:5, 108:9, 108:13,
108:15, 108:19,
108:22, 108:25, 109:2,
109:7, 109:9, 109:10,
109:11, 109:14, 110:8,
110:13, 110:16, 111:1,
111:9, 111:10, 111:12,
111:21, 112:4, 112:10,
112:23, 113:14,
115:15, 117:11,
118:25, 121:8, 121:10,
133:19, 133:22,
133:25, 134:3, 134:12,
134:17, 134:25,
135:12, 137:7, 138:8,
138:18, 139:4, 139:7,
140:25, 142:17,
161:21, 161:22,
162:25, 163:2, 163:4,
163:7, 164:20, 165:7,
166:4, 166:7, 166:19,
167:15, 168:15,
168:17, 169:7, 169:10,
169:15, 169:22, 170:1,
170:8, 171:15, 173:7,
174:23, 175:2, 175:6,
175:19, 176:7, 176:11,
177:9, 178:6, 178:12,
178:14, 179:19, 180:2,
180:5, 180:19, 181:2,
181:6, 182:5, 182:12,
182:18, 183:1, 184:9,
195:9, 195:14, 200:9,
201:23, 202:5, 202:21,
203:2, 203:3, 203:9,
204:6, 205:5, 207:2,
207:9, 207:14, 207:23,
207:25, 209:14,
209:24, 210:1, 210:20,

211:13, 211:14,
211:25, 212:11,
212:15, 212:21,
212:23, 212:24, 213:1,
213:17, 213:20,
213:22, 214:1, 214:2,
214:8, 214:18, 214:19,
215:4, 215:6, 215:16,
217:2, 217:17, 223:5,
223:25, 224:6, 225:14,
225:16, 225:17, 228:3,
228:4, 228:10
**emailed** [1] - 214:2
**emailings** [1] - 199:22
**emails** [37] - 4:18,
57:7, 57:12, 59:3, 68:6,
71:6, 105:20, 105:22,
110:20, 113:22, 115:8,
115:21, 116:25, 135:2,
135:4, 135:17, 140:20,
140:25, 191:16,
199:24, 200:4, 203:13,
209:3, 209:22, 210:7,
210:11, 210:19,
210:21, 210:24, 211:4,
212:6, 220:20, 225:23,
226:12, 227:15,
227:24, 236:12
**Emails** [1] - 16:4
**embrace** [1] - 112:13
**embraces** [1] - 112:11
**emergencies** [1] -
87:24
**emergency** [2] -
47:16, 89:25
**emergent** [1] - 92:4
**emphasizes** [1] -
223:8
**employee** [12] - 20:24,
20:25, 28:20, 45:7,
56:25, 57:1, 57:2,
98:10, 127:19, 181:12,
184:1
**Employees** [4] - 3:3,
3:9, 3:11, 3:16
**employees** [74] -
11:16, 14:22, 21:14,
22:15, 23:14, 25:8,
25:15, 27:14, 27:20,
28:7, 30:7, 30:13,
31:17, 31:18, 32:22,
33:5, 33:14, 33:24,
45:9, 45:12, 45:17,
45:20, 45:23, 47:6,
50:18, 50:23, 51:6,
51:8, 51:20, 51:21,
51:23, 51:25, 52:3,
52:4, 52:7, 52:9, 52:11,
53:2, 53:11, 62:14,
69:12, 90:17, 90:21,

92:19, 100:8, 102:19,
121:20, 122:3, 127:3,
127:7, 128:1, 128:8,
128:10, 128:14,
128:15, 128:17,
142:24, 147:15,
152:19, 153:15,
183:21, 184:11, 190:3,
204:12, 204:16,
204:25, 206:17,
207:15, 207:23,
208:20, 221:24, 231:7,
232:17
**employees'** [1] -
231:15
**employer** [1] - 78:2
**employment** [2] -
44:22, 181:10
**en** [1] - 142:1
**encourage** [4] - 118:8,
213:13, 239:15, 239:19
**encouraged** [1] -
59:13
**end** [18] - 15:5, 15:12,
48:25, 54:9, 68:17,
75:17, 92:10, 112:22,
114:6, 134:23, 157:19,
158:6, 158:7, 158:10,
158:18, 173:16,
194:15, 207:4
**ended** [1] - 20:10
**ends** [3] - 153:14,
238:19, 239:4
**Enforcement** [9] -
16:4, 119:24, 120:1,
130:23, 130:25,
163:13, 163:22,
163:24, 196:18
**enforcement** [15] -
5:4, 58:18, 114:9,
114:13, 114:16,
114:17, 119:19,
119:22, 166:20, 178:9,
179:13, 186:21,
205:15, 207:8
**engage** [1] - 114:10
**engaged** [4] - 22:25,
71:16, 120:23, 239:8
**engagement** [16] -
21:20, 22:6, 24:25,
27:19, 30:15, 31:3,
31:5, 31:12, 34:5,
51:17, 70:7, 80:13,
102:19, 103:3, 119:8,
188:17
**engaging** [1] - 187:15
**engineers** [3] - 20:9,
20:10, 20:21
**engines** [1] - 59:12
**enhancing** [1] - 85:16

**enjoyed** [1] - 13:21
**ensure** [7] - 63:14, 81:17, 82:5, 87:14, 179:16, 184:4, 196:14
**ensuring** [1] - 93:23
**Entellitrak** [7] - 181:7, 181:17, 181:25, 217:7, 218:23, 219:4, 219:20
**enter** [1] - 193:6
**entered** [1] - 148:4
**enthusiasm** [1] - 10:20
**entire** [3] - 130:16, 145:16, 203:3
**entirely** [3] - 11:24, 228:20, 229:24
**entities** [1] - 188:18
**entitled** [2] - 5:9, 233:13
**entity** [1] - 46:7
**entrance** [1] - 78:15
**environment** [1] - 27:4
**equal** [1] - 181:10
**equally** [1] - 148:16
**equities** [1] - 149:21
**error** [1] - 116:5
**escalated** [6] - 198:12, 198:17, 199:11, 199:15, 201:24, 203:12
**especially** [1] - 140:20
**essential** [2] - 25:22, 197:8
**essentially** [9] - 15:20, 18:24, 23:15, 27:9, 31:2, 45:5, 129:19, 136:3, 155:5
**establish** [2] - 60:24
**established** [9] - 34:17, 34:25, 35:4, 89:13, 157:6, 157:7, 188:19, 207:19, 225:15
**establishment** [1] - 48:24
**estate** [1] - 159:1
**et** [2] - 3:3, 3:4
**ETK** [2] - 181:17, 181:25
**Eva** [1] - 3:10
**evaluated** [1] - 69:2
**evaluating** [4] - 53:17, 63:5, 74:8, 74:12
**evaluation** [1] - 74:16
**evening** [1] - 19:20, 20:5, 21:5, 21:19, 22:10, 23:12, 25:10, 25:17, 27:6, 33:16, 39:18, 159:20, 192:16
**events** [2] - 44:6, 135:11
**evidence** [8] - 8:15,

8:17, 132:25, 135:1, 155:9, 157:5, 157:9, 230:25
**exact** [4] - 36:15, 70:18, 100:8, 236:5
**exactly** [10] - 24:7, 46:13, 65:20, 65:25, 66:1, 131:23, 137:5, 177:20, 214:24, 216:1
**examination** [24] - 6:1, 7:8, 8:11, 30:14, 58:7, 58:11, 86:16, 102:6, 106:13, 107:2, 110:5, 110:18, 112:6, 114:11, 114:12, 114:21, 114:22, 121:6, 136:18, 173:17, 207:3, 207:6, 212:1, 213:9
**EXAMINATION** [1] - 124:4
**examinations** [4] - 5:2, 119:16, 214:14, 215:18
**examine** [1] - 83:22
**examined** [2] - 9:6, 234:1
**examiner** [2] - 215:17, 215:20
**Examiner** [1] - 215:21
**examines** [1] - 58:7
**examining** [1] - 106:7
**example** [10] - 17:25, 84:18, 85:25, 116:21, 148:3, 158:11, 162:18, 184:19, 199:11, 236:22
**examples** [1] - 19:2
**exceed** [4] - 45:23, 51:8, 52:2, 52:5
**except** [2] - 59:1, 215:11
**exception** [3] - 48:10, 96:2, 96:4
**excess** [1] - 45:2
**exchange** [3] - 80:3, 101:1, 101:18
**excited** [1] - 234:7
**exciting** [1] - 41:14
**exclusively** [1] - 40:23
**excused** [1] - 5:11
**execute** [4] - 83:18, 134:23, 135:24, 144:8
**executed** [1] - 133:5
**executing** [1] - 133:20
**executive** [21] - 17:11, 17:13, 17:15, 17:22, 47:12, 47:24, 50:7, 153:23, 153:24, 154:2, 154:5, 154:15, 154:19, 155:7, 155:14, 155:21, 156:10, 205:9, 231:3,

231:7
**executives** [1] - 209:13
**exemption** [1] - 132:13
**exercise** [3] - 206:17, 239:9
**Exhibit** [27] - 41:18, 42:13, 122:15, 122:21, 123:22, 123:23, 130:3, 133:19, 134:11, 138:7, 139:1, 139:2, 164:19, 167:6, 174:22, 182:10, 206:14, 215:16, 223:4, 223:24, 224:18, 231:13, 231:18, 231:22
**exhibit** [14] - 114:3, 122:9, 123:11, 123:19, 174:22, 224:19, 224:20, 229:11, 236:3, 236:16, 236:19, 236:20, 237:11, 237:15
**exhibits** [13] - 7:5, 7:19, 8:9, 123:8, 123:9, 123:10, 161:23, 215:15, 231:13, 236:1, 236:2, 237:16, 238:8
**EXIM** [1] - 14:2
**exist** [2] - 90:20, 147:3
**existence** [1] - 149:1
**expect** [3] - 109:6, 174:16, 220:21
**expectations** [3] - 139:11, 213:14, 214:20
**expected** [2] - 46:4, 80:11
**expects** [1] - 31:19
**expedite** [1] - 148:8
**expedited** [1] - 239:16
**expedition** [1] - 238:25
**expenditures** [1] - 40:11
**expenses** [1] - 161:13
**experience** [9] - 11:13, 13:21, 14:2, 17:15, 17:24, 18:13, 31:9, 109:5
**experiences** [1] - 18:12
**expert** [1] - 228:20
**expire** [1] - 45:24
**explain** [8] - 38:10, 42:24, 51:3, 54:1, 54:9, 94:14, 223:17, 223:18
**explained** [2] - 86:3, 128:16
**explaining** [2] - 53:24, 107:16
**explains** [3] - 100:23,

200:15, 218:1
**explicitly** [1] - 16:10
**Export/Import** [1] - 13:17
**express** [1] - 24:14
**extend** [1] - 239:1
**extent** [4] - 115:8, 119:6, 134:25, 236:4
**external** [7] - 88:11, 95:16, 103:4, 118:24, 164:3, 222:22, 223:16
**extraordinary** [2] - 46:21, 47:9

**F**

**FACA** [4] - 96:3, 151:4, 151:11
**face** [4] - 16:8, 16:10, 28:15
**facilities** [2] - 14:6, 190:6
**facing** [3] - 103:12, 106:7, 147:7
**fact** [21] - 16:9, 33:4, 51:20, 73:18, 78:1, 80:9, 84:2, 84:13, 112:7, 113:11, 146:10, 168:19, 183:14, 186:1, 187:11, 188:5, 206:3, 207:18, 210:1, 220:24, 239:9
**fact-finding** [1] - 239:9
**factfinder** [1] - 86:6
**factors** [1] - 158:16
**facts** [7] - 115:13, 129:25, 132:25, 135:1, 155:9, 157:4, 191:9
**fail** [1] - 220:1
**failure** [6] - 146:8, 146:11, 146:15, 147:1, 147:2
**failures** [1] - 146:22
**Fair** [6] - 76:24, 93:21, 93:22, 117:9, 131:3, 187:6
**fair** [23] - 33:5, 66:22, 71:21, 72:17, 81:16, 83:13, 84:1, 91:19, 93:25, 113:2, 114:8, 115:2, 115:4, 115:7, 115:14, 126:18, 143:11, 170:21, 173:14, 207:20, 209:2, 234:2
**faith** [1] - 191:7
**falls** [1] - 118:19
**familiar** [3] - 19:17, 100:7, 146:14
**fantastic** [1] - 57:18

**far** [10] - 22:17, 38:11, 64:21, 116:4, 201:24, 215:12, 216:15, 216:16, 229:16, 232:6
**fascinating** [1] - 11:2
**fast** [3] - 140:8, 149:2, 149:11
**faster** [1] - 132:14
**fat** [1] - 160:25
**favorite** [2] - 57:21, 94:9
**FCRA** [1] - 59:2
**FDIC** [1] - 195:15
**Fe** [1] - 9:20
**fear** [1] - 6:10
**February** [103] - 12:10, 13:24, 15:6, 16:25, 19:5, 19:20, 26:22, 30:4, 30:5, 32:1, 42:3, 42:25, 45:9, 46:4, 47:15, 52:10, 56:21, 61:6, 66:4, 66:5, 66:8, 73:8, 76:4, 76:10, 76:19, 77:14, 78:9, 86:25, 87:3, 90:3, 94:12, 102:15, 104:13, 104:14, 105:19, 106:11, 106:12, 107:5, 107:6, 108:3, 108:15, 111:11, 111:18, 124:10, 124:18, 125:6, 125:12, 126:1, 126:23, 128:4, 130:11, 132:21, 132:24, 133:1, 136:22, 137:7, 137:11, 138:8, 139:22, 141:20, 142:15, 150:15, 150:22, 153:18, 157:1, 159:18, 159:19, 159:22, 161:18, 166:8, 166:22, 168:3, 168:11, 168:15, 169:20, 173:6, 174:7, 177:10, 177:13, 178:7, 179:10, 180:19, 180:21, 184:9, 184:25, 186:17, 188:9, 189:22, 190:9, 195:12, 198:18, 199:1, 199:10, 199:14, 201:21, 203:12, 206:11, 206:22, 211:22, 211:25, 212:12, 213:18
**Fed** [6] - 36:11, 36:14, 36:17, 43:3, 69:18, 159:24
**Federal** [21] - 3:25, 4:2, 35:16, 35:21, 35:24, 38:16, 38:21, 41:3, 41:8, 41:11, 41:13, 42:23, 43:10,

43:12, 43:15, 44:7, 44:15, 53:14, 96:3, 159:23, 160:13
**federal** [6] - 18:19, 46:8, 61:11, 127:3, 222:9, 230:13
**fee** [1] - 92:2
**feedback** [1] - 63:7
**felt** [8] - 21:24, 22:6, 23:4, 23:5, 24:6, 30:22, 71:24, 153:13
**few** [7] - 72:8, 101:7, 108:1, 134:22, 197:1, 213:21, 224:24
**field** [2] - 93:24, 190:15
**figure** [10] - 21:7, 39:7, 42:12, 115:19, 115:24, 146:4, 177:15, 191:17, 221:11, 234:5
**figured** [1] - 80:24
**figuring** [2] - 221:7, 221:10
**file** [10] - 64:3, 119:11, 121:4, 123:8, 190:20, 190:22, 193:18, 195:2, 236:2, 238:3
**filed** [9] - 8:6, 8:13, 133:15, 145:23, 159:10, 162:21, 168:11, 168:17, 236:18
**files** [2] - 119:11, 225:9
**filing** [2] - 64:2, 121:4
**filings** [1] - 7:24
**Filings** [1] - 16:5
**fill** [1] - 105:3
**filled** [1] - 185:17
**final** [3] - 50:15, 60:14, 91:17
**finally** [1] - 27:16
**Finance** [1] - 10:11
**finance** [3] - 12:21, 14:4, 22:3
**finances** [3] - 33:8, 34:10, 34:12
**Financial** [4] - 10:10, 36:20, 38:3
**financial** [32] - 10:12, 18:16, 31:7, 34:14, 34:21, 34:25, 40:1, 40:6, 41:9, 58:8, 72:8, 73:15, 73:25, 75:9, 79:15, 85:10, 90:19, 106:7, 119:8, 153:7, 164:20, 167:15, 169:18, 183:3, 183:5, 183:8, 192:2, 193:11, 217:20, 219:18, 221:2, 223:6

**fine** [3] - 6:20, 8:16, 68:11
**finish** [2] - 110:23, 172:10
**fire** [2] - 129:9, 129:21
**fired** [6] - 128:8, 128:10, 129:1, 148:19, 208:25, 225:11
**firing** [4] - 121:19, 128:14, 129:12, 225:5
**FIRREAs** [1] - 55:16
**first** [64] - 4:21, 4:24, 5:23, 6:1, 6:4, 6:5, 6:16, 9:5, 9:24, 16:14, 17:4, 17:8, 17:22, 18:12, 19:19, 19:20, 24:17, 27:10, 36:15, 41:16, 45:15, 46:1, 46:15, 57:17, 66:4, 66:13, 69:2, 71:22, 78:12, 84:21, 88:21, 101:7, 102:12, 102:23, 103:2, 104:7, 109:2, 121:10, 124:15, 125:5, 126:12, 128:24, 130:4, 131:25, 132:20, 139:11, 148:24, 153:19, 168:2, 174:22, 178:6, 179:1, 184:25, 196:4, 197:25, 198:22, 200:5, 201:10, 203:3, 213:11, 213:12, 224:19, 236:6, 236:13
**firsthand** [1] - 200:1
**fist** [1] - 23:4
**fit** [1] - 161:10
**five** [2] - 152:11, 211:1
**fixed** [1] - 116:5
**flagging** [2] - 179:2, 217:6
**flagship** [1] - 12:18
**flow** [2] - 222:7, 222:8
**fluid** [2] - 153:24, 156:3
**flurry** [8] - 209:3, 209:21, 210:11, 210:12, 210:14, 210:19, 210:21, 212:6
**focus** [2] - 62:22, 195:1
**focused** [5] - 27:5, 40:23, 56:3, 83:15, 149:21
**FOIA** [5] - 14:5, 94:4, 94:5, 94:8, 143:16
**folks** [9] - 27:22, 46:8, 55:6, 68:25, 72:9, 89:5, 94:19, 94:22, 103:3
**follow** [12] - 20:21, 25:19, 62:16, 71:6,

75:11, 79:11, 83:11, 95:24, 123:25, 185:7, 186:7, 232:14
**follow-up** [3] - 25:19, 79:11, 95:24
**followed** [3] - 27:10, 27:13, 98:23
**following** [18] - 22:23, 56:4, 63:22, 127:2, 141:11, 142:20, 143:20, 149:7, 157:17, 158:8, 163:17, 163:22, 175:2, 183:2, 185:20, 185:23, 238:10, 238:25
**follows** [4] - 9:6, 34:4, 92:22, 98:3
**force** [7] - 44:24, 45:1, 62:14, 129:12, 129:13, 154:22, 230:13
**forever** [1] - 122:25
**forgotten** [1] - 37:8
**fork** [2] - 51:13, 51:14
**form** [6] - 69:6, 101:4, 173:19, 175:13, 196:15, 218:21
**formal** [2] - 24:4, 24:6
**former** [1] - 53:6
**formulate** [1] - 159:6
**formulating** [1] - 70:5
**forth** [4] - 58:9, 177:23, 197:9, 227:16
**fortunately** [1] - 14:13
**forward** [9] - 13:22, 39:2, 57:23, 59:1, 78:1, 80:14, 94:23, 106:6, 145:25
**forwarded** [2] - 108:22, 178:12
**foundation** [3] - 173:20, 174:1, 225:14
**four** [6] - 28:19, 151:11, 153:18, 228:19, 229:20, 238:18
**Frank** [4] - 93:18, 117:11, 146:22
**freaked** [1] - 133:8
**free** [1] - 198:2
**Friday** [10] - 4:19, 15:25, 21:18, 106:11, 132:21, 132:24, 133:5, 148:18, 236:14, 238:17
**Friday's** [1] - 64:2
**Friedman** [1] - 3:13
**friends** [2] - 5:21, 115:6
**front** [5] - 3:19, 16:3, 34:2, 131:12, 198:19
**frustration** [1] - 75:17
**fulfil** [4] - 71:17, 74:25, 103:21, 140:8

**fulfilled** [2] - 230:4, 230:17
**fulfilling** [6] - 96:18, 174:13, 186:11, 186:15, 186:18, 230:8
**full** [5] - 4:12, 9:1, 9:8, 78:24, 99:23
**full-time** [2] - 78:24, 99:23
**fully** [3] - 120:19, 227:1, 227:5
**function** [5] - 78:19, 112:7, 130:25, 147:6, 191:24
**functionally** [2] - 33:4, 72:18
**functioning** [1] - 140:13
**functions** [46] - 5:3, 22:8, 24:14, 62:23, 62:25, 67:15, 76:6, 82:20, 84:10, 84:13, 84:14, 92:20, 92:25, 93:13, 94:2, 95:1, 95:4, 100:10, 118:11, 118:12, 119:1, 126:2, 149:18, 149:20, 149:22, 149:23, 150:3, 155:3, 155:14, 156:8, 156:12, 185:3, 186:3, 186:11, 186:15, 186:19, 187:2, 187:7, 187:11, 187:18, 188:6, 188:9, 188:11, 221:20, 230:6
**Fund** [5] - 10:10, 12:17, 12:21, 18:15, 18:16
**fund** [31] - 34:21, 34:24, 35:4, 35:5, 36:20, 36:23, 36:24, 36:25, 37:2, 37:9, 37:11, 37:14, 37:15, 37:18, 37:22, 37:24, 38:17, 38:19, 39:8, 39:22, 43:4, 43:18, 43:23, 160:2, 161:9, 161:11, 161:13
**funding** [6] - 35:21, 35:24, 37:21, 53:15, 160:2, 161:10
**funds** [14] - 34:20, 36:21, 38:16, 38:21, 40:10, 40:14, 41:3, 42:23, 44:7, 44:14, 159:24, 160:3, 160:14, 160:22
**furious** [1] - 112:25
**future** [3] - 65:5, 67:17, 238:5

