```
 1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLUMBIA
 2

 3    National Treasury Employees    )
      Union, et al.,                 )  Civil Action
 4                                   )  No. 25-cv-381
                      Plaintiffs,    )
 5                                   )  EVIDENTIARY HEARING
      vs.                            )
 6                                   )  Washington, DC
      Russell Vought, et al.,        )  March 11, 2025
 7                                   )  Time:  10:18 a.m.
                      Defendants.    )
 8    _____

 9             TRANSCRIPT OF EVIDENTIARY HEARING
                         HELD BEFORE
10        THE HONORABLE JUDGE AMY BERMAN JACKSON
                 UNITED STATES DISTRICT JUDGE
11    _____

12                    A P P E A R A N C E S

13    For Plaintiff:    Deepak Gupta
                        Robert D. Friedman
14                      GUPTA WESSLER LLP
                        2001 K Street, NW
15                      Suite 850 North
                        Washington, DC 20006
16                      (202) 888-1741
                        Email:  Deepak@guptawessler.com
17                      Email:  Robert@guptawessler.com

18                      Jennifer D. Bennett
                        GUPTA WESSLER LLP
19                      505 Montgomery Street
                        San Francisco, CA  94111
20                      (415) 573-0335
                        Email:  Jennifer@guptawessler.com
21
                        Allison Marcy Zieve
22                      Wendy Liu
                        PUBLIC CITIZEN LITIGATION GROUP
23                      1600 20th Street, NW
                        Washington, DC 20009
24                      (202) 588-1000
                        Email:  Azieve@citizen.org
25                      Email:  Wliu@citizen.org
```

```
1    For Defendant:          Brad P. Rosenberg
                             U.S. DEPARTMENT OF JUSTICE
2                            1100 L Street, NW
                             Washington, DC 20005
3                            (202) 514-3374
                             Email:  Brad.rosenberg@usdoj.gov
4    _____

5    Court Reporter:         Janice E. Dickman, RMR, CRR, CRC
                             Official Court Reporter
6                            United States Courthouse, Room 6523
                             333 Constitution Avenue, NW
7                            Washington, DC  20001
                             (202) 354-3267
8
                                  *   *   *
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1        *   *   *   *   *   *  *P R O C E E D I N G S*  *   *   *   *   *   *

2              THE COURTROOM DEPUTY:  We are on the record with

3     Civil Case 25-381, National Treasury Employees Union, et al.,

4     versus Russell Vought, et al.

5              Counsel, starting with plaintiff, please state your

6     appearance for the record.

7              MR. GUPTA:  Good afternoon, Your Honor.  Deepak Gupta

8     for the plaintiffs.  At counsel table are Jennifer Bennett,

9     Gabriel Chess, and Robert Friedman of Gupta Wessler, and Alison

10    Zieve and Wendy Liu for Public Citizen Litigation Group.

11             THE COURT:  All right.  Good afternoon.

12             MR. ROSENBERG:  Good afternoon, Your Honor.  Brad

13    Rosenberg from the Department of Justice Civil Division,

14    Federal Programs Branch, on behalf of the United States.  And

15    with me at counsel's table is Liam Holland, also with the

16    Federal Programs Branch.

17             THE COURT:  All right, everybody.  We are going to

18    complete the testimony of Mr. Martinez.  I believe we are up to

19    the punchy redirect, which will not need to repeat the direct

20    because we have a court reporter, and I was taking notes, too.

21    And then we will -- the plaintiffs are going to put on

22    Mr. Pfaff, yes?  Is that still the plan?

23             MS. BENNETT:  (Nods head.)

24             THE COURT:  Who I want to hear about the current

25    status of the consumer response.
```

```
 1              And, then, are you still planning to call someone
 2     that provided a Doe declaration or was the substance of that
 3     declaration covered in your cross-examination of Mr. Martinez?
 4              MR. GUPTA:  That is still our plan, Your Honor, to
 5     call them.
 6              THE COURT:  Okay.  All right.  My goal is to finish
 7     this up this afternoon.  So I don't see why we can't do that.
 8              So, Mr. Martinez, you can return to the witness
 9     stand, you're still under oath.
10              And, Mr. Rosenberg, please proceed.
11                         REDIRECT EXAMINATION
12     BY MR. ROSENBERG:
13     Q.  Welcome back.
14     A.  Thank you.
15     Q.  Yesterday you provided testimony about various committees,
16     advisory committees at CFPB.  And I believe you were asked
17     about the status of those committees and indicated that you
18     wanted to provide a more fulsome answer, and opposing counsel
19     indicated you would have a opportunity to do so.  Do you recall
20     that exchange?
21     A.  I do, I do.
22     Q.  Please go ahead with the answer that you were going to
23     provide.
24              THE COURT:  Can we have the question first?  And then
25     his answer.
```

```
 1    BY MR. ROSENBERG:

 2    Q.  What was the answer that you were going to provide?

 3              THE COURT:  What is the question that you're asking

 4    him to answer?

 5              MR. ROSENBERG:  I don't have a transcript from

 6    yesterday, but my recollection is that he was asked about the

 7    status of various advisory committees and similar organizations

 8    such as advisory boards at CFPB, including the elimination or

 9    termination of some of those advisory committees and advisory

10    boards.

11              THE COURT:  All right.  Go ahead.

12              THE WITNESS:  Thank you.  My clarification on that

13    specific question was that we received a request for all four

14    FACA councils to be canceled, and those came directly from the

15    General Services Administration as a mandate to cancel those.

16    We did push back with one that was specifically statutorily

17    required.  The other three we did comply with because in the --

18    in the -- in the actual charters, it was clear that they were

19    discretionary councils.  But that did not come directly from

20    the CFPB leadership, that came directly from GSA.

21              THE COURT:  I don't understand what GSA has to do

22    with committees.  I understand what it might have to do with

23    buildings.

24              THE WITNESS:  The General Services Administration

25    actually manages the FACA program for the US.
```

```
 1              THE COURT:  Do you want to tell me what that stands

 2      for?

 3              THE WITNESS:  I actually don't know.

 4              THE COURT:  Okay.  All right.  Do you?

 5              MR. ROSENBERG:  I think he said FACA, were you

 6      referring to the Federal Advisory Committee Act?

 7              THE WITNESS:  Yes.  Thank you.

 8      BY MR. ROSENBERG:

 9      Q.  You mentioned there was one committee that was statutorily

10      required.  Do you recall which one that was?

11      A.  That was the advisory board.  That's in statute.

12      Q.  Last question on this topic.  What do they do?

13      A.  They advise the head of Agency and the CFPB on

14      CFPB-specific issues.

15      Q.  Okay.  I'm going to ask you to turn to the binder that

16      contains the defendant's exhibits.

17              THE COURT:  Have they met to advise anybody about

18      anything?

19              THE WITNESS:  Not currently.  Or recently.

20              MR. ROSENBERG:  And for the record, this is the

21      binder of defendant's exhibits, which has the numbered tabs.

22      We did file earlier today an exhibit list that describes the

23      exhibits by both description -- both by description, Bates

24      number, and ECF number.

25              THE COURT:  Great.
```

1    BY MR. ROSENBERG:

2    Q.  I'm going to ask you to turn to tab 4, please.  And just to

3    be clear, this is CFPB_00006.

4    A.  Yes.

5    Q.  Do you recall being asked about this document during your

6    cross-examination yesterday?

7    A.  Yes.

8    Q.  Do you have an understanding as to how the contracts that

9    are described in this document were identified for termination?

10   A.  My recollection is these specific contracts were identified

11   by the DOGE folks, and they provided the instruction to have

12   these terminated.

13   Q.  Okay.  And this email came from Mr. Paoletta on

14   February 11th?

15   A.  That is correct.

16   Q.  Do you recall --

17               THE COURT:  He's not a DOGE folk.

18               THE WITNESS:  No.

19   BY MR. ROSENBERG:

20   Q.  Do you recall when Mr. Paoletta started working at CFPB?

21   A.  I did not have any interaction with him until approximately

22   Monday, the 10th.

23   Q.  Do you have any understanding as to Mr. Paoletta's

24   understanding of the scope of CFPB operations at the time that

25   this email was issued?

```
 1    A.  No.

 2              THE COURT:  You don't know what his understanding

 3    was; is what you're saying?

 4              THE WITNESS:  Correct.  Yes, ma'am.

 5    BY MR. ROSENBERG:

 6    Q.  And Mr. Paoletta started reinstating many of these

 7    contracts shortly thereafter?

 8    A.  He did.

 9    Q.  Do you have an understanding as to why Mr. Paoletta started

10    reinstating many of these contracts shortly thereafter?

11              THE COURT:  What does "shortly thereafter" mean?

12              THE WITNESS:  Shortly thereafter would have -- would

13    have been within days of the 11th.

14              THE COURT:  So there were some that were reinstated

15    within days of the 11th?

16              THE WITNESS:  I recall, yes, or there was at least an

17    order to halt and give some assurance that they were not going

18    to be closed or terminated.

19    BY MR. ROSENBERG:

20    Q.  I'd like you to turn to tab No. 39.

21              Do you recall providing testimony yesterday about this

22    document?

23    A.  Yes.

24    Q.  It was during your cross-examination, if I recall

25    correctly; is that right?
```

1    A.   That's correct.

2    Q.   Okay.  Per this email, the IntelliTrack contract was

3    reinstated; is that your understanding of what happened?

4    A.   It was.

5    Q.   And in the email, the chief financial officer asks for a

6    justification to turn contracts back on based on what is

7    statutorily required.  In other words -- and what can't be

8    accomplished without the underlying contract.  Do you

9    understand the chief financial officer's email to be reflecting

10   that?

11   A.   Yes.

12   Q.   And do you understand that the IntelliTrack contract did

13   not involve something that is consumer facing?

14   A.   That is correct.

15   Q.   And I believe you provided testimony during your

16   cross-examination yesterday that the CFO has not yet provided

17   guidance on contracts that are necessary to carry out a

18   statutory function.  In other words, you can't carry it out

19   without the contract, versus those that might relate to a

20   statutory function but aren't necessary.  Do you recall that

21   testimony?

22   A.   I do.

23   Q.   Do you have an understanding as to why the chief financial

24   officer is conducting that analysis?

25   A.   Because -- because not all contracts should be turned on --

1    back on.  There -- there may be some discretionary contracts

2    that have been identified over the past couple of years that we

3    may not turn back on.

4    Q.  Do you know whether the chief financial officer is a --

5    conducting a similar case-by-case analysis for other contracts?

6    A.  Yes.

7    Q.  And is that analysis separate from the contracts that

8    Mr. Paoletta has already reinstated?

9    A.  Yes.

10    Q.  One last question on contracts.  You were asked various

11    questions about specific individual contracts and the data that

12    third-party contractors may possess?

13    A.  Yes.

14    Q.  What is your scope of knowledge regarding data held by

15    third-party contractors to CFPB?

16    A.  If they follow the normal procurement process, there are

17    terms and conditions in those contracts that require that the

18    vendor return data back to the government who owns it.

19    Q.  I would like to change topics to work that's taking place

20    at CFPB.  Do you recall being asked during your

21    cross-examination yesterday about what plaintiffs refer to as

22    the acting director's stop-work order and whether it has been

23    rescinded?

24    A.  Yes.

25    Q.  And that -- what plaintiffs refer to as the stop-work order

1    is the email the acting director sent on Monday, February 10th?

2    A.  Yes.

3    Q.  That email did contain exceptions for urgent matters; is

4    that your understanding?

5    A.  My understanding was that our executive or staff could

6    reach out to either Acting Director Vought or Mark Paoletta if

7    they had questions.

8    Q.  Was the February 10th email from the acting director

9    sent -- directing people to contact Mark Paoletta regarding

10   urgent matters sent only to CFPB managers, or was it sent to

11   all CFPB employees?

12   A.  All employees.

13   Q.  And do you know whether people did, in fact, start to reach

14   out to Acting Director Paoletta right away regarding urgent

15   matters?

16   A.  There were -- I recall -- I mean, I was one of them, yes.

17   I definitely reached out for clarification, given our

18   operational infrastructure needs.  But I recall there was at

19   least one or two others that reached out initially.

20   Q.  Was Jason Brown regarding the average prime offer rates --

21   A.  That was one of the ones, absolutely, that he reached out

22   on.

23   Q.  And Christopher Johnson, who is the head of office of

24   consumers --

25              MS. BENNETT:  Objection.  Leading.

1          THE COURT:  Well, let him finish the question.

2    BY MR. ROSENBERG:

3    Q.  Christopher Johnson, who is the head of the Office of

4    Consumer Response, did he contact you that same day about

5    contracts in support of CFPB's consumer resources center?

6    A.  He did.

7    Q.  Did you make sure that the resource center remained

8    operational?

9    A.  Based on the minimal requirements that he provided, yes.

10          THE COURT:  What does that mean?

11          THE WITNESS:  Keeping the lights on, ensuring that

12    the system didn't go down, the system would maintain its status

13    quo, that it didn't come off the website, there were --

14          THE COURT:  So system was physically operational?

15          THE WITNESS:  Correct.

16          THE COURT:  That doesn't have anything to do with

17    stopping work, does it?

18          THE WITNESS:  No.

19          THE COURT:  Okay.

20    BY MR. ROSENBERG:

21    Q.  Is that what Mr. Johnson asked for in that initial request?

22    A.  I don't -- I -- I would have to look.  I'm sorry, I would

23    need to look at the email.

24    Q.  Give me one moment.

25          All right.  I would like to ask you to turn to tab

1    No. 2.  And this is CFPB_00003.

2    A.  Yes.

3    Q.  And this is an email from Mr. Johnson to you, among many

4    others, on Monday, February 10th?

5    A.  That's correct.

6    Q.  That's the same day that the acting director sent his

7    email?

8    A.  That's correct.

9    Q.  Okay.  Does this document refresh your recollection as to

10   the scope of Mr. Johnson's request?

11   A.  It does.

12   Q.  Okay.  And was that request approved?

13   A.  It was.

14   Q.  And did he have subsequent requests regarding operations?

15   A.  He did.  He -- later on he did.  He did reach out directly

16   to Mark Paoletta.

17   Q.  Right.

18       And over time, those subsequent requests were approved,

19   correct?

20   A.  Yes.

21   Q.  And, in fact, Mr. Johnson didn't introduce himself to

22   Mr. Paoletta until, I believe, it was February 26th?  Does that

23   seem right to you?

24   A.  That sounds correct.

25   Q.  Well, let's take a look at tab No. 9.

1          THE COURT:  And was the building closed during that

2     period of time?

3          THE WITNESS:  The building was closed.

4     BY MR. ROSENBERG:

5     Q.  Tab No. 9, which is CFPB_00016 through 00019.

6     A.  Yes.

7     Q.  I would like you to take a look at the -- on the first

8     page, which is CFPB_00016, there's an email from Mr. Johnson to

9     Mr. Paoletta on Wednesday, February 26th, at 11:01 a.m.  Can

10    you take a look at that first paragraph?

11    A.  Yes.

12    Q.  So based on that, reading that paragraph, is it your

13    understanding that that was the first time that Mr. Johnson

14    reached out directly to Mr. Paoletta?

15    A.  Directly to Mr. Paoletta, yes.

16    Q.  Okay.  And his request was approved in that email exchange

17    as well?

18    A.  It was.

19    Q.  Are you aware of Mr. Paoletta ever denying a work request?

20    A.  I don't recall Mr. Paoletta denying requests, but I recall

21    Mr. Paoletta letting employees know that he needed to get back

22    to them.

23    Q.  And you sent an email out on February 27th.  Do you recall

24    your testimony about that yesterday?

25    A.  Well, multiple emails, yes.

1    Q.  Yeah.

2        And the emails to which I'm referring, to be clear, are

3    emails directing people to -- let me pull it up -- directing

4    people to ensure that they're carrying out their functions; is

5    that fair?

6    A.  Yes.

7    Q.  And then, subsequently thereafter, Mr. Paoletta sent out

8    his email on March 2nd, and that's in tab No. 24.  So I'm going

9    to ask you to turn to that.

10       Do you have an understanding, based on Mr. Paoletta's

11   email, as to why he sent out this email?

12            THE COURT:  Did you have personal knowledge as to why

13   he sent out this email?

14            THE WITNESS:  Yes.

15            THE COURT:  How do you have that personal knowledge?

16            THE WITNESS:  I spoke -- I had a conversation with

17   him about it.

18            THE COURT:  Okay.  What did you ask?  How did that

19   come up?  What did you do?

20            THE WITNESS:  It came up because when I -- what was

21   very, very clear to me was that people were not reaching out to

22   Mark Paoletta for questions about statutory work, and that's

23   what prompted my emails to my peers to say, "You may want to

24   reach out to Mark."

25            There was something clearly wrong.  So, I tried to

1    help folks get them to reach out to Mark.  And when I had a

2    subsequent conversation with Mark, Mark became very clear at

3    that point that work had literally stopped in many of these

4    areas.

5              THE COURT:  I'm sorry.  Mark made it clear or you

6    made it clear?

7              THE WITNESS:  I made it clear to Mark that it was

8    very, very clear that people had stopped work.

9              THE COURT:  And you say it was clear to you that

10   people weren't reaching out to him, that's because people were

11   reaching out to you, they knew.

12             THE WITNESS:  They were -- they were either reaching

13   out to me or they were coping me on those emails.

14             THE COURT:  Okay.  All right.  Ask your next

15   question.

16   BY MR. ROSENBERG:

17   Q.  Actually, I want to follow up on that because you

18   said that -- or you inferred that Mr. -- that people were not

19   reaching out to Mr. Paoletta.  Do you have any understanding as

20   to whether prior to this conversation Mr. Paoletta believed

21   that people were reaching out to him as appropriate?

22   A.  He didn't indicate whether people were reaching out to him

23   directly.  But I -- he was only aware of the -- my

24   recollection, he was only aware of the emails that I was copied

25   on.

1    Q.  Was he surprised when you told him that people were not

2    reaching out to him?

3    A.  I -- yeah.  Yes.  I literally said, "Mark, People stopped

4    working."

5    Q.  And he was surprised by that?

6    A.  He genuinely seemed surprised about that.

7    Q.  And Mr. Paoletta's March 2nd email, still on tab 24, refers

8    to both the acting director's February 8, 2025, email and the

9    February 10, 2025, email?

10   A.  Correct.

11   Q.  Now, you testified, I believe, yesterday, that Acting

12   Director Vought's February 10th email has not been rescinded.

13   Do you recall that testimony?

14   A.  Yeah, yes.

15   Q.  When providing that testimony, did you take into account

16   Mr. Paoletta's March 2nd email, which referenced Acting

17   Director Vought's email?

18   A.  I did not take this email into account; that is correct.

19           THE COURT:  Does the email rescind the 2-10 email?

20           THE WITNESS:  It clarifies.  It --

21           THE COURT:  Okay.  I mean, I think -- it's -- they

22   say what they say, and you're asking him how to read it or her

23   asking him how to read it.  It says what it says.  And we'll

24   have to figure out what it says.

25   BY MR. ROSENBERG:

1    Q.  Let me just ask one follow up on this.

2         When you refer to "rescind," were you thinking of a

3    recision in a formal manner, coming from the actor director

4    himself?

5    A.  Yes.

6    Q.  How many emails has the acting director sent out after

7    February 10th to all hands at CFPB?

8    A.  After the 10th, I don't recall seeing any emails.

9    Q.  Now, if either you or Mr. Paoletta authorized the

10   resumption of work, who was ultimately responsible for ensuring

11   that the work is actually resumed?

12   A.  That would be the head of Agency.

13   Q.  What do you mean "the head of Agency"?

14   A.  That would be the acting director.

15   Q.  Do the managers or division heads or assistant directors

16   have responsibility to ensure that their offices are operating

17   pursuant to the guidance that they receive?

18   A.  Of course.

19   Q.  Okay.  So let's turn to tab 32.

20             THE COURT:  32, did you say?

21             MR. ROSENBERG:  32.  CFPB_00079 through -81.

22   BY MR. ROSENBERG:

23   Q.  Do you recall providing testimony yesterday about this

24   document?

25   A.  Yes.

1    Q.  Okay.  And I'll direct you to the middle paragraph.  I

2    think we know who Christopher Johnson is.  He is the associate

3    director of the Division of Consumer Response and Education.

4    And this is an email from to DL_CFPB_CRE_All.  Is that to

5    basically all CRE employees?

6    A.  All of his employees, yes.

7    Q.  Okay.  And does this email operationalize the guidance that

8    he received from Mr. Paoletta regarding the resumption of

9    activities?

10    A.  To the staff, yes.

11    Q.  Is that typical for CFPB operations, for the heads of

12    components or sections to ensure that the components or

13    sections for which they're responsible are actually operating?

14    A.  That would be normal, yes.

15    Q.  Now, yesterday you provided testimony that many of CFPB's

16    operations have resumed.  Do you still stand by that testimony?

17    A.  Operations, in terms of, like, the work that my team does

18    or --

19    Q.  The operations across different functions of the Agency.

20    A.  Oh.  Both programmatic and operationally?

21    Q.  Yes.

22    A.  Yes, yes.

23    Q.  And yesterday you also testified about your state of mind

24    during the week of February 10th to the 14th.  Do you recall

25    that?

1    A.  Yes.

2    Q.  And I forget, because I don't have the transcript, the

3    exact language that you used, but it was a -- I think you may

4    have said or referred to the difficulty that the Agency would

5    face in reassuming its operations or, you know, an end state.

6    Am I recall that testimony correctly?

7    A.  Yes.

8    Q.  But you also testified yesterday that you have hope for the

9    Agency.  What's changed?

10   A.  A lot has changed.  A lot has changed.  It was very

11   frightening that first week.  It was not anything that I had

12   seen before.  It's not something I would expected to have seen

13   before in government.  It just simply was not normal, and the

14   rapidness of the way that it was occurring was overwhelming.

15        And I now realize how much damage can be done with --

16   just within a couple of days to an organization.  And my

17   concern was, was that some of what we were directed to do by

18   DOGE was potentially irreparable from the operational

19   perspective.  I mean, you -- you can't just -- there was -- it

20   was -- it was like rapid fire, it was -- I have referred to

21   this, and this is probably not -- I know yesterday I used the

22   word "mergers and acquisitions," but when I've studied human

23   capital, you often talk about hostile takeovers, and that's

24   what it felt like in that first week.

25   Q.  You've interacted --

1          THE COURT:  Well, you describe it as a hostile

2     takeover, but didn't you also testify that those DOGE people

3     were installed.

4          THE WITNESS:  They were.

5          THE COURT:  Now, as people running the CFPB by not an

6     outside force, but by Acting Director Vought.

7          THE WITNESS:  Yes.

8          THE COURT:  Okay.

9     BY MR. ROSENBERG:

10    Q.  Now, during the -- that -- from that time period to today,

11    have you interacted a great deal with Mark Paoletta?

12    A.  I've interacted mostly with Mark Paoletta.

13    Q.  Do you have an understanding as to his knowledge of the

14    Agency's functions when he first became the chief legal officer

15    versus his knowledge of the Agency's functions today?

16    A.  I would say it's very different.

17    Q.  How?

18    A.  At the very beginning, I believe -- my impression was that

19    he was trusting the DOGE folks that work in-house.  Once he

20    became more aware of our statutory requirements, he became more

21    aware of the operations of the organization, once he was

22    spending more time on our portfolio, he started to ask a lot of

23    questions.

24    Q.  Now, you referred to -- I want to go back to the hope

25    because you discussed, I think, the -- where you believe the

1    Agency was during that week of February 10th to 14th.  Seems

2    like you're in a different place now.  So I'm wondering, is --

3    in terms of the repairability of CFPB's operations, is CFPB

4    making an attempt to repair those operations?

5    A.  Yes.  I would say through the -- I mean, there's a couple

6    of things.  One is the RIF did not occur, fortunately.  And

7    then we received guidance from OMB on providing a roadmap to

8    the rest of the government on how to restructure or reshape the

9    federal workforce through their guidance.  That, to me, seemed

10   likely much more appropriate way to handle a change through

11   change management.

12          And I was advised by Mark to follow the guidance that

13   his boss, through OMB, had issued to the workforce.  That to

14   me, signified personally that we would have the ability to work

15   with our management, to determine what the needs were to get

16   some of the work done -- get the statutory-required work done

17   for the Agency, but I was also concerned that we also had not

18   followed collective bargaining rights for our union.  And this

19   process allows us to do that.  It also provides us the

20   opportunity to consider incentive programs for employees to

21   leave the Agency, if they choose to do that on their own; early

22   buyouts, if they choose to go that avenue.  It just provides a

23   more normalized, under the circumstances, approach.

24          THE COURT:  To reducing the number of people that

25   work there?

1          THE WITNESS:  Correct.  And it was, obviously,

2     helpful, as I pointed out yesterday, to see that the

3     requirement requires that we look at statutory requirements, we

4     look at the workforce itself, we look at the budget itself.

5     Those are all the things I would typically expect to see in any

6     type -- any type of government organization or reorganization.

7          The other thing that's happened that we've talked a

8     lot about the last couple of days is around the contracts being

9     reinstated.  I know it's not perfect, and it's incredibly

10     sloppy, the way that it occurred and how we're getting

11     contracts turned on.  If there's anything positive out of any

12     of this, it's that we have a better understanding and an

13     inventory of what the cause and effect could be in the future

14     for turning off specific contracts and the devastation it could

15     have on the Agency.  So we have a lot more information today

16     than we had before that.

17          And all of this is happening through adults at the

18     table that were able to interact with that understands how

19     government is supposed to run and is savvy enough to know the

20     consequences of not following normal government protocol,

21     which, in my opinion, is the public, its accountability with

22     the public, obviously with the court system, but Congress as

23     well.

24          THE COURT:  But I thought you told me yesterday that

25     while this is not being done in as rushed a fashion, it's not

1    being done in as -- an ill-informed fashion, but there are

2    grownups looking at things and figuring out how do you do this

3    in a logical, appropriate way.  The end game is to end up with

4    no CFPB, and the very important functions, they will go

5    somewhere else.

6              THE WITNESS:  That was the week of the 10th.

7              THE COURT:  Well, I thought the week of the 10th was

8    just no CFPB.  But I thought you're saying, they're still

9    talking about how do we get rid of the employees -- we're going

10   to keep the contracts we need until this is done, but how do we

11   get this down so that whatever has to be gone to some other

12   agency can go, but we're not going to be here?

13             THE WITNESS:  The week of the 10th, that was

14   absolutely correct.  But the other question --

15             THE COURT:  All right.  Well, yesterday I got the

16   distinct impression that you were saying they're doing it in a

17   much more methodical fashion, but that's the goal.

18             THE WITNESS:  The goal, as I understand -- I don't

19   have what the end goal is for this team right now.

20             THE COURT:  Okay.  So you don't know.

21             THE WITNESS:  I don't know.

22             THE COURT:  Okay.

23             THE WITNESS:  I don't know.  I don't know.  I -- what

24   I know is that we have OMB guidance that we've been directed to

25   follow, and I don't know what they're going to mandate as part

1    of that.  I just -- I have absolutely no clue what the end

2    result is for the Bureau.

3    BY MR. ROSENBERG:

4    Q.  Do you have any understanding as to whether there are

5    ongoing discussions about that topic?

6    A.  Not with me.

7    Q.  But is your -- and this is, I think, the last question.

8    Based on the tasks that you've -- that you've been performing

9    regarding the resumption of Bureau activities, resumption of

10   contracts, and attempts to comply with the OMB, OPM memo, do

11   you believe that current leadership at CFPB is committed to

12   fulfilling the Agency statutory functions?

13   A.  That is my understanding.  That is my understanding.  I

14   don't know how, but that is my understanding.  It's not been

15   discussed with me how they're going to do that.  But that --

16   that is what I understand.

17   Q.  They might go to Congress, for example?

18   A.  Yeah.  They could.  And we have a -- as I mentioned

19   yesterday, we have a new director coming in very soon who may

20   have an entirely --

21           THE COURT:  There's been no ongoing discussions with

22   you?

23           THE WITNESS:  Yes, ma'am.

24           THE COURT:  Okay.  He doesn't know.  I'm not saying

25   that you can't prove that, but you can't prove it through him.

1          MR. ROSENBERG:  And I'll just note that it's the

2     plaintiffs' burden of proof.

3          THE COURT:  Okay.  Well, you asked the question.

4          MR. ROSENBERG:  But I think -- I think I'm done.  So

5     I would like to thank you very much for your time.

6          THE COURT:  Okay.  All right.  You're looking like

7     you're planning to get up.

8          MS. BENNETT:  Can we do short recross?

9          THE COURT:  Very short.  I mean, I think you did a

10    very lengthily and thorough cross.  So you don't need to ask

11    him anything you already asked him, even if you think it

12    undermines what he said today.  So direct yourself just to what

13    their redirect was.

14                          RECROSS-EXAMINATION

15    BY MS. BENNETT:

16    Q.  So I just want to ask you a couple of questions about the

17    contracts.

18    A.  Yes.

19    Q.  Can you turn to Bates stamp in the CFPB binder 7 -- pages 7

20    and 8.  This is tab 5.

21    A.  Yes.

22    Q.  And this is an email from you to Sonya White, yes?

23    A.  Yes.

24    Q.  It's a deputy general counsel?

25    A.  Yes.

```
 1    Q.  And Mark Paoletta is CCed on this email?

 2    A.  Yes.

 3    Q.  And you're activating the legal division to do a handful of

 4    operational matters, yes?

 5    A.  Yes.

 6    Q.  And it's sent on February 21, 2025, yes?

 7    A.  That is correct.

 8    Q.  And one of the things they're being activated to do is

 9    procurement contract actions?

10    A.  Yes.

11    Q.  Okay.  And below that, this chain was started with an email

12    from Sonya White, who again is the deputy general counsel,

13    right?

14    A.  Yes.

15    Q.  To you?

16    A.  Yes.

17    Q.  And the contract action they're being asked to get

18    permission to work on is a contract termination template,

19    right?

20    A.  That's what she asked, yes.

21    Q.  Okay.  And then can you turn to Bates stamp 40, please.

22    That is tab 19.  It's, again, CFPB Bates stamp 40.  And this is

23    an email from Vanessa Del Torro.

24    A.  Yes.

25    Q.  Who is a contracting officer?
```

1    A.  Um-hum.

2    Q.  And it was sent on February 28, 2025?

3    A.  Yes.

4    Q.  And you're aware, that's after we entered an agreement to

5    pause any contract termination actions, at least until -- I

6    think it was for a week at that time?  Yes?

7    A.  Based on your timeline yesterday, yes.

8    Q.  Okay.  And you're not on this email, right?  But it was

9    forwarded to you.  If you look up to the next email in the

10   chain, you're on this chain, so you've seen this email?

11   A.  It was.

12   Q.  Okay.

13   A.  It was.

14   Q.  And what this email says is, "We stopped doing the

15   modification to terminate," right?

16   A.  Yes.

17   Q.  So they were in the process of finalizing contract

18   terminations and they stopped the finalization process?

19   A.  It was in the 30 -- 30-day window, yeah.

20   Q.  Yes, okay.

21        So after we have the agreement, they stopped the

22   modification.  And then it says, "We have mostly sent out the

23   stop-work termination notices," right?

24   A.  Yes.

25   Q.  And it doesn't say anything about how many have been

1    rescinded or anything like that, right?

2    A.  No.

3    Q.  And then it says, "Some vendors that were asked to turn

4    back on operations were able to, but others cannot be turned on

5    so easily," right?

6    A.  Yes.

7    Q.  And the reason is, I think from your knowledge, as

8    overseeing procurement, one reason is that contractors, when

9    you send a stop-work notice or a notice of termination, they

10   reassign their contractors to something else, right?

11   A.  Absolutely.

12   Q.  Or reassign the systems to something else, yes?  For

13   example, they might stop maintaining the software that they

14   were using?

15   A.  Stop maintaining the software would be accurate, yes.

16   Q.  Okay.  And then it also says, "Because we sent stop-work or

17   termination notices as directed by those above us, that also

18   means that the vendor does not necessarily have to comply,"

19   right?

20   A.  They could pull out, yes.

21   Q.  Okay.  So if the contracts were -- if those final

22   termination modifications were entered, there would be no way

23   to get that contract back, right, once it gets finally

24   terminated?

25               MR. ROSENBERG:  Objection.  Calls for speculation.

```
1              THE COURT:  If he knows.

2    BY MS. BENNETT:

3    Q.  Do you know, as the person who oversees procurement,

4    whether once a contract termination is finalized whether it has

5    to go through the procurement process again before getting

6    turned back on?

7    A.  It would have to be re-competed again, yes.

8    Q.  Understood, okay.

9              Then just maybe, I think, two more questions.  If you

10   could turn to CFPB 3, which is tab 2 of the defendant's binder.

11   I think we've talked about this email a lot back and forth.  I

12   just want to confirm one question.  This request from Chris

13   Johnson that you're CCed on, you're aware that all of the

14   contracts that he requested stay on were actually sent

15   termination notices, right?

16   A.  That's what I understand.

17   Q.  Okay.  And then on CFPB 19, which I will give you the tab

18   for as soon as I find it.  So tab 9.  You're there before me.

19             So, you talked -- on redirect, you were talking about

20   the top of this email chain at CFPB 16, right, which is an

21   exchange on the 27th of February?

22   A.  Yes, um-hum.

23   Q.  Let's go to the end of that chain, so that's CFPB 19.  And

24   this is an email that you're CCed on, right?

25   A.  Yes.
```

1    Q.  From Christopher Johnson?

2    A.  Yes.

3    Q.  And he's, again, the associate director of consumer

4    response and education, right?

5    A.  Yes.

6    Q.  And this email identified teams and functions that he

7    thought were aligned to the division statutory mandates, right?

8    A.  Yes.

9    Q.  And he sends this email on February 13, 2025, right?

10   A.  To a different -- different group of people, yes.

11   Q.  You're CCed on it, right?

12   A.  Yes.

13   Q.  And so are you aware of anybody getting back to him before

14   the 27th?

15   A.  I'm not aware of any conversation -- I understand -- I

16   recall the conversation -- I was the one that connected Chris

17   Johnson with these two individuals to have a discussion to talk

18   about his program needs.

19   Q.  Okay.  So you're not aware of what happened in the interim,

20   all you're aware of is you got -- you were CCed on an email

21   requesting authorization for an identified population of

22   people, right?

23   A.  Population --

24   Q.  Sorry.  That was a terrible question.

25        What you know is on February 13th, you're CCed on an

1    email from Chris Johnson saying, "This is the group of people I

2    think we need to do statutorily authorized work"?

3    A.  Um-hum.

4    Q.  And the next thing you're aware of is on the 27th, Mark

5    Paoletta says, "Yes," in this.

6    A.  (No response.)

7    Q.  Yes?  I think you have to audibly answer for the court

8    reporter.

9    A.  I didn't know if he was going to object or -- or have a

10   question.

11   Q.  Oh.  Got it.

12   A.  Yes, that is correct.

13   Q.  Okay.  And that's in this flurry of February 27th emails?

14   A.  That is correct.

15   Q.  Okay.  And I just want one more thing -- to make one more

16   thing clear, which is, you're not aware of whether Mark

17   Paoletta was getting requests that he ignored in the interim,

18   are you?

19   A.  Unless -- no.  No.  Unless I was copied on the email or

20   somebody said something, no, I'm not aware of what people

21   reached directly out to him, yeah.

22   Q.  Yeah.

23        So you just don't know?

24   A.  I don't know.

25   Q.  Okay.  No further questions.  Thank you very much.

```
 1    A.  Thank you.

 2              THE COURT:  All right.  Thank you very much.

 3              THE WITNESS:  Thank you, Judge.

 4              THE COURT:  You may step down.  You are excused.

 5              The government has no additional witnesses to call;

 6    is that correct?

 7              MR. ROSENBERG:  No additional witnesses, Your Honor.

 8              THE COURT:  All right.  Plaintiffs can call their

 9    witness.

10              MS. BENNETT:  We would like to call Alex Doe first,

11    if that's all right.

12              THE COURT:  You can call whoever you want to call.

13              MS. BENNETT:  Great.  We would like to call Alex Doe.

14    I will go to the witness room.

15              (Pause.)

16                         ALEX DOE,

17    was called as a witness and, having been first duly sworn, was

18    examined and testified as follows:

19                      DIRECT EXAMINATION

20    BY MR. GUPTA:

21    Q.  Good afternoon.  Thank you for being here.

22              THE COURT:  Before you begin, I just want to let you

23    know that you need to direct that microphone close to you

24    because your chair doesn't move, but it does.  And then try to

25    speak into it.  Thank you.
```

1          THE WITNESS:  Thank you.

2     BY MR. GUPTA:

3     Q.  Did you previously provide testimony to this Court in the

4     form of a declaration?

5     A.  I did.

6     Q.  And you did that under a pseudonym, correct?

7     A.  I did.

8     Q.  And can you explain to the Court why you provided that

9     testimony under a pseudonym?

10    A.  Even whistleblower protections, I feared identification and

11    retaliation by the Bureau.

12    Q.  And the Bureau is the Consumer Financial Protection Bureau?

13    A.  That's correct.

14    Q.  And is that where you work?

15    A.  It is.

16    Q.  Can you please tell the Court what your position is at the

17    Bureau?

18    A.  I'm a senior advisor in the Office of Human Capital, and I

19    report directly to Mr. Martinez.

20    Q.  You report directly to Mr. Martinez, and do you report to

21    anyone else?

22    A.  No.

23    Q.  Can you tell the Court briefly what your educational

24    background is and how long you've worked in government and in

25    the CFPB?

