# Exhibit A

2025 WL 840574
Only the Westlaw citation is currently available.
United States District Court, D. Maryland.

J. DOES 1-26, Plaintiffs,

v.

Elon MUSK, in his official capacity, United
States Doge Service and the Department
of Government Efficiency, Defendants.

Civil Action No. 25-0462-TDC
|
Signed March 18, 2025

**Attorneys and Law Firms**

Norman L. Eisen, Tianna Jade Mays, State Democracy Defenders Fund, Washington, DC, Joaquin Gonzalez, Pro Hac Vice, Mimi Marziani, Pro Hac Vice, Rebecca Stevens, Pro Hac Vice, Marziani, Stevens & Gonzalez PLLC, San Antonio, TX, for Plaintiffs.

Joshua E. Gardner, Jacob S. Siler, DOJ-United States Attorney's Office, Washington, DC, James J. Wen, U.S. Department of Justice, Civil Division, Federal Programs Branch, Washington, DC, for Defendants.

**MEMORANDUM OPINION**

THEODORE D. CHUANG, United States District Judge

**\*1**  Since it was established by Executive Order on January 20, 2025, the "Department of Government Efficiency," or "DOGE," has sent teams of personnel to numerous federal departments and agencies, taken control of their computer systems, and in many instances, taken the lead in terminating numerous contracts and employees. In the case of the United States Agency for International Development ("USAID"), DOGE and its leader, Elon Musk, have also played a leading role in actions taken to shut down and dismantle the agency, which have included permanently closing its headquarters, taking down its website, and engaging in mass terminations of contracts, grants, and personnel. A group of USAID personnel now challenge DOGE's actions as unconstitutional.

Specifically, Plaintiffs J. Does 1 through 26, who are current or recently terminated employees and contractors of USAID, have filed a civil action against Defendants Elon Musk, in his official capacity, the United States DOGE Service, and the Department of Government Efficiency, in which they allege violations of the United States Constitution, including of the Appointments Clause, U.S. Const. art. II, § 2, cl. 2, and of the constitutional principle of the Separation of Powers. Plaintiffs have filed a Motion for a Preliminary Injunction, which is fully briefed. The Court held a hearing on the Motion on February 28, 2025. Where the Court finds that Defendants' unilateral actions to shut down USAID likely violated the United States Constitution, the Motion with be GRANTED IN PART and DENIED IN PART.

**BACKGROUND**

**I. DOGE**

On November 12, 2024, President-Elect Trump announced that "the Great Elon Musk, working in conjunction with American Patriot Vivek Ramaswamy, will lead the Department of Government Efficiency ("DOGE")." Joint Record ("J.R.") 34-35, ECF Nos. 37, 57-1. Among the purposes of DOGE was "to dismantle Government Bureaucracy, slash excess regulations, cut wasteful expenditures, and restructure Federal Agencies." J.R. 35. On November 20, 2024, Musk and Ramaswamy published an op-ed in the *Wall Street Journal* that detailed their plans for DOGE "to cut the federal government down to size." J.R. 37.

On January 20, 2025, President Trump issued Executive Order 14, I 58, "Establishing and Implementing the President's 'Department of Government Efficiency' " ("the DOGE Executive Order"). Exec. Order No. 14,158, 90 Fed. Reg. 8441 (Jan. 20, 2025). The DOGE Executive Order renamed the existing United States Digital Service as the "United States DOGE Service" ("USDS" or "DOGE"), located within the Executive Office of the President. It directed the entity to "implement the President's DOGE Agenda, by modernizing Federal technology and software to maximize governmental efficiency and productivity." *Id.* § 1. The DOGE Executive Order also established within DOGE "the U.S. DOGE Service Temporary Organization," which is "dedicated to advancing the President's 18-month DOGE agenda" through July 4, 2026, and is headed by the "USDS Administrator," who reports to the White House Chief of Staff. *Id.* § 3(b). To coordinate and implement this agenda throughout the Executive Branch, the DOGE Executive Order directs every federal agency to establish a "DOGE Team" of at

least four employees, selected in consultation with the USDS Administrator, and to ensure that DOGE "has full and prompt access to all unclassified agency records, software systems, and IT systems." *Id.* §§ 3(c), 4(b).

**\*2** President Trump has issued multiple additional executive orders that expand DOGE's role. In particular, on February 11, 2025, he signed Executive Order 14,210, "Implementing the President's 'Department of Government Efficiency' Workforce Optimization Initiative," which directs agencies to develop data-driven hiring plans to ensure that new hires are in highest-need areas and mandates that they shall not fill vacancies that "the DOGE Team Lead assesses should not be filled" unless the agency head determines otherwise. Exec. Order No. 14,210, 90 Fed. Reg. 9,669 (Feb. 11, 2025). Another executive order directs that agencies shall consult with DOGE Team Leads on contract and grant reviews, approvals, and terminations. Exec. Order No. 14,222, 90 Fed. Reg. 11,095 (Feb. 26, 2025).

## II. Elon Musk

President Trump has identified Musk as the leader of DOGE. On February 11, 2025, President Trump and Musk held a joint press conference in the Oval Office to answer reporters' questions about DOGE. In a February 18, 2025 joint interview on the Sean Hannity Show, President Trump confirmed that Musk was working for DOGE, stated that he is "a leader," and noted that "he's got some very brilliant young people working for him." J.R. 479. On February 19, 2025, President Trump told an audience of investors and company executives at the Future Investment Initiative Institute Priority Summit that "I signed an order creating the Department of Government Efficiency and put a man named Elon Musk in charge." J.R. 568. On February 26, 2025, President Trump had Musk attend the first meeting of the President's Cabinet, stated that "[o]ne of the most important initiatives is DOGE," and told the Cabinet that Musk was there "to give you a summary of what's happening, some of the things they found." Mot. Ex. 68 at 4. On March 4, 2025, during his Presidential Address to Congress, President Trump stated: "I have created the brand new Department of Government Efficiency. DOGE. Perhaps you've heard of it. Which is headed by Elon Musk, who is in the gallery tonight." J.R. 921.

In discussing Musk's role, President Trump stated that after he signs an executive order, it gets "passed on to [Musk] and his group" and "they're all getting done." J.R. 481. He further stated about Musk:

> [H]e would take that executive order that I'd signed, and he would have those people go to whatever agency it was — "When are you doing it? Get it done. Get it done." And some guy that maybe didn't want to do it, all of a sudden, he's signing — he just doesn't want to be bothered.

J.R. 480. On February 7, 2025, President Trump stated that DOGE is acting "at my insistence." J.R. 123. On February 13, 2025, President Trump told reporters that Musk "answers to me." J.R. 259. For his part, Musk has described DOGE as "a support function for the president and for the ... agencies and departments," Mot. Ex. 68 at 6, and that "one of the biggest functions of the DOGE team is just making sure that the presidential executive orders are actually carried out." J.R. 475.

Musk's public statements and posts on the social media platform X, which is owned by Musk, suggest that he has the ability to cause DOGE to act. On February 2, 2025, Musk promised on X that "D[OGE] will fix it," referencing the National Weather Service internal employee website's description of diversity, equity, and inclusion ("DEI") initiatives, and DOGE later posted that the language was removed. J.R. 91–92. On February 7, 2025, shortly after polling X users on whether a DOGE team member who was fired for racist social media posts should return to the agency, Musk announced that the DOGE member "will be brought back." J.R. 641. As to actions involving agencies, in the afternoon of Friday, February 7, 2025, Musk posted on X, "CFPB RIP." J.R. 205, 215. Then around 10:30 p.m. that evening, a portion of the website of the Consumer Financial Protection Bureau ("CFPB") was shut down, and around 11:00 p.m., CFPB's X account was deleted.

**\*3** However, in a declaration dated February 17, 2025 ("the Fisher Declaration"), Joshua Fisher, the Director of the White House Office of Administration, asserted that Musk's formal position is as an employee of the White House Office with the title of Senior Advisor to the President, and that he is classified as a "Special Government Employee." J.R. 424. Fisher states that Musk is "not an employee of the U.S. DOGE Service or U.S. DOGE Service Temporary Organization," which are entities in the Executive Office of the President that are separate from the White House Office, and that "Musk is not the U.S. DOGE Service Administrator." J.R. 425. On February 25, 2025, the White House announced that Amy Gleason is the Acting USDS Administrator, but that same day, White House Press Secretary Karoline Leavitt confirmed that "the President tasked Elon Musk to oversee the DOGE effort" while others "are helping run DOGE on a day-to-day

basis." J.R. 616. When asked by the Court at the hearing on the Motion, Defendants' counsel was not able to identify who served as Acting USDS Administrator from January 20, 2025 until that date.

### III. DOGE Activities
On January 20, 2025, after the DOGE Executive Order was signed, DOGE team members, including current and former employees of Musk in the private sector, arrived at the Office of Personnel Management ("OPM") and moved into the area including the office of the OPM Director. DOGE locked senior career civil servants out of OPM computer systems that contain datasets related to the federal workforce. On January 23, 2025, OPM announced that it was testing a new capability to communicate with all federal employees.

On January 24, 2025, DOGE announced on X that in the first 80 hours of its operation, it had canceled "approx. $420M of current/impending contracts" and two federal government leases, with a focus "mainly on DEI contracts and unoccupied buildings." J.R. 115. From January 27 to February 7, 2025, DOGE teams began operating at the United States Departments of Education, Energy, Housing and Urban Development, Health and Human Services ("HHS"), Transportation, and Veterans Affairs; the National Oceanic and Atmospheric Administration; the Federal Emergency Management Agency ("FEMA"); the CFPB; and the Centers for Medicare and Medicaid Services.

DOGE has taken numerous actions without any apparent advanced approval by agency leadership. At the Department of Education, DOGE reportedly made almost all of the decisions about "what grants and contracts to cancel and which employees to put on leave, without seeking or considering input from political appointees." J.R. 581. Political appointees were reportedly "caught off guard" when on February 7, 2025, DOGE executed cuts to billions of dollars of funding from the National Institutes of Health to universities and research organizations. J.R. 582. After DOGE team members reportedly terminated personnel at the Department of Agriculture ("USDA") and the Department of Energy, National Nuclear Security Administration ("NNSA"), USDA and NNSA had to work to rescind the firings of some of its essential personnel involved in combating *bird* flu and safeguarding nuclear weapons, respectively. Similarly, at the Cabinet meeting, Musk specifically admitted that at USAID, DOGE mistakenly cancelled funding for Ebola prevention. The former Chief Financial Officer of FEMA has submitted a declaration

stating that, based upon her observation of the events on February 10, 2025 relating to a sudden change in FEMA policy to restrict the sending of certain resources to state and local governments, including a contemporaneous announcement of the change by Musk on X, she has concluded that the decision was made not by FEMA leadership, but by Musk or DOGE.

On February 20, 2025, DOGE reportedly put a $1 spending limit on government credit cards used at the General Services Administration ("GSA"), OPM, CFPB, and USAID. This action pre-dated Executive Order 14,222, signed by President Trump on February 26, 2025, which directed that "all credit cards held by agency employees shall be treated as frozen for 30 days from the date of this order." Exec. Order No. 14,222, 90 Fed. Reg. at 11,095.

**\*4** On February 22, 2025 at 2:46 p.m., Musk posted on X that consistent with President Trump's instructions to "GET MORE AGGRESSIVE," "all federal employees will shortly receive an email requesting to understand what they got done last week," and that the "[f]ailure to respond will be taken as resignation." J.R. 611, 702. Less than three hours later, the email was sent. Subsequently, OPM informed agency leaders that their employees were not required to respond, and certain agency heads directed employees not to respond.

### IV. USAID
On January 20, 2025, in addition to establishing DOGE, President Trump also signed Executive Order 14,169, "Reevaluating and Realigning United States Foreign Aid" ("the Foreign Aid Executive Order"), in which he directed a "90-day pause" of "new obligations and disbursements" of "foreign development assistance" funds in order to assess "programmatic efficiencies and consistency with United States foreign policy," subject to waivers by the Secretary of State for specific programs. Exec. Order No. 14,169, 90 Fed. Reg. 8619 (Jan. 20, 2025). On January 24, 2025, Secretary of State Marco Rubio issued a directive ("the Rubio Order") to all diplomatic and consular posts, consistent with the Foreign Aid Executive Order, that directed a "pause[ ]" on "all new obligations of funding, pending a review, for foreign assistance programs funded by or through the [State] Department and USAID." J.R. 418. The Rubio Order also identified a limited of number of programs for which the Secretary had granted a waiver from the pause and noted that other waivers could be approved by the Director of Foreign Assistance. That same day, DOGE personnel sought access to U.S. Department of the Treasury payment systems

in order to freeze disbursements relating to USAID. Despite warnings from the Acting Secretary of the Treasury that there may not be legal authority "to stop an authorized payment certified by an agency," they eventually gained access. J.R. 145.

On or about Monday, January 27, 2025, DOGE team members ("the DOGE Team" or "the DOGE Team Members") arrived at USAID headquarters at the Ronald Reagan Building in Washington, D.C. to gain access to the agency's financial and personnel systems. That day, 58 senior USAID officials were placed on paid administrative leave for alleged non-compliance with the Rubio Order, "questionable contracting practices," or "managing and administering initiatives no longer deemed to be in the national interest," such as those related to DEI. J.R. 408–09. During that week, the DOGE Team Members were given "root access" to the USAID systems, the highest level of access, and obtained delegate rights to every USAID email account, thus allowing them to see every email and send and delete emails on behalf of every USAID user. J.R. 228.

On Thursday, January 30, 2025, White House officials learned that some USAID grantees overseas had been paid through the HHS payment system. Although the HHS system was apparently the normal channel for those grant payments, the DOGE Team Members reportedly demanded that all USAID senior managers be barred from authorizing payments and that the DOGE Team Members be the exclusive authorizers. That same day, Acting Administrator of USAID Jason Gray was removed from that position, President Trump directed Secretary Rubio to perform the duties and functions of the USAID Administrator, and State Department Director of Foreign Assistance Peter Marocco began performing the duties and functions of the Deputy Administrator of USAID. Marocco has asserted in a declaration ("the Marocco Declaration") that although he consults with the DOGE Team on personnel and other matters, he and Secretary Rubio "have ultimate authority" over decisions relating to personnel and that "the DOGE Team cannot legally direct me to do anything regarding personnel, funding, or the like." J.R. 413.

**\*5** On Friday, January 31, 2025, plaques with USAID's official seal were removed from the agency's offices. On Saturday, February 1, 2025, the USAID website was shut down. That same day, an additional 57 USAID employees were placed on administrative leave.

