**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| NATIONAL TREASURY EMPLOYEES UNION, *et al.*,<br><br>          *Plaintiffs*,<br><br>      v.<br><br>Russell VOUGHT, in his official capacity as Acting Director of the Consumer Financial Protection Bureau, *et al.*,<br>          *Defendants.* | Case No. 1:25-cv-00381-ABJ |

**BRIEF OF 203 MEMBERS OF CONGRESS AS *AMICI CURIAE* IN SUPPORT OF
PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

Douglas R. Jensen*
SHER TREMONTE LLP
90 Broad St., 23d Floor
New York, New York 10004
(202) 202-2600
djensen@shertremonte.com

Hannah Kieschnick*
PUBLIC JUSTICE
475 14th St., Ste 610
Oakland, CA
(510) 622-8150
hkieschnick@publicjustice.net

Lucia Goin (DC Bar No. 1739389)
Shelby Leighton*
PUBLIC JUSTICE
1620 L St. NW, Ste. 630
Washington, DC 20036
(202) 470-1061
(202) 797-8600
lgoin@publicjustice.net
sleighton@publicjustice.net

* Motion for *pro hac vice* admission
forthcoming

*Counsel for Amici Curiae 203 Members of Congress*

## TABLE OF CONTENTS

Table of Contents ........................................................................................................... ii

Table of Authorities........................................................................................................ iii

Interests of *Amici Curiae* ............................................................................................. 1

Introduction and Summary of Argument ...................................................................... 2

Argument ....................................................................................................................... 4

    I.   Congress exercised its constitutional authority to create the CFPB
        in response to the financial crisis of 2008........................................................... 4

    II.  Only Congress has the power to shutter the CFPB............................................. 8

    III. Shuttering the CFPB would leave consumers and businesses
        exposed and many financial Institutions unregulated....................................... 12

    IV. Although other federal agencies and states play an important role in protecting
        consumers, they would not fill the regulatory gap left by a dismantled CFPB. ............... 20

Conclusion ..................................................................................................................... 25

Certificate of Compliance ..............................................................................................

Appendix.........................................................................................................................

# TABLE OF AUTHORITIES

**Cases**

*Beneficial Nat'l Bank v. Anderson*,
  539 U.S. 1 (2003)................................................................................................ 23

*Cantero v. Bank of Am.*,
  602 U.S. 205 (2024)........................................................................................... 23

*CFPB v. Community Fin. Servs. Ass'n of Am., Ltd.*,
  601 U.S. 416 (2024)........................................................................................... 10

*Clinton v. City of New York*,
  524 U.S. 417 (1998)............................................................................................. 9

*Easton v. Iowa*,
  188 U.S. 220 (1903)........................................................................................... 23

*Helvering v. Or. Mut. Life Ins. Co.*,
  311 U.S. 267 (1940)............................................................................................. 9

*INS v. Chadha*,
  462 U.S. 919 (1983)............................................................................................. 9

*Kendall v. U.S. ex rel. Stokes*,
  37 U.S. (12 Pet.) 524 (1838)................................................................................ 9

*Medellin v. Texas*,
  552 U.S. 491 (2008)............................................................................................. 9

*Schooley v. Option One Mortg. Corp.*,
  No. 23-12341, 2024 WL 3440178 (11th Cir. July 17, 2024)............................. 24

*Seila Law LLC v. CFPB*,
  591 U.S. 197 (2020)........................................................................... 4, 6, 10, 20

*Youngstown Sheet & Tube Co. v. Sawyer*,
  343 U.S. 579 (1952)....................................................................................... 9, 10

**Statutes and Regulations**

12 C.F.R. § 1026 ................................................................................................. 16

12 C.F.R. § 1026.43 ............................................................................................ 16

5 U.S.C. § 501...................................................................................................... 19

5 U.S.C. § 987...................................................................................................... 18

12 U.S.C. § 5412 ................................................................................................................11

12 U.S.C. § 5452 .................................................................................................................. 6

12 U.S.C. § 5493 ................................................................................................ 6, 7, 17, 19

12 U.S.C. § 5496 .................................................................................................... 6, 7, 10

12 U.S.C. § 5512 .................................................................................................... 6, 7

12 U.S.C. § 5514 ..............................................................................................7, 11, 22

12 U.S.C. § 5515 ..............................................................................................7, 11, 22

12 U.S.C. § 5531 ................................................................................................................ 22

12 U.S.C. § 5534 ........................................................................................................... 3, 7

12 U.S.C. § 5552 ................................................................................................................ 23

12 U.S.C. § 5581 .................................................................................................................. 6

15 U.S.C. § 1639c .............................................................................................................. 16

16 U.S.C. § 1640 ................................................................................................................ 16

5 U.S.C. § 904 .................................................................................................................... 10

Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010,
    Pub. L. No. 111-203, 124 Stat. 1376 ................................................................ *passim*

Equal Credit Opportunity Act, 15 U.S.C. § 1691 ...................................................... 18

Home Mortgage Disclosure Act, 12 U.S.C. § 2801 .................................................. 17

Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135 ...................11, 12

Interstate Commerce Commission Termination Act of 1995,
    Pub. L. No. 104-88, 109 Stat. 803 .................................................................... 12

National Defense Authorization Act for Fiscal Year 2022,
    Pub. L. No. 117-81, 135 Stat. 1541 (2021) .................................................... 10

Office of Thrift Supervision Integration; Dodd-Frank Act Implementation,
    76 Fed. Reg. 30557 (proposed May 26, 2011) ........................................................ 23

**Legislative Materials**

H.R. 3118, 114th Cong. (2015) ...................................................................................... 10

H.R. Rep. No. 111-367 (2009) ................................................................................ 5

S. Rep. No. 111-176 (2010) ............................................................................. *passim*

**Secondary Sources**

Bobby Conner, et al., *The CFPB is working to reinforce the foundation of a fair, nondiscriminatory and competitive mortgage market*, Consumer Fin. Prot. Bureau (June 28, 2024), https://perma.cc/9VUE-EYV9 ...................................................... 17

Brief of Financial Regulation Scholars as *Amici Curiae*, *Consumer Fin. Prot. Bureau v. Cmty. Fin. Servs. Ass'n of Am.*, 601 U.S. 416 (2024) (No. 22-448) ........................................ 17

Brief of Mortgage Bankers Association, et al. as *Amici Curiae* in Support of Neither Party, *Consumer Fin. Prot. Bureau v. Cmty. Fin. Servs. Ass'n of Am.*, 601 U.S. 416 (2024) (No. 22-448)................................................................................................................. 16

*CFPB Bans Navient from Federal Student Loan Servicing and Orders the Company to Pay $120 Million for Wide-Ranging Student Lending Failures*, Consumer Fin. Prot. Bureau (Sept. 12, 2024), https://perma.cc/X4DK-U5N5 ..................... 15

*CFPB Orders Bank of America to Pay $12 Million for Reporting False Mortgage Data*, Consumer Fin. Prot. Bureau (Nov. 28, 2023), https://perma.cc/GRS2-5MW9 ....................... 17

*CFPB RIP – Elon Musk's Promise to Delete the Agency will Hurt Working Class Families*, U.S. House Comm. on Fin. Servs., Democrats (Feb. 8, 2025), https://perma.cc/R5QB-F28J .................................................................................. 9

*CFPB Sues JPMorgan Chase, Bank of America, and Wells Fargo for Allowing Fraud to Fester on Zelle*, Consumer Fin. Prot. Bureau (Dec. 20, 2024), https://perma.cc/6YSQ-PYDQ .............................................................................. 16

*CFPB Takes Action Against Bank of American for Illegally Charging Junk Fees, Withholding Credit Card Rewards, and Opening Fake Accounts*, Consumer Fin. Prot. Bureau (July 11, 2023), https://perma.cc/4UEA-V6TD ................................................. 14

*CFPB Takes Action Against Draper & Kramer Mortgage for Discriminatory Mortgage Lending Practices*, Consumer Fin. Prot. Bureau (Jan. 17, 2025), https://perma.cc/VH6N-92DJ ............................................................................... 18

*CFPB to distribute nearly $6 million to consumers harmed by predatory loans to veterans*, Consumer Fin. Prot. Bureau (Jan. 2, 2024), https://perma.cc/QJ7F-NLGV ............................ 19

*CFPB to Supervise Credit Reporting*, Consumer Fin. Prot. Bureau (July 16, 2012), https://perma.cc/V8VB-EBQQ ............................................................................... 7

Christine Chen Zinner, *Predatory Fintechs Score as Trump-Musk CFPB Caves on Lawsuit*, Ams. for Fin. Reform (Feb. 22, 2025), https://perma.cc/67K5-EX2X ....................................... 8

Cong. Rsch. Serv., RL30876, *The President's Reorganization Authority: Review and Analysis* (2001) ................................................................. 10

Consumer Fin. Prot. Bureau, *Fair Lending Report of the Consumer Financial Protection Bureau* (June 2024) ........................................................ 18

Consumer Fin. Prot. Bureau, *Supervisory Highlights, Mortgage Servicing Edition: Issue 33 (Spring 2024)* (2024) ........................................................ 14

