UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| NATIONAL TREASURY EMPLOYEES UNION, *et al.*, | ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | Civil Action No. 25-0381 (ABJ) |
| RUSSELL VOUGHT *in his official capacity as Acting Director of the Consumer Financial Protection Bureau, et al.*, | ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

**ORDER**

On April 1, 2025, defendants filed a motion in this court [Dkt. #97] ("Defs.' Mot.") seeking a stay of the Court's March 28 preliminary injunction [Dkt. # 88] ("the Order") for the first time.

To the extent defendants seek a stay of the requirement in the Order that they inform the Court of their compliance with its terms by Friday, April 4, the motion is **GRANTED IN PART**; that obligation is hereby **STAYED**, with plaintiffs' consent, *see* Pls.' Mot. for Briefing Schedule [Dkt. # 92] at 2; Pls.' Opp. to Defs.' Mot. [Dkt. # 98] at 4–5, pending the outcome of the motion for emergency stay pending before the Court of Appeals. The rest of the motion is **DENIED**, but without prejudice to a motion that proposes reasonable and appropriate modifications to the preliminary injunction that preserve its day-to-day managerial discretion. The parties met and conferred in the past and agreed to terms that governed the period between the filing of plaintiffs' motion for a temporary restraining order ("TRO") and the ruling on the motion for preliminary injunction, and the Court encourages them to do so again.

The Court must consider four factors in connection with a motion to stay pending appeal: (1) whether the movant has made a strong showing that it is likely to succeed on the merits; (2) whether the movant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest

lies. *Nken v. Holder*, 556 U.S. 418, 434 (2009). The Supreme Court has explained that the first two factors "are the most critical." *Id.*

Defendants say very little about most of this, and for all of the reasons set forth in the Memorandum Opinion, [Dkt. #87] ("Mem. Op."), the defendants cannot make the necessary showing. First, the Court found that the defendants' objections to its exercise of jurisdiction are unsupported, and after a detailed analysis of the testimony and agency records introduced by both sides, it found that plaintiffs are likely to succeed on the merits of their claims, including the claim that the defendants are in fact engaged in an effort to shut down the agency in violation of law notwithstanding their denials. *See* Mem. Op. at 61–101. This is not just a typical pause while the new administration considers and readjusts agency priorities.

Second, the defendants cannot point to any injury, much less any irreparable injury, that would flow from compliance with an injunction that requires that the agency continue to exist as Congress mandated and to perform its statutorily required duties, including in particular, the duties assigned to the Office of Consumer Response, while the merits of plaintiffs' claims are being litigated.

What is striking about the defendants' motion is that they pay very little attention to the merits of the case at all. They do not seem to dispute that they lack the ability to close the agency established by Congress on their own. Instead, the focus of the attack is the claimed breadth of the remedy. But their description of the Order is at odds with the terms of the Order, and their description of the ruling that prompted it is inaccurate as well.

Defendants assert in their motion and in the motion filed with the Circuit that "[t]he order does not track any specific CFPB duties Congress made obligatory." Defs.' Mot. at 2. But a key provision in the Order is directly tied to the statute and even cites the relevant provision: "Defendants shall ensure that in accordance with 12 U.S.C. § 5492(b)(3), the CFPB Office of Consumer Response continues to maintain a single, toll-free telephone number, a website, and a database for the centralized collection of consumer complaints regarding consumer financial products and services, and that it continues to monitor and respond to those complaints, including by providing Elevated Case Management." Order at 2–3. Moreover, the Order calls for the reinstallation of the Private Student Loan Ombudsman, a position specifically called for by the statute that has been vacant since February 13. Order at 2; *see* Mem. Op. at 18.

Defendants imply that all the Court needed to do was say: keep fulfilling your statutory duties pending the outcome of this case. *See* Defs.' Mot. at 1–2. But they seem to forget that when the plaintiffs proposed an order that simply required them not to interfere with the employees' performance of their statutory duties, the defendants objected to that order on the ground that it was too broad, too vague, and unenforceable. So the Court had to get specific.

Defendants announce that "[t]he Government has repeatedly explained that, absent congressional action, the Bureau will continue to perform mandatory statutory duties," Defs.' Mot. at 1, and that it was doing so when the Court issued its order. *See id*. at 2 ("The Government is likely to succeed in challenging the preliminary injunction[,] because the Bureau will continue to perform its statutory duties . . . ."). *See also id.* at 3 ("Defendants . . . continue to view this Court's intervention and supervision as unnecessary to preserve Defendant CFPB's existence and continued operation."). The defendants' insistence that they should be free to run the agency and implement the statutory requirements without court interference comes a little too late; the evidence the Court of Appeals has not yet seen shows that the defendants made the choice not to run the agency at all – to close it down and fire all of the employees – and that the Reduction in Force ("RIF") notices are ready to go if the injunction is lifted.

