IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NATIONAL TREASURY
EMPLOYEES UNION, *et al.*,

                        *Plaintiffs*,

    v.

RUSSELL VOUGHT, in his official capacity
as Acting Director of the Consumer Financial
Protection Bureau, *et al.*,

                 *Defendants*.

Case No. 25-cv-00381-ABJ

**REPLY IN SUPPORT OF
PLAINTIFFS' MOTION TO
ENFORCE**

Deepak Gupta (DC Bar No. 495451)
Robert Friedman (DC Bar No. 1046738)
Gabriel Chess (DC Bar No. 90019245)
Michael Skocpol (DC Bar No. 1659449)
Gupta Wessler LLP
2001 K Street, NW
North Tower, Suite 850
Washington, DC 20006
(202) 888-1741

Jennifer D. Bennett (pro hac vice)
Gupta Wessler LLP
505 Montgomery Street
San Francisco, CA 94111
(415) 573-0335

*Counsel for Plaintiffs*

Wendy Liu (DC Bar No. 1600942)
Adina Rosenbaum (DC Bar No. 490928)
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-1000

*Counsel for Plaintiffs*

Julie Wilson (DC Bar No. 482946)
General Counsel
Paras N. Shah (DC Bar No. 983881)
Deputy General Counsel
Allison C. Giles (DC Bar No. 439705)
Assistant Counsel
National Treasury Employees Union
800 K Street, NW, Suite 1000
Washington, DC 20001
(202) 572-5500

*Counsel for Plaintiffs National Treasury
Employees Union*

April 25, 2025

**TABLE OF CONTENTS**

Introduction ........................................................................................................................... 1

Factual Background .............................................................................................................. 4

Argument ............................................................................................................................. 10

    I.    The defendants violated the third provision of the injunction when
        they issued RIF notices without making a "particularized assessment"—or
        any assessment at all—of how the Bureau would "perform" its statutory
        duties without the RIF'd employees ...................................................................... 10

    II.    The defendants violated the fourth provision by putting 90% of the
        agency on administrative leave without conducting any assessment, let
        alone a particularized one, that the agency would be able to fulfill its
        statutory functions ............................................................................................... 17

    III.    The defendants violated the Consumer Response and data deletion
        provisions, neither of which say a thing about a "particularized assessment." ............... 19

        A.    The defendants have rendered the Bureau unable to "monitor and
            respond to" consumer complaints. ............................................................. 20

        B.    The defendants stopped maintaining the CFPB's data and put it at
            imminent risk of loss. ................................................................................ 22

Conclusion .......................................................................................................................... 24

## INTRODUCTION

After reviewing hundreds of documents and conducting a two-day evidentiary hearing, this Court entered a preliminary injunction to prevent the defendants from "complet[ing] the destruction of the" CFPB. Dkt. 87 at 2. The defendants appealed and sought a stay of the injunction from the D.C. Circuit, claiming that this Court was wrong: "[T]he Bureau will remain open and continue to perform its statutory functions." No. 25-5091, Mot. to Stay 1. The appeals court left most of the injunction in place. The defendants were still prohibited from impairing or deleting data; and they continued to be required to receive, monitor, and respond to consumer complaints. The court of appeals allowed the defendants to conduct RIFs, but only if they made a "particularized assessment" that the employees being terminated were "unnecessary to the performance of the defendants' statutory duties." And it permitted work stoppages, but, again, only after a "particularized assessment" that any work stoppage "would not interfere with" the CFPB's statutory functions.

That small amount of leeway was all the defendants needed to try to dismantle the Bureau again. Not 24 hours passed after the D.C. Circuit's Friday night order before RIF work resumed. And within days, the defendants sent RIF notices to 90% of the Bureau's workforce, and informed those employees that they would be placed on administrative leave the very next day. When the Bureau's Chief Information Officer first saw who was on the list, he declared "I don't think we can keep operating even for 60-days." Chief Operating Officer Adam Martinez responded, "Understood and I do not disagree." If this Court had not paused those actions, the Bureau's work would have come to an immediate halt.

As of Saturday, April 19, there would be no one handling the "time sensitive" daily tasks that keep the consumer complaint database running, Files Decl. ¶¶ 6–7, 12, working in the Office

of Service Member Affairs, 2d Olstad Decl. ¶¶ 7, 14, ensuring victims are paid out of the Civil Penalty Fund, Harper Doe Decl. ¶ 6, or "perform[ing] essential maintenance on the HMDA platform," a task so important that the defendants exempted it from the February 10 work stoppage, Shelton Decl. ¶ 8. That's just the tip of the iceberg.

But the defendants claim that there's nothing this Court can do. First, they say, they performed a particularized assessment. Having produced emails that look tailor-made for this litigation—while claiming privilege over others that might well reflect what was actually going on—the defendants insist they did all that was required. But that claim cannot be reconciled even with the curated record the defendants have produced.

While the plaintiffs haven't been able to carefully review every document the defendants produced—many of which were handed over last night—our review confirms exactly what members of the RIF team were saying last week: The defendants followed a "numbers-based" approach. Dkt. 111 at 2. Initially, the defendants planned to simply implement the RIF they intended to conduct in February—and to do so fast, by the Sunday following the D.C. Circuit's Friday order. *See* CFPB_2648. But, presumably because it would be tough to make it even appear that they'd done an assessment, that plan was scrapped. Unlike the old plan, the new plan would leave at least a person in each division. CFPB_3032. But the goal was not to ensure the Bureau could perform its statutory functions; it was to reach a "target[]" number. CFPB_0550. By Tuesday afternoon, that number was set at 209—about 10% of the agency. CFPB_3032. Once that number was set, *then* "[s]omeone still[] need[ed] to ID the positions being retained" and "those being released via RIF." *Id.*

In other words, the defendants did not do a "particularized assessment" of which employees were needed for the agency to fulfill its statutory functions and then RIF the rest. They picked a

"final number[]" they wanted the RIF team to hit, CFPB_0188, and then retrofitted the record to meet that number. The defendants did endeavor to make it look like they had done an assessment: At some point, Paoletta and two lawyers from the Office of Management and Budget who were detailed to the CFPB, tried to make sure that the small number of people they were willing to leave at the agency—at least for now—included those who were explicitly identified in the Consumer Financial Protection Act. But there is no evidence of any effort to actually ensure that the CFPB could meet its statutory obligations under that Act, or the many other statutes that govern the agency.

