### INDEX OF SUPPLEMENTAL DECLARATIONS

| Exhibit No. | Declarant | Title |
| --- | --- | --- |
| 1 | Adam Scott | Director of Digital Services |
| 2 | Angela Fox | Senior Counsel in the Bureau's Office of Regulations |
| 3 | Daniel Dodd | Assistant Director for Community Affairs |
| 4 | Danny Pham | Principal Platform Architect in the Office of Technology and Innovation |
| 5 | Harper Doe | Civil Penalty Fund Administrator |
| 6 | Isa Doe, Jordan Doe, Kelly Doe, and Lee Doe | Employees With Oversight Over Contracts and Procurement Actions |
| 7 | J. Frank Vespa-Papaleo | Assistant Director of the Office of Fair Lending and Equal Opportunity |
| 8 | Jason Brown | Assistant Director of the Office of Research |
| 9 | John McNamara & Leslie Parrish | Principal Assistant Director of the Office of Markets and Deputy Assistant Director of the Office of Markets |
| 10 | Kathryn Fong | Chief Privacy Officer |
| 11 | Matthew Pfaff | Chief of Staff for the Office of Consumer Response |
| 12 | Melissa Brand | Director of the Office of Civil Rights |
| 13 | Monica Shelton | Director of Regulatory Technology |
| 14 | Morgan Doe | Senior Counsel in the Legal Division |
| 15 | Per Olstad | Deputy Assistant Director and Senior Advisor in the Office of Consumer Populations |
| 16 | Rebecca Gelfond | Chief of Staff of the Enforcement Division |
| 17 | Shannon Files | Director of Enterprise Data and Analytics |
| 18 | Theresa Burton | Resource Management Officer in the Enforcement Division |
| 19 | Veronica Spicer | Deputy Assistant Director in the Office of Supervision Policy and Operations |

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL TREASURY EMPLOYEES UNION, *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>RUSSELL VOUGHT, in his official capacity as Acting Director of the Consumer Financial Protection Bureau, *et al.*,<br><br>*Defendants*. | Case No. 25-cv-381-ABJ |

**SECOND DECLARATION OF ADAM SCOTT**

I, Adam Scott, declare as follows:

1. I am the Director of Digital Services at the Consumer Financial Protection Bureau (CFPB). The statements made in this declaration are based on my personal knowledge or information provided to me while performing my duties.

2. In my role, I oversee the Design and Development (D&D) Team. Our team is responsible for developing and maintaining critical digital infrastructure and services that enable the CFPB to fulfill its statutory obligations to American consumers. Including myself, the D&D Team consists of 37 employees.

3. In this role my supervisor is Chris Chilbert, Chief Information Officer. I personally supervise five direct reports who help me manage and coordinate the work of the D&D Team— one who oversees user experience design, one who oversees creative services, one who oversees product management, and two engineering managers.

4. I and my team have a wealth of accumulated expertise in meeting the specialized needs of the CFPB, accumulated over more than a decade. I have over 12 years of experience at

the CFPB, working continuously across multiple administrations since January 2013. I have expertise in software development, supervisory technology, education, and design. My team includes individuals with specialized knowledge of consumer finance, digital accessibility requirements, secure software development, user research, records retention, financial education design, and regulatory design that cannot be quickly replaced or outsourced. The majority of the team has worked for the CFPB for over 10 years, resulting in tremendous institutional knowledge and expertise.

### The April 17 RIF notices

5.      On Thursday April 17th, I received a Reduction in Force (RIF) notice. On the same day I received my RIF notice, I learned through communication with members of the D&D team including the managers who report to me that 33 other members of the D&D team received similar RIF notices that also placed them on administrative leave without access to their work devices. In addition, I was told by Chris Chilbert that two additional D&D Team members were planned to have received similar RIF notices as well, according to a list he was provided, but apparently did not receive their RIF notices by e-mail. So it is my understanding that 36 of 37 members of the D&D Team were intended to receive RIF notices, including myself, leaving only 1 staff member remaining to perform the work of the D&D Team after 6:00 p.m. on Friday, April 18th.

6.      The RIF notices gave myself and the other members of my team very little notice of an impending administrative leave and loss of access to our work devices. Staff members received their RIF notices beginning at approximately 2pm, on Thursday, April 17. The RIF notices informed us that our system access would be terminated by 6:00 p.m. on Friday, April 18, 2025. The timing left us with no meaningful time for knowledge transfer or documentation of

critical operational procedures. The abrupt timeline would have made any continuity of operations virtually impossible.

