IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NATIONAL TREASURY
EMPLOYEES UNION, *et al.*,
          *Plaintiffs*,
   v.

RUSSELL VOUGHT, in his official capacity as Acting Director of the Consumer Financial Protection Bureau, *et al.*,
          *Defendants*.

Case No. 25-cv-0381-ABJ

**DECLARATION OF ISA DOE, JORDAN DOE, KELLY DOE, AND LEE DOE**

We, Isa Doe, Jordan Doe, Kelly Doe, and Lee Doe, declare as follows:

1. We are CFPB employees with oversight over contracts and procurement actions. The statements made in this declaration are based on our personal knowledge.

2. We are submitting this declaration pseudonymously and as a group because we fear retaliation. But if the Court would like to know our names and positions, we would be willing to provide them ex parte and under seal.

3. We are filing this declaration to explain that, if the April 17 RIF and administrative leave had not been paused, it is highly likely that CFPB data would have been irretrievably lost. In addition, agency leadership could not have conducted a particularized assessment before issuing the notices because any particularized assessment would have immediately revealed that the impact on procurement alone would make it impossible for the agency to fulfill its statutory functions.

4. Bureau statutory functions are supported by contracts. For example, the Consumer Resource Center relies on a contract with the call center which answers the hotline, a contract for the software that allows call center staff to input data, and a contract for virus protection that

1

ensures that complaints can be safely sent to—and responses safely received from—financial institutions. Funds are distributed from the Redress and Civil Penalty Funds through contracts with three third-party administrators, which currently have about two dozen currently active, each pertaining to a different legal matter, in various stages of distributing funds to affected consumers. And the data needed to calculate the Average Prime Operating Rate (APOR) is purchased via a contract. These are just a few of many examples.

5. Contracting at the Bureau—and government contracting in general—is divided among two groups of people: contracting officers (COs) and contracting officer's representatives (CORs). COs are responsible for the entire procurement process: preparing to solicit bids, soliciting bids, selecting a vendor, and awarding a contract, all the way through to terminating a contract. The CORs' main role is contract administration—that is, managing the contract while it is in place. CORs are delegated responsibilities by COs. Those responsibilities include, among other things, reviewing the goods or services a contractor is providing, ensuring that they comply with the contract and the CFPB's needs, accepting (or rejecting) them, and reviewing the contractor's invoices. While COs are experts in procurement, CORs are subject matter experts. In other words, they are experts in the programmatic area that is served by the contract—and typically are on the programmatic team. So, for example, the COR responsible for the contract with the Consumer Response call center is a member of the Consumer Response team. For many contracts, subject-matter expertise is essential to enabling CORs to oversee a vendor's performance and ensure that a contract is meeting the needs for which it was entered. In addition to the need for subject matter expertise in administering a contract, which a CO typically will not have, segregating the functions of awarding a contract (performed by a CO) and approving the work performed and the invoices (performed by a COR) helps prevent procurement fraud.

6. On April 17, 2025, each of us received a RIF notice, which also informed us that we would be put on administrative leave the following day. Although contracting is a very specialized, technical area, nobody contacted the Senior Procurement Executive, the head of the Office of Finance and Procurement (OFP), or, as far as we know, anyone else in procurement to determine which roles were necessary to provide the bare minimum contracting necessary to support the agency's statutory functions.

7. Leadership did not inform any of us—or, as we understand it, anyone in the Office of Finance and Procurement—who else was RIFed. But based on discussions with our colleagues, all but one Contracting Officer received a RIF notice, as did almost all of the Contracting Officer's Representatives throughout the Bureau. Besides a single Contracting Officer, everyone in procurement was RIFed, including the Senior Procurement Executive.

8. The job of a CO or a COR cannot simply be transferred to another employee. And the duties of the RIFed COs and CORs certainly could not have been transferred in the 24 hours before the administrative leave was going to begin. It takes years of training and experience for a CO to be authorized to bind the government in procurement decisions. Just to become accredited as a CO takes a minimum of 12 months of experience, as well as required training and an exam. In addition, there is a continuing education requirement that must be fulfilled every two years.

