IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL TREASURY EMPLOYEES UNION, *et al.*,<br>　　　　　　*Plaintiffs*,<br>　v.<br>RUSSELL VOUGHT, in his official capacity as Acting Director of the Consumer Financial Protection Bureau, *et al.*,<br>　　　　　　*Defendants*. | Case No. 25-cv-381-ABJ |

**DECLARATION OF J. FRANK VESPA-PAPALEO**

I, J. Frank Vespa-Papaleo, declare:

　　　1.　　I am an employee of the Consumer Financial Protection Bureau (CFPB) where I serve as the Assistant Director (head) of the Office of Fair Lending and Equal Opportunity (OFLEO). I have been an employee of the Bureau for eleven years in OFLEO. I have been an employee of the Bureau for eleven years, serving as one of the executives in OFLEO the entire time. I am submitting this declaration to document the impact that the planned reductions-in-force (RIFs), and the associated inability of employees to work, would have had on my office's ability to fulfill its statutorily required work.

　　　2.　　Prior to April 17, 15 employees worked in OFLEO. I am the only manager in OFLEO at this time, responsible for directly managing that staff, and closely collaborating with nearly every Bureau Division to implement the fair lending program.

　　　3.　　On the afternoon of April 17, I learned that all OFLEO employees other than me had received reduction-in-force notices and would lose access to work systems at 6pm, April 18. I also learned that nearly all other offices and units with whom OFLEO works to complete its

1

statutorily required work received RIF notices eliminating most of their staff (including in External Affairs, Legal Division, RMR, Supervision, Enforcement, and CRE).

4. No one consulted me about the impact that these terminations would have on OFLEO's ability to fulfill its mandatory statutory duties.

5. But for the Court's Order of April 18, 2025, after 6pm on April 18th, OFLEO would have been unable to perform those statutory functions.

6. The Consumer Financial Protection Act (CFPA) requires the Bureau to maintain an Office of Fair Lending and Equal Opportunity, 12 U.S.C. § 5493(c)(1), and requires the establishment of my position as Assistant Director for Fair Lending, 12 U.S.C. § 5493(c)(3).

7. The Act identifies four statutory functions for the Office of Fair Lending and Equal Opportunity.

8. The first is providing oversight and enforcement of federal laws intended to ensure the fair, equitable, and nondiscriminatory access to credit for both individuals and communities, including the Equal Credit Opportunity Act (ECOA) and the Home Mortgage Disclosure Act ("HMDA"). 12 U.S.C. § 5493(c)(2)(A). To fulfill this mandate, my office collaborates with and provides guidance to Supervision and Enforcement to ensure that their investigations and examinations include fair lending inquiries are consistent with the Director's priorities and fair lending law. The second is coordinating the fair lending efforts of the Bureau with other federal agencies and State regulators, to promote consistent, efficient, and effective enforcement of Federal fair lending law. 12 U.S.C. § 5493(c)(2)(B). This requires, among other things, coordination with multiple federal agencies including the FRB, OCC, FDIC, FHFA, HUD, and DOJ, as well as state and tribal regulators and agencies working throughout the country to keep them apprised of the Bureau's fair lending activities and to ensure the Bureau is knowledgeable of

their fair lending efforts. The third is working with private industry, fair lending, civil rights, consumer and community advocates on the promotion of fair lending compliance and education. 12 U.S.C. § 5493(c)(2)(C). Among other things, this work involves engaging stakeholders throughout the country, developing educational materials and presentations, and supporting outreach efforts that help promote fair lending compliance and ensure fair, equitable and nondiscriminatory access to credit as well as taking in stakeholder feedback on Bureau work to inform policy decisions.

9. The fourth is providing annual reports to Congress on the efforts of the Bureau to fulfill its fair lending mandate. 12 U.S.C. § 5493(c)(2)(D). This includes collection data from all Bureau offices that engaged in fair lending work, as well as coordinating, collecting and reporting from other agencies pursuant to reporting obligations under the CFPA, ECOA and HMDA. In fact, we also report out on certain functions annually per the Government Performance and Results Act of 1993, as amended (GPRA) and the GPRA Modernization Act of 2010, and OMB Circular A-11.2.

10. In addition to this work, my office is also responsible for fulfilling statutory obligations under HMDA. This includes: a. Implementing a system for mortgage lenders to report HMDA data, 12 U.S.C. § 2803(f), 2803(h)(1). b. Publishing various compilations of HMDA data and "provid[ing] staff and data processing resources" necessary to accomplish this, 12 U.S.C. § 2809, 2803(j). c. Making HMDA data available to other federal regulators with supervisory or enforcement jurisdiction under HMDA, 12 U.S.C. § 2804(d). OFLEO serves as the primary coordinator for six federal agencies and several CFPB offices involved in fulfilling HMDA's annual data reporting and disclosure requirements. A member of OFLEO's staff who received a RIF notice serves as the Chair of the FFIEC's HMDA Subcommittee, the interagency body tasked

with coordinating HMDA reporting and public disclosure requirements by the CFPB, the FRB, the FDIC, OCC, NCUA and HUD. OFLEO works closely across the CFPB's the HMDA Operations team within the CFPB's Office of Technology & Innovation, which is responsible for creating and maintaining the technological infrastructure for HMDA. Among others, OFLEO works with the Office of Regulations to publish annual compliance guidance for HMDA reporters and the Office of Research to publish annual reports on mortgage lending using HMDA data.

11.   Had the planned RIFs taken place I would have been unable to complete this work on my own. I am an executive responsible for providing legal advice, strategic oversight and long-term planning, and manage a workforce, yet I lack the technical expertise and day-to-day knowledge required to fulfill certain of these requirements (including as a COR for procurement/contract issues, as a technology programmer for HMDA platform updates, as an economist to run statistical analyses, as a press agent to communicate with media outlets, etc). And because everyone else within my office (and other offices performing aspects of the fair lending program) would have been prohibited from working beginning 6 PM on April 18, no one would have been able to train me, especially since that training, given the complexities and wide array of their expertise would take substantial time. Moreover, the sheer volume of mandatory work is too much for one person to handle, which is why the team currently has 15 full time employees. So, if the RIFs had not been stopped, the Bureau would not have met its statutory obligations. In particular, before the RIFs were paused, I became gravely concerned that the HMDA platform might degraded, or needed attention, the lack of trained experts due to the RIF could quickly cause the HMDA platform to devolve, thereby impacting America's mortgage market. with substantial ramifications for the mortgage market.

12.     Chief Legal Officer Mark Paoletta is aware of statutorily required work that my office performed before the RIF notices were sent out. I communicated with him my email several times after Acting Director Vought issued his stop work order. These emails conveyed both the nature of the mandatory work my office handles as well as the volume of the work.

13.     Most recently, on April 7, I emailed Mr. Paoletta to request approval to engage in various different functions related to HMDA under 12 U.S.C. § 5493(c)(2), 12 U.S.C. § 2809 and § 2810. This work involved coordinating six federal agencies, including their teams of researchers, economists, policy experts, technologists and communications staff, to publish statutorily required compilations of HMDA data, as well as a joint press statement announcing the data releases.

14.     All this work, like that described above, is work that I could not have performed on my own had the RIFs not been paused by the Court. Instead, the Bureau's statutorily required work would have gone unfulfilled and, because of the immediate loss of access at 6pm on April 18,

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on April 25, 2025.                                             */s/ J. Frank Vespa-Papaleo*
                                                                          J. Frank Vespa-Papaleo