IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL TREASURY EMPLOYEES UNION, *et al.*,<br>      *Plaintiffs,*<br><br>v.<br><br>RUSSELL VOUGHT, in his official capacity as Acting Director of the Consumer Financial Protection Bureau, *et al.,*<br>      *Defendants.* | Case No. 25-cv-381-ABJ |

**FOURTH DECLARATION OF MATTHEW PFAFF**

I, Matthew Pfaff, declare as follows:

1. I am employed at the Consumer Financial Protection Bureau, where I currently serve as the Chief of Staff for the Office of Consumer Response. I have been with the CFPB since October 2013. The purpose of this fourth declaration is to provide the court with information about the Reduction in Force (RIF) that commenced at the CFPB on April 17, 2025, and was suspended on April 18, 2025. The following is based on my personal knowledge or information provided to me while performing my duties.

**Consumer Response Structure**

2. Consumer Response is made up of five sections and a front office team:

- The **Product Section** builds and maintains the technology systems to accept complaints, respond to complaints, send complaints to companies and other regulators, and share complaint information.

- The **Stakeholder Services Section** manages the CFPB's toll-free number, sends complaints to companies and other regulators for a response, contacts individuals when their complaints are incomplete, grants access for companies and their users to participate in the complaint process, responds to user support tickets (e.g., support tickets from companies, Congress, and

      other government agencies), and coordinates with the CFPB's Privacy Office on suspected privacy breaches.

- The **Investigations Section** monitors complaints, investigates complaints, and handles escalated complaints issues, including reviewing complaints where the individual indicated they are facing an imminent foreclosure.

- The **Data and Governance Section** coordinates with other CFPB offices (e.g., the Office of Servicemember Affairs, the Student Loan Ombudsman), responds to information requests under the Freedom of Information Act and the Privacy Act, leads records retention efforts, reports on official complaint numbers, and supports the maturation of Consumer Response's work.

- The **Quality Section** maintains the Consumer Response Continuity of Operations Plan, conducts internal audits, responds to oversight requests, and develops policies and procedures governing Consumer Response's work.

- The **Front Office** publishes statutorily required reports, coordinates with other regulators and states, and provides centralized support to the sections on matters related to budget, acquisitions, performance management, and personnel.

3. These sections are interdependent. For example, to investigate imminent foreclosure complaints, the Investigations Section relies on complaints the Stakeholder Services Section routes to companies, which in turn relies on the technology that the Product Section builds. Similarly, to respond to oversight bodies and publish statutorily required reports, Consumer Response's Front Office relies on the internal audits conducted by the Quality Section and official complaint reporting produced by the Data and Governance Section.

4. Consumer Response also relies on offices and divisions outside of Consumer Response. For example, Consumer Response collaborates with the Enterprise Platform Team in the Operations Division to maintain the systems to accept and respond to complaints. And Consumer Response relies on the Chief Privacy Officer team to respond to potential privacy breaches.

**Reduction in Force**

5.  Since my third declaration, I have learned that of the approximately 125 employees in Consumer Response, a total of 16 employees did not receive a RIF notice. Every section in Consumer Response, including its front office, was affected by the RIFs. The roster of retained individuals has not been made available to Consumer Response leadership. Managers have not been informed who from their teams received a RIF notice. Information about how these decisions were made—and whether they followed the Office of Personnel Management's RIF process—has not been provided to Consumer Response leadership, including myself, or any of my colleagues in Consumer Response.

6.  I learned of the first RIF notice around 2 PM—and I received my notice around 3:30 PM—on Thursday, April 17, 2025. This notice informed employees that their access to CFPB's systems would be terminated the next day at 6 PM. There were—and are—no plans that could facilitate an orderly transition of essential tasks and duties from approximately 125 to 16 Consumer Response employees within 24 hours. There was no advance notice. And there was no way to prepare.

7.  According to a March 2025 organizational chart, there were the following numbers of employees in Consumer Response's sections prior to the RIF notices:

- **Product**: 13 people
- **Stakeholder Services**: 22 people
- **Investigations**: 46 people
- **Data and Governance**:13 people
- **Quality**: 10 people
- **Front Office**: 20 people

8. Given current information and conversations that I have had with my colleagues, it is my understanding that the RIFs, if implemented, will result in the following numbers of employees in Consumer Response's sections:

- **Product:** 2 people
- **Stakeholder Services:** 0 people
- **Investigations:** 12 people
- **Data and Governance:** 1 person
- **Quality:** 1 person
- **Front Office:** 0 people

9. Based on the decade I have spent working in Consumer Response, my role as Chief of Staff, and the sheer volume of complaints (estimated at more than five million in 2025), it remains my opinion that the Office will be incapable of performing its statutory duties—including providing consumers with timely responses—if the RIFs were to proceed. Completing this work requires considerable training and knowledge. It cannot be performed by a single—or even sixteen—employees, let alone replacement employees with no familiarity of the tasks involved. ECF 106-2 at ¶¶ 6-17.

