IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL TREASURY EMPLOYEES UNION, *et al.*,<br>   *Plaintiffs*,<br><br> v.<br><br>RUSSELL VOUGHT, in his official capacity as Acting Director of the Consumer Financial Protection Bureau, *et al.*,<br><br>   *Defendants*. | Case No. 25-cv-381-ABJ |

**SECOND DECLARATION OF PER OLSTAD**

I, Per Olstad, declare:

1. I serve as Deputy Assistant Director and Senior Advisor in the Office of Consumer Populations at the Consumer Financial Protection Bureau (CFPB). The statements in this declaration are based on my personal knowledge. I am making this declaration to offer a written record concerning the reduction-in-force (RIF) notices issued to CFPB staff on April 17, 2025.

2. I am submitting this declaration to supplement a declaration I previously submitted on March 2, 2025, under the pseudonym, "Greer Doe." I submitted that declaration under a pseudonym because I feared retaliation, and I still do. But I am submitting this declaration under my own name and position because I feel it is important to demonstrate that the management officials best positioned to assess the impact of a RIF on their respective Office's ability to complete statutorily required work—and by extension, the broader CFPB's—were not consulted in any way before or after the actions of April 17, 2025.

3. The Office of Consumer Populations (OCP) sits in the Division of Research, Monitoring, and Regulations (RMR). There are several statutorily required Offices within OCP, including the Office of Servicemember Affairs (12 U.S.C. § 5493(e)(1)), the Office of Financial

Protection for Older Americans (12 U.S.C. § 5493(f)(1)), and the Office of Community Affairs (12 U.S.C. § 5493(b)(2)). In addition to these statutorily required Offices, OCP is responsible for a number of other statutory mandates, including both general and specific requirements, detailed further below.

4. OCP and its component teams and Offices consist of analysts, attorneys, program managers, and experienced practitioners who identify and address financial challenges and barriers affecting specific consumer populations. Our staff particularly focus on specific populations of consumers identified in the Consumer Financial Protection Act of 2010, including servicemembers and Veterans, older adults, traditionally underserved consumers, and students and young consumers. Prior to April 17, 2025, there were 53 full-time positions in OCP.

5. Broadly speaking, our work includes: (1) monitoring the financial marketplace to identify risks and emerging issues faced by these consumer populations; (2) engaging with consumers, industry, and community organizations to improve the CFPB's understanding of consumers' experiences in the market for consumer financial products and services; (3) conducting analysis and publishing research and consumer- or industry-facing resources that offer insights into how specific consumer populations are affected by market developments; and (4) engaging and providing technical assistance to external stakeholders—including both governmental agencies and nongovernmental organizations—to better ensure consumer financial products and services meet the needs of different consumer populations.

6. On April 17, 2025, with no prior warning, staff in OCP and across the Bureau began receiving reduction-in-force (RIF) notices via email. The first wave of notices began just after 2:00 pm ET and appeared to target disabled veterans. The second wave appeared to focus on all other veterans. The initial focus on veterans was confusing and seemed contrary to our understanding of

how RIFs categorize and prioritize staff for retention. But we had no communication about any aspect of the RIF before or after it commenced, and no avenue to reach senior CFPB leadership to better understand what was happening. As subsequent waves of notices were emailed to employees, it became clear that nearly everyone was eventually going to receive a RIF notice. I received my RIF notice at 3:35 pm ET. Reporting in the media around that same time indicated that nearly 1,500 employees were expected to receive notices by the end of the day. That reporting appears consistent with the information provided in the April 18, 2025, declaration of Chief Legal Officer, Mark Paoletta.

7. By the end of April 17, 2024, all but three of the 53 total positions in OCP had been eliminated. The employee occupying one of the remaining three—the Assistant Director for the Office of Servicemember Affairs—had already taken the "fork in the road" and was on long-term administrative leave pending his planned retirement in September. He subsequently confirmed that he no longer had—and still does not have—system access or even any CFPB equipment.

8. The other two remaining positions are managers—the Assistant Director for the Office of Financial Protection for Older Adults and the Staff Director of the Office for Students and Young Consumers—and have no remaining staff in their Offices. The Office of Community Affairs—required by statute under 12 U.S.C. § 5493(b)(2)—had every single position eliminated, leaving zero staff to complete its statutorily required functions.

9. Neither I nor any other OCP management official was consulted by Mr. Paoletta or any other senior CFPB leader about the RIFs or what staff were necessary to fulfill OCP's many statutory mandates. To the best of my knowledge, no manager in the entire Division of RMR was consulted about the RIFs or staffing levels necessary to fulfill our statutorily required work.

10.     The impact of the RIFs was immediate and led to another complete stoppage of OCP's statutorily mandated work. There is no way that the two remaining employees in OCP can fulfill all of the Office's statutorily required work.

11.     As noted above, OCP is responsible for completing a broad set of general and specific statutorily required functions and workstreams. Much of that statutorily required work involves complex, ongoing functions that, by statute, require significant coordination with other units in the CFPB, many of which were also reduced to only a handful of remaining positions.

12.     The general statutory requirements supported by OCP include, but are not limited to: coordinating with other parts of the CFPB to conduct financial education programs (12 U.S.C. § 5511(c)(1)); collecting, investigating, and responding to consumer complaints (12 U.S.C. § 5511(c)(2)); collecting, researching, monitoring, and publishing information relevant to the functioning of markets for consumer financial products and services to identify risks to consumers (12 U.S.C. § 5511(c)(3)); and coordinating with federal and state regulators to promote consistent regulatory treatment of consumer financial products and services (12 U.S.C. § 5495).

