# DECLARATION OF REBECCA GELFOND

I, Rebecca Gelfond, declare as follows:

1.    I am the Chief of Staff of the Enforcement Division of the Consumer Financial Protection Bureau ("CFPB" or "Bureau"). The statements made in this declaration are based on my personal knowledge or information available to me in the course of my duties.  I have served as the Enforcement Chief of Staff since July 2019. In my role, I lead metrics development and reporting; oversee operational functions, including budget, procurement, and facilities; oversee knowledge management; develop, maintain, and coordinate on policies, procedures, and templates; coordinate with Market Specialists on new investigations and prioritization; lead human capital and hiring; coordinate with external affairs on press and website updates; oversee training; coordinate with staff on special projects; lead and coordinate on oversight; oversee the Litigation Specialists Team, which consists of litigation support specialists; oversee and plan leadership and divisional meetings; and coordinate and address non-matter related inquiries. I have been employed at the CFPB since March 2011. I served in the Office of Fair Lending and Equal Opportunity first as Senior Counsel and then as the Fair Lending Enforcement Director until January 2019. Following a reorganization of the Office of Fair Lending and Equal Opportunity under then-Acting Director Mulvaney, I served in the Supervision, Enforcement, and Fair Lending Division Front Office from January 2019 through June 2019 before transitioning to my current role.

2.    The Enforcement Division is comprised of attorneys and professional staff who support the Bureau's mission to protect consumers by conducting investigations and bringing appropriate enforcement actions. Enforcement staff are responsible for the efficient and effective functioning of the Enforcement Division and delivering on the mission of ensuring consumers are

protected from unfair, deceptive, or abusive acts and practices and from discrimination. *See* 12 U.S.C. § 5511(b)(2) (enumerating Bureau objectives).

3.      Enforcement is a statutorily mandated function under the Consumer Financial Protection Act of 2010 ("CFPA"). Congress defined the Bureau's powers in Subtitle B of the CFPA, codified at 5 U.S.C. § 5511, *et seq*. The CFPA mandates the Bureau's statutory purpose providing that "[t]he Bureau shall seek . . . to enforce Federal consumer financial law consistently for the purpose of ensuring that all consumers have access to markets for consumer financial products and services and that markets for consumer financial products and services are fair, transparent, and competitive." 12 U.S.C. § 5511(a). The CFPA further provides that "[t]he primary functions of the Bureau *are* . . . taking appropriate enforcement action to address violations of Federal consumer financial law." 12 U.S.C. § 5511(c)(4) (emphasis added); *see also* 12 U.S.C. §§ 5563, 5564 (authorizing the Bureau to, among other things, enforce Federal consumer financial law through judicial actions and administrative adjudication proceedings). Of note, the Bureau's primary functions are mandated by the statute.

4.      The Bureau is responsible for enforcing Federal consumer financial laws across multiple markets for banks, nonbanks, and individuals. "Federal consumer financial law" includes the CFPA and 18 enumerated consumer laws, namely the Alternative Mortgage Transaction Parity Act of 1982 (12 U.S.C. § 3801 *et seq.*); the Consumer Leasing Act of 1976 (15 U.S.C. § 1667 *et seq.*); the Electronic Fund Transfer Act (15 U.S.C. § 1693 *et seq.*), except with respect to section 920 of that Act [15 U.S.C. § 1693o–2]; the Equal Credit Opportunity Act (15 U.S.C. § 1691 *et seq.*); the Fair Credit Billing Act (15 U.S.C. § 1666 *et seq.*); the Fair Credit Reporting Act (15 U.S.C. § 1681 *et seq.*), except with respect to sections 615(e) and 628 of that Act (15 U.S.C. § 1681m(e), 1681w); the Home Owners Protection Act of 1998 (12 U.S.C. § 4901 *et seq.*); the Fair

Debt Collection Practices Act (15 U.S.C. § 1692 *et seq.*); subsections (b) through (f) of section 43 of the Federal Deposit Insurance Act (12 U.S.C. § 1831t(c)[(b)]–(f)); sections 502 through 509 of the Gramm-Leach-Bliley Act (15 U.S.C. § 6802–6809) except for section 505 as it applies to section 501(b); the Home Mortgage Disclosure Act of 1975 (12 U.S.C. § 2801 *et seq.*); the Home Ownership and Equity Protection Act of 1994 (15 U.S.C. § 1601 note); the Real Estate Settlement Procedures Act of 1974 (12 U.S.C. § 2601 *et seq.*); the S.A.F.E. Mortgage Licensing Act of 2008 (12 U.S.C. § 5101 *et seq.*); the Truth in Lending Act (15 U.S.C. § 1601 *et seq.*); the Truth in Savings Act (12 U.S.C. § 4301 *et seq.*); section 626 of the Omnibus Appropriations Act, 2009 (Public Law 111–8); and the Interstate Land Sales Full Disclosure Act (15 U.S.C. § 1701). The Bureau is also responsible for enforcing certain other requirements including the Military Lending Act. 10 U.S.C. § 987(f)(6); 15 U.S.C. § 1607(a)(6).

5.      On Thursday, April 17, 2025, I received a Reduction in Force ("RIF") notice from Russell T. Vought, Acting Director of the CFPB, stating that I was being released from my competitive level because my position is being eliminated and that I would be placed on administrative leave and lose system access starting at 6 p.m. Friday, April 18, 2025. *Attachment 1.* I soon learned that about 200 out of the approximate 250 employees in the Enforcement Division (approximately 80%) received the same notice, leaving only 50 employees in the Enforcement Division.

6.      Neither I, nor the acting head of the Division, Cara Petersen, were consulted about the RIF, including how many people or which roles were necessary to perform the Division's statutory functions before the RIF notices went out. Nor were we informed beforehand of the timing of the RIF and that all Enforcement Division staff who received a RIF notice were going to be put on administrative leave and lose system access the very next day.

7.    The planned administrative leave, loss of system access, and RIFs will incapacitate the Enforcement Division. The following functions, which are critical to executing on the Bureau's mandated Enforcement statutory function, will no longer be operable due to the reduction in staffing:

a.    Due to the reduction in Enforcement Front Office staffing,[1] Enforcement will be unable to effectively complete its statutorily mandated reporting requirements, which are necessary for transparency and accountability of the Bureau's enforcement mission. Staff responsible for key elements of statutorily mandated reporting, including preparing the Bureau's semi-annual reports to Congress,[2] Government Performance and Results Act (GPRA) reporting,[3] and tax reporting

---

[1] Under my supervision, the following Enforcement Front Office staff are responsible for this reporting: ████████, Deputy Chief of Staff; ████████, Program Analyst; and ████ ████ Program Analyst.

[2] The CFPA requires the Bureau to semi-annually submit a report to the Committee on Banking, Housing, and Urban Affairs of the Senate and the Committee on Financial Services and the Committee on Energy and Commerce of the House of Representatives, which coincides with a requirement for the Bureau Director to appear before those Committees semi-annually. Among other requirements, the report shall include "a list, with a brief statement of the issues, of the public supervisory and enforcement actions to which the Bureau was a party during the preceding year;" "an assessment of significant actions by State attorneys general or State regulators relating to Federal consumer financial law;" "an analysis of the efforts of the Bureau to fulfill the fair lending mission of the Bureau;" and "a list of the significant rules and orders adopted by the Bureau, as well as other significant initiatives conducted by the Bureau, during the preceding year and the plan of the Bureau for rules, orders, or other initiatives to be undertaken during the upcoming period." 12 U.S.C. § 5496(c); *see, e.g.*, CFPB, Semi-Annual Report of the Consumer Financial Protection Bureau (Dec. 10, 2024); CFPB, Semi-Annual Report of the Consumer Financial Protection Bureau (June 4, 2024).

