IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL TREASURY EMPLOYEES UNION, *et al.*,<br><br>    *Plaintiffs,*<br><br>v.<br><br>RUSSELL VOUGHT, in his official capacity as Acting Director of the Consumer Financial Protection Bureau, *et al.*,<br><br>    *Defendants.* | Case No. 25-cv-381-ABJ |

**DECLARATION OF SHANNON FILES**

I, Shannon Files, declare as follows:

1. I am an employee of the Consumer Financial Protection Bureau, where I currently serve as the Director of Enterprise Data and Analytics (EDA). In that role, I oversee 28 employees, spread across five teams, responsible for centralized data management supporting every division in the Bureau, for both mission and operational work. I began in my current role in 2020. I previously worked at the Bureau from 2015 to 2018.

2. On April 17, I learned that 27 of the 28 employees that I oversee in EDA received reduction-in-force notices and would lose their access to the Bureau's systems at 6pm the next day, April 18. The Data Architecture Lead and I did not receive a RIF notice, but my last day at the Bureau is May 2. I shared my intent to leave the Bureau on May 2 on April 2.

1

3. No one consulted with me about the impact that these RIFs would have either on the ability to preserve data and prevent its impairment, or on the ability of the Bureau to carry out its statutorily required work.

4. It would not be possible to preserve the Bureau's data with the one person left on the team after May 2 (or with both of us before then). Even if these functions were transferred to other staff, as far as I am aware, there are not other members of the Bureau who have the knowledge needed to safely handle these assets or manage the data. And if employees lost access on April 18, there would not have been nearly enough time to train people or transfer duties as necessary to protect this data. In the absence of a well-provisioned data management team trained on how to handle data migration, processing, storage, and analytics, it is very likely deleted, modified, corrupted, and left to grow stale.

5. Had the RIFs not been paused, EDA would lose its ability to support the Bureau's statutorily mandated work.

6. For example, EDA is responsible for creating and maintaining the Consumer Complaint Database, which is the database created from intaking complaints from consumers, which is required by 12 U.S.C. § 5493(b)(3)(A). This database is also used in the Complaint Gateway for Government Partners, which is how data is shared with partner agencies, sharing complaint data with partner agencies being required a function required by 12 U.S.C. § 5493(b)(3)(D). Daily operations and maintenance for this work is handled by a core team of two employees, extending to four employees when required by workload (all of whom received RIF notices). The processes mentioned in the following paragraph are executed daily and are highly time sensitive, as they directly impact how quickly complaints are processed and can be responded to by industry.

7.     Routine tasks consist of monitoring the processes that extract data from Salesforce (which houses the CFPB's consumer complaint data when it initially comes in) for loading into the Bureau's central database, monitoring the processes by which data are transformed and made available for complaint reporting and analytics (including the Consumer Complaint Database), monitoring the process that scrubs PII from complaints to make them suitable for public consumption, modifying the database to accommodate changes made to the structure of the upstream Salesforce data, performing remediation of data within the database where it has become out of sync with Salesforce, and working with Consumer Response to develop new enhancements for the processes. All of this work is necessary for the Bureau to meet its obligation of maintaining a centralized database for complaints.

8.     The same is true of the dissemination of the data to other state and federal agencies, which is also statutorily required. On a daily basis, T&I employees (who have now received RIF notices) must address issues that arise in the process of extracting data from the Bureau's system to send it to the application that is shared with outside partners.

9.     EDA also manages the collection and analysis of website usage data for www.consumerfinance.gov through the Google Analytics platform. This work is required in Dodd Frank 12 U.S.C. § 5493 (b)(3)(A), Public Law 115-336 "21st Century IDEA Act," and the Foundations for Evidence-Based Policymaking Act of 2018 44 U.S.C. § 3506(b)(2)(B)(II). Additionally, this data is routinely used in required annual reports to Congress by Consumer Response 12 USC § 5493(b)(3)(C), Office of Financial Education 12 U.S.C. § 5493(d)(4), and the Private Education Loan Ombudsman 12 U.S.C. § 5535(d). This process is not fully automated and is currently conducted by one federal staff member who has received a RIF notice. Without intervention, this data would be unavailable for use by other staff at the Bureau.

The only other staff members with expertise in this dataset and with the Google Analytics tool are in the T&I Design + Development team. They also received RIF notices.

10. EDA also provides critical support to the Enforcement Division. This includes supporting the collection and formatting of data for analysis and supporting analyses for calculating harm, including restitution owed to consumers. It also includes assisting in negotiations with opposing counsel to facilitate productions, managing data productions, and communicating with experts. This work is critical for requesting, acquiring, formatting, storing, accessing, using, analyzing, and determining the applicability of data in any Bureau case that involves significant data.

11. EDA provides similar data support necessary to work performed by the Supervision Division, the Office of Service Member Affairs, and virtually every office in the Bureau.

