## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL TREASURY EMPLOYEES UNION, *et al.*,<br><br>             *Plaintiffs*,<br><br>   v.<br><br>RUSSELL VOUGHT, in his official capacity as Acting Director of the Consumer Financial Protection Bureau, *et al.*,<br><br>             *Defendants*. | Case No. 25-cv-381-ABJ |

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION TO CLARIFY PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

Introduction ........................................................................................................................... 1

Background ............................................................................................................................ 4

Argument .............................................................................................................................. 8

     I.     The ordinary meaning of "combined earnings," the statutory context, and the purpose and history of the Dodd-Frank Act all make clear that the Bureau can draw from the total amount the Fed earns. ........................................ 9

     II.    Vought and OLC's convoluted interpretation of "earnings" is at odds with the text, purpose, and history of the statute. ......................................................... 14

Conclusion ........................................................................................................................... 22

**INTRODUCTION**

The defendants have filed a "notice" announcing that they intend to allow the Bureau to run out of funding, and when it does, they will stop complying with the Court's injunction. Reports that emerged from the Bureau late last week suggest that the CFPB will furlough its employees by the end of the year.[1] But parties may not simply declare that an injunction no longer applies. And the defendants' justification for doing so here—that the Dodd-Frank Act does not allow the CFPB to request the funding Congress provided it—cannot be squared with the text, purpose, or history of the statute. This Court should clarify that refusing to request funding from the Federal Reserve is not a valid justification for violating the injunction.

Immediately after taking over as Acting Director of the Consumer Financial Protection Bureau, Russell Vought decided to shut it down. Within days, Vought was "fully engaged in a hurried effort" to close the agency entirely—"firing all probationary and term-limited employees without cause, cutting off funding, terminating contracts, closing all of the offices, and implementing a reduction in force that would cover everyone else." ECF 87 at 2. If this Court hadn't entered a preliminary injunction, the "whole agency would [have been] completely wiped out." ECF 87 at 76. That injunction remains in place.

Nevertheless, a few weeks ago, Vought told the press that he still plans to "close down the agency."[2] And last week, he told this Court how he plans to circumvent the injunction to do so.

---

[1] Eric Katz, *CFPB to issue mass furlough by year's end and transfer outstanding cases to DOJ*, Government Executive (Nov. 20, 2025), https://www.govexec.com/management/2025/11/cfpb-issue-mass-furlough-years-end-and-transfer-outstanding-cases-doj/ 409688/.

[2] Nandita Bose et al., *White House budget director plans to shut down US consumer finance watchdog within months*, Reuters (Oct. 15, 2025). https://www.reuters.com/business/world-at-work/white-house-budget-director-vought-says-over-10000-federal-workers-could-be-laid-2025-10-15/.

1

The defendants filed a notice declaring that, beginning in early 2026, the CFPB will run out of money, and they do not intend to request more funding from the Federal Reserve. *See* ECF 145. The defendants claim to have just discovered that the Dodd-Frank Act imposes "no obligation" on them to do so. *See* ECF 145-1 ("OLC Memo") at 21. And rather than asking this Court to modify its injunction (which would require them to demonstrate that it should), the defendants have chosen to just "*inform*" the Court that they "do not understand" the injunction to bind them once the CFPB runs out of money—even if that's because they decided not to ask the Fed for funding. ECF 145 at 1-2 (emphasis added).

The defendants' gambit rests on this Court adopting a never-before-seen interpretation of the phrase "combined earnings" in the statutory provision that governs the CFPB's funding. Congress created the CFPB to ensure that a lapse in consumer financial protection, like the one that spurred the 2008 financial crisis, would never happen again. To safeguard the Bureau's ability to protect the nation's economic security, Congress provided it a consistent source of funding, independent the ordinary appropriations process: "Each year (or quarter…)," the Federal Reserve's Board of Governors must transfer to the CFPB the funding "reasonably necessary" to carry out the Bureau's obligations. 12 U.S.C. § 5497(a)(1). That funding, the statute provides, shall be taken "from the combined earnings of the Federal Reserve System." *Id.* The Federal Reserve System, "combined," earns billions of dollars a year—from interest on loans and securities, and fees assessed on regulated entities. By funding the Bureau through these "combined earnings," Congress ensured that the CFPB would never go dark.

But that's precisely what the defendants now say the statute requires. At Vought's request, the Office of Legal Counsel issued a memo asserting that the Federal Reserve's "combined earnings" are not everything that the Federal Reserve System earns combined, but instead

everything the Fed earns *minus* the interest that Federal Reserve Banks pay on deposits. Over the past couple of years, the Fed's Open Market Committee has raised interest rates to combat inflation, so the Banks' combined interest expenses currently exceed their combined earnings. Therefore, the defendants argue, despite earning billions of dollars, the Fed actually has no "earnings" at all—and so, they say, it cannot fund the CFPB.

On the defendants' view, the funding provision that Congress designed to protect the CFPB's independence in fact renders the Bureau inoperable any time the Fed's interest expenses exceed what it earns. That means, in the name of preventing a lapse in consumer financial protection, Congress all but ensured that the Bureau would intermittently stop being able to do its job. And, in the name of preventing a financial crisis, Congress passed a statute that forces the Federal Reserve Board to choose between increasing interest rates to combat inflation and funding the CFPB.

