# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| NATIONAL TREASURY EMPLOYEES UNION, *et al.*, | |
| *Plaintiffs*, | No. 1:25-cv-00381-ABJ |
| v. | |
| RUSSELL VOUGHT, *et al.*, | |
| *Defendants*. | |

## [PROPOSED] BRIEF OF *AMICI CURIAE* FORMER FEDERAL RESERVE OFFICIALS IN SUPPORT OF PLAINTIFFS' MOTION TO CLARIFY

# TABLE OF CONTENTS

STATEMENT OF INTEREST ................................................................................1

BACKGROUND ..............................................................................................2

ARGUMENT .................................................................................................4

I.    The Federal Reserve continues to generate "combined earnings" even under
      OLC's definition of that term. ..........................................................5

II.   The OLC opinion's analysis of "combined earnings" is mistaken. .....................6

      A.    The opinion's interpretation of "combined earnings" is based on private-
            enterprise concepts that do not apply to the nation's central bank. ........6

      B.    The opinion offers an implausible account of why Congress might have
            intended to limit the CFPB's funding to the Federal Reserve's "profits." ..........10

            1.    *Congress could have foreseen that the Federal Reserve would at
                  times lack "profits."* ...............................................10

            2.    *Transferring money to the CFPB when the Federal Reserve lacks
                  "profits" does not impede the Federal Reserve's operations or
                  independence.* .......................................................12

      C.    The opinion fails to consider the implications of its own interpretation on
            the operations and independence of the Federal Reserve. .....................14

CONCLUSION .................................................................................17

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Albrecht v. Comm. on Emp. Benefits of Fed. Rsrv. Emp. Benefits Sys.*,
357 F.3d 67 (D.C. Cir. 2004) ................................................................. 7

*Am. Bank & Trust Co. v. Fed. Rsvr. Bank of Atlanta*,
256 U.S. 350 (1921) ............................................................................ 7

*Fasano v. Fed. Rsrv. Bank of N.Y.*,
457 F.3d 274 (3d Cir. 2006) ................................................................ 7

**Statutes**

12 U.S.C. § 241 ....................................................................................... 7

12 U.S.C. § 243 ....................................................................................... 2

12 U.S.C. § 289 .............................................................................. 2, 9, 10

12 U.S.C. § 290 .............................................................................. 2, 9, 10

12 U.S.C. § 461 ....................................................................................... 3

12 U.S.C. § 1813 ..................................................................................... 7

12 U.S.C. § 5497 ........................................................................ 3, 4, 10, 15

Act of July 4, 2025,
Pub. L. 119-21, 139 Stat. 72 .............................................................. 13

Emergency Economic Stabilization Act of 2008,
Pub. L. No. 110-343, 122 Stat. 3765 ................................................. 11

Federal Reserve Act,
Pub. L. No. 63-43, 38 Stat. 251 (1913) ............................................... 6

Financial Services Regulatory Relief Act of 2006,
Pub. L. No. 109-351, 120 Stat. 1966 ................................................. 11

**Rules**

Fed. R. App. P. 29(a)(4)(E) ..................................................................... 1

D.D.C. Local R. 7(o) ................................................................................................ 1


**Other Authorities**

Bd. of Governors of Fed. Rsrv. Sys., *110th Annual Report* (2023) .............................. 16

Bd. of Governors of Fed. Rsrv. Sys., *FAQS: Who owns the Federal Reserve?*,
    https://www.federalreserve.gov/faqs/about_14986.htm ........................................ 7

Bd. of Governors of Fed. Rsrv. Sys., *Financial Accounting Manual for Federal
    Reserve Banks* (May 2025) ................................................................................. 8

Bd. of Governors of Fed. Rsrv. Sys., *H.4.1 Release: Dec. 4, 2025* ............................. 13

Bd. of Governors of Fed. Rsrv. Sys., *Monetary Policy Report* (Feb. 2025) ................ 13

Cong. Rsch. Serv., *P.L. 119-21, the FY2025 Reconciliation Law, Provisions Related
    to CFPB Funding* (July 16, 2025) ...................................................................... 13

Cong. Rsch. Serv., *Why Is the Federal Reserve Operating at a Loss?*
    (Jan. 23, 2023) .................................................................................................... 4

Edmund L. Andrews, *Fed rescues AIG with $85 billion loan for 80% stake*, N.Y.
    Times (Sept. 17, 2008) ....................................................................................... 7

Fed. Rsrv. Bank of N.Y., *Actions Related to AIG*,
    https://www.newyorkfed.org/aboutthefed/aig ..................................................... 7

