**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| _____ | ) | |
| NATIONAL TREASURY EMPLOYEES | ) | |
| UNION, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 25-0381 (ABJ) |
| | ) | |
| RUSSELL VOUGHT, *in his official* | ) | |
| *capacity as Acting Director of the* | ) | |
| *Consumer Financial Protection Bureau,* | ) | |
| *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION TO CLARIFY**
**PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................... 1

BACKGROUND ............................................................................................................... 3

ARGUMENT .................................................................................................................... 5

I.      Plaintiffs Are Functionally Seeking a New Order—or a Modification to the Preliminary Injunction—to Compel the Acting Director to Request Funding from the Federal Reserve. ...................................................................................... 5

II.     Plaintiffs Have Not Established that the Court May Order the Acting Director to Seek Funding from the Federal Reserve. ........................................... 11

        A.     The Court May Not Modify the Preliminary Injunction Because Defendants' Appeal of the Preliminary Injunction Order Remains Pending. ...................................................................................................... 11

        B.     Plaintiffs Cannot Establish a Likelihood of Success on the Merits of Their Claims for Wholesale Supervision of CFPB Activities Pleaded in the Amended Complaint Because the D.C. Circuit's Opinion Is the Law of the Circuit and Law of the Case. ............................................ 12

        C.     Plaintiffs Have Not Established Any of the Criteria for Obtaining the Mandatory Injunctive Relief that They, in Effect, Are Seeking. ......... 13

III.    Plaintiffs Are Incorrect that the "Combined Earnings of the Federal Reserve System" Refers to the Federal Reserve's Revenues Rather than Its Profits ........ 15

        A.  Plain Meaning. ................................................................................... 17

        B.  Statutory Context and Structure. ..................................................... 19

        C.  Background Presumptions and Legislative Context. ...................... 23

        D.  Legislative History and Purpose. ..................................................... 25

IV.    If the Court Grants Relief to Plaintiffs, It Should Identify with Specificity What It Is Ordering Defendants to Do. ................................................................ 27

V.     Any Order that Explicitly or by Implication Compels the Acting Director to Seek Funding from the Federal Reserve Should Be Temporarily Stayed. ............ 28

CONCLUSION ............................................................................................................... 28

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Ala. Ass'n of Realtors v. U.S. Dep't of Health and Human Servs.*,
  557 F. Supp. 3d 1 (D.D.C. 2021) ...................................................................... 12, 16

*Ayuda, Inc. v. Thornburgh*,
  919 F.2d 153 (D.C. Cir. 1990) ............................................................................. 12

*Blitz v. Donovan*,
  740 F.2d 1241 (D.C. Cir. 1984) ........................................................................... 24

*Bostock v. Clayton Cnty.*,
  590 U.S. 644 (2020) ............................................................................................. 23

*CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*,
  601 U.S. 416 (2024) ....................................................................................... 14, 22

*Combustion Sys. Servs., Inc. v. Schuykill Energy Res., Inc.*,
  No. 92-4228, 1993 WL 496946 (E.D. Pa. 1993) ................................................ 21

*Dep't of Homeland Sec. v. MacLean*,
  574 U.S. 383 (2015) ............................................................................................. 20

*Favia v. Indiana Univ. of Pa.*,
  7 F.3d 332 (3d Cir. 1993) ...................................................................................... 5

*Gaines v. Thompson*,
  74 U.S. 347 (1868) ............................................................................................... 13

*Glob. Health Council v. Trump*,
  No. 25-5097, 2025 WL 2429482 (D.C. Cir. Aug. 20, 2025) .................................. 4

*Griggs v. Provident Consumer Disc. Co.*,
  459 U.S. 56 (1982) ............................................................................................... 11

*Illinois v. Ferriero*,
  60 F.4th 704 (D.C. Cir. 2023) ........................................................................ 13, 14

*In re Aiken Cnty.*,
  725 F.3d 255 (D.C. Cir. 2013) ......................................................................... 8, 11

*In re Cheney*,
  406 F.3d 723 (D.C. Cir. 2005) ............................................................................. 13

*In re Nat'l Nurses United,*
    47 F.4th 746 (D.C. Cir. 2022) ........................................................ 14

*Lovitky v. Trump,*
    949 F.3d 753 (D.C. Cir. 2020) ................................................... 13-14

*Miguel v. McCarl,*
    291 U.S. 442 (1934) ...................................................................... 13

*Mozilla Corp. v. FCC,*
    940 F.3d 1 (D.C. Cir. 2019) ......................................................... 24

*Nat'l Treasury Emps. Union v. Vought,*
    149 F.4th 762 (D.C. Cir. 2025) ........................................... *passim*

*Nat'l Wildlife Fed'n v. United States,*
    626 F.2d 917 (D.C. Cir. 1980) ..................................................... 13

*Oncale v. Sundowner Offshore Servs., Inc.,*
    523 U.S. 75 (1998) ........................................................................ 22

*Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.,*
    810 F.3d 631 (9th Cir. 2015) ....................................................... 12

*Power v. Barnhart,*
    292 F.3d 781 (D.C. Cir. 2002) ..................................................... 14

*Republic of Sudan v. Harrison,*
    587 U.S. 1 (2019) .......................................................................... 20

*Russello v. United States,*
    464 U.S. 16 (1983) ........................................................................ 25

*Sanchez-Espinoza v. Reagan,*
    770 F.2d 202 (D.C. Cir. 1985) ..................................................... 13

*Schering Corp. v. Illinois Antibiotics Co.,*
    62 F.3d 903 (7th Cir. 1995) ......................................................... 10

*Sherley v. Sebelius,*
    689 F.3d 776 (D.C. Cir. 2012) ..................................................... 12

*Tanzin v. Tanvir,*
    592 U.S. 43 (2020) ........................................................................ 23

*United States v. Philip Morris USA*,
   793 F. Supp. 2d 164 (D.D.C. 2011) ................................................................ 5

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ........................................................................................... 12

*Wisdom v. Intrepid Sea-Air Space Museum*,
   993 F.2d 5 (2d Cir. 1993) ............................................................................. 12

**Statutes**

5 U.S.C. § 706 ................................................................................................ 1, 4

12 U.S.C. § 289 .......................................................................................... 20, 24

12 U.S.C. § 341 ................................................................................................ 20

12 U.S.C. § 461 ................................................................................................ 20

12 U.S.C. § 5367 .............................................................................................. 20

12 U.S.C. § 5381 .............................................................................................. 20

12 U.S.C. § 5390 .......................................................................................... 20, 21

12 U.S.C. § 5481 .............................................................................................. 19

12 U.S.C. § 5492 .............................................................................................. 11

12 U.S.C. § 5497 ........................................................................................ *passim*

12 U.S.C. § 5465 .............................................................................................. 20

12 U.S.C. § 8206 .............................................................................................. 20

15 U.S.C. § 78u-6 ............................................................................................. 20

31 U.S.C. § 1341 ................................................................................................. 8

31 U.S.C. § 1342 ......................................................................................... 6, 8, 9

44 U.S.C. Chapter 33 ....................................................................................... 10

Dodd-Frank Wall Street Reform and Consumer Protection Act,
   Pub. L. No. 111-203, 124 Stat. 1376 (2010) ................................................ 20

**Rules**

Fed. R. App. P. 41 ............................................................................................ 4

Fed. R. Civ. P. 65............................................................................... 6, 9, 28

**Other Authorities**

Chris Gallant, *How Are Realized Profits Different From Unrealized or 'Paper' Profits?*,
   Investopedia (July 25, 2023),
   https://www.investopedia.com/ask/answers/06/realizedprofitsvsunrealizedprofits.asp ........... 21

H.R. 4173, 111th Cong.,
   https://www.congress.gov/bill/111th-congress/house-bill/4173/text/ih............................ 24, 25

Mark C. Hansen and Ariela Migdal, Business and Commercial Litigation in Federal Courts
   § 55:40 (5th ed. 2025) ......................................................................................... 20

*Merriam Webster's Collegiate Dictionary* (11th ed. 2020)........................................... 17

Virginia B. Morris & Kenneth M. Morris, Standard & Poor's Dictionary
   of Financial Terms (2007)...................................................................................... 19

*The American Heritage Dictionary of the English Language* (5th ed. 2016).................. 17-18morr

The Federal Reserve Banks, *Combined Financial Statements as of and for the Years Ended
   December 31, 2009 and 2008 and Independent Auditors' Report*
   (Apr. 21, 2010)........................................................................................................ 24

The Federal Reserve Banks, *Combined Financial Statements as of and for the Years Ended
   December 31, 2024 and 2023 and Independent Auditors' Report* (Mar. 12, 2025).................. 17

The Federal Reserve, *Interest on Reserve Balances (IORB) Frequently Asked Questions* (Sept.
   23, 2025), https://www.federalreserve.gov/monetarypolicy/iorb-faqs.htm .................. 16, 23, 27

