**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NATIONAL TREASURY EMPLOYEES UNION, *et al.*, <br><br>                     *Plaintiffs*, <br><br>       v. <br><br> RUSSELL VOUGHT, in his official capacity as Acting Director of the Consumer Financial Protection Bureau, *et al.*, <br><br>                     *Defendants*. | Case No. 25-cv-381-ABJ |

**REPLY IN SUPPORT OF PLAINTIFFS'**
**MOTION TO CLARIFY PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

Introduction.................................................................................................................................1

Argument ....................................................................................................................................3

    I.     The defendants' interpretation is contrary to the text, context, history, and
            purpose of Dodd-Frank ...................................................................................... 3

    II.    The defendants' remaining arguments lack merit ................................................15

          A.    This Court's preliminary injunction, on its face, already prohibits
                 Vought's planned furlough ........................................................................15

          B.    The Antideficiency Act does not excuse a violation of the
                 injunction ..................................................................................................18

          C.    Although no modification of the injunction is necessary, this Court
                 has jurisdiction and authority to do so if necessary ...................................19

          D.    There is no reason for this Court to stay its order....................................21

Conclusion ................................................................................................................................21

## INTRODUCTION

The defendants agree that this Court "can and should" clarify its injunction. They do not dispute that within weeks, they will shut down the CFPB. Indeed, before filing their recent notice, Vought publicly announced that despite the pending litigation, he expects to soon be "successful" in "clos[ing] down the agency." Nandita Bose et al., *White House Budget Director Plans to Shut Down US Consumer Finance Watchdog Within Months*, Reuters (Oct. 15, 2025), https://perma.cc/QPE4-N476. Although the defendants now assert that the Fed's lack of profitability is forcing Vought to close the Bureau, they apparently had not even bothered to "investigat[e]" its forthcoming profitability before making that assertion. It's hard to imagine that if Vought actually sought to keep the Bureau running, he'd need litigation to prompt him to ask that basic question.

The defendants admit that this Court's injunction is still in effect. But they argue that Vought may close the Bureau anyway because OLC has provided him a memorandum, tailor-made to support his novel interpretation of Dodd-Frank, designed to starve the Bureau of funding. Under that interpretation, if the Federal Reserve's interest expenses exceed what the Fed earns, the Fed has no earnings at all and therefore cannot fund the CFPB. As our motion explained, this reading— and OLC's defense of it—is at odds with the plain text of the statute, the surrounding statutory context, and Congress's design for the Bureau to have funding independent of the appropriations process, not funding that unexpectedly comes and goes depending on the Fed's unrelated efforts to govern the economy.

The defendants' response does nothing to fix these shortcomings. They cannot even clear the minimal burden of identifying a single source—not one—that adopts their definition of "earnings" as money taken in minus only interest expenses. Like OLC, they are therefore forced to cobble together lay and technical sources to create a definition that does not exist in the real

world. The defendants' attempt to create a patchwork definition doesn't work, but even if it did, there's no basis to believe that Congress hid a limitation that fundamentally changes the nature of the Bureau's funding independence in such a convoluted game of connect the dots.

The defendants also barely contest that their definition is unworkable in practice. They don't dispute that on their view, the CFPB Director can never know to what extent the Fed will be able to fund the Bureau in the future. So the Director would have to annually ask Congress for funding without knowing whether the Bureau will actually need it or how much to ask for. Nor do the defendants explain over what period the Fed's profits should be tallied—though our motion highlighted this question. That's a glaring omission: The Fed has recently returned to profitability, yet the defendants say nothing about when, in their view, Vought can request funding.

Ultimately, the defendants' response fails for the same reasons as the OLC memo it relies on: It requires the Court to assume that the CFPB's funding provision incorporates a novel definition of the word "earnings" that is at odds with the rest of the Dodd-Frank Act and the Federal Reserve Act, undermines Congress's explicit design to ensure a consistent funding stream for the Bureau, and requires a dysfunctional appropriations process. The only purpose of the defendants' tortuous interpretation is to enable Vought to shut down the CFPB. This Court should reject that interpretation and clarify that it is not a permissible justification for violating this Court's injunction.

The defendants join our request that the Court clarify whether they may rely on their newly minted interpretation of Dodd-Frank to stop complying with the injunction. But, they argue, the Court should not modify the injunction or issue a new one. We agree. Although the Court has jurisdiction to modify the injunction, it need not do so here—and we are not asking it to. All that is necessary in response to the defendants' notice informing the Court that they believe their

interpretation of Dodd-Frank allows them to stop complying with the injunction is an order clarifying that it does not. This Court should grant the motion to clarify.

