## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL TREASURY EMPLOYEES UNION, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> RUSSELL VOUGHT *in his official capacity as Acting Director of the Consumer Financial Protection Bureau*, *et al.*, <br><br> Defendants. | Civil Action No. 25-0381 (ABJ) |

### MEMORANDUM OPINION & ORDER

*"So we want to put [the CFPB] out and
we will be successful probably within the
next two or three months."*

Russell Vought – October 15, 2025[1]

On February 9, 2025, plaintiffs National Treasury Employees Union ("NTEU"), National

Consumer Law Center ("NCLC"), National Association for the Advancement of Colored People

("NAACP"), Virginia Poverty Law Center, Rev. Eva Steege, and the CFPB Employee Association

filed this action against the Acting Director of the Consumer Financial Protection Bureau ("CFPB

or "Bureau"), Russell Vought, and the CFPB itself. *See* Compl. [Dkt. # 1]; Am. Compl. [Dkt. # 7].

Plaintiffs challenged decisions made and actions taken by the defendants to carry out President

---

1    Nandita Bose, et al., *White House Budget Director Plans to Shut U.S. Consumer Finance Watchdog Within Months*, Reuters (Oct. 15, 2025), https://perma.cc/ZVX3-RB8J.

Trump's vow to have the CFPB "totally eliminated." Am. Compl. ¶¶ 2–7, 47 n.14. The complaint was accompanied by a motion for a temporary restraining order [Dkt. # 10], which, with the parties' consent, the Court deemed to be a motion for preliminary injunction. Feb. 14, 2025 Order [Dkt. # 19] at 1. The parties agreed to the terms of an interim order to govern the agency's conduct while that motion was briefed and decided. *Id.* at 1–2.

On March 28, 2025, the Court granted the plaintiffs' motion and issued a preliminary injunction [Dkt. # 88] ("Order" or "Preliminary Injunction") for the reasons set forth in a lengthy memorandum opinion [Dkt. #87] ("Mem. Op."), found at *Nat'l Treasury Emps. Union v. Vought*, 774 F. Supp. 3d 1 (D.D.C. 2025).

The injunction was designed to ensure that the CFPB would continue to exist as Congress mandated and perform its statutorily required duties while the merits of plaintiffs' claims were litigated. Defendants appealed the Order, *see* Notice of Appeal, *Nat'l Treasury Emps. Union v. Vought ("NTEU")*, Case No. 25-5091 (D.C. Cir. Mar. 3, 2025) [Dkt. # 2108518], and they filed a motion for a stay pending appeal [Dkt. # 97], which the Court granted in part but largely denied. *See* Apr. 3, 2025 Order [Dkt. # 102] at 4–5 ("[T]he Order is hardly as onerous or unsupported as defendants would have this Court and the Court of Appeals believe. . . . [T]he Court would be open to further discussion about how it could or should be tailored, but it will not lift the order before those questions are resolved. That is because . . . staying the action would substantially injure the plaintiffs. The defendants would be free to move swiftly to take the steps that would eliminate the agency in thirty days, which the Court has already found they are poised to do, and that would cause plaintiffs irreparable harm.").[2]

---

2    The Court stayed the requirement in the Order that the defendants were to inform the Court of their compliance with the terms of the injunction by April 4, 2025.

The defendants sought similar relief in the Court of Appeals at the same time, and on April 11, 2025, that Court stayed the Order in part.  Per Curiam Order, *NTEU*, Case No. 25-5091 [Dkt. # 2110720].  Shortly thereafter, though, as events unfolded, the Court of Appeals modified and partially rescinded its stay, restoring some of the terms of the original Order.  Per Curiam Order, *NTEU*, Case No. 25-5091 [Dkt. # 2113309].

On August 15, 2025, a panel of the D.C. Circuit issued a ruling vacating the preliminary injunction.  Opinion, *NTEU*, Case No. 25-5091 [Dkt. # 2130273]; Judgment, *NTEU*, Case No. 25-5091 [Dkt. # 2130266-2]; *see also Nat'l Treasury Emps. Union v. Vought*, 149 F.4th 762 (D.C. Cir. 2025).  Plaintiffs sought rehearing en banc, and on December 17, 2025, the D.C. Circuit granted the motion and vacated the panel decision, noting that the partial stay pending appeal entered on April 11, 2025, as later modified on April 28, 2025, remains in effect.  Per Curiam Order, *NTEU*, Case No. 25-5091 [Dkt. # 2150928].

While the petition for rehearing en banc was pending in the Court of Appeals, the parties continued to bring matters to this Court's attention.  On November 10, 2025, the defendants filed what they styled as a "Notice of Potential Lapse in Appropriations to Pay the Expenses of the Bureau" [Dkt. #145] ("Notice"), which transmitted a copy of a November 7 Memorandum issued by the U.S. Department of Justice, Office of Legal Counsel at defendant Vought's request.[3]  The Notice acknowledged "that this Court's injunction, which restricts the agency's conduct regarding employment, contracting, and facilities, among other things, remains in effect."  Notice at 2.  However, it stated that "[u]nder the Office of Legal Counsel's opinion," the Federal Reserve

---

3    U.S. Dep't of Just., Off. of Legal Couns., *Whether the CFPB May Continue to Draw Funds from the Federal Reserve System Under 12 U.S.C. § 5497 When the Federal Reserve is Operating at a Loss* (Nov. 7, 2025) [Dkt. # 145-1] ("OLC Memo") at 1.

"currently lacks combined earnings from which the CFPB can draw," and therefore, it was submitting the Notice "to inform the Court and the parties that the Consumer Finance Protection Bureau . . . anticipates exhausting its currently available funds in early 2026." *Id.* at 1. Defendants added that "[t]he Bureau does not know whether and to the extent to which Congress will appropriate funding to pay the expenses of the Bureau." *Id.*

The OLC Memo that underlies defendants' Notice constitutes a sharp departure from the Bureau's longstanding interpretation of its statutory funding procedure. It takes the position that the CFPB's funding mechanism under 12 U.S.C. § 5947(a)(1), which establishes quarterly transfers from the "combined earnings of the Federal Reserve System," is unavailable when the Federal Reserve operates at a loss. OLC Memo at 1. Over the last few years, the Federal Reserve has raised interest rates to combat inflation, so while it has continued to earn billions of dollars, its interest expenses have exceeded its earnings since 2022. Notwithstanding the fact that the Federal Reserve has been consistently funding the CFPB throughout that period, the OLC opined that the

Federal Reserve has no "earnings" at all and cannot fund the CFPB, and the CFPB Director has

"no statutory obligation" to request funds from the Fed when it is not profitable. *Id.* at 1, 25.[4]

Based on this reasoning, defendant Vought, the Acting Director of the CFPB, informed

President Trump and Congress on November 20, 2025:

> I have determined that sums available to the Bureau under [the Dodd-Frank Act] will not be sufficient to carry out the authorities of the Bureau under Federal consumer financial law for Fiscal Year 2026. I make this determination based on the conclusion of the Office of Legal Counsel (OLC) within the Department of Justice that there are no funds legally available for the Bureau to request from the Federal Reserve System[.]

Ex. A to Defs.' Notice [Dkt. # 147-1] at 2, 4.