# G

**Gabriel** [1] - 3:13
**gap** [1] - 118:8
**gaps** [2] - 71:17, 117:22
**gears** [2] - 159:9, 184:7
**general** [6] - 27:2, 69:11, 78:24, 151:21, 189:14, 228:12
**General** [2] - 70:24, 151:9
**generally** [9] - 10:18, 26:5, 31:13, 45:1, 81:6, 121:11, 196:11, 226:21, 226:22
**generals** [1] - 22:7
**generated** [2] - 147:5, 209:11
**get-go** [1] - 121:20
**gist** [2] - 36:7, 36:9
**given** [10] - 10:21, 22:11, 61:23, 102:2, 140:20, 161:6, 202:15, 208:19, 208:21, 237:21
**goal** [2] - 13:21, 149:1
**goodness** [1] - 38:8
**govern** [1] - 222:8
**governance** [1] - 14:5
**governing** [1] - 218:10
**government** [17] - 5:18, 5:24, 6:16, 14:25, 34:1, 45:1, 46:12, 61:12, 62:17, 81:11, 89:4, 123:9, 141:20, 230:13, 231:8, 233:14, 233:16
**government's** [2] - 72:3, 165:3
**government-wide** [1] - 89:4
**Governors** [1] - 35:16
**graduate** [1] - 9:21
**graduated** [2] - 9:22, 10:3
**grant** [4] - 12:18, 12:19, 18:16, 18:19
**granted** [3] - 25:15, 51:11, 210:25
**granting** [1] - 48:10
**great** [5] - 24:16, 68:12, 92:5, 99:4, 226:15
**ground** [4] - 4:15, 12:8, 228:7, 228:16
**group** [3] - 93:12, 146:16, 146:17
**Group** [1] - 3:15
**groups** [5] - 31:7,

31:18, 54:6, 228:18
**GSA** [3] - 183:14, 183:16, 183:18
**guards** [1] - 28:19
**guess** [3] - 3:19, 7:15, 142:19
**Gueye** [7] - 72:8, 79:15, 85:9, 153:4, 153:6, 153:7, 219:17
**guidance** [20] - 19:12, 46:14, 61:10, 64:17, 78:23, 85:11, 85:22, 94:17, 110:1, 111:24, 112:2, 157:17, 158:9, 172:17, 173:1, 173:4, 206:17, 209:22, 232:4, 232:9
**guide** [1] - 157:18
**gun** [1] - 112:15
**GUPTA** [15] - 3:7, 3:21, 5:17, 5:22, 6:5, 6:25, 8:18, 233:21, 233:23, 233:25, 234:20, 235:10, 235:12, 235:17, 235:23
**Gupta** [4] - 3:7, 3:8, 3:12, 5:16
**guy** [1] - 40:8

# H

**Hagins** [1] - 105:18
**half** [2] - 68:8, 68:15
**hallway** [2] - 27:20, 27:23
**hand** [2] - 72:7, 75:5
**handful** [1] - 69:7
**handing** [2] - 8:21
**handle** [2] - 94:20, 103:3
**handling** [3] - 10:2, 159:12, 202:13
**hands** [5] - 14:14, 61:24, 108:21, 111:21, 171:10
**hands-off** [1] - 14:14
**happy** [5] - 10:18, 38:23, 148:17, 148:19, 225:18
**harassed** [1] - 27:10
**harassment** [2] - 182:4, 221:15
**hard** [6] - 23:3, 53:25, 162:10, 191:10, 205:9, 208:11
**hate** [1] - 54:12
**hatted** [1] - 62:9
**head** [24] - 14:16, 14:17, 14:20, 26:12, 58:24, 61:14, 62:7,

76:13, 93:3, 93:14, 93:20, 109:21, 117:24, 118:14, 124:17, 127:9, 134:21, 161:9, 161:16, 167:5, 196:18, 200:12, 224:4, 226:7
**headed** [5] - 19:24, 65:18, 69:9, 78:17, 234:4
**header** [1] - 16:17
**heading** [1] - 174:23
**headquarters** [6] - 12:23, 13:16, 31:15, 152:7, 186:25
**heads** [7] - 26:16, 57:3, 57:13, 71:2, 80:7, 80:10
**hear** [8] - 4:11, 4:21, 5:5, 6:23, 19:13, 28:22, 128:25, 214:10
**heard** [5] - 28:5, 102:17, 103:2, 158:4, 209:23
**hearing** [32] - 4:14, 4:16, 13:2, 19:7, 29:22, 64:3, 66:11, 86:6, 97:11, 120:14, 121:5, 124:16, 132:24, 133:14, 134:6, 134:18, 135:13, 167:24, 168:2, 198:15, 203:18, 203:21, 210:23, 211:1, 238:3, 238:13, 238:14, 239:4
**heavily** [1] - 83:4
**help** [11] - 79:23, 89:6, 99:23, 122:25, 131:20, 177:15, 179:23, 182:1, 193:4, 220:24, 236:4
**helped** [3] - 209:14, 209:15, 209:16
**helpful** [6] - 57:12, 110:22, 111:17, 194:7, 210:8, 237:9
**helps** [1] - 89:14
**hi** [1] - 64:15
**high** [4] - 9:24, 68:17, 77:22, 183:16
**high-priority** [1] - 77:22
**highest** [1] - 62:24
**highly** [3] - 42:24, 213:13
**Hill** [1] - 27:3
**himself** [4] - 20:13, 27:7, 33:19, 200:10
**hire** [1] - 11:4
**hired** [4] - 10:5, 10:7, 18:23, 67:19
**historical** [2] - 182:25,

184:2
**historically** [3] -
14:15, 14:16, 228:18
**hitting** [1] - 69:16
**HMDA** [10] - 87:15,
88:2, 192:9, 192:11,
192:24, 193:9, 193:24,
194:19, 195:14, 195:21
**hold** [5] - 73:9, 109:12,
116:7, 178:19, 227:12
**holds** [4] - 179:4,
179:5, 179:8, 179:16
**Holland** [1] - 4:1
**Home** [3] - 191:24,
192:9, 193:9
**home** [3] - 187:3,
194:21, 230:18
**honestly** [1] - 204:17
**Honor** [12] - 3:7, 3:23,
5:17, 6:19, 7:4, 38:13,
60:12, 86:11, 99:1,
110:19, 234:17, 234:19
**hope** [4] - 67:16,
67:17, 206:9, 235:2
**host** [1] - 232:13
**hot** [1] - 91:22
**hotline** [14] - 59:22,
60:6, 88:6, 89:21,
90:14, 90:15, 91:7,
91:12, 91:13, 91:14,
91:17, 91:21, 92:5,
93:11
**hour** [2] - 68:8, 68:15
**hours** [8] - 15:18,
24:18, 109:8, 110:2,
110:15, 160:9, 161:7,
213:21
**house** [10] - 24:20,
25:22, 25:23, 26:1,
26:2, 26:9, 92:4,
149:24, 186:6, 205:18
**House** [5] - 10:6,
15:13, 150:23, 151:7,
151:16
**housekeeping** [1] -
235:4
**housing** [1] - 89:14
**HR** [4] - 12:22, 13:15,
143:15, 218:24
**Huggins** [12] - 105:18,
107:12, 108:13, 109:4,
109:7, 109:24, 211:14,
211:24, 212:7, 212:16,
213:2, 213:20
**Huggins's** [4] -
108:25, 109:11,
109:13, 115:15
**hum** [31] - 48:5, 48:18,
52:1, 72:15, 84:11,
88:20, 93:15, 93:19,

124:13, 129:20,
134:16, 134:19,
135:18, 139:3, 141:13,
154:23, 163:23,
166:25, 169:13, 173:3,
174:25, 178:8, 181:1,
187:4, 196:23, 198:13,
201:22, 204:14, 211:6,
219:22, 224:25
**human** [13] - 11:2,
11:20, 14:5, 22:1, 53:4,
53:24, 65:8, 156:21,
190:3, 197:21, 206:10,
231:14
**hundred** [1] - 12:11
**hundreds** [2] - 4:18,
12:11

# I

**ID** [1] - 28:16
**idea** [11] - 31:19,
125:3, 143:10, 194:8,
223:2, 228:10, 230:10,
230:11, 230:14,
230:22, 237:10
**identified** [14] - 48:13,
49:3, 54:7, 70:24,
71:17, 79:8, 80:10,
138:15, 139:5, 139:14,
164:16, 193:9, 196:21,
235:12
**identifies** [5] - 95:25,
130:16, 146:22,
165:12, 169:11
**identify** [13] - 49:6,
57:12, 70:12, 82:18,
83:17, 105:4, 146:11,
146:21, 164:23,
180:15, 235:6, 239:10
**identifying** [3] - 92:23,
166:11, 166:21
**IDs** [2] - 28:11, 28:12
**imagine** [2] - 30:23,
94:7
**immediate** [1] - 87:13
**immediately** [8] -
34:14, 41:8, 41:10,
78:14, 133:15, 134:20,
135:15, 150:24
**impact** [2] - 90:8, 91:5
**impacts** [1] - 225:5
**impediment** [1] -
145:25
**impending** [1] -
231:16
**implement** [2] - 64:12,
121:23
**implementation** [1] -
100:25

**implemented** [3] -
100:24, 148:10, 186:5
**implication** [1] - 86:9
**importance** [2] -
89:22, 103:21, 193:11
**important** [9] - 60:22,
89:6, 91:23, 100:2,
100:3, 100:5, 117:8,
193:12, 220:24
**impossible** [1] - 44:11
**impression** [8] -
23:19, 24:7, 55:25,
137:4, 148:18, 148:21,
187:6, 204:15
**in-coming** [1] - 63:9
**inaccurate** [1] -
127:12, 127:13, 127:21
**incapable** [1] - 238:21
**include** [5] - 39:7,
81:6, 103:6, 132:3,
210:7
**included** [8] - 58:4,
104:7, 107:5, 107:6,
129:1, 140:3, 150:19,
177:13
**includes** [3] - 8:3,
112:9, 236:17
**including** [6] - 3:19,
96:18, 112:19, 159:11,
161:13, 185:12
**Inclusion** [1] - 222:24
**incoming** [1] - 63:6
**increasingly** [1] - 56:5
**incredible** [2] - 11:13,
11:14
**incredibly** [1] - 57:22
**incur** [1] - 37:21
**indeed** [1] - 77:14
**independent** [2] -
10:24, 13:18
**indicated** [5] - 63:22,
110:1, 111:6, 115:6,
235:5
**indicates** [1] - 104:20
**indicating** [2] - 100:8,
136:15
**indicating)** [2] - 62:3,
167:11
**indication** [1] - 27:11
**indirectly** [1] - 225:25
**individual** [8] - 22:11,
22:13, 75:9, 83:12,
146:16, 177:20,
237:11, 237:15
**individuals** [16] - 33:3,
33:7, 33:18, 34:2, 34:9,
41:22, 41:24, 55:7,
55:9, 77:15, 103:13,
134:24, 136:12, 140:3,
158:3, 231:12

**infer** [2] - 115:7,
115:14
**inference** [1] - 191:9
**information** [29] -
4:14, 21:25, 24:23,
25:12, 25:17, 34:15,
39:18, 49:7, 57:19,
59:4, 65:18, 81:22,
90:6, 105:21, 157:20,
157:21, 167:16, 180:2,
181:3, 187:23, 192:2,
192:18, 193:18,
194:10, 195:10,
199:19, 199:21, 216:4,
216:9
**informational** [1] -
192:13
**informed** [1] - 12:25
**infrastructure** [5] -
10:23, 11:23, 14:4,
18:25, 89:20
**inherit** [4] - 143:12,
143:17, 144:11, 149:20
**initial** [6] - 11:21, 25:6,
76:1, 106:25, 121:8,
173:7
**injunction** [8] - 4:17,
4:23, 39:1, 80:19,
124:12, 124:16,
237:23, 239:3
**inner** [2] - 22:5, 22:25
**innovation** [1] - 85:5
**inquiring** [1] - 43:2
**inquiry** [1] - 195:15
**inside** [1] - 92:8
**insight** [4] - 188:2,
228:15, 228:17
**insisting** [1] - 80:17
**inspector** [1] - 22:7
**instance** [2] - 218:22,
219:3
**instead** [2] - 122:9,
150:13
**institution** [2] - 34:25,
106:7
**Institutions** [1] - 10:10
**institutions** [7] - 31:7,
58:8, 90:19, 119:9,
192:2, 193:11, 193:17
**instruct** [2] - 175:18,
175:20
**instructed** [10] - 4:6,
29:10, 47:7, 69:19,
120:17, 150:24, 151:7,
151:10, 151:16, 206:18
**instructions** [3] -
62:16, 65:13, 174:10
**intact** [2] - 192:11,
192:14, 198:4
**intake** [1] - 83:6

**integrity** [1] - 190:16
**intend** [3] - 168:24, 230:1, 232:14
**intended** [8] - 32:12, 43:6, 49:9, 53:10, 109:18, 110:17, 112:5, 190:24
**intending** [1] - 198:5
**intends** [3] - 62:18, 65:5, 233:15
**intent** [9] - 47:6, 71:14, 83:5, 168:21, 168:22, 169:2, 185:7, 190:14, 195:3
**intention** [1] - 185:13
**interact** [1] - 103:8
**interaction** [7] - 9:24, 19:19, 19:20, 20:18, 31:6, 95:5, 205:17
**interest** [7] - 4:24, 5:1, 24:14, 24:19, 29:23, 31:7, 31:18
**interested** [6] - 5:3, 22:5, 68:13, 116:25, 191:3, 238:23
**interesting** [2] - 10:13, 84:15
**internal** [4] - 7:25, 64:1, 148:1, 222:22
**Internal** [1] - 16:4
**internally** [1] - 221:24
**interplay** [1] - 226:2
**interpret** [1] - 106:6
**interpreted** [1] - 106:6
**interrupt** [1] - 12:24
**interruption** [2] - 79:14, 152:1
**intimidation** [1] - 5:13
**introduce** [1] - 43:6
**introduced** [4] - 157:8, 226:13, 236:6
**introduces** [1] - 200:9
**introduction** [1] - 21:5
**inviting** [1] - 70:11
**involve** [3] - 46:18, 55:22, 95:5
**involved** [9] - 11:10, 11:18, 12:2, 55:20, 69:5, 74:16, 137:15, 144:5, 144:6
**involving** [2] - 95:23, 96:7
**iPhone** [1] - 229:7
**irresponsibly** [1] - 73:16
**issuance** [1] - 63:23
**issue** [14] - 8:11, 19:6, 38:10, 38:14, 38:22, 38:25, 40:24, 60:13, 81:2, 99:3, 115:12,

178:24, 179:3, 209:16
**issued** [15] - 61:10, 64:17, 70:14, 79:7, 85:22, 133:12, 141:19, 158:9, 170:3, 176:1, 177:13, 184:23, 206:10, 213:18
**issues** [9] - 27:2, 27:5, 68:21, 77:22, 81:23, 94:21, 141:17, 187:20, 205:15
**IT** [4] - 20:9, 20:10, 20:21, 81:25
**item** [3] - 34:18, 47:13, 96:4
**items** [2] - 37:20, 47:11
**itself** [4] - 31:13, 96:25, 103:5, 177:6

## J

**Jackson** [3] - 77:6, 88:23, 119:21
**Jafnar** [5] - 72:8, 153:4, 153:7, 219:17, 220:23
**Jan** [2] - 96:11, 100:11
**Janis** [1] - 96:8
**Jason** [4] - 223:25, 224:3, 224:23, 225:14
**Jennifer** [2] - 3:12, 124:6
**Jeremy** [4] - 21:13, 92:16, 138:13, 139:22
**Jerome** [2] - 35:15, 159:23
**JJ** [3] - 48:15, 130:3, 138:7
**job** [7] - 11:19, 13:14, 57:18, 78:19, 98:10, 103:8, 191:14
**jobs** [2] - 58:1, 153:16
**Johnson** [18] - 87:21, 88:17, 89:5, 91:6, 92:15, 92:19, 93:3, 99:9, 165:7, 166:20, 196:13, 196:17, 199:24, 200:9, 200:5, 202:21, 202:23, 203:2
**Johnson's** [1] - 99:16
**joined** [2] - 3:11, 125:14
**joining** [1] - 4:1
**jointly** [1] - 6:2
**Jordan** [2] - 21:12, 92:16
**Judge** [5] - 64:11, 77:6, 88:23, 99:24, 119:21

**Judge's** [2] - 18:8, 83:11
**judgment** [2] - 237:25, 239:17
**Julie** [1] - 3:15
**jump** [1] - 91:2
**jumps** [1] - 112:15
**jurisdiction** [1] - 10:19
**jury** [1] - 237:20
**Justice** [1] - 3:24
**justification** [4] - 49:9, 49:21, 50:4, 71:3
**justifications** [8] - 47:21, 48:12, 49:4, 49:6, 49:24, 50:2, 73:20, 223:16
**justified** [1] - 47:16
**justify** [3] - 46:25, 73:21, 220:24
**juxtaposing** [1] - 160:21

## K

**keep** [14] - 11:7, 56:10, 59:12, 65:22, 148:14, 151:13, 193:14, 193:16, 193:19, 195:1, 196:19, 196:20, 210:17, 219:7
**keeping** [2] - 138:21, 168:5
**keeps** [1] - 111:17
**kept** [2] - 140:21, 193:14
**kind** [11] - 9:13, 38:11, 121:9, 121:10, 125:18, 125:19, 159:2, 210:11, 221:17, 234:4, 238:25
**kinds** [1] - 83:24
**KK** [2] - 139:2, 139:19
**knowing** [2] - 228:8, 238:23
**knowledge** [18] - 25:21, 26:9, 32:11, 49:16, 81:23, 89:19, 92:9, 97:4, 116:17, 117:14, 117:20, 118:7, 146:18, 171:25, 172:19, 200:1, 221:11, 230:6
**known** [2] - 133:8, 133:11
**knows** [3] - 26:8, 26:12, 82:15

## L

**label** [1] - 122:24
**labels** [1] - 123:19

**lack** [5] - 58:6, 83:20, 173:19, 174:1, 225:13
**language** [3] - 66:7, 151:15, 186:15
**laptop** [1] - 7:19
**laptops** [2] - 28:14, 78:14
**large** [8] - 38:19, 53:8, 128:1, 132:13, 134:1, 142:16, 158:12
**large-scale** [4] - 128:1, 134:1, 142:16, 158:12
**largely** [3] - 17:16, 123:5, 162:20
**larger** [1] - 16:8
**LaShaun** [2] - 95:10, 95:13
**last** [40] - 4:12, 4:19, 8:8, 29:22, 30:10, 48:4, 60:12, 65:1, 65:9, 66:11, 69:23, 80:18, 84:16, 85:20, 86:12, 90:6, 90:25, 91:15, 116:10, 120:24, 121:7, 148:9, 153:9, 159:6, 178:22, 182:15, 182:18, 203:15, 203:18, 203:19, 215:13, 228:19, 229:19, 229:23, 231:14, 231:23, 235:12, 238:11
**late** [1] - 27:8
**latter** [1] - 185:18
**Law** [2] - 3:9, 3:10
**law** [14] - 8:23, 58:11, 84:3, 109:20, 112:8, 154:25, 205:1, 207:2, 207:6, 207:7, 207:10, 207:11, 207:13
**lawsuit** [3] - 40:23, 168:11, 168:17
**lawsuits** [1] - 40:22
**lawyer** [2] - 3:21, 38:6
**lawyers** [1] - 4:20
**laying** [1] - 57:19
**lead** [2] - 20:20, 20:21, 166:20
**leader** [7] - 11:14, 15:18, 131:20, 137:6, 137:8, 137:9, 137:11
**leaders** [1] - 144:21
**leadership** [45] - 45:15, 54:7, 57:22, 65:18, 74:22, 125:7, 125:10, 126:1, 128:21, 132:16, 132:20, 136:8, 136:10, 136:11, 136:13, 136:15,

136:19, 136:25, 137:1,
137:3, 139:15, 143:12,
143:25, 144:11,
144:17, 144:18, 145:1,
145:2, 145:4, 145:5,
157:18, 157:23,
157:24, 158:5, 159:11,
159:14, 185:2, 185:5,
185:12, 187:15,
187:17, 188:18,
229:25, 232:4, 232:15
  **leading** [1] - 173:16
  **leads** [1] - 100:23
  **leaked** [1] - 115:17
  **learned** [3] - 11:15,
15:14, 44:11
  **lease** [2] - 142:22,
235:22
  **leases** [1] - 231:1
  **least** [12] - 25:7, 35:19,
40:13, 42:3, 101:16,
126:21, 146:21,
194:14, 196:24, 221:8,
222:14, 231:14
  **leave** [22] - 26:19,
28:21, 52:7, 52:11,
68:1, 80:17, 89:21,
91:20, 91:23, 98:11,
98:16, 102:3, 113:19,
114:6, 122:3, 206:11,
206:18, 207:23,
207:24, 213:6, 216:10,
216:13
  **led** [3] - 49:1, 54:23,
54:25
  **left** [15] - 12:10, 18:22,
26:19, 28:21, 54:9,
73:12, 86:16, 86:21,
104:16, 116:21,
143:18, 158:21,
194:19, 225:9, 238:6
  **legal** [33] - 13:1, 22:25,
25:2, 29:18, 32:18,
34:11, 41:6, 43:2,
56:18, 57:5, 57:8,
58:10, 58:16, 58:25,
59:14, 72:16, 78:21,
96:25, 115:13, 119:21,
120:16, 125:15,
125:21, 154:6, 155:9,
159:11, 164:9, 186:6,
199:2, 199:8, 199:22,
222:21, 239:8
  **legally** [2] - 219:7,
221:19
  **legally-required** [1] -
221:19
  **lenders** [1] - 103:7
  **lending** [1] - 192:3
  **Lending** [5] - 76:24,