1    A.   I graduated law school in 2011.  And then 2012, I work for

2    a state agency doing consumer protection.  I did that for about

3    three years before moving to federal consumer protection.  I've

4    been a federal employee for ten years, and five of that has

5    been with the Bureau.

6    Q.   And who is currently in charge of the Bureau?

7    A.   Acting Director Vought.

8    Q.   And when did he become in charge of the Bureau?

9    A.   February 7th.

10   Q.   Okay.  I would like to skip forward -- so that was late on

11   the evening of February 7th?

12   A.   That's correct.

13   Q.   Skip to the first working day of the Bureau, so that was

14   Monday, February 10th.  What happened that day?

15   A.   I logged on, and there was an email from Acting Director

16   Vought telling us to stop all work tasks.  I usually have a

17   standing meeting at 9 a.m. with human capital leads and Adam

18   Martinez, and that meeting had been canceled.  And so we just

19   awaited further instructions.

20   Q.   And did you get further instructions?  Were you assigned

21   any particular work tasks despite the work stoppage?

22   A.   I was.  On the 11th, we fired the probationary employees,

23   and I was asked to review some templates that would be going

24   out to them because there were those in human capital that were

25   concerned about some of the language in the templates that we

1    were provided.

2    Q.  So can you explain what you mean by that?  What were the

3    concerns about the templates?

4    A.  There was wording around kind of indicating they were being

5    let go because of performance, and we had nothing that said

6    that they had poor performance.  And so there were those in

7    human capital that were very concerned about that language, and

8    so we reviewed and discussed that.

9    Q.  And was there justification provided, either in the

10   templates or the notices to go out to the employees, what the

11   justification was for firing all of these employees?

12   A.  I don't believe it was ultimately included in the letters

13   they received, but we did discuss the justification, and it was

14   the executive order on improving government efficiency and

15   Acting Director Vought stop-work order.

16   Q.  Was it your understanding that the templates -- I'm sorry,

17   the notices that they ultimately received later included those

18   justifications?

19   A.  I don't believe so.  I think we used that -- we had to code

20   it internally to explain why they were let go, and I believe it

21   was there, but that they would also later get something called

22   an SF-50.  That just takes time to create, and it would have

23   been included on that document that they'd received.

24   Q.  What's an SF-50?

25   A.  A notice of personnel action.

1    Q.  Okay.  So that document included those justifications, and

2    you said that included the justification based on the

3    February 10th stop-work order Acting Director Vought's email?

4    A.  It did.

5    Q.  Did anyone explain to you why the February 10th stop-work

6    email was a justification for firing all of these people?

7    A.  No.

8    Q.  So what happened after that?  Were you assigned any

9    additional response --

10            THE COURT:  Can you just identify for me which

11   executive order you're talking about that was the other piece

12   of the justification?

13            THE WITNESS:  I forget the full name, but I believe

14   it was on February 11th there was one about increasing

15   government efficiency.

16            THE COURT:  Okay.

17   BY MR. GUPTA:

18   Q.  And so after that, after the -- you reviewed these

19   templates and the probationary employees were terminated, were

20   you given additional responsibilities?

21   A.  I was.  On February 12th I was informed that I would be a

22   project lead for the CFPB team that would be doing the

23   reduction in force for the Bureau and that I would be working

24   with OPM, that there would be a team from both agencies, and I

25   was asked to review an agreement between the Bureau and OPM

1    before Adam signed it to set up that RIF team.

2    Q.  So in other words, you were asked to lead the RIF team?

3    A.  I was.

4    Q.  And that was on February 12th?

5    A.  That was.

6    Q.  And what did leading the RIF team consist of?  What were

7    you asked to do?  You mentioned reviewing a memorandum of

8    understanding?

9    A.  I didn't really know what it would involve.  I just

10   reviewed what services they would be assisting us with because

11   we really had no experience with a reduction in force at the

12   Bureau.  And so I found out more the next day when we met with

13   OPM on what that would look like.

14   Q.  And so that was the first meeting of the RIF team?

15   A.  Was on February 13th.

16   Q.  February 13th.

17       And do you remember when that was?

18   A.  It was in the afternoon, around 3:30.

19   Q.  Who was present at that first meeting of the RIF team?

20   A.  There were four of us from human capital, including myself

21   and Mr. Martinez.  There were several people from OPM, and

22   there were two people from the DOGE team.

23   Q.  So when you say "two people from the DOGE team," what does

24   that mean?  Who were they?

25   A.  Jordan Wick and Jeremy Lewin.

1    Q.  And were they -- had they been detailed to the Consumer

2    Financial Protection Bureau?

3    A.  That was my understanding.  I didn't recognize Jordan Wick,

4    and he was showing up as CFPB on Teams.  So on Teams if you

5    hover over someone, it tells you their position, and he was

6    listed as a DOGE engineer.

7    Q.  So he had a CFPB email address?

8    A.  Um-hum.

9    Q.  And what about Jeremy Lewin?

10   A.  It was my understanding that he was detailed to us as well.

11   That came out later in the meeting.

12   Q.  So at this meeting, who led the meeting?  Who spoke?

13   A.  OPM did initial introductions of who they were.  They had

14   people from various positions, including, like, policy there.

15   And then most of the talking after that was done by Adam

16   Martinez.

17   Q.  And can you recall what Adam Martinez said at this meeting?

18   A.  He explained the plan for the Bureau.  He said that it

19   would be partial transfer of functions, and the rest would be

20   elimination.  And that meeting was very much focused on the

21   elimination.

22   Q.  Transfer of functions, did you have an understanding based

23   on his description of what that meant?

24   A.  Not the specific ones, but that we do have some statutorily

25   required functions, and I understood that to mean those.

1    Q.  So you understood that those functions that are assigned by

2    Congress to the Bureau would be transferred to other agencies?

3    A.  That they had to go somewhere.

4    Q.  And you said that the -- what other -- I don't want to put

5    words in your mouth, so I want to be really clear about what he

6    said.  Did he say anything about offices and divisions of the

7    Bureau?

8    A.  I can't remember if it was at that meeting or the next one,

9    but he did talk about eliminating entire offices, divisions,

10   and units, yes.

11   Q.  Eliminating entire offices, divisions, and units?

12   A.  Um-hum.

13   Q.  And was there any reason given for this, for this action?

14   A.  Again --

15            MR. ROSENBERG:  Objection.  Hearsay.

16            THE COURT:  Well, she's saying what happened at the

17   meeting.  I believe all of that information was also being

18   elicited from the prior witness, what did Mr. Paoletta tell

19   you?  What did Mr. Vought tell you?  What did the DOGE people

20   tell you?  I think while it may be hearsay, there's no jury

21   here and I can assess that when I assess the weight to be given

22   to the testimony.  But I'm not going to exclude it, as I didn't

23   exclude it with the prior witness either.

24            Go ahead.

25   BY MR. GUPTA:

1    Q.  I'm just asking you, just to be clear, you know, to the

2    best of your recollection, what was said in that meeting?  I'm

3    not asking you to speculate on anything.

4    A.  Oh, no, this is my memory of the meeting.

5    Q.  Right.  And so the justification provided for this action

6    was what?

7    A.  It was, again, the executive order.  We started just saying

8    "the executive order," but, I'm referencing the same one each

9    time.  And Director Vought -- or, Acting Director Vought's

10   stop-work order.

11   Q.  Was there any discussion of the timing of a plan for a

12   reduction in force or the -- or how it would be sequenced?

13   A.  Yes.  Adam said that the immediate impact would be 1200

14   employees.  And then we would reduce altogether after that,

15   within 60 to 90 days.  He said the immediate -- I'm sorry, he

16   described it as immediate impact.  There was discussion about

17   how to RIF those employees.  OPM, again, giving us the policy,

18   and they were the experts, gave us two different ways that we

19   could notice those employees.  You could either let those 1200

20   know in informal notice, where you let them know that their

21   areas had been identified for a reduction in force, or you

22   could give a formal notice, where you gave them what is

23   typically 60 days notice that they would be laid off.

24          Jordan and Jeremy -- and Jeremy, they shared a

25   screen, they shared Jordan's screen.  And Jeremy would pop off

1    and on that screen, and he said he was talking to Russ.  The

2    three of them discussed it and very quickly informed us that

3    they would like formal notices to go out no later than

4    February 14th.

5    Q.  I just want to be clear, because you've used some first

6    names.  You said Jeremy was talking to Russ.  You're talking

7    about Jeremy Lewin.  And who did you understand Russ to be?

8    A.  Russ Vought.

9    Q.  So Jeremy was speaking to Russ Vought during this meeting?

10    A.  He was.

11                MR. ROSENBERG:  Objection.  This is now being --

12                THE COURT:  Jeremy represented that he was talking to

13    Mr. Vought?

14                THE WITNESS:  He did.

15                THE COURT:  Was it, like, a Teams or set up where you

16    can see people's faces, or was he messaging someone?

17                THE WITNESS:  I couldn't see Russell Vought, but it

18    was Teams.  And Jeremy kept leaving the screen, but he informed

19    all of us that he was talking to Russ.

20                THE COURT:  Okay.  All right.  So that's what he

21    said.

22                Go ahead.

23    BY MR. GUPTA:

24    Q.  What are competitive areas?  What does that mean?

25    A.  That's how you group employees during a reduction in force.

1    So it's dividing them out to groups.

2    Q.  And you do that because the idea is people should be able

3    to compete for positions and be able to keep -- maybe hold onto

4    their positions in a reduction in force; is that the idea?

5    A.  That they may be entitled to compete for a position, if

6    there are any positions left.

7    Q.  And was it your understanding that this plan would involve

8    people being able to compete for those positions and hold on to

9    the positions?

10   A.  No.  It was clearly explained to us that for these 1200,

11   because we were eliminating -- in fact, this is where this came

12   up, because we were eliminating entire offices, divisions, and

13   units, and we would not even leave a single employee, that

14   there would be no competition because there would be no jobs to

15   compete for.

16   Q.  And what if -- how would it work if there were individual

17   employees, if particular people had been left in those offices?

18   A.  We were informed that if there was a single position left

19   in any of those groups that were identified, that it would be a

20   much lengthier process and we would not be able to complete it

21   by the 14th.

22   Q.  So the only way to accomplish it on that timeline was to

23   eliminate entire offices?

24   A.  Divisions or, yes, groups of competitive areas, yes.

25   Q.  You mentioned doing it by the 14th, so I just wanted to be

1    clear about this.  Who brought that up?  Who said it had to be

2    done by the 14th?  And did anyone say why?

3    A.  Jordan Wick was the one that said it after they had

4    discussed it.  And there was no reason given, just that that

5    was as quick as we could do it.  They wanted to give 30 days'

6    notice instead of 60, and just to do it as quick as possible.

7    Q.  So your understanding from this meeting was that Jordan was

8    communicating with Acting Director Vought, wanted these

9    terminations, these mass terminations to occur by the next day,

10   Friday 14th?

11   A.  Yes.  We had to seek exceptions to make that happen, so

12   that was my understanding.

13   Q.  Was there any discussion in this meeting of getting

14   permission from Congress first before eliminating whole offices

15   that were created by Congress?

16   A.  Not at all.

17   Q.  Was there any discussion of getting permission from

18   Congress first before transferring functions from the Bureau

19   that had been assigned by Congress?

20   A.  Congress never came up.

21            MR. ROSENBERG:  Objection.  Lack of foundation.

22            THE COURT:  He asked if there was any discussion at

23   the meeting, she's at the meeting.  He didn't ask if it was

24   necessary, he just asked it was discussed.

25            MR. ROSENBERG:  I thought the question was:  Was

 1    there discussion --

 2                    MR. GUPTA:  I'll rephrase the question.  At this --

 3                    THE COURT:  I thought he said "was there," so I

 4    assume we're talking about the meeting.

 5                    THE WITNESS:  That was my understanding.

 6    BY MR. GUPTA:

 7    Q.  At that meeting, was there any discussion?

 8    A.  None.

 9                    THE COURT:  Let me ask you a question.  You said 1200

10    people, you used that number a lot.  How many people had

11    been -- when you did the probation employees in the days

12    before, how many employees was that?

13                    THE WITNESS:  There were 85 probationary, and then on

14    the 13th we also did term and it was about 130 of those.

15                    THE COURT:  So if you add those to the 1200, how many

16    would have been left?

17                    THE WITNESS:  I believe we started with 1700, about

18    300 people.

19                    THE COURT:  All right.  Thanks.

20    BY MR. GUPTA:

21    Q.  In your -- based on your understanding of this meeting, was

22    this a discussion about -- a deliberating about how to do this

23    or whether to do this?  Was it predecisional deliberative, or

24    were you being asked to implement this plan?

25    A.  We were being asked to implement this the next day.

1    Q.  Okay.  Is it possible that Adam Martinez was confused about

2    whether Acting Director Vought wanted these RIFs to occur

3    immediately?

4    A.  No.

5    Q.  How do you know that?

6    A.  He asked us for -- or, he asked OPM for templates so that

7    we could do this the next day.  We were provided those

8    templates, and he instructed us to do the work to provide those

9    notices to employees the next day.

10   Q.  So you were put in charge of this team.  The first meeting

11   is the afternoon of the 13th, and you were asked to get this

12   all done by the next day?

13   A.  That's correct.

14   Q.  And was there a time given?

15   A.  Initially, it was just the next day.  It was a lot of

16   information to gather.  Our initial understanding was, as long

17   as it was done by midnight.  At some point it was communicated

18   close of business.  And then that changed further later.

19   Q.  Okay.  I want to turn now to that next day.  Friday,

20   February the 14th, and try to ask you about a chronology of

21   that day.

22   A.  Okay.

23   Q.  What's the first thing that you can remember occurring that

24   day?

25   A.  We received the templates rather late at night on the 13th.

1    OPM did have them, but they needed to review them because they

2    had never given that type of exceptions that we received

3    before.  So we got together at 8:30 in the morning to review

4    those templates, and we had a lot of questions.  So we

5    scheduled a meeting with OPM for 10 o'clock that morning.

6    Q.  Who is "we"?

7    A.  The RIF team.  So members of human capital, but only at the

8    Bureau, and Adam Martinez was there as well.

9    Q.  Okay.  So this was an internal meeting just at the Bureau

10   with you, Adam Martinez, and the team?

11   A.  Yes.

12   Q.  And then did you subsequently have discussions with OPM?

13   A.  We did.

14   Q.  And when did that happen?

15   A.  10 a.m.

16   Q.  And do you recall what was discussed at that meeting?

17   A.  Yes.  I did a lot of the talking at that meeting.  I had

18   questions about the templates.  There was a section of the

19   template that said -- and these are templates that employees

20   would receive, letting them know that they were subject to

21   reduction in force and would be laid off in 30 days.  And there

22   was a section that said that we had created a retention

23   register.  And it had a lot of fields that would be -- that

24   would be populated with information individual to each

25   employee.  It was a lot of information to gather.  We had not

1    yet started gathering it and we had not created retention

2    registers.  So I raised a concern about that and asked if we

3    could remove that section from the template.

4    Q.  Okay.  Can you just explain what a retention register is,

5    for those who don't know much about federal employment?

6    A.  It gives the employee information about, kind of, where

7    they fell among things, if they were able to compete for a job,

8    if there were jobs left.  So it would give them information,

9    like their service, how long they -- their tenure is, and just

10   other pieces of information like that.  If they got any extra

11   credit, basically, for good performance appraisals.  There were

12   eight or so fields.

13   Q.  So none of that was done?

14   A.  None of that was done, and we hadn't created the retention

15   personnel.

16   Q.  And your concern was the template said it was done, but it

17   wasn't?

18   A.  Correct.

19   Q.  Did Adam Martinez, at this meeting, elaborate at all on the

20   plan that he had described the previous day?  Did you learn

21   anything more about the plan and what it would entail?

22   A.  He pulled up a memo to be sent to OMB, and it listed out

23   the specific offices, divisions, and units that would be

24   subject to termination.  And it had the numbers by each one of

25   them.  He had to do that, I think, to request the exception to

1    establish those competitive areas without there being a 90-day

2    period.  And so he pulled that up, and that was the first time

3    I saw that.

4    Q.  That was the first time you saw that memo.  And that was

5    dated the previous day?

6    A.  13th.  Yeah, I believe it was the 13th or 14th.

7              MR. GUPTA:  That's the -- let the record show that's

8    the memo marked as Plaintiffs' Exhibit JJ.  And the memo from

9    Adam Martinez to OPM dated February 13th.

10             THE WITNESS:  Um-hum.

11   BY MR. GUPTA:

12   Q.  So this is the first time you were seeing this document,

13   even though you were the team leader assigned to accomplish

14   these RIFs?

15   A.  Um-hum.

16   Q.  Do you recall your reaction to the memo what you noticed

17   what you saw it?

18   A.  Yeah.  I think it's important to understand in my reaction

19   that it had been explained to us that these -- there could not

20   be a single job left in any of these areas for us to do the

21   work we were doing on the 14th.  So I was shocked to see the

22   Office of Supervision, Enforcement, the Office of Civil Rights,

23   that Adam was letting go of his own ops for an office, and just

24   seeing it black and white, the numbers of people that were

25   being fired was -- it was shocking and it was upsetting.

1    Q.  So was it your understanding that that meant the

2    elimination of entire offices that were created by Congress,

3    like the Office of Enforcement or the Office of Supervision?

4    A.  Yes.

5    Q.  The memo itself, didn't it say that this is entire

6    divisions, offices, and units?

7    A.  That was the only way to get that exception.

8    Q.  And what was the justification provided in that memo, if

9    you recall?

10   A.  Again, the executive order and Acting Director Vought's

11   stop-work order.

12   Q.  And, again, at this meeting, was there any discussion or

13   explanation from Adam or from anyone else of how the email from

14   February 10th directing people to stop work could be a

15   justification for firing and, indeed, abolishing whole units of

16   the Agency?

17   A.  None.

18          THE COURT:  And when you said it's the only way for

19   the exception, you mean the exception to the ordinary notice

20   provisions?

21          THE WITNESS:  I believe that one was attached to the

22   90-day competitive area exception, that's why he had to create

23   that memo.

24   BY MR. GUPTA:

25   Q.  And OPM, did they say whether they had ever provided an

1    exception like this before?

2    A.  The day before they said that they had not, that this was

3    the first.

4    Q.  So this was not normal?

5    A.  It was not.

6    Q.  Okay.  So that meeting was, I think you said, it was at

7    10 a.m. on Friday the 14th?

8    A.  Um-hum.

9    Q.  Did you become aware of an effort to change the timeline --

10   I think you alluded to this earlier -- to get these notices out

11   faster?

12   A.  Yes.  Staff was stressed and trying to pull this

13   information together as quickly as possible.  And, so, around

14   1:30, when I was aware of the hearing from this Court at

15   2 o'clock, I sent an email to Adam, letting him know that we

16   would continue working but that we may want to consider what

17   the Court would do that day when we were, you know, considering

18   the timing of sending out these notices.  I thought we might

19   slow down if we're going to be told we couldn't do it anyway.

20   And the opposite occurred.

21   Q.  Okay.  So you sent this email at 1:00, 1:30, thereabouts --

22   A.  Around 1:30.

23   Q.  -- informing him of the hearing, and you were aware that

24   the hearing was going to be -- you didn't know about this

25   courtroom, but you knew it was going to be at 2 p.m.?

1    A.  At 2 p.m.

2    Q.  And you knew that the lawsuit involved this question about

3    whether or not the Bureau could go ahead and do this?

4    A.  I did.

5    Q.  And the response you got was to speed things up?

6    A.  The response I got is to -- we were still waiting on some

7    attachments that were referenced in the notices we were

8    provided from OPM.  And so 10 to 15 minutes after, Adam thanked

9    me for my email.  And I was instructed through his other senior

10   advisor that he, being Adam, wanted me to reach out to OPM and

11   tell them that they needed to provide the attachments right

12   away and that we no longer had until close of business.  And

13   that after I had done, so he wanted me to forward my email to

14   him so he could reach out to some of their senior leadership

15   and get those attachments quicker.

16   Q.  And did you then instruct the team, "We don't have until

17   the close of business today"?

18   A.  I did.

19   Q.  And you did that by email?

20   A.  I did.

21   Q.  Okay.  Now I want to just talk about the chronology of --

22   you know, did you know when the Court issued its order, when

23   this Court issued its order?

24   A.  A colleague informed me and sent me a copy of the order

25   around 5 o'clock.

1    Q.  So it was, in fact, 5:03 p.m., I can represent to you, is

2    when the order from this Court issued.

3          What did you do when you found out that there had been a

4    court order?

5    A.  I reached out to Adam's other senior advisor and I told her

6    RIFs could not occur until March 3rd.

7    Q.  And that's because you had read the order and it said

8    March 3rd?

9    A.  Yes.

10   Q.  And what was the response?

11   A.  That Adam had not yet heard from Mark Paoletta, and that he

12   insisted that we kept going.

13   Q.  And did you say, "We can't do that because of the court

14   order"?

15   A.  I did.  I said, "These cannot go out today, and I hope Mark

16   Paoletta knows how to read an order."

17   Q.  And did -- was there a response to that?

18   A.  She said, "We still might have to send them out today, DOGE

19   is pressuring Adam for the time that we can still send them

20   out."

21   Q.  And who was going to actually send these notices out?  Who

22   was going to be the person who was going to hit send button if

23   they were going to go out?

24   A.  If they were like the other two notices, it was someone on

25   the other senior director's team, from their systems.  It was

1  not his decision, but he does the coding, he's the one that

2  presses the button.

3  Q.  Did you ever -- as the head of the RIF team, did you get

4  direction from Adam Martinez or from Mark Paoletta or from Russ

5  Vought after that order came out at 5:03 on Friday to stand

6  down and to stop?

7  A.  No.  I told the other senior advisor while we were

8  communicating that I hoped that Adam, if he was going to tell

9  staff to violate a court order, that he had it in writing from

10  the DOGE team because I did not believe they would speak up for

11  him later, and I logged off.

12  Q.  And you meant the DOGE team that was working at CFPB, that

13  had been detailed to CFPB, operating under Acting Director

14  Vought?

15  A.  Correct.

16  Q.  And so did people, in fact, keep working on these notices?

17  A.  They did.  When I logged on later, I saw emails going back

18  and forth at 7:00, and all the way up to near 10 o'clock about

19  these notices and fields for them and what to code them under.

20  Q.  Was it unusual for staff like that to be working up until

21  10 p.m. on a Friday on notices like this?

22  A.  Very.

23  Q.  So when did the RIF team next meet after the Court order?

24  A.  On the 19th of February.

25  Q.  And who was there at that meeting, if you recall?

1    A.  The -- it was just OPM, and I think a smaller group, and

2    then the CFPB RIF team again, including myself and Adam

3    Martinez.

4    Q.  And nobody from DOGE, right?  Now it's just Adam

5    Martinez --

6    A.  I didn't see DOGE in any of their meetings.

7    Q.  Who leads this meeting?

8    A.  Adam, again, did most of the talking.  He was more focused

9    on the transfer of functions at that meeting.  And he was

10   explaining to them -- he was comparing us to the Office of

11   Thrift Supervision and explaining that he had had conversations

12   with new leadership and the chief legal officer about what the

13   wind-down of an agency really meant, and that there were, you

14   know, functions that would need to transfer, and OPM was

15   pressing us to identify where those would transfer and we did

16   not yet have an answer.

17   Q.  You mentioned the Office of Thrift Supervision, what does

18   that have to do with anything?

19   A.  That office was closed when the Bureau was created through

20   the Dodd-Frank.  And so when that agency closed, there were

21   legacy functions that had to go places.  Adam informed us that

22   a lot of those went to OCC, and so he was just using that as a

23   comparison of what needs to happen with the wind-down of an

24   agency.

25   Q.  So in other words, that was an agency that was abolished by

1    Congress?

2    A.  By law.

3    Q.  And the discussion here was what happened when Congress

4    abolished an agency, and the plan was to do the same thing?

5    And was there any discussion in this meeting about going to

6    Congress?

7            THE COURT:  I think that was your summary of what

8    happened.  You weren't there.  So why don't you just ask your

9    question.

10   BY MR. GUPTA:

11   Q.  Was there any discussion, again, about going to Congress

12   first, before implementing this plan?

13   A.  No.  The only comparison was that things would need to

14   transfer.

15   Q.  You referenced that there were -- Adam referred to the new

16   administration.  So is your understanding that he was getting

17   direction for this plan from the acting director?

18   A.  He said new leadership, so I was very clear that he was

19   talking about Acting Director Vought.  He also mentioned the

20   chief legal officer.

21   Q.  Did he refer at this meeting to winding down the Agency?

22   A.  He did.

23   Q.  What did you understand that to mean?

24   A.  Closing of the Agency.  He also referred to the positions

25   that we would need to keep to effectuate the closure of the

1    Agency, but he said that those positions didn't -- those people

2    would also lose their jobs as well.

3    Q.  And he used that phrase, "the closure of the Agency"?

4    A.  He did.

5    Q.  Was there any discussion at this meeting of the court's

6    order?  Because as I understand your testimony, this was the

7    first meeting of the RIF team after the Court had issued an

8    order.

9    A.  Yeah.  The meeting was more focused on what would happen,

10   you know, after the 1200.  So at the end of the meeting, he did

11   let our partners at OPM know that there was a problem and that

12   the union had filed a temporary restraining order that

13   prevented the 1200, but he was kind of just giving an update.

14   But I remember his describing that as a problem.

15   Q.  So he referred to the court's order as a problem.  Did he

16   say anything else about it?

17   A.  I don't remember if he said this or it was implied, but

18   that was -- that was on pause, so we were focusing on what

19   happened after.

20   Q.  On pause?

21   A.  (Nods head.)

22   Q.  Okay.  He said the plan was on pause as a result of the

23   order?

24            MR. ROSENBERG:  Objection.  Leading.

25            THE COURT:  She said that.

1    BY MR. GUPTA:

2    Q.  I'm just asking what your testimony was.

3    A.  If he didn't say -- if he did not say it, it was implied

4    that we would focus on the later phases because that one was on

5    hold.

6    Q.  So your declaration describes the RIF meeting on the week

7    of the 10th, it describes this meeting in substance, but you've

8    provided some additional details for us today.  Why is it that

9    those details were not in your declaration?

10   A.  I was hoping to avoid identification.  But I want to come

11   forward as a whistleblower, and I think there's things that I

12   can share now under my own name that are important because I

13   think what they were doing was illegal and wrong.

14   Q.  Was there an additional meeting after this meeting at which

15   Adam Martinez was present where he discussed with you this

16   plan?

17   A.  Yes.  The next day we had an internal meeting with some

18   human capital colleagues that are not part of the RIF team but

19   we needed to loop them in, they had a need to know some of this

20   information so they could give us some guidance.  And in that

21   meeting, he was a lot more specific about what exactly the plan

22   was for the Bureau.

23   Q.  Can you elaborate on those specifics, to the best of your

24   recollection?

25   A.  He said that acting leadership wanted us to move as quickly

1    as possible, that there would -- Adam said there would no

2    longer be a CFPB.  He said that we were legitimately shutting

3    down.  He said that we would be wiped out within 30 days.  He

4    said that the White House had instructed us to cancel all of

5    our committees and advisory boards and travel cards and

6    purchase cards and to only keep any contracts that were

7    necessary to effectuate the closure of the Agency within

8    30 days.

9          He informed them, because they were not part of these

10   OPM meetings, that without the temporary restraining order, we

11   would have laid off 1,000 people that previous Friday, and that

12   we would be eliminating another 700 positions.  The people in

13   that meeting were not RIF experts, nor were really any of us.

14   So they said they did have one question, that they had heard

15   about retention registers for competing for positions.  And so

16   they asked us about those, and Adam said there would be no

17   positions to compete for.

18   Q.  No positions to compete for, you understood that to mean

19   because the entire divisions would be eliminated?

20   A.  Because the Agency would be eliminated.  He was a lot more

21   specific in that meeting that was just the CFPB.  He said that

22   OPM struggled to understand that we were completely closing.

23   Q.  So this is February 20th.  This is not the week of the

24   10th?

25   A.  (Shakes head.)

1    Q.  The plan had not changed?

2    A.  The plan had not changed.

3    Q.  Were there additional meetings of the RIF team?

4    A.  We met again on the 27th with the joint CFPB/OPM/RIF team.

5    And we discussed some guidance that came out from Acting

6    Director Vought, but in his OMB capacity.  It was giving him

7    guidance about RIFs for federal agencies.

8              THE COURT:  Can I interrupt you a second?  Because

9    I've lost the dates.

10             THE WITNESS:  Sure.

11             THE COURT:  We had the Friday where the hearing was

12   and getting the RIFs out, and that was February 14th.

13             THE WITNESS:  Um-hum.

14             THE COURT:  Then you said the next meeting was the

15   RIF team with OPM and no DOGE people.  Was that the Monday

16   after the 14th?

17             THE WITNESS:  It was -- it was a holiday, it was the

18   19th.

19             THE COURT:  Okay.

20   BY MR. GUPTA:

21   Q.  That was on the 19th, and then you said this other

22   meeting --

23             THE COURT:  Was the 20th.

24             MR. GUPTA:  Was the 20th.

25             THE COURT:  Okay.

1    BY MR. GUPTA:

2    Q.  And then the following meeting, I think you said, was on

3    February 27th?

4    A.  It was.

5    Q.  And you referred to OPM/OMB memorandum.  And that is the

6    memorandum that was issued jointly by those two agencies on

7    February 26th; is that right?

8    A.  That's correct.

9    Q.  Okay.  And so you were saying that Adam was discussing that

10   memorandum?

11   A.  He was discussing that memorandum.  He said he would

12   discuss it further with acting leadership and that he would let

13   us know -- "us" being the RIF team both at CFPB and at OPM --

14   that he would let us know if the plan changed.  And that has

15   never -- to this day has never happened.

16   Q.  So he told you that if the memorandum resulted in any

17   change of the plan, he would let you, as the team leader, know?

18   A.  Yes.

19   Q.  And he has not done so?

20   A.  Correct.

21   Q.  Okay.  Next -- were there any additional meetings of the

22   RIF team?

23   A.  Yes.  But Adam stopped attending.

24   Q.  Adam didn't attend, okay.

25            But when did those meetings occur?

1    A.  We had one Tuesday and Thursday of last week.  I believe

2    that's the 4th and the 6th of March.

3    Q.  March 4th and March 6th, so we're now several weeks away

4    from the acting director taking over the Agency?

5    A.  Correct.

6    Q.  What was the discussion about at the March 4th -- Tuesday,

7    March 4th meeting?

8            THE COURT:  Were those just internal, or were those

9    OPM people, too?

10           THE WITNESS:  Those were with OPM.

11           THE COURT:  Okay.  He asked you what was discussed.

12           THE WITNESS:  On the 4th, it was mostly about a cost

13   estimate for the final phase after the 1200, doing, you know,

14   reduction in force on the rest of the positions.  So it was

15   mostly about a cost estimate.  We talked a little bit about

16   policy because we were -- we were confused in that defining

17   competitive areas for those remaining groups of people.  It

18   talks about local competing areas and we were confused on how

19   to do that since we'll no longer have offices.  So we asked the

20   policy group how that worked, and they said it hadn't happened

21   before so they didn't know.

22   BY MR. GUPTA:

23   Q.  When you say "cost estimates," you mean the cost for OPM to

24   provide services to CFPB to dismantle themselves?

25   A.  Correct.  We were paying them to help up lay ourselves off.

1    Q.  This is about the final phase, so this after the 1200?

2    This is about the last phase?

3    A.  Yes.  From OPM's perspective, they helped with Phase 1, the

4    1200; and Phase 2, this was a -- the meeting was called Phase 2

5    and it was a cost estimate for that.

6    Q.  So this was last Tuesday?

7    A.  Yes.

8    Q.  And to your knowledge, as the head of the RIF team, the

9    plan had not changed?

10   A.  Correct.

11   Q.  Okay.  Let's talk about the meeting last Thursday.  So

12   that's March 6th.  Do you recall who was at that meeting?

13   A.  The CFPB RIF team, but not Adam, and a few members from

14   OPM.

15   Q.  And do you recall what the discussion was about at that

16   meeting?

17   A.  It was about some work they needed us to do to help define

18   something called competitive levels.  I'm still learning about

19   RIFs.  I can't explain that very well, but they -- it was,

20   again, for this last phase we needed to define competitive

21   areas and competitive levels, and this was about the

22   competitive level codes.

23   Q.  So as you understood it, as of last Thursday, the plan was

24   still to abolished entire offices created by Congress?

25   A.  Correct.

```
1              MR. ROSENBERG:  Objection.  Lack of foundation.

2    BY MR. GUPTA:

3    Q.  The plan had not changed, to your knowledge, as of last

4    Thursday?

5    A.  No one has told me that the plan has changed.

6    Q.  I just want to be clear.  Has there been, to knowledge, any

7    change in the reduction in force plan since Thursday, February

8    13th or Friday, February 14th?

9    A.  Nobody has shared that.

10   Q.  Has anyone said, "We can't do this without going to

11   Congress"?

12   A.  No.

13   Q.  Has anyone said, "We can't do this because it's illegal"?

14   Anyone from leadership.

15   A.  No one in leadership has.

16   Q.  But the procedures have changed, you're crossing the Ts and

17   dotting the Is; would that be fair to say?  You've had time to

18   do that with OPM?

19   A.  We've had time to ask more questions and try to do --

20   Q.  So as far as you're aware, as the designated team leader

21   for the RIF team, is the plan still to eliminate the Bureau

22   once the court order is lifted?

23   A.  That's my understanding.  I haven't been told anything

24   different.

25              THE COURT:  Do you have any other duties besides
```

 1    being on the RIF team at this point?

 2            THE WITNESS:  I also work, not directly, but with the

 3    benefits retirement and work life team.  And so with some --

 4    giving them some guidance so that they can counsel employees.

 5    And they've been very confused about what they're allowed to do

 6    and not allowed to do with the stop-work order.  And so I've

 7    been helping to provide some of that guidance.

 8            THE COURT:  Okay.

 9    BY MR. GUPTA:

10    Q.  You mentioned at the beginning of your testimony that you

11    were afraid of retaliation.  Why, despite that, have you

12    decided to come forward and testify in court today?

13    A.  Because I think it's important, and this is the right thing

14    to do.

15    Q.  Thank you.  Thank you very much.

16            THE COURT:  All right.  Cross-examination.

17            I need one second to write a note on an unrelated

18    matter.

19            (Pause.)

20            THE COURT:  All right.  I'm sorry.

21            MR. ROSENBERG:  I do have a housekeeping question.

22            THE COURT:  Okay.

23            MR. ROSENBERG:  Yesterday, when the parties were

24    discussing the calling of pseudonymous witnesses, the Court

25    indicated that they would testify and provide, you know, their

1    name.  I don't --

2            THE COURT:  I don't think I said that.  But, okay.

3            MR. ROSENBERG:  But I just wanted to ask how the

4    Court wanted to proceed.  We're not necessarily asking for that

5    now.  And I don't know --

6            THE COURT:  Well, if it's not an issue now, then I

7    would just proceed by asking the witness questions without

8    using their name.  I'm certain that people at counsel table are

9    aware of who this person is, but I don't think it needs to be

10   on the public record at this moment.

11           MR. ROSENBERG:  Fair enough.

12                          CROSS-EXAMINATION

13   BY MR. ROSENBERG:

14   Q.  Thank you for testifying.  I have just a few questions for

15   you.

16           You spoke about the preparation of RIF notices, but

17   those notices never actually went out, did they?

18   A.  Correct.

19   Q.  Okay.  And you discussed various meetings that you've

20   participated in as part of the RIF team.  Have you participated

21   in meetings with senior CFPB officials such as Mr. Paoletta or

22   Mr. Vought?

23   A.  That hasn't been necessary.

24   Q.  So you have not?

25   A.  Correct.

1    Q.  Okay.  You referred to the fact that Mr. Martinez stopped

2    participating in your meetings on or about February 27th; is

3    that correct?

4    A.  That was the last one he attended.  He did not attend the

5    meetings with OPM.

6    Q.  And was February 28th the date that you submitted a

7    declaration in this case?

8    A.  It was.

9    Q.  Okay.  And that declaration went through some length to

10   describe the actions of Mr. Martinez?

11   A.  It did.

12   Q.  Okay.  And it was publicly filed on this Court's docket; is

13   that correct?

14   A.  Yes.

15            MR. ROSENBERG:  I said I would be short.

16            THE COURT:  Is that it?

17            MR. ROSENBERG:  Thank you for your time.

18            THE COURT:  All righty.  Any redirect?

19            MR. GUPTA:  No.

20            THE COURT:  Okay.  This witness can be excused.

21   We'll take a brief, ten-minute break before the calling of the

22   next witness.  Thank you, everybody.

23            (Recess.)

24            THE COURT:  This is a happy group.  Every time I come

25   in, everybody is bustling around.

1          All right.  Call your next witness.

2          MR. FRIEDMAN:  The plaintiffs will call Matthew Pfaff

3     next.

4                    MATTHEW PFAFF,

5     was called as a witness and, having been first duly sworn, was

6     examined and testified as follows:

7          THE COURT:  I'm just going to tell you about that

8     microphone.  Now you've met it.

9          THE WITNESS:  Got me.

10          THE COURT:  You need to try to lean into it because

11     your chair won't move.