On the evening of February 1, 2025, DOGE Team Members sought access to USAID's data security systems, as well as to restricted areas such as sensitive compartmented information facilities ("SCIFs") at USAID headquarters for which they lacked the necessary security clearances. USAID Director for Security John Vorhees and Deputy Director for Security Brian McGill attempted to block the DOGE Team's access to classified material in restricted areas. Musk and a senior DOGE official intervened, and Musk reportedly made multiple calls to USAID leadership and security officers in which he demanded that DOGE Team Members be granted access to private data and restricted areas and that dozens of USAID officials be suspended. In particular, Musk reportedly called a senior USAID official to demand that the DOGE Team Members be granted access to the SCIFs and threatened to call the United States Marshals Service. The DOGE Team Members were granted access to these facilities, and Vorhees and McGill were placed on administrative leave for attempting to block access. Plaintiff J. Doe 2, a USAID cybersecurity employee, reports that on that day, DOGE Team Members without security clearances used administrative rights to grant themselves access to restricted areas requiring a security clearance. However, Katie Miller, a DOGE official, has posted on X that "[n]o classified material was accessed without proper security clearances." J.R. 65. All classified USAID computer systems have since been dismantled.

By Sunday, February 2, 2025, 2,000 email accounts associated with USAID personnel had been deactivated, including the email accounts of Plaintiffs J. Doe 3, J. Doe 5, and J. Doe 6. That same day, Matt Hopson, who had been recently appointed by President Trump to be the Chief of Staff for USAID, resigned, and the decision was made to terminate the contracts of 800 personal service contractors. In February 2, 2025 posts on X, Musk stated that USAID is "evil," and "USAID is a criminal organization. Time for it to die." J.R. 64, 195. When asked later that evening about the future of USAID, President Trump told reporters that USAID has "been run by a bunch of radical lunatics, and we're getting them out, and then we'll make a decision." J.R. 171.

Shortly after midnight, on Monday, February 3, 2025, Musk hosted a live broadcast on X in which he stated that he checked with President Trump "a few times," went over USAID "in detail," and that "he agreed that we should shut it down." J.R. 65, 171. In explaining the shutdown, Musk stated that USAID was "incredibly politically partisan" in that the agency has been supporting "radically left causes throughout

the world including things that are anti-American." J. R. 172. He further stated:

> So to be clear, in shutting down, which we're in the process of doing, shutting down USAID, the reason for that, as opposed to simply trying to do some minor housecleaning, is that, as we dug into USAID, it became apparent that what we have here is not an apple with a worm in it, but we have actually just a ball of worms ... If you've got an apple that's got a worm in it, but we have actually just a ball of worms, it's hopeless. And USAID is a ball of worms. There is no apple. And when there is no apple, you've just got to basically get rid of the whole thing ... That is why it's got to go, it's beyond repair.

**\*6** Compl. ¶ 53 (quoting Department of Government Efficiency (@DOGE), X (Feb. 2, 2025, 12:25 AM), https://x.com/DOGE/status/1886284966855647234). While Musk was hosting the live X broadcast, DOGE Team Member Gavin Kliger sent an email from a USAID email account to all USAID staff informing them that the USAID headquarters would be closed on Monday, February 3, 2025. After the live broadcast, at 1:54 a.m., Musk posted on X: "We spent the weekend feeding USAID to the wood chipper. Could have gone to some great parties. Did that instead." J.R. 197.

Later, on Monday, February 3, 2025, USAID placed an additional 606 employees on paid administrative leave. Secretary Rubio sent a letter to the chairs and ranking members of the Senate Foreign Relations Committee, the House Foreign Affairs Committee, and the House and Senate Appropriations Committees advising them of the Trump Administration's "intent to initiate consultations with you regarding the manner in which foreign aid is distributed around the world" and that Secretary Rubio had directed Marocco "to begin the process of engaging in a review and potential reorganization of USAID's activities to maximize efficiency and align operations with the national interest." J.R. 421–22. The letter further stated that:

> This review and potential reorganization ... may include, among other things, the suspension or elimination of programs, projects, or activities; closing or suspending missions or posts; closing, reorganizing, downsizing, or renaming establishments, organizations, bureaus, centers or offices; reducing the size of the workforce at such entities; and contracting out or privatizing functions or activities performed by Federal employees.

> The Department of State and other pertinent entities will be consulting with Congress and the appropriate committees

to reorganize and absorb certain bureaus, offices, and missions of USAID. Such consultation shall occur on behalf of the heads of such entities, as directed by the President. In consultation with Congress, USAID may move, reorganize, and integrate certain missions, bureaus, and offices into the Department of State, and the remainder of the Agency may be abolished consistent with applicable law.

J.R. 422. The following day, Tuesday February 4, 2025, an additional 1,416 USAID employees were placed on administrative leave.

On Friday, February 7, 2025, Musk announced on X that the USAID headquarters was now occupied by United States Customs and Border Protection ("CBP"), posted a picture of the US AID headquarters main entrance with the lettering "U.S. Agency for International Development" removed from above the door, and included the descriptive message "Unburdened by what has been." J.R. 383. USAID staff and contractors who worked there were not allowed inside the building to retrieve their personal belongings. By February 7, another 2,104 USAID employees had been identified and slated for placement on administrative leave at 11:59 p.m. that night, which would have resulted in a total of 4,244 of USAID's 4,765 direct hire employees, or close to 90 percent of its workforce, being on administrative leave. That same day, however, in *American Foreign Service Ass'n v. Trump* ("*AFSA*"), a case filed in the United States District Court for the District of Columbia ("D.D.C."), the court issued a temporary restraining order ("TRO") that directed the reinstatement of those USAID employees previously placed on administrative leave and barred USAID from placing additional employees on administrative leave or involuntarily evacuating employees from overseas posts ("the *AFSA* TRO"). *AFSA*, No. 25-cv-0352 (CJN), 2025 WL 435415, at \*3 (D.D.C. Feb. 7, 2025). At that time of the TRO, 2,140 direct hire employees had been placed on administrative leave. According to Marocco, 98 percent of these employees were physically located in the United States, and he was unaware of any located in high-risk countries.

**\*7** On Thursday, February 13, 2025, the *AFSA* TRO was extended until February 21, 2025. *AFSA*, No. 25-cv-0352 (CJN), 2025 WL 485043, at \*1 (D.D.C. Feb. 13, 2025). Also on February 13, a separate TRO was granted in two other D.D.C. cases, *AIDS Vaccine Advocacy Coalition v. United States Department of State* and *Global Health Council v. Trump* (collectively, "*AVAC*"), which barred the State Department, USAID, and other agencies from enforcing

prior orders or issuing new ones to suspend or prevent the obligation or disbursement of foreign assistance funds in connection with grants, contracts, and other agreements in existence as of January 19, 2025 ("the *AVAC TRO*"). *AVAC*, Nos. 25-cv-0400 (AHA), 25-cv-0402 (AHA), 2025 WL 485324, at *6-7 (D.D.C. Feb. 13, 2025).

On February 19, 2025, President Trump stated at the Future Investment initiative Institute Priority Summit that "over the past month, we have effectively eliminated the U.S. Agency for International Development." J.R. 466, No. 1 at 28:15. On Friday, February 21, 2025, the *AFSA* TRO was dissolved, and the court denied a motion for a preliminary injunction because the plaintiffs had not shown a likelihood of irreparable harm, and the court likely lacked jurisdiction because as federal employees, the plaintiffs may be statutorily required to pursue their claims through administrative processes established for such employees. *AFSA*, No. 25-cv-352 (CJN), 2025 WL 573762, at *5–7, *11–12 (D.D.C. Feb. 21, 2025). That same day, in response to a post on X referring to that ruling and stating that "President Trump and DOGE can now DISMANTLE USAID," Musk posted that "the world will be better for this." J.R. 674.

On Sunday, February 23, 2025, DOGE Team Member Kliger created the email account hr_announcements@usaid.gov. Around 3:42 p.m., employees, including Plaintiff J. Doe 21, received a notice from usaid_fo@subscribe.usaid.gov stating that, effective 11:59 p.m. that evening, "all USAID direct hire personnel with the exception of designated personnel responsible for mission-critical functions, core leadership and/or specially designated programs, will be placed on administrative leave globally." J.R. 446. The notice also advised: "Concurrently, USAID is beginning to implement a Reduction-in-Force that will affect approximately 2,000 USAID personnel with duty stations in the United States." J.R. 446. Shortly after receiving the email, J. Doe 21 received a Reduction in Force ("RIF") notice from hr_announcements@usaid.gov consisting of an unsigned memorandum, identified as from "Peter Marocco, Acting Deputy Administrator, USAID," stating that J. Doe 21 was subject to the RIF and would be "separated from the Federal service" effective April 24, 2025. J.R. 440, 448. When J. Doe 21 reached out by email to USAID Employee and Labor Relations as the RIF Notice instructed, J. Doe 21 received a form response stating that the office "only has a skeleton staff at this point and may not be able to respond to everyone individually," and that the office "cannot currently provide information on your individual status." J.R. 453. J. Doe 21

later received an email stating that the office had not sent the RIF notices.

## V. Plaintiffs

Plaintiffs, J. Does 1–26, are current and former employees or personal services contractors ("PSCs") of USAID. PSCs are individuals working for USAID pursuant to their own individual service contracts rather than through a larger contract between USAID and a parent contracting company. Plaintiffs assert that they have been detrimentally impacted by Defendants' actions at or relating to USAID in multiple ways.

**\*8** Beginning on February 2, 2025, multiple Plaintiffs lost all access to USAID electronic systems and applications, including critical payment and security systems on which some Plaintiffs rely for reimbursements or for basic living needs. Some Plaintiffs later regained access to some USAID electronic systems as a result of the *AFSA* TRO. Since they lost access to USAID's electronic systems, some PSC Plaintiffs have been unable to receive reimbursements for travel and health insurance expenses, in some cases totaling thousands of dollars, that are typically covered by USAID. None have reported that their reimbursements have now been paid.

Other Plaintiffs who are posted abroad temporarily lost access to, and in some instances continue to lack access to, electronic systems upon which they rely for basic living needs. For example, J. Doe 22, a USAID employee stationed in a high-risk area in Central America who has been placed on administrative leave, has lost the ability to have electricity, cell phone, and internet bills paid because of the shutdown of USAID's payment system. Though J. Doe 22 asked for and received one extension from the electric company, the State Department mission in that country has reported that there is presently no way for the bills to be paid even though they are now due. If J. Doe 22's electricity, internet, and cell phone are shut down, J. Doe 22 will lack working security cameras that are necessary in light of the high-risk nature of J. Doe 22's posting and will lose the use of radios and cell phones that are the only means by which J. Doe 22 can communicate with the mission's Regional Security Office. Similarly, on February 3, 2025, J. Doe 9, who is a PSC stationed with family in a high-risk area in the Middle East, lost access to a critical security application used by United States government personnel to report dangerous situations and to access emergency assistance. Though access to this application was restored on February 24, 2025, J. Doe 9 continues to experience "an incredible amount of emotional

and psychological distress' " out of concern for the safety of J. Doe 9's family should the security application be disabled again. J.R. 242–43.

Many Plaintiffs have also been placed on administrative leave, terminated, or had their contracts terminated as a result of DOGE's actions at USAID. Since DOGE allegedly gained control of USAID, at least five employee Plaintiffs have been either placed on administrative leave or terminated, and at least three PSC Plaintiffs have had their contracts terminated. J. Doe 8, a recently terminated PSC, has not yet been paid the remainder of unused annual leave and is concerned that it will never be paid because "there is hardly anyone left in the agency to process these payments." J.R. 436. J. Doe 9 has not been informed of any change in status but has been warned that terminated PSCs may need to depart the country within 30 days, which has caused emotional and psychological distress because doing so would require uprooting J. Doe 9's family by, among other things, requiring children to leave school in the middle of the school year. J. Doe 9 is also very concerned about the potential loss of health insurance, which would occur in the event of a termination, because of a medical situation that is serious enough that J. Doe 9 was scheduled to take medical leave in the near future.

Some Plaintiffs have expressed significant concern that, in light of DOGE's all-encompassing access to USAID's data systems, their personally identifiable information ("PII") will be publicly disclosed. Plaintiffs report that their personnel and security clearance files are included in these systems and contain highly sensitive personal information such as social security numbers, passport information, financial records, addresses, and family members' personal information. J. Doe 1's security clearance files include information on foreign contacts and a safety pass phrase. At least one PSC Plaintiff has had PII posted on DOGE's website as part of information about that Plaintiff's contract. Defendants, however, assert that DOGE's website only provides contract information already publicly available on the Federal Procurement Data System.

**\*9** Finally, certain Plaintiffs are fearful that, in light of their association with USAID, their reputations are being damaged by Musk's disparaging public comments about USAID. For example, J. Doe 12, a PSC, has had family members "receive[ ] questions from community members inquiring about the 'lack of accountability and liberal corruption' within USAID, based on" Musk's comments, J.R. 249, and J. Doe 9, a PSC located in the Middle East, has stated that

Musk's statements about USAID have "been picked up by local media outlets" and "have a direct negative impact on the perception of USAID where I work." J.R. 433.

## DISCUSSION

In the Motion, Plaintiffs seek a preliminary injunction granting "narrow emergency" relief to address the immediate needs of Plaintiffs arising from the alleged constitutional violations and broader relief barring Defendants from engaging in future violations of the Appointments Clause or the principle of Separation of Powers. Mot. at 29–30, ECF No. 25.

To obtain a preliminary injunction, moving parties must establish that (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008); *see Dewhurst v. Century Aluminum Co.*, 649 F.3d 287, 290 (4th Cir. 2011). A moving party must satisfy each requirement as articulated. *Pashby v. Delia*, 709 F.3d 307, 320 (4th Cir. 2013). Because a preliminary injunction is "an extraordinary remedy," it "may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22, 129 S.Ct. 365.

In addition to arguing that Plaintiffs have failed to establish each of the requirements for a preliminary injunction, Defendants also argue that the Motion should be denied because Plaintiffs lack standing. The Court will first address this threshold issue.

## I. Standing

Defendants first argue that Plaintiffs lack standing to assert their claims. Because Article III of the United States Constitution limits the jurisdiction of federal courts to "Cases" and "Controversies," plaintiffs in federal civil actions must demonstrate standing to assert their claims. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). The "irreducible constitutional minimum" requirements of standing consist of three elements: (1) the plaintiff must have suffered an "injury in fact"; (2) the injury must be fairly traceable to the actions of the defendant; and (3) it must be "likely" that the injury will be "redressed by a favorable decision." *Id.* at 560–61, 112 S.Ct.

2130 (citations omitted). Standing must be established for each claim and form of relief sought. *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352, 126 S.Ct. 1854, 164 L.Ed.2d 589 (2006). When there are multiple plaintiffs, the Court need only determine that there is at least one plaintiff with standing for a particular claim in order to consider the claim. *Town of Chester v. Laroe Ests., Inc.*, 581 U.S. 433, 439, 137 S.Ct. 1645, 198 L.Ed.2d 64 (2017). Here, Defendants argue that Plaintiffs' claimed harm arising from DOGE's access to their sensitive personal information and data does not constitute an injury in fact, and that Plaintiffs cannot demonstrate that their other alleged injuries are traceable to Defendants and redressable through an injunction against Defendants.