Consumer Fin. Prot. Bureau, *Supervisory Highlights: Issue 37 (Winter 2024)* (2024) ............... 14

Consumer Fin. Prot. Bureau, *Supervisory Highlights: Special Edition Student Lending, Issue 36 (Winter 2024)* (2024) ..................................................... 14

Douglas Gillison, *Consumer protection agency neutralized by Trump's new chief*, REUTERS (Feb. 10, 2025), https://perma.cc/W8NX-GE9X ...................................... 15

Douglas Gillison, *Trump admin drops 5 consumer watchdog cases, including Capital One*, REUTERS (Feb. 27, 2025) ................................................. 4, 8, 13, 15

Fed. Deposit Ins. Corp., *Crisis and Response: an FDIC History 2008-2013* (2018) ................... 5

Fin. Crisis Inquiry Comm'n, *The Financial Crisis Inquiry Report* (2011) ............................... 4, 5

Henry B. Hogue, Cong. Rsch. Serv., R47897, *Abolishing a Federal Agency: The Interstate Commerce Commission* (Jan. 10, 2024) ........................................... 12

*Institutions Subject to Supervisory Authority*, Consumer Fin. Prot. Bureau, https://perma.cc/CR4W-ALZ2 (last visited Feb. 26, 2025) ..................................... 22

Joey Garrison, *Thousands of CFPB Complaints Unanswered after Trump CFPB Purge*, USA TODAY (Feb. 25, 2025), https://perma.cc/2ZVG-2CNX ...................................... 3

Letter from Mick Mulvaney, Acting Director, Consumer Financial Protection Bureau, to Jerome Powell, Chair, Board of Governors of the Federal Reserve System (Mar. 23, 2018) (on file with the Consumer Financial Protection Bureau), https://perma.cc/GR6E-2YRD ............................................................ 11

Letter from Nat'l Consumer Law Center et al., to Michael J. Hsu, Acting Comptroller, Officer of the Comptroller of the Currency (July 19, 2024) (on file with the Nat'l Consumer Law Center), https://perma.cc/7VA5-VNDP ..................... 23

*OCC Ignores Dodd-Frank Act's Repeal of 2004 Preemption Regulations*, Nat'l Consumer Law Center (2011), https://perma.cc/W6W4-MBYC ................................... 23

Office of Servicemember Affairs, *The CFPB is protecting the military community and providing relief*, Consumer Fin. Prot. Bureau (May 23, 2024), https://perma.cc/EH8F-TD7C ............................................................ 19

President Donald Trump, Remarks at Future Investment Initiative Summit
(Feb. 19, 2024), https://perma.cc/T8Z2-L5C9 ............................................................ 2

Rick McKinney, *Dodd-Frank Wall Street Reform and Consumer Financial Protection Act:
A Brief Legislative History with Links, Reports and Summaries*, Law Librs.' Soc'y
of Washington, DC (Oct. 13, 2017), https://perma.cc/8FPZ-9FC7 ............................... 5

Student Borrower Prot. Ctr. & Consumer Fed. of Am., *Memorandum re: Outstanding
CFPB Enforcement Actions* (Feb. 19, 2025).................................................... *passim*

*The CFPB*, Consumer Fin. Prot. Bureau (last updated Dec. 3, 2024),
https://perma.cc/MDD4-CQP6 ................................................................................... 12

*Trump confirms goal to shutter CFPB*, ABA BANKING JOURNAL (Feb. 11, 2025),
https://perma.cc/UMX7-47JW ...................................................................................... 2

U.S. Dep't of Def., *Report on the Military Lending Act and the Effects of High
Interest Rates on Readiness* (2021).............................................................................. 19

**Administrative Proceedings**

*Bank of America, N.A.*, CFPB No. 2023-CFPB-0007 (July 11, 2023) ........................... 14

*TMX Finance LLC*, CFPB No. 2023-CFPB-1 (Feb. 23, 2023) .................................... 19

*Wells Fargo Bank, N.A.*, CFPB No. 2016-CFPB-0015 (Sept. 8, 2016)......................... 14

## INTERESTS OF *AMICI CURIAE*[1]

Proposed *amici* are 203 members of Congress who are well-acquainted with the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 (Dodd-Frank), Pub. L. No. 111-203, 124 Stat. 1376, and the regulatory framework it established to protect consumers in the U.S. financial marketplace. They include members who sponsored Dodd-Frank, participated in drafting it, serve or served on committees with jurisdiction over the federal financial regulatory agencies and the banking industry, and currently serve in the leadership or served in the leadership when Dodd-Frank was passed. They are thus familiar with the essential role that the Consumer Financial Protection Bureau (CFPB or the Bureau) plays in Dodd-Frank's framework. Significantly, based on their experiences, *amici* know that Congress created the CFPB as a new agency with consolidated consumer financial protection authority and gave the Bureau extensive—and in many cases exclusive—mandatory responsibilities and obligations to regulate the very financial institutions whose conduct led to the 2008 financial crisis. Defendants' recent actions toward the CFPB, including implementing sweeping stop-work orders with plans to arbitrarily fire most employees, represent blatant disregard for Congress's role and express directives in clear violation of Dodd-Frank and the Constitution's mandate that the laws be faithfully executed. Not only do those efforts violate our law and constitutional structure, they also threaten the consumers the CFPB was created to protect—and has protected since its creation a decade and a half ago. *Amici* thus have a substantial interest in this case.

A full list of *amici* appears in the Appendix.

---

[1] Pursuant to LcR7(o) and FRAP 29(a)(4)(E), no party's counsel authored this brief, in whole or in part. No party or party's counsel contributed money that was intended to fund preparing or submitting this brief. No person other than *amici curiae* or their counsel contributed money that was intended to fund preparing or submitting this brief.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The CFPB was born out of the most severe economic and financial crisis since the Great Depression. Congress thoroughly investigated the root causes of the 2008 crisis and determined that regulatory failures were largely to blame. Because responsibility for consumer financial protection was dispersed across federal agencies, consumers were, at best, a secondary consideration for regulators. After an exhaustive legislative process, Congress passed the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 (Dodd-Frank), Pub. L. No. 111-203, 124 Stat. 1376. One of the greatest achievements of that bipartisan effort was to consolidate consumer financial protection in a single agency, the CFPB, that would be a watchdog for consumers, armed with the legal authority necessary to prevent another financial meltdown.

President Trump and Defendants seek to undo this progress by Executive fiat, leaving consumers and financial markets unprotected. There is no doubt as to their intent: It is to "shut down" the CFPB.[2] Since his installation as Acting Director of the CFPB, Defendant Vought has taken swift action to achieve that goal and dismantle the Bureau in its entirety. Chief among those actions is his sweeping stop-work order suspending Bureau operations. *See* ECF 23-4.

Clearly these actions are not the normal personnel decisions that come with any government transition. *Contra* Defs.' Opp., ECF 31, at 11, 13. They are a brazen violation of both Dodd-Frank and the Constitution's fundamental principle of separation of powers. Congress exercised its power under Article I of the Constitution to legislate the creation of the CFPB and to require it to perform certain statutory functions. Congress vested the Bureau with the authority to interpret and enforce consumer protection laws, to supervise and regulate the most consequential

---

[2] President Donald Trump, Remarks at Future Investment Initiative Summit (Feb. 19, 2024), https://perma.cc/T8Z2-L5C9; *see also Trump confirms goal to shutter CFPB*, ABA BANKING JOURNAL (Feb. 11, 2025), https://perma.cc/UMX7-47JW.

bank and nonbank financial institutions in the country, to receive and respond to consumer complaints, and more. Defendants cannot unilaterally undo Congress's reasoned determination that consumers need a watchdog. Only Congress can do that.

The President, of course, may disagree with laws enacted by Congress. When that happens, the remedy is to participate in the political process and make a policy proposal to Congress, as Congress is the only branch of government empowered to make laws and, as relevant here, enact legislation that would dismantle a statutorily created agency. This nation's history contains many examples of the branches working together to do just that.

Defendants' stop-work order will have severe consequences for the American people. The CFPB has been a resounding success. It has delivered more than $21 billion back to consumers who have been defrauded by entities like large banks, loan servicers, debt collectors, and payday lenders, some of which were previously not subject to federal supervision. Among the many ways the CFPB has protected consumers, it has confronted the unlawful practices of some of the country's largest financial institutions in lawsuits and enforcement actions, provided certainty and guidance to financial institutions of all sizes, enforced protections against discrimination in consumer financial markets, and halted predatory targeting of servicemembers and their families.