As the defendants put it, this Court "believed" that absent preliminary relief, the CFPB would be dismantled completely before the case came to its conclusion, but that "belief . . . is incorrect and based on outdated evidence since clarified by the current agency leadership." *Id*. at 4, citing Suppl. Decl. of Adam Martinez [Dkt. # 47-1].

Saying something does not make it so. Nor does saying it "repeatedly." Defs.' Mot. at 1, 3, 7, 8.

Apparently, the defendants have not read the entire Memorandum Opinion. It does not predicate the need for an injunction or base its ruling on a "belief." It does not predicate the need for an injunction on outdated evidence. It held two full days of evidentiary hearings involving three witnesses, including Mr. Martinez, and it reviewed every single document submitted by either side. It found that the cited statements in the declaration the defendants are relying on again were not worthy of belief.

Defendants repeat the theme they tried to advance in opposition to the TRO that "it is not uncommon for agency leadership to reevaluate . . . policy choices at the start of a new administration." Defs.' Mot. at 6. They accuse the Court of being unable to distinguish between a "temporary directive asking employees to briefly pause" during a transition and the "wholesale elimination of an agency." *Id.* But as recounted in detail in the Memorandum Opinion, the defendants have consistently attempted to blur the distinction between the initial transition emails issued by Acting Director Bessent on February 3 and by Acting Director Vought on February 8,

3

which the Court did not find to be problematic, and the stop work order issued on February 10, which is the focus of the Order.[1]

Defendants challenge the scope of the Order, asserting that the Court "imposed sweeping restrictions and affirmative requirements affecting administration of all routine Bureau operations, personnel decisions, and contract management." Defs.' Mot. at 2; *see also* Defs.' Mot. at 4 ("[A]gencies that remain fully 'open' possess broad discretion to allocate resources and make personnel decisions . . . ."). The Order in this case does prohibit the agency from sending out the notices that have already been prepared and approved by OPM for all agency employees except the few needed to effectuate the RIF and which would leave no open positions behind. But that is not a routine operation. As to routine workplace management, the Order includes explicit language authorizing the agency to take ordinary employment actions with respect to individual employees. And the Order fully permits the agency to turn off contracts if it determines they are not needed to support statutorily mandated functions. The requirement that they not be terminated entirely, though, is necessary to ensure that it will not take the initiation of a two-year procurement process to turn them back on if plaintiffs succeed in establishing that defendants' effort to eliminate the agency was unlawful.

Finally, the defendants take issue with what they describe as the Court's "inexplicabl[e]" decision to require the Bureau "to adopt specific information-technology policies." Defs.' Mot. at 6. This is also a blatant mischaracterization of the Order. The evidence showed that the defendants were engaged in negotiations to cancel the lease for its headquarters. The record reflects that there are government-wide policies against remote work. The record also reflects that shortly before the hearing on this motion, the agency cancelled the contract for the only technology available for remote work at the CFPB. Therefore, it was necessary, and hardly inexplicable, to require that if employees are going to work, they have to be provided with *either* office space or laptop computers equipped with software that can connect securely with the agency. But the Court did not dictate the particular technology to be selected; it said it could be the brand of virtual desktop that had recently been cancelled "or another similar program." Order at 2.

In short, the Order is hardly as onerous or unsupported as defendants would have this Court and the Court of Appeals believe. As noted above, though, the Court would be open to further

---

[1] Defendants state that the Court "failed to meaningfully grapple" with the fact that employees "ignored the plain language of the email instructing them to seek approval for urgent and critical CFPB obligations." Defs.' Mot. at 7. But the Court specifically found that it is the defendants who are ignoring the plain text of the February 10 order and that their eleventh-hour attempt to recharacterize it as something else on the Sunday afternoon before the hearing was disingenuous and unpersuasive.

4

discussion about how it could or should be tailored, but it will not lift the order before those questions are resolved.

That is because, returning to the *Nken v. Holder* factors, staying the action would substantially injure the plaintiffs. The defendants would be free to move swiftly to take the steps that would eliminate the agency in thirty days, which the Court has already found they are poised to do, and that would cause plaintiffs irreparable harm. Indeed, during the hearing on the motion for preliminary injunction, defendants' only witness, the Chief Operating Officer of the CFPB, testified, "I now realize how much damage can be done . . . just within a couple of days." Tr. of Evidentiary Hr'g (Mar. 10, 2025) [Dkt. # 73] at 74. Given the devastating consequences that would ensue if a stay were entered and the defendants were relieved of their obligation to comply with the Order, the public interest lies decidedly against a stay.

**SO ORDERED.**

AMY BERMAN JACKSON
United States District Judge

DATE: April 3, 2025