Indeed, all of the evidence is to the contrary. The defendants previously told this Court that agency leadership was relying on managers to "identify [statutory duties] up" the chain to leadership. 3/11 Tr. (Dkt. 74) 117. But, as high-level managers from multiple offices attest, they didn't consult with those managers when making their claimed "assessment." And when members of the RIF team raised concerns with CFPB leadership about the "court order requiring … a particularized assessment," "they were told that all that mattered was the numbers." Dkt. 111 at 2.

That is not a particularized assessment—it is not an assessment at all. The preliminary injunction as partially stayed required the defendants to assess—in a particularized way—whether the CFPB could "perform[]" its statutory functions without the employees they sought to RIF. Merely identifying statutorily required offices and divisions and leaving employees in those offices isn't enough. The defendants were required to assess whether those offices and units would still be able to *do* what federal law requires of them.

The defendants could not possibly have done this, and there's absolutely nothing in the documents they produced to suggest they did. Perhaps for that reason, the defendants main pitch to this Court is that the D.C. Circuit's partial stay requires this Court to just take the defendants'

word for it. Despite a court order requiring them to conduct a particularized assessment before conducting a RIF or imposing a work stoppage, they don't actually have to do it—they just have to say they did it, and this Court can inquire no further. That doesn't accord with the plain text of the injunction or the stay order. And it's not the law. Not to mention, the defendants give no explanation at all for why their conduct didn't violate the Consumer Response and data deletion provisions, which don't have particularized assessment requirements. The plaintiffs are still processing the documents handed over at the last minute, but all of the evidence points to the same conclusion: The defendants violated the preliminary injunction.

**FACTUAL BACKGROUND**

On Friday, April 11th, at 7:50 pm, the D.C. Circuit entered its stay order. *See* No. 25-5091. By Saturday, the defendants began to execute a RIF. And by Thursday, they had issued RIF notices to nearly 90% of the Bureau's employees—and informed those employees that they'd be put on administrative leave the next day. Multiple high-level Bureau employees attest that if not paused by this Court, the work stoppage and mass terminations would have immediately disabled the Bureau from meeting its statutory obligations—a consequence so obvious, they say, no particularized assessment could possibly have been done. *See, e.g.*, 2d Olstad Decl. ¶ 10; Spicer Decl. ¶ 20; 4th Pfaff Decl. ¶¶ 9–10.[1]

The defendants moved to achieve this result at remarkable speed:

***Saturday, April 12: Vought kicks off a furious round of "CFPB RIF Work."***

- The day after the D.C. Circuit entered its order, Acting Director Vought sent an email to a small group of CFPB leadership (Mark Paoletta, Adam Martinez, Jafnar Gueye, and Chris Chilbert), DOGE employees, and detailees to the CFPB (including Jeremy Lewin, who was detailed to the CFPB from DOGE). The subject line of the email was "CFPB RIF Work."

---

[1] All documents cited in this brief will be included with the plaintiffs pre-hearing document filing tomorrow at noon.

CFPB_01522. We do not know what this email said, because the defendants have claimed that the contents of this email and several other emails sent on this chain are privileged.

- Less than two hours later, Jeremy Lewin emailed Adam Martinez a "RIF letter template for *tomorrow's planned personnel actions*." CFPB_2648 (emphasis added). Those "planned personnel actions" were going to mirror the RIF that the defendants had previously planned for February. *Id.* Martinez sent Lewin the "master and final list … approved by OPM [that] would have been used on 2/14." *Id.* Lewin made sure to state that he and Vought would "conduct an individualized assessment to, consistent with the DC Circuit's stay, ensure that only non-statutory positions are affected." CFPB_2648–49. The email, sent at 4 pm on Saturday, did not explain how that "individualized assessment" could possibly be conducted in time for "personnel actions" to happen the next day.

- Gavin Kliger (a DOGE detailee) was made an administrator in the Office of Human Capital's technical systems. *See* CFPB_01538. When requesting that access, he relayed that he would "be running this operation and need[s] [the] ability to create, delete, modify and grant access to flows related to [human capital]." *Id.*

- Members of the RIF team met and discussed "DOGE's" plan to "RIF people tomorrow." CFPB_1275. RIF notices were prepared with the date April 13 on them. CFPB_0152.

- Adam Martinez "had discussions with [Gavin Kliger] and Jeremy" Lewin throughout the afternoon, and Martinez had "several employees pull[] information together and provid[e] Gavin with access to a couple of our systems." CFPB_0196.

***Sunday, April 13: Getting DOGE the "access [they] need."***

- The work continued on Sunday. Chief Information Officer Chris Chilbert followed up to ensure that Kliger and Lewin had all the "access [they] need." CFPB_01521. The RIF team asked to schedule a meeting with OPM to discuss "fast moving updates." CFPB_1965.

- The effort to effectuate the mass termination was moving so quickly that not everyone seemed to agree on what should happen. After initially providing Kliger "with the requested access as he said he was being directed by Acting Director Vought," Martinez asked the Chief Information Officer to remove some of that access. CFPB_0546; *see also* CFPB_1122.

- Three hours later, though, Kliger's access was restored, per the "Acting Director['s]" "approv[al]." CFPB_1123.

- Paoletta had a meeting with Jeremy Lewin later that afternoon. CFPB_0138.

- Martinez also sent Kliger and Lewin the "Candidate Separation List" from the failed February RIF, this time relabeled as the "Candidate Separation List 4-13-2025." *Id.*; *see* CFPB_0886 (identifying this spreadsheet as "the list that was proposed for 2/14").