7.      Neither I nor any other managers who supervise the work of the D&D Team were consulted before the CFPB's acting leadership made the decision to issue RIF notices to nearly my entire team.  No one consulted with me to determine the impact that the planned RIF would have on the D&D Team.  Based on conversations with my five direct reports who manage parts of the team's work, I know that none of them were consulted either. And based on my conversations with Chief Information Officer Chris Chilbert, I understand that he also was not consulted, despite his supervisory role over all Bureau technology operations. Other than myself, my direct reports, and Chris Chilbert there are no other managers who have the necessary technical expertise, design knowledge, and understanding of the D&D Team's work to make an informed assessment of the D&D Team's staffing needs. Consequently, it appears that these critical staffing decisions affecting highly specialized technical functions were made without input from any individuals who are familiar enough with the D&D Team to determine how the RIF notices would affect the D&D Team's work, or to meaningfully assess how a RIF of nearly the entire D&D Team would affect the CFPB's ability to carry out its statutorily mandated duties.

### Effects on statutorily required functions

8.      In early March 2025, Chris Chilbert asked me to compile a list of "statutorily required" operations that the D&D Team supports. My understanding is that this request was related to a court hearing that was happening in this case around that time. Although I am not a lawyer, I did my best to work with my team on this request and identified 33 operations that I believe fit this criterion.

9. Among the statutorily required operations that the D&D Team supports are several important software applications that the D&D Team has been responsible for developing and maintaining. Specific examples include:

A. The Consumer Complaint Database: This system processes over 2 million consumer complaints annually, with over 3 million processed in 2024, and is the primary mechanism through which the CFPB publicly publishes complaints, as required by Section 101(b)(3) of the Dodd-Frank Act. The D&D Team built this software and is responsible for maintaining it on an ongoing basis. Regular maintenance, such as software updates to address security vulnerabilities, is essential to keep this database functioning properly and members of the D&D Team with specialized expertise are typically conducting maintenance multiple times per month.

B. Complaint Explorer/Consumer Complaint Gateway for Government Partners: This custom built data sharing and analysis tool is used by the CFPB to review consumer complaints and is accessed by state and federal regulators, who rely on it for their own enforcement actions. This tool processes sensitive complaint data that includes PII and all information entered by a consumer during the complaint process. The sharing of this data with state and federal regulators is mandated by Section 101(b)(3) of Dodd-Frank. Like the Consumer Complaint Database, the Complaint Explorer/Complaint Gateway for Government Partners requires regular software patching, code updates, and ongoing security monitoring, all of which is performed by dedicated members of the D&D Team with specialized technical expertise.

C.  consumerfinance.gov: This is the CFPB's public website, which it is my understanding that the agency is required to maintain under OMB policy and the E-Government Act of 2002. It receives approximately 2 million unique visitors monthly and hosts over 9,000 pages of content. Content distributed through the website includes statutorily mandated reports and public education materials. The CFPB's website is the authoritative way that the public learns about the work of the CFPB and accesses these materials. The website incorporates both text-based web pages and over a dozen custom applications, all of which must comply with various statutory requirements such as those set forth in the E-Government Act of 2002, Section 508 of the Rehabilitation Act, and the 21st Century Integrated Digital Experience Act. The website's technology is highly specialized and cannot be maintained by generic IT staff or transferred to a commercial content management system without significant redevelopment. Examples of specialized and/or custom-built features of the website that cannot be maintained without the D&D Team's specialized knowledge and expertise include:

1. Find a Housing Counselor: This tool shows homebuyers HUD-approved counseling agencies that provide guidance in making informed housing decisions. It is accessed approximately 100,000 times monthly and is used by lending institutions, particularly smaller institutions such as community banks that may lack resources to build their own tools. It is required by 12 U.S.C § 2604 and 12 CFR § 1024.20.

2. Electronic Financial Impact Platform: This tool was custom-built in 2015 in response to a legal settlement between for-profit schools and various state

> Attorneys General, which provides for the tool to be hosted on the CFPB website. It helps incoming students understand the costs associated with colleges they're considering attending.
>
> 3. Financial Education Tools: The CFPB has a statutory mandate under Section 1013(d) of the Dodd-Frank Act to establish and implement initiatives to educate and empower consumers to make better informed financial decisions. Our D&D team, in partnership with the Office of Financial Education, has built and maintains several specialized financial education tools that fulfill this mandate.