9. Becoming a COR also requires training and experience. Like COs, CORs must receive professional accreditation. Even Level I CORs—who are only permitted to administer simple, firm-fixed price contracts (i.e. simple contracts where there is a fixed, predetermined price for a discrete, defined deliverable, such as a contract to purchase laptops)—require 8 hours of training and certification from the Acquisition Career Manager (who was also RIFed). More complex contracts, including contracts for labor—which the Bureau depends on for statutory

functions, such as Consumer Response—require a Level II COR. And Level II CORs need 40 hours of training and 2 years of experience to be certified. After being certified, CORs must continue to maintain accreditation through training and continued experience. In addition, because CORs are ordinarily subject matter experts, they cannot even be easily replaced by other CORs.

10. Any genuine particularized assessment would reveal that halting the work of—and the firing—all but one CO and most of the Bureau's CORs would leave the CFPB unable to handle even the bare minimum amount of procurement and administration work needed to support the statutory obligations of the agency while also complying with applicable regulations. There are hundreds of active contracts at CFPB, many of which directly support statutory requirements and/or are essential to maintaining the infrastructure and operations the Bureau needs to perform those requirements. This workload is far too much for one CO and the remaining CORs to administer.

11. If the RIF and immediate administrative leave had not been paused, contracting functions needed to support the Bureau's statutory functions would have immediately been halted. For example:

 a. There would be no one to manage the contract for the Consumer Response call center. The CO, COR, Alternate COR, and Program Manager responsible for this contract were all RIFed. To keep the call center operational, contracting employees currently must meet with it biweekly to ensure that it is performing its required tasks, problem-solve any issues with the supporting software (such as the database into which hotline operators enter date or the anti-virus software that checks complaints), and resolve any other problems. Without contracting staff, while the center would continue to receive

calls (at least until the contract ran out), nobody would be able to ensure that it was answering those calls or transmitting the data in accordance with the contract and the Bureau's needs; there would be nobody to work with the center if it was not doing so; and nobody to pay the center's invoices—putting in jeopardy its continued operation at all.

      b.      In addition to the contract with the call center itself, operation of the Consumer Response hotline depends on the CFPB's contract with Salesforce. Salesforce provides the database into which hotline operators enter consumer complaints. It provides a record of consumer calls and a case number for future reference. It provides guides that aid hotline operators in routing complaints. Salesforce also records and stores complaint information for future analysis and action, if needed. And it allows the CFPB to store complaint data, analyze complaint data, and take action if a repetitive pattern of complaints is detected by a specific financial entity. The contract with Salesforce also provides for operations and maintenance when Salesforce has a glitch and needs to be maintained and restored to full capacity.

All but one of the contracting staff responsible for the Salesforce contract received RIF notices. The only person left is an alternate COR that's housed in Technology & Innovation, not in Consumer Response. A single back-up COR that is not housed in the office that relies on the contract is insufficient to oversee and administer this vital contract. Without sufficient staff to oversee the Salesforce contract, ensure that the database continues to perform its functions, negotiate with Salesforce if changes need to be made to continue to respond to and monitor consumer complaints, and approve invoices, the database may well stop functioning adequately enough to allow the Bureau to receive, monitor, and respond to complaints.

c. The contract for Average Prime Offer Rate (APOR) data is a yearly subscription, awarded and paid at the beginning of each year. However, because the COR received a RIF notice, if it had not been paused, there would be no one to receive the weekly data, no one to ensure it is delivered as per the contract terms, and no one to resolve any problems with the data.

12.     If the RIF and immediate administrative leave had not been paused, CFPB data would have been at serious risk of deletion. The Bureau has multiple contracts for databases and data storage—contracts that need to be overseen to ensure that the data remains secure and the databases are maintained, that need to be extended or re-bid if they expire, and on which invoices need to be routinely paid. The CO and CORs remaining are insufficient to perform this work. And if it is not done, there is a significant risk that CFPB data will be irretrievably lost. In addition, contracts that have expired or been terminated—or will in the future—cannot simply be abandoned. A CO or COR needs to ensure that the contractor has not only delivered everything it should have, but also that data is preserved and returned to the CFPB and that CFPB property (such as laptops and ID badges) has been returned. Without sufficient contracting staff to perform these functions, data is likely to go unreturned to the Bureau and be deleted, and Bureau property like laptops and phones will also go unreturned—increasing the risk of sensitive information falling into the wrong hands.