10. For example, if implemented, the RIFs will leave the Stakeholder Services Section with no federal employees. There will be no staff to monitor, operate, or provide oversight of the CFPB's toll-free number. There will be no staff to route complaints to companies for a response. There will be no staff to refer complaints to other regulators. There will be no staff to respond to support tickets and provision company access to ensure companies can meet their response obligations. There will be no staff to act on complaints referred by congressional offices, states, and other federal agencies. This will result in many of the same conditions that developed in

February 2025, following the work stoppage order—a disruption that Consumer Response has still not fully recovered from nearly two months later. ECF 38-7 at ¶¶ 12–15, 21. Further, because support teams outside of Consumer Response also received RIF notices, there will be no one to perform necessary tasks that ensure consumers receive timely responses.

11. In another example, the RIFs will reduce the Product Section from thirteen people to two people. The Product Section is composed of people with deep subject matter and technical expertise. Neither of the two remaining employees has the knowledge, skills, abilities, or capacity to maintain the systems necessary for accepting and sharing complaint information with prudential regulators, the Federal Trade Commission, other Federal agencies, and State agencies. This will result in many of the same conditions that developed following the work stoppage order. *Id.* at ¶ 20.

12. These two sections—Stakeholders Services and Product—are responsible for the critical first step of accepting consumer complaints. Problems at this first step will have a ripple effect on all of Consumer Response's work. In addition, because the RIFs would leave nobody in Stakeholder Services, it would not be possible, if the RIFs were implemented, for Consumer Response to provide a timely response to many consumer complaints as statutorily required.

13. In addition, for the Investigations section, if complaint intake and routing is broken—and had these RIFs proceeded, they would have been—then for many complaints, the CFPB would not be able to monitor or investigate those complaints at all as statutorily required.

14. The RIF will make it unlikely that the CFPB can continue programs and remediations implemented based on the findings of the Office of Inspector General (OIG). The OIG—which provides independent oversight of the CFPB and its programs and operations and works to prevent fraud, waste, and abuse—routinely audits and conducts independent analyses on

Consumer Response programs, its structure, and its policies and procedures, among other topics. Consumer Response created programs and devoted staff to ensure that it could faithfully implement the recommendations of this oversight body and respond to ad hoc oversight questions. The RIF eliminates these staff and, in turn, these programs.

15. The RIF will make it unlikely for the CFPB to maintain continuity of operations. In 2013, the CFPB designated Consumer Response as a "Bureau Essential Function," given the importance of complaint handling for the public. In 2018, Consumer Response was designated a "Mission Essential Function" in accordance with Executive Order 12656.[1] This Executive Order, issued by President Reagan in 1988, establishes a framework for the continuity of government and national preparedness. This designation creates various obligations, including identifying personnel and processes by which the CFPB will continue to efficiently maintain services to consumers with minimal disruption under threats and conditions, including emergencies. The RIF eliminates nearly all of the designated staff—both inside and outside of Consumer Response—who maintain continuity of operations for handling consumer complaints.

16. In addition to Consumer Response employees, I understand that nearly 1,400 other of the CFPB's employees received a RIF notice. Consumer Response relies on many of these affected employees to meet its statutory obligations.

17. For example, the Enterprise Data and Analytics team is charged with maintaining data pipelines to allow the CFPB to share consumer-complaint information with regulators and state and federal agencies. It is my understanding that many employees on this team, if not all, have received RIF notices. This team is necessary to the sharing of complaint information with regulators and state and federal agencies, as is statutorily required.

---

[1] Exec. Order No. 12656, 53 FR 47491 (Nov. 18, 1988).

18. In another example, a CFPB employee in the Operations Division is the System Owner for Consumer Response's case management system. The System Owner ensures that the case management system is operating consistent with federal requirements. The case management system is necessary to Consumer Response's work in providing consumers with timely responses to complaints. But the System Owner received a RIF notice.

19. In yet another example, the Chief Privacy Officer is necessary to ensuring that Consumer Response meets its obligations under the Privacy Act, 5 U.S.C. § 552a, and the Trade Secrets Act, 18 U.S.C. § 1905. But the Chief Privacy Officer received a RIF notice.

***

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Executed in Washington, DC this 25th day of April, 2025.

_____
Matthew Pfaff