13.     OCP's specific statutorily required work includes the establishment and functions of CFPB Offices—for example, the Offices of Servicemember Affairs, Community Affairs, and Financial Protection for Older Americans—as well as statutory requirements for CFPB work on specific programs and issues historically fulfilled by OCP.

14.     The mandated functions of the statutorily created Offices include:

o       Under 12 U.S.C. § 5493(b)(2), the Office of Community Affairs is required to provide information, guidance, and technical assistance regarding the offering and provision of consumer financial products and services to traditionally underserved consumers and communities. The Office of Community Affairs is also specifically required

to coordinate with the Office of Financial Education on implementing the strategy to improve consumers' financial literacy (12 USC § 5493(d)(3)(a)).

- The Office for the Financial Protection of Older Americans is established under 12 U.S.C § 5493(g)(1), and is required to help seniors recognize and protect themselves from fraudulent practices (12 U.S.C. § 5493(g)(3)(A)); conduct research to identify effective tools to combat fraud and scams (12 U.S.C. § 5493(g)(3)(D)); coordinate with other federal agencies and state regulators (12 U.S.C. § 5493(g)(3)(E)); and work with community organizations and other non-profits who educate or assist seniors (12 U.S.C. § 5493(g)(3)(F)).

- Similarly, 12 USC § 5493(e)(1) establishes the Office of Servicemember Affairs and requires it to: (A) educate and empower servicemembers and their families to make better informed financial decisions; (B) coordinate with Consumer Response to monitor complaints by servicemembers and direct them to appropriate federal and state agencies; and (C) coordinate with federal and state agencies on consumer protection measures relating to products used by servicemembers. Because there are laws that offer additional protections to servicemembers—for example, the Military Lending Act (10 U.S. Code § 987) and the Servicemembers Civil Relief Act (50 U.S.C. § 3901 et seq.)—and the Office of Servicemember Affairs has developed years of specific subject matter expertise in these areas, the Office plays a critical and irreplaceable—not to mention statutorily required— role in monitoring and responding to servicemember complaints that are received by Consumer Response.

15. Beyond those functions related to the establishment and functions of specific Bureau Offices, OCP has also historically fulfilled specific statutory requirements on behalf of the

5

broader CFPB, including, but not limited to: providing opportunities for consumers to access wealth building and financial services during the tax preparation process to claim earned income tax credits and Federal benefits (12 U.S.C. § 5493(d)(2)(F)); activities intended to prepare the consumer for educational expenses and the submission of financial aid packages (12 U.S.C. § 5493(d)(2)(D)(i)); supporting the functions of the Private Student Loan Ombuds (12 U.S.C. § 5535); and assessing whether conditions or limitations on reverse mortgages are needed (12 U.S.C. § 5602(b)(1)).

16.  OCP has also historically contributed to a number of statutorily required reports, including the Semi-Annual Report to Congress (12 U.S.C. § 5496), the Consumer Response Annual Report to Congress (12 U.S.C. § 5493(b)(3)(C)), the Fair Debt Collection Practices Act Annual Report to Congress (15 U.S.C. § 1692m), the CARD Act Annual Report to Congress (12 U.S.C. § 1637(r)(3)), the Private Student Loan Ombuds Annual Report (12 U.S.C. § 5535(d)), and the Financial Literacy Annual Report (12 U.S.C. § 5493(d)(4)).

17.  I have reviewed the declaration submitted by Chief Legal Officer, Mark Paoletta. I have never met or had a discussion with Mr. Paoletta, so I cannot speak to his familiarity with or knowledge of the CFPB's many statutory mandates. That said, his declaration of April 18, 2025, includes multiple errors of omission and commission and appears to lack a basic understanding of the CFPB's statutorily required functions and work. For example, he incorrectly asserted that the Student Loan Ombudsman is placed within RMR. It is not. He also inaccurately described the "Community Affairs Unit" as an office in the "External Affairs Division." As noted above, the Office of Community Affairs sits within RMR and is specifically required under 12 U.S.C. § 5493(b)(2). The declaration does not address how the remaining staff in OCP will fulfill any—let alone all—of the general or specific statutorily required work required of and performed by OCP.

18. If the RIFs had not been paused by the Court's Order on April 18, 2025, all or nearly all of the statutorily required work outlined above would have ceased. It is implausible, to say the least, that the single remaining position in the Office for the Protection of Older Americans and the Office for Students and Young Consumers could fulfill all the statutory mandates outlined above. Particularly in the short-term, all of that work will essentially stop, and even with more time to adjust CFPB workflows, I do not see any credible approach to ensuring that all of these statutory mandates can be achieved by only two employees. Moreover, the Offices of Community Affairs and Servicemember Affairs were effectively reduced to zero employees (as noted above, the employee occupying the sole remaining position in the Office of Servicemember Affairs is on long-term administrative leave, without system access or equipment, pending his retirement in September 2025). Which means in both the short- and long-term, none of the work statutorily required of those Offices will be completed.

19. Some of the specific work that was stopped includes:
    - Reviewing complaints received from Veterans over the age of 62 to inform coordinated efforts with the Department of Veterans Affairs to combat frauds and scams.
    - Continuing research into age-friendly banking practices and publishing resources aimed at helping financial institutions better identify and prevent frauds and scams targeting older adults.
    - Coordinating with the Office of Regulations to determine how to best address complaint trends from student loan borrowers who have had incorrect amounts auto-debited—by thousands of dollars, in some cases—by their loan servicers.

- o Publishing resources to help consumers impacted by recent natural disasters and completing work on a "rapid response" framework for handling consumer complaints stemming from future natural disasters.

\* \* \*

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Executed in Portland, Oregon on April 23, 2025.

/s Per Olstad<br>
Per Olstad