[3] The purpose of GPRA is to hold agencies accountable for achieving program results, to improve federal program effectiveness through the setting of goals for program performance and measuring results, and to raise public confidence in the federal government. The Bureau reports on its GPRA metrics annually. *See, e.g.*, CFPB, Annual Performance Plan and Report, and Budget Overview (February 2024) (reporting on various enforcement metrics, including the "total amount of consumer relief ordered as a result of public enforcement actions").

under 26 U.S.C. § 6050X received RIF notices.[4] These staff are responsible for building and maintaining the systems from which the information for these reports is tracked and reported. They also ensure consistent data entry and tracking throughout the Enforcement Division, which is essential for accurate reporting. I am not aware of anyone remaining at the Bureau who is qualified to take on this work due to the pending RIF.

b. Due to the reduction in staffing on the Market Specialist and Compliance Team and Enforcement Front Office, Enforcement will be unable to effectively conduct intake of whistleblower tips and act upon those tips, which both serve as an important source of investigations and were contemplated by statute. All Enforcement staff responsible for maintaining and operating the Bureau's whistleblower database,[5] which tracks and facilitates action on tips received RIF notices. The Bureau captures whistleblower submissions of insiders and current or former employees about potential violations of Federal consumer financial law or retaliation in the whistleblower database. Whistleblowers are important to the enforcement function. For example, one authorized litigation was initiated in part due to a whistleblower.

---

[4] Section 6050X requires governmental entities such as the Bureau to file an information return with the IRS with respect to amounts a payor is required to pay, pursuant to certain suits or agreements, with respect to the violation of the law or the investigation or inquiry into the potential violation of the law. Section 6050X also requires the government or governmental entity to furnish a written statement, which provides the same information that was provided to the IRS, to the payor. *See* 26 U.S.C. § 6050X.

[5] ████████, Assistant Deputy Enforcement Director for the Market Specialist and Compliance Team supervised the work of ████████████, a Market Specialist Analyst, and ████████ ████████, a Market Specialist, and were responsible for operating the whistleblower database. Under my supervision, the following Enforcement Front Office staff are responsible for the ongoing maintenance of the database: ████████, Deputy Chief of Staff; ████████████, Program Analyst; and ████████, Program Analyst.

The database is how the Bureau tracks, reviews, and processes the submissions of whistleblowers which 12 U.S.C. § 5567(a)(1) explicitly protects from retaliation. Of note, Mark Paoletta, Chief Legal Officer, had acknowledged the statutory nature of this work having authorized Enforcement to engage in the intake and processing of whistleblower tips. *Attachments 2 and 3*.

c.  Due to the reduction in Enforcement Front Office staffing, Enforcement will be unable to effectively meet its statutory obligation to coordinate with the Federal Trade Commission (FTC) as required by statute and which is necessary to ensure appropriate coordination and avoid duplication of effort. All Enforcement staff responsible for maintaining and updating the database used to coordinate with the FTC received RIF notices.[6] I am not aware of who remains at the Bureau who is qualified to take on this work, which was performed by these staff. The "CFPB-FTC Share Community"[7] is the sole tool the Bureau and FTC rely upon to implement the Bureau's obligations under the memorandum of understanding entered into with the FTC and required by the CFPA, which provides:

> The Bureau and the Federal Trade Commission shall negotiate an agreement for coordinating with respect to enforcement actions by each agency regarding the offering or provision of consumer financial products or services by any covered person . . . or service providers thereto. The agreement shall include procedures for notice to the other agency, where feasible, prior to initiating a civil action

---

[6] Under my supervision, the follow Enforcement Front Office staff are responsible for maintaining and updating the database: ▮▮▮▮▮ Deputy Chief of Staff; ▮▮▮▮▮▮, Program Analyst; ▮▮▮▮▮, Program Analyst; and ▮▮▮▮▮▮▮, Management and Program Analyst.

[7] The CFPB-FTC Share Community is a Salesforce-based database that is a matter management system that allows the FTC and CFPB to share information through automated notifications triggered by data entry regarding new or pending matters.

to enforce any Federal law regarding the offering or provision of consumer financial products or services.

*See* 12 U.S.C. § 5514(c)(3)(a); MOU Between the CFPB and the FTC (February 25, 2019). The Enforcement Division relies on this system to ensure that there is no unintended overlap of work with the FTC. Elimination of the ability to maintain and update the system is also at odds with the new priorities identified by Mark Paoletta: "The Bureau will minimize duplicative enforcement, where another federal regulator is currently engaged in or has concluded enforcement." *Attachment 4 at 2.*

d.   Due to the reduction in Enforcement Front Office operations staff,[8] Enforcement will be unable to effectively procure resources and make expenditures that are necessary to effectively conduct investigations and litigate cases, which are core components of the statutory enforcement mandate. Enforcement must enter into contracts, including for certain document review platforms and obtaining experts, to engage in investigations and litigation. Enforcement also has numerous micro-purchases or purchase card purchases to meet the needs of investigations and litigations. Timely and effective procurement and other purchases are critical to moving enforcement investigations and litigation forward expeditiously. Enforcement has no contracting officers, and all contracting officer's representatives (CORs) within Enforcement received RIF notices. Within Enforcement, these staff facilitate obligations and develop contracts. The COR's

---

[8] I supervise the Enforcement Division's operational staff, who are: ▮▮▮▮▮, Operations Director; ▮▮▮▮▮, Resource Management Officer; ▮▮▮▮▮, Resource Management Office; ▮▮▮▮▮ Operations Analyst; and ▮▮▮▮▮, Operations Analyst.

role is to develop proper requirements and ensure during contract administration that contractors meet the commitments of their contracts, including the timeliness and delivery of quality goods and services as required by the contract. CORs perform necessary steps to implement contracts, including responding to vendor requests, tracking, reviewing, and approving invoices, conducting evaluations, monitoring spending under the contract, and conducting closeout procedures and audits. I am not aware of anyone who remains at the Bureau who is qualified to take on this work, which was previously performed by these Enforcement staff. It is also unclear how purchase card spending will take place without the Enforcement staff who facilitate the approval, tracking, and execution of those expenditures, which are necessary to conduct enforcement work. This includes costs for items such as certificates of good standing necessary for court appearances, sending certified mail, process servers, court reporters, and transcripts. In response to a recent request to expend money to obtain information necessary for a court filing due that day, I was also recently advised by Jafnar Gueye, the Chief Financial Officer, by email dated April 22, 2025, that he "would highly recommend having a gameplan for if RIFs are back in place, as [the Office of Finance and Procurement] OFP will lose its ability to support these types of actions[, namely a time-sensitive purchase card purchase,] all together." *Attachment 5*. I was also advised by Operations personnel that all purchase card holders and operational staff responsible for travel at the Bureau received a RIF notice. Without the ability to

travel, Enforcement will be unable to appear in court or conduct in-person investigational hearings or depositions.[9]

e.  Due to the reduction in Enforcement Front Office staffing, Enforcement will be unable to effectively accomplish numerous other tasks unique to the position descriptions of staff who received RIF notices that are necessary to effectively conduct investigations and litigate cases—core components of the statutory enforcement mandate. Enforcement Front Office staff also perform a variety of critical operational functions to ensure the effective functioning of Enforcement. With the loss of these staff members, it is unclear how Enforcement would be able to do various other tasks necessary for investigations and litigation such as implementing litigation holds; coordinating witness travel, which must be processed as invitational travel; managing various tools needed to conduct work on investigative platforms that provide access to comprehensive databases of public records; overseeing records management across the Division; and maintaining proper access to systems to ensure data security. All are critical tasks that are part of their position descriptions.