12. Had the RIFs not been paused, all this work would have come to a screeching halt when employees lost access to Bureau systems on April 18 at 6pm and, as a result, so would have the Bureau's ability to fulfill its obligation to maintain a consolidated centralized Consumer Complaints Database, to share consumer complaints information with the public and with other regulators, to manage website usage data, to perform enforcement functions, and to do all the other statutorily required work for which EDA provides necessary support.

13. The one other employee who did not receive a RIF notice, a manager in EDA, could not do this work on her own. The sheer volume of the work makes that impossible. And she lacks the access and expertise of all the people who did this work but were RIF'd. I also

4

could not do this work not just for the same reasons, but also because I am leaving the Bureau on May 2 (and two people would not be enough anyway).

14. Additionally, given the scale of the RIF, leaving two managers—including one leaving on May 2—rather than hired staff with the requisite data management subject matter expertise, would create incredible risk to data with no guidance or guardrails to manage data appropriately, how and who should be granted access to data, what level of access follows our policy of least privilege, etc. Because of the scope of the work, one person could not do this alone. Further, there would be no one to even provide training since everyone would have lost access to work systems on April 18. This would heighten the possibility of data breaches or data loss.

15. It also would not be possible to replace this work with contracts. My understanding is that all of the contracting officer representatives who did this work received RIF notices as well. And no one would be able to train the contractors on the Bureau's system anyway.

16. Additionally, EDA's resource manager, who plays a critical role in enabling EDA to meet its statutory obligations by overseeing acquisitions, budget execution, and vendor operations in compliance with federal procurement and IT governance laws, was RIF'd. This individual manages and provides oversight to the full portfolio of EDA's contracts for the data systems on which the Bureau relies. Without this role, the Bureau would lose critical oversight and interdivisional coordination necessary to ensure its data systems remain operational, secure, and compliant with contractual requirements and mission needs. Due to the importance of this role, the CIO authorized them to work during the February agency-wide shutdown to maintain operational continuity.

17. EDA, in short, is a critical processing point for essentially all significant datasets that move into, out of, and through the Bureau. Without our specific expertise on formatting, optimization, transmission, data structures, storage and retrieval, procedures for making the data useable, assuring data quality, enabling access, determining risk, preparing for analysis, analyzing, and more, very few of the functions of the Bureau at all would be possible, nor would the maintenance or understanding of the system and software necessary for other offices to perform most regular parts of their jobs. Eliminating all this critical infrastructure with just 24 hours' notice would have crippled the agency.

18. I am also aware that another unit critical for protecting the Bureau's data would have been drastically reduced had the RIFs not been paused. Specifically, it is my understanding that all but two people on the 23-person cybersecurity team received RIF notices. One of the people who received the notice was the Chief Information Security Officer—the head of cybersecurity for the entire Bureau.

19. As part of my role as the head of EDA, I worked with the cybersecurity team. I am therefore familiar with the work that it performs and believe that the RIFs, had they not been paused, would have immediately compromised the agency's data and related systems. The two remaining employees would not have been able to perform the critical cybersecurity work currently performed by more than 20 people.

20. That would leave the agency's data vulnerable and likely to be corrupted, deleted, or lost for three reasons. First, the Bureau relies on dozens of vendors to maintain its data systems and those vendors frequently send out updates to their platforms. It is my understanding that the Bureau cannot blindly accept those updates, but must instead perform testing to see if they would compromise agency data and put in place mitigation controls and patches as

necessary. In fact, it is my understanding that those tests are rarely completed without identifying the need to establish a bespoke control necessary to protect the Bureau's systems. Because of the number of vendors and number of updates, this is a constant process. The Bureau's remaining employees, had the RIF gone through, would not have been able to do this work. The Bureau also cannot just ignore updates. A system running on old software cannot necessarily be patched when problems arise. Thus, rejecting or ignoring updates would leave the Bureau's data with the same vulnerabilities anytime an issue were to arise.

21. Second, the Bureau is vulnerable to improper data handling by people within the Bureau. It is my understanding that the cybersecurity team had what is referred to as an insider threat team responsible for identifying improper access that could lead to mishandling of data, whether because of incompetence or malintent. I understand that, in the cybersecurity field, so-called insider threats are viewed as the greatest risk to data security. It is my understanding that this entire team received a RIF notice.

22. Third, the RIFs would leave the Bureau's data vulnerable to outsider attacks, including from other nation states. The scale and publicity of the cuts would make it a public fact that the Bureau lacked adequate cybersecurity controls, increasing the chances of intentional attempts to gain improper access to Bureau data.

23. The remaining two employees could not address these multiple fronts on their own. It is therefore my opinion that; the combined effect of these shortcomings, like the combined effect of the RIFs in EDA, would make it very likely that the Bureau's data would be lost, deleted, or impaired.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Executed in Washington, DC this 24th day of April.

Shannon Files