Fortunately, that is not the law that Congress wrote. As the OLC memo admits, nobody— not any court, not the Fed, and not the CFPB—has ever interpreted the term "combined earnings" this way. To the contrary, both the Fed and the CFPB (until Vought needed a mechanism to circumvent this Court's injunction) have consistently understood "combined earnings" to mean, simply, everything the Fed earns. The Fed's interest expenses have exceeded its earnings for years, yet until Vought took over, the CFPB continued to request funding from the Fed, and the Fed continued to provide it. As Chairman Jerome Powell explained to Congress, the Fed itself looked at this question "very carefully" and concluded that the law is "very clear" that it must fund the Bureau even when its expenses exceed its earnings.

With good reason: The ordinary meaning of "earnings" is just money earned. OLC claims to rely on technical definitions from corporate accounting. But the Fed is not a private corporation;

it sets monetary policy for the United States. And none of the sources that OLC cites support its interpretation anyway. The only reason to adopt its reading of "combined earnings" is to shut down the CFPB. This Court should clarify that the defendants may not stop complying with its injunction.

## BACKGROUND

**1.** In the wake of the 2008 financial crisis, Congress created the CFPB and tasked it with "ensuring that all consumers have access to markets for consumer financial products" that "are fair, transparent, and competitive." Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, §§ 1011, 1021, 124 Stat. 1376, 1964, 1979–80 (July 21, 2010) (codified at 12 U.S.C. §§ 5491(a), 5511(a)). Congress transferred substantial authorities to the Bureau from the Federal Reserve Board and other financial regulators—including authority to enforce a range of consumer financial laws and responsibility to supervise compliance by the country's largest banks. *See* 12 U.S.C. §§ 5515, 5564, 5581. Congress housed the new CFPB in the Federal Reserve System, designating it an "independent bureau" within the system. 12 U.S.C. § 5491(a).

To achieve that independence, Congress provided the Bureau with funding outside the ordinary appropriations process. *See* S. Rep. No. 111-176, at 163 (2010) ("The assurance of adequate funding, independent of the Congressional appropriations process, is absolutely essential."). The Dodd-Frank Act provides that, on an annual or quarterly basis, the Fed's Board of Governors "shall transfer to the Bureau from the combined earnings of the Federal Reserve System, the amount determined by the Director to be reasonably necessary to carry out the authorities of the Bureau." 12 U.S.C. § 5497(a)(1). Congress made clear that these funds shall "not be subject to review by" Congressional appropriations committees, and that the Director is not under "any obligation" to "consult with or obtain the consent or approval" of the Office of Management and Budget. *Id.* §§ 5497(a)(2)(C), (a)(4)(E). The sole constraint on this funding is

4

that it "shall not exceed a fixed percentage"—currently 6.5%—"of the total operating expenses of the Federal Reserve System" in 2009. *Id.* § 5497(a)(2). If the Director determines that the CFPB needs more money than that to fund its work "for the upcoming year," the Act requires the Director to prepare a report explaining "the extent to which the funding needs of the Bureau are anticipated to exceed the level of the [funding cap]." *Id.* § 5497(e)(1).

**2.** The Federal Reserve earns money from interest on securities it holds, fees, and interest on loans. *See generally* 12 U.S.C. §§ 342-361; Fed. Rsrv. Sys., *The Fed Explained: What the Central Bank Does* 4 (11th ed. Aug. 2021) (hereinafter *The Fed Explained*).[3] The Fed also has expenses, including paying interest on funds held by depository institutions at the twelve Federal Reserve Banks. *See, e.g.*, *id.* at 42. But the Federal Reserve Banks are not ordinary banks. The Federal Reserve is charged with "conduct[ing] the nation's monetary policy to promote maximum employment and stable prices in the U.S. economy." *Id.* at 1; 12 U.S.C. § 225a. Thus, the Fed does not buy securities or set interest rates to maximize profit, but rather to regulate the nation's economy. *See, e.g.*, Bd. of Governors of the Fed. Rsrv. Sys., *What economic goals does the Federal Reserve seek to achieve through its monetary policy?* (last visited Nov. 20, 2025)[4]; *The Fed Explained* at 35–38 ("[T]he key tools" for the Fed to implement monetary policy "are administered interest rates and open market purchases and sales of securities."); Laura J. Hopper, Fed. Rsrv. Bank of St. Louis, *What Are Open Market Operations?* (Aug. 21, 2019) (explaining how the Fed uses the purchase and sale of securities to impact interest rates).[5]

---

[3] https://www.federalreserve.gov/aboutthefed/files/the-fed-explained.pdf.

[4] https://www.federalreserve.gov/faqs/what-economic-goals-does-federal-reserve-seek-to-achieve-through-monetary-policy.htm.

[5] https://www.stlouisfed.org/open-vault/2019/august/open-market-operations-monetary-policy-tools-explained.