Fed. Rsrv. Sys., *Federal Reserve Banks: Combined Financial Statements as of and
    for the Years Ended December 31, 2024 and 2023 and Independent Auditors'
    Report* .......................................................................................................... 3, 9

Fed. Rsrv. Sys., *Federal Reserve System Audited Annual Financial Statements*,
    https://www.federalreserve.gov/aboutthefed/audited-annual-financial-
    statements.htm. .................................................................................................. 8

Fed. Rsrv. Sys., *The Fed Explained: What the Central Bank Does* (Aug. 2021) .......................... 2

Fed. Rsrv. Sys., *The Federal Reserve Banks: Combined Financial Statements as of
    and for the Years Ended December 31, 2009 and 2008 and Independent Auditors'
    Report* ........................................................................................................... 11

Joseph Gagnon et al., *Expanding Large-Scale Asset Purchases: Effectiveness,
    Benefits, Risks, and Strategies* (Mar. 11, 2009) ................................................ 12

Markets Grp., Fed. Rsrv. Bank of N.Y., *Open Market Operations During 2024*. ........................ 6

Michael S. Derby, *Fed data suggests central bank has stopped losing money*,
　　Reuters (Dec. 3, 2025) ................................................................................ 5

Patrick Honohan, How *much money have central banks really lost?*, Peterson Instit.
　　for Int'l Econ. (June 26, 2025) ....................................................................... 4

Samuel Jordan-Wood, *The Fed's Remittances to the Treasury: Explaining the
　　'Deferred Asset'*, Fed. Rsrv. Bank of St. Louis (Nov. 21, 2023) ............................. 3

*The Federal Bailout of AIG: Hearing Before the H. Comm. on Gov't Oversight and
　　Reform*, 111th Cong. (Jan. 27, 2010) (statement of Thomas C. Baxter, Jr., Gen.
　　Counsel and Exec. Vice Pres., Fed. Rsrv. Bank of N.Y.) ........................................ 8

*The Semiannual Policy Report to the Congress: Hearing Before the S. Comm. on
　　Banking, Hous., and Urb. Affs.*, 119th Cong. (Feb. 11, 2025) (testimony of Jerome
　　H. Powell, Chair, Bd. of Governors of the Fed. Rsrv. Sys.) ................................... 14

## STATEMENT OF INTEREST

Amici are five former Federal Reserve officials with combined decades of experience in the Federal Reserve System.[1] They seek leave to submit this brief under Local Rule 7(o) to aid the Court in its evaluation of the parties' arguments by providing important context concerning the Federal Reserve System.

**Donald Kohn** is a 40-year veteran of the Federal Reserve and served as a member and then vice chair of the Board of Governors from 2002 to 2010. Prior to taking office as a member of the Board of Governors, he served in a number of staff roles at the Board, including secretary of the Federal Open Market Committee (1987-2002) and director of the Division of Monetary Affairs (1987-2001). Mr. Kohn is the Robert V. Roosa Chair in International Economics and Senior Fellow, Economic Studies, at the Brookings Institution.

**Thomas C. Baxter, Jr.** served as a Federal Reserve lawyer for more than 36 years. From March of 1995 until he retired from the Federal Reserve Bank of New York in 2016, he served as the Bank's general counsel and executive vice president. He was also the deputy general counsel of the Federal Open Market Committee during the same period. Mr. Baxter now practices in the Law Offices of Thomas C. Baxter, Jr., LLP and is a senior fellow in the Program on Corporate Compliance and Enforcement at New York University School of Law.

**Sandra Braunstein** directed the Board of Governors' Division of Consumer and Community Affairs from 2004 to 2014. Under her leadership, the Board developed a new regulatory framework for credit cards and established sweeping new regulatory protections for consumers in the residential mortgage market. From 2010 to 2011, Ms. Braunstein played a key

---

[1]    Pursuant to Local Rule 7(o) and Federal Rule of Appellate Procedure 29(a)(4)(E), amici state that no party's counsel authored this brief, in whole or in part. No party or party's counsel contributed money that was intended to fund preparing or submitting this brief. No person other than amici or their counsel contributed money intended to fund preparing or submitting this brief.

role in the transition of division staff and resources to the Consumer Financial Protection Bureau. Ms. Braunstein retired in 2014 after nearly 27 years of service at the Board of Governors.

**William English** spent 25 years at the Board of Governors, including, from 2010 to 2015, as director of the Division of Monetary Affairs and secretary to the Federal Open Market Committee. While on leave from the Board of Governors, Mr. English served as a senior economist at the White House Council of Economic Advisers and the Bank for International Settlements. Mr. English is the Eugene F. Williams, Jr. Professor of the Practice at the Yale School of Management.