U.S. Dep't of Justice, Office of Legal Counsel,
   *Whether the CFPB May Continue to Draw Funds from the Federal Reserve System Under 12
   U.S.C. § 5497 When the Federal Reserve System is Operating at a Loss*,
   49 Op. O.L.C. ___, (Nov. 7, 2025) .................................................................... *passim*

U.S. Office of Personnel Management, Guidance for Shutdown Furloughs (Sept. 2025),
   https://www.opm.gov/policy-data-oversight/pay-leave/reference-materials/guidance-for-
   shutdown-furloughs-sep-28-2025/............................................................................... 9

*Webster's Third New International Dictionary* (1993) ............................................... 17

## INTRODUCTION

In August, the D.C. Circuit determined that this lawsuit was incompatible with the Administrative Procedure Act ("APA")'s conception of the separation of powers. Applying well-established APA principles, the court held that "an APA challenge may not bundle together discrete actions [and inactions] in order to challenge them all together." *Nat'l Treasury Emps. Union v. Vought*, 149 F.4th 762, 789 (D.C. Cir. 2025). Thus, Plaintiffs may not wholesale challenge in this lawsuit "all of the individual 'actions to suspend or terminate CFPB's statutory mandated activities[.]" *Id.* (citation omitted). Instead, the D.C. Circuit instructed that, should the Bureau fail to take a discrete agency action it is statutorily required to take, Plaintiffs could at that point "seek judicial review to 'compel agency action unlawfully withheld or unreasonably delayed.'" *Id.* at 786 (quoting 5 U.S.C. § 706(1)).

Last month, the Office of Legal Counsel ("OLC") issued a memorandum opinion concluding that, so long as "the Federal Reserve has no profits," "it cannot transfer money to the CFPB" under 12 U.S.C. § 5497(a)(1). U.S. Dep't of Justice, Office of Legal Counsel, *Whether the CFPB May Continue to Draw Funds from the Federal Reserve System Under 12 U.S.C. § 5497 When the Federal Reserve System is Operating at a Loss*, 49 Op. O.L.C. ___, at *1 (Nov. 7, 2025) ("OLC Opinion"), *available at* http://www.justice.gov/olc/opinions. Plaintiffs disagree with OLC's reasoning. Mem. in Supp. of Pls.' Mot. to Clarify Prelim. Inj., ECF No. 148-1 ("Pls.' Mem.").

The Court should deny Plaintiffs' motion insofar as they seek more than clarification of Defendants' obligations. Although styled as a motion for clarification, Plaintiffs appear to want an order extending well beyond the existing injunction, one that implicitly requires the CFPB to request funds from the Federal Reserve. While Defendants welcome clarification about their obligations with respect to the *injunction* should the Bureau's funding be exhausted, a clarification of the existing injunction should have no impact on whether the CFPB requests funds, which is not required by the existing injunction. Clarification may affect how the CFPB ensures compliance

with the injunction during the anticipated lapse, but a modification or new injunction would be necessary to order the CFPB to refrain from generally implementing OLC's understanding of § 5497(a)(1) or to order the CFPB seek funds. The Court lacks jurisdiction to modify its preliminary injunction—because its appeal remains pending—to provide Plaintiffs with the functional equivalent of a new or modified order compelling the Acting Director to seek funds from the Federal Reserve. Nor does the operative complaint provide any basis to enter a new interlocutory order compelling the Acting Director to seek funds from the Federal Reserve. The D.C. Circuit's *Vought* opinion concluding that Plaintiffs' claims "fail as a matter of law," 149 F.4th at 794, is now the law of the case (and the law in this Circuit). Plaintiffs run headlong into that now-binding precedent in requesting to nonetheless add the equivalent of a *new* claim regarding the application of § 5497(a)(1) to the "bundle" of actions the D.C. Circuit has already held cannot form the basis of any viable claim.

Nor have Plaintiffs established that they can obtain the mandatory injunctive relief that they are, in effect, seeking. Such relief is in substance mandamus relief, but the Acting Director has already satisfied any duty that § 5497(a)(1) imposes on him because he has already determined the amount of funding reasonably necessary to carry out the authorities of the Bureau. Relief beyond that—such as relief requiring the Acting Director to seek funding from the Federal Reserve—falls outside the scope of mandamus.

Finally, Plaintiffs are simply wrong on the merits of their request; their suggestion that there can be no lapse that could affect Defendants' obligations under the existing injunction is based on an incorrect reading of 12 U.S.C. § 5497(a)(1). As OLC has opined, the "combined Earnings of the Federal Reserve System" refers to the Federal Reserve's profits. When the Federal Reserve is operating at a loss, it cannot transfer funding to the CFPB, and the CFPB then faces a potential lapse in funding that implicates the Antideficiency Act.

Accordingly, this Court can and should make clear whether the CFPB's obligations under the injunction would be affected by a lapse in funding resulting from OLC and CFPB's interpretation of § 5497(a)(1). But it cannot order the CFPB to do more than is provided for in

that injunction. If it adjudicates the meaning of "combined earnings," this Court should reject Plaintiffs' interpretation. And even if the Court were to agree with Plaintiffs on the meaning of "combined earnings," at most it should clarify that the CFPB must continue complying with the injunction; it should not impose new obligations on the CFPB regarding how to effectuate such compliance.[1]

## BACKGROUND

On February 13, 2025, Plaintiffs filed an Amended Complaint, which is the operative complaint in this case. Am. Compl., ECF No. 7. In the Amended Complaint, Plaintiffs sought wholesale APA review of "Defendants' actions and intended further actions to suspend or terminate the CFPB's statutorily mandated activities—including by issuing stop-work instructions, cancelling contracts, declining and returning funding, firing employees, and terminating the lease for its headquarters[.]" *Id.* ¶ 91.

On March 28, 2025, this Court entered an eight-part preliminary injunction. Order, ECF No. 88. Among other things, the preliminary injunction requires Defendants to reinstate all probationary and term employees who had been fired after February 10; to refrain from firing any employee except for cause; to refrain from instituting any work stoppage; to rescind all contract terminations issued after February 10; to provide Bureau employees with "either fully-equipped office space" or the means to work remotely; and to maintain a toll-free telephone number, website, and database in order to respond to consumer complaints. *Id.* The Government appealed. *NTEU v. Vought*, Case No. 25-5091 (D.C. Cir. Mar. 3, 2025), Doc. No. 2108518. On April 11, 2025, the D.C. Circuit issued an Order staying in part provisions of the preliminary injunction. *Id.* Doc. No. 2110720. On April 28, 2025, the D.C. Circuit then modified its partial stay. *Id.* Doc. No. 2113309.[2]

_____

[1] Putative *amici* have filed a brief suggesting that the Fed may have returned to profitability in recent weeks. *See* ECF No. 156. Defendants are investigating that suggestion, which Plaintiffs have not raised in the pending motion.

[2] In response to this Court's order, Defendants have separately identified the provisions of this Court's preliminary injunction remaining in effect in light of the D.C. Circuit stay orders. ECF No. 151.

On August 15, 2025, the D.C. Circuit issued an opinion vacating the preliminary injunction. *Vought*, 149 F.4th at 794.  The court explained that Plaintiffs' lawsuit is fundamentally incompatible with the APA.  *Id*. at 777-90.  The court explained that the lawsuit challenges "a constellation of . . . actions" that were ongoing in early 2025—"the February 10 email, firing employees, cancelling contracts, declining additional funding, and terminating the lease for the Bureau's current headquarters."  *Id*.  "Rather than seeking to challenge any of these discrete decisions that may have caused them harm, the plaintiffs seek to dress up these 'many individual actions' as a single decision in order to challenge them all at once, which is exactly what [the APA] prevents."  *Id*. at 784.  Although it is not consistent with the APA's conception of the separation of powers to seek "to prophylactically ensure that the Bureau can fulfill its statutory mandate[s,]" *id*. at 790, should Plaintiffs' "fears come to pass" and the Bureau fails to take a discrete statutorily mandated action, Plaintiffs "may seek judicial review to 'compel agency action unlawfully withheld or unreasonably delayed[,]'" *id*. at 786 (quoting 5 U.S.C. § 706(1)).

On September 29, 2025, Plaintiffs petitioned the D.C. Circuit for rehearing en banc.  Case No. 25-5091, Doc. No. 2137655.  Because the petition for rehearing en banc remains pending, the D.C. Circuit has not yet issued its mandate.  *See* Fed. R. App. P. 41(b).  Accordingly, the preliminary injunction remains in effect as partially stayed and clarified by the D.C. Circuit.  *See, e.g.*, *Glob. Health Council v. Trump*, No. 25-5097, 2025 WL 2429482, at *1 (D.C. Cir. Aug. 20, 2025) (en banc) (per curiam) ("Because this court's mandate has not yet issued, the preliminary injunction … remains in effect.").