## ARGUMENT

### I.    The defendants' interpretation is contrary to the text, context, history, and purpose of Dodd-Frank.

Like the OLC memo that Vought requested, the defendants' attempt to find support for Vought's shutdown in the phrase "combined earnings" stumbles at every step of statutory construction. They cannot identify even one source, lay or technical, that defines earnings to mean total money earned minus only interest expenses. That alone is enough to reject their interpretation. But their reading is also at odds with the rest of the Dodd-Frank Act and the Federal Reserve Act; and it would mean that a statute designed to secure the CFPB's independence from the ordinary appropriations process, in fact requires the CFPB Director to ask Congress for funding annually— without having any idea of how much to ask for—or risk a shutdown. Until Vought decided he wanted to close the CFPB, nobody had ever interpreted the Dodd-Frank Act this way. This Court should give the statute the same meaning that the Fed, the Congressional Budget Office, and, until recently, the CFPB itself have always understood it to have: The Fed's "combined earnings," available to fund the CFPB, are all that the Federal Reserve System earns.[1]

*Text.* The defendants do not dispute that "earnings" often means simply money earned. *See* Pls.' Mem. 9–10. That's especially true for investment earnings, which form the bulk of the Fed's earnings. *See, e.g.*, Earnings, *New Oxford American Dictionary* 545 (2010) (defining "earnings" as "income derived from an investment or product"); *Earnings,* Black's Law Dictionary (9th ed. 2009) ("Revenue gained from … the investment of capital, or from assets."). Nor do the

---

[1] Unless otherwise noted, all internal quotation marks, citations, alterations, brackets, and ellipses have been omitted from quotations throughout this brief.

defendants dispute that the CFPB, the Fed, and the Congressional Budget Office have all consistently understood Dodd-Frank to use the term in this way. *See* Pls.' Mem. 10–11. Nevertheless, now that they seek to shut down the Bureau, the defendants ask this Court to adopt Vought's newly minted interpretation: that the Fed's "combined earnings" are everything the Fed earns minus the interest it pays to financial institutions. But, like OLC, the defendants cannot cite a *single* source in any context that defines earnings as money taken in minus interest expenses.

**1.** The defendants reject the consensus meaning of "combined earnings" (at 16–17) because, in their view, it doesn't make sense to say that the Fed has earnings when, overall, it is operating at a loss. But the defendants' interpretation has the same result. On their view, the Fed only lacks earnings if its *interest* expenses exceed the money it earns. But if the Fed's *operating* expenses exceed the money it takes in, the defendants' say, the Fed still has earnings, despite operating at a loss. In any event, there's nothing unusual about saying that the Fed is operating at a loss because its expenses exceed its earnings. That accords with how standard dictionaries define "earnings." *See* Pls.' Mem. 9–10.

The defendants note (at 17–18) that some dictionaries offer multiple definitions of the word "earnings": In addition to the ordinary meaning—all money earned—some dictionaries provide an alternative definition of "the balance of revenue after deduction of costs and expenses." *See, e.g.*, Merriam-Webster's Collegiate Dictionary 391 (11th ed. 2005). But that doesn't help the defendants. Their position is that "earnings" means revenue after deduction of *some*, but not all, costs and expenses, and they don't cite a single dictionary saying that.

**2.** Unable to find their definition of "earnings" in any ordinary dictionary, the defendants rehash OLC's argument that it is a technical corporate-accounting usage. But the defendants cite the same sources OLC did, and none of those sources define "earnings" to mean money taken in

minus interest expenses. The defendants' SEC and NASDAQ examples, for instance, use earnings to mean a corporation's "net income," which, in turn, is defined to mean revenue minus *all* expenses. *See* SEC, *Glossary: Net Income*, https://perma.cc/2CZK-BLLH; NASDAQ, *Glossary of Accounting Terms: Net Income*, https://perma.cc/T3NM-4L6Q. Neither uses "earnings" to mean all money received minus interest expenses but including operating expenses.

The defendants also invoke (at 18) the "business community['s]" use of the terms "earnings per share" and "retained earnings." But those terms are far afield from the relevant phrase in the Dodd-Frank Act: "combined earnings." And they have the same problem as the defendants' other sources. At most, they demonstrate that in technical corporate-accounting jargon, earnings can be used to mean "net income." *See, e.g.*, SEC, *Beginner's Guide to Financial Statements*, https://perma.cc/TAV3-HY4T (defining earnings per share as "net income" divided by "the number of outstanding shares"); OLC Memo at 8 (defining "retained earnings" as "the net profit available for distribution" and noting that "net profits" and "net income" are interchangeable terms (quoting Oxford Dictionary of Accounting 361 (4th ed. 2010)). But, again, "net income" is all money earned minus *all* expenses—not all money earned minus just interest expenses. *See supra* 4–5.