And based on the same reasoning, Vought and the CFPB simply announced to the Court

and the plaintiffs that the Bureau's funding is about to "lapse." Notice at 1. What was left unsaid

was that claiming that funds are unavailable is tantamount to closing what is left of the Bureau,

bringing any performance of statutory functions and any remaining ongoing compliance with the

---

[4]    An amicus brief submitted by former officials of the Federal Reserve contends that OLC's analysis of the Fed's profitability is flawed because the Fed never truly operates at a loss. Amicus Br. [Dkt. #162] at 3. Instead, during periods in which the Federal Reserve's expenditures exceed its income, the Federal Reserve ceases remittances to Treasury and records a "deferred asset" on its balance sheet, essentially "borrowing from itself the amount by which earnings failed to cover expenses." *Id.* Once the Fed's income exceeds its expenses again, it pays down the value of the deferred asset before resuming remittances to the Treasury. *Id.* The amici suggest that the Fed may have recently returned to profitability because balance sheets show that the deferred assets total size has fallen in recent weeks. *Id.* at 4. According to amici, this means that the Federal Reserve has positive "combined earnings" under any definition of that term, even the definition in the OLC Memo. *Id.* at 5–6. Defendants have stated they are "investigating th[e] suggestion" that the Fed may have combined earnings available to fund the CFPB, *see* Defs.' Opp. at 3 n.1, and they have requested that the Fed provide its position on this question in a letter sent from the Department of Justice to Federal Reserve Chair Jerome Powell. Defs.' Notice [Dkt. #164] at 1; Ex. A to Defs.' Notice [Dkt. # 164-1] at 2. The Court ordered the defendants to docket any response on the day it was received, Minute Order (Dec. 17, 2025), and nothing has been docketed to date.

terms of the preliminary injunction to a halt, even though the case has not yet been resolved on the merits.

This prompted the November 23 filing of the motion now pending before the Court: plaintiffs' motion to clarify the preliminary injunction [Dkt. # 148] ("Pls.' Mot.); Pls.' Mem. in Supp. of Pls.' Mot. [Dkt. #148-1] ("Pls.' Mem."). Plaintiffs seek "clarification that the defendants may not justify a violation of the preliminary injunction by refusing to request" funding from the Federal Reserve, as, they maintain, the Dodd-Frank Act requires. Pls.' Mot. at 1. The motion is fully briefed. *See* Defs.' Resp. to Pls.' Motion [Dkt. #160] ("Defs.' Opp."); Pls.' Reply [Dkt. # 163]; Br. of Amici Curiae Former Fed. Rsrv. Offs. in Supp. of Pls.' Mot. [Dkt. # 162] ("Amicus Br.").

For the reasons set forth in more detail below, the Court will **GRANT** the motion to clarify. The defendants' interpretation of the Dodd-Frank Act is contrary to the text and intent of the statute and the way it has been consistently interpreted by both the Federal Reserve and the CFPB; acting in accordance with the OLC's flawed reasoning would contravene the plain terms and implicit requirements of this Court's Order as it has been revised by the Court of Appeals; and making that finding does not require any modification of the preliminary injunction.

## <u>STANDARD OF REVIEW</u>

"[T]here is no Federal Rule of Civil Procedure specifically governing 'motions for clarification.'" *United States v. Philip Morris USA Inc.*, 793 F. Supp. 2d 164, 168 (D.D.C. 2011). "The general purpose of a motion for clarification is to explain or clarify something ambiguous or vague, not to alter or amend." *Id.* (quotation marks omitted). "Although such a motion cannot open the door to re-litigating a matter that the court has considered and decided, . . . courts in this Circuit have encouraged parties to

file motions for clarification when they are uncertain about the scope of a ruling . . . and entertaining such motions seems especially prudent if the parties must implement the ruling at issue at subsequent stages of the litigation." *All. of Artists & Recording Cos. v. Gen. Motors Co.*, 306 F. Supp. 3d 413, 418–19 (D.D.C. 2016) (internal citations, alteration, and quotation marks omitted). By clarifying the scope of a previously issued preliminary injunction, a court "add[s] certainty to an implicated party's effort to comply with the order and provide[s] fair warning as to what future conduct may be found contemptuous." *N.A. Sales Co., Inc. v. Chapman Indus. Corp.*, 736 F.2d 854, 858 (2d Cir. 1984).

## <u>ANALYSIS</u>

### I.    Plaintiffs' Motion Does Not Request or Require a Modification of the Preliminary Injunction.

Defendants acknowledge that "this Court can and should make clear whether the CFPB's obligations under the injunction would be affected by a lapse in funding resulting from OLC and CFPB's interpretation of § 5497(a)(1)." Defs.' Opp. at 2. While such an obvious proposition hardly needs clarification, the Court finds and clarifies, at the defendants' invitation, that the CFPB's obligations under the injunction would be directly and profoundly affected by a lapse in funding "resulting from" the CFPB's interpretation of section 5497(a)(1) in accordance with the OLC opinion. A "lapse in funding" would render those obligations impossible to fulfill.

The Court notes, though, that the defendants' use of the passive voice when framing the question tends to obscure what is happening. Funding has not "lapsed," and any shortfall in funding is not the result of a legal memorandum which the Acting Director of the CFPB requested and received; it is the intended result of the defendants' own actions. Therefore, to put it simply, the Court further finds and clarifies that the defendants' decision that they will not *seek* funding will not only affect, but will deliberately frustrate, their obligations under the injunction.

The defendants say they "welcome clarification about their obligations with respect to the injunction," Defs.' Opp. at 1 (emphasis omitted), which they agree remains in force. [5] They argue, though, that what plaintiffs are seeking is a revision or modification of the March 28, 2025 preliminary injunction, which, defendants submit, would not be a proper use of a motion to clarify, and would not be appropriate while the appeal is still pending. *Id.* at 1-2.[6]

It is undeniable that the injunction does not contain a provision expressly ordering the agency to invoke the funding provisions of section 5497. But it sets out clear duties derived from the statute. The defendants' suggestion that it takes a modification of the Order to state that they must do what is necessary to comply with it is inconsistent with the Order and defies common sense.

At the outset, it is important to remember that the Order did not arise in a vacuum; the Court determined that the preliminary injunction was necessary to preserve the status quo in light of the defendants' ongoing hurried efforts – which were described in detail in the Memorandum Opinion[7] – to dismantle the CFPB. *See* Mem. Op. at 3 ("If the defendants are not enjoined, they will eliminate the agency before the Court has the opportunity to decide whether the law permits

---

5    *See* Notice at 2 ("The Bureau acknowledges that this Court's injunction, which restricts the agency's conduct regarding employment, contracting, and facilities, among other things, remains in effect."); *see also* Defs.' Resp. to Order of the Court [Dkt. # 151].

6    Given the order of the Court of Appeals granting rehearing en banc and vacating the panel decision, the Court need not address defendants' argument that it lacks authority to address plaintiffs' motion because the panel opinion rejecting plaintiffs' claims on legal grounds is "the law of the case (and the law in this Circuit)." Defs.' Opp. at 2, 12-13.

7    *See* Mem. Op. at 65-72 (factual findings concerning defendants' activities between February 8, 2025 and the February 14 entry of the consent order), and 73-84 (findings concerning their conduct between February 14 and the March 10 hearing).

them to do it.").[8]  Indeed, they resumed those efforts by initiating a widespread reduction in force

("RIF") the instant the Court of Appeals stayed the preliminary injunction.  Although that action

was exposed and enjoined by this Court, *see* Order dated April 18, 2025, and the Court of Appeals

modified its own stay *sua sponte*, restoring several of the provisions in the injunction, *NTEU*, Case

No. 25-5091 [Dkt. # 2113309], the defendants are actively and unabashedly trying to shut the

agency down again, through different means.