93:21, 93:22, 117:9,
131:3
  **lengthy** [1] - 4:11
  **less** [8] - 49:2, 67:14,
67:16, 109:8, 110:2,
110:14, 161:7, 234:4
  **letter** [13] - 35:13,
35:14, 35:15, 35:22,
35:23, 36:7, 36:9,
36:17, 36:19, 38:20,
39:20, 48:20, 159:22
  **letterhead** [1] - 48:20
  **letters** [10] - 35:20,
123:11, 152:9, 168:21,
168:22, 174:10, 238:5,
238:6, 238:7
  **letting** [5] - 5:14,
15:12, 15:22, 23:14,
25:14
  **level** [7] - 9:24, 43:5,
77:18, 90:22, 93:24,
193:16, 221:18
  **Lewin** [4] - 21:13,
92:17, 138:13, 139:22
  **liaison** [1] - 103:20
  **liaisons** [1] - 11:4
  **Liam** [1] - 4:1
  **Licata** [2] - 79:4, 79:22
  **Licata's** [1] - 79:6
  **lied** [1] - 191:7
  **life** [1] - 18:25
  **lift** [2] - 62:13, 64:11
  **light** [5] - 53:22, 62:14,
94:8, 96:16, 120:24
  **lights** [1] - 196:20
  **limb** [1] - 140:18
  **limited** [1] - 172:19
  **line** [8] - 4:4, 13:1,
13:7, 34:18, 131:25,
208:1, 208:7
  **lines** [1] - 118:17
  **list** [13] - 54:7, 57:23,
72:25, 79:17, 102:24,
102:25, 117:16,
131:12, 131:13,
131:14, 146:24,
169:11, 171:25
  **listed** [1] - 166:2
  **listen** [1] - 4:6
  **listening** [2] - 4:5, 4:9
  **listing** [1] - 166:4
  **listings** [1] - 172:14
  **lists** [3] - 71:19, 95:5,
225:1
  **litigated** [1] - 58:19
  **litigation** [9] - 38:14,
58:19, 81:3, 119:20,
178:19, 179:5, 179:8,
179:16, 182:1
  **Litigation** [1] - 3:15

  **Liu** [1] - 3:14
  **live** [4] - 4:17, 13:3,
28:13, 190:7
  **LL** [1] - 133:19
  **Loan** [1] - 189:2
  **loan** [2] - 104:25,
190:18, 190:24
  **loans** [2] - 5:1, 89:15
  **local** [1] - 67:3
  **locks** [1] - 87:25
  **logistical** [2] - 8:9,
236:1
  **long-term** [1] - 92:1
  **look** [26] - 30:19, 54:3,
64:7, 68:25, 69:10,
69:12, 70:25, 79:3,
79:24, 81:15, 87:9,
94:13, 98:1, 100:21,
102:12, 105:9, 109:3,
118:10, 162:18, 171:7,
173:12, 200:4, 204:10,
206:15, 227:6, 239:11
  **looked** [9] - 13:22,
77:24, 172:3, 172:5,
172:6, 172:9, 172:14,
205:10, 228:11
  **looking** [14] - 28:25,
35:7, 42:12, 53:4,
53:23, 73:5, 135:21,
162:2, 169:7, 172:1,
186:21, 192:19,
222:20, 235:24
  **looks** [3] - 66:18,
224:7, 224:16
  **loop** [1] - 139:17
  **loosely** [1] - 21:24
  **lose** [2] - 182:25,
184:1
  **losing** [1] - 10:19
  **loss** [1] - 225:3
  **lost** [3] - 76:17, 174:18
  **loud** [2] - 171:7,
201:13
  **love** [1] - 12:16
  **lower** [1] - 75:5
  **Luddite** [1] - 7:11
  **lulled** [1] - 170:17
  **lunch** [5] - 86:15,
86:20, 102:25, 104:4,
194:3

## M

  **ma'am** [12] - 17:25,
20:15, 52:21, 59:7,
68:3, 93:5, 128:13,
191:19, 194:22, 222:1,
227:10, 234:14
  **Mahoney** [1] - 48:21
  **mails** [2] - 191:15,

225:24
  **main** [1] - 117:16
  **maintain** [2] - 195:22,
219:7
  **maintained** [2] -
176:21, 185:8
  **maintaining** [1] -
198:1
  **maintains** [1] - 82:1
  **maintenance** [1] -
87:14
  **majority** [7] - 73:14,
128:17, 142:24, 143:4,
152:19, 152:23, 232:17
  **manage** [4] - 157:25,
158:3, 190:23, 222:5
  **manageable** [1] -
141:15
  **managed** [1] - 222:23
  **Management** [6] -
21:1, 46:5, 48:22, 56:5,
61:15, 148:6
  **management** [18] -
13:16, 14:6, 14:12,
58:10, 78:21, 78:23,
96:19, 115:11, 175:24,
198:12, 198:17,
199:11, 199:15,
201:24, 203:13,
218:25, 219:1, 219:4
  **manager** [4] - 12:16,
12:18, 20:19, 77:23
  **manages** [2] - 174:12,
218:24
  **managing** [1] - 89:25
  **mandated** [2] - 62:23,
155:3
  **mandates** [1] - 73:2
  **mandatory** [3] - 45:18,
231:19
  **March** [49] - 64:11,
76:14, 76:15, 84:24,
98:7, 99:8, 99:16,
104:18, 107:11, 108:6,
108:7, 108:14, 108:21,
108:22, 109:3, 109:5,
109:8, 109:11, 109:16,
110:1, 110:14, 110:16,
111:7, 111:18, 112:3,
112:24, 124:14,
124:24, 127:10,
159:10, 160:21,
182:12, 183:2, 192:5,
198:14, 202:7, 202:15,
203:5, 203:19, 204:2,
210:23, 212:21,
212:24, 215:23,
217:24, 219:16, 224:9,
224:10, 224:11
  **marched** [1] - 203:23

**mark** [3] - 78:7, 79:6, 173:15

**Mark** [67] - 32:18, 43:1, 59:14, 64:15, 72:14, 72:15, 72:19, 75:16, 75:23, 77:24, 78:5, 83:2, 83:4, 83:16, 93:20, 94:17, 96:24, 101:8, 106:10, 106:16, 107:24, 110:6, 117:24, 119:2, 119:10, 125:14, 125:20, 139:7, 139:8, 139:10, 139:14, 140:12, 140:17, 144:13, 145:4, 158:5, 158:8, 158:23, 159:2, 161:22, 162:25, 167:18, 169:15, 172:16, 185:15, 187:24, 188:18, 192:13, 199:24, 200:12, 202:10, 204:6, 205:11, 205:13, 209:12, 209:14, 209:19, 213:13, 213:25, 214:6, 215:12, 227:24, 230:1

**Mark's** [1] - 110:16

**marked** [2] - 41:17, 122:9

**market** [2] - 89:14, 96:14

**markets** [3] - 96:14, 98:4, 100:15

**Markets** [3] - 58:3, 228:9

**MARTINEZ** [1] - 9:4

**Martinez** [26] - 5:24, 6:3, 6:5, 6:23, 7:1, 7:5, 9:3, 9:10, 9:11, 9:12, 9:19, 16:3, 107:14, 107:19, 108:8, 110:3, 111:3, 111:11, 111:24, 112:12, 112:14, 124:6, 225:15, 225:24, 236:17

**Martinez's** [3] - 6:12, 8:3, 111:9

**Martinez/Mark** [1] - 109:16

**mass** [2] - 141:21, 231:23

**masse** [1] - 142:1

**master** [3] - 72:25, 73:3, 172:4

**match** [1] - 162:8

**material** [2] - 120:2, 232:5

**materials** [1] - 16:7

**Matt** [2] - 235:10, 235:13

**matter** [5] - 33:2, 125:21, 183:13, 183:14, 228:20

**matters** [6] - 32:17, 32:21, 59:12, 77:16, 179:5, 235:4

**maximum** [1] - 62:22

**mean** [52] - 10:16, 15:9, 17:19, 19:7, 30:19, 31:3, 34:19, 36:6, 44:25, 46:11, 53:12, 66:20, 69:21, 81:25, 87:24, 97:10, 97:11, 100:2, 101:21, 104:6, 106:22, 117:25, 118:5, 120:6, 123:16, 125:20, 127:14, 135:3, 137:1, 137:2, 142:17, 143:15, 147:24, 147:25, 149:17, 152:17, 158:14, 158:22, 158:25, 163:15, 166:3, 168:22, 178:1, 186:5, 186:21, 186:22, 193:19, 214:22, 221:19, 227:5, 229:25

**meaning** [1] - 85:15

**meaningful** [1] - 115:17

**Means** [1] - 10:6

**means** [13] - 34:20, 36:3, 56:24, 56:25, 59:10, 98:17, 98:19, 98:22, 158:2, 204:21, 230:10, 230:11, 230:16

**meant** [9] - 44:1, 61:2, 73:24, 103:16, 106:24, 125:10, 126:6, 191:11, 208:25

**meantime** [2] - 7:4, 214:10

**mechanics** [1] - 46:13

**mechanism** [2] - 4:5, 41:13

**media** [8] - 176:20, 177:4, 177:6, 190:14, 191:5, 208:10, 208:11, 208:12

**medium** [1] - 14:25

**meet** [12] - 46:6, 65:15, 65:17, 66:6, 75:19, 85:14, 85:16, 85:18, 218:9, 220:2, 220:4, 223:9

**meeting** [28] - 26:22, 26:23, 46:5, 46:9, 46:11, 127:25, 128:7, 128:12, 128:16, 129:18, 139:22,

139:25, 142:15, 147:21, 150:18, 150:22, 156:15, 156:17, 157:7, 157:8, 157:9, 157:11, 215:23, 231:24, 232:2, 232:3

**meetings** [5] - 54:20, 142:19, 143:3, 156:19, 157:16

**member** [5] - 10:2, 134:1, 134:12, 135:12, 138:15

**members** [9] - 27:13, 28:15, 99:22, 133:20, 135:6, 139:23, 147:7, 199:10, 199:15

**memo** [25] - 48:20, 61:18, 62:1, 62:2, 62:5, 62:10, 62:15, 62:19, 63:3, 92:16, 92:18, 121:5, 130:2, 130:16, 131:24, 132:12, 137:12, 155:20, 156:21, 156:22, 156:24, 161:12, 236:7

**memorandum** [12] - 25:16, 33:18, 63:23, 65:16, 130:7, 148:5, 156:5, 156:7, 156:16, 156:17, 157:1, 157:8

**memorandum/ agreement** [1] - 180:16

**memorializes** [1] - 130:3

**memory** [2] - 17:10, 171:5

**mention** [7] - 14:21, 126:12, 127:3, 144:13, 146:7, 153:21, 189:2

**mentioned** [8] - 24:10, 25:7, 36:23, 103:7, 144:14, 158:7, 158:24, 189:13

**merger** [1] - 143:17

**Merger** [1] - 143:19

**merits** [1] - 38:25

**message** [13] - 64:1, 64:7, 64:8, 96:24, 108:21, 109:16, 109:18, 112:5, 121:4, 229:5, 229:12, 229:13, 236:7

**messages** [5] - 229:6, 229:7, 229:8, 229:14, 229:16

**method** [1] - 208:9

**methodical** [3] - 159:12, 159:15, 161:7

**methodically** [1] - 142:2

**Mexico** [1] - 9:20

**Michael** [1] - 48:21

**microphone** [1] - 9:13

**Microsoft** [2] - 22:14, 87:16

**middle** [4] - 63:12, 117:17, 211:14, 217:3

**might** [7] - 5:22, 80:23, 86:1, 115:10, 173:9, 173:10, 229:9

**million** [1] - 36:19

**mind** [3] - 69:18, 139:20, 223:24

**mindful** [3] - 126:5, 126:7, 187:19

**minimal** [1] - 196:12

**minimally** [1] - 220:5

**minimum** [1] - 196:14

**Minority** [1] - 222:24

**minute** [5] - 38:15, 118:10, 159:6, 159:7, 194:5

**minutes** [4] - 86:17, 134:8, 134:10, 134:22

**misalignment** [1] - 56:6

**mischaracterizes** [2] - 142:4, 155:19

**mischaracterizing** [1] - 74:23

**misleading** [5] - 129:11, 155:8, 160:11, 173:11, 186:13

**misnomer** [1] - 8:2

**Miss** [1] - 108:12

**missed** [2] - 178:22, 225:15

**missing** [1] - 105:21

**mission** [20] - 24:19, 26:1, 26:13, 39:3, 66:2, 83:15, 83:18, 84:5, 88:3, 120:20, 120:21, 186:5, 188:2, 188:14, 188:24, 191:13, 205:17, 220:22, 228:12, 228:15

**mission's** [1] - 24:25

**mission-critical** [1] - 26:1

**mission-focused** [1] - 83:15

**missioned** [1] - 83:4

**mistake** [3] - 136:3, 136:5, 136:6

**mistaken** [1] - 78:25

**misunderstood** [1] - 136:2

**MM** [1] - 134:11

**mode** [2] - 53:19, 54:15

**moment** [13] - 18:9, 23:25, 35:5, 41:14, 41:20, 64:7, 80:5, 81:15, 94:13, 100:20, 109:13, 116:7, 191:17
**Monday** [16] - 15:18, 32:1, 46:4, 66:18, 80:18, 80:21, 99:16, 108:13, 109:3, 109:5, 109:8, 110:14, 148:20, 182:15, 203:19, 219:16
**money** [19] - 34:13, 35:3, 36:3, 38:16, 38:19, 39:21, 41:7, 41:13, 42:22, 43:24, 44:12, 44:13, 53:13, 69:17, 73:17, 160:10, 161:10, 161:13
**Monitoring** [3] - 76:14, 96:9, 132:6
**monitoring** [4] - 96:14, 114:11, 114:20, 117:18
**month** [5] - 12:1, 39:14, 39:16, 92:2, 234:5
**months** [5] - 11:14, 11:18, 11:19, 70:6, 84:16
**morning** [23] - 3:7, 3:23, 4:3, 9:8, 15:11, 21:13, 21:18, 22:15, 27:12, 39:19, 108:14, 109:25, 119:4, 147:4, 147:20, 149:18, 161:15, 170:18, 227:23, 228:11, 234:3, 234:8
**Mortgage** [4] - 191:24, 192:9, 193:9, 194:21
**mortgage** [2] - 92:3, 192:3
**Mosaic** [1] - 165:15
**most** [20] - 18:15, 27:1, 52:10, 57:9, 58:23, 62:24, 68:13, 69:15, 114:9, 120:19, 147:7, 149:22, 171:19, 186:2, 188:5, 188:9, 188:11, 195:21, 236:11
**Most** [1] - 73:13
**motion** [2] - 133:15, 237:23
**MOU** [2] - 16:5, 34:2
**mouth** [2] - 9:14, 226:17
**move** [22] - 8:14, 8:17, 9:13, 9:14, 19:8, 19:11, 28:1, 29:24, 30:2, 35:6, 38:23, 39:2, 44:16,

86:12, 92:13, 94:1, 94:23, 120:11, 132:14, 170:19, 189:1, 237:18
**moved** [3] - 10:3, 28:3, 237:11
**moving** [10] - 59:1, 78:1, 80:14, 120:21, 141:14, 141:19, 142:1, 148:2, 149:8
**MR** [198] - 3:7, 3:21, 3:23, 5:17, 5:22, 6:5, 6:14, 6:19, 6:21, 6:25, 7:2, 7:4, 7:11, 7:16, 7:23, 8:8, 8:18, 8:22, 9:2, 9:7, 9:18, 12:13, 13:9, 18:7, 19:8, 19:11, 19:15, 20:6, 20:22, 21:9, 23:24, 26:21, 29:15, 29:24, 29:25, 31:21, 32:15, 32:25, 34:7, 36:5, 37:7, 37:12, 38:13, 39:11, 39:25, 40:12, 40:21, 41:1, 42:10, 42:16, 42:19, 44:5, 44:18, 44:21, 47:20, 50:1, 51:1, 52:23, 56:11, 60:12, 60:21, 60:25, 61:4, 61:5, 61:23, 61:25, 63:25, 64:6, 65:1, 65:3, 67:8, 67:11, 67:13, 68:5, 68:10, 68:12, 68:17, 68:19, 71:25, 73:6, 74:20, 75:24, 76:12, 77:5, 78:10, 80:24, 81:1, 82:16, 82:17, 83:10, 84:1, 84:4, 85:21, 85:24, 86:11, 86:17, 86:22, 86:24, 87:6, 87:8, 88:16, 91:1, 91:18, 92:12, 93:7, 93:17, 94:7, 94:10, 95:8, 97:18, 97:25, 99:1, 99:3, 99:5, 100:4, 100:18, 101:15, 102:7, 102:8, 104:2, 104:9, 107:8, 107:17, 107:21, 108:1, 108:7, 108:11, 110:7, 110:10, 110:12, 110:25, 111:5, 111:8, 111:14, 111:20, 111:23, 112:2, 112:13, 112:19, 112:21, 113:2, 113:5, 113:23, 114:1, 114:7, 115:4, 115:23, 116:2, 118:6, 118:21, 118:23, 119:18, 120:13, 120:15, 121:2, 123:4, 123:15, 126:16, 129:11, 129:15,

132:25, 134:24, 136:9, 141:2, 142:4, 143:23, 155:8, 155:19, 157:4, 160:11, 162:5, 162:16, 171:9, 171:11, 172:10, 173:11, 173:24, 186:13, 187:8, 225:13, 225:23, 233:6, 233:16, 233:21, 233:23, 233:25, 234:17, 234:20, 235:4, 235:10, 235:12, 235:17, 235:20, 235:23, 235:25, 236:11, 237:8, 237:14
**MS** [92] - 49:11, 49:16, 97:4, 110:19, 110:24, 122:7, 122:18, 123:7, 124:5, 126:18, 126:19, 129:17, 133:3, 133:16, 133:17, 135:10, 136:17, 138:6, 139:21, 141:7, 142:8, 142:9, 144:4, 144:24, 146:20, 149:14, 150:9, 154:10, 154:12, 154:14, 155:12, 155:22, 156:1, 156:2, 156:25, 157:10, 159:8, 160:16, 160:17, 161:5, 162:7, 162:13, 162:22, 166:3, 166:6, 166:18, 168:8, 168:9, 170:14, 170:21, 170:22, 171:10, 171:12, 172:18, 174:5, 185:22, 186:16, 187:5, 187:12, 187:21, 187:23, 188:22, 188:23, 191:21, 191:22, 194:11, 194:17, 194:18, 198:10, 198:23, 203:25, 206:2, 207:20, 207:21, 210:13, 210:18, 222:11, 224:18, 224:21, 225:18, 225:22, 226:6, 226:15, 226:18, 227:14, 228:25, 229:3, 229:19, 229:22, 230:24, 232:21, 234:19
**multiple** [5] - 40:22, 127:3, 156:20, 158:24, 181:11
**Mulvaney** [5] - 36:16, 37:1, 43:22, 44:2, 161:16
**must** [2] - 80:12, 218:10

# N

**NAACP** [1] - 3:9
**name** [8] - 9:8, 38:2, 122:15, 127:8, 235:20, 235:21, 238:4
**named** [2] - 15:18, 15:23
**names** [8] - 3:18, 17:1, 33:17, 59:19, 59:20, 116:19, 122:23
**narrow** [3] - 85:13, 220:17, 223:8
**narrowly** [2] - 219:23, 222:20
**national** [1] - 27:4
**National** [4] - 3:3, 3:8, 3:9, 3:16
**Native** [1] - 12:18
**nature** [1] - 40:22
**near** [1] - 112:22
**necessarily** [3] - 84:12, 130:5, 186:4
**necessary** [10] - 5:2, 5:6, 45:6, 69:13, 76:5, 84:13, 89:20, 92:19, 166:21, 196:19
**necessity** [1] - 75:21
**need** [53] - 4:22, 5:13, 8:14, 19:10, 26:7, 28:1, 38:12, 39:20, 56:19, 58:1, 65:9, 65:17, 65:21, 65:24, 70:25, 72:2, 73:17, 73:19, 76:21, 82:5, 85:6, 86:14, 92:17, 100:1, 100:3, 105:4, 107:24, 117:3, 118:10, 120:22, 145:16, 157:25, 158:3, 158:24, 160:9, 160:22, 160:25, 172:12, 193:5, 194:2, 205:1, 218:22, 219:3, 220:9, 221:11, 230:4, 232:4, 232:11, 233:2, 234:5, 237:4, 237:17, 238:10
**needed** [33] - 19:25, 30:22, 45:3, 46:14, 57:24, 59:14, 64:16, 65:25, 66:1, 70:9, 71:1, 74:25, 82:19, 85:8, 90:21, 94:22, 131:21, 131:22, 135:23, 144:8, 144:9, 146:10, 156:20, 160:25, 161:1, 172:16, 183:12, 192:10, 198:3, 219:11, 225:11
**needs** [7] - 58:15, 60:23, 85:17, 92:5, 92:23, 230:12, 239:6