12          THE WITNESS:  Got it.  All right.

13          THE COURT:  Thank you.

14                    DIRECT EXAMINATION

15     BY MR. FRIEDMAN:

16     Q.  Good afternoon.

17     A.  Good afternoon.

18     Q.  Can you state your name for the record, please?

19     A.  Matthew Pfaff, or Pfaff.  My family hasn't figured it out.

20     Q.  And where do you work?

21     A.  I work at the Consumer Financial Protection Bureau.

22     Q.  When did you begin working at the Bureau?

23     A.  I began working there October 2013.

24     Q.  What is your current position at the Bureau?

25     A.  I'm currently the chief of staff for the Office of Consumer

1    Response.

2    Q.  When did you begin that, as chief of staff?

3    A.  I began that role in February 2021.

4    Q.  What are your prior positions at the Bureau?

5    A.  Prior to that I worked in our investigations section, most

6    recently as a program manager, an adviser before that, and an

7    investigator before that.

8    Q.  Were all those positions within the Office of Consumer

9    Response?

10   A.  Yes.

11   Q.  What does your current job entail?

12   A.  As the chief of staff, my responsibility is to ensure that

13   our office meets our statutory obligations.  I advise a number

14   of leaders in the office about initiatives, and I also

15   coordinate across the Bureau with various functions.

16   Q.  Who do you report to?

17   A.  I report to Darian Dorsey.  She's currently the deputy

18   associate director for Consumer Response and Education, and she

19   reports to Christopher Johnson.

20   Q.  Do you also work directly with Mr. Johnson?

21   A.  I do.

22   Q.  Just briefly, what does consumer response do?

23   A.  Consumer response does a few things.  We answer questions,

24   so we run a contact center that responds to questions from the

25   public.  We handle complaints.  We get about 350,000 complaints

1    every month and up.  And so we get to work to get those to

2    companies and to other regulators for a response.  And then we

3    analyze and share data, which includes the investigation and

4    monitoring of complaints coming into -- to the Bureau.

5    Q.  What are the benefits to consumers of the services that

6    your office provides?

7    A.  I'll start with the top line number, I think we've returned

8    more than $300 million to American consumers.  Last year about

9    half of complaints were closed with nonmonetary relief, meaning

10   consumers got updates to credit reports, or discontinuation of

11   calls from debt collectors.  The complaint process has stopped

12   imminent foreclosures, it's gotten consumers' loans canceled.

13   It's done a lot of good for the public.

14   Q.  What role do Bureau employees within the Office of Consumer

15   Response play in the complaint process?

16   A.  Our office is organized by various functions.  So starting

17   at the beginning, our product section is -- are the folks who

18   are building the technology to accept complaints and to share

19   that data.  Our stakeholders services section is getting

20   complaints where they need to go, it's managing our hotline.

21   They --

22            THE COURT:  What was the name of that section?  I'm

23   sorry.

24            THE WITNESS:  Stakeholder services.

25            THE COURT:  Stakeholder.

1          THE WITNESS:  Stakeholder services.

2          THE COURT:  So the term "stakeholder" includes

3   consumers?

4          THE WITNESS:  Yes.  To the extent that consumers are

5   sending in -- the primary stakeholders in that section are

6   company, portal users, government portal users, congressional

7   portal users.  So anyone that's interacting with the complaint

8   process, they're -- they're assisting them.

9          Next we have our investigation section, which is

10   responsible for investigating and monitoring complaints.  And

11   within that section is the escalated case management team.

12          We have a data and governing section, which is

13   responsible for providing our official counts of complaints.

14   They also do some project management, respond to information

15   requests from the public.

16          And then finally, we have our quality section, which

17   is responsible for -- it's essentially an audit function.

18   BY MR. FRIEDMAN:

19   Q.  Do employees in the Bureau, outside of Consumer Response,

20   support the office's work?

21   A.  Oh, yes.  We -- we work in close concert with many of our

22   offices.  So, our technology and innovation colleagues have us

23   build the systems that -- that run this entire operation.  We

24   work closely with our privacy colleagues to respond to

25   suspected privacy breaches.  We work closely with our

1    procurement partners who help us bring vendors in to work on

2    the system.  We also work closely with our colleagues in our

3    RMR division, they help us identify market participants to

4    invite them to the portal.  There's also offices within that

5    division that monitor complaints, or Office of Servicemember

6    Affairs, Office of Older Americans, Office of Students and

7    Young Consumers.

8         And we work closely with our regs and legal

9    colleagues to make sure that our system is legal.  We work

10   closely with the private ombudsman to -- who has a variety of

11   responsibilities with complaints.

12        And then, finally, we work very closely with our

13   colleagues in supervision and enforcement.  That partnership

14   has been particularly productive.  They help us bring companies

15   in to participate on the complaint portal, and they also have

16   been a really effective partner in helping consumers get

17   meaningful responses to complaints, when we've seen companies

18   that are not really playing ball, they've been a really

19   close -- close partner that's made the system successful.

20        THE COURT:  What does it mean for a company to

21   participate in the portal?

22        THE WITNESS:  So in order for a company to respond to

23   a consumer they have to first register with us to be able to

24   receive their complaints.  And then we will send the complaints

25   to the company, the company will then, once their in receipt of

1    a complaint, they will -- they typically have -- they have

2    15 days to provide an initial response to the consumer, and

3    then 60 days to provide a final response.

4           And so we have more than 7500 companies that have

5    registered with this portal.  And for them to participate, by

6    that I mean they're providing responses to consumers.

7           THE COURT:  And so that's to enable them to work it

8    among themselves --

9           THE WITNESS:  Exactly.

10          THE COURT:  -- without further involvement of people

11   in your organization?

12          THE WITNESS:  Correct.  There's -- we do have

13   processes that allow us to intervene, but we received more than

14   3 million complaints last year.  And so a lot of this is

15   happening as part of just how the process is designed.

16          THE COURT:  Thank you.

17   BY MR. FRIEDMAN:

18   Q.  We just talked about the support that Bureau employees

19   played.  Does your office also receive support from

20   contractors?

21   A.  We do.  We have --

22          THE COURT:  Can you also get more close to the

23   microphone, thank you.

24   BY MR. FRIEDMAN:

25   Q.  Can you provide an overview of the support that you receive

1    from contractors?

2    A.   Sure.  We have multiple contractors who support us.  I'll

3    start with the largest contract, it's a contract that we have

4    for our consumer -- our contact center.  This contract is

5    providing the agents who will pick up the calls to the 1-800

6    number.

7         We have a contract with Deloitte, that supports us in

8    the development of the software that accepts complaints and

9    helps us get them to companies and other regulators.

10        We have a contract with Ernst & Young, which is a

11   data-sharing contract.  So we sues that vehicle to get

12   complaints, again, share complaints with federal and state

13   agencies.

14        And then we also have a contract with a group called

15   North Ridge, which provides an audit function, independent

16   audit function for our office.

17        THE COURT:  The 1-800 number, that includes human

18   personnel that answer the phone?

19        THE WITNESS:  Correct.  We have -- I think it's about

20   120 agents.  So when you call the 1-800 number, they will pick

21   up, they will give you information about consumer financial

22   products and services, they'll accept a complaint over the

23   phone, they'll give you a status update on your complaint.

24   But, yeah, it's real people.

25        THE COURT:  Do they reach out to any of the

1    stakeholders and try to resolve the complaint, or is that a

2    function --

3              THE WITNESS:  That's -- that's in our shop.

4    That's -- that's all federal staff.

5              THE COURT:  All right.  Thank you.

6    BY MR. FRIEDMAN:

7    Q.  Does your office also receive contracts support that

8    doesn't involve the provision of labor?

9    A.  Yes.  We have a number of contracts that are both housed in

10   our unit and outside of the unit.  That provides -- like,

11   subscription-based software.  So we have a contract that does

12   address verification, so when a consumer comes and puts their

13   address on the complaint form, it will check to ensure that

14   that address is accurate.

15             We have a -- with our colleagues in our technology

16   and innovation shop, we have a virus scanning software, so when

17   a consumer submits an attachment, it will run the virus scan to

18   make sure there's no malicious malware there.

19   Q.  Let's shift gears now.  Who is in charge of the CFPB right

20   now?

21   A.  The current acting director, it is Russell Vought.

22   Q.  When did he take over?

23   A.  I believe it was a Friday, February 7th.

24   Q.  The next day, on February 8th, did he issue a directive to

25   employees?

```
 1    A.  He did.  He sent an email that extended a list of

 2    prohibitions that the then-acting secretary -- I'm sorry,

 3    Acting Director Bessent had sent previously in the week prior.

 4    And he also added a few -- few additional prohibitions.

 5    Q.  Before that February 8th directive, was the Office of

 6    Computer Response working?

 7    A.  Yes.

 8    Q.  And then the next day, February 9th, was a Sunday, correct?

 9    A.  Correct.

10    Q.  Did Acting Director Vought issue another order on

11    February 10th, the next Monday that followed?

12    A.  Yes, he did.  He issued a stop-work order.

13    Q.  On that day, was a request made for consumer response to

14    continue working in any facet?

15    A.  It was a -- it was a conversation that was eventually

16    memorialized in a email that said our contact center would

17    continue operations.

18    Q.  What happened after that for the contact center?

19    A.  That contract was canceled the next day.

20    Q.  After the February 10th email directing people to stop

21    work, what did CFPB employees within the Office of Consumer

22    Response do?

23    A.  We closed our laptop lids and walked away.

24    Q.  So after the stop-work order, was anybody monitoring

25    consumer complaints?
```

1    A.  No.

2    Q.  After the stop-work order, was anybody investigating

3    consumer complaints?

4    A.  No.

5    Q.  After the stop-work order, way anyone handling referrals

6    from other agencies?

7    A.  No.

8    Q.  After the stop-work order, was anybody handling referrals

9    from Congress?

10    A.  No.

11    Q.  After the stop-work order, was anybody within the Bureau

12    working on any consumer complaints that required human

13    intervention to get to the company that was the subject of the

14    complaint?

15    A.  No.

16    Q.  The week of February the 10th, were you asked to analyze

17    the Office of Consumer Response's contracts?

18    A.  I was.

19    Q.  How did that assignment come about?

20    A.  On Monday, February 10th, I received a request from

21    Mr. Johnson to review contracts that were assigned to our

22    office.  This assignment -- I met with Mr. Johnson and

23    Ms. Dorsey later that evening.  Jordan Wick, who I believe is a

24    member of the DOGE who was assigned to the CFPB, he had

25    conducted a preliminary analysis, and we were to go in and --

1    and review those contracts and offer our assessment.

2    Q.  I'm going to ask you to turn to the government's binder,

3    which has numbered tabs.  And if you can turn to tab 2.  Do you

4    see this is an email from Christopher -- sorry.  This is

5    CFPB 3.  This is an email from Christopher Johnson.  And you

6    are one of the recipients on the CC line.  And the larger of

7    the paragraphs identifies a number of contracts.  Do you see

8    that?

9    A.  Yes.

10   Q.  Okay.  And that's dated February 10th?

11   A.  Yep.  At 1:55 p.m.

12   Q.  Do you know if these are the same contracts or some of the

13   same contracts that DOGE had identified at the same time as you

14   were performing your analysis?

15   A.  Yeah.  These -- these contracts, many of -- many of them

16   were on the list that I looked at this -- that evening.

17   Q.  And your analysis assignment came the next day?

18   A.  I'm sorry?

19   Q.  Your assignment to analyze the contracts came the next day;

20   is that correct?

21   A.  I received the request from -- to analyze the contracts on

22   that same day, on February 10th.  And then the -- we received a

23   parallel request from the CFPB chief financial -- chief

24   financial officer to do the same thing the next morning.

25   Q.  How many contracts did you identify as part of that

1   analysis as necessary to complete statutorily required work?

2   A.  We identified five.

3   Q.  How many of those contracts were subsequently canceled?

4   A.  All five.

5   Q.  That same week, were you also asked to write a memo on the

6   Office of Consumer Response's staffing?

7   A.  I was.

8   Q.  How did that assignment come about?

9   A.  On Thursday, February 13th, I was contacted by Mr. Johnson,

10  who requested my assistance in drafting a memo about divisional

11  staffing.  This memo was going to be used to -- for put on a

12  RIF, reduction in force.

13  Q.  What was the due date of that memo?

14  A.  The original due date -- I received the request around

15  2 p.m., the original due date was the same day at 6 p.m., but

16  Jordan Wick, and I believe the other gentleman, his name was

17  Jeremy, again, associated with the DOGE, began asking for

18  updates approximately 60 to 90 minutes later.

19  Q.  Can you turn to tab 10 in the same binder that we were just

20  looking at?

21  A.  Yes.

22  Q.  This starts at CFPB 20.  Is this the memo that you wrote?

23  A.  This is.

24  Q.  Do you see at the bottom, there's a highlighted two

25  sentences?

```
1    A.  Yes.

2              THE COURT:  Just tell me where you are in the binder

3    again.

4              MR. FRIEDMAN:  Oh, tab 10, CFPB 20.

5    BY MR. FRIEDMAN:

6    Q.  Second sentence states, "The functional areas listed below

7    align to statutory responsibility is total of approximately 80

8    to 85."

9         What did you mean by the term "align"?

10   A.  I think the best way to explain that is to walk through a

11   few examples.

12             So, the statute requires that we have a toll-free

13   number, and we have people on staff that manage that toll-free

14   number.  The statute requires us to monitor and investigate

15   complaints.  We have staff in our office that monitor and

16   investigate complaints.

17   Q.  What did the teams that are not in this memo do?

18   A.  The teams not in this memo provide a variety of support

19   services for our office, so they include project managers, they

20   include consumer experience, designers, they include people who

21   fulfil FOIA requests, they -- that sort of thing.  All

22   providing support to all of the sections within our office.

23   Q.  And when you say support services, do they provide services

24   for statutorily required work?

25   A.  They do.
```

1    Q.  Does anybody within the Office of Consumer Response work on

2    matters that are not statutorily required?

3    A.  No.  Everyone is working on statutorily required work.

4    Q.  So why were those other teams not put in your memo?

5    A.  Couple reasons.  Number one, I was -- I was rushing through

6    this memo, I had about -- in total, I spent two hours with this

7    memo, and so I wasn't working for an org chart.  I was racing

8    through the assignment.

9            And then secondly, the prevailing sentiment at the

10   time was that any -- any action that could be perceived as a --

11   as obstructionist or resistance, would just be met with

12   negative consequences for members of the DOGE.

13   Q.  And did Mr. Johnson say anything to you about what he felt

14   could be included in the memo?

15   A.  Yeah.  Mr. Johnson and I had a conversation before I began

16   writing about the teams that we would include, and he agreed

17   with -- he agreed with me that we needed to, you know, have

18   this number south of 150, 155, just, you know, because of --

19   because of the assignment and because of who it was going to.

20   Q.  And when you say 150 to 155, you mean south of the total

21   number of people in the office?

22   A.  Correct.

23   Q.  Did anybody else assist in the contents of the memo?

24            THE COURT:  I'm sorry, when you say keep the number

25   down to less than 150 to 155 people, or 150 to 155 people less

1    than the total number of people you usually have?

2                THE WITNESS:  So --

3                THE COURT:  I'm confused now with the way you summed

4    it up.

5                THE WITNESS:  I'm sorry.  So we have a -- we have a

6    little bit less than 150.  We have about 144 people currently

7    on staff.  The intention was to have that number south of that

8    number.

9                THE COURT:  Okay.

10   BY MR. FRIEDMAN:

11   Q.  I just want to make sure the record is clear.  By the

12   "number south of that number," you mean the number that counts

13   as statutorily aligned?

14   A.  Correct.  Sorry.  The numbers that are listed in this memo

15   would be below 150 to 155.

16   Q.  Did anybody else contribute to the contents of this memo

17   besides you?

18   A.  Mr. Johnson, he provided both the numbers that are

19   throughout the memo.  So throughout the memo there's sentences

20   that say, "The current head count for this area is blank."  He

21   also authored the final paragraph for management and

22   operations.

23   Q.  Do you agree with the head count numbers that he provided?

24   A.  I do not.

25   Q.  Why not?

1    A.  Again, we were working quickly, so we were counting those

2    people in our heads, and by looking at org charts that were on

3    teams, which are known to be problematic, that was also the

4    week that the OPM fork-in-the-road offer expired, people were

5    talking about retirement the night before probationary

6    employees had been terminated, we knew that terms were likely

7    to go that evening.  So we just weren't working from an

8    accurate count.

9            And then secondly, having reflected on this more, I

10   would conclude that everyone in the office is working on a

11   statutorily required function.

12   Q.  Can you provide an example of one of the head counts that

13   you disagree with?

14   A.  Investigations lists the current head count for this area

15   as 30.  And the number is closer to 40.

16   Q.  What happened to the draft after you sent it to

17   Mr. Johnson?

18   A.  I sent it to Mr. Johnson, he made some edits, little nits.

19   And, again, writing that final paragraph.  And then he sent it

20   on to Mr. Martinez and members of -- Jordan and Jeremy, of the

21   DOGE.

22   Q.  Have you heard anything back from anybody about the

23   analysis in this memo?

24   A.  I have not.

25   Q.  When did the Office of Consumer Response return to work?

1   A.  Monday, March 3rd.  At 6 a.m. Mr. Johnson sent out a email

2   activating staff.

3   Q.  Was anyone in the Office of Consumer Response authorized to

4   work before that point?

5   A.  The prior week, on February 27th, there was a limited

6   number of employees who were activated to do a couple of

7   different discrete tasks.  So there were a few employees who

8   were activated to deal with some vendor issues.  There were

9   employees activated to conduct an assessment of system

10  backlogs.  And then there was also a few employees activated

11  for purposes of commencing work on our annual report to

12  Congress, which I was one of those people.

13  Q.  Was there anything else beyond that, February 27th

14  authorization?

15  A.  No.

16  Q.  What is the escalated case management team?

17  A.  The -- the escalated case management team sits in our

18  investigations section, and they respond to both escalated

19  consumer issues, they do deep dive investigations, and they

20  also work on a portfolio of mortgage complaints where the

21  consumer has indicated that they're subject to imminent

22  foreclosure.

23  Q.  Have you reviewed the declaration of Adam Martinez in this

24  case?

25  A.  I have.

1    Q.  In Mr. Martinez's second declaration at paragraph 8 he

2    states, "As of February 27, 2025, members of the escalated case

3    management team, for example, are working."

4        Was the escalated case management team working as of

5    February 27, 2025?

6    A.  No.

7    Q.  How do you know?

8    A.  Mr. Johnson would have, first, told me; but secondly, one

9    of the members of the team reached out following that

10   declaration saying that they were not working.

11   Q.  You're saying Mr. Johnson would have told you.  Did you ask

12   Mr. Johnson whether they were working?

13   A.  Yeah.  He -- he told me they weren't working.

14   Q.  In Mr. Martinez's first declaration he wrote, "Contracts

15   needed for work related to the consumer complaint database have

16   remained intact and operational."

17       Between February 10th and March 3rd, did a single

18   contract owned by consumer response remain intact throughout

19   that period?

20   A.  No.

21   Q.  So I want to take you to the week of March 3rd.  How did

22   you learn that the Office of Consumer Response was going back

23   to work?

24   A.  I received an email from Mr. Johnson.

25   Q.  Can you turn to tab 32 in the blinder that we were looking

1    at?

2          Is this the -- is this an email that is -- not the very

3    first, but the second, March 3rd, 5:59 a.m., from Mr. Johnson,

4    is that the email --

5    A.   That's right.

6    Q.   -- that I alerted you to?

7          And then if you can turn to the next page, page 80,

8    there's another email from Mr. Johnson to Mr. Martinez in the

9    to line, but it begins with "Hi, Mark."  Do you see that?

10   A.   I do.

11   Q.   And the second paragraph begins, "Consistent with your

12   direction and in light of our statutory obligations to conduct

13   financial education programs --" he cites the statute -- "and

14   to collect, investigate, and respond to consumer complaints --"

15   he cites the statute -- he says, "the Division of Consumer

16   Response and Education will take steps to reactivate all staff

17   full-time."

18         At that time, did all staff include the people that were

19   not on the teams identified in your memo?

20   A.   Yes.  This activated everyone, both listed on the memo and

21   not listed on the memo.

22   Q.   Can you describe what it was like when you went back to

23   work on March 3rd?

24   A.   Chaotic is generous.  People had been out of -- out of work

25   for three weeks.  There was a lot of confusion about what was

1    happening.  We also had a variety of challenges that had

2    developed over the prior coming -- the prior weeks, that we

3    needed to address.

4    Q.  Had all the contracts that the Office of Consumer Response

5    used prior to the stop-work order been reinstated?

6    A.  Not all of them, no.

7    Q.  Were any of the contracts that had not been reinstated

8    among the five that you identified as necessary for the

9    office's work?

10   A.  I'm sorry.  Can you repeat that?

11   Q.  Were any of the contracts that had not been reinstated

12   among the five that you had previously identified as necessary

13   for the office's work?

14   A.  Yes.

15   Q.  Can you describe -- give an example of one?

16   A.  Sure.  We have a contract with Ernst & Young, it's our

17   data-sharing contract.  And this contract is -- works on the

18   technology that shares complaints between us and other federal

19   and state regulators.

20   Q.  And without that contract, are you able to share complaints

21   with those other regulators in the same way?

22   A.  No.  No.  Without that contract we've -- these systems

23   invariably develop bugs.  And so beginning last week, we

24   identified -- several of my colleagues identified a bug that's

25   preventing the user from accessing attachments.  And so both

1    internal users can't access this as well as other users of the

2    portal, including federal and state agencies.

3    Q.  Is sharing information with those federal and state

4    agencies something that happens on a weekly basis?

5    A.  It's daily.

6    Q.  Were there any contracts that were turned on but are not

7    back to normal?

8    A.  Yeah.  We have a contract with Deloitte that supports the

9    development of our case management system.  This is a system

10   that's built in a sales force environment, so it requires sales

11   force coders and developers to -- to work insides of it.  When

12   the Deloitte contract was canceled, the staff assigned to that

13   contract had been moved on to other projects because these are

14   people that are typically in demand.  That contract has since

15   been activated, but we are still working with the vendor to

16   identify people who can -- who can work on it.

17   Q.  So, currently, the contract is on, but you have nobody

18   staffing it from Deloitte; is that --

19   A.  That's right.

20   Q.  And you mentioned that they -- the people who -- if

21   staffed, would work on it, would be working on the case

22   management system.  Is the case management system important to

23   the Office of Consumer Response?

24   A.  Very.

25   Q.  Can you explain how?

 1   A.  It's -- the case management system is -- you can think of

 2   it as the central artery of the office.  It's the system that

 3   allows us to take in complaints, get complaints into companies,

 4   it's the system that manages consumers' access as well as

 5   company access.  So, it is essential for getting consumers

 6   timely responses to complaints.

 7   Q.  Was there an assessment of the impact of the stop-work

 8   order on the Office of Consumer Response done the week of

 9   March 3rd?

10   A.  There was.  This -- this is the assessment that began on

11   February 27th.  And on February -- I'm sorry, on March -- on

12   Tuesday, March 4th, there was a briefing about impacts.  And so

13   from that assessment we know that more than 16,000 complaints

14   were awaiting manual review and routing to companies or

15   regulators.  We know that about 500 support tickets came in

16   from company users -- you know, government users to -- to --

17   that needed responding to.  We knew that about 250

18   congressional cases or updates about those cases had been

19   received but not had -- but not been worked.  We also know that

20   about 75 complaints came in that were -- that indicated that

21   they were subject to an immanent foreclosure, and those had not

22   been touched.

23   Q.  In your 11 years at the Office of Consumer Response, had

24   you experienced a backlog like that before?

25   A.  No.

1    Q.  Did you learn anything about how complaints posted to the

2    public database during the stop-work order?

3    A.  The complaints posted to the public database experienced

4    issues as well, and we're currently working through those.

5    Q.  Can you elaborate on whether it was a small number of

6    complaints that didn't make it or a large number?

7    A.  It's thousands of complaints that didn't make it into the

8    database.

9    Q.  Have you learned anything else about the impact of Director

10   Vought's February 10th order on the office's work?

11   A.  Let's see.  Other than -- specific -- about the office --

12   Q.  I'll try it a different way.

13   A.  Sure.

14   Q.  Did you learn anything about the pace of company's response

15   time to consumer complaints?

16   A.  Yes.  The time -- the time that companies take to respond

17   to complaints has increased.

18   Q.  How long will it take the Office of Consumer Response to

19   work through its backlog?

20   A.  Weeks, if not months.

21   Q.  Has the effect of the stop-work order on other offices

22   within the Bureau impacted the Office of Consumer Response?

23   A.  Yes.

24   Q.  Can you explain how?

25   A.  We rely on a variety of other offices to conduct our work.

1    And, so, you know, having -- having the work stop -- stoppage

2    has been difficult.  And so -- would you like me to go through

3    those offices or --

4    Q.  Can you explain the impact on -- it's okay.  We can just

5    move forward.

6        Based on your 11 years of experience in the Office of

7    Consumer Response, what would happen if the current state of

8    affairs continued?

9    A.  If the current state of affairs continued with the

10   contracts that we have, we'll hobble along, but we won't be

11   able to offer services at the level of quality or performance

12   standards that we have in the past.

13   Q.  And based on your 11 years of experience at the Office of

14   Consumer Response, what would happen if the contracts were

15   finally terminated?

16   A.  Oh, the system will collapse.

17        MR. FRIEDMAN:  No further questions.

18        THE COURT:  All right.  Cross-examination?

19                    CROSS-EXAMINATION

20   BY MR. HOLLAND:

21   Q.  Thank you for testifying today, Mr. Pfaff.

22   A.  Thank you.

23   Q.  Get organized here.

24        You testified that you're the chief of staff for the

25   Office of Consumer Response, the CFPB; is that right?

1    A.  That's right.

2    Q.  You also testified that as chief of staff, you're

3    responsible for leading the Office of Consumer Response efforts

4    to meet its statutory obligations; is that right?

5    A.  That's right.

6    Q.  It's true that between approximately February 10, 2025,

7    and, you know, February 26th or March 3rd, whatever the date

8    is, consumer response staff were not working; is that right?

9    A.  That's correct.

10   Q.  And it's true that because staff were not working, the

11   complaint handling operating system experienced a significant

12   disruption; isn't that right?

13   A.  That's right.

14   Q.  Many complaints, by thousands of consumers, not being

15   processed during that period, right?

16   A.  That's correct.

17   Q.  In fact, your estimate is that more than 10,000 complaints

18   were awaiting federal staff review, or at least as of

19   February 26th; isn't that right?

20   A.  More than 16,000.

21   Q.  More than 16,000.

22        And some of those involved people who, as you testified,

23   right, had an imminent foreclosure, which is -- right?

24   A.  Correct.

25   Q.  And folks were not responding to them, right?

1    A.  The complaints that were in the manual queues, they were

2    not being worked.

3    Q.  The 16,000 complaint backlog, that's a large backlog, isn't

4    it?

5    A.  Correct.

6    Q.  It's unprecedented, isn't it?

7    A.  Unprecedented in my memory, yes.

8    Q.  So you would agree, then, that each consumer complaint must

9    be addressed with some urgency to prevent that type of large

10   and unprecedented backlog from building up, right?

11   A.  Yes.

12   Q.  I think you have a binder with -- in front of you, can you

13   turn to tab 56?

14        And that tab has a couple of exhibits in it, and I want

15   you to turn to Exhibit F, which is at -- the top it says, "ECF

16   page No. 20."

17   A.  20 out of 22, correct?

18   Q.  Correct.

19   A.  Okay.

20   Q.  And you've seen this before?

21   A.  Yes.

22   Q.  All right.  This is the email dated February 10th from

23   Acting Director Vought to all staff that you referred to as a

24   stop-work order; is that right?

25   A.  Correct.

1    Q.  Okay.  And you submitted the declaration -- two

2    declarations in this case, right?

3    A.  I did.

4    Q.  In your first declaration, do you recall in paragraph 9

5    characterizing this email as directing staff not to perform any

6    work tasks and to stand down from performing any work task?

7    A.  Correct.

8    Q.  But the email says more than that, doesn't it?

9    A.  The email says to get approval in writing before doing any

10   work tasks.  It also says, "Please alert me through Mark

11   Paoletta if there are any urgent matters."

12   Q.  "If there are urgent matters please alert me through Mark

13   Paoletta," right?

14   A.  Yes.

15   Q.  Despite that directive, you did not contact Mark Paoletta

16   for consumer response approval to address all of the urgent and

17   piling-up consumer complaints; isn't that right?

18   A.  I understood "urgent" to mean something out of the

19   nonordinary course of business.

20   Q.  You didn't think that, like, someone not being able to have

21   their, like, imminent foreclosure complaint addressed was

22   urgent?

23   A.  I consider it urgent, but I would -- I would remind you

24   that 1013 creates an obligation on the director to create the

25   unit that over sees the handling of complaints.  I assume the

1  director, if --

2  Q.  You thought it was urgent, right, but you didn't respond to

3  this email?

4        THE COURT:  All right.  I think you're just arguing

5  with him at this point.

6  BY MR. HOLLAND:

7  Q.  Were you aware that Chris Johnson, the associate director

8  of consumer response, did not email Mark Paoletta requesting

9  authorization to address those consumer complaints at all until

10  at least February 26th at 11 a.m.?

11  A.  I've seen that email, yes.

12        THE COURT:  Would you have known whether there was

13  one in there about a foreclosure without working and going

14  through all the complaints?

15        THE WITNESS:  No.  We would have to write a report.

16  BY MR. HOLLAND:

17  Q.  So it's pretty infrequent that folks contact the Office of

18  Consumer Response about imminent foreclosures?

19  A.  We received 75 complaints about imminent foreclosures

20  during the three-week period.

21  Q.  Right.

22        So this would be pretty typical, right?

23  A.  I'm sorry?

24  Q.  It would be typical that you would receive approximately 75

25  complaints about imminent foreclosures during any three-week

1    period, wouldn't it?

2    A.   It's subject to market fluctuations and what's happening.

3    Q.   There would be at least one every three-week period,

4    wouldn't there?

5    A.   I would imagine some.

6    Q.   Right.

7         So you had some idea that if everyone stopped work, and

8    urgent issues with respect to consumers would not actually be

9    addressed, right?

10   A.   Again, you know, as a employee of the Bureau, we are

11   decided -- we have to decide between, you know, a stop-work

12   order and defining what urgent tasks are.

13   Q.   I think -- okay.  Can you turn to tab 27 in the binder?

14   A.   Sure.

15   Q.   Well, actually, I'm sorry, can we first turn to tab 9?  I'm

16   sorry.

17   A.   Tab 9.  Yes.

18   Q.   So, have you seen this, like, email chain before?  I know

19   you're not on it.

20   A.   I've seen it, yes.

21   Q.   And this is the one you reference before when I asked a

22   question about Mr. Johnson first reaching out to Mr. Paoletta;

23   is that right?

24   A.   I'm sorry.  What was that in reference to?

25   Q.   I'll just ask you.  I mean, you know, as this email

1    indicates, the first time that Mr. Johnson even sent an email

2    of any kind to Mr. Paoletta was actually on February 26th; is

3    that right?

4    A.   That's the only email that -- I'm not in Mr. Johnson's

5    email in box, so I don't know if there were other

6    correspondence here.

7    Q.   From your review, he's introducing himself in the first --

8    A.   Sure, yes.

9    Q.   Okay.  And so, is any -- was any aspect of Mr. Johnson's

10   request on that date denied?

11   A.   No.  No.  Mr. --

12   Q.   How quickly did Mr. Paoletta agree to all of Mr. Johnson's

13   requests for work authorization?

14   A.   Looks like it's a difference of -- Mr. Johnson sent it on a

15   Wednesday night, and Mr. Paoletta responded the next morning.

16   Q.   And you're aware that Mr. Johnson has, like, several roles

17   in the administration, he's not only working as the chief legal

18   officer of CFPB?

19   A.   Mr. Johnson is not the chief legal officer.

20   Q.   I'm sorry, I misspoke.  I meant to say Mr. Paoletta.

21   A.   That's what I've heard, yes.

22   Q.   At the -- like, the bottom of this email chain on page

23   CFPB 19, that's the email that you were talking about on your

24   direct examination; is that right?  Or let me rephrase that.

25         Does that email address the memo that you had worked on,

1    on February 13th?

2    A.  Correct.

3    Q.  And that was not sent to Mark Paoletta on that date; is

4    that right?

5    A.  It was not sent to Mr. Paoletta, no.

6    Q.  Okay.  And were you aware that during that week the entire

7    Office of Consumer Response was left out of whatever RIF

8    planning was going on?

9    A.  I -- I was not aware, no.

10              THE COURT:  Are we?

11              MR. HOLLAND:  Yes, Your Honor.  We've had a lots of

12    testimony.  In fact, if you would like to open up to

13    Plaintiffs' Exhibit JJ, it's in the other binder.

14    BY MR. HOLLAND:

15    Q.  If you move towards the end of that, there's a memo from

16    Adam Martinez to Michael Mahoney?

17    A.  I'm sorry.  You said JJ?

18    Q.  It should be JJ.  I pulled it out myself, so I know.

19              THE COURT:  Well, if he doesn't know you can point me

20    to it later.

21              MR. HOLLAND:  Okay.  I'm just responding to him.  It

22    is, Your Honor, in this memo that has been discussed several

23    times in which there is no Office of Consumer Response in the

24    RIF memo, of, like, nobody was being taken out of that

25    particular office.

1     BY MR. HOLLAND:

2     Q.  I'll just -- you've spoken about a few contracts issue now

3     that people finally have come back to work, little issues here

4     and there with certain contracts.  I assume you're now raising

5     those issues with management so they can be addressed; is that

6     right?

7     A.  We're responding to those issues.

8     Q.  Thank you so much.

9              THE COURT:  Any redirect?

10             MR. FRIEDMAN:  Yeah, just briefly.

11                       REDIRECT EXAMINATION

12    BY MR. FRIEDMAN:

13    Q.  Can you turn -- or if you still have it open to Exhibit JJ?

14    A.  Yes.

15    Q.  You see there's a number, No. 1 there?  Oh, sorry.  It's --

16    there's a memo, that has -- begins to Michael J. Mahoney?

17    A.  Yes.

18    Q.  Okay.  And do you see there's a No. 1 there?  And there's a

19    question and then an answer paragraph?

20    A.  Yes.

21    Q.  Okay.  Now, do you see the second sentence says,

22    "Additional competitive areas will be identified in the next

23    round of divisions, offices, and/or units, including the

24    Division of Operations, Division of Research Monitoring and

25    Regulations, and Division of Consumer Response"?

1          Is the Division of Consumer Response the same as the

2     Office of Consumer Response?

3     A.  Yes.  The -- the formal name is the Division of Consumer

4     Response and Education.

5               MR. FRIEDMAN:  No furthers questions.

6               THE COURT:  All right.  Thank you very much.  The

7     witness can step down.

8               THE WITNESS:  Thank you.

9               THE COURT:  All right.  Is that the end of the

10    witnesses the plaintiff seeks to introduce today?

11              MS. BENNETT:  Yes, Your Honor.

12              THE COURT:  All right.  Now, I've heard the

13    testimony.  I need to review the documents in connection with

14    the testimony.  I wanted to ask a few questions about the state

15    of everyone's positions at this moment.  I had asked at the

16    last hearing for the plaintiffs to take a hard look at the

17    proposed order that they wanted me to introduce, that they

18    wanted me to execute, and one of the main objections that had

19    been raised on the defense side of the courtroom was that they

20    thought your original proposed order was broad and it would put

21    me in the position of monitoring the Agency and constant series

22    of contempt proceedings and evidentiary proceedings of the yes,

23    you are/no, you aren't variety that we've experienced this

24    week.

25              And I had stressed that the -- whatever injunction I

1    issued had to be clear and enforceable so that parties would

2    know when they're violating it, when they're not violating it.

3    So, I wanted to know what the thinking is between the

4    substitution of a very different type of order, saying, "You

5    must have this function, you must have that function, and keep

6    the data, don't fire the employees, don't cancel the

7    contracts."  And this one, which says basically it's still got

8    the, "No delete data, don't fire anybody, reinstate the

9    probationary people, don't give away the money" -- which

10   another judge has already ordered them anyway -- "don't enforce

11   the stop-work order.  Rescind any contract, any contract

12   terminations that enables the statutorily-authorized functions,

13   and basically don't get in the way of the statutory-authorized

14   functions."

15           So, explain to me why you want me to do this as

16   opposed to what you were asking me to do before.

17           MS. BENNETT:  So, the order before, and I apologize,

18   I don't have the text in front of me, but the order before said

19   just don't take any action to interfere with or impair the

20   operations of the CFPB, generally, including a few things.  And

21   so we narrowed it to the statutory authorized functions to make

22   it a more narrowly tailored order.

23           THE COURT:  You also called out specific offices.

24   So, you're not interested in doing that any more?

25           MS. BENNETT:  I think, especially the testimony we've

1    heard, and I think it became very clear to us that these

2    offices are interconnected, and identifying -- limiting it to

3    specific offices would not give sufficient relief, even in the

4    interim.

5        You know, we have heard that there's an ongoing

6    effort to fire everyone in every office, including specific

7    statutorily identified offices.  And so we didn't want the call

8    out of a few offices to limit the relief necessary on an interm

9    basis, but we also recognize that saying, you know, "You have

10   to resume everything at the CFPB," was too broad.

11       THE COURT:  All right.  So any injunctive order has

12   to be predicated on a finding of likelihood of success on the

13   merits of one of your counts.

14       Count 1 talks about an Agency action being *ultra*

15   *vires*, and then one of the two APA counts essentially echoes

16   the same thing by saying there's a final Agency action which is

17   contrary to law.  There's another one that says final Agency

18   action, which is arbitrary and capricious.