### A. Injury in Fact

To satisfy the requirement of an "injury in fact," Plaintiffs must identify " 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.' " *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339, 136 S.Ct. 1540, 194 L.Ed.2d 635 (2016) (quoting *Lujan*, 504 U.S. at 560, 112 S.Ct. 2130). At the hearing, Defendants confirmed that as to this requirement, they contest only whether DOGE's access to Plaintiffs' sensitive personal information and data constitutes an injury in fact. Plaintiffs, however, have alleged other, specific injuries, including that as a result of Defendants' actions: (1) some plaintiffs who are PSCs, including J. Doe 1, J. Doe 8, and J. Doe 20, have had their contracts terminated; (2) at least two plaintiffs, J. Doe 11 and J. Doe 21, have received RIF notices demonstrating that they will be imminently terminated from federal employment in April 2024; (3) Plaintiff J. Doe 22, a USAID employee stationed abroad in a high-risk area who has now been placed on administrative leave, no longer has home electricity, cell phone, and internet bills paid by USAID, as had occurred before Defendants' actions; and (4) at least three plaintiffs, J. Doe 1, J. Doe 3, and J. Doe 6, have work expenses or travel reimbursements that are owed, but have not been paid, by USAID, in some instances totaling thousands of dollars. Where Defendants do not contest that these harms constitute injuries in fact, Plaintiffs have alleged sufficient facts to satisfy this element.

### B. Traceability

**\*10** Next, Plaintiffs must demonstrate that their asserted injuries are fairly traceable to Defendants' actions. *See Lujan*, 504 U.S. at 560, 112 S.Ct. 2130. Under this requirement, plaintiffs need not establish that the challenged action is the "proximate cause" of the injury and instead need only

show that it is "in part responsible for" the asserted injury. *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 315–16 (4th Cir. 2013) (stating that "the concept of concurrent causation" is "useful in evaluating" this element); *see also Sierra Club v. U.S. Dep't of the Interior*, 899 F.3d 260, 283 (4th Cir. 2018).

Here, Plaintiffs have alleged sufficient facts at this stage to support the conclusion that the personnel and contract actions taken against Plaintiffs, as well as the failures to pay their expenses, occurred at least in part because of Defendants' actions. Musk has specifically expressed his desire to shut down USAID and has taken responsibility for the actions taken to do so. On February 2, 2025, Musk publicly stated that "USAID is a criminal organization" and that it was "Time for it to die," J.R. 195, and shortly thereafter stated in a livestream broadcast that "we're in the process of ... shutting down USAID" because "it's beyond repair." Compl. ¶ 53. On February 3, 2025, Musk acknowledged that he was personally engaged in doing so when he posted on X that he had "spent the weekend feeding USAID into the wood chipper." J.R. 197. Plaintiff]. Doe 7, a USAID' employee, has stated that on the following day, February 4, 2025, J. Doe 7 was placed on administrative leave through an email sent by "one of DOGE's representatives." J.R. 237. The record therefore supports the inference that Musk either directed or at least participated in the personnel actions against Plaintiffs.

In addition, DOGE Team Members have demanded and gained full access to USAID's offices and computer systems, including its payments systems and classified information systems, and Musk even threatened to call the United States Marshals if they were not provided with such full access. Where DOGE Team Members had complete control over the USAID electronic payment system, it is entirely reasonable to conclude that Defendants are responsible for the failure to pay Plaintiffs' work and travel expenses.

Defendants, however, argue that traceability cannot be satisfied because Plaintiffs' injuries "were caused by independent actions authorized by USAID and its leadership wielding their own power." Opp'n at 11, ECF No. 28. Defendants focus on the Marocco Declaration, in which Marocco asserts that all actions referenced in his declaration were officially taken by either himself, Secretary Rubio in his capacity as Acting Administrator of USAID, or US AID employees at their direction. Although Plaintiffs dispute that claim, even assuming that USAID officials signed off on all of the decisions at issue, traceability can still be established when the causal relationship "between injury

and challenged action depends upon the decision of an independent third party." *California v. Texas*, 593 U.S. 659, 141 S. Ct. 2104, 2117, 210 L.Ed.2d 230 (2021) (quoting *Lujan*, 504 U.S. at 562, 112 S.Ct. 2130). In such cases, while "plaintiffs attempting to show causation generally cannot rely on speculation about the unfettered choices made by independent actors not before the courts," plaintiffs can satisfy the traceability requirement if they show that "the third parties will likely react in predictable ways" to the challenged action "that in turn will likely injure the plaintiffs." *Food & Drug Admin. v. All for Hippocratic Med.*, 602 U.S. 367, 144 S. Ct. 1540, 1557, 219 L.Ed.2d 121 (2024) ("*FDA*") (citations omitted).

**\*11** Here, the record supports the conclusion that the USAID officials were not actually independent actors and that even if they were, they in fact would predictably sign off on the actions directed or taken by Defendants. President Trump publicly acknowledged that Musk and DOGE wield significant influence across federal agencies when he stated in an interview that Musk "take[s] an executive order that I'd signed, and he would have those people go to whatever agency it was" and then "some guy that maybe didn't want to do it, all of a sudden, he's signing." J.R. 480. Notably, USAID officials who refused to comply with Musk's demands to give DOGE Team Members access to USAID secured facilities and computer systems were subsequently placed on administrative leave. DOGE's level of influence, if not control, is further illustrated by a media account reporting that in some instances when Secretary Rubio directed that certain programs should continue to be funded, DOGE Team Members "would veto" the payments, and because they had control over the electronic payments system, the funding was not released. J.R. 572–73. Furthermore, Marocco has effectively confirmed that DOGE played a role in key decisions by acknowledging that he "sometimes consult[s] or coordinate[s] with policymakers and others at [DOGE]" including by consulting with "the DOGE Team on certain matters, including personnel." J.R. 412-13. Finally, the email that contained the RIF notices sent to J. Doe 11 and J. Doe 21 was sent from a USAID email account created by Kliger, a DOGE Team Member, and the relevant metadata shows that Kliger in fact sent out those RIF notices. The record thus supports the conclusion that relevant actions specifically taken by USAID officials were taken as predictable responses to Defendants' directions and actions, and that, at a minimum, Defendants were directly involved in causing those actions through their role in effectuating personnel and contract actions and terminations. *See Dep't of Commerce v. New York*,

586 U.S. 895, 139 S. Ct. 255, 202 L.Ed.2d 171 l, 2566 (2019). Under these circumstances, the Court finds that Plaintiffs have satisfied the traceability requirement by showing that Defendants are at least "in part responsible for" their asserted injuries. *Libertarian Party of Va.*, 718 F.3d at 316.

**C. Redress ability**

Lastly, Plaintiffs must show that their asserted injury is redressable. To do so, Plaintiffs must demonstrate that "it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Sierra Club*, 899 F.3d at 284 (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000)). The "second and third standing requirements—causation and redressability—are often 'flip sides of the same coin.' " *FDA*, 144 S. Ct. at 1555 (quoting *Sprint Commc'ns Co. v. APCC Servs., Inc.*, 554 U.S. 269, 288, 128 S.Ct. 2531, 171 L.Ed.2d 424 (2008)). "If a defendant's action causes an injury, enjoining the action or awarding damages for the action will typically redress that injury." *Id.* Further, the "burden imposed by this requirement is not onerous." *Deal v. Mercer Cnty. Bd. of Educ.*, 911 F.3d 183, 189 (4th Cir. 201 8). Plaintiffs "need not show that a favorable decision will relieve [their] every injury." *Id.* (alteration in original) (quoting *Sierra Club*, 899 F.3d at 284). "Rather, plaintiffs 'need only show that they personally would benefit in a tangible way from the court's intervention.' " *Id.* (quoting *Sierra Club*, 899 F.3d at 284). "The removal of even one obstacle to the exercise of one's rights, even if other barriers remain, is sufficient to show redressability." *Sierra Club*, 899 F.3d at 285.

Here, the requested relief includes an injunction barring Defendants from "[i]ssuing, implementing, enforcing, or otherwise giving effect to terminations, suspensions, or stop-work orders." Mot. at 29. Such a result would likely address Plaintiffs' injuries, particularly the imminent termination of J. Doe 11 and J. Doe 21, and the recent terminations of the personal services contracts of J. Doe 1, J. Doe 8, and J. Doe 20. In addition, Plaintiffs seek an order that directs Defendants to stop accessing USAID data and electronic systems and to "reinstate access to email, payment, security notification, and all other systems for all USAID current employees and PSCs." Mot. at 29. Where the injuries relating to unpaid bills and expenses are due in part to the DOGE Team's stoppage of the electronic payment system, such an order would likely address the injuries arising from the unpaid bills and expenses of J. Doe I, J. Doe 6, and J. Doe 22.

Defendants assert that the proposed relief cannot redress Plaintiffs' injuries because, as they argued with respect to the traceability requirement, Defendants "lack authority to 'legally direct' USAID to do any of" the actions required by the proposed injunction. Opp'n at 12. The issue of who has control over USAID, however, remains in dispute. Plaintiffs have presented evidence that as a practical matter, Musk and DOGE Team Members acting at his direction have had the ability to cause personnel actions against employees and contractors, to stop payments, and to control any action that requires use of USAID's computer systems. The record reflects that Musk has personally taken credit for shutting down USAID, and that he and another DOGE official overrode objections from USAID officials to gain access to the USAID classified computer systems and facilities for DOGE Team Members and then caused dissenting USAID officials to be placed on administrative leave. It also reflects that DOGE Team Members have had complete control over the USAID computer systems and, on at least one occasion, blocked USAID-approved payments from being sent out. Indeed, at the hearing, Defendants effectively acknowledged that DOGE has total control over USAID systems when their counsel stated that thus far they have been unable to identify a USAID official unconnected to DOGE who would have the ability to take actions over the computer system to assist Plaintiffs with their immediate needs.

 **\*12** Where the record demonstrates that Defendants have had, at a minimum, substantial influence over USAID, and that DOGE Team Members have had a direct role in the personnel and contract actions at USAID, *see supra* part I.B, and "complete control" over USAID computer systems, J.R. 429–30, the Court finds that an injunction directed at Defendants would at least contribute to relieving Plaintiffs of some of their injuries. At a minimum, an order directing Defendants to take actions to reinstate the USAID electronic payment system would remove "one obstacle" to curing Plaintiffs' injuries, which "is sufficient to show redressability." *Sierra Club*, 899 F.3d at 285. Accordingly, the Court concludes that Plaintiffs have satisfied all three requirements to establish standing at this stage of the case.

## II. Likelihood of Success on the Merits

In their Motion, Plaintiffs argue that they are likely to succeed on the merits of both their Appointments Clause claim and their Separation of Powers claim.

### A. Appointments Clause

Plaintiffs assert that they are likely to succeed on the merits of their claim under the Appointments Clause that Musk has acted as an Officer of the United States without having been duly appointed to such a role. The Appointments Clause provides that the President of the United States:

 [S]hall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the [S]upreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.

U.S. Const. art. II, § 2, cl. 2. "The Appointments Clause of the Constitution lays out the permissible methods of appointing 'Officers of the United States,' a class of government officials distinct from mere employees." *Lucia v. Sec. & Exch. Comm'n*, 585 U.S. 237, 241, 138 S.Ct. 2044, 201 L.Ed.2d 464 (2018) (quoting U.S. Const. art. II., § 2, cl. 2). The Appointments Clause divides Officers of the United States ("Officers") into two categories. " '[P]rincipal' officers" may be appointed only by the President, with the advice and consent of the United States Senate. *United States v. Arthrex, Inc.*, 594 U.S. 1, 141 S. Ct. 1970, 1979, 210 L.Ed.2d 268 (2021). "[I]nferior officers," may be appointed in the same manner, or, if Congress so provides, they may be appointed by "the President alone," by a federal court, or by the head of a department. *See id.* at 1979–80 (quoting U.S Const. art. II, § 2, cl.2).

Defendants have not disputed that Musk has not been duly appointed as either a principal or inferior Officer. Plaintiffs characterize Musk as the *de facto* USDS Administrator, a position established by the DOGE Executive Order, while Defendants assert that Musk's official position is Senior Advisor to the President. While both positions are appointed by the President, Musk was not subjected to Senate confirmation, and it is undisputed that Congress did not establish either position as an inferior Officer position subject to appointment by the President only. Accordingly, neither role is that of an Officer.

Plaintiffs argue that the Appointments Clause was violated because Musk carried out the functions of an Officer without being appointed to such a role. To have acted as an Officer, an individual must: (1) "exercise[ ] significant authority pursuant to the laws of the United States"; and (2) "occupy a

'continuing' position established by law." *Lucia*, 585 U.S. at 245, 138 S.Ct. 2044 (citations omitted).

### 1. Significant Authority

Plaintiffs argue that Musk has "exercis[ed] significant authority pursuant to the laws of the United States." *Buckley v. Valeo*, 424 U.S. 1, 126, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (per curiam). Plaintiffs assert that Musk has done as at USAID in a number of ways, including by unilaterally cancelling government contracts; causing USAID personnel who refused to give DOGE Team Members access to USAID systems to be placed on administrative leave; shutting down the USAID website and blocking USAID employees from accessing computer systems; and directing the closure of USAID headquarters.

**\*13** In response, Defendants primarily argue that Musk did not exercise significant authority because his role is purely advisory, and that while he may have suggested, advised, or even directed certain actions, every alleged exercise of significant authority at USAID was actually approved by a USAID official with authority to do so. Generally, the Appointments Clause is not violated when a duly appointed Officer authorizes or ratifies an exercise of significant authority that was otherwise initiated or first approved by a non-Officer. *See, e.g., Andrade v. Regnery*, 824 F.2d 1253, 1257 (D.C. Cir. 1987) ("[I]t does not offend the Appointments Clause so long as the duly appointed official has final authority over the implementation of the governmental action."); *Jooce v. Food & Drug Admin.*, 981 F.3d 26, 28 (D.C. Cir. 2020) ("This court has repeatedly recognized that ratification can remedy a defect arising from the decision of an improperly appointed official."); *Consumer Fin. Prot. Bureau v. Gordon*, 819 F.3d 1179, 1190–91 (9th Cir. 2016) (finding that ratification by a validly appointed Officer "cures any initial Article II deficiencies").

Defendants have presented evidence that most of the major actions taken at USAID that could be deemed to be an exercise of significant authority, even if initiated, suggested, or directed by Musk or the DOGE Team Members, were actually approved by USAID officials either before or shortly after the action occurred. First, in his declaration, Marocco asserts that either he or Secretary Rubio, or a USAID employee acting at their direction, took all of the actions referenced in his declaration, which include the actions to place personnel on administrative leave or to

terminate them and the actions to suspend or terminate grant and contract actions. Moreover, documents in the record, including those submitted in response to the Court's post-hearing request, demonstrate that Marocco or other senior USAID officials approved the decisions to place thousands of USAID employees on administrative leave throughout the first week of February 2025, and that Marocco authorized the RIF notice sent to approximately 2,000 USAID employees on February 23, 2025. The present record also demonstrates that Secretary Rubio authorized the relevant grant and contract actions, including the January 24, 2025 pause on foreign assistance and the February 2, 2025 decision to terminate approximately 800 USAID PSCs. Although Plaintiffs raise questions about whether Marocco or the other identified USAID officials actually approved these actions, and whether they had the statutory and regulatory authority to take them, Plaintiffs have not provided specific evidence refuting Defendants' documentation. At this early stage of the case, the Court finds that it is, at a minimum, more likely than not that USAID officials either took or ratified the relevant personnel and contract actions.