Defendants have now stopped the Bureau's congressionally mandated activities in their tracks. For example, the CFPB is statutorily required to timely respond to consumer complaints, *see* 12 U.S.C. § 5534(a), yet processing rates for these complaints have plummeted since Defendants' orders.[3] What is more, Defendants have instructed Bureau staff to stop working on pending litigation, abruptly dismissing or effectively suspending nearly forty enforcement actions

---

[3] *See* Joey Garrison, *Thousands of CFPB Complaints Unanswered after Trump CFPB Purge*, USA Today (Feb. 25, 2025), https://perma.cc/2ZVG-2CNX.

against a range of bank and nonbank entities,[4] thereby depriving consumers of money they are due and sending a message that risky and unlawful conduct will now go unchecked. If Defendants are successful in their attacks on the CFPB, they will have destroyed the framework Congress created for safeguarding the finances of millions of consumers. As a result, entire swaths of the market will go unprotected from the type of predatory conduct that caused the 2008 crisis because no other federal or state agency has the necessary authority to fill many of the regulatory gaps the Bureau's absence would leave. *Amici* respectfully urge this Court to grant Plaintiffs' motion for a preliminary injunction.

## ARGUMENT

### I.    Congress exercised its constitutional authority to create the CFPB in response to the financial crisis of 2008.

Congress enacted Dodd-Frank in response to the "worst financial meltdown since the Great Depression." Fin. Crisis Inquiry Comm'n, *The Financial Crisis Inquiry Report* 3 (2011) (hereinafter, *Financial Crisis Inquiry Report*). The 2008 crisis "shattered" lives, "shuttered" businesses, "evaporated" savings and wealth, and caused millions of families to lose their homes. S. Rep. No. 111-176, at 39 (2010). More than twenty-six million Americans found themselves out of work or unable to find full-time work, and more than 4 million families lost their homes to foreclosure. *Financial Crisis Inquiry Report*, *supra*, at *xv*; *see also Seila Law LLC v. CFPB*, 591 U.S. 197, 205 (2020) (The 2008 crisis "wiped out over $10 trillion in American household wealth and cost millions of Americans their jobs, their retirements, and their homes."). The crisis had profound consequences for institutions too: Between 2008 and 2013, almost 500 banks failed at a

---

[4] *See* Douglas Gillison, *Trump admin drops 5 consumer watchdog cases, including Capital One*, Reuters (Feb. 27, 2025), https://perma.cc/9NH5-ER7D; Student Borrower Prot. Ctr. & Consumer Fed. of Am., *Memorandum re: Outstanding CFPB Enforcement Actions* (Feb. 19, 2025) (hereinafter, *SBPC/CFA Memo*).

cost of approximately $73 billion to the Deposit Insurance Fund, which is funded by the banking industry.[5] Most of the failed institutions were community banks, located in parts of the country where the subprime mortgage crisis and the recession hit the hardest.[6] At the height of the crisis in 2008, investors and creditors lost confidence in markets, credit markets froze, and the government was required to intervene on an unprecedented scale.[7]

Congress determined that this catastrophe was caused in part by a "spectacular failure" of regulators "to protect average American" consumers. *See* S. Rep. No. 111-176, at 15. Before Dodd-Frank, regulatory authority was dispersed across seven agencies with different jurisdictions and regulatory approaches, *id.* at 10, resulting in "finger pointing among regulators and inaction when problems with consumer products and services arose," *id.* at 168; *see also Financial Crisis Inquiry Report*, *supra*, at *xviii* (emphasizing that federal regulators "had ample power" but "chose not to use it"). Because consumer financial protection was no agency's "primary mission," S. Rep. No. 111-176, at 10, it "fail[ed] to get the attention or focus it need[ed]." *Id.*; *see also id.* (describing the dispersed regulatory system as "too fragmented to be effective"); H.R. Rep. No. 111-367, pt. 1, at 91 (2009) (identifying the "disparate regulatory system" as contributing to the financial crisis).

To remedy these failures and prevent a similar crisis in the future, Congress took decisive bipartisan action. After an exhaustive legislative process involving more than 100 hearings, testimony from more than 560 witnesses, and proceedings that filled more than 12,000 transcript pages, Congress passed Dodd-Frank.[8] To ensure that consumer financial protections would receive

---

[5] Fed. Deposit Ins. Corp., *Crisis and Response: an FDIC History 2008-2013* xiii (2018).

[6] *Id.* at xiv.

[7] *Id.* at xvi.

[8] *See* S. Rep. No. 111-176, at 44-46 (detailing this extensive legislative process); Rick McKinney, *Dodd-Frank Wall Street Reform and Consumer Financial Protection Act: A Brief Legislative History with Links, Reports and Summaries*, Law Librs.' Soc'y of Washington, DC (Oct. 13, 2017), https://perma.cc/8FPZ-9FC7 (same).

undivided attention from a single agency with specialized expertise, Title X of Dodd-Frank, the Consumer Financial Protection Act (CFPA), created a new federal agency—the CFPB. The Bureau's sole mission was to protect Americans from harmful practices in the consumer finance industry. Congress therefore "end[ed] the fragmentation of the current system," S. Rep. No. 111-176, at 11, by transferring to the CFPB the previous "consumer financial protection functions" of other regulators like the Board of Governors of the Federal Reserve System, the Office of the Comptroller of the Currency (OCC), and the Office of Thrift Supervision (OTS), 12 U.S.C. § 5581, and endowing the CFPB with new responsibilities necessary to protect consumers and promote stability in consumer financial markets, *Seila Law*, 591 US at 206.

Congress conferred on the CFPB mandatory responsibilities, including to create and staff a number of offices that must, among other things, develop educational materials to improve consumer financial literacy, 12 U.S.C. § 5493(d), particularly in specified populations like servicemembers and older Americans, *id.* §§ 5493(e), (g); coordinate with other federal agencies, *id.* §§ 5493(e)(1)(c), (g)(3)(e); and report to Congress on their initiatives, *id.* § 5496. Congress also required the CFPB to create an Office of Minority and Women Inclusion, which is legally required to, among other things, create standards for equal opportunity within the CFPB and ensure participation of minority- and women-owned businesses in the CFPB's programs and contracts. *See generally id.* § 5452.

In addition, Congress gave the Bureau rulemaking, supervision, and enforcement responsibilities. As to rulemaking, Congress delegated to the CFPB "exclusive rulemaking authority" under all federal consumer financial protection laws, *id.* §§ 5512(4)(A), 5581(a)(1), with some limited exceptions, *see, e.g., id.* § 5581(b)(5)(E). To inform that rulemaking authority and Congress's own legislative authority, Congress mandated that the CFPB "shall monitor for

6

risks to consumers in the offering or provision of consumer financial products or services" and issue reports on those emerging risks. *Id.* §§ 5512(c)(1), (c)(3).

As to supervision, Congress gave the CFPB "exclusive" power to examine and require reports from the largest depository institutions regarding their compliance with consumer financial protection laws: national banks, thrifts, and credit unions with assets exceeding $10 billion (collectively hereinafter, banks). *Id.* §§ 5515(a)(1), (b)(1). And, based on lessons learned from the 2008 crisis, Congress made the Bureau the first, and generally the only, federal regulator to supervise many non-depository or "nonbank" financial companies, including mortgage companies, private student lenders, payday lenders, debt collectors, and credit reporting agencies. *See id.* § 5514(a)(1); S. Rep. No. 111-176, at 167; *CFPB to Supervise Credit Reporting*, Consumer Fin. Prot. Bureau (July 16, 2012), https://perma.cc/V8VB-EBQQ. Congress required the Bureau to perform its examinations of these banks and nonbanks periodically. *See* 12 U.S.C. §§ 5514(b)(1), 5515(b)(1).

Finally, as to enforcement, Congress delegated to the CFPB "primary" authority to enforce consumer financial laws against the large banks under its supervision, 12 U.S.C. § 5515(c)(1), and "exclusive" authority among other federal agencies to enforce consumer financial laws against the nonbanks under its supervision, *id.* § 5514(c)(1). To support its work, the CFPB must maintain a process for accepting and tracking consumer complaints and report to Congress on that complaint data every year. *Id.* §§ 5534(a), 5493(b)(3)(C). It must issue other regular reports too, many of which must be delivered to Congress, serving as a critical tool to update Congress about risks to consumers in financial markets and inform future legislation. *See, e.g.*, *id.* § 5496(c) (requiring reporting on problems faced by consumers in obtaining financial products and providing list of supervisory or enforcement actions taken).

In short, Congress's reasoned decision-making—made in the wake of and in response to the 2008 financial crisis—resulted in the creation of the Bureau to support and prioritize consumer financial protection through a single government agency. Congress clearly and precisely specified that it wanted the Bureau, not other federal agencies, exercising specified rulemaking, supervision, and enforcement authority. Defendants now seek to undo that statutory mandate without going through the legislative process. They cannot do so under the Constitution.