***Monday, April 14: Martinez recommends a "baseline."***

- By Monday, the defendants had moved on from their plan of using the aborted February RIF as the template. The RIF team met on Monday morning at 9 am. CFPB_1278. Members of the team discussed the D.C. Circuit's stay order, and the "particularized assessment" language specifically. CFPB_2048. One of the members remarked that they believed it called for "a full statutory review," and would not be satisfied by "a title review." *Id.*

- At the 9 am meeting, the team discussed the need to "provide [a] proposal" addressing the "% of reduction" by "[i]dentify[ing] [a] % for each division/office." CFPB_1278. They also discussed the "2012 numbers," meaning the CFPB's staffing level in 2012. *Id.* As Martinez told Paoletta in an email a few hours later, he believed it "would be ideal" to use those numbers "as the baseline." CFPB_1110. Those numbers, he claimed, "allowed for the Bureau to meet the reasonable statutory needs at that time." *Id.* That would mean trimming the Bureau to 831 people. CFPB_1111.

- Martinez attached several documents to that email. One of them was a document created in advance of the attempted February RIF that laid out "essential staff" in operations. CFPB_1110. In that spreadsheet, the operations team had identified "134 Operations positions that were deemed 'essential' through wind down, and 22 more that [the Chief Financial Officer] deemed 'long term essential' [even] after a wind down." CFPB_1116 (Martinez describing spreadsheet).

***Tuesday, April 15: Leadership settles on "final numbers."***

- The RIF team met again the next day. CFPB_1276. While they had been discussing "proposal[s]" the day before, CFPB_1278, at this point they were discussing exact numbers. CFPB_1276. The numbers of employees to be RIF'd were *considerably* higher than the "ideal" baseline Martinez had recommended to Paoletta the day before. CFPB_1110..

- By Tuesday afternoon, the target was set. CFPB_3032. The Bureau would retain only 209 positions. *Id.* The next task, then, was for "[s]omeone ... to ID the positions being retained" and "those being released in the RIF." *Id.*

- By 6:51 pm on Tuesday, April 15, a decision on "final numbers" had been made. CFPB_0188. Martinez sent an email to Paoletta and Daniel Shapiro requesting "the final numbers (spreadsheet)" so Martinez could "enter them into the letters that need to go to OPM for approval?" *Id.* Less than two hours later, Martinez submitted the defendants' request for an exemption to OPM with the "final numbers" they had settled on: 1,482 positions would be eliminated. CFPB_0149–50. That's the same number of positions that the defendants had decided to eliminate as of 4:08 pm—the time at which the "[s]omeone still need[ed] to ID the positions being retained." CFPB_3032.

- More than an hour after Martinez requested the "final numbers"—and less than 45 minutes before he sent the request to OPM—a "position retention worksheet" was sent to Martinez as a "list for senior leadership to help make determinations of positions retained in light of a potential RIF." Position Retention Worksheet.xlsx, as attached to CFPB_1875.

6

***Wednesday, April 16: Kliger and Martinez "yell[]" at the RIF team as they work through the night to get the RIF ready to implement by the next day.***

• Kliger followed up with OPM on the exception request the next morning, telling them it was "the highest priority review for today." CFPB_1105. That evening, OPM memorialized in email, as apparently had elsewhere been "discussed" with Kliger, that the "90 day competitive waiver was approved." *Id.* The RIF that OPM approved—of 1,482 positions—is nearly exactly what the defendants did the next day, when they eliminated 1,483 positions. Dkt. 109 at 137 (Paoletta declaration stating that 1,483 positions were released).

• Over the course of Wednesday and Thursday, the defendants worked non-stop to execute the RIFs. *See* CFPB_2052 (time stamps at 3:56 am). Martinez was "yelling at" members of the team, and Kliger was "yelling at" Martinez. CFPB_2054.

***Thursday, April 17: Almost 90% of the Bureau is RIF'd and put on administrative leave.***

• On Thursday, the defendants implemented the RIF. Consistent with the decision they made Tuesday and conveyed to OPM in the request for the exception, the defendants eliminated 1,483 positions. Dkt. 109 at 137.[2]

• RIF notices went out throughout the day on Thursday, informing employees that their separation would be effective June 16, 2025, but that they would lose access to "work systems, including email and internal platforms," at 6:00 pm ET on April 18. Dkt. 109 at 9.

***The supposed "particularized assessment":***

Between Sunday and Thursday, the defendants tried to create a record of having completed a "particularized assessment." But the evidence suggests that the "assessment" that they conducted was nothing more than a show, and—even assuming they were acting in good faith—they completely failed to "assess" what they were required to consider: the Bureau's ability to "perform[]" its statutory duties without the employees they were terminating.

Mark Paoletta testified that the "assessment" was performed by him and "two other CFPB attorneys." Dkt. 109 at 2. Those two attorneys are Victoria Dorfman and Daniel Shapiro, who are detailed to the CFPB from OMB. *See, e.g.*, CFPB_0332. The emails produced by the defendants

---

[2] Only 1,408 employees received RIF notices. *See* Dkt. 108. That's because a RIF eliminates positions, and some of the positions that were eliminated were vacant. *See, e.g.*, CFPB_0851 (attached spreadsheet includes column for "reduction required from vacancies").

reveal how little Paoletta, Shapiro, and Dorfman actually know about how the Bureau "perform[s]" its statutory duties. For example, Dorfman sent Paoletta and Shapiro an email on Sunday with the subject line "Statutorily-required units // brief history." CFPB_0332. At the top was a short paragraph discussing how Supervision, Enforcement, and Fair Lending are organized. Beneath that was a copy and paste from a top Google result when you search for the CFPB's "organic statute." *Id.* Dorfman described these as "the units" that the statute "names." *Id.* Dorfman also forwarded Paoletta and Shapiro an email from Martinez with a list of "references to the specific statutory positions and functions at a high level," CFPB_0645, and information about two reorganizations that "were executed over the past two years." CFPB_0192. Two days later, the three of them had determined the "final number[]" of employees to retain. CFPB_0188. Apparently, within two days of gathering this basic info about what the statutorily required offices even were, Paoletta, Dorfman, and Shapiro had determined exactly how many employees were needed across the Bureau for each of these divisions not only to exist on paper, but to "perform[]" the duties assigned to them by statute.