D. Credit Reporting Data Analysis Tool (Metro 2): The D&D team recently built and now maintains a custom data analysis tool for credit reporting data as used by the Supervision and Enforcement divisions. Credit reporting issues are the top consumer complaint category, representing approximately 70% of all complaints the CFPB has received. This tool aims to significantly improve what was previously a time-consuming and manual process for credit report analysis that is mandated by Section 1025 of the Dodd-Frank Act. This tool—whose purpose is to enable the agency to operate in a more streamlined and efficient manner—will be necessary to support priorities 2 and 3, as outlined in the April 16, 2025 memo from Mark Paoletta titled "2025 Supervision and Enforcement Priorities." As with the other applications discussed here, it requires the specialized knowledge and expertise of members of the D&D Team to maintain.

10. A single staff member would not be able to maintain, monitor, and patch even one of these systems by himself. The sheer volume of work and time required would be far too much

for a single person. In addition, no one person would have enough specialized knowledge and expertise with each of these systems to effectively maintain them all.

11. In addition, the abrupt loss of extensive experience and expertise in maintaining these custom-built systems would make continuity of operations nearly impossible. Commercial off-the-shelf solutions cannot meet the CFPB's specialized regulatory requirements without extensive customization requiring the same level of technical expertise we currently possess. Others who might attempt to step in would not have familiarity with the specific and often unique applications the CFPB relies on. Moreover, there is only one other team within the CFPB that has staff with the right technical expertise to hypothetically take over some of the D&D Team's duties. That would be the Regulatory Technology (Reg Tech) team which includes a small number of software engineers, but no design expertise. I have been told that everyone on the Reg Tech team received RIF notices on April 17 as well, except for one person: the team's supervisor (my peer who manages that team), who does not have the necessary expertise to maintain the platforms that we are responsible for.

12. In addition to maintaining these systems that enable the CFPB to carry out its statutorily mandated duties, other examples of work done by the D&D Team that affects the CFPB's ability to fulfill its statutory obligations includes the following.

    A. The D&D Team maintains and regularly updates templates that CFPB personnel use to produce statutorily required reports mandated by the Dodd-Frank Act. The D&D Team's work ensures that these templates comply with Section 508 of the Rehabilitation Act of 1973 and the Americans with Disabilities Act (ADA).

    B. The D&D Team similarly develops and maintains model forms and disclosures that the CFPB provides to industry under Section 1032(b) of the Dodd-Frank Act. These

        model forms reduce the burden on industry by providing sample files, resources, and ensuring legal compliance. The D&D Team's work ensures that these model forms comply with the requirements of Section 1032(b), Section 508 of the Rehabilitation Act of 1973, and the Americans with Disabilities Act (ADA).

    C.    The D&D Team conducts application security monitoring to remediate security vulnerabilities in CFPB software. In performing this work, the D&D Team helps ensure compliance with federal statutes such as the Federal Information Security Modernization Act, the Privacy Act of 1974, the Gramm-Leach-Bliley Act, and the E-Government Act of 2002.

    D.    The D&D team's work is also essential for CFPB's compliance with the 21st Century Integrated Digital Experience Act (21st Century IDEA), which establishes specific requirements for federal digital services. As required by Section 3(a) of the 21st Century IDEA Act, our team ensures that CFPB's digital services: (1) are accessible to individuals with disabilities in accordance with Section 508 of the Rehabilitation Act, (2) maintain a consistent appearance across all consumer-facing tools and applications, (3) eliminate duplication through regular review, elimination, and consolidation, (4) include easy-to-use search functions, (5) are provided through industry standard secure connections, (6) are based on analysis and testing of user needs, and (7) function on mobile devices.

13.    Again, a single staff member would not be anywhere near sufficient to enable the D&D Team to keep track of and ensure compliance with all of the legal requirements described above.

14. The drastic reduction in technical staff within the D&D Team would cause significant security vulnerabilities in systems that handle sensitive consumer financial information. Without sufficient personnel to monitor and address security threats, apply critical patches, or maintain compliance with federal security standards (such as those mandated by the Federal Information Security Modernization Act), the CFPB would face increased risk of data breaches and compliance violations that could harm consumers and undermine public trust in the agency.

15. For all these reasons, the RIF notices issued to nearly my entire team on April 17 to take effect April 18 would have made it impossible for the CFPB to maintain even a fraction of the statutorily mandated systems the Design and Development Team manages, and would have severely impaired the CFPB's ability to fulfill its statutory duties while remaining in compliance with other federal laws.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Executed in Guilford, Connecticut on April 25, 2025.

Adam Scott

9