13.     If the RIF and administrative leave had not been paused, that would have led to *increased* waste, fraud, and abuse. The Prompt Payment Act requires that agencies pay invoices within 30 days. The Prompt Payment Act also stipulates that the Government must notify vendors of improper invoices within 7 days of receipt. With only one CO and few CORs—and no CORs in some offices—invoices would not get reviewed or paid on time. That would lead the CFPB to

owe penalties and interest. In addition, the vendors could sue the government for failure to pay. And vendors would likely stop work on their contracts, including contracts supporting statutorily required functions. In addition, one purpose of CORs' oversight of contracts is to prevent fraud and abuse—both internally by separating the functions of the person who enters the contract and the person who approves invoices, and externally by monitoring government vendors and ensuring invoices are proper.

14. We are aware that there is an executive order suggesting an intent to consolidate the procurement of common goods and services in the General Services Administration. But for several reasons, this could not possibly replace the contracting functions supporting statutorily required functions that the April 17th RIF and administrative leave would have immediately halted. The consolidation does not apply to agency-specific procurement. And the CFPB does procure agency-specific goods and services: APOR data, consumer response database and maintenance, civil penalty fund, and expert witnesses for example. In addition, the process of transferring any common procurement to GSA is planned over an extended time period that has been laid out by GSA. So if almost all contracting staff were put on leave on April 18th, there would be nobody to replace them.

15. There are also various roles required by the Federal Acquisition Regulation (FAR) where separation of duties is required, which cannot all be performed by a single CO. For instance, the Office of Finance and Procurement has one Competition Advocate. Competition Advocates are required by Federal Acquisition Regulation 6.502 to review contracting operations to, among other things, promote full and open competition. In practical terms, having one person both serve as a CO to establish the competition strategy—i.e the strategy for bidding a contract— and then serve as a Competition Advocate and approve that own competition strategy is a conflict

of interest. The Bureau's current Competition Advocate is retiring, and there is a hiring freeze. The sole remaining CO cannot take on the duties of a Competition Advocate. There are additional roles that cannot be performed by the Contracting Officer, including the Senior Procurement Executive, Head of Contracting Activity, and Acquisition Career Manager. There would be no one left with a professional procurement background to assume these duties.

16. There are a few facts about the February 11th, 2025 mass contract termination we believe would be useful for the court:

    a. The weekend before the order to terminate the contracts was issued, Jordan Wick, whom we understand to be associated with DOGE, spoke with procurement staff asking how to use PRISM, our procurement system, to cancel contracts. Although agency leadership said that he had read-only access to PRISM, the functions he was discussing require write access.

    b. Although Mr. Wick was speaking with procurement staff, the initial order to terminate all contracts supporting Enforcement, Supervision, Consumer Response, Director's Office, and External Affairs came from Chief Legal Officer Mark Paoletta, on behalf of Acting Director Russell Vought. We are aware that Chief Operating Officer Adam Martinez has testified in this litigation that things have changed now that there are "adults in the room"—referring to Mr. Paoletta and Acting Director Vought. But this mass cancellation came from both of them and not DOGE. From the time Acting Director Vought was appointed on February 7, direction on contracts has primarily come from Mr. Paoletta.

    c. The February 11th contract stop-work orders had lasting ramifications, the effects of which are still being felt today, and will continue to be felt in the coming months. The

Bureau must negotiate and pay settlement costs for terminated contracts; review, negotiate, and pay requests for equitable adjustments submitted by impacted contractors; re-procure contracts that support statutorily-required activities which expired after a stop-work order or termination for convenience notification had been issued in mid-February; pay interest on invoices that are still outstanding or were paid late (in accordance with the Prompt Payment Act), and other related effects.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on April 25, 2025, in Washington, D.C.

/s/Isa Doe
Isa Doe

/s/Jordan Doe
Jordan Doe

/s/Kelly Doe
Kelly Doe

/s/Lee Doe
Lee Doe