f.  Due to the elimination of all E-law litigation support specialists (ESS),[10] Enforcement will be unable to effectively process incoming and outgoing

---

[9] The CFPB has independent litigating authority and is not represented by the U.S. Department of Justice in enforcement actions in the district and circuit courts. *See* 12 U.S.C. § 5564 ("The Bureau may act in its own name and through its own attorneys in enforcing any provision of this title, rules thereunder, or any other law or regulation, or in any action, suit, or proceeding to which the Bureau is a party.").

[10] "E-law" focuses on electronic evidence such as electronic discovery or "e-discovery," which involves the identification, processing, review, and production of electronically stored information ("ESI").

productions in investigations and litigations—core components of the statutory enforcement mandate. ESS are responsible for all aspects of e-discovery, including document production intake and export, document analytics and manipulation, security of productions, and litigation and trial support for attorneys and paralegals. Specifically, they gather information obtained from CIDs and subpoenas and process and manipulate it onto various electronic review platforms to allow Enforcement staff to search and analyze evidence. They are assigned at the outset of each investigation and play essential roles from investigation to litigation. All ESS staff received RIF notices.[11] I am not aware of who remains at the Bureau who is qualified to take on this work, which was performed by these staff. Without these professionals Enforcement would be unable to effectively intake and send out productions, which is critical to conducting investigations and engaging in litigation.

g.   Due to the elimination of all investigators and forensic accountants, Enforcement will be unable to accomplish several investigatory tasks unique to these positions that are necessary to effectively conduct investigations and litigation cases—core components of the statutory enforcement mandate. Investigators and forensic accountants gather, analyze, and prepare evidence in support of investigations and litigations, including financial evidence. This includes researching confidential and open-source databases; gathering facts regarding business practices; analyzing financial statements, entities' ability to pay, and potential restitution and

---

[11] ███████, Director of Litigation Technology, leads the Enforcement Division's team of ESS consisting of: ████████████████████████████████████████ ███████████████████.

remediation; gathering, identifying, and interviewing potential subjects and third-party witnesses; examining, compiling, and collecting evidence and preserving its chain-of-custody; conducting pretexting; and preparing declarations and testifying at trial. All investigators and forensic accountants received RIF notices.[12] I am not aware of anyone who remains at the Bureau who is qualified to take on this work, which was performed by these staff.

h. Due to the reduction in economists and technologists and inability to replace such resources through procurement, Enforcement will be unable to effectively prosecute cases requiring data and technological support. With industry's increasing reliance on technology and the growing existence of data, there is substantial need for data analytics and technology expertise across numerous Enforcement matters. These staff work on matter planning, data requests, providing complex data analytics, developing case theories, assisting with the questioning of technical witnesses, and providing other related assistance. Economists are uniquely skilled to apply technical skills necessary to effectively investigate and litigate, including investigating complex causal relationships in data, identifying harmed borrowers, and determining damages. Technologists provide expertise on specific technological tools that subjects of investigations use, including user

---

[12] ████████, Director of Investigators, leads the Enforcement Division's team of investigators and forensic accountants: ██████████, Senior Investigator; █████ ████ Senior Investigator; ██████████, Consumer Outreach Investigator; █████████, Forensic Accountant; ████, Forensic Accountant; ████████ Senior Investigator; ██████, Senior Investigator; ██████ Consumer Outreach Investigator; ██████, Consumer Outreach Investigator; ███████, Senior Investigator; █████████, Supervisory Investigator; ██████, Consumer Outreach Investigator; ████ ████ Senior Investigator; and ███████, Senior Investigator.

experience, artificial intelligence, and computational modelling. These subject matter experts ensure that the Bureau's enforcement matters are supported with consistent, quality, and duplicatable evidence that is provided on a timely and cost-efficient basis. With the exception of a single economist who is serving a one-year non-reimbursable detail at the Federal Trade Commission, as directed and approved by Mark Paoletta, whose status I was unable to confirm, all Enforcement economists and technologists received a RIF notice.[13] I am not aware of anyone who remains at the Bureau who is qualified to take on this work, which was performed by these staff. Additionally, I am not aware of a mechanism that would allow the Bureau to timely and efficiently procure replacement resources given that the RIF crippled the Enforcement Division's procurement process.

i. The CFPB Continuity of Operations Plan (COOP) identified the need to address time-sensitive enforcement obligations in judicial or administrative matters as one of the Bureau's mission essential functions (MEF) that is critical to the Bureau's strategic contingency planning efforts. The Enforcement Continuity Plan, in draft since June 2024, provides a framework for identifying relevant deadlines and requirements, seeking extensions, or otherwise responding in a timely fashion as necessary in the event of an extended outage, disruption of service, or unforeseen circumstances. The plan sets forth the enforcement continuity roles and responsibilities and lays out specific responsibilities of each of the roles identified

---

[13] _____, Director of Quantitative Analytics, leads the Enforcement Division's team of economists: _____. The Enforcement Division also has two Technologists, _____, who report to me.

above, including specifically, the Chief of Staff, Deputy Chief of Staff/Operations Director, Resource Management Officer, Program Analyst/Management and Program Analyst, ESS, Investigator/Forensic Accountant, Economist, and Litigation Technology Director. This further emphasizes the critical importance of these roles within the Enforcement Division.

8.      The impending administrative leave, if it had not been stayed, likely would have had immediate consequences on pending matters. It did not appear that any steps were taken to ensure the Enforcement Division could function even in the short term during the 60-day RIF Notice Period. Nobody informed Ms. Petersen or me who in Enforcement would receive a RIF notice and consequently would be put on administrative leave and lose system access on April 18, 2015 at 6 p.m. The Enforcement Division has several matters in ongoing litigation. This put Enforcement in the position of potentially having cases with no Bureau representation because there may have been no remaining Enforcement staff with any system access who had appeared in the matter as of April 18, 2025 at 6 p.m.

9.      Senior leadership in Enforcement made best efforts to piece together remaining staff through word-of-mouth. Our best estimate was that there would likely be several ongoing matters with no assigned staff. For example, in one active case, the local rules require that a local attorney have an appearance entered. We discovered that the local attorney for that case had received a RIF notice and was about to be put on administrative leave. I understand that Ms. Peterson emailed Daniel Shapiro, the Deputy Chief Legal Officer, who is a detailee from OMB, copying Mark Paoletta, to ask if one person from each case team with active litigation could have their administrative leave delayed. Although Mr. Shapiro said he would get back to her on solutions, I understand that neither he nor Mr. Paoletta ever responded.