The "primary" tool that the Fed uses to implement monetary policy is its power to pay interest—and set the interest rate—on deposits at the Federal Reserve Banks. Bd. of Governors of the Fed. Rsrv. Sys., *Interest on Reserve Balances (IORB) Frequently Asked Questions* (last visited Nov. 22, 2025)[6]; Jane E. Ihrig & Scott A. Wolla, Fed. Rsrv. Bank of St. Louis, *The Fed's New Monetary Policy Tools* (Aug. 3, 2020).[7] The Fed first received statutory authorization to pay interest on deposits in 2008. *See* Financial Services Regulatory Relief Act of 2006, Pub. L. No. 109-351, § 201, 120 Stat. 1966, 1968–69 (codified as amended at 12 U.S.C. § 461(b)(12)(A)); Emergency Economic Stabilization Act of 2008, Pub. L. No. 110-343, § 128, 122 Stat. 3765, 3796. Since that time, the interest rate that Reserve Banks offer has become essential to the Fed's ability to influence interest rates economy wide: It operates as a benchmark for financial institutions in their own lending activities, as banks will not lend at a rate below what they could earn by holding those same funds at a Reserve Bank. *See The Fed Explained*, *supra*, at 36. The targeting of interest rates, in turn, helps the Federal Reserve carry out its dual statutory mandate of maximizing employment and stabilizing prices, as changes in interest rates affect willingness to spend, invest, and save throughout the economy. *See id.* at 21.

In recent years, to combat inflation, the Federal Reserve has raised the interest rate it pays on deposits at the Fed, leading the Reserve's interest expenses to outstrip its earnings. Jerome H. Powell, *Understanding the Fed's Balance Sheet* (Oct. 14, 2025).[8] But until Vought took over, the Fed continued to fund the CFPB. *Funds transfer requests*, CFPB (last visited Nov. 19, 2025).[9]

---

[6] https://www.federalreserve.gov/monetarypolicy/iorb-faqs.htm.

[7] https://www.stlouisfed.org/publications/page-one-economics/2020/08/03/the-feds-new-monetary-policy-tools.

[8] https://www.federalreserve.gov/newsevents/speech/powell20251014a.htm.

[9] https://www.consumerfinance.gov/about-us/budget-strategy/funds-transfer-requests/.

Chairman Powell testified to Congress that this was a deliberate decision, not an oversight: The Fed "looked at th[e] question very carefully" and determined that "it's very clear on the law and the legislative history that we're still required to make those payments." *See Hearings to examine the Semiannual Monetary Policy Report to the Congress, including S.257, to improve the resilience of critical supply chains*, *before the S. Comm. on Banking, Hous., and Urb. Affs.*, 119th Cong. 1:24:50–1:26:02. (Feb. 11, 2025) (testimony of Jerome H. Powell, Chair, Bd. of Governors of the Fed. Rsrv. Sys.) (hereinafter "Powell Senate Testimony 2025").[10] Although Vought has not requested any additional funding, he has continued to spend the funding the agency previously took during this time.

**3.** On November 10, the defendants filed a notice with this Court stating that they will run out of funds early in the new year and will not request additional funding from the Federal Reserve. ECF 145. The notice attaches a memo from the Office of Legal Counsel, which explains that Vought sought to interpret the Dodd-Frank Act as prohibiting the CFPB from drawing funding from the Fed unless the Fed is profitable—and turned to OLC for help. *See* ECF 145-1 ("OLC Memo") at 1. OLC, in turn, provided a memo supporting Vought's position. *See id.* A few companies that had been sued by the Bureau for violating consumer financial protection laws had previously tried a version of this argument: They contended that the Federal Reserve may only fund the CFPB if its earnings exceed all of its expenses. OLC Memo at 4–6. But they were unsuccessful. *See id.* at 6. So OLC decided to try a new tack. *Id.* at 15. According to OLC, in providing that the Bureau should be funded from the "combined earnings" of the Federal Reserve System, the Dodd-Frank Act used the term "combined earnings" to mean everything the Fed earns minus some expenses—the interest the Fed pays—but not others. *Id.* at 1. If that is a negative

---

[10] https://www.congress.gov/event/119th-congress/senate-event/336600.

number, OLC asserts, the Fed may not fund the Bureau. *See id.* at 1. And the CFPB need not request any funding from it. *See id.* at 21–23.

Relying on this memo, the defendants "inform[ed]" the Court that the Bureau will soon run out of money. ECF 145 at 1–2.[11] They argue that to continue the Bureau's operations—in compliance with this Court's injunction—during what they deem a "lapse in appropriations" would violate the Antideficiency Act. *Id.* So the defendants have unilaterally decided that the injunction cannot require them to do so. *Id.* In other words, they have notified the Court that they intend not to comply with the injunction once the Bureau runs out of money. *Id.*

## ARGUMENT

When a party subject to an injunction believes it is legitimately unable to comply with the court's order, that party must move to modify the injunction. *See Gov't of Province of Man. v. Zinke*, 849 F.3d 1111, 1117 (D.C. Cir. 2017). Doing so requires proof of a "significant change in circumstances" and allows the court that imposed the injunction to assess the merits of the claim that the injunction should be altered. *Id.* The defendants here skipped that step. Instead, they chose to "inform the Court" that they will no longer be under any "obligation" to continue complying with its injunction once the Bureau has run out of funds because Vought chose not to ask for any. ECF 145 at 1–2.