**Donald Hammond** served as chief operating officer to the Board of Governors from 2012 to 2019, in which role he was responsible for overseeing the Board's day-to-day operations, its strategic planning, and its administrative and financial management functions. From 2007 to 2012, he was deputy director of the Division of Reserve Bank Operations and Payment Systems, which oversees the policies and operations of the Reserve Banks, including financial accounting. Mr. Hammond retired in 2019 after 35 years of federal government service.

## BACKGROUND

The Federal Reserve System is made up of several components, including the Board of Governors and the twelve regional Federal Reserve Banks. The Reserve Banks generate substantial income through fees for services to depository institutions and, in particular, from interest on securities they hold and acquire in the course of the Federal Reserve's open market operations. *See* Fed. Rsrv. Sys., *The Fed Explained: What the Central Bank Does* 4 (Aug. 2021) ("*The Fed Explained*"), *available at* https://www.federalreserve.gov/aboutthefed/files/the-fed-explained.pdf. The Reserve Banks use part of that income to pay their "necessary expenses," *see* 12 U.S.C. § 289(a)(1)(A), a category that includes assessments levied by the Board of Governors to pay its estimated expenses, *id.* § 243, as well as funds transferred by the Board to

the CFPB under 12 U.S.C. § 5497(a). The necessary expenses of the Reserve Banks also include interest payments to depository institutions on balances they maintain at the Reserve Banks, at rates determined by the Federal Reserve. *See id.* § 461(b)(12) (referring to these interest payments as "earnings on balances"). The Reserve Banks also use the money they generate to pay dividends to their member banks, *id.* § 289(a)(1), and to credit surplus accounts held at each Reserve Bank, up to a statutory cap, *id.* § 289(a)(2)-(3)(A). Any remaining money is transferred by the Board of Governors to the Department of the Treasury for deposit in the general fund of the Treasury. *Id.* § 289(a)(3)(B); *see also id.* § 290.

During periods in which the Federal Reserve's expenditures exceed its income, the Federal Reserve ceases remittances to Treasury and records a "deferred asset" on its balance sheet—essentially, borrowing from itself the amount by which earnings failed to cover expenses. Once the Federal Reserve has positive net income again, it pays down the value of the deferred asset before resuming remittances to the Treasury. *See* Miguel Faria-e-Castro & Samuel Jordan-Wood, *The Fed's Remittances to the Treasury: Explaining the 'Deferred Asset'*, Fed. Rsrv. Bank of St. Louis (Nov. 21, 2023), https://www.stlouisfed.org/on-the-economy/2023/nov/fed-remittances-treasury-explaining-deferred-asset; *see also* Fed. Rsrv. Sys., *Federal Reserve Banks: Combined Financial Statements as of and for the Years Ended December 31, 2024 and 2023 and Independent Auditors' Report* 21, *available at* https://www.federalreserve.gov/aboutthefed/files/combinedfinstmt2024.pdf (deferred asset reflects "the amount of net excess earnings the Reserve Banks will need to realize in the future before remittances to the Treasury resume") ("2024 Financial Statements").

In recent years, as the Federal Reserve raised interest rates to control inflation, the amount it was required to pay in interest on deposits at the Reserve Banks exceeded its earnings

on securities. *See generally* Cong. Rsch. Serv., *Why Is the Federal Reserve Operating at a Loss?* (Jan. 23, 2023), *available at* https://www.congress.gov/crs-product/IN12081; *see also* Patrick Honohan, *How much money have central banks really lost?*, Peterson Instit. for Int'l Econ. (June 26, 2025), https://www.piie.com/blogs/realtime-economics/2025/how-much-money-have-central-banks-really-lost (comparing the Federal Reserve's balance sheet to those of other central banks, which have likewise reported losses over the last several years). So rather than remitting money to Treasury, the Federal Reserve has been accruing a deferred asset that it will pay down before resuming remittances.

## ARGUMENT

The Office of Legal Counsel opinion submitted by Defendants in this case purports to explain what are "the combined earnings of the Federal Reserve System," as used in the Dodd-Frank Act, 12 U.S.C. § 5497(a). *See* OLC Op. at 1 (ECF No. 145-1). The opinion interprets the term "combined earnings" to refer to a specific measure that it calls "profits." *Id.* at 12. Based on that interpretation, and on OLC's and the Consumer Financial Protection Bureau's apparent understanding that the Federal Reserve is currently "unprofitable," the opinion concludes that no money is available under section 5497(a) to fund the CFPB's continued operations. *Id.* at 20–21.