On November 7, 2025, the Office of Legal Counsel ("OLC") issued a memorandum opinion concluding that, because "the Federal Reserve has no profits" at present, "it cannot transfer money to the CFPB" under 12 U.S.C. § 5497(a)(1).  OLC Opinion at *1.

After OLC issued its opinion, Defendants notified the Court and the parties that the CFPB anticipates exhausting available funds in early 2026 and may be subject to a lapse in appropriations.  ECF No. 145.  On November 20, 2025, Acting Director Vought issued a report required by 12 U.S.C. § 5497(e)(1) in which he identified the amount determined by the Director

to be reasonably necessary for the Bureau to carry out its authorities under law.  *See* ECF No. 147-1.

On November 23, 2025, Plaintiffs filed a motion for an order providing that "a failure to request funding from the Federal Reserve is not a permissible justification for violating the preliminary injunction."  [Proposed] Order Granting Pls.' Mot. To Clarify, ECF No. 148-2.  The memorandum of points and authorities in support of the requested order principally challenges OLC's interpretation of 12 U.S.C. § 5497(a)(1), as described in OLC's opinion dated November 7, 2025.  Pls.' Mem.

## ARGUMENT

### I.    Plaintiffs Are Functionally Seeking a New Order—or a Modification to the Preliminary Injunction—to Compel the Acting Director to Request Funding from the Federal Reserve.

Plaintiffs' motion should be denied insofar as it seeks a new order—or a modification of the Court's injunction—to in effect compel the Acting Director "to request funding from the Federal Reserve[.]"  Pls.' Mem. at 1.  "The general purpose of a motion for clarification is to explain or clarify something ambiguous or vague not to alter or amend."  *United States v. Philip Morris USA*, 793 F. Supp. 2d 164, 168 (D.D.C. 2011) (citation omitted).  Because Plaintiffs may not bypass the standards that apply to seek or modify an injunction, the Court "must look beyond the motion's caption to its substance."  *Favia v. Indiana Univ. of Pa.*, 7 F.3d 332, 337 (3d Cir. 1993).  Plaintiffs' motion entirely fails to justify its apparent view that the preliminary injunction was intended to govern the Bureau's interpretation of § 5497(a) and the resultant possibility of a lapse in appropriations.  Plaintiffs' memorandum fails to identify or discuss any language in the Court's injunction indicating that it controls how Defendants would navigate an absence of funding and their obligations under the Antideficiency Act.

Referencing "the injunction" only at the highest level of generality, Plaintiffs suggest that it would violate the injunction if (1) the Acting Director does not submit a letter to the Federal

Reserve seeking funding under 12 U.S.C. § 5497(a)(1),[3] or (2) if the Acting Director operates the Bureau consistent with statutory obligations under the Antideficiency Act in the event of a lapse in appropriations.[4]  Contrary to Plaintiffs' assertions, there is no provision of the existing injunction compelling the Acting Director to submit a letter to the Federal Reserve seeking 12 U.S.C. § 5497(a)(1) funding.  Nor does compliance with the Antideficiency Act—which requires a pause, during an appropriations lapse, in "ongoing, regular functions of [the agency] the suspension of which would not imminently threaten the safety of human life or the protection of property[,]" 31 U.S.C. § 1342—violate any provision of an injunction that can and must be construed in harmony with that statute.

*First*, the injunction does not include a provision compelling the Acting Director to submit a letter to the Federal Reserve seeking funding; indeed, it does not address the Bureau's funding or budgeting at all.  The law is clear that "[e]very order granting an injunction" must "state its terms specifically" and "describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required."  Fed. R. Civ. P. 65(d).  A review of the terms of the preliminary injunction, ECF No. 88, shows that no provision describes in reasonable detail the action Plaintiffs now say is required: to seek funding from the Federal Reserve.

Such a mandatory injunction was never requested and would have been advisory in nature at the time the Court entered the preliminary injunction.  Indeed, the Amended Complaint pleads no facts or claims alleging that the Acting Director has a mandatory statutory duty to seek funding from the Federal Reserve or that failing to do so would be based on a misreading of the term "combined earnings" in 12 U.S.C. § 5497(a)(1).  Unsurprisingly, the Court's Memorandum Opinion justifying the preliminary injunction order does not analyze whether Plaintiffs were likely to succeed on the merits of any claim for a mandatory preliminary injunction compelling the Acting

---

[3] *See* Pls.' Mem. at 22 ("This Court should clarify that defendants may not violate its injunction by refusing to request funding").

[4] *See* Pls.' Mem. at 8 (asserting that Defendants "have notified the Court that they intend not to comply with the injunction once the Bureau runs out of money").

Director to seek funding from the Federal Reserve.  Mem. Op., ECF No. 87.  The opinion nowhere analyzes 12 U.S.C § 5497.  *Id*.  Rather, Plaintiffs are asking that the Court resolve issues of statutory interpretation for the first time in the present motion.  *See generally* Pls.' Mem. Unsurprisingly, Plaintiffs cite no case in which a court resolved a complex issue of statutory interpretation as part of a motion purporting to "clarify" that the issue was already resolved when the court issued a prior injunction.

Proceedings in this case confirm that the preliminary injunction does not include a provision compelling the Acting Director to submit a letter to the Federal Reserve seek funding. Immediately after the Court entered its preliminary injunction, it issued a Minute Order directing the Plaintiffs to inform the Court why they are "no longer seeking the restriction in the February 14 consent order prohibiting defendants from transferring or relinquishing money from the Reserve Fund other than to satisfy ordinary operating obligations[.]"  Minute Order (Mar. 28, 2025).  In response, Plaintiffs explained that they "did not request that a prohibition on doing so be included in the interim order only because they were trying to propose as narrow an order as possible."  ECF No. 94 at 1.

Construing some unidentified provision of the injunction to include a directive compelling the Acting Director to seek funding from the Federal Reserve would be entirely inconsistent with Plaintiffs' representations that they "were trying to propose as narrow an order as possible."  *Id*. Indeed, Plaintiffs represented that if Defendants attempted to transfer or relinquish the money in the CFPB reserve fund in violation of the Consumer Financial Protection Act, they would promptly seek to modify the Court's injunction to include a provision "requiring that the money be returned and enjoining the defendants from any future attempt to transfer or relinquish the funds during the pendency of this case."  *Id*.  But under Plaintiffs' new (and incorrect) understanding of the injunction, there would have been no need for modification in that circumstance because Plaintiffs instead could have sought "clarification" that—regardless of the terms it states specifically—the injunction already precludes the Acting Director from transferring or relinquishing money in the CFPB reserve fund, based on essentially the same reasoning as Plaintiffs' present motion.

*Second*, Plaintiffs are incorrect to suggest that Defendants would violate the existing injunction if they operate the Bureau consistent with the Antideficiency Act's requirement to pause "ongoing, regular functions of [the agency] the suspension of which would not imminently threaten the safety of human life or the protection of property[,]" 31 U.S.C. § 1342, during a lapse in appropriations.  The Antideficiency Act imposes statutory duties on the Acting Director, the Bureau, and Bureau staff.  Specifically, it prohibits federal agencies from obligating funds beyond the amount appropriated, 31 U.S.C. § 1341(a)(1)(A)-(B), and from "employ[ing] personal services exceeding that authorized by law except for emergencies involving the safety of human life or the protection of property," *id*. § 1342.  The emergency exception "does not include ongoing, regular functions of government the suspension of which would not imminently threaten the safety of human life or the protection of property." *Id*.

The law is clear that the Executive Branch must comply with its obligations only insofar "as there is appropriated money available[.]" *In re Aiken Cnty.*, 725 F.3d 255, 259 (D.C. Cir. 2013). "Of course, if Congress appropriates no money for a statutorily mandated program, the Executive obviously cannot move forward." *Id*.  Plaintiffs cite no authority for the notion that an injunction running against an Executive Branch official should be read as implicitly ordering the Government to continue performing tasks for which it lacks funding.[5]

Indeed, construing some unidentified provision of the preliminary injunction as compelling Defendants to operate the Bureau in violation of the Antideficiency Act would be inconsistent with this Court's Memorandum Opinion justifying the order.  The Court viewed an injunction as necessary to preclude the CFPB from being "dissolved and dismantled completely in approximately thirty days[.]"  ECF No. 87 at 112.  But agencies are subject to lapses in appropriations without being dissolved and dismantled.  Indeed, most agencies were recently subject to a forty-three-day lapse in appropriations without being dissolved and dismantled.  The

---

[5] The government acknowledges that lawful court orders explicitly requiring an agency to act without funding generally trigger the Antideficiency Act's exception permitting payment obligations "authorized by law."  31 U.S.C. §§ 1341(a)(1)(B), 1342.