**3.** The defendants claim (at 23–24) that their interpretation of the word "earnings" is supported by the Federal Reserve's accounting practices. But Fed Chairman Jerome Powell testified to Congress that that it is "very clear" that the consensus interpretation of the Fed's "combined earnings"—not the defendants'—is the correct one. *See Hearings to Examine the Semiannual Monetary Policy Report to the Congress, Including S.257, to Improve the Resilience of Critical Supply Chains, before the S. Comm. on Banking, Hous., and Urb. Affs.*, 119th Cong. 1:24:50–1:26:02 (Feb. 11, 2025) (testimony of Jerome H. Powell, Chair, Bd. of Governors of the

Fed. Rsrv. Sys.). And the Fed's accounting manual uses "earnings" to mean all money earned, not the defendants' bespoke definition of all money earned minus interest expenses. The manual *contrasts* "earnings" with "expenses." Bd. of Governors of the Fed. Rsrv. Sys., *Financial Accounting Manual for Federal Reserve Banks* 24 (May 2025), *available at* https://perma.cc/WWS4-JBKF (*"Financial Accounting Manual"*). And it consistently reflects the ordinary definition of "earnings" to mean simply funds that are earned. *See, e.g.*, *id.* at 47–48 (referring to forms of "income," such as "interest earnings on bills, notes, revenue bonds, and warrants," "interest earnings on federal agency and government sponsored enterprise mortgage-backed securities," and "earnings from investments denominated in foreign currencies"); *id.* at 22 (using "earnings" to refer to "interest accrued"); *id.* at 44 (referring to "earnings on balances held at a Reserve Bank"); *id.* at 47 (referring to "interest earnings on loans to depository institutions").

None of these uses can be read, as the defendants would have it, to mean money earned minus interest expenses. Indeed, that is not even a number that the Fed tracks. *See* Former Fed Offs. Amicus Br. 8–9; The Federal Reserve Banks, *Combined Financial Statements as of and for the Years Ended December 31, 2009 and 2008 and Independent Auditors' Report* at 3 (April 21, 2010) ("2009 FRS Statement").

**4.** Ultimately, neither OLC nor the defendants can come up with a single source that defines "earnings" to mean all money earned minus interest expenses. At most, their sources demonstrate that although the term "earnings" ordinarily refers to gross earnings (all money earned), it is sometimes used in corporate accounting to mean net earnings—all money earned minus all expenses. But the defendants don't argue for either of those two meanings. They can't contend that Fed's "earnings" mean its net earnings, because the Federal Reserve Act already uses the term "net earnings" to refer to the money that the Fed earns minus all its expenses. *See* Pls.' Mem. 12,

17–18; 12 U.S.C. § 289(a)(2). And if "earnings" is given its ordinary meaning of all money earned, the defendants can't claim that a lack of funding requires them to shut down the CFPB. So the defendants have invented a new definition of "earnings" that has no support in either ordinary or technical understandings of that word. But statutes should be given their ordinary meaning, not a made-up meaning Congress could not have been aware of because it was invented years after the statute was passed.

*Statutory context.* The defendants' inability to offer any support for their novel definition of "earnings" is itself sufficient to reject it. But if more were needed, the statutory context demonstrates that the defendants' interpretation cannot be correct. The defendants' attempt to show otherwise fares no better than OLC's.

**1.** First, the defendants concede that other provisions of the Dodd-Frank Act use the term "earnings" to mean money earned—not money earned minus interest expenses. *See* Opp'n 20. They quibble only with how many. *Id.* And although the defendants claim that "many" other provisions "have a more specific meaning" of earnings, they cite just one: "Amounts received by the [Federal Deposit Insurance Corporation], including assessments …, interest and other earnings from investments, and repayments … shall be deposited into the Fund," 12 U.S.C. § 5390(n)(2); Opp'n 20. But even this provision refutes the defendants' reading. By its terms, "earnings" are "amounts received," not amounts received minus some but not all expenses.[2] The defendants cannot explain why "earnings" should be given an idiosyncratic meaning in one provision of Dodd-Frank, when the same word bears its ordinary meaning in the rest of the statute. *See*

---

[2] Indeed, the statute provides that expenses are paid from the Fund into which investment "earnings" and other "amounts received" are deposited. 12 U.S.C. § 5390(n)(1).

*Goldstein v. S.E.C.*, 451 F.3d 873, 882 (D.C. Cir. 2006) ("We ordinarily presume that the same words used in different parts of a statute have the same meaning.").

The defendants also rehash OLC's argument that if "earnings" means all the money that the Fed earns, it would be synonymous with Dodd-Frank's use of the word "revenues." Opp'n 20. But the defendants admit that the statute never uses the word "revenues" to refer to all the money the Fed takes in. *Id.* Instead, they say, the statute uses "revenues" to mean "the money a *company* takes in." *Id.* (emphasis added). And the Federal Reserve System is not a company. *See* Pls.' Mem. 5, 15–16; Former Fed Offs. Amicus Br. 7. It's not surprising, then, that Dodd-Frank used a different word.