Throughout the proceedings in this case, the defendants have argued at every juncture that

no court supervision was necessary because they were in fact performing their statutory obligations

and not seeking to shutter the agency.  They maintained that the circumstances described in

plaintiffs' motion for preliminary injunction, including the directive issued by defendant Vought

on February 10 that "employees should stand down from performing any work task," *see* Email of

Feb. 10, 2025 [Dkt. # 23-4], were nothing more than the realignment of priorities typical of a new

administration, and a reflection of the administration's attempts to impose fiscal responsibility.

Defendants first staked out this position in their opposition to plaintiffs' motion for a

preliminary injunction, which was supported by a declaration from the CFPB's Chief Operating

Officer.  *See* Defs.' Opp. to Prelim. Inj. Mot. [Dkt. # 31],[9] and Ex. 1, the February 24, 2025

---

8    *See also* Mem. Op. at 47 ("[N]otwithstanding defendants' considerable efforts to paper
over what they were assiduously trying to accomplish in one stroke before the Court ruled at the
TRO hearing on February 14, their subsequent attempts to deny what was afoot are at odds with
the undisputed facts in the record and the documents produced by both sides."); *id.* at 65 ("The
evidence reveals that: the defendants were in fact engaged in a concerted, expedited effort to shut
the agency down entirely when the motion for injunctive relief was filed; while the effort to do so
was stalled by the Court's intervention, the plan remains unchanged; and the defendants have
absolutely no intention of operating the CFPB at all.").

9    Defendants maintained that the Acting Director was "committed to implementing the
President's policies, consistent with the law, and acting as a faithful steward of the Bureau's
resources."  Defs.' Opp. to Prelim. Inj. Mot. [Dkt. # 31] at 1.  *See also id.* at 2 ("'[A]s Acting

Declaration of Adam Martinez [Dkt. # 31-1] (Martinez Decl.").[10]  Plaintiffs filed supplemental

declarations casting doubt on Martinez's first declaration with their reply, *see* Pls.' Suppl. Decls.

[Dkt. # 38-1–17], and defendants docketed a second declaration from Martinez, which backed

away from the first one, in response.  *See* Supp. Martinez Decl. [Dkt. # 47-1].[11]  After hearing the

cross-examined testimony of the people involved, including Martinez, and reviewing the materials

submitted by both sides, the Court found defendants' representations and Martinez's declarations

to be inconsistent with the facts on the ground.  *See* Mem. Op. at 90-96.

---

Director Vought noted in a letter to the Federal Reserve, the 'Bureau's new leadership will run a substantially more streamlined and efficient bureau[.]'  The predicate to running a 'more streamlined and efficient bureau' is that there will continue to be a CFPB.").  Defendants touted the then-pending nomination of a new CFPB director as action "inconsistent with Plaintiffs' view of current events," *id.*, but as of this date, there is still no Director other than Acting Director Vought.

10    Under the heading "The CFPB is Committed to Performing Statutory Obligations," Martinez averred, "[s]ince the arrival of the Acting Director, the new leadership is engaging in ongoing decision-making to assess how to make the Bureau more efficient and accountable.  Our leadership has worked to comply with statutorily required functions, and my operations team has been mindful of this as we advise on operational related issues."  Martinez Decl. [Dkt. # 31-1] ¶ 19; *see also id.* ¶ 25 ("[N]ew leadership is engaged in ongoing decision-making to assess how to make the Bureau more efficient and accountable, consistent with this Administration's goals of reforming the federal bureaucracy, reducing wasteful spending, and streamlining efficiencies in the federal government.")  Martinez described the Acting Director's communications as "common practice at the beginning of a new administration and/or during the transition of a new head of agency."  *Id.* ¶ 3.

11    This time, Martinez admitted that the accounts submitted by plaintiffs' declarants were "not inaccurate," and he agreed that, in fact, he had referred to the "closure of the agency" during the week of February 10.  Supp. Martinez Decl. ¶ 3.  He attempted to attribute the February 10 shutdown to DOGE, but that turned out to be inconsistent with the exhibits showing that the current leadership had taken charge on February 7, and his testimony was substantially undermined on cross-examination.  *See* Mem. Op. at 72, citing Mar. 10 Tr. at 121-22, 126.

The Order was then entered "[u]pon consideration of the motion, defendants' opposition, plaintiffs' reply, the parties' supplemental submissions, the arguments advanced and evidence introduced during the hearings conducted on March 3, 10, and 11, 2025, and the full record in this case, and for the reasons set forth in the accompanying Memorandum Opinion." Order at 1. And as the Court explained in no uncertain terms in that opinion, the purpose of the preliminary injunction was to ensure that the agency would continue to do its statutorily required work while the case was pending:

> For all of the reasons set forth above, the Court will GRANT plaintiffs' motion and issue a preliminary injunction that maintains the agency's existence until this case has been resolved on the merits, reinstating and preserving the agency's contracts, work force, data, and operational capacity, and protecting and facilitating the employees' ability to perform statutorily required activities.

Mem. Op. at 112.

In order to accomplish that objective, the injunction as issued included a broad, but clear paragraph:

> Defendants shall not enforce the February 10, 2025 stop-work order or require employees to take administrative leave in furtherance of that order, and **defendants shall not reinstitute or seek to achieve the outcome of a work stoppage, whether through a stop-work order, an order directing employees to take administrative leave, or any other means.**

Order ¶ 4 (emphasis added). This is the first impediment to the defendants' plan to forego seeking any funding.

Defendants appealed and sought a stay of the preliminary injunction, insisting, as they had at the hearing on the motion for an injunction, that the Order was unsupported because they had every intention of complying with their obligations. *See* Defs.' Mot. for Stay Pending Appeal [Dkt. # 97] at 4 ("The Government has repeatedly explained that, absent congressional action, the

Bureau will continue to perform mandatory statutory duties.  Given that explanation, and longstanding authority making clear that obey-the-law injunctions are both unnecessary and improper, injunctive relief was not appropriate here.").   After this Court denied the stay, defendants' motion was granted in part by the Court of Appeals in an order that emphasized the panel's expectation that the agency would continue to perform its statutory functions while the case was pending.[12]  *NTEU*, Case No. 25-5091 (D.C. Cir. Apr. 11, 2025) [Dkt. # No. 2110720].  Paragraph 4 of the injunction remained in effect, given the Circuit's recognition that the Order would "allow work stoppages that defendants have determined, after a particularized assessment, would not interfere with the performance of defendants' statutory duties."  *NTEU*, Case No. 25-5091 [Dkt. # 2110720] at 1-2.