**negotiated** [1] - 80:16
**never** [12] - 26:6, 53:5, 53:10, 89:12, 139:19, 145:9, 190:16, 193:1, 206:8, 208:16, 225:17
**New** [2] - 9:20, 44:15
**new** [37] - 11:24, 18:23, 45:15, 54:7, 64:16, 64:17, 74:22, 80:15, 80:20, 121:24, 125:7, 125:10, 126:1, 128:21, 132:16, 132:19, 136:8, 136:10, 136:11, 136:12, 136:15, 136:19, 136:25, 137:1, 137:3, 139:14, 153:23, 153:24, 155:7, 155:13, 155:21, 156:15, 158:15, 159:10, 159:14, 160:9, 187:15
**newly** [1] - 162:14
**next** [29] - 12:2, 12:14, 15:7, 22:15, 27:12, 28:1, 28:4, 28:6, 40:15, 52:22, 67:7, 75:4, 75:9, 95:7, 104:1, 112:18, 112:24, 116:1, 129:9, 131:21, 135:9, 141:18, 170:5, 170:6, 170:11, 178:5, 180:24, 181:25, 188:20
**nice** [2] - 86:2, 237:10
**nice-to-have** [1] - 86:2
**night** [2] - 20:2, 20:3
**nobody** [3] - 150:6, 201:23, 205:7
**nomenclature** [1] - 122:25
**none** [1] - 229:16
**nonetheless** [2] - 14:20, 119:23
**nonrepetitive** [1] - 233:4
**noon** [1] - 166:10
**normal** [5] - 71:13, 94:20, 121:1, 121:7, 121:9
**not-to-exceed** [4] - 45:23, 51:8, 52:2, 52:5
**notable** [1] - 69:15
**note** [16] - 4:3, 7:23, 8:1, 16:7, 19:16, 32:16, 40:12, 41:24, 48:25, 65:14, 68:17, 84:23, 105:21, 106:20, 121:3, 177:9
**noted** [1] - 115:15
**notes** [1] - 237:4
**nothing** [7] - 121:2,

175:13, 175:15, 204:22, 206:20, 206:23, 232:6
**notice** [16] - 46:18, 46:22, 46:25, 47:2, 47:3, 47:6, 50:19, 121:4, 121:24, 150:13, 169:1, 169:2, 169:4, 174:6, 175:13, 204:23
**notices** [9] - 50:13, 50:16, 79:12, 79:16, 170:3, 170:8, 170:25, 221:5, 236:10
**notification** [3] - 71:13, 174:23, 175:2
**notifications** [2] - 79:7, 139:12
**notified** [1] - 15:13
**noting** [2] - 30:4, 99:22
**notwithstanding** [1] - 87:17
**number** [34] - 16:18, 16:19, 16:22, 51:10, 54:10, 69:2, 69:6, 72:6, 73:7, 75:5, 81:13, 92:18, 107:3, 116:11, 123:6, 149:17, 162:2, 162:19, 162:20, 171:2, 171:4, 171:13, 171:16, 183:5, 193:4, 197:11, 198:2, 224:17, 236:20, 236:22, 236:24, 236:25
**numbered** [3] - 162:21, 236:8, 236:14
**numbering** [2] - 123:8, 237:3
**numbers** [20] - 51:4, 52:20, 81:14, 91:14, 122:8, 122:17, 122:19, 123:9, 123:10, 162:7, 162:11, 162:16, 162:17, 236:3, 236:15, 236:16, 237:12, 237:15, 238:5
**Nykea** [1] - 220:25

**O**

**o'clock** [2] - 22:15, 68:15
**Obama** [2] - 18:1, 18:2
**object** [3] - 173:14, 173:19
**objected** [1] - 173:20
**objection** [27] - 49:11, 49:12, 49:14, 49:15, 49:16, 97:4, 110:19, 115:7, 126:16, 129:11, 132:25, 134:24, 136:9,

141:2, 142:4, 143:23, 155:8, 155:19, 157:4, 160:11, 173:11, 173:17, 173:18, 173:25, 186:13, 187:8, 225:13
**Objection** [1] - 49:13
**obligation** [1] - 43:25
**obligations** [5] - 82:20, 96:18, 126:7, 126:10, 164:17
**obvious** [1] - 86:8
**obviously** [7] - 7:12, 13:10, 14:9, 31:11, 34:1, 149:21, 174:3
**occur** [2] - 89:3, 146:13
**occurred** [14] - 10:13, 26:25, 27:1, 34:3, 36:10, 36:12, 44:6, 47:14, 57:3, 60:7, 98:21, 102:25, 154:16, 215:23
**occurring** [1] - 10:18
**occurs** [3] - 34:4, 45:2
**odd** [3] - 15:24, 17:17, 27:11
**offered** [3] - 49:25, 51:15, 51:17
**offhand** [1] - 199:18
**Office** [23] - 4:25, 10:11, 21:1, 46:5, 48:21, 56:5, 57:19, 58:2, 61:14, 93:21, 104:12, 131:3, 148:5, 164:7, 199:4, 216:18, 217:4, 222:23, 223:20, 223:22, 223:23, 228:9
**office** [28] - 10:3, 10:10, 11:20, 11:21, 22:7, 58:2, 58:18, 76:23, 103:20, 104:19, 104:20, 104:22, 114:16, 117:13, 131:12, 132:4, 182:24, 189:14, 189:16, 189:22, 190:21, 206:10, 215:20, 218:2, 221:7, 221:8, 221:10, 231:8
**office's** [1] - 182:22
**officer** [61] - 13:17, 13:20, 13:23, 13:25, 14:8, 14:19, 22:25, 24:23, 25:12, 29:18, 32:18, 34:11, 34:14, 40:2, 40:6, 41:6, 41:9, 43:2, 56:18, 57:5, 57:8, 58:10, 58:17, 58:25, 72:8, 72:16, 73:15,

73:25, 75:9, 79:15, 81:22, 85:10, 90:6, 94:20, 96:25, 125:16, 131:19, 153:7, 159:11, 164:20, 167:16, 169:18, 174:11, 180:3, 180:9, 181:4, 183:3, 183:5, 183:8, 186:6, 192:18, 195:10, 199:2, 199:8, 199:22, 217:20, 219:18, 221:2, 223:6
**officers** [4] - 164:11, 175:18, 176:2, 220:23
**offices** [13] - 57:17, 129:6, 130:16, 132:1, 145:17, 146:23, 147:3, 152:11, 155:2, 156:11, 216:17, 228:14, 231:6
**official** [2] - 48:9, 81:8
**officially** [1] - 21:4
**old** [2] - 9:2, 155:17
**OMB** [19] - 22:24, 23:4, 56:7, 58:17, 61:18, 62:8, 62:9, 62:11, 64:18, 65:12, 78:13, 78:24, 121:5, 157:1, 157:17, 230:12, 232:5, 232:10, 236:7
**OMB/OPM** [1] - 156:16
**ombudsman** [6] - 104:25, 189:6, 189:14, 189:16, 190:18, 190:21
**Ombudsman** [1] - 189:2
**ombudsman's** [3] - 104:19, 104:20, 104:22
**once** [6] - 22:24, 90:15, 104:22, 124:10, 143:13, 230:11
**one** [133] - 3:21, 6:21, 7:23, 7:24, 9:12, 12:24, 16:4, 16:9, 17:1, 17:5, 17:8, 17:22, 17:25, 18:13, 22:11, 22:14, 25:3, 28:7, 28:14, 28:15, 32:6, 34:18, 35:20, 37:19, 40:17, 41:15, 42:11, 42:21, 45:18, 45:25, 46:24, 47:12, 47:21, 47:24, 51:21, 51:22, 55:5, 55:13, 56:23, 57:17, 57:20, 59:1, 60:12, 63:12, 63:25, 73:12, 74:7, 75:9, 77:23, 79:22, 80:5, 82:14, 87:22, 88:10, 94:11, 95:9, 95:10, 100:19, 101:3, 101:18, 102:16, 102:18, 104:10,

107:13, 107:14, 107:15, 107:16, 107:20, 107:22, 108:4, 109:12, 113:18, 116:7, 116:10, 117:25, 118:17, 118:19, 124:1, 125:5, 127:7, 127:10, 129:8, 129:21, 130:19, 130:23, 139:22, 146:16, 146:21, 147:1, 151:12, 152:24, 154:13, 155:17, 155:24, 156:10, 159:9, 167:14, 173:20, 175:22, 189:13, 191:3, 192:24, 197:2, 197:5, 198:22, 200:5, 200:22, 201:9, 208:20, 210:15, 210:16, 211:7, 215:14, 215:15, 220:22, 221:13, 225:3, 229:1, 229:2, 229:4, 229:9, 229:18, 229:19, 231:23, 235:13, 236:13, 236:14, 237:14

**one-line** [1] - 34:18
**one-question** [1] - 229:2
**one-year** [3] - 45:18, 51:21, 51:22
**ones** [8] - 51:21, 88:13, 92:4, 100:9, 117:6, 151:14, 221:11, 226:13
**ongoing** [4] - 39:2, 39:3, 187:7, 187:16
**OO** [1] - 48:3
**open** [8] - 4:4, 41:16, 91:13, 91:19, 92:5, 92:7, 123:22, 239:20
**opened** [2] - 92:5, 214:21
**operate** [4] - 13:1, 87:16, 87:17, 89:21
**operating** [12] - 13:19, 13:23, 13:25, 14:8, 14:19, 39:13, 39:15, 89:24, 121:1, 131:19, 160:14, 215:11
**operation** [1] - 198:5
**operational** [22] - 11:22, 14:4, 18:25, 22:1, 22:8, 24:12, 59:12, 70:7, 87:22, 87:24, 94:21, 104:22, 104:24, 149:22, 172:17, 187:19, 192:11, 196:4, 198:4, 222:21, 227:1, 227:5
**operational-related**

[1] - 187:19
**operations** [19] - 12:16, 22:5, 23:1, 24:12, 25:22, 34:21, 43:19, 70:1, 94:19, 120:18, 120:25, 126:4, 126:6, 159:12, 185:8, 187:18, 196:6, 196:11, 198:2
**Operations** [2] - 132:3, 192:8
**opined** [1] - 226:11
**opinion** [4] - 37:4, 56:6, 75:2, 237:2
**opinions** [2] - 23:3, 63:8
**OPM** [22] - 47:7, 47:22, 50:21, 51:5, 62:11, 128:1, 128:12, 130:9, 132:12, 135:17, 137:15, 138:3, 147:25, 148:3, 150:18, 150:22, 155:20, 156:17, 156:19, 156:21, 157:1, 158:8
**OPM's** [1] - 48:9
**OPM/OMB** [1] - 156:4
**opportunity** [7] - 5:7, 10:14, 70:8, 111:1, 115:9, 115:17, 238:20
**opposed** [3] - 74:12, 80:18, 188:20
**opposing** [1] - 115:6
**opposition** [2] - 124:12, 237:22
**ops** [1] - 172:19
**option** [1] - 41:7
**options** [2] - 189:10, 189:13
**order** [61] - 27:9, 40:13, 40:16, 47:12, 47:24, 50:7, 56:8, 56:14, 62:13, 64:23, 65:12, 70:14, 82:19, 121:12, 122:3, 133:12, 134:6, 141:20, 142:10, 145:15, 145:23, 146:1, 152:14, 152:18, 153:23, 153:24, 154:2, 154:5, 154:15, 154:16, 154:19, 155:7, 155:14, 155:21, 156:10, 168:22, 177:12, 177:22, 179:11, 180:22, 182:7, 184:8, 184:23, 184:24, 189:23, 190:4, 203:17, 205:5, 205:10, 206:4, 206:22, 208:22, 208:24, 208:25, 210:3,

215:2, 231:3, 231:7, 237:12
**ordered** [3] - 62:17, 151:21, 217:10
**ordering** [1] - 237:15
**orderly** [2] - 232:14, 239:16
**ordinary** [2] - 30:18, 44:10
**org** [3] - 22:3, 116:15, 117:1
**organization** [23] - 12:17, 13:18, 14:4, 18:18, 18:22, 19:1, 22:5, 34:18, 44:9, 46:16, 53:8, 58:24, 59:13, 65:22, 71:16, 72:20, 89:13, 117:24, 147:6, 147:7, 227:7, 228:13, 228:15
**organizational** [1] - 118:18
**organizations** [5] - 57:21, 71:3, 80:10, 103:8, 117:17
**organized** [1] - 232:9
**oriented** [2] - 31:15, 31:16
**original** [1] - 162:15
**originally** [2] - 11:23, 30:25
**origination** [1] - 65:11
**otherwise** [5] - 32:21, 109:22, 109:24, 206:18, 216:13
**outdated** [1] - 116:19
**outline** [2] - 92:18, 218:13
**outlined** [1] - 155:6
**outlines** [2] - 131:24, 224:13
**outset** [1] - 43:17
**outside** [9] - 28:23, 59:5, 59:6, 59:9, 59:17, 73:21, 95:2, 95:5, 119:20
**overnight** [1] - 233:9
**oversee** [1] - 221:8
**oversight** [1] - 192:20
**overview** [3] - 9:23, 13:11, 45:12
**owe** [1] - 138:18
**own** [4] - 10:23, 81:25, 89:19, 98:24
**owned** [1] - 81:11

## P

**p.m** [6] - 66:10, 97:11, 108:22, 109:3, 135:13,

235:3
**pace** [3] - 141:15, 149:9, 170:17
**page** [50] - 16:19, 16:21, 16:22, 25:4, 25:11, 29:1, 29:4, 30:1, 31:23, 35:6, 35:8, 35:12, 41:18, 42:16, 48:4, 48:17, 62:19, 62:21, 63:13, 90:9, 102:13, 107:18, 122:13, 122:20, 130:4, 137:4, 154:19, 162:17, 162:19, 162:20, 167:14, 169:14, 170:6, 174:22, 179:17, 179:25, 195:17, 198:25, 202:18, 211:14, 219:16, 224:17, 224:19, 224:20, 224:22, 233:5, 236:20
**pages** [6] - 4:18, 16:17, 48:19, 81:13, 162:1, 236:23
**painstaking** [1] - 86:5
**painted** [1] - 191:15
**Paoletta** [100] - 32:18, 43:1, 59:14, 64:16, 66:5, 72:14, 72:15, 72:19, 72:22, 72:23, 75:8, 75:23, 76:11, 77:10, 77:17, 78:16, 79:7, 79:11, 84:24, 92:23, 92:25, 93:20, 94:17, 94:25, 96:1, 96:24, 97:2, 97:19, 99:8, 99:13, 100:22, 100:24, 101:8, 106:10, 106:17, 108:8, 108:21, 109:4, 109:11, 109:16, 109:22, 109:23, 110:2, 111:1, 111:6, 111:20, 111:24, 112:3, 112:10, 112:20, 112:23, 115:14, 115:16, 117:24, 119:2, 119:10, 125:14, 139:8, 139:14, 140:13, 140:18, 144:5, 144:6, 144:14, 145:4, 145:7, 145:10, 158:5, 158:8, 158:23, 161:22, 162:25, 167:18, 169:15, 172:16, 185:15, 187:24, 188:18, 192:13, 199:24, 200:12, 202:10, 204:6, 205:11, 209:12, 209:20, 209:22, 210:4, 210:20, 212:23, 213:25, 214:8,

214:16, 215:5, 215:12,
216:6, 216:9, 227:25,
230:1
  **Paoletta's** [7] - 78:11,
85:2, 98:3, 104:18,
107:11, 108:13, 111:9
  **Papaleo** [2] - 93:18,
117:11
  **paper** [4] - 7:17,
42:10, 42:13, 86:7
  **paperwork** [1] - 34:4
  **Pappalardo** [3] - 96:8,
100:11, 100:23
  **paragraph** [11] - 49:1,
49:3, 175:5, 186:24,
187:14, 189:3, 192:7,
196:5, 197:25, 198:24,
199:1
  **parallel** [1] - 239:1
  **Paras** [1] - 3:15
  **parcel** [1] - 158:20
  **parenthetical** [1] -
42:7
  **part** [25] - 7:7, 10:14,
10:23, 10:25, 11:11,
39:5, 55:15, 103:8,
104:11, 104:12,
115:20, 121:5, 124:15,
143:3, 149:24, 150:19,
151:3, 158:25, 178:22,
185:18, 186:5, 189:8,
205:17, 208:5, 226:13
  **particular** [3] - 4:24,
115:2, 115:11
  **parties** [9] - 59:5,
59:6, 59:10, 59:17,
80:16, 95:5, 223:16,
234:7, 238:24
  **parties'** [1] - 4:13
  **partners** [1] - 73:21
  **parts** [2] - 65:11,
200:22
  **party** [1] - 95:2
  **passage** [1] - 63:12
  **passed** [4] - 12:4,
12:5, 12:6, 12:7
  **past** [6] - 45:4, 64:17,
69:16, 70:5, 70:6,
101:23
  **Pastor** [1] - 3:10
  **pause** [3] - 116:8,
175:7, 175:11
  **pauses** [1] - 31:11
  **pay** [10] - 34:21, 34:25,
44:16, 92:3, 161:13,
182:22, 183:9, 183:21,
191:4, 208:12
  **payment** [3] - 182:24,
184:2, 190:24
  **payroll** [3] - 11:22,

11:24
  **Payton** [1] - 3:16
  **PDF** [1] - 122:14
  **peers** [3] - 26:11, 57:3,
57:16
  **penalty** [7] - 34:24,
39:8, 43:4, 43:18,
43:23, 124:22, 124:25
  **pending** [1] - 237:23
  **pennies** [1] - 69:20
  **people** [103] - 3:18,
4:8, 7:18, 8:17, 9:1,
11:5, 12:11, 18:15,
18:21, 33:13, 39:19,
43:17, 51:10, 52:15,
52:18, 53:6, 53:16,
54:21, 55:8, 56:4, 56:7,
56:19, 57:13, 59:16,
59:23, 59:25, 65:19,
65:23, 66:16, 67:17,
67:18, 67:21, 67:23,
67:25, 68:22, 74:6,
74:10, 74:16, 76:17,
76:21, 76:23, 76:25,
77:11, 79:4, 79:21,
82:25, 86:15, 88:8,
88:11, 89:15, 90:14,
91:20, 94:16, 98:16,
101:10, 106:20, 115:9,
116:21, 120:23, 129:2,
129:9, 129:13, 129:21,
132:20, 133:6, 137:2,
137:4, 137:14, 137:24,
137:25, 139:5, 142:1,
147:10, 147:11,
147:14, 148:17,
149:17, 185:12,
189:22, 189:25,
190:25, 192:19, 193:3,
201:4, 204:17, 205:25,
208:2, 208:25, 209:10,
209:22, 210:3, 210:7,
220:10, 221:15,
221:20, 225:11,
225:20, 230:5
  **per** [5] - 39:14, 39:15,
78:21, 106:19, 232:7
  **perceived** [1] - 75:17
  **percent** [1] - 73:11
  **perception** [1] -
185:19
  **perform** [8] - 76:5,
82:19, 87:11, 92:19,
94:2, 94:25, 155:2,
156:11
  **performed** [3] - 98:9,
105:16, 174:15
  **performing** [14] -
32:19, 32:22, 87:14,
164:16, 184:12, 187:2,

187:11, 204:12,
204:19, 204:21,
204:22, 205:1, 205:7,
228:2
  **perhaps** [5] - 15:1,
25:6, 104:11, 124:1,
171:5
  **period** [15] - 10:5,
39:16, 45:17, 45:18,
45:19, 51:7, 51:25,
53:1, 53:18, 61:10,
97:21, 148:20, 158:19,
197:13, 197:19
  **perjury** [2] - 124:22,
124:25
  **Permission** [1] - 61:20
  **permission** [15] - 7:7,
64:3, 66:12, 66:14,
66:20, 66:21, 76:25,
98:9, 121:3, 132:12,
201:10, 201:18,
201:21, 202:15, 209:3
  **person** [11] - 26:9,
26:15, 26:19, 89:2,
105:4, 135:17, 191:12,
191:17, 204:22,
212:15, 235:13
  **Personal** [2] - 48:21,
97:4
  **personal** [8] - 32:11,
49:16, 89:19, 94:18,
171:24, 172:19,
191:10, 191:11
  **personally** [3] - 14:13,
15:10, 78:20
  **personnel** [4] - 19:24,
22:16, 34:23, 225:3
  **Personnel** [3] - 21:1,
46:5, 148:5
  **perspective** [1] -
94:21
  **Pfaff** [3] - 6:8, 235:10,
235:13
  **phase** [7] - 54:4, 54:5,
54:6, 139:11, 152:24,
153:1
  **phases** [1] - 201:9
  **phone** [7] - 4:4, 13:5,
43:1, 88:12, 92:9,
101:10, 190:8
  **phrase** [1] - 145:1
  **physical** [2] - 231:6,
231:8
  **physically** [1] - 183:15
  **pick** [2] - 88:12,
104:16
  **picks** [1] - 92:9
  **picture** [2] - 191:15,
191:16
  **pictures** [3] - 27:24,