19       So specifically now, what Agency action are you

20   asking me to deem to be unlawful, either under Count 1 or the

21   APA counts?

22       MS. BENNETT:  Sure.  So under Count 1, I think the

23   labeling is confusing.  We would be happy to fix it, but it's

24   really a separation of powers count.  And so the stop-work

25   order saying that the Agency can do -- essentially shutting

1    down the functioning of the Agency is a violation of the

2    separation of powers, at least as -- with regard to the

3    statutorily authorized functions.

4              Similarly, the firing --

5              THE COURT:  Before you get to whether it's a

6    constitutional --

7              MS. BENNETT:  Sure.

8              THE COURT:  -- violation, aren't you also saying it's

9    a violation of the provisions in the U.S. Code that

10   establishes --

11             MS. BENNETT:  Yes.

12             THE COURT:  So you don't even have to get in the

13   battle between the Congress and the President.

14             MS. BENNETT:  Yes, right.

15             THE COURT:  You're not suing the President, correct?

16             MS. BENNETT:  Right.  So that stop-work order, we

17   think is a violation of the statute, it's a violation of

18   separation of powers.  It's also arbitrary and capricious.

19   It's very clear that there was no analysis that went into the

20   scope of that order, who's work did what.  And to the extent

21   there was analysis, it was disregard.  So we think it's both

22   contrary to the constitution, contrary to law, and arbitrary

23   and capricious.

24             The same is true with the wholesale termination of

25   contracts.  The same is true with the decision to fire the

1      probationary employees en masse, the term employees en masse,

2      and everybody else en masse.  And the same is true with the

3      decision that we're going to wind down or close the Agency.

4              THE COURT:  Well, you've pointed to a document that

5      reflects -- whether it's a final decision or a decision -- a

6      decision to get rid of all the probationary and term employees,

7      to send out notices terminating the contracts and to stop work.

8              The upshot of all that and the intent of all that,

9      according to -- I believe your position and I believe you think

10     you've proved this through the witnesses you've put on -- is to

11     dismantle and eliminate the Agency completely.  But is there a

12     decision to do that in the record that you're challenging, or

13     are you challenging these other decisions and saying the reason

14     injunctive relief is needed is because of the intent behind

15     them and if we don't have interim relief, there would be no way

16     to fix it if that's what happened in the meantime?

17             MS. BENNETT:  I think both are true.  So I think you

18     could draw from the testimony today that there was a decision

19     to wind down or close the Agency, but I don't think for

20     preliminary relief you need to decide that.  I think the

21     decisions to terminate the contracts, fire the employees and

22     stop work are sufficient to themselves cause irreparable harm

23     if they're not preliminarily enjoined.  And we've heard a lot

24     of testimony, including from Mr. Martinez, that if you stop all

25     the contracts, that's irreparable, that the decisions to fire

1    the employees were causing harm.  And if they do get fired,

2    there won't be positions for them to come back to.  So that's

3    irreparable.

4         And the same thing from the stop-work order, we've

5    heard that even trying, you know, to wrestle up some work that

6    happens before the hearing last week, people weren't able to do

7    that work and there was a whole bunch of problems that were

8    caused by the -- you know, even just a three-week stop of the

9    Agency not working.

10         And so we don't -- I don't think you need to get to

11    the question, the ultimate question of what they were trying to

12    do with that.  I think those decisions themselves are

13    sufficient to justify preliminary relief.

14         THE COURT:  Well, given the arguments about the

15    collective barring agreement and the existence of the Merit

16    System Protection Board, et cetera, do I have jurisdiction to

17    review the decision to fire anyone or is that also just

18    something that's demonstrative of the underlying goal of the

19    other decisions?

20         MS. BENNETT:  I think both.  And I'm just going to

21    grab my notes on that, if you don't mind.

22         THE COURT:  Okay.

23         MS. BENNETT:  So, I do think you have jurisdiction,

24    and what the Supreme Court's recent decision in *Axon* tells us

25    is the question is whether the particular claims brought are of

1    the type Congress intended to be reviewed within the statutory

2    structure.  So that's the MSPB, and I think they're also saying

3    the FLRA, the union grievance process.

4              And this case is quite similar to *Axon*, actually, in

5    that the ordinary statutory review scheme does not apply to

6    extraordinary claims like this.  That's what the Supreme Court

7    said in *Axon*.  Look, they said, there's a separation of powers

8    problem here, it's an extraordinary situation.  And we're not

9    going to assume that when Congress created an administrative

10   process for ordinary fights between employees and their

11   employers that it applies to this extraordinary claim.

12             And I think if you go through the *Thunder Basin*

13   factors, you get to the same place.  You know these are

14   statutory schemes that don't have any explicit mention of

15   jurisdiction stripping, so we're looking at what is implied in

16   the statute.  There's nothing that says there's no

17   jurisdiction.  And the factors all point to not -- Congress not

18   intending to strip this Court of jurisdiction in this kind of

19   extraordinary case.

20             So the first factor is whether all meaningful review

21   will be foreclosed.  I think, you know, it is clear here

22   that -- and I think the testimony of Mr. Martinez shows that

23   there might be no Agency to be reinstated to, if everybody gets

24   fired.  I think this is to your point, the firing is towards a

25   goal of dismantling the Agency.  And the intent was that there

1    be nothing left, and so, you know, the employees could not get

2    relief before the MSPB or the FLRA because there won't be jobs

3    to come back to.

4         I also so want to point out that the government is in

5    several courts and before Congress stating that these

6    tribunals, the MSPB and FLRA, are unconstitutional because of

7    the for-cause removal statutes.  And I'm not aware of any

8    situation ever where the government has argued that people

9    should be channeled to a tribunal that they say is

10   unconstitutional, that they say any decision that comes from

11   that tribunal will be unconstitutional.  I'm not aware of a

12   court ever ordering that relief.

13        And the other reason is, as you mentioned, you know,

14   the employees aren't the only plaintiffs here.  And to get

15   relief, we've heard that you, consumers, the NCLC, cannot give

16   relief to its consumers if there are no employees at the CFPB.

17   You know, Pastor Steege, if there's no student loan ombudsman,

18   cannot go to the student loan ombudsman office, et cetera.

19        THE COURT:  Okay.  Let me ask you, the other issue

20   they're saying, I know you've already addressed voluntary

21   cessation and whether that's a defense here.  And I think

22   everybody has briefed that.  And I know their position, I know

23   your position.  But their position is also that the trigger for

24   the APA is finality.  And clearly, we know that the RIF got

25   stopped in its tracks.  It still seems to be being planned, but

1    where is the thing that's final?

2        I think with your -- with respect to the stop-work

3    order, you're saying, "It never got rescinded, they're just

4    giving little exceptions here and there, and it's still in

5    place."  They're saying, "But we've granted every exception

6    everybody has asked for," so we have to figure that out.

7        But what's your answer to the finality question?

8    Which is a little bit different than the mootness question.

9        MS. BENNETT:  Sure.  So two answers to that.  The

10   first is, you know, all of the evidence we have heard is that

11   there was a final decision to do this that was interrupted by a

12   court order.  And so I'm not aware of any case that says if you

13   have a final decision but the Court enjoins it before you can

14   effectuate that decision, it's somehow no longer a final

15   decision.

16       And the second answer is, you know, to the extent the

17   APA doesn't apply, it is still a violation of the separation of

18   powers, and there is no final decision necessary to find that

19   the action is a violation of the separation of powers and needs

20   to be enjoined for that reason.

21       THE COURT:  And are the plaintiffs -- I understand

22   that you've identified them and explained why you believe that

23   they have standing because they will suffer an injury in fact

24   due to these actions, if they go through.  Did they have

25   standing to raise the constitutional question, the separation

1    of powers issue?

2         MS. BENNETT:  Yes.  So the question in standing is

3    injury.  Are they injured?  And they've certainly been injured

4    by these actions.  And the Supreme Court's decision in *Duke*

5    *Power* and the Supreme Court's recent decisions in the

6    appointments clause cases -- and I could get citations for both

7    of those -- has made very clear, if you have an injury from an

8    agency's action, it doesn't have to be -- there doesn't have to

9    be any nexus between the reason the agency's action was illegal

10   to have standing to challenge it.  You can challenge an agency

11   action that injures you even if, you know, the reason is

12   irrelevant.

13        So, for example, I think *Collins v. Yellen* is the

14   most recent case on this.  And that was an appointments cause

15   challenge.  And what the Court said is as long the action

16   injured you, you don't have to have been injured because the

17   action was unconstitutional, the action could have injured you

18   for some other reason.  But, that's enough for standing.

19        THE COURT:  Okay.  I think I've asked you the

20   questions I wanted to ask you.

21        MS. BENNETT:  Okay.  And we would be very happy to

22   provide any citations or very short briefing that you would

23   like on a short timeline.

24        THE COURT:  Right.  Well, my concern with -- I mean,

25   I think you all have briefed most of these issues before, or

1  you've mentioned these cases in argument.  And if I ask for

2  briefing, then I'm going to want to get it and read it, and

3  that just delays when you get your answer, which doesn't seem

4  to be what anybody is looking for here.

5          MS. BENNETT:  Understood.  But even if you want just

6  citations to the cases, we would be happy to provide them.

7          THE COURT:  I appreciate that.  I think *Collins v.*

8  *Yellen* I can find.

9          MS. BENNETT:  Okay.  And the other case that's really

10  clear on this is *Duke Power*, and I can't remember who was on

11  the other side of *Duke Power*, but it's a Supreme Court case.

12          THE COURT:  All right.  Thank you.

13          MS. BENNETT:  Sure.

14          THE COURT:  All right.  I have a few questions for

15  the government.

16          Are there any particular objections with respect to

17  this order that are different from your objections to the other

18  order?  I mean, I understand the general objections to

19  irreparable harm, standing, jurisdiction, all of that.  But, if

20  I found that there was something that warranted relief to

21  preserve the Agency until the merits were reached, are there

22  aspects of this that are particularly odious from your

23  perspective?

24          MR. ROSENBERG:  Yes.

25          THE COURT:  The whole thing?

1          MR. ROSENBERG:  I can walk through --

2          THE COURT:  Besides -- okay.

3          MR. ROSENBERG:  I'm happy to walk through them.  So

4    I'm looking at the current proposed order, which is -- I

5    believe it's ECF 606.

6          THE COURT:  And to be fair, the first paragraph is

7    essentially similar to what the agreed-upon paragraph was in

8    the TRO.  And you may still not be agreeing but I don't

9    think --

10         MR. ROSENBERG:  And I will object on that paragraph.

11   I mean, we agreed in order to provide this Court with an

12   opportunity to resolve the preliminary injunction.  We know

13   that the Court is working on that decision.  But one of the

14   issues that has arisen concerns these contracts, and there's

15   been testimony about contractors and contractor data.  But,

16   there hasn't been testimony about, you know, if you have a

17   contract, is the data actually CFPB data?  Might there be

18   another copy of that data some place else?  Is the data on

19   those contracts that might be held by those third-party

20   contractor subject to the Federal Records Act.

21         So we object to the data preservation issue because

22   it does raise longer term some operational challenges for the

23   CFPB.

24         Now, we've agreed to pause or freeze the suspension

25   of those contracts, and I'm prepared to speak to that issue as

1    well.  But at least on that first paragraph, we think that

2    there does need to be, if the Court were to issue a preliminary

3    injunction, more specificity as to what the data is.

4         It's also unclear, after these two days of testimony,

5    whether any data that might be held by contractors or any data

6    that the Agency has more generally, are necessary to resolve or

7    preserve the claims of these plaintiffs.  Because when the

8    Court enters an injunction, the extraordinary relief of a

9    preliminary injunction, it has to enter the narrowest form

10   injunctive relief necessary to preserve the status quo.

11        And the plaintiffs here are a serious of different

12   organizations, you know, some unions, some consumer advocacy

13   groups.  But it's unclear, for example, whether, I don't know,

14   the preservation of EEOC-related data is necessary in order to

15   resolve the claims that the plaintiffs have here.  So that

16   would be our objection to paragraph No. 1.

17        For paragraph No. 2, regarding the termination of

18   CFPB employees, you've heard testimony that CFPB intends to

19   comply with the OMB, OPM memo.  That process is one that's

20   ongoing.  And it's the government's position that that memo has

21   functionally superseded any actions that were previously going

22   to take place.

23        Does a preliminary injunction that says that

24   defendants shall not terminate any CFPB employee except for

25   cause and defendant shall not issue a notice of reduction in

1    force to any CFPB employee preclude the Agency from complying

2    with that OMB/OPM memo?  It's in the middle of that process,

3    it's predecisional, if you want to call it that, at this point.

4    And yet, this proposed preliminary injunction would preclude

5    the Agency from even engaging in or ultimately fulfilling that

6    process, which if it were to do so, would be very different

7    from what was contemplated the week of February 10th.

8             THE COURT:  Well, I don't think we know that.

9             MR. ROSENBERG:  But the injunction that plaintiffs

10   would have the Court issue would prevent the Agency from even

11   being able to participate in a different process.  And I don't

12   believe that there's been any testimony from plaintiffs' side

13   or any argument from plaintiffs' side challenge the Agency's

14   ability to engage in that process.  Nor could there be because

15   the process has only just begun.

16             So that's part of the challenge here, that this is an

17   amorphous case where -- I'm not going to say my good friends --

18   but opposing counsel even indicated when they got up here just

19   a few moments ago that it's a little bit less than clear what

20   they're seeking.  And if it's less than clear what they're

21   seeking and if it's less than clear what their claims are

22   about, then this Court needs to be very careful in crafting a

23   preliminary injunction that provides clarity for the CFPB.

24             THE COURT:  Well, I think it's a little hard to blame

25   the lack of specificity on the plaintiffs when the orders that

1    were issued that sent them to court were blanket orders, all

2    contracts, all employees, all provisionary employees.  So you

3    can't turn around and put the onus on them, "Well, how come you

4    aren't more specific?"  They were dealing with something that

5    since then you're saying is changing, and I have to determine

6    if it's changing enough to have eliminated anything that I need

7    to do or not.  But, I think the fact that they came in with

8    broad requests parallels the broad nature of the initial

9    orders.

10                 Do you agree that paragraph 4, that's something

11   you're already obligated to do by the Court in Maryland?

12                 MR. ROSENBERG:  The Court in Maryland has not yet

13   issued a decision on the preliminary injunction.  It's extended

14   it's time window to, you know, basically issue the equivalent

15   of a temporary restraining order with a time limit.  I don't

16   know whether that court is waiting on this Court to decide or

17   vice versa.  But there's no final decision from that Court.  We

18   are under a temporary order.

19                 THE COURT:  But we had something like that in our

20   original TRO, anyway, before I really knew much about what was

21   going on in Maryland, I think, in the order that the two sides

22   hammered out together, probably because you knew you were

23   already obligated to do that; is that fair to say?

24                 MR. ROSENBERG:  On No. 4, I would just say the

25   testimony shows that CFPB can't do what's in No. 4 in any

1    event.  So I mean, I think there's a legal problem with that.

2         THE COURT:  That was my original question, I got a

3    very long answer to that.  Okay.

4         All right.  Well, now that you've told me repeatedly

5    and pointed to a lot of documents that have words to this

6    effect, that it is absolutely the position of the Agency that,

7    at least while it's still in existence, it's going to perform

8    its statutorily required duties, that's who we're measuring

9    employees against, that's what we're measuring the contracts

10   against, that's what -- those are the requests that we're

11   asking for and that we're granting on a regular basis.  If

12   that's true, then what is the problem with memorializing that?

13        MR. ROSENBERG:  Couple of problems.  Number one,

14   going back to the point of the amorphous nature of plaintiffs's

15   claims.

16        THE COURT:  Well, now I'm not talking anything

17   amorphous about clear claims.

18        MR. ROSENBERG:  Okay.

19        THE COURT:  I'm saying something about their claims

20   makes me want to have interim relief, and you're telling me,

21   "There is nothing to see here, Judge, because we are all in on

22   statutorily required duties."  What is offensive about an order

23   confirming that?

24        MR. ROSENBERG:  There is ambiguity as to what the

25   scope of those statutorily required duties are.  I think we

1    heard it just now from Mr. Pfaff --

2             THE COURT:  So you're saying that every one of these

3    emails is ambiguous that you've been showing me all day, and

4    the order that was issued on February 27th and the order that

5    was issued on March 2nd are ambiguous?

6             MR. ROSENBERG:  No.

7             THE COURT:  Okay.

8             MR. ROSENBERG:  You heard if now from Mr. Pfaff when

9    he testified, he felt that there were urgent matters, yet he

10   did not bring those matters to Mr. Paoletta's attention.  He

11   also submitted --

12            THE COURT:  That's urgent matters.  That's not

13   statutorily required.  Don't change --

14            MR. ROSENBERG:  He also submitted a memo that

15   apparently was intentionally incorrect because that memo

16   identified a certain number of statutorily required employees.

17   And then on the stand today he said, "Well, it's actually much

18   larger than that, it's broader than that."  So --

19            THE COURT:  Okay.  So there's a document in the

20   record at this point that I believe the plaintiffs created at

21   Docket 48-5, which is a lengthy chart of statutory duties.  Do

22   you disagree with that chart?

23            MR. ROSENBERG:  I have not had an opportunity to

24   review that chart, but I will point to one area where when

25   plaintiffs were asked to narrow their proposed preliminary

1    injunction, they actually made it broader.  So if you look at

2    paragraph 6 --

3            THE COURT:  I just want to know --

4            MR. ROSENBERG:  It's too broad to know.  It's vague.

5            THE COURT:  Does the director -- acting director of

6    the Consumer Finance Protection Bureau, today, know what the

7    statutorily required duties are?  And did Mr. Paoletta know

8    when he sent out the emails that you have asked me to rely on

9    and to comfort me that the statutorily required duties are

10   under control, does that have meaning for you or does that not

11   have a meaning for you?

12           MR. ROSENBERG:  It has a meaning in the sense that

13   the Agency's operations are broad.  And when individuals have

14   identified statutory duties, they have been approved by

15   Mr. Paoletta.  Now --

16           THE COURT:  So it's up to the employees to identify

17   them up and not for the director to identify them down?

18           MR. ROSENBERG:  Under the current operation of the

19   Bureau, that is the way that it's been functioning.  And that

20   provides an opportunity for the Bureau and its leadership to

21   identify -- to have employees raise those concerns, which

22   they've been asked to do, invited to do, and then they can

23   evaluate those concerns.  The problem is --

24           THE COURT:  They've been invited to do it because

25   they've been told to stop doing all work, and then you decided

1    to add an exception for statutorily required work, but you've

2    asked them to identify what that is.

3              MR. ROSENBERG:  Because those employees are the most

4    familiar with the operation of the Bureau.  Remember, this is

5    new acting leadership at the Bureau that's only been there for

6    a couple of weeks.  And that was part of the reason why I asked

7    Mr. Martinez about Mr. Paoletta's full knowledge and

8    understanding of the Bureau.  That knowledge and understanding

9    has grown over time, and that has affected they type of

10    approvals that have taken place.

11             The problem with looking at -- there are actually two

12    paragraph 6s in plaintiffs' proposed order, the current version

13    of it.  But looking at the second paragraph 6, it says,

14    "Defendant shall not impair, suspend, or terminate the Bureau's

15    ability to perform its statutorily required functions or to

16    comply with its statutory obligations."

17             That may lead to a circumstance where plaintiffs have

18    one view of what their statutory functions are, CFPB leadership

19    may have a different view, and this Court may have a third view

20    because we haven't identified specifically what those

21    statutorily required functions are.  And that creates a risk of

22    contempt for the Agency because they're not being put on clear

23    notice as to what's required.  Instead of making their proposed

24    order narrower, they made it broader, and it's a real risk.

25             THE COURT:  I thought you might say that.  And I

1    personally would not be interested in having daily contempt

2    proceedings.  But how do we solve that problem?  Let's say I

3    want to issue an order.  Do I order you to give me a list of

4    statutorily required functions and tell me what -- all the

5    orders that you're telling me I should rely on in knowing that

6    everything is happening at this Agency that's supposed to

7    happen is really happening?  Should I ask you to draft a list

8    or should I ask you to tell me if there's anything on the

9    plaintiffs' list that you say is not statutorily authorized?

10           One issue of have for both of you is where -- and I

11   think I raised this the other day, but I haven't asked for your

12   answer today -- is where examinations fall in this requirement.

13   I understand that a certain level of supervision and

14   enforcement falls within the Agency may, Agency may.  They have

15   to have the offices for those offices to do what they do within

16   the discretion of the politically appointed leadership, I

17   understand that.

18           But some of the things those same organizations do is

19   to report their results of examinations to Congress, to the

20   President, various places, which enables, I guess, Congress or

21   the President to oversee whether they like -- they think the

22   enforcement division is being aggressive enough or too

23   aggressive or whatever.

24           So how do you do your reporting without doing

25   examinations?  Would you agree that examination function is

1    required?

2              MR. ROSENBERG:  Under that circumstance, it may be.

3    But, if the question is preparing a report for Congress,

4    Congress isn't a plaintiff in this case, so it's unclear how an

5    injunction from this Court would remedy a harm there.  I mean,

6    that's part of the problem.  Is that -- and the statutory

7    functions that plaintiffs have identified appear to be

8    literally everything that the Agency does.  They want -- they

9    can take --

10             THE COURT:  Isn't that what that means?  I mean, you

11   used the term more often than they did.  This term is taken

12   straight from the February 27 email and then the February --

13   and then the March 2nd email, which was actually sent to

14   someone saying, you know, "How can you dare defy my clear

15   order?"

16             MR. ROSENBERG:  If that --

17             THE COURT:  So somebody thought it was clear when

18   they wrote it in an email.  So somebody in your side knows what

19   it means.  And isn't it the same?  I don't know.  If it's not

20   the same as what plaintiffs thinks it means, then it sounds

21   like both of you need to tell me what it means because you like

22   the term as much as they do.  They've adopted it from you.

23             MR. ROSENBERG:  But what CFPB has been doing is

24   that --

25             THE COURT:  Your co-counsel is dying to say

1    something, so why don't you check in with him.

2           MR. ROSENBERG:  Let me finish the point.  As I

3    said --

4           THE COURT:  Okay.  Not that you weren't going to say

5    something good, but I wanted to make sure he got whatever he

6    was trying to get out, out.

7           MR. ROSENBERG:  You can come on up.

8           MR. HOLLAND:  I don't want to steal your thunder.

9           MR. ROSENBERG:  No.  I mean, it's -- go ahead.

10           MR. HOLLAND:  Can I just say, Your Honor, I mean,

11    this is -- the problem with this case, like, if you read *Norton*

12    and the block quotes we put in our brief from the Supreme Court

13    on these issues.  Is that the plaintiffs can't bring a claim

14    for everything the Agency is doing.  I really encourage you to

15    go back and read the block quotes from *Norton v. Southern Utah*

16    *Alliance Foundation*, or whatever it's called.  But, like, the

17    point is, right, Your Honor, Congress tasked the Agency, not

18    this Court, with going through and figuring out a process for

19    identifying how it's going to comply with each one of it's

20    statutory obligations.  That's --

21           THE COURT:  I do not want to manage this agency.  But

22    the problem they are presenting is that if I determine that

23    what's happening is that they're trying to shut it down.  And

24    if I determine that the shutdown violates the statute, and

25    that's not the way executives shut down agencies, they go --

1    just everything the congressman said in their amicus brief,

2    that they sit down and they engage in a process of saying, "We

3    don't like the CFPB, we're going to break it up."  The same way

4    they created Homeland Security or they're going to have to if

5    they decide to get rid of education, they can't just do it at

6    the White House.  They're going to have to do it on the Hill.

7    They have friendly houses of Congress on the Hill.

8         You know, whether this is popular, this Agency and

9    its work, which doesn't cost the taxpayers anything but brings

10   billions to them, whether that's popular to the constituents of

11   the members of Congress, and whether they want to fight for it

12   or not fight for it or whether they're equally happy to have

13   this work done under the umbrella of an existing agency in the

14   interest of streamlining the federal government is not a matter

15   for me to determine.

16         My only concern is until that gets determined, then

17   who gets to decide, whether it's the President or Congress.

18   If, at the end of the day, I decide or the Circuit decides or

19   the Supreme Court decides that it's only Congress, and they say

20   it's only Congress, if it's already been gotten rid of below,

21   it's too late.

22         That's what I'm trying to figure out.  What do we

23   need to say if that, I determine, is what's going on.

24         MR. HOLLAND:  I think your order is confusing the,

25   like, if I decide something and the merits is wrong, therefore

1    there's something I can do.  When, in fact, the merits are for

2    claims for wholesale supervision.  The Supreme Court has been

3    very clear that Congress devised how a court addresses this.

4    It's for a plaintiff with an -- who is injured by, like, an

5    individualized failure to act with respect to an

6    individualized, for example, consumer complaint, they can bring

7    an action under 7061.

8              THE COURT:  They aren't those people.

9              MR. HOLLAND:  That's a problem.

10             THE COURT:  They are facing the inability to be

11   served at all.  This case may or may not fit into the *Norton*

12   framework.  I will look at it.  I'm not saying I'm not going to

13   look at it.  I'm just trying to figuring out.

14             I think there are plenty of case law that talk about

15   preserving the status quo.  And your status quo is statutory

16   stuff is going on, not to worry.  And they're saying, "Not

17   really because we don't actually have the people and we don't

18   actually have the contracts.  And, so, we need some assurance."

19             Obviously the fact that you all agreed to something

20   that became a court order before had a direct and immediate

21   effect on the dismantling of this agency, your own witness

22   testified to that, your own documents demonstrate that.  But

23   the conversation hasn't ended.  It's continued.  So, the

24   question is:  What is the appropriate thing to order?  And it

25   seems to me that you're saying the term "statutory obligations"

1   is too broad and not enforceable.  And I would like to not --

2   and you're also saying I don't have the authority to do it, but

3   if I think I have the authority to do it under the unique

4   circumstances of this case, are you telling me you don't know

5   what they mean?

6               MR. ROSENBERG:  Yes.

7               THE COURT:  Okay.

8               MR. ROSENBERG:  I think there are some more

9   objections.

10              THE COURT:  All right.

11              MR. ROSENBERG:  Paragraph 5.

12              THE COURT:  Well, that's just poorly written.

13              MR. ROSENBERG:  Yes.  We can agree on that.

14              THE COURT:  What else?

15              MR. ROSENBERG:  But beyond that -- I mean, this goes

16  to -- this goes to the Vought email that plaintiffs have

17  characterized as a stop-work order.

18              THE COURT:  It is a stop-work order.

19              MR. ROSENBERG:  With exceptions.  With exceptions.

20              THE COURT:  It doesn't have an exception.  It says

21  "If you have an urgent matter, you can reach out to me."  That

22  doesn't say there's an exception for urgent matters.  You can

23  read it how you want to read it, but I think the way you've

24  been trying to read it is not true to the language.

25              MR. ROSENBERG:  Okay.  You are the factfinder here.

1    So, but what I would nonetheless say is, in some ways they are

2    two sides of the same coin.  So the reason that those emails

3    were issued in part, if not entirely, was to get operational

4    control of the Agency.  After those emails were issued,

5    testimony shows that people requested exceptions, and they were

6    granted.

7         Now, the other way one could do it, is instead of

8    saying, "No, unless I tell you yes," there could be a

9    presumption that it's yes, unless I tell you no.

10        Would paragraph 5, as written, that says, "Do not

11   enforce the order that CFPB employees and contractors stop work

12   at or for the CFPB," set that aside, it seems to be what

13   plaintiffs are requesting there, does CFPB still have the

14   discretion to make individual decisions to tell employees not

15   to do something?  Or is that something for plaintiffs, who

16   represent CFPB employees, to decide, instead of having CFPB

17   management decide.  Or to put it more bluntly, is that -- would

18   the CFPB employees, who are in court here, have this Court

19   decide what functions can continue rather than have the Agency

20   leadership itself decide?

21        And in that regard, paragraph No. 5 is confusing.

22        You know, regarding paragraph 6 and the freeze on the

23   termination of contracts, one of the issues -- and we realize

24   that the Court may disagree with this, but one of the issues

25   that we do firmly believe is that there's bloat in CFPB's

1      contracts, and that there's testimony that that goes back to

2      the prior administration.  And one of the things that CFPB is

3      trying to do is to reduce its costs, which is well within the

4      mainstream of, you know, what an agency can do.

5              And we've discussed a lot of different contacts.

6      There are various snippets based on the record that we have,

7      and it was a record that was pulled together very quickly, in a

8      matter of days, but, you know, both sides worked to pull that

9      together for the Court.  But would this require CFPB to

10     maintain all of its contracts?  It has to maintain not only the

11     contract --

12             THE COURT:  Well, the think I've been asking you to

13     work on for two weeks was which are the ones that they think

14     are essential?  I think you've shown me documents where each

15     organization is saying that, and some have been turned back on,

16     some have not been turned back on.  Some have been turned back

17     on in name only because they can't actually perform.  But, that

18     was what I thought you all were going to discuss.  You reached

19     an agreement, which is broad and has this kind of language and

20     doesn't specify contracts, and said it's going to expire next

21     Monday, when we might still be here talking.

22             So, I don't have a problem with a more narrowly

23     targeted version of that, but I don't have the expertise to

24     draft it.  So, you know, I think every time that you all put

25     your heads together in this case, there's been more clarity,

1    and something that becomes more easily enforceable, and maybe

2    something that both sides can live with.  Because I am

3    concerned that there is a disconnect between the language in

4    the, "Oh, absolutely, do your statutorily required duties,

5    that's what we want you to do," and what's actually happening

6    and what's actually going on behind the scenes and what's

7    actually being planned.

8            We're still having RIF team meetings that result, at

9    the end of the day, with nobody left.  And that may be

10   something that is allowed to happen, but I don't think it's

11   something that's allowed to happen the way it's happening.  I

12   don't think it's up to the President and Mr. Vought, or even

13   the President and the new director of the CFPB.

14           So, I want to preserve an agency that could be

15   revived, if necessary.  That doesn't mean it has to be the

16   agency that it was on January 31st.  But it has to be something

17   like what it is now or maybe even a little bit better than it

18   is now, that can limp along -- well, I think hobble was the

19   word that Mr. Pfaff used -- until we get to the merits.  I

20   don't think we can have nothing, is where I'm leaning to right

21   now.  I have not decided.  I'm thinking out loud here.

22           But I think a lot of evidence has been introduced

23   that supports a conclusion that the same people who are sitting

24   in a room and talking about RIFing are still sitting in a room

25   and talking about RIFing.  So -- and that the process for

1    restarting contracts hasn't been as smooth as advertised.

2            So I still have to think about whether I can issue

3    such an order on the record that I have now, with the

4    plaintiffs that I have now.  Given standing, given whether we

5    have final order, given whether I see a statutory violation,

6    given the *Norton* case, given all the cases that have been

7    provided to me.

8            And I'm not making fun of you, I want you to

9    understand that.  I really will look at what you think is

10   important.

11           So I have to do all those things.  And the reason I

12   don't like to tell you when I'm going to finish is because I

13   cannot tell you that -- if I'm going to come out at the end of

14   the day persuaded by one side or the other.  I am concerned

15   about the factual situation.  This was a very illuminating two

16   days.

17           And, so, the question I asked at the end of yesterday

18   was:  Are you willing to live with what you did agree to

19   between now and the ruling on the preliminary injunction?

20           MR. ROSENBERG:  We are willing to maintain the freeze

21   on the termination of contracts, you know, using the same

22   language that we had before, which is a carve out for the

23   lease, through March 28th.  Which is the end of the week that

24   you indicated you would, you know --

25           THE COURT:  All right.

1          MR. ROSENBERG:  -- endeavor to issue a decision.

2          THE COURT:  Aim for, yes.

3          MR. ROSENBERG:  With one clarification, it's our

4    understanding that if the Court issues a preliminary

5    injunction -- and to be clear, we don't think it should -- but

6    if it does, that would supersede.

7          THE COURT:  It would vacate -- okay.  Well, I would

8    like it if you all put it in writing and docket that, that

9    would be a helpful thing.

10         And I would also encourage you to think about, if

11   there are ways to draft an order -- that you don't want me to

12   issue at all -- that you find more easily understandable and

13   enforceable and that you think meets what I'm sort of referring

14   to as your minimum daily requirements.  What is -- what do I

15   have to order, as opposed to what would you like me to order.

16   And I think if you can actually agree on those things, that

17   would be great.  If you have dueling proposals for how to

18   improve what's on the table, that would be great, too.

19         So I'm not going to give you a date for that.  But I

20   think to the extent I have information like that by the end of

21   this week, that would be terrific.  And if you improve on it in

22   agreement with each other between now and when you get an order

23   from me, I'm never going to say it's too late to agree to

24   something.

25         All right.  Is there anything else anybody needs to

1    say at this moment?

2            MS. BENNETT:  No, your.

3            THE COURT:  Okay.  All right.  Thank you very much,

4    everybody.

5                            *   *   *

6

7

8

9

10            CERTIFICATE OF OFFICIAL COURT REPORTER

11

12    I, JANICE DICKMAN, do hereby certify that the above and

13    foregoing constitutes a true and accurate transcript of my

14    stenographic notes and is a full, true and complete transcript

15    of the proceedings to the best of my ability.