However, the present record does not support the conclusion that USAID officials made or ratified the decisions to initiate a shutdown of USAID by permanently closing the USAID headquarters and taking down the USAID website beginning the weekend of February 1, 2025. Notably, Marocco did not claim in his declaration, directly or indirectly, that he, Secretary Rubio, or any other USAID official approved those decisions. Further, in response to the Court's post-hearing request in which it directed Defendants to submit the "specific orders or other decision documents, signed by the authorizing government official, that authorized' " an enumerated list of relevant decisions, ECF No. 66, Defendants provided such authorizing documents for most of the decisions, but not for these two. Instead, as to the decision to shut down USAID headquarters permanently, Defendants provided only documentation of the separate action on February 7, 2025 by the GSA to formally cancel USAID's occupancy in the building, an action that necessarily followed a decision on behalf of USAID to close and vacate the premises. Indeed, the authority cited by GSA for its action, 41 C.F.R. § 102-85.75, provides that "[c]ustomer agencies can terminate any space assignments" upon written notice, making clear that except in the case of an emergency or forced move by GSA, of which there is no evidence, the decision to terminate the use of USAID headquarters would have been made by or on behalf of USAID, not by GSA. 41 C.F.R. § 102-85.75(a), (b). Similarly, Defendants have provided only a February 1, 2025

email from a USAID official merely noting that the USAID website was offline, without showing any authorization for this action by a USAID official.

**\*14** Thus, based on the present record, the only individuals known to be associated with the decisions to initiate a shutdown of USAID by permanently closing USAID headquarters and taking down its website are Musk and DOGE Team Members. On February 2 and 3, Musk specifically stated about USAID on X that it was "Time for it die," J.R. 195, that "we're in the process of ... shutting down USAID," Compl. ¶ 53, and that he had "spent the weekend feeding USAID to the wood chipper," J.R. 197. On February 3, a DOGE Team Member announced to USAID personnel in an email that headquarters were going to be closed that day. Though the message stated that the action was done "[a]t the direction Agency leadership," J.R. 196, Defendants have failed to provide documentation, or even to claim, that any duly appointed USAID officer actually made this decision.

This record must be considered alongside the fact that Musk appears to have been involved in the shutdown of CFPB headquarters as well, and the evidence that shows or strongly suggests that Musk and DOGE, despite their allegedly advisory roles, have taken other unilateral actions without any apparent authorization from agency officials. Such actions include terminating key employees at USDA and NNSA responsible for work on the bird flu outbreak and nuclear weapons who had to be rehired immediately, announcing and effectuating a sudden change in policy at FEMA that its former Chief Financial Officer has stated was not approved by agency leadership, and sending out an email requiring all federal employees to document their accomplishments for the week. Under these circumstances, the evidence presently favors the conclusion that contrary to Defendants' sweeping claim that Musk has acted only as an advisor, Musk made the decisions to shutdown USAID's headquarters and website even though he "*lacked the authority* to make that decision." Opp'n at 18.

As for whether such decisions constitute an exercise of significant authority, other than noting that this inquiry "focuse[s] on the extent of power an individual wields in carrying out his assigned functions," the United States Supreme Court has not further defined the significant authority requirement. *Lucia*, 585 U.S. at 245, 138 S.Ct. 2044. Although many cases involving the Appointments Clause involve the exercise of adjudicative functions, such as those of an administrative law judge, *see, e.g. id.* at 241, 138

S.Ct. 2044, or prosecutorial authority, *see, e.g., United States v. Donziger*, 38 F.4th 290, 296 (2d Cir. 2022), "significant authority" has not been limited to such activities. Indeed, without specifically ruling on whether the action constituted significant authority, courts have considered and decided Appointments Clause challenges in which the authority exerted included authorizing the termination of employees through a reduction-in-force, *see Andrade*, 824 F.2d at 1254–55, and the procurement of government materials and payment of contractors, *see United States v. Maurice*, 26 F. Cas. 1211, 1214 (Marshall, Circuit Justice, C.C.D. Va. 1823) (stating that the duties "of a purchasing quartermaster, commissary, and paymaster" are "important duties" that are "performed by persons who are considered as officers of the United States").

In *Tucker v. Commissioner of Internal Revenue*, 676 F.3d 1129 (D.C. Cir. 2012), the court identified three considerations to be utilized in distinguishing between an inferior Officer and an employee that relate to the type of authority exercised: (1) "the significance of the matters resolved by the officials"; (2) "the discretion they exercise in reaching their decisions"; and (3) "the finality of those decisions." *Id.* at 1133. Here, at least one decision in question—to permanently close an agency's headquarters as part of the shutdown of the agency—is a matter of great significance. Where Defendants' counsel acknowledged at the hearing that action to shut down a federal agency would constitute the use of significant authority, the decision to take this momentous step toward such a shutdown likewise meets this standard. Notably, the permanent closure of USAID headquarters also resulted in the permanent closure of USAID's classified operations center. For purposes of USAID, the decision at issue was the equivalent of a decision at the Department of Defense to close down the Pentagon and release it for use by another agency. Such an action is at least as significant as, and likely more significant than, the approval of a RIF at issue in *Andrade.* 824 F.2d at 1254–55, 1257.

**\*15** Where there is no statutory or regulatory requirement to close down a federal agency such as USAID, the exercise of this authority involves substantial discretion. Lastly, where USAID's headquarters was not only closed and vacated, but turned back to GSA to be transferred to CBP, the decision was plainly final. The Court therefore finds that the action of authorizing the permanent closure of an agency headquarters as part of an overall plan to dismantle the agency is the exercise of significant authority that must be performed by an Officer of the United States.

Defendants' argument that Plaintiffs' Appointment Clause claim fails because Musk is not occupying an office "established by law" that has the legal authority to take the action in question does not alter this conclusion. Since the case referenced by Defendants, *Landry v. FDIC*, 204 F.3d 1125, 1133 (D.C. Cir. 2000), the same court has held that an Appointments Clause claim may proceed even if the office at issue was not formally created by Congress or the Executive Branch. *See Tucker*, 676 F.3d at 1133 & n.1 ("We read *Landry*'s reference to the 'established by Law' question as a 'threshold trigger,' ... to mean that such an inquiry may but need not be the start of an Appointments Clause analysis." (quoting *Landry*, 204 F.3d at 1133)). Notably, courts have considered Appointments Clause challenges not only when Congress conferred upon the position held by the decisionmaker the legal authority to take the action in question, but also in situations where a government official did not have such statutory authority but nevertheless exercised that authority without having been appointed in the constitutionally required manner. *See, e.g.*, *Jooce*, 981 F.3d at 27–28 (considering an Appointments Clause challenge to the issuance of rule by a lower level agency official who lacked statutory authority to issue the rule); *Willie v. Raimondo*, No. 22-0689-BAH, 2024 WL 2832599, at *2, *5 (D. Md. June 3, 2024) (same).

Plaintiffs agree that Musk has no formal legal authority to make the decisions at issue, but they assert that as a factual matter, Musk has exerted actual authority at USAID that only a properly appointed Officer can exercise. To deny Plaintiffs' Appointments Clause claim solely on the basis that, on paper, Musk has no formal legal authority relating to the decisions at issue, even if he is actually exercising significant authority on governmental matters, would open the door to an end-run around the Appointments Clause. If a President could escape Appointments Clause scrutiny by having advisors go beyond the traditional role of White House advisors who communicate the President's priorities to agency heads and instead exercise significant authority throughout the federal government so as to bypass duly appointed Officers, the Appointments Clause would be reduced to nothing more than a technical formality. *Cf. Lucia*, 585 U.S. at 245, 138 S.Ct. 2044 (stating that the significant authority inquiry "focuse[s] on the extent of power an individual wields in carrying out his assigned functions").

### 2. Continuing Position

The Supreme Court first addressed the continuing position requirement in *United States v. Germaine*, 99 U.S. 508, 25 L.Ed. 482 (1878). *See Lucia*, 585 U.S. at 245, 138 S.Ct. 2044. In *Germaine*, the Supreme Court held that a surgeon appointed by the Commissioner of Pensions, who was "called on by [the Government] in some special case[s]" to conduct medical examinations on an as-needed basis, was not an Officer of the United States because his duties were "not continuing and permanent, and they [were] occasional and intermittent." *Germaine*, 99 U.S. at 512. Subsequently, in *Auffmordt v. Hedden*, 137 U.S. 310, 11 S.Ct. 103, 34 L.Ed. 674 (1890), the Supreme Court found that a merchant appraiser who was "selected as an emergency arises, upon the request of [a Government] importer for a reappraisal" was also not an officer where "[h]is position [was] without tenure, duration, continuing emolument, or continuous duties," and where he acted "only occasionally and temporarily." *Id.* at 326–27, 11 S.Ct. 103. More recently, in *Morrison v. Olson*, 487 U.S. 654, 108 S.Ct. 2597, 101 L.Ed.2d 569 (1988), the Supreme Court concluded that an independent counsel in the United States Department of Justice was an Officer rather than a mere employee, even though the position's tenure was temporary, in that the appointment terminated when the counsel "completed or substantially completed any investigations or prosecutions undertaken pursuant to" the statute creating the position. *Id.* at 664, 671, 108 S.Ct. 2597 n.12. Beyond these three cases, the Supreme Court has not "explained how to determine what constitutes a sufficiently 'continuing position.' " *Donziger*, 38 F.4th at 296.

**\*16** In *Donziger*, the United States Court of Appeals for the Second Circuit held that a private attorney appointed as a temporary special prosecutor for a contempt case pursuant to Federal Rule of Criminal Procedure 42(a)(2) was in a "continuing position" for purposes of the Appointments Clause. *Id.* at 297–98. Based on the Supreme Court precedent, the *Donziger* court identified three factors to consider on this issue: "(1) the position is not personal to a particular individual; (2) the position is not transient or fleeting; and (3) the duties of the position are more than incidental." *Id.* at 297.

Here, the position at issue is the USDS Administrator, an office which was established by the DOGE Executive Order. *See* Exec. Order No. 14,158, 90 Fed. Reg. at 8,441. As to whether it is personal to a particular individual, although Defendants assert that Musk's role is unique to himself,

neither the DOGE Executive Order nor any of the other executive orders that relate to DOGE refer to any particular individual and instead purport to create an office and a position. *See, e.g., id.*; Exec. Order No. 14,170, 90 Fed. Reg 8,621 (Jan. 20, 2025); Exec. Order No. 14,222, 90 Fed. Reg. at 11,095. Notably, at various times other individuals, including Vivek Ramaswamy and Amy Gleason, have been referenced by the President or the White House as being a leader of DOGE. The position is therefore not personal to a particular individual.

As for whether the position is "transient or fleeting," the DOGE Executive Order sets an 18-month term for the President's DOGE agenda and the U.S. DOGE Service Temporary Organization, an entity within DOGE, to run until July 2026. *See* Exec. Order No. 14,158, 90 Fed. Reg. at 8,441. However, unlike in *Germaine* and *Auffmordt*, in which the governmental duties of the surgeon and appraiser were to be performed on an as-needed basis when the Government required their services for short, specific, and singular tasks and thus were "occasional and intermittent," *Germaine*, 99 U.S. at 512, or "temporar[y]," *Auffmordt*, 137 U.S. at 327, 11 S.Ct. 103, here, the executive orders contemplate robust, ongoing duties for DOGE during that time period. These functions include "modernizing federal technology and software," Exec. Order No. 14,158, 90 Fed. Reg. at 8441; advising on a "Federal Hiring Plan" and assessing whether new vacancies should be filled, Exec. Order No. 14,170, 90 Fed. Reg. at 8,621; identifying all "sources of Federal funding for illegal aliens," Exec. Order No. 14,218, 90 Fed. Reg. 10,581 (Feb. 19, 2025); and coordinating with agencies on efforts to rescind or promulgate regulations and on contract and grant reviews, approvals, and terminations, *see* Exec. Order No. 14,219, 90 Fed. Reg. 10,583 (Feb. 19, 2025); Exec. Order No. 14,222, 90 Fed. Reg. at 11,095. In practice, in his first month with DOGE, Musk and his DOGE Team Members have been heavily engaged in gaining access to agency computer systems; identifying grants, contracts, and employees to be terminated; using government-wide emails to monitor employees' weekly activities; and shutting down agency headquarters and websites. Indeed, DOGE's activities reportedly have required around-the-clock work by certain DOGE Team Members.

The head of DOGE is therefore more akin to the independent counsel in *Morrison* or the special prosecutor in *Donziger*, who held temporary but continuous roles that would eventually end when the required assignment, in those cases, the investigation and prosecution of specific individuals

pursuant the scope of the appointment, was "completed or substantially completed." *Morrison*, 487 U.S. at 664, 108 S.Ct. 2597; *Donziger*, 38 F.4th at 295, 298–99 (finding that a special prosecutor for a single contempt case was in a continuing position). Here, as the head of DOGE, Musk's continuing role over the next 18 months encompasses a set of duties that in many ways are broader than the specific prosecutorial functions in those cases.

**\*17**  Finally, the DOGE duties described in the executive orders and the actual work conducted, which include the carrying out of presidential directives relating to reducing the number of regulations, addressing waste in grants and contracts, and determining the appropriate size of the federal workforce, are not merely "incidental" to the regular operations of government. *Donziger*, 38 F.4th at 297. The Court therefore finds that the USDS Administrator is a "continuing position." *See Lucia*, 138 S. Ct. at 2051.

Defendants, however, assert that Musk is not actually the USDS Administrator. Based on the Fisher Declaration, they assert that Musk is a non-career Special Government Employee who officially holds the title of Senior Advisor to the President, within the White House Office, and who "has no actual or formal authority to make government decisions himself" and thus can "only advise the President and communicate the President's directives." J.R. 424–25. In the declaration, Fisher also asserts that Musk "is not the U.S. DOGE Service Administrator." J.R. 425.

In contrast, Plaintiffs argue that regardless of the formal status of Musk, he "is in fact the '*de facto*' " USDS Administrator and that as the head of DOGE, he exercises actual authority in ways that an advisor to the President does not. Reply at 11, ECF No. 35 (quoting Compl. at 1). As discussed above, President Trump has consistently and repeatedly stated that Musk is in charge of DOGE. *See Texas v. United States*, 809 F.3d 134, 185 (5th Cir. 2015) (relying on presidential statements at the preliminary injunction stage); *aff'd by an evenly divided court*, 579 U.S. 547, 136 S. Ct. 2271, 195 L.Ed.2d 638 (2016) (per curiam); *Cnty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 522–23 (N.D. Cal. 2017) (same). Most notably, on February 19, 2025, President Trump publicly stated, "I signed an order creating the Department of Government Efficiency and put a man named Elon Musk in charge." J.R. 568. Musk spoke on behalf of DOGE at a joint press conference with the President on February 11, in a joint interview with the President on February 18, and at the Cabinet meeting on February 26.