## II.        Only Congress has the power to shutter the CFPB.

President Trump and Acting Director Vought cannot unilaterally eliminate a federal agency created by Congress. Although they claim to be issuing "routine[]" directives that come at the start of any administration, Defs.' Opp., ECF 31, at 1, their actions reveal a swift and concerted effort to dismantle the CFPB. Acting Director Vought issued an expansive stop-work order, instructing CFPB employees to cease doing "any work tasks," ECF 23-4, which includes the Bureau's statutorily mandated work, such as supervising banks for compliance with consumer financial protection laws.[9] He closed and removed signs at the Bureau's headquarters. *See* ECF 14 at 11. And he arbitrarily fired employees, with potential plans to transfer others to different agencies. *See id.* at 18-19. The intent is clear. President Trump has repeatedly stated that his goal is to "shut down" the CFPB. *See supra* note 1. Highlighting President Trump and Acting Director Vought's intent to shutter the Bureau, Elon Musk, who has publicly held himself out as leading the so-called Department of Government Efficiency (DOGE) publicly posted, "RIP CFPB," on his social media

---

[9] Moreover, as of this filing, the Bureau has abruptly dismissed at least six cases and effectively suspended dozens of pending enforcement cases. *See SBPC/CFA Memo*, *supra* note 4; Gillison, *Trump admin drops 5 consumer watchdog cases, including Capital One*, *supra* note 4; Christine Chen Zinner, *Predatory Fintechs Score as Trump-Musk CFPB Caves on Lawsuit*, Ams. for Fin. Reform (Feb. 22, 2025), https://perma.cc/67K5-EX2X.

account while DOGE employees were granted access to the CFPB and the sensitive data it holds.[10] Thus, whether by taking actions that effectively end the Bureau's work or by simply refusing to continue its congressionally mandated duties, Defendants seek to do what only Congress can do: amend Dodd-Frank. The CFPB must continue to exist, in practice and in name, until Congress decides otherwise.

"The President's power, if any, to issue [an] order must stem either from an act of Congress or from the Constitution itself." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952). As to the latter, Article I vests "all legislative powers" in Congress, U.S. Const., art. I, § 1, and "no provision in the Constitution [] authorizes the President to enact, to amend, or to repeal statutes," *Clinton v. City of New York*, 524 U.S. 417, 438 (1998), including the statute creating the CFPB. That power rests with Congress, and Congress alone. *See INS v. Chadha*, 462 U.S. 919, 954 (1983) (The "repeal of statutes, no less than enactment, must conform with Art. I."); *see also Helvering v. Or. Mut. Life Ins. Co.*, 311 U.S. 267, 272 (1940) (concluding that "only Congress can take away" a particular right conferred by statute). "As Madison explained in The Federalist No. 47, under our constitutional system of checks and balances, 'the magistrate in whom the whole executive power resides cannot of himself make a law.'" *Medellin v. Texas*, 552 U.S. 491, 528 (2008). To hold otherwise "would be clothing the President with a power entirely to control the legislation of congress." *Kendall v. U.S. ex rel. Stokes*, 37 U.S. (12 Pet.) 524, 613 (1838).

Nor is there a statutory basis for Defendants' actions. There "is no statute that expressly authorizes the President" to dissolve the CFPB or transfer its congressionally mandated responsibilities to other agencies, and there is no "act of Congress from which such a power can

---

[10] *See CFPB RIP – Elon Musk's Promise to Delete the Agency will Hurt Working Class Families*, U.S. House Comm. on Fin. Servs., Democrats (Feb. 8, 2025), https://perma.cc/R5QB-F28J.

be fairly implied." *See Youngstown*, 343 U.S. at 585. Although previous laws known as Reorganization Acts delegated to Presidents the authority to restructure the Executive branch— including, under some versions of the statute, by establishing, abolishing, consolidating, or transferring the power of a department or independent agency—Congress let the last Reorganization Act lapse in 1984.[11] Now, the President lacks any general authorization from Congress to dissolve or restructure executive agencies that Congress created by statute.

Nor does Dodd-Frank itself delegate to the President the authority to dismantle the CFPB. To the contrary, the Act vests in *Congress* substantial oversight responsibility over the Bureau. Among other things, Congress receives regular reports from the agency,[12] has directed the agency to undertake rulemakings,[13] and has disapproved of certain regulations under the Congressional Review Act, 5 U.S.C. §§ 801-08.[14] Even while amending the CFPB's governing statutes from time to time, Congress has rejected efforts to eliminate the Bureau wholesale.[15] So, too, has the Supreme Court. *See CFPB v. Community Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416 (2024) (concluding that the CFPB funding mechanism was consistent with the Appropriations Clause); *Seila Law*, 591 U.S. at 208 (concluding narrowly that for-cause removal of director of CFPB circumscribed the President's ability to oversee the Executive branch, but severing the offending provision).

---

[11] *See* Cong. Rsch. Serv., RL30876, *The President's Reorganization Authority: Review and Analysis* 1, 4-9 (2001); 5 U.S.C. § 904 (1984).

[12] *See* 12 U.S.C. § 5496(a).

[13] *See, e.g.*, National Defense Authorization Act for Fiscal Year 2022, Pub. L. No. 117-81, § 6102, 135 Stat. 1541, 2383-84 (2021) (directing CFPB to issue rule related to adverse information in consumer reports resulting from human trafficking).

[14] *See* Pub. L. No. 115-74, 131 Stat. 1243 (2017) (disapproving CFPB rule related to arbitration agreements); Pub. L. No. 115-172, 132 Stat. 1290 (2018) (disapproving CFPB rule related to indirect auto lending).

[15] *See* H.R. 3118, 114th Cong. (2015) (proposed bill to "eliminate the Bureau of Consumer Financial Protection by repealing title X of the Dodd-Frank Wall Street Reform and Consumer Protection Act, commonly known as the Consumer Financial Protection Act of 2010").

Without power "from the Constitution itself" or "an act of Congress," *Youngstown*, 343 U.S. at 585—both of which are wholly lacking here—a President who disagrees with a law enacted by Congress is "limit[ed] . . . to the recommending of laws he thinks wise and the vetoing of laws he thinks bad," *id.* at 587. In other words, the President must participate in the political process and adhere to our constitutional structure, not simply ignore them. And unless and until Congress changes the laws, the President must follow them. Indeed, John Michael ("Mick") Mulvaney, the Acting Director of the CFPB during President Trump's first term, understood this. As much as he personally disagreed with the mission of the CFPB, he acknowledged in a periodic request for funding from the Federal Reserve that he was still "bound to execute the law as written," which in turn required ensuring that the Bureau had sufficient funding to carry out its legal responsibilities.[16] By contrast, Acting Director Vought's instructions flout Dodd-Frank and prevent the Bureau from performing its various statutorily mandated responsibilities, like supervising banks and nonbanks. *See* 12 U.S.C. §§ 5514(b)(1), 5515(b)(1).

In fact, America's history includes numerous examples of the branches working together to either restructure or eliminate a statutorily created agency. Dodd-Frank is one. In response to a proposal from the Obama Administration, the Act eliminated one agency, OTS, and transferred its remaining powers to other agencies within the Executive branch. *See* 12 U.S.C. § 5412(b)(2)(B)(i); S. Rep. No. 111-176, at 25-26 (describing Obama Administration's proposal to abolish OTS, which had been responsible for regulating the thrifts that accounted for 73% of failed institution assets in the 2008 crisis). Similarly, following the attacks of September 11, 2001, Congress passed the Homeland Security Act of 2002 to bring together the national security functions of disparate

---

[16] Letter from Mick Mulvaney, Acting Director, Consumer Financial Protection Bureau, to Jerome Powell, Chair, Board of Governors of the Federal Reserve System (Mar. 23, 2018) (on file with the Consumer Financial Protection Bureau), https://perma.cc/GR6E-2YRD.

agencies in the Executive branch and place them under the umbrella of the newly created Department of Homeland Security, abolishing some agencies in the process. *See* Homeland Security Act of 2002, Pub. L. No. 107, 296, §§ 441, 451(b), 471, 116 Stat. 2135, 2192, 2195-96, 2205. As a final example, Congress abolished and transferred the powers of the Interstate Commerce Commission (ICC), which had previously regulated railroad companies, after "a multi-decade process" during which "Congress and the President had been actively reconsidering the [ICC's] regulatory mission."[17] All three of these changes followed exhaustive legislative processes with significant input from the President, exemplifying how our constitutional system is intended to operate. Here, however, rather than trying to persuade Congress to exercise *its* authority to amend or repeal portions of Dodd-Frank, the President seeks to evade that well-established process with an unconstitutional power grab. That cannot stand.

### III.    Shuttering the CFPB would leave consumers and businesses exposed and many financial institutions unregulated.

The CFPB has been a resounding success. Since its creation, the Bureau has vigorously used its powers to regulate consumer financial markets, ensuring that banks and nonbank entities alike are not engaging in risky, deceptive, or unfair practices that could destabilize the market and lead to another financial meltdown. To date, the CFPB has returned more than $21 billion improperly taken from at least 205 million consumers, in addition to at least $5 billion in civil penalties made available to compensate consumers in cases where the business that took their money is insolvent.[18]

---

[17] *See* Henry B. Hogue, Cong. Rsch. Serv., R47897, *Abolishing a Federal Agency: The Interstate Commerce Commission* 2 (Jan. 10, 2024); *see also* Interstate Commerce Commission Termination Act of 1995, Pub. L. No. 104-88, 109 Stat. 803.

[18] *The CFPB*, Consumer Fin. Prot. Bureau (last updated Dec. 3, 2024), https://perma.cc/MDD4-CQP6.