There is no evidence that Paoletta, Dorfman, or Shapiro spoke with the heads of the CFPB's programmatic divisions or offices to get their assessment of what was needed to continue their statutory functions—and multiple high-level agency officials have submitted declarations saying otherwise. *See* McNamara and Parrish Decl. ¶¶ 5–9 (Office of Markets); Olstad Decl. ¶ 9 (Office of Consumer Populations); Dodd Decl. ¶¶ 1–5 (Community Affairs); Brown Decl. ¶ 5 (Office of Research); Spicer Decl. ¶ 17 (Supervision); 4th Pfaff Decl. ¶¶ 5–6 (Consumer Response). Paoletta's declaration suggests he consulted with "agency operations personnel," Dkt. 109 at 2, but Martinez himself believed that the Bureau could not "keep operating even for 60-days without keeping many of the[] folks" that were RIF'd, CFPB_2312. The defendants didn't even keep a

warm body in each of the offices that are specifically named in the Consumer Financial Protection Act. For example, Paoletta testified that he somehow "determined that the statutory duties of" the Office of Service Members Affairs "could be performed by 1 person." Dkt. 109 at 4. The one person he left in the Office, though, is on "long-term administrative leave pending his planned retirement in September." 2d Olstad Decl. ¶ 7. This is far from the only role that the defendants nominally retained, so they could "perform" their statutory duties, but that is in reality already or soon-to-be vacant. *See, e.g.*, Files Decl. ¶ 2.

**The consequences of the RIF and work stoppage:**

The massive RIF and work stoppage would have had devastating consequences for the Bureau's performance of its statutory duties absent this Court's issuance of a TRO. That's little surprise, given that the defendants failed to consider, let alone plan for, how the Bureau would do its work going forward. The consumer complaint database would have stopped functioning. *See* Files Decl. ¶¶ 6–7, 12. No one would be there "to monitor, operate, or provide oversight of the CFPB's toll-free number," either. 4th Pfaff Decl. ¶ 9. The Bureau's data—and the personal data of American consumers and the sensitive commercial data of financial institutions that the Bureau holds—would have been immediately put at risk, too. *See, e.g.*, Scott Decl. ¶¶ 5, 14. Data about interest rates on which the entire U.S. mortgage industry relies might be compromised, Shelton Decl. ¶ 9, service members and their families would have been left out to dry, 2d Olstad Decl. ¶ 7, and inquiries from small businesses seeking the CFPB's help in complying with the law would have gone unanswered, Fox Decl. ¶ 3. In other words, the immediate, obvious impact of the defendants' actions would be to halt the statutory functions of the Bureau.

**ARGUMENT**

"District courts have the authority to enforce the terms of their mandates." *Sierra Club v. McCarthy*, 61 F. Supp. 3d 35, 39 (D.D.C. 2014). Courts should exercise that authority, and "grant a motion to enforce," "if a prevailing plaintiff demonstrates that a defendant has not complied with a judgment entered against it." *Id.* That is precisely what the plaintiffs have demonstrated here.

**I.    The defendants violated the third provision of the injunction when they issued RIF notices without making a "particularized assessment"—or any assessment at all—of how the Bureau would "perform" its statutory duties without the RIF'd employees.**

Ignoring entirely the other provisions of the preliminary injunction that they have violated, the defendants focus on the third, which governs RIFs. Their argument, though, relies on a flawed interpretation of the D.C. Circuit's stay order, and a factual account that is disconnected from reality.

**1.** Start first with the language of the D.C. Circuit's order. The D.C. Circuit partially stayed the third provision of this Court's injunction "insofar as it prohibits defendants from terminating or issuing a notice of reduction in force to employees whom defendants have determined, after a particularized assessment, to be unnecessary to the performance of defendants' statutory duties." Stay Order 1. That means the defendants are *only* allowed to issue RIF notices if they have conducted a "particularized assessment" into whether the employees they wish to RIF are "unnecessary to the performance of defendants' statutory duties." *Id.* The plain text of that order makes two things clear about the defendants' obligations.

*First*, the defendants must make an "assessment" about whether the CFPB can "perform[]" its statutory duties without the employees they wish to RIF. That entails making an "evaluation or estimation of the … ability" of the CFPB to "carry[] out or accomplish[]" its statutory duties without the employees under consideration. New Oxford American Dictionary 96, 1302 (3d ed. 2010) (definitions of "assessment" and "performance," respectively).

10

*Second*, the injunction not only requires the defendants to make this "assessment," but it requires that the assessment be "particularized." Something is "particularized" if it is done "in detail" or "itemize[d]." Webster's New World Dictionary 985 (3d ed. 1988); *see also* New Oxford American 1277 (to "particularize" is to "treat individually or in detail"). And "particularized assessment" is a phrase that is familiar to the law. It is regularly used to describe a court's or party's obligation to conduct fact-sensitive, case-specific analysis, often that involves weighing multiple factors and objective evidence. *See, e.g.*, *Hooker v. U.S. Dep't of Health and Hum. Servs.*, 887 F. Supp. 2d 40, 59 (D.D.C. 2012) (describing the "particularized assessment" the government must undertake in FOIA cases, which requires "engag[ing] in [a] balancing test before deciding whether to disclose or withhold each record"); *James v. Jacobson*, 6 F.3d 233, 239–40 (4th Cir. 1993) (holding district court erred in denying plaintiffs' request to proceed anonymously at trial because it made only a "general," rather than a "particularized[,] assessment" when it reasoned by "general-proposition" and failed to engage in "a true exercise of case-specific discretion"); *Scott v. United States*, 436 U.S. 128, 132, 136 (1978) (endorsing D.C. Circuit's interpretation of a statute as requiring a "particularized assessment," which entails making an "objective assessment" sensitive to the particular "facts and circumstances of each case"). As the D.C. Circuit has elsewhere described the government's obligation when the government needs to put forward a "particularized assessment," the task is to offer "an explanation tailored to the specific information at issue." *Al Oda v. United States*, 559 F.3d 539, 546 (D.C. Cir. 2009).