10.     If the administrative leave had not been paused, my understanding based on assumed remaining staff, is that it would have been difficult if not impossible to transition litigation responsibilities to the remaining employees in a responsible way. Because of the immediate administrative leave, there would have been insufficient time to allow those receiving RIF notices to hand off their investigations or litigation such as by conducting appropriate records management and creating transition documents.

11.     On Friday, April 18, 2025, Ms. Petersen sent an email to Mark Paoletta, Victoria Dorfman, and Daniel Shapiro identifying many of these issues and requesting they identify which employees did not receive a RIF notification:

> As I mentioned, in addition to the potential local counsel issue . . . , there appear to be several other matters where the planned RIF would mean the Bureau would no longer be represented and out of compliance with local rules because all attorneys on the matter would be on administrative leave and thus withdrawing. To ensure that attorneys have appeared in all the enforcement actions the Bureau is pursuing, that the matters are staffed, and to operate, I need a list of all Enforcement staff who are not subject to the RIF. And, to the extent that people will be losing access to the system anytime soon, I ask that at least one member of each pending litigation have their administrative leave delayed so we can make an orderly plan for transitioning those matters and ensuring there are attorneys who can appear in the litigation. I'm also concerned because, based on what I'm hearing from my teams, our litigation support and front office positions were all eliminated, which would seriously interfere with our ability to do our work, including intaking document and data productions, protecting and preserving data, conducting investigations, analyzing the financial condition of the subjects of our investigations, procuring resources (e.g., experts), conducting trials, and tracking and reporting on our work, so I'm anxious to learn if any of those staff remain.

*Attachment 6.*  On April 21, 2025, Victoria Dorfman, a detailed Senior Legal Advisor reporting to Mark Paoletta, responded that "[a]s you may have seen, the court issued a stay, so for now, all of the activities you outlined should continue. If there are any changes in the stay status, we will be in touch with you to address these concerns."

12.    It is also not clear to me that the actual number of staff anticipated to serve in Enforcement is intended to be 50. Based on my understanding of who did and did not receive a RIF notice in the Enforcement Division, at least 11 of the employees retained were previously terminated as probationary employees who were reinstated in response to a court order, including one term employee. My understanding is that in addition to seeking to terminate the lease at Headquarters in Washington, D.C., the Bureau is terminating or already terminated the leases at all regional offices, including the New York and Atlanta offices. However, of those Enforcement staff whom I understand did not receive a RIF Notice, 6 are located in Atlanta, 7 are located in New York, and 8 are remote (*i.e.*, duty-stationed in their home locations, such as Boston, Massachusetts). The CFPA mandates that "[t]he principal office of the Bureau shall be in the District of Columbia." 12 U.C.S. § 5491(e). Additionally, the Presidential Action issued on January 20, 2025, provides that "[h]eads of all departments and agencies in the executive branch of Government shall, as soon as practicable, take all necessary steps to terminate remote work arrangements and require employees to return to work in-person at their respective duty stations on a full-time basis, provided that the department and agency heads shall make exemptions they deem necessary." I am unaware of any work to exempt the Bureau from this requirement. There are only 28 Enforcement staff who did not receive RIF notices and who (a) were not previously terminated probationary employees; and (b) are duty-stationed in the District of Columbia—of whom only 15 are Enforcement Attorneys. Combined with the presidential directive to hire no more than one employee for every four employees that depart, additional reductions in staff only further call into question the ability of the Enforcement Division to fulfill its statutory mandate.

* * *

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Executed in Chevy Chase, MD this 23rd day of April, 2025.

*Rebecca Gelfond*

Rebecca Gelfond

## Index of Attachments

Attachment 1  Reduction in Force Notice dated April 17, 2025

Attachment 2  March 5, 2025 Email from Mark Paoletta re: Memo on Authorized ENF Work

Attachment 3  March 4, 2025 Recommendation for the Acting Director re: Authorized Enforcement Work

Attachment 4  April 16, 2025 Memo from Mark Paoletta re: 2025 Supervision and Enforcement Priorities

Attachment 5  April 22, 2025 Email from Jafnar Gueye re Rush Pcard Request Coming Today for a Court Filing

Attachment 6  April 18, 2025 Email from Cara Petersen re Enforcement Requests

MEMORANDUM FOR:    REBECCA GELFOND

FROM:    Russell T. Vought
    Acting Director of Consumer Financial Protection Bureau

DATE:    April 17, 2025

SUBJECT:    Specific Notice of Reduction in Force

I regret to inform you that you are affected by a reduction in force (RIF) action. This RIF action is necessary to restructure the Bureau's operations to better reflect the agency's priorities and mission.

This is your specific notice of RIF. In accordance with RIF procedures specified in Title 5, Code of Federal Regulations, Part 351, you are being released from your competitive level because your position is being eliminated. Consequently, you will be separated from Federal service effective June 16, 2025. In the event you are qualified and have assignment rights to a position that becomes available during the notice period, you will be informed via a specific, subsequent RIF notice. Should the circumstances of the RIF otherwise change, this notice may be withdrawn.

Please be advised that you will retain access to work systems, including email and internal platforms until 6:00 PM Eastern Time, on April 18, 2025. After that time system access will be discontinued, and you will be placed in an administrative leave status through your official separation date as outlined above.

It is recommended that you download a copy of your eOPF and performance records and send **only** personnel related documents to your personal email address. Employees **are strictly prohibited** from sending any Bureau work related documents, emails, information or data to their personal email address. **Employees are only authorized to email personal records outside of the Bureau.** Employees who send Bureau work related documents externally will be subject to disciplinary action up to and including removal from federal service.

Also, please ensure that your personal information is updated in HRConnect including your personal email address, personal phone number and home address. This information will be important as we continue to communicate with your during the RIF period.

**Retention Standing**

This action is being taken under the civil service RIF regulations and procedures. CFPB retains information used in connection with this action, including retention registers which list employees in retention standing order by civil service tenure group and subgroup, veterans' preference, performance ratings, and length of Federal service.

**Competitive Area:** OFFICE OF ENFORCEMENT
**Type of Service:** Excepted-Permanent

Exhibit 1
Page 1 of 4

**Work Schedule:** Full-Time
**Position:** Supervisory Attorney-Adviser, CN-72, **Series** 0905
**Competitive Level:** A010
**Tenure Group and Subgroup:** Tenure Group 1
**Veterans' Preference:** None

███████████████████████

█████████████████████████████████████████████
███████████████
███████████████████████████████████████████
███████████████
████████████████████████████████████████████
███████████████

██████████████████████████████████████████

████████████████████████████████████████

█████████████████████████████████████████████████
███████████████████████████

Please contact the Bureau of Fiscal Service (BFS) at ████████████████ or
█████████████████████████ immediately if you believe any of the above information is
incorrect. The Bureau is committed to correcting any incorrect employee information.

You may be eligible for a severance pay. For eligibility, please visit OPM's Severance Pay Fact
Sheet.