The Court should clarify that the defendants may not justify violating the injunction by choosing not to request funding from the Fed. *See, e.g.*, *United States v. Philip Morris USA Inc.*, 793 F. Supp. 2d 164, 168–69 (D.D.C. 2011) (explaining that district courts have the power to

---

[11] On Friday, the defendants filed a second notice stating that they had sought funding from Congress. ECF 147. But as the defendants themselves admit, they do "not know whether and the extent to which Congress will appropriate funding." ECF 145 at 1. And the statute makes clear that the Bureau shall seek funding—up to the statutory cap—from the Fed. 12 U.S.C. § 5497(a).

clarify an order by "applying it in a concrete context or particular factual situation"). The plain meaning of the Dodd-Frank Act's text, its structure, and (until OLC's memo) the understanding of every government entity to have considered the issue all confirm that "combined earnings" means the total amount the Fed earns, not the total amount it earns minus some expenses but not others. Because these earnings well exceed the amount needed to fund the CFPB, it follows that the Bureau can draw enough funds to comply with the Court's injunction; all it needs to do is request from the Fed the funds to which it is entitled—funds that the Fed has already determined it would be obligated to provide. The defendants' novel contrary interpretation depends on a definition of "earnings"—as the total amount earned minus only interest expenses—that has no precedent, would decimate Congress's attempt to secure an independent source of funding for the Bureau, and is unworkable in practice. Put differently, Congress did not hide in the phrase "combined earnings" a novel meaning that could destroy the agency's design, threatening the economic stability that the agency was meant to protect.

I.     **The ordinary meaning of "combined earnings," the statutory context, and the purpose and history of the Dodd-Frank Act all make clear that the Bureau can draw from the total amount the Fed earns.**

Every relevant tool of statutory interpretation confirms that the phrase "combined earnings of the Federal Reserve System" means what, until recently, everyone agreed it meant: the total amount of money the Fed earns.

*Ordinary meaning.* Statutory interpretation "begin[s] with the text." *Pac. Gas & Elec. Co. v. FERC*, 113 F.4th 943, 948 (D.C. Cir. 2024). And where a term is undefined, this Court must apply its "ordinary, contemporary, [and] common meaning." *Pierre-Noel ex rel. K.N. v. Bridges Pub. Charter Sch.*, 113 F.4th 970, 980 (D.C. Cir. 2024).

Here, the ordinary meaning of "combined earnings" accords with the CFPB's longstanding interpretation. "Combined" means to be "unite[d] or merge[d]." *Combine*, *New Oxford American*

*Dictionary* 345 (2010). And the primary, ordinary definition of "earnings" is simply "something earned." *Earnings*, *Webster's New Dictionary of the English Language* 108 (2006). In other words, earnings are "money obtained in return for labor or services" or "income derived from an investment or product." *Earnings*, *New Oxford American Dictionary* 545 (2010); *see also Earnings*, *Concise Oxford English Dictionary* 450 (2008) ("money or income earned"); *Earnings*, *Black's Law Dictionary* (9th ed. 2009) ("Revenue gained from labor or services, from the investment of capital, or from assets. *See* INCOME.").

Put those definitions together, and the phrase "combined earnings of the Federal Reserve System" means all the money the Fed takes in, i.e., the money earned from the Fed's bonds and securities, the interest from its loans, and the fees it collects. Indeed, that is exactly how Justice Alito (the only Justice to have interpreted this language) understood it: "The Federal Reserve Banks' earnings represent interest on and gains derived from the purchase and sale of securities, as well as fees they receive for services provided to depository institutions, 'such as check clearing, funds transfers, and automated clearinghouse operations.'" *CFPB v. Cmty. Fin. Servs. Ass'n of Am.*, 601 U.S. 416, 450 (2024) (Alito, J., dissenting) (quoting *The Fed Explained*, *supra*, at 4).

OLC claims that "[c]ommon dictionary definitions interpret 'earnings' to describe 'the balance of revenue after deduction of costs and expenses.'" OLC Memo at 7 (quoting *Merriam-Webster's Collegiate Dictionary* 391 (11th ed. 2005)). But the definitions OLC cites are secondary definitions. The primary, ordinary meaning is simply money earned. *See Merriam-Webster's Collegiate Dictionary* 391 (11th ed. 2005) (primary definition is "something (as wages) earned"); *Webster's Third New International* 714 (1993 ed.) (offering first definition of "something (as wages or dividends) earned as compensation for labor or the use of capital"); *The American*

10

*Heritage Dictionary of the English Language* 561 (5th ed. 2016) (providing a first definition of "salary or wages," and an alternate definition of "gains from investments").

And that is how every relevant actor has understood the term. The CFPB endorsed this reading just last year. *See* Opp. to Mot. Dismiss at 6, *CFPB v. Purpose Fin., Inc.*, No. 7:24-cv-3206 (D.S.C. Oct. 3, 2024), ECF 48. Chairman Powell explained the Fed's view that "it's very clear" that the Fed is "still required to make those [requested] payments" even if it is operating at a loss. *See* Powell Senate Testimony 2025, *supra*, at 1:24:50–1:26:02. And the Congressional Budget Office, in analyzing the One Big Beautiful Bill Act's reduction of the statutory cap for Bureau funding, explained that it expected the Fed to continue to transfer money to the Bureau, despite its recognition of the Fed's recent "net losses." *See* Cong. Budget Off., *Reconciliation Recommendations of the House Committee on Financial Services* 4 (May 7, 2025).[12]

There's no dispute that the Federal Reserve System has taken in more than enough money to fund the Bureau. There are, therefore, "combined earnings" available from which the Bureau may draw and that the Fed "shall" transfer. 12 U.S.C. § 5497(a)(1).

**Statutory context.** The statutory "context" supports giving the phrase combined earnings this ordinary meaning. *West Virginia v. EPA*, 597 U.S. 697, 721 (2022). Here, that context confirms that "combined earnings" as used in Dodd-Frank means simply the total money taken in by the Fed.