The Federal Reserve, however, has recently returned to "profitability," and thus a central factual premise of the OLC opinion simply does not hold. Even setting that aside, the opinion fails to take seriously either the Federal Reserve's different understanding of its "combined earnings" or the way the Federal Reserve System actually operates, particularly in its

implementation of monetary policy. A proper understanding of the Federal Reserve's role, operations, and independence contradicts the analysis offered by OLC.

**I.    The Federal Reserve continues to generate "combined earnings" even under OLC's definition of that term.**

The OLC opinion analyzes "whether the Consumer Financial Protection Bureau … can lawfully continue to draw funds from the Federal Reserve after determining that the Federal Reserve is unprofitable." OLC Op. at 1; *see also id.* at 20 ("[W]e understand that the Federal Reserve currently lacks combined earnings from which the CFPB can draw."). The Federal Reserve, however, is once again "profitable" and has "combined earnings" even under OLC's understanding of that term.

As noted, the Federal Reserve's expenditures have exceeded its revenues in the recent past. The OLC opinion reflects that OLC and the CFPB understand this to still be the case—i.e., that the Federal Reserve's obligations to pay interest on reserves continue to exceed its earnings on the securities it holds and that the deferred asset continues to grow. *See, e.g.*, OLC Op. at 1, 20. But that key assumption is incorrect. As reflected in the Federal Reserve's most recent weekly balance sheets, the deferred asset is currently shrinking—which means that the Federal Reserve's earnings on securities (and income from other sources) now exceed its expenses. The deferred asset's total size fell from $243.8 billion on November 5, to $243.5 billion on November 12, to $243.4 billion on November 19, to $243.2 billion on November 26—a decrease of roughly $600 million over the course of November.[2] *See generally* Michael S. Derby, *Fed data suggests central bank has stopped losing money*, Reuters (Dec. 3, 2025), *available at*

---

[2]    The Federal Reserve publishes weekly summaries of its balance sheets known as H.4.1. releases, available at https://www.federalreserve.gov/releases/h41/. The cumulative deferred asset amount is reflected in table 6 of each release under the label "Earnings remittances due to the U.S. Treasury."

https://www.reuters.com/business/fed-data-suggests-central-bank-has-stopped-losing-money-2025-12-03/. That amount represents net excess earnings that, in times when the Federal Reserve was not recording a deferred asset, would be remitted to Treasury. And it means that the Federal Reserve System is earning more than it is expending and thus has positive "combined earnings" under any of the definitions of that term considered in the opinion, including the definition embraced by OLC. (The Federal Reserve projects that its net interest income will continue to rise, largely due to lower short-term interest rates and to reinvestments in higher-yielding securities. *See* Markets Grp., Fed. Rsrv. Bank of N.Y., *Open Market Operations During 2024* 37–38, *available at* https://www.newyorkfed.org/medialibrary/media/markets/omo/omo2024-pdf.) The core factual premise of the OLC opinion is thus incorrect.

## II.    The OLC opinion's analysis of "combined earnings" is mistaken.

### A.    The opinion's interpretation of "combined earnings" is based on private-enterprise concepts that do not apply to the nation's central bank.

The Federal Reserve is the nation's central bank, and as such it plays a unique role that is not comparable to that of private banks or other profit-maximizing enterprises. In considering when the CFPB may be funded from the "combined earnings" of the Federal Reserve System, the OLC opinion overlooks this critical context. It thus arrives at an erroneous understanding of that term and of when the CFPB may receive funds.

The Federal Reserve is fundamentally different from private organizations. It was established by Congress in 1913 to serve critical public functions as a central bank. *See* Federal Reserve Act, Pub. L. No. 63-43, 38 Stat. 251 (1913). These functions include implementing the nation's monetary policy, ensuring the safety and soundness of the banking system, containing systemic risk in financial markets, and promoting consumer protection and community

development. *See, e.g.*, *The Fed Explained* 1; *Albrecht v. Comm. on Emp. Benefits of Fed. Rsrv. Emp. Benefits Sys.*, 357 F.3d 62, 67 (D.C. Cir. 2004).