Court also explained that the injunction was needed to preclude Defendants from "overstepp[ing] their statutory and constitutional authority and usurp[ing] the power of the members of Congress who were democratically elected by the people in every state of the union."  ECF No. 87 at 107. Ignoring the limits that the Antideficiency Act places on Defendants' authority to perform other statutory functions during a lapse in appropriations would usurp the power of the members of Congress and President who were democratically elected and enacted the statute.

The best reading of the preliminary injunction's provisions does not compel the Acting Director to operate the Bureau in violation of the Antideficiency Act's statutory mandates.  Again, that is especially so considering that an injunction must "state its terms specifically" and "describe in reasonable detail . . . the act or acts restrained or required."  Fed. R. Civ. P. 65(d).

Consider, for example, provision #3.  ECF No 88 ¶ 3.  Provision #3 states that "Defendants shall not terminate any CFPB employee, except for cause related to the individual employee's performance or conduct; and defendants shall not issue any notice of reduction-in-force to any CFPB employee."  *Id*.  To be sure, if the agency is subject to a lapse in appropriations, the Antideficiency Act may compel Defendants to furlough employees who are not excepted "for emergencies involving the safety of human life or the protection of property."  31 U.S.C. § 1342. But a furlough is not the same as a reduction-in-force or a termination.  As Office of Personnel Management guidance explains, "[a] reduction in force is a process to separate or reassign employees when positions have been abolished.  A furlough is the placing of an employee in a temporary non-duty, non-pay status because of lack of work or funds, or non-disciplinary reasons." U.S. Office of Personnel Management, Guidance for Shutdown Furloughs at 50 (Sept. 2025), *available at* https://www.opm.gov/policy-data-oversight/pay-leave/reference-materials/guidance-for-shutdown-furloughs-sep-28-2025/.

Consider provision #1.  ECF No. 88 ¶ 1.  That provision is a follow-the-law injunction with respect to seemingly all provisions of the Federal Records Act.  *Id*.  It states that "Defendants, shall maintain and shall not delete, destroy, remove, or impair any data or other CFPB records covered by the Federal Records Act (hereinafter 'agency data') except in accordance with the procedures

described in 44 U.S.C. Chapter 33." *Id.* Plaintiffs nowhere explain how a lapse in appropriations necessarily results in a Federal Records Act violation. Pls.' Mem. Plaintiffs do not suggest that other Executive Branch agencies that were subject to the recent forty-three-day lapse in appropriations somehow necessarily violated the Federal Records Act. And should a lapse occur, the CFPB would take steps to preserve its records, data, and other property as required by the Federal Records Act and other provisions of law and permitted by the Antideficiency Act.

Consider provision #4. That provision precludes Defendants from enforcing the terms of an email that was issued to agency staff on February 10, 2025. ECF No. 88 ¶ 4. It also provides that Defendants "shall not reinstitute or seek to achieve the outcome of a work stoppage, whether through a stop-work order, an order directing employees to take administrative leave, or any other means." *Id*. But the D.C. Circuit has determined that this provision "allow[s] work stoppages that defendants have determined after a particularized assessment, would not interfere with the performance of defendants' statutory duties." Order at 1-2, *NTEU v. Vought*, No. 25-5091 (D.C. Cir. Apr. 11, 2025). It is only under that understanding of the provision that it "remains in effect." *Id*. at 2.

Because provision #4 remains in effect only on the understanding that it does "not interfere with the performance of defendants' statutory duties," Order at 1-2, *NTEU v. Vought*, No. 25-5091 (D.C. Cir. Apr. 11, 2025), including those arising under the Antideficiency Act, Defendants' compliance with the Antideficiency Act, after a particularized assessment, cannot violate provision #4. Indeed, courts are not authorized "to issue injunctions that authorize or direct people to violate valid federal statutes." *Schering Corp. v. Illinois Antibiotics Co.*, 62 F.3d 903, 907 (7th Cir. 1995).

In addition to the D.C. Circuit's clarification of provision #4 as permitting work stoppages that are consistent with Defendants' performance of its mandatory statutory duties, this Court has separately clarified the provision. Specifically, this Court has clarified that it is the putative "stop work order issued on February 10, which is the focus of the [preliminary injunction] Order." ECF No. 102 at 4. And Plaintiffs do not dispute that Defendants have issued no email to agency staff that is anything like the February 10 email since issuance of the injunction. Nor do Plaintiffs

suggest that the Court considered the Antideficiency Act when it issued the preliminary injunction order.  The preliminary injunction order did not issue during a lapse in appropriations and does not explicitly mandate that the agency perform functions without appropriations.  That was not the "focus of the Order."  *Id.*

Finally, consider provision #6.  That provision enjoins Defendants to continue "to maintain a single, toll-free telephone number, a website, and a database for the centralized collection of consumer complaints regarding consumer financial products and services, and that it continues to monitor and respond to those complaints, including by providing Elevated Case Management." ECF No. 88 ¶ 6.  But the provision applies only "in accordance with 12 U.S.C. § 5492(b)(3)[.]" *Id.*  And that provision applies only insofar "as there is appropriated money available[,]" *In re Aiken Cnty.*, 725 F.3d at 259, consistent with the language of the Antideficiency Act.

## II.    Plaintiffs Have Not Established that the Court May Order the Acting Director to Seek Funding from the Federal Reserve.

### A.    The Court May Not Modify the Preliminary Injunction Because Defendants' Appeal of the Preliminary Injunction Order Remains Pending.

Again, this Court should deny Plaintiffs' motion to the extent that Plaintiffs are not seeking clarification but are instead seeking an order that explicitly or in effect compels the Acting Director "to request funding from the Federal Reserve[,]" Pls.' Mem. at 1, based on their rejection of OLC's view of § 5497(a)(1).  Insofar as such an order modifies this Court's preliminary injunction, it is precluded.  "The filing of a notice of appeal . . . divests the district court of its control over those aspects of the case involved in the appeal." *Griggs v. Provident Consumer Disc. Co.*, 459 U.S. 56, 58 (1982).  Because no mandate has issued from the D.C. Circuit regarding the appeal, the Court may not issue an order adding another provision to the preliminary injunction compelling the Acting Director to seek funding from the Federal Reserve.

**B.    Plaintiffs Cannot Establish a Likelihood of Success on the Merits of Their Claims for Wholesale Supervision of CFPB Activities Pleaded in the Amended Complaint Because the D.C. Circuit's Opinion Is the Law of the Circuit and Law of the Case.**

Plaintiffs cannot establish the criteria necessary for a new interlocutory injunction compelling the Acting Director to seek funding from the Federal Reserve because the D.C. Circuit's opinion addressing this Court's preliminary injunction is law of the case. That opinion precludes Plaintiffs from establishing the criteria for any such injunction based on the claims pleaded in the operative complaint. "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

Plaintiffs must show that they are likely to succeed on the merits of the claims pleaded in the operative complaint. *See Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.*, 810 F.3d 631, 633 (9th Cir. 2015) ("When a plaintiff seeks injunctive relief based on claims not pled in the complaint, the court does not have the authority to issue an injunction."). Plaintiffs cannot do so because the D.C. Circuit's opinion addressing this Court's preliminary injunction is law of the case and forecloses any conclusion that Plaintiffs are likely to succeed on the merits of any relevant claim pleaded in the operative complaint.

When the D.C. Circuit's "opinion was released it became the law of this circuit" regardless of the "[s]tay of the mandate." *Ayuda, Inc. v. Thornburgh*, 919 F.2d 153, 154 (D.C. Cir. 1990) (Henderson, J., concurring); *see, e.g.*, *Wisdom v. Intrepid Sea-Air Space Museum*, 993 F.2d 5, 7 (2d Cir. 1993). The D.C. Circuit's opinion is not only law of the circuit, but it is law of the case. *See Sherley v. Sebelius*, 689 F.3d 776, 782 (D.C. Cir. 2012); *Ala. Ass'n of Realtors v. U.S. Dep't of Health and Human Servs.*, 557 F. Supp. 3d 1, 8 (D.D.C. 2021). The D.C. Circuit definitively concluded that Plaintiffs' APA claims in Counts Three and Four of the Amended Complaint fail because they do not challenge a circumscribed and discrete agency action, let alone final agency action. *Vought*, 149 F.4th at 777-90. The D.C. Circuit also concluded that the claims pleaded in

Counts Three and Four are not ripe for Administrative Procedure Act review. *Id*. And the D.C. Circuit concluded that Plaintiffs' claims in Count One "fail as a matter of law." *Id*. at 794.[6]

Because Plaintiffs cannot show a likelihood of success on the merits of any relevant claim pleaded in the operative complaint, the Court may not issue a new interlocutory injunctive order compelling the Acting Director to seek funding from the Federal Reserve. That is so regardless of whether Plaintiffs can make the required showing on the other required factors.