And, in any event, the defendants' interpretation runs into the same problem. Both the Dodd-Frank Act and the Federal Reserve Act use the term "profit," which is what the defendants say "earnings" means in these statutes. *See, e.g.*, 12 U.S.C. § 333 (referring to the "profits" of a "mutual savings bank"); *id.* § 371c-1(b)(3)(B)(iii) ("profit" of an underwriter); *id.* § 604 ("profit or loss" of a "foreign branch" of a "national banking association"); *id.* § 626 ("net profits of the corporation"); *id.* § 5390(c)(3)(B)(ii) (excluding "damages for lost profits"); *id.* § 5390(s)(3) (defining "compensation" to include, among other things, "any profits realized from the sale of the securities of the covered financial company"); 15 U.S.C. § 8305(b)(1)(D) ("loss sharing[] or profit sharing"). The defendants try to explain away a couple of these examples, but there are many more. *See id.*

**2.** Like OLC, the defendants also cannot reconcile their interpretation of "earnings" with the provision of the Federal Reserve Act governing the Fed's distribution of funds. The parties agree that this provision identifies "net earnings" as earnings minus "necessary expenses." *See* 12 U.S.C. § 289(a)(1), (a)(2); Pls.' Mem. 12, 17–18; Opp'n 21. And the defendants do not dispute that

the Fed's "interest expenses" are "necessary." The only logical conclusion, therefore, is that "earnings" are what the Fed receives *before* taking out interest (and other necessary) expenses.

In response, the defendants say only that "OLC believes that what § 289 describes as 'necessary expenses' are what the Federal Reserve financial statements call operating expenses." Opp'n 21. It's not clear whether the defendants share this belief. And they cite nothing in the statute to support it. Nor could they. When Congress wanted to refer solely to "operating expenses," it used that phrase. *See* 12 U.S.C. § 5497(a); Pls.' Mem. 18.

The best the defendants can do is note "OLC's claim that in the 2009 Financial Statement the Federal Reserve treated [its] total operating expenses as 'necessary expenses' under § 289(a)(1)(A)." Opp'n 24. OLC's sole support for that claim is a sentence in the notes to the 2009 statement that says that the Fed "transfers excess earnings to the Treasury … after providing for the costs of operations, payment of dividends, and reservation of an amount necessary to equate surplus with capital paid-in." 2009 FRS Statement at 20. But that sentence doesn't even use the phrase "operating expenses." The "costs of [the Fed's] operations"—the phrase the sentence actually uses—include not just its "operating expenses" (i.e., overhead) but also the interest it pays on its deposits. *See, e.g.*, IFRS, International Accounting Standard at A1046 (characterizing interest expense as part of "operating activities"); Generally Accepted Accounting Principles at 942-230-55-2 (including interest expenses as part of "operating activities"); Katharine Paljug, *Operating Costs: Definition, Formula, Types, and Examples*, https://perma.cc/77AR-BN8R (explaining that for a corporation "operating costs" for a corporation are "made up of the COGS

[cost of goods sold] and operating expenses"). Like Congress, when the Fed wants to refer just to "operating expenses," it says so. *See, e.g.*, 2009 Statement at 3, 9, 18, 47.[3]

**3.** In addition to being inconsistent with the text of related statutory provisions, the defendants' interpretation of "combined earnings" cannot be squared with the statutory scheme that governs CFPB funding itself. Indeed, as our opening brief explained, adopting the defendants' interpretation would render that scheme unworkable. Pls.' Mem. 12–13, 19–20. The defendants all but concede as much. Opp'n 27. Instead, they argue that workability concerns should not overcome the plain meaning of the statute. *Id.* But as explained above, the defendants' interpretation has no basis in the words of the statute. So the defendants ask this Court to adopt an interpretation that is *both* atextual and unworkable.

Dodd-Frank authorizes the CFPB to request additional appropriations from Congress by reporting "the extent to which the funding needs of the Bureau are anticipated to exceed" the maximum amount that the Fed is permitted to transfer. 12 U.S.C. § 5497(e)(1)(B). The defendants concede that the statute does not contemplate a circumstance in which the CFPB cannot depend on getting that maximum amount from the Fed. Opp'n 22. And they do not dispute that under their interpretation, it would be impossible for the CFPB Director to know how much funding the Fed will be able to transfer to the CFPB. So it's impossible to know whether the Bureau will need congressional appropriations "for the upcoming year" and, if so, how much. 12 U.S.C. § 5497(e)(1)(A). *see* Pls.' Mem. 12–13, 19. Thus, on the defendants' view, the Dodd-Frank Act

---

[3] The defendants provide a chart purporting to compare this single sentence in the notes to the accounting statement with the statute. Opp'n 25. But as in the text, the defendants' chart replaces the words the Fed actually used—"costs of operations"—with its preferred phrase, "operating expenses." An argument that the statute should be interpreted based on a single sentence in notes to an accounting statement—and still requires rewriting that sentence to succeed—is no more convincing in chart form than it is in text.

requires the CFPB Director to ask Congress for appropriations that the Bureau may or may not need in an amount that's impossible to predict.

The defendants don't argue otherwise. Instead, they contend (at 23) that the impact of the "volatility in combined earnings" created by their interpretation "*may*" be mitigated because the Fed can transfer funds on either an annual or quarterly basis. But that doesn't solve the problem: To avoid the risk that the agency goes unfunded, the Bureau's Director would still need to ask Congress every year for funding, without knowing whether the Bureau will need it or how much to ask for.