Not even a week had gone by before the defendants attempted to implement an even more comprehensive RIF than the one that had prompted the lawsuit.  When the plaintiffs asked for the Court's assistance, defendants again scoffed at the need for intervention by insisting that they were performing their statutory obligations.  *See* Defs.' Resp. to Pls.' Mot. to Enforce [Dkt. # 121] at 4.  Defendants relied again on the second Martinez declaration, ignoring the fact that it had been

---

12    "The district court's March 28, 2025 order granting appellees' motion for a preliminary injunction is stayed in part pending appeal.  Provision two (2) is stayed insofar as it requires defendants to reinstate employees whom defendants have determined, after an individualized assessment, to be unnecessary to the performance of defendants' statutory duties.  Provision three (3) is stayed insofar as it prohibits defendants from terminating or issuing a notice of reduction in force to employees whom defendants have determined, after a particularized assessment, to be unnecessary to the performance of defendants' statutory duties.  The court understands provision four (4) to allow work stoppages that defendants have determined, after a particularized assessment, would not interfere with the performance of defendants' statutory duties.  **On that understanding, provision four (4) remains in effect**.  Provision eight (8) is stayed.  All other provisions of the preliminary injunction remain in full effect pending further order of the court."  *NTEU*, Case No. 25-5091 (D.C. Cir. Apr. 11, 2025) [Dkt. # 2110720] (emphasis added).

thoroughly discredited during the hearing, and that he had no personal knowledge upon which to base his statement that the current leadership was planning to comply with the statute. *See* Mem. Op. at 90-96. The Court temporarily stayed the reduction in force so that it could conduct an evidentiary hearing to resolve the dispute as to what was actually transpiring, and when the defendants sought appellate review of that interim decision, the Court of Appeals revised and partially rescinded its own stay *sua sponte. NTEU*, Case No. 25-5091 (D.C. Cir. Apr. 28, 2025), Order [Dkt. # 2113309]. Thus, paragraph 4, as it was understood by the Court of Appeals, remains in force, and the Circuit's April 28 Order reiterated its understanding that statutory functions would continue.[13]

Declining to ask the Federal Reserve for funding unquestionably achieves the outcome of a work stoppage. Therefore, the Court can clarify first, without modifying its order, that the decision recounted in the Notice is directly contradictory to paragraph 4 of the injunction as it was interpreted by the Court of Appeals. The agency is not claiming that the intended work stoppage is based on a particularized assessment that it will not interfere with statutorily mandated duties. Second, the preliminary injunction obligates the defendants to perform certain specific statutory functions and to maintain a sufficient number of employees and the physical space and

---

13    "[P]laintiffs highlight that the proposed RIF currently at issue, involving nearly 90 percent of agency employees, exceeds the scope of the RIF that prompted the district court's original preliminary injunction. Given these ongoing disputes, we think it best to restore the interim protection of paragraph (3) of the preliminary injunction, which ensures that plaintiffs can receive meaningful final relief should the defendants not prevail in this appeal . . . ." *NTEU*, No. 25-5091 (D.C. Cir. Apr. 28, 2025), Order [Dkt. # 2113309].

Even the opinion dissenting from the April 28 decision to modify the stay acknowledged the continuing need for the agency to perform statutorily imposed obligations: "To the extent the stay was unclear, I would clarify that if the defendants' actions cause a plaintiff to lose services required by statute, the district court may issue appropriate relief[.]" *Id.* (Rao, J. dissenting).

technological capacity to do them, and the decision announced in the Notice undermines those provisions as well.[14]

Among other terms, the injunction now in force, as modified by the Court of Appeals in April, provides:

> ¶ 2: Defendants shall reinstate all probationary and term employees terminated between February 10, 2025 and the date of this order, including but not limited to, Julia Barnard, the Private Student Loan Ombudsman. This provision is stayed "insofar as it requires defendants to reinstate employees whom defendants have determined, after an individualized assessment, to be unnecessary to the performance of defendants' statutory duties."[15]

> ¶ 3: Defendants shall not terminate any CFPB employee, except for cause related to the individual employee's performance or conduct; and defendants shall not issue any notice of reduction-in-force to any CFPB employee.[16]

> ¶ 5: To ensure that employees can perform their statutorily mandated functions, the defendants must provide them with either fully-equipped office space, or permission to work remotely and laptop computers that are enabled to connect securely to the agency server through the Citrix Virtual Desktop or another similar program.

---

14    It was necessary to be specific in the Order since the CFPB vigorously opposed the concept of a broad directive that it must continue to perform its statutory duties while the case was pending on the grounds that it was too vague to be understood. *See* Mem. Op. at 97-99, citing March 11 Tr. at 120-124.

15    This portion of the Circuit's stay was left unchanged by the April 18 Order. *See NTEU*, No. 25-5091 (D.C. Cir. Apr. 11, 2025) [Dkt. # 2110720].

16    On April 11, the Court of Appeals ordered that provision 3 was "stayed insofar as it prohibits defendants from terminating or issuing a notice of reduction in force to employees whom defendants have determined, after a particularized assessment, to be unnecessary to the performance of defendants' statutory duties." The stay was modified *sua sponte* by the Circuit on April 28, 2025 to provide: "paragraph (3) of the preliminary injunction under review is now effective pending further order of this court." *NTEU*, Case No. 25-5091 (D.C. Cir. Apr. 28, 2025) [Dkt. # 2113309].

¶ 6: Defendants shall ensure that in accordance with 12 U.S.C. § 5492(b)(3), the CFPB Office of Consumer Response continues to maintain a single, toll-free telephone number, a website, and a database for the centralized collection of consumer complaints regarding consumer financial products and services, and that it continues to monitor and respond to those complaints, including by providing Elevated Case Management.

¶ 7: Defendants shall rescind all notices of contract termination issued on or after February 11, 2025, and they may not reinitiate the wholesale cancellation of contracts. This provision does not prohibit the defendants from ordering that work or services under specific contracts be halted based on an individualized assessment that the contract involved is unnecessary for the agency to fulfill its statutory functions. To ensure that this Court can award full relief at the end of the case, however, the defendants may not finalize the termination of any contract.[17]

The Court did not craft the requirements embodied in paragraphs 2 and 6 on its own; they were drawn directly from the Dodd-Frank Act. *See* 12 U.S.C. § 5493(b)(3)(A), which requires "establishing a single, toll-free telephone number, a website, and a database . . . to facilitate the centralized collection of, monitoring of, and response to consumer complaints regarding consumer financial products or services," and section 5535(a), which calls for designating a Private Education Loan Ombudsman within the Bureau "to provide timely assistance to borrowers of private education loans." And the statute imposes a long list of other mandatory duties. *See, e.g.*, Mem. Op. at 6-7, citing 12 U.S.C. § 5494 (a) (establishing a Consumer Advisory Board); 12 U.S.C. § 5493(b)(2) (establishing a unit to provide information regarding the provision of consumer financial products to traditionally underserved communities); 12 U.S.C. § 5493(b)(1) (establishing a unit responsible for researching, analyzing, and reporting on a number of specific issues,

---

[17]    Pursuant to the partial stay entered by the Court of Appeals on April 11, provisions 5, 6, and 7 remained "in full effect" pending further order of the court. *NTEU*, Case No. 25-5091 (D.C. Cir. Apr. 11, 2025) [Dkt. # 2110720] at 2 (emphasis added).

including developments in markets for consumer financial products or services, among others); 12 U.S.C. § 5493(c)(1) (establishing the Office of Fair Lending and Equal Opportunity); 12 U.S.C. § 5493(d) (establishing the Office of Financial Education); 12 U.S.C. § 5493(e) (establishing the Office of Service Member Affairs); 12 U.S.C. § 5493(g)(1) (establishing the Office of Financial Protection for Older Americans); *see also* Third Declaration of Matthew Pfaff [Dkt. # 106-2] (detailing statutory duties of the Office of Consumer Response).