28:12, 28:14
  **piece** [3] - 42:13, 55:5,
71:4
  **pieces** [1] - 86:7
  **pinch** [1] - 69:19
  **PIV** [1] - 27:15
  **pivot** [1] - 159:6
  **pivotal** [1] - 141:18
  **place** [16] - 28:23,
46:15, 50:22, 65:12,
70:18, 80:17, 99:23,
121:24, 129:22, 148:6,
179:6, 188:17, 189:25,
212:23, 219:11, 232:10
  **placed** [4] - 37:23,
52:7, 54:7, 179:4
  **plainly** [1] - 114:15
  **plaintiff** [2] - 3:5, 4:24
  **plaintiffs** [8] - 3:8,
4:22, 5:6, 5:23, 81:2,
115:10, 124:7, 235:4
  **plaintiffs'** [22] - 6:22,
7:6, 8:1, 41:17, 48:2,
48:15, 74:11, 114:3,
115:13, 133:19,
136:11, 138:7, 164:19,
174:21, 206:14,
215:16, 223:4, 223:25,
224:18, 231:13,
231:22, 235:7
  **Plaintiffs'** [3] - 130:3,
139:1, 139:2
  **plaintiffs's** [1] -
182:11
  **plan** [13] - 67:4,
127:24, 129:19, 130:3,
141:25, 142:23,
145:19, 145:20, 146:8,
158:11, 232:8, 232:16,
235:5
  **planned** [2] - 154:17,
225:6
  **planning** [4] - 8:16,
132:19, 194:9, 233:19
  **plans** [5] - 53:4, 63:14,
157:11, 157:14, 232:7
  **platform** [1] - 87:16
  **played** [3] - 26:17,
36:15, 37:2
  **playing** [1] - 93:24
  **pleasure** [1] - 124:2
  **plus** [1] - 7:12
  **PoC** [1] - 180:11
  **point** [38] - 12:11,
13:10, 15:13, 18:23,
21:19, 23:6, 23:10,
23:12, 24:21, 24:24,
25:3, 28:14, 33:3, 35:2,
66:13, 72:17, 72:20,
83:11, 86:14, 88:2,

97:21, 99:15, 100:2, 101:23, 110:10, 110:18, 110:25, 113:24, 137:19, 146:8, 146:15, 146:21, 146:25, 147:2, 148:24, 159:13, 188:14, 194:14
**pointed** [1] - 27:22
**pointer** [1] - 123:24
**points** [10] - 19:12, 30:11, 106:1, 146:11, 147:1, 160:24, 180:13, 180:14, 207:11, 213:18
**policy** [7] - 31:14, 31:16, 31:19, 46:6, 46:8, 48:9, 103:5
**political** [1] - 26:18
**population** [3] - 71:4, 214:24, 231:12
**portfolio** [1] - 214:25
**portfolios** [3] - 10:19, 143:13, 143:15
**portion** [3] - 204:18, 204:20, 204:21
**portions** [1] - 219:24
**position** [16] - 7:13, 10:8, 12:22, 13:20, 14:3, 14:14, 14:18, 18:14, 26:18, 45:24, 63:11, 105:1, 105:3, 118:19, 189:4
**positions** [4] - 4:13, 14:6, 51:6, 57:24
**possibility** [4] - 46:1, 55:13, 142:23, 147:19
**possible** [14] - 41:11, 43:11, 69:20, 85:7, 128:19, 128:22, 131:21, 140:9, 142:18, 148:9, 149:2, 149:11, 164:18, 205:16
**possibly** [4] - 63:6, 158:14, 208:11, 233:18
**post** [1] - 9:23
**post-college** [1] - 9:23
**posture** [1] - 23:2
**potential** [8] - 37:20, 53:17, 61:7, 65:5, 71:17, 89:3, 102:18, 225:13
**potentially** [5] - 27:7, 37:21, 55:15, 69:14, 195:21
**Poverty** [1] - 3:10
**Powell** [2] - 35:16, 159:23
**practice** [1] - 40:22
**pre** [1] - 127:16
**pre-decisional** [1] - 127:16

**precision** [1] - 114:23
**prefer** [1] - 5:25
**preference** [1] - 193:17
**preliminary** [8] - 4:16, 4:23, 39:1, 80:19, 124:12, 124:16, 237:23, 239:2
**prepare** [6] - 7:13, 46:9, 113:6, 113:11, 201:16, 235:22
**prepared** [6] - 64:11, 73:20, 131:23, 223:15, 236:2, 238:16
**presence** [2] - 55:14, 208:17
**present** [3] - 5:19, 22:20, 44:3
**presentation** [1] - 4:17
**preservation** [7] - 81:3, 81:7, 81:24, 178:21, 178:24, 179:19, 179:20
**preservation-specific** [1] - 178:24
**preserve** [2] - 173:9, 174:8
**preserved** [3] - 81:18, 82:5, 82:10
**preserving** [4] - 175:14, 175:16, 177:3, 178:17
**President** [3] - 18:17, 30:4, 47:12
**President's** [3] - 47:24, 50:7, 62:22
**presidential** [2] - 17:18, 17:23
**press** [2] - 115:17, 191:18
**presumably** [5] - 23:11, 59:6, 133:25, 145:4, 215:2
**presume** [5] - 30:22, 138:25, 140:22, 214:23, 233:3
**pretty** [8] - 18:22, 40:24, 69:16, 97:3, 118:18, 121:9, 121:11, 233:6
**prevent** [2] - 182:1, 192:23
**prevented** [1] - 186:25
**preview** [1] - 68:14
**previous** [3] - 69:5, 209:21, 229:11
**previously** [4] - 101:18, 218:24, 226:11, 236:18
**primarily** [1] - 22:1

**principal** [2] - 211:17, 212:18
**priority** [1] - 77:22
**pro** [1] - 129:12
**pro-reductions** [1] - 129:12
**proactively** [1] - 157:18
**probationary** [10] - 45:17, 45:18, 45:20, 51:7, 51:21, 51:24, 121:20, 128:8, 148:20, 208:20
**probing** [1] - 191:8
**problem** [9] - 77:24, 83:7, 145:22, 145:25, 167:10, 167:13, 179:14, 217:10, 226:3
**problems** [3] - 197:16, 221:18, 226:8
**procedural** [1] - 232:18
**procedures** [1] - 45:6
**proceed** [6] - 5:16, 7:22, 13:8, 65:5, 96:1, 100:25
**proceeding** [4] - 4:5, 5:9, 13:1, 68:10
**proceedings** [1] - 4:7
**process** [28] - 11:1, 11:12, 11:17, 12:1, 24:4, 41:7, 45:5, 46:10, 58:19, 65:11, 70:5, 70:18, 74:2, 74:22, 75:2, 98:23, 112:22, 142:25, 152:11, 158:1, 174:19, 177:17, 202:13, 205:14, 232:10, 239:16, 239:17
**processes** [1] - 65:10
**processing** [4] - 53:25, 94:5, 190:3, 197:21
**procurement** [8] - 14:5, 22:2, 71:13, 81:8, 177:17, 209:15, 220:21, 221:8
**program** [12] - 12:17, 12:18, 12:19, 18:17, 26:12, 26:13, 26:16, 51:12, 89:6, 190:25
**programmatic** [16] - 24:14, 24:20, 26:1, 26:2, 26:8, 57:4, 66:2, 70:2, 70:3, 70:7, 80:8, 83:4, 149:24, 188:14, 220:22, 228:20
**programming** [1] - 198:6
**programs** [3] - 18:20,

26:11, 57:5
**Programs** [5] - 3:25, 4:2, 217:18, 218:2, 223:21
**prohibited** [1] - 141:21
**prohibiting** [2] - 177:22, 207:11
**prohibition** [1] - 213:8
**project** [2] - 20:19
**promise** [1] - 84:25
**prompted** [2] - 79:18, 107:11
**prompts** [2] - 108:3, 108:4
**pronounces** [1] - 153:5
**proof** [1] - 6:16
**proposal** [4] - 5:19, 6:2, 65:10, 157:18
**propose** [1] - 236:19
**proposed** [4] - 5:24, 49:2, 100:25
**protect** [1] - 93:23
**Protection** [2] - 36:20, 38:3
**protesting** [1] - 28:22
**protocol** [1] - 35:22
**Provar** [1] - 165:21
**provide** [10] - 19:12, 22:16, 25:18, 39:17, 47:6, 50:4, 70:20, 73:20, 214:17, 215:11
**provided** [13] - 7:25, 24:9, 25:16, 46:14, 47:22, 50:2, 53:18, 72:4, 78:13, 127:15, 127:17, 218:5
**provides** [1] - 92:9
**providing** [7] - 78:23, 99:10, 103:13, 214:20, 216:4, 216:8, 216:12
**proving** [1] - 4:22
**provisioned** [1] - 78:14
**provisions** [1] - 81:6
**proviso** [3] - 207:1, 207:10, 207:15
**pseudonymous** [4] - 127:7, 235:14, 235:20, 235:21
**public** [14] - 4:4, 5:9, 8:14, 13:1, 31:18, 64:3, 103:12, 103:13, 147:7, 176:16, 192:23, 193:6, 195:1, 196:15
**Public** [1] - 3:15
**public-facing** [1] - 147:7
**publicly** [3] - 8:6, 50:7, 58:20

**pull** [5] - 20:18, 34:14, 44:14, 71:18, 123:16
**pulled** [5] - 57:25, 58:21, 71:5, 120:3, 120:5
**pulling** [1] - 174:16
**purchase** [7] - 81:9, 151:20, 151:22, 152:3, 177:17, 183:17, 183:19
**purchased** [2] - 177:16, 177:17
**purchases** [1] - 183:22
**purporting** [1] - 111:2
**purpose** [2] - 85:8, 237:24
**purposes** [7] - 37:16, 37:17, 37:19, 38:24, 38:25, 85:1, 181:11
**pursuant** [2] - 62:21, 80:2
**pursued** [1] - 120:8
**purview** [1] - 25:12
**push** [1] - 114:2
**pushback** [1] - 157:19
**pushing** [1] - 27:23
**put** [15] - 7:9, 7:20, 57:23, 65:9, 71:8, 92:3, 103:11, 121:24, 123:18, 140:5, 142:6, 193:1, 193:3, 219:10, 232:10
**putting** [1] - 122:2

## Q

**quality** [1] - 62:24
**quarrel** [2] - 115:10, 177:14
**quarter** [4] - 36:18, 39:23, 160:2, 161:14
**quarterly** [1] - 35:20
**questioned** [3] - 84:21, 190:15, 227:23
**questions** [38] - 4:20, 37:4, 43:22, 44:19, 60:19, 60:20, 71:23, 72:22, 75:14, 77:11, 77:15, 86:8, 86:9, 103:24, 104:1, 105:10, 106:21, 107:23, 142:7, 149:23, 170:19, 174:17, 177:20, 183:6, 183:12, 183:13, 194:15, 208:18, 220:15, 227:8, 228:14, 228:24, 229:10, 229:20, 232:4, 232:22, 232:24, 233:8
**quickly** [11] - 13:13,

22:13, 22:22, 40:24, 77:20, 98:2, 123:17, 128:19, 128:22, 148:9, 232:23
**quite** [2] - 10:19, 197:1
**quote** [4] - 127:12, 127:21, 129:10, 143:3

## R

**Railton** [1] - 3:14
**rainy** [2] - 37:14, 161:11
**raise** [1] - 61:24
**raised** [7] - 26:23, 38:14, 81:2, 158:25, 219:13, 219:15, 219:16
**raising** [1] - 106:20
**ran** [1] - 57:5
**rarely** [1] - 45:2
**re** [2] - 142:3, 236:2
**re-file** [1] - 236:2
**reach** [7] - 41:11, 77:18, 87:10, 99:14, 106:11, 213:25, 239:13
**reached** [2] - 34:14, 205:13
**reaches** [1] - 213:2
**reaching** [4] - 94:17, 99:13, 106:16, 200:18
**reaction** [2] - 30:16, 30:17
**reactivate** [1] - 99:14
**reactivated** [2] - 73:19, 100:9
**reactivation** [3] - 85:15, 99:22, 223:11
**reacts** [1] - 5:11
**read** [16] - 32:8, 32:9, 32:10, 58:20, 62:20, 64:14, 82:7, 122:22, 134:15, 141:1, 163:20, 171:7, 175:4, 199:4, 224:15, 233:10
**reading** [7] - 86:6, 86:7, 103:16, 103:18, 110:20, 191:4, 218:21
**ready** [4] - 6:10, 7:19, 44:18, 86:12
**real** [1] - 159:1
**reality** [1] - 153:15
**realize** [1] - 213:24
**really** [23] - 10:13, 19:5, 39:1, 45:23, 57:18, 57:20, 77:3, 80:14, 81:9, 86:4, 94:22, 103:24, 108:8, 120:11, 122:15, 141:17, 149:15, 172:19, 192:21,

208:11, 228:13, 232:23
**reason** [15] - 24:20, 27:8, 37:23, 44:13, 50:22, 53:9, 82:9, 82:12, 132:23, 140:17, 140:25, 177:14, 183:10, 183:11, 226:7
**reasonable** [8] - 109:6, 166:9, 182:3, 194:14, 218:5, 218:15, 219:8, 221:14
**reasons** [5] - 18:14, 40:18, 42:21, 95:17, 208:21
**rebroadcast** [1] - 4:9
**rebut** [1] - 5:7
**recap** [2] - 215:23, 216:1
**receipt** [1] - 113:13
**receive** [3] - 50:15, 189:11, 213:25
**received** [24] - 4:14, 4:18, 15:11, 15:22, 19:23, 25:14, 42:21, 43:1, 45:16, 50:10, 65:21, 78:2, 109:15, 109:16, 109:17, 110:1, 110:15, 140:10, 150:12, 186:12, 213:1, 225:16, 225:25, 238:13
**receiving** [4] - 97:19, 140:12, 169:4, 197:17
**recent** [2] - 160:5, 231:15
**recently** [1] - 218:11
**recess** [2] - 102:4, 194:12
**recipient** [1] - 41:25
**recognize** [12] - 29:6, 30:2, 32:4, 32:5, 35:13, 35:14, 41:20, 48:6, 116:11, 139:4, 189:3, 230:17
**recognized** [3] - 85:19, 127:5, 230:3
**recollection** [6] - 11:9, 15:17, 22:21, 42:25, 49:23, 78:13
**recommend** [1] - 106:16
**recommendation** [2] - 59:1, 201:16
**recommendations** [4] - 57:4, 94:18, 157:23, 159:7
**recommended** [1] - 111:24
**recommending** [2] - 106:9, 199:25
**reconcile** [1] - 51:4

**record** [32] - 3:2, 3:6, 4:4, 4:7, 4:9, 9:9, 23:25, 38:2, 60:24, 72:6, 105:10, 121:5, 122:14, 122:17, 122:18, 123:12, 123:25, 128:25, 130:2, 162:8, 166:19, 215:4, 215:14, 217:7, 219:8, 226:14, 229:17, 236:5, 237:11, 237:22, 237:24, 238:2
**records** [12] - 14:5, 82:3, 143:15, 173:9, 174:8, 175:16, 175:24, 176:21, 177:4, 177:18, 179:19, 180:15
**recovered** [1] - 177:25
**recruited** [3] - 12:22, 13:16, 18:14
**redactions** [1] - 215:19
**redirect** [5] - 6:6, 6:18, 233:4, 233:12, 233:13
**reduce** [6] - 47:7, 70:13, 86:20, 129:10, 129:23
**reduced** [2] - 47:1, 85:3
**reduction** [5] - 44:24, 45:1, 49:3, 62:14, 230:13
**Reduction** [1] - 129:13
**Reduction-in-force** [1] - 129:13
**reductions** [2] - 129:12, 154:22
**refer** [3] - 83:15, 144:17, 236:22
**reference** [5] - 48:12, 54:2, 72:25, 73:2, 227:24
**referenced** [4] - 16:10, 47:12, 160:1, 228:10
**references** [3] - 122:8, 122:9, 136:10
**referencing** [1] - 151:4
**referred** [14] - 16:24, 24:1, 36:13, 62:1, 72:21, 74:21, 77:6, 89:10, 91:4, 96:3, 154:3, 154:6, 160:12, 237:14
**referring** [19] - 20:8, 25:4, 33:2, 53:19, 57:13, 59:18, 61:13, 61:19, 75:15, 83:15, 91:7, 92:16, 107:18, 135:1, 136:11, 190:25, 210:15, 210:16, 236:24

**refers** [6] - 36:19, 72:13, 85:2, 87:14, 126:17, 171:15
**refined** [1] - 56:24
**reflect** [1] - 75:2
**reflected** [1] - 116:16
**reframed** [1] - 173:25
**refresh** [1] - 171:5
**regard** [1] - 65:5
**regarding** [27] - 35:21, 40:14, 41:2, 48:24, 61:7, 62:13, 63:22, 64:18, 73:1, 77:16, 81:3, 94:4, 104:10, 104:19, 106:19, 109:15, 110:16, 117:10, 119:5, 127:11, 132:13, 160:12, 167:21, 168:16, 206:11, 213:13, 236:1
**regardless** [1] - 143:2
**regards** [8] - 43:10, 46:15, 54:2, 65:10, 90:8, 91:14, 214:20, 230:12
**regional** [1] - 152:11
**regular** [2] - 96:17, 96:19
**regularly** [1] - 232:3
**regulating** [1] - 58:13
**Regulation** [2] - 58:3, 76:14
**regulation** [3] - 58:14, 96:15, 100:16
**Regulations** [2] - 96:9, 132:6
**regulations** [4] - 117:18, 118:1, 118:3, 205:16
**regulators** [3] - 10:17, 11:3, 55:17
**regulatory** [1] - 103:5
**rehash** [1] - 170:7
**reinstate** [6] - 57:8, 84:5, 181:16, 181:22, 183:9, 183:16
**reinstated** [10] - 73:13, 73:14, 79:10, 80:3, 82:19, 90:20, 90:23, 171:3, 171:20, 219:5
**reinstatement** [5] - 72:1, 109:18, 110:17, 112:6, 171:16
**reinstating** [2] - 170:24, 171:15
**related** [14] - 83:4, 96:18, 179:5, 187:19, 192:8, 192:11, 194:24, 194:25, 196:6, 198:2, 198:4, 199:2, 221:14, 232:8

**relates** [1] - 222:23
**relatively** [1] - 14:24, 41:14, 77:20
**releasing** [1] - 152:6
**relevant** [2] - 91:3, 117:7
**reliance** [1] - 89:2
**relied** [1] - 156:10
**relief** [1] - 94:7
**reluctant** [1] - 6:9
**rely** [1] - 159:5
**relying** [3] - 8:10, 220:23
**remain** [3] - 58:19, 88:11, 213:6
**remained** [3] - 120:4, 192:11, 198:4
**remember** [1] - 46:3, 203:24
**reminder** [1] - 73:18
**removed** [2] - 176:17, 177:6
**repairable** [1] - 153:9
**repeat** [2] - 120:11, 155:11
**repeated** [1] - 136:9
**rephrase** [1] - 155:25
**replacement** [2] - 190:18, 190:24
**report** [16] - 14:7, 40:6, 59:24, 113:19, 166:11, 208:2, 214:17, 215:7, 215:11, 216:5, 216:6, 216:9, 216:13, 221:16, 230:12
**reported** [1] - 228:19
**reporter** [3] - 11:7, 13:14, 201:12
**reporting** [5] - 5:2, 114:19, 119:10, 119:12, 226:3
**reports** [8] - 27:13, 106:9, 106:19, 106:21, 113:9, 113:12, 195:2, 214:21
**represent** [5] - 64:8, 177:12, 203:21, 204:1, 210:24
**representative** [2] - 33:19, 174:12
**representatives** [1] - 180:9
**representing** [1] - 55:7
**represents** [1] - 56:18
**request** [11] - 58:24, 59:4, 94:2, 94:4, 105:5, 161:8, 182:21, 183:16, 200:21, 201:1, 213:5

**requested** [11] - 22:12, 24:10, 25:10, 36:11, 57:8, 58:12, 109:17, 119:10, 132:12, 216:5, 216:9
**requesting** [8] - 21:25, 36:13, 36:17, 38:21, 59:19, 201:9, 209:3
**requests** [6] - 83:15, 84:5, 97:20, 200:18, 209:11, 210:25
**require** [5] - 55:18, 81:10, 147:14, 175:1, 195:3
**Required** [1] - 174:23
**required** [61] - 55:7, 55:11, 55:16, 55:19, 56:20, 57:6, 57:23, 58:4, 58:11, 59:2, 62:25, 66:12, 68:22, 79:23, 82:20, 84:10, 84:13, 88:4, 92:6, 94:2, 98:8, 105:3, 105:13, 105:16, 109:20, 112:8, 113:8, 118:16, 118:20, 118:24, 119:1, 120:20, 130:21, 131:1, 131:5, 131:9, 146:23, 151:12, 153:14, 154:3, 164:23, 166:4, 167:22, 168:16, 169:11, 185:3, 187:18, 196:12, 204:12, 205:1, 206:20, 206:23, 207:2, 207:6, 207:7, 207:11, 207:13, 218:4, 219:7, 221:11, 221:19
**requirement** [7] - 85:14, 85:16, 85:18, 192:25, 196:14, 220:5, 223:10
**requirements** [23] - 65:12, 71:18, 75:20, 106:21, 114:19, 114:21, 119:21, 140:8, 154:6, 155:6, 166:12, 185:7, 185:20, 185:24, 186:8, 192:9, 220:2, 222:7, 222:21, 230:4, 230:9, 232:12, 232:19
**requires** [5] - 46:21, 71:13, 147:3, 147:12, 192:1
**rescind** [1] - 79:12
**rescinded** [4] - 56:16, 56:17, 79:8, 184:14
**rescinding** [1] - 170:8
**Research** [10] - 58:3, 76:14, 96:9, 131:7, 223:22, 223:23, 224:5, 224:6, 224:7, 227:18