16                    Dated this 11th day of March, 2025

17

18

19                    _____

20                    Janice E. Dickman, CRR, CMR, CCR
                      Official Court Reporter
21                    Room 6523
                      333 Constitution Avenue, N.W.
22                    Washington, D.C.  20001

23

24

25

## $

**$300** [1] - 70:8

## 0

**00019** [1] - 14:5

## 1

**1** [7] - 63:3, 99:15, 99:18, 102:14, 102:20, 102:22, 112:16
**1,000** [1] - 59:11
**1-800** [3] - 74:5, 74:17, 74:20
**10** [10] - 17:9, 47:5, 47:15, 51:7, 52:8, 54:18, 54:21, 79:19, 80:4, 92:6
**10,000** [1] - 92:17
**1013** [1] - 94:24
**10th** [28] - 7:22, 11:1, 11:8, 13:4, 17:12, 18:7, 18:8, 19:24, 22:1, 24:6, 24:7, 24:13, 35:14, 37:3, 37:5, 50:14, 58:7, 59:24, 76:11, 76:20, 77:16, 77:20, 78:10, 78:22, 85:17, 90:10, 93:22, 113:7
**11** [4] - 89:23, 91:6, 91:13, 95:10
**11:01** [1] - 14:9
**11th** [5] - 7:14, 8:13, 8:15, 35:22, 37:14
**120** [1] - 74:20
**1200** [10] - 41:13, 41:19, 43:10, 45:9, 45:15, 57:10, 57:13, 62:13, 63:1, 63:4
**12th** [2] - 37:21, 38:4
**13** [1] - 31:9
**130** [1] - 45:14
**13th** [12] - 31:25, 38:15, 38:16, 45:14, 46:11, 46:25, 49:6, 49:9, 64:8, 79:9, 98:1
**144** [1] - 82:6
**14th** [14] - 19:24, 22:1, 42:4, 43:21, 43:25, 44:2, 44:10, 46:20, 49:6, 49:21, 51:7, 60:12, 60:16, 64:8
**15** [2] - 52:8, 73:2
**150** [6] - 81:18, 81:20, 81:25, 82:6, 82:15
**155** [5] - 81:18, 81:20, 81:25, 82:15
**16** [1] - 30:20

**16,000** [4] - 89:13, 92:20, 92:21, 93:3
**1700** [1] - 45:17
**19** [4] - 27:22, 30:17, 30:23, 97:23
**19th** [3] - 54:24, 60:18, 60:21
**1:00** [1] - 51:21
**1:30** [3] - 51:14, 51:21, 51:22
**1:55** [1] - 78:11

## 2

**2** [10] - 13:1, 30:10, 51:15, 51:25, 52:1, 63:4, 78:3, 79:15, 112:17
**2-10** [1] - 17:19
**20** [4] - 79:22, 80:4, 93:16, 93:17
**2011** [1] - 35:1
**2012** [1] - 35:1
**2013** [1] - 68:23
**2021** [1] - 69:3
**2025** [8] - 17:8, 17:9, 27:6, 28:2, 31:9, 85:2, 85:5, 92:6
**20th** [3] - 59:23, 60:23, 60:24
**21** [1] - 27:6
**22** [1] - 93:17
**24** [2] - 15:8, 17:7
**25-381** [1] - 3:3
**250** [1] - 89:17
**26th** [7] - 13:22, 14:9, 61:7, 92:7, 92:19, 95:10, 97:2
**27** [4] - 85:2, 85:5, 96:13, 120:12
**27th** [12] - 14:23, 30:21, 31:14, 32:4, 32:13, 60:4, 61:3, 67:2, 84:5, 84:13, 89:11, 116:4
**28** [1] - 28:2
**28th** [2] - 67:6, 128:23
**2nd** [2] - 15:8, 17:7, 17:16, 116:5, 120:13

## 3

**3** [3] - 30:10, 73:14, 78:5
**30** [6] - 28:19, 44:5, 47:21, 59:3, 59:8, 83:15
**30-day** [1] - 28:19
**300** [1] - 45:18
**31st** [1] - 127:16

**32** [4] - 18:19, 18:20, 18:21, 85:25
**350,000** [1] - 69:25
**39** [1] - 8:20
**3:30** [1] - 38:18
**3rd** [9] - 53:6, 53:8, 84:1, 85:17, 85:21, 86:3, 86:23, 89:9, 92:7

## 4

**4** [4] - 7:2, 114:10, 114:24, 114:25
**40** [3] - 27:21, 27:22, 83:15
**48-5** [1] - 116:21
**4th** [6] - 62:2, 62:3, 62:6, 62:7, 62:12, 89:12

## 5

**5** [5] - 26:20, 52:25, 124:11, 125:10, 125:21
**500** [1] - 89:15
**56** [1] - 93:13
**5:03** [2] - 53:1, 54:5
**5:59** [1] - 86:3

## 6

**6** [5] - 79:15, 84:1, 117:2, 118:13, 125:22
**60** [5] - 41:15, 41:23, 44:6, 73:3, 79:18
**606** [1] - 111:5
**6s** [1] - 118:12
**6th** [3] - 62:2, 62:3, 63:12

## 7

**7** [2] - 26:19
**700** [1] - 59:12
**7061** [1] - 123:7
**75** [3] - 89:20, 95:19, 95:24
**7500** [1] - 73:4
**7:00** [1] - 54:18
**7th** [3] - 35:9, 35:11, 75:23

## 8

**8** [3] - 17:8, 26:20, 85:1
**80** [2] - 80:7, 86:7
**81** [1] - 18:21
**85** [2] - 45:13, 80:8
**8:30** [1] - 47:3

**8th** [2] - 75:24, 76:5

## 9

**9** [7] - 13:25, 14:5, 30:18, 35:17, 94:4, 96:15, 96:17
**90** [2] - 41:15, 79:18
**90-day** [2] - 49:1, 50:22
**9th** [1] - 76:8

## A

**a.m** [7] - 14:9, 35:17, 47:15, 51:7, 84:1, 86:3, 95:10
**ability** [3] - 22:14, 113:14, 118:15
**able** [13] - 23:18, 29:4, 43:2, 43:3, 43:8, 43:20, 48:7, 72:23, 87:20, 91:11, 94:20, 105:6, 113:11
**abolished** [3] - 55:25, 56:4, 63:24
**abolishing** [1] - 50:15
**absolutely** [6] - 11:21, 24:14, 25:1, 29:11, 115:6, 127:4
**accept** [2] - 70:18, 74:22
**accepts** [1] - 74:8
**access** [3] - 88:1, 89:4, 89:5
**accessing** [1] - 87:25
**accomplish** [2] - 43:22, 49:13
**accomplished** [1] - 9:8
**according** [1] - 104:9
**account** [2] - 17:15, 17:18
**accountability** [1] - 23:21
**accurate** [3] - 29:15, 75:14, 83:8
**acquisitions** [1] - 20:22
**act** [1] - 123:5
**Act** [2] - 6:6, 111:20
**acting** [16] - 10:22, 11:1, 11:8, 13:6, 17:8, 18:6, 18:14, 35:7, 56:17, 58:25, 61:12, 62:4, 75:21, 76:2, 117:5, 118:5
**Acting** [18] - 11:6, 11:14, 17:11, 17:16, 21:6, 35:15, 36:15,

37:3, 41:9, 44:8, 46:2, 50:10, 54:13, 56:19, 60:5, 76:3, 76:10, 93:23

**action** [18] - 27:17, 36:25, 40:13, 41:5, 81:10, 101:19, 102:14, 102:16, 102:18, 102:19, 108:19, 109:8, 109:9, 109:11, 109:15, 109:17, 123:7

**actions** [6] - 27:9, 28:5, 67:10, 108:24, 109:4, 112:21

**activated** [7] - 27:8, 84:6, 84:8, 84:9, 84:10, 86:20, 88:15

**activating** [2] - 27:3, 84:2

**activities** [2] - 19:9, 25:9

**actor** [1] - 18:3

**actual** [1] - 5:18

**Adam** [33] - 35:17, 38:1, 39:15, 39:17, 41:13, 46:1, 47:8, 47:10, 48:19, 49:9, 49:23, 50:13, 51:15, 52:8, 52:10, 53:11, 53:19, 54:4, 54:8, 55:2, 55:4, 55:8, 55:21, 56:15, 58:15, 59:1, 59:16, 61:9, 61:23, 61:24, 63:13, 84:23, 98:16

**Adam's** [1] - 53:5

**add** [2] - 45:15, 118:1

**added** [1] - 76:4

**additional** [9] - 33:5, 33:7, 37:9, 37:20, 58:8, 58:14, 60:3, 61:21, 76:4

**Additional** [1] - 99:22

**address** [8] - 39:7, 75:12, 75:13, 75:14, 87:3, 94:16, 95:9, 97:25

**addressed** [5] - 93:9, 94:21, 96:9, 99:5, 107:20

**addresses** [1] - 123:3

**Administration** [2] - 5:15, 5:24

**administration** [3] - 56:16, 97:17, 126:2

**administrative** [1] - 106:9

**adopted** [1] - 120:22

**adults** [1] - 23:17

**advertised** [1] - 128:1

**advise** [3] - 6:13, 6:17, 69:13

**advised** [1] - 22:12

**adviser** [1] - 69:6

**advisor** [4] - 34:18, 52:10, 53:5, 54:7

**advisory** [7] - 4:16, 5:7, 5:8, 5:9, 6:11, 59:5

**Advisory** [1] - 6:6

**advocacy** [1] - 112:12

**affairs** [2] - 91:8, 91:9

**Affairs** [1] - 72:6

**affected** [1] - 118:9

**afraid** [1] - 65:11

**afternoon** [9] - 3:7, 3:11, 3:12, 4:7, 33:21, 38:18, 46:11, 68:16, 68:17

**agencies** [9] - 37:24, 40:2, 60:7, 61:6, 74:13, 77:6, 88:2, 88:4, 121:25

**agency** [14] - 24:12, 35:2, 55:13, 55:20, 55:24, 55:25, 56:4, 109:10, 121:21, 122:13, 123:21, 126:4, 127:14, 127:16

**Agency** [48] - 6:13, 18:12, 18:13, 19:19, 20:4, 20:9, 22:1, 22:17, 22:21, 23:15, 25:12, 50:16, 56:21, 56:24, 57:1, 57:3, 59:7, 59:20, 62:4, 100:21, 102:14, 102:16, 102:17, 102:19, 102:25, 103:1, 104:3, 104:11, 104:19, 105:9, 106:23, 106:25, 110:21, 112:6, 113:1, 113:5, 113:10, 115:6, 118:22, 119:6, 119:14, 120:8, 121:14, 121:17, 122:8, 125:4, 125:19

**agency's** [2] - 109:8, 109:9

**Agency's** [4] - 21:14, 21:15, 113:13, 117:13

**agents** [2] - 74:5, 74:20

**aggressive** [2] - 119:22, 119:23

**ago** [1] - 113:19

**agree** [9] - 82:23, 93:8, 97:12, 114:10, 119:25, 124:13, 128:18, 129:16, 129:23

**agreed** [6] - 81:16, 81:17, 111:7, 111:11, 111:24, 123:19

**agreed-upon** [1] - 111:7

**agreeing** [1] - 111:8

**agreement** [6] - 28:4, 28:21, 37:25, 105:15, 126:19, 129:22

**ahead** [6] - 4:22, 5:11, 40:24, 42:22, 52:3, 121:9

**aim** [1] - 129:2

**al** [2] - 3:3, 3:4

**alert** [2] - 94:10, 94:12

**alerted** [1] - 86:6

**Alex** [2] - 33:10, 33:13

**ALEX** [1] - 33:16

**align** [2] - 80:7, 80:9

**aligned** [2] - 31:7, 82:13

**Alison** [1] - 3:9

**Alliance** [1] - 121:16

**allow** [1] - 73:13

**allowed** [4] - 65:5, 65:6, 127:10, 127:11

**allows** [2] - 22:19, 89:3

**alluded** [1] - 51:10

**altogether** [1] - 41:14

**ambiguity** [1] - 115:24

**ambiguous** [2] - 116:3, 116:5

**American** [1] - 70:8

**Americans** [1] - 72:6

**amicus** [1] - 122:1

**amorphous** [3] - 113:17, 115:14, 115:17

**analysis** [10] - 9:24, 10:5, 10:7, 77:25, 78:14, 78:17, 79:1, 83:23, 103:19, 103:21

**analyze** [4] - 70:3, 77:16, 78:19, 78:21

**annual** [1] - 84:11

**answer** [15] - 4:18, 4:22, 4:25, 5:2, 5:4, 32:7, 55:16, 69:23, 74:18, 99:19, 108:7, 108:16, 110:3, 115:3, 119:12

**answers** [1] - 108:9

**anyway** [3] - 51:19, 101:10, 114:20

**APA** [4] - 102:15, 102:21, 107:24, 108:17

**apologize** [1] - 101:17

**appear** [1] - 120:7

**appearance** [1] - 3:6

**applies** [1] - 106:11

**apply** [2] - 106:5, 108:17

**appointed** [1] - 119:16

**appointments** [2] - 109:6, 109:14

**appraisals** [1] - 48:11

**appreciate** [1] - 110:7

**approach** [1] - 22:23

**appropriate** [4] - 16:21, 22:10, 24:3, 123:24

**approval** [2] - 94:9, 94:16

**approvals** [1] - 118:10

**approved** [4] - 13:12, 13:18, 14:16, 117:14

**arbitrary** [3] - 102:18, 103:18, 103:22

**are/no** [1] - 100:23

**area** [4] - 50:22, 82:20, 83:14, 116:24

**areas** [11] - 16:4, 41:21, 42:24, 43:24, 49:1, 49:20, 62:17, 62:18, 63:21, 80:6, 99:22

**argued** [1] - 107:8

**arguing** [1] - 95:4

**argument** [2] - 110:1, 113:13

**arguments** [1] - 105:14

**arisen** [1] - 111:14

**artery** [1] - 89:2

**aside** [1] - 125:12

**aspect** [1] - 97:9

**aspects** [1] - 110:22

**assess** [2] - 40:21

**assessment** [5] - 78:1, 84:9, 89:7, 89:10, 89:13

**assigned** [8] - 35:20, 37:8, 40:1, 44:19, 49:13, 77:21, 77:24, 88:12

**assignment** [7] - 77:19, 77:22, 78:17, 78:19, 79:8, 81:8, 81:19

**assist** [1] - 81:23

**assistance** [1] - 79:10

**assistant** [1] - 18:15

**assisting** [2] - 38:10, 71:8

**associate** [4] - 19:2, 31:3, 69:18, 95:7

**associated** [1] - 79:17

**assume** [4] - 45:4, 94:25, 99:4, 106:9

**assurance** [2] - 8:17, 123:18

**attached** [1] - 50:21

**attachment** [1] - 75:17

**attachments** [4] - 52:7, 52:11, 52:15, 87:25
**attempt** [1] - 22:4
**attempts** [1] - 25:10
**attend** [2] - 61:24, 67:4
**attended** [1] - 67:4
**attending** [1] - 61:23
**attention** [1] - 116:10
**audibly** [1] - 32:7
**audit** [3] - 71:17, 74:15, 74:16
**authored** [1] - 82:21
**authority** [2] - 124:2, 124:3
**authorization** [4] - 31:21, 84:14, 95:9, 97:13
**authorized** [8] - 18:9, 32:2, 84:3, 101:12, 101:13, 101:21, 103:3, 119:9
**avenue** [1] - 22:22
**average** [1] - 11:20
**avoid** [1] - 58:10
**awaited** [1] - 35:19
**awaiting** [2] - 89:14, 92:18
**aware** [26] - 14:19, 16:23, 16:24, 21:20, 21:21, 28:4, 30:13, 31:13, 31:15, 31:19, 31:20, 32:4, 32:16, 32:20, 51:9, 51:14, 51:23, 64:20, 66:9, 95:7, 97:16, 98:6, 98:9, 107:7, 107:11, 108:12
**Axon** [3] - 105:24, 106:4, 106:7

### B

**background** [1] - 34:24
**backlog** [5] - 89:24, 90:19, 93:3, 93:10
**backlogs** [1] - 84:10
**ball** [1] - 72:18
**bargaining** [1] - 22:18
**barring** [1] - 105:15
**based** [13] - 9:6, 12:9, 14:12, 15:10, 25:8, 28:7, 37:2, 39:22, 45:21, 75:11, 91:6, 91:13, 126:6
**Basin** [1] - 106:12
**basis** [3] - 88:4, 102:9, 115:11
**Bates** [4] - 6:23,

26:19, 27:21, 27:22
**battle** [1] - 103:13
**became** [6] - 16:2, 21:14, 21:20, 102:1, 123:20
**become** [2] - 35:8, 51:9
**becomes** [1] - 127:1
**began** [5] - 68:23, 69:3, 79:17, 81:15, 89:10
**begin** [3] - 33:22, 68:22, 69:2
**beginning** [4] - 21:18, 65:10, 70:17, 87:23
**begins** [3] - 86:9, 86:11, 99:16
**begun** [1] - 113:15
**behalf** [1] - 3:14
**behind** [2] - 104:14, 127:6
**below** [4] - 27:11, 80:6, 82:15, 122:20
**benefits** [2] - 65:3, 70:5
**BENNETT** [24] - 3:23, 11:25, 26:8, 26:15, 30:2, 33:10, 33:13, 100:11, 101:17, 101:25, 102:22, 103:7, 103:11, 103:14, 103:16, 104:17, 105:20, 105:23, 108:9, 109:2, 109:21, 110:5, 110:9, 110:13
**Bennett** [1] - 3:8
**Bessent** [1] - 76:3
**best** [3] - 41:2, 58:23, 80:10
**better** [2] - 23:12, 127:17
**between** [12] - 37:25, 85:17, 87:18, 92:6, 96:11, 101:3, 103:13, 106:10, 109:9, 127:3, 128:19, 129:22
**beyond** [2] - 84:13, 124:15
**billions** [1] - 122:10
**binder** [10] - 6:15, 6:21, 26:19, 30:10, 78:2, 79:19, 80:2, 93:12, 96:13, 98:13
**bit** [5] - 62:15, 82:6, 108:8, 113:19, 127:17
**black** [1] - 49:24
**blame** [1] - 113:24
**blank** [1] - 82:20
**blanket** [1] - 114:1
**blinder** [1] - 85:25

**bloat** [1] - 125:25
**block** [2] - 121:12, 121:15
**bluntly** [1] - 125:17
**Board** [1] - 105:16
**board** [1] - 6:11
**boards** [5] - 5:8, 5:10, 59:5
**boss** [1] - 22:13
**bottom** [2] - 79:24, 97:22
**box** [1] - 97:5
**Brad** [1] - 3:12
**Branch** [2] - 3:14, 3:16
**breaches** [1] - 71:25
**break** [2] - 67:21, 122:3
**brief** [3] - 67:21, 121:12, 122:1
**briefed** [2] - 107:22, 109:25
**briefing** [3] - 89:12, 109:22, 110:2
**briefly** [3] - 34:23, 69:22, 99:10
**bring** [5] - 72:1, 72:14, 116:10, 121:13, 123:6
**brings** [1] - 122:9
**broad** [8] - 100:20, 102:10, 114:8, 117:4, 117:13, 124:1, 126:19
**broader** [3] - 116:18, 117:1, 118:24
**brought** [2] - 44:1, 105:25
**Brown** [1] - 11:20
**budget** [1] - 23:4
**bug** [1] - 87:24
**bugs** [1] - 87:23
**build** [1] - 71:23
**building** [4] - 14:1, 14:3, 70:18, 93:10
**buildings** [1] - 5:23
**built** [1] - 88:10
**bunch** [1] - 105:7
**burden** [1] - 26:2
**Bureau** [42] - 25:2, 25:9, 34:11, 34:12, 34:17, 35:5, 35:6, 35:8, 35:13, 37:23, 37:25, 38:12, 39:2, 39:18, 40:2, 40:7, 44:18, 47:8, 47:9, 52:3, 55:19, 58:22, 64:21, 68:21, 68:22, 68:24, 69:4, 69:15, 70:4, 70:14, 71:19, 73:18, 77:11, 90:22, 96:10, 117:6, 117:19, 117:20, 118:4, 118:5, 118:8

**Bureau's** [1] - 118:14
**business** [4] - 46:18, 52:12, 52:17, 94:19
**bustling** [1] - 67:25
**button** [2] - 53:22, 54:2
**buyouts** [1] - 22:22
**BY** [47] - 4:12, 5:1, 6:8, 7:1, 7:19, 8:5, 8:19, 12:2, 12:20, 14:4, 16:16, 17:25, 18:22, 21:9, 25:3, 26:15, 30:2, 33:20, 34:2, 37:17, 40:25, 42:23, 45:6, 45:20, 49:11, 50:24, 56:10, 58:1, 60:20, 61:1, 62:22, 64:2, 65:9, 66:13, 68:15, 71:18, 73:17, 73:24, 75:6, 80:5, 82:10, 91:20, 95:6, 95:16, 98:14, 99:1, 99:12

### C

**cancel** [3] - 5:15, 59:4, 101:6
**canceled** [6] - 5:14, 35:18, 70:12, 76:19, 79:3, 88:12
**cannot** [5] - 29:4, 53:15, 107:15, 107:18, 128:13
**capacity** [1] - 60:6
**Capital** [1] - 34:18
**capital** [7] - 20:23, 35:17, 35:24, 36:7, 38:20, 47:7, 58:18
**capricious** [3] - 102:18, 103:18, 103:23
**cards** [2] - 59:5, 59:6
**careful** [1] - 113:22
**carry** [2] - 9:17, 9:18
**carrying** [1] - 15:4
**carve** [1] - 128:22
**case** [28] - 10:5, 67:7, 71:11, 84:16, 84:17, 84:24, 85:2, 85:4, 88:9, 88:21, 88:22, 89:1, 94:2, 106:4, 106:19, 108:12, 109:14, 110:9, 110:11, 113:17, 120:4, 121:11, 123:11, 123:14, 124:4, 126:25, 128:6
**Case** [1] - 3:3
**case-by-case** [1] - 10:5
**cases** [6] - 89:18, 109:6, 110:1, 110:6,

128:6
**caused** [1] - 105:8
**causing** [1] - 105:1
**CC** [1] - 78:6
**CCed** [6] - 27:1, 30:13, 30:24, 31:11, 31:20, 31:25
**center** [6] - 12:5, 12:7, 69:24, 74:4, 76:16, 76:18
**central** [1] - 89:2
**certain** [4] - 66:8, 99:4, 116:16, 119:13
**certainly** [1] - 109:3
**cessation** [1] - 107:21
**cetera** [2] - 105:16, 107:18
**CFO** [1] - 9:16
**CFPB** [70] - 4:16, 5:8, 5:20, 6:13, 6:14, 7:20, 7:24, 10:15, 10:20, 11:10, 11:11, 18:7, 19:11, 21:5, 22:3, 24:4, 24:8, 25:11, 26:19, 27:22, 30:10, 30:17, 30:20, 30:23, 34:25, 37:22, 39:4, 39:7, 54:12, 54:13, 55:2, 59:2, 59:21, 61:13, 62:24, 63:13, 66:21, 75:19, 76:21, 77:24, 78:5, 78:23, 79:22, 80:4, 91:25, 97:18, 97:23, 101:20, 102:10, 107:16, 111:17, 111:23, 112:18, 112:24, 113:1, 113:23, 114:25, 118:18, 120:23, 122:3, 125:11, 125:12, 125:13, 125:16, 125:18, 126:2, 126:9, 127:13
**CFPB's** [4] - 12:5, 19:15, 22:3, 125:25
**CFPB-specific** [1] - 6:14
**CFPB/OPM/RIF** [1] - 60:4
**CFPB_00003** [1] - 13:1
**CFPB_00006** [1] - 7:3
**CFPB_00016** [2] - 14:5, 14:8
**CFPB_00079** [1] - 18:21
**chain** [7] - 27:11, 28:10, 30:20, 30:23, 96:18, 97:22
**chair** [2] - 33:24, 68:11
**challenge** [5] - 109:10, 109:15, 113:13, 113:16

**challenges** [2] - 87:1, 111:22
**challenging** [2] - 104:12, 104:13
**change** [7] - 10:19, 22:10, 22:11, 51:9, 61:17, 64:7, 116:13
**changed** [11] - 20:9, 20:10, 46:18, 60:1, 60:2, 61:14, 63:9, 64:3, 64:5, 64:16
**changing** [2] - 114:5, 114:6
**channeled** [1] - 107:9
**chaotic** [1] - 86:24
**characterized** [1] - 124:17
**characterizing** [1] - 94:5
**charge** [4] - 35:6, 35:8, 46:10, 75:19
**chart** [4] - 81:7, 116:21, 116:22, 116:24
**charters** [1] - 5:18
**charts** [1] - 83:2
**check** [2] - 75:13, 121:1
**Chess** [1] - 3:9
**chief** [16] - 9:5, 9:9, 9:23, 10:4, 21:14, 55:12, 56:20, 68:25, 69:2, 69:12, 78:23, 91:24, 92:2, 97:17, 97:19
**choose** [2] - 22:21, 22:22
**Chris** [4] - 30:12, 31:16, 32:1, 95:7
**Christopher** [7] - 11:23, 12:3, 19:2, 31:1, 69:19, 78:4, 78:5
**chronology** [2] - 46:20, 52:21
**Circuit** [1] - 122:18
**circumstance** [2] - 118:17, 120:2
**circumstances** [2] - 22:23, 124:4
**citations** [3] - 109:6, 109:22, 110:6
**cites** [2] - 86:13, 86:15
**Citizen** [1] - 3:10
**Civil** [3] - 3:3, 3:13, 49:22
**claim** [2] - 106:11, 121:13
**claims** [9] - 105:25, 106:6, 112:7, 112:15, 113:21, 115:15, 115:17, 115:19, 123:2

**clarification** [3] - 5:12, 11:17, 129:3
**clarifies** [1] - 17:20
**clarity** [2] - 113:23, 126:25
**clause** [1] - 109:6
**clear** [33] - 5:18, 7:3, 15:2, 15:21, 16:2, 16:5, 16:6, 16:7, 16:8, 16:9, 32:16, 40:5, 41:1, 42:5, 44:1, 56:18, 64:6, 82:11, 101:1, 102:1, 103:19, 106:21, 109:7, 110:10, 113:19, 113:20, 113:21, 115:17, 118:22, 120:14, 120:17, 123:3, 129:5
**clearly** [3] - 15:25, 43:10, 107:24
**close** [10] - 33:23, 46:18, 52:12, 52:17, 71:21, 72:19, 73:22, 104:3, 104:19
**closed** [7] - 8:18, 14:1, 14:3, 55:19, 55:20, 70:9, 76:23
**closely** [6] - 71:24, 71:25, 72:2, 72:8, 72:10, 72:12
**closer** [1] - 83:15
**closing** [2] - 56:24, 59:22
**closure** [3] - 56:25, 57:3, 59:7
**clue** [1] - 25:1
**co** [1] - 120:25
**co-counsel** [1] - 120:25
**Code** [1] - 103:9
**code** [2] - 36:19, 54:19
**coders** [1] - 88:11
**codes** [1] - 63:22
**coding** [1] - 54:1
**coin** [1] - 125:2
**collapse** [1] - 91:16
**colleague** [1] - 52:24
**colleagues** [8] - 58:18, 71:22, 71:24, 72:2, 72:9, 72:13, 75:15, 87:24
**collect** [1] - 86:14
**collective** [2] - 22:18, 105:15
**collectors** [1] - 70:11
**Collins** [2] - 109:13, 110:7
**comfort** [1] - 117:9
**coming** [4] - 18:3, 25:19, 70:4, 87:2

**commencing** [1] - 84:11
**committed** [1] - 25:11
**Committee** [1] - 6:6
**committee** [1] - 6:9
**committees** [7] - 4:15, 4:16, 4:17, 5:7, 5:9, 5:22, 59:5
**communicated** [1] - 46:17
**communicating** [2] - 44:8, 54:8
**companies** [8] - 70:2, 72:14, 72:17, 73:4, 74:9, 89:3, 89:14, 90:16
**company** [8] - 71:6, 72:20, 72:22, 72:25, 77:13, 89:5, 89:16
**company's** [1] - 90:14
**comparing** [1] - 55:10
**comparison** [2] - 55:23, 56:13
**compete** [7] - 43:3, 43:5, 43:8, 43:15, 48:7, 59:17, 59:18
**competed** [1] - 30:7
**competing** [2] - 59:15, 62:18
**competition** [1] - 43:14
**competitive** [10] - 42:24, 43:24, 49:1, 50:22, 62:17, 63:18, 63:20, 63:21, 63:22, 99:22
**complaint** [16] - 70:11, 70:15, 71:7, 72:15, 73:1, 74:22, 74:23, 75:1, 75:13, 77:14, 85:15, 92:11, 93:3, 93:8, 94:21, 123:6
**complaints** [46] - 69:25, 70:4, 70:9, 70:18, 70:20, 71:10, 71:13, 72:5, 72:11, 72:17, 72:24, 73:14, 74:8, 74:12, 76:25, 77:3, 77:12, 80:15, 80:16, 84:20, 86:14, 87:18, 87:20, 89:3, 89:6, 89:13, 89:20, 90:1, 90:3, 90:6, 90:7, 90:15, 90:17, 92:14, 92:17, 93:1, 94:17, 94:25, 95:9, 95:14, 95:19, 95:25
**complete** [3] - 3:18, 43:20, 79:1
**completely** [2] - 59:22,

104:11

**comply** [6] - 5:17, 25:10, 29:18, 112:19, 118:16, 121:19

**complying** [1] - 113:1

**components** [2] - 19:12

**Computer** [1] - 76:6

**concern** [5] - 20:17, 48:2, 48:16, 109:24, 122:16

**concerned** [5] - 22:17, 35:25, 36:7, 127:3, 128:14

**concerns** [4] - 36:3, 111:14, 117:21, 117:23

**concert** [1] - 71:21

**conclude** [1] - 83:10

**conclusion** [1] - 127:23

**conditions** [1] - 10:17

**conduct** [3] - 84:9, 86:12, 90:25

**conducted** [1] - 77:25

**conducting** [2] - 9:24, 10:5

**confirm** [1] - 30:12

**confirming** [1] - 115:23

**confused** [5] - 46:1, 62:16, 62:18, 65:5, 82:3

**confusing** [3] - 102:23, 122:24, 125:21

**confusion** [1] - 86:25

**Congress** [33] - 23:22, 25:17, 40:2, 44:14, 44:15, 44:18, 44:19, 44:20, 50:2, 56:1, 56:3, 56:6, 56:11, 63:24, 64:11, 77:9, 84:12, 103:13, 106:1, 106:9, 106:17, 107:5, 119:19, 119:20, 120:3, 120:4, 121:17, 122:7, 122:11, 122:17, 122:19, 122:20, 123:3

**congressional** [2] - 71:6, 89:18

**congressman** [1] - 122:1

**connected** [1] - 31:16

**connection** [1] - 100:13

**consequences** [2] - 23:20, 81:12

**consider** [3] - 22:20, 51:16, 94:23

**considering** [1] - 51:17

**consist** [1] - 38:6

**Consistent** [1] - 86:11

**constant** [1] - 100:21

**constituents** [1] - 122:10

**constitution** [1] - 103:22

**constitutional** [2] - 103:6, 108:25

**consumer** [33] - 3:25, 9:13, 12:5, 31:3, 35:2, 35:3, 69:22, 69:23, 72:23, 73:2, 74:4, 74:21, 75:12, 75:17, 76:13, 76:25, 77:3, 77:12, 80:20, 84:19, 84:21, 85:15, 85:18, 86:14, 90:15, 92:8, 93:8, 94:16, 94:17, 95:8, 95:9, 112:12, 123:6

**Consumer** [36] - 12:4, 19:3, 34:12, 39:1, 68:21, 68:25, 69:8, 69:18, 70:14, 71:19, 76:21, 77:17, 79:6, 81:1, 83:25, 84:3, 85:22, 86:15, 87:4, 88:23, 89:8, 89:23, 90:18, 90:22, 91:7, 91:14, 91:25, 92:3, 95:18, 98:7, 98:23, 99:25, 100:1, 100:2, 100:3, 117:6

**Consumers** [1] - 72:7

**consumers** [13] - 11:24, 70:5, 70:8, 70:10, 71:3, 71:4, 72:16, 73:6, 89:5, 92:14, 96:8, 107:15, 107:16

**consumers'** [2] - 70:12, 89:4

**contact** [8] - 11:9, 12:4, 69:24, 74:4, 76:16, 76:18, 94:15, 95:17

**contacted** [1] - 79:9

**contacts** [1] - 126:5

**contain** [1] - 11:3

**contains** [1] - 6:16

**contemplated** [1] - 113:7

**contempt** [3] - 100:22, 118:22, 119:1

**contents** [2] - 81:23, 82:16

**continue** [4] - 51:16, 76:14, 76:17, 125:19

**continued** [3] - 91:8,

91:9, 123:23

**contract** [35] - 9:2, 9:8, 9:12, 9:19, 27:9, 27:17, 27:18, 28:5, 28:17, 29:23, 30:4, 74:3, 74:4, 74:7, 74:10, 74:11, 74:14, 75:11, 76:19, 85:18, 87:16, 87:17, 87:20, 87:22, 88:8, 88:12, 88:13, 88:14, 88:17, 101:11, 111:17, 126:11

**contracting** [1] - 27:25

**contractor** [2] - 111:15, 111:20

**contractors** [10] - 10:12, 10:15, 29:8, 29:10, 73:20, 74:1, 74:2, 111:15, 112:5, 125:11

**Contracts** [1] - 85:14

**contracts** [61] - 7:8, 7:10, 8:7, 8:10, 9:6, 9:17, 9:25, 10:1, 10:5, 10:7, 10:10, 10:11, 10:17, 12:5, 23:8, 23:11, 23:14, 24:10, 25:10, 26:17, 29:21, 30:14, 59:6, 75:7, 75:9, 77:17, 77:21, 78:1, 78:7, 78:12, 78:13, 78:15, 78:19, 78:21, 78:25, 79:3, 87:4, 87:7, 87:11, 88:6, 91:10, 91:14, 99:2, 99:4, 101:7, 103:25, 104:7, 104:21, 104:25, 111:14, 111:19, 111:25, 114:2, 115:9, 123:18, 125:23, 126:1, 126:10, 126:20, 128:1, 128:21

**contrary** [3] - 102:17, 103:22

**contribute** [1] - 82:16

**control** [2] - 117:10, 125:4

**conversation** [8] - 15:16, 16:2, 16:20, 31:15, 31:16, 76:15, 81:15, 123:23

**conversations** [1] - 55:11

**coordinate** [1] - 69:15

**copied** [2] - 16:24, 32:19

**coping** [1] - 16:13

**copy** [2] - 52:24, 111:18

**correct** [50] - 7:15, 8:4,

9:1, 9:14, 12:15, 13:5, 13:8, 13:19, 13:24, 17:10, 17:18, 23:1, 24:14, 27:7, 32:12, 32:14, 33:6, 34:6, 34:13, 35:12, 46:13, 48:18, 54:15, 61:8, 61:20, 62:5, 62:25, 63:10, 63:25, 66:18, 66:25, 67:3, 67:13, 73:12, 74:19, 76:8, 76:9, 78:20, 81:22, 82:14, 92:9, 92:16, 92:24, 93:5, 93:17, 93:18, 93:25, 94:7, 98:2, 103:15

**correctly** [2] - 8:25, 20:6

**correspondence** [1] - 97:6

**cost** [6] - 62:12, 62:15, 62:23, 63:5, 122:9

**costs** [1] - 126:3

**councils** [2] - 5:14, 5:19

**counsel** [9] - 3:5, 3:8, 4:18, 26:24, 27:12, 65:4, 66:8, 113:18, 120:25

**counsel's** [1] - 3:15

**count** [5] - 82:20, 82:23, 83:8, 83:14, 102:24

**Count** [3] - 102:14, 102:20, 102:22

**counting** [1] - 83:1

**counts** [6] - 71:13, 82:12, 83:12, 102:13, 102:15, 102:21

**couple** [10] - 10:2, 20:16, 22:5, 23:8, 26:16, 81:5, 84:6, 93:14, 115:13, 118:6

**course** [2] - 18:18, 94:19

**Court** [38] - 34:3, 34:8, 34:16, 34:23, 51:14, 51:17, 52:22, 52:23, 53:2, 54:23, 57:7, 65:24, 66:4, 106:6, 106:18, 108:13, 109:15, 110:11, 111:11, 111:13, 112:2, 112:8, 113:10, 113:22, 114:11, 114:12, 114:16, 114:17, 118:19, 120:5, 121:12, 121:18, 122:19, 123:2, 125:18, 125:24, 126:9, 129:4

**court** [15] - 3:20, 23:22, 32:7, 53:4, 53:13, 54:9, 64:22, 65:12, 107:12, 108:12, 114:1, 114:16, 123:3, 123:20, 125:18
**COURT** [162] - 3:11, 3:17, 3:24, 4:6, 4:24, 5:3, 5:11, 5:21, 6:1, 6:4, 6:17, 6:25, 7:17, 8:2, 8:11, 8:14, 12:1, 12:10, 12:14, 12:16, 12:19, 14:1, 15:12, 15:15, 15:18, 16:5, 16:9, 16:14, 17:19, 17:21, 18:20, 21:1, 21:5, 21:8, 22:24, 23:24, 24:7, 24:15, 24:20, 24:22, 25:21, 25:24, 26:3, 26:6, 26:9, 30:1, 33:2, 33:4, 33:8, 33:12, 33:22, 37:10, 37:16, 40:16, 42:12, 42:15, 42:20, 44:22, 45:3, 45:9, 45:15, 45:19, 50:18, 56:7, 57:25, 60:8, 60:11, 60:14, 60:19, 60:23, 60:25, 62:8, 62:11, 64:25, 65:8, 65:16, 65:20, 65:22, 66:2, 66:6, 67:16, 67:18, 67:20, 67:24, 68:7, 68:10, 68:13, 70:22, 70:25, 71:2, 72:20, 73:7, 73:10, 73:16, 73:22, 74:17, 74:25, 75:5, 80:2, 81:24, 82:3, 82:9, 91:18, 95:4, 95:12, 98:10, 98:19, 99:9, 100:6, 100:9, 100:12, 101:23, 102:11, 103:5, 103:8, 103:12, 103:15, 104:4, 105:14, 105:22, 107:19, 108:21, 109:19, 109:24, 110:7, 110:12, 110:14, 110:25, 111:2, 111:6, 113:8, 113:24, 114:19, 115:2, 115:16, 115:19, 116:2, 116:7, 116:12, 116:19, 117:3, 117:5, 117:16, 117:24, 118:25, 120:10, 120:17, 120:25, 121:4, 121:21, 123:8, 123:10, 124:7, 124:10, 124:12, 124:14, 124:18, 124:20, 126:12, 128:25, 129:2, 129:7

**court's** [2] - 57:5, 57:15
**Court's** [4] - 67:12, 105:24, 109:4, 109:5
**COURTROOM** [1] - 3:2
**courtroom** [2] - 51:25, 100:19
**courts** [1] - 107:5
**covered** [1] - 4:3
**crafting** [1] - 113:22
**CRE** [1] - 19:5
**create** [3] - 36:22, 50:22, 94:24
**created** [10] - 44:15, 47:22, 48:1, 48:14, 50:2, 55:19, 63:24, 106:9, 116:20, 122:4
**creates** [2] - 94:24, 118:21
**credit** [2] - 48:11, 70:10
**CROSS** [2] - 66:12, 91:19
**cross** [8] - 4:3, 7:6, 8:24, 9:16, 10:21, 26:10, 65:16, 91:18
**CROSS-EXAMINATION** [2] - 66:12, 91:19
**cross-examination** [7] - 4:3, 7:6, 8:24, 9:16, 10:21, 65:16, 91:18
**crossing** [1] - 64:10
**current** [12] - 3:24, 25:11, 68:24, 69:11, 75:21, 82:20, 83:14, 91:7, 91:9, 111:4, 117:18, 118:12

**D**

**daily** [3] - 88:5, 119:1, 129:14
**damage** [1] - 20:15
**dare** [1] - 120:14
**Darian** [1] - 69:17
**data** [20] - 10:11, 10:14, 10:18, 70:3, 70:19, 71:12, 74:11, 87:17, 101:6, 101:8, 111:15, 111:17, 111:18, 111:21, 112:3, 112:5, 112:14
**data-sharing** [2] - 74:11, 87:17
**database** [4] - 85:15, 90:2, 90:3, 90:8
**date** [8] - 67:6, 79:13, 79:14, 79:15, 92:7,

97:10, 98:3, 129:19
**dated** [4] - 49:5, 49:9, 78:10, 93:22
**dates** [1] - 60:9
**days** [15] - 8:13, 8:15, 20:16, 23:8, 41:15, 41:23, 45:11, 47:21, 59:3, 59:8, 73:2, 73:3, 112:4, 126:8, 128:16
**days'** [1] - 44:5
**deal** [2] - 21:11, 84:8
**dealing** [1] - 114:4
**debt** [1] - 70:11
**decide** [11] - 96:11, 104:20, 114:16, 122:5, 122:17, 122:18, 122:25, 125:16, 125:17, 125:19, 125:20
**decided** [4] - 65:12, 96:11, 117:25, 127:21
**decides** [2] - 122:18, 122:19
**decision** [21] - 54:1, 103:25, 104:3, 104:5, 104:6, 104:12, 104:18, 105:17, 105:24, 107:10, 108:11, 108:13, 108:14, 108:15, 108:18, 109:4, 111:13, 114:13, 114:17, 129:1
**decisions** [7] - 104:13, 104:21, 104:25, 105:12, 105:19, 109:5, 125:14
**declaration** [13] - 4:2, 4:3, 34:4, 58:6, 58:9, 67:7, 67:9, 84:23, 85:1, 85:10, 85:14, 94:1, 94:4
**declarations** [1] - 94:2
**deem** [1] - 102:20
**deep** [1] - 84:19
**Deepak** [1] - 3:7
**Defendant** [1] - 118:14
**defendant** [1] - 112:25
**defendant's** [3] - 6:16, 6:21, 30:10
**defendants** [1] - 112:24
**defense** [2] - 100:19, 107:21
**define** [2] - 63:17, 63:20
**defining** [2] - 62:16, 96:12
**definitely** [1] - 11:17
**defy** [1] - 120:14
**Del** [1] - 27:23
**delays** [1] - 110:3