Musk's public statements and posts on X, in which he has stated on multiple occasions that DOGE will take action, and such action occurred shortly thereafter, demonstrate that he has firm control over DOGE. For example, on February 2, 2025, shortly after Musk promised on X that "D[OGE] will fix it," referencing the National Weather Service internal employee website's description of DEI initiatives at the agency, DOGE posted that the language was removed. J.R. 91-92. On February 7, 2025, shortly after polling X users on whether a DOGE team member who was fired for racist social media posts should return to the agency, Musk announced that the DOGE member "will be brought back." J.R. 641.

Although the White House announced on February 25, 2025, that Amy Gleason is now the Acting USDS Administrator, that same day, White House Press Secretary Karoline Leavitt maintained that "the president tasked Elon Musk to oversee the DOGE effort" while noting that others "are helping run DOGE on a day-to-day basis." J.R. 616. Notably, at the February 28, 2025 hearing on this Motion, Defendants' counsel could not identify, despite having made an inquiry, who the USDS Administrator was before Gleason. Then on March 4, 2025, in a Presidential Address to Congress, President Trump stated that he had "created the new brand new Department of Government Efficiency. DOGE.... Which is headed by Elon Musk." J.R. 921.

 **\*18**  At this preliminary stage, the record demonstrates that, at least during the time period relevant to this Motion, Musk was, at a minimum, likely the official performing the duties and functions of the USDS Administrator. Even if viewed from the standpoint of the Senior Advisor position that he occupies on paper, the record of his activities to date establishes that his role has been and will continue to be as the leader of DOGE, with the same duties and degree of continuity as if he was formally in that position. *Cf.* Officers of the United States Within the Meaning of the Appointments Clause, 31 Op. O.L.C. 73, 117 (2007) ("Congress could not evade the Appointments Clause by, for example, the artifice of authorizing a contract for the supervision of the Justice Department, on the ground that no 'office' of Attorney General would be created by law."). The Court therefore finds that Musk has a "continuing position" for purposes of the Appointments Clause.

Where the present record supports the conclusion that Musk, without having been duly appointed as an Officer of the United States, exercised significant authority reserved for an

Officer while serving in a continuing governmental position, the Court finds that Plaintiffs have demonstrated a likelihood of success on the merits of the Appointments Clause claim as to the decision to permanently close USAID headquarters. At this stage, the Court need not and does not address whether the remaining decisions and actions referenced by Plaintiffs constituted significant authority exercised by Musk.

### B. Separation of Powers

Plaintiffs also argue that Defendants' actions relating to USAID, in the collective, violate the principle of Separation of Powers under the United States Constitution in that they exceed the authorities of the Executive Branch and encroach upon those of the Legislative Branch. Although they identify several potential Separation of Powers violations, the focus of their argument is that Defendants have acted to eliminate USAID, a federal agency created by statute, where only Congress may do so, and in doing so have usurped Congress's authority to create and abolish offices.

### 1. The Elimination of USAID

The record demonstrates that Defendants, as well as other government officials, have acted swiftly to shut down, dismantle, and effectively eliminate USAID as an independent agency.

On Sunday, February 2, 2025, Musk specifically announced the dismantling of USAID when he posted on X that "USAID is a criminal organization. Time for it to die." J.R. 174, 195. That same weekend and in the following days, Defendants physically closed USAID headquarters and shut down key functionalities of the agency. As of Friday, January 31, 2025, plaques with the USAID agency seal were removed from USAID offices, and on Monday, February 3, 2025, the USAID headquarters was permanently closed, with employees no longer permitted to enter. Shortly thereafter, the name of the agency was removed from the facade of the building, and as reported by Musk on X on February 7, 2025, CBP took over the USAID office space. That agency is reportedly reconfiguring the space for its own use.

In addition to the physical shutdown of USAID, on February 1, 2025, the USAID website was taken offline, and around that time approximately 2,000 USAID email accounts were deactivated. USAID's classified computer systems have been dismantled or are not available for use. USAID's Automated

Directive System, which contains all internal USAID policies and guidance, has also been taken offline.

In the early hours of Monday, February 3, 2025, as these activities were occurring, Musk specifically stated in a livestream on X that DOGE's actions relating to USAID were not a "minor housecleaning," and that instead DOGE was "shutting down USAID," which he asserted was necessary because USAID was "just a ball of worms" that has "got to go" because "it's beyond repair." Compl. ¶ 53. He stated that he had checked with President Trump "a few times" and confirmed that President Trump "agreed that we should it shut down." J.R. 171. After the livestream ended, Musk took personal credit for the shutdown of USAID by stating on X that he was among those that had spent the weekend "feeding USAID into the wood chipper." J.R. 197.

**\*19** The dismantling of USAID has included the elimination or sidelining of almost its entire workforce. On January 27, 2025, 58 senior employees were placed on administrative leave, and by February 4, 2025, USAID had placed a total of 2,137 employees on administrative leave. By February 7, 2025, USAID had identified another 2,104 employees who would have been placed on administrative leave that day but were not so placed because of the *AFSA* TRO. Thus, out of USAID's 4,765 direct hire employees, 4,241, or almost 90 percent were on or slated for placement on administrative leave by February 7. On February 23, 2025, after the *AFSA* TRO was lifted, USAID employees were notified that virtually all employees, with limited exceptions, were placed on administrative leave as of that day, and RIF notices were issued to terminate approximately 2,000 employees including J. Doe 11 and J. Doe 21. In the RIF notice, USAID acknowledged that it was eliminating "competitive area[s]," J.R. 448, which generally amounts to the elimination of bureaus or offices. *See* J.R. 912 (stating that competitive area means "bureau" or "office"); 5 C.F.R. § 351.402 (stating that a "competitive area may consist of all or part of an agency" and that "[t]he minimum competitive area is a subdivision of the agency under separate administration within the local commuting area"). In a declaration, a USAID employee familiar with the agency's staffing data has estimated that over 50 percent of USAID's civil and foreign service employees in Washington, D.C. have received a RIF notice. Further, as stated by Marocco in his February 22, 2025 declaration, nearly 800 PSCs have been terminated, a figure which appears to include J. Doe 1, J. Doe 8, and J. Doe 20 and represents approximately 75 percent of all PSCs employed by USAID. *See* USAID, *Fiscal Year 2024 Agency Financial Report* at 3

(2024) (stating that USAID workforce includes 1,061 U.S. PSCs).

The shutdown activities have also included termination of contracts and grants. Since the initial, across-the-board "pause" on "all new obligations of funding," J.R. 418, DOGE has taken credit, based on its own accounting, for terminating 2,191 contracts worth $26.1 billion and 2,366 grants worth $41.8 billion, for a total of nearly $68 billion. *See* doge.gov/savings (last updated Mar. 10, 2025).

As a result of these and other actions, USAID appears to be unable to perform its core functions and even certain basic functions of a governmental agency. For example, J. Doe 26 has stated in a declaration that "the Agency financial system (Phoenix) has not been accessible or functional," which prevents the processing of payments for employees, contractors, and grantees. J.R. 256. As reported by J. Doe 1, valid payments for completed work are not being made, even for work that is subject to an exemption or waiver from the funding freeze. As reported by J. Doe 2 and J. Doe 7, all of USAID's classified systems, including the USAID classified operations center, have been dismantled and are not operational, meaning that it can no longer engage in certain disaster response operations. As reported by J. Doe 20 and another USAID employee, USAID staffing has been reduced to the point that in some bureaus there are no personnel with credentials as a timekeeper who can prepare and review documents to have personnel paid, and contracting officers have been placed on administrative leave such that terminated PSCs cannot finalize contract modifications and complete offboarding, including receiving payments owed to them.

Finally, it is likely that USAID is no longer able to perform certain statutorily required activities. J. Doe 2 has stated that as a result of the dismantling of the agency, USAID is not complying with statutory requirements, such as those in the Federal Information Technology Acquisition Reform Act, the Federal Information Security Management Act, the Privacy Act, the E-Government Act of 2002, and the Government Performance and Results Act, among others. The shutdown of the USAID website also likely prevents USAID from fulfilling reporting and transparency obligations as required by Congress. *See* Further Consolidated Appropriations Act, 2024 ("FY24 Appropriations Act"), Pub. L. 118-47, 138 Stat 460, 770, div. F, tit. VII, § 7016(b).

Throughout these activities, Musk has consistently framed them as part of the elimination of USAID. On February 13,

2025, Musk reposted a video on X in which he stated that "We need to delete entire agencies, as opposed to leave part of them behind." J.R. 268. After the *AFSA* TRO was lifted on February 21, Musk agreed with the statement that "DOGE can now DISMANTLE USAID" and declared that "the world will be better for this." J.R. 674. Indeed, on February 19, 2025, President Trump stated at a public event that "we have effectively eliminated the U.S. Agency for International Development." J.R. 466.

**\*20** Taken together, these facts support the conclusion that USAID has been effectively eliminated.

**2. Legal Standard**

Under *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952), federal courts may consider claims of a violation of Separation of Powers under the United States Constitution. *Id.* at 587–89, 72 S.Ct. 863 (holding that the President acted beyond his constitutional powers by ordering the seizure of steel mills in order to bolster wartime production); *see, e.g.*, *NLRB v. Noel Canning*, 573 U.S. 513, 525, 134 S.Ct. 2550, 189 L.Ed.2d 538 (2014) (collecting cases); *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1232 (9th Cir. 2018). To act within its authority, the President or the Executive Branch must act based on authority that "stem[s] either from an act of Congress or from the Constitution itself." *Youngstown*, 343 U.S. at 585, 72 S.Ct. 863. Courts apply a tripartite framework, originally set forth in Justice Robert Jackson's concurrence in *Youngstown*, to assess whether an executive action runs afoul of the Separation of Powers. *Medellin v. Texas*, 552 U.S. 491, 524, 128 S.Ct. 1346, 170 L.Ed.2d 190 (2008). First, "[w]hen the President acts pursuant to an express or implied authorization of Congress, his authority is at its maximum, for it includes all that he possesses in his own right plus all that Congress can delegate." *Youngstown*, 343 U.S. at 635, 72 S.Ct. 863 (Jackson, J., concurring). Second, if Congress is silent and neither grants nor denies authority, the President must rely only on the President's independent powers as established by the Constitution and possibly based on authority existing in "a zone of twilight" in which there may be "concurrent authority" with Congress. *Id.* at 637, 72 S.Ct. 863. Finally, if the President "takes measures incompatible with the express or implied will of Congress," then the President's "power is at its lowest ebb" and the President may "rely only upon his own constitutional powers

minus any constitutional powers of Congress over the matter." *Id.*

**3. Congressional Authorization**

The Court first considers whether Congress has expressly or impliedly authorized Defendants' course of conduct in dismantling and eliminating USAID. There is no statute that authorizes the Executive Branch to shut down USAID. Generally, Congress has reserved to itself the power to create and abolish federal agencies, as well as to authorize restructuring of the Executive Branch. From 1932 to 1984, Congress has at times authorized the President to submit a reorganization plan that could include plans to transfer or abolish all or part of an agency or the functions of an agency, or to consolidate or coordinate part of an agency or its functions with another agency or part of an agency, which would take effect if approved through a special legislative process consisting of resolutions adopted by both the House of Representatives and the Senate. *See* Cong. Rsch. Serv., R42852, *Presidential Reorganization Authority: History, Recent Initiatives, and Options for Congress*, 3 (2012). This statutory grant of authority, however, expired on December 31, 1984, and has not since been reinstated. *See id.*; 5 U.S.C. §§ 903–906.

More specifically, Congress has made clear through statute its express will that USAID be an independent agency, and that it not be abolished or substantially reorganized without congressional approval. USAID was first created by an Executive Order in 1961. Exec. Order No. 10,973, 26 Fed Reg. 10,469, § 102 (Nov. 7, 1961) (directing the Secretary of State to "establish an agency in the Department of State to be known as the Agency for International Development"). In 1998, Congress specifically established USAID in statute through the Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"), Pub. L. 105-277, Div. G, 112 Stat. 2681–761. Under FARRA, USAID was designated as an independent agency within the Executive Branch, and the position of the USAID Administrator was established as one under the "direct authority and foreign policy guidance of the Secretary of State." 22 U.S.C. §§ 6563, 6592. Specifically, FARRA provided that:

**\*21** Unless abolished pursuant to the reorganization plan submitted under section 6601 of this title, and except as provided in section 6562 of this title, there is within the Executive branch of Government the United States Agency

for International Development as an entity described in section 104 of Title 5.

*Id.* § 6563(a). As referenced in this provision, Congress required the President to submit to Congress a reorganization plan and report addressing "the consolidation and streamlining" of USAID and "the transfer of certain functions" to the State Department, and in which he could "provide for the abolition" of USAID and "the transfer of all of its functions to the Department of State." *Id.* § 6601(a) (2)–(3), (d)(1). Congress also directed that certain functions of USAID, specifically press and administrative functions, be removed from the agency and reorganized under the State Department. *Id.* § 6581(b). In the report submitted pursuant to § 6601, President Clinton proposed that USAID "continue as an independent establishment in the Executive Branch" and recommended transferring to the State Department only those specific functions proposed for such transfer in FARRA. *See* J.R. 307 (Reorganization Plan and Report §§ 1(d), 2(c) (revised Mar. 1999)); 22 U.S.C. §§ 6601(d)(2)(B)(ii), 6581, 6613(b). This temporary authority to propose the abolition of USAID or transfer of USAID to the State Department expired on December 20, 1998. *See* 22 U.S.C. § 6601(a).

Notably, in FARRA, Congress specifically acted to abolish certain other federal agencies relating to foreign affairs, specifically, the United States Arms Control and Disarmament Agency, the United States Information Agency, and the United States International Development Cooperation Agency, and to transfer their functions to the State Department. *Id.* §§ 6501(2)(A), 6511–6512, 6531–6533, 6561–6562.

Since FARRA, Congress has not granted the President direct statutory authority to reorganize, reconstitute, consolidate, or abolish the agency. Indeed, Congress has rejected efforts to eliminate USAID outright. *See* S. 908, § 1401, 104th Cong. (1995) (introduced June 9, 1995); H.R. 5108, 118th Cong. (2023) (introduced Aug. 1, 2023); *see also Youngstown,* 343 U.S. at 586, 72 S.Ct. 863 (considering the failure to pass legislation introduced in Congress as indicative of congressional will); *City & Cnty, of San Francisco,* 897 F.3d at 1234 & n.4 (same). Defendants therefore generally lack congressional authorization to dismantle, eliminate, or abolish USAID.