A sudden halt to the CFPB's important—and mandatory—work would also be devastating for consumers, small businesses, and the country's overall financial stability. Formally or practically eliminating the CFPB—for example, through stop-work orders and a significant reduction in its workforce—would upend Dodd-Frank's framework: new and ongoing rulemaking would cease, preventing regulatory responses to evolving financial technology and markets; supervision would cease, leaving many financial institutions unmonitored and unchecked; and enforcement of many consumer financial protection laws would be limited, leaving millions of consumers with little recourse for the money they lose to unlawful financial practices. Already, the Bureau has abruptly dismissed or effectively suspended nearly forty pending enforcement actions—depriving any harmed consumers of money they are entitled to recoup and sending a message to financial institutions that their unlawful conduct will now go unchecked.[19] The effects would be felt in all corners of the markets for consumer financial products and services.

The following sections provide specific examples of the CFPB's work and the harm that will result if Defendants succeed in dismantling the Bureau.

### *Supervising Financial Institutions*

As explained in Part I, *supra*, the CFPB is the only federal agency authorized to supervise the nation's largest banks for their compliance with consumer financial protection laws. It also supervises nonbanks of all sizes in certain market segments, like mortgage companies and payday lenders, as well as larger nonbank participants in other consumer financial market segments, like credit reporting agencies, digital payment apps, and debt collectors. Congress empowered the

---

[19] *See* Gillison, *Trump admin drops 5 consumer watchdog cases, including Capital One*, *supra* note 4; *SBPC/CFA Memo*, *supra* note 4.

CFPB in this way to improve oversight of the consumer financial marketplace based on lessons learned from the 2008 financial crisis. The Bureau has taken its authority seriously.

The CFPB employs hundreds of examiners who engage in year-round supervision of these institutions to ensure compliance with consumer financial protection laws. Critically, this work has helped identify potentially unlawful practices early and remedy them before the need for enforcement arises. For example, after the CFPB identified issues with potentially illegal overdraft fees among the large banks it supervised, those institutions agreed to refund nearly $250 million to consumers.[20] As an example of the CFPB's supervision of nonbanks, the Bureau has actively monitored the mortgage industry following a period of increasing default servicing activity related to the COVID-19 pandemic[21] as well as student loan lenders and servicers.[22]

This supervision has led to enforcement actions by the Bureau against the nation's largest banks for violations of consumer protection laws. As just two examples, Wells Fargo agreed to a $100 million civil penalty for opening deposit and credit accounts in consumers' names without their knowledge,[23] and Bank of America agreed to pay $250 million for opening fake credit card accounts without authorization, illegally charging repeated "insufficient funds" fees for the same transaction, and withholding rewards promised to consumers.[24] In the nonbank realm, an enforcement action against student-loan servicer Navient Corporation for among other things,

---

[20] Consumer Fin. Prot. Bureau, *Supervisory Highlights: Issue 37 (Winter 2024)* 5 (2024).

[21] Consumer Fin. Prot. Bureau, *Supervisory Highlights, Mortgage Servicing Edition: Issue 33 (Spring 2024)* 1 (2024).

[22] Consumer Fin. Prot. Bureau, *Supervisory Highlights: Special Edition Student Lending, Issue 36 (Winter 2024)* (2024).

[23] *Wells Fargo Bank, N.A.*, CFPB No. 2016-CFPB-0015 (Sept. 8, 2016) (consent order).

[24] *Bank of America, N.A.*, CFPB No. 2023-CFPB-0007 (July 11, 2023) (consent order); *CFPB Takes Action Against Bank of American for Illegally Charging Junk Fees, Withholding Credit Card Rewards, and Opening Fake Accounts*, Consumer Fin. Prot. Bureau (July 11, 2023), https://perma.cc/4UEA-V6TD.

botching payment processing and misleading borrowers about their repayment plans, resulted in $100 million paid back to consumers, a $20 million civil penalty fine, and a permanent ban on Navient serving federal student loans.[25]

Defendants have suspended this vital work, directing CFPB employees to cease "all supervision and examination activity"[26] and, apparently, enforcement activity too.[27] As of February 27, 2025, the Bureau has abruptly dismissed at least six actions: one against Capital One for allegedly misleading millions of consumers about interest rates on saving accounts that cost them more than $2 billion; one against a student loan servicer for allegedly collecting on student loans discharged in bankruptcy; one against a mortgage lender for allegedly steering borrowers toward unaffordable mortgages to buy manufactured homes; one against one of the largest mortgage lenders in the country for allegedly taking illegal kickbacks; one against an installment lender for using "loan churning" to generate millions in fees and added costs; and one against an online lending platform for allegedly deceiving borrowers about fees on its loans that cost borrowers more than $20 million.[28] Moreover, the Bureau does not appear to have taken steps to settle or otherwise obtain consumer relief in other pending enforcement actions, such as a pending (as of February 27, 2025) action against JPMorgan Chase, Bank of America, and Wells Fargo for allegedly allowing fraud to proliferate on their payment app, Zelle, costing consumers over $870

---

[25] *CFPB Bans Navient from Federal Student Loan Servicing and Orders the Company to Pay $120 Million for Wide-Ranging Student Lending Failures*, Consumer Fin. Prot. Bureau (Sept. 12, 2024), https://perma.cc/X4DK-U5N5.

[26] Douglas Gillison, *Consumer protection agency neutralized by Trump's new chief*, Reuters (Feb. 10, 2025), https://perma.cc/W8NX-GE9X.

[27] *SBPC/CFA Memo*, *supra* note 3.

[28] Gillison, *Trump admin drops 5 consumer watchdog cases, including Capital One*, *supra* note 3.

million.[29] Without the Bureau serving as a watchdog, financial institutions will be emboldened to engage in unfair, deceptive, and abusive practices in violation of consumer protection laws—hurting consumers, placing smaller banks that remain subject to regulation by other agencies at a competitive disadvantage, and creating the kind of market instability that Dodd-Frank was designed to prevent.

***Minimizing Risk in Consumer Financial Markets***

The CFPB also plays a key role in managing lenders' legal risks so that consumers can access necessary credit, including mortgages, credit cards, and auto loans. The Bureau does this by issuing rules creating "safe harbors" that allow companies to avoid legal liability if they meet certain requirements. Under the Truth in Lending Act (TILA), for example, creditors face civil legal liability if they make residential mortgage loans without a good faith determination that the consumer can pay the loan. *See* 15 U.S.C. §§ 1639c(a), 1640(a). Without the Bureau's guidance, that legal exposure risked chilling lenders into issuing fewer mortgages, potentially "dry[ing] up the supply of financing for the housing market and hurting consumers."[30] The CFPB, however, has promulgated a safe-harbor rule under which "qualified mortgages"—such as those where the loan's annual percentage rate is at or below a threshold published weekly by the CFPB—are deemed to comply with TILA's ability-to-repay requirements. 12 C.F.R. § 1026.43(e). The CFPB also issues model forms that lenders can use to avoid liability for failing to make required disclosures, and it has issued more than 120 to date. 12 C.F.R. § 1026 (Regulation Z), apps. G, H. Without updates, these safe harbors and model forms could soon become obsolete, meaning that

---

[29] *CFPB Sues JPMorgan Chase, Bank of America, and Wells Fargo for Allowing Fraud to Fester on Zelle*, Consumer Fin. Prot. Bureau (Dec. 20, 2024), https://perma.cc/6YSQ-PYDQ.

[30] Brief of Mortgage Bankers Association, et al. as *Amici Curiae* in Support of Neither Party, *Consumer Fin. Prot. Bureau v. Cmty. Fin. Servs. Ass'n of Am.*, 601 U.S. 416 (2024) (No. 22-448), at 10.

shuttering the CFPB could severely tighten access to mortgages, credit cards, and the other types of credit that consumers rely on to navigate financial transactions big and small. *See* Brief of Financial Regulation Scholars as *Amici Curiae*, *Consumer Fin. Prot. Bureau v. Cmty. Fin. Servs. Ass'n of Am.*, 601 U.S. 416 (2024) (No. 22-448), at 9-10 (estimating "that losing CFPB safe harbors would tighten credit access for at least 6 million home-mortgage applicants, 25 million car-loan applicants, and 193 million credit-card customers").

***Combatting Redlining and Discrimination in Consumer Financial Markets***

The CFPB has also carried out its congressional mandate to "ensure the fair, equitable, and non-discriminatory access to credit for both individuals and communities." 12 U.S.C. § 5493(c)(2). As part of this mandate, the CFPB must establish an Office of Fair Lending and Equal Opportunity, *id.* § 5493(c)(1), which must provide annual reports to Congress and coordinate its efforts with other agencies and states, *id.* § 5493(c)(2). Relatedly, the CFPB is required under the Home Mortgage Disclosure Act (HMDA), 12 U.S.C. §§ 2801 *et seq.*, to collect and publish demographic data that is essential for identifying discrimination and other concerning trends in the mortgage lending industry, and it brings enforcement actions to ensure that lenders are providing the required information.[31] Not only does this data help the CFPB itself enforce fair lending laws, but it also helps states and members of the public to do so. The loss of HMDA data would leave both regulators and the public in the dark as to possible discrimination and problematic trends in mortgage lending that could signal another financial crisis.