The documents suggest that the defendants thought they could get away with firing the vast majority of the Bureau, as long as they left one warm body in each office explicitly identified by the Consumer Financial Protection Act. *See, e.g.*, CFPB_2825; CFPB_0332. Even if that was all the injunction required the defendants failed to meet the bar. *See, e.g.*, 2d Olstad Decl. ¶ 7 (lone

person left in Office of Service Member Affairs has no access to CFPB systems and is not working). But that's an untenable understanding of the plain language of the injunction *and* the CFPB's "statutory duties."

Federal law doesn't just require the CFPB to *have* certain offices; it requires those offices to *do* things. So Consumer Response, for example, is not just a unit that the director "shall establish," but is also a unit with "functions": "collect[ing]," "monitor[ing]," "and respon[ding] to consumer complaints." 12 U.S.C. § 5493(b)(3)(A). And the Office of Service Member Affairs must be "establish[ed]." *Id.* § 5493(e)(1). But it also "shall be responsible for developing and implementing initiatives" to "educate and empower service members," to "monitor complaints by service members," and to "coordinate efforts among Federal and State agencies … relating to … service members." *Id.* This is a pattern that repeats itself across many of the CFPB's statutory duties. *See, e.g.*, *id.* § 5493(d) (Office of Financial Education); *id.* § 5493(g) (Office of Financial Protection for Older Americans); *id.* § 5512(c) (market monitoring); 15 U.S.C. § 1639c(c)(2) (requirement to "publish, and update at least weekly, average prime offer rates"). And those are not the only statutes under which the Bureau has obligations. *See, e.g.*, 5 U.S.C. § 552a(e)(10); 44 U.S.C. § 3520. What the injunction requires, then, is not that there be a particular number of people in a particular office. It's that the defendants "evaluat[e]" how the loss of the employees they seek to RIF would affect the CFPB's "ability" to "carry[] out or accomplish[]" these statutorily required tasks—not just whether the Bureau would have bodies in the offices which are required to do things.

Putting the pieces together, the injunction only allows the defendants to issue RIF notices to employees if they have (1) "evaluat[ed]" how the loss of the RIF'd employees would affect the CFPB's "ability" to "carry[] out or accomplish[]" its statutorily required duties, New Oxford 96,

1302, and (2) done that that evaluation "in detail," Webster's 985, with attention paid to "the specific information at issue," *Al Odah*, 559 F.3d at 546—that is, the information about the need, or lack thereof, to retain the employee to "perform[] … statutory duties," Stay Order 1.

**2.** The defendants failed entirely to meet their burden before issuing the RIF notices on April 17. The evidence strongly suggests that *no* "assessment" was done to identify how terminating the employees that were RIF'd would affect the Bureau's ability to "carry[] out or accomplish" its statutory duties. New Oxford 96, 1302. And it certainly doesn't reflect a "particularized" assessment—one that was done "in detail." Webster's 985.

Instead, what it reveals is that the defendants chose a number of positions to eliminate, without considering the Bureau's ability to function thereafter, while trying to create a paper-trail that suggested otherwise. Stay Order 1. Over the weekend, the DOGE designees—acting at the behest of Vought, *see* CFPB_0196; CFPB_1123—rushed to try and execute the RIF that was previously planned for February. Paoletta apparently intervened on Sunday and helped to get everyone "on the same page." CFPB_0671. But starting again on Monday morning at 9 am, the RIF team was back at work trying to "provide [a] proposal" for a "% of reduction." CFPB_1278. They offered one such proposal, based on the 2012 staffing numbers, which the defendants seemingly ignored. *See* CFPB_1110. Instead, by Tuesday afternoon the defendants had settled on a *much* larger "final number[]" to cut: 1,482 positions. CFPB_0188; CFPB_0149–50; CFPB_3032.

The defendants transparently pretextual efforts to "conduct[] [an] assessment," CFPB_1039, can't mask this numbers-based approach. For one, the "final number[]," CFPB_0188, was determined *before* Paoletta and his two detailed attorneys—Shapiro and Dorfman—had access to the "position retention worksheet" that they were provided for the purpose of "mak[ing] determinations of positions retained in light of a potential RIF." CFPB_1849. And when they

settled on that final number, "someone still need[ed] to ID the positions being retained" and "those being released." CFPB_3032. How the defendants could know it was possible to operate all of the Bureau's statutory functions with 209 employees, but not yet have determined which positions were needed, is unclear.

And the putative "assessment" the defendants made *before* setting the "final number," is hard to take seriously. In one email Dorfman sent to Paoletta and Shapiro, she merely copy-pasted the section of Dodd-Frank that identifies offices required by statute. CFPB_0332. Paoletta testified that he has spent weeks "assessing how the agency can fulfill its statutory duties." Dkt. 109 at 2. If that's true, one would think that by this point he'd identified the offices required by statute. And there's nothing in the documents that the defendants produced—which should have included everything leadership relied on in making a supposed "particularized assessment"—that supports that assertion. Paoletta's declaration itself reveals his lack of familiarity with the Bureau's statutory functions and duties. He describes the "Community Affairs Unit," for instance, as the "only statutorily required component" of the "External Affairs Division." Dkt. 109 at 3. But "Community Affairs" doesn't sit within the External Affairs Division; it sits within the "Consumer Populations Office." Dodd Decl. ¶¶ 8–9; *see also* Olstad Decl. ¶ 17. And everyone in Community Affairs received a RIF notice despite Paoletta saying one person had been left; if that person exists, the people in Community Affairs do not know who it is. Dodd Decl. ¶¶ 4, 10. Paoletta's, Dorfman's, and Shapiro's lack of knowledge about the Bureau meant that even their bare attempt to identify statutorily required positions failed. They terminated multiple positions that *are* required by law. *See* Morgan Doe Decl. ¶¶ 8(a), 9(a), 9(d).