**RIF Package**

Each employee impacted by RIF has access to documents that outline applicable benefits for
which you may be eligible or entitled as appropriate. To access these documents, you may make
an appointment with the Bureau of Fiscal Service (BFS) to obtain paper copies of the documents.
You may make an appointment by contacting BFS at ████████ ████████ or
████████████████████████. In addition, the websites to certain relevant external benefits
provided by other entities are found immediately below.

For training benefits under the Workforce Improvement Act of 1998, please visit
www.careeronestop.org.

For unemployment compensation benefits, please refer to the Department of Labor website at
www.dol.gov.

For general transition assistance information, please refer to the OPM Employee's Guide to
Career Transition or contact OHC at ██████████████████████.

Exhibit 1
Page 2 of 4

**Appeal and Grievance Rights**

U.S. Merit Systems Protection Board (MSPB)
If you believe your retention rights have not been applied correctly or have been violated, you may appeal this action to the MSPB. Your appeal must be in writing and may be filed any time after the effective date of the action being appealed until no later than 30 calendar days after the effective date. Failure to file an appeal within the time limit may result in dismissal of the appeal as untimely filed. More information on filing appeals is included in your RIF package. You may also access the MSPB website at www.mspb.gov for additional and further detailed information on the appeal process.

Equal Employment Opportunity (EEO)

If you believe this termination is being taken in whole or in part because of discrimination based on race, color, religion, sex, national origin, disability, age, genetic information, pregnancy and/or reprisal for prior EEO activity, you may file a discrimination complaint with the Agency's Office of Civil Rights. To initiate the formal discrimination complaint process, you must first contact an EEO Counselor within forty-five (45) calendar days of the employment action or event you believe is discriminatory, harassing, or retaliatory. You may contact the Office of Civil Rights at ██████████████ or ██████████████████████

Office of Special Counsel

If you believe this action is being taken in retaliation for your making protected whistleblowing disclosures, you may also seek corrective action from the U.S. Office of Special Counsel (OSC). If you do so, your appeal may be limited to whether the Agency took one or more covered personnel actions against you in retaliation for making protected whistleblowing disclosures, and you will not be able to challenge the decision on other bases in that action. To seek corrective action from the OSC, you may submit your complaint online. More information on or about filing a complaint with the OSC may be found at https://osc.gov/Pages/File-Complaint.aspx.  As an alternative, you may communicate in writing to the following address:

> Complaints Examining Unit
> U.S. Office of Special Counsel
> 1730 M Street, N.W., Suite 218
> Washington, DC 20036-4505

**Conclusion**

This action is being taken in accordance with the applicable civil service RIF regulations. Included in your RIF package is a copy of the Office of Personnel Management (OPM) retention regulations, 5 C.F.R. Part 351. Further and detailed information about the RIF regulations may also be accessed on OPM website, Reductions in Force. You may make an appointment to review and obtain a copy of the RIF regulations and/or records pertaining to you by contacting the Bureau of Fiscal Service.

Exhibit 1
Page 3 of 4

The Employee Assistance Program (EAP) is available free to you and in most cases your immediate family. EAP counselors are available 24 hours a day, 365 days per year at ███████ ███████████████████ or http://www.foh4you.com/.

Because you are being separated through a RIF action, you are eligible for career transition and placement assistance. Specifically, you are eligible for the Bureau Reemployment Priority List (RPL), Career Transition Assistance Program (CTAP), and Interagency Career Transition Assistance Program (ICTAP). Your RIF package includes further information on these programs.

Please be advised that an early resignation may affect your eligibility for placement assistance and your appeal rights. It may also impact your ability to qualify for unemployment compensation and training benefits provided under WIA. You are encouraged to contact your State's Department of Labor and Employment for any questions regarding unemployment compensation. You are also encouraged to contact the Bureau of Fiscal Service (BFS) at ███████████████████ or ███████████████████████ to determine how an early resignation may affect your benefits.

This RIF action does not reflect directly on your service, performance, or conduct. It is being taken solely for the reasons stated above. Leadership at the Bureau of Consumer Financial Protection are appreciative of your service.

Attachments (7)
1. MSPB Appeal Information
2. OPM Retention Regulations
3. Severance Pay Estimate
4. Unemployment Insurance
5. State Workforce Programs
6. Authorization for Release of Employment Information
7. CTAP, ICTAP and Reemployment Priority List (RPL) Program Information

Exhibit 1
Page 4 of 4



From: Petersen, Cara (CFPB)
To: DL CFPB ENFORCEMENT SENIORS; ██████████
Subject: Fw: Memo on Authorized ENF Work
Date: Wednesday, March 5, 2025 6:13:35 PM

From: Paoletta, Mark (CFPB) ████████████████
Sent: Wednesday, March 5, 2025 5:46:28 PM
To: Petersen, Cara (CFPB)
Cc: Shapiro, Daniel (CFPB) ████████████████, Dorfman, Victoria (Detailee)
████████████████████

Subject: RE: Memo on Authorized ENF Work

Hi Cara,

We are reviewing your memo and will provide responses on rolling basis so you can move forward.

For Section A, enforcement staff are authorized to conduct the work outlined in this section. Please submit any substantive filings to me, Daniel and Victoria for review and approval before filing.

For Section D, enforcement staff are authorized to conduct the work outlined in this section.

For Section E, enforcement staff area authorized to conduct the work outlined in this section.

The activities I am approving in this email are not subject to my direction not to make communications to parties subject to pending enforcement matters and that performing these activities will not be considered a violation of the Acting Director's stand down order for purposes of the CFPB's new tip line.

Will respond to the other requests soon.

Thanks.

Mark

From: Petersen, Cara (CFPB) ████████████████
Sent: Tuesday, March 4, 2025 5:12 PM
To: Paoletta, Mark (CFPB) ████████████████
Cc: Shapiro, Daniel (CFPB) ████████████████
Subject: Memo on Authorized ENF Work

Hi Mark,

Exhibit 2
Page 1 of 2



By way of follow up to your 3/2 message to staff, I am seeking direction on Enforcement's statutorily required work. Attached is a recommendation and decision memo to the Acting Director requesting authority to conduct certain categories of Enforcement work. I can revise the memo to be to you, like I've done for other decision memos, if that's appropriate. I am happy to discuss, and thanks in advance for your assistance so I can provide Enforcement staff with clear guidance on what work tasks they can conduct.

Cara

Exhibit 2
Page 2 of 2

March 4, 2025

Recommendation Memo for the Acting Director

| **FROM** | Cara Petersen, Acting Enforcement Director |
|---|---|
| **SUBJECT** | Authorized Enforcement Work |

Recommendation

Enforcement recommends that you authorize Enforcement staff to conduct specific categories of work described below in support of the Bureau's primary function to enforce Federal consumer financial law as outlined herein.

Background

Enforcement views our function as mandated by statute,[1] and "taking appropriate enforcement action to address violations of Federal consumer financial law" is among the Bureau's primary functions.[2] However, since Acting Director Vought's February 10, 2025 email not to perform any work tasks, Enforcement has only raised urgent matters to Mark Paoletta for approval to proceed with specific work tasks. These issues were all connected to urgent deadlines in pending litigation.

In light of the March 2, 2025 email from Acting Director Vought directing CFPB employees to perform work required by law, we require guidance on the scope of our authority to conduct specific work tasks so we can provide Enforcement staff with clear direction. Given the broad range of work Enforcement conducts in all phases of investigations, litigation, and post-judgment work, and given the number of individualized situations that arise in those contexts, Enforcement seeks directional feedback on the below.