*First*, that ordinary meaning is consistent with how the term is used elsewhere in the Dodd-Frank Act. For example, one provision authorizes Federal Reserve Banks to "pay earnings on balances maintained by or on behalf of" certain systemically important financial entities. *Id.* § 5465(c). Another requires the Securities and Exchange Commission to report annually to

---

[12] https://www.cbo.gov/system/files/2025-05/HFS_Reconciliation2025.pdf.

Congress on the amount of "earnings on investments" made from its Investor Protection Fund. 15 U.S.C. § 78u-6(g)(5)(D); *see also* 12 U.S.C. § 461(b)(12) (providing for the payment of "earnings" on balances maintained at a Federal Reserve Bank); *id.* § 5390(n)(2) (directing the FDIC to deposit "interest and other earnings from investments"). Each of these provisions uses "earnings" to mean, consistent with the dictionary definitions outlined above, money earned—not money earned minus some subset of expenses.

*Second*, interpreting "combined earnings" to mean all money the Fed takes in accords with Congress's use of "earnings" in the statutory provision that governs how the Federal Reserve Banks distribute their funds. *See* 12 U.S.C. § 289. That provision refers to "*net* earnings" as the funds remaining after "all necessary expenses of a Federal reserve bank have been paid." 12 U.S.C. § 289(a)(1), (a)(2) (emphasis added). Earnings, therefore, are what a Federal Reserve Bank has earned *before* taking out necessary expenses.

*Finally*, the ordinary meaning of "earnings" accords with the rest of the statutory funding scheme. As explained above, Dodd-Frank caps the funding the Bureau can receive from the Fed at a fixed percentage of the Fed's 2009 operating expenses. 12 U.S.C. § 5497(a)(2). If funding up to that cap is insufficient to meet the Bureau's needs for the "upcoming year," the Act authorizes the Bureau to request additional funding from Congress. 12 U.S.C. § 5497(e)(1). To do so, the Director must prepare a "report" specifically explaining how the Bureau's needs will "exceed the level of the amount set forth in [the section describing the cap]." 12 U.S.C. § 5497(e)(1)(B). In other words, the statute contemplates that the statutory cap might be insufficient; it does not contemplate that the Bureau might need to request funds from Congress before even reaching the cap.

In addition, this mechanism to request additional funds from Congress becomes unworkable if "combined earnings" is not everything the Fed earns—which will always exceed the statutory cap—but instead everything the Fed earns minus unpredictable interest expenses. To request additional funding, the statute requires that the Director assess whether the Bureau will require such funding for the "upcoming *year*." 12 U.S.C. § 5497(e)(1) (emphasis added). If "combined earnings" varied unpredictably based on interest rates, it would be virtually impossible to make this assessment.

***Statutory purpose and history.*** The ordinary meaning of "combined earnings" also effectuates the statute's purpose, as reflected in its text and history. *See Noble v. Nat'l Ass'n of Letter Carriers*, 103 F.4th 45, 51 (D.C. Cir. 2024). Congress created the Bureau in the wake of the Great Recession to bring stability to a patchwork system of consumer financial regulation. Recognizing the importance of that task, Congress expressly designed the Bureau to be "independent," giving its Director (now-invalidated) removal protections and housing the Bureau within the independent Federal Reserve. 12 U.S.C. § 5491(a). Congress has long recognized the need for financial regulators to have financial independence, free from the ordinary annual appropriations process. *See, e.g.*, 12 U.S.C. §§ 16, 243, 1755, 1815(d), 1820(e).

And it provided the Bureau that independence by funding it not through the ordinary appropriations process, but through the Fed's own "combined earnings." *See* 12 U.S.C. § 5497(a)(1); *see also* S. Rep. No. 111-176, at 163 (2010) (expressing that "the assurance of adequate funding" was "absolutely essential"); 156 Cong. Rec. S5928 (daily ed. July 15, 2010) (statement of Sen. Christopher Dodd) (observing that "requir[ing] the Federal Reserve System to automatically fund the CFPB … will ensure that the CFPB has the resources it needs to perform its functions"). Congress further protected the Bureau's funding independence by shielding the

13

funds drawn from the Fed from review by congressional appropriations committees and explicitly rejecting any requirement that the Office of Management and Budget approve the Bureau's budget. 12 U.S.C. § 5497(a)(2)(C), (a)(4)(E).

Only the ordinary, consensus view of "combined earnings" as total money earned effectuates Congress's purpose—reflected in its statutory design—to provide the Bureau an independent, stable source of funding. If "combined earnings" meant combined earnings minus interest expenses, the CFPB's funding would depend on interest rates—and could vary annually, quarterly, or even weekly. That would transform a funding structure intended to provide unique financial security into one that is uniquely insecure.

## II.    Vought and OLC's convoluted interpretation of "earnings" is at odds with the text, purpose, and history of the statute.

Instead of the ordinary meaning of "combined earnings"—the meaning that the Fed and the CFPB applied for years—OLC asserts that Congress hid within Dodd-Frank an idiosyncratic definition that would intermittently shut down the Bureau, simply because the Fed needed to raise interest rates to regulate the economy. But that claim can't be squared with the text, history, or purpose of the statute.