Neither the Board of Governors nor the Reserve Banks are profit-maximizing private enterprises. The Board of Governors is a federal agency. *See, e.g.*, 12 U.S.C. § 241 (establishing the Board); *id.* § 1813(q) (defining the Board as a "Federal banking agency"); *Albrecht*, 357 F.3d at 67 (recognizing the Board as "[a]n integral part of the federal government"). The Reserve Banks are public-private enterprises and "are not operated for profit." Bd. of Governors of Fed. Rsrv. Sys., *FAQS: Who owns the Federal Reserve?*, https://www.federalreserve.gov/faqs/about_14986.htm; *see also The Fed Explained*, at 9 ("[U]nlike private corporations, Reserve Banks are not operated in the interest of shareholders, but rather in the public interest."); *Fasano v. Fed. Rsrv. Bank of N.Y.*, 457 F.3d 274, 283 (3d Cir. 2006) ("Ultimately, the Federal Reserve Banks are 'not private business. The policy of the Federal Reserve Banks is governed by the policy of the United States with regard to them.'" (quoting *Am. Bank & Trust Co. v. Fed. Rsrv. Bank of Atlanta*, 256 U.S. 350, 359 (1921)).

The fundamental differences between the Federal Reserve and commercial banks were vividly illustrated during the financial crisis of 2007-08, as when, for example, the Federal Reserve provided credit to American International Group, Inc. (AIG) after an attempt to arrange private financing via JPMorgan Chase and Goldman Sachs fell through when the deal proved too risky for those banks to move forward. *See* Edmund L. Andrews, *Fed rescues AIG with $85 billion loan for 80% stake*, N.Y. Times (Sept. 17, 2008), *available at* https://www.nytimes.com/2008/09/17/business/worldbusiness/17iht-17insure.16217125.html; *see generally* Fed. Rsrv. Bank of N.Y., *Actions Related to AIG*, https://www.newyorkfed.org/aboutthefed/aig. The Federal Reserve was able to step into the shoes of these commercial banks, notwithstanding the financial

risk of lending billions to a company on the edge of bankruptcy, in fulfillment of its financial stability mission. *See The Federal Bailout of AIG: Hearing Before the H. Comm. on Gov't Oversight and Reform*, 111th Cong. 181 (Jan. 27, 2010) (statement of Thomas C. Baxter, Jr., Gen. Counsel and Exec. Vice Pres., Fed. Rsrv. Bank of N.Y.) ("An AIG bankruptcy under the economic conditions existing in the fall of 2008 would have had catastrophic consequences for our financial system and our economy."), *available at* https://www.congress.gov/111/chrg/ CHRG-111hhrg63136/CHRG-111hhrg63136.pdf.

The Federal Reserve's unique functions led the Board of Governors to "develop[] specialized accounting principles and practices that it considers to be appropriate for the nature and function of a central bank," recognizing that "[a]ccounting principles for entities with the unique powers and responsibilities of the nation's central bank have not been formulated by accounting standard-setting bodies." Bd. of Governors of Fed. Rsrv. Sys., *Financial Accounting Manual for Federal Reserve Banks* iii (May 2025) ("*Accounting Manual*"), *available at* https://www.federalreserve.gov/aboutthefed/files/bstfinaccountingmanual.pdf.

The Federal Reserve's specialized accounting practices do not track "profit," and neither that term nor that general concept are used in the annual audited financial statements of the Board of Governors or the Reserve Banks. *See* Fed. Rsrv. Sys., *Federal Reserve System Audited Annual Financial Statements*, https://www.federalreserve.gov/aboutthefed/audited-annual- financial-statements.htm. The very concept of "profit" does not translate neatly to the context of a central bank, since the primary purpose of a central bank is not to make money in the way a private business does, nor does the failure to generate "profit" adversely affect the Federal Reserve's ability to operate. For example, as the Federal Reserve has explained, "[t]he Reserve Banks do not present a statement of cash flows because their liquidity and cash position do not

affect their ability to meet their financial obligations and responsibilities." *Accounting Manual* at 90. While "[p]rofit motivated entities provide a cash flow statement to disclose their ability to generate future cash flows and thus the ability to meet their obligations," "this does not represent a risk to the Reserve Banks." *Id.*

Forgetting this context, the OLC opinion draws frequent comparisons to private enterprises, as when it suggests it is appropriate to consult specialized definitions of "earnings" from accounting dictionaries or equates Federal Reserve practices with those of private banks. *See, e.g.*, OLC Op. at 8, 11. The unique functions and purposes of a central bank render these comparisons to commercial enterprises fundamentally inapposite.