### C. Plaintiffs Have Not Established Any of the Criteria for Obtaining the Mandatory Injunctive Relief that They, in Effect, Are Seeking.

1. Plaintiffs are seeking an order that in effect compels the Acting Director "to request funding from the Federal Reserve[.]" Pls.' Mem. at 1. Because the relief demanded would require the Acting Director to take a specific action, it constitutes a mandatory rather than prohibitory injunction. And a request for "a mandatory injunction against a federal official is analyzed as one requesting mandamus." *Nat'l Wildlife Fed'n v. United States*, 626 F.2d 917, 918 n.1 (D.C. Cir. 1980).[7] "To establish entitlement to mandamus relief, the plaintiff must demonstrate 1) a clear and indisputable right to the particular relief sought against the federal official, 2) that the federal official is violating a clear duty to act, and 3) that the plaintiff has no adequate alternative remedy." *Illinois v. Ferriero*, 60 F.4th 704, 713 (D.C. Cir. 2023). "[T]he 'party seeking mandamus has the burden of showing that its right to issuance of the writ is clear and indisputable.'" *Lovitky v. Trump*,

---

[6] The D.C. Circuit did not pass on Plaintiffs' claims in Count II. *Vought*, 149 F.4th at 773 n.2. But those claims challenge the Government's construction of the Federal Vacancies Reform Act, not 12 U.S.C. § 5497(a)(1). Claims in Count II therefore provide no basis for the Court to conclude that Plaintiffs are likely to succeed on the merits of their claims regarding the proper construction of 12 U.S.C. § 5497(a)(1) in this action.

[7] Plaintiffs cannot avoid the applicable standard by artful pleading. *See Miguel v. McCarl*, 291 U.S. 442, 452 (1934) ("The mandatory injunction here prayed for is in effect equivalent to a writ of mandamus, and governed by like considerations."); *Gaines v. Thompson*, 74 U.S. 347, 352 (1868) (explaining that "doctrine" applicable to "relief sought . . . through the writ of mandamus . . . is as applicable to the writ of injunction[.]"); *In re Cheney*, 406 F.3d 723, 729 (D.C. Cir. 2005) (en banc) ("'The principles that governed the former writ now govern attempts to secure similar relief,' such as a mandatory injunction ordering a government employee or agency to perform a duty owed to the plaintiff" (quoting *Sanchez-Espinoza v. Reagan*, 770 F.2d 202, 207 n.7 (D.C. Cir. 1985)).

949 F.3d 753, 759-60 (D.C. Cir. 2020) (quoting *Power v. Barnhart*, 292 F.3d 781, 784 (D.C. Cir. 2002)).  Courts often discuss the first two "elements for mandamus-type relief—clear right to relief and clear duty to act—concurrently[.]" *Id* at 760.  The "question becomes whether the [Plaintiffs] have 'demonstrated a clear and indisputable right to relief based on a clear and compelling duty to act, as required to support mandamus relief.'" *Illinois*, 60 F.4th at 715 (citation omitted).  Plaintiffs have failed to make any of these showings for their request for an order compelling the Acting Director "to request funding from the Federal Reserve[.]"  Pls.' Mem. at 1.

2. Plaintiffs cannot establish that 12 U.S.C. § 5497(a)(1) imposes a "crystal-clear legal duty" on the CFPB Director, *see In re Nat'l Nurses United*, 47 F.4th 746, 752 (D.C. Cir. 2022), "to request funding from the Federal Reserve."  Pls.' Mem.  As OLC explains, "[o]n its face, Congress's instruction that 'the Board of Governors shall transfer to the Bureau from the combined earnings of the Federal Reserve System, the amount determined by the Director to be reasonably necessary to carry out the authorities of the Bureau under Federal consumer financial law' is not directed at the CFPB" at all.  OLC Opinion at *30-31 (quoting 12 U.S.C. § 5497(a)(1)).  Rather, the statute imposes on "the Board of Governors" of the Federal Reserve a duty to "transfer to the Bureau" certain sums of money.  12 U.S.C. § 5497(a)(1).  And in any event, regardless of the proper interpretation of "combined earnings" in 12 U.S.C. § 5497(a)(1), at a minimum it does not *clearly* mean what Plaintiffs say.

To be sure, the statute implies that the Director must determine "the amount . . . reasonably necessary to carry out the authorities of the Bureau under Federal consumer financial law[.]"  *Id.* But Plaintiffs do not suggest that the Acting Director has failed to comply with that obligation. Nor could they, given that he has made the required determination in the context of issuing reports in compliance with 12 U.S.C. § 5497(e)(1)(B).  *See* ECF No. 147.  And while a letter issued by the CFPB Director to the Federal Reserve may be one avenue by which the Federal Reserve can learn of the Director's determination as to the funding needs of the Bureau, the statutory language itself does not compel any such letter.  *See CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416, 422 (2024) ("Each year, the Bureau *may* requisition . . .") (emphasis added).  In short, even

if Bureau leadership is complying with OLC's opinion by not "instruct[ing]" the Federal Reserve "to transfer funds[,]" ECF No. 145-1 at 24, any dispute as to a failure to act under the statute is more appropriately directed at the Federal Reserve, not the CFPB or the Acting Director.

### III.    Plaintiffs Are Incorrect that the "Combined Earnings of the Federal Reserve System" Refers to the Federal Reserve's Revenues Rather than Its Profits

Plaintiffs' contention that Defendants' obligations under the existing injunction will not be affected by a lapse in appropriations is premised on their disagreement with OLC's and CFPB's reading of 12 U.S.C. § 5497(a)(1). Plaintiffs' view of § 5497(a)(1) is mistaken, but even if this Court adopts that view, a clarification ruling could at most make clear that Defendants' interpretation is not a basis for failing to perform all the tasks set out in the injunction; as explained above, it could not order Defendants to request funding under Plaintiffs' interpretation of §5497(a)(1).

> Under § 5497(a)(1), Congress provided that:
>
> Each year (or quarter of such year), beginning on the designated transfer date, and each quarter thereafter, the Board of Governors shall transfer to the Bureau from the combined earnings of the Federal Reserve System, the amount determined by the Director to be reasonably necessary to carry out the authorities of the Bureau under Federal consumer financial law, taking into account such other sums made available to the Bureau from the preceding year (or quarter of such year).

12 U.S.C. § 5497(a)(1).

In its opinion, OLC construed the term "'combined earnings of the Federal Reserve System'" as referring "to the Federal Reserve's profits, calculated by subtracting its interest expenses from its revenues." OLC Opinion at *1. Thus, if the "Federal Reserve has no profits, it cannot transfer money to the CFPB." *Id.*

In contrast, Plaintiffs' view that "earnings" means "all the money the Fed takes in," Pls.' Mem. at 10, is inconsistent with other provisions of Dodd-Frank—when Congress wanted to talk about "all the money" that an entity takes in, *id.* at *10, in that statute, it used the word "revenues," not "earnings." *See* OLC Opinion at *14-15. Despite twenty-one invocations of the term "ordinary

meaning," Plaintiffs' core argument—that the Federal Reserve "earns" money by losing it—is far from ordinary. In ordinary usage, earnings and losses are opposites.

This same dichotomy is reflected by the Federal Reserve's use of the terms "net interest income" and "net interest expense" as two sides of the same coin. *See* OLC Opinion at *3. Both terms describe the yield from the Fed's primary banking activities, calculated by subtracting interest expenses from interest income. *Id.* But "net interest income" represents a positive yield, and "net interest expense" reflects a negative yield. *Id.* These concepts correspond to the ordinary and accounting concepts of profit and loss, because interest expenses are the cost at which the Federal Reserve generates interest income. *Id.* at *13. "If the Federal Reserve no longer paid interest on reserve balances," or deposits, banks' desire to leave funds on deposit with the Federal Reserve would "plummet." The Federal Reserve, *Interest on Reserve Balances (IORB) Frequently Asked Questions* (Sept. 23, 20205), https://www.federalreserve.gov/monetarypolicy/iorb-faqs.htm. Banks would withdraw deposits, and the Federal Reserve would need to make corresponding sales of its revenue-generating investments, "shrink[ing] its balance sheet rapidly." *Id.* Thus, the Federal Reserve has publicly justified its interest expenses by explaining that, "[w]hile the Federal Reserve pays interest on [deposits], it also receives interest income" from investments made with and offered as security for those deposits. *Id.* This contradicts Plaintiffs' suggestion that the Fed's willingness and ability to absorb losses for the sake of monetary policy somehow mean its interest expenses are "unrelated to the money it earns." Pls.' Mem. at 18. It also contradicts their suggestion that the concept of "profit" is inapplicable to the Fed. *Id.* at 8. Rather, the Federal Reserve tracks the profitability of its primary banking activities by offsetting its interest expenses against its interest income and the profitability of its other activities in the "[o]ther items of income [or] loss" section of its income statement. *See* OLC Opinion at *3.