And there's another problem with the defendants' interpretation: What is the time period for assessing "combined earnings"? Although we raised this issue in our opening brief, the defendants offer no response. Pls.' Mem. 19–20. This isn't an academic question. For the last several weeks, the money the Fed has taken in has exceeded its interest expenses. Michael S. Derby, *Fed Data Suggests Central Bank Has Stopped Losing Money*, Reuters (Dec. 3, 2025), https://perma.cc/FTL5-MFEV. And according to public reporting, the Fed "appears to be on track for the combined profits of the 12 Reserve Banks to be over $2 billion in the current quarter." *Id.* That is more than enough to fund the Bureau for the entire year. Vought told Congress in his appropriations report that he needs $279,566,358.82 for the year (while also telling Congress that amount would be insufficient to comply with this Court's injunction). ECF 147-1 at 1, 2 n.1. Besides claiming ignorance (at n.1), the defendants offer no explanation for why they have not requested that amount.[4]

---

[4] The defendants assert that only amici, and not the plaintiffs, raised the possibility that the Fed would soon be profitable, and so they did not have time to "investigat[e]" that suggestion. Opp'n 3 n.1. But the plaintiffs did raise this point. *See* Pls.' Mem. 19 n.16. And at any rate, a Director that actually intends to run the CFPB shouldn't need an opposing party in litigation to

***Statutory purpose and history***. The defendants also cannot square their interpretation with the statute's evident design to provide the CFPB a consistent, independent funding source. The defendants do not dispute that, under their reading, during times of economic volatility when consumers are particularly vulnerable, the Fed is forced to choose between sound monetary policy and funding the CFPB. Instead, they argue (at 26) that this is the unfortunate effect of a "compromise" Congress supposedly made to "ensure[] that the Federal Reserve would never have to create or increase a deferred asset to fund the CFPB" if the Fed was ever "unprofitable." The defendants cite nothing in the text or history of the statute to support this argument.

And it makes no sense. As the former Fed officials explain, the Fed's profitability doesn't matter. Former Fed Offs. Amicus Br. 7–9. A deferred asset is merely an accounting mechanism that the Fed uses to record a negative liability when the Fed's expenses exceed its income. See *Financial Accounting Manual* at 45. Neither its existence nor its size has any effect on the Fed's ability to operate. *See, e.g.*, 2009 FRS Statement at 12. The defendants offer no explanation for why Congress would sacrifice the CFPB's funding for something that has no impact. Moreover, adopting the defendants' interpretation would not prevent the Fed from creating or increasing a deferred asset to fund the CFPB. Even on the defendants' view, the Fed has to fund the CFPB when its operating expenses—which in recent years have been more than $9 billion, 2024 Financial Statement at 4—exceed the money it earns. The defendants can't explain why Congress would allow the Bureau to be funded when the Fed is experiencing net losses, but only if the losses are caused by the cumulative effect of interest and operating expenses, not when they're caused by interest expenses alone.

---

alert him to the fact that hundreds of millions of dollars are available to do so. Nor should the Department of Justice need private litigants to inform it of the Federal Reserve's finances.

The closest the defendants come to offering any support for this inexplicable "compromise"—besides OLC's speculation—is to repeat OLC's reliance on Congress's choice of the House's funding provision over the Senate's. But the defendants provide no reason to believe that Congress made this choice to prevent the Fed from funding the CFPB whenever monetary policy caused the Fed's interest expenses to exceed the money it earns. In fact, the defendants offer no evidence at all about why Congress chose the House provision.

And contrary to the defendants' assertion, giving the funding provision that Congress actually enacted its ordinary meaning does not resurrect the unenacted bill. The unenacted Senate provision would automatically fund the maximum amount even when the Bureau didn't need it; the enacted provision allows the Director to request only what is necessary. *See* Pls.' Mem. 21. And the Senate provision would have required regulated entities to provide additional funding to the Bureau through assessments; the enacted House provision imposes less of a burden on those entities and requires the Bureau to go to Congress any time it needs more money. *See id.* The defendants simply ignore these differences. While we cannot know for certain why Congress chose the House's funding provision over the Senate's, it's far more plausible that it didn't want to mandate unnecessary funding or burden regulated entities than that it wanted to allow the Bureau's independence to come and go. *See also* Amicus Br. of Current and Former Members of Congress, *Rise Economy v. Vought*, Case No. 25-cv-10481 (N.D. Cal. Dec. 15, 2025) (brief of current and former members of Congress, including Sen. Chris Dodd and Rep. Barney Frank explaining that that the defendants' interpretation is both "wrong as a matter of statutory interpretation" and "at odds with Congress's plan in setting up the Bureau").[5]

---

[5] The defendants note (at 25–26) that Congress required the Fed to fund other entities without limiting this requirement based on the Fed's profitability. But that's all the more reason to