All of this, along with ensuring that the agency has the necessary personnel, space, and equipment to perform its required functions, takes money. The agency does not dispute that. *See* November 20, 2025 letter from Russell T. Vought, Acting Director CFPB, to President Donald J. Trump, [Dkt. 147-1], Ex. A to Notice at 1 ("The Bureau's 'funding need' for Fiscal Year 2026 is $279,566,358.82.")[18] Notably, though, not one penny of the funding needed to run the agency that has returned over $21 billion to American consumers comes from taxpayer dollars. And consistent with the mandatory nature of the language in the statute, *see* 12 U.S.C. § 5497(a)(1) ([T]he Board of Governors *shall* transfer to the Bureau . . . the amount determined by the Director to be reasonably necessary to carry out the authorities of the Bureau under Federal consumer financial law . . . .") (emphasis added), the Federal Reserve has never questioned or turned down a requisition request. *Hearings to Examine the Semiannual Monetary Policy Report to the Congress, Including S.257, to Improve the Resilience of Critical Supply Chains, Before the S. Comm. on*

---

18    Defendants state in a footnote in the same letter that in order to comply with the Court's injunction, which requires the Bureau continue operating "at levels consistent with the since-repealed 12% funding cap," the Bureau's funding need would be $677,493,173. Ex. A. to Notice at 1 n.1. This discrepancy is unexplained.

*Banking, Hous., and Urb. Affs.*, 119th Cong. 1:24:50-1:26:03 (Feb. 11, 2025) ("Powell Testimony"). [19]

Yet, the defendants have informed the Court that they do not intend to ask.

The defendants have not tried to suggest that compliance with their obligations under the injunction could be possible without funding from the Federal Reserve, and therefore, the requirement that they seek the funds Congress directed the Federal Reserve to provide – and which the Fed has always provided upon request – is implicit in and necessary to the injunction, and the defendants' actions contravene paragraphs 2, 3, 5, 6, and 7 of the Order.

The Order was grounded in factual findings set out nine months ago in nearly thirty pages of the Memorandum Opinion's 112 pages.

> What happened in February was not merely a realignment of priorities. The Court has found after an evidentiary hearing and the review of an extensive record, that the plaintiffs are likely to establish that the defendants stopped all work, and that they took, and plan to take, additional concrete steps to dismantle and shut down the agency entirely, in violation of statutory mandates. Plaintiffs are likely to prove that even if some statutorily required work resumed when the stop work order was relaxed, defendants have already made a decision to abandon their statutory obligations to the many members of the public who are consumers.

Mem. Op. at 107.[20]

---

[19]    *Hearings to Examine the Semiannual Monetary Policy Report to the Congress, Including S.257, to Improve the Resilience of Critical Supply Chains, Before the S. Comm. on Banking, Hous., and Urb. Affs.*, 119th Cong. (Feb. 11, 2025), https://www.congress.gov/event/119th-congress/senate-event/336600.

[20]    While the injunction was initially vacated by the panel on the grounds that neither the Administrative Procedure Act nor the Constitution authorizes judicial review of an executive branch decision to shut the doors of an agency created by Congress without Congressional approval, the panel did not reject or even address the Court's factual findings. And the defendants' representations in their briefs on appeal that it was never their goal to decimate the agency, *see,*

Nothing has changed.  The injunction is still largely in place, but today, the agency is hanging by a thread.

The instant motion was filed because Acting CFPB Director Vought, who is also the Secretary of the Office of Management and Budget, has docketed a notice informing the Court that, notwithstanding all of those protestations and orders, he has no intention of asking the Federal Reserve for the funding Congress determined the agency was legally entitled to receive.

The reasons behind this are clear.  Defendants' repeated assertions that they were not planning to shut down the agency and could be counted upon to perform their statutory functions have been belied not only by their actions, but once again, by the Acting Director's own public statements in an appearance on the Charlie Kirk Show:

> We don't have anyone working there except our Republican appointees and a few career [employees] that are doing statutory responsibilities while we close down the agency . . . We want to put it out – and we will be successful probably within the next two, three months.

Dan Ennis, *Dive Deposits: Vought Sees CFPB Shuttered in '2-3 Months,'* BANKING DIVE (Oct. 17, 2025), https://perma.cc/8KT8-S6WX.[21]

---

*e.g.*, Appellants' Brief, *NTEU*, Case No. 25-5091 (Apr. 25, 2025) [Dkt. # 2113060] at 4-5**,** ring hollow at this point.

21      As Acting Director Vought's statement reveals, while the Court of Appeals reinstated the prohibition against the intended mass firing of employees while the Order was on appeal, that does not mean that CFPB employees have been permitted to perform their important work.  Many have been forced to take administrative leave throughout the pendency of the case.  *See, e.g.*, Pls.' Ex. J [Dkt. # 60-1] at 27.

This candid statement does not mark a change in the Acting Director's approach; he said as much on his first day on the job,[22] and it would be foolhardy not to take Russell Vought at his word this time.

Finally, it is worth nothing that the statute places the funding obligation on the Federal Reserve Bank. *See* 22 U.S.C. § 5497 ("[T]he Board of Governors shall transfer to the Bureau . . . the amount determined by the Director to be reasonably necessary to carry out the authorities of the Bureau under Federal consumer financial law.")  Yet here, it was not the Fed, which was supposedly faced with an inability to pay, but the CFPB that sought the OLC opinion. The opinion provides a theory – contrary to historical practice, as will be discussed below – under which the Fed could claim an inability to fulfill a request, and the agency could decline to make one.  But it does not purport to advise the agency that it is prohibited from asking.[23]  And the CFPB did not ask the Court how to address that circumstance; it simply declared that permission was not necessary.

---

[22]    *See* @russvought X (February 8, 2025), Ex. F. to Roston/Scible Decl. [Dkt. # 38-17] ("The CFPB has been a woke & weaponized agency against disfavored industries and individuals for a long time.  This must end."); President Trump also told a reporter on February 10, 2025, that he intended to have the CFPB "totally eliminated" and that "[t]he CFPB "was a very important thing to get rid of, and it was also a waste.  I mean, number one, it was a bad group of people running it, but it was also a waste."  *See* Alejandra Jaramillo, *Trump Confirms Goal to "Totally Eliminate" the Consumer Financial Protection Bureau*, CNN (Feb. 10, 2025), Ex. G to Roston/Scible Decl. [Dkt. # 38-17].

[23]    *See* OLC Memo at 21 ("Together, these clauses may preclude the Director from requesting, drawing, or requisitioning funds from the Federal Reserve if the CFPB has determined that there are no available funds to disperse under the sole congressional appropriation for the CFPB – section 5497(a)(1).  We need not and do not definitively resolve that issue here, though because the CFPB Director has no statutory obligation to requisition funds from the Federal Reserve under such circumstances.").

For those reasons, the Court clarifies that defendants' "Notice," announcing the agency's intention to forego *asking* for funding is inconsistent with the text and stated purpose of the injunction as modified by the Court of Appeals, and it does not require a modification of the injunction to say so. *See Philip Morris*, 793 F. Supp. 2d at 168–69 (stating that a motion for clarification "ask[s] the Court to construe the scope of its Order by applying it in a concrete context or particular factual situation"); *see also J.G.G. v. Trump*, No. 25-5124, 2025 WL 3198891, at *2 (D.C. Cir. Nov. 14, 2025) ("Judicial orders are not suggestions; they are binding commands that the Executive Branch, no less than any other party must obey. Disagreements with judicial decisions must be resolved through motions, stays, and appeals, not through unilateral noncompliance." (citation omitted)) (unpublished opinion).