**research** [5] - 89:14, 96:14, 100:15, 117:18, 132:6
**research's** [1] - 226:7
**resect** [1] - 100:6
**reserve** [19] - 6:6, 35:4, 35:5, 36:23, 36:25, 37:2, 37:9, 37:11, 37:18, 37:22, 37:24, 38:17, 38:19, 39:22, 160:2, 160:23, 161:9, 161:13
**Reserve** [18] - 35:17, 35:21, 35:24, 38:16, 38:21, 41:3, 41:8, 41:11, 41:13, 42:23, 43:10, 43:12, 43:15, 44:7, 44:15, 53:14, 159:23, 160:13
**reshaping** [2] - 47:13, 64:19
**resignation** [1] - 51:11
**resisted** [1] - 238:12
**resizing** [1] - 55:2
**resolved** [1] - 80:19
**resolving** [1] - 90:1
**resort** [2] - 91:15, 91:17
**resource** [1] - 88:22
**resources** [4] - 190:17, 193:2, 218:10, 231:14
**respect** [2] - 114:9, 155:5
**respects** [2] - 105:20, 119:20
**respond** [11] - 111:1, 115:17, 134:8, 134:20, 135:15, 166:10, 193:6, 210:2, 213:11, 217:6
**responded** [6] - 27:16, 64:14, 96:19, 111:4, 181:16, 208:8
**responding** [2] - 109:11, 109:24
**responds** [8] - 79:16, 85:10, 99:9, 107:12, 108:13, 111:16, 111:23, 183:3
**Response** [23] - 4:25, 57:20, 76:20, 88:18, 92:24, 93:4, 99:21, 100:7, 104:12, 119:3, 132:8, 147:6, 164:5, 165:10, 190:22, 192:24, 196:18, 199:4, 200:13, 200:16, 226:23, 226:25, 227:21
**response** [26] - 5:2, 28:17, 64:14, 85:1,

85:9, 88:13, 89:1, 91:20, 93:10, 104:18, 109:6, 111:6, 166:9, 166:20, 167:1, 198:11, 201:2, 201:5, 203:3, 214:1, 219:17, 221:4, 222:15, 223:1, 226:19, 231:15

**responses** [1] - 79:5
**responsibilities** [3] - 74:24, 144:12, 199:3
**responsibility** [3] - 78:21, 175:22, 228:21
**responsible** [6] - 24:22, 148:2, 174:12, 211:18, 221:7, 221:10
**rest** [6] - 62:17, 122:2, 128:14, 153:1, 153:2, 239:6
**restarting** [1] - 85:2
**restitution** [1] - 35:1
**restored** [1] - 85:7
**restraining** [2] - 134:6, 145:23
**restricted** [1] - 80:21
**result** [4] - 18:21, 46:9, 79:19, 182:2
**resume** [6] - 96:17, 101:25, 102:5, 105:13, 194:6, 234:15
**resumed** [1] - 119:2
**resuming** [2] - 224:23, 234:10
**resumption** [1] - 102:11
**retaliation** [1] - 6:10
**retrieving** [1] - 82:2
**retroactive** [2] - 16:1, 16:2
**return** [8] - 38:16, 41:7, 41:13, 42:22, 81:7, 81:10, 102:3, 231:3
**return-to-work** [1] - 231:3
**returned** [3] - 12:15, 13:10, 216:24
**returning** [2] - 35:2, 41:2
**reverse** [1] - 42:14
**reverts** [1] - 66:7
**review** [7] - 63:13, 95:3, 102:20, 119:25, 124:1, 160:25, 175:5
**reviewed** [3] - 163:16, 172:15, 172:16
**reviewing** [1] - 75:20
**RIF** [29] - 44:23, 45:6, 45:7, 46:10, 46:21, 47:7, 47:17, 48:11,

49:10, 50:13, 50:15, 50:19, 50:22, 51:19, 54:4, 54:6, 54:7, 60:13, 64:12, 70:18, 74:5, 121:24, 142:25, 144:8, 146:13, 231:24, 232:2, 232:7, 232:8
**RIF'd** [1] - 65:11
**RIFing** [2] - 128:15, 149:17
**RIFs** [18] - 44:22, 46:1, 46:2, 46:12, 46:15, 53:17, 60:19, 60:20, 61:7, 61:12, 63:22, 65:6, 104:12, 104:13, 132:13, 137:15, 148:6, 153:24
**right-hand** [2] - 72:7, 75:5
**Rights** [3] - 216:19, 217:4, 223:20
**ring** [1] - 38:2
**risk** [4] - 180:15, 181:12, 181:13, 195:19
**risky** [2] - 67:10, 67:11
**RMR** [2] - 94:12, 98:3
**road** [2] - 51:13, 51:14
**roadmap** [2] - 61:11, 157:22
**Robert** [1] - 3:13
**Rohit** [1] - 14:11
**role** [5] - 13:25, 26:17, 78:22, 125:19, 204:23
**roll** [1] - 67:11
**room** [10] - 5:15, 6:24, 27:17, 28:1, 28:4, 28:8, 102:3, 192:18, 192:20, 237:20
**Rosenbeg** [3] - 7:22, 120:10, 234:16
**ROSENBERG** [183] - 3:23, 6:14, 6:19, 6:21, 7:2, 7:4, 7:11, 7:16, 7:23, 8:8, 8:22, 9:2, 9:7, 9:18, 12:13, 13:9, 18:7, 19:8, 19:11, 19:15, 20:6, 20:22, 21:9, 23:24, 26:21, 29:15, 29:24, 29:25, 31:21, 32:15, 32:25, 34:7, 36:5, 37:7, 37:12, 38:13, 39:11, 39:25, 40:12, 40:21, 41:1, 42:10, 42:16, 42:19, 44:5, 44:18, 44:21, 47:20, 50:1, 51:1, 52:23, 56:11, 60:12, 60:21, 60:25, 61:4, 61:5, 61:20, 61:23, 61:25, 63:25, 64:6,

65:1, 65:3, 67:8, 67:11, 68:5, 68:10, 68:12, 68:17, 68:19, 71:25, 73:6, 74:20, 75:24, 76:12, 77:5, 78:10, 80:24, 81:1, 82:16, 82:17, 83:10, 84:1, 84:4, 85:21, 85:24, 86:11, 86:17, 86:22, 86:24, 87:6, 87:8, 88:16, 91:1, 91:18, 92:12, 93:7, 93:17, 94:7, 94:10, 95:8, 97:18, 97:25, 99:1, 99:3, 99:5, 100:4, 100:18, 101:15, 102:7, 102:8, 104:2, 104:9, 107:8, 107:17, 107:21, 108:1, 108:7, 108:11, 110:7, 110:10, 110:12, 110:25, 111:5, 111:8, 111:14, 111:20, 111:23, 112:2, 112:13, 112:19, 112:21, 113:2, 113:5, 113:23, 114:1, 114:7, 115:4, 115:23, 116:2, 118:6, 118:21, 118:23, 119:18, 120:13, 120:15, 121:2, 123:4, 123:15, 126:16, 129:11, 129:15, 132:25, 134:24, 136:9, 141:2, 142:4, 143:23, 155:8, 155:19, 157:4, 160:11, 162:5, 162:16, 171:9, 171:11, 172:10, 173:11, 173:24, 186:13, 187:8, 225:13, 225:23, 233:6, 233:16, 234:17, 235:4, 235:20, 235:25, 236:11, 237:8, 237:14
**rOSENBERG** [1] - 67:13
**Rosenberg** [1] - 3:24
**roughly** [1] - 129:2
**round** [4] - 131:17, 132:1, 132:3, 132:20
**row** [1] - 3:19
**rule** [3] - 48:10, 49:15, 239:2
**rules** [2] - 132:13, 141:5
**ruling** [1] - 37:24
**run** [5] - 26:11, 47:6, 71:12, 74:5, 190:6
**running** [20] - 16:17, 48:11, 48:17, 59:13, 60:1, 60:5, 61:12, 72:18, 116:4, 117:1,

117:2, 117:13, 117:21, 117:23, 118:17, 118:25, 186:3, 188:6, 188:9, 188:12
**rush** [1] - 239:14
**Russ** [4] - 125:10, 140:5, 145:9, 158:5
**Russell** [1] - 3:4

## S

**sake** [2] - 48:1, 237:6
**Santa** [2] - 9:20
**Saturday** [3] - 15:6, 30:4, 102:15
**save** [2] - 42:10, 73:17
**savings** [2] - 44:17, 70:12
**saw** [4] - 62:2, 107:22, 107:24, 118:25
**scale** [6] - 128:1, 132:13, 134:1, 142:16, 146:5, 158:12
**scenario** [1] - 36:15
**scenarios** [1] - 84:17
**scenes** [1] - 188:17
**scheduled** [2] - 133:14, 234:13
**scheduling** [1] - 233:2
**school** [1] - 9:2
**scope** [3] - 25:20, 30:9, 119:20
**Scott** [1] - 3:14
**Scott-Railton** [1] - 3:14
**screen** [2] - 7:10, 140:4
**se** [1] - 78:21
**searches** [1] - 179:4
**second** [29] - 12:24, 17:4, 33:1, 37:22, 41:15, 45:22, 55:15, 58:2, 69:15, 80:5, 89:18, 109:12, 127:10, 129:8, 129:22, 131:17, 131:25, 132:3, 136:1, 136:2, 159:9, 179:24, 191:3, 200:24, 201:15, 213:16, 224:19, 235:25, 236:14
**Secret** [1] - 27:3
**Secretary** [7] - 10:22, 15:16, 15:22, 17:19, 19:6, 19:23, 87:17
**secretary** [4] - 17:2, 49:18, 105:6, 121:9
**section** [5] - 92:24, 117:20, 217:17, 217:18, 223:22
**security** [8] - 14:6,

26:24, 27:2, 27:4, 27:5, 28:19, 180:2, 181:3

**security-specific** [1] - 27:5

**see** [37] - 5:10, 7:21, 16:13, 16:22, 27:14, 27:20, 28:10, 28:20, 62:20, 63:12, 64:12, 76:12, 87:3, 90:8, 108:15, 117:2, 117:5, 117:9, 117:16, 123:13, 124:2, 154:20, 160:25, 172:3, 175:8, 178:20, 183:18, 186:9, 190:9, 191:8, 193:19, 201:7, 208:13, 214:24, 228:3, 232:16, 239:20

**seeing** [1] - 65:23

**seek** [3] - 111:25, 115:9, 205:2

**seeking** [1] - 109:12

**seeks** [2] - 111:23, 112:2

**seem** [3] - 10:20, 38:9, 190:25

**sees** [2] - 113:1, 161:10

**Senate** [1] - 63:9

**senate** [1] - 63:11

**senate-confirmed** [1] - 63:11

**send** [12] - 29:21, 38:20, 42:20, 50:15, 56:14, 77:11, 169:1, 175:2, 175:6, 175:18, 225:21, 229:6

**sending** [8] - 31:17, 85:11, 95:17, 108:9, 121:12, 135:2, 197:16, 229:8

**sends** [7] - 23:13, 35:20, 91:6, 110:8, 111:20, 204:6, 213:20

**senior** [4] - 10:9, 78:22, 144:19, 144:21

**sense** [3] - 24:6, 46:12, 64:10

**sensitive** [2] - 27:2, 179:2

**sent** [61] - 15:19, 15:21, 16:25, 29:9, 29:19, 30:3, 30:25, 33:16, 36:16, 42:21, 44:12, 56:8, 73:18, 76:4, 79:16, 83:3, 94:14, 95:3, 95:24, 97:2, 97:5, 97:6, 100:11, 105:20, 106:25, 107:22, 108:3, 108:17, 109:2, 109:7,

111:1, 112:5, 130:7, 134:17, 137:6, 137:12, 159:22, 163:7, 166:22, 168:17, 168:19, 168:21, 169:10, 169:20, 170:2, 174:7, 178:9, 180:2, 191:4, 197:9, 203:5, 212:23, 213:17, 214:1, 214:2, 214:8, 217:24, 221:5, 224:9, 224:11, 225:24

**sentence** [8] - 75:22, 95:1, 181:25, 187:10, 187:20, 213:11, 213:12, 213:16

**Sentinel** [2] - 179:3, 179:4

**separate** [8] - 10:4, 15:22, 101:3, 101:9, 205:16, 218:8, 223:2, 236:19

**separately** [4] - 8:14, 205:13, 213:24, 237:18

**separation** [1] - 231:16

**sequence** [1] - 5:17

**sequential** [1] - 162:11

**sequentially** [2] - 162:21, 236:14

**sequestered** [1] - 6:23

**series** [4] - 30:6, 79:5, 108:4, 113:21

**seriously** [2] - 41:10, 73:15

**serve** [4] - 13:16, 45:18, 45:20, 49:9

**serves** [1] - 17:10

**Service** [2] - 27:3, 218:2

**service** [6] - 19:17, 27:9, 45:21, 46:7, 103:22

**ServiceNow** [1] - 87:15

**services** [3] - 10:2, 89:2, 103:13

**Services** [4] - 38:4, 70:24, 151:9, 151:21

**serving** [4] - 10:8, 13:15, 45:23, 125:18

**session** [1] - 22:14

**set** [10] - 7:6, 8:23, 8:24, 45:24, 52:25, 59:22, 208:1, 208:7, 209:11

**sets** [1] - 123:8

**settlements** [1] - 182:2

**setup** [1] - 52:24

**several** [19] - 19:24, 24:23, 45:14, 57:7, 64:17, 144:7, 161:19, 163:10, 165:12, 167:24, 179:4, 183:11, 186:10, 192:18, 195:19, 196:22, 224:13, 232:10

**Shah** [1] - 3:15

**shall** [1] - 114:16

**shape** [1] - 69:6

**Shapiro** [1] - 95:3

**share** [1] - 201:16

**shared** [5] - 43:15, 46:6, 46:7, 65:16, 100:12

**SharePoint** [1] - 25:11

**shed** [1] - 53:22

**sheer** [1] - 28:5

**sheet** [3] - 7:24, 8:2, 8:4

**shoot** [1] - 71:22

**shop** [2] - 28:16, 71:13

**short** [6] - 10:5, 181:18, 181:22, 197:13, 229:1, 233:25

**shortly** [5] - 10:3, 15:21, 28:22, 84:25, 85:11

**show** [7] - 7:19, 20:9, 20:11, 22:13, 28:16, 38:18, 233:11

**showed** [11] - 21:6, 21:11, 21:13, 21:15, 28:12, 107:14, 107:15, 225:24, 229:11, 233:11, 233:12

**showing** [1] - 20:10

**shown** [1] - 225:20

**shows** [1] - 33:12

**shut** [4] - 127:5, 150:24, 151:7, 151:16

**shutting** [2] - 23:20, 150:2

**sic** [1] - 81:14

**side** [16] - 24:12, 24:20, 25:22, 26:1, 26:2, 26:8, 70:2, 70:4, 139:15, 186:5, 188:2, 188:24, 198:5, 228:12, 228:15

**sided** [1] - 42:8

**sides** [2] - 4:12, 5:12

**signature** [2] - 25:16, 215:21

**signed** [3] - 33:19, 47:13, 185:18

**significant** [2] - 39:22, 51:10

**silly** [1] - 234:5

**similar** [12] - 14:2, 21:18, 31:10, 35:22, 36:17, 58:3, 95:9, 95:17, 100:9, 100:12, 105:19, 161:15

**similarly** [1] - 127:20

**simplicity** [1] - 122:8

**simplify** [1] - 96:1

**simply** [2] - 110:25, 236:20

**single** [10] - 69:12, 117:6, 117:25, 146:8, 146:11, 146:15, 146:21, 146:25, 147:1, 147:2

**site** [3] - 24:18, 25:11, 196:14

**sits** [1] - 44:14

**sitting** [4] - 28:7, 65:4, 67:20, 235:2

**situation** [9] - 30:20, 31:11, 77:25, 89:23, 153:11, 153:25, 156:3, 161:6, 184:17

**six** [1] - 130:14

**size** [2] - 14:25, 230:7

**skip** [1] - 60:17

**slow** [3] - 11:6, 170:16, 170:19

**slower** [2] - 141:14, 149:9

**slows** [1] - 237:2

**small** [10] - 11:20, 14:24, 38:8, 55:13, 70:23, 171:2, 171:13, 171:15, 171:16, 183:22

**smaller** [3] - 15:2, 15:3, 231:12

**SME** [1] - 228:20

**SMEs** [1] - 174:16

**social** [6] - 176:20, 177:4, 177:6, 208:10, 208:11, 208:12

**software** [7] - 178:14, 181:6, 181:9, 182:1, 182:22, 197:5, 197:8

**solely** [1] - 159:4

**someone** [4] - 5:6, 61:24, 82:18, 123:1

**sometime** [5] - 92:22, 141:10, 168:10, 168:13, 216:19

**sometimes** [3] - 51:13, 137:1, 159:5

**somewhat** [4] - 23:2, 31:14, 36:25, 123:25

**somewhere** [2] - 45:5, 154:8

**soon** [2] - 63:7, 85:7

**sooner** [1] - 15:10

**sorry** [18] - 11:8, 44:4, 62:4, 99:2, 106:2, 126:18, 130:15, 133:23, 139:19, 160:19, 165:24, 170:21, 178:22, 194:3, 198:19, 201:12, 217:16, 234:23
**sort** [10] - 24:11, 30:2, 46:20, 50:5, 117:16, 139:14, 140:4, 140:18, 145:14, 238:1
**sought** [1] - 205:11
**sound** [1] - 118:1
**sounds** [6] - 130:12, 154:7, 157:13, 199:9, 224:16, 234:3
**space** [1] - 28:3
**speaking** [3] - 143:11, 143:25, 144:11
**speaks** [1] - 96:25
**specific** [43] - 11:19, 17:19, 18:14, 20:20, 24:9, 25:1, 26:11, 27:5, 29:16, 30:10, 30:13, 30:20, 34:20, 36:9, 37:20, 46:14, 47:11, 47:13, 52:20, 54:6, 57:2, 57:3, 75:13, 90:24, 101:5, 102:16, 123:19, 147:3, 147:11, 147:25, 148:18, 159:5, 168:4, 169:23, 178:24, 182:3, 193:4, 193:24, 213:17, 226:24, 227:24, 228:14, 228:18
**specifically** [21] - 10:8, 18:23, 31:12, 33:17, 34:11, 34:12, 34:16, 43:4, 43:21, 79:22, 85:8, 90:6, 103:2, 144:8, 148:22, 172:16, 189:2, 191:25, 195:3, 196:13, 221:13
**specifics** [4] - 154:7, 178:20, 178:25, 228:1
**speculate** [1] - 158:14
**speed** [4] - 16:13, 64:7, 108:12, 170:18
**spend** [1] - 215:10
**spoken** [1] - 119:19
**spreadsheet** [4] - 73:3, 79:8, 168:15, 172:4
**Sprinklr** [4] - 176:19, 176:20, 177:3, 177:16
**SS** [1] - 231:22
**staff** [73] - 11:23, 19:23, 21:6, 22:12, 23:13, 26:17, 27:12,

27:25, 28:10, 28:15, 29:10, 29:12, 45:2, 46:6, 46:7, 53:24, 57:9, 63:4, 65:8, 69:19, 70:11, 70:22, 71:15, 72:20, 77:18, 78:13, 78:22, 84:19, 98:24, 99:14, 101:6, 108:24, 109:14, 110:15, 111:2, 113:11, 113:14, 113:16, 115:16, 120:19, 125:19, 131:18, 131:19, 140:13, 148:1, 148:22, 156:21, 157:11, 157:14, 157:16, 157:19, 157:21, 158:2, 158:24, 159:3, 174:18, 176:11, 176:23, 193:2, 204:6, 204:23, 209:17, 220:21, 221:16, 225:5, 225:9, 228:19
**staffing** [1] - 53:4
**stage** [1] - 5:4
**stakeholder** [7] - 30:15, 31:3, 31:5, 31:12, 102:19, 103:3, 119:8
**stakeholders** [4] - 99:15, 102:24, 103:6, 222:22
**stalked** [1] - 27:10
**stamp** [16] - 162:1, 166:6, 167:7, 176:8, 178:4, 194:1, 195:4, 195:7, 200:6, 202:1, 202:18, 204:10, 212:14, 215:6, 216:24, 217:15
**stamped** [3] - 161:24, 162:14, 165:4
**stamps** [3] - 162:15, 180:25, 211:12
**stand** [12] - 10:14, 10:15, 10:16, 10:20, 10:22, 11:1, 11:11, 11:17, 32:22, 49:12, 159:14, 184:12
**stand-up** [5] - 10:14, 10:15, 11:1, 11:11, 11:17
**standing** [1] - 28:7
**stands** [2] - 106:14, 212:2
**start** [16] - 46:15, 68:24, 102:3, 105:12, 117:5, 120:21, 125:2, 125:3, 134:18, 176:7, 199:25, 200:19, 202:15, 234:21, 235:1,