**delete** [1] - 101:8
**deliberating** [1] - 45:22
**deliberative** [1] - 45:23
**Deloitte** [4] - 74:7, 88:8, 88:12, 88:18
**demand** [1] - 88:14
**demonstrate** [1] - 123:22
**demonstrative** [1] - 105:18
**denied** [1] - 97:10
**denying** [2] - 14:19, 14:20
**Department** [1] - 3:13
**deputy** [3] - 26:24, 27:12, 69:17
**DEPUTY** [1] - 3:2
**describe** [4] - 21:1, 67:10, 86:22, 87:15
**described** [3] - 7:9, 41:16, 48:20
**describes** [3] - 6:22, 58:6, 58:7
**describing** [1] - 57:14
**description** [3] - 6:23, 39:23
**designated** [1] - 64:20
**designed** [1] - 73:15
**designers** [1] - 80:20
**despite** [3] - 35:21, 65:11, 94:15
**detailed** [3] - 39:1, 39:10, 54:13
**details** [2] - 58:8, 58:9
**determine** [6] - 22:15, 114:5, 121:2, 121:24, 122:15, 122:23
**determined** [1] - 122:16
**devastation** [1] - 23:14
**develop** [1] - 87:23
**developed** [1] - 87:2
**developers** [1] - 88:11
**development** [2] - 74:8, 88:9
**devised** [1] - 123:3
**difference** [1] - 97:14
**different** [17] - 19:19, 21:16, 22:2, 31:10, 41:18, 64:24, 84:7, 90:12, 101:4, 108:8, 110:17, 112:11, 113:6, 113:11, 118:19, 126:5
**difficult** [1] - 91:2
**difficulty** [1] - 20:4
**direct** [6] - 3:19, 19:1, 26:12, 33:23, 97:24,

123:20

**DIRECT** [2] - 33:19, 68:14

**directed** [3] - 20:17, 24:24, 29:17

**directing** [6] - 11:9, 15:3, 50:14, 76:20, 94:5

**direction** [3] - 54:4, 56:17, 86:12

**directive** [3] - 75:24, 76:5, 94:15

**directly** [12] - 5:14, 5:19, 5:20, 13:15, 14:14, 14:15, 16:23, 32:21, 34:19, 34:20, 65:2, 69:20

**director** [20] - 11:1, 11:8, 13:6, 18:3, 18:6, 18:14, 19:3, 25:19, 31:3, 56:17, 62:4, 69:18, 75:21, 94:24, 95:1, 95:7, 117:5, 117:17, 127:13

**Director** [21] - 11:6, 11:14, 17:12, 17:17, 21:6, 35:7, 35:15, 36:15, 37:3, 41:9, 44:8, 46:2, 50:10, 54:13, 56:19, 60:6, 76:3, 76:10, 90:9, 93:23

**director's** [3] - 10:22, 17:8, 53:25

**directors** [1] - 18:15

**disagree** [3] - 83:13, 116:22, 125:24

**disconnect** [1] - 127:3

**discontinuation** [1] - 70:10

**discrete** [1] - 84:7

**discretion** [2] - 119:16, 125:14

**discretionary** [2] - 5:19, 10:1

**discuss** [3] - 36:13, 61:12, 126:18

**discussed** [13] - 21:25, 25:15, 36:8, 42:2, 44:4, 44:24, 47:16, 58:15, 60:5, 62:11, 66:19, 98:22, 126:5

**discussing** [3] - 61:9, 61:11, 65:24

**discussion** [16] - 31:17, 41:11, 41:16, 44:13, 44:17, 44:22, 45:1, 45:7, 45:22, 50:12, 56:3, 56:5, 56:11, 57:5, 62:6,

63:15

**discussions** [3] - 25:5, 25:21, 47:12

**dismantle** [2] - 62:24, 104:11

**dismantling** [2] - 106:25, 123:21

**disregard** [1] - 103:21

**disruption** [1] - 92:12

**distinct** [1] - 24:16

**dive** [1] - 84:19

**dividing** [1] - 43:1

**division** [6] - 18:15, 27:3, 31:7, 72:3, 72:5, 119:22

**Division** [8] - 3:13, 19:3, 86:15, 99:24, 99:25, 100:1, 100:3

**divisional** [1] - 79:10

**divisions** [9] - 40:6, 40:9, 40:11, 43:12, 43:24, 48:23, 50:6, 59:19, 99:23

**DL_CFPB_CRE_All** [1] - 19:4

**Docket** [1] - 116:21

**docket** [2] - 67:12, 129:8

**document** [10] - 7:5, 7:9, 8:22, 13:9, 18:24, 36:23, 37:1, 49:12, 104:4, 116:19

**documents** [4] - 100:13, 115:5, 123:22, 126:14

**Dodd** [1] - 55:20

**Dodd-Frank** [1] - 55:20

**DOE** [1] - 33:16

**Doe** [3] - 4:2, 33:10, 33:13

**DOGE** [20] - 7:11, 7:17, 20:18, 21:2, 21:19, 38:22, 38:23, 39:6, 40:19, 53:18, 54:10, 54:12, 55:4, 55:6, 60:15, 77:24, 78:13, 79:17, 81:12, 83:21

**done** [19] - 20:15, 22:16, 23:25, 24:1, 24:10, 26:4, 39:15, 44:2, 46:12, 46:17, 48:13, 48:14, 48:16, 52:13, 61:19, 70:13, 89:8, 122:13

**Dorsey** [2] - 69:17, 77:23

**dotting** [1] - 64:17

**down** [19] - 12:12,

24:11, 33:4, 51:19, 54:6, 55:13, 55:23, 56:21, 59:3, 81:25, 94:6, 100:7, 103:1, 104:3, 104:19, 117:17, 121:23, 121:25, 122:2

**draft** [4] - 83:16, 119:7, 126:24, 129:11

**drafting** [1] - 79:10

**draw** [1] - 104:18

**due** [4] - 79:13, 79:14, 79:15, 108:24

**dueling** [1] - 129:17

**Duke** [3] - 109:4, 110:10, 110:11

**duly** [2] - 33:17, 68:5

**during** [15] - 7:5, 8:24, 9:15, 10:20, 14:1, 19:24, 21:10, 22:1, 42:9, 42:25, 90:2, 92:15, 95:20, 95:25, 98:6

**duties** [9] - 64:25, 115:8, 115:22, 115:25, 116:21, 117:7, 117:9, 117:14, 127:4

**dying** [1] - 120:25

---

# E

**early** [1] - 22:21

**easily** [3] - 29:5, 127:1, 129:12

**ECF** [3] - 6:24, 93:15, 111:5

**echoes** [1] - 102:15

**edits** [1] - 83:18

**Education** [4] - 19:3, 69:18, 86:16, 100:4

**education** [3] - 31:4, 86:13, 122:5

**educational** [1] - 34:23

**EEOC** [1] - 112:14

**EEOC-related** [1] - 112:14

**effect** [4] - 23:13, 90:21, 115:6, 123:21

**effective** [1] - 72:16

**effectuate** [3] - 56:25, 59:7, 108:14

**efficiency** [2] - 36:14, 37:15

**effort** [2] - 51:9, 102:6

**efforts** [1] - 92:3

**eight** [1] - 48:12

**either** [7] - 11:6, 16:12, 18:9, 36:9, 40:23, 41:19, 102:20

**elaborate** [3] - 48:19,

58:23, 90:5

**elicited** [1] - 40:18

**eliminate** [3] - 43:23, 64:21, 104:11

**eliminated** [3] - 59:19, 59:20, 114:6

**eliminating** [6] - 40:9, 40:11, 43:11, 43:12, 44:14, 59:12

**elimination** [4] - 5:8, 39:20, 39:21, 50:2

**email** [84] - 7:13, 7:25, 9:2, 9:5, 9:9, 11:1, 11:3, 11:8, 12:23, 13:3, 13:7, 14:8, 14:16, 14:23, 15:8, 15:11, 15:13, 17:7, 17:8, 17:9, 17:12, 17:16, 17:17, 17:18, 17:19, 19:4, 19:7, 26:22, 27:1, 27:11, 27:23, 28:8, 28:9, 28:10, 28:14, 30:11, 30:20, 30:24, 31:6, 31:9, 31:20, 32:1, 32:19, 35:15, 37:3, 37:6, 39:7, 50:13, 51:15, 51:21, 52:9, 52:13, 52:19, 76:1, 76:16, 76:20, 78:4, 78:5, 84:1, 85:24, 86:2, 86:4, 86:8, 93:22, 94:5, 94:8, 94:9, 95:3, 95:8, 95:11, 96:18, 96:25, 97:1, 97:4, 97:5, 97:22, 97:23, 97:25, 120:12, 120:13, 120:18, 124:16

**emails** [14] - 14:25, 15:2, 15:3, 15:23, 16:13, 16:24, 18:6, 18:8, 32:13, 54:17, 116:3, 117:8, 125:2, 125:4

**employee** [7] - 35:4, 43:13, 47:25, 48:6, 96:10, 112:24, 113:1

**employees** [53] - 11:11, 11:12, 14:21, 19:5, 19:6, 22:20, 24:9, 35:22, 36:10, 36:11, 37:19, 41:14, 41:17, 41:19, 42:25, 43:17, 45:11, 45:12, 46:9, 47:19, 65:4, 70:14, 71:19, 73:18, 75:25, 76:21, 83:6, 84:6, 84:7, 84:9, 84:10, 101:6, 104:1, 104:6, 104:21, 105:1, 106:10, 107:1, 107:14, 107:16, 112:18, 114:2, 115:9,

116:16, 117:16,
117:21, 118:3, 125:11,
125:14, 125:16, 125:18
**Employees** [1] - 3:3
**employers** [1] -
106:11
**employment** [1] - 48:5
**en** [3] - 104:1, 104:2
**enable** [1] - 73:7
**enables** [2] - 101:12,
119:20
**encourage** [2] -
121:14, 129:10
**end** [15] - 20:5, 24:3,
24:19, 25:1, 30:23,
57:10, 98:15, 100:9,
122:18, 127:9, 128:13,
128:17, 128:23, 129:20
**endeavor** [1] - 129:1
**ended** [1] - 123:23
**enforce** [2] - 101:10,
125:11
**enforceable** [4] -
101:1, 124:1, 127:1,
129:13
**enforcement** [3] -
72:13, 119:14, 119:22
**Enforcement** [2] -
49:22, 50:3
**engage** [2] - 113:14,
122:2
**engaging** [1] - 113:5
**engineer** [1] - 39:6
**enjoined** [2] - 104:23,
108:20
**enjoins** [1] - 108:13
**ensure** [5] - 15:4,
18:16, 19:12, 69:12,
75:13
**ensuring** [2] - 12:11,
18:10
**entail** [2] - 48:21,
69:11
**enter** [1] - 112:9
**entered** [2] - 28:4,
29:22
**enters** [1] - 112:8
**entire** [10] - 40:9,
40:11, 43:12, 43:23,
50:2, 50:5, 59:19,
63:24, 71:23, 98:6
**entirely** [2] - 25:20,
125:3
**entitled** [1] - 43:5
**environment** [1] -
88:10
**equally** [1] - 122:12
**equivalent** [1] -
114:14
**Ernst** [2] - 74:10,

87:16
**escalated** [6] - 71:11,
84:16, 84:17, 84:18,
85:2, 85:4
**especially** [1] - 101:25
**essential** [2] - 89:5,
126:14
**essentially** [4] - 71:17,
102:15, 102:25, 111:7
**establish** [1] - 49:1
**establishes** [1] -
103:10
**estimate** [4] - 62:13,
62:15, 63:5, 92:17
**estimates** [1] - 62:23
**et** [4] - 3:3, 3:4,
105:16, 107:18
**evaluate** [1] - 117:23
**evening** [4] - 35:11,
77:23, 78:16, 83:7
**event** [1] - 115:1
**eventually** [1] - 76:15
**evidence** [2] - 108:10,
127:22
**evidentiary** [1] -
100:22
**exact** [1] - 20:3
**exactly** [2] - 58:21,
73:9
**examination** [9] - 4:3,
7:6, 8:24, 9:16, 10:21,
65:16, 91:18, 97:24,
119:25
**EXAMINATION** [7] -
4:11, 26:14, 33:19,
66:12, 68:14, 91:19,
99:11
**examinations** [3] -
119:12, 119:19, 119:25
**examined** [2] - 33:18,
68:6
**example** [8] - 25:17,
29:13, 83:12, 85:3,
87:15, 109:13, 112:13,
123:6
**examples** [1] - 80:11
**except** [1] - 112:24
**exception** [10] - 48:25,
50:7, 50:19, 50:22,
51:1, 108:5, 118:1,
124:20, 124:22
**exceptions** [7] - 11:3,
44:11, 47:2, 108:4,
124:19, 125:5
**exchange** [3] - 4:20,
14:16, 30:21
**exclude** [2] - 40:22,
40:23
**excused** [2] - 33:4,
67:20

**execute** [1] - 100:18
**executive** [6] - 11:5,
36:14, 37:11, 41:7,
41:8, 50:10
**executives** [1] -
121:25
**exhibit** [1] - 6:22
**Exhibit** [4] - 49:8,
93:15, 98:13, 99:13
**exhibits** [4] - 6:16,
6:21, 6:23, 93:14
**existence** [2] - 105:15,
115:7
**existing** [1] - 122:13
**expect** [1] - 23:5
**expected** [1] - 20:12
**experience** [4] -
38:11, 80:20, 91:6,
91:13
**experienced** [4] -
89:24, 90:3, 92:11,
100:23
**expertise** [1] - 126:23
**experts** [2] - 41:18,
59:13
**expire** [1] - 126:20
**expired** [1] - 83:4
**explain** [11] - 34:8,
36:2, 36:20, 37:5, 48:4,
63:19, 80:10, 88:25,
90:24, 91:4, 101:15
**explained** [4] - 39:18,
43:10, 49:19, 108:22
**explaining** [2] - 55:10,
55:11
**explanation** [1] -
50:13
**explicit** [1] - 106:14
**extended** [2] - 76:1,
114:13
**extent** [4] - 71:4,
103:20, 108:16, 129:20
**extra** [1] - 48:10
**extraordinary** [5] -
106:6, 106:8, 106:11,
106:19, 112:8

**F**

**FACA** [3] - 5:14, 5:25,
6:5
**face** [1] - 20:5
**faces** [1] - 42:16
**facet** [1] - 76:14
**facing** [2] - 9:13,
123:10
**fact** [12] - 11:13,
13:21, 43:11, 53:1,
54:16, 67:1, 92:17,
98:12, 108:23, 114:7,

123:1, 123:19
**factfinder** [1] - 124:25
**factor** [1] - 106:20
**factors** [2] - 106:13,
106:17
**factual** [1] - 128:15
**failure** [1] - 123:5
**fair** [5] - 15:5, 64:17,
66:11, 111:6, 114:23
**fall** [1] - 119:12
**falls** [1] - 119:14
**familiar** [1] - 118:4
**family** [1] - 68:19
**far** [1] - 64:20
**fashion** [3] - 23:25,
24:1, 24:17
**faster** [1] - 51:11
**feared** [1] - 34:10
**February** [73] - 7:14,
11:1, 11:8, 13:4, 13:22,
14:9, 14:23, 17:8, 17:9,
17:12, 18:7, 19:24,
22:1, 27:6, 28:2, 30:21,
31:9, 31:25, 32:13,
35:9, 35:11, 35:14,
37:3, 37:5, 37:14,
37:21, 38:4, 38:15,
38:16, 42:4, 46:20,
49:9, 50:14, 54:24,
59:23, 60:12, 61:3,
61:7, 64:7, 64:8, 67:2,
67:6, 69:3, 75:23,
75:24, 76:5, 76:8,
76:11, 76:20, 77:16,
77:20, 78:10, 78:22,
79:9, 84:5, 84:13, 85:2,
85:5, 85:17, 89:11,
90:10, 92:6, 92:7,
92:19, 93:22, 95:10,
97:2, 98:1, 113:7,
116:4, 120:12
**federal** [12] - 22:9,
35:3, 35:4, 48:5, 60:7,
74:12, 75:4, 87:18,
88:2, 88:3, 92:18,
122:14
**Federal** [4] - 3:14,
3:16, 6:6, 111:20
**fell** [1] - 48:7
**felt** [3] - 20:24, 81:13,
116:9
**few** [14] - 63:13, 66:14,
69:23, 76:4, 80:11,
84:7, 84:10, 99:2,
100:14, 101:20, 102:8,
110:14, 113:19
**fields** [3] - 47:23,
48:12, 54:19
**fight** [2] - 122:11,
122:12

**fights** [1] - 106:10
**figure** [3] - 17:24, 108:6, 122:22
**figured** [1] - 68:19
**figuring** [3] - 24:2, 121:18, 123:13
**file** [1] - 6:22
**filed** [2] - 57:12, 67:12
**final** [16] - 29:21, 62:13, 63:1, 73:3, 82:21, 83:19, 102:16, 102:17, 104:5, 108:1, 108:11, 108:13, 108:14, 108:18, 114:17, 128:5
**finality** [1] - 107:24, 108:7
**finalization** [1] - 28:18
**finalized** [1] - 30:4
**finalizing** [1] - 28:17
**finally** [5] - 29:23, 71:16, 72:12, 91:15, 99:3
**Finance** [1] - 117:6
**Financial** [3] - 34:12, 39:2, 68:21
**financial** [8] - 9:5, 9:9, 9:23, 10:4, 74:21, 78:23, 78:24, 86:13
**finish** [4] - 4:6, 12:1, 121:2, 128:12
**fire** [8] - 20:20, 101:6, 101:8, 102:6, 103:25, 104:21, 104:25, 105:17
**fired** [4] - 35:22, 49:25, 105:1, 106:24
**firing** [5] - 36:11, 37:6, 50:15, 103:4, 106:24
**firmly** [1] - 125:25
**first** [37] - 4:24, 14:7, 14:10, 14:13, 20:11, 20:24, 21:14, 33:10, 33:17, 35:13, 38:14, 38:19, 42:5, 44:14, 44:18, 46:10, 46:23, 49:2, 49:4, 49:12, 51:3, 56:12, 57:7, 68:5, 72:23, 85:8, 85:14, 86:3, 94:4, 96:15, 96:22, 97:1, 97:7, 106:20, 108:10, 111:6, 112:1
**fit** [1] - 123:11
**five** [5] - 35:4, 79:2, 79:4, 87:8, 87:12
**fix** [2] - 102:23, 104:16
**FLRA** [3] - 106:3, 107:2, 107:6
**fluctuations** [1] - 96:2
**flurry** [1] - 32:13

**focus** [1] - 58:4
**focused** [3] - 39:20, 55:8, 57:9
**focusing** [1] - 57:17
**FOIA** [1] - 80:21
**folk** [1] - 7:17
**folks** [6] - 7:11, 16:1, 21:19, 70:17, 92:25, 95:17
**follow** [5] - 10:16, 16:17, 18:1, 22:12, 24:25
**followed** [2] - 22:18, 76:11
**following** [3] - 23:20, 61:2, 85:9
**follows** [2] - 33:18, 68:6
**for-cause** [1] - 107:7
**force** [14] - 21:6, 37:23, 38:11, 41:12, 41:21, 42:25, 43:4, 47:21, 62:14, 64:7, 79:12, 88:10, 88:11, 113:1
**foreclosed** [1] - 106:21
**foreclosure** [5] - 84:22, 89:21, 92:23, 94:21, 95:13
**foreclosures** [4] - 70:12, 95:18, 95:19, 95:25
**forget** [2] - 20:2, 37:13
**fork** [1] - 83:4
**fork-in-the-road** [1] - 83:4
**form** [3] - 34:4, 75:13, 112:9
**formal** [4] - 18:3, 41:22, 42:3, 100:3
**forth** [2] - 30:11, 54:18
**fortunately** [1] - 22:6
**forward** [5] - 35:10, 52:13, 58:11, 65:12, 91:5
**forwarded** [1] - 28:9
**foundation** [2] - 44:21, 64:1
**Foundation** [1] - 121:16
**four** [2] - 5:13, 38:20
**framework** [1] - 123:12
**Frank** [1] - 55:20
**free** [2] - 80:12, 80:13
**freeze** [3] - 111:24, 125:22, 128:20
**Friday** [9] - 44:10, 46:19, 51:7, 54:5,

54:21, 59:11, 60:11, 64:8, 75:23
**FRIEDMAN** [13] - 68:2, 68:15, 71:18, 73:17, 73:24, 75:6, 80:4, 80:5, 82:10, 91:17, 99:10, 99:12, 100:5
**Friedman** [1] - 3:9
**friendly** [1] - 122:7
**friends** [1] - 113:17
**frightening** [1] - 20:11
**front** [2] - 93:12, 101:18
**fulfil** [1] - 80:21
**fulfilling** [2] - 25:12, 113:5
**full** [3] - 37:13, 86:17, 118:7
**full-time** [1] - 86:17
**fulsome** [1] - 4:18
**fun** [1] - 128:8
**function** [10] - 9:18, 9:20, 71:17, 74:15, 74:16, 75:2, 83:11, 101:5, 119:25
**functional** [1] - 80:6
**functionally** [1] - 112:21
**functioning** [2] - 103:1, 117:19
**functions** [27] - 15:4, 19:19, 21:14, 21:15, 24:4, 25:12, 31:6, 39:19, 39:22, 39:25, 40:1, 44:18, 55:9, 55:14, 55:21, 69:15, 70:16, 101:12, 101:14, 101:21, 103:3, 118:15, 118:18, 118:21, 119:4, 120:7, 125:19
**furthers** [1] - 100:5
**future** [1] - 23:13

**G**

**Gabriel** [1] - 3:9
**game** [1] - 24:3
**gather** [2] - 46:16, 47:25
**gathering** [1] - 48:1
**gears** [1] - 75:19
**general** [3] - 26:24, 27:12, 110:18
**General** [2] - 5:15, 5:24
**generally** [2] - 101:20, 112:6
**generous** [1] - 86:24
**gentleman** [1] - 79:16
**genuinely** [1] - 17:6

**given** [13] - 11:17, 37:20, 40:13, 40:21, 44:4, 46:14, 47:2, 105:14, 128:4, 128:5, 128:6
**goal** [6] - 4:6, 24:17, 24:18, 24:19, 105:18, 106:25
**governing** [1] - 71:12
**government** [16] - 10:18, 20:13, 22:8, 23:6, 23:19, 23:20, 33:5, 34:24, 36:14, 37:15, 71:6, 89:16, 107:4, 107:8, 110:15, 122:14
**government's** [2] - 78:2, 112:20
**grab** [1] - 105:21
**graduated** [1] - 35:1
**granted** [2] - 108:5, 125:6
**granting** [1] - 115:11
**great** [5] - 6:25, 21:11, 33:13, 129:17, 129:18
**grievance** [1] - 106:3
**group** [7] - 31:10, 32:1, 42:25, 55:1, 62:20, 67:24, 74:14
**Group** [1] - 3:10
**groups** [5] - 43:1, 43:19, 43:24, 62:17, 112:13
**grown** [1] - 118:9
**grownups** [1] - 24:2
**GSA** [2] - 5:20, 5:21
**guess** [1] - 119:20
**guidance** [12] - 9:17, 18:17, 19:7, 22:7, 22:9, 22:12, 24:24, 58:20, 60:5, 60:7, 65:4, 65:7
**GUPTA** [22] - 3:7, 4:4, 33:20, 34:2, 37:17, 40:25, 42:23, 45:2, 45:6, 45:20, 49:7, 49:11, 50:24, 56:10, 58:1, 60:20, 60:24, 61:1, 62:22, 64:2, 65:9, 67:19
**Gupta** [2] - 3:7, 3:9

**H**

**half** [1] - 70:9
**halt** [1] - 8:17
**hammered** [1] - 114:22
**handful** [1] - 27:3
**handle** [2] - 22:10, 69:25

**handling** [4] - 77:5, 77:8, 92:11, 94:25
**hands** [1] - 18:7
**happy** [6] - 67:24, 102:23, 109:21, 110:6, 111:3, 122:12
**hard** [2] - 100:16, 113:24
**harm** [4] - 104:22, 105:1, 110:19, 120:5
**head** [14] - 3:23, 6:13, 11:23, 12:3, 18:12, 18:13, 54:3, 57:21, 59:25, 63:8, 82:20, 82:23, 83:12, 83:14
**heads** [4] - 18:15, 19:11, 83:2, 126:25
**hear** [1] - 3:24
**heard** [14] - 53:11, 59:14, 83:22, 97:21, 100:12, 102:1, 102:5, 104:23, 105:5, 107:15, 108:10, 112:18, 116:1, 116:8
**hearing** [6] - 51:14, 51:23, 51:24, 60:11, 100:16, 105:6
**hearsay** [2] - 40:15, 40:20
**held** [3] - 10:14, 111:19, 112:5
**help** [6] - 16:1, 62:25, 63:17, 72:1, 72:3, 72:14
**helped** [1] - 63:3
**helpful** [2] - 23:2, 129:9
**helping** [2] - 65:7, 72:16
**helps** [1] - 74:9
**Hi** [1] - 86:9
**highlighted** [1] - 79:24
**Hill** [2] - 122:6, 122:7
**himself** [3] - 13:21, 18:4, 97:7
**hit** [1] - 53:22
**hobble** [2] - 91:10, 127:18
**hold** [3] - 43:3, 43:8, 58:5
**holiday** [1] - 60:17
**Holland** [1] - 3:15
**HOLLAND** [11] - 91:20, 95:6, 95:16, 98:11, 98:14, 98:21, 99:1, 121:8, 121:10, 122:24, 123:9
**Homeland** [1] - 122:4
**Honor** [9] - 3:7, 3:12, 4:4, 33:7, 98:11, 98:22,

100:11, 121:10, 121:17
**hope** [3] - 20:8, 21:24, 53:15
**hoped** [1] - 54:8
**hoping** [1] - 58:10
**hostile** [2] - 20:23, 21:1
**hotline** [1] - 70:20
**hours** [1] - 81:6
**House** [2] - 59:4, 122:6
**house** [1] - 21:19
**housed** [1] - 75:9
**housekeeping** [1] - 65:21
**houses** [1] - 122:7
**hover** [1] - 39:5
**hum** [9] - 28:1, 30:22, 32:3, 39:8, 40:12, 49:10, 49:15, 51:8, 60:13
**Human** [1] - 34:18
**human** [9] - 20:22, 35:17, 35:24, 36:7, 38:20, 47:7, 58:18, 74:17, 77:12

---

# I

**idea** [3] - 43:2, 43:4, 96:7
**identification** [2] - 34:10, 58:10
**identified** [21] - 7:9, 7:10, 10:2, 31:6, 31:21, 41:21, 43:19, 78:13, 79:2, 86:19, 87:8, 87:12, 87:24, 99:22, 102:7, 108:22, 116:16, 117:14, 118:20, 120:7
**identifies** [1] - 78:7
**identify** [9] - 37:10, 55:15, 72:3, 78:25, 88:16, 117:16, 117:17, 117:21, 118:2
**identifying** [2] - 102:2, 121:19
**ignored** [1] - 32:17
**ill** [1] - 24:1
**ill-informed** [1] - 24:1
**illegal** [3] - 58:13, 64:13, 109:9
**illuminating** [1] - 128:15
**imagine** [1] - 96:5
**immanent** [1] - 89:21
**immediate** [4] - 41:13, 41:15, 41:16, 123:20
**immediately** [1] - 46:3
**imminent** [7] - 70:12,

84:21, 92:23, 94:21, 95:18, 95:19, 95:25
**impact** [5] - 41:13, 41:16, 89:7, 90:9, 91:4
**impacted** [1] - 90:22
**impacts** [1] - 89:12
**impair** [2] - 101:19, 118:14
**implement** [2] - 45:24, 45:25
**implementing** [1] - 56:12
**implied** [3] - 57:17, 58:3, 106:15
**important** [6] - 24:4, 49:18, 58:12, 65:13, 88:22, 128:10
**impression** [2] - 21:18, 24:16
**improve** [2] - 129:18, 129:21
**improving** [1] - 36:14
**in-house** [1] - 21:19
**inability** [1] - 123:10
**incentive** [1] - 22:20
**include** [5] - 80:19, 80:20, 81:16, 86:18
**included** [6] - 36:12, 36:17, 36:23, 37:1, 37:2, 81:14
**includes** [3] - 70:3, 71:2, 74:17
**including** [9] - 5:8, 38:20, 39:14, 55:2, 88:2, 99:23, 101:20, 102:6, 104:24
**incorrect** [1] - 116:15
**increased** [1] - 90:17
**increasing** [1] - 37:14
**incredibly** [1] - 23:9
**indeed** [1] - 50:15
**independent** [1] - 74:15
**indicate** [1] - 16:22
**indicated** [7] - 4:17, 4:19, 65:25, 84:21, 89:20, 113:18, 128:24
**indicates** [1] - 97:1
**indicating** [1] - 36:4
**individual** [4] - 10:11, 43:16, 47:24, 125:14
**individualized** [2] - 123:5, 123:6
**individuals** [2] - 31:17, 117:13
**inferred** [1] - 16:18
**informal** [1] - 41:20
**information** [14] - 23:15, 40:17, 46:16, 47:24, 47:25, 48:6,

48:8, 48:10, 51:13, 58:20, 71:14, 74:21, 88:3, 129:20
**informed** [8] - 24:1, 37:21, 42:2, 42:18, 43:18, 52:24, 55:21, 59:9
**informing** [1] - 51:23
**infrastructure** [1] - 11:18
**infrequent** [1] - 95:17
**initial** [5] - 12:21, 39:13, 46:16, 73:2, 114:8
**initiatives** [1] - 69:14
**injunction** [14] - 100:25, 111:12, 112:3, 112:8, 112:9, 112:23, 113:4, 113:9, 113:23, 114:13, 117:1, 120:5, 128:19, 129:5
**injunctive** [3] - 102:11, 104:14, 112:10
**injured** [6] - 109:3, 109:16, 109:17, 123:4
**injures** [1] - 109:11
**injury** [3] - 108:23, 109:3, 109:7
**innovation** [2] - 71:22, 75:16
**insides** [1] - 88:11
**insisted** [1] - 53:12
**installed** [1] - 21:3
**instead** [4] - 44:6, 118:23, 125:7, 125:16
**instruct** [1] - 52:16
**instructed** [3] - 46:8, 52:9, 59:4
**instruction** [1] - 7:11
**instructions** [2] - 35:19, 35:20
**intact** [2] - 85:16, 85:18
**IntelliTrack** [2] - 9:2, 9:12
**intended** [1] - 106:1
**intending** [1] - 106:18
**intends** [1] - 112:18
**intent** [3] - 104:8, 104:14, 106:25
**intention** [1] - 82:7
**intentionally** [1] - 116:15
**interact** [1] - 23:18
**interacted** [3] - 20:25, 21:11, 21:12
**interacting** [1] - 71:7
**interaction** [1] - 7:21
**interconnected** [1] - 102:2

**interest** [1] - 122:14
**interested** [2] - 101:24, 119:1
**interfere** [1] - 101:19
**interim** [5] - 31:19, 32:17, 102:4, 104:15, 115:20
**interm** [1] - 102:8
**internal** [4] - 47:9, 58:17, 62:8, 88:1
**internally** [1] - 36:20
**interrupt** [1] - 60:8
**interrupted** [1] - 108:11
**intervene** [1] - 73:13
**intervention** [1] - 77:13
**introduce** [3] - 13:21, 100:10, 100:17
**introduced** [1] - 127:22
**introducing** [1] - 97:7
**introductions** [1] - 39:13
**invariably** [1] - 87:23
**inventory** [1] - 23:13
**investigate** [3] - 80:14, 80:16, 86:14
**investigating** [2] - 71:10, 77:2
**investigation** [2] - 70:3, 71:9
**investigations** [4] - 69:5, 83:14, 84:18, 84:19
**investigator** [1] - 69:7
**invite** [1] - 72:4
**invited** [2] - 117:22, 117:24
**involve** [4] - 9:13, 38:9, 43:7, 75:8
**involved** [2] - 52:2, 92:22
**involvement** [1] - 73:10
**irrelevant** [1] - 109:12
**irreparable** [5] - 20:18, 104:22, 104:25, 105:3, 110:19
**issue** [17] - 66:6, 75:24, 76:10, 99:2, 107:19, 109:1, 111:21, 111:25, 112:2, 112:25, 113:10, 114:14, 119:3, 119:10, 128:2, 129:1, 129:12
**issued** [15] - 7:25, 22:13, 52:22, 52:23, 53:2, 57:7, 61:6, 76:12, 101:1, 114:1, 114:13,

116:4, 116:5, 125:3, 125:4
**issues** [14] - 6:14, 84:8, 84:19, 90:4, 96:8, 99:3, 99:5, 99:7, 109:25, 111:14, 121:13, 125:23, 125:24, 129:4
**itself** [4] - 23:4, 50:5, 125:20

## J

**January** [1] - 127:16
**Jason** [1] - 11:20
**Jennifer** [1] - 3:8
**Jeremy** [12] - 38:25, 39:9, 41:24, 41:25, 42:6, 42:7, 42:9, 42:12, 42:18, 79:17, 83:20
**JJ** [5] - 49:8, 98:13, 98:17, 98:18, 99:13
**job** [3] - 48:7, 49:20, 69:11
**jobs** [4] - 43:14, 48:8, 57:2, 107:2
**Johnson** [36] - 11:23, 12:3, 12:21, 13:3, 13:21, 14:8, 14:13, 19:2, 30:13, 31:1, 31:17, 32:1, 69:19, 69:20, 77:21, 77:22, 78:5, 79:9, 81:13, 81:15, 82:18, 83:17, 83:18, 84:1, 85:8, 85:11, 85:12, 85:24, 86:3, 86:8, 95:7, 96:22, 97:1, 97:14, 97:16, 97:19
**Johnson's** [4] - 13:10, 97:4, 97:9, 97:12
**joint** [1] - 60:4
**jointly** [1] - 61:6
**Jordan** [8] - 38:25, 39:3, 41:24, 44:3, 44:7, 77:23, 79:16, 83:20
**Jordan's** [1] - 41:25
**judge** [1] - 101:10
**Judge** [2] - 33:3, 115:21
**jurisdiction** [6] - 105:16, 105:23, 106:15, 106:17, 106:18, 110:19
**jury** [1] - 40:20
**Justice** [1] - 3:13
**justification** [10] - 9:6, 36:9, 36:11, 36:13, 37:2, 37:6, 37:12, 41:5, 50:8, 50:15

**justifications** [2] - 36:18, 37:1
**justify** [1] - 105:13

## K

**keep** [7] - 24:10, 43:3, 54:16, 56:25, 59:6, 81:24, 101:5
**keeping** [1] - 12:11
**kept** [2] - 42:18, 53:12
**kind** [6] - 36:4, 48:6, 57:13, 97:2, 106:18, 126:19
**knowing** [1] - 119:5
**knowledge** [11] - 10:14, 15:12, 15:15, 21:13, 21:15, 29:7, 63:8, 64:3, 64:6, 118:7, 118:8
**known** [2] - 83:3, 95:12
**knows** [3] - 30:1, 53:16, 120:18

## L

**labeling** [1] - 102:23
**labor** [1] - 75:8
**lack** [3] - 44:21, 64:1, 113:25
**laid** [3] - 41:23, 47:21, 59:11
**language** [7] - 20:3, 35:25, 36:7, 124:24, 126:19, 127:3, 128:22
**laptop** [1] - 76:23
**large** [3] - 90:6, 93:3, 93:9
**larger** [2] - 78:6, 116:18
**largest** [1] - 74:3
**last** [17] - 6:12, 10:10, 23:8, 25:7, 62:1, 63:2, 63:6, 63:11, 63:20, 63:23, 64:3, 67:4, 70:8, 73:14, 87:23, 100:16, 105:6
**late** [4] - 35:10, 46:25, 122:21, 129:23
**law** [5] - 35:1, 56:2, 102:17, 103:22, 123:14
**lawsuit** [1] - 52:2
**lay** [1] - 62:25
**lead** [3] - 37:22, 38:2, 118:17
**leader** [2] - 49:13, 61:17, 64:20
**leaders** [1] - 69:14
**leadership** [14] - 5:20,