Defendants also likely lack congressional authorization to take even the primary specific steps toward abolition of USAID already conducted. In relation to the most recent appropriation for USAID, Congress placed certain

restrictions on any "reorganization, redesign or other plan" relating to USAID, which consists of any actions to "expand, eliminate, consolidate or downsize" the agency or its bureaus and offices, including "the transfer to other agencies of the authorities and responsibilities of" bureaus and offices, and any actions to "expand or reduce the size of the permanent Civil Service [or] Foreign Service ... from the staffing levels previously justified to the Committees on Appropriations for fiscal year 2024." FY24 Appropriations Act, § 7063 ("Section 7063"). Specifically, this provision states that funds appropriated to USAID "may not be used to implement a reorganization, redesign, or other plan ... without prior consultation" by the agency head "with the appropriate congressional committees," that "such funds shall be subject to the regular notification procedures of the Committees on Appropriations," and that any such notification must "include a detailed justification for the proposed action." *Id.*

**\*22** For purposes of this provision, Congress has defined "prior consultation" as a:

> [P]re-decisional engagement between a relevant Federal agency and the Committees on Appropriations during which such Committees are given a meaningful opportunity to provide facts and opinions, in advance of any public announcement, to inform: (1) the use of funds; (2) the development, content, or conduct of a program or activity; (3) or a decision to be taken.

118 Cong. Rec. H2087 (Mar. 22, 2024); FY24 Appropriations Act § 4 (stating that this explanatory statement "shall have the same effect ... as if it were a joint explanatory statement of a committee of conference"). The term "subject to the regular notification procedures of the Committee on Appropriations," FY24 Appropriations Act § 7063, means that "such Committees must be notified not less than 15 days in advance of the initial obligation of funds." 118 Cong. Rec. H2087 (Mar. 22, 2024); *see also* FY24 Appropriations Act § 7015.

Defendants' primary actions aimed at eliminating USAID, including the closing of USAID headquarters and drastic staffing reductions such as the termination of approximately 50 percent of US AID personnel, qualify as parts of a reorganization of the agency covered by the requirements of this provision, whether as a form of eliminating or downsizing the agency or one of its offices, or as reducing staffing below the previously justified levels. *See* FY24 Appropriations Act § 7063. Secretary Rubio's February 3, 2025 letter to congressional committees stating that Marocco had been tasked with "begin[ning] the process of engaging in a review

and potential reorganization of USAID's activities" that could include, among other activities, the "closing, reorganizing, [or] downsizing" of bureaus and offices, "reducing the size of the workforce," and eventually abolishing parts of USAID, J.R. 421–22, while referencing Section 7063, does not render such actions authorized by Congress. First, the actions to shut down USAID headquarters and its website occurred between January 31, 2025 and the morning of February 3, 2025, before or as the letter was sent, and thus involved the unauthorized expenditure of funds before consultation, and without the required advanced notice. *See* FY24 Appropriations Act §§ 7015, 7063. The letter also did not constitute "prior consultation" under the FY24 Appropriations Act because it was not a "pre-decisional engagement" that provided the Appropriations Committees with "a meaningful opportunity to provide facts and opinions, in advance of any public announcement," relating to the use of funds or the decisions to be taken. 118 Cong. Rec. H2087 (Mar. 22, 2024). Rather, Musk's public announcement that USAID was being shut down, and the electronic notification to employees of the closure of USAID headquarters, occurred before the February 3 letter was sent. Further, where USAID's placement of almost all of its workforce on administrative leave, termination of approximately 75 percent of its PSCs, and termination of up to 50 percent of employees all occurred shortly after the letter was sent, and likely would have occurred earlier in the absence of the *AFSA* TRO, there is no evidence that the congressional committees had the opportunity to weigh in before these key actions were taken and publicly announced.

**\*23** Although the letter provided certain general reasons for initiating consultations, such as inefficient foreign assistance processes and lack of coordination that creates discord in foreign policy, it provided no explanation of any kind, much less the required "detailed justification for the proposed action," for the closure of USAID headquarters or for the mass termination of the employees and PSCs. FY24 Appropriations Act § 7063.

Notably, in the past, when the Executive Branch sought to pursue a USAID reorganization, it first submitted a plan to Congress, engaged in discussions relating to it, and moved forward with the plan only after Congress had communicated its assent. For example, during the first Trump Administration, USAID engaged in a two-year reorganization process, in which USAID Administrator Mark Green undertook nearly 100 consultations with Members of Congress and their staff and submitted nine congressional notifications to the relevant subcommittees, describing

proposed structural changes in over 115 pages of detail. Marian L. Lawson, Nick M. Brown, Emily M. Morgenstern, Cong. Rsch. Serv., R45779, *Transformation at the U.S. Agency for International Development (USAID)*, 2 n.4, 8, 9 n.32 (2019). Here, there is no evidence that Defendants provided any such plan or engaged in such consultations and notifications regarding the specific reorganization activities taken as part of the elimination USAID.

Where Congress has consistently reserved for itself the power to create and abolish federal agencies, specifically established USAID as an agency by statute, and has not previously permitted actions taken toward a reorganization or elimination of the agency without first providing a detailed justification to Congress, Defendants' actions taken to abolish or dismantle USAID are "incompatible with the express or implied will of Congress." *Youngstown*, 343 U.S. at 637, 72 S.Ct. 863 (Jackson, J., concurring). Accordingly, the third *Youngstown* category applies, and the President's "power is at its lowest ebb." *Id.*

### 4. Constitutional Authority

In the absence of congressional authorization, the dismantling of USAID must be supported by the President's "own constitutional powers minus any constitutional powers of Congress in the matter." *Id.* at 637–38, 72 S.Ct. 863. Pursuant to the third category of *Youngstown*, the "President's asserted power must be both 'exclusive' and 'conclusive' on the issue." *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 10, 135 S.Ct. 2076, 192 L.Ed.2d 83 (2015) (quoting *Youngstown*, 343 U.S. at 637–38, 72 S.Ct. 863 (Jackson, J., concurring)). On this issue, courts examine the text and structure of the Constitution as well as relevant precedent and history. *Id.*

In asserting constitutional authority for their actions relating to USAID, Defendants claim that they "fit well within the President's Article 11 authority." Opp'n at 23. Specifically, Defendants point to the President's foreign affairs powers under Article II of the Constitution. Although Congress has certain authorities in relation to foreign affairs, including through its war and foreign commerce powers, *see Zivotofsky*, 576 U.S. at 21, 135 S.Ct. 2076; *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 396, 123 S.Ct. 2374, 156 L.Ed.2d 376 (2003), the President has the "vast share of responsibility for the conduct of our foreign relations" and has "a degree of independent authority to act." *Garamendi*, 539 U.S. at 414, 123 S.Ct. 2374. As Defendants acknowledge, however,

"[t]he Executive is not free from the ordinary controls and checks of Congress merely because foreign affairs are at issue." *Zivotofsky*, 576 U.S. at 21, 135 S.Ct. 2076. Notably, the case law relied upon by Defendants to support the applicability of the President's foreign affairs powers to the present case recognizes the overlap of the political branches' foreign affairs powers and endorses the supremacy of presidential foreign affairs powers only as they relate to substantive issues of foreign policy or interactions with foreign countries. *See Garamendi*, 539 U.S. at 414–15, 123 S.Ct. 2374 (holding that the California Holocaust Victim Insurance Relief Act was preempted because it interfered with the President's authority to conduct foreign policy and to enter into executive agreements with foreign countries to settle claims of American citizens); *Zivotofsky*, 576 U.S. at 7–8, 21, 135 S.Ct. 2076 (holding that a statute requiring that passports for American citizens born in Jerusalem record the place of birth as "Israel" violated the Separation of Powers because the President has exclusive authority to grant formal recognition to a foreign sovereign, and the Executive Branch did not recognize any country as having sovereignty over Jerusalem); *United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 312, 315, 319–20, 57 S.Ct. 216, 81 L.Ed. 255 (1936) (finding that a congressional resolution permitting the president to bar the sale of arms in relation to a particular armed conflict was not an unconstitutional delegation of legislative power to the Executive Branch because of the President's foreign affairs power as "the sole organ of the federal government in the field of international relations").

**\*24**  Here, however, the primary actions at issue—the closure of USAID headquarters, the placement on leave or termination of 90 percent of its workforce, and the termination of large numbers of contracts, including those with personal services contractors—relate largely to the structure of and resources made available to a federal agency, not to the direct conduct of foreign policy or engagement with foreign governments. Plaintiffs do not challenge individual decisions on what particular foreign aid initiatives should be advanced, whether to provide foreign aid to a particular nation, or how USAID personnel should operate in a foreign nation. Rather, they challenge the treatment within the agency of USAID personnel and contractors, the vast majority of whom are located in the United States, and whether their agency should operate independently or be shut down and absorbed into other parts of the federal government.

Although such functions necessarily have some connection to foreign policy because of the nature of USAID's mission,

under Defendants' theory, the President would have unilateral control over all aspects of the State Department and could even abolish it as a matter of the foreign policy power. *Youngstown* itself, however, illustrates that the fact that an executive action has some nexus to Article II presidential powers, whether relating to foreign policy or the President's role as Commander-in-Chief, does not necessarily render the action constitutional. *Cf. Youngstown*, 343 U.S. at 587, 72 S.Ct. 863 (holding that the seizure of steel mills "cannot be properly sustained as an exercise of the President's military power as Commander in Chief"). Here, where the actions taken against USAID primarily relate to the internal affairs of government, they cannot be justified based solely on the President's foreign affairs powers.

Defendants' reference at the hearing to the President's purported power "to avoid waste, fraud, and abuse," which the Court construes as an invocation of the President's Article II power to ensure that the laws are faithfully executed, fares no better. Hrg Tr. at 104, ECF No. 53. Where this power allows the President to engage in "the general administrative control of those executing the laws," including the "power of removing those for whom he cannot continue to be responsible," *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 492–93, 130 S.Ct. 3138, 177 L.Ed.2d 706 (2010) (quoting *Myers v. United States*, 272 U.S. 52, 164, 47 S.Ct. 21, 71 L.Ed. 160 (1926)), it may justify the termination or placement on leave of certain employees. When, however, the Executive Branch takes actions in support of the stated intent to abolish an agency, such as permanently closing the agency headquarters and engaging in mass terminations of personnel and contractors, those actions conflict with Congress's constitutional authority to prescribe if and how an agency shall exist in form and function. *See id.* at 500, 130 S.Ct. 3138 ("Congress has plenary control over the salary, duties, and even existence of executive offices."); *Freytag v. Comm'r of Internal Revenue*, 501 U.S. 868, 883, 111 S.Ct. 2631, 115 L.Ed.2d 764 (1991) (recognizing Congress's "authority to create offices"); *Myers v. United States*, 272 U.S. 52, 128–29, 47 S.Ct. 21, 71 L.Ed. 160 (1926) ("The Legislature creates the office, defines the powers, limits its duration, and annexes a compensation." (quoting 1 Annals of Congress, 581, 582)). Accepted understandings and practice underscore the proposition that even while the President can generally address issues such as waste and fraud, Congress alone holds the constitutional authority to take action to eliminate agencies that it has created. *See Zivotofsky*, 576 U.S. at 23, 135 S.Ct. 2076 ("In separation-of-powers cases this Court has often 'put significant weight

upon historical practice.' " (quoting *Noel Canning*, 573 U.S. at 524, 134 S.Ct. 2550)). Beyond the examples discussed above of Congress statutorily abolishing other foreign policy agencies through FARRA, Congress has repeatedly acted to abolish or significantly reorganize agencies by statute in other contexts. For example, in 1995, Congress abolished the Interstate Commerce Commission and transferred any remaining functions to the Surface Transportation Board within the Department of Transportation. ICC Termination Act of 1995, Pub. L. No. 104-88, 109 Stat. 803, §§ 101, 701–702. In 2002, Congress abolished the Immigration and Naturalization Service by statute and transferred its functions to the United States Department of Homeland Security. Homeland Security Act of 2002, Pub L. No. 107-296, 116 Stat. 2135 §§ 441, 451(b), 471. This history demonstrates that even considering the identified Article II authority, the power to act to eliminate federal agencies resides exclusively with Congress. *See Zivotofsky*, 576 U.S. at 28, 135 S.Ct. 2076.

**\*25** Although examples of unilateral executive actions to eliminate an agency are rare, one instructive case demonstrates that executive action aimed at abolishing a statutorily mandated agency and its programs violates the Separation of Powers even before the agency is entirely eliminated. In *Local 2677, American Federation of Government Employees v. Phillips*, 358 F. Supp. 60, 72 (D.D.C. 1973), the Court found a Separation of Powers violation pursuant to *Youngstown* when the President sought to terminate the Office of Economic Opportunity ("OEO"), submitted a budget proposal that the OEO receive no funding for the following year for its Community Action Agency ("CAA") program, and stopped providing new funding to CAA grantees and instead required them to phase out their activities. *Id.* at 72, 77–78. The court held that even without the final termination of the program, the steps taken toward its termination violated the Separation of Powers because "it is for the Congress in the responsible exercise of its legislative power to make provisions for termination" of a program, and that "[u]ntil those provisions are made, the function of the Executive is to administer the program in accord with the legislated purposes." *Id.* at 79. The court also found that in seeking to terminate or abolish OEO and its CAA program, the Executive's plan violated the then-existing statutory requirement of 5 U.S.C. § 903(a), that "a reorganization plan be submitted to the Congress before the abolition of that function or the agency itself can take place." *Id.* at 80.

Similarly, Defendants' present actions to dismantle USAID violate the Separation of Powers because they contravene congressional authority relating to the establishment of an agency. To find that the President's Article II powers permit such action would mean that "no barrier would remain to the executive ignoring any and all Congressional authorizations if he deemed them, no matter how conscientiously, to be contrary to the needs of the nation." *Id.* at 77; *see also City & Cnty. of San Francisco*, 897 F.3d at 1232 ("[T]he President may not decline to follow a statutory mandate or prohibition simply because of policy objections.") (quoting *In re Aiken Cnty.*, 725 F.3d 255, 259 (D.C. Cir. 2013)). Where Congress has prescribed the existence of USAID in statute pursuant to its legislative powers under Article I, the President's Article II power to take care that the laws are faithfully executed does not provide authority for the unilateral, drastic actions taken to dismantle the agency.

Defendants' remaining argument does not alter this conclusion. In opposing Plaintiffs' Separation of Powers claim, Defendants do not advance any factual claim that Defendants' actions do not effectively constitute the elimination of USAID as an agency. Rather, they argue that, based on *Dalton v. Specter*, 511 U.S. 462, 114 S.Ct. 1719, 128 L.Ed.2d 497 (1994), this claim cannot succeed because it amounts only to a claim that the Executive Branch exceeded its statutory authority. In *Dalton*, the plaintiffs sought to enjoin the closure of a naval base pursuant to President George H.W. Bush's acceptance of the recommendation of a commission that was established by, and followed a process set forth in, the Defense Base Closure and Realignment Act of 1990. *Id.* at 466, 114 S.Ct. 1719. After finding that the Administrative Procedure Act ("APA") did not apply to decisions by the President, the Court held that while his actions could "still be reviewed for constitutionality," such a constitutional claim failed because "an action taken by the President in excess of his statutory authority" does not necessarily violate the Constitution, and the plaintiffs' claim amounted only to one asserting a statutory violation. *Id.* at 473–74, 114 S.Ct. 1719.