---

[31] *See, e.g.*, Bobby Conner, et al., *The CFPB is working to reinforce the foundation of a fair, nondiscriminatory and competitive mortgage market*, Consumer Fin. Prot. Bureau (June 28, 2024), https://perma.cc/9VUE-EYV9; *CFPB Orders Bank of America to Pay $12 Million for Reporting False Mortgage Data*, Consumer Fin. Prot. Bureau (Nov. 28, 2023), https://perma.cc/GRS2-5MW9.

The CFPB has also advanced Congress's mandate to advance fair lending goals by supervising financial institutions' compliance with the Equal Credit Opportunity Act (ECOA), 15 U.S.C. § 1691 *et seq.*, a landmark civil rights law that protects consumers from discrimination in credit transactions, and robustly enforcing the Act when financial institutions do not comply. As one of many examples, just last month, the CFPB took enforcement action against Draper & Kramer Mortgage Corporation for discriminatory redlining practices like intentionally concentrating its marketing in majority-white neighborhoods and avoiding marketing to majority-Black and Hispanic areas, resulting in disproportionately low numbers of mortgages in majority-Black and Hispanic neighborhoods compared to other lenders.[32] The CFPB's consent order bans Draper from engaging in residential mortgage lending for five years and requires it to pay a $1.5 million civil money penalty.[33] As another example, in November 2023, the CFPB ordered Citibank to pay $25.9 million in fines and consumer redress for intentionally discriminating against Armenian-American credit card applicants.[34] And in December 2023, the Bureau sued a Texas company, Colony Ridge, for targeting Hispanic borrowers with predatory loans to buy flood-prone land lacking water, sewer, or electrical infrastructure.[35]

### *Protecting Servicemembers*

As a final example, the CFPB works to protect servicemembers, including by enforcing the Military Lending Act of 2006 (MLA), 10 U.S.C. § 987, which protects servicemembers and their families from predatory lending practices. To date, the CFPB's congressionally mandated

---

[32] *CFPB Takes Action Against Draper & Kramer Mortgage for Discriminatory Mortgage Lending Practices*, Consumer Fin. Prot. Bureau (Jan. 17, 2025), https://perma.cc/VH6N-92DJ.
[33] *Id.*
[34] Consumer Fin. Prot. Bureau, *Fair Lending Report of the Consumer Financial Protection Bureau* 28-29 (June 2024).
[35] *Id.* at 29.

Office of Servicemember Affairs has fielded more than 400,000 complaints.[36] *See* 12 U.S.C. § 5493(e)(1). In response to these complaints, it has initiated enforcement actions, provided guidance to financial institutions under its supervision on how to comply with consumer financial protection laws affecting servicemembers, and referred complaints to other agencies that also have enforcement authority for servicemember protections but are not set up to receive complaints directly from impacted people, such as the Department of Justice, which enforces the Servicemembers Credit Relief Act (SCRA), 50 U.S.C. §501 *et seq.*[37]

As a Department of Defense report found, the CFPB's enforcement work has advanced the Department's "goals of ensuring that service members have access to fair, responsible credit."[38] To date, the CFPB has brought enforcement actions in forty-two cases involving harm to servicemembers and veterans, delivering $183 million in redress to those particular consumers.[39] For example, in 2023, TitleMax was required to pay more than $5 million to consumers and a $10 million civil penalty for violating the MLA and other consumer financial protection laws by extending car title loans with unlawful interest rates, failing to make certain disclosures, and imposing unlawful arbitration and onerous notice requirements.[40] As another example, in 2024, the CFPB returned $6 million in financial relief to veterans who were misled into selling their pension and disability benefits.[41]

---

[36] Office of Servicemember Affairs, *The CFPB is protecting the military community and providing relief*, Consumer Fin. Prot. Bureau (May 23, 2024), https://perma.cc/EH8F-TD7C.

[37] *Id.*

[38] U.S. Dep't of Def., *Report on the Military Lending Act and the Effects of High Interest Rates on Readiness* 15 (2021).

[39] Office of Servicemember Affairs, *supra* note 34.

[40] *See TMX Finance LLC*, CFPB No. 2023-CFPB-1 (Feb. 23, 2023) (consent order).

[41] *CFPB to distribute nearly $6 million to consumers harmed by predatory loans to veterans*, Consumer Fin. Prot. Bureau (Jan. 2, 2024), https://perma.cc/QJ7F-NLGV.

Defendants' actions threaten to once again leave servicemembers and their families exposed to the predatory practices Congress sought to halt. Indeed, the Bureau already appears to have suspended a lawsuit against MoneyLion Technologies for allegedly overcharging servicemembers on loans and refusing to cancel memberships in violation of the MLA.[42] And even if other agencies might theoretically enforce the MLA and SCRA, the loss of the CFPB's supervision and an office to receive servicemembers' complaints would be substantial, making it difficult to identify and respond to the ever-changing practices being used to target servicemembers and their families.

\*\*\*

The scope and breadth of the Bureau's work cannot be overstated. The CFPB has successfully implemented the statutory functions envisioned in Dodd-Frank, returning billions of dollars to consumers defrauded by entities like large banks, loan servicers, debt collectors, and payday lenders, and protecting the financial markets on which our economy depends. Its regulatory guidance provides pathways for small businesses to ensure their compliance with federal law and minimize the risk of operating in the consumer financial marketplace. And its consumer-facing work allows the Bureau to interact directly with the country's most economically vulnerable populations, lowering the barriers to economic mobility and providing victimized consumers with a chance for recourse and accountability. An end to the Bureau would mean an end to this work.

## IV.    Although other federal agencies and states play an important role in protecting consumers, they would not fill the regulatory gap left by a dismantled CFPB.

No other entity can fill the CFPB's shoes. Thus, the dissolution of the Bureau will "trigger a major regulatory disruption and . . . leave appreciable damage to Congress's work in the consumer-finance arena." *Seila Law*, 591 U.S. at 237.

---

[42] *SBPC/CFA Memo*, *supra* note 4.

*Other federal agencies.* As explained, Congress chose to make the CFPB the first and often only line of defense against the type of practices that contributed to the financial crisis in 2008. Without the CFPB, no federal agency would have the authority to make rules interpreting many federal consumer protection laws, to supervise large banks and various nonbanks' compliance with consumer financial protection laws, and to enforce those laws against the institutions that are at the highest risk of contributing to instability in financial markets. Dismantling the CFPB now arguably would leave an even riskier regulatory landscape than the one that led to the 2008 financial crisis. Before the crisis, seven federal agencies were charged with some amount of consumer financial protection authority, even if those agencies did not exercise that authority to the same extent as the CFPB. Because Congress, through Dodd-Frank, rejected that approach in favor of a new framework centered around the CFPB, no other federal agency has the lawful authority to fully pick up the Bureau's mantle.

Even if Congress reallocated the Bureau's responsibilities to other federal agencies, the redistribution would still severely disrupt financial markets and leave consumers vulnerable. First, the experience of Dodd-Frank shows that this work takes time. No matter how motivated, Congress would be simply unable to immediately enact a comprehensive overhaul of the entire federal consumer financial protection statutory and regulatory landscape, meaning there would be a destabilizing gap before any agency was authorized to interpret and enforce consumer financial protection laws. In the meantime, the systems relied on by financial institutions and consumers would fall into disarray—banks could not rely on regulatory guidance, consumers could not file complaints, enforcement would grind to a halt, and banks and nonbanks alike could engage in unscrupulous behavior in the absence of ongoing supervision.

Second, Dodd-Frank's framework was not created haphazardly. It was the product of an extensive legislative process that determined that problems of disparate authority, political influence, and regulatory capture helped contribute to the financial crisis of 2008. For the first time in the nation's history, Congress created a single federal agency to look out *for consumers*. Thousands of people work at the CFPB with the sole aim of carrying out these statutory mandates. Particularly as President Trump slashes personnel and budgets at agencies across the federal government, it is difficult to imagine any agency being able to replicate the consumer financial protection expertise of the CFPB's staff or to carry on supervision and enforcement efforts at the same level. Indeed, the CFPB was created in part to address the lack of resources and expertise being directed at consumer financial protection issues at other agencies. So, even if it were lawful to dismantle the Bureau absent direction from Congress—and it is not—authorizing other agencies to enforce consumer financial protection laws would not be a substitute for the CFPB. It would, at best, be a return to the unstable state of affairs pre-Dodd-Frank.

***States.*** Nor will states be able to fully take on the critical work that the CFPB does to protect consumers and stabilize markets. To begin with, states cannot step in to supervise the financial institutions, like large national banks, that the CFPB currently has sole statutory authority to oversee. *See* 12 U.S.C. § 5515(b)(1). The CFPB also plays a central role in supervising various nonbank financial institutions, like mortgage companies and payday lenders. *See id.* § 5514(b)(1). Dismantling the Bureau would therefore create a perverse situation in which the institutions most likely to destabilize the economy—currently holding assets collectively totaling more than $21 trillion[43]—would be subject to the least amount of oversight.