Similarly revealing, several of the employees that the defendants decided to retain after having made their "assessment" had already resigned, accepted the deferred resignation program

14

(the Fork in the Road), or were on administrative leave in advance of a pending retirement. *See, e.g.*, Fines Decl. ¶ 2. The defendants knew as much—noting in their planning documents that "final counts will be lower" than the number nominally reflected in the RIF. CFPB_0365 ("Onboard includes later departures for [deferred resignation program], resignation, [and] retirement."). This was true even of employees that the defendants left as the sole remaining member of statutorily required offices. So when Paoletta says in his declaration that he "determined that the statutory duties" of the Office of Service Members Affairs "could be performed by 1 person," Dkt. 109 at 4, he neglects to mention that the one person he left in that office "was on long term administrative leave pending his planned retirement," Olstad Decl. ¶ 7. So much for the Bureau's purported recent prioritization of "providing redress to service members and their families." Dkt. 109 at 7 (Paoletta's "2025 Supervision and Enforcement Priorities").

But *even* if the defendants made a sincere attempt to identify offices required by the Consumer Financial Protection Act and ensure that at least someone was left in them, they did not satisfy the requirements of the injunction. For one thing, there are other statutes that also govern the CFPB. *See, e.g.*, Morgan Doe Decl. ¶¶ 8–9. And more importantly, the injunction doesn't require the defendants to simply ensure that offices named in the statute exist. It requires the defendants to "assess[]" the CFPB's ability to "carry[] out or accomplish[]"—that is, perform—its statutory duties without the employees they sought to RIF. Oxford American 96, 1302. The defendants *at best* assessed whether there would be people *in* statutorily required offices or functions—not whether those offices could satisfy their statutory obligations without the RIF'd employees.

In reality, the record belies the claim that the defendants considered at all—let alone "in detail," as is necessitated by the adjective "particularized," Webster's 985—*how* the Bureau would

"carry[] out or accomplish" its statutory duties. Although the defendants previously told this Court they were dependent on programmatic managers identifying their statutory functions, the defendants did not consult with the heads of offices or divisions about how they would accomplish their statutorily required work when they were left with a tiny sliver of their old staff—or none at all. *See, e.g.*, McNamara and Parrish Decl. ¶¶ 5–9 (Office of Markets); Olstad Decl. ¶ 9 (Office of Consumer Populations); Dodd Decl. ¶¶ 1–5 (Community Affairs); Brown Decl. ¶ 5 (Office of Research). If they had, they would have learned that the Bureau obviously could not continue to perform its statutory obligations if the RIF went into effect. Indeed, even without consulting with programmatic managers, any genuine assessment would have immediately made that clear: It doesn't take too much work to determine that a unit that analyzes data needs data analysts. *See* McNamara Decl. ¶¶ 9-12. Or a unit that is statutorily required to operate a consumer complaint hotline needs employees to manage the hotline. *See* 4th Pfaff Decl. ¶ 2.

And the defendants' numbers-based approach, in which they left a sprinkling of people behind in offices or units that are mentioned in the statute, also completely failed to consider the interdependence of the Bureau. Take as an example the "Operations Division," which Paoletta said "is not required by statute." Paoletta Decl. ¶ 15. The defendants cut the Operations Division down to 30 employees—only a few more than had previously been determined would be "long term essential" *even after* "wind down" of the Bureau. CFPB_1116. But those employees provide services without which other divisions and units cannot "perform[]" their required functions. "[T]he consumer complaint database," for example, "would stop working" if the Salesforce technology on which it relies broke down—but the defendants RIF'd the Operations employee responsible for "maintain[ing]" that system. Pham Decl. ¶¶ 2–3.

At bottom, the defendants insist that this Court has to take them at their word when they say—based entirely on Paoletta's declaration—that they conducted the requisite assessment. But the Court has already concluded that the defendants' assurances—and the paper trail of emails they have tried to create—are "so disingenuous that the Court is left with little confidence that the defense can be trusted to tell the truth about anything." Dkt. 87 at 65. There's little reason to trust them now. Paoletta was the one feeding Martinez the testimony that this Court already concluded was misleading. *See id.* at 93. And Martinez has already proffered *more* misleading testimony, telling the Court at the hearing on April 18 that he was "told of the potential of a RIF around, approximately, Tuesday or Wednesday of this week." 4/18 Tr. (Dkt. 112) 10. The documents show that Martinez spent the weekend in touch with Vought, Paoletta, DOGE, and others about the RIF, which he was told at the time were planned for Sunday. CFPB_0196. In short, the defendants cannot credibly claim—and the records affirmatively disprove—that they conducted the "particularized assessment" required before issuing the RIF notices.

## II.    The defendants violated the fourth provision by putting 90% of the agency on administrative leave without conducting any assessment, let alone a particularized one, that the agency would be able to fulfill its statutory functions.

The defendants not only RIF'd more than 1,400 employees. They also—the next day—would have disconnected them from all CFPB systems. Dkt. 109 at 9. This work stoppage violated the preliminary injunction. While the defendants offered at least a charade of a "particularized assessment" before conducting RIFs, they didn't even bother to pretend to consider whether the work stoppage would "interfere with the performance of defendants' statutory duties." Stay Order 2. They take the same approach in their briefing in this Court, failing to even acknowledge the work stoppage provision of the injunction.

The defendants' failure to assess whether the work stoppage would "interfere with the performance" of their statutory duties is most obvious in their complete failure to consult with any

of the programmatic heads of offices or units. If the defendants were "assess[ing]" what would happen if, without warning, they prohibited 90% of the Bureau's workforce from working, they would have wanted to understand what those employees were working on, how their work would be replaced, what information would be lost without them, what needed to happen for transition and succession planning, and a whole lot more. They asked none of those questions.