    A.  Pending Litigation

For pending litigation matters, we understand that you are assessing pending litigations to determine whether to authorize them proceeding. To date, we understand you to have authorized Enforcement proceeding with the following matters:

- *CFPB v. MoneyLion Technologies Inc., et al.* (S.D.N.Y. No. 1:22-cv-08308);
- *CFPB v. Craig Manseth, et al.* (W.D.N.Y. 1:22-cv-29); and
- *CFPB, et al. v. StratFS, LLC, et al.* (W.D.N.Y. No. 1:24-cv-00040).

---

[1] *See* 12 U.S.C. § 5511(a) ("[t]he Bureau shall seek to . . ., where applicable, enforce Federal consumer financial law consistently for the purpose of ensuring that all consumers have access to markets for consumer financial products and services and that markets for consumer financial products and services are fair, transparent, and competitive.").

[2] 12 U.S.C. § 5511(c)(4). *See also* 12 U.S.C. §§ 5563, 5564 (authorizing the Bureau to, among other things, enforce Federal consumer financial law through judicial actions and administrative adjudication proceedings).

Exhibit 3
Page 1 of 6

For *MoneyLion*, the Chief Legal Officer has confirmed that staff and managers are authorized to conduct all necessary tasks to prosecute that case. Enforcement seeks similar authorization to conduct the full range of activities to effectively and efficiently prosecute *Manseth*, *StratFS*, and other litigations to the extent they are authorized, including but not limited to:

- reviewing documents and analyzing data,
- conducting factual and legal research and analysis,
- conducting all aspects of discovery,
- engaging with co-counsel and opposing counsel,
- working, communicating, and sharing investigatory material with other government agencies,
- communicating with third parties in relation to the litigation,
- issuing and enforcing subpoenas,
- making appearances,
- engaging and working with experts,
- engaging our outside vendor to facilitate sharing and review of documents/data with partners; and
- filing motions, briefs, reports, and other documents required for litigation and in response to court requests and orders.

As you continue your assessment of the other pending litigation matters on Enforcement's docket, Enforcement will continue to bring urgent issues to you for resolution on a case-by-case basis. In the meantime, we seek authority to conduct ministerial tasks in these matters, including:

- communicating with opposing counsel and co-counsel regarding non-substantive issues,
- filing counsel appearances,
- withdrawing counsel from cases,[3]
- monitoring the docket by reviewing filings and orders,[4] and
- taking steps to ensure preservation of documents, including working with terminated contractors.

We also stand ready to assist in your review of pending litigation matters as you continue to assess them.

B. Post-judgment Matters

For enforcement actions that are post-judgment, the Bureau has several responsibilities to facilitate compliance with orders and ensure timely consumer redress. Subjects of orders are required to make certain submissions, which necessitate Bureau review and often response. Additionally, for Bureau-administered redress and payments from the Civil Penalty Fund, the CFO's office relies

---

[3] This was previously authorized via email dated February 26, 2025.

[4] This was previously authorized via email dated February 26, 2025.

2

Exhibit 3
Page 2 of 6

on Enforcement to provide information and analyze data regarding the identification of harmed consumers and allocation of consumer redress. *See generally* 12 U.S.C. § 5497(d); 12 C.F.R. Part 1075.

Enforcement accordingly seeks authorization for matters that are post-judgment to:

- respond to requests from counsel relating to redress,
- engage with counsel on compliance submissions, including Compliance and Redress Plans the orders require them to submit, including non-objecting to such plans consistent with the orders,
- conduct work necessary to meet deadlines associated with orders,
- conduct work necessary, and in collaboration with the CFO's office, to facilitate Bureau-administered redress and Civil Penalty Fund distributions being timely paid, and
- continue work to monitor for compliance with final orders, including reviewing incoming submissions and conducting work necessary to assess compliance with the order, which may include seeking clarifications and additional information from the subject. *See generally* 12 U.S.C. § 5481(14) ("Federal consumer financial law" is defined to include an "order prescribed by the Bureau.").

C. Pending Investigations

On February 10, 2025, Mark Paoletta indicated implementation of all past enforcement priorities must cease and that the Acting Director is implementing new enforcement priorities. Please let us know what information would be most helpful to facilitate your assessment, as with litigations, of which pending investigations should proceed consistent with the Acting Director's new priorities and we will prepare briefing materials.

In the meantime, with respect to pending investigations, Enforcement seeks authority to conduct internal investigational activities and to obtain information voluntarily, including:

- intaking and processing productions in response to previously issued CIDs,
- reviewing documents and analyzing data already in the Bureau's possession,
- working, communicating, and sharing investigatory material with other government agencies,
- conducting factual, legal, and economic research and analysis,
- utilizing and accessing confidential, non-compulsory, law enforcement tools and databases,
- drafting internal documents,
- engaging in outreach to consumers and other third parties, such as former employees, through non-compulsory means (*e.g.*, informal interviews); and
- interacting with subjects of investigations and their counsel for the limited purposes of responding to routine questions from counsel, taking steps to extend pending investigatory deadlines, and seeking tolling agreements; we would not engage in other interactions with parties who are subject to the investigation absent separate approval.

Ceasing our internal investigatory activities puts Bureau claims at risk of being time-barred

3

Exhibit 3
Page 3 of 6

because we will have been in receipt of information and not timely reviewed it. *See* 12 U.S.C. § 5564(g)(1) ("Except as otherwise permitted by law or equity, no action may be brought under this title more than 3 years after the date of discovery of the violation to which an action relates."). Enforcement wishes to prevent Bureau claims from becoming time-barred to preserve the ability to pursue pending investigations that the Acting Director later determines are consistent with his new priorities.

D. Whistleblower Tip Line

We seek authority to engage in intake and processing of whistleblower tips regarding potential violations of consumer financial laws and to communicate with whistleblowers to gather additional information and the Department of Labor regarding claims of retaliation. Enforcement's whistleblower tip line and database are the means by which the Bureau receives, tracks, reviews, and processes the submissions of whistleblowers that 12 U.S.C. §§ 5567(a)(1) explicitly protects from retaliation.

E. Administrative and Professional Support and Divisional Coordination

We also seek the general authority to provide administrative and professional support for all authorized work, including:

- assessing and assigning work and staff,
- approving necessary purchases and invoices,
- updating databases, and
- traveling, including facilitating travel, approving travel, and taking necessary training to enable travel.

We also seek authority to (a) engage with staff in other Divisions who typically support, or provide operational assistance to, enforcement work in connection with Enforcement's authorized work, and (b) have Enforcement staff conduct work to support the authorized work of other Divisions.

Conclusion

For the foregoing reasons, Enforcement recommends that you authorize Enforcement staff to conduct specific categories of work in support of the Bureau's primary function to enforce Federal consumer financial law as outlined herein.

We also seek clarity that the activities described above are not subject to the Chief Legal Officer's direction not to make communications to parties subject to pending enforcement matters and that performing these activities will not be considered a violation of the Acting Director's stand down order for purposes of the CFPB's new tip line.

As additional matters are authorized or as further issues present themselves, we will request further authority as needed.