**A.** According to OLC, "combined earnings" does not mean all money earned, but instead all money earned minus interest (but not other) expenses. OLC does not point to anything in the statute that says this. Nor does it point to anything demonstrating that all money earned minus interest expenses is a calculation that has any relevance to the Fed's operations. And as explained above, OLC cannot seriously contend that its definition reflects the ordinary meaning of earnings. So instead, OLC asserts that the phrase "combined earnings of the Federal Reserve System" should be interpreted by analogizing to "technical definitions and usage" that it has cobbled together from the corporate context. ECF 145-1 at 8.

That assertion fails twice over: First, the Fed is not a private corporation; it's an instrument of the government's monetary policy. And OLC offers no compelling reason why a statute governing regulators should be interpreted in accordance with cherry-picked definitions governing private corporations, rather than its ordinary meaning. Second, OLC's analogy fails on its own terms. Even its cherry-picked definitions don't support its reading.

**1.** OLC's attempt to substitute its bespoke corporate analogy for ordinary meaning fails from the start. "[U]ntil and unless someone points to evidence suggesting otherwise, affected individuals and courts alike are entitled to assume statutory terms bear their ordinary meaning." *Niz-Chavez v. Garland*, 593 U.S. 155, 163 (2021). And as explained above, the "ordinary, popular meaning" of "combined earnings" "fits this statute to a T." Opp'n to Mot. to Dismiss at 6, *CFPB v. Purpose Financial, Inc.*, No. 7:24-cv-3206 (D.S.C. Oct. 3, 2024), ECF 48.

OLC contends that "earnings" can only be defined as money earned in the context of an *individual*'s earnings. OLC Memo at 16. But the sources it cites don't say that. Those sources demonstrate that the money that an individual earns does, indeed, constitute that individual's earnings. *See id.* But they don't suggest that the same is not true of an entity. And, as explained above, the Dodd-Frank Act repeatedly uses the word "earnings," in accordance with its primary, ordinary meaning, to describe the earnings of entities, not individuals. *See supra* 11–12. OLC offers no basis for concluding that the statute uses the term differently in the funding provision.

OLC argues that this ordinary meaning must nevertheless be discarded in favor of snippets from corporate accounting texts because Dodd-Frank was "passed specifically to regulate the financial industry." ECF 145-1, at 8. But courts have repeatedly given Dodd-Frank its ordinary meaning. *See, e.g.*, *CFPB v. CashCall, Inc.,* 35 F.4th 734, 746 (9th Cir. 2022) (consulting dictionary to determine the ordinary meaning of "deceptive"); *CFPB v. Aria*, 54 F.4th 1168, 1172

(9th Cir. 2022) (same for "financial"); *Nat'l Cmty. Reinvestment Coal. v. CFPB*, 2022 WL 4447293, at \*16 (D.D.C. 2022) (same for CFPB's authority to issue regulations pertaining to "class of transactions"). The Fed is not a corporation. Its aim isn't to maximize profits. Rather, its mandate is to "conduct the nation's monetary policy to support the goals of maximum employment and stable prices." Bd. of Governors of the Fed. Rsrv. Sys., *What economic goals does the Federal Reserve seek to achieve through its monetary policy?* (last visited Nov. 20, 2025). For that reason, the Fed has recognized that corporate accounting principles are not necessarily "appropriate for the nature and function of a central bank." *See Federal Reserve System Audited Annual Financial Statements* (last visited Nov. 20, 2025).[13] Where Congress wanted to provide a specialized technical meaning, it said so. *See, e.g.*, 12 U.S.C. § 5481 (setting out definitions for "credit," "foreign exchange," "payment instrument," and "stored value," among others).

Moreover, OLC concedes that "combined earnings" does not even *have* a single, identifiable technical corporate-finance meaning—let alone the meaning it proffers. OLC Memo at 7–8. That's why it takes pages of single-spaced text for OLC to manufacture its alternative definition. If Congress were going to incorporate into Dodd-Frank a made-up, ostensibly "technical" definition of "combined earnings," especially one that would undermine the whole point of the independent-funding provision, it would have said so.

**2.** In any event, OLC's alternative definition fails on its own terms. OLC does not cite a single source that defines earnings as total money earned minus interest expenses. That alone is sufficient to reject its interpretation. The defendants should not be permitted to shut down an agency based on a novel interpretation of the Dodd-Frank Act that even the Office of Legal Counsel could not find a single authority to support.

---

[13] https://www.federalreserve.gov/aboutthefed/audited-annual-financial-statements.htm.

Lacking any authority, OLC rests its interpretation on a convoluted analogy between the Fed and a corporation that sells goods. Its reasoning is difficult to follow, but it seems to be this: In corporate accounting, the word "earnings" is sometimes given a technical definition of either "profit" or "net income." OLC Memo at 7. And while the use of these terms "may vary significantly," one way a goods-selling corporation might label its bookkeeping is:

$$\begin{aligned} &\text{Revenues} \\ &\underline{- \text{Cost of Goods Sold}} \\ &= \text{Profit} \\ &\underline{- \text{Operating Expenses}} \\ &= \text{Net Income}^{21} \end{aligned}$$

*Id.* So, OLC says, "earnings" within the meaning of the Dodd-Frank Act must *either* be the Fed's revenue minus some cost analogous to the costs of goods sold (profit), or that value minus its operating expenses (net income). The new "plain meaning" of "earnings" that OLC purports to have recently uncovered is thus apparently ambiguous. OLC Memo at 11.