Nor does the Federal Reserve track and report out, under any label, the particular measure of "earnings" that the OLC opinion uses—i.e., "total interest income" minus "total interest expense" plus "the sum of non-interest income or losses," *see id.* at 12. That measure is not specifically provided in either the Federal Reserve's Audited Annual Financial Statements or its weekly balance sheets, *see* Bd. of Governors of Fed. Rsrv. Sys., *Federal Reserve Balance Sheet: Factors Affecting Reserve Balances - H.4.1*, https://www.federalreserve.gov/releases/h41/ ("H.4.1. Releases"). While that measure can be *calculated* from the information in the Federal Reserve's financial statements, the fact that it is not tracked and reported by the Federal Reserve further demonstrates that this metric plays no meaningful role in Federal Reserve operations and is not what Congress meant when it used the term "combined earnings."

Likewise, it is not the case that the Federal Reserve treats "earnings" (as understood by OLC) as "the funds flowing into the waterfall [in 12 U.S.C. § 289]" and from which the obligations in section 289 are met. *Contra* OLC Op. at 12. As the OLC opinion recognizes, that measure has been negative in several recent years. *See, e.g.*, 2024 Financial Statements at 4

(reporting "total interest income," "total interest expense," and the sum of non-interest income or losses, which when combined equals negative $67.7 billion). The understanding expressed in the opinion therefore is not only inconsistent with the Federal Reserve's actual operations but would seem to leave the Reserve Banks with no money to pay even their "necessary expenses" under section 289, *see* 12 U.S.C. § 289(a)(1)(A). Instead, and as explained in more detail in Section II.B. below, a lack of "profits" does not prevent the Federal Reserve from continuing to meet any of its obligations—including the obligation to make requested transfers to the CFPB under the terms of 12 U.S.C. § 5497(a).[3]

In short, OLC's reliance on what it understands to be "standard accounting practice for banks" is inappropriate in light of the Federal Reserve's unique role and inconsistent with longstanding Federal Reserve practice of which Congress would have been aware when it established the CFPB.

> **B.      The opinion offers an implausible account of why Congress might have intended to limit the CFPB's funding to the Federal Reserve's "profits."**

OLC's speculation about why Congress might have intended to fund the CFPB only from the Federal Reserve's "profits" likewise misunderstands the Federal Reserve's operations and, in particular, the means by which it implements monetary policy.

> **1.      *Congress could have foreseen that the Federal Reserve would at times lack "profits."***

At the outset, OLC errs in asserting that Congress could not have imagined the Federal Reserve's "century-long record of profitability" would ever come to an end. *See* OLC Op. at 14.

---

[3]    Because the Federal Reserve is always able to satisfy its financial obligations, OLC is wrong to assume that, even if Congress had intended the specific definition of "earnings" described in the opinion, the Federal Reserve would be able to make required transfers to the CFPB only during periods in which that measure of "earnings" is positive.

Just a few years before creating the CFPB, Congress for the first time granted the Federal Reserve the power to pay interest on the deposits it holds from private banks—a power that, in certain circumstances, now causes the Federal Reserve to sometimes lack "profits." *See* Emergency Economic Stabilization Act of 2008, Pub. L. No. 110-343, § 128, 122 Stat. 3765, 3796 (accelerating effective date of authority initially granted to the Federal Reserve in the Financial Services Regulatory Relief Act of 2006, Pub. L. No. 109-351, §§ 201, 203, 120 Stat. 1966, 1968-69).

Congress gave the Federal Reserve this power so that it had a new tool for conducting monetary policy. The Federal Reserve could now influence market interest rates by setting the interest rate that *it* would pay its own depositors. By increasing the interest it pays, the Federal Reserve could increase the cost of credit because banks would not lend for less than they could make by holding the funds at the Federal Reserve. A consequence of this new power was that the Federal Reserve could easily lack "profits" at times—namely, when it raised interest rates relatively quickly, as it might decide to do to curb inflation. In such an economic condition, the assets it owns could well earn lower interest than the new, higher interest rate it pays to its depositors—thus resulting in a temporary lack of "profits."

This possibility would not have come as a surprise to the Congress that enacted the Dodd-Frank Act in 2010 in response to a global financial crisis, and after having so recently given the Federal Reserve this important new tool. Indeed, the Federal Reserve's annual financial statement for 2009 specifically noted that "[t]he Board of Governors requires the Reserve Banks to transfer excess earnings to the Treasury" but that, "[i]n the event of losses or an increase in capital paid-in at a Reserve Bank, payments to Treasury are suspended and earnings are retained until the surplus is equal to the capital paid-in." Fed. Rsrv. Sys., *The*