And Plaintiffs do not dispute that the Federal Reserve has been operating at a loss. *But see supra* Note 1. "In every year since 2022, the Federal Reserve's costs have exceeded its revenue." OLC Opinion at *1. But Plaintiffs' position is that, by engaging in financial transactions that cost far more than they yield, the Federal Reserve is generating "earnings" it otherwise would not have.

*See* Pls.' Mem. at 10.  That position turns ordinary meaning on its head.  They claim that the Fed "earns billions of dollars a year" only because of the amount it takes in.  *Id.* at 2.  But in 2024, the Federal Reserve paid about $227 billion in interest to depositors in exchange for the use of the money they deposited—and used that money to generate only about $159 billion in interest income.  The Federal Reserve Banks, *Combined Financial Statements as of and for the Years Ended December 31, 2024 and 2023 and Independent Auditors' Report* at 4 (Mar. 12, 2025) ("2024 Financial Statements").  Plaintiffs are not claiming that the Fed earns money *despite* engaging in unprofitable transactions.  Rather, they are claiming that the Federal Reserve is earning billions because of those unprofitable transactions.  But losing money is not earning money.

In short, Plaintiffs' contention that the Federal Reserve earns money by losing it is unpersuasive.  In contrast, OLC's opinion is supported by the traditional tools of statutory construction, including (1) the plain meaning at the time of enactment, (2) statutory structure, (3) the Federal Reserve's accounting practices, and (4) consideration of Congress's policy aims.  OLC Opinion at *9-21.

### A.  Plain Meaning.

First, OLC's opinion is supported by the plain meaning at the time of enactment.  *Id.* at *10-13.  "Common dictionary definitions interpret 'earnings' to describe 'the balance of revenue after deduction of costs and expenses.'"  *Id.* at *10 (quoting *Merriam-Webster's Collegiate Dictionary* 391 (11th ed. 2005)).[8]  OLC also relied on *Webster's Third New International Dictionary* 714 (1993 ed.) and *The American Heritage Dictionary of the English Language* 561 (5th ed. 2016).  *Id.*  The ordinary meaning of the term "combined" is "'to unite into a single number or expression."  *Id.* at *28 (quoting Merriam-Webster's Collegiate at 246).  "Coupled with the word 'earnings,' the phrase 'combined earnings' in section 5497(a)(1) therefore refers to the collective profits . . . of the Reserve Banks."  *Id.*

---

[8] OLC cites several other dictionary definitions in support of its reading.  OLC Opinion at *13.

Plaintiffs claim that *Merriam Webster's Collegiate* and *Webster's Third New International* do not list business profits as the first definition.  Pls.' Mem. at 10-11.  But both of those dictionaries disclaim the order of entries bearing any meaning.  *See Merriam Webster's Collegiate Dictionary* 20a (11th ed. 2020) ("The order of senses within an entry is historical"); *Webster's Third New International Dictionary* 17a (1993) (noting that the ordering "does not evaluate senses or establish an enduring hierarchy of importance among them.").

"The best sense" of any word "is the one that most aptly fits the context of an actual genuine utterance."  *See id.*  Thus, it makes no difference that *The American Heritage Dictionary of the English Language* (5th ed. 2016) places more common meanings first.  *See id.* at xxiv.  That dictionary's first definition—salary or wages—has no application to this case because the Federal Reserve has no salary or wages.  *See id.* at 561.  The next definition—business profits— corresponds to OLC's interpretation.  *See id.*

In any event, "the weight of authority indicates that 'earnings' requiring offsetting at least some costs against revenue."  OLC Opinion at *22.

Although Plaintiffs claim that every "relevant" actor has understood earnings to mean revenue, Pls.' Mem. at 11, they do not dispute that in the business and financial context, "earnings" refers to either profit or net income, *see* OLC Opinion at *10-13.  Plaintiffs obscure the fact that many important American institutions, such as the SEC and Nasdaq, understand earnings to mean business profits.  *See id.* at *10.  And the business community uses terms such as "earnings per share" and "retained earnings" to refer exclusively to the concept of profit or net income.  *See id.* at *10-11.  This means that "alternative uses of 'earnings' outside the corporate context are inapposite."  *Id.* at *22.

Seeking to get around this problem, Plaintiffs assert that "courts have repeatedly given Dodd-Frank its ordinary meaning" as opposed to one that considers the business and financial context.  Pls.' Mem. at 15-16.  But each of the terms that it offers by way of example is a non-technical term.  *Id.*  Plaintiffs do not explain how "deceptive," "financial," and "class of transactions" have special meanings in the accounting world.  *See id.*  Giving non-technical

18

meaning to non-technical terms is fully consistent with interpreting "earnings" in a way that is supported by ordinary dictionaries, accounting dictionaries, and the Federal Reserve's own usage both before and after Dodd-Frank.  And in any event, Plaintiffs' characterization of OLC's interpretation as a "bespoke corporate analogy," *id*. at 15, ignores the numerous definitions from non-technical dictionaries upon which OLC relies.  OLC Opinion at *10; *supra* Part III.A.

Plaintiffs urge that section 5497 refers to "the earnings of entities, not individuals," and allege OLC's sources fail to make this distinction.  Pls.' Mem. at 15.  But OLC's sources draw this exact distinction.  *Compare* OLC Opinion at *10 ("From a corporate perspective, earnings are profits, or net income, after the company has paid income taxes and bond interest.") (quoting Virginia B. Morris & Kenneth M. Morris, Standard & Poor's Dictionary of Financial Terms 64 (2007) ("Standard & Poor's Dictionary")), *with* OLC Opinion at *22 ("In the case of an individual, earnings include salary and other compensation for work you do, as well as interest, dividends, and capital gains from your investments") (quoting Standard & Poor's Dictionary at 64).  And OLC agrees that the "colloquial meaning of 'earnings' in the individual context is not controlling in the context of section 5497 and should not guide [its] statutory construction."  *Id*. at *23.[9]

Plaintiffs are wrong to suggest that Congress, in the Dodd-Frank Act or elsewhere, uses terms in a technical sense only when it provides an express definition.  *See* Pls.' Mem. at 16 (citing 12 U.S.C. § 5481).  Plaintiffs provide no authority for this novel assertion.  *Id*.  In fact, the Dodd-Frank Act plainly uses undefined accounting terms.  For example, section 5497 itself refers to assets, liabilities, surplus, deficit, income, expenses, audit, salaries, compensation, and forecasts. It would be absurd to construe those terms without considering how an accountant or business would understand them.  Doing so would render the statute unintelligible.

### B.  Statutory Context and Structure.

Second, OLC's opinion is supported by statutory structure.  OLC Opinion at *13-16. "Congress generally acts intentionally when it uses particular language in one section of a statute

---

[9] In any event, as OLC explained in its opinion, "even individual earnings account for the costs associated with an income-generating activity."  OLC Opinion at *23.

but omits it in another." *Republic of Sudan v. Harrison*, 587 U.S. 1, 12 (2019) (quoting *Dep't of Homeland Sec. v. MacLean*, 574 U.S. 383, 391 (2015)).  Thus, the term "earnings" in § 5497(a)(1) must be distinguished "from the use of the term 'revenues' elsewhere in Dodd-Frank[.]"  OLC Opinion at *14.  *See, e.g.*, Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, § 167(b)(2), 124 Stat. 1376, 1433 (2010) (codified at 12 U.S.C. § 5367(b)(2)) (referring to "revenues generated from [a specific] activity"); *id.* § 201(b), 124 Stat. at 1444 (codified at 12 U.S.C. § 5381(b)) (referring to "the consolidated revenues of such company from such activities" in relation to the definition of "financial company"); *id.* § 527(5)(C)(i)(II), 124 Stat. at 1592 (codified at 12 U.S.C. § 8206(5)(C)(i)(II)) (referring to the generation of "annual revenues"); *id.* § 1473(h)(2), 124 Stat. at 2195 (referring to "[i]ncremental revenues").

Plaintiffs assert that "Dodd-Frank never uses the term 'revenues' to mean all the money taken in by the Federal Reserve System."  Pls.' Mem. at 19.  But the Act does use the term "revenues" to refer to all the money a company takes in, *see* OLC Opinion at *14 n.22, and each Reserve Bank is a "body corporate[,]" 12 U.S.C. § 341.