Unable to support their "compromise" theory, the defendants pivot to arguing that maybe Congress simply didn't think the Fed's interest expenses would ever exceed the money it earns. But as the former Fed officials (at 11–12) explain, just two years before establishing the Bureau's funding mechanism, Congress gave the Fed the ability, for the first time, to pay interest on deposits. *See also* Pls.' Mem. 6. This represented a major shift in how the Fed implements its monetary policy and the expenses it would take on. Thus, as amici note, the possibility of the Fed running at a loss "would not have come as a surprise" to the Congress that crafted the Bureau's funding scheme; rather, as both statutes were a response to the 2008 recession, that risk would more likely have been front of mind. Former Fed Offs. Amicus Br. 11–12.

Finally, shifting away from defending their own interpretation, the defendants accuse (at 27) the consensus interpretation of also putting Bureau funding at risk because the Fed's total earnings could, in theory, drop below the Bureau's needs. But even when the Fed was operating under what it referred to as a "scarce reserves regime," it still brought in ("earned") tens of billions of dollars. *See* The Federal Reserve*, Interest on Reserve Balances (IORB) Frequently Asked Questions* (Sept. 23, 2025)[6]; *see also, e.g.*, Fed. Rsrv. Banks, *Federal Reserve Banks Combined Financial Statements* (Mar. 31, 2008) (reporting more than $44 billion in 2007). The notion that the Fed would not bring in the statutory cap in the amount of a few hundred million dollars just isn't plausible.

\*        \*        \*

---

reject a fringe interpretation of Dodd-Frank that would require believing that Congress departed from that practice in funding an agency it sought to ensure had a secure, independent funding source.

[6] https://www.federalreserve.gov/monetarypolicy/iorb-faqs.htm.

In the end, every tool of statutory construction decisively supports the consensus interpretation. The defendants admit that the consensus interpretation applies an often-used ordinary definition of "earnings," but cannot identify any source articulating their contrary definition. The defendants can neither square their definition with other uses with "earnings" in related statutory provisions nor explain how their interpretation would be workable within the larger statutory scheme governing the Bureau's funding. And the defendants are unable to explain why Congress would impose such a substantial limit on the Bureau's financial independence— and as this case shows, a potential limit on the Bureau functioning at all—in such an obscure way. This Court should clarify that the defendants' novel interpretation is not a valid justification for violating the injunction.

## II.     The defendants' remaining arguments lack merit.

The defendants agree (at 2) that this Court "can and should" clarify its injunction. They argue only that the plaintiffs' motion should be denied "insofar as it seeks" a new injunction or a modification. Opp'n 5. But the plaintiffs seek neither.

### A.     This Court's preliminary injunction, on its face, already prohibits Vought's planned furlough.

The defendants contend (at 5–7) that the plaintiffs effectively seek a new injunction, but the plaintiffs are not requesting any relief that this Court has not already granted. The Court's existing preliminary injunction already straightforwardly prohibits Vought's attempt to shutter the agency—just as it prohibited his previous attempts.

"The starting point for interpreting a court order is the plain meaning of the text." *Adem v. Bush*, 2006 WL 1193853, at *4 (D.D.C. 2006). Here, the court's order, on its face, plainly prohibits Vought's latest gambit. Paragraph 4 of the order expressly prohibits the defendants from "seek[ing] to achieve the outcome of a work stoppage, whether through a stop-work order, an order

15

directing employees to take administrative leave, or any other means." Order of Mar. 28, 2025, ECF No. 88, at 2. A "work stoppage" is exactly what Vought would achieve if he furloughed every employee in two weeks—as news articles, which the defendants have not denied, have reported. That he will claim that a lack of funding—attributable to his choice not to request it—preceded that furlough doesn't change that conclusion. And although the D.C. Circuit has since clarified that paragraph 4 "allow[s] work stoppages that defendants have determined, after a particularized assessment, would not interfere with the performance of defendants' statutory duties," the defendants do not claim to have made the requisite particularized assessment here; in fact, their notice to this Court tacitly acknowledges that they will not be able to fulfill the Bureau's statutory duties. Order, *Nat'l Treasury Emps. Union v. Vought*, 2025 WL 1721068, at *1 (D.C. Cir. 2025). Thus, unlike *United States v. Philip Morris USA Inc.*, on which the defendants rely, the plaintiffs' motion does not request additional relief, but just asks the Court to "construe the scope of its Order by applying it" to the "particular factual situation" at hand. 793 F. Supp. 2d 164, 168–69 (D.D.C. 2011). A motion for clarification is the right tool for that job. *See, e.g.*, *id.*; *Potter v. D.C.*, 382 F. Supp. 2d 35, 37 (D.D.C. 2005) (granting a motion to clarify whether a preliminary injunction applies to a defendant's specific conduct).