## II.    The OLC Memo Does Not Supply Grounds to Defund the CFPB; The Term "Combined Earnings" Means Everything the Federal Reserve Earns.

The Dodd-Frank Act established the CFPB and set out exactly how it would be funded. Unlike most federal agencies, the Bureau does not rely on annual appropriations from Congress, *Seila Law LLC v. CFPB*, 591 U.S. 197, 207 (2020); rather, it "receives funding directly from the Federal Reserve, which is itself funded outside the appropriations process through bank assessments." *Id.* at 207–08, citing 12 U.S.C. §§ 5497(a)(1), (2)(A)(iii), 2(B).

The statute provides:

> Each year (or quarter of such year), . . . the Board of Governors shall transfer to the Bureau from the combined earnings of the Federal Reserve System, the amount determined by the Director to be reasonably necessary to carry out the authorities of the Bureau under Federal consumer financial law, taking into account such other sums made available to the Bureau from the preceding year[.]

*Id.* § 5497.

Congress mandated that these funds "shall not be subject to review by" Congress or the House or Senate appropriations committees. 22 U.S.C. § 5497(a)(2)(C). It also explained that the

statute "may not be construed as implying any obligation on the part of the [CFPB] Director to consult with or obtain the consent or approval of the Director of the Office of Management and Budget" with respect to its financial operating plans and forecasts "or any jurisdiction or oversight over the affairs or operation of the Bureau." *Id.* § (a)(4)(E).[24]  The only constraint on the total funding to be provided is that "the amount that shall be transferred in any fiscal year shall not exceed a fixed percentage of the total operating expenses of the Federal Reserve System," *id.* § 5497(a)(2), which was identified as 6.5% of those expenses in every year after fiscal year 2013.[25] With these provisions in the Dodd-Frank Act, Congress ensured that there would a consistent source of funding, independent of the ordinary appropriations process, for the new agency it established to protect consumers.  The Supreme Court approved the arrangement as consistent with the Constitution in *CFPB v. Community Financial Services Association of America, Ltd.*, 601 U.S. 416 (2024).

The legal dispute presented in the pending motion to clarify turns on the meaning of the term "combined earnings."  Plaintiffs contend that it simply means the total amount the Federal Reserve takes in or earns, which includes the interest it receives from borrowers on loans it extends, the fees it collects, and the billions of dollars it realizes each year from its investments in bonds and securities.  Pls.' Mem. at 5-6; Pls.' Reply at 2-3; *see generally* 12 U.S.C. §§ 342-361.

---

24    This provision offers the agency little independence since the Director of the OMB has been serving as the Acting Director of the CFPB for more than ten months.

25    If the Bureau Director determines that the CFPB needs more money than that to fund the agency "for the upcoming year," they must prepare a report and submit it to Congress explaining "the extent to which the funding needs of the Bureau are anticipated to exceed the level of the [funding cap]."  *Id.* § 5497(e)(1).

The Fed, of course, has expenses, including paying interest on funds held by depository institutions and the twelve Federal Reserve Banks. Pls.' Mem. at 5-6; Pls.' Reply at 2-3. But plaintiffs maintain that the term "combined earnings" does not call for a net figure, and that the statute does not require that those expenses be taken into account.

In the Notice issued on November 10, 2025, and in their opposition to the motion to clarify, defendants reject this construction. Relying on a memorandum supplied by the Office of Legal Counsel at their request, defendants posit that "combined earnings" means everything the Fed earns *minus* the interest the Federal Reserve Banks pay on deposits, but not any other expenses. Defs.' Opp. at 15. Defendants maintain that if the Federal Reserve has no profits in a given year because its interest expenses exceeds its income, no money can be transferred to the CFPB. *Id.*

One problem with this is that it is entirely inconsistent with the way the Dodd-Frank Act has been consistently interpreted by all the parties involved. Until Acting Director Vought issued his Notice, both the Bureau and the Federal Reserve Chair had been adamant that the provision should be read as the plaintiffs read it today, insisting that the Fed must fund the Bureau even when its expenses exceed its earnings. As recently as 2024, the CFPB took the position in other litigation that the "plain meaning" of "combined earnings . . . refers to the System's income." *See* Opp. to Mot. Dismiss at 6-7, *CFPB v. Purpose Fin., Inc.*, No. 7-24-cv-3206 (D.S.C. Oct. 3, 2024). Fed Chair Jerome Powell reiterated this interpretation in testimony before Congress; he explained that the Fed "looked at th[is] question very carefully" and determined that "it's very clear on the law and legislative history" that the Fed is "required to make those payments" even when the Fed is operating at a loss. Powell Testimony at 1:24:50-1:26:03. Chair Powell reported that the Federal Reserve has never denied a CFPB funding request because "we don't have authority under the law to do so." *Id.* Moreover, the Congressional Budget Office also recently recognized that the Federal

Reserve should continue to transfer money to the CFPB even though the Fed has been operating

at a loss.  *See* Cong. Budget Off., *Reconciliation Recommendations of the House Committee on*

*Financial Services* at 4 (May 7, 2025).[26]  This practice has been followed since 2022.  Powell

Testimony at 1:24:50-1:26:03.

Furthermore, the defendants' novel position cannot be squared with the plain meaning of

the word "earnings," the statutory context of the provision, or the legislative intent behind the

establishment of the Bureau.

A.    **The Ordinary Meaning of "Combined Earnings" Is All Money Earned.**

When construing a statutory term, a court first must look to the "language of the act itself."

*Higgins v. Marshall*, 584 F.2d 1035, 1037 (D.C. Cir. 1978), citing *Caminetti v. United States*, 242

U.S. 470, 485 (1917).  Where a term is undefined, the court must apply its "ordinary,

contemporary, [and] common meaning."  *Pierre-Noel ex rel. K.N. v. Bridges Pub. Charter Sch.*,

113 F.4th 970, 980 (D.C. Cir. 2024).  The Dodd-Frank Act does not include a definition of

"combined earnings," and as the defendants acknowledge, Defs.' Opp. at 18, primary dictionary

definitions match the meaning advanced by plaintiffs.

Dictionaries define "earnings" as "something (such as wages) earned."  *Earnings*,

MERRIAM-WEBSTER DICTIONARY 391 (11th ed. 2020); *Earnings*, BLACK'S LAW DICTIONARY (9th

ed. 2009) ("Revenue gained from labor or services, from the investment of capital, or from

assets[.]").  Given the *Black's* definition and others, plaintiffs submit that the interpretation of

"earnings" as simply money earned is "especially true for investment earnings, which form the

_____

26    https://www.cbo.gov/system/files/2025-05/HFS_Reconciliation2025.pdf.

bulk of the Fed's earnings."  Pls.' Reply at 3, citing NEW OXFORD AMERICAN DICTIONARY 545 (2010) (defining "earnings" as "income derived from an investment or product").

Defendants and the OLC Memo skip over the first definitions available in the dictionaries they consulted, and they seize instead upon secondary definitions that define the term as "the balance of revenue after deduction of costs and expenses."  Defs.' Opp. at 17-19; *see* OLC Memo at 7, quoting MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 391 (11th ed. 2005).  Defendants justify this approach with the assertion that the order of definitions in a dictionary "makes no difference," although they concede that the dictionary entries relied upon by plaintiffs "place[] more common meanings first."  Defs.' Opp. at 18.