237:24
**started** [28] - 14:8, 17:11, 22:10, 27:19, 27:20, 28:9, 28:10, 28:12, 43:22, 69:8, 71:16, 71:18, 74:12, 78:12, 79:24, 80:13, 113:11, 129:22, 141:17, 141:18, 142:11, 152:6, 185:17, 198:18, 203:15, 209:6, 209:8, 210:12
**starting** [9] - 3:5, 10:7, 48:16, 74:23, 99:6, 105:17, 107:9, 148:11, 224:22
**starts** [10] - 84:24, 99:8, 100:22, 108:5, 108:20, 121:6, 176:7, 176:8, 177:9, 182:18
**state** [11] - 3:6, 4:25, 9:8, 150:15, 150:19, 150:23, 157:20, 158:6, 158:7, 158:10, 158:18
**statement** [3] - 153:17, 157:5, 190:14
**statements** [4] - 53:19, 127:11, 127:21, 191:8
**states** [2] - 182:24, 190:6
**States** [3] - 3:25, 13:17, 19:17
**stating** [2] - 94:25, 113:14
**status** [24] - 10:24, 34:12, 58:14, 64:10, 72:25, 78:11, 113:15, 116:3, 119:7, 119:24, 120:25, 147:22, 168:2, 190:7, 195:15, 209:18, 214:22, 215:13, 215:15, 226:11, 226:22, 227:7, 227:18, 228:6
**statuses** [1] - 73:12
**statute** [11] - 12:4, 12:5, 59:2, 104:21, 105:16, 106:19, 114:13, 147:3, 147:12, 155:3, 192:1
**statutes** [6] - 154:3, 155:5, 218:10, 222:8
**statutorily** [42] - 55:19, 56:20, 57:6, 57:23, 62:23, 62:25, 66:11, 68:1, 68:22, 82:19, 84:10, 84:13, 88:4, 92:6, 98:8, 105:13, 113:8, 114:15,

114:24, 118:16, 118:20, 118:24, 119:1, 120:20, 130:21, 131:1, 131:5, 131:9, 146:23, 151:12, 155:14, 156:7, 156:12, 164:23, 167:21, 168:16, 169:11, 185:3, 187:18, 204:12, 206:20, 206:23
**statutorily-authorized** [4] - 68:1, 156:7, 156:12, 167:21
**statutorily-required** [12] - 56:20, 57:23, 62:25, 84:10, 84:13, 113:8, 118:16, 118:20, 164:23, 169:11, 185:3, 187:18
**statutory** [58] - 55:7, 55:11, 55:16, 57:13, 58:4, 58:11, 63:13, 65:20, 66:7, 71:7, 71:18, 74:24, 75:19, 76:6, 76:16, 76:20, 77:2, 79:23, 80:11, 80:20, 83:17, 84:14, 85:14, 85:16, 92:20, 92:24, 94:2, 95:1, 96:18, 97:7, 97:9, 106:21, 113:20, 126:2, 126:7, 126:10, 131:7, 164:16, 166:12, 185:7, 185:20, 185:23, 186:2, 186:7, 186:11, 186:15, 186:18, 187:2, 187:7, 187:11, 192:8, 192:25, 199:3, 220:4, 223:10, 230:4, 230:9, 232:12
**statutory-authorized** [5] - 66:7, 76:16, 76:20, 77:2, 97:9
**statutory-required** [6] - 55:7, 55:11, 55:16, 58:4, 79:23, 94:2
**statutory/regulatory** [1] - 73:2
**stayed** [1] - 28:4
**Steege** [1] - 3:10
**step** [6] - 129:8, 129:9, 129:19, 129:22, 131:21
**still** [46] - 22:19, 22:20, 28:24, 28:25, 29:3, 31:22, 35:7, 48:2, 55:7, 60:1, 60:4, 66:13, 66:25, 67:3, 67:21, 67:23, 70:1, 70:9, 71:1, 90:14, 105:1, 106:14, 110:4, 114:6, 117:3, 145:16, 149:10, 157:21, 181:17,

181:20, 193:17, 194:9,
196:15, 208:13, 211:5,
212:1, 212:8, 213:9,
213:22, 226:13, 231:7,
231:15, 231:24, 232:2,
233:7
  **stood** [1] - 151:11
  **stop** [30] - 43:25, 49:9,
52:6, 56:8, 56:14,
77:25, 152:14, 154:16,
168:23, 168:24, 169:4,
184:8, 184:23, 184:24,
189:23, 190:4, 193:17,
193:19, 203:17,
205:19, 206:4, 206:22,
207:16, 208:21,
208:24, 210:3, 212:7,
221:17, 228:13
  **stop-work** [16] - 49:9,
52:6, 56:8, 56:14,
154:16, 184:8, 184:23,
184:24, 189:23, 190:4,
203:17, 206:4, 206:22,
208:21, 208:24, 210:3
  **stoppage** [8] - 31:16,
47:14, 88:21, 108:15,
213:18, 213:22, 214:5,
214:11
  **stopped** [7] - 30:25,
43:24, 77:23, 85:3,
107:1, 193:1, 196:1
  **stopping** [1] - 194:14
  **store** [1] - 81:25
  **stored** [2] - 181:10,
182:22
  **strategies** [1] - 100:25
  **streaming** [1] - 28:13
  **street** [1] - 92:3
  **strike** [1] - 17:17
  **stroller** [1] - 27:23
  **strong** [1] - 57:23
  **strongly** [1] - 195:22
  **structure** [2] - 116:15,
116:16
  **structures** [1] - 34:5
  **struggling** [1] - 148:14
  **Student** [1] - 189:2
  **student** [4] - 5:1,
104:25, 190:18, 190:24
  **stuff** [3] - 87:22,
118:4, 205:12
  **style** [2] - 14:12,
115:11
  **subject** [6] - 46:17,
50:19, 198:11, 221:21,
223:3, 228:20
  **submit** [2] - 105:4,
236:5
  **submitted** [29] - 4:19,
16:14, 50:21, 51:5,

58:24, 91:7, 91:8,
123:9, 123:10, 124:9,
124:10, 124:14,
124:18, 124:19, 125:5,
127:4, 153:19, 184:24,
186:2, 188:8, 189:17,
189:21, 190:9, 198:15,
235:14, 236:9, 236:10,
236:12, 238:13
  **subsections** [1] -
117:21
  **subsequent** [4] - 34:4,
43:1, 53:6, 157:16
  **subsequently** [2] -
174:17, 227:25
  **subset** [1] - 70:23
  **substance** [1] - 84:25
  **substantial** [2] -
123:17, 238:14
  **substantive** [1] -
109:7
  **subunits** [1] - 117:17
  **successful** [2] - 158:2
  **successfully** [1] -
193:6
  **succinct** [1] - 73:20
  **sudden** [1] - 28:5
  **suddenly** [1] - 209:3
  **suffering** [1] - 226:8
  **sufficient** [3] - 40:10,
160:2, 161:12
  **suggest** [2] - 136:3,
190:17
  **suggested** [1] - 114:5
  **suggesting** [4] - 74:8,
115:23, 190:10, 191:6
  **suggestions** [1] -
220:17
  **suit** [1] - 159:1
  **sum** [2] - 86:8, 160:20
  **summarize** [5] - 36:6,
36:7, 76:12, 79:6,
117:2
  **summary** [2] - 237:25,
239:17
  **Sunday** [4] - 66:10,
66:18, 204:4, 210:21
  **superimpose** [1] -
236:20
  **superimposed** [1] -
236:25
  **supervision** [34] -
30:14, 58:6, 105:7,
105:13, 106:13,
108:23, 108:24,
109:14, 110:4, 110:17,
112:6, 113:7, 114:8,
114:10, 114:20, 119:5,
119:7, 164:1, 188:12,
207:3, 207:5, 207:7,

211:8, 211:18, 211:25,
212:8, 212:19, 213:2,
213:9, 214:13, 214:14,
215:11, 216:12, 227:15
  **Supervision** [3] -
130:19, 130:21, 213:6
  **supervision/
examination** [1] -
109:19
  **supervisor** [2] - 83:1,
98:13
  **supervisors** [3] -
66:19, 98:12, 98:15
  **supervisory** [2] -
113:11, 113:16
  **supplemental** [2] -
124:14, 198:14
  **support** [19] - 4:14,
14:3, 55:9, 65:21, 73:1,
84:10, 84:12, 94:22,
94:23, 99:14, 112:7,
120:20, 124:11,
167:21, 168:16,
189:11, 191:9, 195:18,
237:22
  **supported** [1] - 237:21
  **supporting** [1] -
161:19
  **supports** [1] - 46:7
  **suppose** [1] - 236:24
  **supposed** [10] - 46:18,
53:5, 59:24, 59:25,
71:7, 110:4, 138:10,
166:10, 175:6, 190:21
  **Supreme** [2] - 37:24,
69:8
  **surprise** [1] - 67:22
  **surprised** [5] - 15:10,
36:10, 37:1, 60:7
  **surprising** [1] - 17:20
  **surrounding** [1] -
81:23
  **suspend** [3] - 75:12,
169:23, 170:1
  **switch** [2] - 41:15,
72:2
  **switched** [1] - 195:5
  **switching** [1] - 159:9
  **swore** [2] - 124:19,
124:24
  **sworn** [1] - 9:5
  **sync** [1] - 167:8
  **system** [31] - 7:20,
11:22, 11:24, 11:25,
13:5, 22:2, 22:3, 22:13,
43:3, 58:22, 81:8, 83:6,
120:3, 123:20, 147:9,
177:16, 193:18, 217:7,
217:11, 218:23, 219:1,
219:4, 219:7, 222:5,

237:3, 237:4
  **System** [1] - 35:17
  **systems** [17] - 22:12,
23:16, 24:9, 24:11,
24:20, 24:21, 25:1,
25:12, 25:13, 25:21,
26:2, 26:6, 26:7, 33:22,
81:25, 89:4, 123:8

# T

  **T&I** [3] - 85:3, 85:4,
192:19
  **tab** [108] - 16:12,
28:24, 29:2, 29:3, 30:1,
31:22, 35:8, 35:10,
41:17, 42:13, 48:3,
48:4, 48:15, 72:5, 73:6,
75:4, 79:1, 81:12,
84:22, 87:1, 87:6,
87:20, 87:22, 88:17,
89:17, 89:18, 91:2,
91:3, 92:13, 92:16,
93:8, 93:18, 94:4,
94:11, 94:24, 95:9,
95:10, 95:18, 95:20,
96:7, 96:22, 98:1, 98:6,
99:6, 100:20, 101:22,
102:12, 104:17, 105:8,
105:10, 107:3, 107:9,
107:25, 108:2, 108:5,
108:18, 109:4, 109:10,
109:13, 110:13,
111:12, 112:23,
116:10, 122:13, 123:5,
161:25, 162:4, 162:5,
162:6, 162:18, 162:23,
165:4, 167:6, 168:8,
169:14, 170:5, 170:11,
170:23, 172:22, 176:4,
176:5, 178:4, 178:6,
179:2, 179:24, 179:25,
180:24, 193:25, 195:7,
198:20, 198:24, 200:5,
202:2, 202:19, 202:24,
202:25, 211:11,
212:13, 215:5, 216:24,
217:15, 217:16,
236:21, 236:22
  **table** [8] - 3:12, 3:19,
4:1, 23:5, 28:9, 141:16,
232:9, 232:17
  **tabs** [2] - 236:3,
236:19
  **tailed** [1] - 27:10
  **talks** [4] - 154:22,
155:2, 156:11, 175:14
  **tangible** [1] - 7:17
  **targeted** [1] - 233:3
  **targeting** [1] - 238:25

**task** [2] - 32:19, 32:22
**tasks** [5] - 13:11, 85:3,
87:14, 87:17, 184:12
**taxpayer** [1] - 36:3
**taxpayers** [1] - 103:12
**team** [58] - 10:15,
22:11, 23:5, 23:14,
28:1, 54:8, 58:7, 64:16,
65:16, 71:19, 79:22,
89:14, 90:1, 90:7,
90:11, 93:10, 96:15,
99:17, 99:18, 99:22,
100:12, 100:14, 101:5,
104:20, 118:3, 126:5,
126:6, 133:20, 134:1,
134:13, 134:22, 135:1,
135:2, 135:7, 135:12,
135:17, 149:22, 157:2,
172:2, 177:18, 185:11,
185:12, 186:7, 187:18,
198:12, 198:18,
199:11, 199:15,
201:24, 203:3, 203:13,
213:21, 221:16,
231:24, 231:25, 232:2,
232:3
**Teams** [6] - 22:14,
101:21, 229:12,
229:13, 229:14, 229:16
**technical** [1] - 22:16
**technically** [3] - 96:24,
193:21, 218:2
**technology** [5] -
28:15, 85:5, 171:14,
171:16, 172:20
**teed** [1] - 115:12
**teeny** [1] - 170:16
**template** [1] - 175:19
**temporary** [4] - 40:13,
62:13, 134:6, 145:23
**ten** [4] - 65:9, 86:20,
134:10, 194:5
**ten-minute** [1] - 194:5
**tend** [2] - 101:10,
191:9
**tenure** [1] - 79:20
**term** [9] - 45:24, 52:2,
83:20, 92:1, 128:10,
146:14, 181:18,
181:22, 208:20
**terminate** [15] - 45:16,
70:15, 71:14, 75:12,
128:17, 128:25, 142:1,
142:24, 151:10,
151:22, 164:12,
169:22, 170:1, 183:19,
232:17
**terminated** [29] - 45:9,
45:13, 45:14, 45:19,
51:7, 51:8, 51:20,

51:21, 52:3, 73:9,
75:18, 76:6, 76:7, 79:9,
131:17, 131:19,
132:21, 133:5, 143:4,
148:17, 152:20,
153:15, 164:15,
168:20, 189:6, 195:19,
196:24, 208:20, 218:11
**terminating** [1] - 153:1
**termination** [25] -
45:7, 62:14, 76:1, 79:7,
79:12, 128:1, 132:14,
134:1, 134:13, 135:7,
135:12, 146:5, 152:6,
165:1, 167:1, 169:2,
170:3, 170:8, 174:7,
174:10, 175:1, 175:13,
197:17, 221:5, 231:23
**terminations** [17] -
46:2, 134:23, 135:24,
136:8, 138:10, 141:21,
142:16, 142:21,
142:22, 153:3, 154:16,
154:17, 156:11,
156:18, 158:12,
180:17, 208:21
**terms** [10] - 30:17,
69:17, 81:10, 82:4,
89:24, 119:11, 174:13,
174:19, 230:7
**testified** [26] - 9:6,
36:20, 52:24, 84:8,
101:1, 108:2, 119:5,
125:6, 125:14, 125:18,
125:25, 126:4, 127:20,
141:8, 147:4, 147:20,
149:18, 156:3, 160:4,
179:18, 184:16, 185:8,
196:4, 196:11, 206:3,
211:4
**testify** [5] - 6:9, 227:7,
227:15, 227:18, 235:16
**testifying** [4] - 13:3,
110:20, 186:1, 235:7
**testimony** [35] - 4:17,
5:11, 6:7, 6:12, 13:6,
19:13, 33:3, 74:21,
103:19, 104:10,
116:24, 117:10, 119:4,
120:24, 121:8, 124:8,
124:9, 125:3, 126:15,
127:11, 129:1, 138:23,
142:5, 142:10, 155:20,
159:14, 160:12,
160:23, 193:14,
209:21, 227:22,
229:24, 234:3, 239:12
**text** [11] - 64:1, 64:7,
64:8, 101:11, 101:13,
101:18, 121:4, 229:6,

229:7, 229:8, 236:7
**thanking** [1] - 99:9
**THE** [595] - 3:2, 3:18,
3:22, 4:3, 5:21, 6:3,
6:15, 6:20, 6:24, 7:1,
7:3, 7:9, 7:15, 7:18,
8:7, 8:16, 8:19, 8:25,
9:12, 9:15, 9:16, 9:17,
12:3, 12:7, 12:12,
12:24, 17:21, 17:25,
18:5, 18:6, 19:5, 19:9,
19:14, 20:2, 20:3,
20:13, 20:15, 20:16,
20:17, 21:3, 21:4,
21:11, 21:12, 21:16,
21:17, 21:22, 21:24,
22:9, 22:10, 22:17,
22:19, 23:7, 23:9,
23:10, 23:11, 23:17,
23:22, 23:23, 25:19,
25:24, 25:25, 26:3,
26:4, 26:5, 26:8, 26:10,
26:12, 26:14, 26:15,
26:17, 26:20, 29:11,
29:12, 29:14, 29:22,
31:3, 31:5, 31:8, 31:10,
31:20, 32:10, 32:13,
32:14, 32:21, 32:24,
33:12, 33:15, 33:20,
33:21, 33:23, 33:25,
34:6, 36:3, 36:4, 37:3,
37:5, 37:6, 37:10,
38:11, 38:24, 39:9,
39:10, 39:13, 39:15,
39:17, 39:22, 39:24,
40:16, 40:25, 42:8,
42:11, 42:18, 43:17,
43:20, 44:1, 44:4,
44:20, 46:17, 46:19,
46:20, 46:23, 46:24,
47:1, 47:3, 47:4, 47:9,
47:11, 47:15, 47:18,
47:19, 49:12, 49:17,
49:19, 49:20, 49:23,
49:24, 50:24, 50:25,
51:15, 51:17, 51:19,
51:22, 51:24, 52:1,
52:2, 52:4, 52:6, 52:8,
52:12, 52:14, 52:15,
52:17, 52:18, 52:20,
52:22, 54:13, 54:16,
54:17, 54:19, 54:20,
54:22, 54:23, 54:25,
55:2, 55:5, 55:10,
55:12, 55:18, 55:21,
55:22, 55:23, 55:25,
56:2, 56:8, 56:9, 56:10,
56:16, 56:17, 56:21,
56:23, 56:24, 57:2,
57:11, 57:15, 57:16,
57:17, 59:3, 59:6, 59:8,

59:11, 59:16, 59:21,
59:22, 60:2, 60:4, 60:6,
60:8, 60:9, 60:11,
60:19, 60:23, 61:1,
61:21, 64:5, 64:21,
64:24, 64:25, 65:19,
66:2, 66:4, 66:9, 66:10,
66:15, 66:17, 66:23,
66:25, 67:2, 67:4, 67:6,
67:7, 67:10, 67:20,
67:22, 67:24, 68:3,
68:4, 68:11, 68:15,
68:18, 69:25, 70:3,
70:14, 70:17, 70:19,
70:22, 71:6, 71:9,
71:10, 71:11, 71:21,
71:24, 73:4, 73:8,
73:10, 73:11, 73:13,
73:18, 73:23, 73:24,
73:25, 74:7, 74:10,
74:11, 74:14, 74:15,
74:18, 74:19, 75:22,
75:23, 76:9, 76:10,
76:13, 76:22, 76:23,
77:1, 77:2, 77:4, 78:4,
78:5, 78:6, 78:7, 80:7,
80:9, 80:16, 80:22,
80:23, 80:25, 82:14,
82:25, 83:3, 83:9,
83:21, 84:2, 85:19,
85:22, 85:23, 86:3,
86:13, 86:19, 86:23,
87:5, 87:7, 87:22,
87:23, 87:24, 88:2,
88:5, 88:7, 88:8, 88:10,
88:13, 88:14, 88:15,
89:18, 90:5, 90:13,
90:17, 90:23, 90:24,
91:11, 91:13, 91:19,
91:22, 91:23, 91:25,
92:1, 92:8, 92:11, 93:3,
93:5, 93:6, 93:9, 93:12,
93:14, 93:15, 93:16,
94:9, 94:24, 95:6, 95:7,
97:5, 97:6, 97:8, 97:13,
97:15, 97:17, 97:22,
97:24, 98:7, 98:13,
98:15, 98:18, 98:20,
98:21, 98:22, 98:23,
98:25, 99:2, 99:4,
99:25, 100:6, 100:11,
100:14, 100:15,
100:17, 101:9, 101:12,
101:13, 101:14,
101:23, 102:5, 102:23,
103:1, 103:6, 103:9,
103:10, 103:11,
103:15, 103:18,
103:23, 104:6, 107:5,
107:7, 107:13, 107:20,
107:22, 108:6, 108:10,

110:3, 110:8, 110:11,
110:21, 111:3, 111:7,
111:13, 111:15,
111:22, 112:1, 112:9,
112:15, 112:25, 113:4,
113:18, 113:25, 114:3,
114:8, 115:19, 115:25,
117:25, 118:2, 118:4,
118:5, 118:15, 118:22,
119:12, 119:14,
119:15, 119:17,
120:10, 120:14, 121:6,
121:14, 121:15,
121:18, 121:19,
121:22, 121:23, 122:1,
122:2, 122:5, 122:6,
122:11, 122:12,
122:20, 123:5, 123:14,
123:21, 129:13,
129:16, 133:1, 133:2,
133:11, 135:4, 135:5,
135:6, 135:8, 135:9,
136:14, 137:6, 137:8,
137:9, 137:10, 137:11,
137:13, 137:14,
137:16, 137:17,
137:18, 137:19,
137:21, 137:22,
137:23, 137:24, 138:1,
138:2, 138:4, 138:5,
139:19, 141:3, 141:4,
141:5, 142:6, 143:24,
144:2, 144:5, 144:6,
144:10, 144:13,
144:16, 144:19,
144:21, 144:22,
144:23, 146:14,
146:15, 146:19,
148:24, 149:3, 149:4,
149:5, 149:6, 149:8,
149:10, 149:12,
149:13, 150:6, 150:8,
154:11, 155:10,
155:25, 156:24, 157:6,
158:18, 158:22,
160:15, 160:21, 161:3,
161:4, 162:4, 162:6,
162:10, 162:14, 166:1,
166:5, 166:7, 166:13,
166:14, 166:16,
166:17, 168:6, 170:11,
170:13, 170:16,
172:12, 173:12, 174:2,
185:10, 185:15,
186:24, 187:1, 187:2,
187:9, 187:14, 187:22,
188:19, 191:2, 191:19,
191:20, 194:2, 194:13,
197:25, 198:7, 198:9,
198:22, 203:24,
205:19, 205:21,