25:11, 52:14, 55:12, 56:18, 58:25, 61:12, 64:14, 64:15, 117:20, 118:5, 118:18, 119:16, 125:20
**leading** [4] - 11:25, 38:6, 57:24, 92:3
**leads** [2] - 35:17, 55:7
**lean** [1] - 68:10
**leaning** [1] - 127:20
**learn** [4] - 48:20, 85:22, 90:1, 90:14
**learned** [1] - 90:9
**learning** [1] - 63:18
**lease** [1] - 128:23
**least** [9] - 8:16, 11:19, 28:5, 92:18, 95:10, 96:3, 103:2, 112:1, 115:7
**leave** [2] - 22:21, 43:13
**leaving** [1] - 42:18
**led** [1] - 39:12
**left** [9] - 43:6, 43:17, 43:18, 45:16, 48:8, 49:20, 98:7, 107:1, 127:9
**legacy** [1] - 55:21
**legal** [9] - 21:14, 27:3, 55:12, 56:20, 72:8, 72:9, 97:17, 97:19, 115:1
**legitimately** [1] - 59:2
**length** [1] - 67:9
**lengthier** [1] - 43:20
**lengthily** [1] - 26:10
**lengthy** [1] - 116:21
**less** [6] - 81:25, 82:6, 113:19, 113:20, 113:21
**letters** [1] - 36:12
**letting** [4] - 14:21, 47:20, 49:23, 51:15
**level** [3] - 63:22, 91:11, 119:13
**levels** [2] - 63:18, 63:21
**Lewin** [3] - 38:25, 39:9, 42:7
**Liam** [1] - 3:15
**lids** [1] - 76:23
**life** [1] - 65:3
**lifted** [1] - 64:22
**light** [1] - 86:12
**lights** [1] - 12:11
**likelihood** [1] - 102:12
**likely** [2] - 22:10, 83:6
**limit** [2] - 102:8, 114:15
**limited** [1] - 84:5
**limiting** [1] - 102:2

limp [1] - 127:18
line [3] - 70:7, 78:6, 86:9
list [6] - 6:22, 76:1, 78:16, 119:3, 119:7, 119:9
listed [6] - 39:6, 48:22, 80:6, 82:14, 86:20, 86:21
lists [1] - 83:14
literally [3] - 16:3, 17:3, 120:8
Litigation [1] - 3:10
Liu [1] - 3:10
live [2] - 127:2, 128:18
loan [2] - 107:17, 107:18
loans [1] - 70:12
local [1] - 62:18
logged [3] - 35:15, 54:11, 54:17
logical [1] - 24:3
look [16] - 12:22, 12:23, 13:25, 14:7, 14:10, 23:3, 23:4, 28:9, 38:13, 100:16, 106:7, 117:1, 123:12, 123:13, 128:9
looked [1] - 78:16
looking [10] - 24:2, 26:6, 79:20, 83:2, 85:25, 106:15, 110:4, 111:4, 118:11, 118:13
looks [1] - 97:14
loop [1] - 58:19
lose [1] - 57:2
lost [1] - 60:9
loud [1] - 127:21

M

ma'am [2] - 8:4, 25:23
Mahoney [2] - 98:16, 99:16
main [1] - 100:18
mainstream [1] - 126:4
maintain [4] - 12:12, 126:10, 128:20
maintaining [2] - 29:13, 29:15
malicious [1] - 75:18
malware [1] - 75:18
manage [2] - 80:13, 121:21
management [15] - 22:11, 22:15, 71:11, 71:14, 82:21, 84:16, 84:17, 85:3, 85:4, 88:9, 88:22, 89:1, 99:5,

125:17
manager [1] - 69:6
managers [3] - 11:10, 18:15, 80:19
manages [2] - 5:25, 89:4
managing [1] - 70:20
mandate [2] - 5:15, 24:25
mandates [1] - 31:7
manner [1] - 18:3
manual [2] - 89:14, 93:1
March [23] - 15:8, 17:7, 17:16, 53:6, 53:8, 62:2, 62:3, 62:6, 62:7, 63:12, 84:1, 85:17, 85:21, 86:3, 86:23, 89:9, 89:11, 89:12, 92:7, 116:5, 120:13, 128:23
Mark [26] - 11:6, 11:9, 13:16, 15:22, 15:24, 16:1, 16:2, 16:5, 16:7, 17:3, 21:11, 21:12, 22:12, 27:1, 32:4, 32:16, 53:11, 53:15, 54:4, 86:9, 94:10, 94:12, 94:15, 95:8, 98:3
marked [1] - 49:8
market [2] - 72:3, 96:2
Martinez [7] - 3:18, 4:3, 4:8, 34:19, 34:20, 35:18, 38:21, 39:16, 39:17, 46:1, 47:8, 47:10, 48:19, 49:9, 54:4, 55:3, 55:5, 58:15, 67:1, 67:10, 83:20, 84:23, 86:8, 98:16, 104:24, 106:22, 118:7
Martinez's [2] - 85:1, 85:14
Maryland [3] - 114:11, 114:12, 114:21
mass [1] - 44:9
masse [3] - 104:1, 104:2
matter [4] - 65:18, 122:14, 124:21, 126:8
matters [11] - 11:3, 11:10, 11:15, 27:4, 81:2, 94:11, 94:12, 116:9, 116:10, 116:12, 124:22
Matthew [2] - 68:2, 68:19
MATTHEW [1] - 68:4
mean [34] - 8:11, 11:16, 12:10, 17:21,

18:13, 20:19, 22:5, 26:9, 36:2, 38:24, 39:25, 42:24, 50:19, 56:23, 59:18, 62:23, 72:20, 73:6, 80:9, 81:20, 82:12, 94:18, 96:25, 109:24, 110:18, 111:11, 115:1, 120:5, 120:10, 121:9, 121:10, 124:5, 124:15, 127:15
meaning [4] - 70:9, 117:10, 117:11, 117:12
meaningful [2] - 72:17, 106:20
means [5] - 29:18, 120:10, 120:19, 120:20, 120:21
meant [5] - 39:23, 50:1, 54:12, 55:13, 97:20
meantime [1] - 104:16
measuring [2] - 115:8, 115:9
meet [2] - 54:23, 92:4
meeting [54] - 35:17, 35:18, 38:14, 38:19, 39:11, 39:12, 39:17, 39:20, 40:8, 40:17, 41:2, 41:4, 42:9, 44:7, 44:13, 44:23, 45:4, 45:7, 45:21, 46:10, 47:5, 47:9, 47:16, 47:17, 48:19, 50:12, 51:6, 54:25, 55:7, 55:9, 56:5, 56:21, 57:5, 57:7, 57:9, 57:10, 58:6, 58:7, 58:14, 58:17, 58:21, 59:13, 59:21, 60:14, 60:22, 61:2, 62:7, 63:4, 63:11, 63:12, 63:16
meetings [10] - 55:6, 59:10, 60:3, 61:21, 61:25, 66:19, 66:21, 67:2, 67:5, 127:8
meets [2] - 69:13, 129:13
member [1] - 77:24
members [7] - 47:7, 63:13, 81:12, 83:20, 85:2, 85:9, 122:11
memo [39] - 25:10, 48:22, 49:4, 49:8, 49:16, 50:5, 50:8, 50:23, 79:5, 79:10, 79:11, 79:13, 79:22, 80:17, 80:18, 81:4, 81:6, 81:7, 81:14, 81:23, 82:14, 82:16, 82:19, 83:23, 86:19, 86:20, 86:21, 97:25,

98:15, 98:22, 98:24, 99:16, 112:19, 112:20, 113:2, 116:14, 116:15
memorandum [6] - 38:7, 61:5, 61:6, 61:10, 61:11, 61:16
memorialized [1] - 76:16
memorializing [1] - 115:12
memory [2] - 41:4, 93:7
mention [1] - 106:14
mentioned [10] - 6:9, 25:18, 38:7, 43:25, 55:17, 56:19, 65:10, 88:20, 107:13, 110:1
mergers [1] - 20:22
Merit [1] - 105:15
merits [5] - 102:13, 110:21, 122:25, 123:1, 127:19
messaging [1] - 42:16
met [6] - 6:17, 38:12, 60:4, 68:8, 77:22, 81:11
methodical [1] - 24:17
Michael [2] - 98:16, 99:16
microphone [3] - 33:23, 68:8, 73:23
middle [2] - 19:1, 113:2
midnight [1] - 46:17
might [12] - 5:22, 9:19, 25:17, 29:13, 51:18, 53:18, 106:23, 111:17, 111:19, 112:5, 118:25, 126:21
million [2] - 70:8, 73:14
mind [2] - 19:23, 105:21
minimal [1] - 12:9
minimum [1] - 129:14
minute [1] - 67:21
minutes [2] - 52:8, 79:18
misspoke [1] - 97:20
modification [2] - 28:15, 28:22
modifications [1] - 29:22
moment [3] - 12:24, 66:10, 100:15
moments [1] - 113:19
Monday [9] - 7:22, 11:1, 13:4, 35:14, 60:15, 76:11, 77:20, 84:1, 126:21

**money** [1] - 101:9
**monitor** [3] - 72:5, 80:14, 80:15
**Monitoring** [1] - 99:24
**monitoring** [4] - 70:4, 71:10, 76:24, 100:21
**month** [1] - 70:1
**months** [1] - 90:20
**mootness** [1] - 108:8
**morning** [4] - 47:3, 47:5, 78:24, 97:15
**mortgage** [1] - 84:20
**most** [6] - 39:15, 55:8, 69:5, 109:14, 109:25, 118:3
**mostly** [4] - 21:12, 28:22, 62:12, 62:15
**mouth** [1] - 40:5
**move** [5] - 33:24, 58:25, 68:11, 91:5, 98:15
**moved** [1] - 88:13
**moving** [1] - 35:3
**MR** [117] - 3:7, 3:12, 4:4, 4:12, 5:1, 5:5, 6:5, 6:8, 6:20, 7:1, 7:19, 8:5, 8:19, 12:2, 12:20, 14:4, 16:16, 17:25, 18:21, 18:22, 21:9, 25:3, 26:1, 26:4, 29:25, 33:7, 33:20, 34:2, 37:17, 40:15, 40:25, 42:11, 42:23, 44:21, 44:25, 45:2, 45:6, 45:20, 49:7, 49:11, 50:24, 56:10, 57:24, 58:1, 60:20, 60:24, 61:1, 62:22, 64:1, 64:2, 65:9, 65:21, 65:23, 66:3, 66:11, 66:13, 67:15, 67:17, 67:19, 68:2, 68:15, 71:18, 73:17, 73:24, 75:6, 80:4, 80:5, 82:10, 91:17, 91:20, 95:6, 95:16, 98:11, 98:14, 98:21, 99:1, 99:10, 99:12, 100:5, 110:24, 111:1, 111:3, 111:10, 113:9, 114:12, 114:24, 115:13, 115:18, 115:24, 116:6, 116:8, 116:14, 116:23, 117:4, 117:12, 117:18, 118:3, 120:2, 120:16, 120:23, 121:2, 121:7, 121:8, 121:9, 121:10, 122:24, 123:9, 124:6, 124:8, 124:11, 124:13, 124:15, 124:19,

124:25, 128:20, 129:1, 129:3
**MS** [24] - 3:23, 11:25, 26:8, 26:15, 30:2, 33:10, 33:13, 100:11, 101:17, 101:25, 102:22, 103:7, 103:11, 103:14, 103:16, 104:17, 105:20, 105:23, 108:9, 109:2, 109:21, 110:5, 110:9, 110:13
  **MSPB** [3] - 106:2, 107:2, 107:6
**multiple** [2] - 14:25, 74:2
**must** [3] - 93:8, 101:5

## N

**name** [9] - 37:13, 58:12, 66:1, 66:8, 68:18, 70:22, 79:16, 100:3, 126:17
**names** [1] - 42:6
**narrow** [1] - 116:25
**narrowed** [1] - 101:21
**narrower** [1] - 118:24
**narrowest** [1] - 112:9
**narrowly** [2] - 101:22, 126:22
**National** [1] - 3:3
**nature** [2] - 114:8, 115:14
**NCLC** [1] - 107:15
**near** [1] - 54:18
**necessarily** [2] - 29:18, 66:4
**necessary** [14] - 9:17, 9:20, 44:24, 59:7, 66:23, 79:1, 87:8, 87:12, 102:8, 108:18, 112:6, 112:10, 112:14, 127:15
**need** [21] - 3:19, 12:23, 24:10, 26:10, 32:2, 33:23, 55:14, 56:13, 56:25, 58:19, 65:17, 68:10, 70:20, 100:13, 104:20, 105:10, 112:2, 114:6, 120:21, 122:23, 123:18
**needed** [11] - 14:21, 47:1, 52:11, 58:19, 63:17, 63:20, 81:17, 85:15, 87:3, 89:17, 104:14
**needs** [8] - 11:18, 22:15, 31:18, 55:23, 66:9, 108:19, 113:22,

129:25
  **negative** [1] - 81:12
**never** [7] - 44:20, 47:2, 61:15, 66:17, 108:3, 129:23
**new** [6] - 25:19, 55:12, 56:15, 56:18, 118:5, 127:13
**next** [31] - 16:14, 28:9, 32:4, 38:12, 40:8, 44:9, 45:25, 46:7, 46:9, 46:12, 46:15, 46:19, 54:23, 58:17, 60:14, 61:21, 67:22, 68:1, 68:3, 71:9, 75:24, 76:8, 76:11, 76:19, 77:17, 78:19, 78:24, 86:7, 97:15, 99:22, 126:20
**nexus** [1] - 109:9
**night** [3] - 46:25, 83:5, 97:15
**nits** [1] - 83:18
**nobody** [5] - 55:4, 64:9, 88:17, 98:24, 127:9
**none** [4] - 45:8, 48:13, 48:14, 50:17
**nonetheless** [1] - 125:1
**nonmonetary** [1] - 70:9
**nonordinary** [1] - 94:19
**normal** [6] - 10:16, 19:14, 20:13, 23:20, 51:4, 88:7
**normalized** [1] - 22:23
**North** [1] - 74:15
**Norton** [4] - 121:11, 121:15, 123:11, 128:6
**note** [2] - 26:1, 65:17
**notes** [2] - 3:20, 105:21
**nothing** [5] - 36:5, 106:16, 107:1, 115:21, 127:20
**notice** [11] - 29:9, 36:25, 41:19, 41:20, 41:22, 41:23, 44:6, 50:19, 112:25, 118:23
**noticed** [1] - 49:16
**notices** [18] - 28:23, 29:17, 30:15, 36:10, 36:17, 42:3, 46:9, 51:10, 51:18, 52:7, 53:21, 53:24, 54:16, 54:19, 54:21, 66:16, 66:17, 104:7
**number** [30] - 6:24, 22:24, 45:10, 69:13,

70:7, 74:6, 74:17, 74:20, 75:9, 78:7, 80:13, 80:14, 81:5, 81:18, 81:21, 81:24, 82:1, 82:7, 82:8, 82:12, 83:15, 84:6, 90:5, 90:6, 99:15, 115:13, 116:16
**numbered** [2] - 6:21, 78:3
**numbers** [5] - 48:24, 49:24, 82:14, 82:18, 82:23

## O

**o'clock** [4] - 47:5, 51:15, 52:25, 54:18
**oath** [1] - 4:9
**object** [3] - 32:9, 111:10, 111:21
**objection** [8] - 11:25, 29:25, 40:15, 42:11, 44:21, 57:24, 64:1, 112:16
**objections** [5] - 100:18, 110:16, 110:17, 110:18, 124:9
**obligated** [2] - 114:11, 114:23
**obligation** [1] - 94:24
**obligations** [6] - 69:13, 86:12, 92:4, 118:16, 121:20, 123:25
**obstructionist** [1] - 81:11
**obviously** [3] - 23:1, 23:22, 123:19
**OCC** [1] - 55:22
**occur** [5] - 22:6, 44:9, 46:2, 53:6, 61:25
**occurred** [2] - 23:10, 51:20
**occurring** [2] - 20:14, 46:23
**October** [1] - 68:23
**odious** [1] - 110:22
**offensive** [1] - 115:22
**offer** [4] - 11:20, 78:1, 83:4, 91:11
**office** [21] - 11:23, 49:23, 55:19, 69:13, 69:14, 70:6, 70:16, 73:19, 74:16, 75:7, 77:22, 80:15, 80:19, 80:22, 81:21, 83:10, 89:2, 90:11, 98:25, 102:6, 107:18
**Office** [36] - 12:3, 34:18, 49:22, 50:3, 55:10, 55:17, 68:25,

69:8, 70:14, 72:5, 72:6, 76:5, 76:21, 77:17, 79:6, 81:1, 83:25, 84:3, 85:22, 87:4, 88:23, 89:8, 89:23, 90:18, 90:22, 91:6, 91:13, 91:25, 92:3, 95:17, 98:7, 98:23, 100:2
**office's** [4] - 71:20, 87:9, 87:13, 90:10
**officer** [10] - 9:5, 9:24, 10:4, 21:14, 27:25, 55:12, 56:20, 78:24, 97:18, 97:19
**officer's** [1] - 9:9
**offices** [26] - 18:16, 40:6, 40:9, 40:11, 43:12, 43:17, 43:23, 44:14, 48:23, 50:2, 50:6, 62:19, 63:24, 71:22, 72:4, 90:21, 90:25, 91:3, 99:23, 101:23, 102:2, 102:3, 102:7, 102:8, 119:15
**official** [1] - 71:13
**officials** [1] - 66:21
**often** [2] - 20:23, 120:11
**Older** [1] - 72:6
**OMB** [7] - 22:7, 22:13, 24:24, 25:10, 48:22, 60:6, 112:19
**OMB/OPM** [1] - 113:2
**ombudsman** [3] - 72:10, 107:17, 107:18
**once** [6] - 21:19, 21:21, 29:23, 30:4, 64:22, 72:25
**one** [58] - 5:16, 6:9, 6:10, 10:10, 11:16, 11:19, 11:21, 12:24, 18:1, 22:6, 27:8, 29:8, 30:12, 31:16, 32:15, 37:14, 40:8, 41:8, 44:3, 48:24, 50:21, 54:1, 58:4, 59:14, 62:1, 64:5, 64:15, 65:17, 67:4, 78:6, 81:5, 83:12, 84:12, 85:8, 87:15, 95:13, 96:3, 96:21, 100:18, 101:7, 102:13, 102:15, 102:17, 111:13, 112:19, 115:13, 116:2, 116:24, 118:18, 119:10, 121:19, 125:7, 125:23, 125:24, 126:2, 128:14, 129:3
**ones** [3] - 11:21, 39:24, 126:13

**ongoing** [4] - 25:5, 25:21, 102:5, 112:20
**onus** [1] - 114:3
**open** [2] - 98:12, 99:13
**operating** [4] - 18:16, 19:13, 54:13, 92:11
**operation** [3] - 71:23, 117:18, 118:4
**operational** [8] - 11:18, 12:8, 12:14, 20:18, 27:4, 85:16, 111:22, 125:3
**operationalize** [1] - 19:7
**operationally** [1] - 19:20
**Operations** [1] - 99:24
**operations** [15] - 7:24, 13:14, 19:11, 19:16, 19:17, 19:19, 20:5, 21:21, 22:3, 22:4, 29:4, 76:17, 82:22, 101:20, 117:13
**opinion** [1] - 23:21
**OPM** [30] - 25:10, 37:24, 37:25, 38:13, 38:21, 39:13, 41:17, 46:6, 47:1, 47:5, 47:12, 49:9, 50:25, 52:8, 52:10, 55:1, 55:14, 57:11, 59:10, 59:22, 60:15, 61:13, 62:9, 62:10, 62:23, 63:14, 64:18, 67:5, 83:4, 112:19
**OPM's** [1] - 63:3
**OPM/OMB** [1] - 61:5
**opportunity** [5] - 4:19, 22:20, 111:12, 116:23, 117:20
**opposed** [2] - 101:16, 129:15
**opposing** [2] - 4:18, 113:18
**opposite** [1] - 51:20
**ops** [1] - 49:23
**order** [88] - 8:17, 10:22, 10:25, 36:14, 36:15, 37:3, 37:11, 41:7, 41:8, 41:10, 50:10, 50:11, 52:22, 52:23, 52:24, 53:2, 53:4, 53:7, 53:14, 53:16, 54:5, 54:9, 54:23, 57:6, 57:8, 57:12, 57:15, 57:23, 59:10, 64:22, 65:6, 72:22, 76:10, 76:12, 76:24, 77:2, 77:5, 77:8, 77:11, 87:5, 89:8, 90:2,

90:10, 90:21, 93:24, 96:12, 100:17, 100:20, 101:4, 101:11, 101:17, 101:18, 101:22, 102:11, 102:25, 103:16, 103:20, 105:4, 108:3, 108:12, 110:17, 110:18, 111:4, 111:11, 112:14, 114:15, 114:18, 114:21, 115:22, 116:4, 118:12, 118:24, 119:3, 120:15, 122:24, 123:20, 123:24, 124:17, 124:18, 125:11, 128:3, 128:5, 129:11, 129:15, 129:22
**ordered** [1] - 101:10
**ordering** [1] - 107:12
**orders** [4] - 113:25, 114:1, 114:9, 119:5
**ordinary** [3] - 50:19, 106:5, 106:10
**org** [2] - 81:7, 83:2
**organization** [5] - 20:16, 21:21, 23:6, 73:11, 126:15
**organizations** [3] - 5:7, 112:12, 119:18
**organized** [2] - 70:16, 91:23
**original** [5] - 79:14, 79:15, 100:20, 114:20, 115:2
**ourselves** [1] - 62:25
**outside** [3] - 21:6, 71:19, 75:10
**oversee** [1] - 119:21
**overseeing** [1] - 29:8
**oversees** [1] - 30:3
**overview** [1] - 73:25
**overwhelming** [1] - 20:14
**own** [5] - 22:21, 49:23, 58:12, 123:21, 123:22
**owned** [1] - 85:18
**owns** [1] - 10:18

**P**

**p.m** [7] - 51:25, 52:1, 53:1, 54:21, 78:11, 79:15
**pace** [1] - 90:14
**page** [5] - 14:8, 86:7, 93:16, 97:22
**pages** [1] - 26:19
**Paoletta** [45] - 7:13, 7:20, 8:6, 8:9, 10:8, 11:6, 11:9, 11:14,

13:16, 13:22, 14:9, 14:14, 14:15, 14:19, 14:20, 14:21, 15:7, 15:22, 16:19, 16:20, 18:9, 19:8, 21:11, 21:12, 27:1, 32:5, 32:17, 40:18, 53:11, 53:16, 54:4, 66:21, 94:11, 94:13, 94:15, 95:8, 96:22, 97:2, 97:12, 97:15, 97:20, 98:3, 98:5, 117:7, 117:8
**Paoletta's** [6] - 7:23, 15:10, 17:7, 17:16, 116:10, 118:7
**paragraph** [23] - 14:10, 14:12, 19:1, 82:21, 83:19, 85:1, 86:11, 94:4, 99:19, 111:6, 111:7, 111:10, 112:1, 112:16, 112:17, 114:10, 117:2, 118:12, 118:13, 124:11, 125:10, 125:21, 125:22
**paragraphs** [1] - 78:7
**parallel** [1] - 78:23
**parallels** [1] - 114:8
**part** [10] - 24:25, 58:18, 59:9, 66:20, 73:15, 78:25, 113:16, 118:6, 120:6, 125:3
**partial** [1] - 39:19
**participants** [1] - 72:3
**participate** [4] - 72:15, 72:21, 73:5, 113:11
**participated** [2] - 66:20
**participating** [1] - 67:2
**particular** [5] - 35:21, 43:17, 98:25, 105:25, 110:16
**particularly** [2] - 72:14, 110:22
**parties** [2] - 65:23, 101:1
**partner** [2] - 72:16, 72:19
**partners** [2] - 57:11, 72:1
**partnership** [1] - 72:13
**party** [3] - 10:12, 10:15, 111:19
**past** [2] - 10:2, 91:12
**Pastor** [1] - 107:17
**pause** [7] - 28:5, 33:15, 57:18, 57:20, 57:22, 65:19, 111:24
**paying** [1] - 62:25

**peers** [1] - 15:23
**people** [68] - 11:9,
11:13, 15:3, 15:4,
15:21, 16:8, 16:10,
16:18, 16:21, 16:22,
17:1, 21:2, 21:5, 22:24,
31:10, 31:22, 32:1,
32:20, 37:6, 38:21,
38:22, 38:23, 39:14,
40:19, 43:2, 43:8,
43:17, 45:10, 45:18,
49:24, 50:14, 54:16,
57:1, 59:11, 59:12,
60:15, 62:9, 62:17,
66:8, 73:10, 74:24,
76:20, 80:13, 80:20,
81:21, 81:25, 82:1,
82:6, 83:2, 83:4, 84:12,
86:18, 86:24, 88:14,
88:16, 88:20, 92:22,
99:3, 101:9, 105:6,
107:8, 123:8, 123:17,
125:5, 127:23
**People** [1] - 17:3
**people's** [1] - 42:16
**per** [1] - 9:2
**perceived** [1] - 81:10
**perfect** [1] - 23:9
**perform** [4] - 94:5,
115:7, 118:15, 126:17
**performance** [4] -
36:5, 36:6, 48:11,
91:11
**performing** [3] - 25:8,
78:14, 94:6
**period** [8] - 14:2,
21:10, 49:2, 85:19,
92:15, 95:20, 96:1,
96:3
**permission** [3] -
27:18, 44:14, 44:17
**person** [3] - 30:3,
53:22, 66:9
**personal** [2] - 15:12,
15:15
**personally** [2] - 22:14,
119:1
**personnel** [3] - 36:25,
48:15, 74:18
**perspective** [3] -
20:19, 63:3, 110:23
**persuaded** [1] -
128:14
**Pfaff** [8] - 3:22, 68:2,
68:19, 91:21, 116:1,
116:8, 127:19
**PFAFF** [1] - 68:4
**phase** [4] - 62:13,
63:1, 63:2, 63:20
**Phase** [3] - 63:3, 63:4

**phases** [1] - 58:4
**phone** [2] - 74:18,
74:23
**phrase** [1] - 57:3
**physically** [1] - 12:14
**pick** [2] - 74:5, 74:20
**piece** [1] - 37:11
**pieces** [1] - 48:10
**piling** [1] - 94:17
**piling-up** [1] - 94:17
**place** [7] - 10:19, 22:2,
106:13, 108:5, 111:18,
112:22, 118:10
**places** [2] - 55:21,
119:20
**plaintiff** [4] - 3:5,
100:10, 120:4, 123:4
**plaintiffs** [24] - 3:8,
3:21, 10:21, 10:25,
33:8, 68:2, 100:16,
107:14, 108:21, 112:7,
112:11, 112:15, 113:9,
113:25, 116:20,
116:25, 118:17, 120:7,
120:20, 121:13,
124:16, 125:13,
125:15, 128:4
**plaintiffs'** [5] - 26:2,
113:12, 113:13,
118:12, 119:9
**Plaintiffs'** [2] - 49:8,
98:13
**plaintiffs's** [1] -
115:14
**plan** [24] - 3:22, 4:4,
39:18, 41:11, 43:7,
45:24, 48:20, 48:21,
56:4, 56:12, 56:17,
57:22, 58:16, 58:21,
60:1, 60:2, 61:14,
61:17, 63:9, 63:23,
64:3, 64:5, 64:7, 64:21
**planned** [2] - 107:25,
127:7
**planning** [3] - 4:1,
26:7, 98:8
**play** [1] - 70:15
**played** [1] - 73:19
**playing** [1] - 72:18
**plenty** [1] - 123:14
**point** [15] - 16:3,
46:17, 65:1, 84:4, 95:5,
98:19, 106:17, 106:24,
107:4, 113:3, 115:14,
116:20, 116:24, 121:2,
121:17
**pointed** [3] - 23:2,
104:4, 115:5
**policy** [4] - 39:14,
41:17, 62:16, 62:20

**politically** [1] - 119:16
**poor** [1] - 36:6
**poorly** [1] - 124:12
**pop** [1] - 41:25
**popular** [2] - 122:8,
122:10
**populated** [1] - 47:24
**population** [2] - 31:21,
31:23
**portal** [8] - 71:6, 71:7,
72:4, 72:15, 72:21,
73:5, 88:2
**portfolio** [2] - 21:22,
84:20
**position** [12] - 34:16,
39:5, 43:5, 43:18,
68:24, 100:21, 104:9,
107:22, 107:23,
112:20, 115:6
**positions** [17] - 39:14,
43:3, 43:4, 43:6, 43:8,
43:9, 56:24, 57:1,
59:12, 59:15, 59:17,
59:18, 62:14, 69:4,
69:8, 100:15, 105:2
**positive** [1] - 23:11
**possess** [1] - 10:12
**possible** [4] - 44:6,
46:1, 51:13, 59:1
**posted** [2] - 90:1, 90:3
**potentially** [1] - 20:18
**Power** [3] - 109:5,
110:10, 110:11
**powers** [7] - 102:24,
103:2, 103:18, 106:7,
108:18, 108:19, 109:1
**preclude** [2] - 113:1,
113:4
**predecisional** [2] -
45:23, 113:3
**predicated** [1] -
102:12
**preliminarily** [1] -
104:23
**preliminary** [13] -
77:25, 104:20, 105:13,
111:12, 112:2, 112:9,
112:23, 113:4, 113:23,
114:13, 116:25,
128:19, 129:4
**preparation** [1] -
66:16
**prepared** [1] - 111:25
**preparing** [1] - 120:3
**present** [2] - 38:19,
58:15
**presenting** [1] -
121:22
**preservation** [2] -
111:21, 112:14

**preserve** [4] - 110:21,
112:7, 112:10, 127:14
**preserving** [1] -
123:15
**President** [7] - 103:13,
103:15, 119:20,
119:21, 122:17,
127:12, 127:13
**presses** [1] - 54:2
**pressing** [1] - 55:15
**pressuring** [1] - 53:19
**presumption** [1] -
125:9
**pretty** [2] - 95:17,
95:22
**prevailing** [1] - 81:9
**prevent** [2] - 93:9,
113:10
**prevented** [1] - 57:13
**preventing** [1] - 87:25
**previous** [3] - 48:20,
49:5, 59:11
**previously** [4] - 34:3,
76:3, 87:12, 112:21
**primary** [1] - 71:5
**prime** [1] - 11:20
**privacy** [2] - 71:24,
71:25
**private** [1] - 72:10
**probation** [1] - 45:11
**probationary** [7] -
35:22, 37:19, 45:13,
83:5, 101:9, 104:1,
104:6
**problem** [14] - 57:11,
57:14, 57:15, 106:8,
115:1, 115:12, 117:23,
118:11, 119:2, 120:6,
121:11, 121:22, 123:9,
126:22
**problematic** [1] - 83:3
**problems** [2] - 105:7,
115:13
**procedures** [1] - 64:16
**proceed** [3] - 4:10,
66:4, 66:7
**proceedings** [3] -
100:22, 119:2
**process** [21] - 10:16,
22:19, 28:17, 28:18,
30:5, 43:20, 70:11,
70:15, 71:8, 73:15,
106:3, 106:10, 112:19,
113:2, 113:6, 113:11,
113:14, 113:15,
121:18, 122:2, 127:25
**processed** [1] - 92:15
**processes** [1] - 73:13
**procurement** [6] -
10:16, 27:9, 29:8, 30:3,

30:5, 72:1
**product** [1] - 70:17
**productive** [1] - 72:14
**products** [1] - 74:22
**program** [3] - 5:25, 31:18, 69:6
**programmatic** [1] - 19:20
**programs** [2] - 22:20, 86:13
**Programs** [2] - 3:14, 3:16
**prohibitions** [2] - 76:2, 76:4
**project** [3] - 37:22, 71:14, 80:19
**projects** [1] - 88:13
**prompted** [1] - 15:23
**proof** [1] - 26:2
**proposals** [1] - 129:17
**proposed** [7] - 100:17, 100:20, 111:4, 113:4, 116:25, 118:12, 118:23
**Protection** [5] - 34:12, 39:2, 68:21, 105:16, 117:6
**protection** [2] - 35:2, 35:3
**protections** [1] - 34:10
**protocol** [1] - 23:20
**prove** [2] - 25:25
**proved** [1] - 104:10
**provide** [18] - 4:18, 4:23, 5:2, 34:3, 46:8, 52:11, 62:24, 65:7, 65:25, 73:2, 73:3, 73:25, 80:18, 80:23, 83:12, 109:22, 110:6, 111:11
**provided** [19] - 4:2, 4:15, 7:11, 9:15, 9:16, 12:9, 19:15, 34:8, 36:1, 36:9, 41:5, 46:7, 50:8, 50:25, 52:8, 58:8, 82:18, 82:23, 128:7
**provides** [7] - 22:19, 22:22, 70:6, 74:15, 75:10, 113:23, 117:20
**providing** [8] - 8:21, 17:15, 18:23, 22:7, 71:13, 73:6, 74:5, 80:22
**provision** [1] - 75:8
**provisionary** [1] - 114:2
**provisions** [2] - 50:20, 103:9
**pseudonym** [2] - 34:6, 34:9
**pseudonymous** [1] -

65:24
**public** [8] - 23:21, 23:22, 66:10, 69:25, 70:13, 71:15, 90:2, 90:3
**Public** [1] - 3:10
**publicly** [1] - 67:12
**pull** [4] - 15:3, 29:20, 51:12, 126:8
**pulled** [4] - 48:22, 49:2, 98:18, 126:7
**punchy** [1] - 3:19
**purchase** [1] - 59:6
**purposes** [1] - 84:11
**pursuant** [1] - 18:17
**push** [1] - 5:16
**put** [13] - 3:21, 40:4, 46:10, 79:11, 81:4, 100:20, 104:10, 114:3, 118:22, 121:12, 125:17, 126:24, 129:8
**puts** [1] - 75:12

## Q

**quality** [2] - 71:16, 91:11
**questions** [19] - 10:11, 11:7, 15:22, 21:23, 26:16, 30:9, 32:25, 47:4, 47:18, 64:19, 66:7, 66:14, 69:23, 69:24, 91:17, 100:5, 100:14, 109:20, 110:14
**queues** [1] - 93:1
**quick** [2] - 44:5, 44:6
**quicker** [1] - 52:15
**quickly** [6] - 42:2, 51:13, 58:25, 83:1, 97:12, 126:7
**quite** [1] - 106:4
**quo** [4] - 12:13, 112:10, 123:15
**quotes** [2] - 121:12, 121:15

## R

**racing** [1] - 81:7
**raise** [3] - 108:25, 111:22, 117:21
**raised** [3] - 48:2, 100:19, 119:11
**raising** [1] - 99:4
**rapid** [1] - 20:20
**rapidness** [1] - 20:14
**rates** [1] - 11:20
**rather** [2] - 46:25, 125:19
**re** [1] - 30:7

**re-competed** [1] - 30:7
**reach** [9] - 11:6, 11:13, 13:15, 15:24, 16:1, 52:10, 52:14, 74:25, 124:21
**reached** [9] - 11:17, 11:19, 11:21, 14:14, 32:21, 53:5, 85:9, 110:21, 126:18
**reaching** [9] - 15:21, 16:10, 16:11, 16:12, 16:19, 16:21, 16:22, 17:2, 96:22
**reaction** [2] - 49:16, 49:18
**reactivate** [1] - 86:16
**read** [10] - 17:22, 17:23, 53:7, 53:16, 110:2, 121:11, 121:15, 124:23, 124:24
**reading** [1] - 14:12
**real** [2] - 74:24, 118:24
**realize** [2] - 20:15, 125:23
**really** [15] - 38:9, 38:11, 40:5, 55:13, 59:13, 72:16, 72:18, 102:24, 110:9, 114:20, 119:7, 121:14, 123:17, 128:9
**reason** [13] - 29:7, 29:8, 40:13, 44:4, 104:13, 107:13, 108:20, 109:9, 109:11, 109:18, 118:6, 125:2, 128:11
**reasons** [1] - 81:5
**reassign** [2] - 29:10, 29:12
**reassuming** [1] - 20:5
**receipt** [1] - 72:25
**receive** [7] - 18:17, 47:20, 72:24, 73:19, 73:25, 75:7, 95:24
**received** [16] - 5:13, 19:8, 22:7, 36:13, 36:17, 36:23, 46:25, 47:2, 73:13, 77:20, 78:21, 78:22, 79:14, 85:24, 89:19, 95:19
**recent** [3] - 105:24, 109:5, 109:14
**recently** [2] - 6:19, 69:6
**recess** [1] - 67:23
**recipients** [1] - 78:6
**recision** [1] - 18:3
**recognize** [2] - 39:3, 102:9
**recollection** [6] - 5:6,

7:10, 13:9, 16:24, 41:2, 58:24
**record** [12] - 3:2, 3:6, 6:20, 49:7, 66:10, 68:18, 82:11, 104:12, 116:20, 126:6, 126:7, 128:3
**Records** [1] - 111:20
**recross** [1] - 26:8
**RECROSS** [1] - 26:14
**RECROSS-EXAMINATION** [1] - 26:14
**redirect** [5] - 3:19, 26:13, 30:19, 67:18, 99:9
**REDIRECT** [2] - 4:11, 99:11
**reduce** [2] - 41:14, 126:3
**reducing** [1] - 22:24
**reduction** [11] - 37:23, 38:11, 41:12, 41:21, 42:25, 43:4, 47:21, 62:14, 64:7, 79:12, 112:25
**refer** [4] - 10:21, 10:25, 18:2, 56:21
**reference** [2] - 96:21, 96:24
**referenced** [3] - 17:16, 52:7, 56:15
**referencing** [1] - 41:8
**referrals** [2] - 77:5, 77:8
**referred** [9] - 20:4, 20:20, 21:24, 56:15, 56:24, 57:15, 61:5, 67:1, 93:23
**referring** [3] - 6:6, 15:2, 129:13
**refers** [1] - 17:7
**reflected** [1] - 83:9
**reflecting** [1] - 9:9
**reflects** [1] - 104:5
**refresh** [1] - 13:9
**regard** [2] - 103:2, 125:21
**regarding** [9] - 10:14, 11:9, 11:14, 11:20, 13:14, 19:8, 25:9, 112:17, 125:22
**register** [3] - 47:23, 48:4, 72:23
**registered** [1] - 73:5
**registers** [2] - 48:2, 59:15
**regs** [1] - 72:8
**regular** [1] - 115:11
**Regulations** [1] -