Here, however, Plaintiffs' Separation of Powers claim is not based only on alleged statutory violations but instead further asserts that the elimination of USAID exceeds the President's Article II powers. Under *Youngstown*, courts may permissibly consider whether Congress has authorized the President to act through a statute, as relevant to, but not dispositive of, a Separation of Powers claim. *Youngstown*, 343 U.S. at 635, 72 S.Ct. 863 (Jackson, J., concurring). Such consideration

of the impact of statutes on a Separation of Powers claim is common. *See, e.g., id.* at 585–86, 72 S.Ct. 863; *Dames & Moore v. Regan,* 453 U.S. 654, 670–74, 101 S.Ct. 2972, 69 L.Ed.2d 918 (1981). Where, as discussed above, Defendants' actions exceed the President's constitutional powers based in part on, but not because of, statutory provisions that relate to the creation and potential reorganization and abolition of USAID, the Court finds that the Separation of Powers claim is not an APA claim or another claim based only on a violation of statutory authority.

**\*26**  Accordingly, for the reasons discussed above, the Court finds that it is likely that Plaintiffs will succeed on their Separation of Powers claim relating to the dismantling of USAID. Based on this finding, the Court need not and will not address Plaintiffs' assertion that Defendants also violated the Separation of Powers through "the unlawful obstruction of congressionally appropriated funds." Mot. at 14. While Plaintiffs identify a valid theory of a Separation of Powers violation that may well apply in this case, where Plaintiffs merely referenced this argument without providing specific analysis, the Court will not consider it at this stage but may do so if it is more fully developed at later stages of this case. *See City & Cnty. of San Francisco,* 897 F.3d at 1233–35; *see also AVAC,* Nos. 25-0400 (AHA), 25-0402 (AHA), 2025 WL 752378, at \* 14 (D.D.C. Mar. 10, 2025).

### III. Irreparable Harm

The second requirement for a preliminary injunction is that the plaintiff will likely suffer irreparable harm in the absence of preliminary relief. *See Winter,* 555 U.S. at 20, 129 S.Ct. 365. "Where the harm suffered by the moving party may be compensated by an award of money damages at judgment, courts generally have refused to find that harm irreparable." *Hughes Network Sys., Inc. v. Inter Digital Commc'ns Corp.,* 17 F.3d 691, 694 (4th Cir. 1994). Moreover, to establish irreparable harm, a plaintiff "must make a 'clear showing' that the plaintiff will suffer harm that is 'neither remote nor speculative, but actual and imminent.' " *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land,* 915 F.3d 197, 216 (4th Cir. 2019) (quoting *Direx Israel, Ltd. v. Breakthrough Med. Corp.,* 952 F.2d 802, 812 (4th Cir. 1991)).

At the outset, the Court addresses Plaintiffs' argument that a finding of liability on either of their constitutional claims would necessarily establish irreparable harm. Though Plaintiffs are correct that, "the denial of a constitutional right ... constitutes irreparable harm for purposes of equitable jurisdiction," *Ross v. Meese,* 818 F.2d 1132, 1135 (4th Cir.

1987), courts have limited the application of that principle "to cases involving individual rights, not the allocation of powers among the branches of government." *Aposhian v. Barr,* 958 F.3d 969, 990 (10th Cir. 2020), *abrogated on other grounds, Garland v. Cargill,* 602 U.S. 406, 144 S. Ct. 1613, 1619 & n.2, 219 L.Ed.2d 151 (2024); *cf. Roman Cath. Diocese of Brooklyn v. Cuomo,* 592 U.S. 14, 141 S. Ct. 63, 67, 208 L.Ed.2d 206 (2020) (per curiam) (finding that an infringement of a First Amendment right results in irreparable harm); *Ross,* 818 F.2d at 1134–35 (finding that an infringement of a Fourth Amendment right results in irreparable harm). Indeed, two United States Courts of Appeals have considered whether Appointments Clause or Separation of Powers violations necessarily establish irreparable harm and have concluded that they do not. *See Alpine Sec. Corp. v. Fin. Indus. Regul. Auth.,* 121 F.4th 1314, 1333–34 (D.C. Cir. 2024); *Leacho, Inc. v. Consumer Prod. Safety Comm'n,* 103 F.4th 748, 753 (10th Cir. 2024) (holding that "while violations of certain individual constitutional rights, without more, can constitute irreparable harm, violations of the Constitution's separation of powers provisions do not").

*Axon Enterprise, Inc. v. Federal Trade Commission,* 598 U.S. 175, 143 S. Ct. 890, 215 L.Ed.2d 151 (2023), cited by Plaintiffs, is not to the contrary. In *Axon,* the Supreme Court held that that a plaintiff need not exhaust administrative remedies consisting of a proceeding before an administrative law judge ("ALJ") before pursuing a claim in federal court that the ALJ had been installed in violation of the Appointments Clause, in part because the injury of being subjected to an "illegitimate proceeding" before the ALJ "is impossible to remedy" once that proceeding is completed. *Id.* at 903. As the *Alpine* court correctly concluded in analyzing *Axon,* this determination was grounded in the requirements of the statutory scheme establishing the administrative process and neither addressed the issue of whether, nor leads to the conclusion that, an Appointments Clause or Separation of Powers violation necessarily causes irreparable harm for purposes of a preliminary injunction. *See Axon,* 143 S. Ct. at 903–04; *Alpine,* 121 F.4th at 1336. Recognizing the distinction between constitutional rights held by individuals and those relating to the authorities of the branches of government, this Court will not rely on a broad principle that the constitutional violations asserted here necessarily establish likely irreparable harm and will therefore consider whether Plaintiffs have otherwise met this requirement.

**\*27**  Plaintiffs' additional arguments on this issue include that they are facing or will likely face irreparable harm based

on the physical security risk that some Plaintiffs stationed abroad are experiencing; the reputational injury that they are suffering from Musk's disparaging public comments about USAID; and the disclosure of sensitive personal and potentially classified information to DOGE Team Members. As to physical security, Plaintiff J. Doe 22 is facing an ongoing physical security risk as a result of DOGE'S control and dismantling of USAID. J. Doe 22 is a USAID employee stationed in a high-risk area in Central America who was placed on administrative leave on February 23, 2025, and because of DOGE'S shutdown of the USAID payment system, there is no way to pay J. Doe 22's electricity, cell phone, and internet bills. J. Doe 22 reports that this situation remains despite the alleged waiver in place for payments to provide USAID personnel abroad with access to basic resources, and J. Doe 22's Mission leadership has informed J. Doe 22 that it still has "no way to pay" even though the cell phone and internet bills were due at the end of February 2025. J.R. 457. Though J. Doe 22 has not lost service yet, a loss of electricity and cell phone service would create serious security risks because "[o]nce the electricity goes out," J. Doe 22 will "lose access to ... security cameras and radios," and the radio and cell phone are J. Doe 22's only means of contacting the Mission's Regional Security Office to address security threats. J.R. 457.

Thus, while USAID generally represented in its administrative leave announcement of February 23, 2025 that overseas employees "will retain access to Agency systems and to diplomatic and other resources" until they return to the United States, J.R. 446, J. Doe 22's account, which post-dates that announcement, illustrates that USAID cannot be deemed to have fully addressed all security risks facing overseas personnel on administrative leave. Notably, the February 22, 2025 Marocco Declaration, the only declaration relating to USAID personnel submitted by Defendants in this case, discussed personnel in high-risk locations only in relation to the February 7 placement of USAID personnel on administrative leave and did not attest to the safety of personnel in high-risk areas who were placed on administrative leave on February 23, such as J. Doe 22. Thus, unlike in other cases with different factual records, *see AFSA*, 2025 WL 573762, at *5–7; Defs. Notice of Supp. Authority Ex. A at 7-11, ECF No. 60-1, J. Doe 22's specific account of circumstances creating a physical security risk in a high-risk location arising from Defendants' control of USAID systems demonstrates a likelihood of irreparable harm. *Cf. Bollat Vasquez v. Mayorkas*, 520 F. Supp. 3d 94, 111–12 (D. Mass. 2021) (concluding that plaintiffs faced likely irreparable harm

when a governmental policy required them to remain in a dangerous part of a foreign country in which plaintiffs faced "daily peril").

While the security risk to J. Doe 22 is sufficient to demonstrate a likelihood of irreparable harm, Plaintiffs have identified an additional form of likely irreparable harm consisting of reputational harms stemming from Musk's disparaging public statements about USAID. Generally, a claim that an employee's "reputation would be damaged as a result of" an adverse employment action does not establish irreparable harm as required for a preliminary injunction. *Sampson v. Murray*, 415 U.S. 61, 91–92, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974). In *Sampson*, in which a federal employee sought a "temporary injunction" barring her dismissal pending an administrative appeal, the alleged reputational harm stemmed from the general "humiliation and damage to ... reputation" and "embarrassment of being wrongfully discharged" that would ensue from a termination. *Id.* at 63, 66, 91, 94 S.Ct. 937. The Supreme Court specifically recognized, however, that "cases may arise in which the circumstances surrounding an employee's discharge, together with the resultant effect on the employee, may so far depart from the normal situation that irreparable injury might be found." *Id.* at 92, 94 S.Ct. 937 n.68. Courts have invoked this exception in such abnormal and compelling circumstances. *See Roe v. Dep't of Defense*, 947 F.3d 207, 212, 229–30 (4th Cir. 2020) (affirming a determination that the discharge of two HIV-positive Air Force servicemembers based on the Air Force's determination that this status made them unfit for service would likely lead to irreparable harm in part because their injury was compounded by "the stigma facing those living with HIV" and the likelihood that the discharges would force them to "address questions from others" that would effectively force them to reveal their HIV-positive status); *Heineke v. Santa Clara Univ.*, 736 F. App'x 622, 624 (9th Cir. 2018) (finding that *Sampson* did not "foreclose the possibility that reputational damage and emotional distress" from an adverse employment action "may represent irreparable harm" and remanding for a determination on whether a plaintiff suspended from his faculty position based an investigation into a student's sexual harassment complaint had established likely irreparable harm on these bases).

*28 Here, if the stated reasons for the shutdown of USAID and the related personnel actions were limited to, as asserted by Marocco, the need to assess "USAID's operations and align its functions to the President's and the Secretary [of State's] priorities," J.R. 407, the termination of Plaintiffs

Case 1:25-cv-00381-ABJ    Document 80-1    Filed 03/20/25    Page 25 of 30

and other USAID personnel would result in the typical reputational harm that stems from a termination, which would not support a finding of irreparable harm. *See Sampson*, 415 U.S. at 91–92, 94 S.Ct. 937. However, Defendants' public statements regarding the reasons for the actions relating to USAID go far beyond the ordinary. On February 2, 2025, as USAID headquarters was being shut down, Musk stated on X that USAID is "evil" and in another post that has been viewed at least 33.2 million times, that "USAID is a criminal organization." J.R. 64, J.R. 195. The next day, Musk also publicly stated in a lengthy discussion on X that USAID was not "an apple with a worm in it" but was instead "just a ball of worms" that is "hopeless" and "beyond repair" to the point that "you've got to basically get rid of the whole thing." Compl. ¶ 53; J.R. 172. He also stated that USAID had been engaged in "anti-American" activity. J.R. 172. Where such a prominent member of the Executive Branch has publicly described Plaintiffs' place of employment in these ways on such a large media platform, and in a way that effectively characterizes it not as an agency in which certain individuals have engaged in misconduct but as a criminal enterprise from top to bottom, the likely harm to the reputation of personnel who worked there is of a different order of magnitude, because these statements naturally cast doubt on the integrity of those who worked there. At a minimum, they likely diminish the value of the experience of working at USAID in the eyes of future employers, with lasting impact because such personnel necessarily must rely upon and discuss their prior work experience at USAID when they search for new employment upon any final termination from USAID, as well as in future employment searches.

Such reputational injury does not appear to be merely speculative, as at least one Plaintiff has already begun to experience it. J. Doe 12, a USAID PSC, has reported personally hearing "remarks that explicitly and implicitly accused USAID workers of being 'corrupt' and 'stealing from the American people' " and has had family members state "that they have received questions from community members inquiring about the 'lack of accountability and liberal corruption' within USAID, based on" Musk's statements about USAID and its personnel. J.R. 248–49. Relatedly, J. Doe 9, who is posted in the Middle East, has reported that Musk's derogatory statements about USAID are available on media outlets in that region and "have a direct negative impact on the perception of USAID where I work." J.R. 433. Under these highly unusual and extraordinary circumstances, the reputational injury faced by Plaintiffs "so far depart[s] from the normal situation" that the Court finds that it constitutes an additional form of likely irreparable harm for purposes of a preliminary injunction. *See Sampson*, 415 U.S. at 92 n.68, 94 S.Ct. 937; *cf. Roe*, 947 F.3d at 229–30.

Finally, Plaintiffs have argued that the disclosure of sensitive personal information available to the DOGE Team will likely result in irreparable harm. Because the DOGE Team Members demanded and received root access to USAID's systems, they can view, extract, and export the sensitive personal data of all current and former USAID employees. Generally, the public disclosure or the likely disclosure of PII or other sensitive personal information can cause irreparable harm. *See, e.g., United States v. Miami Univ.*, 294 F.3d 797, 818-19 (6th Cir. 2002) ("Once personally identifiable information has been made public, the harm cannot be undone."); *Senior Execs. Ass'n v. United States*, 891 F. Supp. 2d 745, 755 (D. Md. 2012) ("[G]enerally speaking, the public disclosure of confidential information is irreparable."). Outside of the preliminary injunction context, courts have concluded that the disclosure of classified information to individuals without authorization to view it irreparably harms the government. *See, e.g., Snepp v. United States*, 444 U.S. 507, 513, 100 S.Ct. 763, 62 L.Ed.2d 704 (1980); *United States v. Hashmi*, 621 F. Supp. 2d 76, 82–83 (S.D.N.Y. 2008) (finding that requiring defense counsel to obtain a security clearance was justified given the Government's "strong interest in preventing the irreparable harm of disclosing classified information"); *United States v. Al-Arian*, 267 F. Supp. 2d 1258, 1266–67 (M.D. Fla. 2003) (same). By extension, where classified information relates to a particular individual, that person could be irreparably harmed by its disclosure to someone who lacks a security clearance.

Here, there are specific reasons to be concerned about the potential public disclosure of personal, sensitive, or classified information. First, as described above, the DOGE Team Members took extreme measures to gain access to classified information, including in SCIFs, when there was no identified need to do so and, as confirmed by J. Doe 11, at least some of them lacked security clearances. These measures included threatening to call the U.S. Marshals and then placing security personnel on administrative leave for attempting to enforce restrictions relating to classified material. Relatedly, J. Doe 2, a USAID employee on administrative leave with responsibilities relating to cybersecurity and privacy, has reported that DOGE Team Members without security clearances used their root access to USAID's systems to "grant themselves access to restricted areas requiring security clearance." J.R. 228.