---

[43] *See Institutions Subject to Supervisory Authority*, Consumer Fin. Prot. Bureau, https://perma.cc/CR4W-ALZ2 (last visited Feb. 26, 2025) (summing the total assets of all CFPB depository institutions and affiliates as of June 30, 2024).

States' ability to challenge these institutions' practices as unfair, deceptive, or abusive is also limited without a rule by the CFPB defining a practice as such. 12 U.S.C. §§ 5531, 5552(a)(2). In light of Defendants' instruction to cease work, if the CFPB stops issuing such rules, the concept of unfair, deceptive, or abusive practices will be frozen in time, making it more difficult for states to respond to changes in the financial marketplace and unfair practices facilitated by emerging technologies like artificial intelligence and cryptocurrency.

States are also limited in their ability to bring enforcement actions under their own laws. Federal law preempts state laws regulating national banks when the state law "prevents or significantly interferes with the national bank's exercise of its powers," *Cantero v. Bank of Am.*, 602 U.S. 205, 220 (2024); *see also Easton v. Iowa*, 188 U.S. 220, 229, 230-31 (1903) (similar), and historically, some courts have interpreted this preemptive reach broadly, *see, e.g.*, *Beneficial Nat'l Bank v. Anderson*, 539 U.S. 1, 11 (2003) (holding that the National Bank Act preempts state-law usury claims against national banks). Although Dodd-Frank limited the scope of National Bank Act preemption, *see Cantero*, 602 U.S. at 214, the OCC has continued to interpret the preemptive reach of federal law broadly enough to preempt whole categories of state consumer financial laws regarding, for example, the terms of credit or disclosure requirements for bank accounts.[44] Even if the OCC's approach has faced scrutiny,[45] there is no doubt that preemption continues to hinder states from creating and implementing their own comprehensive regulatory frameworks. Without the CFPB, these enforcement issues will multiply because, in the Bureau's

---

[44] *OCC Ignores Dodd-Frank Act's Repeal of 2004 Preemption Regulations*, Nat'l Consumer Law Center (2011), https://perma.cc/W6W4-MBYC; Office of Thrift Supervision Integration; Dodd-Frank Act Implementation, 76 Fed. Reg. 30557 (proposed May 26, 2011).

[45] Letter from Nat'l Consumer Law Center et al., to Michael J. Hsu, Acting Comptroller, Officer of the Comptroller of the Currency (July 19, 2024) (on file with the Nat'l Consumer Law Center), https://perma.cc/7VA5-VNDP.

absence, state-chartered banks may be tempted to re-charter as national banks in an effort to avoid supervision for compliance with consumer financial protection laws.

Legal constraints aside, state attorneys general are limited in their practical abilities to supervise, investigate, and enforce the law to the same extent as the CFPB. Through Dodd-Frank, Congress explicitly created the CFPB to act as a federal complement and counterpart to state attorneys general. And, as the States' *amicus* brief makes clear, states rely on the CFPB's supervision and investigatory efforts to inform and support their own regulatory and enforcement work. *See generally* ECF 24. Without the federal-state collaboration envisioned by Dodd-Frank, states will be hampered in their ability to protect their constituent consumers.

***Private enforcement.*** For many of the same reasons, private enforcement of consumer financial protection law cannot take the place of the CFPB. For one, the combination of the CFPB's consumer-complaint system and supervisory authority to examine large banks and many nonbanks enables it to uncover possible issues that are not apparent to the public. And not all consumer financial protection statutes can be enforced privately. Indeed, the CFPA itself "did not create a private right of action," so consumers cannot challenge a practice as unfair, deceptive, or abusive under the CFPA. *See Schooley v. Option One Mortg. Corp.*, No. 23-12341, 2024 WL 3440178, at *1 (11th Cir. July 17, 2024).

Finally, as a practical matter, consumers are unlikely to be able to challenge certain practices that harm consumers and financial markets because of barriers to bringing private actions. For example, they may face Article III standing barriers to challenge practices that hurt both individuals and financial markets but do not cause direct economic injury; they may be subject to class action waivers or mandatory arbitration provisions that prevent them from seeking class-wide relief for systemic violations; and they may be unable find a lawyer to represent them in

24

individual cases involving relatively small economic losses.[46] In short, the regulatory framework Congress established in Dodd-Frank is necessary in part because private enforcement is insufficient.

***

The CFPB is uniquely situated to protect consumers and guard against the predatory practices that led to the 2008 financial crisis. Both by design and by practical constraint, no one else would be able to fill many of the regulatory gaps that would be left should Defendants succeed in their concerted effort to eviscerate the Bureau. Even beyond *amici*'s constitutional concerns— and they are significant, *see supra* Part II—dismantling the CFPB would thus threaten a return to the financial and economic conditions that led to that meltdown. Defendants' unlawful conduct must be stopped.

**CONCLUSION**

For the foregoing reasons, the Court should grant Plaintiffs' motion for a preliminary injunction.

Date: February 28, 2025                       Respectfully submitted,

Douglas R. Jensen*                            /s/ Hannah Kieschnick
SHER TREMONTE LLP                             Hannah Kieschnick*
90 Broad St., 23d Floor                       PUBLIC JUSTICE
New York, New York 10004                      475 14th St., Ste 610
(202) 202-2600                                Oakland, CA
djensen@shertremonte.com                      (510) 622-8150
                                              hkieschnick@publicjustice.net

                                              /s/ Lucia Goin
                                              Lucia Goin (DC Bar No. 1739389)
                                              Shelby Leighton*

---

[46] *See, e.g.*, Luke P. Norris, *The Promise and Perils of Private Enforcement*, 108 Va. L. Rev. 1483, 1536 (2022) (stating that "[i]n the banking, credit card, telephone, and cable and internet sectors, arbitration clauses are present in fifty to ninety percent of consumer contracts").

25

PUBLIC JUSTICE
1620 L St. NW, Ste. 630
Washington, DC 20036
(202) 797-8600
lgoin@publicjustice.net
sleighton@publicjustice.net

\* Motion for *pro hac vice* admission
forthcoming

*Counsel for Amici Curiae 203 Members of Congress*

**CERTIFICATE OF COMPLIANCE**

I hereby certify that this brief complies with all the applicable requirements of LCvR 7(o), including all formatting requirements set forth in this rule. Specifically, the undersigned certifies that the brief complies with the applicable page limit set forth in LCvR 7(o) as it contains 25 pages.

I acknowledge that my brief may be stricken if it fails to comply with any of the applicable requirements.