Instead, according to Paoletta himself, three lawyers—two of whom are merely detailed to the CFPB from OMB—holed up and made the decisions alone. Dkt. 109 at 2. It's unimaginable how those three working alone could have made an "assessment," let alone a "particularized" one, about what would immediately happen if you shut down 90% of the work of a complex, large organization like the CFPB. These complexities are exactly why employees "typically" continue working after they receive RIF notices, using the time "to transfer any duties." Dkt. 66-1 at 13. In advance of the planned February RIF, Martinez himself explained that in an email that both Paoletta and Daniel Shapiro received. *See id.*

The defendants' failure to consult with any of the employees they weren't firing about how they would do their jobs going forward demonstrates the defendants' carelessness, too. Take, for instance the employee that "manage[s] and oversee[s]" HMDA Operations—a team of seven that "operates the technology system necessary to collect data under the Home Mortgage Disclosure Act," as required by statute. Shelton Decl. ¶ 1. Every one of her team members was fired. *Id.* ¶ 3. She, though, "lack[s] the technical expertise" to do the statutory work that her team currently does. *Id.* ¶ 7. Tellingly, even after Vought's February stop-work order, a skeleton team of HMDA Operations staff and contractors were granted an exception to perform essential maintenance on the HMDA platform. *Id.* ¶ 8. Now, though, "all of the people that were previously told to work so that HMDA reporting would continue were included in the RIFs and told to immediately stop

working on April 18th at 6pm." *Id.* The defendants apparently put even less thought into this work stoppage than the one that brought the Bureau's work to a screeching halt in February.

Similar consequences would have played out across the Bureau. "If the RIF and administrative leave had not been paused," "[t]here would be no one to manage the contract for the Consumer Response call center" and "no one to receive the weekly data" used to calculate the Average Prime Offer Rate and "ensure it is delivered as per the contract terms." Isa Doe Decl. ¶ 1, 11. The team that responds to small businesses' inquiries about how to comply with the law—as the Bureau is statutorily required to do—would have gone dark. Fox Decl. ¶¶ 3, 7 (describing the high volume of "inquiries per month"). The enforcement division would have been thrown into chaos, at risk of violating court rules, losing data, and more. *See* CFPB_0191 (head of the enforcement division—who was not issued a RIF notice—reaching out to Paoletta on April 18 and raising myriad concerns about enforcement's ability to function); Gelfond Decl. ¶ 7. And the cuts to Supervision mean that the Bureau can't meet the "stated goals" Paoletta himself articulated. Spicer Decl. ¶ 20. The list goes on. *See, e.g.*, Brand Decl. ¶¶ 3, 10–11 (discussing Bureau's inability to comply with federal civil rights laws); Olstad Decl. ¶ 7 (there would be nobody in the Office of Servicemember Affairs).

### III. The defendants violated the Consumer Response and data deletion provisions, neither of which say a thing about a "particularized assessment."

The defendants make no attempt to prove that the Bureau actually has a chance at functioning—in the short or long term. Their defense rests entirely on contorting "particularized assessment" into a meaningless rubber stamp and demanding this Court look the other way while the Bureau is once again dismantled in plain sight.

But even if that dubious interpretation withstood scrutiny, it would not save the defendants from violating paragraphs 1 and 6 of this Court's order. Those prohibitions establish substantive

standards, not procedural safeguards: The defendants "shall maintain" and must not "delete" or "impair" data, Dkt. 88 ¶ 1, and they must "maintain a single, toll-free telephone number, a website, and a database for the centralized collection of consumer complaints regarding consumer financial products and services" and "continue[] to monitor and respond to those complaints, including by providing Elevated Case Management," *id.* ¶ 6. The evidence shows that the RIFs, if not stopped, will violate these provisions.

> **A.    The defendants have rendered the Bureau unable to "monitor and respond to" consumer complaints.**

The defendants' failure to make any effort to show that Consumer Response could fulfill its statutory obligations is particularly telling. This Court's clarification order specifically put them on notice that the Court found it "likely" that, "with the RIF, the agency will be unable to operate the Office of Consumer Response as required by statute and the preliminary injunction order." April 19, 2025 Minute Order. Yet they have nothing to say.

That's unsurprising. The plaintiffs already proved once that a work stoppage precludes Consumer Response from fulfilling its statutory duties. In the immediate aftermath of the February 10 stop-work order, as this Court explained, Consumer Response experienced an "unprecedented backlog," couldn't monitor complaints, failed to refer complaints to other stakeholders or to route them to regulated entities, and was unable to "maintain[]" the "case management system and systems for sharing data." Dkt. 87 at 81–82, 102. And that meant Consumer Response could not fulfill its statutory responsibilities. *See* 12 U.S.C. § 5493(b)(3)(A).

The April 17 RIFs, if this Court hadn't interfered, would have yielded the same consequences. Prior to April 17, Consumer Response had 128 people spread across five sections. Dkt. 109 ¶ 8; 4th Pfaff Decl. ¶ 2. The RIF would've left it with just 16 people—a nearly 90 percent reduction. Dkt. 109 ¶ 8. And, critically, the RIF would have left the most foundational components

of Consumer Response—those responsible for ensuring that the complaints database is operational and that complaints get to the right place—with a *total* of 2 people. 4th Pfaff Decl. ¶¶ 2, 8. Both of those people work in the Product Section, which helps to maintain (along with, as explained below, teams outside Consumer Response) the Bureau's technology for running the consumer complaint database. *Id.* ¶ 2. And the two people left are not able to cover the wide array of tasks necessary to keep the database running: "neither … has the knowledge, skills, abilities, or capacity to maintain the systems." *Id.* ¶ 11. Plus, the RIF left *zero* people in the Stakeholder Services Section, *id.* ¶ 8, which is responsible for managing the Bureau's toll-free number for complaints, ensuring complaints with missing information are completed, granting database access to companies that need to respond to complaints, and processing support tickets from companies, Congress, and other government agencies—all necessary tasks to ensure that complaints are not merely submitted, but actually get to the right place. *Id.* ¶ 2.

Consumer Response, moreover, depends not just on its own staff to meet the statutory obligations that are the subject of the Court's order, but also on staff in other divisions. For example, the Enterprise Data and Analytics team (within the Technology and Innovation Division), which would have been reduced from 28 employees to two, is essential to helping maintain the consumer complaints database and facilitate the distribution of complaints. Files Decl. ¶¶ 2, 7, 8. On a daily basis, two to four employees—all of whom received RIF notices—handle "time sensitive" daily tasks to support the technology that keeps complaints coming in and moving them to the right place (e.g., a company or another agency). Files Decl. ¶¶ 6–7. Because this work would have "come to a screeching halt" on April 18, so would have the Bureau's ability "to maintain a consolidated centralized Consumer Complaints Database." Files Decl. ¶ 12.