4

Exhibit 3
Page 4 of 6



Recommendation Memo Reviewer Sheet

| Subject/Document Title | | |
| --- | --- | --- |
| Authorized Enforcement Work | | |
| Name of Document Owner | Division | Telephone Extension |
| Cara Petersen | Enforcement | ███████ |
| Approved by (name of Associate or Assistant Director) | | |
| Cara Petersen | | |
| Office | Name of Reviewer | Date |
| [Insert office] | [Insert name of reviewer] | [Insert date] |
| Office | Name of Reviewer | Date |
| [Insert office] | [Insert name of reviewer] | [Insert date] |
| Office | Name of Reviewer | Date |
| [Insert office] | [Insert name of reviewer] | [Insert date] |
| Office | Name of Reviewer | Date |
| [Insert office] | [Insert name of reviewer] | [Insert date] |

Exhibit 3
Page 5 of 6

5

**Consumer Financial Protection Bureau**
1700 G Street NW
Washington, D.C. 20552

cfpb  Consumer Financial
      Protection Bureau

Decision Memo from the Acting Director

| FROM | Russell Vought |
|------|----------------|
| TO | Acting Enforcement Director |
| SUBJECT | Authorized Enforcement Work |

I authorize Enforcement staff to conduct the following work recommended by Enforcement on March 4, 2025, as follows:

_____ Enforcement staff are authorized to conduct the work outlined in Section A.

_____ Enforcement staff are authorized to conduct the work outlined in Section B.

_____ Enforcement staff are authorized to conduct the work outlined in Section C.

_____ Enforcement staff are authorized to conduct the work outlined in Section D.

_____ Enforcement staff are authorized to conduct the work outlined in Section E.

Work that Enforcement staff is authorized to conduct is not subject to the Chief Legal Officer's direction not to make communications to parties subject to pending enforcement matters and performing these activities will not be considered a violation of the Acting Director's stand down order for purposes of the CFPB's new tip line.

_____          _____
Russell Vought                                                    Date
Acting Director
Consumer Financial Protection Bureau

Exhibit 3
Page 6 of 6



**Consumer Financial
Protection Bureau**

1700 G Street NW, Washington, D.C. 20552

April 16, 2025

| | |
|---|---|
| **TO** | CFPB Staff |
| **FROM** | Mark R. Paoletta<br>Chief Legal Officer |
| **SUBJECT** | 2025 SUPERVISION AND ENFORCEMENT PRIORITIES |

This document sets out the Bureau's supervision and enforcement priorities. The Bureau will focus its enforcement and supervision resources on pressing threats to consumers, particularly service members and their families, and veterans. To focus on tangible harms to consumers, the Bureau will shift resources away from enforcement and supervision that can be done by the States. All prior enforcement and supervision priority documents are hereby rescinded.

1. To avoid the ever-increasing number of supervisory exams, which are multiplying the cost of running businesses and raising consumer prices, Supervision shall decrease the overall number of "events" by 50%. The focus should be on conciliation, correction, and remediation of harms subject to consumers' complaints. Supervision should focus on collaborative efforts with the supervised entities to resolve problems so that there are measurable benefits to consumers.

2. The Bureau's focus will shift back to depository institutions, as opposed to non-depository institutions. In 2012, 70% of the Bureau's supervision focused on banks and depository institutions and 30% on nonbanks. Now that proportion has completely flipped, with over 60% on nonbanks and less than 40% on banks and depository institutions. The Bureau must seek to return to the 2012 proportion and focus on the largest banks and depository institutions.

3. The Bureau will focus on actual fraud against consumers, where there are identifiable victims with material and measurable *consumer damages* as opposed to matters based on the Bureau's perception that consumers made "wrong" choices. The areas of priorities are:

   a. Mortgages (getting the highest priority).

**consumerfinance.gov**

Exhibit 4
Page 1 of 3

    b.   FCRA/Reg V data furnishing violations.

    c.   FDCPA/Reg F relating to consumer contracts/debts.

    d.   Various fraudulent overcharges, fees, etc.

    e.   Inadequate controls to protect consumer information resulting in actual loss to consumers.

4. The Bureau will focus on redressing tangible harm by getting money back directly to consumers, rather than imposing penalties on companies in order to simply fill the Bureau's penalty fund.

5. The Bureau will focus on providing redress to service members and their families, and veterans.

6. The Bureau will respect Federalism:

    a.   The Bureau will deprioritize participation in multi-state exams unless *required* by statute (rather than merely permitted).

    b.   The Bureau will deprioritize supervision where States have and exercise ample regulatory and supervisory authority, unless required by statute (rather than merely permitted).

    c.   The Bureau will minimize duplicative enforcement, where State regulators or law enforcement authorities are currently engaged in or have concluded an investigation into the same matter.

7. The Bureau will respect other federal agencies' regulatory ambit:

    a.   The Bureau will eliminate duplicative supervision or supervision outside of the Bureau's authority (e.g., no supervision of M&A, just because regulated entities are involved, or attempt to insert itself into bankruptcy supervision).

    b.   To the extent feasible, the Bureau will coordinate exams' timing with other/primary federal regulators.

    c.   The Bureau will minimize duplicative enforcement, where another federal regulator is currently engaged in or has concluded enforcement.

8. The Bureau will not pursue supervision under novel legal theories, including of the Bureau's authority. It will focus on areas that are clearly within its statutory authority.

9. The Bureau will not engage in or facilitate unconstitutional racial classification or discrimination in its enforcement of fair lending law:

    a.   The Bureau will not engage in redlining or bias assessment supervisions or enforcement based solely on statistical evidence and/or stray remarks that may be susceptible to adverse inferences.

    b.   The Bureau will pursue only matters with proven actual intentional racial discrimination and actual identified victims. Such matters shall be brought to the leadership's attention and maximum penalties will be sought.

10. The Bureau will deprioritize the following:

    a. Loans or other initiatives for "justice involved" individuals (criminals).

    b. Medical debt.

    c. Peer-to-peer platforms and lending.

    d. Student loans.

    e. Remittances.

    f. Consumer data.

    g. Digital payments.

11. The Bureau's primary consumer enforcement tools are its disclosure statutes.  The Bureau shall not engage in attempts to create price controls.



**From:** Gueye, Jafnar (CFPB)
**To:** Gelfond, Rebecca (CFPB); Olson, Nicholas (CFPB) ███ (CFPB); CFPB_PCARD
**Cc:** ███ Re: Rush Pcard Request Coming Today for a Court Filing
**Subject:**
**Date:** Tuesday, April 22, 2025 2:40:08 PM
**Attachments:** 4-22-25 2025-04-22 PCard and Check Request Form - ENF Corp Status.pdf

Please see attached.
Also for your awareness, I would highly recommend having a gameplan for if KIFs are back in place, as OFP will lose its ability to support these types of actions all together. Please make sure you make this clear as you're talking to leadership about litigation. I'll do the same.

Respectfully,

Jafnar

**From:** Gelfond, Rebecca (CFPB) ███
**Sent:** Tuesday, April 22, 2025 1:51 PM
**To:** Olson, Nicholas (CFPB) ███ Gueye, Jafnar (CFPB) ███ CFPB_PCARD
███
**Cc:** ███
**Subject:** RE: Rush Pcard Request Coming Today for a Court Filing

Attached.