To resolve the ambiguity that OLC itself created, it turns to the so-called waterfall provision of the Federal Reserve Act. OLC Memo at 10 (citing 12 U.S.C. § 289). As explained above, that provision uses the term "net earnings" to mean earnings minus "all necessary expenses." *See* 12 U.S.C. § 289. Without explanation, OLC asserts that "all necessary expenses" should be understood to mean just operating expenses. OLC Memo at 10. Therefore, OLC reasons, "net earnings" within the meaning of the Dodd-Frank Act are equivalent to what a goods-selling company might call net income; and earnings, it says, are thus what a goods-seller might call profits. *Id.*

**3.** Each step of this analogy fails. Start with the last. OLC's argument depends on the claim that "net earnings" are "earnings" minus "operating expenses." That's the basis for its claim that

"earnings" must already have other expenses taken out—otherwise, "net earnings" would be earnings minus *all* necessary expenses, not just operating expenses. But that's exactly what the statute says: "Net earnings" are earnings minus "all necessary expenses"—interest expenses and operating expenses alike. 12 U.S.C. § 289(a)(1)(A). When Congress means just operating expenses, it says so. 12 U.S.C. § 5497(a)(2) (providing that Bureau funding shall be capped at "a fixed percentage of the total operating expenses of the Federal Reserve System"). As explained above, if "net earnings" is earnings minus *all* necessary expenses, "earnings" is simply money earned.[14]

But OLC's analogy fails even before it reaches that point. To state the obvious, the Fed is not a goods-selling—or any other kind of—private corporation. Again, its mandate is not profit; it's economic regulation. "[U]nlike a private company," the Fed's expenses may outstrip its earnings, and that does "not reduce [the Fed's] capital, cause it to become insolvent, or require a capital infusion to maintain solvency." Marc Labonte, Cong. Res. Serv., *The Fed's Balance Sheet and Quantitative Tightening* (April 3, 2025).[15] And the interest that the Fed pays on its deposits is not analogous to a corporation's cost of goods. A company's cost of goods is the amount it pays to create the goods it sells. The interest that the Fed pays on deposits, by contrast, is unrelated to the money it earns, which comprises gains from bonds, securities, and fees. The Fed pays interest to control the economy's interest rates, not as a cost of generating profit.

---

[14] OLC claims that "[t]here is a line [in the Fed's financial statement] for (1) '[t]otal operating expenses,' which the Federal Reserve treats as its 'necessary expenses' under section 289(a)(1)(A)." OLC Memo at 12. But the source does not support the claim. *See* Fed. Rsrv. Banks, *Combined Financial Statements as of and for the Years Ended December 31, 2009 and 2008 and Independent Auditors' Report* ("2009 FRS Statement") at 3 (April 21, 2010). The statement identifies "interest expenses" and "operating expenses" without any suggestion that one but not the other qualifies as "necessary expenses."

[15] https://www.congress.gov/crs-product/IF12147.

OLC argues that the phrase "combined earnings" must nevertheless mean "profits" because otherwise, it would be synonymous with "revenues," a term Dodd-Frank also uses. *See* OLC Memo at 10–11. But Dodd-Frank never uses the term "revenues" to mean all the money taken in by the Federal Reserve System. And regardless, the statute uses the term "profits" too. *See, e.g.*, 12 U.S.C. § 5390(c)(3)(B)(ii) (excluding "damages for lost profits"); *id.* § 5390(s)(3) (defining "compensation" to include, among other things, "any profits realized from the sale of the securities of the covered financial company"). At most, then, OLC's argument amounts to the claim that Congress used different words for similar concepts, regardless of how the word "earnings" is interpreted. That doesn't help determine which definition is right. But statutory context does help: OLC's interpretation would give the word "earnings" a different meaning in the CFPB-funding provision than anywhere else in the statute. *See supra* 11–12.

OLC's interpretation is also unworkable. As explained above, it would require the CFPB's director to request appropriations from Congress for the upcoming year without any way of knowing whether those appropriations will be necessary or how much to request. Worse, OLC's interpretation may make it impossible to determine when—or even whether—the Fed may permissibly fund the Bureau. That's because the statute provides no guidance on *when* "combined earnings" should be calculated. That's not a problem if "combined earnings" means total amount earned: That amount will always exceed the statutory cap on CFPB funding. *See infra* n.18. But if "combined earnings" means amount earned minus interest expenses, that's a problem. Whether the money the Fed has earned exceeds its interest expenses depends on the time period.[16] So how

---

[16] Indeed, the Fed has projected that its earnings will exceed its expenses once again in the near future. *See* Asher Rose, *Fed projected to turn profitable again after three years of losses*, Peterson Inst. for Int'l Econ. (June 18, 2025), https://www.piie.com/research/piie-charts/2025/fed-projected-turn-profitable-again-after-three-years-losses.

are profits to be calculated? By looking backwards to the prior 365 days? The most recent annual statement of the Fed? The quarter preceding the Bureau's quarterly request? The most recent week, given that the Federal Reserve Banks remit excess holdings to the Treasury on a weekly basis?[17] Why not the cumulative historical finances of the Fed since its creation? Under OLC's reading, this question is essential, and Congress provided no guidance.[18]

OLC also cannot explain why Congress—determined to prevent gaps in consumer protection like those that led to the 2008 financial crisis—would have designed a funding mechanism that risked the Bureau having to intermittently shut down for lack of funding. And OLC's interpretation doesn't just undermine the CFPB's independence; it also undermines the independence of the Fed. If the CFPB's funding is tied to the Fed's interest expenses, then during periods of inflation, the Fed will have to choose between raising interest rates to combat inflation or ensuring that its interest expenses are low enough to continue funding the CFPB. Giving "combined earnings" its ordinary meaning ensures that the Fed does not need to choose between effective monetary policy and consumer protection.