11

*Federal Reserve Banks: Combined Financial Statements as of and for the Years Ended December 31, 2009 and 2008 and Independent Auditors' Report* 20, *available at* https://www.federalreserve.gov/aboutthefed/files/BSTcombinedfinstmt2009.pdf. Similarly, the Federal Reserve recognized that its actions to stabilize the financial system—in particular, its purchase of large quantities of assets such as mortgage-backed securities—"would increase Federal Reserve, and overall government, net income in the near term at the cost of increasing the volatility of such income over time" and that in the future, rising interest rates could require the Federal Reserve to "defer payments to the Treasury until the deficiency in the surplus account has been restored." Joseph Gagnon et al., *Expanding Large-Scale Asset Purchases: Effectiveness, Benefits, Risks, and Strategies* (Mar. 11, 2009), *available at* https://www.federalreserve.gov/monetarypolicy/files/FOMC20090311memo02.pdf. Congress had good cause to recognize that the "century-long record of profitability" that existed while the Federal Reserve was not paying interest on deposits, OLC Op. at 14, would not be predictive of future outcomes once the Federal Reserve began paying interest to its depositors.

### 2. *Transferring money to the CFPB when the Federal Reserve lacks "profits" does not impede the Federal Reserve's operations or independence.*

OLC's opinion also misunderstands the Federal Reserve's operations in positing that limiting the CFPB's funding to the Federal Reserve's profits "helped preserve the central bank's independence." OLC Op. at 14. According to the opinion, transferring funds to the CFPB when the Federal Reserve lacks "profits" would "force[]" the Federal Reserve to "recognize greater losses" than it otherwise would. *Id.* But as noted above, a deferred asset causes no harm to the Federal Reserve. As a central bank, the Federal Reserve can continue to perform all of its critical functions and to satisfy all of its financial obligations while recording a deferred asset on its balance sheet.

Unlike what may be true for a private business, "[n]egative net income and the associated deferred asset do not affect the Federal Reserve's conduct of monetary policy or its ability to meet its financial obligations." Bd. of Governors of Fed. Rsrv. Sys., *Monetary Policy Report* 42 (Feb. 2025), *available at* https://www.banking.senate.gov/imo/media/doc/mpr_2-11-25.pdf. As a result, the Federal Reserve's operations are not impeded by the size of the deferred asset, which merely results from the Federal Reserve carrying out its responsibilities to implement monetary policy. There is thus no factual basis for OLC's suggestion that "the Federal Reserve's operational independence" is meaningfully altered by a requirement that the Board of Governors transfer funds to the CFPB even when that requires the Federal Reserve to increase the deferred asset entry on its balance sheet. *See* OLC Op. at 14–15.

Moreover, the opinion overlooks that the maximum transfer to CFPB authorized under statute is a pittance compared to the current size of the deferred asset. Under the CFPB's statute, as recently amended, the CFPB could request up to roughly $446 million for fiscal year 2025. *See* Act of July 4, 2025, Pub. L. 119-21, § 30001, 139 Stat. 72, 126; Cong. Rsch. Serv., *P.L. 119-21, the FY2025 Reconciliation Law, Provisions Related to CFPB Funding* 1 (July 16, 2025), *available at* https://www.congress.gov/crs-product/IN12578. The Federal Reserve's most recent weekly balance sheet reflects the size of the deferred asset at slightly under $243.2 billion. *See* Bd. of Governors of Fed. Rsrv. Sys., *H.4.1 Release: Dec. 4, 2025*, https://www.federalreserve.gov/releases/h41/20251204/. The Federal Reserve's independence is not meaningfully affected by having to make relatively small, capped transfers to the CFPB even while recording a deferred asset.

**C.    The opinion fails to consider the implications of its own interpretation on the operations and independence of the Federal Reserve.**

The OLC opinion purports to interpret part of the Federal Reserve Act, to explicate key aspects of the Federal Reserve's accounting practices, and to determine what are the "combined earnings of the Federal Reserve System" while failing to grapple with the fact that the Federal Reserve has come to a very different conclusion on that question. The opinion reflects no respect for the expertise or independence of the Federal Reserve or the ways its interpretation could implicate ongoing Federal Reserve operations.

The Federal Reserve does not share OLC's view that the Federal Reserve System's "combined earnings" are its "profits" and that the Federal Reserve can transfer money to the CFPB only during times that the System is generating positive "profits."  Indeed, the Board of Governors has continually and lawfully transferred funds to the CFPB over the several years that the Federal Reserve did not run a "profit." Last February, Chairman Powell informed the Senate Banking Committee that the Federal Reserve had "very carefully" considered the question of whether it could continue to transfer funds to the CFPB despite the lack of profits and concluded that "it's very clear on the law and the legislative history that we're still required to make those payments." *The Semiannual Policy Report to the Congress: Hearing Before the S. Comm. on Banking, Hous., and Urb. Affs.*, 119th Cong. 1:24:50–1:26:02 (Feb. 11, 2025) (testimony of Jerome H. Powell, Chair, Bd. of Governors of the Fed. Rsrv. Sys.), *available at* https://www.banking.senate.gov/hearings/02/04/2025/the-semiannual-monetary-policy-report-to-the-congress.