Plaintiffs argue that statutory context supports their reading because of how the term "earnings" is used elsewhere in the Dodd-Frank Act.  Pls.' Mem. at 11-12 (citing 12 U.S.C. §§ 5465(c), 461(b)(12), 5390(n)(2); and 15 U.S.C. § 78u-6(g)(5)(D)).  But, in their own specific contexts, many of these uses have a more specific meaning.  OLC Opinion at *23-24.  For example, one usage refers to "earnings from investments"—not earnings or combined earnings more generally.  12 U.S.C. § 5390(n)(2); *see* OLC Opinion at *23-24.  OLC explains that these uses of "'earnings' are most naturally understood as the difference between the value of an initial outlay [in this case, the cost of an investment] against a later inflow that it was intended to yield—that is, that 'earnings' account for costs and are not the equivalent of 'revenues.'"  *Id.* at *24.

Nor are Plaintiffs correct to suggest that OLC's interpretation is implausible in light of the term "net earnings" as it is used in 12 U.S.C. § 289.  *See* Pls.' Mem. at 12.  Plaintiffs suggest that OLC's interpretation of "earnings," if applied to 12 U.S.C. § 289, would render as surplusage the term "net" in that provision.  *Id.*  But that is not so.  OLC's interpretation gives different meanings

to "net earnings" in § 5497 and "earnings" in § 289. *See* OLC Opinion at \*14-16. Specifically, "earnings" is the difference between revenues and interest expenses (revenues minus interest expenses), while "net earnings" is the difference between earnings and necessary expenses (earnings minus necessary expenses). *See id.* at \*14-16. In other words, the parties agree that "earnings" are "what a Federal Reserve Bank has earned *before* taking out necessary expenses" but OLC disagrees with Plaintiffs' interpretation of "necessary expenses." Pls.' Mem. at 12. OLC believes that what § 289 describes as "necessary expenses" are what the Federal Reserve financial statements call operating expenses. *See* OLC Opinion at \*14 ("In other words, 'net earnings' here are the Federal Reserve's earnings minus its operating expenses—its equivalent of the accounting concept 'net income.'").

Similarly, Plaintiffs are wrong to suggest that the Dodd-Frank Act's use of the term "profits" elsewhere somehow supports their reading. Pls.' Mem. at 19 (citing 12 U.S.C. §§ 5390(c)(3)(B)(ii), 5390(s)(3)). The phrase "lost profits[,]" *see* 12 U.S.C. § 5390(c)(3)(B)(ii), frequently arises in commercial litigation involving damage calculations, as it is used in § 5490(c)(3)(B)(ii). *See* Mark C. Hansen and Ariela Migdal, Business and Commercial Litigation in Federal Courts § 55:40 (5th ed. 2025) (describing "two commonly recognized methods of proving lost profits"); *Combustion Sys. Servs., Inc. v. Schuykill Energy Res., Inc.*, No. 92-4228, 1993 WL 496946, at \*2 (E.D. Pa. 1993) (declining to give weight to an individual's use of the term "lost profits" because it was a "legal term[] of art"). So it is neither surprising that Dodd-Frank invoked the term in § 5390(c)(3), which addresses damages claims, nor that Dodd-Frank did not use the phrase in relation to the financial waterfall of the Federal Reserve system.

And the term "profits realized from the sale of securities," 12 U.S.C. § 5390(s)(3), invokes a recognized distinction "between realized profits and gains, and unrealized or so-called 'paper profits'" when "buying and selling assets for profit." Chris Gallant, *How Are Realized Profits Different From Unrealized or 'Paper' Profits?*, Investopedia (July 25, 2023), https://www.investopedia.com/ask/answers/06/realizedprofitsvsunrealizedprofits.asp. Again, it is

unsurprising that Dodd-Frank employed the phrase "realized profits" here and did not employ it to describe the CFPB's funding mechanism.

Other provisions of § 5497 support OLC's reading. As OLC explains, the fact that Congress created "a safety mechanism should the CFPB experience funding shortfalls" under § 5497(e) indicates that "Congress anticipated the political branches serving as the ultimate backstop for CFPB funding in the ([at-the-time] unlikely) event of a shortfall." OLC Opinion at *25; *see Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. at 422. Plaintiffs argue § 5497(e) instead supports their reading. Pls.' Mem. at 12-13. And it is true that the § 5497(e) report must include "the extent to which the funding needs of the Bureau are anticipated to exceed the level of the amount set forth in subsection (a)(2)"—which is a cap on funding under § 5497(a) based on a fixed percentage of total operating expenses. 12 U.S.C. § 5497(e)(1)(B). The statute does not require reporting the extent to which funding needs are anticipated to exceed the available funds in subsection (a)(1). *Id*. "But it does show that Congress understood the funding mechanism it created might not always be sufficient to fund CFPB's operations, and that the backstop Congress provided was the ordinary appropriations process." OLC Opinion at *25 n.28. As OLC indicates, the structure of the reporting requirement likely reflects that Congress did not anticipate "the 'combined earnings' of the Federal Reserve would be exhausted." *Id*.[10] And in any event, it is statutory text, not congressional expectations, that control. *See Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79 (1998).

Plaintiffs suggest that "[i]f 'combined earnings' varied unpredictably based on interest rates, it would be virtually impossible to make" assessment for the upcoming year. Pls.' Mem. at 13. But that is simply not true. A period of unpredictability in combined earnings of the Federal Reserve relevant to the Bureau's ability to draw on those combined earnings would in no way preclude the Director from determining that, due to anticipated volatility, "sums available to the Bureau under the section will not be sufficient to carry out the authorities of the Bureau" for that

---

[10] As explained in more detail *infra* Part III.D., the Federal Reserve System had been profitable for a century at the time the Dodd-Frank Act became law.

upcoming year and so notifying Congress.  12 U.S.C. § 5497(e)(1)(A).  Moreover, Congress's decision to frame the Federal Reserve's duty to transfer funds to the Bureau *either* each year or each "quarter of such year," *see id*. § 5497(a)(1), may help accommodate the possibility of volatility in combined earnings—even though such volatility likely was not a primary concern of the Congress adopting the measure, *see infra* Part III.D.

Plaintiffs' criticisms of OLC's analysis because "the Fed is not a goods-selling—or any other kind of—private corporation" are unpersuasive.  Pls.' Mem. at 18.  The Federal Reserve may be unique in its willingness to absorb losses "to control the economy's interest rates," but it does not follow that the Federal Reserve's interest expenses are "unrelated to the money it earns."  *Id.*  "If the Federal Reserve no longer paid interest on reserve balances," or deposits, it would lose deposits and "shrink its balance sheet rapidly."  *See* The Federal Reserve, *Interest on Reserve Balances (IORB) Frequently Asked Questions*.  It would not be able to hold the investments that generate its interest income.  Thus, the Federal Reserve's interest expenses are directly related to its interest income.  *See id.* ("While the Federal Reserve pays interest on [deposits], it also receives interest income" from investments made with and offered as security for those deposits).  And when its interest expenses exceed its interest income, its banking activities generate losses rather than earnings.

### C.  Background Presumptions and Legislative Context.

Third, the OLC Opinion explains that the legislative context of the Dodd-Frank Act supports its interpretation.  OLC Opinion at *16-18.  "[W]hile legislative history can never defeat unambiguous statutory text, historical sources can be useful for [the] different purpose" of discerning "the law's ordinary meaning at the time of enactment[.]"  *Bostock v. Clayton Cnty.*, 590 U.S. 644, 674 (2020).  "[B]ackground presumptions can inform the understanding of a word or phrase[.]"  *Tanzin v. Tanvir*, 592 U.S. 43, 52 (2020).

OLC explains that "Congress legislated against the background of the Federal Reserve's accounting practices" and "the Federal Reserve's financial statements—both today and in 2009 . . .

confirm [its] statutory construction." OLC Opinion at *16. For example, the Federal Reserve has explained that "the Reserve Banks . . . transfer excess earnings to the Treasury . . . after providing for the costs of operations, payment of dividends, and reservation of' surplus funds." *Id.* (quoting *The Federal Reserve Banks, Combined Financial Statements as of and for the Years Ended December 31, 2009 and 2008 and Independent Auditors' Report* at 20 (Apr. 21, 2010) ("2009 Financial Statement")). By using the term "excess earnings" to describe the funds that remain after operating expenses, dividend payments, and reserved surplus funds, the Federal Reserve implicitly recognized that these three items are the difference between its earnings and its remittances to Treasury. *Id.* at 17. *See also Mozilla Corp. v. FCC*, 940 F.3d 1, 25 (D.C. Cir. 2019) (considering statutory language that reflected "nearly verbatim" language from earlier consent decree); *Blitz v. Donovan,* 740 F.2d 1241, 1245 (D.C. Cir. 1984) (presuming "that Congress was aware that the pivotal word[s] . . . had been construed in similar contexts as a term of art."). Notably, interest expenses are not among the outlays deducted from earnings, and must therefore be accounted for upstream from earnings by deducting them from revenues. *Id.*