Vought's attempts to wiggle out of the injunction's plain language are frivolous. First, he argues (at 10) that, given the D.C. Circuit's clarification, paragraph 4 "remains in effect only on the understanding that it does 'not interfere with the performance of defendants' statutory duties.'" Because the Antideficiency Act prohibits spending funds that Congress has not appropriated, he reasons (at 8) that he is obligated to comply with the injunction "only insofar as there is appropriated money available." That argument, however, seriously misreads the D.C. Circuit's order. The court allowed work stoppages only where the defendants have made a particularized

determination that the *stoppage itself* would not interfere with their statutory duties. It did not authorize them to evade the injunction whenever they believe that some other statutory obligation requires it. Thus, even if Vought were right that the Antideficiency Act requires the planned furlough (and as we've explained, he is not), his remedy would be to request an order from this Court modifying the terms of its injunction—not to *unilaterally* ignore his obligations based on his own (incorrect) reading of federal law. *See Walker v. City of Birmingham*, 388 U.S. 307, 317 (1967). "Disagreements with judicial decisions must be resolved through motions, stays, and appeals, not through unilateral noncompliance." *J.G.G. v. Trump*, 2025 WL 3198891, at *2 (D.C. Cir. 2025) (en banc).

The second argument is just as weak. The defendants argue (at 10–11) that the "focus" of paragraph 4 is the "stop work order issued on February 10," and that, since the injunction was issued, the defendants "have issued no email to agency staff that is anything like the February 10 email." But although it is true that the first sentence of paragraph 4 prohibits the defendants from "enforc[ing] the February 10, 2025 stop-work order," the provision doesn't stop there. It also provides that they shall not "seek to achieve the outcome of a work stoppage" by "*any other means*." Order of Mar. 28, 2025, at 2 (emphasis added). Regardless of the injunction's "focus," the defendants do not (and cannot) deny that their planned furlough would violate the plain language of that prohibition.

The defendants' only answer to that point (at 6) is that this Court's injunction is too vague to satisfy Rule 65(d)'s requirement that an injunction "state its terms specifically." Their claimed confusion is difficult to square with their view that they needed to file a notice advising the Court that they plan not to comply. Regardless, Rule 65 does not require the level of specificity that the defendants demand. It requires only "reasonable detail" as to "the act or acts restrained or

required." Fed. R. Civ. P. 65(d). And where "a proclivity for unlawful conduct is shown," as with Vought's repeated attempts to unlawfully shut down the CFPB, general prohibitions "are often necessary to prevent further violations." *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 192 (1949); *see also, e.g.*, *United States v. Philip Morris USA Inc.*, 801 F.3d 250, 254 (D.C. Cir. 2015); *see also, e.g.*, *U.S. Dep't of Just. v. Daniel Chapter One*, 89 F. Supp. 3d 132, 143 (D.D.C. 2015) ("A federal court has broad power to restrain acts which are of the same type or class as unlawful acts which the court has found to have been committed or whose commission in the future, unless enjoined, may fairly be anticipated from the defendant's conduct in the past." (quoting *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 395 U.S. 100, 132 (1969)). The defendants do not claim that it's unclear that the injunction prohibits them from stopping the agency's work by furloughing its employees.

Vought's planned shutdown would likely violate other provisions of the injunction, too. The defendants appear to acknowledge (at 11), for example, that the agency, in the absence of funding, will be unable to maintain a "toll-free telephone number, a website, and a database for the centralized collection of consumer complaints," as paragraph 6 of this Court's order requires. *See* Order of Mar. 28, 2025, at 2–3. And it might also violate paragraph 3's requirement that the defendants "shall not terminate any CFPB employee" or "issue any notice of reduction-in-force." *Id.* at 2.

The plaintiffs do not ask for anything this Court has not already ordered. They merely ask that the Court clarify that the defendants' newfound interpretation of Dodd-Frank does not justify noncompliance with the injunction this Court already entered.

### B.    The Antideficiency Act does not excuse a violation of the injunction.

The defendants also suggest (at 10–11) that the Court's injunction can't require them to spend money in violation of the Antideficiency Act. "Ignoring the limits that the Antideficiency

Act places on Defendants' authority to perform other statutory functions during a lapse in appropriations," they argue (at 9), "would usurp the power of the members of Congress and President who were democratically elected and enacted the statute."

This argument assumes the correctness of the defendants' view that the Fed has no "combined earnings" from which the CFPB can draw. For the reasons set forth above, however, ample funding remains available to the CFPB under section 5497. And, as the Supreme Court has explained, that section's funding provision "contains the requisite features of a congressional appropriation": It "authorizes the Bureau to draw public funds from a particular source—'the combined earnings of the Federal Reserve System,' in an amount not exceeding an inflation-adjusted cap," and "specifies the objects for which the Bureau can use those funds—to 'pay the expenses of the Bureau in carrying out its duties and responsibilities.'" *CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416, 435 (2024). Complying with the injunction, therefore, would require only that the defendants spend money that Congress has already appropriated.