Finding a lack of support in standard dictionaries, defendants point to technical financial and accounting dictionaries, arguing that because the Dodd-Frank Act was passed to regulate the financial industry, those technical definitions should be accorded greater weight.  *Id.*; *see also* OLC Memo at 10-13.  Defendants assert that "many important American institutions" such as the U.S. Securities and Exchange Commission, Nasdaq, and the "business community" understand earnings to mean business profits and urge the Court follow that example.  *Id.*

That may be so, but that is not the context in which these parties are operating, and the Court cannot ignore the unique role the Federal Reserve plays in the American financial system. As the amici, five former Federal Reserve officials, explain, the Federal Reserve is "fundamentally different from private organizations," Amicus Br. at 6, and its goal is not to maximize profit to pay earnings to shareholders.  *Id.* ("The Federal Reserve is the nation's central bank, and as such it plays a unique role that is not comparable to that of private banks or other profit-maximizing enterprises.")  Rather, it regulates the nation's economy and conducts the nation's monetary policy by promoting "maximum employment, stable prices, and moderate long-term interest rates."  12

U.S.C. § 225a.  Given its mission, the Federal Reserve is in a position to absorb losses that would not be feasible for a profit-seeking or publicly traded company.  *See* Amicus Br. at 9 ("The unique functions and purposes" of [the Federal Reserve] render . . . comparisons to commercial enterprises fundamentally inapposite.").[27]

Moreover, the contradiction inherent in defendants' interpretation undercuts any attempt to maintain that it is textually based.  The OLC and defendants do not propose that "combined earnings" means *all* income minus *all* expenses; they contend that only a certain subset of expenses – interest payments – should be subtracted from the Fed's income to calculate its "combined earnings."  Defs.' Opp. at 15.  This cannot be squared with any definition or common understanding of the term; defendants do not point to a single dictionary entry, accounting principle, or business practice that supports this unusual hybrid approach.  Even the secondary definitions of "earnings" set forth in the OLC Memo and defendants' brief define the term as the balance of revenue after *all* expenses are subtracted.

Words in statutes must be interpreted according to their "ordinary, contemporary, common meaning*." Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 433-34 (2019) (looking to

---

[27]    "The Federal Reserve's unique functions led the Board of Governors to "develop[] specialized accounting principles and practices that it considers to be appropriate for the nature and function of a central bank," recognizing that "[a]ccounting principles for entities with the unique powers and responsibilities of the nation's central bank have not been formulated by accounting standard-setting bodies."  Amicus Br. at 9, quoting FINANCIAL ACCOUNTING MANUAL FOR FEDERAL RESERVE BANKS III (MAY 2025), BD. OF GOVERNORS OF FED. RSRV. SYS., https://perma.cc/KE8S-B2SK.  Thus, according to the amici, the OLC's proposed definition of "combined earnings" fails for an additional, practical reason: the Fed does not track or report the particular measure of "earnings" that defendants are advancing.  *Id.*  The Federal Reserve's "profits" or "interest earned minus expenses" are not tracked on the Fed's annual financial statements or weekly balance sheets.  *Id.*, citing FEDERAL RESERVE BALANCE SHEET: FACTORS AFFECTING RESERVE BALANCES – H.4.1, BD. OF GOVERNORS OF FED. RSRV. SYS., https://perma.cc/FG2L-KP6L.  This reinforces the conclusion that Congress did not tie the CFPB's funding stream to this metric.

dictionaries at the time a statute was enacted). Here, the common definition of "earnings" is the simplest one – everything that an individual or entity earns, before expenses are subtracted. Defendants have not advanced a compelling or coherent reason to supplant the common, everyday meaning of "earnings" with a technical, business-oriented understanding, and other courts that have had occasion to construe the Dodd-Frank Act give its statutory terms their ordinary meaning. *See, e.g.*, *CFPB v. CashCall, Inc.*, 35 F.4th 734, 746 (9th Cir. 2022) (using the dictionary to determine the ordinary meaning of "deceptive"); *CFPB v. Aria*, 54 F.4th 1168, 1172 (9th Cir. 2022) (relying on dictionary definitions of "financial"). Defendants' suggestion that these cases are distinguishable because they construe terms that "do not have special meaning in the accounting world," Defs.' Opp. at 18, is unpersuasive; defendants do not point to any cases in which a court has opted to apply a secondary, technical definition to a commonly used term to override its plain, ordinary meaning.

## B. The Statutory Context Supports Giving the Word "Earnings" in Section 5497 Its Ordinary Meaning.

Plaintiffs' interpretation is bolstered by the fact that other provisions of the Dodd-Frank Act use the term "earnings" consistent with its ordinary meaning. *See, e.g.*, 12 U.S.C. § 5465(c) (authorizing Federal Reserve Banks to "pay earnings on balances maintained by or on behalf of" certain financial entities); *see also id.* § 461(b)(12) (authorizing balances maintained at a Federal Reserve bank to receive "earnings to be paid by the Federal Reserve bank" quarterly); *id.* § 5390(n)(2) (establishing an "Orderly Liquidation Fund" for covered financial entities in which "earnings from investments" are deposited); and 15 U.S.C. § 78u-6(g)(5)(D) (requiring reporting to Congress on the "amount of earnings on investments," among other metrics). Defendants do not dispute that these provisions use "earnings" to mean all money brought in without subtracting some subset of expenses. Defs.' Opp. at 20. Instead, they posit that these examples must be

separately evaluated in their own "specific contexts" because many of them have a "more specific meaning." *Id.* For example, they suggest that the term "earnings from investments" is "naturally understood" as the difference between the value of an initial outlay, such as a cost of investment, minus a later value that the investment yielded. *Id.*, citing 12 U.S.C. § 5390(n)(2) ("Amounts received by the [Federal Deposit Insurance Corporation], including assessments . . . , interest and other earnings from investments, and repayments . . . shall be deposited into the Fund."). But if anything, even this provision supports the notion that "earnings" is a category of "amounts received," rather than a net number derived after expenses are subtracted from revenue.

Consideration of the overall statutory scheme of the Dodd-Frank Act also supports giving the phrase "combined earnings" its ordinary meaning. To begin with, the funding arrangement prescribed for the Bureau would be unworkable if "combined earnings" was read to mean anything other than what the bank takes in. If the Fed's ability to transfer money to the CFPB depended on unpredictable interest expenses, it would be nearly impossible for the CFPB Director to assess whether the Bureau's funding would be sufficient on any given year and whether the Bureau would need to seek congressional appropriations "for the upcoming year" and, if so, how much. 12 U.S.C. § 5497(e)(1)(A). And, as noted in the amicus brief, the parties involved would need to base their predictions on a measure of "earnings" that the Federal Reserve does not even bother to track. *See* Amicus Br. at 9, citing FEDERAL RESERVE BALANCE SHEET: FACTORS AFFECTING RESERVE BALANCES – H.4.1, BD. OF GOVERNORS OF FED. RSRV. SYS., https://perma.cc/FG2L-KP6L.