205:22, 205:24,
205:25, 206:1, 207:18,
210:10, 210:14,
221:22, 222:1, 222:2,
222:3, 222:4, 222:6,
222:7, 222:10, 224:17,
225:17, 225:20, 226:1,
226:4, 226:5, 226:12,
226:16, 227:6, 227:10,
227:11, 227:12,
227:13, 228:24, 229:2,
229:21, 230:16,
230:19, 230:20,
230:22, 230:23,
232:25, 233:7, 233:18,
233:22, 233:24, 234:1,
234:14, 234:15,
234:18, 234:21,
234:24, 234:25, 235:8,
235:11, 235:15,
235:19, 235:21,
235:24, 236:8, 237:1,
237:10, 237:19
  **theirs** [1] - 123:10
  **themselves** [2] -
26:16, 102:20
  **theories** [1] - 115:13
  **theory** [1] - 83:22
  **thereafter** [2] - 10:3,
28:22
  **therefore** [1] - 4:16
  **they've** [4] - 41:17,
118:2, 230:25, 231:6
  **thinking** [10] - 97:14,
97:15, 101:1, 113:21,
136:2, 194:4, 215:1,
230:6, 230:14, 230:20
  **third** [3] - 35:4, 45:22,
51:9
  **Thomas** [1] - 3:13
  **thoroughly** [1] -
239:13
  **thoughtful** [1] -
239:16
  **thousands** [1] -
226:20
  **thread** [1] - 178:5
  **three** [12] - 11:14,
11:18, 11:19, 12:1,
13:19, 21:14, 34:16,
34:20, 134:8, 172:12,
200:21, 229:9
  **three-month** [1] - 12:1
  **threshold** [1] - 183:23
  **throughout** [2] - 31:1,
205:14
  **Thursday** [3] - 19:21,
21:19, 27:6
  **tickets** [1] - 193:5
  **time-sensitive** [1] -

179:2
  **timeframe** [3] - 47:1,
47:8, 148:18
  **timeline** [7] - 14:9,
75:25, 77:20, 199:17,
199:23, 203:11, 211:3
  **timing** [6] - 90:2,
142:14, 145:15,
148:11, 185:16, 194:16
  **tiny** [2] - 11:6
  **tip** [3] - 208:1, 208:7
  **title** [2] - 20:16, 20:17
  **today** [16] - 4:17, 8:11,
65:4, 67:14, 67:16,
73:11, 88:19, 102:10,
120:24, 125:3, 152:16,
153:23, 160:4, 199:14,
233:13, 236:6
  **together** [6] - 65:9,
67:5, 123:16, 129:2,
137:3, 232:3
  **toll** [1] - 198:2
  **toll-free** [1] - 198:2
  **tomorrow** [9] - 138:19,
234:7, 234:8, 234:13,
234:15, 234:22,
238:21, 238:23, 239:20
  **took** [4] - 58:3, 102:25,
104:8, 238:16
  **tools** [1] - 219:14
  **top** [19] - 14:16, 14:21,
16:16, 35:12, 41:18,
48:21, 62:21, 65:22,
65:23, 70:4, 81:13,
81:20, 82:2, 117:5,
162:17, 195:17, 224:9,
236:25
  **top-down** [3] - 14:16,
14:21, 70:4
  **topic** [9] - 20:23,
60:17, 68:13, 72:2,
86:12, 104:4, 229:2,
229:4, 229:19
  **topics** [7] - 19:16,
44:18, 60:14, 68:20,
102:10, 228:24, 228:25
  **tops** [1] - 86:18
  **totally** [2] - 153:12,
167:8
  **touch** [2] - 39:5,
191:23
  **toward** [1] - 62:21
  **towards** [3] - 54:11,
69:9, 185:18
  **track** [5] - 162:16,
162:20, 168:5, 217:11
  **tracks** [1] - 136:22
  **trade** [2] - 10:4, 31:6
  **training** [2] - 231:19,
231:20

  **tranches** [1] - 236:13
  **transcript** [3] - 122:22,
123:12, 173:24
  **transfer** [8] - 36:11,
36:17, 40:14, 43:3,
43:11, 44:7, 69:17,
147:18
  **transferees** [1] - 11:21
  **transferred** [2] -
11:25, 53:13
  **transition** [9] - 17:5,
17:8, 17:18, 18:1, 18:2,
18:3, 18:4
  **transitional** [1] -
121:10
  **transitioning** [1] -
18:18
  **transitions** [3] - 17:23,
18:10, 31:9
  **transmitted** [1] - 95:4
  **transpired** [2] - 140:2,
238:3
  **travel** [3] - 22:2,
151:22, 152:3
  **Treasury** [26] - 3:3,
3:9, 3:16, 10:8, 10:14,
10:21, 12:9, 12:15,
12:22, 13:12, 13:15,
15:2, 15:3, 17:2, 17:16,
18:9, 18:13, 31:10,
31:13, 44:13, 44:14,
44:15, 105:5, 105:6,
121:9
  **Treasury's** [3] - 10:21,
11:24, 19:23
  **treated** [2] - 5:13,
57:11
  **trial** [5] - 45:19, 51:7,
51:25, 123:24, 237:19
  **trial-period** [1] - 45:19
  **trick** [1] - 230:18
  **tried** [1] - 210:8
  **triggered** [1] - 181:2
  **trimmed** [1] - 161:1
  **triple** [1] - 238:7
  **TRO** [9] - 64:11, 64:22,
133:4, 133:15, 148:9,
148:15, 148:22,
152:17, 152:19
  **true** [13] - 124:19,
124:25, 127:19,
127:22, 129:7, 140:20,
149:4, 149:6, 149:8,
153:17, 155:17,
173:13, 173:17
  **Trump** [5] - 18:2, 18:4,
30:4, 36:15
  **trusted** [1] - 14:13
  **try** [16] - 18:25, 21:7,
42:10, 46:13, 69:19,

70:13, 73:17, 92:13, 94:19, 155:24, 157:22, 177:15, 194:13, 211:9, 229:21

**trying** [15] - 42:12, 54:1, 60:24, 64:10, 101:4, 114:1, 114:2, 121:23, 162:7, 177:19, 208:11, 221:1, 225:8, 237:2, 238:24

**Tuesday** [5] - 42:25, 112:24, 148:20, 182:16, 236:13

**turn** [73] - 7:20, 16:9, 16:12, 16:16, 16:21, 28:24, 29:1, 30:1, 31:22, 31:23, 35:6, 48:3, 48:15, 62:19, 68:13, 68:18, 72:5, 75:4, 79:1, 80:6, 81:12, 83:7, 87:1, 87:20, 89:17, 92:13, 93:8, 93:18, 95:20, 96:7, 96:22, 99:6, 100:20, 101:22, 104:17, 105:7, 107:3, 108:18, 116:9, 130:4, 133:19, 134:10, 138:7, 139:1, 161:17, 161:23, 162:10, 164:19, 167:6, 169:14, 170:5, 172:22, 174:21, 176:4, 178:4, 179:24, 180:24, 182:10, 193:25, 195:4, 202:1, 202:18, 203:17, 211:7, 211:11, 211:13, 212:13, 219:15, 220:2, 220:6, 220:13, 223:4

**turnaround** [1] - 90:2

**turned** [8] - 13:4, 54:17, 80:1, 183:14, 219:21, 221:3, 221:12, 223:23

**turning** [4] - 73:16, 85:12, 219:23, 223:24

**twice** [1] - 124:9

**two** [57] - 6:8, 9:1, 10:4, 16:3, 20:9, 20:10, 30:10, 37:19, 42:8, 42:21, 45:20, 45:25, 47:11, 47:21, 48:12, 49:3, 49:6, 49:14, 51:23, 56:15, 60:14, 60:19, 60:20, 60:21, 68:20, 70:6, 73:12, 88:21, 93:12, 102:9, 105:20, 109:8, 110:2, 110:15, 121:20, 129:19, 136:22, 142:7, 153:1, 164:9, 180:21,

182:7, 185:16, 190:17, 201:8, 224:20, 228:22, 228:24, 228:25, 233:23, 233:24, 233:25, 235:4, 235:5, 236:6, 236:13, 236:17

**two-page** [1] - 224:20

**two-sided** [1] - 42:8

**two-step** [1] - 129:19

**two-year** [2] - 51:23, 121:20

**type** [10] - 18:9, 52:2, 57:21, 85:25, 105:15, 106:3, 109:7, 109:9, 170:20, 182:4

**types** [4] - 14:6, 18:10, 94:20, 106:8

**typical** [7] - 121:11, 121:13, 121:17, 121:21, 121:25, 122:4, 239:17

**typically** [6] - 31:16, 34:4, 45:21, 46:18, 47:5, 210:1

## U

**U.S** [1] - 89:15

**ultimately** [3] - 29:19, 115:11, 137:8

**um-hum** [31] - 48:5, 48:18, 52:1, 72:15, 84:11, 88:20, 93:15, 93:19, 124:13, 129:20, 134:16, 134:19, 135:18, 139:3, 141:13, 154:23, 163:23, 166:25, 169:13, 173:3, 174:25, 178:8, 181:1, 187:4, 196:23, 198:13, 201:22, 204:14, 211:6, 219:22, 224:25

**unaware** [1] - 133:10

**unclear** [2] - 136:10, 177:19

**uncommon** [1] - 62:11

**under** [20] - 11:23, 14:9, 14:19, 25:12, 30:21, 36:15, 36:25, 40:13, 62:21, 117:21, 124:22, 124:25, 127:8, 160:23, 178:19, 183:23, 183:24, 192:9, 204:15, 236:19

**undergoing** [1] - 37:24

**underscore** [1] - 162:2

**underscored** [1] - 98:8

**understandably** [2] -

5:25, 6:9

**understood** [28] - 32:9, 55:12, 61:4, 75:20, 89:22, 97:3, 125:22, 136:1, 136:2, 145:14, 145:22, 146:12, 147:16, 147:19, 150:5, 155:22, 169:1, 172:8, 183:15, 186:6, 193:8, 196:2, 196:17, 200:4, 207:7, 207:22, 208:6, 212:13

**Understood** [1] - 158:10

**undertake** [1] - 22:9

**unexpectedly** [3] - 176:17, 177:6, 177:23

**unfortunately** [2] - 28:8, 236:15

**union** [1] - 145:23

**Union** [3] - 3:3, 3:9, 3:17

**unique** [4] - 14:18, 31:11, 184:16, 184:18

**unit** [3] - 56:25

**United** [3] - 3:25, 13:17, 19:17

**units** [3] - 130:17, 132:1, 145:17

**unless** [6] - 44:18, 144:17, 162:11, 209:24, 209:25, 238:7

**unload** [1] - 148:22

**unnecessary** [1] - 159:24

**unrepairable** [1] - 153:12

**unusual** [4] - 17:20, 18:11, 38:20, 42:24

**up** [87] - 8:11, 10:14, 10:15, 10:16, 10:20, 10:22, 11:1, 11:7, 11:11, 11:17, 17:4, 20:9, 20:10, 20:11, 21:6, 21:11, 21:13, 21:15, 22:22, 23:25, 25:19, 34:2, 37:15, 37:18, 37:19, 40:24, 41:16, 43:8, 43:20, 43:21, 48:20, 49:12, 52:25, 54:9, 59:22, 60:1, 60:4, 63:5, 66:13, 71:6, 74:4, 75:11, 79:11, 83:11, 86:8, 87:9, 88:12, 92:9, 92:22, 95:24, 98:3, 99:17, 104:16, 114:4, 115:12, 116:4, 117:1, 117:2, 117:13, 117:21, 118:16, 118:25,

123:22, 141:11, 141:12, 151:11, 153:14, 157:17, 157:23, 162:8, 186:3, 188:6, 188:9, 188:12, 190:11, 199:25, 208:1, 208:7, 208:13, 223:19, 227:22, 229:4, 232:3, 237:2

**upcoming** [1] - 193:10

**update** [4] - 138:18, 214:22, 215:13, 215:15

**updated** [1] - 140:21

**upset** [1] - 115:14

**upward** [2] - 158:1, 158:3

**urged** [2] - 194:23, 195:22

**urgent** [3] - 32:17, 32:21, 77:16

**useful** [1] - 194:10

**utilize** [1] - 22:13

## V

**vacant** [3] - 105:1, 105:2, 189:4

**vague** [4] - 11:9, 126:16, 136:9, 173:11

**validated** [1] - 117:23

**various** [6] - 7:25, 36:21, 41:22, 79:4, 99:11, 113:8

**vary** [1] - 83:12

**vast** [4] - 128:17, 142:24, 143:4, 232:17

**vendors** [3] - 79:16, 173:10, 174:9

**version** [1] - 11:20

**versus** [3] - 3:4, 38:3, 227:5

**Vespa** [2] - 93:18, 117:11

**Vespa-Papaleo** [2] - 93:18, 117:11

**via** [3] - 91:7, 91:8, 106:11

**viable** [1] - 190:12

**view** [4] - 108:25, 136:19, 161:7, 186:17

**views** [1] - 103:5

**violates** [1] - 114:12

**Virginia** [1] - 3:10

**virtual** [2] - 22:14, 231:10

**virtually** [1] - 44:11

**vision** [1] - 158:15

**visions** [1] - 4:15

**volume** [2] - 16:7, 123:17

**Vought** [50] - 3:4, 23:7, 23:13, 25:14, 30:3, 30:21, 32:2, 35:15, 44:1, 49:9, 49:18, 56:9, 56:14, 61:11, 61:13, 61:14, 62:6, 62:17, 63:4, 75:14, 78:16, 102:14, 106:2, 121:11, 125:10, 130:13, 136:21, 137:6, 137:24, 138:18, 138:21, 138:23, 139:25, 140:11, 140:21, 145:5, 145:7, 145:9, 151:24, 158:5, 158:9, 159:17, 161:18, 161:21, 163:4, 163:8, 169:24, 184:11, 208:8, 229:25

**Vought's** [12] - 29:10, 29:12, 33:15, 33:16, 50:10, 72:21, 77:14, 79:20, 86:25, 87:3, 87:18, 89:8

**Vought/Paoletta** [1] - 185:11

## W

**wait** [6] - 66:19, 93:9, 134:13, 134:22, 135:19, 135:22

**waiting** [1] - 79:17

**walk** [8] - 8:20, 68:6, 68:20, 68:21, 98:2, 99:7, 157:16, 167:9

**walked** [2] - 28:8, 174:19

**wants** [7] - 19:12, 19:13, 32:11, 37:4, 60:17, 113:24, 123:1

**warranted** [1] - 47:10

**Warren** [6] - 11:9, 11:10, 52:25, 95:11, 95:13, 95:24

**Washington** [1] - 10:4

**ways** [5] - 30:19, 53:23, 146:3, 186:10, 224:13

**Ways** [1] - 10:6

**web** [1] - 25:11

**website** [13] - 90:8, 90:9, 90:13, 91:5, 91:8, 91:9, 91:15, 116:3, 120:1, 192:20, 192:22, 198:2, 218:21

**Wednesday** [1] - 148:17

**week** [57] - 4:12, 22:22, 22:23, 23:19,

31:1, 45:9, 56:2, 56:4, 61:6, 64:17, 67:15, 70:17, 76:1, 90:6, 90:25, 104:13, 110:7, 111:5, 111:7, 120:14, 126:23, 127:16, 130:13, 136:22, 141:9, 141:11, 141:18, 142:10, 142:19, 142:20, 143:7, 143:20, 143:21, 143:22, 145:14, 145:15, 145:20, 146:7, 147:21, 148:7, 148:9, 148:24, 149:4, 149:7, 150:24, 153:9, 182:18, 203:15, 203:18, 203:19, 231:14, 235:12, 239:1, 239:5

**weekend** [2] - 15:19, 78:7

**weeks** [6] - 64:17, 127:1, 158:22, 180:21, 182:7, 185:16

**welcome** [6] - 4:6, 102:9, 130:5, 237:1, 237:6, 238:3

**Wendy** [1] - 3:14

**Wessler** [2] - 3:8, 3:12

**whatsoever** [1] - 60:10

**whereby** [1] - 74:22

**White** [4] - 15:13, 150:23, 151:6, 151:16

**whole** [10] - 25:1, 71:4, 103:11, 129:5, 150:10, 185:11, 218:24, 221:18, 224:15, 232:13

**wholesale** [3] - 164:12, 165:1, 167:1

**Wick** [2] - 21:13, 92:16

**wide** [3] - 89:4, 146:5, 222:14

**wide-scale** [1] - 146:5

**widely** [1] - 180:5

**willing** [2] - 67:11, 82:23

**Wilson** [1] - 3:15

**wind** [9] - 53:19, 54:2, 54:15, 55:2, 126:13, 126:20, 126:21, 146:8, 230:1

**wind-down** [3] - 53:19, 54:2, 54:15

**winding** [4] - 54:10, 125:4, 126:9, 147:23

**window** [3] - 27:24, 28:2, 47:5

**wiped** [1] - 150:10

**wish** [1] - 40:15

**withdraw** [1] - 174:1

**withdrawn** [1] - 79:9

**WITNESS** [199] - 9:15, 9:17, 12:7, 17:25, 18:6, 20:3, 20:15, 20:17, 21:4, 21:12, 21:17, 21:24, 22:10, 22:19, 23:9, 23:11, 23:22, 25:24, 26:3, 26:5, 26:10, 26:14, 26:17, 29:12, 31:5, 31:10, 32:13, 32:24, 33:15, 33:21, 33:25, 36:4, 37:5, 39:9, 39:15, 39:22, 43:20, 44:4, 46:19, 46:23, 47:1, 47:4, 47:11, 47:18, 49:19, 49:23, 50:25, 51:17, 51:22, 52:1, 52:4, 52:8, 52:14, 52:17, 52:20, 54:16, 54:19, 54:22, 54:25, 55:5, 55:12, 55:21, 55:23, 56:2, 56:9, 56:17, 56:23, 57:2, 57:15, 57:17, 59:6, 59:11, 59:21, 60:2, 60:6, 60:9, 64:24, 66:2, 66:9, 66:15, 66:23, 67:2, 67:6, 67:22, 68:3, 70:3, 70:17, 70:22, 71:9, 71:11, 71:24, 73:10, 73:13, 73:23, 73:25, 74:10, 74:14, 74:18, 75:23, 76:10, 76:22, 77:1, 77:4, 78:5, 78:7, 80:9, 80:22, 83:3, 85:23, 87:23, 88:2, 88:7, 88:10, 88:14, 90:5, 90:17, 90:24, 91:13, 91:22, 91:25, 92:8, 93:5, 93:12, 93:15, 95:6, 97:6, 97:13, 97:17, 97:24, 98:13, 98:18, 98:21, 98:23, 100:11, 100:15, 101:12, 101:14, 103:1, 103:9, 103:11, 103:18, 107:7, 118:2, 118:5, 119:14, 119:17, 121:14, 121:18, 121:22, 122:1, 122:5, 122:11, 133:2, 135:5, 135:8, 137:8, 137:10, 137:13, 137:16, 137:18, 137:21, 137:23, 138:1, 138:4, 141:4, 144:2, 144:6, 144:13, 144:19, 144:22, 146:15, 149:3, 149:5, 149:8, 149:12,

150:8, 158:22, 161:3, 166:13, 166:16, 170:13, 185:15, 187:1, 191:19, 198:7, 205:21, 205:24, 206:1, 222:1, 222:3, 222:6, 222:10, 225:17, 226:4, 227:10, 227:12, 230:19, 230:22, 234:24

**witness** [20] - 6:17, 6:24, 8:23, 9:5, 38:18, 49:15, 60:13, 61:19, 68:7, 84:2, 84:3, 102:6, 108:2, 122:6, 136:12, 172:10, 173:12, 194:9, 227:6, 235:18

**witness's** [1] - 160:12

**witnesses** [11] - 4:21, 4:24, 5:12, 6:22, 13:3, 194:10, 233:14, 233:17, 233:20, 235:5, 235:6

**Women** [1] - 222:24

**wondered** [1] - 104:7

**wonderful** [1] - 10:13

**Wonderful** [1] - 9:17

**wondering** [1] - 27:15

**word** [2] - 54:5, 144:17

**wording** [1] - 174:24

**words** [3] - 49:14, 72:3, 219:10

**work-hold** [1] - 73:9

**workforce** [5] - 29:9, 47:13, 64:18, 120:22, 143:4

**workings** [1] - 23:1

**works** [4] - 42:9, 43:3, 43:4, 169:1

**worries** [1] - 195:6

**worthwhile** [2] - 121:17

**wrap** [2] - 40:24, 43:8

**wrapped** [1] - 22:22

**write** [5] - 113:19, 225:21, 237:2, 238:20, 238:21

**writing** [1] - 32:19

**wrote** [5] - 61:2, 72:11, 82:15, 110:3, 200:2

**WW** [1] - 215:16

## X

**XO** [1] - 122:21

## Y

**year** [8] - 12:3, 45:18, 51:21, 51:22, 51:23, 69:16, 121:20, 159:25

**years** [7] - 13:19, 45:20, 45:25, 70:6, 160:5, 228:19
**yesterday** [3] - 96:17, 213:17, 216:5
**York** [1] - 44:15
**Young** [11] - 20:11, 21:12, 21:19, 27:6, 29:18, 41:25, 42:6, 64:9, 137:20, 151:10, 151:24
**young** [3] - 20:23, 25:8, 101:20
**yourself** [3] - 4:9, 175:4, 222:5
**yourselves** [1] - 233:19

## Z

**zero** [3] - 36:11, 36:14, 36:17
**zeroing** [1] - 40:11
**Zieve** [1] - 3:14