99:25
  **regulators** [5] - 70:2, 74:9, 87:19, 87:21, 89:15
  **reinstate** [1] - 101:8
  **reinstated** [8] - 8:14, 9:3, 10:8, 23:9, 87:5, 87:7, 87:11, 106:23
  **reinstating** [2] - 8:6, 8:10
  **relate** [1] - 9:19
  **related** [2] - 85:15, 112:14
  **relief** [15] - 70:9, 102:3, 102:8, 104:14, 104:15, 104:20, 105:13, 107:2, 107:12, 107:15, 107:16, 110:20, 112:8, 112:10, 115:20
  **rely** [1] - 90:25, 117:8, 119:5
  **remain** [1] - 85:18
  **remained** [2] - 12:7, 85:16
  **remaining** [1] - 62:17
  **remedy** [1] - 120:5
  **remember** [7] - 38:17, 40:8, 46:23, 57:14, 57:17, 110:10, 118:4
  **remind** [1] - 94:23
  **removal** [1] - 107:7
  **remove** [1] - 48:3
  **reorganization** [1] - 23:6
  **repair** [1] - 22:4
  **repairability** [1] - 22:3
  **repeat** [2] - 3:19, 87:10
  **repeatedly** [1] - 115:4
  **rephrase** [2] - 45:2, 97:24
  **report** [9] - 34:19, 34:20, 69:16, 69:17, 84:11, 95:15, 119:19, 120:3
  **reporter** [2] - 3:20, 32:8
  **reporting** [1] - 119:24
  **reports** [2] - 69:19, 70:10
  **represent** [2] - 53:1, 125:16
  **represented** [1] - 42:12
  **request** [14] - 5:13, 12:21, 13:10, 13:12, 14:16, 14:19, 30:12, 48:25, 76:13, 77:20, 78:21, 78:23, 79:14,

97:10
  **requested** [3] - 30:14, 79:10, 125:5
  **requesting** [3] - 31:21, 95:8, 125:13
  **requests** [9] - 13:14, 13:18, 14:20, 32:17, 71:15, 80:21, 97:13, 114:8, 115:10
  **require** [2] - 10:17, 126:9
  **required** [25] - 5:17, 6:10, 9:7, 22:16, 39:25, 77:12, 79:1, 80:24, 81:2, 81:3, 83:11, 115:8, 115:22, 115:25, 116:13, 116:16, 117:7, 117:9, 118:1, 118:15, 118:21, 118:23, 119:4, 120:1, 127:4
  **requirement** [2] - 23:3, 119:12
  **requirements** [4] - 12:9, 21:20, 23:3, 129:14
  **requires** [4] - 23:3, 80:12, 80:14, 88:10
  **rescind** [3] - 17:19, 18:2, 101:11
  **rescinded** [4] - 10:23, 17:12, 29:1, 108:3
  **Research** [1] - 99:24
  **reshape** [1] - 22:8
  **resistance** [1] - 81:11
  **resolve** [4] - 75:1, 111:12, 112:6, 112:15
  **resource** [1] - 12:7
  **resources** [1] - 12:5
  **respect** [2] - 96:8, 108:2, 110:16, 123:5
  **respond** [7] - 71:14, 71:24, 72:22, 84:18, 86:14, 90:16, 95:2
  **responded** [1] - 97:15
  **responding** [4] - 89:17, 92:25, 98:21, 99:7
  **responds** [1] - 69:24
  **response** [19] - 3:25, 31:4, 32:6, 37:9, 52:5, 52:6, 53:10, 53:17, 69:22, 69:23, 70:2, 73:2, 73:3, 76:13, 85:18, 90:14, 92:8, 94:16, 95:8
  **Response** [31] - 12:4, 19:3, 69:1, 69:9, 69:18, 70:15, 71:19, 76:6, 76:22, 81:1, 83:25, 84:3, 85:22, 86:16,

87:4, 88:23, 89:8, 89:23, 90:18, 90:22, 91:7, 91:14, 91:25, 92:3, 95:18, 98:7, 98:23, 99:25, 100:1, 100:2, 100:4
  **Response's** [2] - 77:17, 79:6
  **responses** [3] - 72:17, 73:6, 89:6
  **responsibilities** [2] - 37:20, 72:11
  **responsibility** [3] - 18:16, 69:12, 80:7
  **responsible** [6] - 18:10, 19:13, 71:10, 71:13, 71:17, 92:3
  **rest** [3] - 22:8, 39:19, 62:14
  **restarting** [1] - 128:1
  **restraining** [3] - 57:12, 59:10, 114:15
  **restructure** [1] - 22:8
  **result** [3] - 25:2, 57:22, 127:8
  **resulted** [1] - 61:16
  **results** [1] - 119:19
  **resume** [1] - 102:10
  **resumed** [2] - 18:11, 19:16
  **resumption** [4] - 18:10, 19:8, 25:9
  **retaliation** [2] - 34:11, 65:11
  **retention** [5] - 47:22, 48:1, 48:4, 48:14, 59:15
  **retirement** [2] - 65:3, 83:5
  **return** [3] - 4:8, 10:18, 83:25
  **returned** [1] - 70:7
  **review** [14] - 35:23, 37:25, 47:1, 47:3, 77:21, 78:1, 89:14, 92:18, 97:7, 100:13, 105:17, 106:5, 106:20, 116:24
  **reviewed** [5] - 36:8, 37:18, 38:10, 84:23, 106:1
  **reviewing** [1] - 38:7
  **revived** [1] - 127:15
  **rid** [4] - 24:9, 104:6, 122:5, 122:20
  **Ridge** [1] - 74:15
  **RIF** [30] - 22:6, 38:1, 38:2, 38:6, 38:14, 38:19, 41:17, 47:7, 54:3, 54:23, 55:2, 57:7,

58:6, 58:18, 59:13, 60:3, 60:15, 61:13, 61:22, 63:8, 63:13, 64:21, 65:1, 66:16, 66:20, 79:12, 98:7, 98:24, 107:24, 127:8
  **RIFing** [2] - 127:24, 127:25
  **RIFs** [6] - 46:2, 49:14, 53:6, 60:7, 60:12, 63:19
  **rights** [1] - 22:18
  **Rights** [1] - 49:22
  **righty** [1] - 67:18
  **risk** [2] - 118:21, 118:24
  **RMR** [1] - 72:3
  **road** [1] - 83:4
  **roadmap** [1] - 22:7
  **Robert** [1] - 3:9
  **role** [2] - 69:3, 70:14
  **roles** [1] - 97:16
  **room** [1] - 33:14, 127:24
  **ROSENBERG** [71] - 3:12, 4:12, 5:1, 5:5, 6:5, 6:8, 6:20, 7:1, 7:19, 8:5, 8:19, 12:2, 12:20, 14:4, 16:16, 17:25, 18:21, 18:22, 21:9, 25:3, 26:1, 26:4, 29:25, 33:7, 40:15, 42:11, 44:21, 44:25, 57:24, 64:1, 65:21, 65:23, 66:3, 66:11, 66:13, 67:15, 67:17, 110:24, 111:1, 111:3, 111:10, 113:9, 114:12, 114:24, 115:13, 115:18, 115:24, 116:6, 116:8, 116:14, 116:23, 117:4, 117:12, 117:18, 118:3, 120:2, 120:16, 120:23, 121:2, 121:7, 121:9, 124:6, 124:8, 124:11, 124:13, 124:15, 124:19, 124:25, 128:20, 129:1, 129:3
  **Rosenberg** [2] - 3:13, 4:10
  **round** [1] - 99:23
  **routing** [1] - 89:14
  **ruling** [1] - 128:19
  **run** [4] - 23:19, 69:24, 71:23, 75:17
  **running** [1] - 21:5
  **rushed** [1] - 23:25
  **rushing** [1] - 81:5
  **Russ** [7] - 42:1, 42:6,

42:7, 42:8, 42:9, 42:19, 54:4
**Russell** [3] - 3:4, 42:17, 75:21

## S

**sales** [2] - 88:10
**savvy** [1] - 23:19
**saw** [4] - 49:3, 49:4, 49:17, 54:17
**scan** [1] - 75:17
**scanning** [1] - 75:16
**scenes** [1] - 127:6
**scheduled** [1] - 47:5
**scheme** [1] - 106:5
**schemes** [1] - 106:14
**school** [1] - 35:1
**scope** [5] - 7:24, 10:14, 13:10, 103:20, 115:25
**screen** [4] - 41:25, 42:1, 42:18
**second** [9] - 60:8, 65:17, 80:6, 85:1, 86:3, 86:11, 99:21, 108:16, 118:13
**secondly** [2] - 81:9, 83:9, 85:8
**secretary** [1] - 76:2
**section** [13] - 47:18, 47:22, 48:3, 69:5, 70:17, 70:19, 70:22, 71:5, 71:9, 71:11, 71:12, 71:16, 84:18
**sections** [3] - 19:12, 19:13, 80:22
**Security** [1] - 122:4
**see** [17] - 4:7, 23:2, 23:5, 42:16, 42:17, 49:21, 55:6, 78:4, 78:7, 79:24, 86:9, 90:11, 99:15, 99:18, 99:21, 115:21, 128:5
**seeing** [3] - 18:8, 49:12, 49:24
**seek** [1] - 44:11
**seeking** [2] - 113:20, 113:21
**seeks** [1] - 100:10
**seem** [2] - 13:23, 110:3
**sees** [1] - 94:25
**send** [7] - 29:9, 53:18, 53:19, 53:21, 53:22, 72:24, 104:7
**sending** [2] - 51:18, 71:5
**sends** [1] - 31:9
**senior** [7] - 34:18,

52:9, 52:14, 53:5, 53:25, 54:7, 66:21
**sense** [1] - 117:12
**sent** [32] - 11:1, 11:9, 11:10, 13:6, 14:23, 15:7, 15:11, 15:13, 18:6, 27:6, 28:2, 28:22, 29:16, 30:14, 48:22, 51:15, 51:21, 52:24, 76:1, 76:3, 83:16, 83:18, 83:19, 84:1, 97:1, 97:14, 98:3, 98:5, 114:1, 117:8, 120:13
**sentence** [2] - 80:6, 99:21
**sentences** [2] - 79:25, 82:19
**sentiment** [1] - 81:9
**separate** [1] - 10:7
**separation** [7] - 102:24, 103:2, 103:18, 106:7, 108:17, 108:19, 108:25
**sequenced** [1] - 41:12
**series** [1] - 100:21
**serious** [1] - 112:11
**served** [1] - 123:11
**service** [1] - 48:9
**Servicemember** [1] - 72:5
**services** [11] - 38:10, 62:24, 70:5, 70:19, 70:24, 71:1, 74:22, 80:19, 80:23, 91:11
**Services** [2] - 5:15, 5:24
**set** [3] - 38:1, 42:15, 125:12
**several** [6] - 38:21, 62:3, 87:24, 97:16, 98:22, 107:5
**SF-50** [2] - 36:22, 36:24
**Shakes** [1] - 59:25
**shall** [3] - 112:24, 112:25, 118:14
**share** [5] - 58:12, 70:3, 70:18, 74:12, 87:20
**shared** [3] - 41:24, 41:25, 64:9
**shares** [1] - 87:18
**sharing** [3] - 74:11, 87:17, 88:3
**shift** [1] - 75:19
**shocked** [1] - 49:21
**shocking** [1] - 49:25
**shop** [2] - 75:3, 75:16
**short** [5] - 26:8, 26:19, 67:15, 109:22, 109:23
**shortly** [4] - 8:7, 8:10,

8:11, 8:12
**show** [1] - 49:7
**showing** [2] - 39:4, 116:3
**shown** [1] - 126:14
**shows** [3] - 106:22, 114:25, 125:5
**shut** [2] - 121:23, 121:25
**shutdown** [1] - 121:24
**shutting** [2] - 59:2, 102:25
**side** [6] - 100:19, 110:11, 113:12, 113:13, 120:18, 128:14
**sides** [4] - 114:21, 125:2, 126:8, 127:2
**signed** [1] - 38:1
**significant** [1] - 92:11
**signified** [1] - 22:14
**similar** [4] - 5:7, 10:5, 106:4, 111:7
**similarly** [1] - 103:4
**simply** [1] - 20:13
**single** [4] - 43:13, 43:18, 49:20, 85:17
**sit** [1] - 122:2
**sits** [1] - 84:17
**sitting** [2] - 127:23, 127:24
**situation** [3] - 106:8, 107:8, 128:15
**skip** [2] - 35:10, 35:13
**sloppy** [1] - 23:10
**slow** [1] - 51:19
**small** [1] - 90:5
**smaller** [1] - 55:1
**smooth** [1] - 128:1
**snippets** [1] - 126:6
**software** [5] - 29:13, 29:15, 74:8, 75:11, 75:16
**solve** [1] - 119:2
**someone** [6] - 4:1, 39:5, 42:16, 53:24, 94:20, 120:14
**somewhere** [2] - 24:5, 40:3
**Sonya** [2] - 26:22, 27:12
**soon** [2] - 25:19, 30:18
**sorry** [22] - 12:22, 16:5, 31:24, 36:16, 41:15, 65:20, 70:23, 76:2, 78:4, 78:18, 81:24, 82:5, 82:14, 87:10, 89:11, 95:23, 96:15, 96:16, 96:24, 97:20, 98:17, 99:15
**sort** [2] - 80:21,

129:13
**sounds** [2] - 13:24, 120:20
**south** [4] - 81:18, 81:20, 82:7, 82:12
**southern** [1] - 121:15
**speaking** [1] - 42:9
**specific** [14] - 5:13, 6:14, 7:10, 10:11, 23:14, 39:24, 48:23, 58:21, 59:21, 90:11, 101:23, 102:3, 102:6, 114:4
**specifically** [3] - 5:16, 102:19, 118:20
**specificity** [2] - 112:3, 113:25
**specifics** [1] - 58:23
**specify** [1] - 126:20
**speculate** [1] - 41:3
**speculation** [1] - 29:25
**speed** [1] - 52:5
**spending** [1] - 21:22
**spent** [1] - 81:6
**spoken** [1] - 99:2
**staff** [23] - 11:5, 19:10, 51:12, 54:9, 54:20, 68:25, 69:2, 69:12, 75:4, 80:13, 80:15, 82:7, 84:2, 86:16, 86:18, 88:12, 91:24, 92:2, 92:8, 92:10, 92:18, 93:23, 94:5
**staffed** [1] - 88:21
**staffing** [3] - 79:6, 79:11, 88:18
**stakeholder** [4] - 70:24, 70:25, 71:1, 71:2
**stakeholders** [3] - 70:19, 71:5, 75:1
**stamp** [3] - 26:19, 27:21, 27:22
**stand** [5] - 4:9, 19:16, 54:5, 94:6, 116:17
**standards** [1] - 91:12
**standing** [8] - 35:17, 108:23, 108:25, 109:2, 109:10, 109:18, 110:19, 128:4
**stands** [1] - 6:1
**start** [3] - 11:13, 70:7, 74:3
**started** [8] - 7:20, 8:6, 8:9, 21:22, 27:11, 41:7, 45:17, 48:1
**starting** [2] - 3:5, 70:16
**starts** [1] - 79:22

**state** [12] - 3:5, 19:23, 20:5, 35:2, 68:18, 74:12, 87:19, 88:2, 88:3, 91:7, 91:9, 100:14
**states** [2] - 80:6, 85:2
**States** [1] - 3:14
**stating** [1] - 107:5
**status** [8] - 3:25, 4:17, 5:7, 12:12, 74:23, 112:10, 123:15
**statute** [8] - 6:11, 80:12, 80:14, 86:13, 86:15, 103:17, 106:16, 121:24
**statutes** [1] - 107:7
**statutorily** [27] - 5:16, 6:9, 9:7, 32:2, 39:24, 79:1, 80:24, 81:2, 81:3, 82:13, 83:11, 101:12, 102:7, 103:3, 115:8, 115:22, 115:25, 116:13, 116:16, 117:7, 117:9, 118:1, 118:15, 118:21, 119:4, 119:9, 127:4
**statutorily-authorized** [1] - 101:12
**statutory** [26] - 9:18, 9:20, 15:22, 21:20, 22:16, 23:3, 25:12, 31:7, 69:13, 80:7, 86:12, 92:4, 101:13, 101:21, 106:1, 106:5, 106:14, 116:21, 117:14, 118:16, 118:18, 120:6, 121:20, 123:15, 123:25, 128:5
**statutory-authorized** [1] - 101:13
**statutory-required** [1] - 22:16
**stay** [1] - 30:14
**steal** [1] - 121:8
**Steege** [1] - 107:17
**step** [2] - 33:4, 100:7
**steps** [1] - 86:16
**still** [26] - 3:22, 4:1, 4:4, 4:9, 17:7, 19:16, 24:8, 52:6, 53:18, 53:19, 63:18, 63:24, 64:21, 88:15, 99:13, 101:7, 107:25, 108:4, 108:17, 111:8, 115:7, 125:13, 126:21, 127:8, 127:24, 128:2
**stop** [43] - 10:22, 10:25, 28:23, 29:9, 29:13, 29:15, 29:16, 35:16, 36:15, 37:3,

37:5, 41:10, 50:11, 50:14, 54:6, 65:6, 76:12, 76:20, 76:24, 77:2, 77:5, 77:8, 77:11, 87:5, 89:7, 90:2, 90:21, 91:1, 93:24, 96:11, 101:11, 102:24, 103:16, 104:7, 104:22, 104:24, 105:4, 105:8, 108:2, 117:25, 124:17, 124:18, 125:11
**stop-work** [30] - 10:22, 10:25, 28:23, 29:9, 29:16, 36:15, 37:3, 37:5, 41:10, 50:11, 54:6, 76:12, 76:24, 77:2, 77:5, 77:8, 77:11, 87:5, 89:7, 90:2, 90:21, 93:24, 96:11, 101:11, 102:24, 103:16, 105:4, 108:2, 124:17, 124:18
**stoppage** [2] - 35:21, 91:1
**stopped** [11] - 16:3, 16:8, 17:3, 28:14, 28:18, 28:21, 61:23, 67:1, 70:11, 96:7, 107:25
**stopping** [1] - 12:17
**straight** [1] - 120:12
**streamlining** [1] - 122:14
**stressed** [2] - 51:12, 100:25
**strip** [1] - 106:18
**stripping** [1] - 106:15
**structure** [1] - 106:2
**struggled** [1] - 59:22
**student** [2] - 107:17, 107:18
**Students** [1] - 72:6
**studied** [1] - 20:22
**stuff** [7] - 47:20, 48:24, 77:13, 84:21, 89:21, 96:2, 111:20
**submits** [1] - 75:17
**submitted** [4] - 67:6, 94:1, 116:11, 116:14
**subscription** [1] - 75:11
**subscription-based** [1] - 75:11
**subsequent** [3] - 13:14, 13:18, 16:2
**subsequently** [3] - 15:7, 47:12, 79:3
**substance** [2] - 4:2, 58:7
**substitution** [1] -

101:4
**success** [1] - 102:12
**successful** [1] - 72:19
**sues** [1] - 74:11
**suffer** [1] - 108:23
**sufficient** [3] - 102:3, 104:22, 105:13
**suing** [1] - 103:15
**summary** [1] - 56:7
**summed** [1] - 82:3
**Sunday** [1] - 76:8
**supersede** [1] - 129:6
**superseded** [1] - 112:21
**supervision** [3] - 72:13, 119:13, 123:2
**Supervision** [4] - 49:22, 50:3, 55:11, 55:17
**support** [11] - 12:5, 71:20, 73:18, 73:19, 73:25, 74:2, 75:7, 80:18, 80:22, 80:23, 89:15
**supports** [3] - 74:7, 88:8, 127:23
**supposed** [2] - 23:19, 119:6
**Supreme** [8] - 105:24, 106:6, 109:4, 109:5, 110:11, 121:12, 122:19, 123:2
**surprised** [3] - 17:1, 17:5, 17:6
**suspected** [1] - 71:25
**suspend** [1] - 118:14
**suspension** [1] - 111:24
**sworn** [2] - 33:17, 68:5
**system** [17] - 12:12, 12:14, 23:22, 72:2, 72:9, 72:19, 84:9, 88:9, 88:22, 89:1, 89:2, 89:4, 91:16, 92:11
**System** [1] - 105:16
**systems** [4] - 29:12, 53:25, 71:23, 87:22

**T**

**tab** [22] - 7:2, 8:20, 12:25, 13:25, 14:5, 15:8, 17:7, 18:19, 26:20, 27:22, 30:10, 30:17, 30:18, 78:3, 79:19, 80:4, 85:25, 93:13, 93:14, 96:13, 96:15, 96:17
**table** [5] - 3:8, 3:15, 23:18, 66:8, 129:18

**tabs** [2] - 6:21, 78:3
**tailored** [1] - 101:22
**takeover** [1] - 21:2
**takeovers** [1] - 20:23
**talks** [2] - 62:18, 102:14
**targeted** [1] - 126:23
**task** [1] - 94:6
**tasked** [1] - 121:17
**tasks** [7] - 25:8, 35:16, 35:21, 84:7, 94:6, 94:10, 96:12
**taxpayers** [1] - 122:9
**team** [44] - 19:17, 24:19, 37:22, 37:24, 38:1, 38:2, 38:6, 38:14, 38:19, 38:22, 38:23, 46:10, 47:7, 47:10, 49:13, 52:16, 53:25, 54:3, 54:10, 54:12, 54:23, 55:2, 57:7, 58:18, 60:3, 60:4, 60:15, 61:13, 61:17, 61:22, 63:8, 63:13, 64:20, 64:21, 65:1, 65:3, 66:20, 71:11, 84:16, 84:17, 85:3, 85:4, 85:9, 127:8
**Teams** [4] - 39:4, 42:15, 42:18
**teams** [7] - 31:6, 80:17, 80:18, 81:4, 81:16, 83:3, 86:19
**technology** [4] - 70:18, 71:22, 75:15, 87:18
**template** [4] - 27:18, 47:19, 48:3, 48:16
**templates** [12] - 35:23, 35:25, 36:3, 36:10, 36:16, 37:19, 46:6, 46:8, 46:25, 47:4, 47:18, 47:19
**temporary** [4] - 57:12, 59:10, 114:15, 114:18
**ten** [2] - 35:4, 67:21
**ten-minute** [1] - 67:21
**tenure** [1] - 48:9
**term** [10] - 45:14, 71:2, 80:9, 104:1, 104:6, 111:22, 120:11, 120:22, 123:25
**terminate** [4] - 28:15, 104:21, 112:24, 118:14
**terminated** [6] - 7:12, 8:18, 29:24, 37:19, 83:6, 91:15
**terminating** [1] - 104:7
**termination** [15] - 5:9, 7:9, 27:18, 28:5, 28:23,

29:9, 29:17, 29:22,
30:4, 30:15, 48:24,
103:24, 112:17,
125:23, 128:21
**terminations** [4] -
28:18, 44:9, 101:12
**terms** [4] - 10:17,
19:17, 22:3, 83:6
**terrible** [1] - 31:24
**terrific** [1] - 129:21
**testified** [10] - 17:11,
19:23, 20:8, 33:18,
68:6, 91:24, 92:2,
92:22, 116:9, 123:22
**testify** [3] - 21:2,
65:12, 65:25
**testifying** [2] - 66:14,
91:21
**testimony** [33] - 3:18,
4:15, 8:21, 9:15, 9:21,
14:24, 17:13, 17:15,
18:23, 19:15, 19:16,
20:6, 34:3, 34:9, 40:22,
57:6, 58:2, 65:10,
98:12, 100:13, 100:14,
101:25, 104:18,
104:24, 106:22,
111:15, 111:16, 112:4,
112:18, 113:12,
114:25, 125:5, 126:1
**text** [1] - 101:18
**thanked** [1] - 52:8
**THE** [221] - 3:2, 3:11,
3:17, 3:24, 4:6, 4:24,
5:3, 5:11, 5:12, 5:21,
5:24, 6:1, 6:3, 6:4, 6:7,
6:17, 6:19, 6:25, 7:17,
7:18, 8:2, 8:4, 8:11,
8:12, 8:14, 8:16, 12:1,
12:10, 12:11, 12:14,
12:15, 12:16, 12:18,
12:19, 14:1, 14:3,
15:12, 15:14, 15:15,
15:16, 15:18, 15:20,
16:5, 16:7, 16:9, 16:12,
16:14, 17:19, 17:20,
17:21, 18:20, 21:1,
21:4, 21:5, 21:7, 21:8,
22:24, 23:1, 23:24,
24:6, 24:7, 24:13,
24:15, 24:18, 24:20,
24:21, 24:22, 24:23,
25:21, 25:23, 25:24,
26:3, 26:6, 26:9, 30:1,
33:2, 33:3, 33:4, 33:8,
33:12, 33:22, 34:1,
37:10, 37:13, 37:16,
40:16, 42:12, 42:14,
42:15, 42:17, 42:20,
44:22, 45:3, 45:5, 45:9,

45:13, 45:15, 45:17,
45:19, 49:10, 50:18,
50:21, 56:7, 57:25,
60:8, 60:10, 60:11,
60:13, 60:14, 60:17,
60:19, 60:23, 60:25,
62:8, 62:10, 62:11,
62:12, 64:25, 65:2,
65:8, 65:16, 65:20,
65:22, 66:2, 66:6,
67:16, 67:18, 67:20,
67:24, 68:7, 68:9,
68:10, 68:12, 68:13,
70:22, 70:24, 70:25,
71:1, 71:2, 71:4, 72:20,
72:22, 73:7, 73:9,
73:10, 73:12, 73:16,
73:22, 74:17, 74:19,
74:25, 75:3, 75:5, 80:2,
81:24, 82:2, 82:3, 82:5,
82:9, 91:18, 95:4,
95:12, 95:15, 98:10,
98:19, 99:9, 100:6,
100:8, 100:9, 100:12,
101:23, 102:11, 103:5,
103:8, 103:12, 103:15,
104:4, 105:14, 105:22,
107:19, 108:21,
109:19, 109:24, 110:7,
110:12, 110:14,
110:25, 111:2, 111:6,
113:8, 113:24, 114:19,
115:2, 115:16, 115:19,
116:2, 116:7, 116:12,
116:19, 117:3, 117:5,
117:16, 117:24,
118:25, 120:10,
120:17, 120:25, 121:4,
121:21, 123:8, 123:10,
124:7, 124:10, 124:12,
124:14, 124:18,
124:20, 126:12,
128:25, 129:2, 129:7
**themselves** [4] -
62:24, 73:8, 104:22,
105:12
**then-acting** [1] - 76:2
**thereabouts** [1] -
51:21
**thereafter** [5] - 8:7,
8:10, 8:11, 8:12, 15:7
**therefore** [1] - 122:25
**they've** [7] - 65:5,
72:18, 109:3, 117:22,
117:24, 117:25, 120:22
**thinking** [3] - 18:2,
101:3, 127:21
**thinks** [1] - 120:20
**third** [4] - 10:12,
10:15, 111:19, 118:19

**third-party** [3] - 10:12,
10:15, 111:19
**thorough** [1] - 26:10
**thousands** [2] - 90:7,
92:14
**three** [8] - 5:17, 35:3,
42:2, 86:25, 95:20,
95:25, 96:3, 105:8
**three-week** [4] -
95:20, 95:25, 96:3,
105:8
**Thrift** [2] - 55:11,
55:17
**throughout** [3] -
82:19, 85:18
**thunder** [1] - 121:8
**Thunder** [1] - 106:12
**Thursday** [6] - 62:1,
63:11, 63:23, 64:4,
64:7, 79:9
**tickets** [1] - 89:15
**timeline** [4] - 28:7,
43:22, 51:9, 109:23
**timely** [1] - 89:6
**timing** [2] - 41:11,
51:18
**today** [16] - 6:22,
21:10, 21:15, 23:15,
26:12, 52:17, 53:15,
53:18, 58:8, 65:12,
91:21, 100:10, 104:18,
116:17, 117:6, 119:12
**together** [6] - 47:3,
51:13, 114:22, 126:7,
126:9, 126:25
**toll** [2] - 80:12, 80:13
**toll-free** [2] - 80:12,
80:13
**top** [3] - 30:20, 70:7,
93:15
**topic** [2] - 6:12, 25:5
**topics** [1] - 10:19
**Torro** [1] - 27:23
**total** [4] - 80:7, 81:6,
81:20, 82:1
**touched** [1] - 89:22
**towards** [2] - 98:15,
106:24
**tracks** [1] - 107:25
**transcript** [2] - 5:5,
20:2
**transfer** [6] - 39:19,
39:22, 55:9, 55:14,
55:15, 56:14
**transferred** [1] - 40:2
**transferring** [1] -
44:18
**travel** [1] - 59:5
**Treasury** [1] - 3:3
**tribunal** [2] - 107:9,

107:11
**tribunals** [1] - 107:6
**tried** [1] - 15:25
**trigger** [1] - 107:23
**TRO** [2] - 111:8,
114:20
**true** [8] - 92:6, 92:10,
103:24, 103:25, 104:2,
104:17, 115:12, 124:24
**trusting** [1] - 21:19
**try** [6] - 33:24, 46:20,
64:19, 68:10, 75:1,
90:12
**trying** [9] - 51:12,
105:5, 105:11, 121:6,
121:23, 122:22,
123:13, 124:24, 126:3
**Ts** [1] - 64:16
**Tuesday** [4] - 62:1,
62:6, 63:6, 89:12
**turn** [24] - 6:15, 7:2,
8:20, 9:6, 10:3, 12:25,
15:9, 18:19, 26:19,
27:21, 29:3, 30:10,
46:19, 78:2, 78:3,
79:19, 85:25, 86:7,
93:13, 93:15, 96:13,
96:15, 99:13, 114:3
**turned** [8] - 9:25,
23:11, 29:4, 30:6, 88:6,
126:15, 126:16
**turning** [1] - 23:14
**two** [19] - 11:19, 30:9,
31:17, 38:22, 38:23,
41:18, 53:24, 61:6,
79:24, 81:6, 94:1,
102:15, 108:9, 112:4,
114:21, 118:11, 125:2,
126:13, 128:15
**type** [7] - 23:6, 47:2,
93:9, 101:4, 106:1,
118:9
**typical** [3] - 19:11,
95:22, 95:24
**typically** [4] - 23:5,
41:23, 73:1, 88:14

# U

**U.S** [1] - 103:9
**ultimate** [1] - 105:11
**ultimately** [4] - 18:10,
36:12, 36:17, 113:5
**ultra** [1] - 102:14
**um-hum** [9] - 28:1,
30:22, 32:3, 39:8,
40:12, 49:10, 49:15,
51:8, 60:13
**umbrella** [1] - 122:13
**unclear** [3] - 112:4,

112:13, 120:4
**unconstitutional** [4] - 107:6, 107:10, 107:11, 109:17
**under** [16] - 4:9, 22:23, 34:6, 34:9, 54:13, 54:19, 58:12, 102:20, 102:22, 114:18, 117:10, 117:18, 120:2, 122:13, 123:7, 124:3
**underlying** [2] - 9:8, 105:18
**undermines** [1] - 26:12
**understandable** [1] - 129:12
**understood** [7] - 30:8, 39:25, 40:1, 59:18, 63:23, 94:18, 110:5
**Union** [1] - 3:3
**union** [3] - 22:18, 57:12, 106:3
**unions** [1] - 112:12
**unique** [1] - 124:3
**unit** [3] - 75:10, 94:25
**United** [1] - 3:14
**units** [7] - 40:10, 40:11, 43:13, 48:23, 50:6, 50:15, 99:23
**unlawful** [1] - 102:20
**unless** [4] - 32:19, 125:8, 125:9
**unprecedented** [3] - 93:6, 93:7, 93:10
**unrelated** [1] - 65:17
**unusual** [1] - 54:20
**up** [37] - 3:18, 4:7, 15:3, 15:19, 15:20, 16:17, 18:1, 24:3, 26:7, 28:9, 38:1, 39:4, 42:15, 43:12, 44:1, 44:20, 48:22, 49:2, 52:5, 54:10, 54:18, 54:20, 62:25, 70:1, 74:5, 74:21, 82:4, 93:10, 94:17, 98:12, 105:5, 113:18, 117:16, 117:17, 121:7, 122:3, 127:12
**update** [2] - 57:13, 74:23
**updates** [3] - 70:10, 79:18, 89:18
**upsetting** [1] - 49:25
**upshot** [1] - 104:8
**urgency** [1] - 93:9
**urgent** [16] - 11:3, 11:10, 11:14, 94:11, 94:12, 94:16, 94:18, 94:22, 94:23, 95:2,

96:8, 96:12, 116:9, 116:12, 124:21, 124:22
**US** [1] - 5:25
**user** [1] - 87:25
**users** [7] - 71:6, 71:7, 88:1, 89:16
**Utah** [1] - 121:15

## V

**vacate** [1] - 129:7
**vague** [1] - 117:4
**Vanessa** [1] - 27:23
**variety** [5] - 72:10, 80:18, 87:1, 90:25, 100:23
**various** [9] - 4:15, 5:7, 10:10, 39:14, 66:19, 69:15, 70:16, 119:20, 126:6
**vehicle** [1] - 74:11
**vendor** [4] - 10:18, 29:18, 84:8, 88:15
**vendors** [2] - 29:3, 72:1
**verification** [1] - 75:12
**versa** [1] - 114:17
**version** [2] - 118:12, 126:23
**versus** [3] - 3:4, 9:19, 21:15
**vice** [1] - 114:17
**view** [3] - 118:18, 118:19
**violate** [1] - 54:9
**violates** [1] - 121:24
**violating** [2] - 101:2
**violation** [8] - 103:1, 103:8, 103:9, 103:17, 108:17, 108:19, 128:5
**vires** [1] - 102:15
**virus** [2] - 75:16, 75:17
**voluntary** [1] - 107:20
**Vought** [24] - 3:4, 11:6, 21:6, 35:7, 35:16, 36:15, 40:19, 41:9, 42:8, 42:9, 42:13, 42:17, 44:8, 46:2, 54:5, 54:14, 56:19, 60:6, 66:22, 75:21, 76:10, 93:23, 124:16, 127:12
**Vought's** [6] - 17:12, 17:17, 37:3, 41:9, 50:10, 90:10

## W

**waiting** [2] - 52:6, 114:16
**walk** [3] - 80:10,

111:1, 111:3
**walked** [1] - 76:23
**warranted** [1] - 110:20
**ways** [3] - 41:18, 125:1, 129:11
**website** [1] - 12:13
**Wednesday** [2] - 14:9, 97:15
**week** [29] - 19:24, 20:11, 20:24, 22:1, 24:6, 24:7, 24:13, 28:6, 58:6, 59:23, 62:1, 76:3, 77:16, 79:5, 83:4, 84:5, 85:21, 87:23, 89:8, 95:20, 95:25, 96:3, 98:6, 100:24, 105:6, 105:8, 113:7, 128:23, 129:21
**weekly** [1] - 88:4
**weeks** [6] - 62:3, 86:25, 87:2, 90:20, 118:6, 126:13
**weight** [1] - 40:21
**welcome** [1] - 4:13
**Wendy** [1] - 3:10
**Wessler** [1] - 3:9
**whistleblower** [2] - 34:10, 58:11
**White** [4] - 26:22, 27:12, 59:4, 122:6
**white** [1] - 49:24
**whole** [4] - 44:14, 50:15, 105:7, 110:25
**wholesale** [2] - 103:24, 123:2
**Wick** [5] - 38:25, 39:3, 44:3, 77:23, 79:16
**willing** [2] - 128:18, 128:20
**wind** [4] - 55:13, 55:23, 104:3, 104:19
**wind-down** [2] - 55:13, 55:23
**winding** [1] - 56:21
**window** [2] - 28:19, 114:14
**wiped** [1] - 59:3
**WITNESS** [58] - 5:12, 5:24, 6:3, 6:7, 6:19, 7:18, 8:4, 8:12, 8:16, 12:11, 12:15, 12:18, 14:3, 15:14, 15:16, 15:20, 16:7, 16:12, 17:20, 21:4, 21:7, 23:1, 24:6, 24:13, 24:18, 24:21, 24:23, 25:23, 33:3, 34:1, 37:13, 42:14, 42:17, 45:5, 45:13, 45:17, 49:10, 50:21, 60:10, 60:13,

60:17, 62:10, 62:12, 65:2, 68:9, 68:12, 70:24, 71:1, 71:4, 72:22, 73:9, 73:12, 74:19, 75:3, 82:2, 82:5, 95:15, 100:8
**witness** [13] - 4:8, 33:9, 33:14, 33:17, 40:18, 40:23, 66:7, 67:20, 67:22, 68:1, 68:5, 100:7, 123:21
**witnesses** [5] - 33:5, 33:7, 65:24, 100:10, 104:10
**wondering** [1] - 22:2
**word** [2] - 20:22, 127:19
**wording** [1] - 36:4
**words** [6] - 9:7, 9:18, 38:2, 40:5, 55:25, 115:5
**workforce** [3] - 22:9, 22:13, 23:4
**works** [1] - 87:17
**worry** [1] - 123:16
**wrestle** [1] - 105:5
**write** [3] - 65:17, 79:5, 95:15
**writing** [5] - 54:9, 81:16, 83:19, 94:9, 129:8
**written** [1] - 124:12, 125:10
**wrote** [3] - 79:22, 85:14, 120:18

## Y

**year** [2] - 70:8, 73:14
**years** [6] - 10:2, 35:3, 35:4, 89:23, 91:6, 91:13
**Yellen** [2] - 109:13, 110:8
**yesterday** [20] - 4:15, 5:6, 7:6, 8:21, 9:16, 10:21, 14:24, 17:11, 18:23, 19:15, 19:23, 20:8, 20:21, 23:2, 23:24, 24:15, 25:19, 28:7, 65:23, 128:17
**Young** [3] - 72:7, 74:10, 87:16
**yourself** [1] - 26:12

## Z

**Zieve** [1] - 3:10