**\*29** Unlike in some cases in which assurances were provided that DOGE Team Members have complied and will comply with protocols for protecting sensitive information, *see Univ. of Cal. Student Ass'n v. Carter*, No. 25-354 (RDM), 2025 WL 542586, at \*5–6 (D.D.C. Feb. 17, 2025), no such assurances have been provided here. Rather, on at least one occasion, Defendants have publicly disclosed personal information relating to one of the PSC Plaintiffs by posting information about that individual's personal services contract on a DOGE website. Although Defendants correctly note that the same information appears to already be publicly available on the Federal Procurement Data System website, with the likely greater exposure of the DOGE website as a means to inform the general public about DOGE's progress in saving taxpayer dollars, they should have redacted such PII from a personal services contract listing before posting it on DOGE's website. Furthermore, disclosure of personal information is of greater concern where some Plaintiffs, such as J. Doe 1, are or have previously been posted overseas in high-risk areas, and have expressed concern about "highly sensitive personal information" such as "foreign contacts" and "a safety pass phrase" being released from personnel and security clearance files. J.R. 224.

Under the circumstances in the present record, where the DOGE Team Members have displayed an extremely troubling lack of respect for security clearance requirements and agency rules relating to access to sensitive data, where they did not redact PII being posted on their public website, and where certain Plaintiffs whose personal information could be disclosed remain vulnerable in high-risk areas around the world, the Court finds that the potential disclosure of sensitive personal information presents another form of likely irreparable harm. *See Oak Grove Techs., LLC v. Attwa*, No. 23-cv-334-BO-RN, 2024 WL 84703, at \*2 (E.D.N.C. Jan. 8, 2024) (finding that "the risk that the security of" employees' personally identifiable information "could be breached" while that data was in defendant's possession established likely irreparable harm); *Am. Fed'n of Teachers v. Bessent*, No. DLB-25-0430, 2025 WL 582063, at \*13–14 (D. Md. Feb. 24, 2025).

For these reasons, Plaintiffs have satisfied the requirement of likely irreparable harm, and the Court need not address their remaining arguments on this issue.

## IV. Balance of the Equities and the Public Interest

The remaining requirements for a preliminary injunction are that the balance of equities tips in the plaintiffs' favor, and that an injunction is in the public interest. *See Winter*, 555 U.S. at 20, 129 S.Ct. 365. When one party is the Government, these two factors merge and are properly considered together. *Nken v. Holder*, 556 U.S. 418, 435, 129 S.Ct. 1749, 173 L.Ed.2d 550 (2009). In general, the Government and the public interest are not harmed by a preliminary injunction that temporarily enjoins activity that is likely to be unconstitutional under the present circumstances. *See Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002); *Centro Tepeyac v. Montgomery Cnty.*, 722 F.3d 184, 191 (4th Cir. 2013). Where the Court has concluded that Defendants actions have likely violated both the Appointments Clause and Separation of Powers, these factors weigh in Plaintiffs' favor. In this instance, the public interest is specifically harmed by Defendants' actions, which have usurped the authority of the public's elected representatives in Congress to make decisions on whether, when, and how to eliminate a federal government agency, and of Officers of the United States duly appointed under the Constitution to exercise the authority entrusted to them.

Beyond this broad interest, the record further demonstrate that these factors favor an injunction. Where Plaintiffs located overseas have identified serious concerns about security and safety, and the actions that likely violate the constitutional provisions at issue here have already placed them in economic jeopardy, an injunction addressing these issues would benefit them. As for Defendants' interests, as discussed below, a preliminary injunction would not be directed at USAID, which is not a party to this case, and thus would not impact its ability to act, including in relation to foreign policy interests. Rather, the restrictions would be placed only on Defendants and would be unlikely to impede their ability to conduct assigned work pursuant to the various executive orders that complies with the Constitution and federal law. The Court therefore finds that the balance of the equities and the public interest weigh in Plaintiffs' favor.

## V. Remedy

**\*30** Where all four required elements have been established, the Court will grant a preliminary injunction. Specifically, Plaintiffs request a preliminary injunction providing certain "narrow emergency relief" to Plaintiffs, consisting of barring Defendants from accessing, utilizing, and disclosing Plaintiffs' sensitive personal information outside of USAID, barring them from destroying their personal property left in offices to which they have lost access, and requiring them to

"reinstate access to email, payment, security notification, and other systems for all USAID current employees and PSCs," including restoring emails deleted when access was removed. Mot. at 29–30. More broadly, Plaintiffs seek a preliminary injunction:

> Enjoining Defendants from "[i]ssuing, implementing, enforcing, or otherwise giving effect to terminations, suspensions, or stop-work orders" in connection with any contracts, grants, ... or other foreign assistance awards in existence as of January 19, 2025," similar to the relief granted in [the *AVAC* TRO] and clarifying that the relief extends to USAID PSCs.

> ***

> Setting aside as unlawful any actions undertaken or directed by Defendants in connection with USAID.

> Enjoining Defendants from undertaking or directing any further action in connection with USAID unless and until Defendant Musk is properly appointed pursuant to the Appointments Clause and provided that such action conforms with the Constitutional Separation of Powers and federal statutes, including the Foreign Affairs Reform and Restructuring Act of 1998 and the Further Consolidated Appropriations Act of 2024.

> Enjoining Defendants from undertaking or directing any further action in connection with USAID that exceeds DOGE's stated mission of "modernizing Federal technology and software," pursuant to Executive Order 14158, unless and until Defendant Musk is properly appointed pursuant to the Appointments Clause and provided that such action conforms with the Constitutional Separation of Powers and applicable federal statutes.

*Id.*

As to the terms of the injunction, "the traditional function of a preliminary injunction" is to "maintain the status quo until after a trial and final judgment." *Pierce v. N.C. State Bd. of Elections*, 97 F.4th 194, 209 (4th Cir. 2024). "Crafting a preliminary injunction is an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents." *Roe*, 947 F.3d at 231 (quoting *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 579, 137 S.Ct. 2080, 198 L.Ed.2d 643 (2017)). In considering the equities, a court should consider the "concrete burdens that would fall on the party seeking the injunction" while ensuring that the injunction is "no more burdensome to the defendant than necessary to provide

complete relief to the plaintiffs." *Id.* (citations omitted). A court should also "mold its decree to meet the exigencies of the particular case" and "pay particular regard for the public consequences." *Id.*

With these principles in mind, the Court will grant some but not all of the relief requested. The Court will grant most of the "narrow emergency relief" requested by Plaintiffs. Specifically, to address the ongoing security and privacy concerns, and to mitigate the short-term impact on Plaintiffs who have been adversely impacted by the likely unconstitutional shutdown activities of Defendants, it will require DOGE Team Members, who have total control of the USAID computer systems, to reinstate access to email, payments, security notifications, and other electronic systems, including restoring deleted emails, for current USAID employees and PSCs. Where DOGE Team Members are government employees and it is unclear to what extent they need access to particular information for specific agency needs, the Court will not enjoin Defendants from accessing any particular personal or sensitive information of Plaintiffs or others, but it will enjoin Defendants from any disclosure outside the agency of PII or other personal information of USAID employees or PSCs, including but not limited to the posting of unredacted PII of PSCs on the DOGE website. Any legally required disclosures of such information outside the agency may be executed by USAID personnel unaffiliated with Defendants. At this time, where USAID personnel were permitted to reenter USAID headquarters to retrieve personal belongings, the request relating to that issue appears to be moot.

**\*31** Although Defendants assert that the preliminary injunction should apply only to Plaintiffs, where the parties have been unable to identify a means by which individualized relief could be provided without jeopardizing Plaintiffs' anonymity, and the record already contains multiple examples of USAID personnel who were placed on administrative leave or otherwise sanctioned for objecting to Defendants' actions, the Court finds that applying these requirements to all current USAID employees and PSCs, including those on administrative leave, is necessary to provide full relief to Plaintiffs. While these steps impose some limited burdens on Defendants, they are warranted in light of the benefit to Plaintiffs.

As for the broader requested relief, the Court finds Plaintiffs' proposed terms overbroad and too general and non-specific to provide adequate notice of what conduct is enjoined. The

Court will address the issues identified in those requests through narrower, more specific provisions. Although the mass personnel and contract terminations are part of the ongoing dismantling of USAID that likely violates the constitutional principle of Separation of Powers, the Court will not categorically enjoin them because while Defendants may have participated in them, the record presently supports the conclusion that USAID either approved or ratified those decisions, so such relief would effectively enjoin USAID. Such an injunction is not warranted where USAID is not a party to this case and thus was not on notice of the need to contest such an injunction, Plaintiffs have effectively taken the position that USAID is not acting in concert with Defendants but instead has frequently been at odds with Defendants, and Plaintiffs have not even requested injunctive relief against USAID.

However, in relation to the Separation of Powers claim, the Court will enjoin Defendants from taking any actions in relation to additional terminations or placements on administrative leave of USAID personnel; terminations of USAID contracts or grants; closures or shutdowns of USAID buildings, bureaus, offices; or permanent shutdowns or terminations of USAID information technology systems, including permanent deletions of the contents of the USAID website or collections of USAID electronic records. Such restrictions are warranted in that where Defendants appear to have been primarily responsible for the rush to shut down USAID, the restrictions will assist in maintaining the status quo so as to delay a premature, final shutdown of USAID, which would adversely impact Plaintiffs by resulting in final terminations that would be particularly damaging in light of the reputational harms discussed above. The impact on Defendants would be limited because the restrictions do not bar DOGE Team Members from engaging in USAID activities that are separate and distinct from these activities. The impact on the public interest is also limited because the injunction does not prevent USAID from engaging in lawful activities in these categories directly, including those necessary to effectuate foreign policy interests, and there is no reason to believe that it cannot do so without the assistance of Defendants.

In relation to the likely Appointments Clause violation, to maintain the status quo and prevent additional potential violations during the pendency of the case, the Court will enjoin Defendants from engaging in any actions relating to USAID without the express authorization of a USAID official with legal authority to take or approve the action. While this provision may cover activity not specifically subject to the Appointments Clause, its breadth is necessary to provide an objective standard that can be fairly understood and applied, and it creates no undue burden on Defendants in light of their steadfast position that their role is purely advisory.

**\*32** As for the specific likely violation, the typical remedy after a final determination on the merits is to void the decision made by the unauthorized official, which in this instance would result in the reopening of USAID headquarters. *See Lucia*, 585 U.S. at 251, 138 S.Ct. 2044. Where the likely unauthorized closure has materially advanced the unauthorized elimination of USAID that will have detrimental impacts on both Plaintiffs and the public interest, and where additional delay will likely prevent the Court from granting full relief after a final resolution on the merits, the Court will require Defendants, within 14 days, to secure and submit a written agreement among all necessary parties that ensures that USAID will be able to reoccupy USAID headquarters at its original location in the event of a final ruling in favor of Plaintiffs. In light of Defendants' demonstrated ability to act rapidly across the Executive Branch, the Court finds that the burden of this requirement on Defendants is reasonable. However, recognizing that an Appointments Clause violation may be cured by a ratification of the decision by a duly appointed Officer, the Court will stay this requirement if Defendants secure and submit, within 14 days, a signed ratification of the decision to permanently close USAID headquarters from the Acting Administrator of USAID or another Officer of the United States with authority to do so on behalf of USAID. *See Jooce*, 981 F.3d at 28.

As to Defendants' specific requests in the event of a preliminary injunction, the Court will not consolidate the preliminary injunction motion with a final determination on the merits because factual disputes remain that will require discovery before a final decision on the merits can be made. Based on the Court's findings of Plaintiffs' likelihood of success on the merits, the likely irreparable harm to Plaintiffs, and the public interest, and where the Court does not find Defendants' will be unduly burdened by the terms of the injunction to be issued, the Court will not stay the injunction pending appeal or the filing of a notice of appeal. *See Nken*, 556 U.S. at 434, 129 S.Ct. 1749. Pursuant to Federal Rule of Civil Procedure 65(c), the Court will require the posting of only a limited bond where there has been no showing that Defendants will necessarily have to expend materially significant resources in order to comply with the injunction.

**CONCLUSION**

For the foregoing reasons, the Court finds that Defendants' actions taken to shut down USAID on an accelerated basis, including its apparent decision to permanently close USAID headquarters without the approval of a duly appointed USAID Officer, likely violated the United States Constitution in multiple ways, and that these actions harmed not only Plaintiffs, but also the public interest, because they deprived the public's elected representatives in Congress of their constitutional authority to decide whether, when, and how to close down an agency created by Congress.

Accordingly, the Motion for a Preliminary Injunction will be GRANTED IN PART and DENIED IN PART. The Motion will be granted in that the Court will issue the accompanying Preliminary Injunction. The Motion will be otherwise denied. A separate Order shall issue.

**PRELIMINARY INJUNCTION**

For the reasons set forth in the accompanying Memorandum Opinion, which is incorporated by reference, it is hereby ORDERED that:

1. For purposes of this Order, "Defendants" refers to Elon Musk, in his official capacity; the United States DOGE Service; the Department of Government Efficiency; and their officers, agents, servants, employees, and attorneys. The term shall also include all individuals who at any time from January 20, 2025 through the pendency of this Preliminary Injunction have been designated as, or have served in the role as, a DOGE Team Lead or DOGE Team Member pursuant to Executive Order 14,158 for purposes of any activities relating to the United States Agency for International Development ("USAID"), regardless of the formal personnel status of that individual.

2. Defendants are ENJOINED as follows:

   a. Defendants shall reinstate access to email, payment, security notification, and all other electronic systems, including restoring deleted emails, for all current USAID employees and personal services contractors ("PSCs"), whether in active status or on administrative leave, and shall provide written confirmation to the Court that this requirement has been satisfied within **7 days** of the date of this Order.

   **\*33**  b. Defendants shall not disclose outside of USAID any personally identifiable information ("PII"), other personal information, or information contained in an individual's personnel file, security clearance file, or PSC contract file relating to any current or former USAID employee or PSC, including but not limited to the posting of unredacted PII of PSCs on the DOGE website.

   c. Defendants shall not take any action, or engage in any work, relating to the shutdown of USAID, defined for present purposes as: placement of employees on administrative leave, reductions-in-force, employee terminations, or contract terminations relating to any USAID employees or PSCs; terminations of USAID contracts or grants; closures of USAID buildings, bureaus, or offices; and permanent shutdowns or terminations of any USAID information technology systems, including but not limited to permanent deletions of the contents of the USAID website or collections of USAID electronic records.

   d. Defendants shall not take any other actions relating to USAID without the express authorization of a USAID official with legal authority to take or approve the action.

   e. Within **14 days** of the date of this Order, Defendants shall secure and submit to the Court a written agreement among all necessary parties that ensures that USAID will be able to reoccupy USAID headquarters at the Ronald Reagan Building in Washington, D.C. in the event of a final ruling in favor of Plaintiffs. This requirement will be stayed if, within **14 days** of the date of this Order, Defendants secure and submit to the Court a ratification of the decision to permanently close USAID headquarters signed by the Acting Administrator of USAID or another Officer of the United States with the authority to do so on behalf of USAID.

3. Pursuant to Federal Rule of Civil Procedure 65(c), Plaintiffs are required to post with this Court a bond of $100.

4. The Preliminary Injunction shall take effect upon posting of the bond.

2025 WL 840574

Violations of this Preliminary Injunction shall subject Defendants and all other persons bound by this Order to all applicable penalties, including contempt of court.

**All Citations**

--- F.Supp.3d ----, 2025 WL 840574

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.