*/s/ Lucia Goin*
Lucia Goin

*Counsel for Amici Curiae*
*203 Members of Congress*

## APPENDIX: LIST OF *AMICI CURIAE*

1. **Maxine Waters**
   Representative of California

2. **Hakeem Jeffries**
   Representative of New York

3. **Katherine Clark**
   Representative of Massachusetts

4. **Pete Aguilar**
   Representative of California

5. **Joe Neguse**
   Representative of Colorado

6. **Jamie Raskin**
   Representative of Maryland

7. **Rosa L. DeLauro**
   Representative of Connecticut

8. **Gerald E. Connolly**
   Representative of Virginia

9. **Alma S. Adams**
   Representative of North Carolina

10. **Gabe Amo**
    Representative of Rhode Island

11. **Yassamin Ansari**
    Representative of Arizona

12. **Jake Auchincloss**
    Representative of Massachusetts

13. **Becca Balint**
    Representative of Vermont

14. **Nanette Barragán**
    Representative of California

15. **Joyce Beatty**
    Representative of Ohio

16. **Wesley Bell**
    Representative of Missouri

17. **Ami Bera, M.D.**
    Representative of California

18. **Donald S. Beyer Jr.**
    Representative of Virginia

19. **Sanford D. Bishop, Jr.**
    Representative of Georgia

20. **Suzanne Bonamici**
    Representative of Oregon

21. **Brendan F. Boyle**
    Representative of Pennsylvania

22. **Shontel Brown**
    Representative of Ohio

23. **Julia Brownley**
    Representative of California

24. **Nikki Budzinski**
    Representative of Illinois

25. **Janelle Bynum**
    Representative of Oregon

26. **Salud O. Carbajal**
    Representative of California

27. **André Carson**
    Representative of Indiana

28. **Troy A. Carter, Sr.**
    Representative of Louisiana

29. **Greg Casar**
    Representative of Texas

30. **Ed Case**
    Representative of Hawaii

31. **Sean Casten**
    Representative of Illinois

32. **Kathy Castor**
    Representative of Florida

33. **Joaquin Castro**
    Representative of Texas

34. **Sheila Cherfilus-McCormick**
    Representative of Florida

35. **Judy Chu**
    Representative of California

36. **Gilbert R. Cisneros, Jr.**
    Representative of California

37. **Yvette Clarke**
    Representative of New York

38. **Emanuel Cleaver, II**
    Representative of Missouri

39. **James E. Clyburn**
    Representative of South Carolina

40. **Steve Cohen**
    Representative of Tennessee

41. **Herb Conaway, MD**
    Representative of New Jersey

42. **J. Luis Correa**
    Representative of California

43. **Joe Courtney**
    Representative of Connecticut

44. **Angie Craig**
    Representative of Minnesota

45. **Jasmine Crockett**
    Representative of Texas

46. **Jason Crow**
    Representative of Colorado

47. **Danny K. Davis**
    Representative of Illinois

48. **Madeleine Dean**
    Representative of Pennsylvania

49. **Diana DeGette**
    Representative of Colorado

50. **Suzan K. DelBene**
    Representative of Washington

51. **Chris Deluzio**
    Representative of Pennsylvania

**52. Mark DeSaulnier**
   Representative of California

**53. Maxine Dexter**
   Representative of Oregon

**54. Debbie Dingell**
   Representative of Michigan

**55. Lloyd Doggett**
   Representative of Texas

**56. Sarah Elfreth**
   Representative of Maryland

**57. Veronica Escobar**
   Representative of Texas

**58. Adriano Espaillat**
   Representative of New York

**59. Dwight Evans**
   Representative of Pennsylvania

**60. Cleo Fields**
   Representative of Louisiana

**61. Shomari C. Figures**
   Representative of Alabama

**62. Lizzie Fletcher**
   Representative of Texas

**63. Bill Foster**
   Representative of Illinois

**64. Valerie P. Foushee**
   Representative of North Carolina

**65. Lois Frankel**
   Representative of Florida

**66. Laura Friedman**
   Representative of California

**67. Maxwell Alejandro Frost**
   Representative of Florida

**68. John Garamendi**
   Representative of California

**69. Sylvia Garcia**
   Representative of Texas

**70. Robert Garcia**
   Representative of California

**71. Jesús "Chuy" García**
   Representative of Illinois

**72. Dan Goldman**
   Representative of New York

**73. Jimmy Gomez**
   Representative of California

**74. Maggie Goodlander**
   Representative of New Hampshire

**75. Josh Gottheimer**
   Representative of New Jersey

**76. Al Green**
   Representative of Texas

**77. Raúl Grijalva**
   Representative of Arizona

**78. Jahana Hayes**
Representative of Connecticut

**79. Jim Himes**
Representative of Connecticut

**80. Steven Horsford**
Representative of Nevada

**81. Chrissy Houlahan**
Representative of Pennsylvania

**82. Steny H. Hoyer**
Representative of Maryland

**83. Val Hoyle**
Representative of Oregon

**84. Jared Huffman**
Representative of California

**85. Glenn F. Ivey**
Representative of Maryland

**86. Jonathan L. Jackson**
Representative of Illinois

**87. Sara Jacobs**
Representative of California

**88. Pramila Jayapal**
Representative of Washington

**89. Henry C. ("Hank") Johnson, Jr.**
Representative of Georgia

**90. Julie Johnson**
Representative of Texas

**91. Sydney Kamlager-Dove**
Representative of California

**92. Marcy Kaptur**
Representative of Ohio

**93. William Keating**
Representative of Massachusetts

**94. Robin L. Kelly**
Representative of Illinois

**95. Timothy M. Kennedy**
Representative of New York

**96. Ro Khanna**
Representative of California

**97. Raja Krishnamoorthi**
Representative of Illinois

**98. Greg Landsman**
Representative of Ohio

**99. John B. Larson**
Representative of Connecticut

**100. George Latimer**
Representative of New York

**101. Summer L. Lee**
Representative of Pennsylvania

**102. Susie Lee**
Representative of Nevada

**103. Teresa Leger Fernández**
Representative of New Mexico

104. **Mike Levin**
Representative of California

105. **Sam T. Liccardo**
Representative of California

106. **Ted W. Lieu**
Representative of California

107. **Zoe Lofgren**
Representative of California

108. **Stephen F. Lynch**
Representative of Massachusetts

109. **Seth Magaziner**
Representative of Rhode Island

110. **John W. Mannion**
Representative of New York

111. **Doris Matsui**
Representative of California

112. **Lucy McBath**
Representative of Georgia

113. **Sarah McBride**
Representative of Delaware

114. **April McClain Delaney**
Representative of Maryland

115. **Jennifer L. McClellan**
Representative of Virginia

116. **Betty McCollum**
Representative of Minnesota

117. **Kristen McDonald Rivet**
Representative of Michigan

118. **Morgan McGarvey**
Representative of Kentucky

119. **James P. McGovern**
Representative of Massachusetts

120. **LaMonica McIver**
Representative of New Jersey

121. **Gregory W. Meeks**
Representative of New York

122. **Robert J. Menendez**
Representative of New Jersey

123. **Grace Meng**
Representative of New York

124. **Kweisi Mfume**
Representative of Maryland

125. **Dave Min**
Representative of California

126. **Gwen S. Moore**
Representative of Wisconsin

127. **Joseph D. Morelle**
Representative of New York

128. **Kelly Morrison**
Representative of Minnesota

129. **Jared Moskowitz**
Representative of Florida

130. **Seth Moulton**
Representative of Massachusetts

131. **Frank J. Mrvan**
Representative of Indiana

132. **Kevin Mullin**
Representative of California

133. **Jerrold Nadler**
Representative of New York

134. **Richard E. Neal**
Representative of Massachusetts

135. **Donald Norcross**
Representative of New Jersey

136. **Eleanor Holmes Norton**
Representative of the District of Columbia

137. **Alexandria Ocasio-Cortez**
Representative of New York

138. **Johnny Olszewski**
Representative of Maryland

139. **Ilhan Omar**
Representative of Minnesota

140. **Frank Pallone, Jr.**
Representative of New Jersey

141. **Jimmy Panetta**
Representative of California

142. **Chris Pappas**
Representative of New Hampshire

143. **Nancy Pelosi**
Representative of California

144. **Scott H. Peters**
Representative of California

145. **Brittany Pettersen**
Representative of Colorado

146. **Chellie Pingree**
Representative of Maine

147. **Stacey E. Plaskett**
Representative of the Virgin Islands

148. **Mark Pocan**
Representative of Wisconsin

149. **Nellie Pou**
Representative of New Jersey

150. **Ayanna Pressley**
Representative of Massachusetts

151. **Mike Quigley**
Representative of Illinois

152. **Delia C. Ramirez**
Representative of Illinois

153. **Emily Randall**
Representative of Washington

154. **Josh Riley**
Representative of New York

155. **Luz M. Rivas**
Representative of California

156. **Deborah K. Ross**
Representative of North Carolina

157. **Raul Ruiz**
Representative of California

158. **Andrea Salinas**
Representative of Oregon

159. **Linda T. Sánchez**
Representative of California

160. **Mary Gay Scanlon**
Representative of Pennsylvania

161. **Jan Schakowsky**
Representative of Illinois

162. **Brad Schneider**
Representative of Illinois

163. **Kim Schrier, M.D.**
Representative of Washington

164. **David Scott**
Representative of Georgia

165. **Robert C. "Bobby" Scott**
Representative of Virginia

166. **Terri A. Sewell**
Representative of Alabama

167. **Brad Sherman**
Representative of California

168. **Mikie Sherrill**
Representative of New Jersey

169. **Lateefah Simon**
Representative of California

170. **Adam Smith**
Representative of Washington

171. **Eric Sorensen**
Representative of Illinois

172. **Darren Soto**
Representative of Florida

173. **Melanie A. Stansbury**
Representative of New Mexico

174. **Greg Stanton**
Representative of Arizona

175. **Haley Stevens**
Representative of Michigan

176. **Marilyn Strickland**
Representative of Washington

177. **Suhas Subramanyam**
Representative of Virginia

178. **Tom Suozzi**
Representative of New York

179. **Eric Swalwell**
Representative of California

180. **Emilia Sykes Beal**
Representative of Ohio

181. **Mark Takano**
Representative of California

182. **Shri Thanedar**
Representative of Michigan

183. **Mike Thompson**
Representative of California

184. **Bennie G. Thompson**
Representative of Mississippi

185. **Dina Titus**
Representative of Nevada

186. **Rashida Tlaib**
Representative of Michigan

187. **Jill Tokuda**
Representative of Hawaii

188. **Paul D. Tonko**
Representative of New York

189. **Norma J. Torres**
Representative of California

190. **Ritchie Torres**
Representative of New York

191. **Lori Trahan**
Representative of Massachusetts

192. **Derek T. Tran**
Representative of California

193. **Sylvester Turner**
Representative of Texas

194. **Lauren Underwood**
Representative of Illinois

195. **Juan Vargas**
Representative of California

196. **Marc Veasey**
Representative of Texas

197. **Nydia M. Velázquez**
Representative of New York

198. **Eugene Vindman**
Representative of Virginia

199. **Debbie Wasserman Schultz**
Representative of Florida

200. **Bonnie Watson Coleman**
Representative of New Jersey

201. **George T. Whitesides**
Representative of California

202. **Nikema Williams**
Representative of Georgia

203. **Frederica S. Wilson**
Representative of Florida