Other critical support to Consumer Response comes from the Bureau's contracting officers. They are responsible for managing the contract with the call center that runs the Bureau's statutorily required toll-free hotline. Isa Doe Decl. ¶ 11.a. Of course, the Bureau staff in Stakeholder Services that oversees the call center contractors were RIF'd, but even were the center theoretically able to temporarily continue on without any substantive federal oversight, the contracting officer responsible for approving invoices and ensuring contractual obligations are met also received a RIF notice. *Id.* ¶ 11.a.

The combined effect of this all is to take out virtually everything that Consumer Response needs—internal and external—to process complaints and get them to the right place. It thus doesn't matter that the RIF left a handful of people in Consumer Response. The reality is that the database, hotline, and distribution mechanisms are the backbone of Consumer Response's statutory obligations. If they are broken, nothing works. And the RIFs would've broken them. Thus, the consistent testimony on this subject—indeed, because the government made no record, the *only* testimony—is that Consumer Response will be unable to fulfil its statutory duties. 4th Pfaff Decl. ¶ 8; Files Decl. ¶ 12; Isa Doe Decl. ¶ 11. That is a violation of this Court's order.

**B.    The defendants stopped maintaining the CFPB's data and put it at imminent risk of loss.**

Like the work stoppage provision, the defendants have ignored the data deletion provision of the injunction altogether. Their actions, though, clearly violate this Court's order—which was left untouched by the D.C. Circuit—that they "maintain" and "not delete, destroy, remove or impair any data or other CFPB records." Dkt. 88 at 2. On this score, their violations are several.

The defendants RIF'd, and would have immediately stopped the work of, huge numbers of employees responsible for maintaining CFPB data. The Director of the Enterprise Data and Analytics team explained that she oversees a team of 28 people "responsible for centralized data

22

management supporting every division in the Bureau." Files Decl. ¶ 1. Of the 28 people on her

team, 27 were fired. *Id.* ¶ 2. She and only one employee were retained. *Id. B*ut she put in notice of

her intent to resign on April 2 and will leave the Bureau on May 2, at which point there would be

only one employee left. *Id.* As she explained, it won't "be possible to preserve the Bureau's data

with the one person left," or even with two employees "before then." *Id.* ¶ 4. That will lead to the

loss and impairment of data in the consumer complaint database, that must be collected by law

from the CFPB's website, and from the Supervision Division, the Office of Service Member

Affairs, and several other offices that perform statutorily required work. *See id.* ¶¶ 6–11.

The near shuttering of that team is far from the only thing the defendants did that violates

the data preservation provision. Among other things, they:

- Put at risk 28.5 million CFPB files related to active litigation. Burton Decl. ¶¶ 3, 5, 9.

- Fired the person who manages the contract for the storage of consumer complaints. Pham Decl. ¶¶ 2–3, 5.

- Terminated 36 of 37 members of a team without which the CFPB will be exposed to "significant security vulnerabilities in systems that handle sensitive consumer financial information." Scott Decl. ¶¶ 5, 14.

- RIF'd the team that performs "[n]ecessary maintenance of the [Home Mortgage Disclosure Act] Platform" without which the platform "will eventually break," causing the CFPB to "lose the database of HMDA data." Shelton Decl. ¶ 8.

- Removed large numbers of contracting officer's representatives—the "subject matter experts" who "administer[]" contracts once they are entered into—who ensure that data is preserved and returned to the CFPB after the expiration or termination of contracts. Isa Doe Decl. ¶¶ 5, 12.

- Eliminated the position of the Chief Data Officer—a statutorily required role, *see* 44 U.S.C. § 3520—and his entire team. Morgan Doe Decl. ¶ 9(d).

- Eliminated the position of the Chief Information Security officer—also a statutorily required role—and 21 out of 23 people on the cybersecurity team. Files Decl. ¶ 18.

- Laid off the Chief Privacy Officer—and all of the staff in the Privacy Office—who led the CFPB's "breach response team," "manag[ed] privacy risks," ensured that the CFPB maintained its records in compliance with the Privacy Act, and otherwise protected the

personal identifying information of American consumers that is in the CFPB's custody. Fong Decl. ¶¶ 3, 5–6, 8.

The defendants cannot possibly explain—which might be why they haven't tried—how these actions, and their implementation of the RIFs and administrative leave generally, can be reconciled with the provision of this Court's order governing data preservation.

## CONCLUSION

The Court should grant the motion to enforce.

Dated: April 25, 2025                                    Respectfully submitted,

/s/ Deepak Gupta                                          /s/ Wendy Liu
Deepak Gupta (DC Bar No. 495451)               Wendy Liu (DC Bar No. 1600942)
Robert Friedman (DC Bar No. 1046738)         Adina Rosenbaum (DC Bar No. 490928)
Gabriel Chess (DC Bar No. 90019245)            Public Citizen Litigation Group
Michael Skocpol (DC Bar No. 1659449)          1600 20th Street NW
Gupta Wessler LLP                                         Washington, DC 20009
2001 K Street, NW                                          (202) 588-1000
North Tower, Suite 850
Washington, DC 20006                                    *Counsel for Plaintiffs*
(202) 888-1741

                                                                     Julie Wilson (DC Bar No. 482946)
Jennifer D. Bennett                                        General Counsel
Gupta Wessler LLP                                         Paras N. Shah (DC Bar No. 983881)
505 Montgomery Street                                  Deputy General Counsel
San Francisco, CA 94111                                Allison C. Giles (DC Bar No. 439705)
(415) 573-0335                                              Assistant Counsel
                                                                     National Treasury Employees Union
*Counsel for Plaintiffs*                                  800 K Street, NW, Suite 1000
                                                                     Washington, DC 20001
                                                                     (202) 572-5500

                                                                     *Counsel for Plaintiff National Treasury Employees Union*