Thanks!
Rebecca

**CFPB Enforcement Chief of Staff**
**Office:** ███  **Mobile:** ███

Confidentiality Notice: If you received this email by mistake, you should notify the sender of the mistake and delete the e-mail and any attachments. An inadvertent disclosure is not intended to waive any privilege.

**From:** Olson, Nicholas (CFPB) ███
**Sent:** Tuesday, April 22, 2025 1:49 PM
**To:** Burton, Theresa (CFPB) ███ Gueye, Jafnar (CFPB) ███
███ CFPB_PCARD
**Cc:** Gelfond, Rebecca (CFPB) ███
**Subject:** RE: Rush Pcard Request Coming Today for a Court Filing

Theresa and all – I don't believe your Request was signed by the required Enforcement executive (bottom right signature block).

Exhibit 5
Page 1 of 4



Sincerely,

Nick Olson
Procurement Team Lead | Office of Finance and Procurement
Mobile: ▮▮▮▮▮▮

Consumer Financial Protection Bureau
consumerfinance.gov

Confidentiality Notice: If you received this email by mistake, you should notify the sender of the mistake and delete the e-mail and any attachments. An inadvertent disclosure is not intended to waive any privileges.

From: Burton, Theresa (CFPB) ▮▮▮▮▮▮
Sent: Tuesday, April 22, 2025 1:03 PM
To: Gueye, Jafnar (CFPB) ▮▮▮▮▮▮ CFPB_PCARD ▮▮▮▮
Cc: Gelfond, Rebecca (CFPB) ▮▮▮▮▮▮
Subject: RE: Rush Pcard Request Coming Today for a Court Filing

Good Afternoon,

Attached please find the pcard request for approval. Please reach out to Theresa Ridder as soon as you have approval, and she will assist with getting the correct documents from the website.

Thank you,
Theresa

From: Burton, Theresa (CFPB)
Sent: Tuesday, April 22, 2025 11:06 AM
To: Gueye, Jafnar (CFPB) ▮▮▮▮▮▮
Cc: Gelfond, Rebecca (CFPB) ▮▮▮▮
Subject: Rush Pcard Request Coming Today for a Court Filing
Importance: High

Good Morning Everyone,

Just a heads up that Enforcement has a rush pcard request that we're putting together now. One of our matter teams just found out that they need to get status information on two corporate entities before a court filing today. I will send this over as soon as possible

Thank you,

Exhibit 5
Page 2 of 4



**Theresa L. Burton**
Resource Management Officer | Enforcement
Office: ███████████    Mobile: ███████████

Consumer Financial Protection Bureau
**consumerfinance.gov**

Confidentiality Notice: If you received this email by mistake, you should notify the sender of the mistake and delete the email and any attachments. An inadvertent disclosure is not intended to waive any privileges.

Exhibit 5
Page 3 of 4



## PURCHASE CARD AND CHECK PAYMENT REQUEST FORM

(Credit Card Payments are limited to $10,000 and Checks are limited to $5,000)

**REQUESTOR INFORMATION** – Should be an employee who has the authority to spend for their office such as a former cardholder, approving official, budget POC, or head of the office. These fields will be input into CitiDirect Card Management System that will interface with Oracle once statements are closed.

Requesting Employee's Name Theresa Burton

Internal Org Code for Requesting Office ▮▮▮▮

Budget Object Class (BOC) ▮▮▮▮      Budget Line ID (BLID) ▮▮▮▮

General Description of Category of the Purchase (For example "FO supplies" or "FO trainings")
Corporate Records

Additional Detail Description (For example paper and ink for printers at HQ)
Corporate Status Records from Deleware Secretary of State

**VENDOR INFORMATION**

Credit Card or Check Payment  Credit Card ▾      Total Dollar Amount 29.00

Vendor Name Delaware Dept of State      Vendor Tax ID/UEI (if check or for services) N/A

Vendor Address https://icis.corp.delaware.gov

Description of Purchase and Additional Payment Instructions for OFP's use in making the payment (website/login info for vendor website, phone number if payment required via phone, etc):
https://icis.corp.delaware.gov/Ecorp/EntitySearch/NameSearch.aspx, please coordinate payment with ▮▮▮▮

**IMPACT STATEMENT**

Per Treasury guidance, the Office of Finance and Procurement (OFP) is reviewing all Purchase Card Payment Requests before approving. Pursuant to this, we are asking for an Impact Statement for each requested purchase. Please provide an Impact Statement regarding which statutory requirement(s) the Bureau will not be able to meet without this purchase. Please note your Impact Statement should be short but robust enough to withstand external scrutiny.

Dodd Frank Sec. 1021 – Enforcement is filing a second amended complaint in an approved litigation case, and must confirm the status of the entities listed in the complaint before the filing.

Authorized Signatory for Requesting Office      SAO Approval for Office of Finance and Procurement

Procurement Management Approval      Deputy Associate Director for Requesting Office

Exhibit 5
Page 4 of 4



**From:** Petersen, Cara (CFPB)
**To:** Gelfond, Rebecca (CFPB) ████████████
**Subject:** Fw: Enforcement requests
**Date:** Monday, April 21, 2025 2:45:41 PM

---

**From:** Dorfman, Victoria (Detailee) ████████████████
**Sent:** Monday, April 21, 2025 2:37:52 PM
**To:** Petersen, Cara (CFPB) ████████████████
**Cc:** Paoletta, Mark (Detailee)(CFPB ████████████████ Shapiro, Daniel (Detailee)
████████████████
**Subject:** RE: Enforcement requests

Cara, thank you for reaching out. As you may have seen, the court issued a stay, so for now, all of the activities you outlined should continue. If there are any changes in the stay status, we will be in touch with you to address these concerns. Thank you.

**From:** Petersen, Cara (CFPB) ████████████████
**Sent:** Friday, April 18, 2025 3:53 PM
**To:** Paoletta, Mark (Detailee)(CFPB ████████████████ Shapiro, Daniel (Detailee)
████████████████ Dorfman, Victoria (Detailee)
**Subject:** Enforcement requests

All,

I sent a couple requests earlier today in response to the email chain about the Experian filing, but I thought it might be best to send a separate email to raise these issues generally and loop in Victoria.

As I mentioned, in addition to the potential local counsel issue in Experian, there appear to be several other matters where the planned RIFs would mean the Bureau would no longer be represented and out of compliance with local rules because all attorneys on the matter would be on administrative leave and thus withdrawing. To ensure that attorneys have appeared in all the enforcement actions the Bureau is pursuing, that the matters are staffed, and to operate, I need a list of all Enforcement staff who are not subject to the RIF. And, to the extent that people will be losing access to the system anytime soon, I ask that at least one member of each pending litigation have their administrative leave delayed so we can make an orderly plan for transitioning those matters and ensuring there are attorneys who can appear in the litigation. I'm also concerned because, based on what I'm hearing from my teams, our litigation support and front office positions were all eliminated, which would seriously interfere with our ability to do our work, including intaking document and data productions, protecting and preserving data, conducting investigations, analyzing the financial condition of the

Exhibit 6
Page 1 of 2



subjects of our investigations, procuring resources (e.g., experts), conducting trials, and tracking and reporting on our work, so I'm anxious to learn if any of those staff remain.

Thank you,
Cara

Exhibit 6
Page 2 of 2