**B.** With nothing else to support it, OLC resorts to legislative history. But nothing in the statute's legislative history—or the hodgepodge of other arguments OLC tries—suggests that Congress hid an idiosyncratic definition of "combined earnings" in the CFPB's funding mechanism. OLC notes that an early House bill said that the Fed shall annually transfer ten percent

---

[17] U.S. Gov't Accountability Off., GAO-02-939, *Federal Reserve System: The Surplus Account* 11 (Sept. 2002).

[18] OLC suggests that the consensus interpretation raises the same problem because the Fed may not earn enough money to exceed the statutory cap. OLC Memo at 24. That is an exceedingly remote possibility. The year before Dodd-Frank was passed, the Fed earned $63 billion in interest alone, and it earns interest from trillions of dollars in holdings today. 2009 FRS Statement" at 3; Jerome H. Powell, *Understanding the Fed's Balance Sheet* (Oct. 14, 2025), https://www.federalreserve.gov/newsevents/speech/ powell20251014a.htm.

of its "total system expenses" to fund the CFPB, without mentioning where the funding should come from. OLC Memo at 18 (citing H.R. 4173, 111th Cong. § 4109(a)(l)). Congress rejected the House's funding provision in favor of the Senate's. *See* S. 3217, 111th Cong., § 1017 (as placed on Senate calendar Apr. 15, 2010). But that rejection doesn't tell us *why* it did so, let alone provide sufficient justification to ignore the ordinary meaning, context, and purpose of the statute. There were numerous differences between the provisions, any one of which—or none, given that they came in the context of passing sweeping new legislation covering a range of topics—could explain Congress's choice: They had different caps, different roles for the CFPB director, and different mechanisms for allowing the CFPB to seek additional funding. *Compare* H.R. 4173, 111th Cong. § 4109(a)(l), (b) (2009) *with* 12 U.S.C. § 5497(a), (e). OLC offers no evidence that Congress adopted the Senate version of the bill *because* it identified the source of funds as the Fed's "combined earnings"—let alone a secret definition of "combined earnings" that would mean the CFPB would have to go dark simply because the Fed raised interest rates to stabilize inflation.

*Second*, OLC asserts that Congress must have chosen to fund the CFPB only when the Fed's earnings exceed its interest expenses to protect the Fed's independence. OLC Memo at 14, 18. But the existence or size of the Federal Reserve System's losses "play no role in [its] decision making [and] have no effect at all on [the Fed's] ability to conduct monetary policy." *The Semiannual Monetary Policy Report to Congress*, before the S. Comm. on Banking, Hous., and Urb. Affs., 117th Cong. 1:32:00–1:32:20. (June 22, 2022) (testimony of Jerome H. Powell, Chair, Bd. of Governors of the Fed. Rsrv. Sys.).[19] By contrast, as explained above, it is OLC's new

---

[19] https://www.banking.senate.gov/hearings/the-semiannual-monetary-policy-report-to-congress.

interpretation that would improperly intrude on the Fed's independence by requiring it to factor the Bureau's survival into its monetary policy decisions.

*Third*, OLC tries to draw support from a supposed contrast between the Bureau's funding—which OLC says "specif[ies] the source of funds for the CFPB"—and the Fed's Board of Governors' funding—which OLC says has no specified source. OLC Memo at 13. But the Board's funding does have a source: "the Federal reserve banks." 12 U.S.C. § 243. Indeed, all appropriations must "identify a source of public funds … to satisfy the Appropriations Clause." *Cmty. Fin. Servs. Ass'n of Am.*, 601 U.S. at 426. At any rate, OLC offers no persuasive explanation for why this difference in funding would mean that "combined earnings" must be given OLC's interpretation. It wouldn't.

*    *    *

Ultimately, the only meaning of "combined earnings" that makes sense is the meaning that the Fed and the CFPB have given it for years: everything the Federal Reserve System earns. This Court should clarify that the defendants may not violate its injunction by refusing to request funding based on a novel interpretation of the statute purpose-built to shut down the Bureau.

**CONCLUSION**

This Court should grant the motion to clarify.

Dated: November 23, 2025

Respectfully submitted,

/s/ Jennifer Bennett
Jennifer D. Bennett (*pro hac vice*)
Gupta Wessler LLP
235 Montgomery Street, Suite 629
San Francisco, CA 94104
(415) 573-0336

Deepak Gupta (DC Bar No. 495451)
Robert Friedman (D.C. Bar. No. 1046738)

Gupta Wessler LLP
2001 K Street, NW
North Tower, Suite 850
Washington, DC 20006

(202) 888-1741
Stephanie Garlock (D.C. Bar No. 1779629)
Wendy Liu (DC Bar No. 1600942)
Adina H. Rosenbaum (DC Bar No. 490928)
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-1000

*Counsel for Plaintiffs*

Paras N. Shah (DC Bar No. 983881)
*General Counsel*
Allison C. Giles (DC Bar No. 439705)
*Assistant Counsel*
National Treasury Employees Union
800 K Street, NW, Suite 1000
Washington, DC 20001
(202) 572-5500

*Counsel for NTEU*

23