The opinion also fails to grapple with the way that the Federal Reserve actually manages its finances. Both now and at the time the Dodd-Frank Act was passed, each of the twelve Reserve Banks reports on its financial condition and remits any excess earnings to Treasury

separately and on a weekly basis. *See* H.4.1. Releases; *see also* Fed. Rsrv. Bank of St. Louis,

*H.4.1 Factors Affecting Reserve Balances of Depository Institutions and Condition Statement of*

*Federal Reserve Banks, 1916-2025*, https://fraser.stlouisfed.org/title/h41-factors-affecting-

reserve-balances-depository-institutions-condition-statement-federal-reserve-banks-83

(collecting more than a century of similar weekly reports). Meanwhile, the Dodd-Frank Act

provides for transfers to the CFPB on an annual or quarterly basis. *See* 12 U.S.C. § 5497(a)(1).

While OLC acknowledges the existence of the Federal Reserve's "[weekly] settlement

schedule," OLC Op. at 18, it makes no effort to square its interpretation of "combined earnings"

with that longstanding practice. For example, the Reserve Banks may generate substantial

"combined earnings" (as OLC defines that term) in some weeks but record losses in other weeks;

the opinion does not address what amount, if any, of those "combined earnings" could be

transferred to the CFPB. If OLC's view is that "combined earnings" can be calculated only at the

end of each quarter or year (seemingly based on how often the CFPB Director chooses to request

funds), that view disregards that the Reserve Banks remit excess earnings to Treasury every

week, with the result that such funds will not be held until the end of each quarter or year for

transfer to the CFPB.

Indeed, OLC's opinion might be read to require the Federal Reserve to meaningfully

revamp its financial management practices. To determine whether it could properly transfer

funds to the CFPB, the Federal Reserve would need to begin tracking "profits" in the manner set

out in the opinion. And the Reserve Banks would seem to need to hold on to excess earnings for

at least a quarter to determine whether they had "profits" that could be transferred to the CFPB—

contrary to their established practices of remitting net excess earnings to Treasury on a weekly

basis. OLC blithely acknowledges that the Federal Reserve may need to "change its [weekly]

settlement schedule," *id.*, but discounts the impact that its new interpretation would have on the Federal Reserve's ongoing operations. It also fails to consider that Congress legislated against the backdrop of the Federal Reserve's longstanding existing practices, was presumably aware of those practices, and gave no indication that it intended to legislate a change in how the Reserve Banks manage their finances.

The opinion also ignores the way in which its analysis would undermine and complicate the Federal Reserve's consumer protection and community affairs activities. In addition to its work in other areas, such as monetary policy, the Federal Reserve promotes consumer protection, financial inclusion, and community development through various means, including its examinations of financial institutions and its issuance of regulations that implement consumer protection and community reinvestment laws. *See, e.g.*, Bd. of Governors of Fed. Rsrv. Sys., *110th Annual Report* 83 (2023), *available at* https://www.federalreserve.gov/publications/files/2023-annual-report.pdf. In many of these areas, the Board of Governors coordinates with and relies on the work of the CFPB, such as when the agencies work together to coordinate their examinations of supervised institutions or to adjust dollar thresholds in consumer regulations such as Regulation Z, which implements the Truth in Lending Act. *See id.* at 89, 95–96. The CFPB also collects and publishes data under the Home Mortgage Disclosure Act that the Board of Governors relies on when conducting examinations. The system envisioned by the OLC opinion—in which the CFPB is intermittently defunded during times of economic flux—would undermine the Federal Reserve's ability to carry out its own consumer protection work by mothballing an important partner in that work.

**CONCLUSION**

The Court should take due account of the unique role of the Federal Reserve System and its longstanding past practices in resolving Plaintiffs' motion to clarify.

December 5, 2025                    Respectfully submitted,

                                    */s/ Kevin E. Friedl*
                                    Kevin Friedl (D.C. No. 90033814)
                                    Josephine T. Morse (D.C. No. 1531317)
                                    Democracy Forward Foundation
                                    P.O. Box 34553
                                    Washington, D.C. 20043
                                    (202) 448-9090
                                    kfriedl@democracyforward.org
                                    jmorse@democracyforward.org