Plaintiffs are incorrect to doubt OLC's claim that in the 2009 Financial Statement the Federal Reserve treated total operating expenses as "necessary expenses" under § 289(a)(1)(A). *See* Pls.' Mem. at 18 n.14. Again, page 20 of the 2009 Financial Statement indicates that "the Reserve Banks . . . transfer excess earnings to the Treasury . . . after providing for the costs of operations, payment of dividends, and reservation of" surplus funds. 2009 Financial Statement at 20. And 12 U.S.C. § 289 also requires three deductions from earnings to calculate remittances to the Treasury. OLC Opinion *13-16. Comparing the two formulas indicates that the term "Cost of Operations" in the Federal Reserve's statements and "Necessary Expenses" in § 289 are equivalent:

| 2009 Financial Statement | Section 289 |
|---|---|
| Earnings | Earnings |
| - Operating Expenses | - Necessary Expenses |
| - Dividends | - Annual Dividends |
| - Surplus Fund | - Capped Surplus Funds |
| = Transfer to Treasury | = Transfer to Treasury |

Plaintiffs' contrary suggestion that the 2009 Financial Statement can be read to include "interest expenses" as part of "necessary expenses" focuses on page 3 to the exclusion of page 20. *See* Pls.' Mem. at 18 n.14.    Page 20 makes clear that the "excess earnings" transferred to the Treasury reflect three deductions from earnings.  2009 Financial Statement at 20.  Page 3 shows that each of these deductions corresponds to a separate line item in the Federal Reserve's books—and that the three deductions from earnings do not include interest expenses, which appear on a separate line item.  *Id.* at 3.

### D.  Legislative History and Purpose.

Fourth, the OLC Opinion explains how legislative history and Congress's policy aims support its interpretation.  Courts sometimes consider the "evolution of [a] statutory provision[]" as it made its way through the Congress to support "further evidence [of] Congress['s] inten[t]." *Russello v. United States*, 464 U.S. 16, 23 (1983).  OLC explains that the "original proposal would have provided the CFPB with a mandatory payment of a fixed portion of the Federal Reserve's 'total system expenses' without limiting this payment to any particular source of funds."  OLC Opinion at *19 (citing H.R. 4173, 111th Cong. § 4109(a)(1)[11]).  That proposal "would have ensured that the CFPB would receive funding regardless of the Federal Reserve's financial performance." *Id*.  That original proposal is essentially what Plaintiffs contend Congress enacted into law.

But after legislative proceedings, Congress ultimately restricted § 5497(a)(1) transfers such that they came not from total system expenses of the Federal Reserve, but from its "combined earnings."  12 U.S.C. § 5497(a)(1).  Plaintiffs point out that we cannot know for certain "why" Congress changed the original proposal's language to allow funding only from "combined

---

[11] *Available at* https://www.congress.gov/bill/111th-congress/house-bill/4173/text/ih.

earnings," Pls.' Mem. at 21, when it could have required the Federal Reserve to fund the CFPB even when it is unprofitable, as it required the Federal Reserve to do for other entities. OLC Opinion *25-26. The Court should accord the difference in these provisions a difference in meaning. *See id.* at *19. Indeed, Plaintiffs offer no alternative explanation. Pls.' Mem. at 21.

Indeed, Congress's decision to limit § 5497(a)(1) transfers to money from the combined earnings of the Federal Reserve System reflects rational purposes. Plaintiffs say that construing "combined earnings" to mean revenues "effectuates Congress's purpose—reflected in its statutory design—to provide the Bureau an independent, stable source of funding." Pls.' Mem. at 14. But the final statute reflects a compromise that places limits on that interest by requiring funding to come from earnings. 12 U.S.C. § 5497(a)(1). That compromise advances an interest in minimizing Federal Reserve System losses if the Federal Reserve System might one day not run at a profit—an interest that would not be advanced had the original language of H.R. 4173 § 4109(a)(1) been signed into law. OLC Opinion at *20-21. Indeed, "limiting the transfer of funds to profits ensured that the Federal Reserve would never have to create or increase a deferred asset to fund the CFPB in the never-before-seen event that [the] Federal Reserve became unprofitable[.]" *Id.* at *20. Thus, Congress "str[uck] a balance between providing stable CFPB funding and preserving the Federal Reserve' operational independence." *Id*. at *21.

In any event, Congress in 2010 may well have believed that limiting the source of § 5497(a)(1) funding to Federal Reserve System profits as opposed to total system expenses placed only a minimal burden on "provid[ing] the Bureau an independent, stable source of funding." Pls.' Mem. at 14. After all, at the time the Dodd-Frank Act was signed into law, the Federal Reserve had a "century-long record of profitability"—through various interest-rate environments— indicating that "Federal Reserve profits" were likely "a reliable source of plentiful funds." OLC Opinion at *19. Indeed, the "Federal Reserve had over $39 billion of profits in 2008 and nearly $57.4 billion in 2009." *Id.* At the lower of these figures, the Federal Reserve's profits "were sufficient to cover the $242 million budget for the CFPB's first full year of operations more than 160 times over." *Id*.

Although Plaintiffs raise workability issues with OLC's interpretation of the statute, Pls.' Mem. at 19-20, nothing about their interpretation inherently avoids those concerns.  Plaintiffs downplay that issue, asserting that it is "an exceedingly remote possibility" that the Federal Reserve "may not earn enough money to exceed the statutory cap." *Id.* at 20 n.18.  They base that contention on the fact that the Federal Reserve earned $63 billion in interest the year before Dodd-Frank was passed and "earn[ed] interest from trillions of dollars in holdings today." *Id.*  But the volume of investments that the Federal Reserve may hold depends on a variety of factors that can fluctuate—including the interest the Federal Reserve pays to depositors, the perceived strength of the Federal Reserve as a central bank, and the perceived stability of the U.S. dollar. *Cf.* The Federal Reserve, *Interest on Reserve Balances (IORB) Frequently Asked Questions* ("If the Federal Reserve no longer paid interest on reserve balances, demand for reserves would plummet," and "[t]he Federal Reserve would shrink its balance sheet rapidly.").  Because factors influencing the Federal Reserve's volume of investments can change significantly over time, the Federal Reserve's revenue is not a given.  To the extent Plaintiffs are arguing that Congress would have assumed § 5497(a)(1) was workable because a shortfall in revenue "is an exceedingly remote possibility," Pls.' Mem. at 20 n.18, this is essentially the same argument presented by OLC: when Dodd-Frank was passed, the Federal Reserve had a century-long record of profitability, Congress would have also assumed that a shortfall in profits was an exceedingly remote possibility.  OLC's opinion reflects the view that § 5497(a)(1) should not be interpreted counter to its plain meaning, counter to standard banking and Federal Reserve accounting practices, merely so that the reporting mechanism in § 5497(e)(1) works smoothly in a context that Congress would not have anticipated as a likely possibility.

## IV.  If the Court Grants Relief to Plaintiffs, It Should Identify with Specificity What It Is Ordering Defendants to Do.

Defendants have no intention of violating a court order.  If the Court grants Plaintiffs' motion, the Court should provide Defendants with crystal clear language in the order accompanying its opinion identifying with specificity precisely what the Court is requiring them

to do.  Federal Rule of Civil Procedure 65(d)(1)(C) requires as much for good reason.  Ambiguous orders at high levels of generality are little more than invitations for Plaintiffs to later claim that Defendants are flouting judicial orders.

**V.    Any Order that Explicitly or by Implication Compels the Acting Director to Seek Funding from the Federal Reserve Should Be Temporarily Stayed**.

Should the Court enter an order that explicitly or by implication compels the Acting Director "to request funding" from the Federal Reserve, *see* Pls.' Mem. at 22, the Government respectfully requests that the relief be stayed pending the disposition of any appeal that is authorized, or at a minimum that such relief be administratively stayed for a period of seven days to allow the United States an opportunity to seek an emergency, expedited stay from the D.C. Circuit if an appeal is authorized.  Additionally, if relief is based on the existing injunction, Defendants renew their request to stay that portion of the existing injunction pending the disposition of the existing appeal.

## CONCLUSION

For the foregoing reasons, the Court may clarify the existing injunction and Defendants' obligations under it, but it should not enter an order that has the force or effect of compelling the Acting Director to seek funds from the Federal Reserve.

Dated: December 8, 2025

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

BRAD P. ROSENBERG
Special Counsel

LIAM C. HOLLAND
Trial Attorney
Federal Programs Branch

*/s/ Charles E.T. Roberts*
CHARLES E.T. ROBERTS
Counsel
U.S. Department of Justice
Civil Division
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20005
Tel.: (202) 305-1141
Fax: (202) 616-8470
E-mail: Charles.Roberts2@usdoj.gov

*Attorneys for Defendants*