### C.    Although no modification of the injunction is necessary, this Court has jurisdiction and authority to do so if necessary.

Vought next argues (at 11–15) that this Court lacks jurisdiction to modify its preliminary injunction while that order is pending on appeal, and that the plaintiffs in any event have not demonstrated entitlement to such a modification. As already explained, however, the plaintiffs are not asking the Court for any new relief, but only for clarification that Vought's planned work stoppage would violate its *existing* order. Vought agrees (at 2) that this Court "can and should" grant such relief. *See Wash. Metro. Area Transit Comm'n v. Reliable Limousine Serv., LLC*, 985 F. Supp. 2d 23, 29 (D.D.C. 2013) (District courts have "power to clarify [an] injunction" that is on appeal "to supervise compliance" with that injunction.).

Because the Court need not modify its injunction, it doesn't matter whether it would have jurisdiction to do so. But the defendants are wrong that the Court would, in that circumstance, lack jurisdiction. It is true that, "[g]enerally, filing a notice of appeal … confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal." *Wash. Metro. Area Transit Comm'n*, 985 F. Supp. 2d at 29. "An appeal from the grant or denial of a preliminary injunction," however, "does not divest the trial court of jurisdiction"; the court "retains jurisdiction to enforce its prior order" or to take "other steps in the litigation" to provide relief. 11A *Wright & Miller's Fed. Prac. & Proc.* § 2962. Thus, a "district court is not deprived of jurisdiction to modify a preliminary injunction while that injunction is on appeal." *Cobell v. Norton,* 310 F. Supp. 2d 77, 83 n.10 (D.D.C. 2004); *see also, e.g.*, *Wash. Metro. Area Transit Comm'n*, 985 F. Supp. 2d at 29; *Nat'l Grange of the Ord. of Patrons of Husbandry v. Cali. State Grange*, 182 F. Supp. 3d 1065, 1072 (E.D. Cal. 2016) (holding that an appeal from an injunction "does not divest the district court of jurisdiction to continue its supervision, even though in the course of that supervision the court acts upon or modifies the order from which the appeal is taken").

The defendants are also wrong to claim (at 12–15) that if it were necessary to obtain a modification of the existing injunction, the plaintiffs would be required to once again demonstrate likelihood of success on the merits or to satisfy the other preliminary-injunction factors. The plaintiffs made that showing when they obtained the original injunction, and "[it]t is beyond challenge that the standard for determining whether modification is appropriate is whether the purposes of the litigation as incorporated into the injunctive decree have been fully achieved." *1250 24th St. Assocs. Ltd. P'ship v. Brown*, 684 F. Supp. 326, 328 (D.D.C. 1988).

Again, though, this Court need not reach the question because the plaintiffs seek only clarification—a request the defendants agree the Court should grant.

### D.    There is no reason for this Court to stay its order.

Finally, the defendants ask the Court to stay any order requiring them to request funding. But, again, the plaintiffs seek only that this Court clarify that they cannot justify violating the injunction by claiming that the Dodd-Frank Act prohibits the Fed from funding the Bureau.

Moreover, the defendants have made no effort to show that the traditional stay factors would be satisfied. *See Nken v. Holder*, 556 U.S. 418, 434 (2009). Nor could they. The parties have already litigated a stay of this Court's order here and in the court of appeals. And the D.C. Circuit has opted to allow the injunction to remain in effect, including while the en banc petition is pending, to "ensure[] that plaintiffs can receive meaningful final relief should the defendants not prevail in this appeal." Order of Apr. 18, 2025, at 2. The Supreme Court has recognized that "eliminat[ing] the CFPB" "would trigger a major regulatory disruption and would leave appreciable damage to Congress's work in the consumer-finance arena." *Seila Law LLC v. CFPB*, 591 U.S. 197, 236–37 (2020). And, as this Court has explained: "Once the agency is gone, there will be no opportunity to afford relief at a later point in the litigation." Op. 101.

Yet again, though, this Court need not reach this issue because the defendants have not even asked for a stay of a clarification order, an order they concede this Court should issue.

## CONCLUSION

The Court should grant the motion for clarification.


Dated: December 15, 2025                                    Respectfully submitted,

                                                           */s/ Jennifer D. Bennett*
                                                           Jennifer D. Bennett (*pro hac vice*)
                                                           Gupta Wessler LLP

235 Montgomery Street, Suite 629
San Francisco, CA 94104
(415) 573-0336

Deepak Gupta (DC Bar No. 495451)
Robert Friedman (DC Bar. No. 1046738)
Gupta Wessler LLP
2001 K Street, NW
North Tower, Suite 850
Washington, DC 20006
(202) 888-1741

*Counsel for Plaintiffs*

Paras N. Shah (DC Bar No. 983881)
*General Counsel*
Allison C. Giles (DC Bar No. 439705)
*Assistant Counsel*
National Treasury Employees Union
800 K Street, NW, Suite 1000
Washington, DC 20001
(202) 572-5500

*Counsel for NTEU*