Moreover, defendants' interpretation cannot be squared with the mandatory language that permeates the Act. *See, e.g.*, 12 U.S.C. § 5497(a)(1) ("Each year . . . the Board of Governors shall transfer to the Bureau . . . the amount determined by the Bureau to be reasonably necessary . . . ."); *id.* § 5497(a)(2) ("[T]he amount that shall be transferred to the Bureau . . . shall not exceed . . . .");

*id.* § 5497(a)(3) (stating that during the transition period after the Bureau was first established, "the Board of Governors shall transfer . . . ."). There is no suggestion that the Director should assess what the Fed can afford when he calculates what is reasonably necessary; the only limit Congress imposed was the proviso that the funding could not exceed a fixed percentage of the Fed's 2009 operating expenses. *Id.* § 5497(a)(2). If funding up to that statutory cap is insufficient to meet the Bureau's needs, it may request additional appropriations from Congress by having the Director submit a report explaining "the extent to which the funding needs of the Bureau are anticipated to exceed" the maximum amount the Federal Reserve is permitted to transfer. *Id.* § 5497(e)(1)(b). Thus, the statute contemplates that regardless of whether the Fed is operating at a profit or a loss during any particular year, the Fed will automatically transfer the requisitioned amount as long as it falls under statutory cap. And in a scenario where the statutory cap is insufficient, the statute contemplates that the CFPB "shall" report that determination to the President and to Congress and it can request additional funding from Congress. *Id.* Notably, the statute does not foresee a scenario in which the Bureau circumvents the process and notifies the President or the legislature of a shortfall when the amount needed does not exceed the statutory cap, or no request has been lodged at all.

Looking to other financial statutes, it is clear that Congress knows how refer to "net earnings" when that is what it means. For example, in the so-called "waterfall provision" of the Federal Reserve Act, Congress limited the amount of surplus funds that may be held in the Federal Reserve banks and required that amounts that exceed the limit be transferred to the Board of Governors, and from there to the Treasury Secretary "for deposit in the general fund of the Treasury." *See* 12 U.S.C. § 289(a)(3)(b). In doing so, it required first that "[a]fter all necessary expenses of a Federal reserve bank have been paid or provided for," shareholders are entitled to a

dividend. *Id.* § 289(a)(1). It then instructed, "[t]hat portion of net earnings of each Federal reserve bank which remains after dividend claims have been paid," shall be deposited in the bank's surplus fund. *Id.* § 289(a)(2). Thus, Congress deliberately chose to utilize the term "net earnings," and not simply "earnings" when discussing the disposition of reserve bank funds after "all necessary expenses of a Federal reserve bank have been paid." *Id.* § 289(a)(1).

Defendants attempt to avoid the impact of this plain demonstration of Congress's understanding of the words it was using by positing that the term "necessary expenses" in subsection (a)(1)(A) is meant to refer to "operating expenses" under the Federal Reserve's accounting practices, citing a Financial Statement from 2009. Defs.' Opp. at 21, 24-25. But Congress has also carefully utilized the term "operating expenses" when that was what it meant. *See* 12 U.S.C. § 5497(a)(2) (providing that CFPB funding shall be capped at a "fixed percentage of the total operating expenses of the Federal Reserve System"). So the decision to omit the modifier "net" when talking about "combined earnings" in the CFPB funding provision is telling.[28]

---

28    The OLC asserts that Congress enacted the Dodd-Frank Act against the backdrop of the Federal Reserve's existing accounting practices, particularly 12 U.S.C. § 289. OLC Memo at 11-12. It recognizes that the Federal Reserve Act calls for net "earnings" to "flow[] into the waterfall," and submits that the same meaning should inform the interpretation of the CFPB funding provisions in the Dodd-Frank Act. *Id.* at 12. But OLC takes its understanding of the term "earnings" from the central bank's 2009 Financial Statement – which was not drafted by Congress – as opposed to the Federal Reserve Act itself, and it ignores the fact that in that statute, Congress deliberately used the term "net earnings," and not simply "earnings." *See* 12 U.S.C. § 289(a)(2). And, as the former Federal Reserve officials explained in their amicus brief, net earnings have been negative in recent years. Amicus Br. at 9-10. Thus, the OLC's reading of both statutes is not only inconsistent with the Federal Reserve's actual operations, but as a practical matter, it would leave the Reserve Banks without any money to pay their own necessary expenses under the Federal Reserve Act. *See* 12 U.S.C. § 289(a)(1)(A).

**C.**     **Congress's Purpose in Establishing the CFPB Can Only Be Effectuated If "Combined Earnings" Is Given Its Ordinary Meaning.**

Finally, construing "combined earnings" to mean everything the Fed brings in comports with the legislative history and purpose of the Dodd-Frank Act.  As the Court set forth in detail in the opinion granting the preliminary injunction, the CFPB was created in response to the severe economic crisis precipitated by the collapse of the subprime mortgage market.  *Seila L.*, 591 U.S. at 206.  Under those circumstances, Congress established the CFPB to serve as "an independent financial regulator within the Federal Reserve System."  *Id.*  It is apparent from the funding arrangement enshrined in the Act – which is entirely separate from the ordinary appropriations process and the political considerations and accommodations that characterize that process, and is not reviewable by either Congressional appropriations committee – that Congress intended that the Bureau must be able to rely upon a stable, independent source of funding.  The definition of "combined earnings" set forth in the OLC Memo and advanced by defendants here would undermine that objective because the Bureau's funding could fluctuate significantly based on interest rates, putting the Fed in the untenable position of choosing between controlling inflation by adjusting interest rates or ensuring there was a "profit" in place to fund the CFPB.  And

defendants have not pointed to any contemporaneous material that would suggest this is what Congress had in mind.[29]

## CONCLUSION

For all of the reasons set forth above, Plaintiffs' motion to clarify the preliminary injunction is **GRANTED**.  The Court clarifies that the claimed "lapse" in funding, which was manufactured by the defendants based solely on the OLC Memo, is not a valid justification for the agency's unilateral decision to abandon its obligations under the injunction.  The statutory text of the Dodd-Frank Act governs, and it prescribes a process through which the CFPB is to request the funding it needs to carry out the mission it was assigned by Congress, and the Federal Reserve must provide that funding from its "combined earnings."  This process has unfolded seamlessly since the Bureau was established in 2011, even in the years since 2022 when the Federal Reserve's interest expenses have exceeded its earnings.

Neither the statute, the injunction, nor the Fed's willingness to pay has changed; the only new circumstance is the administration's determination to eliminate an agency created by Congress with the stroke of pen, even while the matter is before the Court of Appeals.  It appears that defendants' new understanding of "combined earnings" is an unsupported and transparent

---

29    The defendants warn that plaintiffs' reading of the statute would violate the Anti-Deficiency Act, Defs.' Opp. at 10-11, but that argument rises and falls with the strained interpretation of "earnings" in the OLC Memo.  The Supreme Court has held that if the statute is interpreted as the Federal Reserve and the Bureau have interpreted and implemented it since the agency's inception, it gives rise to no Anti-Deficiency Problem.  *See CFPB v. Cmty. Fin. Servs. Ass'n*, 601 U.S. at 435 ("[W]e conclude that the statute that authorizes the Bureau to draw funds from the combined earnings of the Federal Reserve System is an 'Appropriatio[n] made by Law.' We therefore hold that the requirements of the Appropriations Clause are satisfied.").  Compliance with the preliminary injunction, then, would only involve the expenditure of funds that have already been appropriated.

attempt to starve the CPFB of funding and yet another attempt to achieve the very end the Court's injunction was put in place to prevent.  This ruling therefore construes the scope of the existing Order to clarify that the defendants' unilateral decision to decline to request funding, based on an unsupported interpretation of the Dodd-Frank Act, contravenes the preliminary injunction.

**SO ORDERED.**

AMY BERMAN JACKSON
United States District Judge

DATE:  December 30, 2025